*LIST OF COUNSEL ON SIGNATURE PAGE*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**STATE OF ARIZONA**, *ex rel.* KRIS MAYES, ATTORNEY GENERAL;

**THE PEOPLE OF THE STATE OF CALIFORNIA**;

**STATE OF COLORADO**, *ex rel.* PHILIP J. WEISER, ATTORNEY GENERAL;

**STATE OF CONNECTICUT**;

**STATE OF DELAWARE**, *ex rel.* KATHLEEN JENNINGS, ATTORNEY GENERAL OF THE STATE OF DELAWARE;

**STATE OF GEORGIA** *ex rel.* CHRISTOPHER M. CARR, ATTORNEY GENERAL OF THE STATE OF GEORGIA;

**STATE OF HAWAIʻI**, *ex rel.* ANNE E. LOPEZ, ATTORNEY GENERAL;

**STATE OF IDAHO**, through ATTORNEY GENERAL RAÚL R. LABRADOR;

**THE PEOPLE OF THE STATE OF ILLINOIS**;

**STATE OF INDIANA**;

**STATE OF KANSAS**, *ex rel.* KRIS W. KOBACH, Attorney General;

**COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF**

1  **THE COMMONWEALTH OF KENTUCKY**;

2  **STATE OF LOUISIANA**;

3  **STATE OF MAINE**;

4  **OFFICE OF THE ATTORNEY GENERAL OF MARYLAND**;

5  **STATE OF MICHIGAN** *ex rel.* DANA NESSEL, ATTORNEY GENERAL;

6

7  **STATE OF MINNESOTA**, by its ATTORNEY GENERAL, KEITH ELLISON;

8  **STATE OF MISSOURI**, *ex rel.* ANDREW BAILEY, ATTORNEY GENERAL;

9

10  **STATE OF NEBRASKA** *ex rel.* MICHAEL T. HILGERS, ATTORNEY GENERAL;

11

12  **MATTHEW J. PLATKIN**, ATTORNEY GENERAL FOR THE **STATE OF NEW JERSEY**, AND **CARI FAIS**, ACTING DIRECTOR OF THE **NEW JERSEY DIVISION OF CONSUMER AFFAIRS**;

13

14

15  **THE PEOPLE OF THE STATE OF NEW YORK**, by LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK;

16

17

18  **STATE OF NORTH CAROLINA**, *ex rel.* JOSHUA H. STEIN, ATTORNEY GENERAL;

19

20  **STATE OF NORTH DAKOTA**, *ex rel.* DREW WRIGLEY, ATTORNEY GENERAL;

21  **STATE OF OHIO**, *ex rel.* ATTORNEY GENERAL DAVE YOST;

22

23  **STATE OF OREGON** *ex rel.* ELLEN F. ROSENBLUM, ATTORNEY GENERAL FOR THE STATE OF OREGON;

24

25  **COMMONWEALTH OF PENNSYLVANIA** BY ATTORNEY GENERAL MICHELLE A. HENRY;

26

27  **STATE OF RHODE ISLAND**;

28

1  **STATE OF SOUTH CAROLINA**, *ex. rel.*
   ALAN M. WILSON, IN HIS OFFICIAL
2  CAPACITY AS ATTORNEY GENERAL OF
   THE STATE OF SOUTH CAROLINA;

3
   **STATE OF SOUTH DAKOTA** *ex rel.*
4  MARTY J. JACKLEY, SOUTH DAKOTA
   ATTORNEY GENERAL;
5
   **COMMONWEALTH OF VIRGINIA**,
6  *ex rel.* JASON S. MIYARES,
   ATTORNEY GENERAL;
7
   **STATE OF WASHINGTON**, *ex rel.*
8  ROBERT W. FERGUSON, ATTORNEY
   GENERAL;
9
   **STATE OF WEST VIRGINIA**, *ex rel.*
10 PATRICK MORRISEY, ATTORNEY
   GENERAL; and
11
   **STATE OF WISCONSIN**,
12
                            **Plaintiffs**,
13
                       **v.**
14
   **META PLATFORMS, INC.**;
15
   **INSTAGRAM, LLC**;
16
   **META PAYMENTS, INC.**; and
17
   **META PLATFORMS TECHNOLOGIES,**
18 **LLC,**

19                         **Defendants**.

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

I.     SUMMARY OF THE CASE ................................................................... 1

II.    PUBLIC INTEREST ............................................................................. 4

III.   JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT ................... 4

IV.    RELEVANT TIMES ............................................................................. 5

V.     PLAINTIFFS ..................................................................................... 6

VI.    DEFENDANTS ................................................................................... 6

VII.   TRADE AND COMMERCE IN THE FILING STATES ............................ 10

VIII.  META'S SCHEME TO EXPLOIT YOUNG USERS FOR PROFIT ............ 11

       A.     To maximize profit, Meta's business model focuses on increasing young
              users' engagement. ............................................................... 12

              1.     Meta monetizes young users' attention through data harvesting and
                     targeted advertising. ................................................. 12

              2.     Meta specifically targets young users. ............................. 14

              3.     Meta designs and deploys features to capture young users' attention
                     and prolong their time on its Social Media Platforms. ............ 19

       B.     Meta falsely represents that its Social Media Platform features are safe and
              not designed to induce young users' compulsive and extended use. ........ 23

              1.     Meta represents to the public that its Social Media Platforms are
                     designed to support young users' well-being. ...................... 24

              2.     Meta prioritizes maximizing engagement over young users' safety. ... 25

              3.     Meta's Recommendation Algorithms encourage compulsive use,
                     which Meta does not disclose. ..................................... 28

              4.     The Recommendation Algorithms are harmful to young users'
                     mental health, notwithstanding Meta's representations to the
                     contrary. .......................................................... 34

              5.     Meta's use of social comparison features such as "Likes" also
                     promotes compulsive use and mental health harms for young users. ... 41

              6.     Meta's use of disruptive audiovisual and haptic notifications
                     interferes with young users' education and sleep. ................. 51

              7.     Meta promotes Platform features such as visual filters known to
                     promote eating disorders and body dysmorphia in youth. ............ 56

              8.     Meta offers features that it claims promote connection between
                     friends, but actually serve to increase young users' time spent on
                     the Platform. ...................................................... 61

              9.     Through its Platform features, Meta discourages young users'
                     attempts to disengage, notwithstanding Meta's representations to
                     the contrary........................................................ 62

i

**TABLE OF CONTENTS**
(continued)

Page

10. Meta knows its Platform features are addictive and harmful, but misrepresents and omits this information in public discourse. ................ 67

11. Meta makes its Platforms and associated harmful features available to especially young and vulnerable users. ................................. 70

C. Meta has misled its users and the public by boasting a low prevalence of harmful content on its Social Media Platforms ▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ............................................. 73

D. Meta's Platform features cause young users significant physical and mental harm, of which Meta is keenly aware. ................................. 80

IX. META'S COPPA NONCOMPLIANCE ....................................................... 105

A. COPPA requires Meta to obtain verifiable parental consent for Instagram and Facebook users under the age of 13. ......................... 106

B. Meta does not comply with COPPA with respect to Instagram. ...................... 107

1. Meta possesses actual knowledge of children on Instagram and collects their personal information without obtaining parental consent ...................................................................... 107

2. Instagram is "directed to children." ........................................... 124

3. Meta does not obtain verifiable parental consent before collecting personal information from users under the age of 13 on Instagram. ...... 136

C. Meta does not comply with COPPA with respect to Facebook. ........................ 137

1. Meta has actual knowledge of users under age 13 on Facebook. ........... 137

2. Facebook is "directed to children." .......................................... 138

3. Meta does not obtain verifiable parental consent before collecting personal information from users under age 13 on Facebook. ................ 141

X. META CONTINUES TO EXPAND AND INTRODUCE NEW PLATFORMS ......... 142

XI. SUMMARY OF META'S DECEPTIVE AND UNFAIR OR UNCONSCIONABLE ACTS AND PRACTICES .......................................... 143

CLAIMS FOR RELIEF .......................................................................... 145

PRAYER FOR RELIEF .......................................................................... 198

1

### I.   SUMMARY OF THE CASE

2       1.      Over the past decade, Meta[1]—itself and through its flagship Social Media

3   Platforms Facebook and Instagram (its Social Media Platforms or Platforms)—has profoundly

4   altered the psychological and social realities of a generation of young Americans. Meta has

5   harnessed powerful and unprecedented technologies to entice, engage, and ultimately ensnare

6   youth and teens. Its motive is profit, and in seeking to maximize its financial gains, Meta has

7   repeatedly misled the public about the substantial dangers of its Social Media Platforms. It has

8   concealed the ways in which these Platforms exploit and manipulate its most vulnerable

9   consumers: teenagers and children.[2] And it has ignored the sweeping damage these Platforms

10  have caused to the mental and physical health of our nation's youth. In doing so, Meta engaged

11  in, and continues to engage in, deceptive and unlawful conduct in violation of state and federal

12  law.

13      2.      Meta's scheme involved four parts: (1) through its development of Instagram and

14  Facebook, Meta created a business model focused on maximizing young users' time and attention

15  spent on its Social Media Platforms; (2) Meta designed and deployed harmful and

16  psychologically manipulative product features to induce young users' compulsive and extended

17  Platform use, while falsely assuring the public that its features were safe and suitable for young

18  users; (3) ███████████████████████████████████████████████████

19  ███████████████████, while routinely publishing misleading reports boasting a

20  deceptively low incidence of user harms; and (4) despite overwhelming internal research,

21  independent expert analysis, and publicly available data that its Social Media Platforms harm

22  young users, Meta still refuses to abandon its use of known harmful features—and has instead

23  redoubled its efforts to misrepresent, conceal, and downplay the impact of those features on

24  young users' mental and physical health.

25  _____

26  [1] The term "Meta" as used herein refers collectively to Defendants Meta Platforms, Inc.;
    Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC, unless otherwise
27  specified.

        [2] The term "young users" as used herein refers to users of Meta's Platforms who are under
28  18 years of age when using the Platform(s).

3.      *First,* Meta's business model is based on maximizing the time that young users spend on its Social Media Platforms. Meta targets young users and incentivizes its employees to develop ways to increase the time that young users spend on its Platforms. The more time young users spend on Instagram and Facebook, the more Meta earns by selling advertising targeted to those users.

4.      *Second,* consistent with this business model, Meta has developed and refined a set of psychologically manipulative Platform features designed to maximize young users' time spent on its Social Media Platforms. Meta was aware that young users' developing brains are particularly vulnerable to certain forms of manipulation, and it chose to exploit those vulnerabilities through targeted features such as: (a) dopamine-manipulating recommendation algorithms; (b) "Likes" and social comparison features known by Meta to harm young users; (c) audiovisual and haptic alerts that incessantly recall young users to Meta's Social Media Platforms while at school and during the night; (d) visual filter features known to promote young users' body dysmorphia; and (e) content-presentation formats, such as infinite scroll, designed to discourage young users' attempts to self-regulate and disengage with Meta's Platforms.

5.      In promoting and marketing these features to young users, Meta deceptively represented that the features were *not* manipulative; that its Social Media Platforms were *not* designed to promote young users' prolonged and unhealthy engagement with social media; and that Meta had designed and maintained its Social Media Platforms to ensure safe experiences for young users. These representations, both express and implied, were false and misleading.

6.      *Third,* to assuage public concerns about harms to young users on Meta's Social Media Platforms, Meta routinely published profoundly misleading reports purporting to show impressively low rates of negative and harmful experiences by users of its Platforms.

2

[REDACTED]

[REDACTED]

7.     *Fourth*, despite the strong and well-researched links between young people's use of Meta's Social Media Platforms and psychological and physical harm, Meta has continued to conceal and downplay its Platforms' adverse effects. Research has shown that young people's use of Meta's Social Media Platforms is associated with depression, anxiety, insomnia, interference with education and daily life, and many other negative outcomes. Internal studies that Meta commissioned (which were kept private until they were leaked by a whistleblower) reveal that Meta has known for *years* about the serious harms associated with young users' time spent on its Social Media Platforms. Nonetheless, Meta has continued to deny and downplay these harmful effects to the public and to promote its Platforms as safe for young users.

8.     Finally, Meta has also flouted its obligations under the Children's Online Privacy Protection Act (COPPA) by unlawfully collecting the personal data of its youngest users without their parents' permission. Meta has marketed and directed its Social Media Platforms to children under the age of 13 and has actual knowledge that those children use its Platforms. But Meta has refused to obtain (or even to attempt to obtain) the consent of those children's parents prior to collecting and monetizing their personal data. [REDACTED] Nonetheless, Meta refuses to limit its collection and use of those children's personal information as required by law.

9.     These exploitative and harmful acts and practices by Meta are unlawful. They constitute unfair and/or deceptive acts or practices under the state consumer protection statutes, violate COPPA, and further constitute unlawful acts under common law principles.

10.    Now, instead of acknowledging and remedying the harms associated with these unlawful practices, Meta appears to be *expanding* the use of these practices into new Platforms and domains. This includes, for example, Meta's Virtual Reality (VR) Metaverse, where young users are immersed into Meta's new Horizon Worlds platform; Meta's communication Platforms like WhatsApp and Messenger; and other products, in which Meta uses evolving technology to

replicate the harmful strategies it honed through its experiments on the young users of Instagram and Facebook.

11. Arizona; the People of the State of California (California); Colorado; Connecticut; Delaware; Georgia; Hawai'i; Idaho; the People of the State of Illinois, by and through Attorney General Kwame Raoul (Illinois); Indiana; Kansas; Kentucky; Louisiana; Maine; Office of the Attorney General of Maryland (Maryland); Michigan; State of Minnesota, by its Attorney General, Keith Ellison (Minnesota); Missouri; Nebraska; Matthew J. Platkin, Attorney General for the State of New Jersey, and Cari Fais, Acting Director of the New Jersey Division of Consumer Affairs (New Jersey); New York; North Carolina; North Dakota, ex rel. Drew H. Wrigley, Attorney General (North Dakota); Ohio; Oregon; Pennsylvania; Rhode Island; South Carolina; South Dakota; Virginia; Washington; West Virginia; and Wisconsin (collectively, the Filing States) seek to enjoin Meta's present and ongoing unlawful conduct that harms young users and obtain any other remedies provided for under state or federal laws.

## II. PUBLIC INTEREST

12. This action is in the public interest of the Filing States. Meta has engaged in, and will continue to engage in, the unlawful acts and practices set forth below. Meta's unlawful acts and practices affect a significant number of consumers in the Filing States. These acts and practices have caused and will continue to cause adverse effects to consumers in the Filing States.

## III. JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT

### A. Jurisdiction

13. This Court has subject matter jurisdiction over the claims in this Complaint pursuant to 28 U.S.C. § 1331 because they involve questions of federal law arising under COPPA, 15 U.S.C. § 6501 *et seq.*; 16 C.F.R. §§ 312.4, 312.5, 312.9. This Court has supplemental jurisdiction over the Filing States' state law claims pursuant to 28 U.S.C. § 1367(a), as all claims alleged herein form part of the same case or controversy.

14. This Court has general personal jurisdiction over Meta because each Defendant's principal place of business is in California and each Defendant intentionally avails itself of the California market so as to render the exercise of jurisdiction over it by courts in California

consistent with traditional notions of fair play and substantial justice. Cal. Civ. Proc. Code § 410.10.

15.     This Court has personal jurisdiction over Meta for the Filing States' COPPA claims because all Defendants have their principal place of business in Menlo Park, a city in this District. 15 U.S.C. § 6504(e)(2).

16.     Meta conducts business in this District through itself or its subsidiaries over which it exercises complete dominion and control. Meta and its subsidiaries operate as a common enterprise while engaging in the unfair, deceptive, and other unlawful acts and practices alleged below. Because Meta and its subsidiaries have operated as a common enterprise, this Court has jurisdiction over each entity individually and collectively.

**B.     Venue**

17.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because all Defendants reside in this District. All Defendants have their principal place of business in Menlo Park, a city in this District. Moreover, a substantial part of the unlawful conduct complained of herein occurred in this District, where Meta's headquarters is located.

**C.     Divisional Assignment.**

18.     This case is properly assigned to the Oakland or San Francisco Divisions because the civil action arises in substantial part from events or omissions in San Mateo County. Civil L.R. 3-2(d). All Defendants' principal places of business are located in Menlo Park, a city in San Mateo County, where Meta's conduct was controlled and directed.

**IV.     RELEVANT TIMES**

19.     Meta's conduct is in continuing violation of the laws supporting the claims for relief in this Complaint, beginning at a time unknown to the Filing States, but no later than 2012, and such claims have continuously accrued through the present. This action is timely brought pursuant to the parties' Tolling Agreement signed by Meta's counsel on July 18, 2022, which

Complaint for Injunctive and Other Relief

tolls all claims ripe as of December 20, 2021. This action is also timely brought pursuant to any applicable state statutes.[3]

## V.    PLAINTIFFS

20.    This action is brought by and through a coalition of the Filing States' Attorneys General.

21.    The Filing States bring this action pursuant to the authority conferred on the State Attorneys General by applicable federal and state law. The Attorneys General of the Filing States are authorized by COPPA to bring actions to enforce COPPA's provisions. 15 U.S.C. § 6504(a)(1). Pursuant to 15 U.S.C § 6504(a)(2), the Filing States notified the Federal Trade Commission (FTC) of this action. The Attorneys General are also authorized by their respective states' Unfair and Deceptive Acts and Practices statutes (UDAP Statutes) to enforce such statutes.[4] These state laws authorize the states to seek injunctive and other equitable relief, as well as, in some states, restitution, civil penalties, declaratory relief, attorneys' fees, expenses, and costs.

## VI.    DEFENDANTS

22.    The Defendants in this action include Meta Platforms, Inc. (Meta Platforms), Instagram, LLC (Instagram), Meta Payments, Inc. (Meta Payments), and Meta Platforms Technologies, LLC (Meta Technologies) (collectively, Meta).

---

[3] Cal. Bus. & Prof. Code § 17208; Cal. Civ. Proc. Code § 338(h); Colo. Rev. Stat. § 6-1-115; 815 ILCS 505/3; Ind. Code § 24-5-0.5-5(b); Mich. Comp. Laws §§ 445.911(9), 600.5805, 600.5813; Minn. Stat. § 541.05; Mo. Rev. Stat. §516.120; Neb. Rev. Stat. §§ 59-1612; 87-303.10; N.J. STAT. ANN. 2A:14-1.2; N.Y. C.P.L.R. §§ 213(9), 214(2); N.D. Cent. Code § 51-15-12; Ohio Rev. Code § 1345.07(E); S.C. Code Ann. § 39-5-150; Wis. Stat. § 100.18(11)(b)3.

[4] Ariz. Rev. Stat. §§ 44-1521 to -1534; Cal. Bus. & Prof. Code §§ 17203, 17204, 17205-17206.1, 17500, 17534.5, 17535, 17536; Colo. Rev. Stat. §§ 6-1-103, 107, 110, and 112; Conn. Gen. Stat. §§ 42-110m(a) and 42-110o(b); 6 Del. Code Ann. §§ 2513 and 2532; O.C.G.A. §§ 10-1-397(b)(2) and 10-1-397.1; Haw. Rev. Stat. § 480-20; 815 ILCS 505/3; Ind. Code § 24-5-0.5-4(c); K.S.A. § 50-623 *et seq.*; Ky. Rev. Stat. Chapter 367, *et seq.*; LA. REV. STAT. ANN. §§ 51:1401-1428; ME. REV. STAT. ANN. tit. 5, § 209; Mich. Comp. Laws §§ 445.905 and 445.910; Minn. Stat. §§ 8.01, 8.31, and 325D.44 *et seq.*; Mo. Rev. Stat. § 407.100; Neb. Rev. Stat. §§ 59-1608 *et seq*; 87-303.02 *et seq.*; N.J. STAT. ANN. § 56:8-1 to 227; N.Y. Exec. Law § 63(12); N.C.G.S. §§ 75-14 to 75-15.2; N.D. Cent. Code §§ 54-12-01, -17, and §§ 51-15-04, -07, -10, -11; Ohio Rev Code § 1345.02; O.R.S. § 646.632; 73 P.S. § 201-4; R.I. Gen. Laws § 6-13.1-5(a); S.C. Code Ann. § 39-5-10, *et seq.*; Va. Code §§ 59.1-201.1 to 203 and 205 to 207; Wash. Rev. Code §§ 19.86.080, .140; Wis. Stat. §§ 100.18(11)(a) and (d); and 165.25(4)(ar).

23.     Defendant Meta Platforms is a Delaware corporation with its principal place of business in Menlo Park, California. As relevant here, Meta Platforms, through itself or its subsidiaries, develops, markets, and operates Social Media Platforms and other internet-based Platforms and products including Facebook, Instagram, Messenger, and WhatsApp. Meta also develops, markets, and operates the VR Social Media Platform Horizon Worlds.

24.     Meta Platforms transacts or has transacted business in this District, the Filing States, and throughout the United States. At all times material to this Complaint, acting alone or in concert with its subsidiaries (identified below), Meta Platforms has advertised, marketed, and distributed its Social Media Platforms to consumers throughout the United States.

25.     Meta Platforms was formerly known as Facebook, Inc. until it changed its corporate name in October 2021. In 2004, Mark Zuckerberg founded the Social Media Platform The Facebook, while a student at Harvard University. At that time, Myspace was popular, along with websites like Friendster and Flickr. The Facebook spread among colleges via word of mouth and exclusive invitations and became more popular among young adults. Zuckerberg dropped out of Harvard to develop the Platform into a company, and it became known as Facebook.

26.     Facebook's popularity not only grew—it changed the entire landscape of the internet. In 2004, only 5% of U.S. adults used any social media platform. As of 2021, 69% of U.S. adults used Facebook *alone*.

27.     Following the success of Facebook, Meta Platforms expanded through a series of acquisitions. On April 9, 2012, Meta Platforms purchased Instagram reportedly for $1 billion. Meta Platforms acquired Instagram in part because it believed that if Instagram grew to a large scale, it could be very disruptive to Facebook.

28.     More importantly, Instagram was most popular among young users—a market where Meta was seeking to expand as Facebook's primary audience aged and the Platform lost its "cool" factor.

29.     By the end of 2016, Instagram grew to over 600 million users. By 2018, Instagram had revenues surpassing $10 billion, and it has been estimated to be valued at over $100 billion. An estimated 62% of teens in the United States regularly use Instagram.

30.     Meta Platforms has also expanded into virtual reality gaming, hardware, and software, since acquiring the virtual reality headset creator Oculus in 2014.

31.     In October 2021, Facebook rebranded the company to "Meta," a move meant to encapsulate that its subsidiaries and products went beyond the Facebook Platform and to emphasize its work on the so-called "metaverse."

32.     As a result of acquisitions such as Instagram and Oculus, Meta Platforms has continued to dominate the market of Social Media Platforms and apps, becoming the largest social media company in the world. As of October 2023, Meta Platforms' market capitalization— the value of the company—exceeded $800 billion.

33.     At all times material to this Complaint, Meta Platforms formulated, directed, controlled, had the authority to control, or participated in the acts and practices set forth in this Complaint.

34.     Defendant Meta Platforms currently operates its business primarily through its subsidiaries. Meta Platforms' key subsidiaries include Instagram, Meta Payments, and Meta Platforms Technologies.

35.     Defendant Instagram offers a mobile application that enables users to share content such as photographs and videos online and over social networks. Instagram is a limited liability company formed in Delaware, and shares its principal place of business in Menlo Park, California, with Meta Platforms. Defendant Meta Platforms is the sole member or manager of Instagram.

36.     Defendant Meta Payments is incorporated in the State of Florida and shares its principal place of business in Menlo Park, California, with Meta Platforms. Meta Payments processes payments made through Meta's Social Media Platforms. Meta Platforms directly owns Meta Payments, its subsidiary.

37.     Defendant Meta Technologies is a Delaware limited liability company and shares its principal place of business in Menlo Park, California, with Meta Platforms. Previously known as Facebook Technologies, LLC, Meta Technologies has absorbed Meta's Oculus business

segment, which it acquired in 2014. Meta Technologies develops Meta's virtual reality technology. Defendant Meta Platforms is the sole member or manager of Meta Technologies.

38.     As detailed in the allegations below, Meta Platforms, itself and through its Defendant subsidiaries over which it exercises authority and control (collectively, Meta), has engaged in, and continues to engage in, unfair, deceptive, and unlawful activity in the Filing States and in this District.

39.     Meta operates as a common enterprise. All Defendants have their principal place of business at Meta Platforms' corporate headquarters in Menlo Park, California. As discussed below, senior executives at Meta Platforms, including Zuckerberg—Meta Platforms' CEO, board chair, and controlling shareholder—exercise control over important policy and staffing decisions relating to its Social Media Platforms.

40.     Meta also represents itself as a common enterprise. Meta's financial disclosures describe Facebook, Instagram, Messenger, and WhatsApp, as Meta's "'family' of products," and report revenue and expenses for the entire "family" together. Instagram's Terms of Use agreement currently identifies "The Instagram Service" as "one of the Meta Products, provided to you by Meta Platforms, Inc." Meta's supplemental terms of service for its "Meta Platforms Technologies Products" is similarly styled as an agreement between Meta Platforms and the user. "Meta Platforms Technologies Products" are defined to include its VR-related products, such as its Meta Quest and Oculus virtual reality headsets, and Meta Horizon Worlds, its virtual reality Social Media Platform. Meta Platforms also reports its revenue from its VR business segment in its financial disclosures.

41.     Meta's corporate website represents the leaders of its subsidiaries as Meta's "executives" alongside Zuckerberg and other Meta Platforms executives. For example, Adam Mosseri is identified as "Head of Instagram" and is described as having "been at Meta" for more than 11 years. Stephane Kasriel, the CEO of Meta Payments, is identified on Meta's website as "the head of Commerce and Financial Technologies at Meta" who "oversees all commerce and fintech work across Meta's technologies and platforms."

9

43.    In addition to sharing a headquarters,

44.    Because Meta operates as a common enterprise, each Defendant is jointly and severally liable for the acts and practices alleged below.

## VII.    TRADE AND COMMERCE IN THE FILING STATES

45.    As described in this Complaint, Meta has engaged and continues to engage in conduct that constitutes, is in connection with, or affects "trade," "commerce," "advertising," "business," "merchandise," "occupation," "sale," "vocation," "consumer acts or practices," and/or "consumer transactions," as those terms are defined in the Filing States' UDAP Statutes.[5]

46.    Although users can establish accounts on Meta's Social Media Platforms without paying a fee, Meta does not provide its Platforms for free—rather, it charges its users by collecting their data and time, which Meta then converts into advertising dollars.

47.    For example, this is confirmed by Instagram's terms of use:

> We agree to provide you with the Instagram Service. . . . Instead of paying to use Instagram, by using the Service covered by these Terms, you acknowledge that we can show you ads that businesses and organizations pay us to promote on and off the Meta Company Products. We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you.

---

[5] Cal. Bus. & Prof. Code § 17200; Colo. Rev. Stat. §§ 6-1-106, 6-1-105; Conn. Gen. Stat. § 42-110b(a); 6 Del. Code Ann. § 2511(6); O.C.G.A. § 10-1-392(7), (10), (28); Haw. Rev. Stat. § 480-1; 815 ILCS 505/1(f); Ind. Code § 24-5-0.5-2(a)(1); K.S.A. § 50-624; Ky. Rev. Stat. § 367.110; La. Rev. Stat. Ann. § 51:1402(10); Me. Rev. Stat. Ann. tit. 5, § 206(3); Mo. Rev. Stat. §407.020 as defined in §407.010(7); Neb. Rev. Stat. § 59-1602; N.J. Stat. Ann. §. 56:8-1; N.C.G.S. § 75-1.1(a); N.D. Cent. Code § 51-15-02; Ohio Rev. Code § 1345.01; O.R.S. § 646.605(8); 73 P.S. § 201-2(3); R.I. Gen. Laws § 6-13.1-1(5); S.D.C.L. ch. 37-24; Va. Code § 59.1-198; Wash. Rev. Code § 19.86.010(2).

48.     Meta provides tools for businesses to advertise on its Platforms. Meta's "Campaign Ideas Generator" provides "campaign ideas, pre-made assets, and resources that are specific to your small business needs."

49.     Meta provides other features and tools so that it and its users can generate revenue and engage in commerce. For example, the Instagram Shopping feature allows small businesses and global brands alike to advertise and sell goods, which users can purchase directly through the Instagram Platform.

50.     Meta encourages and provides tools for users to engage in commerce themselves. Meta's creator monetization tools, for example, allow users to make money through Instagram and Facebook. Meta has also signaled that it is testing creator monetization tools on its Horizon Worlds Platform.

51.     Meta also allows direct advertising by users on its Instagram Platform. In November 2013, Meta created "Sponsored Posts," where Instagram users could use posts in their "Feed" to promote a specific product. As a result, many Instagram users (including young users) became "influencers," compensated by advertisers for promoting a product through their posts.

52.     In addition, in approximately June 2023, Meta began offering Meta Verified to Instagram and Facebook account holders within the United States. Account holders can purchase a Meta Verified subscription bundle that includes account verification with impersonation protections and access to increased visibility and support. Meta Verified is available on Instagram and Facebook for a monthly fee of $11.99 when a user subscribes from the web (Facebook account holders only) and $14.99 when a user subscribes in the Instagram or Meta apps.

**VIII.     META'S SCHEME TO EXPLOIT YOUNG USERS FOR PROFIT**

53.     Meta has exploited young users of its Social Media Platforms, including by: (1) creating a business model focused on maximizing young users' time on its Platforms; (2) employing harmful and psychologically manipulative Platform features while misleading the public about the safety of those features; (3) publishing misleading reports purporting to show low rates of user harms; and (4) in spite of the overwhelming evidence linking its Social Media

1   Platforms to young user harms, refusing to address those harms while continuing to conceal and

2   downplay its Platforms' adverse effects.

3       **A.    To maximize profit, Meta's business model focuses on increasing young users'**

4           **engagement.**

5           **1.    Meta monetizes young users' attention through data harvesting and**

6               **targeted advertising.**

7       54.    Meta's core business model across its Social Media Platforms is monetizing user

8   information and attention by increasing engagement, otherwise known as time spent, on its

9   Platforms. Meta is constantly striving to sustain and increase user engagement on its Platforms so

10  that it can sell more and better advertising opportunities to paying advertisers.

11      55.    Meta generates most of its revenue from advertisers, who are able to use targeted

12  advertising based on the personal data Meta collects for each user. As Meta's CFO David Wehner

13  indicated in a January 2019 earnings call:

14          In terms of our ability to continue to grow the advertising business,
            it's about working to develop the best—the best products we can to
15          enable advertisers to achieve their end business results. Targeting
            obviously very is [sic] important in that.
16

17      56.    When Meta succeeds in maintaining a user's interest through its recommendation

18  algorithms—thus keeping the user on a Platform for a longer time—Meta can collect more data

19  on the user and serve the user more advertisements.

20  

21

22

23      58.    Increasing the time spent on Meta's Platforms increases the effective delivery of

24  targeted ads—a pivotal factor in Meta's ability to generate revenue. In an April 2019 earnings

25  call, Meta's CFO noted, "we're relying on continuing to improve targeting. And so you've got—

26  the risk there is of course the headwinds that we talked about on the ad targeting front and how

27  that will play into U.S. growth as well."

28

Complaint for Injunctive and Other Relief



61.     Advertisers do not have long-term commitments to Meta's Platforms. Accordingly, Meta must continue to deliver ads in an effective manner to retain paying advertisers and maintain and increase its revenue.

62.     Meta has emphasized ad effectiveness as a top priority for future growth. As then-Chief Operating Officer Sheryl Sandberg told investors on a 2019 earnings call, "[o]ver time our systems will do a better job deciding where your ads should be placed and even helping you target. And so you're seeing us build tools in that direction as well."

63.     As Meta noted in its 2021 Annual Report to the SEC, "[t]he size of our user base and our users' level of engagement across our products are critical to our success." It noted that factors affecting Meta's revenue generation include (1) "user engagement, including time spent on [Meta's] products"; (2) increasing "user access to and engagement with [Meta's] products"; (3) Meta's ability "to maintain or increase the quantity or quality of ads shown to users"; (4) maintaining traffic to monetized features like the "Feed" and "Stories"; (5) the "effectiveness of [Meta's] ad targeting"; and (6) the degree to which users engage with Meta's ads.

64.     Meta's Recommendation Algorithms were designed with its business purpose in mind, namely, to capture users' attention and keep them engaged on the Platforms.

65.     These algorithms do not promote any specific message by Meta. Rather, the algorithms function on a user-by-user basis, detecting the material each individual is likely to engage with and then increasingly displaying similar material to maximize the time spent (and user data collected) on the Platforms.

13

67.     Meta's algorithms apply not only to material generated by users but also to advertisements. As Sandberg expressed in a 2019 earnings call, "[a]cross all of our platforms and formats, we're investing in AI [artificial intelligence] to make ads more relevant and effective. In Q4, we developed new AI ranking models to help people see ads they're more likely to be interested in."

**2.     Meta specifically targets young users.**

68.     Meta is financially motivated to attract and retain young users on its Social Media Platforms and has been for many years.



---

[6] Meta's Drebbel team, formerly known as the Rabbithole team, focuses on the concept of "preference amplification"—in laymen's terms, "going down a content rabbit hole"—within Meta's Platforms.

74.     This concern over young user engagement (and its decline) naturally has extended to Instagram.

75.     About 22 million teens log on to Instagram in the U.S. each day.

76.     In recent years, Instagram has become Meta's most successful Social Media Platform in attracting and retaining young users.

77.     Within approximately two years of its purchase by Meta, over 50% of teenagers in the United States used Instagram, and

15



Complaint for Injunctive and Other Relief



Complaint for Injunctive and Other Relief



82.     Meta and its advertisers want to attract young people because they

are more likely to: (1) be influenced by advertisements; (2) become lifelong customers; and (3) set trends that the rest of society emulates. To draw young people into its ecosystem and keep them coming back, Meta employs technologies designed to maximize young users' time on, and engagement with, its Social Media Platforms.

85.     But externally, Meta has denied that it places a monetary value on young users. On September 30, 2021, at a Senate subcommittee hearing, Senator Amy Klobuchar asked Meta executive Antigone Davis what Meta believed the lifetime monetary value of young users was; Davis responded, "[t]hat's just not the way we think about [it]." Davis also denied that Meta "considered the profit value of developing products when [Meta] make[s] their decisions of how those products look," testifying that this would be a "terrible business model."

> **3.     Meta designs and deploys features to capture young users' attention and prolong their time on its Social Media Platforms.**

86.     Acquiring young users helps secure Meta's profit stream over time. By capturing users' attention and engagement when they are young, Meta ensures future engagement and monetization as those young users grow up.

19

87.     Meta thus develops and implements features to attract young users and keep them engaged on its Social Media Platforms for as long as possible. These features include: engagement-based (as opposed to chronological) feeds; infinite scroll; push notifications; ephemeral content; and video-based content.

88.     Meta had originally displayed content on a user's "Feed" chronologically, i.e., in the order the content was posted by people the user elected to follow. Meta moved from chronological Feeds to engagement-based Feeds in 2009 (for Facebook) and 2016 (for Instagram).

89.     The engagement-based Feed is different and alters the users' experience. It algorithmically presents material to users based on several engagement components: posts with more "Likes," comments, and other indicia of user engagement are displayed to users first.

90.     This change was designed to prioritize material most likely to engage users for longer periods of time.

91.     In the fall of 2016, Instagram debuted its infinite scroll system.

92.     Infinite scroll is characterized by the partial display of additional content at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation (without seeing the top portion of the next post in their Feed).

93.     The "teasing" of yet-to-be-viewed content continues indefinitely; as the user scrolls down the Feed, new content is automatically loaded and "teased."

94.     This "teasing" feature is intended to keep young users of the Platform engaged and continuing to scroll to the new content.

95.     In April 2015, Meta introduced a variety of "push notifications" to Instagram. Push notifications are auditory and visual cues to alert users when accounts they follow add new content.

96.     Push notifications allowed Instagram to draw its users back to the Platform at any time of day.

20

97.     Meta also sought to increase engagement through making certain content available to users only temporarily—with notifications and visual design cues indicating that the content would soon disappear forever (ephemeral content).

98.     Ephemeral content leads young users to more frequently open Meta's Social Media Platforms so they do not "miss out" on any new content. This phenomenon is called "Fear of Missing Out," or "FOMO." Meta designed ephemeral content features in its Social Media Platforms to induce this sense of FOMO in young users.

99.     For example, on August 2, 2016, Meta introduced a feature to Instagram designed to show images and narratives for only a short amount of time before disappearing, known as the "Stories" feature. Meta released a similar feature to Facebook in 2017.



102.    Another example is "Live," which gives users the ability to livestream videos to followers or the public.

103.    Meta launched Facebook Live on a limited basis to celebrities and other high-profile users in August 2015, with the feature being available to all users by April 2016. Instagram soon followed in November 2016.

104.    Live allows users to create video content in real time that their followers can watch and react to, often called "going Live."

105.    When an account goes Live, the Instagram Platform sends out a notification.



107.    In addition to video-streaming offered through the Live feature, Meta has also designed and implemented several video features, including "IGTV," "Instagram Video," and

21

ultimately "Reels."[7] As with prior features, Meta focused on teen engagement with these video features.



109.    In 2020, when Meta introduced its short-form video feature, "Reels," to the U.S. market on Instagram, ████████████████████████████████████████ Reels were made available on Facebook in September 2021.

110.    Reels are algorithmically presented to users based on a number of factors, including the user's activity, the popularity of the content, and the viewer's connection to the creator.

111.    Reels display metrics such as Like counts, comments, and views in the video itself, which reduces the need for the user to navigate away from the video.

[7] IGTV was revamped in October 2021 (in a shift to Instagram Video), and ultimately removed completely from the Platform in March 2022. Reels was merged with and superseded "Instagram Video" in June 2022.

22

1 ███████ ████████████████████████████████

2 ████████████████████████████████████████

3 ████████████████████████████████████████

4 ████████████████████████████████████████

5 ███████████████████████████████████

6 **B.    Meta falsely represents that its Social Media Platform features are safe and not**

7 **designed to induce young users' compulsive and extended use.**

8 117.    Meta has misrepresented the impact of the features used by its Social Media

9 Platforms that drive young users to spend extended time on the Platforms.

10 118.    While Meta consistently reassures parents, lawmakers, and users that its Social

11 Media Platforms are suitable for young users and designed to promote their well-being, it

12 continues to develop and implement features that it knows induce young users' extended,

13 addictive, and compulsive social media use. These features include:

14 • Algorithmic recommendation and sequencing;

15 • Public display and quantification of engagement metrics such as Likes;

16 • Face and body image manipulation filters;

17 • Disruptive audiovisual and haptic alerts;

18 • Infinite scroll and autoplay formats;

19 • Permitting and encouraging users to create multiple accounts; and

20 • "Ephemeral" presentation of social content.

21 ███████ ██████████████████████████████

22 ███████████████████████████████████ Instagram had the

23 potential to positively affect its users by providing, among other things, a positive community and

24 connection with others who shared identities, abilities, and interests—including isolated youth in

25 marginalized racial, ethnic, and sexual minorities.[8]

26 ████████████████████████████████████████

27 ──────────────
[8] *See Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* 6,

28 Dept. Health & Human Servs. (2023) ("[S]tudies have shown that social media may support the

**1.    Meta represents to the public that its Social Media Platforms are designed to support young users' well-being.**

120.    For years, Meta has claimed that its top priority is well-being, and that Instagram and Facebook are safe and age-appropriate Platforms for young users.

121.    Meta's public messaging is intended to convey that its Social Media Platforms are carefully designed to be safe and suitable for young users.

122.    Meta represents to the public, including investors and analysts, that it prioritizes safety. For example, during a public earnings call on January 29, 2020, Sandberg stated, "[we] have to keep people safe and give them control over their experience on our apps. And we are."

123.    Later that year, on October 29, 2020, Sandberg explained during a different public earnings call that "[w]hile we continue to invest in helping businesses, we are equally focused on keeping our platform safe."

124.    Other top executives made similar assurances through public appearances, statements to the media, and statements to lawmakers.

125.    As reported by Quartz, at a technology event in the spring of 2018, Instagram Director of Fashion Partnerships Eva Chen publicly stated that Meta's "entire focus is focusing on the wellbeing of the community" and that "[m]aking the community a safer place, a place where people feel good, is a huge priority for Instagram."

126.    In June 2019, Mosseri (Head of Instagram) told CBS in an interview that teen well-being is a top priority. And two years later, in May 2021, Mosseri minimized Instagram's negative impact on teens, characterizing it to reporters as "quite small," as reported by the Wall Street Journal that September.

███████████████████████████████████████████████████████

mental health and well-being of lesbian, gay, bisexual, asexual, transgender, queer, intersex and other youths by enabling peer connection, identity development and management, and social support."), http://archive.today/QAytZ.

128.     Meta has also sought to persuade lawmakers that its Platforms are safe for youth. On September 30, 2021, Meta executive Antigone Davis testified to Congress, "[w]e have put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17."

129.     Meta has also sought to reassure the public that it prioritizes youth safety on its own blogs and Platform websites. On December 7, 2021, Mosseri wrote in a blog post entitled "Raising the Standard for Protecting Teens and Supporting Parents Online" that "[a]t Instagram, we've been working for a long time to keep young people safe on the app."

130.     Similarly, Instagram's website characterized the Instagram app as a "safe and supportive community" for its users.

131.     Likewise, a blog post from December 15, 2022 on about.instagram.com bears the title "Continuing to Keep Instagram Safe and Secure."

133.     Through these and other public messages, Meta has intentionally created the false impression that its Platforms are safe for young users, and that Meta prioritizes safety over user engagement.

**2.     Meta prioritizes maximizing engagement over young users' safety.**

134.     Meta denies that it seeks to maximize young users' engagement on its Social Media Platforms.

137.    Zuckerberg stated to Congress on March 25, 2021, that "it is a common misconception that our teams—our goals, or even have goals, of trying to increase the amount of time that people spend" and "I don't give our News Feed team or our Instagram team goals around increasing the amount of time that people spend."

138.    Meta has also claimed, in a statement published by Gizmodo on October 3, 2021, to "do internal research to ask hard questions and find out how we can best improve the experience for teens."

139.    These representations were false and misleading. Contrary to Meta's public statements, one of Meta's key goals is to induce young users to spend ever-increasing amounts of time on its Social Media Platforms.

Complaint for Injunctive and Other Relief



150.    Thus, notwithstanding Meta's public representations to the contrary, increasing young users' engagement was, and is, a core business objective for Meta.

**3.    Meta's Recommendation Algorithms encourage compulsive use, which Meta does not disclose.**

151.    Instagram and Facebook employ Recommendation Algorithms that curate content from the main feeds and other parts of the Platforms.

152.    The Recommendation Algorithms use data points, or "signals," harvested from individual users to choose and/or arrange each new piece of content to display to a user. Such signals include, but are not limited to, overt actions like Liking a post or following a page as well as such unconscious actions such as lingering on—but not otherwise engaging with—certain content or visiting but not following another user's page.

153.    Meta employs Recommendation Algorithms universally across its Social Media Platforms, including the Instagram Platform's Main Feed (the scrolling presentation of content immediately visible upon opening the app) and Explore Feed (another scrolling presentation of algorithmically curated content that can be guided by a user's text input in a search field).

154.    Meta designed its Recommendation Algorithms to maximize youth engagement in several ways but did not disclose these engagement-maximization features to the public—instead representing that these algorithms were intended to *benefit* the user.

155.    *First*, Meta designed the Recommendation Algorithms to present material to young users in an unpredictable sequence rather than displaying posts chronologically.

156.    Specifically, Meta's Recommendation Algorithms display content to young users through a sequencing method referred to by psychologists as "variable reinforcement schedules" or "variable reward schedules."

157.    As Dr. Mark D. Griffiths, Distinguished Professor of Behavioral Addiction at Nottingham Trent University, explains:

> The rewards [experienced on social media platforms]—which may be physiological, psychological and/or social—can be infrequent but even the anticipation of one of these rewards can be psychologically and/or physiologically pleasing. The rewards are what psychologists refer to as variable reinforcement schedules and

is one of the main reasons why social media users repeatedly check their screens. Social media sites are 'chock-ablock' with unpredictable rewards. Habitual social media users never know if their next message or notification will be the one that makes them feel really good. In short, random rewards keep individuals responding for longer and has been found in other activities such as the playing of slot machines and video games.[9]

158.   Because they do not work in a predictable pattern, these "variable reinforcement schedules" trigger a release of dopamine, a neurotransmitter released by the brain in response to certain stimuli. Dopamine, commonly "seen to be the 'pleasure chemical,'" is released in anticipation of a potential reward. However, dopamine neurons fire for only a relatively short period of time, and after dopamine is released, an "individual can become disheartened and disengaged."[10]

159.   As researchers Rasan Burhan and Jalal Moradzadeh explain, the variable reinforcement schedules baked into social media platforms like Instagram can lead to "addiction with dopamine implicated":

[T]he user can be kept in a loop. Essentially, that's how the social media apps exploit these innate systems. The way this comes about is through a term referred to as Variable Reward Schedules. This works by positive stimuli being provided at random intervals. By users checking their phones for notifications and updates at periodic intervals for something that could be intrinsically rewarding. Most of the time it's a neutral stimuli, but on occasion there may be a positive stimuli leading to the rewarding dopamine release hence keeping the user in the feedback loop.[11]

---

[9] Mark D. Griffiths, *Adolescent Social Networking: How Do Social Media Operators Facilitate Habitual Use?*, 36 Educ. & Health J. 66, 67 (2018), http://archive.today/cPgJ1 (internal references omitted).

[10] Rasan Burhan & Jalal Moradzadeh, *Neurotransmitter Dopamine (DA) and its Role in the Development of Social Media Addiction*, 11 J. Neurology & Neurophysiology 1, 1 (2020), http://archive.today/kxldL.

[11] *Id.* at 1-2.

161.    By algorithmically serving content to young users according to variable reward schedules, Meta manipulates dopamine releases in its young users, inducing them to engage repeatedly with its Platforms—much like a gambler at a slot machine.

165.    Nonetheless, and as illustrated above, as recently as 2020, Meta continued to intentionally design its Platforms to manipulate dopamine responses in its young users to

Complaint for Injunctive and Other Relief

maximize time spent on its Platforms. Meta did not disclose that its algorithms were designed to capitalize on young users' dopamine responses and create an addictive cycle of engagement.

166.    *Second,* Meta uses data harvested from its users to target user engagement on an individual level via its Recommendation Algorithms—making continued engagement even more difficult for young users to resist.

167.    In a June 8, 2021 public blog post on Instagram's website, Mosseri stated that Meta collects and supplies its Recommendation Algorithms with thousands of "signals" across Instagram's Feed and Stories, including "[y]our activity" and "[y]our history of interacting with someone." Mosseri's post explained that the collection of "[y]our activity . . . helps us understand what you might be interested in . . ." and the collection of "[y]our history of interacting with someone . . . gives us a sense of how interested you are generally in seeing posts from a particular person."

168.    Similarly, Facebook's Vice President of Global Affairs wrote in Medium on March 31, 2021, about Facebook's Recommendation Algorithms: "The goal is to make sure you see what you find most meaningful—not to keep you glued to your smartphone for hours on end. You can think about this sort of like a spam filter in your inbox: it helps filter out content you won't find meaningful or relevant, and prioritizes content you will."

169.    Likewise, Meta's terms of service on data collection state that Meta uses user data to "[p]rovide, personalize and improve our Products," "[p]rovide measurement, analytics, and other business services," "[p]romote safety, integrity and security," "[c]ommunicate with you," and "[r]esearch and innovate for social good."

170.    In reality, though, Meta tracks and logs the behavior of millions of young users and utilizes that data to refine and strengthen the features that induce young users' compulsive Social Media Platform use.

171.    As young users engage with Meta's Social Media Platforms, they are unwittingly training Meta's Recommendation Algorithms to provide the particular flow of content, notifications, and features that will most effectively keep them online.

172.    Again, Meta does not disclose to consumers that it is weaponizing young users' data to capture and keep their attention.

173.    Meta admits in its Privacy Policy that it uses data provided by its young users for purposes other than facilitating meaningful social experiences, such as "improv[ing] our Products . . . includ[ing] personalizing features, content and recommendations, such as your Facebook Feed, Instagram feed, Stories, and ads."

174.    This includes using young users' data to "[t]est out new products and features to see if they work" and to "[g]et feedback on our ideas for products or features."

175.    But Meta's representations about its Recommendation Algorithms do not effectively apprise young users of the reality that Meta is harvesting vast amounts of personal data to train its Recommendation Algorithms to induce them to keep using the Platforms.

176.    *Third*, the Recommendation Algorithms increase young users' engagement by periodically presenting those users with psychologically and emotionally gripping content, including content related to eating disorders, violent content, content encouraging negative self-perception and body image issues, bullying content, and other categories of content known by Meta to provoke intense reactions.

177.    Meta's Recommendation Algorithms are optimized to promote user engagement. Serving harmful or disturbing content has been shown to keep young users on the Platforms longer. Accordingly, the Recommendation Algorithms predictably and routinely present young users with psychologically and emotionally distressing content that induces them to spend increased time on the Social Media Platforms. And, once a user has interacted with such harmful content, the Recommendation Algorithm feeds that user additional similar content.





183.    Again, though, Meta's public statements regarding its algorithms' amplification of distressing and problematic content did not reflect Meta's true awareness of these problems.

184.    In fact, Meta has strongly denied that its Social Media Platforms amplify extreme, distressing, or problematic content.

185.    For example, on September 30, 2021, Davis denied that Meta promotes harmful content, such as content promoting eating disorders to youth, when she testified before Congress, stating, "we do not direct people towards content that promotes eating disorders. That actually violates our policies, and we remove that content when we become aware of it. We actually use AI to find content like that and remove it."

187.    Likewise, in a June 8, 2021 post on the Instagram website, titled "Shedding More Light on How Instagram Works," Mosseri describes Meta's Recommendation Algorithms by providing examples of benign content recommendations (e.g., "if you're interested in dumplings you might see posts about related topics, like gyoza and dim sum . . ."). The post provides no accompanying examples or warnings disclosing that the Recommendation Algorithms also tend to suggest content that is dangerous or harmful for young users.

188.    The Instagram website also boasts that "[a]t Instagram, we have guidelines that govern what content we recommend to people" and specifies that Instagram "avoid[s] making recommendations that may be inappropriate for younger viewers . . . . We use technology to detect both content and accounts that don't meet these Recommendations Guidelines and to help us avoid recommending them. As always, content that goes against our Community Guidelines will be removed from Instagram."

189.    A parent or young user encountering these and similar communications by Meta could reasonably understand Meta to be representing that its Recommendation Algorithms do *not* promote content to young users that violates Meta's Recommendation Guidelines or is otherwise dangerous or inappropriate for young users.

190.    But as explained above, Meta does increase young users' engagement with its Platforms by periodically presenting them with psychologically and emotionally gripping content, including content related to eating disorders, violent content, content encouraging negative self-perception and body image issues, bullying content, and other categories of content known by Meta to provoke intense reactions from users.

**4.    The Recommendation Algorithms are harmful to young users' mental health, notwithstanding Meta's representations to the contrary.**

191.    Meta falsely represents that its Recommendation Algorithms are benign and designed for young users' well-being. For example, during a congressional hearing on March 25,

2021, Zuckerberg denied that Meta "make[s] money off creating an addiction to [its] platforms." At the same hearing, Zuckerberg stated that "the way we design our algorithms is to encourage meaningful social interactions" and denied that Meta's teams "have goals[] of trying to increase the amount of time that people spend [using Meta's Platforms]."

192.    Elsewhere, Meta has reiterated that its Recommendation Algorithms are optimized to yield "positive experience[s]" or "meaningful interactions" as opposed to maximizing "time spent" by users on the Platforms. For example, on September 30, 2021, Davis testified before Congress that Meta "made changes to our News Feed to allow for more meaningful interactions, knowing it would impact time spent" and that Meta did this "because we were trying to build a positive, more positive experience."

193.    But as described above, the Recommendation Algorithms are far from benign: they promote young users' compulsive social media use in a sophisticated and individualized manner and are designed to capture and retain young users' attention—often to the detriment of their mental and physical health.

194.    These harms are pervasive and often measurable.







37

207.     Instagram researchers (who are ultimately funded by and report to Meta) have also observed that "[s]ocial comparison exacerbates problems teens are dealing with" in that, "[a]lthough others' behaviors online can hurt, the self-scrutiny and anxiety associated with personal consumption patterns is more damaging to mental health."

38

But in its public communications with current and prospective users, Meta conceals these aspects of its Recommendation Algorithms.

220. Meta understands the psychologically manipulative nature of its Platforms' functionality, has knowledge that its minimally constrained Recommendation Algorithms

promote harmful content, and is aware that users "wish[] Instagram [gave] them better control

over what [content] they [see]."



222.    At the same time Meta was prioritizing engagement over safety (and in turn,

increasing its profits), Meta continued to insist that user well-being (especially teen well-being)

was its top priority, including through a January 2018 statement by Zuckerberg that the company

was "focused on making sure Facebook isn't just fun to use, but also good for people's

wellbeing," as reported by the Guardian.

223.    For example, on October 5, 2021, Zuckerberg reacted to former Facebook product

manager Frances Haugen's whistleblower revelations and testimony to Congress—which sent

Meta's stock price down over 10% in the six weeks following the initial revelations—by publicly

stating in a post on his Facebook profile: "At the heart of these accusations is this idea that we

prioritize profit over safety and well-being. That's just not true."

224.    Despite its knowledge that Meta's Recommendation Algorithms harm young

users' health, Meta does not disclose these harms to young users or their parents in its public

communications or in its user registration processes for its Social Media Platforms.

225.    Meta denies that its Recommendation Algorithms are designed to be addictive and

that the algorithms promote emotionally distressing content, but Meta knows that it designs its

algorithms to be addictive and to promote such content. Meta's misrepresentations and omissions

regarding its Recommendation Algorithms' promotion and amplification of harmful content

deprives users, including the parents of young users, of informed decision-making authority

regarding whether and how to engage with Meta's Social Media Platforms.

**5.    Meta's use of social comparison features such as "Likes" also promotes compulsive use and mental health harms for young users.**

226.    Meta's Social Media Platforms contain additional design features that exacerbate social comparison, such as the quantification and display of Like counts on each piece of content on Instagram and Facebook.

227.    Likes are a quick way for users to express validation or approval of other users' photos or videos, by clicking or tapping a heart icon or the iconic thumbs-up icon. Likes were developed by Meta between 2010 and 2013.

228.    ████████████████████████████████████
███████████████████████████████████████

Despite that knowledge, Meta has elected to publicly downplay its negative effects on young users rather than eliminating the feature for young users or truthfully disclosing its negative effects.



Complaint for Injunctive and Other Relief

251.    As of October 2023, Like counts on all users' posts remain visible by default on Instagram and Facebook.

252.    Rather than removing visible Like counts for all users by default ██████████, users who wish to hide Like counts from posts in their Instagram or Facebook Feeds must navigate submenus of preferences to affirmatively opt in.

253.    Meta could have, at a minimum, hidden Like counts for young users of Instagram and Facebook, but it declined to do so. Instead, Meta continues to show young users Like counts for all content in its Social Media Platforms by default.

255.    ██████████ Meta continues to quantify and display social statistics such as Likes on its Platforms by default.



261.     Meta chose to continue displaying Like counts and to continue prioritizing the display of "popular" posts.

265.

Indeed, in the context of discussing whether Like counts should remain visible at WIRED's annual conference on November 8, 2019, Mosseri publicly stated that "[w]e will make decisions that hurt the business if they're good for people's well-being and health . . . ."

1

2

3

4

5

6

7

8

9

10

11

12

13

14    273.

15

16

17

18    Meta declined to implement Project Daisy as a default for

19    young users, only making it available to young users as an opt-in setting.

20

21

22

23

24

25

26

27

28





283.

284.     A May 26, 2021 Meta blog post, titled "Giving People More Control on Instagram and Facebook," claimed that although the company tested Daisy "to see if it might depressurize people's experience on Instagram," Meta had decided not to implement it as a default because "not seeing like counts was beneficial for some, and annoying to others."

288.     Through these and other public statements, Meta falsely represented that Project Daisy was not implemented by default in Instagram and Facebook because Meta lacked evidence that the Platform changes tested in Project Daisy were beneficial to the mental health and well-being of its users—or because the impact of removing visible Like counts was too "individualized" to be beneficial as a default setting applicable to a general audience.



Complaint for Injunctive and Other Relief

297. ████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████
█████████████████████
███ ███████████████████████████████
██████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████████████
██████████████████

**6.**   **Meta's use of disruptive audiovisual and haptic notifications interferes
with young users' education and sleep.**

299.   Meta's Social Media Platforms use incessant notifications that recall young users'
attention back to the Social Media Platforms when they are engaging in unrelated activities, such
as attending school.

300.   For example, by default, Instagram frequently delivers notifications to young
users' smartphones, ███████████████████████████████████████████
████████████████████

301.   By default, Instagram employs a range of notifications when the application is
installed on a smartphone. These include haptic alerts (vibration or pulse), banner notifications,
sound notifications, badge notifications (persistently displayed red indicator encircling a number
representing certain events that have not yet been viewed by the user), and email notifications.

302.   These notifications are disruptive for all users but are especially intrusive and
harmful for young users, who are particularly vulnerable to distraction and psychological
manipulation.

303.   Meta sends notifications to users, which trigger audiovisual and haptic alerts on
users' smartphones, when other users on the Platform take any of the following actions:

- Following the user;

51

1    • Going Live (i.e., starting a live broadcast);

2    • Liking or commenting on the user's posts;

3    • Mentioning the user in a comment or tagging the user in a post; or

4    • Sending the user a message.

5 

6 

7 

8 

9 

10 

11 

12 

13 

14 

15 

16 

17 

18    309.    Meta has employed notifications across its Social Media Platforms to drive

19    increased user engagement.

20    310.    Sean Parker, founding president of Meta, explicitly acknowledged this:

21    The thought process that went into building these applications,
      Facebook being the first of them . . . was all about: "[h]ow do we
22    consume as much of your time and conscious attention as
      possible?" That means that we need to sort of *give you a little*
23    *dopamine hit every once in a while, because someone liked or*
      *commented on a photo or a post* or whatever. And that's going to
24    get you to contribute more content and that's going to get you . . .
      more likes and comments. It's a social-validation feedback loop . . .
25    exactly the kind of thing that a hacker like myself would come up
      with, because you're exploiting a vulnerability in human
26    psychology. The inventors, creators—me, Mark [Zuckerberg],
      Kevin Systrom on Instagram, all of these people—understood this
27    consciously. And we did it anyway.

28

311.    As Meta knows, young users are particularly susceptible to these techniques and find it hard to resist applications that send them frequent and persistent alerts.

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

313.    Researchers have documented how these notifications, including Likes on Instagram, have an impact on the brain similar to the effect of taking stimulating drugs:

> Although not as intense as [a] hit of cocaine, positive social stimuli will similarly result in a release of dopamine, reinforcing whatever behavior preceded it . . . . Every notification, whether it's a text message, a "like" on Instagram, or a Facebook notification, has the potential to be a positive social stimulus and dopamine influx.[13]

314.    Young users frequently re-open and re-engage with Instagram repeatedly throughout the day and at night when prompted to do so by the alerts and notifications they receive from Instagram on their smartphones.

315.    By sending notifications to young users, Meta causes young users' smartphones to produce audiovisual and haptic alerts that distract from and interfere with young users' education and sleep.

316.    Meta defaults young users into receiving notifications on Instagram and Facebook,

███████████████████████████████████████

███████████████████████████████████████

317.    While users can technically disable notifications, Meta knows that requiring users to opt out of receiving notifications greatly reduces the likelihood that they will do so.

███████████████████████████████████████

---

[13] Trevor Haynes, *Dopamine, Smartphone & You: A Battle for Your Time,* Harv. Univ. SITN Blog (May 1, 2018), https://archive.ph/9MMhY.



54

1 ███████████████████████████████████████████
  ███████████████████████████████████████

2 ████████████████████████████████████

3     325.    Even so, Instagram does not offer users a setting to permanently disable all

4 notifications on Instagram at once. At most, users can opt to pause all notifications for up to 8

5 hours at a time. Users seeking to permanently disable all notifications must disable each category

6 of notifications one by one.

7     326.    After users disable notifications, Meta pressures such users to reinstate

8 notifications when they use Instagram. For example, Meta periodically sends a user the below

9 nudge message after a user disables notifications on their smartphone and subsequently logs onto

10 Instagram through a web browser:



21    327.    Upon information and belief, the wording of the "Turn On" and "Not Now"

22 options is designed to pressure users, including young users, to revert to the default notification

23 settings even after they have attempted to disengage from Instagram by turning those notifications

24 off.

25 ████████████████████████████████████████
   ████ ███████████████████████████████████

26 ███████████████████████████████████████████
   ████████████████████████████████████████

27

28

1

2

329.    Through notifications and other features, Meta's Social Media Platforms are designed to maximize user time, addict and re-addict users (including young users), and effectively mandate that a user's experience is on Meta's revenue-maximizing terms, even when users attempt to modify their own behavior to reduce the time they spend on Instagram.

330.    Publicly, Meta touts its Social Media Platforms' time management "tools," creating the misleading impression that Meta's Social Media Platforms are designed to empower users' efforts to self-limit the duration and frequency of their social media use.

331.    For example, on August 1, 2018, Meta published a post online titled "New Time Management Tools on Instagram and Facebook" that described "new tools to help people manage their time on Instagram and Facebook" because Meta purportedly "want[s] the time people spend on Instagram and Facebook to be intentional, positive and inspiring."

332.    Meta's public representations concerning its time management tools are deceptive in light of Meta's choice to default users, including young users, into a barrage of smartphone alerts that incessantly recall them to the Social Media Platforms and then pressure young users to revert to those defaults when they attempt to opt out.

**7.    Meta promotes Platform features such as visual filters known to promote eating disorders and body dysmorphia in youth.**

333.    As referenced above, Meta also deceives the public by representing in its public communications that its Social Media Platforms do not allow content that promotes or encourages eating disorders—all while actively choosing to retain Platform features known by Meta to promote those very disorders, despite expert warnings about the resulting harms to young users.

334.    For example, on September 30, 2021, Meta executive Davis denied that Meta promotes harmful information, such as information that promotes eating disorders, when testifying before Congress, stating: "[w]e do not direct people towards content that promotes eating disorders. That actually violates our policies, and we remove that content when we become aware of it. We actually use AI to find content like that and remove it."

56

335. Davis also testified that for teen girls struggling with "loneliness, anxiety, sadness, and eating disorders," they "were more likely to say that Instagram was affirmatively helping them, not making it worse."

336. Davis also testified that Instagram "work[s] with experts to help inform our product and policies" around eating disorders. Meta publishes this same statement in a section devoted to "[e]ating disorders" and "negative body image" in its "parent and guardian's guide to Instagram," which it makes available on its website.

337. Generally, and as described above, Meta falsely represents to the public that Meta does not prioritize user engagement or Meta's profits over young users' safety.

57

Complaint for Injunctive and Other Relief

345.    Meta's initial response to the public backlash was to institute a temporary ban on the camera filters.



59

362. ▮▮▮▮▮▮▮▮ left Meta in November 2022.

As of October 2023, these filters remain available on Instagram.



368. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ it continued to misrepresent to the public that Instagram helped teen girls struggling with mental health and eating disorders. Davis falsely denied to the public and lawmakers that Meta promotes and makes available content

1    associated with eating disorders, when in fact, Meta's own Platform features are associated with

2    body image issues related to eating disorders.

3         **8.    Meta offers features that it claims promote connection between friends, but**

4         **actually serve to increase young users' time spent on the Platform.**

8         370.    Another Meta feature from 2016 that encourages young users to continuously

9    engage with Instagram is the "multiple accounts" function, which allows users to register up to

10   five accounts without having to log out of any one account to access another.

11        371.    This multiplies the number of unexhausted personalized Feeds vying for young

12   users' attention

**9.     Through its Platform features, Meta discourages young users' attempts to disengage, notwithstanding Meta's representations to the contrary.**

373.    Meta employs design features, including but not limited to infinite scroll, autoplay, push notifications, and ephemeral content, that work to override young users' attempts to disengage from Meta's Social Media Platforms. These tactics, which are wholly within Meta's control, make it difficult for young users to cease engagement with Meta's Platforms— independent of the content with which the users interact.

374.    Meta has long denied that its Social Media Platforms are designed to be addictive. In July 2018, Meta told the BBC that "at no stage does wanting something to be addictive factor into" the design process for its Platforms.

375.    On September 30, 2021, Davis testified before Congress that Meta does not build its Platforms to be addictive and disputed the addictive nature of Meta's Platforms.

376.    However, through its design features, Meta ensures that young users struggle to disengage from its Social Media Platforms.

377.    The infinite scroll system, for example, makes it difficult for young users to disengage because there is no natural end point for the display of new information. The Platforms do not stop displaying new information when a user has viewed all new posts from their peers. Instead, the Platform displays new content and suggests relevant information that has yet to be viewed, provoking the young users' FOMO.

378.    As the inventor of infinite scroll noted about the feature's addictive qualities, "[i]f you don't give your brain time to catch up with your impulses . . . you just keep scrolling."

379.    Meta also deploys the autoplay feature to keep young users engaged on its Platforms. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

381.     Much like infinite scroll, the autoplay feature encourages young users to continuously engage on the Platform because it provides them with an ongoing supply of content.

382.     As commentators have observed, "it's the way Instagram encourages you to watch Stories at every turn that makes them addicting":

> Stories are the first thing you see when you open the app—they're housed at the top of the screen—but they also periodically show up in the middle of scrolling through your feed . . . . And once you're watching one person's Story, you're automatically shepherded into the next person's Story without ever even leaving the interface.

383.     Meta also designed Reels with the infinite scroll feature to maximize the amount of time that users spend on the Platform.

384.     Facebook and Instagram Reels automatically and perpetually play as the user swipes the screen up to the next video. The short-form nature of Reels discourages users from navigating away or closing the app.

385.     Other aspects of Reels, including the placement of the Like, "comment," "save," and "share" buttons on top of the video, reduce or prevent interruption and keep the user constantly viewing the video.

387.     Meta also uses design features, including ephemeral content, to induce a sense of FOMO in young users and keep them engaged on the Platforms.

388.     Ephemeral content on Meta's Social Media Platforms is content temporarily made available to users with notifications and visual design cues indicating that the content will soon disappear.

389.    Meta designed ephemeral content features in its Social Media Platforms, such as Stories or Live, to induce a sense of FOMO in young users.

390.    Unlike content delivery systems which permit a user to view existing posts on a schedule convenient for the user, content released through Live is only available in real-time—such that a young user's failure to quickly join the livestream when it begins means that the user will miss out on the chance to view the content entirely.



393.    Meta could make Live videos and Stories available for viewing days or weeks after they are created; instead, Meta chooses to use ephemeral content features to induce in its young users a sense of urgency or FOMO.

394.    Meta similarly designs its Messenger Platform with ephemeral content features: for example, users can enable Vanishing Mode in which messages disappear when the user exits that mode.

1

2

3      396.    An October 2019 internal presentation entitled "Teen Mental Health Deep Dive"

4  discussed the findings from a survey of over 2,500 teenagers who use Instagram on at least a

5  monthly basis.

6      397.    Among the researchers' conclusions was the finding that "[y]oung people are

7  acutely aware that Instagram can be bad for their mental health, yet are compelled to spend time

8  on the app for fear of missing out on cultural and social trends."

9      398.    Other Meta documents acknowledge this problem, noting that over half of

10  Instagram's teen users report struggling with FOMO.

11

12

13

14

15

16

17

18

19      401.    Meta's use of ephemeral content features to cultivate FOMO and exploit

20  psychological vulnerabilities in young users belies Meta's deceptive statements that it prioritizes

21  young users' well-being.

22

23

24

25

26

27

28



410.     Many of Meta's design features—audiovisual and haptic alerts, infinite scroll and autoplay, ephemeral content features, quantification and display of Likes, and highly refined algorithmic sequencing of content feeds—overwhelm that dopamine sensitivity known by Meta to exist in young users' developing brains.

411.     These features induce young users' engagement with Meta's Platforms, and the effect of these use-inducing mechanisms is cumulative because they act in concert.

412.     By creating and refining these features, Meta has succeeded in making it difficult for young users to resist spending extended time on its Platforms.

413.     The features create a feedback loop that is integral to Meta's current business model.

**10.     Meta knows its Platform features are addictive and harmful, but misrepresents and omits this information in public discourse.**

414.     Meta understands the cyclical and harmful nature of its psychologically manipulative features, but persists in subjecting young users to those features, choosing to downplay and deny the harmful aspects of its Platforms instead of correcting those problems.

415.     During a congressional hearing on March 25, 2021, Zuckerberg stated he did not believe Meta's Platforms harm children. Instead, Zuckerberg suggested that Meta's Platforms are good for teens and adults alike because they "help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do."



Complaint for Injunctive and Other Relief

418.   In 2019 and 2020, Zuckerberg and Mosseri met multiple times with Jonathan Haidt, a New York University professor studying the effects of social media on teens' mental health.

Haidt recalled that "[i]t was not suggested to me that they had internal research showing a problem."

419.   At the March 25, 2021 congressional hearing, Zuckerberg was asked whether passive consumption of social media content, like that promoted by Instagram's infinite scroll, harmed children's mental health. Zuckerberg refused to give a yes or no answer,

Zuckerberg again played up the benefits of Meta's Platforms to the committee, stating that "[o]verall, the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits by helping people feel more connected and less lonely."

68



425.    In May 2021, Mosseri told reporters that the research he had seen suggested Instagram's effects on teen well-being are likely "quite small," as reported by the Wall Street Journal that September.

427.   Externally, Meta's leadership continued to be evasive about the company's research. On December 8, 2021, Mosseri told Congress, "I don't believe that research suggests that our products are addictive."

[redacted]

429.   Through these and other misrepresentations to young users, Congress, and members of the public regarding the negative effect its Platform features have on young users' mental health—as well as Meta's purported prioritization of teen well-being and safety over profits—Meta deceives the public about the qualities, nature, and effects of its Social Media Platforms.

**11.   Meta makes its Platforms and associated harmful features available to especially young and vulnerable users.**

430.   Meta is aware that teens, preteens (also known as tweens), and even younger children use its Platforms, including Instagram, and has intentionally developed and marketed those Platforms towards these young users.

431.   Meta knows that it continues to harm young users because Meta's design features have clear and well-documented harms to young users.

432.   Meta's decision to expose young users to this combination of features and implementation of those features—knowing that they are effective because they are psychologically manipulative and knowing that they are harmful for young users—constitute unfair acts or practices that are impermissible under the law.

433.   Meta exposes users under age 13 to these psychologically manipulative design features.

434.   A study cited by Meta in response to a congressional inquiry shows that 81% of parents report that their children began using social media between the ages of 8 and 13.

435.    Meta knows that a significant portion of preteens (at least 11% of 9 to 11-year olds) use Instagram.

438.    Meta deceives the public regarding its policies when underage accounts are reported. If someone reports that an account belongs to an individual under the age of 13, Instagram's Help Center claims that "[w]e will delete the account if we can't verify the account is managed by someone over 13 years old."

Zuckerberg told Congress on March 25, 2021, "if we detect that someone might be under the age of 13, even if they lied, we kick them off."

439.

However, even though Meta targets children under the age of 13, Meta employees go to great lengths to maintain plausible deniability that Meta is aware of children under the age of 13 on Instagram.

441.    Meta's interest in preteens is unsurprising as Meta has historically regarded children between the ages of 10 and 12 as a "valuable but untapped audience."

442.    Meta formed an internal team to study preteens and commissioned strategy papers to analyze the long-term business opportunities presented by preteens.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

444.    Meta believes children to be such a strategically lucrative class of users that it also planned to create a new Instagram Platform for children under 13 called "Instagram Kids."

445.    News of Instagram Kids was leaked, however, before Meta released the Platform.

446.    After receiving intense scrutiny and backlash from State Attorneys General and Congress about Instagram's effect on young people's mental health, Meta "pause[d]" development of the Instagram Kids service.

447.    Nonetheless, Meta has made statements internally and publicly continuing to make the case for Instagram Kids and suggesting an intent to resume development and deployment of Instagram Kids in the future.

448.    Meta's external narrative around its proposed Platforms for users under age 13 was misleading because Meta claimed it would prioritize "safety and privacy" of kids under age 13 in versions of Instagram, including in a statement issued to the press and reported by CNBC on May 10, 2021,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

72

457.    In the meantime, young users, including users under the age of 13, continue to use the ordinary version of Instagram even though users under 13 years-old are nominally prohibited from doing so.

**C.    Meta has misled its users and the public by boasting a low prevalence of harmful content on its Social Media Platforms**

458.    Through its public representations, Meta has created the false impression that Facebook and Instagram are safe Platforms on which users rarely encounter harmful content.

459.     In the face of criticism from parents, experts, and policymakers that its Social Media Platforms are harmful for young users, Meta has endeavored to persuade its users and the broader public that its Social Media Platforms are safe and suitable for young users.

460.     To that end, Meta regularly publishes Community Standard Enforcement Reports (CSER or Reports) that boast very low rates of its community standards being violated █████████████████████████████████████████████████████████████████████████████████████████████████

461.     The Reports, published quarterly, describe the percentage of content posted on Instagram and Facebook that Meta removes for violating Instagram and Facebook's Community Standards or Guidelines. Meta often refers to that percentage as its "prevalence" metric.

462.     Meta often amplifies the reach of the Reports and its "prevalence" metrics by announcing them through press releases, distributing them in advance to members of the press, and holding conference calls with the press to tout their release.

████████████████████████████████████████████████████████████████████████████████████

464.     Meta has publicly represented that the "prevalence" statistics in the Reports are a reliable measure of the safety of its Social Media Platforms—even going so far as to assert that the CSER "prevalence" numbers were "the internet's equivalent" of scientific measurements utilized by environmental regulators to assess the levels of harmful pollutants in the air. For example, in a May 23, 2019 post on its website entitled "Measuring Prevalence of Violating Content on Facebook," Meta stated the following:

> One of the most significant metrics we provide in the Community Standards Enforcement Report is prevalence. . . . We care most about how often content that violates our standards is actually seen relative to the total amount of times *any* content is seen on Facebook. This is similar to measuring concentration of pollutants in the air we breathe. When measuring air quality, *environmental regulators look to see what percent of air is Nitrogen Dioxide to determine how much is harmful to people. Prevalence is the internet's equivalent* — a measurement of what percent of times someone sees something that is harmful. [Second emphasis added.]

465.    Zuckerberg told Congress on March 25, 2021 that Meta's "prevalence" numbers serve as a "model" for companies' transparency efforts.

466.    The Reports are intentionally used by Meta to create the impression that because Meta aggressively enforces its Community Standards—thereby reducing the "prevalence" of community-standards-violating content—Meta's Social Media Platforms are safe products that only rarely expose users (including young users) to harmful content and harmful experiences.

472.    Nevertheless, Meta publicly represents that Instagram and Facebook are safe because Meta enforces its Community Standards.

473.    For example, the third quarter 2019 Report touts Meta's "Progress to Help Keep People Safe." Likewise, the second quarter 2023 Report states that "[w]e publish the Community Standards Enforcement Report . . . to more effectively track our progress and demonstrate our continued commitment to making Facebook and Instagram safe."

474.    Each of the Reports—whether they contain an express representation about safety—create the net impression that harmful content is not "prevalent" on Meta's Platforms and that the Platforms are therefore safe for users, including young users.



480.    The impression that the Reports create—that Meta's Platforms are safe and users only rarely encounter harmful content—is false and misleading.

481.    Meta's third quarter 2021 Report estimated that on Instagram, "less than 0.05% of views were of content that violated our standards against Suicide & Self-Injury." That representation created the impression that it was very rare for users to experience content relating to suicide and self-injury on Instagram.

483.    In other words, while a reader of the CSER Reports could reasonably understand that self-harm content on Instagram is rarely encountered by users—far less than 1% of the time—

77

490.    The third quarter 2021 Report concluded that only "0.05-0.06%" of views on Instagram were of content that violated Meta's standards on bullying and harassment. This representation created the impression that it was very rare for users to experience bullying or harassment on Instagram.

498.

Meta affirmatively misrepresented that fact through its Reports.

499.    Meta's Reports similarly misrepresented the frequency that its users experienced harmful content on Facebook. For example, in its Report for the fourth quarter of 2020, Meta represented that only about 0.05% of views of content on Facebook were of violent and graphic content.

501.    Relatedly, Zuckerberg's public statements about "prevalence" of harmful content creates a misleading picture regarding the harmfulness of Meta's Social Media Platforms.

  
Zuckerberg and other company leaders focus on "prevalence" metrics in public communications because those metrics create a distorted picture about the safety of Meta's Social Media Platforms.



507.    On information and belief, Meta issued the Reports and made other public statements to minimize the public's awareness of the harmful experiences that are widespread on Instagram and Facebook—particularly for young users.

**D.    Meta's Platform features cause young users significant physical and mental harm, of which Meta is keenly aware.**

508.    Increased use of social media platforms, including those operated by Meta, result in physical and mental health harms particularly for young users, who experience higher rates of

Complaint for Injunctive and Other Relief

major depressive episodes, anxiety, sleep disturbances, suicide, and other mental health concerns.[14]

509.    Social media use among young users began a dramatic increase in the United States in 2012 when Meta acquired Instagram to expand its youth appeal. Instagram increased from 50 million users in 2012 to over 500 million users by 2016, with a significant share of its user base composed of young users.

510.    As Meta focused on designing features to increase time spent on its Platforms, heavy consumers of social media began to exhibit worse mental health outcomes than light consumers.[15]

511.    Hours spent on social media and the internet have become more strongly associated with poor psychological health (such as self-harm behaviors, depressive symptoms, low life satisfaction, and low self-esteem) than hours spent on electronic gaming and watching TV.[16] Making matters worse, heavier social media use has led to poorer sleep patterns (e.g., later sleep and wake times on school days and trouble falling back asleep after nighttime awakening) and poorer sleep quality.[17]

---

[14] *See, e.g.*, Jonathan Haidt & Jean Twenge, Social Media and Mental Health: A Collaborative Review (unpublished manuscript, on file with New York University), *available at* tinyurl.com/SocialMediaMentalHealthReview (last visited Oct. 23, 2023); Jacqueline Nesi et al., *Handbook of Adolescent Digital Media Use and Mental Health*, Cambridge Univ. Press (2022).

[15] *See, e.g.*, Jean Twenge & W. Keith Campbell, *Digital Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychiatric Q. 311 (2019).

[16] Jean Twenge & Eric Farley, *Not All Screen Time Is Created Equal: Associations with Mental Health Vary by Activity and Gender*, 56 Soc. Psychiatry & Psychiatric Epidemiology 2017 (2021).

[17] Holly Scott et al., *Social Media Use and Adolescent Sleep Patterns: Cross-Sectional Findings from the UK Millennium Cohort Study*, 9 BMJ Open 1 (2019); Garrett Hisler et al., *Associations Between Screen Time and Short Sleep Duration Among Adolescents Varies by Media Type: Evidence from a Cohort Study*, 66 Sleep Med. 92 (2020).

512.     Such sleep interference in turn causes or exacerbates symptoms of depression and anxiety.[18] Lack of sleep also has negative physical effects, including interfering with the antibody response to vaccines.[19]

513.     These physical and mental harms are particularly acute for young users, who are less able to self-regulate the time they spend on social media platforms. When companies like Meta design platforms to exploit young users' psychological vulnerabilities, the harms are compounded. Researchers call this a positive feedback loop: those who use social media habitually are less able to regulate their behavior; that habitual use, in turn, can lead back to more social-media use; and restarting the cycle, that additional use makes it even harder to regulate the problematic behavior.[20]

514.     Young users are at a formative stage of development where they are both especially vulnerable to excessive social media use and especially sensitive to its ensuing impacts. Research indicates that going through puberty while being a heavy social media user interferes with a sensitive period for social learning.[21] Heavy use of social media in this sensitive developmental period can have negative impacts on long-term life satisfaction.[22]

---

[18] Megan A. Moreno & Anna F. Jolliff, *Depression and Anxiety in the Context of Digital Media*, *in* Handbook of Adolescent Digital Media Use and Mental Health 227 (2022); *see also, e.g.,* Huges Sampasa-Kanyinga et al., *Use of Social Media is Associated With Short Sleep Duration in a Dose-Response Manner in Students Aged 11 to 20 Years*, 107 Acta Paediatrica 694, 694-700 (2018).

[19] Karine Spiegel et al., *A Meta-analysis of the Associations Between Insufficient Sleep Duration and Antibody Response to Vaccination*, 33 Current Biology 998 (2023).

[20] Maria T. Maza et al., *Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development*, 177 JAMA Pediatrics 160 (2023).

[21] *See, e.g.*, Amy Orben et al., *Windows of Developmental Sensitivity to Social Media*, 13 Nature Comm. 1649 (2022).

[22] *Id.*

515.     Young users—who are particularly attuned to FOMO—often feel an extra need to be connected at night and frequently wake up throughout the night to check social media notifications.[23] Socializing at night makes it harder for young users to sleep.[24]

516.     Young users who use social media for more than five hours per day are three times more likely than non-users to not sleep enough,[25] contributing to associated physical and mental health impacts.

517.     Children who use social media for more than five hours per day are many times more likely to have clinically relevant symptoms of depression than non-users.[26]

---

[23] Anushree Tandron et al., *Sleepless Due to Social Media? Investigating Problematic Sleep Due to Social Media and Social Media Sleep Hygiene*, 113 Computers in Human Behavior 106487 (2020).

[24] Regina J.J.M. van den Eijnden et al., *Social Media Use and Adolescents' Sleep: A Longitudinal Study on the Protective Role of Parental Rules Regarding Internet Use Before Sleep*, 18 Intl. J. Envtl. Res. Pub. Health 1346 (2021).

[25] Sampasa-Kanyinga et al., *supra* note 18; *see also* Marian Freedman & Michael G. Burke, *Social Media and Sleep Duration-There Is a Connection!*, 35 Contemp. Pediatrics J. (2018).

[26] Twenge & Farley, *supra* note 16.

518.    Beginning with Instagram's rise in popularity in 2012, the Centers for Disease Control and Prevention (CDC) observed in its Youth Risk Behavior Study the percentage of high school students "who experienced persistent feelings of sadness or hopelessness" skyrocket over the subsequent decade.[27]



519.    Over this same time period, there has also been an increase in youth hospitalization rates for suicidal ideation and suicide attempts. In 2008, prior to the rise of Instagram, hospital visits for suicidal ideation and attempts represented only 0.66% of visits among all age ranges. By 2015, as Instagram's popularity grew, that share had almost doubled, with suicidal ideation and attempts accounting for 1.82% of all visits, with the highest rates of increase among youth ages 12 to 17 years old.[28]

---

[27] *Youth Risk Behavior Survey, Data Summary & Trends Report: 2011-2021*, at 61, Ctrs. for Disease Control & Prevention (2023), archive.ph/NYuQX.

[28] Gregory Plemmons et al., *Hospitalization for Suicide Ideation or Attempt: 2008-2015*, 141 Pediatrics 1, 4-5 (2018); *see also* Brett Burstein et al., *Suicidal Attempts and Ideation Among Children and Adolescents in US Emergency Departments, 2007-2015*, 173 JAMA Pediatrics 598, 598-600 (2019).



**Figure.  Associated Changes in Pediatric Emergency Department (ED) Visits for Suicide Attempts (SA) and Suicidal Ideation (SI)**

For children age 5 to younger than 18 years and overall pediatric emergency department visits for all children age younger than 18 years over time. Error bars indicate 95% CI.

520.    The youth mental health crisis fueled by social media platforms has been particularly detrimental for girls and young women.

521.    Immediately before Instagram's rise in popularity and usership, major predictors for the mental health well-being of U.S. girls and young women were stable or trending down.

85

1   522. Beginning with Instagram's rise in popularity in 2012, however, the rates of

2 suicides, self-poisonings, major depressive episodes, and depressive symptoms among girls and

3 young women jumped demonstrably.[29]



FIGURE 1. Indicators of poor mental health among U.S. girls and young women, 2001–2018[a]

[a] Standard deviations are within means at the generational level, not at the individual level, and thus should not be used to calculate individual-level effect sizes.
[b] Source: Centers for Disease Control and Prevention. Suicide rates among 12- to 14-year-old girls.
[c] Source: Spiller et al. (14). Self-poisoning among 13- to 15-year-old girls.
[d] Source: Twenge et al. (11). Major depressive episode among 14- to 15-year-old girls.
[e] Sources: Keyes et al. (8) and Twenge et al. (9). Depressive symptoms among eighth-grade girls.

16   523. Particularly concerning is the rise of suicidal ideation among girls over the time

17 period that Instagram has surged. According to the CDC's Youth Risk Behavior Survey, in 2011,

18 19% of high school girls seriously considered attempting suicide. By 2021, that figure reached

19 30%:[30]

---

26   [29] Jean Twenge, *Increases in Depression, Self-Harm, and Suicide Among U.S. Adolescents After 2012 and Links to Technology Use: Possible Mechanisms*, 2 Psychiatric Res. Clinical Prac. 19 (2020).

   [30] *Youth Risk Behavior Survey*, *supra* note 27.



524.    This increase in suicidal ideation among girls has been matched by an increase in suicide attempts. In just the one decade of Instagram's rising popularity, there was a 30% increase in the rate of high school girls who attempted suicide: [31]

---

[31] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12



13   525.    Increased rates of suicidal ideation and attempts have led to an overall higher rate

14   of completed suicide among young girls. Indeed, in 2013 alone—the year after Instagram's surge

15   in popularity among young users—the suicide rate for 13-year-old girls jumped by around 50%.[32]

16   526.    This youth mental health crisis fueled by social media platforms like Instagram

17   only stands to worsen. The COVID-19 pandemic has exacerbated excessive social media use. The

18   increase in consumption of digital and social media by young users during this time is linked to

19   an increase in "ill-being" and media addiction.[33] ████████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████

22   527.    Meta is not only fully aware that the worsening youth mental health crisis is fueled

23   by social media platforms, but has long known that its Platforms are directly contributing to this

24   crisis.

25

26   _____

27   [32] Haidt & Twenge, *supra* note 14, at 316.

28   [33] Laura Marciano et al., *Digital Media Use and Adolescents' Mental Health During the Covid-19 Pandemic: A Systematic Review and Meta-Analysis,* 9 Front Pub. Health 793868 (2021).



529.    Meta's design choices and practices take advantage of and contribute to young users' susceptibility to addiction. They exploit psychological vulnerabilities of young users through the false promise that meaningful social connection lies in the next story, image, or video and that ignoring the next piece of social content could lead to social isolation.

531.    Meta has conducted detailed internal research that demonstrates the mental health impacts of its Platforms on young users, notably a "Teen Mental Health Deep Dive" that surveyed over 2,500 young users in the U.S. and U.K.

532.    Through this "Teen Mental Health Deep Dive," Meta identified that young users are coping with a variety of emotional issues, including not having "enough friends" or having friends "who aren't really their friends" (52%), having "to create a perfect image" and not being "honest about feelings" (67%), wanting to "hurt [or] kill themselves" (14%), feeling "down, sad, []depressed[,] [a]lone, or lonely (62%), and feeling "not good enough [or] [a]ttractive" (70%).

533.    The broad takeaway from Meta's "Teen Mental Health Deep Dive" was that "[s]ocial media amplifies many of the age-old challenges of being a teenager. The always-on nature of social media means that teens' social lives have infiltrated into every part of life without

1  a break."

2

3      534.    Meta has found that Instagram specifically impacted young users, with one in five

4  teens stating that Instagram makes them feel worse about themselves.

5      535.    Elaborating further,            teens responded that Instagram use led to them

6  feeling "not good enough," with                                        24%

7  reporting the feelings started on Instagram.

8      536.    Meta knows that "[t]eens blame Instagram for increases in the rates of anxiety and

9  depression among teens." Instagram's deliberate design features, such as "comparisons of

10  followers and like counts," exploit teens' vulnerability to social comparison, creating a negative

11  feedback loop that leads to mental health harm including self-esteem, anxiety, and insecurity

12  issues.

13      537.    Meta also knows that although "young people are acutely aware that Instagram can

14  be bad for their mental health," they feel "compelled to spend time on the app" because Meta has

15  designed its Platforms to exploit young users' "fear of missing out on cultural and social trends."

16      538.    These problems are not confined to Instagram but implicate Facebook as well.

17  When Facebook was rolled out to college campuses from 2004 to 2006, researchers compared the

18  rollout at particular colleges to the subsequent mental health of those colleges' students. After

19  Facebook arrived on campus, students at the college suffered from worse mental health: they used

20  mental-healthcare services more, their academic performance suffered, and so did their job

21  prospects.[34]

22

23

24

25

26

27  _____
     [34] *See* Press Release, MIT Sloan School of Management, Academic Study Reveals New
28  Evidence of Facebook's Negative Impact on the Mental Health of College Students (Sept. 27,
     2022), http://archive.today/tv6Ff.



Complaint for Injunctive and Other Relief



552.     As Meta's Platforms disturb sleep, fuel adverse mental health consequences, facilitate social comparison, cause anxiety, and fail to prevent bullying and harassment, this combination has a dangerous effect on young users.

562.     Similarly, even though Meta knows that its Platforms are harmful to teenagers' mental health, Meta externally characterizes Instagram as a source of support for teens struggling with thoughts of suicide and self-injury and mental health issues generally, including in Mosseri's December 8, 2021 congressional testimony.

564.     Meta takes great effort to distance itself from the reality that Meta's Platforms are harmful for teen mental health. For example, when M.R., a 14-year-old, committed suicide after being exposed to suicide and self-injury content on Instagram, Meta sent an executive to a U.K. coroner's court to deny that its Platform played any role in M.R.'s suicide—

94

565.    During an official inquest investigating the role that social media platform content played in M.R.'s death, and as reported by the Guardian on September 30, 2022, a Meta executive said that such content was "safe" for children to see. The coroner rejected this claim, finding instead in his October 13, 2022 report that M.R. "died from an act of self-harm whilst suffering from depression and the negative effects of on-line content" that she had not sought out, but that the Platforms' algorithms had pushed on her.

566.    The coroner's inquest report continued:

> The platform operated in such a way using algorithms as to result, in some circumstances, of binge periods of images, video clips and text some of which were selected and provided without requesting them. These binge periods . . . are likely to have had a negative effect on [M.R.] . . . In some cases, the content was particularly graphic, tending to portray self-harm and suicide as an inevitable consequence of a condition that could not be recovered from. The sites normalised her condition focusing on a limited and irrational view without any counterbalance of normality.

567.    The coroner further observed that "[t]here was no age verification when signing up to the on-line platform" and that M.R.'s parents "did not have access, to the material being viewed or any control over that material." Unsurprisingly, M.R. was under the age of 13 when she began using Instagram.



96

574.    Meta similarly downplayed the issue of compulsive use on its Platform.

575.    In addition to downplaying statements about the harms of its Platforms, Meta also mischaracterizes platform features as helpful to well-being when in fact they are designed to fail.

576.    To illustrate, Meta knows that its features contribute to teens struggling with the amount of time they spend on Meta's Social Media Platforms such as Instagram. Meta researchers noted that "[t]eens talk about the amount of time they spend on Instagram as one of the 'worst' aspects of their relationship to the app." Meta researchers observed that in conversations, teens had "an addicts' narrative about their use" and "wish[ed] they could spend less time caring about it, but they can't help themselves."

577.    While Meta adopted so-called "time management" tools, in reality, those tools cannot effectively counteract the overwhelming power of features like infinite scroll, autoplay, and other use-inducing features.

578.    In 2018, Meta launched "Daily Limit," a feature it claimed would enable users to restrict the amount of time they spend on Instagram each day. Despite the feature's name, it does not enable users to restrict the amount of time they spend on the app.

579.    Instead, Daily Limit serves a pop-up notification whenever a user reaches the maximum amount of time they wish to spend on Instagram each day. But this feature was designed so that the user can easily dismiss the notification and return to using Instagram unimpeded.

580.    Moreover, the Daily Limit pop-up notification invites the user to reconsider their preferred time limit. Upon information and belief, similar to nudges described above (where, if a user turns their notifications off, Meta nudges the user to turn notifications back on), Meta

designed the Daily Limit feature to regularly tempt users, especially young users, to revert to harmful, time-maximizing settings each and every time the user reaches their chosen limit.

581.    In December 2021—just one day before Mosseri was scheduled to appear before Congress, and shortly after a whistleblower thrust the well-being issues Meta causes teens onto the national stage—Instagram launched the "Take a Break" tool. Take a Break sends users a pop-up notification when they have spent more than a specified period of time scrolling without interruption.

582.    As with the Daily Limit notification, the Take a Break notification is easily dismissed for a quick return to more infinite scrolling.

584.

Once the whistleblower report was no longer front-page news, Meta further watered down the Daily Limit tool: while users could initially select a Daily Limit as low as ten minutes, in February 2022, Meta quietly raised the minimum to 30 minutes.

1

2

3       588.   In designing its Daily Limit and Take a Break features, Meta could have provided

4   young users with robust tools that, once enabled, empowered young users to effectively self-

5   regulate their use of Meta's Social Media Platforms.

6       589.   But instead of being able to *set it and forget it*, young users who make what can be

7   a difficult choice to limit their daily use or take a break must make this difficult decision over and

8   over again. Meta's design choices make the proverbial wagon that much easier for young users to

9   fall off.

10       590.   Upon information and belief, Meta does so because it does not want its users to

11   avail themselves of tools that could help protect them from the addictive nature of Meta's

12   Platforms.

13       591.   Moreover, Meta has repeatedly made misleading statements regarding its own

14   internal research on user harms on its Platforms.

15       592.   For example, Meta claims that it conducts research to make its Platforms safer for

16   teens. During congressional testimony on September 30, 2021, Davis stated that "we conduct this

17   research [about young people's experiences on Instagram] . . . to minimize the bad and maximize

18   the good."

19

20

21       593.   As another example, in August 2021, Senators Richard Blumenthal and Marsha

22   Blackburn wrote to Zuckerberg with detailed questions concerning the nature and findings of

23   Meta's research on "the effects of social media platforms on kids' well-being." The senators

24   specifically asked whether Meta's research had "ever found that its platforms and products can

25   have a negative effect on children's and teens' mental health or well-being." Meta's letter in

26   response failed to disclose its own studies demonstrating that the answer was yes.

27

28

99

594.    Beginning in September 2021, the Wall Street Journal published a series of articles based on documents leaked by whistleblower Haugen, which detailed Meta's knowledge of the harms associated with using Meta's platforms.

595.    Meta—at the direction of its highest officers—publicly downplayed the results of the company's own research. Meta criticized its researchers' methods and conclusions, and the company crafted statements that sidestepped the negative experiences that its research showed many teen users—especially teen girls—had on its platforms.

596.    For instance, in a September 26, 2021, blog post, Meta's Vice President of Research Pratiti Raychoudhury suggested that some of the presentations relied upon by the Wall Street Journal used "shorthand language . . . and d[id] not explain the caveats on every slide" because they were "created for and used by people who understood the limitations of the research."

the Hard Life Moments research—which revealed that some Instagram users experiencing certain mental health struggles believed the Platform exacerbated those issues—

598.    Meta's response to the articles also contained misleading statements about the substance of the research. Raychoudhury's September 26, 2021, post claimed that "research shows that on 11 of 12 well-being issues, teenage girls who said they struggled with those difficult issues also said that Instagram made them better rather than worse."

600.     More broadly, and as the New York Times reported in October 2021, Meta's external response to the leaks "angered some employees who had worked on the research." As one researcher noted, the company was in effect "making a mockery of the research."



604.     Yet, on September 30, 2021, when Senator Blackburn asked Davis in a congressional hearing how Meta was "restricting access to data internally" and whether Meta's "policies changed since the Wall Street Journal articles," Davis responded, "not that I'm aware of certainly."

605.     Meta knows that its Social Media Platforms caused, and continue to cause, harm to young users.

607.    Nevertheless, Meta repeatedly failed to implement changes over the years to address these ongoing harms.

608.    In 2017, Facebook's former Vice President for User Growth publicly stated that he prohibits his own children from using Facebook, and Meta researchers wrote in a public post that they were "worrie[d] about [their] kids' screen time."

611.    Instead of listening to its employees' concerns and prioritizing user well-being and safety, Meta disbanded its responsible innovation team, which was devoted to addressing "the potential downsides of its products."



Complaint for Injunctive and Other Relief



Complaint for Injunctive and Other Relief



629.

Bejar, former Meta Director of Site Integrity and former consultant to Meta, testified in 2023 that Zuckerberg ignored his appeals for Meta to prioritize user well-being and engage in a "culture shift" to ensure teen safety on its Platforms. As Bejar further testified, Meta "know[s] about harms that teenagers are experiencing in its product, and they're choosing not to engage about it or do meaningful efforts around it."

630.    Despite the direct, personal experience of Meta's employees of the harms of Meta's design and features, Meta's own internal studies documenting the harmful effects of these features, the opinions of many external experts and whistleblowers, and the voices of Meta's young users themselves ███████████████████████████ Meta has persisted in developing and deploying features that exploit young users' psychological vulnerabilities and significantly harm young users in its pursuit of profit.

## IX.    META'S COPPA NONCOMPLIANCE

631.    The Children's Online Privacy Protection Act of 1998 (COPPA) protects the privacy of children by requiring technology companies like Meta to obtain informed consent from parents prior to collecting the personal information of children online.

632.    Meta routinely violates COPPA in its operation of Instagram and Facebook by collecting the personal information of children on those Platforms without first obtaining (or even attempting to obtain) verifiable parental consent, as required by the statute.

105

**A.      COPPA requires Meta to obtain verifiable parental consent for Instagram and Facebook users under the age of 13.**

633.    COPPA prohibits social media companies like Meta from collecting personal information from children without first obtaining verifiable parental consent if: (a) the operator of the social media platform has actual knowledge that it is collecting personal information from a child; or (b) the operator's service is directed to children. 15 U.S.C. § 6502(a)(1).

634.    Meta's operation of Instagram and Facebook is subject to COPPA's verifiable parental consent requirement under both of the two statutory triggers: (a) Meta routinely obtains actual knowledge that users on Instagram and Facebook are under 13 years old; and (b) Meta targets children as users of Instagram and Facebook, making the Platforms directed to children. *See* 16 C.F.R. § 312.2.

635.    The term "child" is defined by 15 U.S.C. § 6501(1) to mean an individual under the age of 13. The terms "child," "children," "under-13 user(s)," "U13 users," and "child-users" herein refer to children under the age of 13.

636.    "Verifiable parental consent" requires, at a minimum, providing a child's parent with notice of Meta's "personal information collection, use, and disclosure practices" and further requires Meta to obtain the parent's authorization for Meta to collect, use, or disclose the child's information. Both of these requirements must be completed before Meta may collect a child's information. 15 U.S.C. § 6501(9).

637.    Meta does not obtain—or even attempt to obtain—verifiable parental consent before collecting the personal information of children on Instagram and Facebook. "Personal information" is defined by statute and regulation to mean "individually identifiable information about an individual collected online," including the child's name, address, email address, personal identifiers, geolocation information, and photographs or videos of the child, among other categories of information. 15 U.S.C. § 6501(8); 16 C.F.R § 312.2. Meta collects personal information in these categories from all registered users of Instagram, including children.

638.    Instead of obtaining verifiable parental consent, Meta relies on Instagram's and Facebook's nominal bans on under-13 users to avoid any responsibility under COPPA to its

1    under-13 users and their parents. ██████████████████████████████

2    ██████████████████████████████████████████ Meta is not exempt from

3    COPPA.

4         639.    COPPA empowers State Attorneys General to bring suit against companies that

5    violate the verifiable parental consent requirement. COPPA permits State Attorneys General to

6    obtain injunctive relief, damages, restitution, and other relief on behalf of residents of their States.

7    15 U.S.C. § 6504(a)(1).

8         640.    COPPA also requires the FTC to promulgate regulations consistent with the

9    statute's verifiable parental consent requirement as well as the "actual knowledge [of a] child"

10   and "directed to children" statutory triggers. 15 U.S.C. § 6502(b). The FTC has promulgated such

11   regulations as the Children's Online Privacy Protection Rule. *See* 16 C.F.R. § 312.1 *et seq.*

12   (COPPA Rule) (last promulgated Jan. 17, 2013).

13        641.    Under COPPA and the COPPA Rule, Meta is subject to COPPA's "verifiable

14   parental consent" requirement—but Meta flouts its obligations under COPPA with respect to its

15   operation of Instagram and Facebook.

16       **B.    Meta does not comply with COPPA with respect to Instagram.**

17            **1.    Meta possesses actual knowledge of children on Instagram and collects**

18                 **their personal information without obtaining parental consent.**

19        642.    Meta is subject to COPPA's verifiable parental consent requirement, among other

20   reasons because it collects the personal information of users under the age of 13 on Instagram

21   despite having "actual knowledge that it is collecting personal information from [children]." 15

22   U.S.C. § 6502(a)(1).

23        643.    Publicly, for example in congressional testimony provided by Meta executive

24   Antigone Davis on September 30, 2021, Meta has downplayed its actual knowledge of under-13

25   users on Instagram by pointing out that its terms of service nominally disallow use of Instagram

26   by under-13 users—and that, in recent years, Meta has prompted users to self-report that they are

27   at least 13 years old.

28

644.     Despite Meta's efforts to avoid its responsibilities under COPPA by attempting to maintain willful ignorance of its users under the age of 13, Meta routinely obtains actual knowledge of under-13 users on Instagram.



a.

648.     Despite its public-facing claims that users under the age of 13 are not allowed on Instagram, including in congressional testimony provided by Meta executive Davis in September 2021,

108



Complaint for Injunctive and Other Relief



656.    Despite possessing actual knowledge of Instagram users under the age of 13 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Meta refuses to obtain verifiable parental consent as required by COPPA for users under the age of 13.



660.

Meta did not obtain verifiable parental consent for its ongoing collection of personal information from those users.

664.    Externally, Meta denies that it strives to attract underage users to its Platforms. For example, in September 2021, in response to a Wall Street Journal article regarding underage users on Instagram, Meta provided a written statement claiming that "[l]ike all technology companies,

111



none
none

none


of course we want to appeal to the next generation, but that's entirely different from the false assertion that we knowingly attempt to recruit people who aren't old enough to use our apps."



667.     [redacted] for their children under the age of 13 does not satisfy Meta's obligation to obtain verifiable parental consent under COPPA for the collection and use of the child's personal information. [redacted] does not provide parents with the notices required by COPPA, including notices of what personal information Meta is collecting from their children, nor does it satisfy COPPA's requirement to ensure that the person providing consent is actually the parent of the child.

669.     In this instance and many others, Meta did not meaningfully enforce its nominal age restriction on Instagram, despite its external claims to the contrary, including in Davis's

Complaint for Injunctive and Other Relief

September 30, 2021 congressional testimony, in which she stated that "we will remove [underage accounts]."

Complaint for Injunctive and Other Relief



678.     Meta collects information that identifies accounts on its various Social Media Platforms that belong to the same individual user. For example, Meta collects email addresses from users when they set up new Facebook and Instagram accounts. Meta instructs its Instagram and Facebook users to provide an email address "that only you can access." In or around September 2020, Meta released a feature called "Accounts Center," which allows users to link their accounts on Facebook, Instagram, and Messenger using a single sign on.

682.

Externally, however, Meta claimed in a July 27, 2021 post, titled "How Do We Know Someone Is Old Enough to Use

114

Our Apps?," that it used a users' age stated to either Platform to gate users' access to both Platforms.

685.     Meta deceives the public regarding its policies when underage accounts are reported. If someone reports that an account belongs to an individual under the age of 13, Meta claims on its Instagram Help Center that "we will delete the account if we can't verify the account is managed by someone over 13 years old."

Zuckerberg told Congress on March 25, 2021, "if we detect that someone might be under the age of 13, even if they lied, we kick them off."



Complaint for Injunctive and Other Relief



696.

; this research, provided by an organization called Thorn, revealed that of children ages 9-12, 45% used Facebook and 40% used Instagram daily.

In this way, Meta goes through great lengths to avoid meaningfully complying with COPPA, looking for loopholes to excuse its knowledge of users under the age of 13 and maintain their presence on the Platform.

e.    **Meta knows that Instagram's lack of effective age-gating elicits false self-reports of children's ages.**

699.    For most of its history, up until December 2019, Instagram did not require new users to disclose their age or date of birth in order to create an Instagram account. During that

117

time, Meta did not require users to take even the minimal step of self-attesting that they were over the age of 13. Instead, for over seven years, under-13 users faced no practical obstacles to creating accounts on Instagram.



702.    Eventually, in response to pressure from regulators and the public, Meta purported to implement an age gate as part Instagram's account registration process—but the term "gate" was a misnomer because it did not prevent under-13 users from creating and using Instagram accounts.

703.    To the contrary, Meta initially designed its age gate in a way that prompted all users, including children under the age of 13, to provide an age over 13. Specifically, Meta's sign-up page contained a drop-down menu that automatically generated a date and year of birth representing the user to be 13 years old. The design of the age gate signaled to children the specific date that they could affirm to advance through the registration process, even though the date automatically populated by Instagram was not their actual date of birth.

704.    Meta knew that its use of a sign-up page automatically generating a date 13 years prior to the date of registration aided under-13 users in misrepresenting their age in order to access Instagram.

705.    "[E]ncourag[ing] children to falsify their ages to gain access" is impermissible under COPPA. *See COPPA July 2020 Guidance* § H(3).[35]

706.    Meta only recently changed Instagram's sign-up page to automatically generate the instant date and year, rather than a date 13 years prior.

707.    Meta's adoption of an age gate that permits the user to enter *any* date of birth, regardless of its accuracy, still does not prevent under-13 users from using Instagram.

---

[35] *Complying with COPPA: Frequently Asked Questions*, Fed. Trade Comm'n (July 2020), https://archive.ph/PEj8q (hereinafter "July 2020 COPPA Guidance").

709.     In sum, Meta's age gate efforts for Instagram have long been ineffective: first, Instagram utilized no age gate for several years, then implemented an age gate that defaulted to an entry of ages over 13, and now uses an age gate that still depends on an under-13 user to correctly self-report their own age, without any verification.

711.     ▮▮▮▮▮▮▮▮▮▮▮▮ Nonetheless, Meta externally touts its age-gating as an effective means to keep children under the age of 13 off Instagram and Facebook.

712.     While testifying before Congress on September 30, 2021, Meta executive Davis stated: "if we see someone trying to, repeatedly, change the [birth] date to get past that [age screen], we actually will restrict their ability to access the app."

119



Complaint for Injunctive and Other Relief

723.

While Meta externally claimed that it built under-13 products for kids and tweens in a September 27, 2021 post on Instagram's website entitled "Pausing 'Instagram Kids' and Building Parental Supervision Tools,"

725.    Meta has access to, and chooses not to use, feasible alternative age verification methods that would significantly reduce or eliminate the number of underage users on Meta's Social Media Platforms, for example, by requiring young users to submit student IDs upon registration.

729.    Externally, Meta misleads the public by claiming, in a March 17, 2021 post on Instagram's website, that "we know that young people can lie about their date of birth. We want to do more to stop this from happening,"

730.    Rather than excluding under-13 users from Instagram, Meta could alternatively comply with COPPA by obtaining informed parental consent after providing notice to parents of its intent to collect and use children's personal information. Meta chooses not to do so.

731.    Despite knowing that its lack of age gates and later implementation of minimal age gate designs have allowed users under age 13 onto Instagram, Meta does not obtain verifiable parental consent before collecting the personal information of those users who routinely register for, and provide their personal information to, Instagram.

        **f.**

737.

Meanwhile, Meta publicly maintains that it does not allow under-13 users on its Platforms, relying primarily on its faulty age-collection at sign-up.

743.    Meta externally claimed, through congressional testimony provided by Mosseri on December 8, 2021, that "we train our technology to identify if people are above or below 18 using multiple signals,"—including birthday posts—and that Meta is building new technology to do the same for users under 13. ███████████████████████████████████

744.    Former Meta Director of Site Integrity and former consultant to Meta Bejar testified that Meta does not meaningfully utilize birthday posts to identify users who claim to be over 13 years old but are not. In fact, Meta's internal reporting mechanism for using birthday posts is complicated which prevents most reports from reaching "completion," or the point where a person successfully submits a report to Instagram.

745.    Despite Meta's actual knowledge, acquired through its possession and review of estimated age data and/or acquired through other sources, that Meta collects personal information of users under the age of 13 in the ordinary course of its operations, Meta does not obtain verifiable parental consent for under-13 users.

**2.      Instagram is "directed to children."**

746.    Independent of Meta's "actual knowledge" of users under age 13, Meta is also subject to COPPA's verifiable parental consent requirement because Instagram, or a portion thereof, is "directed to children." *See* 15 U.S.C. § 6502(a)(1); 16 C.F.R. § 312.2.

747.    The FTC promulgated regulations implementing Section 6502(b) of COPPA, including 16 C.F.R. § 312.2, which defines website or online service "directed to children" as one "that is targeted to children." The regulation lists factors for determining whether an online

service, or a part thereof, is directed to children and therefore subject to the statute's "verifiable parental consent" requirement. These factors include:

> subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable empirical evidence regarding audience composition, and evidence regarding the intended audience.

16 C.F.R. § 312.2.

748.    An online service is "directed to children" if it "targets children as one of its audiences - even if children are not the primary audience."[36] Even if a website claims to target teenagers or adults, "in reality, [the] site may attract a substantial number of children under 13, and thus may be considered [to be] . . . 'directed to children' . . . ."[37]

749.    Under COPPA and applicable regulations, Instagram is "directed to children" considering the following facts: (1) Instagram's "audience composition" includes millions of users under the age of 13; (2) advertising that promotes Instagram and appears on Instagram is directed to children; (3) Meta's design of the Instagram registration process allows children to use Instagram; ██████████████████████████████████████████████████████ ██████ (5) subject matter, characters, activities, music, and other content on Instagram are child-oriented; and (6) models and celebrities on Instagram are children and/or child-oriented.

### a.    Instagram's audience composition includes millions of users under the age of 13.

750.    Under 16 C.F.R. § 312.2, empirical evidence regarding audience composition is relevant to determining whether an online service, or a portion thereof, is directed to children. ██████████████████████████████████████████████████████ ████████████████████████████

---

[36] July 2020 COPPA Guidance, *supra* note 35.

[37] *Id.*



755.    There are millions of under-13 users on Instagram today.

756.    The sheer number of under-13 users of Instagram composing Instagram's audience demonstrates that Instagram is, in fact, targeted to children.

757.    On information and belief, Meta possesses competent and reliable empirical evidence, and such evidence is corroborated by external sources, reflecting the generally known fact that there are millions of under-13 users on Instagram.

   **b.    Advertising that promotes Instagram and appears on Instagram is directed to children.**

758.    Under 16 C.F.R. § 312.2, whether "advertising promoting or appearing on . . . the online service is directed to children" is relevant to determining whether an online service, or a portion thereof, is directed to children.

759.    Meta's ads promoting Instagram feature and are directed to children—and ads that Meta hosts on Instagram are also child-directed.

760.     Meta has published advertising campaigns for Instagram featuring actors who appear to be children or teens, as shown in the below screenshot from a television commercial for Instagram that aired in April 2023:



761.     Meta also posted an advertisement for Instagram on YouTube in October 2021, featuring one or more individuals who appear to be children or teens, as depicted in the following screenshot:

762.     These advertisements and others by Meta related to Instagram were directed to children and teens and featured individuals who appeared to be children or teens.

763.    And Meta displays advertisements within Instagram that feature children and are directed to children.

764.    For example, according to Meta's Ad Library website, an advertisement promoting the children's television show "Dinosaur Train" and the "PBS KIDS Prime Video Channel" was run on Instagram and Facebook in July 2023, as depicted in the following screenshot:



765.    Also according to Meta's Ad Library website, an advertisement featuring children's cartoon characters "the Minions" was run on Instagram in July 2023, as depicted in the following screenshot:

128

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



17   766.   Meta's practice of hosting advertisements targeting children is another way that
18 Instagram is directed to children.

19           **c.   Meta's design of the Instagram registration process allows children**
20                **under 13 to use Instagram.**

21   767.   As set forth in detail above, Instagram first utilized no age gate for several years,
22 then implemented an age gate that defaulted to a user age of 13 or above, then implemented an
23 age gate that depends on children to self-report their own age. Meta is aware that because of these
24 intentional design choices, under-13 users routinely supply a false date of birth when registering
25 for Instagram.

26   768.   Meta has access to, and chooses not to use, alternative feasible age verification
27 methods that would significantly reduce or eliminate the number of underage users on Meta's

28

1    Social Media Platforms, for example, by requiring young users to submit student IDs upon

2    registration.

3          769.    Instagram's decision not to use effective age verification that would exclude

4    under-13 users is one way that it effectively targets and welcomes under-13 users onto the

5    Platform.

6          770.    Because Meta does not effectively exclude users under the age of 13 from

7    Instagram, Meta's external narrative regarding its COPPA compliance and age verification is

8    misleading, including inaccurate public statements by Zuckerberg himself. ████████████

9    ████████████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████████████

11   ████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████

13   ████████████████████████████████████████████

14          **d.     Users under age 13 are an "intended audience" of Instagram.**

15         771.    Under 16 C.F.R. § 312.2, "evidence regarding the intended audience" of an online

16   service is relevant to determining whether an online service, or a portion thereof, is directed to

17   children. A platform is "directed to children" if it targets children as "one of its audiences—even

18   if children are not the primary audience."[38]

19   ████████████████████████████████████████████████████████████████

20   ████████████████

21   ████████████████████████████████████████████████████████████

22   ████████████████████████████████████████████████████████████████

23   ████████████████████████████████████████████████████████████████

24   ████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████

26

27
_____

28         [38] July 2020 COPPA Guidance, *supra* note 35.



778.    Gen Alpha is the generation with birth years beginning in the 2010s (in 2020, this would have included children aged 10 and under).

Complaint for Injunctive and Other Relief

787.    At times, Meta even publicly acknowledges that focusing on Instagram users under age 13 is a part of its business strategy.

788.    For example, in September 2018, Meta released a "guide" for parents, urging them to allow their children to join Instagram, lest the children risk "social marginalization."

Commentators noted that the guide suggested that children under the age of 13 already use

Instagram

792.   Despite its widespread efforts to secure the market of users under the age of 13, externally, Meta denies that it designs Instagram to appeal to children; for example, Davis testified to Congress on September 30, 2021 that Meta's Platforms are not designed for children 12 and under.

793.   Meta's communications expressing its intent to reach under-13 users are one way that it reveals itself to be "directed to children."

     **e.**  **Subject matter, characters, activities, music, and other content on Instagram are child-oriented.**

794.   Under 16 C.F.R. § 312.2, "subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content" are relevant to determining whether an online service, or a portion thereof, is directed to children.

795.   Instagram publicly hosts thousands of accounts and pages on its Platform that include child-oriented subject matter, characters, activities, music, and other categories of content for children.

796.    To list only a few representative examples, Meta has admitted that it hosts the following accounts or pages on Instagram. Each such account or page on Instagram is child-oriented because it hosts images and videos relating to a character, product, or brand that is specially made for and/or marketed to children:

| Instagram Page | URL |
| --- | --- |
| Bluey | https://www.instagram.com/officialblueytv/ |
| DC Super Hero Girls | https://www.instagram.com/dcsuperherogirls/ |
| Disney Junior | https://www.instagram.com/disneyjunior/ |
| Dr. Seuss | https://www.instagram.com/drseuss/ |
| Dragon Ball Super | https://www.instagram.com/dragonballsuper/ |
| Hasbro | https://www.instagram.com/hasbro/ |
| Hello Kitty | https://www.instagram.com/hellokitty/ |
| Hot Wheels | https://www.instagram.com/hotwheelsofficial/ |
| JoJo Siwa | https://www.instagram.com/itsjojosiwa/ |
| Lego | https://www.instagram.com/lego/ |
| Mickey Mouse | https://www.instagram.com/mickeymouse/ |
| Miraculous Ladybug | https://www.instagram.com/miraculous/ |
| Monster High | https://www.instagram.com/monsterhigh/ |
| My Little Pony | https://www.instagram.com/mylittlepony/ |
| Nick Jr. | https://www.instagram.com/nickjr/ |
| Nickelodeon | https://www.instagram.com/nickelodeon/ |
| Paddington Bear | https://www.instagram.com/paddingtonbear/ |
| Patrick Star | https://www.instagram.com/officialpatrickstar/ |
| PAW Patrol | https://www.instagram.com/pawpatrol/ |
| PBS Kids | https://www.instagram.com/pbskids/ |
| Peppa Pig | https://www.instagram.com/officialpeppa/ |
| Pokemon | https://www.instagram.com/pokemon/ |

| | |
|---|---|
| Rugrats | https://www.instagram.com/rugrats/ |
| Sesame Street | https://www.instagram.com/sesamestreet/ |
| Sonic the Hedgehog | https://www.instagram.com/sonicthehedgehog/ |
| SpongeBob SquarePants | https://www.instagram.com/spongebob/ |
| Teenage Mutant Ninja Turtles | https://www.instagram.com/tmnt/ |
| Thomas & Friends | https://www.instagram.com/thomasandfriends/ |
| Transformers | https://www.instagram.com/transformersofficial/ |

797.    These and thousands of other child-oriented parts of Instagram are "a part []of" an online service that "is directed to children."[39]

798.    Meta's maintenance and/or promotion of thousands of child-oriented pages on Instagram is one of the ways that Meta causes Instagram to be "directed to children."

**f.    Models and celebrities on Instagram are children and/or child-oriented.**

799.    Under 16 C.F.R. § 312.2, the "age of models, presence of child celebrities, [and] celebrities who appeal to children" are relevant to determining whether an online service, or a portion thereof, is directed to children.

800.    Meta hosts, maintains, and promotes thousands of accounts on Instagram that are dedicated to displaying images and videos of child models, child celebrities, and other child-oriented celebrities.

801.    As a representative example, Instagram currently hosts the Instagram account of JoJo Siwa, a popular celebrity among tweens. JoJo Siwa is now over the age of 13 but she has maintained an active public Instagram account since she was approximately 8 years old.

802.    When confronted with evidence that JoJo Siwa—then and now a popular celebrity among tweens—had been active on Instagram since she was eight years old, and had Instagram followers who were minors, Mosseri's response was: "I don't want to hear it."

_____
[39] *See* 16 C.F.R. § 312.2.

803.    Thousands of pages on Instagram feature child celebrities and child-oriented celebrities which are directed to children.



**3.     Meta does not obtain verifiable parental consent before collecting personal information from users under the age of 13 on Instagram.**

806.    Despite Meta's "actual knowledge" of under-13 users and the fact that Instagram is "directed to children," Meta does not obtain verifiable parental consent, as required by COPPA, before collecting the personal information of its child users.

807.    To obtain verifiable parental consent, Meta would need to (1) first provide notice to the parent of the company's "personal information collection, use, and disclosure practices," then (2) obtain the parent's authorization for the company to "collect[], use, and disclos[e], as applicable . . . personal information and the subsequent use of that information"—all in conformity with the COPPA regulations and all prior to the child's information being collected. 15 U.S.C. § 6501(9).

808.    On information and belief, Meta does not provide sufficient notice on its Instagram websites or Platform, through a prominently posted link or directly to parents, about what information it collects from children, how it uses such information, its disclosure practices, and parents' rights to review or delete their children's information.

810.   Meta nonetheless collects "personal information" from all registered users of Instagram, including all users under the age of 13 on Instagram, without first obtaining verifiable parental consent.

811.   Meta collects "personal information" of children through Instagram including, but not limited to, geolocation information, persistent identifiers of the child, unique device identifiers, photos and videos of the child, and other individually identifiable information about each user under the age of 13.

**C.    Meta does not comply with COPPA with respect to Facebook.**

812.   Under COPPA, Meta is also required to obtain verifiable parental consent with respect to users under the age of 13 on Facebook including because (1) Meta has "actual knowledge" of under-13 users on Facebook; and (2) Facebook, or a portion thereof, is directed to children.

**1.    Meta has actual knowledge of users under age 13 on Facebook.**





819.    Meta is also aware that its registration process for Facebook does not prevent users under the age of 13 from creating Facebook accounts—and that it allows them onto the Platform despite nominally prohibiting them.

**2.    Facebook is "directed to children."**

822.    Upon information and belief, Facebook is "directed to children" and because Facebook maintains and promotes thousands of pages and accounts that are child-oriented.

138

828.    Additionally, thousands of Facebook pages and accounts are child-oriented, including because they feature child-oriented subject matter, characters, activities, and music, as well as child models, child celebrities, and celebrities who appeal to children.

829.    And Meta has published advertising campaigns designed to encourage more children to use its Social Media Platforms like Facebook. Meta touts the alleged safety of those Platforms. In a recent television ad, Meta claimed that it "build[s] technology that gives you more

control and helps keep you safe" including through "tools that can protect—so you can connect." This advertisement featured children, as shown in the screenshot below:



830.    Similarly, Meta permits advertisements to be displayed within Facebook that feature children and are directed to children.

831.    According to Meta's Ad Library website, an advertisement promoting the PBS Kids television show "Wild Kratts" and the "PBS KIDS Prime Video Channel" was run on Facebook in July 2023, as depicted in the following screenshot:

Complaint for Injunctive and Other Relief

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15



16    832.    Because Facebook is targeted to children, Meta is required to obtain verifiable

17    parental consent for its collection of personal information from users under the age of 13.

18         **3.    Meta does not obtain verifiable parental consent before collecting personal**

19             **information from users under age 13 on Facebook.**

20    833.    Despite being required under COPPA to obtain verifiable parental consent, Meta

21    does not obtain—or even attempt to obtain—verifiable parental consent before collecting the

22    personal information of children on Facebook.

23    834.    On information and belief, Meta also does not provide sufficient notice on its

24    Facebook websites or Platform, through a prominently posted link or directly to parents, about

25    what information it collects from children, how it uses such information, its disclosure practices,

26    and parents' rights to review or delete their children's information.

27

28

835.    The "personal information" of children collected by Meta through Facebook includes, but is not limited to, geolocation information, persistent identifiers of the user, unique device identifiers, photos and videos of the children, and other individually identifiable information about each child-user.

## X.    META CONTINUES TO EXPAND AND INTRODUCE NEW PLATFORMS

836.    Meta has indicated ████████████████ that it plans to expand its presence in the Virtual Reality (VR) arena.

837.    Virtual Reality is a new way to interact with computers wherein a user's body is virtually placed into a 3D digital world that they can control by moving their body as though in the real world.

838.    Meta first ventured into virtual reality when, in 2014, it purchased VR headset manufacturer Oculus. Meta has since developed a flagship VR Social Media Platform called "Horizon Worlds."

839.    In May 2022, the organization SumOfUs (now called Eko), released a report documenting the harms it found on Horizon Worlds, including harassment and abuse.

840.    On March 8, 2023, the Center for Countering Digital Hate published a report about bullying, sexual harassment of minors, and harmful content on Horizon Worlds.

841.    As of April 2023, Meta made Horizon Worlds available to young users between the ages of 13 to 17.

842.    The Filing States have attempted to investigate Meta's actions in the VR space, specifically by issuing Civil Investigative Demands on June 7, 2023, requesting information about minors on Horizon Worlds, including users under age 13.

843.    To date, Meta has not responded to the Filing States' requests for information and documents on this topic.

844.    Upon information and belief, Meta is developing and deploying new features on its nascent virtual reality Platforms such as Horizon Worlds, which users may link to their accounts on Facebook and Instagram.

845.     Upon information and belief, Meta's conduct in the VR space may create harm to minors such that it constitutes violations of states' consumer protection laws and yield further violations under COPPA.

## XI.     SUMMARY OF META'S DECEPTIVE AND UNFAIR OR UNCONSCIONABLE ACTS AND PRACTICES

### A.     Deceptive Acts and Practices

846.     Meta engaged in the following deceptive acts and practices, with the intent that consumers rely on the deceptive acts and practices:

a.  Meta misrepresented, directly or indirectly, expressly or by implication, that its Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed;

b.  Meta misrepresented, directly or indirectly, expressly or by implication, that its Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality;

c.  Meta misrepresented, directly or indirectly, expressly or by implication, through the publication of CSER reports and █████████████████████████ ████████████████████, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

d.  Meta misrepresented, directly or indirectly, expressly or by implication that it prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms;

e.  Meta misrepresented, directly or indirectly, expressly or by implication that Meta prevents under-13 users from using Instagram and/or Facebook when in fact Meta was aware that it does not prevent under-13 users from using Instagram and Facebook;

f.  Meta misrepresented, directly or indirectly, expressly or by implication that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data;

g.  Meta has made other false and deceptive representations, including as set forth in paragraphs 1 through 835.

**B.      Unfair and/or Unconscionable Acts and Practices**

847.    Meta engaged in unfair and unconscionable acts and practices, including the following unfair and/or unconscionable acts and practices, in connection with young users' use of and/or addiction to Meta's Social Media Platforms:

a.  Meta targeted its Social Media Platforms to young users while knowingly designing its Social Media Platforms to include features that Meta knew to be psychologically and physically harmful to young users—including features known to promote compulsive, prolonged, and unhealthy use by young users;

b.  Meta utilized Social Media Platform features that unfairly and/or unconscionably harm young users independently of any actions taken by third-party users of Meta's Platforms. These features include infinite scroll, ephemeral content features, autoplay, quantification and display of "Likes," and disruptive alerts, all of which were unfairly and/or unconscionably utilized by Meta to extract additional time and attention from young users whose developing brains were not equipped to resist those manipulative tactics;

c.  Meta designed, developed, and deployed disruptive audiovisual and vibration notifications and alerts and ephemeral content features in a way that unfairly and/or unconscionably exploited young users' psychological vulnerabilities and cultivated a sense of "fear of missing out" in order to induce young users to spend more time than they would otherwise choose on Meta's Social Media Platforms;

d.  Meta algorithmically served content to young users, according to "variable reinforcement schedules," thereby manipulating dopamine releases in young users,

144

1        unfairly or unconscionably inducing them to engage repeatedly with its products—

2        much like a gambler at a slot machine; and

3      e.    Meta collected the personal information of under-13 users of Instagram and Facebook

4        without first obtaining verifiable parental consent, which violated COPPA and the

5        COPPA Rule.

6      848.    Meta's deployment of manipulative and harmful features, both on their own and

7  especially in combination, for use by young users are unfair and/or unconscionable acts or

8  practices.

9      849.    At all relevant times, Meta had a thorough understanding of the mental and

10  physical harms and addiction suffered by young users of its Social Media Platforms. Instead of

11  taking adequate measures to mitigate these damaging effects, Meta turned a blind eye to them,

12  and persisted in exploiting young users' psychological vulnerabilities. Meta's acts and practices

13  alleged herein are immoral, unethical, oppressive, and unscrupulous, including because they

14  constitute knowing decisions causing unnecessary and unjustified harm to young users for Meta's

15  financial gain.

16      850.    Meta's acts and practices alleged herein, including Meta's actions taken to

17  encourage young users' compulsive and unhealthy use of and addiction to its Social Media

18  Platforms, are offensive to public policy, as defined by statute and common law. The protection

19  of minors from the harms of addiction and related afflictions are well-established objectives

20  underlying public policy in the Filing States; Meta's acts and practices alleged herein, including

21  Meta's actions taken to encourage young users' compulsive and unhealthy use of and addiction to

22  its Social Media Platforms, are therefore offensive to public policy.

23

24                   **CLAIMS FOR RELIEF**

25         **COUNT I: COPPA VIOLATIONS BY META**

26        **(15 USC § 6501 *et seq.*; 16 C.F.R. § 312.1 *et seq.*)**

27      851.    The Filing States reallege and incorporate herein by reference each of the

28  allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

852.    Meta has repeatedly collected, used, or shared personal information about children under the age of 13 and continues to systematically do so.

853.    Meta has failed and continues to fail to provide direct notice to parents about the information it collects from children and how it uses such information, and its disclosure practices are in violation of Sections 312.4(b) and 312.4(c) of the COPPA Rule, 16 C.F.R. § 312.4(b)-312.4(c).

854.    Meta has failed and continues to fail to provide sufficient notice on its Social Media Platforms about the information it collects from children and how it uses such information, and its disclosure practices are in violation of Section 312.4(d) of the COPPA Rule, 16 C.F.R. § 312.4(d).

855.    Meta has failed to obtain verifiable parental consent prior to collecting or using any personal information of children, in violation of Section 312.5 of the COPPA Rule, 16 C.F.R. § 312.5.

856.    Under 16 C.F.R. § 312.9, a violation of COPPA constitutes an unfair or deceptive act or practice, in violation of 15 U.S.C. § 45.

857.    The Filing States have reason to believe that Meta has violated COPPA and the COPPA Rule with respect to residents of each filing state.

858.    Under 15 U.S.C § 6504, the Attorneys General of the Filing States are empowered to bring a civil action to:

        a.   Enjoin practices which violate COPPA and the COPPA Rule;

        b.   Enforce compliance with the COPPA Rule;

        c.   Obtain damages, restitution, and other compensation; and

        d.   Obtain such other relief as the Court may consider appropriate.

859.    Absent injunctive relief by this Court, Meta is likely to continue to violate the COPPA Rule.

**COUNT II: VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT, ARIZ. REV. STAT. §§ 44-1521 to -1534**

860.   The State of Arizona incorporates and realleges each of the paragraphs 1 through 850 as if fully set forth herein.

861.   The conduct described in the preceding paragraphs of this Complaint constitutes deception, deceptive or unfair acts or practices, fraud, false pretenses, false promises, misrepresentations, or concealment, suppression or omission of material facts with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of merchandise in violation of Ariz. Rev. Stat. §§ 44-1521 to -1534.

862.   While engaging in the acts and practices alleged in this Complaint, Meta knew or should have known that its conduct was of the nature prohibited by Ariz. Rev. Stat. § 44-1522, subjecting it to enforcement and penalties as provided in Ariz. Rev. Stat. § 44-1531(A).

863.   With respect to the concealments, suppressions, or omissions of material fact described above, Meta did so with intent that others rely on such concealments, suppressions, or omissions.

864.   With respect to the unfair acts and practices described above, these acts and practices caused or were likely to cause substantial injuries to consumers that were not reasonably avoidable by consumers and were not outweighed by countervailing benefits to consumers or to competition.

**COUNT III: FALSE OR MISLEADING STATEMENTS BY META IN VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17500 (BY THE PEOPLE OF THE STATE OF CALIFORNIA)**

865.   The People of the State of California (California) reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs 1 through 859 as though fully alleged in this cause of action.

866.   From a date unknown to California and continuing to the present, Meta has engaged in and continues to engage in acts or practices that constitute violations of California

147

Business and Professions Code section 17500 *et seq*., by making or causing to be made untrue or misleading statements with the intent to induce members of the public to use Meta's platforms when such statements were likely to mislead members of the public about the nature and safety of Meta's platforms. Meta's untrue or misleading representations include, but are not limited to, the representations described in paragraph 846.

867.    At the time the untrue or misleading representations were made, Meta knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

## COUNT IV: UNFAIR COMPETITION BY META IN VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200 (BY THE PEOPLE OF THE STATE OF CALIFORNIA)

868.    California realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1 through 859 and 865 to 867 as though fully alleged in this cause of action.

869.    From a date unknown to California and continuing to the present, Meta has engaged in and continues to engage in unlawful, unfair, or fraudulent acts or practices, which constitute unfair competition within the meaning of Section 17200 of the Business and Professions Code. Meta's acts of unfair competition include, but are not limited to, the following:

870.    Meta has committed unlawful business practices by violating California Business and Professions Code section 17500 *et seq*., as alleged in Count III;

871.    Meta has made deceptive representations, directly or indirectly, expressly or by implication, regarding its Social Media Platforms, including, but not limited to, those described in paragraph 846.

872.    Meta has engaged in unfair acts and omissions with regard to its Social Media Platforms, as described in paragraphs 847-850.

873.    Meta has engaged in the acts and practices alleged in Count I, which violated COPPA and the COPPA Rule.

148

1    **COUNT V: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE**
2    **COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT. § 6-1-105(1)(e)**

3        874.    Colorado realleges and incorporates by reference each of the allegations contained
4    in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

5        875.    In numerous instances in connection with the advertising, marketing, promotion,
6    and other representations regarding its Platforms, including but not limited to statements made to
7    reporters, statements made to the public via Meta's website, and statements provided in testimony
8    to Congress, such as through the means described in paragraphs 846.a. through 846.g., Meta
9    knowingly and/or recklessly made false representations regarding the characteristics, uses,
10   benefits, and/or alterations of its Platforms.

11       876.    Such representations include, but are not limited to, those set forth in paragraphs
12   846.a. through 846.g. These and other false statements by Meta were material to consumers'
13   decisions regarding their usage of Meta's Platforms. These representations also had the capacity
14   to deceive consumers and were intended to induce young consumers' use of the Platforms.

15       877.    The deceptive acts or practices alleged herein constitute separate violations of the
16   Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both
17   separately and as taken together, Meta violated Colo. Rev. Stat. § 6-1-105(1)(e).

18

19   **COUNT VI: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE**
20   **COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT. § 6-1-105(1)(g)**

21       878.    Colorado realleges and incorporates by reference each of the allegations contained
22   in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

23       879.    Through the acts and omissions described above, including but not limited to those
24   set forth in paragraphs 846.a. through 846.g., Meta represented that its Social Media Platforms
25   met a particular standard, quality, and grade of safety appropriate for its young users that Meta
26   knew or should have known they did not meet.

27       880.    For example, as detailed above, Meta made specific representations regarding the
28   safety of its Platforms in its "Community Standards Enforcement Reports," which described the

149

1  percentage of content posted that Meta removed for violating its Community Standards. In its

2  Reports and accompanying statements made on its website, to reporters, and to Congress, Meta

3  promoted this "prevalence" metric as a reliable measure of the safety of its Social Media

4  Platforms. Meta represented that because it aggressively enforced its Community Standards—

5  thereby reducing the "prevalence" of Community-Standards-violating content—its Social Media

6  Platforms were safe products for young users, and only rarely exposed young users to harmful

7  content and harmful experiences.

8       881.    But Meta knew or should have known the "prevalence" of content which violated

9  its Community Standards was not the same as the actual "prevalence" of harmful content on its

10  Social Media Platforms. Meta knew or should have known that the prevalence of harmful

11  content—████████████████████████████████████—was significantly higher

12  than the public-facing prevalence metrics Meta reported to consumers. Meta thus knew that its

13  Social Media Platforms did not meet the standard, quality, and/or grade necessary to make it safe

14  for young users, despite its representations to the contrary.

15       882.    The representations alleged herein constitute separate violations of the Colorado

16  Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately

17  and as taken together, Meta violated Colo. Rev. Stat. § 6-1-105(1)(g).

18

19  **COUNT VII: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE**

20  **COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT. § 6-1-105(1)(u)**

21       883.    Colorado realleges and incorporates by reference each of the allegations contained

22  in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

23       884.    In numerous instances in connection with the advertising, marketing, promotion,

24  and other representations regarding its Platforms, including but not limited to statements made to

25  reporters, statements made to the public via Meta's website, and statements provided in testimony

26  to Congress, such as through the means described in paragraphs 846.a. through 846.g., Meta

27  failed to disclose material information to consumers regarding its Social Media Platforms. Such

28  information includes but is not limited to the fact that these Platforms were designed to induce

1    compulsive and extended use, the effects of which are particularly harmful for young users, and

2    that harmful content on the Platforms was more prevalent than what Meta represented to

3    consumers.

4         885.    Meta knew this information at the time it advertised, promoted, and/or sold its

5    Platforms but failed to disclose it. Meta made these and other material omissions with an intent to

6    induce young users to use its Social Media Platforms.

7         886.    The material omissions alleged herein constitute separate violations of the

8    Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both

9    separately and as taken together, Meta violated Colo. Rev. Stat. § 6-1-105(1)(u).

10

11         **COUNT VIII: DECEPTIVE AND UNFAIR ACTS OR PRACTICES BY META IN**

12              **VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT,**

13                        **COLO. REV. STAT. § 6-1-105(1)(rrr)**

14         887.    Colorado realleges and incorporates by reference each of the allegations contained

15    in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

16         888.    Through the above-described acts and omissions, including but not limited to the

17    acts and omissions described in paragraphs 847 through 850, Meta knowingly and/or recklessly

18    engaged in unfair, unconscionable, deceptive, deliberately misleading, false, and/or fraudulent

19    acts and/or practices.

20         889.    At all relevant times, Meta knew of the mental and physical harms suffered by

21    young users of its Social Media Platforms. Meta deliberately misled consumers regarding these

22    harms and exploited the vulnerabilities of young users to maximize engagement. Such conduct

23    led to, among other things, young users' compulsive and unhealthy use of, and addiction to, the

24    Social Media Platforms.

25         890.    Meta's acts and omissions alleged herein offend public policy, fall in the

26    penumbra of conduct generally recognized under common-law theories of products liability, and

27    are immoral, unethical, oppressive, and unscrupulous, including because they constitute knowing

28    decisions causing unnecessary and unjustified harm to young users for Meta's financial gain.

891.    Meta's acts and omissions alleged herein are also likely to cause, and have caused, substantial injury to consumers that could not be reasonably avoided. Young users could not have reasonably avoided injuries resulting from Meta's acts and omissions, nor can they do so in the future, for numerous reasons, including but not limited to Meta's misrepresentations and failure to disclose the dangerous nature of its Social Media Platforms, and Meta's use of psychologically manipulative engagement-inducing features, knowing that young users are especially susceptible to those features.

892.    The deceptive and/or unfair act or practices engaged in by Meta as recited above constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Meta violated Colo. Rev. Stat. § 6-1-105(1)(rrr).

**COUNT IX: VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONNECTICUT GENERAL STATUTES § 42-110b *et seq*.**

893.    At all relevant times, Meta was engaged in trade or commerce in Connecticut pursuant to Connecticut General Statutes (Conn. Gen. Stat.) § 42-110b(a).

894.    The State of Connecticut realleges and incorporates herein by reference each allegation contained in the preceding paragraphs 1 through 850.

895.    The State of Connecticut alleges that the aforesaid acts and practices in paragraph 846 constitute deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b(a).

896.    The State of Connecticut alleges that the aforesaid acts and practices of Meta in paragraphs 847 through 850 offend public policy pertaining to the protection of minors from the harms of addiction as well as protecting the privacy and safety of minors online as embodied in COPPA.

897.    The State of Connecticut alleges that the aforesaid acts and practices of Meta in paragraphs 847 to 850 are oppressive, unethical, immoral, and unscrupulous.

898.    Meta's conduct substantially harmed Connecticut consumers in that Meta's unfair acts and omissions caused young Connecticut users' compulsive and unhealthy use of and

addiction to Meta's Social Media Platforms which resulted in mental and physical harms, as alleged in paragraphs 847 through 850.

899.    Meta's acts and practices, as described herein, therefore constitute unfair acts or practices in violation of Conn. Gen. Stat. § 42-110b(a).

900.    Meta knew, or should have known, that its conduct was unfair or deceptive in violation of Conn. Gen. Stat. § 42-110b, and as a consequence Meta is subject to civil penalties of not more than $5,000 per violation pursuant to Conn. Gen. Stat. § 42-110o(b).

## COUNT X: VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT (Delaware CFA), 6 Del. Code Ann. § 2513 *et seq.*

901.    The State of Delaware, *ex rel.* Kathleen Jennings, Attorney General, incorporates and realleges each of the paragraphs 1 through 859.

902.    Meta and each Defendant at all relevant times were "person[s]" as defined under the Delaware CFA. Specifically, Meta and each Defendant were corporations, businesses, or partnerships.

903.    Meta conducted "sale[s]" of "merchandise" as defined by the Delaware CFA during all relevant times.

904.    Meta created and disseminated "advertisements" as defined by the Delaware CFA during all relevant times.

905.    Meta intentionally and purposefully sold and transacted in merchandise and advertisement within the State of Delaware at all relevant times.

906.    The State of Delaware alleges that Meta's acts and omissions described in paragraphs 1 to 850 of this Complaint constitute violations of the Delaware CFA, including 6 Del. Code Ann. § 2513(a).

907.    Meta acted, used, and/or employed deception, fraud, false pretense, false promise, misrepresentation, unfair practice, and/or the concealment, suppression, or omission of material fact with intent that others rely upon such concealment, suppression, or omission, in connection

with the sale, lease, receipt, or advertisement of merchandise, by engaging in the conduct described in paragraph 846.

908.    Meta engaged in unfair practices because its actions described in paragraphs 847-850 caused or were likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

909.    Meta's violation of various laws and regulations, including the Children's Online Privacy Protection Rule (COPPA) constituted a substantial injury to the consumers and constituted an unfair practice as defined by the Delaware CFA.

910.    Meta has willfully engaged in the acts and practices described in this Complaint in violation of the Delaware CFA because it knew or should have known that its conduct was a violation of the Delaware CFA.

## COUNT XI: VIOLATIONS OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT (Delaware DTPA), 6 Del. Code Ann. § 2531 *et seq.*

911.    The State of Delaware, *ex rel.* Kathleen Jennings, Attorney General, incorporates and realleges each of the paragraphs 1 through 850 as if fully set forth herein.

912.    The Delaware DTPA, 6 Del. Code Ann. § 2531 *et seq*., prohibits a business from engaging in conduct which creates a likelihood of confusion or of misunderstanding.

913.    Meta and each Defendant are "person[s]" engaged in a business, trade or commerce in the State of Delaware within the meaning of § 2531 of the Delaware DTPA.

914.    As described in paragraphs 1 to 850 of the Complaint, Meta has engaged in conduct which created the likelihood of confusion or misunderstanding.

915.    Meta represented that its goods and/or services had approval, characteristics, ingredients, uses, benefits, or quantities that they did not have in violation of 6 Del. Code Ann. § 2532 (a)(5).

916.    Meta advertised goods or services with intent not to sell them as advertised in violation of 6 Del. Code Ann. § 2532(a)(9).

917.     Meta engaged in a series of conduct, described in paragraph 846 which similarly create a likelihood of confusion or of misunderstanding. 6 Del. Code Ann. § 2532(a)(12).

918.     Meta's actions constituted willful violations of the Delaware DTPA because they knew or should have known that its conduct was prohibited by that statute.

**COUNT XII: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF GEORGIA FAIR BUSINESS PRACTICES ACT, O.C.G.A. § 10-1-390 *et seq.***

919.     The State of Georgia, by and through Christopher M. Carr, Attorney General of the State of Georgia, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

920.     Prior to initiating this proceeding under the Georgia Fair Business Practices Act (FBPA), the State of Georgia, by and through the Attorney General and his designees, complied with O.C.G.A. § 10-1-397(c).

921.     The State of Georgia, by and through the Attorney General, is authorized pursuant to O.C.G.A. § 10-1-397(b)(2) to initiate this action, which may be brought in federal district court pursuant to O.C.G.A. § 10-1-397.1.

922.     Meta's consumer acts or practices are or were conducted in "trade" or "commerce," as those terms are defined in O.C.G.A. § 10-1-392(a)(28) of the FBPA, in whole or in part in the State of Georgia.

923.     Meta and each Defendant are or were during all relevant times engaged in the conduct of "consumer acts or practices," as that term is defined in O.C.G.A. § 10-1-392(a)(7) of the FBPA, in whole or in part in the State of Georgia.

924.     While engaged in consumer acts or practices in trade or commerce, Meta is using, has used, and/or is about to use the following deceptive methods, acts, and practices in whole or in part in the State of Georgia, including through the means described in paragraph 846.

925.     Meta's aforesaid methods, acts, and practices are deceptive and are thus unlawful under the FBPA, including O.C.G.A. § 10-1-393(a) and (b).

926.    The State of Georgia, by and through the Attorney General, is authorized to bring this action whether or not any person has actually been misled by Meta's deceptive methods, acts, and practices.

**COUNT XIII: UNFAIR ACTS OR PRACTICES BY META IN VIOLATION OF GEORGIA FAIR BUSINESS PRACTICES ACT, O.C.G.A. § 10-1-390 *et seq.***

927.    The State of Georgia, by and through Christopher M. Carr, Attorney General of the State of Georgia, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

928.    Prior to initiating this proceeding under the FBPA, the State of Georgia, by and through the Attorney General and his designees, complied with O.C.G.A. § 10-1-397(c).

929.    The State of Georgia, by and through the Attorney General, is authorized pursuant to O.C.G.A. § 10-1-397(b)(2) to initiate this action, which may be brought in federal district court pursuant to O.C.G.A. § 10-1-397.1.

930.    Meta's consumer acts or practices are or were conducted in "trade" or "commerce," as those terms are defined in O.C.G.A. § 10-1-392(a)(28) of the FBPA, in whole or in part in the State of Georgia.

931.    Meta is or was during all relevant times engaged in the conduct of "consumer acts or practices," as that term is defined in O.C.G.A. § 10-1-392(a)(7) of the FBPA, in whole or in part in the State of Georgia.

932.    While engaged in consumer acts or practices in trade or commerce, Meta is using, has used, and/or is about to use unfair methods, acts, and practices in whole or in part in the State of Georgia, that cause, have caused, and/or are likely to cause young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms, including by the means described in paragraphs 847 through 850.

933.    At all relevant times, Meta had a thorough understanding of the mental and physical harms and addiction suffered by young users of its Social Media Platforms. Instead of taking adequate measures to mitigate these damaging effects, Meta turned a blind eye to them,

and persisted in its use of manipulative and harmful features to exploit young users'
psychological vulnerabilities.

934. Meta's methods, acts, and practices alleged herein have caused, continue to cause, and/or are likely to cause substantial injury to consumers including physical and mental harms as well as significant risks to the health and safety of consumers—especially young users.

935. The substantial injury suffered by consumers due to Meta's methods, acts, and practices could not be reasonably avoided. Young users could not have reasonably avoided injuries resulting from Meta's acts and practices, including because Meta misrepresented and failed to disclose the dangerous nature of its Social Media Platforms and because Meta utilized psychologically manipulative engagement-inducing features, knowing that young users are especially susceptible to those psychologically manipulative tactics.

936. The substantial injury that Meta's methods, acts, and practices alleged herein have caused, continue to cause, and/or are likely to cause consumers is not outweighed by countervailing benefits to consumers or competition.

937. Meta's methods, acts, and practices alleged herein are immoral, unethical, oppressive, and unscrupulous, including because they constitute knowing decisions causing unnecessary and unjustified harm to young users for Meta's financial gain.

938. The Georgia legislature has expressed a public policy goal of protecting youth from the harms of addiction and related afflictions and unhealthy use of the internet. Meta's methods, acts, and practices alleged herein, including Meta's actions taken to encourage young users' compulsive and unhealthy use of and addiction to its Social Media Platforms, are therefore offensive to public policy.

939. Meta's aforesaid methods, acts, and practices as a result are unfair and thus are unlawful under the FBPA, including O.C.G.A. § 10-1-393(a) and (b).

940. The State of Georgia, by and through the Attorney General, is authorized to bring this action whether or not any person has actually been misled by Meta's unfair methods, acts, and practices.

**COUNT XIV: UNFAIR OR DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE HAWAIʻI UNFAIR AND DECEPTIVE ACTS OR TRADE PRACTICES ACT, HAW. REV. STAT. CHAPTER 480**

941.    The State of Hawaiʻi realleges and incorporates herein by reference each of the allegations contained in the paragraphs 1 through 850 as though fully alleged in this cause of action.

942.    The State of Hawaiʻi alleges that the aforementioned acts and practices by Meta constitute deceptive acts or practices in violation of the Hawaiʻi Unfair and Deceptive Acts or Trade Practices Act (HIUDAP), *Haw. Rev. Stat.* (HRS) § 480-1 *et seq.*

943.    The State of Hawaiʻi alleges that the aforesaid acts and practices of Meta in paragraphs above are unfair because they offend public policy and are oppressive, unethical, immoral, unscrupulous, and/or substantially injurious.

944.    Meta's unfair or deceptive acts or practices described above constitute multiple, separate violations of the HIUDAP.

945.    Meta's violations of the HIUDAP justify penalties of up to $10,000, per Defendant, for each violation pursuant to HRS § 480-3.1.

**COUNT XV: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *et seq.***

946.    The People of the State of Illinois reallege and incorporate herein by reference each of the allegations contained in paragraphs 1-850 above as though fully alleged in this cause of action.

947.    In numerous instances in the course of trade or commerce, including through the means described in the allegations in paragraphs 53-835 above, Meta engaged in the following deceptive acts, practices, and omissions, with the intent that consumers rely on the deceptive acts, practices, and omissions:

158

    a.   Misrepresenting, directly or indirectly, expressly or by implication, that Meta's Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed;

    b.   Misrepresenting, directly or indirectly, expressly or by implication, that Meta's Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality;

    c.   Misrepresenting, directly or indirectly, expressly or by implication, through the publication of CSER reports ██████████████████████████ ████████████, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

    d.   Misrepresenting, directly or indirectly, expressly or by implication, that Meta prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms;

    e.   Misrepresenting, directly or indirectly, expressly or by implication, that Meta prevents under-13 users from using Instagram and/or Facebook when in fact Meta was aware that it does not prevent under-13 users from using Instagram and Facebook;

    f.   Misrepresenting, directly or indirectly, expressly or by implication, that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data; and

    g.   Making other false and deceptive representations, as set forth in the allegations in paragraphs 53-835 above.

948.    By engaging in the acts and practices alleged herein, Meta engaged in unfair and deceptive acts or practices declared unlawful under Section 2 of the Illinois Consumer Fraud and

1    Deceptive Business Practices Act (Illinois Consumer Fraud Act), 815 ILCS 505/2, which states in

2    relevant part:

3              Unfair methods of competition and unfair or deceptive acts or
               practices, including but not limited to the use or employment of
4              any deception fraud, false pretense, false promise,
               misrepresentation or the concealment, suppression or omission of
5              any material fact, with intent that others rely upon the
               concealment, suppression or omission of such material fact, or the
6              use or employment of any practice described in Section 2 of the
               "Uniform Deceptive Trade Practices Act", approved August 5,
7              1965, in the conduct of any trade or commerce are hereby declared
               unlawful whether any person has in fact been misled, deceived or
8              damaged thereby.

9

10              **COUNT XVI: UNFAIR ACTS OR PRACTICES BY META**

11        **IN VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE**

12              **BUSINESS PRACTICES ACT, 815 ILCS 505/1 *et seq*.**

13        949.    The People of the State of Illinois reallege and incorporate herein by reference

14    each of the allegations contained in paragraphs 1-850 above as though fully alleged in this cause

15    of action.

16        950.    Meta, in the course of trade or commerce, engaged in unfair acts and practices that

17    caused young users' compulsive and unhealthy use of and addiction to Meta's Social Media

18    Platforms, including by:

19        a.   Targeting its Social Media Platforms to young users while knowingly designing its

20             Social Media Platforms to include features that Meta knew to be psychologically and

21             physically harmful to young users—including features known to promote compulsive,

22             prolonged, and unhealthy use by young users;

23        b.   Utilizing Social Media Platform features that unfairly harm young users independently

24             of any actions taken by third-party users of Meta's Platforms. These features include

25             infinite scroll, ephemeral content features, autoplay, quantification and display of

26             Likes, and disruptive alerts, all of which were unfairly utilized by Meta to extract

27             additional time and attention from young users whose developing brains were not

28             equipped to resist those manipulative tactics;

c.  Designing, developing, and deploying disruptive audiovisual and vibration notifications and alerts and ephemeral content features in a way that unfairly exploited young users' psychological vulnerabilities and cultivated a sense of "fear of missing out" in order to induce young users to spend more time than they would otherwise choose on Meta's Social Media Platforms;

d.  Algorithmically serving content to young users according to "variable reinforcement schedules," thereby manipulating dopamine releases in young users, unfairly inducing them to engage repeatedly with its products—much like a gambler at a slot machine; and

e.  Collecting the personal information of under-13 users of Instagram and Facebook without first obtaining verifiable parental consent.

951.    Meta's deployment of manipulative and harmful features, both on their own and especially *in combination*, for use by young users is an unfair act or practice.

952.    At all relevant times, Meta had a thorough understanding of the mental and physical harms and addiction suffered by young users of its Platforms. Instead of taking adequate measures to mitigate these damaging effects, Meta turned a blind eye to them, and persisted in exploiting young users' psychological vulnerabilities. Meta's acts and practices alleged herein are immoral, unethical, oppressive, and unscrupulous, including because they constitute knowing decisions causing unnecessary and unjustified harm to young users for Meta's financial gain.

953.    Meta's acts and practices alleged herein also have caused and continue to cause substantial injury to consumers that could not be reasonably avoided. Young users could not have reasonably avoided injuries resulting from Meta's acts and practices, including because Meta misrepresented and failed to disclose the dangerous nature of its Social Media Platforms and because Meta utilized psychologically manipulative engagement-inducing features, knowing that young users are especially susceptible to those psychologically manipulative tactics.

954.    Meta's acts and practices, including Meta's actions taken to encourage young users' compulsive and unhealthy use of and addiction to its Social Media Platforms, are offensive to public policy, as defined by statute and common law. The Illinois legislature has expressed a

public policy goal of protecting youth from the harms of addiction and related afflictions. *See, e.g.*, Juvenile Court Act of 1987, Article IV ("Addicted Minors"), 705 ILCS 405/4-1 *et seq.*; Juvenile Drug Court Treatment Act, 705 ILCS 410 (recognizing public policy goal of reducing juvenile addiction to drugs); Illinois Gambling Act, 230 ILCS 10 *et seq.* (recognizing policy issues related to "[c]ompulsive gambling" and prohibiting minors from casino gambling). The protection of minors from the dangers of addiction is a well-established objective underlying public policy in Illinois; Meta's acts and practices alleged herein, including Meta's actions taken to encourage young users' compulsive and unhealthy use of and addiction to its Social Media Platforms, are therefore offensive to public policy.

955.    In addition, the public policy of protecting youth's private information and requiring parental consent prior to collecting this information is established in COPPA and the COPPA Rule.

956.    By engaging in the acts and practices alleged herein, Meta engaged in unfair acts or practices declared unlawful under Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (Illinois Consumer Fraud Act), 815 ILCS 505/2, which states in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

162

**COUNT XVII: CONDUCT VIOLATIVE OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT BY META, IN VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *et seq.***

957.    The People of the State of Illinois reallege and incorporate herein by reference each of the allegations contained in paragraphs 1-850 above as though fully alleged in this cause of action.

958.    Section 2 of the Illinois Uniform Deceptive Trade Practices Act provides, in relevant part, that a person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

    a.  represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have (815 ILCS 510/2(a)(5));

    b.  represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another (815 ILCS 510/2(a)(7)); and

    c.  engages in any other conduct which similarly create a likelihood of confusion or misunderstanding (815 ILCS 510/2(a)(12)).

959.    Specifically, Meta, in the course of trade or commerce, engaged in conduct described in Sections 2(a)(5), (7), and (12) of the Uniform Deceptive Trade Practices Act, 815 ILCS 510.2(a)(5), (7), & (12) by:

    a.  Representing that Meta's Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed;

    b.  Representing that Meta's Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality;

c.  Representing, through the publication of CSER reports ████████████ ████████████████████████████████, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

d.  Representing that Meta prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms;

e.  Representing that Meta prevents under-13 users from using Instagram and/or Facebook when in fact Meta was aware that it does not prevent under-13 users from using Instagram and Facebook;

f.  Representing that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data; and

g.  Making other false and deceptive representations, as set forth in the allegations in paragraphs 53-835 above.

960.    By engaging in the acts and practices alleged herein, Meta engaged in unfair or deceptive acts or practices declared unlawful under Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (Illinois Consumer Fraud Act), 815 ILCS 505/2, which states in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, *or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965,* in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. (emphasis added).

**COUNT XVIII: UNFAIR OR DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT, IND. CODE § 24-5-0.5-3(a), -3(b)(1), AND -3(b)(2)**

961.    The State of Indiana realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

962.    The Deceptive Consumer Sales Act (DCSA) regulates unfair, abusive, and/or deceptive acts, omissions, and/or practices between a supplier and consumer when engaging in consumer transactions. Ind. Code § 24-5-0.5 *et seq.*

963.    Under the DCSA, a consumer transaction includes services and other intangibles. Ind. Code § 24-5-0.5-2.

964.    In supplying Indiana consumers with products and services, Meta was and remains involved in consumer transactions in Indiana, as defined by Ind. Code § 24-5-0.5-2.

965.    Meta regularly engages in or solicits consumer transactions with Indiana consumers. As such, Meta is a supplier pursuant to Ind. Code § 24-5-0.5-2.

966.    Meta has engaged in unfair, abusive, and/or deceptive acts, omissions, and/or practices affecting Indiana consumers, in violation of Ind. Code § 24-5-0.5-3(a), in connection with consumers transactions as detailed throughout this Complaint, including but not limited to the misrepresentations, unfair and deceptive acts, omissions and practices identified in Section XI above.

967.    Meta has engaged in unfair, abusive, and/or deceptive acts, omissions, and/or practices affecting Indiana consumers, in violation of Ind. Code § 24-5-0.5-3(a), in connection with consumers' transactions as detailed throughout this Complaint, including but not limited to the conduct in violation of the Children's Online Privacy Protection Act, 15 USC § 6501 et seq.; 16 C.F.R. § 312.1 et seq., as set forth in Count I above.

968.    Meta has engaged in deceptive acts affecting Indiana consumers in violation of Ind. Code § 24-5-1.5-3(b)(1), by misrepresenting that its products and/or services had performance, characteristics, uses, and/or benefits they did not have, which Meta knew or

reasonably should have known that they did not have, as detailed throughout this Complaint, including but not limited to the misrepresentations identified in Section XI(A) above.

969.    Meta has engaged in deceptive acts affecting Indiana consumers in violation of Ind. Code § 24-5-1.5-3(b)(2), by misrepresenting that its products and/or services were of a particular standard, quality, grade, style, or model when they were not, and which Meta knew or reasonably should have known they were not, as detailed throughout this Complaint, including but not limited to the misrepresentations identified in Section XI(A) above.

970.    Each of Meta's unfair and deceptive acts, omissions and practices constitutes a separate violation of the DCSA actionable by the Attorney General of the State of Indiana.

**COUNT XIX: KNOWING VIOLATIONS OF THE INDIANA DECEPTIVE CONSUMER SALES ACT AND INCURABLE DECEPTIVE ACTS, IND. CODE § 24-5-0.5-1 *et seq*.**

971.    The State of Indiana realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

972.    Meta committed the acts alleged in this Complaint with knowledge of their deceptive nature, and therefore committed knowing violations of the DCSA, subjecting it to penalties under Ind. Code § 24-5-0.5-4(g).

973.    The unfair and deceptive acts asserted in this Complaint are incurable deceptive acts and were committed by Meta as part of a scheme, artifice, or device with intent to defraud or mislead, subjecting Meta to penalties under Ind. Code § 24-5-0.5-8.

**COUNT XX: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT, K.S.A. § 50-626**

974.    The State of Kansas, *ex rel.* Kris W. Kobach, Attorney General, realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

975.    Meta is or was during all relevant times a "supplier" who in the ordinary course of business, solicits, engages in or enforces "consumer transactions," whether or not dealing directly

166

with the consumer, as those terms are defined in K.S.A. § 50-624 of the Kansas Consumer Protection Act (KCPA).

976.    In numerous instances, in connection with a consumer transaction, Meta engaged in deceptive acts or practices as alleged and described herein, specifically including the conduct described in paragraphs 1 through 850, in violation of K.S.A. § 50-626.

977.    Each of Meta's deceptive acts or practices as alleged herein, constitute a separate violation of K.S.A. § 50-626.

**COUNT XXI: UNCONSCIONABLE ACTS OR PRACTICES BY META IN VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT, K.S.A. §50-627**

978.    The State of Kansas, *ex rel*. Kris W. Kobach, Attorney General, realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

979.    Meta is or was during all relevant times a "supplier" who in the ordinary course of business, solicits, engages in or enforces "consumer transactions," whether or not dealing directly with the consumer, as those terms are defined in K.S.A. § 50-624 of the Kansas Consumer Protection Act (KCPA).

980.    Meta's acts or practices, as alleged and described herein, specifically including the conduct described in paragraphs 1 through 850, are unconscionable, in violation of K.S.A. § 50-627.

981.    Each unconscionable practice alleged herein, constitutes a separate violation of K.S.A. § 50-627.

**COUNT XXII: VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT, KY. REV. STAT. CHAPTER § 367 *et seq.***

982.    The Commonwealth of Kentucky, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

167

983.     Meta and each Defendant is or was during all relevant times "persons" conducting "trade" or "commerce" as those terms are defined in Ky. Rev. Stat. §§ 367.110 - 367.300 of the Kentucky Consumer Protection Act (KYCPA).

984.     The Commonwealth of Kentucky alleges that the aforesaid acts and practices of Meta constitute unfair, false, misleading, or deceptive acts or practices in violation of the KYCPA, including Ky. Rev. Stat § 367.170.

985.     Kentucky consumers have suffered harm and loss as a result of Meta's violations of the KYCPA.

986.     Meta has willfully engaged in the acts and practices described in this Complaint in violation of the KYCPA. Accordingly, the Commonwealth seeks the imposition of civil penalties pursuant to Ky. Rev. Stat. § 367.990 for each and every violation of the KYCPA in addition to other relief sought herein.

987.     The Commonwealth believes that the public interest is served by seeking before this Court a permanent injunction to restrain the methods, acts, and practices described herein. The Commonwealth believes that Kentucky consumers are suffering and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

## COUNT XXIII: VIOLATIONS OF LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, LA. REV. STAT. ANN. §§ 51:1401 to 1428

988.     The State of Louisiana incorporates and realleges each and every allegation in paragraphs 1 through 850 as if fully set forth herein.

989.     The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana Consumer Protection Law) prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. LA. REV. STAT. ANN. § 51:1405(A).

990.     At all relevant times, Meta has engaged in the conduct of "trade" or "commerce" as those terms are defined by LA. REV. STAT. ANN. § 51:1402(10).

991.    Meta has engaged in unfair and deceptive acts or practices in violation of the Louisiana Consumer Protection Law as described in the preceding paragraphs and summarized in Section XI of the Complaint.

992.    Each unfair and deceptive act or practice constitutes as a separate violation of the Louisiana Consumer Protection Law.

## COUNT XXIV: VIOLATIONS OF THE MAINE UNFAIR TRADE PRACTICES ACT, ME. REV. STAT. ANN. tit. 5, § 207

993.    Maine realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

994.    In numerous instances in connection with the advertising, marketing, promotion, and other representations regarding its products, including but not limited to statements made to the public through reporters and through statements provided in testimony to Congress, Meta made deceptive representations, directly or indirectly, expressly or by implication, with the intent that consumers rely on the deceptive representations, including but not limited to the representations set forth in paragraph 846. Each deceptive act or practice alleged herein is an intentional violation of the Maine Unfair Trade Practices Act, ME. REV. STAT. ANN. tit. 5, § 207.

995.    Moreover, each violation of COPPA alleged herein is an intentional violation of the Maine Unfair Trade Practices Act, ME. REV. STAT. ANN. tit. 5, § 207.

## COUNT XXV: VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT, MICH. COMP. LAWS § 445.901 *et seq.*

996.    The State of Michigan, by and through Attorney General Dana Nessel, realleges and reaffirms each and every allegation set forth in the preceding paragraphs as if fully restated herein.

997.    The State of Michigan brings this claim under the Michigan Consumer Protection Act (MCPA), asserting claims under § 3(1) of the MCPA, Mich. Comp. Laws §§ 445.903(1),

which protects Michigan residents against "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."

998.    The Attorney General has provided sufficient notice and is authorized to bring this claim pursuant to Mich. Comp. Laws § 445.905 and 445.911, as well as her *parens patriae* authority.

999.    At all relevant times, Meta was engaged in the conduct of trade or commerce as that term is defined at Mich. Comp. Laws § 445.902(1)(g).

1000.   The allegations set forth above comprise violations of the following subsections of the MCPA, Mich. Comp. Laws § 445.903(1):

(a) Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services.

(b) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have.

(e) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner.

1001.   Specifically, Meta violated § 3(1)(a) by knowingly and intentionally causing confusion about its services' approval through, inter alia, the publication of CSER reports ████, and through other communications, suggesting that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was.

1002.   For the same reason, Meta violated § 3(1)(b) by misrepresenting its goods or services' characteristics, uses, and benefits by, inter alia, knowingly and intentionally publishing CSER reports ███████████████████████████████████████████████████ ████, and through other communications, suggesting that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was.

1003.   Meta violated § 3(1)(s) by failing to reveal the above-described material facts and other known or suspected realities regarding the negative or harmful user experiences on Meta's Social Media Platforms, which misled consumers and could not have been reasonably known by them, in part because consumers lack access to Meta's internal data and metrics.

1004.   Meta violated § 3(1)(bb) through representations and statements of fact material to users' decision to use Meta's Social Media Platforms by routinely publishing misleading reports boasting a deceptively low incidence of user harms, deceptively representing that targeted features of its platforms are not manipulative or otherwise designed to promote young users' prolonged and unhealthy engagement with social media, and misrepresenting that its platforms are designed and maintained to ensure safe experiences for young users.

1005.   Meta violated § 3(1)(cc) by making representations of fact in a positive manner, i.e., making statements through published reports and otherwise to the effect that targeted features of its platforms are not manipulative or otherwise designed to promote young users' prolonged and unhealthy engagement with social media, and that its platforms are designed and maintained to ensure safe experiences for young users. It failed to reveal facts material to the users' transaction with Meta ███████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████ the revealing of which would have been material to users' decision to engage with the platforms.

1006.   Individual consumers have suffered damages as a result of Meta's conduct. Again, all of the allegations regarding Meta's practices apply to tens of thousands of Michigan residents.

1007.   Meta's violations of the MCPA were persistent, knowing, and willful.

**COUNT XXVI**

**DECEPTIVE TRADE PRACTICES**

**MINN. STAT. § 325D.43 *et seq.***

1008.   The State of Minnesota, by its Attorney General, Keith Ellison, re-alleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 850 above as though fully alleged in this cause of action.

1009.   Minnesota Statutes section 325D.44, subdivision 1 provides in part:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

> (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

> (14) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.[40]

1010.   Meta and each Defendant are "persons" within the meaning of Minnesota Statutes section 325D.44.

1011.   Meta's Social Media Platforms are a "good" or "service" within the meaning of Minnesota Statutes section 325D.44.

1012.   In numerous instances in the course of business, vocation, or occupation, Meta violated Minnesota Statutes section 325D.44, subdivision 1(5), 1(7), and 1(14) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, and engaging in deceptive acts, practices, and omissions that caused a likelihood of confusion or of

---

[40] Pursuant to 2023 Minn. Laws ch. 57, art. 4, section 6, Minn. Stat. § 325D.44, subd. 1(13) is to be re-codified as Minn. Stat. § 325D.44, subd. 1(14). For simplicity, the State of Minnesota refers to this provision as Minn. Stat. § 325D.44, subd. 1(14), though this provision has been in effect for the full relevant time period and continues through the present.

1  misunderstanding among Minnesota consumers in connection with its advertising, marketing,

2  promotion, and other representations regarding its goods or services. Those acts, practices, and

3  omissions include, but are not limited to:

4    a. Misrepresenting, directly or indirectly, expressly or by implication, that Meta's Social

5       Media Platforms are not psychologically or physically harmful for young users and are

6       not designed to induce young users' compulsive and extended use, when they are in

7       fact so designed;

8    b. Misrepresenting, directly or indirectly, expressly or by implication, that Meta's Social

9       Media Platforms are less addictive and/or less likely to result in psychological and

10      physical harm for young users than its Social Media Platforms are in reality;

11   c. Misrepresenting, directly or indirectly, expressly or by implication, through the

12      publication of CSER reports ████████████████████████████████████████

13      ███████████████████, and through other communications, that the incidence or

14      prevalence of negative or harmful user experiences on Meta's Social Media Platforms

15      was lower than it actually was;

16   d. Misrepresenting, directly or indirectly, expressly or by implication, that Meta

17      prioritized young users' health and safety over maximizing profits, when in fact Meta

18      subordinated young user health and safety to its goal of maximizing profits by

19      prolonging young users' time spent on its Social Media Platforms;

20   e. Misrepresenting, directly or indirectly, expressly or by implication, that Meta prevents

21      under-13 from using Instagram and/or Facebook when in fact Meta was aware that it

22      does not prevent under-13 users from using Instagram and Facebook;

23   f. Misrepresenting, directly or indirectly, expressly or by implication, that Meta's

24      collection of user data was not for the purpose of causing those users to become

25      addicted to the Social Media Platforms, when in reality that was one of the purposes

26      for which Meta collected user data; and

27   g. Making other false and deceptive representations set forth in this Complaint.

28

1013.   Due to Meta's deceptive acts, practices, and omissions described in this Complaint, consumers are suffering, have suffered, and will continue to suffer substantial injury.

1014.   Meta's acts, practices, and omissions described in this Complaint constitute multiple separate violations of Minnesota Statutes section 325D.44, subdivision 1.

## COUNT XXVII

### UNFAIR OR UNCONSCIONABLE ACTS

### MINN. STAT. § 325D.43 *et seq.*

1015.   The State of Minnesota, by its Attorney General, Keith Ellison, re-alleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 850 above as though fully alleged in this cause of action.

1016.   Minnesota Statutes section 325D.44, subdivision 1(13) prohibits any person from engaging in "unfair methods of competition" or "unfair or unconscionable acts or practices." Minn. Stat. § 325D.44, subd. 1(13).[41]

1017.   "[A]n unfair method of competition or an unfair or unconscionable act or practice is any method of competition, act, or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers."[42]

1018.   In numerous instances in the course of business, vocation, or occupation, Meta violated Minnesota Statutes section 325D.44, subdivision 1(13) by engaging in unfair or unconscionable acts, practices, and omissions that were unethical, oppressive, or unscrupulous and/or substantially injurious to consumers. Those acts, practices, and omissions include, but are not limited to:

---

[41] 2023 Minn. Laws ch. 57, art. 4, sect. 6 (to be codified at Minn. Stat. § 325D.44, subd. 1(13)), took effect on August 1, 2023. Therefore, the relevant time for the State of Minnesota's claim under Count XXVII pursuant to Minn. Stat. § 325D.44, subdivision 1(13) began on August 1, 2023, and continues through the present.

[42] 2023 Minn. Laws ch. 57, art. 4, sect. 17 (to be codified at Minn. Stat. § 325F.69, subd. 8); *see* 2023 Minn. Laws ch. 57, art. 4, sect. 7 (to be codified at Minn. Stat. § 325D.44, subd. 2(b)).

a. Meta's targeting its Social Media Platforms to young users while knowingly designing its Social Media Platforms to include features that Meta knew to be psychologically and physically harmful to young users—including features known to promote compulsive, prolonged, and unhealthy use by young users;

b. Meta utilizing Social Media Platform features that unfairly and/or unconscionably harm young users independent of any actions taken by third-party users of Meta's Platforms. These features include infinite scroll, ephemeral content features, autoplay, quantification and display of "Likes," and disruptive alerts, all of which were unfairly and/or unconscionably utilized by Meta to extract additional time and attention from young users whose developing brains were not equipped to resist those manipulative tactics;

c. Meta designing, developing, and deploying disruptive audiovisual and vibration notifications and alerts and ephemeral content features in a way that unfairly and/or unconscionably exploited young users' psychological vulnerabilities and cultivated a sense of "fear of missing out" in order to induce young users to spend more time than they would otherwise choose on Meta's Social Media Platforms;

d. Meta algorithmically serving content to young users, according to "variable reinforcement schedules," thereby manipulating dopamine releases in its young users, unfairly or unconscionably inducing them to engage repeatedly with its products— much like a gambler at a slot machine; and

e. Meta's deployment of manipulative and harmful features, both on its own and in combination, for use by young users.

1019.   These acts, practices, and omissions caused young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms. At all relevant times, Meta had a thorough understanding of the mental and physical harms and addiction suffered by young users of its Platforms. Instead of taking adequate measures to mitigate these damaging effects, Meta turned a blind eye to them, and persisted in exploiting young users' psychological vulnerabilities. Meta's acts, practices, and omissions alleged herein are unethical, oppressive, and unscrupulous,

175

including because they constitute knowing decisions causing unnecessary and unjustified harm to young users for Meta's financial gain.

1020.   Meta's acts, practices, and omissions alleged herein also have caused and continue to cause substantial injury to consumers that could not be reasonably avoided. Young users could not have reasonably avoided injuries resulting from Meta's acts, practices, and omissions, including because Meta misrepresented and failed to disclose the dangerous nature of its Social Media Platforms and because Meta utilized psychologically manipulative engagement-inducing features, knowing that young users are especially susceptible to those psychologically manipulative tactics.

1021.   Due to Meta's unfair and unconscionable acts, practices, and omissions described in this Complaint, consumers are suffering, have suffered, and will continue to suffer substantial injury.

1022.   Meta's unfair and unconscionable acts, practices, and omissions described in this Complaint constitute multiple separate violations of Minnesota Statutes section 325D.44, subdivision 1(13).

**COUNT XXVIII: UNFAIR AND DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT (MO. REV. STAT. § 407.020)**

1023.   Missouri realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

1024.   The Missouri Merchandising Practices Act (MMPA), Mo. Rev. Stat. §407.020.1 prohibits every "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce."

1025.   At all relevant times, Meta was engaged in trade or commerce in Missouri pursuant to the MMPA.

1026.   Missouri alleges that the aforesaid acts and practices of Meta summarized in Paragraph 846 constitute acts or practices involving misrepresentations, deception, or the concealment, suppression, or omission of material fact in violation of Mo. Rev. Stat. §407.020.1.

1027.   Missouri alleges that the aforesaid acts and practices of Meta summarized in Paragraphs 847 through 850 constitute unfair practices that are unethical, oppressive, or unscrupulous and present a risk of or cause substantial injury to consumers in violation of Mo. Rev. Stat. §407.020.1.

1028.   Each unlawful act or practice alleged herein constitutes a separate violation of the Missouri Merchandising Practices Act.

## COUNT XXIX: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT

1029.   The State of Nebraska realleges and incorporates herein each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

1030.   The Nebraska Consumer Protection Act (NE CPA) prohibits deceptive acts or practices in the conduct of any trade or commerce. Neb. Rev. Stat. § 59-1602.

1031.   As described in preceding paragraphs and summarized in Section XI.A of the Complaint, Meta has engaged in deceptive acts or practices in violation of the NE CPA.

1032.   Each deceptive act or practice, as alleged herein, constitutes a separate violation of the NE CPA and the NE UDTPA.

## COUNT XXX: UNFAIR ACTS OR PRACTICES BY META IN VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT

1033.    The State of Nebraska realleges and incorporates herein each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

1034.   The Nebraska Consumer Protection Act (NE CPA) prohibits unfair acts or practices in the conduct of any trade or commerce. Neb. Rev. Stat. § 59-1602.

1035.   As described in preceding paragraphs and summarized in Section XI.B of the Complaint, Meta has engaged in unfair acts or practices in violation of the NE CPA.

1036.   Each unfair act or practice, as alleged herein, constitutes a separate violation of the NE CPA and the NE UDTPA.

## COUNT XXXI: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT

1037.   The State of Nebraska realleges and incorporates herein each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

1038.   The Nebraska Uniform Deceptive Trade Practices Act (NE UDTPA) specifies multiple practices, which when conducted in the course of business, constitute deceptive trade practices. Neb. Rev. Stat. § 87-302(a).

1039.   Meta's actions, as described in preceding paragraphs and summarized in Section XI.A, constitute deceptive trade practices in violation of Neb. Rev. Stat. §§ 87-302(a)(2), 87-302(a)(5), 87-302(a)(7), 87-302(a)(9), and 87-302(a)(14).

1040.   Each deceptive act or practice, as alleged herein, constitutes a separate violation of the NE CPA and the NE UDTPA.

## COUNT XXXII: UNCONSCIONABLE ACTS OR PRACTICES BY META IN VIOLATION OF THE NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT

1041.   The State of Nebraska realleges and incorporates herein each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

1042.   The NE UDTPA prohibits unconscionable acts or practices by a supplier in connection with a consumer transaction. Neb. Rev. Stat. § 87-303.01.

1043.   As described in preceding paragraphs and summarized in Section XI.B, Meta is a supplier and has engaged in unconscionable trade practices in connection with a consumer transaction in violation of Neb. Rev. Stat. § 87-303.01.

1044.   Each unconscionable act or practice, as alleged herein, constitutes a separate violation of the NE CPA and the NE UDTPA.

**COUNT XXXIII: VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. ANN. §§ 56:8-1 to 227**

1045.   New Jersey realleges and incorporates by reference each and every factual allegation in the paragraphs above as if the same were fully set forth herein.

1046.   As set forth above and at all relevant times, Meta engaged in and continues to engage in commercial practices pursuant to the New Jersey Consumer Fraud Act (CFA), N.J. STAT. ANN. §§ 56:8-1 to 227.

1047.   These commercial practices were and continue to be made in connection with the sale and advertisement of merchandise.

1048.   These commercial practices constitute unconscionable or abusive commercial practices in violation of the CFA.

1049.   These commercial practices constitute acts of deception, fraud, false pretense, false promise, and misrepresentation in violation of the CFA.

1050.   These commercial practices knowingly conceal, suppress, and omit material facts with the intent that consumers relied upon the concealed, suppressed, and omitted material facts.

1051.   The conduct described in Count I is conclusively presumed to be to be an unlawful act in violation of the CFA. N.J. STAT. ANN. § 56:8-4b.

1052.   These commercial practices were and continue to be material to the sale and advertisement of merchandise.

1053.   While engaging in the acts and practices alleged in this Complaint, Meta knew or should have known that that its conduct was of the nature prohibited by N.J. STAT. ANN. § 56:8-2,

1   subjecting itself to enforcement and penalties as provided in N.J. STAT. ANN. §§ 56:8-8, 11, 13,

2   14, and 15.

3        1054.   Each unlawful practice alleged herein constitutes a separate violation of the CFA.

4

5        **COUNT XXXIV: VIOLATION OF N.Y. GENERAL BUSINESS LAW § 349**

6        1055.   The Attorney General of the State of New York realleges and incorporates by

7   reference each and every allegation in the paragraphs above as if the same were fully set forth

8   herein.

9        1056.   New York General Business Law (GBL) § 349 provides that "[d]eceptive acts or

10  practices in the conduct of any business, trade or commerce or in the furnishing of any service in

11  [New York] are . . . unlawful."

12       1057.   At all relevant times, Meta has been engaged in business, trade or commerce in

13  New York within the meaning of GBL § 349.

14       1058.   Meta engaged in deceptive practices in providing its Social Media Platforms, as set

15  forth above.

16       1059.   The Attorney General of the State of New York timely provided Meta with the

17  pre-litigation notice required by GBL § 349(c).

18       1060.   By engaging in the acts and practices described above, all of which were material,

19  Meta has engaged in and continues to engage in deceptive practices in violation of GBL § 349(a).

20

21       **COUNT XXXV: VIOLATION OF N.Y. GENERAL BUSINESS LAW § 350**

22       1061.   The Attorney General of the State of New York realleges and incorporates by

23  reference each and every allegation in the paragraphs above as if the same were fully set forth

24  herein.

25       1062.   New York General Business Law (GBL) § 350 prohibits "false advertising in the

26  conduct of any business."

27       1063.   At all relevant times, Meta has been engaged in business in New York within the

28  meaning of GBL § 350.

1064.   Meta made representations and/or omissions of fact that were materially misleading, and thereby made false advertisements, in the course of advertising, marketing, promotion, and other representations regarding its Social Media Platforms, as set forth above.

1065.   The Attorney General of the State of New York timely provided Meta with the pre-litigation notice required by GBL § 349(c).

1066.   By engaging in the acts and practices described above, all of which were material, Meta has engaged in and continues to engage in false advertising in violation of GBL § 350.

**COUNT XXXVI: REPEATED AND PERSISTENT FRAUD IN VIOLATION OF N.Y. EXECUTIVE LAW § 63(12)**

1067.   The Attorney General of the State of New York realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

1068.   New York Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General of the State of New York.

1069.   At all relevant times, Meta has engaged in the carrying on, conducting or transaction of business in New York within the meaning of New York Executive Law § 63(12).

1070.   Meta engaged in repeated and/or persistent fraud in violation of New York Executive Law § 63(12) in the course of its advertising, marketing, promotion, and other representations regarding its Social Media Platforms in New York State, including those discussed in Section XI.A above.

1071.   By engaging in the acts and practices described above, Meta has engaged in and continues to engage in repeated fraudulent acts or persistent fraud in violation of New York Executive Law § 63(12).

**COUNT XXXVII: REPEATED AND PERSISTENT ILLEGALITY IN VIOLATION OF**

**N.Y. EXECUTIVE LAW § 63(12)**

1072.   The Attorney General of the State of New York realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

1073.   New York Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General of the State of New York.

1074.   At all relevant times, Meta has engaged in the carrying on, conducting or transaction of business in New York within the meaning of New York Executive Law § 63(12).

1075.   Meta engaged in repeated and/or persistent illegality in violation of New York Executive Law § 63(12) through its violations of: (i) 15 USC § 6502(a); (ii) 16 C.F.R. §§ 312.4(b)-(d) and 312.5; (iii) N.Y. Gen. Bus. Law § 349; and/or (iv) N.Y. Gen. Bus. Law § 350.

1076.   By engaging in the acts and practices described above, Meta has engaged in and continues to engage in repeated illegal acts or persistent illegality in violation of New York Executive Law § 63(12).

**COUNT XXXVIII: VIOLATION OF FTC ACT § 5 IN VIOLATION OF N.Y.**

**EXECUTIVE LAW § 63(12)**

1077.   The Attorney General of the State of New York realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

1078.   New York Executive Law § 63(12) makes "repeated fraudulent or illegal acts or…persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General of the State of New York.

1079.   Section 5(a) of the Federal Trade Commission Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

1080.   An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n).

1081.   At all relevant times, Meta has engaged in carrying on, conducting or transaction of business in New York within the meaning of New York Executive Law § 63(12).

1082.   Meta has engaged in repeated illegality by committing unfair acts and practices in the design, advertising, promotion, marketing, and distribution of Social Media Platforms including but not limited to those discussed in section XI.B above.

1083.   Meta's conduct has caused and is likely to cause substantial injury to consumers in New York and throughout the United States that cannot be reasonably avoidable and is not outweighed by countervailing benefits.

1084.   By engaging in the acts and practices described above, which include violations of Section 5(a) of the Federal Trade Commission Act, Meta has engaged in and continues to engage in repeated illegal acts or persistent illegality in violation of New York Executive Law § 63(12).

### COUNT XXXIX: VIOLATIONS OF THE NORTH CAROLINA UNFAIR OR DECEPTIVE TRADE PRACTICES ACT, N.C.G.S. § 75-1.1
### (BY STATE OF NORTH CAROLINA)

1085.   The State of North Carolina incorporates and re-alleges paragraphs 1 through 850 as if they were fully set forth herein.

1086.   The North Carolina Unfair or Deceptive Trade Practices Act prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C.G.S. § 75-1.1(a).

1087.   Meta has committed unfair or deceptive acts or practices in violation of N.C.G.S. § 75-1.1(a) as described in this Complaint, including but not limited to:

a.   Targeting its Social Media Platforms to young users, despite understanding the risks of psychological and physical harms, including compulsive and unhealthy use of or addiction to its Social Media Platforms.

183

b.   Designing its Social Media Platforms to exploit young users' psychological
vulnerabilities with engagement-inducing features including but not limited to infinite
scroll, ephemeral content display, autoplay, and disruptive audiovisual and vibration
notifications, producing compulsive, prolonged, or unhealthy use by young users.

c.   Failing to comply with the Children's Online Privacy Protection Act, 15 U.S.C. §
6501 *et seq.*, as alleged in Count I, in violation of public policy.

d.   Falsely, deceptively, or misleadingly representing, directly or indirectly, expressly or
by implication, that:

i.   Meta's Social Media Platforms are not psychologically or physically harmful
for young users, while Meta knew young users experienced such harms.

ii.   Meta's Social Media Platforms are not designed to induce young users'
compulsive, prolonged, or unhealthy use, when they are in fact so designed.

iii.   The incidence of negative or harmful user experiences on Meta's Social Media
Platforms is low, while omitting Meta's knowledge regarding the heightened
extent users encountered such experiences.

iv.   Meta prioritized young users' health and safety, when in fact Meta
subordinated young users' health and safety to the goal of maximizing profits
by prolonging time spent on its Social Media Platforms.

v.   Users under 13 are excluded from Meta's Social Media Platforms, when Meta
knew that its policies and practices were insufficient to exclude such users.

1088.   Meta's above-described unfair or deceptive acts and practices have been in or
affecting commerce in North Carolina.

**COUNT XL: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF N.D.
CENT. CODE §51-15-02 (BY NORTH DAKOTA)**

1089.   The State of North Dakota, *ex rel*. Drew H. Wrigley, Attorney General,
incorporates and realleges paragraphs 1 through 850 as if they were fully set forth herein.

184

1090.   In numerous instances, in connection with the sale or advertisement of merchandise, as defined by N.D. Cent. Code § 51-15-01, Meta engaged in unlawful and deceptive acts or practices by making misrepresentations or false promises, directly or indirectly, expressly, impliedly, or by omission of material facts, with the intent that others rely thereon, including the misrepresentations set forth in Section XI.A above, in violation of N.D. Cent. Code §51-15-02.

1091.   Each of Meta's deceptive acts or practices, misrepresentations, or false promises, as alleged herein, constitutes a separate violation of N.D. Cent. Code §51-15-02.

**COUNT XLI: UNLAWFUL ACTS OR PRACTICES BY META IN VIOLATION OF N.D. CENT. CODE §51-15-02 (BY NORTH DAKOTA)**

1092.   The State of North Dakota, *ex rel*. Drew H. Wrigley, Attorney General, incorporates and realleges paragraphs 1 through 850 as if they were fully set forth herein.

1093.   Meta's acts, uses, or employments of acts or practices, in connection with the sale or advertisement of any merchandise, as alleged and described herein, including specifically in Section XI.B above, are unconscionable or caused, or are likely to cause, substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, and constitute violations of N.D. Cent. Code §51-15-02.

1094.   Each of Meta's unlawful acts or practices, as alleged herein, constitute a separate violation of N.D. Cent. Code §51-15-02.

**COUNT XLII: VIOLATIONS OF OHIO CONSUMER SALES PRACTICES ACT – UNFAIR OR DECEPTIVE ACTS OR PRACTICES - OHIO REVISED CODE § 1345.02**

1095.   Ohio realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

1096.   Meta and each Defendant are "suppliers," as they engaged in the business of effecting "consumer transactions" by soliciting "consumers" either directly or indirectly for

185

services, including access to Meta's Social Media Platforms in exchange for users' personal data and time, for a purpose that was primarily for personal, family, or household use, as those terms are defined by Ohio Rev. Code §1345.01(A), (C), and (D).

1097.   In numerous instances in connection with the advertising, marketing, promotion, and other representations regarding its products, including through the means described in Section XI, paragraphs 846 through 850, Meta committed unfair or deceptive acts or practices in violation of the Ohio Consumer Sales Practices Act (CSPA), Ohio Rev. Code §1345.02(A), by making the deceptive representations, directly or indirectly, expressly or by implication, with the intent that consumers rely on the deceptive representations, including, but not limited to, the representations outlined in Section XI, paragraphs 846 through 850.

1098.   Further, Meta committed unfair or deceptive acts or practices in violation of the CSPA, Ohio Rev. Code §1345.02(A), by engaging in unfair acts and omissions that caused young users' compulsive and unhealthy use of, and addiction to, Meta's Social Media Platforms. At all relevant times, Meta had a thorough understanding of the mental and physical harms and addiction suffered by young users of its Platforms. Instead of taking adequate measures to mitigate these damaging effects, Meta knowingly persisted in exploiting young users' psychological vulnerabilities. Meta's acts and omissions constitute knowing decisions causing unnecessary and unjustified harm to young users for Meta's financial gain. Meta's unfair acts include, but are not limited to, the acts outlined in Section XI, paragraphs 846 through 850.

1099.   Each unfair or deceptive act or practice engaged in by Meta as recited above constitutes a separate violation of the CSPA.

1100.   The acts or practices described above have been previously determined by Ohio courts to violate the CSPA, Ohio Rev. Code §1345.01 *et seq*. Meta committed said violations after such decisions were made available for public inspection pursuant to Ohio Rev. Code §1345.05(A)(3).

1   **COUNT XLIII: VIOLATIONS OF OHIO CONSUMER SALES PRACTICES ACT –**

2   **UNCONSCIONABLE CONSUMER SALES ACTS OR PRACTICES - OHIO REVISED**

3   **CODE §1345.03**

4    1101.   Ohio realleges and incorporates herein by reference each of the allegations

5   contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of

6   action.

7    1102.   Meta knowingly designed platforms that ignored the damaging effect said

8   platforms have on young users' psychological vulnerabilities. Meta made immoral, unethical,

9   oppressive and unscrupulous decisions that prioritized Meta's financial gain at the expense of its

10  young users' mental health.

11   1103.   Meta's conduct, acts or omissions, as described herein, constitute unconscionable

12  acts and practices in violation of the CSPA, O.R.C. 1345.03(A).

13   1104.   Each unconscionable act or practice engaged in by Meta as recited above

14  constitutes a separate violation of the CSPA.

15   1105.   The acts or practices described above have been previously determined by Ohio

16  courts to violate the CSPA, Ohio Rev. Code §1345.01, *et seq*. Meta committed said violations

17  after such decisions were made available for public inspection pursuant to Ohio Rev. Code

18  §1345.05(A)(3).

19

20  **COUNT XLIV: VIOLATIONS OF OREGON'S UNLAWFUL TRADE PRACTICES ACT**

21  **(UTPA), O.R.S. § 646.607(1)**

22   1106.   The State of Oregon, *ex rel*. Ellen F. Rosenblum, Attorney General, incorporates

23  and realleges each of the paragraphs 1 through 850 as if fully set forth herein.

24   1107.   Meta employed unconscionable tactics in violation of O.R.S. § 646.607(1) when,

25  acting in the course of its businesses, vocations, or occupations, Meta engaged in acts and

26  omissions in connection with selling or disposing of goods or services that caused young users'

27  compulsive and unhealthy use of and addiction to Meta's Social Media Platforms.

28

Complaint for Injunctive and Other Relief

1108.   Meta's violations of the UTPA set forth herein were willful because Meta knew or should have known that its conduct violated the UTPA.

1109.   Pursuant to O.R.S. §§ 646.632, 646.636, and 646.642, the State of Oregon seeks a permanent injunction against Meta; restitution for consumers; civil penalties up to $25,000 per willful violation; and costs, reasonable expenses, and attorneys' fees.

1110.   Meta and each Defendant was served with a notice in writing that identified the alleged unlawful conduct and the relief the State of Oregon would seek. Neither Meta nor any Defendant executed and delivered a satisfactory assurance of voluntary compliance as provided in O.R.S. § 646.632(2).

**COUNT XLV: VIOLATIONS OF OREGON'S UTPA, O.R.S. § 646.608(1)(e)**

1111.   The State of Oregon, *ex rel.* Ellen F. Rosenblum, Attorney General, incorporates and realleges each of the paragraphs 1 through 850 and Count XLIV as if fully set forth herein.

1112.   Meta, acting in the course of its businesses, vocations, or occupations, violated O.R.S. § 646.608(1)(e) when Meta expressly and by implication made false or misleading representations that its goods or services have characteristics, uses, benefits or qualities that the goods or services do not have. The representations relate to Meta's Social Media Platforms, including but not limited to those representations described in paragraph 846.

1113.   Meta's violations of the UTPA set forth herein were willful because Meta knew or should have known that its conduct violated the UTPA.

1114.   Pursuant to O.R.S. §§ 646.632, 646.636, and 646.642, the State of Oregon seeks a permanent injunction against Meta; restitution for consumers; civil penalties up to $25,000 per willful violation; and costs, reasonable expenses, and attorneys' fees.

1115.   Meta and each Defendant was served with a notice in writing that identified the alleged unlawful conduct and the relief the State would seek. Neither Meta nor any Defendant executed and delivered a satisfactory assurance of voluntary compliance as provided in O.R.S. § 646.632(2).

**COUNT XLVI: VIOLATIONS OF OREGON'S UTPA, O.R.S. § 646.608(1)(t)**

1116.   The State of Oregon, *ex rel*. Ellen F. Rosenblum, Attorney General, incorporates and realleges each of the paragraphs 1 through 850 and Counts XLIV and XLV as if fully set forth herein.

1117.   Meta, acting in the course of its businesses, vocations, or occupations, violated O.R.S. § 646.608(1)(t) when Meta failed to disclose concurrent with tender or delivery of Meta's Social Media Platforms known material defects and material nonconformities resulting in young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms.

1118.   Meta's violations of the UTPA set forth herein were willful because Meta knew or should have known that its conduct violated the UTPA.

1119.   Pursuant to O.R.S. §§ 646.632, 646.636, and 646.642, the State of Oregon seeks a permanent injunction against Meta; restitution for consumers; civil penalties up to $25,000 per willful violation; and costs, reasonable expenses, and attorneys' fees.

1120.   Meta and each Defendant was served with a notice in writing that identified the alleged unlawful conduct and the relief the State would seek. Neither Meta nor any Defendant executed and delivered a satisfactory assurance of voluntary compliance as provided in O.R.S. § 646.632(2).

**COUNT XLVII: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (UTPCPL)**

1121.   The Commonwealth of Pennsylvania realleges and incorporates herein by reference each of the paragraphs 1 through 850 as if fully set forth herein.

1122.   At all relevant times set forth herein, Meta has engaged in trade and commerce pursuant to 73 P.S. § 201-2(3) of the UTPCPL, in connection with its sale and advertisement of merchandise.

1123.   Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce as defined by subclauses (i) through (xxi) of Section 201-2(4) of

189

the UTPCPL are declared unlawful, and whenever the Attorney General has reason to believe that any person is using or is about to use any method, act, or practice declared unlawful, Section 201-4 of the UTPCPL authorizes the Attorney General to bring an action against such person to restrain these methods, acts, or practices.

1124.   The acts and practices described in paragraphs 1 through 850 constitute deceptive acts or practices, as prohibited by section 201-3 of the UTPCPL as defined by subclauses 201-2(4)(ii), (vii), and (xxi) of section 201-2(4) as follows:

   a.   Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services, 73 P.S. § 201-2(4)(ii);

   b.   Representing that goods or services are of a particular standard, quality or grade, or that goods are a particular style or model, if they are of another, 73 P.S. § 201-2(4)(vii); and

   c.   Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

1125.   The Commonwealth of Pennsylvania alleges that all of the practices described above were performed willfully. Accordingly, and pursuant to section 201-8 of the UTPCPL, the Commonwealth of Pennsylvania seeks the imposition of civil penalties of One Thousand and 00/100 Dollars ($1,000.00) for each violation of the UTPCPL in addition to other relief sought, as appropriate.

1126.   The Commonwealth of Pennsylvania believes that the public interest is served by seeking before this Court a permanent injunction to restrain the methods, acts and practices described herein, as well as seeking restitution and civil penalties for violation of the law. The Commonwealth of Pennsylvania believes that citizens of the Commonwealth of Pennsylvania are suffering and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

## COUNT XLVIII: UNFAIR ACTS OR PRACTICES BY META IN VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (UTPCPL)

1127.   The Commonwealth of Pennsylvania realleges and incorporates herein by reference each of the paragraphs 1 through 850 as if fully set forth herein.

1128.   At all relevant times set forth herein, Meta has engaged in trade and commerce pursuant to 73 P.S. § 201-2(3) of the UTPCPL, in connection with its sale and advertisement of merchandise.

1129.   Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce as defined by subclauses (i) through (xxi) of section 201-2(4) of the UTPCPL are declared unlawful, and whenever the Attorney General has reason to believe that any person is using or is about to use any method, act, or practice declared unlawful, section 201-4 of the UTPCPL authorizes the Attorney General to bring an action against such person to restrain these methods, acts, or practices.

1130.   The acts and practices described in paragraphs 1 through 850 constitute unfair methods of competition or unfair or deceptive acts or practices, as prohibited by section 201-3 of the UTPCPL as defined by subclause 201-2(4)(xxi) of section 201-2(4) as follows: Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

1131.   The Commonwealth of Pennsylvania alleges that all of the practices described above were performed willfully. Accordingly, and pursuant to section 201-8 of the UTPCPL, the Commonwealth of Pennsylvania seeks the imposition of civil penalties of One Thousand and 00/100 Dollars ($1,000.00) for each violation of the UTPCPL in addition to other relief sought, as appropriate.

1132.   The Commonwealth of Pennsylvania believes that the public interest is served by seeking before this Court a permanent injunction to restrain the methods, acts and practices described herein, as well as seeking restitution and civil penalties for violation of the law. The Commonwealth of Pennsylvania believes that citizens of the Commonwealth of Pennsylvania are

1    suffering and will continue to suffer harm unless the acts and practices complained of herein are

2    permanently enjoined.

3

4    **COUNT XLIX: VIOLATIONS OF RHODE ISLAND DECEPTIVE TRADE PRACTICES**

5    **ACT, R.I. GEN. L. §§ 6-13.1-1 TO 6-13.1-10**

6        1133.   The State of Rhode Island incorporates and realleges each of the paragraphs 1

7    through 850 as if fully set forth herein.

8        1134.   The Rhode Island Deceptive Trade Practices Act (RI DTPA) makes unfair

9    methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

10   commerce unlawful. R.I. Gen. Laws § 6-13.1-2.

11       1135.   The RI DTPA defines "unfair methods of competition and unfair and deceptive

12   acts or practices" as, among other things, "conduct that . . . creates a likelihood of confusion or of

13   misunderstanding," "any other methods, acts, or practices that mislead or deceive members of the

14   public in a material respect," and "any act or practice that is unfair or deceptive to the consumer."

15   R.I. Gen. Laws § 6-13.1-1(6)(xii), (xiv), (xiii).

16       1136.   Any person, firm, or corporation who violates the RI DTPA is liable for a civil

17   penalty up to $10,000 for each violation. R.I. Gen. Laws § 6-13.1-8.

18       1137.   Meta's acts or practices enumerated in the foregoing paragraphs have been in the

19   conduct of trade or commerce, directly or indirectly, in Rhode Island.

20       1138.   As alleged herein, Meta made representations including that Meta's Social Media

21   Platforms are not designed to harm young users or to induce compulsive use, that Meta's Social

22   Media Platforms are less addictive than they actually are, that the incidence of negative user

23   experiences was lower than it actually was, that Meta was not prioritizing profit maximization

24   over young users' well-being when it was, that Meta effectively excluded under-13 users when its

25   safeguards were insufficient, that Meta complied with federal laws and regulations related to the

26   exclusion of under-13 users when it did not, and that Meta did not collect user data for the

27   purpose of causing addiction to its Social Media Platforms when it had such a purpose. These

28   representations constitute conduct that creates a likelihood of confusion or misunderstanding and

that deceive and mislead members of the public regarding Meta's Social Media Platforms. R.I. Gen. Laws § 6-13.1-1(6)(xii), (xiii), (xiv).

1139.   Similarly, as alleged herein, Meta is engaging in unfair acts to consumers, including implementing psychologically manipulative, engagement-inducing features that harm consumers and targeting young users despite knowing their specific vulnerability to compulsive and unhealthy platform use. These unfair acts constitute conduct that is especially unfair to younger users. R.I. Gen. Laws § 6-13.1-1(6)(xiii).

1140.   Meta's acts or practices, both past and continuing, are immoral, unethical, oppressive, unscrupulous, and substantially injurious to Rhode Island consumers. Pursuant to R.I. Gen. Laws § 6-13.1-2 and § 6-13.1-5, the acts, practices, representations, and omissions of Meta described herein are unlawful, violate the prohibition against unfair or deceptive acts or practices found in RI DTPA, and restraint of these practices is in the public interest.

**COUNT L: VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT, S.C. CODE ANN. SECTION 39-5-10 *et seq*.**

1141.   The State of South Carolina realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this section.

1142.   The State of South Carolina brings this claim under the South Carolina Unfair Trade Practices Act (SCUTPA), asserting a claim under sections 39-5-50 and 39-5-110 of the South Carolina Code.

1143.   Section 39-5-10 *et seq*. of the South Carolina Code prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

1144.   Meta's acts and practices as described in this Complaint constitute "trade" or "commerce" within the meaning of SCUTPA.

1145.   Meta engaged in unfair and/or deceptive acts or practices within the meaning of Section 39-5-20 of the South Carolina Code through, inter alia, acts and omissions that caused young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms.

1146.   Meta's misrepresentations are deceptive because they have the capacity to mislead a substantial number of consumers.

1147.   An act or practice may be unfair if it offends public policy; is immoral, unethical, oppressive, unconscionable, or causes injury to consumers. Meta's acts or practices as alleged in this Complaint are unfair.

1148.   Meta's unfair and deceptive conduct related to addicting young users to its Platforms affects the public interest. Moreover, Meta's acts or practices regarding South Carolina as alleged herein are capable of repetition.

1149.   Meta knew or reasonably should have known that its conduct violated SCUTPA and therefore is willful for the purposes of section 39-5-110 of the South Carolina Code, justifying civil penalties.

1150.   The State of South Carolina seeks all remedies available under SCUTPA including, without limitation, the following:

a.   Injunctive and other equitable relief pursuant to section 39-5-50(a) of the South Carolina Code;

b.   Restoration of all ascertainable losses under section 39-5-50(b) of the South Carolina Code to any person or entity who suffered them as a result of Meta's conduct;

c.   Civil penalties in an amount up to $5,000.00 per violation with every unfair or deceptive act or practice by Meta constituting a separate and distinct violation; and

d.   Costs and attorneys' fees pursuant to section 1-7-85 of the South Carolina Code.

**COUNT LI: VIOLATIONS OF VIRGINIA CONSUMER PROTECTION ACT, VA. CODE §§ 59.1-198 TO 59.1-207**

1151.   The Commonwealth of Virginia, *ex rel*. Jason S. Miyares, Attorney General, incorporates and realleges each of the paragraphs 1 through 850 as if fully set forth herein.

1152.   Meta is or was during all relevant times a "supplier" of "goods" and/or "services" in connection with "consumer transactions" as those terms are defined in § 59.1-198 of the Virginia Consumer Protection Act (VCPA).

194

Complaint for Injunctive and Other Relief

1153.   The Commonwealth of Virginia alleges that the aforesaid acts and practices of Meta, including but not limited to those described in paragraph 846, constitute violations of the VCPA, including Virginia Code § 59.1-200(A)(5), (6), and (14).

1154.   Individual consumers have suffered losses as a result of Meta's violations of the VCPA.

1155.   Meta has willfully engaged in the acts and practices described in this Complaint in violation of the VCPA.

1156.   Pursuant to Va. Code §§ 59.1-203, 205, and 206, the Commonwealth of Virginia seeks a permanent injunction against Meta restraining future VCPA violations; restitution for consumers for monies acquired by means of any VCPA violations; and civil penalties, costs, reasonable expenses, and attorneys' fees.

**COUNT LII: DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, WASH. REV. CODE § 19.86.020**

1157.   Washington realleges and incorporates herein by reference each of the allegations contained in the preceding paragraph 1 through 850 as though fully alleged in this cause of action.

1158.   Meta engaged in deceptive acts or practices affecting Washington consumers, including young users, parents of young users, and Meta advertisers, and in violation of Wash. Rev. Code. § 19.86.020 by making representations, directly or indirectly, expressly or by implication, regarding its Social Media Platforms, including but not limited to the following: (a) that Meta's Social Media Platforms are not psychologically or physically harmful for young users and children and are not designed to induce compulsive and extended use by young users and children; (b) that Meta's Social Media Platforms are not addictive and/or are unlikely to result in psychological or physical harm for young users and children; (c) that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms is lower than it actually is; (d) that Meta prioritized young users' and children's health and safety over maximizing profits; (e) that Meta does not allow the promotion of harmful material on its Social Media Platforms; (f) that under-13 users are effectively excluded by Meta from using Instagram

195

and/or Facebook; (g) that Meta's collection of user data was not for the purpose of increasing users' use of the Social Media Platforms; and (h) other deceptive representations.

1159.   Meta's conduct as described herein occurred in trade or commerce within the meaning of the Washington Consumer Protection Act, Wash. Rev. Code. § 19.86.010(2), directly or indirectly affecting the people of the State of Washington.

1160.   Meta's deceptive acts or practices affected the public interest in that they impacted numerous Washington consumers and other consumers.

1161.   Meta's deceptive acts or practices are likely to continue without relief from this Court.

1162.   Based on the above deceptive acts or practices, the State of Washington is entitled to relief under the Washington Consumer Protection Act including injunctive relief and restitution pursuant to Wash. Rev. Code. § 19.86.080, civil penalties pursuant to Wash. Rev. Code. § 19.86.140 for each and every violation of Wash. Rev. Code. § 19.86.020, and reimbursement of the costs of this action, including reasonable attorneys' fees, pursuant to Wash. Rev. Code. § 19.86.080.

**COUNT LIII: UNFAIR ACTS OR PRACTICES BY META IN VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, WASH. REV. CODE § 19.86.020**

1163.   Washington realleges and incorporates herein by reference each of the allegations contained in the preceding paragraph 1 through 850 as though fully alleged in this cause of action.

1164.   Meta engaged in unfair acts or practices affecting Washington consumers, including young users, parents of young users, and Meta advertisers, and in violation of Wash. Rev. Code. § 19.86.020 by (a) encouraging or facilitating young users' and children's compulsive and unhealthy use of and addiction to Meta's Social Media Platforms; (b) downplaying, minimizing, denying, or otherwise ignoring instances of harm suffered by young users and children on Meta's Social Media Platforms; (c) downplaying, minimizing, denying, or otherwise ignoring the association between harms and the use of Meta's Social Media Platforms by young users and children; (d) targeting its Social Media Platforms to young users and children while

196

1    designing its Social Media Platforms to include features psychologically and physically harmful

2    to young users and children—including Meta-designed and -deployed features known to promote

3    compulsive, prolonged, and unhealthy use; (e) adopting design choices that have the capacity to

4    harm young users, including infinite scroll, ephemeral content features, autoplay, and disruptive

5    alerts; (f) designing, developing, and/or deploying disruptive audiovisual and vibration

6    notifications and alerts and ephemeral features to induce young users and children to spend more

7    time using the Social Media Platforms; and (g) algorithmically exploiting "variable reinforcement

8    schedules," inducing young users and children to over-engage with Meta's products.

9        1165.   Meta's conduct as described herein occurred in trade or commerce within the

10   meaning of the Washington Consumer Protection Act, Wash. Rev. Code. § 19.86.010(2), directly

11   or indirectly affecting the people of the State of Washington.

12       1166.   Meta's unfair acts or practices affected the public interest in that they impacted

13   numerous Washington consumers and other consumers.

14       1167.   Meta's unfair acts or practices are likely to continue without relief from this Court.

15       1168.   Based on the above unfair acts or practices, the State of Washington is entitled to

16   relief under the Washington Consumer Protection Act including injunctive relief and restitution

17   pursuant to Wash. Rev. Code. § 19.86.080, civil penalties pursuant to Wash. Rev. Code. §

18   19.86.140 for each and every violation of Wash. Rev. Code. § 19.86.020, and reimbursement of

19   the costs of this action, including reasonable attorneys' fees, pursuant to Wash. Rev. Code. §

20   19.86.080.

21

22   **COUNT LIV: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF**

23   **WISCONSIN'S DECEPTIVE TRADE PRACTICES ACT, WIS. STAT. § 100.18(1)**

24       1169.   Wisconsin realleges and incorporates herein by reference each of the allegations

25   contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of

26   action.

27       1170.   In numerous instances, with the intent to sell, distribute, or increase the

28   consumption of its products and/or services, Meta directly or indirectly made, published, or

placed before the public, representations that were untrue, deceptive, or misleading, including but not limited to the following representations by Meta:

    a.  that Meta's Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed;

    b.  that Meta's Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality;

    c.  representing, through the publication of CSER reports, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

    d.  that Meta prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms;

    e.  that under-13 users are effectively excluded by Meta from using Instagram and/or Facebook when in fact Meta was aware that its policies and practices were insufficient to exclude all under-13 users from the Platforms; and

    f.  that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data.

1171.  Each deceptive act or practice alleged herein, constitutes a separate violation of the Wisconsin Deceptive Trade Practices Act. By engaging in the acts and practices alleged herein, Meta engaged in deceptive acts or practices declared unlawful under Wis. Stat. § 100.18(1).

**PRAYER FOR RELIEF**

A.  On the Filing States' joint COPPA claim, pursuant to 15 U.S.C. § 6504(a)(1) and as authorized by the Court's own equitable powers, the Filing States request that the Court:

1.  Enter a permanent injunction to stop ongoing violations and prevent future violations of the COPPA Rule by Meta;

2.  Make such other orders as may be necessary to enforce Meta's compliance with the COPPA Rule;

3.  Award the Filing States damages, restitution, and other compensation;[43] and

4.  Award other and additional relief the Court may determine to be just and proper.

B.  On the Filing States' individual claims set forth in paragraphs 860 through 1171, each State respectfully requests that the Court:

    1.  For Arizona:

        a.  Pursuant to Ariz. Rev. Stat. § 44-1528(A)(1), issue a permanent injunction in accordance with Ariz. R. Civ. P. 65(d)(1), enjoining and restraining (a) Meta, (b) its officers, agents, servants, employees, attorneys, and (c) all persons in active concert or participation with anyone described in part (a) or (b) of this paragraph, directly or indirectly, from engaging in deceptive, misleading, or unfair acts or practices, or concealments, suppressions, or omissions, that violate the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A), including specific injunctive relief barring Meta from engaging in the unlawful acts and practices set forth above;

        b.  Pursuant to Ariz. Rev. Stat. § 44-1528(A)(2), order Meta to restore to all persons in interest any monies or property, real or personal, which may have been acquired by any means or any practice in this article declared to be unlawful;

        c.  Pursuant to Ariz. Rev. Stat. § 44-1528(A)(3), order Meta to disgorge all profits, gains, gross receipts, or other benefits obtained as a result of its unlawful acts alleged herein;

---

[43] Maine does not join in the request for monetary relief on the Filing States' joint COPPA claim.

d. Pursuant to Ariz. Rev. Stat. § 44-1531, order Meta to pay to the State of Arizona a civil penalty of up to $10,000 for each willful violation by each Defendant of Ariz. Rev. Stat. § 44-1522;

e. Pursuant to Ariz. Rev. Stat. § 44-1534, order Meta to reimburse the State of Arizona for its costs and attorneys' fees incurred in the investigation and prosecution of Meta's activities alleged in this Complaint;

f. Pursuant to Ariz. Rev. Stat. § 44-1201, require Meta to pay pre-judgment and post-judgment interest to the State of Arizona and all consumers;

g. Award the State such further relief the Court deems just and proper under the circumstances.

2. For California:

a. With respect to the state law claims set forth by California, pursuant to California Business and Professions Code sections 17203 and 17535, order that Meta, its successors, agents, representatives, employees, and all persons who act in concert with them be permanently enjoined from committing any acts which violate California Business and Professions Code sections 17200 and 17500, including, but not limited to, the acts and practices alleged in this Complaint; pursuant to California Business and Professions Code section 17536, award the People of the State of California civil penalties of $2,500 for each violation of California Business and Professions Code section 17500, as proved at trial; pursuant to California Business and Professions Code section 17206, award the People of the State of California civil penalties of $2,500 for each violation of California Business and Professions Code section 17200, as proved at trial (which are cumulative to the penalties awarded pursuant to section 17536); pursuant to California Business and Professions Code section 17206.1, award the People of the State of California additional civil penalties of $2,500 for each violation of California Business and

1    Professions Code section 17200 against one or more disabled persons, as

2    proved at trial; make such orders or judgments, pursuant to California

3    Business and Professions Code sections 17203 and 17535, as may be

4    necessary to prevent the use or employment by Meta of any act or practice

5    that violates California Business and Professions Code sections 17200 or

6    17500, or as may be necessary to restore to any person in interest any

7    money or property which Meta may have acquired either directly or

8    indirectly from such persons by means of any practice that violates

9    California Business and Professions Code sections 17200 or 17500; and

10    award the People of the State of California all other relief to which they are

11    legally entitled under California law.

12    3. For Colorado:

13        a. An order and judgment declaring Meta's conduct to be in violation of the

14            Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-105(1)(e), (g),

15            (u), and (rrr).

16        b. An order and judgment to enjoin and prevent the use and employment of

17            the deceptive trade practices described in this Complaint and which are

18            necessary to completely compensate the State of Colorado, its institutions,

19            and any person injured by means of any such practice. Such relief shall

20            include a judgment in an amount to be determined at trial for restitution,

21            disgorgement, or other equitable relief, including injunctive relief, pursuant

22            to Colo. Rev. Stat. § 6-1-110(1).

23        c. An order permanently enjoining Meta and anyone in active concert or

24            participation with Meta with notice of such injunctive orders, from

25            engaging in any deceptive trade practices as defined in and proscribed by

26            the Colorado Consumer Protection Act and as set forth in this Complaint,

27            pursuant to Colo. Rev. Stat. § 6-1-110(1).

28

Complaint for Injunctive and Other Relief

1           d.  An order requiring Meta to forfeit and pay civil penalties pursuant to Colo.

2               Rev. Stat. § 6-1-112(1)(a).

3           e.  An order requiring Meta to pay the costs and expenses of this action

4               incurred by the Attorney General, including, but not limited to, expert costs

5               and attorneys' fees, pursuant to Colo. Rev. Stat. § 6-1-113(4).

6           f.  Any such further orders as the Court may deem just and proper to

7               effectuate the purposes of the Colorado Consumer Protection Act.

8     4.  For Connecticut:

9           a.  With respect to the state law claims set forth by the State of Connecticut,

10              pursuant to the Connecticut Unfair Trade Practices Act (CUTPA),

11              Connecticut General Statutes (Conn. Gen. Stat.) § 42-110b *et seq.,* award

12              the State of Connecticut: (1) civil penalties for each willful violation of

13              CUTPA committed by Meta up to $5,000 per violation pursuant to Conn.

14              Gen. Stat. § 42-110o; (2) damages and restitution for Connecticut

15              consumers, pursuant to Conn. Gen. Stat. § 42-110m; (3) disgorgement,

16              pursuant to Conn. Gen. Stat. § 42-110m; (4) injunctive and other equitable

17              relief, pursuant to Conn. Gen. Stat. § 42-110m; (5) costs and attorney's

18              fees, pursuant to Conn. Gen. Stat. § 42-110m; and (6) other remedies as the

19              Court may deem appropriate under the facts and circumstances of the case.

20     5.  For Delaware:

21           a.  With respect to the Delaware CFA claim set forth by the State of Delaware

22              in Count X pursuant to 6 Del. Code Ann. §§2522, 2523 and 2526, a

23              permanent injunction enjoining Meta from violating the Delaware CFA,

24              award to the state civil penalties of up to $10,000 per violation for each

25              willful violation of § 2513 of the Delaware CFA, the exact number of

26              violations to be proven at trial; award all sums necessary to restore to any

27              consumers the money or property acquired from them by Meta in

28              connection with violations of § 2513 of the Delaware CFA; award to the

1    State its costs as well as attorneys' fees, and all other remedies and relief

2    available at law and equity that this Court deems fit.

3    b.  With respect to the Delaware DTPA claim set forth by the State of

4    Delaware in Count XI pursuant to 6 Del. Code Ann. §§ 2532 and 2533 and

5    award to the state a permanent injunction enjoining Meta from violating the

6    Delaware DTPA, civil penalties of up to $10,000 per violation for each

7    willful violation of § 2532 of the Delaware DTPA, the exact number of

8    violations to be proven at trial; award all sums necessary to restore to any

9    consumers the money or property acquired from them by Meta in

10   connection with violations of § 2532 of the Delaware DTPA; award to the

11   State its costs as well as attorneys' fees, and all other remedies and relief

12   available at law and equity that this Court deems fit.

13   6.  For Georgia:

14   a.  Declaring that Meta has violated the FBPA by engaging in the unlawful

15   acts and practices alleged herein;

16   b.  Permanently enjoining Meta from engaging in the unfair and/or deceptive

17   acts and practices alleged herein;

18   c.  Permanently enjoining Meta from violating the FBPA;

19   d.  Ordering that Meta pay restitution to any person or persons adversely

20   affected by Meta's actions in violation of the FBPA;

21   e.  Assessing a civil penalty against Meta in the amount of $5,000.00 per

22   violation of the FBPA;

23   f.  Assessing attorneys' fees and costs against Meta; and

24   g.  Granting such other and further relief as the Court deems just and

25   appropriate.

26   7.  For Hawai'i:

27   a.  Declaring that Meta has violated HIUDAP by engaging in the unlawful

28   acts and practices alleged herein;

b. Permanently enjoining Meta from engaging in any acts that violate HIUDAP, including, but not limited to, the unfair or deceptive acts or practices alleged herein;

c. Assessing civil penalties against Meta in the amount not exceeding $10,000.00 for each and every violation of HIUDAP pursuant to HRS § 480-3.1;

d. Awarding the State's reasonable attorneys' fees and costs pursuant to HRS § 480-14 (c) for violations of HIUDAP;

e. Pre- and post-judgment interest; and

f. Awarding such other relief as this Court deems just and equitable.

8. For Illinois:

a. Find that Meta violated Section 2 of the Consumer Fraud Act, 815 ILCS 505/2, by engaging in unlawful acts and practices including, but not limited to, the unlawful acts and practices alleged herein;

b. Enter a permanent injunction pursuant to 815 ILCS 505/7 to prevent future violations of the Consumer Fraud Act;

c. Order Meta to pay penalties up to $50,000 per unfair or deceptive act or practice and an additional amount of $50,000 for each act or practice found to have been committed with the intent to defraud, as provided in Section 7 of the Consumer Fraud Act, 815 ILCS 505/7;

d. Order Meta to pay monetary relief, including restitution to Illinois consumers, and disgorgement of revenues pursuant to 815 ILCS 505/7;

e. Order Meta to pay all costs of the State of Illinois in bringing this action pursuant to 815 ILCS 505/10;

f. Award any other and additional relief as the Court may determine to be just and proper.

9. For Indiana:

a.  Pursuant to Ind. Code § 24-5-0.5-4(c)(1), permanently enjoin Meta from engaging in acts or omissions alleged in this Complaint that violate the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*;

b.  Pursuant to Ind. Code § 24-5-0.5-4(c)(2), order Meta to pay restitution to aggrieved Indiana consumers;

c.  Pursuant to Ind. Code § 24-5-0.5-4(c)(4), order Meta to pay costs, awarding the Office of the Attorney General its reasonable expenses incurred in the investigation and prosecution of this action;

d.  Pursuant to Ind. Code § 24-5-0.5-4(g), order Meta to pay civil penalties for Meta's knowing violations of Ind. Code § 24-5-0.5-3(a) and Ind. Code §§ 24-5-0.5-3(b)(1) and (2), payable to the State of Indiana, in the amount of five thousand dollars ($5,000.00) per violation;

e.  Pursuant to Ind. Code § 24-5-0.5-8, order Meta to pay civil penalties for Meta's incurable deceptive acts, payable to the State of Indiana, in the amount of five hundred dollars ($500.00) per violation; and

f.  Pursuant to Ind. Code § 24-5-0.5-4(c), all other just and proper relief, including but not limited to equitable relief such as disgorgement of revenues from any ill-gotten gains.

10. For Kansas:

a.  Permanently enjoin Meta, pursuant to K.S.A. 50-632 from engaging in any acts that violate the KCPA, including, but not limited to, the deceptive and unconscionable acts or practices alleged herein;

b.  Order Meta to pay civil penalties in the amount of $10,000.00, pursuant to K.S.A. 50-636(a), for each violation of the KCPA;

c.  Order Meta to pay all expenses and investigation fees, pursuant to K.S.A. 50-632(a)(4); and

d.  Such other relief as the Court deems just and equitable.

11. For Kentucky:

1          a.  Disgorgement and restitution pursuant to Ky. Rev. Stat.§ 15.020, Ky. Rev.

2              Stat.§ 367.110 through Ky. Rev. Stat.§ 367.990, and common law;

3          b.  Injunctive and other equitable relief pursuant to Ky. Rev. Stat. § 15.020,

4              Ky. Rev. Stat. § 367.190, and common law;

5          c.  Civil penalties pursuant to Ky. Rev. Stat.§ 367.990(2);

6          d.  Costs and attorneys' fees pursuant to Ky. Rev. Stat. § 367.110 through Ky.

7              Rev. Stat.§ 367.990, Ky. Rev. Stat.§ 48.005(4), and common law; and

8          e.  Other remedies as the Court may deem appropriate under the facts and

9              circumstances of the case.

10    12. For Louisiana:

11          a.  An order declaring Meta's conduct to be in violation of LA. REV. STAT.

12              ANN. § 51:1405;

13          b.  Issuing a permanent injunction prohibiting Meta from engaging in future

14              unfair and deceptive trade practices pursuant to LA. REV. STAT. ANN.

15              § 51:1407;

16          c.  Ordering Meta to pay civil penalties for each and every violation of the

17              Louisiana Consumer Protection Law pursuant to LA. REV. STAT. ANN.

18              § 51:1407;

19          d.  Ordering Meta to pay all costs and reasonable attorneys' fees for the

20              prosecution and investigation of this action; and

21          e.  Ordering any other additional relief as the Court may deem just and proper.

22    13. For Maine:

23          a.  An order pursuant to ME. REV. STAT. ANN. tit. 5, § 209 to permanently

24              enjoin and restrain the use of the unfair or deceptive methods, acts, or

25              practices which are unlawful under ME. REV. STAT. ANN. tit. 5, § 207 as

26              described in this Complaint;

27

28

b. An order pursuant to ME. REV. STAT. ANN. tit. 5, § 209 requiring Meta to forfeit and pay civil penalties for each intentional violation of the Maine Unfair Trade Practices Act;

c. An order requiring Meta to pay the costs and expenses of this action incurred by the Attorney General, including, but not limited to, expert costs and attorneys' fees, pursuant to ME. REV. STAT. ANN. tit. 5, § 209 and ME. REV. STAT. ANN. tit. 14, § 1522(1)(A); and

d. Any such further orders as the Court may deem just and proper to effectuate the purposes of the Maine Unfair Trade Practices Act.

14. For Michigan:

a. The Attorney General for the State of Michigan seeks a permanent injunction against Meta restraining future violations of the MCPA and other law; a civil fine of $25,000 per violation; a declaratory judgment that the conduct comprising MCPA violations described above are unlawful; restitution and monetary damages of not less than $250.00 per consumer damaged by the MCPA violations described above; costs and reasonable attorneys' fees; and any other relief this Court considers just and proper.

15. For Minnesota:

a. With respect to the state law claims set forth by the State of Minnesota, award judgment against Meta, jointly and severally, as follows:

   i. Declaring that Meta's actions and omissions, as described in this Complaint, constitute multiple, separate violations of Minnesota Statutes section 325D.44, subdivision 1;

   ii. Permanently enjoining Meta and its employees, officers, directors, agents, successors, assignees, affiliates, merged or acquired predecessors, parents or controlling entities, subsidiaries, and all other persons acting in concert or participation with them from

1    engaging in conduct in violation of Minnesota Statutes section

2    325D.44, subdivision 1;

3         iii.    Awarding judgment against Meta for restitution, disgorgement,

4    and/or damages for Minnesota consumers under Minnesota Statutes

5    section 8.31, the *parens patriae* doctrine, the general equitable

6    powers of this Court, and any other authority;

7         iv.    Awarding judgment against Meta for civil penalties pursuant to

8    Minnesota Statutes section 8.31, subdivision 3, for each separate

9    violation of Minnesota Statutes section 325D.44, subdivision 1;

10        v.    Awarding the State of Minnesota its costs, including litigation

11    costs, costs of investigation, and attorneys' fees, as authorized by

12    Minnesota Statutes section 8.31, subdivision 3a; and

13        vi.    Granting such further relief as provided by law or equity or as the

14    Court deems appropriate and just.

15    16. For Missouri:

16        a.    An order declaring Meta's conduct to be in violation of the Missouri

17    Merchandising Practices Act (MMPA), Mo. Rev. Stat. §407.020;

18        b.    An order permanently enjoining Meta and anyone in active concert or

19    participation with Meta with notice of such injunctive orders, from

20    engaging in any unlawful practices as defined in and proscribed by the

21    MMPA and as set forth in this Complaint, pursuant to Mo. Rev. Stat.

22    §407.100.1;

23        c.    An order to prevent the employment and recurrence of the unlawful acts

24    and practices described in this Complaint, including disgorgement, or other

25    equitable relief, including injunctive relief, pursuant to Mo. Rev. Stat.

26    §407.100.3;

27        d.    An order an order of restitution, payable to the State of Missouri, as may be

28    necessary to restore to any person who has suffered any ascertainable loss

208

as a result of Meta's unlawful practices, pursuant to Mo. Rev. Stat. §407.100.4;

    e.  An order requiring Meta to pay an amount equal to ten percent of any restitution awarded, pursuant to Mo. Rev. Stat. §407.140.3;

    f.  An order requiring Meta to pay civil penalties pursuant to Mo. Rev. Stat. §407.100.6;

    g.  An order requiring Meta to pay the Attorney General's costs and fees of investigating and prosecuting this action, including, but not limited to, expert costs and attorneys' fees, pursuant to Mo. Rev. Stat. §407.130; and

    h.  Any such further orders as the Court may deem just and proper to effectuate the purposes of the MMPA.

17. For Nebraska:

    a.  Permanently enjoining Meta, its agents, employees, and all other persons and entities, corporate or otherwise, in active concert or participation with any of them, pursuant to Neb. Rev. Stat. §§ 59-1608 and 87-303.05, from engaging in conduct described in the Complaint to be in violation of the Consumer Protection Act and Uniform Deceptive Trade Practices Act;

    b.  Permanently enjoining Meta, its agents, employees, and all other persons and entities, corporate or otherwise, in active concert or participation with any of them, pursuant to Neb. Rev. Stat. §§ 59-1608 and 87-303.05, from violating the Consumer Protection Act, Uniform Deceptive Trade Practices Act, and any amendments thereto;

    c.  Ordering Meta to pay restitution, pursuant to Neb. Rev. Stat. §§ 59-1608(2) and 87-303.05(1), to any person or persons adversely affected by Meta's acts or practices in violation of the Nebraska Consumer Protection Act and Nebraska Uniform Deceptive Trade Practices Act;

    d.  Ordering Meta to pay the State a civil penalty in the amount of two thousand ($2,000.00) dollars per violation, pursuant Neb. Rev. Stat. §§ 59-

1614 and 87-303.11, for each and every violation of the Consumer

Protection Act and Uniform Deceptive Trade Practices Act;

   e.  Ordering Meta to pay the State's costs and attorneys' fees in this matter,

pursuant to Neb. Rev. Stat. §§ 59-1608 and 87-303(b); and

   f.  Granting such further relief as the Court may deem just and appropriate.

18. For New Jersey:

   a.  With respect to the state law claims set forth by New Jersey, pursuant to

the Consumer Fraud Act (CFA), N.J. STAT. ANN. §§ 56:8-1 to 227, award

New Jersey: (1) the maximum statutory civil penalties for each violation of

CFA committed by Meta of $10,000 for the first violation and $20,000 for

each second and subsequent violation, pursuant to N.J. STAT. ANN. §§

56:8-13 and 14; (2) damages and restitution for New Jersey consumers

under N.J. STAT. ANN. § 56:8-8; (3) injunctive and other equitable relief,

pursuant to N.J. STAT. ANN. § 56:8-8; (4) treble damages under N.J. STAT.

ANN. § 56:8-19; (5) costs and attorneys' fees pursuant to N.J. STAT. ANN. §

56:8-11; and (6) any other remedies as the Court may deem appropriate

under the facts and circumstances of the case.

19. For New York:

   a.  Permanently enjoining Meta from violating the laws of the State of New

York, including New York Executive Law § 63(12) and New York General

Business Law §§ 349 and 350;

   b.  Directing Meta to make full restitution to consumers and pay damages

caused, directly or indirectly, by the fraudulent, deceptive, and illegal acts

complained of herein plus applicable pre-judgment interest;

   c.  Directing Meta to pay a civil penalty of $5,000 for each violation of New

York General Business Law Article 22-A, pursuant to New York General

Business Law § 350-d;

d.   Directing such other equitable relief as may be necessary to redress Meta's violations of New York law;

e.   Directing Meta to produce an accounting of profits and to disgorge all profits resulting from the fraudulent and illegal practices alleged herein;

f.   Awarding the Attorney General of the State of New York its costs; and

g.   Granting such other and further relief as the Court deems just and proper.

20. For North Carolina:

a.   Permanently enjoin Meta from engaging in the unfair or deceptive acts and practices described herein and from engaging in any other acts and practices with the same purpose or effect, pursuant to N.C.G.S. § 75-14;

b.   Enter any other permanent relief necessary to remedy the effects of Meta's unfair or deceptive conduct, pursuant to N.C.G.S. § 75-14;

c.   Award the State of North Carolina the disgorgement of profits from Meta's unfair or deceptive acts and practices;

d.   Award the State of North Carolina civil penalties, pursuant to N.C.G.S. § 75-15.2;

e.   Award the State of North Carolina its costs, including a reasonable attorney's fee, incurred by the investigation and litigation of this matter, pursuant to N.C.G.S. § 75-16.1;

f.   Award the State of North Carolina any and all other legal and equitable relief as the Court may determine to be just and proper.

21. For North Dakota:

a.   Find that Meta engaged in acts or practices that violate N.D. Cent. Code §51-15-02;

b.   Permanently enjoin Meta from engaging in any acts or practices that violate N.D. Cent. Code §51-15-02, including the unlawful acts or practices alleged herein, pursuant to N.D. Cent. Code §51-15-07;

211

  c. Award for the benefit of the state of North Dakota civil penalties of up to $5,000 for each violation of N.D. Cent. Code §51-15-02, pursuant to N.D. Cent. Code §51-15-11;

  d. Award all sums necessary to prevent Meta's use or employment of unlawful practices, and restore to persons any money or property that may have been acquired by means of a practice violating N.D. Cent. Code § 51-15-02, pursuant to N.D. Cent. Code §51-15-07;

  e. Award, to the Attorney General, reasonable attorneys' fees, investigation fees, costs, and expenses of the investigation and prosecution of this action, pursuant to N.D. Cent. Code §51-15-10; and

  f. Award such other relief as this Court deems just and equitable.

22. For Ohio:

  a. Issue a declaratory judgment that each act or practice complained of herein violates the CSPA, Ohio Rev. Code §1345.01 *et seq*., in the manner set forth in the Complaint;

  b. Issue a permanent injunction enjoining Meta, its agents, employees, successors or assigns, and all persons acting in concert and participation with them, directly or indirectly, through any corporate device, partnership, or other association, under these or any other names, from engaging in the acts and practices of which Ohio complains and from further violating the CSPA, Ohio Rev. Code §1345.01 *et seq*.;

  c. Assess, fine and impose upon Meta a civil penalty of up to $25,000.00 for each separate and appropriate violation of the CSPA described herein pursuant to Ohio Rev. Code §1345.07(D);

  d. Grant Ohio its costs incurred in bringing this action, including but not limited to, the cost of collecting on any judgment awarded;

  e. Order Meta to pay all court costs associated with this matter; and

f.  Grant such other relief as the Court deems to be just, equitable, and appropriate.

23. For Oregon:

 a.  Entering a permanent injunction to prevent Meta from future violations of Oregon's UTPA, pursuant to O.R.S. § 646.636;

 b.  Awarding civil penalties up to $25,000 for each willful violation of O.R.S. § 646.607 and O.R.S. § 646.608, pursuant to O.R.S. § 646.642; and

 c.  Awarding reasonable attorneys' fees and costs of the investigation, preparation, and litigation, pursuant to O.R.S. § 646.632(8) and O.R.C.P. 68.

24. For Pennsylvania:

 a.  Declaring Meta's conduct as described herein above to be in violation of the UTPCL;

 b.  Permanently enjoining Meta and all other persons acting on its behalf, directly or indirectly, from violating the UTPCL;

 c.  Directing Meta to make full restitution, pursuant to section 201-4.1 of the UTPCL, to all consumers who have suffered losses as a result of the acts and practices alleged in this Complaint and any other acts or practices which violate the UTPCL;

 d.  Directing Meta to pay to the Commonwealth of Pennsylvania civil penalties of One Thousand and 00/100 Dollars ($1,000.00) for each instance of a past or present violation of the UTPCL;

 e.  Requiring Meta to pay the Commonwealth of Pennsylvania's investigative and litigation costs in this matter; and

 f.  Granting such other general, equitable and/or further relief as the Court deems just and proper.

25. For Rhode Island:

a. Enter an order permanently enjoining Meta from engaging in any of the acts or practices described herein and any further violation of the RI DTPA;

b. Declare the acts or practices described herein to be unlawful under the RI DTPA;

c. Order Restoration to any person in interest any moneys or property, real or personal, that may have been acquired by means of any act or practice described herein;

d. Order Meta to pay the State of Rhode Island's costs and attorneys' fees;

e. Order Meta to pay a civil penalty of up to ten thousand dollars ($10,000.00) per violation of the Deceptive Trade Practices Act as provided by R.I. Gen. Laws § 6-13.1-8; and

f. Order any other relief that the Court deems appropriate.

26. For South Carolina:

a. Permanently enjoin Meta, pursuant to section 39-5-50(a) of the South Carolina Code from engaging in any acts that violate SCUTPA, including, but not limited to, the unfair or deceptive acts or practices alleged herein;

b. Order Meta to restore to all persons and entities all ascertainable losses suffered as a result of Meta's violations of SCUTPA;

c. Order Meta to pay civil penalties in the amount of $5,000.00, pursuant to section 39-5-110(a) of the South Carolina Code, for each and every willful violation of SCUTPA;

d. Order Meta to pay attorneys' fees and costs pursuant to section 1-7-85 of the South Carolina Code for violations of SCUTPA;

e. Pre- and post-judgment interest; and

f. Such other and further relief as this Court deems just and equitable.

27. For Virginia:

a. Pursuant to Virginia Code § 59.1-203, enter a permanent injunction against Meta restraining future VCPA violations;

b. Pursuant to Virginia Code § 59.1-206(A), award to the Commonwealth of Virginia civil penalties of up to $2,500.00 per violation for each willful violation of § 59.1-200 of the VCPA, the exact number of violations to be proven at trial;

c. Pursuant to Virginia Code § 59.1-205, award all sums necessary to restore to any consumers the money or property acquired from them by Meta in connection with violations of § 59.1-200 of the VCPA;

d. Pursuant to Virginia Code § 59.1-206(D), award to the Commonwealth of Virginia its costs, reasonable expenses incurred in investigating and preparing the case, up to $1,000.00 per violation of § 59.1-200 of the VCPA, the exact number of violations to be proven at trial, as well as the Commonwealth of Virginia's attorneys' fees; and

e. Award any such other and additional relief as this Court deems just and proper.

28. For Washington:

a. Adjudge and decree that Meta has engaged in the conduct complained of herein;

b. Adjudge and decree that the conduct complained of in the Complaint constitutes unfair or deceptive acts or practices in violation of the Washington Consumer Protection Act, Wash. Rev. Code. § 19.86;

c. Issue a permanent injunction enjoining and restraining Meta and its representatives, successors, assigns, officers, agents, servants, employees, and all other persons acting or claiming to act for, on behalf of, or in active concert or participation with Meta from continuing or engaging in the unlawful conduct complained of herein;

215

d.  Assess civil penalties, pursuant to Wash. Rev. Code. § 19.86.140, of up to $7,500 per violation against Meta for each and every violation of Wash. Rev. Code. § 19.86.020 alleged herein;

e.  Assess an enhanced civil penalty of $5,000, pursuant to Wash. Rev. Code. § 19.86.140, against Meta for each and every violation of Wash. Rev. Code. § 19.86.020 alleged herein that target or impact specific individuals, groups of individuals, or communities based on demographic characteristics, including but not limited to sex and age;

f.  Order Meta to pay restitution and/or other monetary relief;

g.  Disgorge Meta of money, property, or data (including any algorithms developed using such data) acquired by Meta as a result of the conduct complained of herein;

h.  Award the State of Washington the costs of bringing this action, including reasonable attorney's fees; and

i.  Award any other and additional relief as the Court may determine to be just and proper.

29. For Wisconsin:

a.  An order and judgment declaring Meta's conduct to be in violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18(1);

b.  An order and judgment requiring Meta to restore any pecuniary losses suffered by any person because of Meta's acts or practices in violation of Wis. Stat. § 100.18(1);

c.  An order and judgment permanently enjoining Meta, its successors, assigns, officers, directors, agents, dealers, servants, employees, representatives, solicitors, and all persons acting or claiming to be acting on its behalf, pursuant to Wis. Stats. §§ 100.18(11)(a) and (d) from making further false, deceptive, or misleading representations;

d.  An order and judgment imposing civil forfeitures against Meta in the amount of not less than $50 nor more than $200 for each violation of Wis. Stat. § 100.18(1) pursuant to Wis. Stat. § 100.26(4), consumer protection surcharges pursuant to Wis. Stat. § 100.261, plus all applicable assessments and costs;

e.  An order and judgment awarding the State of Wisconsin the expenses of investigation and prosecution of this action, including attorneys' fees, pursuant to Wis. Stat. § 100.263; and

f.  Any such other and further relief as justice and equity may require.

217

1    Dated: October 24, 2023                Respectfully submitted,

2

3

**KRIS MAYES**                   **ROB BONTA**
4    Attorney General               Attorney General
State of Arizona               State of California
5

*/s/ Vince Rabago*            */s/ Bernard Eskandari*
6    Vince Rabago (AZ No. 015522 CA No.    Nicklas A. Akers (CA SBN 211222)
167033) *pro hac vice app. forthcoming, if*    Senior Assistant Attorney General
7    *required*                 Bernard Eskandari (CA SBN 244395)
8    Chief Counsel - Consumer Protection and    Supervising Deputy Attorney General
Advocacy Section           Megan O'Neill (CA SBN 343535)
9    Nathan Whelihan (AZ No. 037560) *pro hac*    Joshua Olszewski-Jubelirer
*vice app. forthcoming, if required*      (CA SBN 336428)
10    Assistant Attorney General         Marissa Roy (CA SBN 318773)
Arizona Attorney General's Office      Deputy Attorneys General
11    2005 North Central Avenue         California Department of Justice
12    Phoenix, AZ 85004             Office of the Attorney General
Phone: (602) 542-3725         455 Golden Gate Ave., Suite 11000
13    Fax:   (602) 542-4377         San Francisco, CA 94102-7004
14    Vince.Rabago@azag.gov         Phone: (415) 510-4400
Nathan.Whelihan@azag.gov       Fax: (415) 703-5480
15                        Bernard.Eskandari@doj.ca.gov
*Attorneys for Plaintiff State of Arizona*
16                        *Attorneys for Plaintiff the People of the State*
*of California*
17

18

19

20

21

22

23

24

25

26

27

28

1
2

**PHILIP J. WEISER**
Attorney General
State of Colorado

3
4

 _/s/ Bianca E. Miyata_
Bianca E. Miyata, CO Reg. No. 42012,
*pro hac vice app. forthcoming, if required*

5
6

Senior Assistant Attorney General
Lauren M. Dickey, CO Reg. No. 45773
First Assistant Attorney General

7
8

Megan Paris Rundlet, CO Reg. No. 27474
Senior Assistant Solicitor General
Elizabeth Orem, CO Reg. No. 58309

9
10

Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center

11
12

Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203

13

Phone: (720) 508-6651
bianca.miyata@coag.gov

14
15

*Attorneys for Plaintiff State of Colorado, ex rel. Philip J. Weiser, Attorney General*

16
17

**WILLIAM TONG**
Attorney General
State of Connecticut

18
19

*/s/ Lauren H. Bidra*
Lauren H. Bidra (CT Juris No. 440552)
Special Counsel for Media and Technology

20
21

*Pro hac vice app. forthcoming, if required*
Matthew Fitzsimmons (CT Juris No. 426834)

22
23

Chief Counsel
*Pro hac vice app. forthcoming, if required*
Connecticut Office of the Attorney General

24
25

165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5306

26

Fax: 860-808-5593
Lauren.Bidra@ct.gov
Matthew.Fitzsimmons@ct.gov

27
28

*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

/s/ Dashiell Raj Radosti
Owen Lefkon
Director of Fraud and Consumer Protection
Marion Quirk
Director of Consumer Protection
Dashiell Radosti (DE Bar 7100*), pro hac vice app. forthcoming, if required*
Deputy Attorney General,
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8800
Dashiell.Radosti@delaware.gov

*Attorneys for Plaintiff State of Delaware*

**CHRISTOPHER M. CARR**
Attorney General
State of Georgia

*/s/ Melissa M. Devine*
Melissa M. Devine (GA Bar No. 403670),
*pro hac vice app. forthcoming, if required*
Assistant Attorney General
Office of the Attorney General of the State of Georgia
2 Martin Luther King Jr. Drive, SE, Ste. 356
Atlanta, GA 30334
Phone: (404) 458-3765
Fax: (404) 651-9108
mdevine@law.ga.gov

*Attorneys for Plaintiff State of Georgia*

1

2

**ANNE E. LOPEZ**
Attorney General
State of Hawai'i

3

4

/s/ *Bryan C. Yee*
BRYAN C. YEE (HA JD No. 4050)
Supervising Deputy Attorney General

5

6

CHRISTOPHER T. HAN (HA JD No.
11311), *pro hac vice app. forthcoming, if
required*

7

Deputy Attorney General
Department of the Attorney General

8

Commerce and Economic Development
Division

9

425 Queen Street

10

Honolulu, Hawai'i 96813
Phone: (808) 586-1180

11

Bryan.c.yee@hawaii.gov
Christopher.t.han@hawaii.gov

12

13

*Attorneys for Plaintiff State of Hawai'i*

14

**RAÚL R. LABRADOR**

15

Attorney General
State of Idaho

16

By:     /s/ *Nathan Nielson*

17

Stephanie N. Guyon (ID Bar No. 5989)

18

*pro hac vice app. forthcoming, if required*
Nathan H. Nielson (ID Bar No. 9234)

19

*pro hac vice app. forthcoming, if required*
Deputy Attorneys General

20

Attorney General's Office
P.O. Box 83720

21

Boise, ID 83720-0010

22

(208) 334-2424
stephanie.guyon@ag.idaho.gov

23

nathan.nielson@ag.idaho.gov

24

*Attorneys for Plaintiff State of Idaho*

25

26

27

28

**KWAME RAOUL**
Attorney General
State of Illinois

By:      /s/ *Susan Ellis*
**Susan Ellis**, Chief, Consumer Protection
Division (IL Bar No. 6256460)
**Greg Grzeskiewicz**, Chief, Consumer Fraud
Bureau (IL Bar No. 6272322)
**Jacob Gilbert**, Deputy Chief, Consumer
Fraud Bureau (IL Bar No. 6306019)
**Daniel Edelstein**, Supervising Attorney,
Consumer Fraud Bureau (IL Bar No.
6328692)
**Adam Sokol**, Senior Assistant Attorney
General, Consumer Fraud Bureau (IL Bar
No. 6216883)
**Hanan Malik**, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No.
6316543)
**Emily María Migliore**, Assistant Attorney
General, Consumer Fraud Bureau (IL Bar
No. 6336392)
**Kevin Whelan**, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No.
6321715)
**Office of the Illinois Attorney General**
100 W. Randolph Street
Chicago, Illinois 60601
312-814-2218
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Daniel.Edelstein@ilag.gov
Adam.Sokol@ilag.gov
Hanan.Malik@ilag.gov
Emily.Migliore@ilag.gov
Kevin.Whelan@ilag.gov
*(pro hac vice applications forthcoming, if
required)*

*Attorneys for Plaintiff the People of the State
of Illinois*

Complaint for Injunctive and Other Relief

| | |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |

**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Scott L. Barnhart*
Scott L. Barnhart (IN Atty No. 25474-82)
*pro hac vice app. forthcoming, if required*
Chief Counsel and Director of Consumer
Protection
Corinne Gilchrist (IN Atty No. 27115-53)
*pro hac vice app. forthcoming, if required*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49)
*pro hac vice app. forthcoming, if required*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
 Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*


**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/   Sarah M. Dietz*
Sarah Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice app.
forthcoming, if required*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*


**DANIEL J. CAMERON**
Attorney General
Commonwealth of Kentucky

 */s/ J. Christian Lewis*
J. CHRISTIAN LEWIS (KY Bar No.
87109), *Pro hac vice app. forthcoming, if
required*
PHILIP HELERINGER (KY Bar No.
96748), *Pro hac vice app. forthcoming, if
required*
GREGORY B. LADD (KY Bar No. 95886),
*Pro hac vice app. forthcoming, if required*
ZACHARY RICHARDS (KY Bar No.
99209), *Pro hac vice app. forthcoming, if
required*
ASSISTANT ATTORNEYS GENERAL
1024 CAPITAL CENTER DRIVE
SUITE 200
FRANKFORT, KY 40601
CHRISTIAN.LEWIS@KY.GOV
PHILIP.HELERINGER@KY.GOV
GREG.LADD@KY.GOV
ZACH.RICHARDS@KY.GOV
PHONE: (502) 696-5300
FAX: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of
Kentucky*

221

**JEFF LANDRY**
Attorney General
State of Louisiana

*/s/ Arham Mughal*
Arham Mughal (LA Bar No. 38354), *pro hac vice app. forthcoming, if required*
L. Christopher Styron (LA Bar No. 30747), *pro hac vice app. forthcoming, if required*
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
MughalA@ag.louisiana.gov
StyronL@ag.louisiana.gov

*Attorneys for State of Louisiana*


**AARON M. FREY**
Attorney General
State of Maine

/s/ Brendan F.X. O'Neil
Brendan F.X. O'Neil, Maine Bar No. 9900, *pro hac vice app. forthcoming, if required*
Michael Devine, Maine Bar No. 5048
Laura Lee Barry Wommack, Maine Bar No. 10110
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
brendan.oneil@maine.gov
michael.devine@maine.gov
lauralee.barrywommack@maine.gov

*Attorneys for Plaintiff State of Maine*


**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s/ Elizabeth J. Stern*
Philip D. Ziperman (Maryland CPF No. 9012190379), *pro hac vice app. forthcoming, if required*
Deputy Chief, Consumer Protection Division
Elizabeth J. Stern (Maryland CPF No. 1112090003), *pro hac vice app. forthcoming, if required*
Assistant Attorney General
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6417 (Mr. Ziperman)
Phone: (410) 576-7226 (Ms. Stern)
Fax: (410) 576-6566
pziperman@oag.state.md.us
estern@oag.state.md.us

*Attorneys for Plaintiff Office of the Attorney General of Maryland*


**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482), *pro hac vice app. forthcoming, if required*
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
517-335-7632
PingD@michigan.gov

*Attorneys for Plaintiff State of Michigan*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ James Van Buskirk*
JAMES VAN BUSKIRK (MN Bar No.
0392513), *pro hac vice app. forthcoming, if
required*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 757-1150
james.vanbuskirk@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota, by
its Attorney General, Keith Ellison*


**ANDREW BAILEY**
Attorney General
State of Missouri

By: */s/ Michael Schwalbert*
Michael Schwalbert, MO Bar #63229,
*pro hac vice app. forthcoming, if required*
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Attorney for Plaintiff State of Missouri, ex
rel. Andrew Bailey, Attorney General*

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

*/s/ Michaela J. Hohwieler*
Michaela J. Hohwieler (NE #26826)
Assistant Attorney General
*pro hac vice app. forthcoming, if required*
Colin P. Snider (NE #27724)
Assistant Attorney General
*pro hac vice app. forthcoming, if required*
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
Phone: (402) 471-3840
Email: michaela.hohwieler@nebraska.gov
Email: colin.snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*


**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

By: */s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008),
*pro hac vice app. forthcoming, if required*
Chief, Deputy Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov

*Attorneys for Plaintiff New Jersey Division
of Consumer Affairs*

1

**LETITIA JAMES**
Attorney General
State of New York

2

3

/s/ *Christopher D'Angelo*

4

Christopher D'Angelo, Chief Deputy
Attorney General, Economic Justice
Division (NY Bar No. 4348744)

5

Christopher.D'Angelo@ag.ny.gov

6

Kim Berger, Chief, Bureau of Internet and
Technology (NY Bar No. 2481679)

7

Kim.Berger@ag.ny.gov

8

Clark Russell, Deputy Chief, Bureau of
Internet and Technology (NY Bar No.

9

2848323)
Clark.Russell@ag.ny.gov

10

Nathaniel Kosslyn, Assistant Attorney
General (NY Bar No. 5773676)

11

Nathaniel.Kosslyn@ag.ny.gov

12

New York State Office of the Attorney
General

13

28 Liberty Street
New York, NY 10005

14

(212) 416-8262

15

*Pro hac vice applications forthcoming, if
required*

16

17

*Attorneys for Plaintiff the People of the State
of New York*

18

19

20

21

22

23

24

25

26

27

28

**JOSHUA H. STEIN**
Attorney General
State of North Carolina

/s/ *Kevin Anderson*

Kevin Anderson (N.C. Bar No. 22635), *pro
hac vice app. forthcoming, if required*
Senior Counsel
Sarah G. Boyce
Deputy Attorney General & General Counsel
Jasmine McGhee
Senior Deputy Attorney General
Josh Abram
Kunal Choksi
Special Deputy Attorneys General
Charles G. White
Assistant Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6006
Facsimile: (919) 716-6050
kander@ncdoj.gov

*Attorneys for Plaintiff State of North
Carolina*

1  **DREW H. WRIGLEY**
   Attorney General
2  State of North Dakota

3  By: /s/ Elin S. Alm
4  Elin S. Alm (ND Bar No. 05924)
   *pro hac vice app. forthcoming, if required*
5  Assistant Attorney General
   Parrell D. Grossman (ND Bar No. 04684)
6  Director, Consumer Protection and Antitrust
   Division
7  Office of Attorney General
8  1720 Burlington Drive, Suite C
   Bismarck, ND 58504-7736
9  Telephone (701) 328-5570
   ealm@nd.gov
10 pgrossman@nd.gov

11
   *Attorneys for Plaintiff State of North Dakota,*
12 *ex rel. Drew H. Wrigley, Attorney General*

**DAVE YOST**
Attorney General
State of Ohio

/s/ Kevin R. Walsh
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999)
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031
*(pro hac vice application forthcoming, if required)*

*Attorneys for State of Ohio, ex rel. Attorney General Dave Yost,*

**ELLEN F. ROSENBLUM**
Attorney General
State of Oregon

/s/ Jordan M. Roberts
Jordan M. Roberts (Oregon Bar No. 115010), *pro hac vice app. forthcoming, if required*
Assistant Attorney General
Oregon Department of Justice
Consumer Protection Section
100 SW Market Street
Portland, Oregon 97201
Telephone:    (971) 673-1880
Facsimile:    (971) 673-1884
E-mail: jordan.m.roberts@doj.state.or.us

*Attorneys for State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon*

225

1

2

**MICHELLE A. HENRY**
Attorney General
Commonwealth of Pennsylvania

3

4

/s/ Timothy R. Murphy
TIMOTHY R. MURPHY
Senior Deputy Attorney General (PA Bar
No. 321294)
Email: tmurphy@attorneygeneral.gov
JONATHAN R. BURNS
Deputy Attorney General (PA Bar No.
315206)
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530
(pro hac vice application forthcoming, if
required)

5

6

7

8

9

10

11

12

13

Attorneys for Plaintiff the Commonwealth of
Pennsylvania

14

**PETER F. NERONHA**
Attorney General
State of Rhode Island

15

16

17

    /s Stephen N. Provazza
Stephen N. Provazza (R.I. Bar No. 10435),
pro hac vice app. forthcoming
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

18

19

20

21

22

Attorneys for Plaintiff State of Rhode Island

23

24

25

26

27

28

**ALAN WILSON**
Attorney General
State of South Carolina

/s/ Anna C. Smith
C. HAVIRD JONES, JR.
Senior Assistant Deputy Attorney General
JARED Q. LIBET
Assistant Deputy Attorney General
ANNA C. SMITH (SC Bar No. 104749),
pro hac vice app. forthcoming, if required
Assistant Attorney General
CLARK C. KIRKLAND, JR.
Assistant Attorney General
**OFFICE OF THE ATTORNEY
GENERAL OF SOUTH CAROLINA**
P.O. Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-0536
annasmith@scag.gov

Attorneys for Plaintiff the State of South
Carolina, ex rel. Alan M. Wilson, in His
Official Capacity as
Attorney General of the State of South
Carolina

**MARTY J. JACKLEY**
Attorney General
State of South Dakota

/s/ Jessica M. LaMie
By: Jessica M. LaMie (SD Bar No. 4831),
pro hac vice app. forthcoming, if required
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Jessica.LaMie@state.sd.us

Attorneys for Plaintiff State of South Dakota

226

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JASON S. MIYARES**
Attorney General
Commonwealth Of Virginia

*/s/ Joelle E. Gotwals*
Steven G. Popps
Deputy Attorney General
Richard S. Schweiker, Jr.
Senior Assistant Attorney General and
Section Chief
Joelle E. Gotwals (VSB No. 76779), *pro hac vice app. forthcoming, if required*
Assistant Attorney General
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone:      (804) 786-8789
Facsimile:      (804) 786-0122
E-mail: jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth of Virginia*
*ex rel. Jason S. Miyares, Attorney General*

**ROBERT W. FERGUSON**
Attorney General
State of Washington

*/s/ Joseph Kanada*
Joseph Kanada (WA Bar No. 55055), *pro hac vice app. forthcoming, if required*
Alexandra Kory
Rabi Lahiri
Gardner Reed
Alexia Diorio
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Joe.Kanada@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**PATRICK MORRISEY**
Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267), *pro hac vice app. forthcoming, if required*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia,*
*ex rel. Patrick Morrisey, Attorney General*

1

2

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

3

/s/ R. Duane Harlow

4

R. DUANE HARLOW
Assistant Attorney General

5

WI State Bar #1025622, *pro hac vice app*
*forthcoming, if required*

6

Wisconsin Department of Justice

7

Post Office Box 7857
Madison, Wisconsin 53707-7857

8

(608) 266-2950
harlowrd@doj.state.wi.us

9

10

*Attorneys for Plaintiff State of Wisconsin*

11

12

*\* In compliance with Civil Local Rule 5-1(i)(3), the filer of this document attests under penalty of perjury that all signatories have concurred in the filing of this document.*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Injunctive and Other Relief