No. 25-

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

*In re* THE PEOPLE OF THE STATE OF CALIFORNIA,
*Petitioner.*

_____

THE PEOPLE OF THE STATE OF CALIFORNIA,
*Petitioner–Plaintiff,*

v.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA,
*Respondent,*

THE PEOPLE OF THE STATE OF CALIFORNIA, et al.,
*Real-Parties-in-Interest–Plaintiffs,*

v.

META PLATFORMS, INC., et al.,
*Real-Parties-in-Interest–Defendants.*

_____

## ADDENDUM TO PETITION FOR A WRIT OF MANDAMUS
_____

ROB BONTA
  *Attorney General of California*
NICKLAS A. AKERS
  *Senior Assistant Attorney General*
BERNARD A. ESKANDARI
  *Supervising Deputy Attorney General*
MEGAN M. O'NEILL
JOSHUA E. OLSZEWSKI-JUBELIRER
  *Deputy Attorneys General*
CALIFORNIA DEPARTMENT OF JUSTICE
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230
Telephone: (213) 269-6348
bernard.eskandari@doj.ca.gov
  *Attorneys for Petitioner the People of the
  State of California*

January 28, 2025

TRIAL-COURT ORDERS

Order Granting-In-Part and Denying-In-Part Meta's Request for Party
    Discovery on Third-Party State Agencies Pursuant to Fed. R. Civ. P.
    34 and Granting Meta's First, Second, and Third Administrative
    Motions for Leave to File Supplemental Information (Sept. 6, 2024)
    (Dkt No. 1117) ..................................................................................... 1

In-Chambers Text Only Order (Sept. 25, 2024) (Dkt No. 1174) ............. 249

Order Denying Motion to Stay Enforcement of September 6, 2024 Order
    (Oct. 15, 2024) (Dkt No. 1213) ...................................................... 266

Discovery Management Order No. 12 Following Discovery Management
    Conference of November 21, 2024 (Nov. 25, 2024) (Dkt No.
    1380) .............................................................................................. 276

In-Chambers Text Only Order (Dec. 27, 2024) (Dkt No. 1489) .............. 284

OTHER DOCUMENTS

State Attorneys General's Opposed Administrative Motion for Stay (Sept.
    20, 2024) (Dkt No. 1167) ................................................................ 285

State Attorneys General's Motion for Relief from Nondispositive Pretrial
    Order of Magistrate Judge (Sept. 20, 2024) (Dkt No. 1168) ........... 305

Notice of Voluntary Dismissal Without Prejudice (North Dakota) (Oct. 16,
    2024) (Dkt No. 1219) ..................................................................... 366

Joint Stipulation of Dismissal with Prejudice (Georgia) (Nov. 22, 2024) (Dkt
    No. 1359) ........................................................................................ 368

Case Management Order No. 19 (Nov. 26, 2024) (Dkt No. 1383) ........... 371

Notice of Information in Response to Court Directive Regarding State-
    Agency Discovery Issue (California Governor) (Dec. 2, 2024) (Dkt
    No. 1393) ........................................................................................ 375

Status Update and Statement Re: State Agency Discovery (California
    Governor) (Dec. 9, 2024) (Dkt No. 1429)....................................... 378

Notice of Information Regarding State-Agency Discovery Issue (Kansas)
    (Dec. 11, 2024) (Dkt No. 1441)...................................................... 384

Meta Defendants' Notice of Motion and Motion for Discovery Sanctions Regarding State Agencies (Dec. 23, 2024) (Dkt No. 1485)............ 400

Joint Status Report on State Agencies' Production of Documents (Jan. 7, 2025) (Dkt No. 1503) ...................................................................... 493

Agenda and Joint Statement for January 17, 2025, Case Management Conference (Jan. 10, 2025) (Dkt No. 1515) .................................... 527

Notice of Voluntary Dismissal Without Prejudice (Florida) (Dec. 9, 2024) (N.D. Cal. No. 23-05885, Dkt No. 48)............................................ 552

Notice of Voluntary Dismissal Without Prejudice (Montana) (Dec. 16, 2024) (N.D. Cal. No. 24-00805, Dkt No. 37)............................................ 555

Defendant Meta Platforms, Inc.'s First Request For Production of Documents to Plaintiff the People of the State of California (Feb. 27, 2024) ............................................................................................ 557

Meta Defendants' Notice of Intent to Serve Subpoenas (Dec. 18, 2024) . 576

Defendant Meta Platforms, Inc.'s Meta Subpoena to California Department of Child Support Services Cover Letter (July 17, 2024)................. 589

*United States v. Apple Inc.*, Joint Letter (Sept. 20, 2024) (D.N.J. No. 24-04055, Dkt. No. 117) ...................................................................... 629

*Dist. of Columbia v. Meta Platforms*, No. 2023-CAB-006550, Order Denying Without Prejudice Defendants' Motion to Compel Discovery (D.C. Sup. Ct. Dec. 18, 2024)........................................................... 652

TRANSCRIPT EXCERPTS

Case Management Conference (Sept. 13, 2024) (Dkt No. 1170).............. 655

Case Management Conference (Oct. 25, 2024) (Dkt No. 1296) ............... 664

Discovery Management Conference (Oct 24, 2024) (Dkt No. 1302) ....... 675

Discovery Management Conference (Nov. 21, 2024) (Dkt No. 1372) ..... 685

Case Management Conference (Nov. 22, 2024) (Dkt No. 1431).............. 698

Discovery Management Conference (Dec. 11, 2024) (Dkt No. 1457)...... 713

Discovery Management Conference (Jan. 16, 2025) (Dkt No. 1578)....... 752

Case Management Conference (Jan. 17, 2025) (Dkt. No. 1613).............. 768

United States District Court
Northern District of California

1
2
3
4                    **UNITED STATES DISTRICT COURT**
5                   **NORTHERN DISTRICT OF CALIFORNIA**
6                       **SAN FRANCISCO DIVISION**
7

8   | IN RE: SOCIAL MEDIA ADOLESCENT | Case No. <u>22-md-03047-YGR</u> (PHK) |
    | ADDICTION/PERSONAL INJURY |  |
9   | PRODUCTS LIABILITY LITIGATION | **ORDER GRANTING-IN-PART AND** |
    |  | **DENYING-IN-PART META'S** |
10  |  | **REQUEST FOR PARTY DISCOVERY** |
    |  | **ON THIRD-PARTY STATE AGENCIES** |
11  | This Document Relates to: | **PURSUANT TO FED. R. CIV. P. 34** |
    |  | **AND GRANTING META'S FIRST,** |
12  | All Actions | **SECOND, AND THIRD** |
    |  | **ADMINISTRATIVE MOTIONS FOR** |
13  |  | **LEAVE TO FILE SUPPLEMENTAL** |
    |  | **INFORMATION** |
14
15                          Re: Dkts. 685, 738, 1031, 1074, 1110

16                                **INTRODUCTION**

17          This case is a multidistrict litigation between various private and public plaintiffs and social

18  media defendants. Now before the Court is a dispute between Defendant Meta Platforms, Inc.

19  ("Meta") and those thirty-five State Plaintiffs who appear by, and in several cases are themselves,

20  the Attorneys General of various states. Each State Plaintiff is represented by attorneys from the

21  office of their respective State Attorney General. After Meta served requests for production of

22  documents under Federal Rule of Civil Procedure 34 on the State Attorneys General, the Parties

23  disputed whether or not certain identified state agencies should be subject to party discovery, and

24  thus, whether the States Attorneys General should not only collect and produce documents from the

25  Attorney General's office but also from relevant custodians within the identified state agencies.

26  [Dkt. 685]. The State Attorneys General all object to the document requests for a variety of reasons

27  and, germane to the instant Order, they object to treating their respective state agencies as being

28  subject to party discovery and insist that all of these agencies are third parties from whom Meta

should seek documents by subpoenas under Federal Rule of Civil Procedure 45. *Id.* at 8–10. Meta disagrees and contends that the Requests for Production served on the State Attorneys General are the proper vehicle for seeking documents from the identified agencies, and that forcing Meta to serve over 200 subpoenas duces tecum under Rule 45 is not justified and is overly burdensome.

Accordingly, the primary issue in dispute is whether the named State Plaintiffs have "control" for purposes of discovery over their respective state agencies' documents. *See id.* at 6–7, 9–10; *see also* Dkt. 738. After careful review of multiple rounds of briefing, the relevant legal standards, and oral argument at multiple hearings, the Court herein sets forth its conclusions of a state-by-state analysis to resolve whether and which named State Plaintiffs have control over their respective state agencies' documents – and thus whether such documents are to be sought in discovery by requests for production under Rule 34 (party discovery) or by subpoenas under Rule 45 (third party discovery). For the following reasons, Meta's request to compel the State Plaintiffs to include their identified state agencies within the scope of party discovery is **GRANTED-IN-PART** and **DENIED-IN-PART**. [Dkts. 685, 738]

## BACKGROUND

On February 23, 2024, Meta sent the State Attorneys General a list of state agencies "that may possess information relevant to the claims or defenses." Dkt. 685 at 6. Meta served requests for production of documents under Rule 34 on the State Attorneys General on February 27, 2024. [Dkt. 686 at 1]. The Parties subsequently met and conferred, as required by this Court's Standing Order for Discovery, regarding whether the Parties could reach negotiated resolution of the instant dispute. [Dkt. 685]. The Parties included discussion of this dispute in their Joint Status Report on Discovery filed on February 16, 2024. [Dkt. 617 at 17].

The Court heard oral argument on this issue at the Discovery Management Conference ("DMC") held on February 22, 2024. *See* Dkt. 648. At that hearing, the Court ordered the Parties to submit a chart specifying the state agencies from whom Meta sought discovery, including an indication from the corresponding state Attorney General whether or not that state Attorney General would be representing the identified agencies for purposes of discovery in this case. *Id.* The Parties thereafter submitted the chart to this Court via email.

<div style="writing-mode: vertical-lr">United States District Court
Northern District of California</div>

On March 15, 2024, the State Attorneys General and Meta filed a Joint Letter Brief setting forth their respective positions on this dispute over whether the state agencies should be subject to party discovery.  [Dkt. 685].  The Parties identified this dispute as a "ripe" dispute in their Joint Status Report on Discovery filed on March 15, 2024.  [Dkt. 686 at 8].  The Court heard oral argument on this dispute at the DMC held on March 18, 2024.  *See* Dkts. 691, 699.  On April 1, 2024, the State Attorneys General and Meta filed their Joint Supplemental Letter Brief on the issue of state agency discovery which included supplemental briefing on a state-by-state basis addressing arguments from each of the thirty-five State Attorneys General and Meta's rebuttal to each.  [Dkt. 738,].  As part of that Supplemental Letter Brief was the chart (previously lodged with the Court) identifying the specific state agencies at issue and the indication from each of the State Attorneys General whether or not their office would represent each such agency in discovery in this case.  [Dkt. 738-1].

In the April 12, 2024, Joint Status Report on Discovery, the Parties requested guidance on whether they should be prepared for further oral argument on this dispute.  [Dkt. 750 at 8].  By Order dated April 17, 2024, the Court directed the Parties to be prepared to discuss the extent to which additional oral argument regarding this dispute was needed or desired.  [Dkt. 759].  At the April 22, 2024 DMC, the Court sought the Parties' views on whether further oral argument was warranted in light of the record presented.  *See* Dkts. 777, 782.  While Meta did not seek further oral argument, certain State Attorneys General requested further oral argument.  On April 24, 2024, pursuant to the Court's instructions, the State Attorneys General filed a Notice indicating that the states of Arizona, California, New Jersey, and Pennsylvania requested the opportunity to present further oral argument.  [Dkt. 787].  The Notice indicated that the "remainder of the State AGs will have their interests represented by a singular argument presented by a member of the State AGs MDL Co-Lead Counsel [unidentified in the Notice]."  *Id.* at 2.  On May 2, 2024, the State Attorneys General filed an amendment to the Notice, indicating that the "State AGs have reconsidered their position and respectfully amend their request" and indicated that only the states of Arizona, California, New Jersey, and Pennsylvania sought additional oral argument (and thus dropped the request for an additional, as yet unidentified, state Attorney General to also present argument on behalf of the

United States District Court
Northern District of California

1    remainder of the states). [Dkt. 803 at 2]. The remaining State Attorneys General did not seek

2    additional oral argument. *Id.* The Court heard additional oral argument from the Parties at a hearing

3    on May 6, 2024. [Dkt. 818].

4    On July 24, 2024, the State Attorneys General filed an Administrative Motion for Leave to

5    File Supplemental Information. [Dkt. 1031]. The Administrative Motion sought leave to file

6    information that Meta had served a Notice of its intent to serve twenty-six subpoenas on some of

7    the agencies at issue. *Id.* The Notice indicated that Meta was taking these steps without waiving its

8    rights with regard to this pending dispute. On July 29, 2024, Meta filed its Response to the

9    Administrative Motion, indicating that Meta did not object to the submission of these subpoenas as

10   supplemental information. [Dkt. 1035]. Meta informed the Court that Meta served another twenty-

11   six subpoenas on various state agencies on July 29, 2024. *Id.* at 2 n.1. Meta repeated its stated

12   position that service of these subpoenas without waiving Meta's position that the state agencies

13   should be subject to party discovery. *Id.* at 2. On August 19, 2024, the State Attorneys General filed

14   a Second Administrative Motion for Leave to File Supplemental Information. [Dkt. 1074]. This

15   Second Administrative Motion sought leave to file information that Meta had served an additional

16   Notice of its intent to serve an additional fifty-seven subpoenas on additional agencies at issue. *Id.*

17   at 2. The Notice indicated that Meta takes no position with regard to this Second Administrative

18   Motion. *Id.* at 6.

19                                            **LEGAL STANDARDS**

20   The following legal standards apply to the Court's analysis of the control issue for each of

21   the states, discussed further below.

22   **I.      CONTROL UNDER FED. R. CIV. P. 34**

23   Rule 34 requires a party served with document requests to produce responsive, non-

24   privileged documents which are in that party's possession, custody, or control. Because Rule 34 is

25   written in the disjunctive, control is a separate and sufficient basis for production; issues such as

26   actual possession, legal ownership, and custody are distinct from the issue of control. *Soto v. City*

27   *of Concord*, 162 F.R.D. 603, 619 (N.D. Cal. 1995) (finding the City of Concord has control of

28   documents of non-employee psychiatrists who evaluated individual officer-defendants); *Bess v.*

United States District Court
Northern District of California

*Cate*, No. 2:07-cv-1989 JAM JFM, 2008 WL 5100203, at *1 (E.D. Cal. Nov. 26, 2008) (for control issue "legal ownership of the document is not determinative."). The Ninth Circuit has held that "[c]ontrol is defined as the legal right to obtain documents on demand." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999) [hereinafter *Citric Acid*] (quoting *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)) (concluding that legal control test is proper standard under Fed. R. Civ. P. 45). As the party seeking production of documents under Rule 34, Meta has the burden of proving that a State's Attorney General has legal control over (*i.e.*, the legal right to obtain on demand) the identified State's agencies' documents. *Hitachi, Ltd. v. AmTRAN Tech. Co.*, No. C-05-2301-CRB (JL), 2006 WL 2038248 at *1 (N.D. Cal. 2006) (citing *Norman v. Young*, 422 F.2d 470, 472–73 (10th Cir. 1970)).

In *Citric Acid*, the Ninth Circuit provided guidance on what is required to show a "legal right to obtain documents upon demand." *Citric Acid*, 191 F.3d at 1107. In the factual situation in that case, the Ninth Circuit focused on whether or not there existed a contract "expressly giv[ing] . . . the right to obtain the records . . . upon demand." *Id.* "[T]he cases are fairly uniform that a contractual obligation to provide documents is dispositive of the issue of control." *Masimo Corp. v. Shenzhen Mindray Bio–Med. Elecs. Co.*, No. SA CV 12-02206-CJC (DFMx), 2015 WL 12912331, at * 2 (C.D. Cal. Apr. 17, 2015). The Ninth Circuit also explained that, in *Citric Acid*, there was an absence of "legal control" because the subpoenaed party "lacks the *legal ability* to obtain documents from" the third party. 191 F.3d at 1107 (emphasis added). Accordingly, based on *Citric Acid* then, either a contractual right or a legal ability to obtain documents are factors sufficient to show "legal control" over documents for purposes of Rule 34.

In *Citric Acid*, the Ninth Circuit further explained that an indicator of a lack of legal control occurs when the allegedly controlled third party can refuse to provide documents without legal or other repercussions:

> C&L–US [(the subpoenaed party)] asked C&L–Switzerland [(the third-party allegedly under control)] to produce those documents, but C&L–Switzerland refused. There is no mechanism for C&L–US to compel C&L–Switzerland to produce those documents, and it is not clear how Varni wants C&L–US to go about getting the ECAMA documents, since C&L–Switzerland could legally —and without breaching any contract—continue to refuse to turn over such

**Add. 5** <sup>5</sup>

documents.

*Citric Acid*, 191 F.3d at 1108.

Thus, under *Citric Acid*, a "mechanism" to compel the third party to produce the documents, such as an ability to enforce a legal duty under a contract, would demonstrate legal control (and in the facts of *Citrc Acid*, no such contractual mechanism existed).

Subsequent to *Citric Acid*, the Ninth Circuit has not delineated with precision what other factors are sufficient to show a "legal right to obtain documents upon demand." *See, e.g.*, *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. 167, 169 (N.D. Cal. 2001) (observing that while *Citric Acid*'s legal control test "has been accepted within this circuit in discussions of both Rule 34(a) and 45(a)[,] . . . there has been little discussion as to precisely what is meant by 'legal right' and 'upon demand'").

Courts agree that the *Citric Acid* legal control test is a fact specific inquiry. *See Perez v. State Farm Mut. Auto. Ins. Co.*, No. C-06-01962 JW (PSG), 2011 WL 1362086, at *2 (N.D. Cal. Apr. 11, 2011) ("The determination of control is often fact-specific."); *Miniace v. Pac. Maritime Ass'n*, No. C 04-03506 SI, 2006 WL 335389, at *1 (N.D. Cal. Feb. 13, 2006) ("'Legal right' is evaluated in the context of the facts of each case."). Because the inquiry is fact specific, no court has attempted to limit or compile all factors relevant to an analysis under the *Citric Acid* legal control test.

As a general matter, "[f]ederal courts have interpreted 'control' broadly." *Hitachi*, 2006 WL 2038248, at *1 (finding legal control and granting motion to compel Hitachi to search and produce documents from third party, Hitachi's licensing agent Inpro); *Miniace*, 2006 WL 335389, at *1 ("'Control' need not be actual control; courts construe it broadly as 'the legal right to obtain documents upon demand.'"). "The definition of control under Rule 34 includes situations well beyond those which would permit a finding of *in personam* jurisdiction or liability based on an alter ego situation." *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp. Inc.*, No. CV 14-03053 MWF (AFMx), 2018 WL 1157752, at *21 (C.D. Cal. Mar. 2, 2018) (citation omitted).

Because determination of the issue of control is fact specific depending on the totality of circumstances, there are no fully exhaustive lists of factors which have been found relevant to

United States District Court
Northern District of California

1  determining control. However, helpfully, at least one federal district court approaching this issue

2  has surveyed the case law:

> [T]here are a number of factors which may be distilled from case law
> which help to determine when documents in the possession of one
> corporation may be deemed under control of another corporation.
> These factors focus on the other corporation's actual control or
> inferred control, including any "complicity" in storing or withholding
> documents. They include (a) commonality of ownership, (b)
> exchange or intermingling of directors, officers or employees of the
> two corporations, (c) exchange of documents between the
> corporations in the ordinary course of business, (d) any benefit or
> involvement by the non-party corporation in the transaction, and (e)
> involvement of the non-party corporation in the litigation . . . .
> [B]ecause of the ownership situation, there often exists some
> intermingling of directors, officers, or employees, or business
> relations. Consequently, the subsidiary may be required to respond to
> a Rule 34 request which includes the parent company's documents.
> Sister corporations are subject to the same analysis.

12  *Uniden Am. Corp. v. Ericsson Inc.*, 181 F.R.D. 302, 306–07 (M.D.N.C. 1998) (internal citations

13  omitted).

14  Further, as noted, the *Citric Acid* approach to control includes evaluation of whether there is

15  a legal right to access the documents. *Citric Acid*, 191 F.3d at 1107. Accordingly, under a

16  straightforward application of the "legal right" standard, where a statute (or similar legal mandate)

17  provides a right to obtain documents, that statute or legal mandate has been held to be sufficient to

18  demonstrate control over third party's documents for purposes of discovery. *See In re ATM Fee*

19  *Antitrust Litig.*, 233 F.R.D. 542, 544–45 (N.D. Cal. 2005) ("by federal statute, a bank holding

20  company necessarily controls its subsidiary banks. . . . Therefore, if [third party] BANA or any other

21  wholly-owned subsidiary bank of [defendant] BAC has possession and custody of documents

22  responsive to Plaintiffs' requests, then [defendant] BAC has legal control of the documents through

23  its control of the [third-party] subsidiary bank and must produce any which are responsive to

24  Plaintiffs' Rule 34 requests."). For purposes of establishing "legal control" over documents,

25  "[d]ecisions from within this circuit have noted the importance of a legal right to access documents

26  created by *statute*, affiliation or employment." *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. at 170

27  (emphasis added) (finding "legal control" and ordering party to obtain and produce transcript not

28  within current possession where federal regulation, 17 C.F.R. § 203.6, grants legal right to ask for

**Add. 7** [7]

and obtain transcript of testimony from SEC). Therefore, in the analysis of individual states below, the Court will consider whether there exists a statute or other legal mandate which satisfies the control test.

Despite their request for state-by-state briefing and separate opportunities for oral argument from each state, throughout the briefing and oral argument, the Attorneys General of the individual states raise several arguments that implicate the same or similar legal issues. The Court turns to these common legal issues and the legal standards applicable to all of the states' objections to party discovery for their agencies and, to avoid prolixity, addresses them here instead of repeating them in the discussion of each state's arguments.

## II.    STATE LAW AND CONTROL UNDER FED. R. CIV. P. 34

The instant dispute involves document requests served upon governmental entities. However, the Court notes that precedent regarding the application of the control factors in the context of document requests made upon private corporations or entities may be illustrative. In a case involving the New York Attorney General, the Supreme Court held that "[i]f a State chooses to pursue enforcement of its laws in court, then it is not exercising its power of visitation and will be treated like a litigant. *An attorney general acting as a civil litigant must* file a lawsuit, survive a motion to dismiss, *endure the rules of procedure and discovery*, and risk sanctions if his claim is frivolous or his discovery tactics abusive." *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 531 (2009) (emphasis added). The Ninth Circuit has held that "[w]hen the government is named as a party to an action, it is placed in the same position as a private litigant, and the rules of discovery in the Federal Rules of Civil Procedure apply." *Exxon Shipping Co. v. U.S. Dep't of Int.*, 34 F.3d 774, 776 n.4 (9th Cir. 1994). Not surprisingly then, the fact that this case involves governmental entities rather than private entities does not materially change the legal or analytical approach to the control issue.

Nevertheless, the Court is cognizant that governmental agencies differ from private entities in certain ways, as stressed by the state Attorneys General. These differences are accounted for in the analyses below. However, because the Court is not relying on the law of private corporations or corporate governance to analyze the control issue here, the differences are not in and of

themselves outcome determinative of the inquiry. For example, the fact that private corporations are legal entities formed under state law, whereas the state Attorney General is (typically) an office created by a state constitution, has little bearing on distinguishing precedent on the issue of control. Other than pointing out these kinds of public/private differences, the Attorneys General do not demonstrate how or why the legal precedent cited are distinguishable based on the legal (or constitutional) source of creation of the entities for deciding the control issue. From the Court's review, the precedent relevant to the issues here do not apply a different legal control test based on whether an entity is a for-profit business as opposed to a governmental agency or officer.

Because the inquiry for control is fact-specific, courts have examined the state's constitutional or statutory scheme as part of the totality of circumstances when deciding whether one governmental entity has control over the documents of another governmental entity. *See, e.g.*, *United States v. Am. Express Co.*, No. 10-CV-04496-NGG (RER), 2011 WL 13073683 (E.D.N.Y. July 29, 2011) [hereinafter *Amex*]; *Bd. of Educ. of Shelby Cnty., Tenn. v. Memphis City Bd. of Educ.*, No. 2:11-CV-02101-SHM, 2012 WL 6003540 (W.D. Tenn. Nov. 30, 2012), *supplemented*, No. 2:11-CV-02101-SHM, 2012 WL 6607288 (W.D. Tenn. Dec. 18, 2012); *Washington v. GEO Grp., Inc.*, No. 3:17-CV-05806-RJB, 2018 WL 9457998, at *3 (W.D. Wash. Oct. 2, 2018); *In re Generic Pharms. Pricing Antitrust Litig.*, 571 F. Supp. 3d 406 (E.D. Pa. 2021) [hereinafter *Generic Pharmaceuticals (I)*]; *Illinois ex rel. Raoul v. Monsanto Co.*, No. 22 C 5339, 2023 WL 4083934 (N.D. Ill. June 20, 2023) [hereinafter *Monsanto*]; *In re Generic Pharms. Pricing Antitrust Litig.*, 699 F. Supp. 3d 352 (E.D. Pa. 2023) [hereinafter *Generic Pharmaceuticals (II)*].

Ultimately, the control issue under Rule 34 is governed by federal law. A federal district court has the authority under federal law to order disclosure of documents in discovery in civil actions, notwithstanding state law which put limits on such disclosure. *Gonzales v. Spencer*, 336 F.3d 832, 834–35 (9th Cir. 2003) (Although state law limited prosecutor's access to juvenile records, "the court could have ordered disclosure notwithstanding state law[.]"). District court opinions have recognized that a state law restriction on producing documents is not a barrier to a finding of control, and thus, have ordered production of a third-party agency's documents as part of party discovery. *See, e.g.*, *Doe v. Cnty. of Santa Clara*, No. 15-cv-01725-EJD (HRL), 2015 WL 14073467, at *1

United States District Court
Northern District of California

**Add. 9** [9]

United States District Court
Northern District of California

(N.D. Cal. Nov. 30, 2015) ("Federal courts may grant lawyers permission to view juvenile case files in spite of California's contrary confidentiality laws, however, because federal privilege law controls who may access evidence"); *Evans v. City of Tulsa*, No. 08-CV-547-JHP-TLW, 2009 WL 3254907, at *2 (N.D. Okla. Oct. 7, 2009) (ordering the defendant municipality in case involving both federal and state law claims to produce documents from three agencies (county clerk, district attorney, and Family and Children Services) and stating that "[i]n federal questions cases, federal courts are not bound by state statutes which impose limits on the discovery process").

Similarly, federal regulations, even when interpreted with the force of law, cannot be enforced if they purport to override the Federal Rules of Civil Procedure. *In re Bankers Tr. Co.*, 61 F.3d 465, 470–71 (6th Cir. 1995) [hereinafter *Bankers Trust*]. In *Bankers Trust*, the Federal Reserve Board refused to produce documents because a federal regulation barred their production absent following procedures to request such documents via separate action in district court in Washington, D.C. *Id.* at 469. The *Bankers Trust* opinion analyzed the conflict between the federal regulation and Rule 34, and concluded that the Federal Rules of Civil Procedure govern whether the documents should be produced:

> We likewise conclude that Congress did not empower the Federal Reserve to prescribe regulations that direct a party to deliberately disobey a court order, subpoena, or other judicial mechanism requiring the production of information. We therefore hold that the language in 12 C.F.R. § 261.14 that requires a party that is served with a subpoena, order, or other judicial process to continually decline to disclose information or testimony exceeds the congressional delegation of authority and cannot be recognized by this court. Such a regulation is plainly inconsistent with Rule 34 and cannot be enforced. To allow a federal regulation issued by an agency to effectively override the application of the Federal Rules of Civil Procedure and, in essence, divest a court of jurisdiction over discovery, the enabling statute must be more specific than a general grant of authority as found here.
>
> Moreover, we find no compelling reason to discard the relatively straightforward discovery methods outlined in the Federal Rules of Civil Procedure simply because the Federal Reserve has attempted to mandate a different procedure.

*Id*. at 470–71.

Analogously, the Supreme Court has recognized that discovery in a federal civil action is controlled by federal law, and that a finding of control over documents cannot be disregarded even

in situations where foreign law would potentially impose criminal sanctions for producing the documents. *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 205–06 (1958). Thus, discovery laws and corporate laws rooted in a different sovereign are insufficient to override the application of the "legal control" test. control. *Japan Halon Co. v. Great Lakes Chemical Corp.*, 155 F.R.D. 626, 627 (N.D. Ind. May 28, 1993) (finding subsidiary has control over parent corporation documents and rejecting and argument that "international interpretation of its corporate structure and the Japanese discovery law result in the conclusion that its does not have the requisite control over documents in possession of its parent companies"). Furthermore, the *Uniden* Court explained that "[t]he expanded definition of control under Rule 34 was signaled by the Supreme Court's decision in *Societe Internationale*." *Uniden*, 181 F.R.D. at 306. As the *Uniden* Court explained further:

> This [Supreme Court] language indicates a direction to lower courts to closely examine the actual relationship between two corporations and guard against not just fraud and deceit, but also sharp practices, inequitable conduct, or other false and misleading actions whereby corporations try to hide documents or make discovery of them difficult. Certainly, this broad construction of Rule 34 is consonant with American civil process which puts a premium on disclosure of facts to ascertain the truth as the means of resolving disputes.

*Id.*

In the same regard, the Ninth Circuit has held that a federal statute (and federal regulations promulgated thereunder) cannot serve as a basis for a government agency to refuse to provide discovery. *Exxon Shipping*, 34 F.3d at 776–78 (rejecting government agencies' refusals of subpoenaed depositions based on both federal statute and regulations). The Ninth Circuit held long ago that agency regulations (and the statutes under which the regulations were promulgated) are not proper barriers to production of documents where control has been found. *Harvey Aluminum (Inc.) v. N.L.R.B.*, 335 F.2d 749, 753 (9th Cir. 1964) ("Whether the compulsion of the rule [for an agency to produce documents] is constitutional or statutory, the Board may not avoid it by adopting regulations inconsistent with its requirements.").

The import of these precedents is that, if a court finds control over documents, then neither federal statute nor federal regulation (nor foreign law) are a legal bar to application of Rule 34 and

1     requiring production based on that finding of control.  To the extent the state Attorneys General

2     argue that a state statute would excuse or bar production of the agencies' documents even where the

3     Court finds control, then for similar reasons that argument is legally unsound.  Here, the Multistate

4     Complaint asserts claims under the Federal Children's Online Privacy Protection Act ("COPPA")

5     on behalf of all the Filing States.  *See California v. Meta Platforms, Inc.*, No. 23-cv-05448, at Dkt.

6     1, ¶¶ 851-59 (N.D. Cal. Oct. 24, 2023) [hereinafter Multistate Complaint]. "[I]n cases presenting

7     federal questions, such as here, ***discoverability***, privileges and confidentiality ***are governed by***

8     ***federal law***, not state law." *Garner v. City of New York*, No. 17-CV-843 (JGK)(KNF), 2018 WL

9     5818109, at *3 (S.D.N.Y. Oct. 17, 2018) (civil rights case asserting both federal and state law causes

10    of action) (emphasis added).

11            While courts have considered the impact of state constitutions and state laws in analyzing

12    the issue of control where governmental entities are involved, comity-based arguments do not

13    require a finding of a lack of control as a matter of law.  Precedent makes clear that notions of comity

14    or arguments about the supremacy of state law (including even a co-pending state court proceedings)

15    are not sufficient to bar a party seeking discovery in a federal court under federal law.  *In re*

16    *PersonalWeb Techs., LLC Pat. Litig.*, No. 18-md-02834-BLF, 2022 WL 19833889, at *1 (N.D. Cal.

17    Apr. 12, 2022) (rejecting comity arguments as bases to bar motion to compel enforcement of third

18    party subpoenas in federal court where state law receivership action was co-pending and noting that

19    "[i]t is settled law that state courts have no authority to bar – by injunction or otherwise – the

20    prosecution of *in personam* actions in federal courts").

21    **III.    SEPARATION AND INDEPENDENCE OF A STATE ATTORNEY GENERAL**
      **        FROM THE EXECUTIVE BRANCH OF THE STATE**

22            The state Attorneys General all argue, using almost identical verbiage, that the office of their

23    state Attorney General is either a separate constitutional officer, separately elected, and/or with

24    separate spheres of authority which make that office independent from the local office of the

25    Governor, which includes all the identified state agencies within the executive branch of that State.

26    *See* Dkt. 685 at 9–10.  This argument relies on either the state constitution or state laws defining the

27    roles of the different state officers, and as such, the above discussion regarding how state law does

28

*United States District Court*
*Northern District of California*

not override federal law applies with equal force.  Further, based on this separation of powers argument, the state Attorneys General argue that they are not the state officers ultimately overseeing the state agencies (the Governor being that officer). They argue, for that reason, that the state Attorneys General have no control over those agencies.  *Id.* at 10.  Indeed, some courts deciding a control issue in the context of governmental entities have put weight on the separation of powers issue under the facts of established there.  *In re Gold King Mine Release in San Juan Cnty.*, No. 1:18-MD-02824-WJ, 2020 WL 13563527 at *3–4 (D.N.M. Dec. 23, 2020).

However, with further examination, these arguments focusing on a dual executive under a state constitution (from which stems the separation of powers between a state Attorney General and a state Governor) are not entirely persuasive.  Corollary arguments that the state Attorneys General have no executive authority over the state agencies (such as "[t]hey do not set agency priorities, cannot discipline agency employees") are equally unpersuasive.  *See* Dkt. 685 at 9–10.  These arguments ignore the reality that the "legal control" issue for discovery arises when there are two legally distinct or separate entities.  If the mere fact that two separately constituted or formed entities were enough to defeat control, then there would almost never be a finding of control.  Indeed, in the analogous situation where two "sister corporations" are involved, courts have found control of one entity over the documents of another.  *See Uniden*, 181 F.R.D. at 307–08 (finding control as between two "sister corporations" where neither was under the corporate authority of the other).  This illustrates the point: if one of two "sister corporations" can be found to have control over documents of the other, then for the same reasons, one of two parts of a split or dual executive can be found to have control of documents of the other.

The state Attorneys General emphasize the separateness of the agencies from the Attorney General without explanation as to how specifically that separation affects control as to the documents at issue.  If only one entity were involved, then by definition that single entity would "possess" the documents under Rule 34 and the disjunctive issue of control would not arise.  *Illumina Cambridge Ltd. v. Complete Genomics, Inc.*, No. 19-mc-80215-WHO (TSH), 2020 WL 820327, at *8–9 (N.D. Cal. Feb.19, 2020).  Whether or not there is a "dual executive" or separation of powers is not by itself dispositive of the control issue.  Analogously, in the context of corporate

entities, lack of ownership interests by one corporation of another is not sufficient to defeat a finding of control.  *See QC Labs v. Green Leaf Lab* LLC, No. 8:18-cv-01451-JVS (JDEx), 2019 WL 6797250, at *8–9 (C.D. Cal. July 19, 2019) (finding control even though two entities "are not in a parent-wholly owned subsidiary relationship, nor do the two entities have identical ownership structure").  To the extent some precedent cited by the state Attorneys General have relied on policy-based reasons rooted in comity for finding a lack of control by an Attorney General over a state agency, those decisions are distinguishable because they do not apply the Ninth Circuit's *Citric Acid* test (for example, state Attorneys General cite a state intermediate appellate court opinion, *People ex rel. Lockyer v. Superior Ct.*, 19 Cal. Rptr. 3d 324 (Cal. Ct. App. 2004), which did not apply Rule 34); they involve a factual record different from the record here; and they appear not to involve or consider factors such as commonality of counsel, commonality of interests, or the discussion of the supremacy of federal law in this inquiry (informed at least in part by the Supreme Court's directive in *Societe Internationale* and the cases cited above).  [Dkt. 685 at 9–10].

The existence of a separation of powers between a state Attorney General and a Governor may be a factor in the control analysis, but that factor does not necessarily preclude the Attorney General's legal right to access to state agency documents.  The logical fallacy of the "separation of powers" argument is that this concept concerns distinct spheres of governmental authority to act within their roles as arms of the government and does not necessarily impact whether or not there is control of documents for purposes of discovery.  To be clear, control under Rule 34 is a discovery concept and is not subject of the exact same conceptual bounds of "corporate control" (as a parent-subsidiary) or "operational control" (such as setting agency policy or disciplining agency employees, as the state Attorney Generals argue).  Where one entity is under the day-to-day operational control of another, that factual situation has been found to be a factor in finding control, because such unfettered power to control all the operations of another entity would indicate a legal right to obtain the documents (again, such as in a parent-subsidiary situation).  *See In re ATM Fee Antitrust Litig.*, 233 F.R.D. at 545; *see also LG Display Co., Ltd. v. Chi Mei Optroelectronics Corp.*, No. 08CV2408-L (POR), 2009 WL 223585, at *3 (S.D. Cal. Jan. 28, 2009) ("Numerous courts have concluded that a parent corporation has a sufficient degree of ownership and control over a wholly-

United States District Court
Northern District of California

1    owned subsidiary that it must be deemed to have control over documents located with that

2    subsidiary.").

3       But, the converse is not necessarily true: lack of operational, day-to-day control of an entity

4    does not end the inquiry, as the state Attorneys General argue – otherwise, control would never be

5    found in situations except those involving a parent-subsidiary or similar direct-control type of

6    relationship. For example, in *Choice-Intersil Microsystems, Inc. v. Agere Sys.*, the Court found that

7    a subsidiary corporation had control of the documents of its parent corporation for purposes of

8    discovery, despite the fact that the subsidiary by definition lacked corporate or operational control

9    over the parent corporation. *Choice-Intersil Microsystems, Inc. v. Agere Sys.*, 224 F.R.D. 471, 472–

10    73 (N.D. Cal. 2004) (finding subsidiary has control of documents of parent corporation); *see also*

11    *Uniden*, 181 F.R.D. at 307–08 (finding control as between two "sister corporations" where neither

12    was under the corporate authority of the other). "'The control analysis for Rule 34 purposes does

13    not require the party to have actual managerial power over the foreign corporation, but rather that

14    there be close coordination between them.'" *St. Jude Medical S.C., Inc. v. Janssen-Counotte*, 305

15    F.R.D. 630, 638 (D. Or. 2015). Here, the attorney-client relationship between the state Attorneys

16    General and their respective state agencies (a relationship mandated by state law) necessitates close

17    coordination. Thus, although operational control may be a factual situation which demonstrates a

18    legal right to obtain the documents, the absence of such "managerial power" in terms of day-to-day

19    operations or policy making is not determinative for evaluating "control" for purposes of discovery.

20       Similarly, to the extent the State Attorneys General argue that they lack "unfettered access"

21    or some otherwise unbounded right to access state agencies' documents, such argument is legally

22    incorrect. A determination of "control" of documents, for purposes of Rule 34, does not require

23    showing "unfettered access" to all state agencies' documents under all circumstances. *Monsanto*,

24    2023 WL 4083934, at *5 ("Despite the State's characterization of the issue, we need not decide

25    whether the Illinois Attorney General has "unfettered access to all state agencies' records under all

26    circumstances." Rather, the issue is one of "control" under Rule 34 – nothing more, nothing less.").

27    Further, the state Attorneys General implicitly assume an overly restrictive view of the control test

28    for documents under Rule 34. To the contrary, courts have recognized that control for purposes of

document discovery is liberally construed. *E.g.*, *Miniace*, 2006 WL 335389, at *1; *Evans v. Tilton*, No. 1:07CV01814 DLB PC, 2010 WL 1136216, at *1–2 (E.D. Cal. Mar. 19, 2010); *Inland Concrete Enterprises, Inc. v. Kraft Americas LP*, No. CV 10-1776-VBF (OPX), 2011 WL 13209239, at *3–4 (C.D. Cal. Feb. 3, 2011).

Indeed, control of documents in the split-governmental context is amply demonstrated by a Western District of Tennessee decision. *Bd. of Educ. of Shelby Cnty., Tenn.*, 2012 WL 6003540, at *3. In that case, the Court found that the Tennessee Attorney General had control of the documents of the "Tennessee General Assembly, its legislators, representatives, or agents" – despite the fact that the state's legislature is not under executive control or authority of the state's Attorney General. *Id.* Clearly, under the Tennessee state constitution, the Attorney General does not exert supervisory control over the Tennessee legislature. But that factor was not determinative of the control issue for documents under Rule 34. "Control" for purposes of discovery is not coterminous with the concept of "functional control" or "political control".

Ultimately, the argument that state agencies are outside a state Attorney General's executive authority is merely another way to restate that there are two distinct entities involved. Seen for what it is, that argument amounts to nothing more than restating the issue to be decided, without helping to decide the issue. Similarly, arguing that the state agencies are independent because there is a "divided executive" under a state constitution again improperly conflates the "legal control" issue for discovery of documents with "operational control" or "functional independence." Under the legal standards discussed, the Court finds these arguments and these alleged factors to be ultimately unhelpful in determining whether or not there is control for purposes of discovery, because these arguments beg the issue and as such are not outcome determinative of the control issue.

## IV.   COMMONALITIES BETWEEN THE STATES, THE STATE ATTORNEYS GENERAL, AND THE STATE AGENCIES

There are thirteen cases in this Multi-District Litigation in which the States themselves are the named plaintiffs and in which the Attorney General of that State is not named as co-plaintiff (but is rather counsel representing the plaintiff). *See* Multistate Complaint (naming California, Connecticut, Idaho through its Attorney General, Illinois, Indiana, Kentucky, Louisiana, Maine,

United States District Court
Northern District of California

Minnesota by its Attorney General, New York by its Attorney General, Pennsylvania by its Attorney General, Rhode Island, and Wisconsin as plaintiffs). Further, there are nineteen cases in this Multi-District Litigation in which both the State itself and the Attorney General (as relator) are the named co-plaintiffs, and thus both entities are represented by the Attorney General of that State. *Id.* (naming "*ex rel.*" the Attorney Generals of Arizona, Colorado, Delaware, Georgia, Hawai'i, Kansas, Michigan, Missouri, Nebraska, North Carolina, North Dakota, Ohio, Oregon, South Carolina, South Dakota, Virginia, Washington, and West Virginia); *see also Montana v. Meta Platforms, Inc.*, No. 24-cv-00805, at Dkt. 1 (N.D. Cal. Dec. 1, 2023) (Montana Complaint naming "State of Montana, *ex rel*. Austin Knudsen, Attorney General" as "Plaintiffs"); *see also U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 481 F. Supp. 2d 815, 823 n.6 (S.D. Tex. 2007) ("the Fifth Circuit has expressly held that relator is a party to the suit."); *accord Power Authority ex rel. Solar Liberty Energy Sys. v. Advanced Energy Indus.*, No. 19-CV-1542-LJV-JJM, 2024 WL 957788, at *2 (W.D.N.Y Mar. 6, 2024).

In all thirty-two cases, the State itself is a party to the suit. Courts have found that discovery obligations extend to other government agencies even if they are non-parties based on the recognition that the State (or the government as a whole) is essentially the real party in interest and thus the discovery obligation extends to the entire government. In an analogous case involving an order for the production of documents from a non-party agency proceeding, the Ninth Circuit held that:

> [t]he rationale of the rule [requiring production of the documents, witness statements] . . . applies with equal vigor whether the statements are in the possession of the agency conducting the hearing *or of another agency of the government* . . . . The [National Labor Relations] Board, the Department of Justice, and the Department of Labor are all parts of the government of the United States. The proceedings which the Board initiated against petitioners were public proceedings, undertaken on behalf of that government to enforce a public Act. In a criminal prosecution the Department of Justice would scarcely be heard to say that it was not required to produce statements otherwise within the rule *simply because the documents rested in the hands of another federal agency*, and we perceive no valid distinction, for this purpose, between that case and this one.

*Harvey Aluminum*, 335 F.2d at 754 (citations omitted) (emphasis added); *cf. also Bank Line v. United States*, 76 F. Supp. 801, 803–04 (S.D.N.Y. 1948) (ordering production of documents from

1   non-party, the Department of the Navy, noting that "[t]he several departments are all agencies of

2   one government, possessed, theoretically, at least, of a single will" where "suit is prosecuted by the

3   Department of Justice for the benefit of the Treasury Department, and that the Navy Department [is]

4   not exercising any discretion as to institution of litigation.").

5       This rationale has been applied to the governments of other nation states, such as in a case

6   involving Ghana: "When an agency of government institutes suit, any obligation to disclose relevant

7   information extends to the government Qua government requiring disclosure of all documents in its

8   possession, custody or control, not just those materials in the immediate possession of the particular

9   agency-plaintiff." *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D. Mass.

10  1979).

11      Under different factual situations, state agencies have been found to be agents of their

12  respective States. *See, e.g.*, *San Francisco NAACP v. San Francisco Unified School Dist.*, 484 F.

13  Supp. 657, 667 (N.D. Cal. 1979) (collecting cases which "have found liability [of a State] under an

14  agency theory" involving school boards); *In re Airport Car Rental Antitrust Litig.*, 521 F. Supp.

15  568, 586–87 (N.D. Cal. 1981), *aff'd*, 693 F.2d 84 (9th Cir. 1982) ("Air travelers require ground

16  transportation and it would follow that the [airport operating agency Air] Board, as the agent of the

17  state in performing this function, would have a duty to provide adequate and reliable services.")

18  (quoting *Padgett v. Louisville & Jefferson Cnty. Air Bd.*, 492 F.2d 1258, 1260 (6th Cir. 1974)); *San

19  Francisco Unified Sch. Dist. v. Johnson*, 479 P.2d 669, 677 (Cal. 1971) ("the state [of California]

20  has created local school districts, whose governing boards function as agents of the state.");

21  *Crumpler v. Bd. of Admin.*, 108 Cal. Rptr. 293, 305 (Cal. Ct. App. 1973) (finding Board of

22  Administration of Public Employees' Retirement System and city of Mendocino "were agents of

23  the state [of California]" in administering that retirement system).  A principal-agent relationship

24  has been held to be a factor that supports a finding of control for purposes of discovery.  *Lofton v.

25  Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR (JSC), 2014 WL 10965261, at *2 (N.D. Cal.

26  Nov. 25, 2014); *Hitachi*, 2006 WL 2038248 at *1; *Rosie v. Romney*, 256 F. Supp. 2d 115, 118 (D.

27  Mass. 2003).  Meta argues that the agencies at issue are under the control of their respective State,

28  and therefore subject to party discovery.  *See* Dkt. 685 at 6–7 (citing cases).

**Add. 18**[18]

United States District Court
Northern District of California

However, the state Attorneys General argue that other courts have recognized that Rule 34 should not be interpreted to allow party discovery of every agency of a state government, merely because suit was filed in the name of the State absent a showing of some other factors demonstrating control. *Id.* at 9 (citing cases). As with other factors impacting the control issue, the case law makes clear that this factor is one among the totality of circumstances to be considered in deciding whether or not there is control. *See Colorado v. Warner Chilcott Holdings*, No. 05-02182, 2007 WL 9813287, at *4 (D.D.C. May 8, 2007) (The Court "will not aggregate separate state governmental agencies without a strong showing to the contrary by Defendants[.]"). The *Amex* opinion followed *Warner Chilcott Holdings* in finding that the state Attorneys General lacked control over their respective agencies' documents because that court granted "great deference" to the dual executive, separate agency factors. *Amex*, 2011 WL 13073683, at *2. As recognized by *Warner Chilcott Holdings*, court can take this factor into account under the totality of the circumstances for evaluating control for each state. *Warner Chilcott Holdings*, 2007 WL 9813287, at *4

A more specific concept of "independence" involves the state Attorney General's independent discretion to file a lawsuit. The state Attorneys General argue that, by pursuing these civil enforcement actions, the state Attorneys General are acting within their exclusive independent authority under their state constitutions and that this independent prosecutorial authority does not require involvement of any state agencies (with exceptions for certain states where specific agencies are, in fact, required to approve and proceed with the litigation). The *Generic Pharmaceuticals (II)* Court rejected the argument that, because the Attorney General was suing as an independent agency, it necessarily lacked control over other agencies' documents. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 358. As that Court noted, the District of Columbia's "Attorney General has 'broad power to exercise all such authority as the public interest requires' and has 'wide discretion in determining what litigation to pursue to uphold the public interest, absent specific constitutional or statutory guidance to the contrary.'" *Id.* The *Generic Pharmaceuticals (II)* Court reasoned that "[t]his broad authority, in the context of litigation where the AGO is representing the District of Columbia, does not support the position that the AGO cannot exercise its authority to obtain documents from other agencies." *Id.*

United States District Court
Northern District of California

Conversely, in *Amex*, that Court relied on the factor that "the decision to pursue an enforcement action against Amex was one of policy, made independently of the State Governors and state agencies" as a basis to find a lack of control. *Amex*, 2011 WL 13073683, at *2. However, the *Amex* Court failed to address or apparently consider the point considered by the *Generic Pharmaceuticals (II)* opinion: such broad authority on the part of the state Attorneys General (in filing the litigation) would in fact be consistent with having a right to exercise authority to obtain documents from other agencies (and at least would be inconsistent with a lack of such authority). *Compare Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 358, *with Amex*, 2011 WL 13073683, at *2.

Indeed, courts have found when a state Attorney General initiates litigation on behalf of the state, and thus exercises authority to file a lawsuit *parens patriae*, that Attorney General has legal control over agency documents. *See, e.g.*, *GEO Grp., Inc.*, 2018 WL 9457998, at *3 ("In this Court's view, where the plaintiff is the State of Washington, discovery addressed to the State of Washington includes its agencies. Because the AGO is the law firm to the State of Washington, the AGO should respond to and produce discovery on behalf of the State of Washington, including its agencies."); *Compagnie Francaise d'Assurance Pour le Com. Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 35 (S.D.N.Y. 1984) (where an "agency of government institutes suit, any obligation to disclose relevant information extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff"); *see also United States v. AT&T*, 461 F. Supp. 1314, 1333–34 (D.D.C. 1978) ("The Attorney General . . . [is] responsible for instituting and conducting the criminal and civil litigation of the United States[]" "it hardly seems reasonable to insulate the entire government, other than the Attorney General's Office, from the direct discovery process.").

Similarly, many of the state Attorneys General argue that the non-party agencies are not parties to this case, and thus they are by definition not subject to party discovery. The short response to this circular argument is that Rule 34 reaches non-parties where there is control, so a third party's status as a third party to the case is no basis on which to find a lack of control. This argument ignores the many cases in which a non-party was found properly subject to party discovery under

Rule 34 because the named party had control over the non-party's documents. *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, No. 21-CV-00299, 2022 WL 1540589 at *1–2 (W.D. Tex. May 16, 2022) ("In many examples the United States points to, Texas has demonstrated its control over documents held by non-party agencies or officials . . . . The Court finds that Texas has control over documents and ESI that are held by [the Office of the Governor], [the Office of the Attorney General], and any other executive agency known to the State to be in the possession, custody, or control of relevant documents. Because Texas has control over these items, it must produce the items responsive to the United States' Rule 34 production request.").

## V. "VIRTUAL VETO"

Throughout their briefs and at oral argument, the state Attorneys General stressed the "dual/divided executive" of their constitutional structures of their local governments. The Court is mindful of the nature of state governance and has taken it into account as appropriate. Indeed, courts have discussed the unique positions in which state Attorneys General sit within a state government. *Amex*, 2011 WL 13073683, at *3. Focusing on the independent authority of a state Attorney General as compared to the separate authority of the remainder of the executive branch, the *Amex* Court found that state Attorneys General lacked control over their respective state agencies' documents based on the risk of the agencies having a potential "virtual veto" on their state Attorney General:

> It is not for this court to interfere with the State Attorneys General's ability to exercise their state constitutional power to bring an enforcement lawsuit absent gubernatorial approval. To find that the State Attorneys General have control over the documents in possession of state agencies that operate wholly independently of the State Attorneys General would be giving the Governors' Offices and state agencies a 'virtual veto' over the policy decision to bring an enforcement action that rightfully lies with the State Attorneys General."

*Id.* The state Attorneys General rely on this "virtual veto" argument in this Multi-District Litigation.

Upon further examination, the "virtual veto" argument is speculative as to why and how an agency's actions in responding to discovery would rise to the level of the hypothetical "virtual veto" over litigation. The *Amex* opinion does not adequately explain how treating a non-party agency as subject to party discovery would, by itself, result in a state Governor's preventing or obstructing future lawsuits by its attorney general. *See id.* Indeed, regardless of the non-party agency's actions,

the state Attorney General would still have its own independent authority to initiate and prosecute its own lawsuits – there is no "veto" over that power. *Monsanto*, 2023 WL 4083934, at *3. The *Amex* Court does not discuss why the Governor or agencies would refuse to comply with party discovery, when faced with a court order requiring them to do so. Nor does the *Amex* opinion explain why there would be a "veto" in light of the procedural remedies available to secure production of documents from the hypothetically refusing state agencies; nor does the opinion discuss alternative procedures available to obtain discovery from recalcitrant third parties.

More fundamentally, the *Amex* Court's alleged harm from a "virtual veto" is illusory. Even if state agencies operate independently from their state attorneys general, the *Amex* opinion ignores the role that state attorneys general have as counsel for the state agencies. As discussed below, typically a State's constitutional or statutory scheme mandates that all state agencies utilize their state Attorney General as legal counsel in litigation (albeit sometimes with allowable exceptions under certain conditions, none of which have been shown to exist or been triggered in this Multi-District Litigation). Under such required representation schemes, the state Attorneys General must still advise, confer, and coordinate with their clients (the respective state agencies) regardless of whether a discovery request is served pursuant to Rule 34 or Rule 45. The "virtual veto" argument assumes without explanation that these agencies would refuse to comply with party discovery under Rule 34, but would at the same time comply with third-party discovery under Rule 45. In other words, the "virtual veto" argument assumes the agencies would reject party discovery with such vehemence that they would risk sanctions, but inexplicably would comply normally in response to subpoenas. While the burdens and procedures between Rule 34 document requests and third-party subpoenas differ in some respects, as a practical matter, when it comes down to the fundamental issue of whether documents will be produced, the same general types of discussions between counsel as to relevance, scope, proportionality, and privilege apply to both. It is not explained why an agency would absolutely refuse to produce documents at all under Rule 34 without good and proper reasons, and yet why the same good and proper reasons would disappear in the face of a subpoena. Further, it is not explained why a Governor or state agency lacks the exact same "virtual veto" if and when it were to obstinately refuse to produce any documents at all in response to a subpoena –

1   the same unfounded fear that an agency would act so extremely uncooperatively is unbounded and

2   (under the plaintiffs' hypothetical) would be just as likely to occur in response to a subpoena.

3          Further, these unsubstantiated fears that agencies would refuse to produce documents, even

4   when coordinating with their own lawyers from their own state Attorney General's office, ignores

5   the close relationship lawyers have with their clients.  Indeed, this argument ignores the likely much

6   closer relationship that a state agency would have with lawyers from their state's Attorney General's

7   office, who repeatedly represent their state's agencies in multiple matters throughout the years.  This

8   argument also ignores that this refusal to produce documents sought under Rule 34 would persist

9   even after these state Attorneys General perform able legal services and reasonably advise their

10  clients about the obligations to comply with reasonable, proportional discovery under the Federal

11  Rules (and the enforcement mechanisms available when parties refuse to comply at all).  Combined

12  with the fact that there is no explanation how a refusal to produce documents would necessarily put

13  the litigation to an end (*i.e.*, veto the litigation), the alleged harm here is based on a hyperbolic,

14  worst-case scenario argument.  Therefore, the notion that Governors or state agencies could

15  effectively veto an enforcement action by withholding documents sought under Rule 34 is an

16  unfounded hypothetical and not a strong basis on which to find a lack of control where other factors

17  support such a finding.

18         As discussed, if the state agencies simply refused to provide documents, the *Amex* opinion

19  ignores that they *would* be subject to legal consequences.  *Lofton*, *v. Verizon Wireless (VAW) LLC*,

20  308 F.R.D. 276, 285 (N.D. Cal. 2015) ("The court's inherent authority to sanction includes not only

21  the authority to sanction a party, but also the authority to sanction the conduct of a nonparty who

22  participates in abusive litigation practices, or whose actions or omissions cause the parties to incur

23  additional expenses.").  A Court has the inherent authority to enforce its own Orders to control the

24  conduct of the proceedings, protect the "orderly administration of justice," and maintain "the

25  authority and dignity of the court."  *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764–67 (1980).

26  Should a state agency violate an Order compelling production, this Court would have the inherent

27  authority to issue sanctions (including monetary sanctions) against the state agencies committing

28  any such hypothetical refusal to abide by Court Order.  The Ninth Circuit has long recognized that,

United States District Court
Northern District of California

**Add. 23**[23]

if non-party agencies refuse to produce documents, ultimately the courts may compel them to do so. *Harvey Aluminum*, 335 F.2d at 754 ("[T]he Departments of Justice and Labor are not sovereign, and though the [National Labor Relations] Board may not be able to compel them to produce documents in their possession, the President *or, if need be, the courts, may do so*.") (emphasis added).

The "virtual veto" argument suffers from a further legal weakness: the argument appears to be based on incorrect views of the legal duties and the role of counsel in the discovery process. As counsel for a party subject to discovery, a state Attorney General has the legal authority and duty to take action to make inquiry and collect the documents from the uncooperative state agencies directly and cannot simply sit on their hands in the face of an uncooperative client. *See, e.g.*, *Rhea v. Washington Dep't. of Corr.*, 2010 WL 5395009, at *6 (W.D. Wash. Dec. 27, 2010) (State Attorney General representing agency: "counsel" "has an obligation to not just request documents of his client, but to search for sources of information. Counsel must communicate with the client, identify all sources of relevant information, and 'become fully familiar with [the] client's document retention policies, as well as [the] client's data retention architecture.'") (internal citation omitted). "The relevant rules and case law establish that an attorney has a duty and obligation to have knowledge of, supervise, or counsel the client's discovery search, collection, and production. It is clear to the Court that an attorney cannot abandon his professional and ethical duties imposed by the applicable rules and case law and permit an interested party or person to 'self-collect' discovery without any attorney advice, supervision, or knowledge of the process utilized." *Equal Emp. Opportunity Comm'n v. M1 5100 Corp.*, No. 19-CV-81320, 2020 WL 3581372, at *2–3 (S.D. Fla. July 2, 2020) ("Attorneys have a duty to oversee their clients' collection of information and documents, especially when ESI is involved, during the discovery process. Although clients can certainly be tasked with searching for, collecting, and producing discovery, it must be accomplished under the advice and supervision of counsel, or at least with counsel possessing sufficient knowledge of the process utilized by the client. Parties and clients, who are often lay persons, do not normally have the knowledge and expertise to understand their discovery obligations, to conduct appropriate searches, to collect responsive discovery, and then to fully produce it, especially when dealing with ESI, without counsel's guiding hand.").

1    This would not be the first time an attorney was faced with a client who posed difficulties in

2    collecting documents for discovery. *See, e.g.*, *Qualcomm Inc. v. Broadcom Corp.*, No. 05cv1958-

3    B (BLM), 2010 WL 1336937, at *2–5 (S.D. Cal. April 2, 2010). Counsel in a litigation have legal

4    duties to take proactive steps in supervising and searching for documents in discovery that go far

5    beyond simply acceding to a client who fails (or worse, refuses) to produce or provide documents.

6    *Id.* (detailing "Discovery Errors" by counsel); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2016

7    WL 5791210, at *3–4 (N.D. Cal. Oct. 4, 2016) (awarding discovery sanctions where, among other

8    things, there was "no indication that Safeway's counsel guided or monitored [client employee] Mr.

9    Guthrie's search of the legacy drive in any significant way").

10    Counsel cannot simply advise clients about document requests and leave it up to the client

11    to decide whether or not to risk sanctions for failure to produce – in appropriate circumstances,

12    counsel may need to personally conduct or directly supervise a client's collection, review, and

13    production of responsive documents. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 16-

14    cv-06370-EJD (VKD), 2020 WL 2838806, at *5–7 (N.D. Cal. June 1, 2020) (awarding discovery

15    sanctions: "It is not enough for counsel to provide advice and guidance to a client about how to

16    search for responsive documents, and then not inquire further about whether that advice and

17    guidance were followed . . . . The Court does not conclude that counsel must always personally

18    conduct or directly supervise a client's collection, review, and production of responsive documents.

19    However, in the circumstances presented here, the Court finds that [counsel] Sheppard Mullin did

20    not make a reasonable effort to ensure that [sanctioned party] Ningbo Sunny produced all the

21    documents responsive to Orion's requests and thus violated its obligations under Rule 26(g)(1)(B) .

22    . . . [T]the Court orders Ningbo Sunny's new counsel of record to undertake an independent effort

23    to ensure that Ningbo Sunny fully complies with Orion's post-judgment document requests."); *see*

24    *also Etopus Tech., Inc. v. Liu*, No. 23-cv-06594-HSG (PHK), 2024 WL 3311053, at *6 (N.D. Cal.

25    July 5, 2024) (ordering production of documents and ordering counsel to provide supplemental

26    response "attesting to the fact that Defendant's counsel performed the search for documents directly

27    (and did not rely solely on their client), and attesting to whether Defendant's counsel themselves

28    performed a reasonable, good faith search").

United States District Court
Northern District of California

**Add. 25**[25]

The Court finds as legally erroneous the argument that the state Attorneys General would lack control over state agency materials simply because litigation counsel is either helpless in the face of an uncooperative client or can satisfy their obligations as officers of the Court by merely acquiescing to a client's refusal to collect documents (and presumably allowing a client to face sanctions).  *See Kaur v. Alameida*, No. CV F 05 276 OWW DLB, 2007 WL 1449723, at *2 (E.D. Cal. May 15, 2007) (finding defendants have control over agency documents and ordering further search: "defendants *and counsel are reminded of their duty under Rule 34* to conduct a diligent search and reasonable inquiry in effort to obtain responsive documents") (emphasis added).  The "virtual veto" arguments are based on a fundamentally flawed misunderstanding of counsel's role and the available procedures under the Federal Rules for the proper conduct of discovery and the rational administration of justice – counsel have a proactive duty to conduct discovery under the rules without requiring constant judicial intervention.  "In complex litigation such as this, cases are shaped, if not won or lost, in the discovery phase. The rules of discovery must necessarily be largely self-enforcing. The integrity of the discovery process rests on the faithfulness of ***parties and counsel*** to the rules—both the spirit and the letter. '[T]he discovery provisions of the Federal Rules are meant to function without the need for constant judicial intervention and . . . those Rules rely on the honesty and good faith of counsel in dealing with adversaries.'  The rules of procedure (and attorneys' duty to adhere to them) apply with equal force to decisions made in private discussions behind closed doors in a client's office on how much effort to expend to answer the opposing party's discovery, as to attorney conduct in the bright light of open court." *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 507 (D. Md. 2000) (citation omitted) (emphasis added); *see also King v. Habib Bank Ltd.*, No. 20-cv-04322-LGS-OTW, Dkt. 272, slip op. at 2 (S.D.N.Y. July 1, 2024) ("embroil[ing this judge] in day-to-day supervision of discovery [is] a result directly contrary to the overall scheme of the federal discovery rules").

In addition to supervising the collection of documents and making inquiry of clients to ensure proper collection of documents is undertaken, attorneys representing clients in court proceedings have legal duties under the Federal Rules of Civil Procedure to work cooperatively to improve the administration of civil justice, both as officers of the court and under their ethical

obligations as members of the bar. *See* Fed. R. Civ. P. 1 advisory committee's note to 2015 amendment; *see also* Fed. R. Civ. P. 26(g) advisory committee's note to 1983 amendment ("Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37. . . . The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that *obliges each attorney* to stop and think about the legitimacy of a discovery request, a response thereto, or an objection. The term 'response' includes answers to interrogatories and to requests to admit as well as responses to production requests. ***If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse.***") (emphasis added)

These duties imposed on counsel are important for the discovery system under the Federal Rules to operate rationally and effectively. As the Ninth Circuit has recognized, "legal duties" are logical antecedent to "legal rights" and thus the state Attorneys' General legal duties to undertake proactive efforts to collect documents from clients in discovery are the flip side to the legal right to access those documents. *Newman v. Sathyavaglswaran*, 287 F.3d 786, 790 n.5 (9th Cir. 2002) ("The logical relationship between rights and duties has been the subject of considerable academic examination. Wesley Hohfeld famously described rights and duties as 'jural correlatives'—different aspects of the same legal relation. Oliver Wendell Holmes described rights as 'intellectual constructs used to describe the consequences of legal obligations. [sic] As he puts it [in The Common Law (1881)], 'legal duties are logically antecedent to legal rights.'") (internal citations omitted). Here, the recognition that a state Attorney General, presumptively counsel for its state agencies, has legal duties to supervise the collection of (and possibly directly obtain) documents from those agencies for discovery leads logically to the conclusion that the state Attorneys General have the legal right to access those documents. That is, counsel's legal duty to ensure collection of documents from a client is a different aspect of (and correlates juridically to) a legal right to access those documents, and thus supports the conclusion of control for purposes of discovery.

Finally, as discussed herein, the issue of control is analyzed on a state-by-state basis. Assuming there is a factual record showing an actual, cognizable, and not an unfounded hypothetical

risk of a "virtual veto" materializing in a particular State, the Court would consider that factor among the totality of circumstances to evaluate the control issue.

## VI.    ATTORNEY-CLIENT RELATIONSHIP AND LEGAL RIGHT TO ACCESS

As noted, many (if not all) of the state Attorneys General have confirmed that they will (or likely will) represent their respective state agencies. When a state agency is mandated to use the state attorney general as its exclusive legal counsel, this mandate carries with it an indication that the attorney general has legal control over the agency's documents. The close coordination underlying an attorney-client relationship is a factor in the legal control analysis. "In general, an attorney is presumed to have control over documents in its client's possession." *Perez v. Perry*, No. SA-11-CV-360-OLG-JES, 2014 WL 1796661, at *2 (W.D. Tex. May 6, 2014).

In *Love v. New Jersey Dept. of Corr.*, No. 2:15-CV-4404-SDW-SCM, 2017 WL 3477864, at *5–6 (D.N.J. Aug. 11, 2017), the Court held that the defendants have control over the documents of a third-party state agency "albeit through their attorney" where those defendants were defended by the New Jersey Attorney General, who also represented the third-party agency. *Accord Williams v. Hawn*, No. 1:21-cv-446, 2022 WL 22859198, at *2 (W.D. Mich. Aug. 26, 2022) (finding defendants have control over third-party agency documents: "Courts have considered the existence of a principal-agent relationship sufficient to satisfy the 'possession, custody, or control' requirement . . . . Here, Defendants are represented by the Michigan Attorney General, which has demonstrated access to [third-party agency] MDOC documents and materials in many cases before this Court.").

In *Synopsys, Inc. v. Ricoh Co.*, No. C-03-2289 MJJ (EMC), 2006 WL 1867529 (N.D. Cal. July 5, 2006), the defendants sought an order compelling Ricoh to search for and produce documents from a third party, KBSC. The Court ordered that search for documents where it was "especially telling" that common counsel was involved:

> In making this order, the Court finds that Ricoh has sufficient control over KBSC for purposes of Rule 34 for the Court to order counsel for Ricoh to search the storage facility . . . . Although the Court acknowledges that voluntary cooperation between a party and a third party does not automatically establish control, the facts here suggest that there is more than just voluntary cooperation. It is especially telling that KBSC agreed to be represented by Ricoh's counsel for

United States District Court
Northern District of California

> purposes of discovery and, more important, that Ricoh was able to secure a search of the storage facility by Mr. Bershader and a declaration from the same within only three days of the parties' meet and confer."

*Id.* at \*2. Under *Synopsys*, then, the fact that the party and third party are represented by the same counsel is "especially telling" and thus a relevant factor in finding legal control. The Court is cognizant that *Synopsys* cites out-of-circuit case law which refers to the "practical ability" factor rejected by the Ninth Circuit in *Citric Acid*. *Id.* (citing *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146 (S.D.N.Y. 1997)). However, in *In re NCAA Student-Athlete Name & Likeness Litig.*, No. 09-cv-01967 CW (NC), 2012 WL 161240, at \*4 (N.D. Cal. Jan. 17, 2012), the Court undertook a "close look at the facts of those two cases" and explained that at least in part their holdings did not fundamentally rely on the "practical ability" test. The Court held that, even if the Court were to apply the rejected "practical ability" test, under the facts of the case the moving party failed to support a finding of "practical ability." *Id.*

In the state governance context, a legal relationship between the state Attorney General and the agency establishes a direct legal link between the agency and the plaintiff (either directly where the Attorney General is a named plaintiff, or through counsel), thus supporting a finding of control. *See Bd. of Educ. of Shelby Cnty., Tenn.*, 2012 WL 6003540, at \*3 ("Based upon these statutory duties to handle 'all legal services,' 'direct and supervise' all litigation, and 'represent' the State of Tennessee, one such responsibility must be to respond appropriately to discovery requests on behalf of the entities of the state government that he represents as required by the Federal Rules of Civil Procedure."). As the designated legal representative for a state agency, the Attorney General has professional and ethical obligations to access to all relevant documents to provide effective legal counsel and representation. This access is *legally mandated* (and goes beyond a mere practicality), ensuring that the Attorney General can fulfill their duties under the Federal Rules.

If a state agency's use of the state Attorney General as legal counsel is not mandatory but relies on consent of the state agency, the analysis of legal control over the agency's documents may rely on other factors such as whether, in a given case, the state agency has already committed in fact to be so represented, or if there are no conditions for the state agency to avoid relying on the free legal services of the state attorney general. While a state agency may be granted by statute some

**Add. 29**[29]

United States District Court
Northern District of California

1    potential or theoretical ability to choose legal representation, often that ability is subject to the

2    discretion of the state Attorney General or subject to some other restriction (such as a conflict of

3    interest).  Further, at hearings in this Multi-District Litigation which involves some states where the

4    state agency may have some ability to be represented by counsel other than the state Attorney

5    General, this Court has inquired of and suggested to the State Attorneys General that they discuss

6    this litigation and confirm whether or not the agencies at issue will rely on their local state Attorney

7    General.  *See* Dkt. 818.  The Court notes that, to date, no separate counsel has entered appearances

8    for any of the state agencies at issue, and the state Attorneys General previously indicated that they

9    have either chosen not to or (at minimum) simply failed to confer with their state agencies, even as

10   a courtesy.  However, a number of State Attorneys General have voluntarily sent litigation hold

11   notices to their respective identified agencies, and pursuant to this Court's Order, the State Attorneys

12   General who did not voluntarily do so have sent litigation hold notices to their respective agencies.

13   [Dkt. 1025].  Despite having notice of this litigation and the fact that they may be the subject of

14   discovery, none of the state agencies at issue have moved to intervene to advance their own alleged

15   interests in not being subject to party discovery.  And no state agencies (where they would have the

16   ability to do so under state law) have indicated that they retained private or separate counsel (such

17   as agency counsel) to represent their interests without the benefit of otherwise free legal

18   representation from their State Attorney General.  Thus, the current record submitted to this Court

19   for decision indicates that no state agencies have confirmed they will retain separate counsel (as

20   none has entered appearance), and the Court analyzes the issues for the states below with the factual

21   record as the State Attorneys General have chosen to submit.

22   **VII.    A PARTY TO THE SUIT IS BOTH A LEGAL SERVICES PROVIDER WHILE
            ALSO COUNSEL TO BOTH ITSELF AS A PARTY AND COUNSEL TO THE
23          THIRD PARTY**

24          As discussed, in nineteen of the state lawsuits here, the state Attorney General is a named

25   party to the suit as relator.  Further, in another three lawsuits, the state Attorney General is the sole

26   named plaintiff.  *See* Multistate Complaint (naming Attorneys General of Maryland and New

27   Jersey); *see also Office of the Attorney General, State of Florida, Department of Legal Affairs v.*

28   *Meta Platforms, Inc.*, No. 23-cv-05885, at Dkt. 1 (N.D. Cal. Oct. 24, 2023) (Florida complaint

naming "Office of the Attorney General, State of Florida" as Plaintiff). Thus, in twenty-two of the cases in this Multi-District Litigation the Party nominally subject to party discovery as plaintiff is the state Attorney General itself. In the remaining thirteen state Plaintiff cases in this Multi-District Litigation, the plaintiff state is represented by the state Attorney General as counsel.

As discussed in the state-by-state analysis below, for many (if not most) of the states the Attorney General is obligated by local law to represent the state agencies at issue in this matter. Indeed, several of the state Attorneys General have indicated to the Court that they will in fact represent their state agencies at issue for purposes of discovery in this case. *See* Dkt. 738-1. For the remainder, the state Attorney General may have some element of statutory discretion not to necessarily represent the state agencies under certain conditions (such as a conflict of interest) – but no such conditions have been presented to the Court by any of the state Attorneys General. Accordingly, the upshot is that, on the current record before the Court, it appears that all (or virtually all) of the state Attorneys General will represent both the named plaintiff and the state agencies at issue for purposes of discovery in this case.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both a party to the case while also acting or able to act as counsel for a third party. However, law firms and legal services providers are themselves parties to litigation sometimes. And this case would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel v. Salas*, No. MC 17-17965, 2018 WL 691649, at *4 (E.D. La. Feb. 2, 2018) ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").

Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. Thus, to the extent a state Attorney General represents a state agency for discovery, that state Attorney General would be presumed to have control over the documents in its client's possession.

United States District Court
Northern District of California

Precedent explains why courts have found a legal services provider, particularly a state Attorney General, representing both a party and a third party (particularly a state agency) to be properly found to have control of the third party's documents for discovery. First, again as discussed above, control in this context does not mean "operational" or "managerial" control – these precedents are not deciding that a law firm directs the day-to-day operations of their client, and arguments by several of the state Attorneys General that they do not control the state agencies in this "operational" or "executive" sense are not on point. Second, in a reflection that control should be grounded in reality, courts find control in situations involving government attorneys representing both a party and a third-party agency based on their real-world experiences and the facts as a whole. *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1453 ("[c]ontrol must be firmly placed in reality.").

Multiple courts have found that a party (such as a government employee or official) has control over documents of a state agency based in part on the fact that the governmental party was represented by and/or employed by the state Attorney General:

> If Defendants seek to avoid production by contending that they are not in possession, custody or control of the requested documents, their objection is denied. The specific facts of this action render such an objection unfounded. By virtue of their employment with non-party CDCR [California Department of Corrections and Rehabilitation], individual defendants are represented by the Attorney General's Office. It is this Court's experience that either individual defendants who are employed by CDCR and/ or the Attorney General can generally obtain documents, such as the ones at issue here, from CDCR by requesting them. They have constructive control over the requested documents, and the documents must be produced.

*Pulliam v. Lozano*, No. 1:07-CV-964-LJO-MJS, 2011 WL 335866, at *1 (E.D. Cal. Jan. 31, 2011); *see also Quiroga v. Green*, No. 1:11CV00989 AWI DLB, 2013 WL 6086668, at *2 (E.D. Cal. Nov. 19, 2013) (affirming Magistrate Judge order finding defendant has control over third-party agency documents: "it is this Court's experience that either individual defendants who are employed by CDCR, and/or the Attorney General who represents them, can generally obtain documents from CDCR by requesting them. If this is the case, then, based on their relationship with CDCR, they have constructive control over the requested documents and the documents must be produced."); *accord Mitchell v. Adams*, No. CIVS062321GEBGGHP, 2009 WL 674348, at *9, 11–13, 17 (E.D.

**Add. 32**[32]

Cal. Mar. 6, 2009) (rejecting multiple objections regarding alleged lack of control of agency documents where common counsel represented a party and the agency). To the extent these precedent involve a government official as the party found to have control over agency documents, these precedents are even more germane to the twenty-four cases here where the state Attorney General themselves are the specifically named plaintiff or co-plaintiff.

Similarly, in *Zackery*, the Court overruled the objection that the named individual defendants lacked control over the documents of a third-party agency. *Zackery v. Stockton Police Dep't.*, No. CIVS-05-2315MCEDADP, 2007 WL 1655634, at *4 (E.D. Cal. June 7, 2007). The *Zackery* Court ordered that discovery be provided to the plaintiff directly by the government counsel involved (who both represented the named defendants and the agency): "the court will direct ***counsel for defendants*** [Office of the City Attorney] to make the necessary inquiries and arrangements for the requested citizen complaint records to be produced to plaintiff." *Id*. (emphasis added).

These cases are illustrative of factual situations involving the same prosecuting attorneys (such as a state Attorney General) representing both a named party and the third party agency, and demonstrate that courts conclude there is control such that the agency documents were subject to party discovery. This factor of "common counsel" and its impact on a finding of control extends beyond the governmental entity context, thus demonstrating that this factor is recognized and applied by courts in a broader context. *See, e.g.*, *Almont Ambulatory Surgery Center, LLC*, 2018 WL 1157752, at *19 (finding control where, among "[o]ther factors that courts consider to 'determine when documents in the possession of one corporation may be deemed under control of another corporation,' . . . Additional factors include: employing the same attorneys") (citations omitted); *see also M.L.C., Inc. v. N. Am. Philips Corp.*, 109 F.R.D. 134, 139 (S.D.N.Y. 1986) (finding control where "[i]n fact, it appears that Mr. Hainline [(counsel for the third parties)] and defendants' present counsel have a working relationship.").

To be clear, the Court is not relying on these precedents to demonstrate the practical ability of the state Attorney General to obtain documents from the state agencies. Rather these precedents demonstrate that, under the totality of circumstances, control can be found where the decision is firmly placed in reality. These precedents also demonstrate that the hypothetical fear of agency

refusals to cooperate with party discovery has not materialized.

Finally, the Court is not holding broadly that the law requires finding a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party. However, this factor is one of the totality of factors which impact the control inquiry and here, because the state Attorneys General are either parties themselves or at least are counsel for a party, and because the state Attorneys General will represent the state agencies for discovery, this factor takes on particular significance.

## VIII. STATUTORY RESTRICTIONS ON A STATE ATTORNEY GENERAL FROM ACCESSING DOCUMENTS FROM THE STATE'S AGENCIES

Several state Attorneys General have argued that local statutes place limitations on their ability to access documents from a state agency. These are discussed in detail in the state-by-state analysis below. As a preliminary matter, not all of these statutes actually place limits on the state Attorneys General as argued. Some are limited to only a specific subset of agencies (some of which are not even relevant to this matter). And detailed analysis shows that some actually provide a mechanism and a right to access agency documents, not prohibit access.

As a variation of this argument, some of the state Attorneys General argue that public channels or public information requests are required for the state Attorney General to obtain documents from state agencies. This argument is based on an interpretation of the various "open records" statutes which the Court finds legally erroneous. None of the cited "public records" statutes state that they are the exclusive method by which a state Attorney General can access documents from state agencies. Further, the state Attorneys General argue perhaps too much in this regard – if their arguments are taken literally, then these "open records" statutes would constitute a legal right to access the agencies' documents on the part of the corresponding state Attorney General. By definition, an "open records" statute provides a mechanism by which a state Attorney General can literally obtain requested documents upon demand from an agency. If the state Attorneys General were correct that, every time a lawyer of the state Attorney General seeks documents from state agencies, a public records law requests would be routine and necessary, then the logical conclusion is that the public records law would be a routinely used legal right to access those documents and

34

records of the agency subject to the Act. At least one court has found that a state "public records" Freedom of Information Act constitutes a legal right to access documents from an agency for purposes of "control" under Rule 34. *See Flagg v. City of Detroit*, 252 F.R.D. 346, 355–57 (E.D. Mich. 2008) ("Because at least some of the text messages maintained by [(third party)] SkyTel are 'public records' within the meaning of Michigan's FOIA, it would be problematic, to say the least, to conclude that the [named defendant] City lacks a legal right to obtain these records as necessary to discharge its statutory duty of disclosure."). However, the Court finds that the arguments based on these "open records" statutes to be incorrect, in any event.

The "open records" arguments are particularly weak in the situation where a state Attorney General is required to act as counsel for the state agencies by local mandate. If this interpretation of the "open records" statutes were correct, then the state Attorneys General would have to submit an "open record" request or "public information" request even when representing a state agency, to get documents from its own client. In fact, under the argument presented, any lawyer representing any state agency (whether the state Attorney General or private counsel) would be forced to use an "open records" request to obtain documents from their own client. Such an interpretation is nonsensical and impractical, as well as contrary to the principles of effective legal representation. As counsel, a state Attorney General will have the normal type of direct access to the necessary documents from its own clients, ensuring efficient and comprehensive legal support for the agencies involved. The Attorneys General's role as legal counsel for state agencies (with concomitant ethical and professional obligations) directly contradicts the argument that they would be entirely restricted from accessing their clients' documents. In their capacity as counsel, Attorneys General are often responsible for representing the interests of state agencies, which would include responding to subpoenas and managing legal matters on their behalf. This representative role inherently requires a level of access to agency documents necessary to fulfill their duties effectively. The state Attorneys General cite no precedent requiring any attorneys representing a state agency to use either an "open records" request or a subpoena to obtain documents from their own clients. The cited "public records" or "open information" statutes are not shown to be actual impediments to normal attorney-client access to documents, because those statutes apply to records which are to be

United States District Court
Northern District of California

United States District Court
Northern District of California

produced for public inspection (and not for purposes of litigation such as this Multi-District Litigation), particularly where there is a Protective Order limiting public availability of confidential documents.

While other statutes discussed below may be factors in the legal control analysis, such statutes are only one among the totality of factors for deciding control and the discussion above regarding the impact (or lack thereof) of state statutes on this issue is of equal force.

## IX. THIRD PARTY INVOLVEMENT IN THE LITIGATION AND WHETHER THE THIRD PARTY STANDS TO BENEFIT FROM THE LITIGATION

In the context of corporate disputes, courts have found legal control when a party and non-party have similar financial interests. In *Hitachi*, Defendant AmTRAN argued that Plaintiff and patent owner Hitachi had legal control over documents from Hitachi's patent licensing agent Inpro II Licensing Sarl (Inpro), and accordingly that Hitachi should obtain and produce documents from Inpro in response to AmTRAN's Rule 34 document requests. *Hitachi*, 2006 WL 1038248, at *1. The *Hitachi* opinion noted that "a subsidiary will be required to produce documents wholly owned by the parent company. The third party's financial interest in the litigation might further require its cooperation in the discovery process." *Id.* (citations omitted).

In the context of state governance, this principle applies where state Attorneys General and the state agencies would benefit from a damage award resulting from the litigation brought by the state Attorney General. Just as courts have found legal control in corporate settings when a party and non-party have similar financial interests, a similar rationale applies to state entities. *Id.* If a state agency stands to gain financially from the litigation outcome, its interests align closely with those of the Attorney General. *Cf. Japan Halon*, 155 F.R.D. at 628–29 ("This court does not agree that because neither parent corporation owns a majority of the shares, neither will benefit. The court is also not convinced that because any award would go to Japan Halon, its parent corporations would not benefit directly enough to warrant any production of documents on their behalf."). When litigation proceeds directly support or fund a state agency, it is reasonable to expect full cooperation in the discovery process. This cooperation ensures the availability of relevant documents, enhancing the attorney general's enforcement actions and promoting justice. Here, all the States have expressly

1   stated that "[t]his action is in the public interest of the Filing States" and thus have made clear they

2   have a substantial stake in the outcome of this action going even beyond financial interests.  *See*

3   Multistate Complaint at ¶ 12.

4   **X.   OTHER RELEVANT FACTORS**

5        As discussed above, the Ninth Circuit rejected the "practical ability" as the test for legal

6   control in *Citric Acid*.  *See Genentech, Inc. v. Trustees of Univ. of Pennsylvania*, No. C 10-2037

7   PSG, 2011 WL 5373759, at *2 (N.D. Cal. Nov. 7, 2011) (distinguishing *Hitachi*'s citation to

8   "practical ability" case law); *see also In re NCAA Student-Athlete Name & Likeness Litig.*, 2012

9   WL 161240, at *4.  The Court notes that one district court in this Circuit has carefully analyzed

10  *Citric Acid* and found that the Ninth Circuit cited favorably therein to a Third Circuit opinion which

11  holds that "practical ability" is a factor for the "legal control" test.  *AFL Telecomms. LLC v.*

12  *SurplusEQ.com Inc.*, No. CV11-1086 PHX DGC, 2012 WL 2590557, at *2 (D. Az. July 5, 2012)

13  (citing *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140–41 (3rd Cir. 1988)).  Precedents in this

14  district have, however, distinguished *AFL Telecommunications*.  *See Seifi v. Mercedes-Benz U.S.A.,*

15  *LLC*, No. 12-CV-05493TEH (JSC), 2014 WL 7187111, at *2 (N.D. Cal. Dec. 16, 2014); *cf. also*

16  *Dugan v. Lloyds TSB Bank, PLC*, No. 12CV02549WHANJV, 2013 WL 4758055, at *2 (N.D. Cal.

17  Sept. 4, 2013).

18       As noted, the issue in *Citric Acid* arose in the context of a motion to enforce a subpoena

19  directed to a third party, in which the moving party was seeking discovery from a fourth party via

20  that third party.  *Citric Acid*, 191 F.3d at 1106–07.  That is, in *Citric Acid* the subpoenaed third party

21  was alleged to control a further uninvolved fourth party.  *Id.*

22       District court opinions have noted that *Citric Acid* dealt with a subpoena, and those opinions

23  have assumed that the standard and scope of "legal control" for purposes of a subpoena is the same

24  as the standard for evaluating the scope of "legal control" for purposes of a document request to a

25  party under Fed. R. Civ. P. 34.  *See, e.g.*, *Soto*, 162 F.R.D. 603; *Hitachi*, 2006 WL 2038248; *In re*

26  *Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. 167; *Perez*, 2011 WL 1362086; *Miniace*, 2006 WL 335389.

27  However, it appears that no Ninth Circuit case has specifically addressed whether the scope and

28  standard for evaluating "legal control" under Rule 34 is the same with regard to a subpoena under

United States District Court
Northern District of California

Rule 45 (which was at issue in *Citric Acid*).  As noted, other Circuits have expressly held that "practical ability" is a factor for the legal control test in the context of document requests under Rule 34.  *Gerling Int'l Ins. Co.*, 839 F.2d at 140–41.

As the Ninth Circuit has stated, "[w]e begin with the principle that the district court is charged with effectuating the speedy and orderly administration of justice.  There is universal acceptance in the federal courts that, in carrying out this mandate, a district court has the authority to enter pretrial case management and discovery orders designed to ensure that the relevant issues to be tried are identified, that the parties have an opportunity to engage in appropriate discovery and that the parties are adequately and timely prepared so that the trial can proceed efficiently and intelligibly."  *United States v. W.R. Grace*, 526 F.3d 499, 508–09 (9th Cir. 2008).  Further, district courts have wide discretion in controlling and managing the discovery process.  *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988).  Indeed, "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery."  *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).  As examples, "upon motion[,] the court may limit the time, place, and manner of discovery, or even bar discovery altogether on certain subjects, as required 'to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'"  *Id.*  (quoting Fed. R. Civ. P. 26(c)).  "And[,] the court may also set the timing and sequence of discovery."  *Crawford-El*, 523 U.S. at 598.

Here, the complexity of the multidistrict litigation creates a compounding impact on streamlining discovery.  Courts should also consider the goals of efficiency, preservation of judicial resources, preservation of party resources, and simplification of an already complex discovery landscape.  Courts should consider the manner and process for pretrial discovery in order to reduce the expense, number of disparate disputes, and procedural complexity.  Document requests directed to one party are, in this Court's experience, typically more efficient and streamlined than multiple separate subpoenas each directed to non-parties.

In the context of a state in which the statutory scheme mandates the Attorney General to represent a state agency in litigation, a state Attorney General *will* represent those state agencies in responding to the discovery here, regardless of whether the documents are sought by Rule 34

United States District Court
Northern District of California

requests for production or by Rule 45 subpoenas. It would be wasteful to require a party in a complex litigation to serve individual subpoenas on a multitude of state agencies, particularly where all parties and this Court know that the Attorneys General *will be* representing those state agencies in responding to the subpoenas. It is not firmly grounded in reality, and thus elevates form over substance, to ignore that, at the end of the day, many if not all of the parties will be litigating and negotiating for the documents sought with the very same legal services providers.

Several state Attorneys General have argued that, for analytical purposes, the Court should subdivide their offices between the team or division of attorneys litigating this Multi-District Litigation versus other sections or divisions of that particular state Attorney General, in order to argue that there should not be any consequences flowing from the state Attorneys General representing both the plaintiff and the state agencies. Such argument is not supported by citation to law and is contrary to the weight of law. The scope of an attorney-client relationship (and the duties flowing therefrom) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office:

> When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the "rule of imputed disqualification," . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . . The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender.

*People ex rel. Peters v. Dist. Ct. In & For Cnty. of Arapahoe*, 951 P.2d 926, 930 (Colo. 1998); *accord City of Cnty. of Denver v. Cnty. Ct. of City & Cnty. of Denver*, 37 P.3d 453, 457 (Colo. App. 2001); *see also Kirk v. First Am. Title Ins. Co.*, 108 Cal. Rptr. 3d 620, 637–38, 642 (Cal. Ct. App. 2010), *as modified* (May 6, 2010) (recognizing rebuttable presumption of imputed knowledge in the context of government attorneys). Some jurisdictions treat public legal service organizations like private law firms in the context of the scope of the attorney-client relationship. Even in jurisdictions which do not automatically impute shared confidences from an attorney-client relationship to an entire public law office, those courts recognize that ethical screening or other procedures are required. At a general level, the law does not support the blanket argument that different individual

1   lawyers in the Attorney General's office have separate, discrete attorney-client relationships with

2   their clients.

3       In this multidistrict litigation, this Court has convened monthly Discovery Management

4   Conferences in order to provide regular and detailed guidance on the complex discovery process

5   and discovery disputes.  As fact discovery has progressed, the Court has been presented with

6   numerous discovery motions necessitating separate, hours-long hearings on such disputes.

7   Managing and controlling state agency discovery as set forth herein is, in one way, intended to help

8   facilitate management of the overall discovery process in this multidistrict litigation.  Resolution of

9   this "control" issue is directly related to proper and rational management of discovery.

10      This is not merely a hypothetical concern about managing discovery.  If the state Attorneys

11  General were correct as to the absolute lack of control of any of the agencies at issue, then Meta

12  would be required to issue over 250 individual subpoenas, and then negotiate the scope of each

13  subpoena after receiving written responses and objections to each.  The state agencies and their

14  counsel would be required to correspondingly respond and object to all of these subpoenas and

15  negotiate them with Meta.  As a result, there would be the potential for these parties to present over

16  200 allegedly separate disputes over these subpoenas to this Court, with the potential for raising

17  inconsistent or contradictory arguments.  This is not merely a hypothetical concern.  The Fourth

18  Circuit was confronted with precisely this situation.  *In re S.C. Dep't of Parks, Recreation &*

19  *Tourism*, 103 F.4th 287, 289 (4th Cir. 2024).  In that case, a group of multiple States sued Google

20  for alleged antitrust violations, among them South Carolina.  *Id.*  Google then served party

21  discovery, including document requests on the State Attorneys General who objected to the

22  discovery requests to the extent they sought state agency documents, and the Attorneys General

23  argued (as here) that Google should serve subpoenas on the state agencies.  *Id.*  Indeed, the State

24  Attorneys General (including South Carolina) wrote that "Google issued Federal Rule 45 subpoenas

25  to numerous state agencies, and State Plaintiffs believe that these subpoenas are the proper channels

26  for Google to seek documents that are in the possession, custody, or control of those agencies."  *Id.*

27  Instead of litigating the "control" issue in that case, Google opted instead to voluntarily serve

28  subpoenas on the state agencies.  *Id.*  Despite the statements by the South Carolina Attorney General

United States District Court
Northern District of California

40

about the propriety of the subpoena process, the South Carolina Department of Parks, Recreation and Tourism ("SCPRT") disagreed with the statements of the South Carolina Attorney General and moved to quash Google's subpoena entirely based on Eleventh Amendment immunity arguments. *Id.* at 289–90.  In arguments highly reminiscent of the arguments about "control" asserted in this action, "[a]ccording to SCPRT, because the attorney general 'does not represent SCPRT or have custody, possession, or control over its records,' and because he 'did not bring his claims against Google in a sovereign capacity,' his joining the State to the litigation against Google could not have waived the Eleventh Amendment immunity of SCPRT, which is a 'statutorily and constitutionally separate' state agency." *Id.* at 291.  The district court denied SCPRT's motion to quash.  On appeal, the Fourth Circuit affirmed and rejected South Carolina's arguments which emphasized the "separateness" of the agency from the State and emphasized the argument that the Attorney General "does not represent" the agency and does not "have custody or control of its records." *Id*. at 293. While *In re South Carolina Department of Parks, Recreation & Tourism* ultimately dealt with waiver of Eleventh Amendment immunity by a state Attorney General extending to all agencies of the state, the teachings for the analogous situation here is self-evident: requiring a party (like Google in that case, or Meta here) to serve subpoenas on different state agencies who could then assert different (even contradictory) arguments against the subpoenas, where there is a demonstrable and legal basis for finding control, is not conducive to the just and efficient administration of justice.

To the extent the Court find "control" under Rule 34 standards and finds some state agencies are subject to party discovery, their documents would be sought by document requests directed just to one party in each state.  While there are real-world implications for management of discovery that flow from the Court's resolution of this control issue, to be clear the Court has analyzed the issues under appropriate legal standards discussed herein, but also cognizant of the broad discretion the Court exercises in ordering the sequence and management of discovery consistent with the Federal Rules.

Accordingly, the Court exercises its authority in finding the conclusions as to control for each state below pursuant to appropriate legal standards and under the totality of circumstances, firmly grounding its decision in reality and underpinned by the Court's full discretion.

**DISCUSSION**

As an initial matter, the Court notes that this discovery dispute solely concerns whether the State Attorneys General's offices have legally sufficient control such that, in responding to Meta's discovery requests, the state agencies' documents should be obtained and produced by the State Attorneys General in response to Fed. R. Civ. P. 34 document requests. For the purposes of this dispute, the Parties do not dispute that the State Attorneys General lack possession or custody of the documents from the state agencies – the only issue presented is the issue of control. Indeed, the law would be clear that the State Attorneys General would have the obligation to respond to the discovery requests if they did have possession or custody of the documents. To the extent the Parties frame their arguments or this dispute as to whether the agencies should be treated as "parties" for this multidistrict litigation such arguments are, at best, imprecise. Whether a party needs to or is requested to be joined as a named party to this case under Fed. R. Civ. P. 19 or 20 are issues, of course, beyond the scope of the discovery referral order in this action.

Thus, the issue at hand is the specific question: whether the State Attorneys General have legal control, for the purposes of discovery, over their respective state agencies under relevant legal standards. It is self-evident from the length of this opinion that state Attorneys General and Meta raised complex questions in the context of the factors used to determine control under the "legal control" test. In light of (and incorporating by reference) this discussion of the legal standards, the Court next analyzes the control issue on a state-by-state basis. The Court approaches that state-by-state analysis following the directive that, fundamentally, "[c]ontrol must be firmly placed in reality." *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1453.

**I.     ARIZONA**

In opposition to the control issue, the Arizona Attorney General argues primarily the following factors: (1) Arizona agencies may respond without the Arizona Attorney General's assistance; (2) the Arizona Attorney General's powers arise from statute and are thus not plenary; and (3) the Arizona Attorney General is a separate entity and independent from the Arizona agencies. [Dkt. 738-2 at 2]

In support of a finding of control with regard to these state agencies' documents, Meta argues

based primarily on the following factors: (1) the Arizona Attorney General is the chief legal advisor for the State; and (2) certain Arizona agencies are proscriptively barred from obtaining counsel other than the Arizona Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following Arizona Agencies: Board of Regents, Commerce Authority, Department of Child Safety; Department of Education; Department of Health Services; Governor's Office; Governor's Office of Strategic Planning and Budgeting; Office of Economic Opportunity; and State Board of Education. *Id.* All but three of these state agencies are prohibited from employing legal counsel (or making expenditures for legal services) outside the Arizona Attorney General's office. Ariz. Rev. Stat. §§ 41-192(A), -192(D).

After considering the Parties' briefs, oral argument and other material submitted, and applying appropriate legal standards discussed herein, the Court finds that the factors weigh in favor of a finding that the Arizona Attorney General does have legal control, for purposes of discovery, over most of the Arizona agencies at issue. While the Arizona Attorney General asserts that Arizona agencies might respond without its assistance and that the Arizona Attorney General's powers arise from (and thus are somehow limited by) statute, these arguments do not negate the fact that the Attorney General is the chief legal advisor for the state government. Ariz. Rev. Stat. § 41-192(A). The statutory scheme in Arizona requires that "[t]he attorney general ***shall***: 1. Be the legal advisor of the departments of this state and render such legal services as the departments require . . . . [A]nd coordinate the legal services required by other departments of this state or other state agencies." Ariz. Rev. Stat. § 41-192(A)(1)–(3) (emphasis added).

Importantly, the Arizona Attorney General's arguments do not negate the fact that all but three of the Arizona agencies at issue here are barred by Arizona law from obtaining counsel other than the Attorney General. Ariz. Rev. Stat. § 41-192(D). Indeed, the Arizona Attorney General previously confirmed that its office would definitely represent at least four of the Arizona agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 3–4]. And in their more recent brief, the Arizona Attorney General conceded that they will represent five state agencies at issue. Dkt. 738-2 at 2 (referring "to the five [agencies] that the [Arizona Attorney General] currently will, at the request of the agency, represent"). The Arizona statute is clear on its

United States District Court
Northern District of California

face that six of the agencies at issue are prohibited completely from retaining separate counsel. *See* Ariz. Rev. Stat. § 41-192(D). While the Arizona Attorney General indicated to the Court that the Attorney General would not represent the Arizona Department of Education and the Arizona Governor's Office of Strategic Planning and Budgeting, that is an error of law because neither of these agencies are exempt from the express statutory prohibition on retaining different counsel. *See* Ariz. Rev. Stat. § 41-192(D). And to be clear, despite its name, the Arizona Governor's Office of Strategic Planning and Budgeting is an agency outside the Arizona Governor's office, has duties to advise both the Governor and Legislature, and is statutorily situated within the Act defining the Arizona Department of Administration. *See* Ariz. Rev. Stat. at §§ 41-701, -722 to -723. Further, as noted above, the Arizona Attorney General has apparently not conferred with these agencies and no other counsel has entered appearance to date for these agencies. Because the Arizona statute is clear on its face that six agencies are barred from retaining separate counsel, *see* Ariz. Rev. Stat. § 41-192(D), the Court finds, based on the current record, that the Arizona Attorney General will serve as counsel in this matter for six agencies (Department of Child Safety; Department of Education; Department of Health Services; Governor's Office of Strategic Planning and Budgeting; Office of Economic Opportunity; and State Board of Education).

As to the three other state agencies (the Commerce Authority, Board of Regents, and Governor's office), the Arizona statutory scheme allows those other agencies to retain separate counsel apart from the state Attorney General. *see* Ariz. Rev. Stat. §§ 41-192(D)(4), (7), and (10). The Arizona Attorney General has represented to the Court that these three agencies will not be represented by the Attorney General for purposes of discovery in this matter, should subpoenas be served on these three agencies. [Dkt. 738-1 at 3–4].

Accordingly, it appears that under the statutory scheme six agencies will be represented by the Arizona Attorney General in this matter for discovery. *See* Ariz. Rev. Stat. §§ 41-192(A), -192(D). Thus, because the Arizona Attorney General will be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery, the Court in its discretion determines that a finding of control as to these six agencies is further supported by the simple and pragmatic realities involved in these circumstances.

1    Further, the Court notes that the State Attorneys General have filed an Administrative

2    Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

3    to various state agencies, including the Arizona Department of Child Safety, the Arizona

4    Department of Education, and the Arizona Department of Health Services. [Dkt. 1031-5 at 734–

5    859]. None of these state agencies are allowed to employ legal counsel other than the Arizona

6    Attorney General and thus by statute each must be represented by the Arizona Attorney General in

7    this matter for discovery. *See* Ariz. Rev. Stat. §§ 41-192(D) ("no state agency other than the attorney

8    general shall employ legal counsel or make an expenditure or incur an indebtedness for legal

9    services, but the following are exempt from this section[,]" listing state agencies other than the three

10    at issue). This arrangement indicates strongly that the Attorney General, in fulfilling its role as

11    Chief Legal Advisor, would necessarily and inherently have access to and control over the necessary

12    documents for effective legal representation of these state agencies. Therefore, these subpoenas,

13    and the statutory scheme in Arizona regarding how the Attorney General will respond to them,

14    further support the Court's conclusion that the Arizona Attorney General has legal control, for the

15    purposes of discovery, over at least these the three agencies recently listed in the intent to issue

16    subpoenas.

17    Relatedly, the Arizona Attorney General has taken the position that communications

18    between the Arizona Attorney General and these state agencies would be covered by the attorney-

19    client privilege if such communications are encompassed within the scope of discovery sought by

20    Meta. [Dkt. 738-2 at 2]. To the extent the Arizona Attorney General has attempted to subdivide its

21    own office between the team litigating this case and other "agency counsel sections" of the state

22    Attorney General, that argument is incorrect. The Arizona Attorney General proffers this argument

23    to limit the attorney-client privilege (and hence the attorney-client relationship) only as to some

24    parts of the state Attorney General's office but not other sub-teams, without citation to any legal

25    support for that proposition. The scope of attorney-client relationship (and the duties flowing

26    therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety

27    of a legal services organization due to well-known rules of imputation of confidences to a legal

28    services organization, including a public law office as discussed above. *See, e.g.*, *People ex rel.*

*Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings v. State*, 441 S.E.2d 262, 266 (Ga. 1994) (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun v. Area Agency on Aging of Se. Arkansas*, 618 S.W.3d 137, 137 (Ark. 2021) (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").

Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required to avoid either imputed or actual sharing of confidences to avoid a finding of dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that no courts support the Arizona Attorney General's argument that different individual lawyers in the Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Arizona Attorney General's attempt to simultaneously disclaim the existence of an attorney-client relationship as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Arizona Attorney General's Office and these agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these

legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Arizona Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Arizona Attorney General's office and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010).

Further, there is no statutory, legal, or administrative rule cited which prohibits the Arizona Attorney General from accessing the documents of the state agencies at issue. To the extent the Arizona Attorney General relies on the statutory origins of that office, such state statutes are unavailing to prohibit a finding of control here. Analogously, in *Osborn*, the Arizona federal Magistrate Judge overruled objections and ordered individual defendants (officials of the Arizona Department of Corrections) to produce personnel documents from the files of the state agency, despite arguments that state statutory restrictions forbade the production of the documents. *Osborn v. Bartos*, 2010 WL 3809847 at *15 (D. Ariz. Sept. 20, 2010). The *Osborn* court rejected the arguments of the Arizona Attorney General (representing the defendants in that case) that an under an Arizona statute "they are without authority to produce the records" and that Arizona regulations "make personnel files confidential." *Id.* The Court ordered the defendants in *Osborn* "to produce, from **whatever personnel or similar file** specifically related to the designated officer, **where such records are normally maintained**, the performance appraisals and disciplinary records in Request 4 as to the named Defendants[.]" *Id.* at *16 (emphasis added).

Further, the Arizona Attorney General does not cite any statutory or legal prohibition on the Arizona Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.

United States District Court
Northern District of California

*See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists as to the six agencies represented by the Arizona Attorney General.

Indeed, at least one other federal court has previously found that the Arizona Attorney General has legal control over Arizona state agency materials.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Arizona Attorney General's having control with regard to documents of the state agencies at issue.  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Arizona and given the Arizona Attorney General's office's experience in litigating and losing an analogous issue as to authorization to produce documents from agency files in *Osborn*, this Court is disappointed that the Arizona Attorney General and Meta were unable  to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*.  As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Accordingly, in view of the legal standards and the record viewed in the totality of

United States District Court
Northern District of California

circumstances, the Court finds that the Arizona Attorney General has control, for the purposes of discovery, over the documents of six of the Arizona agencies at issue, listed above. The Court notes that the Court credits the Arizona Attorney General's offices representation to this Court that the Board of Regents, Commerce Authority, and Governor's office will not be represented by any attorney within the Arizona Attorney General's office for purposes of this case. Should that representation turn out to be in error or shown to be false, the Court will reconsider its findings as to control with regard to those three agencies upon proper motion.

## II.   CALIFORNIA

In opposition to the control issue, the California Attorney General argues primarily the following factors: (1) the California Attorney General is a separate entity and independent from the California agencies; (2) California agencies are statutorily responsible for maintaining their own records; and (3) if found to be subject to control for purposes of discovery, the California agencies would thereby be granted a "virtual veto" over the California Attorney General's independent responsibilities to bring enforcement actions. [Dkt. 738-3 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) California law sets forth a preference for the California Attorney General to be employed as the attorney of all legal matters in which California has an interest; (2) the California Attorney General is presumptively the legal representative of all California agencies in any judicial proceedings unless specifically exempted; and (3) California agencies, with limited exception, are proscriptively barred from obtaining counsel other than the California Attorney General, without consent from the California Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following California Agencies: Business, Consumer Services, and Housing Agency; Department of Child Support Services; Department of Consumer Affairs; Department of Education, Department of Finance; Department of Health Care Services; Department of Public Health; Office of the Governor; Governor's Office of Business and Economic Development; Health and Human Services Agency; Mental Health Services Oversight and Accountability Commission; Office of Data and Innovation; and School Finance Authority. *Id.*

After considering the Parties' briefs, oral argument and other material submitted, and

applying appropriate legal standards discussed herein, the Court finds that the factors weigh in favor of a finding that the California Attorney General does have legal control, for purposes of discovery, over the California agencies in dispute.  While the California Attorney General is a separate entity and while the California agencies maintain their own records, this does not outweigh the requirement that the California Attorney General is statutorily required to act as the California agencies' counsel, with limited exceptions which are not shown to be applicable here.  *See* Cal. Govt. Code § 11040(a).

The California Legislature made clear that the California statutory scheme prefers the California Attorney General represent state agencies: "It is the intent of the [California] Legislature that overall efficiency and economy in state government be enhanced by employment of the Attorney General as counsel for the representation of state agencies and employees in judicial and administrative adjudicative proceedings."  Cal. Govt. Code § 11040(a).  The statutory scheme in California presumes that the California Attorney General will represent state agencies in judicial actions (even to the exclusion of that agency's own counsel) absent written consent: "Except with respect to employment by the state . . . agencies specified by . . . name in Section 11041 or when specifically waived by statute other than Section 11041, a state agency ***shall obtain the written consent of the Attorney General*** before doing either of the following: (1) Employing in-house counsel to represent a state agency or employee in any judicial or administrative adjudicative proceeding.  (2) Contracting with outside counsel."  *Id.* at § 11040(c) (emphasis added).

Further, the California Legislature has made clear "that it is in the best interests of the people of the State of California that ***the Attorney General be provided with the resources*** needed to develop and maintain the Attorney General's capability to provide competent legal representation of state agencies and employees ***in any judicial*** or administrative adjudicative ***proceeding***."  *Id.* at § 11040(a) (emphasis added).  Access to documents from state agencies are "resources needed" for the California Attorney General "to provide competent legal representation of state agencies" in this action.

Indeed, the California Attorney General confirmed that its office could represent all of the California agencies at issue, if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 4–5].  The Court notes that the State Attorneys General have filed an Administrative

United States District Court
Northern District of California

1    Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

2    to various state agencies, including the California Department of Child Support Services, the

3    California Department of Education, and the California Mental Health Services Oversight and

4    Accountability Commission. [Dkt. 1031-3 at 27–153].  None of these state agencies are allowed to

5    employ legal counsel other than the California Attorney General absent written consent, and no such

6    consent has been presented thus far.  Accordingly, and based on the record before the Court, it

7    appears that under the statutory scheme each will be represented by the California Attorney General

8    in this matter for discovery, whether because of the intended subpoenas or because the Court finds

9    control for purposes of discovery.  *See* Cal. Govt. Code § 11040(a). Thus, as a matter of the efficient

10   and rational administration of justice in this case, because the California Attorney General will be

11   involved in representing these state agencies in any event in this case (whether to respond to

12   subpoenas or to respond to party discovery), the Court in its discretion determines that a finding of

13   control is further supported by the simple and pragmatic realities involved in these circumstances.

14       At oral argument, counsel for the California Attorney General argued that, even if the Court

15   found that the California Attorney General had legal access and control over the California state

16   agencies' materials, those state agencies could disagree and simply refuse to provide requested

17   documents to the California Attorney General and could hypothetically put the California Attorney

18   General in a position of being at risk of sanctions through no fault of its own.  This is a variation on

19   the "virtual veto" argument, discussed above, which the Court finds unpersuasive to rebut the

20   finding of control.  The California Attorney General's argument asserts that their office lacks any

21   legal mechanism to force or require compliance from the state agencies, which in their view

22   demonstrates lack of control.  *Id.*  This argument is without merit.  First, this argument rests entirely

23   on an unreasonable, unfounded, hypothetical assumption that, despite this Court issuing an Order

24   finding control, the state agencies would simply refuse to provide documents based on nothing more

25   than an obstinate and unreasoned disagreement.  The California Attorney General presented no facts,

26   no affidavits, no prior examples of state agency refusals, and no testimony to support this feared

27   response by California state agencies.

28       Indeed, in many analogous cases in which a California prison official was sued individually,

**Add. 51**[51]

the courts found that the individual official had control over documents of a state agency (the California Department of Corrections and Rehabilitation (CDCR)) and thus the state agency was subject to party discovery – and those findings are based in part on the fact that the individual party defendants were represented by and/or employed by the California Attorney General:

> If Defendants seek to avoid production by contending that they are not in possession, custody or control of the requested documents, their objection is denied. The specific facts of this action render such an objection unfounded. By virtue of their employment with non-party CDCR, individual defendants are represented by the Attorney General's Office. It is this Court's experience that either individual defendants who are employed by CDCR and/ or the Attorney General can generally obtain documents, such as the ones at issue here, from CDCR by requesting them. They have constructive control over the requested documents, and the documents must be produced.

*Pulliam*, 2011 WL 335866, at *1; *see also Quiroga*, 2013 WL 6086668, at *2 (affirming Magistrate Judge order finding defendant has control over third-party agency documents: "it is this Court's experience that either individual defendants who are employed by CDCR, and/or the Attorney General who represents them, can generally obtain documents from CDCR by requesting them. If this is the case, then, based on their relationship with CDCR, they have constructive control over the requested documents and the documents must be produced."); *accord Mitchell*, 2009 WL 674348, at *9, 11–13, 17 (rejecting multiple objections regarding alleged lack of control of agency documents).

Similarly, in *Zackery*, the Court overruled the objection that the named defendants lacked control over the documents of a third-party agency. *Zackery*, 2007 WL 1655634, at *4. The *Zackery* Court granted relief to the Plaintiff seeking discovery as follows: "the court will direct **counsel for defendants** [Office of the City Attorney] to make the necessary inquiries and arrangements for the requested citizen complaint records to be produced to plaintiff." *Id*. These California precedents make clear that courts in California have in fact found control in numerous factual situations in which the involvement of the same prosecuting attorneys (often the California Attorney General) representing both a named party and the third-party agency supported the conclusion of control such that the California agency documents were subject to party discovery.

To be clear, the Court is not relying on these precedents to demonstrate the practical ability

of the state Attorney General to obtain documents from the state agencies, rather these precedents rebut and demonstrate exactly the opposite of the hypothetical fear of agency refusal posited by the state Attorneys General as a reason why they should be found not to have control for purposes of discovery. Contrary to the unfounded assumption that state agencies will refuse to provide documents, the Court presumes, instead, that parties (including third parties such as the agencies at issue here) will act reasonably in the face of a court Order and will comply with the Federal Rules of Civil Procedure. "We think that surely one must assume that litigants will obey court orders. Once we assume otherwise, then our system of jurisprudence is in serious trouble." *E. I. du Pont de Nemours & Co. v. Finklea*, 442 F. Supp. 821, 825 (S.D. W. Va. 1977); *see also Casas v. City of Baldwin Park*, No. B270313, 2017 WL 1153336, at \*6 (Cal. Ct. App. 2017) (The Court recognized the existence of "the legal presumption that defendants had regularly discharged their duties and complied with the court's order.").

Second, this argument ignores the fact that Meta has the ability to file a motion to compel production of documents by any such hypothetically disagreeing state agencies, and thus there is indeed a procedural and legal avenue to enforce compliance from any such hypothetically intransigent agencies. The state Attorneys General's argument that they lack legal mechanism to force compliance from their state agencies is myopic. Should Meta be required to file a motion to compel, the Court is perspicacious enough to understand that the fault would lie with the hypothetical state agency and not the California Attorney General, and in the event some enforcement mechanism were needed (such as the hypothetically feared sanctions), the Court would presumably have the wisdom to understand how and where to focus any such enforcement Order.

Finally, the Court is not persuaded by the argument that the California Attorney General lacks control over state agency documents, because an attorney in a court proceeding can simply do nothing when faced with a client who (hypothetically here) refuses to collect or provide documents for production in discovery. As counsel for a party subject to discovery, the California Attorney General has the legal authority and duty to take action to make inquiry and collect the documents from the uncooperative state agencies directly, and cannot simply sit on their hands in the face of an uncooperative client – this is would not be the first time an attorney was faced with a client who

United States District Court
Northern District of California

was difficult to deal with in collecting documents for discovery. *See, e.g.*, *Qualcomm Inc.*, 2010 WL 1336937, at \*2–5. Counsel in a litigation has legal duties to take pro-active steps in supervising and searching for documents in discovery that go far beyond simply acceding to a client who fails to (or worse, refuses to) produce or provide documents. *Id.* at \*2–5 (detailing "Discovery Errors" by counsel); *Rodman*, 2016 WL 5791210, at \*3–4 (awarding discovery sanctions where, in part, "there is no indication that Safeway's counsel guided or monitored [client employee] Mr. Guthrie's search of the legacy drive in any significant way."). Counsel cannot simply advise clients about document requests and leave it up to the client to decide whether or not to risk sanctions for failure to produce – in appropriate circumstances, counsel may need to personally conduct or directly supervise a client's collection, review, and production of responsive documents. *Optronic Techs., Inc.*, 2020 WL 2838806, at \*5–7 (awarding discovery sanctions; "It is not enough for counsel to provide advice and guidance to a client about how to search for responsive documents, and then not inquire further about whether that advice and guidance were followed . . . . The Court does not conclude that counsel must always personally conduct or directly supervise a client's collection, review, and production of responsive documents. However, in the circumstances presented here, the Court finds that [counsel] Sheppard Mullin did not make a reasonable effort to ensure that [sanctioned party] Ningbo Sunny produced all the documents responsive to Orion's requests and thus violated its obligations under Rule 26(g)(1)(B) . . . . [T]the Court orders Ningbo Sunny's new counsel of record to undertake an independent effort to ensure that Ningbo Sunny fully complies with Orion's post-judgment document requests."). The Court rejects as legally erroneous the California Attorney General's arguments, because they are based on a misunderstanding of counsel's role (and duties) in discovery and the available procedures under the Federal Rules for the proper conduct of discovery and the rational administration of justice. *See King*, Case No. 20-cv-04322-LGS-OTW, Dkt. 272, slip op. at 2 ("embroil[ing] the judge] in day-to-day supervision of discovery [is] a result directly contrary to the overall scheme of the federal discovery rules.").

In addition to their duties to supervise the collection of documents and make inquiry of clients to ensure proper collection of documents is undertaken, attorneys representing clients in court proceedings have legal duties under the Federal Rules of Civil Procedure to work cooperatively to

improve the administration of civil justice, both as officers of the Court and under their ethical obligations as members of the bar of this Court. *See* Fed. R. Civ. P. 1 advisory committee's note to 2015 amendment. "Rule 26(g) imposes *an affirmative duty to engage in pretrial discovery in a responsible manner* that is consistent with the spirit and purposes of Rules 26 through 37 . . . . The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that *obliges each attorney* to stop and think about the legitimacy of a discovery request, *a response thereto, or an objection* . . . . If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." *See* Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment.

As the Ninth Circuit has recognized, "legal duties" are jural correlatives and logically antecedent to "legal rights" – and thus the California Attorney General's legal duties to undertake proactive efforts to collect documents from clients in discovery are the flip side to the legal right to access those documents. *Newman v. Sathyavaglswaran*, 287 F.3d 786, 790 n.5 (9th Cir. 2002) ("The logical relationship between rights and duties has been the subject of considerable academic examination. Wesley Hohfeld famously described rights and duties as 'jural correlatives'— different aspects of the same legal relation. Oliver Wendell Holmes described rights as 'intellectual constructs used to describe the consequences of legal obligations. [sic] As he puts it [in The Common Law (1881)], 'legal duties are logically antecedent to legal rights.'") (internal citations omitted). Here, the recognition that a state Attorney General, presumptively counsel for state agencies here, has legal duties to supervise the collection of (and possibly directly obtain) documents from those agencies for discovery lends further support to the conclusion that the state Attorney General has the legal right to access those documents. That is, counsel's legal duty to ensure collection of documents from a client is a different aspect of (and correlates juridically to) a legal right to access those documents, and thus supports the conclusion of control for purposes of discovery.

The California Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the California Attorney General would necessarily have access to and thus control over the

relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at

*5–6 (finding state Attorney General has control over agency documents "based on his broad

statutory and common law powers to control and manage legal affairs on behalf of state agencies,

has a legal right to obtain responsive documents from the state agencies referenced in the

Complaint"). To the extent the California Attorney General argues that these agencies are "separate

entities under law" from the state Attorney General and are not supervised by the state Attorney

General, *see* dkt. 738-3 at 2, that argument misapprehends the "legal control" test for documents –

the issue is not simply whether one entity is under the day-to-day operational control of the other

(such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities

are legally separate (such as two different and separately incorporated entities), but rather whether

there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for

Rule 34 purposes does not require the party to have actual managerial power over the foreign

corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*,

305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and

the state agencies (a relationship mandated by state law) necessitates close coordination. While

operational control may be a factual situation which demonstrates a legal right to obtain the

documents, the absence of such "executive or functional control" is not determinative for evaluating

"control" for purposes of discovery. By definition, the "legal control" issue for discovery arises

when there are two legally distinct or separate entities – otherwise, if only one entity were involved,

there would be no dispute that party discovery covered that one entity. As discussed above, courts

have found "control" for purposes of discovery where a party is clearly not in managerial control

over the third-party, such as a subsidiary having control over the documents of a parent corporation,

or an individual government officer having control over the documents of an entire agency. Thus,

arguing that the agencies "operate outside the California Attorney General's authority" or are

"established as a separate entity, under various laws or constitutional provisions" is simply re-stating

the issue, *id.*, and not determinative of the issue. Arguing that the agencies are "controlled" by the

Governor or another "independently elected official" in a "divided executive" under the California

Constitution, *id.*, confuses and conflates the "legal control" issue for discovery with "operational

1    control" or "independence" and thus constitutes a legally erroneous argument.

2      Further, there is no statutory, legal, or administrative rule cited which prohibits the California

3 Attorney General from accessing the documents of the state agencies at issue. Nor is there citation

4 to any statutory or legal prohibition on the California Attorney General's representing the state

5 agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat

6 unusual situation, in which a law enforcement organization (the Attorney General) is both a party

7 to the case while also acting as counsel for a third party. However, this would not be the first time

8 that a legal services provider, as a party, is found to have control over third party documents for

9 purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his

10 law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas

11 defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida

12 lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had

13 possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is

14 presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at

15 *2. The Court is not holding broadly that there must be a finding of a legal right of access to and

16 thus control over third party client documents in every case involving a legal services provider as a

17 party; rather under the particular facts here and under the totality of circumstances viewed in light

18 of applicable legal standards, the Court finds that control exists here.

19      Consistent with the analysis of this issue as raised by other state Attorneys General, the Court

20 finds the California Attorney General's "virtual veto" argument unpersuasive. [Dkt. 738-3 at 2].

21 As explained above (and incorporated herein by reference), the "virtual veto" argument is entirely

22 speculative. This argument is based on an unfounded assumption that state agencies would

23 inexplicably obstruct a state attorney general's independent law enforcement responsibilities. The

24 argument also directly contradicts the well-established legal principle and statutory scheme that a

25 state Attorney General, acting as counsel, inherently has access to relevant documents to effectively

26 represent a state agency.

27      Finally, the Court has recognized that the issue of control of state agency documents when

28 a State is a party has been litigated and decided against numerous States in a previous Multi-District

United States District Court
Northern District of California

Litigation involving most of the same States and state Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, California is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* As discussed above, the California Attorney General has, from this Court's review of precedent, repeatedly litigated and lost on the analogous issue of control of state agency documents in cases involving a state official sued individually, typically involving control over documents of the California Department of Corrections and Rehabilitation. Other states have apparently repeatedly litigated and lost the same issue, resulting in one court within the Ninth Circuit warning a state Attorney General to avoid unnecessarily multiplying the proceedings and risk sanctions. *Emanuel v. Collins*, No. 3:20-CV-0566-RCJ-CLB, 2022 WL 22236619, at *3 n.2 (D. Nev. July 20, 2022) (Finding control: "This Court has expressly rejected similar arguments made by NDOC [(Nevada Department of Corrections)] and its counsel in the past. Therefore, Defendants and their counsel are cautioned and reminded that improper discovery conduct in this, or other cases, may result in discovery sanctions in the future.") (citation omitted). Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states in that case, given that California was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, and further given the California Attorney General's repeatedly litigating and losing a similar control issue in the face of multiple reasoned decisions adverse to the California Attorney General, this Court is disappointed that the California Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where (as here) there is guidance in precedent on the discovery issue at hand.

### III.  COLORADO

In opposition to the control issue, the Colorado Attorney General argues primarily the

following factors: (1) the Colorado Attorney General brought the lawsuit under its own independent law enforcement capacity; (2) the Colorado legislature has recognized that the Colorado Attorney General cannot access Colorado agencies' documents when it is acting in its enforcement capacity; and (3) the Colorado Attorney General is a separate entity and independent from the Colorado agencies. [Dkt. 738-4 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) Colorado agencies are proscriptively barred from retaining litigation counsel other than the Colorado Attorney General; (2) the Colorado Attorney General has already confirmed that it would represent the identified agencies in responding to a Meta subpoena; and (3) the Colorado Attorney General admits that it intends to assert privilege claims. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Behavioral Health Administration; Department of Education; Department of Higher Education; Department of Human Services; Department of Regulatory Agencies; Office of the Governor; Office of Economic Development & International Trade; and Office of State Planning and Budgeting. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Colorado Attorney General does have legal control, for purposes of discovery, over the Colorado agencies in dispute. While the Colorado Attorney General is a separate entity and while the Colorado Attorney General did bring the instant action pursuant to its own independent authority, this does not outweigh the requirement that the Colorado Attorney General must statutorily act as the Colorado agencies' counsel. Colo. Rev. Stat. § 24-31-101(1)(a). Under Colorado's statutory scheme, "[t]he attorney general: ***Shall act*** as the chief legal representative of the state ***and be the legal counsel*** and advisor ***of each*** department, division, office, board, commission, bureau, and ***agency of state government[.]***"). *Id.* (emphasis added); *see also* Colo. Rev. Stat. § 24-31-111(1) ("The attorney general ***shall*** provide legal services for each state agency as provided in section 24-31-101.") (emphasis added). Under Colorado law, "[n]o state agency shall appoint, solicit, or employ any person to perform legal services except in accordance with this part 1." Colo. Rev. Stat. § 24-31-111(2). None of the statutory exceptions in section -111, which requires a finding by the Colorado Governor of a failure or refusal to provide legal representation

by the Colorado Attorney General, are argued or present in this case.  Colo. Rev. Stat. § 24-31-111(5).

Indeed, the Colorado Attorney General confirmed that its office will represent all of the Colorado agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 6].  The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Colorado Behavioral Health Administration and the Colorado Department of Education.  [Dkt. 1031-3 at 154–237].  Neither of these state agencies are allowed to employ legal counsel other than the Colorado Attorney General absent a finding by the Colorado Governor that the Colorado Attorney General has been unable, failed to, or refuses to provide legal services to the agencies, and no exceptions to an agency's prohibition on employing separate counsel has been presented thus far.  *See* Colo. Rev. Stat. § 24-31-111(5).  Accordingly, it appears that under the statutory scheme each agency will be represented by the Colorado Attorney General in this matter for discovery.  *See* Colo. Rev. Stat. § 24-31-101(1)(a).  Thus, because the Colorado Attorney General appears likely to be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Colorado Attorney General has taken the position that communications between the Colorado Attorney General and these state agencies would be covered by the attorney-client privilege when the Colorado Attorney General is legal counsel for a state agency.  [Dkt. 738-4 at 2].  "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at \*2.  To the extent the Colorado Attorney General is asserting that the attorney-client privilege applies to communications between the Colorado Attorney General's office and the agencies at issue when they are represented (as they will be here) by that office, that further supports the conclusion of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

**Add. 60**

Further, there is no statutory, legal, or administrative rule cited which prohibits the Colorado Attorney General from accessing the documents of the state agencies at issue. While the Colorado Attorney General cites a statute which requires their office to enter into information sharing agreements with state licensing agencies in enforcement actions, none of the agencies at issue here are licensing agencies. Colo. Rev. Stat. § 6-1-116(4). Indeed, it is clear that the Colorado Legislature's view is that "it best serves the consumer protection interests of the state to allow a licensing authority to share with a district attorney or the attorney general information regarding a regulated person, which information may be relevant to a consumer protection investigation of the regulated person" and that "District attorneys and the attorney general are tasked with, and have the expertise needed for, enforcing consumer protection laws in the state." Colo. Rev. Stat. § 6-1-116(1)(b)–(d). Viewed in context, the Colorado Legislature expressed its intention that these state licensing authorities would share information with the Colorado Attorney General specifically to "*facilitate* the investigation and *enforcement of complaints* alleging violations of consumer protection or unfair trade laws." Colo. Rev. Stat. § 6-1-116(4) (emphasis added). Thus, the cited statute does not serve as a prohibition on the Colorado Attorney General's access to these licensing agencies' documents, but to the contrary serves as an encouraged means for sharing information in order to "facilitate" enforcement actions. The statute provides for a procedural, legal mechanism, approved by the Colorado Legislature, for these licensing agencies to share information with the Colorado Attorney General. If anything, the statute cited by the Colorado Attorney General further supports a finding of legal right of access and thus control over these licensing agency documents, and the Court finds the Colorado Attorney General's characterization of this statute as barring access or evidence of lack of right to access as erroneous.

Further, to the extent the Colorado Attorney General argues that there must be an information sharing agreement from licensing agencies in order to disclose the agencies' records, this argument is in essence the same "virtual veto" argument advanced by several other states' Attorneys General and discussed above. As explained previously, the Court finds the "virtual veto" argument to be speculative and unpersuasive. This argument is based on an unfounded assumption that state agencies would inexplicably obstruct a state's attorney general's independent law enforcement

United States District Court
Northern District of California

responsibilities.  The argument also directly contradicts the well-established legal principle and statutory scheme that a state attorney general, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.  Finally, as noted, none of the Colorado agencies at issue in this case are licensing authorities and thus the statute regarding an information sharing agreement is not applicable to the agencies under consideration here.

There is no citation to any statutory or legal prohibition on the Colorado Attorney General's representing the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharms*. opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there.  *Id.* at 365 n.5.  In that case, Colorado is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources

62

United States District Court
Northern District of California

resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Colorado was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, the Court is disappointed that the Colorado Attorney General and Meta unable to reach a negotiated resolution here as well. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## IV. CONNECTICUT

In opposition to the control issue, the Connecticut Attorney General argues primarily the following factors: (1) the Connecticut Attorney General brought the lawsuit under its own independent law enforcement capacity; (2) the Connecticut Attorney General is a separate entity and independent from the Connecticut agencies; and (3) the Connecticut agencies would create a "virtual veto" over the Connecticut Attorney General's independent responsibilities to bring enforcement actions. [Dkt. 738-5 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Connecticut Attorney General must act as counsel for the Colorado agencies. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Commission for Educational Technology; Department of Consumer Protection (the agency responsible for "authoriz[ing] the [Connecticut Attorney General]" to bring this suit); Department of Economic and Community Development; Department of Education; Department of Mental Health and Addiction Services; Department of Public Health; Department of Children and Families; Office of Health Strategy; office of Higher Education; Office of Policy and Management; Office of the Child Advocate; Office of the Governor; and Office of the State Comptroller. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Connecticut Attorney General does have legal control, for purposes of discovery, over the Connecticut agencies in dispute. While the Connecticut Attorney General is a separate entity and while the Connecticut Attorney General did bring the instant action in its own

<div align="center">

**Add. 63**[63]

</div>

1    independent authority, this does not outweigh the requirement that the Connecticut Attorney

2    General must statutorily act as the Connecticut agencies' counsel.  Conn. Gen. Stat. § 3-125.

3          Under Connecticut's statutory scheme, "[t]he Attorney General shall have general

4    supervision over all legal matters in which the state is an interested party, except those legal matters

5    over which prosecuting officers have direction."  *Id.*  Further, the Connexticut Attorney General

6    "shall appear for . . . all heads of departments and state boards, commissioners, agents, inspectors,

7    committees, auditors, chemists, directors, harbor masters, and institutions . . . in all suits and other

8    civil proceedings . . . in which the state is a party or is interested . . . in any court or other tribunal,

9    as the duties of his office require[.]"  *Id.*  Such representation is for "all such suits shall be conducted

10   by [the Connecticut Attorney General] or under [their] direction."  *Id.*

11         Indeed, the Connecticut Attorney General confirmed that its office will represent all of the

12   Connecticut agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

13   [Dkt. 738-1 at 7–8].  Accordingly, it appears undisputed that under the Connecticut statutory scheme

14   each will be represented by the Connecticut Attorney General in this matter for discovery.  *See*

15   Conn. Gen. Stat. § 3-125.  Thus, because the Connecticut Attorney General appears likely to be

16   involved in representing these state agencies in any event in this case, whether to respond to

17   subpoenas or to respond to party discovery.

18         Further, the Connecticut Department of Consumer Protection is, under Connecticut law,

19   tasked with authorizing the Connecticut Attorney General to bring Connecticut Unfair Trade

20   Practices Act enforcement actions such as the current action.  *See* Conn. Gen. Stat. § 42-110m.  The

21   Connecticut Attorney General has taken the position that communications between its office and

22   the Connecticut Department of Consumer Protection regarding authorizing this action (with no

23   limitation as to time frame) is subject to the attorney-client privilege.  [Dkt. 738-5 at 2].  By

24   definition, an attorney-client relationship is a prerequisite to assertion of the attorney-client

25   privilege.  *See Graf*, 610 F.3d at 1156.  Thus, the Connecticut Attorney General's admission that it

26   has an existing (indeed pre-existing) attorney-client relationship with this specific state agency

27   regarding this matter lends further support for a finding of a legal right of access and thus control

28   over the documents of the Connecticut Department of Consumer Protection.  Regardless of whether

United States District Court
Northern District of California

**Add. 64**⁶⁴

or not there is control with regard to the other Connecticut state agencies, the position of the Connecticut Department of Consumer Protection is markedly different and, at a minimum, the Court finds that the Connecticut Attorney General's office has legal right to access and thus control over the documents of the Connecticut Department of Consumer Protection for purposes of discovery in this matter.

Relatedly, the Connecticut Attorney General has taken the position that communications between the Connecticut Attorney General and the other state agencies at issue would be covered by the attorney-client privilege when the Connecticut Attorney General is legal counsel for those state agency. [Dkt. 738-4 at 2]. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Connecticut Attorney General is asserting the attorney-client privilege applies to communications between the Connecticut Attorney General's office and the agencies at issue when they are represented (as they will be here) by that office further supports the conclusion of control here.

In addition, there is no statutory, legal, or administrative rule cited which prohibits the Connecticut Attorney General from accessing the relevant documents of any of the state agencies at issue. There is no citation to any statutory or legal prohibition on the Connecticut Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court

1    has noted that "[i]n general, an attorney is presumed to have control over documents in its client's

2    possession." *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be

3    a finding of a legal right of access to and thus control over third party client documents in every

4    case involving a legal services provider as a party; rather, under the particular facts here, and under

5    the totality of circumstances viewed in light of applicable legal standards, the Court finds that

6    control exists here.

7        The Connecticut Attorney General's role as counsel for the agencies at issue inherently

8    involves obtaining necessary documents for effective representation in litigation.  In acting as

9    counsel, the Connecticut Attorney General would necessarily have access to and thus control over

10   the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934,

11   at *5–6 (finding state Attorney General has control over agency documents "based on his broad

12   statutory and common law powers to control and manage legal affairs on behalf of state agencies,

13   has a legal right to obtain responsive documents from the state agencies referenced in the

14   Complaint").    To the extent the Connecticut Attorney General argues that the Connecticut

15   Constitution establishes the Governor and the Attorney General as "independently elected officials

16   filling separate constitutionally created offices," *see* dkt. 738-5 at 2, that argument misapprehends

17   the "legal control" test for documents – the issue is not simply whether the two entities are legally

18   separate (such as two different and separately incorporated entities or legally established entities),

19   but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The

20   control analysis for Rule 34 purposes does not require the party to have actual managerial power

21   over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude*

22   *Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state

23   Attorney General and the state agencies (a relationship mandated by state law) necessitates close

24   coordination.  While operational control may be a factual situation which demonstrates a legal right

25   to obtain the documents, the absence of such "executive or functional control" is not determinative

26   for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for

27   discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity

28   were involved, there would be no dispute that party discovery covered that one entity.  As discussed

United States District Court
Northern District of California

above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that the Connecticut Attorney General is separate from the executive branch agencies under the control of the Governor is merely a restatement of the issue and not determinative of the issue.  *Id.*  Arguing that the agencies are "controlled" by the Governor (who is an "independently elected official" in a "dual executive" under the Connecticut Constitution) confuses and conflates the "legal control" issue for discovery with "operational control" or "independence" and thus constitutes a legally erroneous argument.

Finally, to the extent the Connecticut Attorney General asserts essentially the same "virtual veto" argument advanced by several other States' Attorneys General, as discussed above the Court finds the "virtual veto" argument to be speculative and unpersuasive.  This argument is based on an unfounded assumption that state agencies would inexplicably obstruct a state's attorney general's independent law enforcement responsibilities.  The argument also directly contradicts the well-established legal principle and statutory scheme that a state attorney general, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.

Indeed, at least one other federal court has previously found that the Connecticut Attorney General has legal control over Connecticut state agency materials.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Connecticut Attorney General's having control with regard to documents of the state agencies at issue.  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Connecticut, this Court is disappointed that the Connecticut Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*  As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out

discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Therefore, the Court concludes that the Connecticut Attorney General has legal control, for the purposes of discovery, over the documents held by the Connecticut agencies listed by Meta.

## V.    DELAWARE

In opposition to the control issue, the Delaware Attorney General argues primarily the following factors: (1) Delaware law explicitly indicates that the Delaware Department of Justice does not have a right to access Delaware state agency documents in lieu of discovery under a state statute; and (2) Delaware case law has previously held that control over documents turns on whether a party has the power, unaided by courts, to force document production.  [Dkt. 738-6 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Delaware agencies are proscriptively barred from obtaining counsel other than the Delaware Attorney General, without consent from the Delaware Attorney General and the Governor of Delaware.  *Id.* at 3 (citations omitted).  Here, Meta seeks discovery from the following agencies: Department of Education; Department of Health and Human Services; Department of Services for Children, Youth and Families; Office of Management and Budget; and Office of the Governor.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Delaware Attorney General has legal control, for purposes of discovery, over the Delaware agencies in dispute.  The Court finds that mandatory representation by the Delaware Attorney General, subject to consent of the Delaware Attorney General and Governor of Delaware, weighs heavily towards a finding of legal control.

The Delaware Attorney General heavily relies on a statutory argument based on Title 29, § 250(b) of the Delaware Code, which states:

> The Attorney General shall have the right of access at all times to the books, papers, records and other documents of any officer, department, board, agency, instrumentality or commission of the state government. The Attorney General shall not have this right of access for purposes of discovery in any civil actions brought by or on the relation of the Attorney General other than for the books, papers, records, and documents of the Department of Justice.

The Delaware Attorney General argues that the second sentence should be interpreted to

prohibit the Delaware Attorney General any possible right to access the documents of any state agencies "for purposes of discovery" in any action filed by the Attorney General. [Dkt. 738-6 at 2]. The Delaware Attorney General's interpretation of the statute is contrary to the express language of the statute cited. The first sentence of Section 2508(b) gives the Attorney General a broad right to access the documents of state agencies on demand. The second sentence of Section 2508(b) says that "[t]he Attorney General shall not have this right of access" to the documents. The intent of the statute is thus clear – in investigations, in defense of civil action, and in criminal actions, the Delaware Attorney General has a broad right to access state agency documents. In civil actions initiated by the Delaware Attorney General, the statute simply provides that the Delaware Attorney General cannot rely on this statute as a substitute for discovery in that action. However, contrary to the Delaware Attorney General's argument, this statute does not take away every or any other right the Attorney General may have to access the documents of state agencies. At best, the second sentence of Section 2508(b) puts the Delaware Attorney General in the same position as most (if not all) of the other state Attorneys General with regard to control – there being no express statutory right to access documents, the Court examines whether other sources of law provide that right. The second sentence of Section 2508(b) indicates a legislative intent to require the Attorney General to use other available avenues to obtain documents from state agencies in connection with civil litigation, and an intent to disallow the Attorney General to use this statute as an end-around normal discovery procedures. This statute does not prohibit or forbid the Delaware Attorney General from seeking agency documents using any such other available or normal processes.

The Delaware Attorney General further argues that this statute "is thus consistent with the general rule in Delaware that 'attorneys do not exercise control over their clients' property.'" Dkt. 738-6 at 2 (citing *Sokol Holdings, Inc. v. Dorsey & Whitney, LLP*, No. CIV.A. 3874-VCS, 2009 WL 2501542, at *4 (Del. Ch. Aug. 5, 2009)). First, the decision by the Delaware Attorney General to cite *Sokol* is unusual because that case involved a motion to transfer jurisdiction from the Chancery court to Colorado Superior Court. In so holding, the Delaware court stated that "[t]his case has no relevant connection to Delaware, and Delaware law has no bearing on it." *Sokol*, 2009 WL 2501542, at *5. Accordingly, the Delaware Attorney General's argument that *Sokol* demonstrates a "general

United States District Court
Northern District of California

rule in Delaware" is undercut by the very case they cite, and the Court does not credit the argument for that reason alone.

Second, the excerpt from *Sokol* quoted by the Delaware Attorney General has no bearing on control for purposes of discovery. *Sokol* involved a dispute between a law firm and a former client over alleged overbilling of fees and alleged breach of fiduciary duty, and the parties there disputed whether subject matter jurisdiction was proper in Chancery Court or in a Superior Court which can hear professional negligence (i.e., legal) claims. The statement quoted from *Sokol* by the Delaware Attorney General in this Court is a passage distinguishing the scope of the attorney-client relationship from the scope of a fiduciary duty of a trustee when they control property of another as a fiduciary. *Id.* at *4. The *Sokol* opinion's statement, viewed in proper context, indicates that attorneys do not control under the rules governing fiduciary duties the property of a client. And *Sokol* recognized that there can, in fact, be "circumstances in which an attorney exercises control over the property of a client." *Id.*

Further, the Court notes that *Sokol*'s analysis is consistent with this Court's analysis of the close relationship between attorneys and clients regarding control for purposes of discovery discussed above. The *Sokol* opinion states that "attorneys simply hold positions of heightened trust . . . which requires the attorney to meet certain professional standards." *Id.*

Facially, this statute makes no mention of attorney controlling client property and thus does not support the Delaware Attorney General's argument. More importantly, this argument erroneously confuses property ownership concepts with control for purposes of discovery. In *In Synopsys*, Judge Chen found control where "the word control does not require that the party have legal ownership or actual physical possession of the documents at issue." *Synopsys*, 2006 WL 1867529, at *2 (citation and internal quotations omitted). Indeed, "while courts have cautioned that "[l]egal ownership is not determinative of whether a party has . . . control of a document for the purposes of Rule 34 the court takes this to mean: if the third-party has 'legal ownership' of the document, the inquiry as to control does not end there. Conversely, if a party does have legal ownership, as here, the court finds a strong indication that defendants possess the very definition of 'control' over these documents." *Ice Corp. v. Hamilton Sundstrand Corp.*, 245 F.R.D. 513, 521 (D.

**Add. 70**[70]

Kan. 2007) (internal quotations omitted); *see also* 7 Moore's Federal Practice – Civil § 34.14 ("Legal restrictions that may limit a party's ability to obtain certain documents or to disclose them to others will not necessarily preclude a finding that the party has possession, custody, or control over those documents.").

The Delaware Attorney General relies on not only *Sokol* and other Delaware state caselaw to argue lack of control. [Dkt. 738-6 at 2]. The Delaware Attorney General cites *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, No. CIV.A. 379-N, 2005 WL 1713067, at *11 (Del. Ch. July 13, 2005), for the proposition that the "key inquiry" for control "is whether they have "the power, unaided by the courts, to force production of the documents." First, *Deephaven* is an unpublished Chancery Court opinion applying Delaware's statutory scheme under Section 220 of Title 8 of the Delaware Code, for a shareholder to inspect the records kept by a Delaware corporation as a fiduciary for its shareholders, which is a far cry from Rule 34. *Id.* As discussed above, control of property by someone acting under a fiduciary duty is not the same legal standard for control of documents under Rule 34, and to the extent the Delaware Attorney General asserts otherwise, that argument is legally erroneous. Second, the Delaware Attorney General also argues here that its argument based on *Deephaven* is supported by another state law case, *Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499, 510 (Del. 2005). [Dkt. 738-6 at 2]. That case is not helpful or germane to the issues here. *Weinstein*, like *Deephaven*, concerned inspection of documents controlled by a subsidiary corporation, and the *Weinstein* opinion makes clear that the analysis under Delaware's Section 220 requires two different types of specific control, the first being the "fiduciary" control discussed above, and the second being "actual control" to control operations of a subsidiary organization to force that entity to provide its financial documents for inspection. *Weinstein*, 870 A.2d at 511–12. The discussion in *Weinstein* regarding whether court enforcement of a duty to open documents up for corporate inspection is specifically based on the text of Section 200, and jurisprudence under that state law. *Id.* The cited passage from *Weinstein* nowhere uses the phrase "key inquiry" and nowhere equates Section 220 with Rule 34. Fundamentally, the Court finds the Delaware Attorney General's arguments based on Section 220 and Delaware Chancery Court precedent to be legally irrelevant. Indeed, the Court has serious concerns about the manner in which

the control issue was presented and briefed by several of the state Attorneys General, including the Delaware Attorney General, given how attenuated these state law arguments are from the law under Rule 34.

To be clear, the Court rejects the argument that a "key inquiry" under Rule 34 is whether the party involved has "the power, unaided by the courts, to force production of the documents." Indeed, the issue of control under Rule 34 only requires determining if there is a "legal right" to access or obtain the documents upon demand. Often, a party with a "legal right" must, in fact, use the court system to enforce and validate that right. Nothing in the text of Rule 34 or the Federal Rules of Civil Procedure state, much less imply, that control is to be construed as a discretionary, extra-judicial exercise of "power" (unlike the Delaware statute and case law relied upon heavily by the Delaware Attorney General here). To the contrary, the Federal Rules contemplate and provide measures for parties to seek judicial relief when confronted with a party refusing to produce documents in discovery. *See, e.g.*, Fed. R. Civ. P. 37. Further, the scheme for discovery under the Federal Rules contemplate that, in appropriate circumstances, not only can judicial relief for discovery be sought, but also the courts have the authority to sanction parties (and third parties) for failure to obey a discovery order, among other conduct. Fed. R. Civ. P. 37(b)-(f). A simple review of the Federal Rules demonstrates the inapplicability of Delaware's statutory scheme as analogous for purposes of this dispute.

Further, as discussed in the Legal Standards section above, the inquiry regarding control for purposes of Rule 34 discovery is a federal question, governed by the Federal Rules of Civil Procedure. As discussed above, even if the Delaware Attorney General's interpretation of Section 2508 were correct, that state statute can not preempt federal law, and Delaware's Section 220, and related case law, are not persuasive in evaluating the control issue under Rule 34, because that statutory scheme is so different from Rule 34. Even though detailed consideration of the specific factors under a comity analysis are not applicable in this case given the Supremacy Clause of the U.S. Constitution, the Court has analyzed the cited state law statutes and cases for completeness. *Cf., e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02CIV5571RJHHBP, 2006 WL 3378115, at *2–4 (S.D.N.Y. Nov. 16, 2006) (holding that international comity did not support allowing French

United States District Court
Northern District of California

1    "blocking statute" to prohibit discovery proceeding under Federal Rules of Civil Procedure 34 and

2    45).  The Court's extensive review of the cited Delaware statute and case law, summarized herein,

3    demonstrates that the Delaware Attorney General's arguments here are, at best, incorrect as a matter

4    of law, and, at worst, risk raising questions as to counsel's judgment and credibility.

5        Because Section 2508 does not operate to foreclose a finding of control under Rule 34, as

6    discussed above, the Court next turns to analyzing the issue of control with regard to other factors.

7    Importantly, the Delaware Attorney General's arguments do not negate the fact that all but of the

8    Delaware agencies at issue here are barred by Delaware law from obtaining counsel other than the

9    Attorney General, absent consent from the Attorney General.  Del. Code. § 2507.  Indeed, the

10   Delaware Attorney General confirmed that its office could represent all of the Delaware agencies at

11   issue, if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 8].  As

12   noted above, the Delaware Attorney General has had months to confer with the agencies about

13   whether they would seek consent to obtain different counsel.  To date, no such other counsel has

14   entered appearance for the Delaware state agencies, and the Delaware Attorney General has not

15   indicated that it has provided any consents to any of the agencies.  Under Delaware's statutory

16   scheme,

17           the Attorney General shall have the following powers, duties and
             authority: . . .  to provide legal advice, counsel and services for
18           administrative offices, agencies, departments, boards, commissions
             and officers of the state government concerning any matter arising in
19           connection with the exercising of their official powers or duties . . . ,
             to represent as counsel in all proceedings or actions which may be
20           brought on behalf of or against them in their official capacity in any
             court, except in actions in which the State has a conflicting interest,
21           all officers, agencies, departments, boards, commissions and
             instrumentalities of state government.
22

23   Del. Code. § 2504(3) (emphasis added).

24       Accordingly, based on the record presented to the Court, under the Delaware statutory

25   scheme each agency at issue here will be represented by the Delaware Attorney General in this

26   matter for discovery.  *See* Del. Code §§ 2503, 2507.  Thus, as a matter of the efficient and rational

27   administration of justice in this case, because the Delaware Attorney General will be involved in

28   representing these state agencies in any event in this case (whether to respond to subpoenas or to

United States District Court
Northern District of California

respond to party discovery), the Court in its discretion determines that a finding of control is further supported by the simple and pragmatic realities involved in these circumstances.

Relatedly, the Delaware Attorney General has taken the position that communications between the Delaware Attorney General's office and these state agencies would be covered by the attorney-client privilege. [Dkt. 738-6 at 2]. To the extent the Delaware Attorney General has attempted to subdivide its own office between Delaware Attorney General's attorneys in the Fraud and Consumer Division (litigating this case to date) and other attorneys in the Delaware Attorney General's Civil Division (who alleged "are responsible for providing legal advice and representation to the Delaware State Agencies"), *see id.*, in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Attorney General's office but not other "divisions" of that same organization, that argument is not supported by citation to any law and is contrary to the weight of law. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g., People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . . The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious

disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that no courts support the Delaware Attorney General's argument that different individual lawyers in the Delaware Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Delaware Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Georgia Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Georgia Attorney General is asserting that the attorney-client privilege applies to communications between the Georgia Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

In addition, there is no citation to any statutory or legal prohibition on the Delaware Attorney

General's representing the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

## VI.     FLORIDA

In opposition to the control issue, the Florida Attorney General argues primarily the following factors: (1) Florida law prevents the Florida Attorney General from accessing documents held by Florida agencies; (2) the Florida Attorney General is a separate entity and independent from the Florida agencies; (3) the Florida Attorney General brought the lawsuit under its own independent law enforcement capacity; and (4) Florida agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records.  [Dkt. 738-7 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) Florida agencies are proscriptively barred from obtaining counsel other than the Florida Attorney General, with certain legal exceptions; and (2) the Florida laws, which purportedly prevents the Florida Attorney General from accessing documents held by Florida agencies, are "wholly unrelated to the discovery at issue[.]"  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Commerce; Department of Agriculture and Consumer

United States District Court
Northern District of California

1    Services; Department of Children and Families; Department of Education; Department of Health;

2    and Office of the Governor.  *Id.*

3         After considering the factors argued in the briefs, the Court finds that the factors weigh in

4    favor of a finding that the Florida Attorney General does have legal control, for purposes of

5    discovery, over the certain listed Florida agencies.  While the Florida Attorney General is a separate

6    entity and while the Florida Attorney General does bring the instant action in its own independent

7    authority, this does not outweigh the requirement that the Florida Attorney General must statutorily

8    act as the Florida agencies' counsel.

9         Under Florida's statutory scheme, the Florida Attorney general "[s]hall appear in and attend

10   to, in behalf of the state, all suits or prosecutions, civil or criminal or in equity, in which the state

11   may be a party, or in anywise interested, in the Supreme Court and district courts of appeal of this

12   state."  Fla. Stat. § 16.01(4).  Additionally, the Florida Attorney General "[s]hall appear in and attend

13   to such suits or prosecutions in any other of the courts of this state or in any courts of any other state

14   or of the United States."  Fla. Stat. § 16.01(5).  Moreover, "[t]he Department of Legal Affairs shall

15   be responsible for providing all legal services required by any department, unless otherwise

16   provided by law.  However, the Attorney General may authorize other counsel where emergency

17   circumstances exist and shall authorize other counsel when professional conflict of interest is

18   present."  Fla. Stat. § 16.015.

19        Curiously, the Florida Attorney General takes the position that it would not represent the

20   listed agencies.  [Dkt. 738-1 at 9].  However, on the record before the Court, this is an error of law

21   because neither of these agencies are exempt from the express prohibition on retaining different

22   counsel.  Accordingly, it appears undisputed that under the Florida statutory scheme each state

23   agency at issue here will be represented by the Florida Attorney General in this matter for discovery.

24   *See* Fla. Stat. § 16.01(4).  Thus, because the Florida Attorney General appears likely to be involved

25   in representing these state agencies in any event in this case, whether to respond to subpoenas or to

26   respond to party discovery.

27        Relatedly, the Florida Attorney General has not disclaimed whether it will assert that

28   communications between the Florida Attorney General and these state agencies are covered by the

attorney-client privilege. [Dkt. 738-7 at 2]. The Florida Attorney General's argument that "in Florida, the privilege is not waived by communicating work product or attorney-client privileged material to another state agency" is circular. *Id.* If there is an attorney client relationship between the Florida Attorney General and these state agencies, then by definition any such communications would not operate as a waiver of privilege because they are inherently privileged to begin with. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at \*2. To the extent the Florida Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Florida Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Florida Attorney General from accessing the relevant documents of any of the state agencies at issue. The Florida Attorney General's argument that two Florida state agencies are required to maintain their own records is unavailing. [Dkt. 738-7 at 2]. Simply having a statute that makes these Florida agencies statutorily responsible for maintaining, preserving, retaining, and providing their own records does not demonstrate that the Florida Attorney General lacks access to those documents. First, the statutes cited by the Florida Attorney General relate to records and materials which are outside the scope of and thus not a restriction on the discovery sought in this case. Fla. Stat. § 893.055 (the Florida Attorney General's ability to request records held by the Florida Department of Health); Fla. Stat. § 409.9072 (the Florida Agency for Health Care Administration's provision of Medicaid-related documents to the Florida Attorney General). Second, the Florida statutes here do not specifically restrict or prohibit the Florida Attorney General's access to agency records for discovery purposes – rather, as noted they provide mechanisms for the Florida Attorney General to request and gain access to specific documents from those two state agencies in certain

circumstances. The general statutory responsibility of Florida agencies to manage their own records does not negate the Florida Attorney General's role as counsel for those agencies, which inherently involves obtaining necessary documents for effective representation in litigation. Therefore, because these statutes do not prohibit the Florida Attorney General's access to the state agencies' materials relevant in this matter for discovery, the Court finds that the Florida Attorney General has a legal right to access and thus control of the relevant records of the agencies listed by Meta.

In addition, there is no citation to any statutory or legal prohibition on the Florida Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Florida Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Florida Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at \*5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

United States District Court
Northern District of California

United States District Court
Northern District of California

right to obtain responsive documents from the state agencies referenced in the Complaint").  To the extent the Florida Attorney General argues that the state agencies are "independent" of the Florida Attorney General, are "not under the supervision nor control" of the Florida Attorney General, and that under the Florida Constitution the Attorney General is an "independent, elected official," *see* dkt. 738-7 at 2, these arguments misapprehend the "legal control" test for documents – the issue is not simply whether the two entities are legally separate (such as two different and separately incorporated entities or legally established entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that "[n]one of them [the state agencies] are related to" the Florida Attorney General and that they "operate outside of the Florida [Attorney General Office's] authority," is merely a restatement of the issue and not determinative of the issue. [Dkt. 738-7 at 2].  Arguing that the "decision to pursue this enforcement action was at the discretion of the Florida [Attorney General Office] and made independently of the state agencies," confuses and conflates the "legal control" issue for discovery with "operational control" or "daily functional independence" and thus constitutes a legally erroneous argument.  *Id.*

Indeed, at least one other federal court has previously found that the Florida Attorney General has control over Florida state agency materials under Fed. R. Civ. P. 34 and "they are

therefore subject to party discovery." *Freyre v. Hillsborough Cnty. Sheriff's Off.*, No. 813CV02873T27TBM, 2016 WL 1029512, at *2 (M.D. Fla. Mar. 9, 2016), *vacated*, No. 813CV02873T27TBM, 2016 WL 4502463 (M.D. Fla. July 6, 2016) (citations omitted) (The Court later vacated the order as a part of the parties' settlement. *Freyre*, 2016 WL 4502463, at *1).

The Florida Attorney General argues that the *Freyre* was vacated and thus should be disregarded. [Dkt. 738-7 at 2]. The *Freyre* opinion is not binding precedent, and the fact that *Freyre* was vacated in connection with a settlement impacts the rights of the parties to that case. But nothing in the vacatur of that opinion requires this Court to blind itself to whatever persuasive effect flows from that Florida Federal Court's analysis. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above, the analysis by the Florida Federal Court is certainly consistent with (and to that extent further supports) the analysis here with regard to the Florida Attorney General having control with regard to documents of the state agencies at issue.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Florida is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Florida was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Florida Attorney General and Meta here were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is

United States District Court
Northern District of California

1    guidance in precedent on the discovery issue at hand.

2    **VII.    GEORGIA**

3            In opposition to the control issue, the Georgia Attorney General argues primarily the

4    following factors: (1) the Georgia Attorney General must utilize public channels to compel an

5    agency to produce document; (2) the Georgia Attorney General is a separate entity and independent

6    from the Georgia agencies; and (3) the Georgia Attorney General brought the lawsuit under its own

7    independent law enforcement capacity.  [Dkt. 738-8 at 2].

8            In support of a finding of control with regard to these state agencies' documents, Meta argues

9    based primarily on the following factors: (1) Georgia agencies are proscriptively barred from

10   obtaining counsel other than the Georgia Attorney General, with limited exceptions; and (2) the

11   Georgia Attorney General's purported required use of public channels to compel an agency to

12   produce documents is limited for circumstance which require the records be produced for public

13   inspection.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Board of Regents;

14   Department of Behavioral Health and Developmental Disabilities; Department of Economic

15   Development; Department of Education; Department of Family and Children Services; Department

16   of Human Services; Department of Public Health; Governor's Office; and Office of the Child

17   Advocate. *Id.*

18           After considering the factors argued in the briefs, the Court finds that the factors weigh in

19   favor of a finding that the Georgia Attorney General does have legal control, for purposes of

20   discovery, over the listed Georgia agencies.  While the Georgia Attorney General is a separate entity

21   and while the Georgia Attorney General does bring the instant action in its own independent

22   authority, this does not outweigh the requirement that the Georgia Attorney General must statutorily

23   act as the Georgia agencies' counsel.

24           Under Georgia's statutory scheme, the Georgia Attorney General has the duty to "represent

25   the state in all civil actions tried in any court[.]"  Ga. Code § 45-15-3(6).  Additionally, the Georgia

26   Attorney General's department "is vested with complete and exclusive authority and jurisdiction in

27   all matters of law relating to the executive branch of the government and every department, office,

28   institution, commission, committee, board, and other agency thereof.  Every department, office,

United States District Court
Northern District of California

1   institution, commission, committee, board, and other agency of the state government is prohibited

2   from employing counsel in any manner whatsoever unless otherwise specifically authorized by

3   law." Ga. Code § 45-15-34.

4           Indeed, the Georgia Attorney General confirmed that its office could represent all of the

5   Georgia agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt.

6   738-1 at 9–10].  The Court notes that the State Attorneys General have filed an Administrative

7   Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

8   to various state agencies, including the Georgia Department of Behavioral Health and

9   Developmental Disabilities and the Georgia Department of Education.  [Dkt. 1031-4 at 17-101].

10  Neither of these state agencies are allowed to employ legal counsel other than the Georgia Attorney

11  General absent circumstances not at issue here.  Ga. Code §§ 45-15-3, -14, -34.  Accordingly, it

12  appears that under the statutory scheme each will be represented by the Georgia Attorney General

13  in this matter for discovery.  Thus, because the Georgia Attorney General appears likely to be

14  involved in representing these state agencies in any event in this case, whether to respond to

15  subpoenas or to respond to party discovery.

16          Further, the Georgia Attorney General has taken the position that communications between

17  the Georgia Attorney General and these state agencies would be covered by the attorney-client

18  privilege, and that communications between the specific prosecution team in this case and the state

19  agencies would be covered by the work product doctrine (but apparently not the attorney-client

20  privilege).  [Dkt. 738-8 at 2].  To the extent the Georgia Attorney General has attempted to subdivide

21  its own office between the prosecution team in this case and other divisions of the state Attorney

22  General in order to somehow argue that the scope of attorney-client privilege is limited only as to

23  some parts of the state Attorney General's office but not other sub-teams (such as the Consumer

24  Protection Division which is the prosecuting team for this action), that argument is not supported

25  by citation to law and is contrary to the weight of law.  The scope of attorney-client relationship

26  (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege)

27  encompasses the entirety of a legal services organization due to well-known rules of imputation of

28  confidences to a legal services organization, including a public law office.  *See, e.g.*, *People ex rel.*

United States District Court
Northern District of California

*Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . .  The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that no courts support the Georgia Attorney General's argument that different individual lawyers in the Georgia Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Georgia Attorney General's attempt to simultaneously disclaim the

existence of an attorney-client privilege as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Georgia Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Georgia Attorney General is asserting that the attorney-client privilege applies to communications between the Georgia Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Georgia Attorney General from accessing the relevant documents of any of the state agencies at issue. The Georgia Attorney General's argument that the Georgia Attorney General must use public channels to obtain documents from state agencies is not a credible interpretation of the statute relied upon – there is no citation that a public records request is the only way for the Georgia Attorney General to get documents from state agencies. [Dkt. 738-8 at 2]. If the Georgia Attorney General were correct, then the Georgia Attorney General would have to submit an Open Records Act request even when representing a state agency, to get documents from its own client – which is not merely impractical but also contrary to the principles of effective legal representation. As counsel, the Georgia Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved. The Georgia Open Records Act is not an impediment to that access, because that Act only applies to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents). *Bowers v. Bd. of Regents of the Univ. Sys. of Georgia*, 378 S.E.2d 460, 460 (Ga. 1989). Further, there is no citation to any statutory or legal prohibition on the Georgia

United States District Court
Northern District of California

Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Georgia Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Georgia Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Georgia Attorney General argues that "various constitutionally created state officials whom Georgia residents separately elect and endow with distinct responsibilities" and that the Georgia Attorney General and the head of the Department of Education "are constitutional officers and separately elected in statewide elections," *see* dkt. 738-8 at 2, these arguments misapprehend the "legal control" test for documents – the issue is not simply whether one entity (or the head of an entity) is under the day-to-day operational control of the other (such as a parent-wholly-owned-

subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities or legally established corporations), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that these "elected officials – including the [Georgia] Governor and the [Georgia Attorney General] – can have different interests and litigate against each other," is merely a restatement of the issue that there are two entities involved here and not determinative of that issue. *Id.* Arguing that "the [Georgia Attorney General] alone brought this action . . . outside the scope of any agency representation or direction from the [Georgia] Governor," confuses and conflates the "legal control" issue for discovery with "operational control" or "daily functional independence" and thus constitutes a legally erroneous argument. *Id.*

## VIII. HAWAI'I

In opposition to the control issue, the Hawai'i Attorney General argues primarily the following factors: (1) the Hawai'i Attorney General is a separate entity and independent from the Hawai'i agencies; and (2) the Hawai'i Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-9 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues

based primarily on the following factors: (1) the Hawai'i Attorney General must act as counsel for the Hawai'i agencies; and (2) Hawai'i has already confirmed that it will represent each of the identified agencies in responding to a Meta subpoena. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Budget and Finance; Department of Business, Economic Development and Tourism; Department of Commerce and Consumer Affairs; Department of Education; Department of Health; Department of Human Services; Governor; and State Council on Mental Health. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Hawai'i Attorney General does have legal control, for purposes of discovery, over the Hawai'i agencies in dispute. While the Hawai'i Attorney General is a separate entity and while the Hawai'i Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the Hawai'i Attorney General must statutorily act as the Hawai'i agencies' counsel.

Under Hawai'i's statutory scheme, the Hawai'i Attorney General "shall administer and render state legal services, including furnishing of written legal opinions to the governor, legislature, and such state departments and officers as the governor may direct; represent the State in all civil actions in which the State is a party[.]" Haw. Rev. Stat. § 26-7. Additionally, the Hawai'i Attorney General shall "at all times when called upon, give advice and counsel to the heads of departments, district judges, and other public officers, in all matters connected with their public duties, and otherwise aid and assist them in every way requisite to enable them to perform their duties faithfully." Haw. Rev. Stat. § 28-4.

Indeed, the Hawai'i Attorney General confirmed that its office could represent all of the Hawai'i agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 9–10]. Indeed, the Hawai'i Attorney General will act as counsel for the Hawai'i agencies if the agencies receive a subpoena from Meta. [Dkt. 738-1 at 10–11]. Accordingly, it appears that under the statutory scheme each will be represented by the Hawai'i Attorney General in this matter for discovery, whether because of any future subpoenas or because the Court finds control for purposes of discovery. *See id*. Thus, because the Hawai'i Attorney General appears likely to be

1    involved in representing these state agencies in any event in this case, whether to respond to

2    subpoenas or to respond to party discovery.

3          Relatedly, the Hawai'i Attorney General has taken the position that all communications

4    between any division of the Hawai'i Attorney General and these state agencies would be covered

5    by the attorney-client privilege.  [Dkt. 738-9 at 2].  "[T]o to the extent that [the State] asserts an

6    attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t

7    is inconsistent for the State to argue that on one hand the [State] Attorney General represents these

8    individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule

9    of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  The fact that the Hawai'i Attorney General

10   is asserting the attorney-client privilege applies to communications between the Hawai'i Attorney

11   General's office and the agencies at issue further supports the conclusion of control here.  Assertion

12   of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client

13   relationship.  *See Graf*, 610 F.3d at 1156.

14         Further, there is no statutory, legal, or administrative rule cited which prohibits the Hawai'i

15   Attorney General from accessing the relevant documents of any of the state agencies at issue.  The

16   Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization,

17   the attorney general, is both a party to the case while also acting as counsel for a third party.

18   However, this would not be the first time that a legal services provider, as counsel for a party, is

19   found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018

20   WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and

21   defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .

22   Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as

23   to responsive materials over which Salas and his law firm had possession, custody or control.").

24   Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over

25   documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2. The Court is not holding

26   broadly that there must be a finding of a legal right of access to and thus control over third party

27   client documents in every case involving a legal services provider as a party; rather, under the

28   particular facts here, and under the totality of circumstances viewed in light of applicable legal

**Add. 89**[89]

1    standards, the Court finds that control exists here.

2          The Hawai'i Attorney General's role as counsel for the agencies at issue inherently involves

3    obtaining necessary documents for effective representation in litigation.  In acting as counsel, the

4    Hawai'i Attorney General would necessarily have access to and thus control over the relevant

5    documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6

6    (finding state Attorney General has control over agency documents "based on his broad statutory

7    and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

8    right to obtain responsive documents from the state agencies referenced in the Complaint").  To the

9    extent the Hawai'i Attorney General argues that these agencies are "independent" from the state

10   Attorney General and are not supervised by the state Attorney General, *see* dkt. 738-9 at 2, that

11   argument misapprehends the "legal control" test for documents – the issue is not simply whether

12   one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-

13   subsidiary relationship), and not simply whether the two entities are legally separate (such as two

14   different and separately incorporated entities), but rather whether there is a legal right to obtain the

15   documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require

16   the party to have actual managerial power over the foreign corporation, but rather that there be close

17   coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-

18   client relationship between the state Attorney General and the state agencies (a relationship

19   mandated by state law) necessitates close coordination.  While operational control may be a factual

20   situation which demonstrates a legal right to obtain the documents, the absence of such "executive

21   or functional control" is not determinative for evaluating "control" for purposes of discovery.  By

22   definition, the "legal control" issue for discovery arises when there are two legally distinct or

23   separate entities – otherwise, if only one entity were involved, there would be no dispute that party

24   discovery covered that one entity.  As discussed above, courts have found "control" for purposes of

25   discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary

26   having control over the documents of a parent corporation, or an individual government officer

27   having control over the documents of an entire agency. Thus, arguing that "the agencies identified

28   by Meta are distinct entities under Hawai'i law.  [The Hawai'i Attorney General] is one of a

United States District Court
Northern District of California

maximum of twenty principal departments within the Executive Branch" is simply re-stating the issue, and not determinative of the issue. [Dkt. 738-9 at 2]. The Hawai'i Attorney General's argument that: "Each department is headed by a separate executive, and subject to the supervision of the governor" erroneously conflates the "legal control" issue with "operational control" or "functional independence" of the head of each entity. *Id.*

Further, the Hawai'i Attorney General's citation to and reliance on *Lobisch v. United States*, No. CV 20-00370 HG-KJM, 2021 WL 6497240 (D. Hawaii Aug. 19, 2021), is unavailing. In *Lobisch*, the Plaintiff sued the United States Government and sought party discovery from every agency of the United States Government, including any branch of the military and any federal employee. *Id.* at *1. There, the Party seeking discovery made no showing of control and simply argued based on the plain language of Fed. R. Civ. P. 34. *Id.* at 1–2. The *Lobisch* Court rejected that Plaintiff's arguments as contrary to the mandates of Fed. R. Civ. P. 1 as well as contrary to the Federal Torts Claim Act (the substantive law underlying the lawsuit). *Id.* at 2. Because there was no attempt to show control in *Lobisch*, that opinion never discusses the issue and never analyzes the issue under *Citric Acid*. Accordingly, the *Lobisch* decision is not determinative or even germane to the issue here. Unlike in *Lobisch*, here there has been extensive argument over and (as detailed in this Order) extensive analysis of the control issue under the facts presented.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Hawai'i is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Hawai'i was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that

the Hawai'i Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## IX.    IDAHO

In opposition to the control issue, the Idaho Attorney General argues primarily the following factors: (1) the Idaho Attorney General is a separate entity and independent from the Idaho agencies; (2) the Idaho Attorney General may demand records from other agencies; however, it may only do so pursuant to statute; and (3) the Idaho Attorney General brought the lawsuit under its own independent law enforcement capacity.  [Dkt. 738-10 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Idaho agencies are proscriptively barred from obtaining counsel other than the Idaho Attorney General, with limited exceptions.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Commerce Department; Education Board; Education Department; Governor's Office; and Health and Welfare Department.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Idaho Attorney General does not have legal control, for purposes of discovery, over the Idaho agencies in dispute.  While the Idaho Attorney General must act as the legal counsel for the Idaho agencies, this requirement does not override the statutory limitation that the Attorney General may only demand documents from these agencies if explicitly permitted by statute.  Since the present lawsuit was initiated under the Idaho Attorney General's independent law enforcement capacity and no relevant statute grants the Idaho Attorney General authority to demand documents from the Idaho agencies in question, the Court concludes that the Idaho Attorney General does not have legal control, for the purposes of discovery, over the Idaho agencies in dispute.

Under Idaho's statutory scheme, the Idaho Attorney General shall "perform all legal services for the state and to represent the state and all departments, agencies, offices, officers, boards, commissions, institutions and other state entities in all courts and before all administrative tribunals

United States District Court
Northern District of California

United States District Court
Northern District of California

or bodies of any nature."  Idaho Code § 67-1401(1).  Additionally, the Idaho Attorney General is required to "advise all departments, agencies, offices, officers, boards, commissions, institutions and other state entities in all matters involving questions of law."  Idaho Code § 67-1401(2). Furthermore, "no department, agency, office, officers, board, commission, institution or other state entity shall be represented by or obtain its legal advice from an attorney at law other than the attorney general," with certain exceptions.  Idaho Code § 67-1406.  One such exception potentially relevant includes "colleges and universities" which "may employ private counsel to advise them and represent them before courts of the *state of Idaho*."  Idaho Code § 67-1406(2).  However, the instant matter is not before the State of Idaho.

Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies.  *See* Dkt. 1031-5.  None of these state agencies are allowed to employ legal counsel other than the Idaho Attorney General and thus by statute each must be represented by the Idaho Attorney General in this matter for discovery.  This arrangement indicates strongly that the state Attorney General, in fulfilling its role as chief legal advisor, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.  Therefore, the Court concludes that the Idaho Attorney General has legal control, for the purposes of discovery, over the documents held by the Idaho agencies listed by Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case.  *See Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there.  *Id.* at 356 n.5.  In that case, Idaho is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there.  *Id.*  Given that Idaho was able to reach a negotiated

resolution of the control dispute in that Multi-District Litigation, this Court is disappointed that Meta and Idaho were unable to reach a negotiated resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## X.    ILLINOIS

In opposition to the control issue, the Illinois Attorney General argues primarily the following factors: (1) the Illinois Attorney General is a separate entity and independent from the Illinois agencies; and (2) the Illinois Attorney General brought the lawsuit under its own independent law enforcement capacity.  [Dkt. 738-11 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Illinois Attorney General is required to represent Illinois agencies, pursuant to the Illinois Constitution.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Board of Education; Board of Higher Education; Department of Children and Family Services; Department of Commerce and Economic Opportunity; Department of Human Services; Department of Public Health; and Office of the Governor.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Illinois Attorney General does have legal control, for purposes of discovery, over the Illinois agencies in dispute.  While the Illinois Attorney General is a separate entity and while the Illinois Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the Illinois Attorney General is "the legal officer of the State." Ill. Const. Art. V, § 15.  The Illinois Constitution has been interpreted to require that the Illinois Attorney General represent state agencies.  *People ex rel. Sklodowski v. State*, 642 N.E.2d 1180, 1184 (Ill. 1994), *as modified on denial of reh'g* (Nov. 15, 1994).  Indeed, the Illinois Attorney General admits that "the [Illinois Attorney General] has broad statutory and common law powers to conduct litigation on behalf of State agencies[.]"  [Dkt. 738-11 at 2].

Indeed, the Illinois Attorney General confirmed that its office could represent all of the

Illinois agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 11–12]. Accordingly, it appears that under the Illinois Constitutional scheme each will likely be represented by the Illinois Attorney General in this matter for discovery, whether because of any future subpoenas or because the Court finds control for purposes of discovery. *See Env't Prot. Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. 1977). Thus, because the Illinois Attorney General appears likely to be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Illinois Attorney General has taken the position that any past or future communications between any the Illinois Attorney General and these state agencies, if they are responsive to Meta's discovery requests, would be covered by the attorney-client privilege. [Dkt. 738-11 at 2]. Indeed, the Illinois Attorney General admis that "attorney-client relationship exists between a State agency and the Attorney General." *Id.* (quoting *Env't Prot. Agency*, 372 N.E.2d at 52). "[T]o the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Illinois Attorney General is asserting the attorney-client privilege applies to communications between the Illinois Attorney General's office and the agencies at issue (and admitting that an attorney-client relationship exists, even as to past communications relevant to discovery in this case) further supports the conclusion of control here.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Illinois Attorney General from accessing the relevant documents of any of the state agencies at issue. The Illinois Attorney General cites two statutes which allegedly restrict state agencies from providing "certain types of information to anyone, even other agencies." Dkt. 738-11 at 2 (citing 20 Ill. Comp. Stat. 2305/2.1(c); 410 Ill. Comp. Stat. 305/9(2)). Those two statutes are not applicable to scope of discovery in this action: Section 2.1(c) relates to "[s]haring of information on reportable illnesses, health conditions, unusual disease or symptom clusters, or suspicious events between and among public health and law enforcement authorities[,]" and Section 9(2) relates to the confidentiality of

"[a]ll information and records held by a State agency, local health authority, or health oversight agency pertaining to HIV-related information[.]"  The Illinois Legislature knew how to specify restricting sharing of information between agencies and the Illinois Attorney General in these two specific instances, but failed to do so more generally for discovery (unlike, for example, the Delaware Legislature as discussed above), and this lack of a general prohibition supports a finding of control.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Illinois Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Illinois Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").  To the extent the Illinois Attorney General argues that the Illinois Attorney General and the Illinois

Governor "are independently elected by the State's voters; they serve in different roles, enjoy unique rights and responsibilities, and have control over separate governmental functions," *see* dkt. 738-11 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "there is no law that gives the [Illinois Attorney General] control over their [the agencies'] executive functions" is simply re-stating the issue to be decided, and not determinative of the issue. *Id.* The Illinois Attorney General's argument that these are "independent state agencies" erroneously conflates the "legal control" issue with "operational control" or "functional independence" of each entity.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals*

*(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Illinois is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Illinois was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Illinois Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XI. INDIANA

In opposition to the control issue, the Indiana Attorney General argues primarily the following factors: (1) the Indiana Attorney General is a separate entity and independent from the Indiana agencies; (2) certain offices are entitled to employ counsel for litigation purposes without approval from the Indiana Attorney General; (3) the Indiana Attorney General brought the lawsuit under its own independent law enforcement capacity; and (4) the Indiana Attorney General is not seeking damages on behalf of the listed agencies. [Dkt. 738-12 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Indiana agencies are proscriptively barred from obtaining counsel other than the Indiana Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Commission on Improving the Status of Children in Indiana; Department of Child Services; Department of Education; Department of Health; Family and Social Services Administration; Governor; Office of Management and Budget; and State Board of Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Indiana Attorney General does have legal control, for purposes of discovery, over the listed Indiana agencies which are not subject to an exception of mandatory

United States District Court
Northern District of California

United States District Court
Northern District of California

representation. While the Indiana Attorney General is a separate entity and while the Indiana Attorney General does bring the instant action in its own independent authority and does not seek damages on behalf of the listed agencies, this does not outweigh the requirement that the Indiana Attorney General will act as the agencies' counsel. The statutory scheme in Indiana requires that "[t]he attorney general shall have charge of and direct the prosecution of all civil actions that are brought in the name of the state of Indiana or any state agency." Ind. Code § 4-6-3-2(a). "The [Indiana] Attorney General's authority to represent the State, *its agencies* and officers is nearly exclusive, and agencies may not employ any attorney without the written consent of the Attorney General." *Indiana State Highway Comm'n v. Morris*, 528 N.E.2d 468, 474 (Ind. 1988) (emphasis added).

Importantly, the Indiana Attorney General's arguments do not negate the fact that all of the Indiana agencies at issue here are barred by Indiana law from obtaining counsel other than the Indiana Attorney General: "No agency . . . shall have any right to name, appoint, employ, or hire any attorney or special or general counsel to represent it or perform any legal service in behalf of the agency and the state without the written consent of the attorney general." Ind. Code § 4-6-5-3(a). Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Commission on Improving the Status of Children in Indiana, the Indiana Department of Education, and the Indiana Department of Health. [Dkt. 1031-5 at 227–352]. None of these state agencies are allowed to employ legal counsel other than the Indiana Attorney General absent consent (and there is no indication of any such consent in the record) and thus by statute each must be represented by the Indiana Attorney General in this matter for discovery. *See* Ind. Code §§ 4-6-5-1, -2 (the Indiana Attorney General "shall have the sole right and power" to assign an attorney "to any agency of the state of Indiana to perform in behalf of such agency"). This arrangement indicates strongly that the Indiana Attorney General, in fulfilling its statutory role to as "nearly exclusive" legal representative of state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies. Therefore, the Court concludes that the Indiana Attorney General has legal control, for

1   the purposes of discovery, over the documents held by the Indiana agencies listed by Meta, including

2   in particular the three agencies recently listed in the intent to issue subpoenas.

3          Relatedly, the Indiana Attorney General has taken the position that communications between

4   the Indiana Attorney General and these state agencies would be covered by the attorney-client

5   privilege if such communications are encompassed within the scope of discovery sought by Meta.

6   [Dkt. 738-12 at 2]. Indeed, the Indiana Attorney General admits that "Indiana law has long cemented

7   the idea that '[t]he relationship of attorney and client clearly applies to the [Indiana] Attorney

8   General and the state agencies he represents, and the attorney-client privilege should protect

9   communications exchanged in that relationship.'" *Id.* "[T]o to the extent that [the State] asserts an

10  attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t

11  is inconsistent for the State to argue that on one hand the [State] Attorney General represents these

12  individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule

13  of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Indiana Attorney General

14  is asserting the attorney-client privilege applies to communications between the Indiana Attorney

15  General's office and the agencies at issue even as to past communications within the scope of

16  relevant discovery in this case further supports the conclusion of control here.

17         Further, there is no statutory, legal, or administrative rule cited which prohibits the Indiana

18  Attorney General from accessing the documents of the state agencies at issue. The Indiana Attorney

19  General argues control is somehow lacking because Indiana law contemplates that the Indiana

20  Attorney General can issue civil investigative demands to state agencies. Dkt. 738-12 at 2 (citing

21  Ind. Code §§ 4-6-3-1, -3 (regarding issuance of civil investigative demands to state agencies)). As

22  Meta argues, however, the fact that there exists a statutory right for the Indiana Attorney General

23  demonstrates that the Indiana Legislature expressly intended there to be a formal mechanism for

24  sharing of documents between state agencies and the Indiana Attorney General. [Dkt. 738 at 3].

25  There is nothing in this statutory scheme which indicates that the procedure for issuing civil

26  investigative demands to agencies is the exclusive manner by which the Indiana Attorney General

27  can obtain documents from state agencies, and rather than implying that the statute prohibits or

28  denigrates from a legal right to obtain documents from state agencies, the statutory scheme here

United States District Court
Northern District of California

1    indicates support for (and a legal mechanism for) information sharing between Indiana agencies and

2    the Indiana Attorney General.

3          The Indiana Attorney General does not cite to any general statutory or legal prohibition on

4    the Indiana Attorney General's representing the state agencies in this matter for purposes of

5    discovery.  The Indiana Attorney General cites to one entity, the Indiana Economic Development

6    Corporation, which is defined under state law as an "independent instrumentality" and not a state

7    agency, and which has an express statutory right to retain its own legal counsel.  Dkt. 738-12 at 2

8    (citing Ind. Code §§ 5-28-3-2, -5-3).  Meta expressly disclaims seeking "party discovery" from the

9    Indiana Economic Development Corporation and expressly commits to "treat the Economic

10   Development Corporation as a non-party for purposes of discovery." [Dkt. 738-12 at at 3 n.1].

11         The Indiana Attorney General's role as counsel for the agencies at issue inherently involves

12   obtaining necessary documents for effective representation in litigation.  In acting as counsel, the

13   Indiana Attorney General would necessarily have access to and thus control over the relevant

14   documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6

15   (finding state Attorney General has control over agency documents "based on his broad statutory

16   and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

17   right to obtain responsive documents from the state agencies referenced in the Complaint").  To the

18   extent the Indiana Attorney General argues that the Indiana Attorney General "is a separately elected

19   and statutorily created office" from the Indiana Governor, *see* dkt. 738-12 at 2, that argument

20   misapprehends the "legal control" test for documents – the issue is not simply whether one entity is

21   under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary

22   relationship), and not simply whether the two entities are legally separate (such as two different and

23   separately incorporated entities), but rather whether there is a legal right to obtain the documents as

24   explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to

25   have actual managerial power over the foreign corporation, but rather that there be close

26   coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-

27   client relationship between the state Attorney General and the state agencies (a relationship

28   mandated by state law) necessitates close coordination.  While operational control may be a factual

situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Indiana Attorney General "does not exert generalized control over the agencies or their documents," dkt. 738-12 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Indiana Attorney General's argument that these are "agencies are not subject to management by [the Indiana Attorney General], are not directed by [the Indiana Attorney General]," erroneously conflates the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery. *Id.*

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

United States District Court
Northern District of California

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Indiana is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Indiana was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Indiana Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XII. KANSAS

In opposition to the control issue, the Kansas Attorney General argues primarily the following factors: (1) the Kansas Attorney General is a separate entity and independent from the Kansas agencies; (2) Kansas agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records; and (3) the Kansas Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-13 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Kansas Attorney General must appear for the state and control the state's prosecution or defense. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Board of Regents; Department for Aging and Disability Services; Department for Children and Families; Department of Administration; Department of Commerce; Department of Education; Department of Health and Environment; and Governor. *Id.*

103

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Kansas Attorney General has legal control, for purposes of discovery, over the listed Kansas agencies. First, the statutory scheme in Kansas requires that "[t]he attorney general *shall* appear for the state, and prosecute and defend any and all actions and proceedings, civil or criminal, . . . in all federal courts, in which the state shall be *interested* or a party, and *shall*, when so appearing, control the state's prosecution or defense." Kan. Stat. § 75-702(a) (emphasis added). It cannot be seriously disputed that the State of Kansas is interested when one or more of its state agencies are the target of discovery in a federal action. Second, the Kansas Attorney General is the chief legal officer for the state of Kansas. *DeBerry v. Kansas State Bd. of Acct.*, 196 P.3d 958, 958 (Kan. Ct. App. 2008) ("Acting as counsel for the Board, which is the administrative agency in charge of regulating the practice of certified public accountancy in the state of Kansas, is entirely consistent with the attorney general's role as chief legal officer for the State. Although the legislature has identified various situations in which the attorney general is *required* to provide representation, we find no Kansas law that precludes the attorney general from representing the Board under the particular circumstances presented in this case.") (emphasis in original). Further, Kansas's statutory scheme requires that "[t]he attorney general *shall* . . . prosecute or *defend* for the state *all actions*, civil or criminal, relating to any matter *connected with their departments*." Kan. Stat. § 75-703 (emphasis added).

Importantly, the Kansas Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Kansas agencies at issue here to employ or obtain counsel in this matter other than the Attorney General. [Dkt. 738-13 at 2]. Indeed, the Kansas Attorney General confirmed that its office would definitely represent all of the Kansas agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 13]. Accordingly, it appears that under the statutory scheme each agency will be represented by the Kansas Attorney General in this matter for discovery. *See* Kan. Stat. §§ 75-702, -703. Curiously, the Kansas Attorney General takes the position that it would not represent the listed agencies. [Dkt. 738-1 at 13]. However, on the record before the Court, this is an error of law because neither of these agencies are exempt from the express prohibition on retaining different

counsel.  Thus, because the Kansas Attorney General will be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Kansas Attorney General has taken the position that communications between the Kansas Attorney General and these state agencies would be covered by the attorney-client privilege if such communications are encompassed within the scope of discovery sought by Meta. [Dkt. 738-13 at 2].  "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  Just as the Court in *Perez* rejected the inconsistent approach to privilege there, here the Kansas Attorney General argues that "the Attorney General does not ***currently*** represent any of the identified agencies" while at the same time arguing that "***if*** another state agency requests legal representation or legal advice from the [Kansas] Attorney General's Office, or receives a discovery request in this litigation, information related to those communications with that agency ***are privileged***, under privilege doctrines including attorney-client privilege."  Dkt 738-13 at 2 (emphasis added).  The Kansas Attorney General's attempt to preserve the ability to assert the attorney-client privilege between the Kansas Attorney General's office and the agencies at issue further supports the conclusion of control here.  Here, it is illusory to argue "if" the Kansas Attorney General would represent the state agencies – the Kansas Attorney General has already confirmed that their office will do so for discovery in this matter.  [Dkt. 738-1 at 13].  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Kansas Attorney General from accessing the documents of the state agencies at issue for purposes of discovery.  The Kansas Attorney General's argument that the Kansas Attorney General must use either the Kansas Open Records Act, Kan. Stat. § 45-215 *et seq.*, or a subpoena to obtain documents from state agencies who are their client is not a credible interpretation of the Kansas Open Records Act – there is no citation that a public records request is the only way for the Kansas Attorney

United States District Court
Northern District of California

United States District Court
Northern District of California

General to get documents from state agencies they are representing in litigation. [Dkt. 738-8 at 2]. If the Kansas Attorney General were correct, then the Kansas Attorney General would have to submit an Open Records Act request even when representing a state agency, to get documents from its own client – which is not merely impractical and not believable but also contrary to the principles of effective legal representation. If the Kansas Attorney General's supposition that, every time the Kansas Attorney General seeks documents from state agencies, Open Records Act requests would be routine and necessary, then the logical conclusion is that Open Records Act would be a routinely used legal right to access those documents and records of the agency subject to the Act. At least one court has found that a state "public records" Freedom of Information Act constitutes a legal right to access documents from an agency for purposes of "control" under Rule 34. *See Flagg*, 252 F.R.D. at 355–57 ("Because at least some of the text messages maintained by [(third party)] SkyTel are 'public records' within the meaning of Michigan's FOIA, it would be problematic, to say the least, to conclude that the [named defendant] City lacks a legal right to obtain these records as necessary to discharge its statutory duty of disclosure."). As counsel, the Kansas Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved. The Kansas Open Records Act is not an impediment to that access, because that Act only applies to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents). Kan. Stat. § 45-220(a). Further, the Kansas Open Records Act nowhere states that this statute is the only means by which the Kansas Attorney General can obtain records from other state agencies – the statute merely sets up a permissive system for public inspection, not a restriction or limitation on access. Indeed, the Kansas Attorney General has cited no precedent requiring the Kansas Attorney General to use either an Open Records Act request or a subpoena to obtain documents from state agencies represented in litigation by the Kansas Attorney General. The Court finds this argument to be wholly unpersuasive. Finally, the argument that there is no statute or law specifically authorizing the Kansas Attorney General "unfettered access to or the right to compel document production of other agencies' documents" is legally incorrect. Control, for purposes of

Rule 34, does not require showing "unfettered access" to all state agencies' documents under all circumstances. *Monsanto*, 2023 WL 4083934, at \*5 ("Despite the State's characterization of the issue, we need not decide whether the Illinois Attorney General has "unfettered access to all state agencies' records under all circumstances." Rather, the issue is one of "control" under Rule 34 – nothing more, nothing less."). Further, the state Attorney General's argument implicitly assumes an overly restrictive view of the control test for documents under Rule 34. To the contrary, courts have recognized that control for purposes of document discovery is liberally construed. *E.g.*, *Miniace*, 2006 WL 335389, at \*1; *Evans*, 2010 WL 1136216, at \*1–2; *Inland Concrete Enterprises, Inc.*, 2011 WL 13209239, at \*3–4.

Additionally, the Kansas Attorney General does not cite any statutory or legal prohibition on the Kansas Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both counsel for a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Kansas Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Kansas Attorney General would necessarily have access to and thus control over the relevant

documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Kansas Attorney General argues that the Kansas Attorney General "separate and distinct elected entity with separate duties and responsibilities as delineated in the Kansas Constitution and Kansas law," *see* dkt. 738-13 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Kansas Attorney General "is not suing on behalf of or representing any state agency in this litigation; rather, he brings this action under independent statutory authority," dkt. 738-13 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Kansas Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is

insufficient to rebut a finding of legal control of the documents for purposes of discovery.

In opposition, the Kansas Attorney General cites and relies upon *Amex*, 2011 WL 13073683, and *Warner Chilcott Holdings*, 2007 WL 9813287, at *4–5.  [Dkt. 78-13 at 2].  As discussed above (and incorporated herein), the Court finds neither of these cases to be persuasive (and neither is binding).  Both cases focus on the issue of executive control and the structure of the executive branch of the local state government, and as discussed above, the Ninth Circuit's standard for control is not limited to or determined by whether there is "operational control" of one entity by another in day-to-day functions.  *Citric Acid*, 191 F.3d at 1107–08 (explaining that control over local unions was not found in *International Union* even though the national union could theoretically dissolve and take over the operations and hence the documents of the local unions).

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there.  *Id.* at 356 n.5.  In that case, Kansas is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Kansas was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Kansas Attorney General and Meta were unable to reach a negotiated resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XIII.   KENTUCKY

In opposition to the control issue, the Kentucky Attorney General argues primarily the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    following factors: (1) the Kentucky Attorney General is a separate entity and independent from the

2    Kentucky agencies; (2) only two agencies, which are not on Meta's listed agencies, allow the

3    Kentucky Attorney General to have access to material evidence and information; (3) Kentucky

4    agencies have their own staffing and capacity to independently initiate and participate in litigation

5    and retain counsel as they see fit; and (4) the Kentucky Attorney General brought the lawsuit under

6    its own independent law enforcement capacity.  [Dkt. 738-14 at 2].

7          In support of a finding of control with regard to these state agencies' documents, Meta argues

8    primarily the Kentucky Attorney General must act as chief legal officer tasked with attending to the

9    legal business of Kentucky state agencies.  *Id.* at 3.  Here, Meta seeks discovery from the following

10   agencies: Board of Education, Cabinet for Health and Family Services, Department for Behavioral

11   Health, Developmental and Intellectual Disabilities, Department for Business Development,

12   Department for Public Health, Department of Education, Finance and Administration Cabinet,

13   Governor, and Office of State Budget Director.  *Id.*

14         After considering the factors argued in the briefs, the Court finds that the factors weigh in

15   favor of a finding that the Kentucky Attorney General has legal control, for purposes of discovery,

16   over the listed Kentucky agencies. First, the Kentucky "Attorney General is the chief law officer of

17   the Commonwealth of Kentucky and all of its departments, commissions, agencies, and political

18   subdivisions, and the legal adviser of all state officers, departments, commissions, and agencies[.]"

19   Ky. Rev. Stat. § 15.020(1).  Second, the statutory scheme in Kentucky requires that "the Attorney

20   General ***shall*** . . . ***enter an appearance in all cases***, hearings, and proceedings in and before all

21   other courts, tribunals, or commissions in or out of the state, ***and attend to all litigation*** and legal

22   business in or out of the state required of the office by law, or in which the Commonwealth has an

23   interest, ***and any litigation*** or legal business that ***any*** state officer, department, commission, or

24   ***agency may have*** in connection with, or growing out of, his, her, or ***its official duties***[.]"  Ky. Rev.

25   Stat. § 15.020(3) (emphasis added).

26         The Court notes that the State Attorneys General have filed an Administrative Motion to file

27   supplemental information that Meta has recently served an intent to issue subpoenas to various state

28   agencies.  *See* Dkt. 1031-5.  Indeed, the Kentucky Attorney General confirmed that its office could

1   represent all of the state agencies at issue if Meta were to serve those agencies with a subpoena in

2   this matter. [Dkt. 738-1 at 13–14]. Accordingly, it appears that under the statutory scheme each

3   agency will likely be represented by the Kentucky Attorney General in this matter for discovery.

4   *See* Ky. Rev. Stat. § 15.020(1). Thus, because the Kentucky Attorney General will likely be

5   involved in representing these state agencies in any event in this case, whether to respond to

6   subpoenas or to respond to party discovery.

7         The Kentucky Attorney General relies on statutory authority for Kentucky agencies to hire

8   their own counsel to demonstrate that the Kentucky Attorney General may have no role in

9   representing the agencies here and thus would not have control. Dkt. 738-14 at 2 (citing Ky. Rev.

10  Stat. § 12.210). However, the Kentucky Legislature made clear that this statute does not denigrate

11  from Section 15.020 quoted above which requires that the Kentucky Attorney General "shall"

12  appear in any litigation that any agency may have in connection with its official duties. *See* Ky.

13  Rev. Stat. § 12.230 ("KRS 15.020 shall remain in full force and effect, except to the extent the same

14  is in conflict with KRS 12.200 to 12.220[.]"). Further, the Kentucky statutory scheme continues to

15  recognize that "[t]he [Kentucky] Governor or any department ***may require the advice or***

16  ***services*** of the Attorney General and the assistant attorneys general in matters relating to the duties

17  or functions of ***any such office or department***." *Id.* (emphasis added).

18        Further, there is no statutory, legal, or administrative rule cited which prohibits the Kentucky

19  Attorney General from accessing the documents of the state agencies at issue for purposes of

20  discovery. To the contrary, the Kentucky Attorney General admits that state law requires that "***[a]ll***

21  ***departments, agencies***, officers, and employees ***of the Commonwealth shall fully cooperate with***

22  ***the [Kentucky] Attorney General*** in carrying out the functions of [Kentucky consumer protection

23  laws]." Ky. Rev. Stat. § 367.160(1) (emphasis added). This statutory requirement affords the

24  Kentucky Attorney General the legal right to obtain documents from state agencies when enforcing

25  state consumer protection laws, thus satisfying the *Citric Acid* test for control here.

26        The Court recognizes that this is a somewhat unusual situation, in which a law enforcement

27  organization, the attorney general, is both counsel for a party to the case while also acting or able to

28  act as counsel for a third party. However, this would not be the first time that a legal services

United States District Court
Northern District of California

provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Kentucky Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation. In acting as counsel, the Kentucky Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Kentucky Attorney General argues that the "Kentucky agencies at issue . . . are distinct and separate entities," *see* dkt. 738-14 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law)

necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. *See, e.g.*, *Sublett v. Henson*, No. 5:16-CV-00184-TBR, 2018 WL 3939333, at *3–6 (W.D. Ky. Aug. 16, 2018) (rejecting objections of named defendants, officers and officials of state prison, to document requests, and finding warden has control over documents of the Kentucky Department of Corrections). Thus, arguing that "[t]he Kentucky Attorney General and [Kentucky] Governor are separately elected constitutional officers of the Commonwealth . . . [and] the other agencies named by Meta are headed by individuals appointed by the Governor," dkt. 738-14 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Kentucky Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

In opposition, the Kentucky Attorney General cites several cases in which the Kentucky Attorney General has been "in direct legal conflict with these agencies." [Dkt. 738-14 at 2 n.1]. This argument is merely another way of restating the "operational independence" argument rejected argument above. The fact that, in other cases involving different issues, the Kentucky Attorney General has been adverse to state agencies is not determinative of whether there is control for purposes of the documents sought in discovery in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 356–57. Just as a joint defense group in a multi-defendant litigation may include companies which, in other venues, are adverse litigants, the law understands that entities may be adverse in one forum and still yet may have aligned legal interests in another.

Finally, the Court has recognized that the issue of control of state agency documents, when

United States District Court
Northern District of California

a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Id.* at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Kentucky is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Kentucky was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Kentucky Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

### XIV.  LOUISIANA

In opposition to the control issue, the Louisiana Attorney General argues primarily the following factors: (1) the Louisiana Attorney General is a separate entity and independent from the Louisiana agencies; and (2) most Louisiana agencies have their own general counsel or contract with outside counsel to handle their other legal needs. [Dkt. 738-15 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Louisiana Attorney General acts as the chief legal officer of the state and is required by statute to represent state agencies in all litigation involving tort claims. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Children and Family Services, Department of Education, Department of Health, Department of Economic Development, Office of Planning and Budget, and Office of the Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Louisiana Attorney General does have legal control, for purposes of

1    discovery, over the listed Louisiana agencies which are not subject to an exception of mandatory

2    representation.  While the Louisiana Attorney General is a separate entity and while the Louisiana

3    Attorney General does bring the instant action in its own independent authority, this does not

4    outweigh the requirement that the Louisiana Attorney General will act as the agencies' counsel.  The

5    statutory scheme in Louisiana requires that "[t]he attorney general **shall** represent the state and **all**

6    **departments and agencies** of state government in **all litigation** arising out of or involving **tort**[.]"

7    La. Stat. § 49:257(A) (emphasis added).  "[C]onsumer protection claims sound in tort[.]"  *Zodiac*

8    *21, Inc. v. Oyo Hotels, Inc.*, No. CV 20-63-SDD-RLB, 2020 WL 6479160, at \*6 n.56 (M.D. La.

9    Nov. 3, 2020) (analyzing claim under Louisiana Unfair Trade Practice and Consumer Law); *accord*

10    *Kreger v. Gen. Steel Corp.*, No. CIV.A. 07-575, 2010 WL 2902773, at \*12 (E.D. La. July 19, 2010)

11    ("class members' consumer protection claims . . . sound in tort).  Indeed, the Louisiana Attorney

12    General admits here that "the Louisiana Attorney General does represent state agencies in specific

13    circumstances, such as litigation arising out of or involving tort[.]"  [Dkt. 738-15 at 2].

14        Further, the Court notes that the State Attorneys General have filed an Administrative

15    Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

16    to various state agencies, including the Louisiana Department of Education and the Louisiana

17    Department of Health.  [Dkt. 1031-5 at 1070–1153].  The Louisiana Attorney General is required

18    by statute to represent each of these agencies in this matter for discovery.  *See* La. Stat. § 49:257(A).

19    This arrangement indicates strongly that the Louisiana Attorney General, in fulfilling its state

20    constitutional role as "chief legal officer of the state," La. Const. art. IV, § 8, would necessarily and

21    inherently have access to and control over the necessary documents for effective legal representation

22    of these state agencies.  Therefore, the Court concludes that the Louisiana Attorney General has

23    legal control, for the purposes of discovery, over the documents held by the Louisiana agencies

24    listed by Meta, including in particular the agencies recently listed in the intent to issue subpoenas.

25        The Louisiana Attorney General has taken the position that, because that office "does not

26    represent agencies in this action," communications between the Louisiana Attorney General and

27    these state agencies "are **generally** not protected under the attorney-client privilege."  Dkt. 738-15

28    at 2 (emphasis added).  The Louisiana Attorney General's use of the word "generally" reveals the

United States District Court
Northern District of California

1   intention: the Louisiana Attorney General is attempting to preserve the ability to assert the attorney-
2   client privilege later when faced with formal discovery (or this Order). It is illusory to argue the
3   Louisiana Attorney General does not presently represent the state agencies – the Louisiana Attorney
4   General has already confirmed that their office could do so for discovery in this matter.  [Dkt. 738-
5   1 at 14–15].  And as discussed above, the Louisiana Legislature requires the Louisiana Attorney
6   General to represent agencies in cases such as this which sound in tort.  "[T]o to the extent that [the
7   State] asserts an attorney-client privilege with these legislators, it does so solely in their official
8   capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney
9   General represents these individuals, but that for discovery purposes the [Plaintiff] United States
10  must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  Just as the
11  court in *Perez* rejected the inconsistent approach to privilege there, here the Court rejects the
12  Louisiana Attorney General's apparent intention to argue now (in opposition to this motion) that
13  "generally" the privilege does not apply, while plainly relying on the word "generally" to preserve
14  the ability to assert the privilege later.  The Louisiana Attorney General's attempt to preserve the
15  ability to assert the attorney-client privilege between the Louisiana Attorney General's office and
16  the agencies at issue further supports the conclusion of control here.  Assertion of the attorney-client
17  privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610
18  F.3d at 1156.

19       Further, there is no statutory, legal, or administrative rule cited which prohibits the Louisiana
20  Attorney General from accessing the documents of the state agencies at issue.  [Dkt. 738-15 at 2].
21  Because the Louisiana Attorney General is required to serve as counsel for the Louisiana agencies
22  in litigation arising out of or involving tort, the Court is not persuaded by the argument that "most
23  state agencies have their own general counsel or contract with outside counsel to handle their ***other***
24  legal needs."  *Id.* (emphasis added).  The instant case falls outside the scope of "their other legal
25  needs" and therefore such authority by the agencies in "other" areas of law is legally irrelevant here.
26  Similarly, the Louisiana Attorney General does not cite to any general statutory or legal prohibition
27  on the Louisiana Attorney General's representing the state agencies in this matter for purposes of
28  discovery.

United States District Court
Northern District of California

1    The Louisiana Attorney General's role as counsel for the agencies at issue inherently

2    involves obtaining necessary documents for effective representation in litigation.  In acting as

3    counsel, the Louisiana Attorney General would necessarily have access to and thus control over the

4    relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at

5    *5–6 (finding state Attorney General has control over agency documents "based on his broad

6    statutory and common law powers to control and manage legal affairs on behalf of state agencies,

7    has a legal right to obtain responsive documents from the state agencies referenced in the

8    Complaint").  To the extent the Louisiana Attorney General argues that the Louisiana Attorney

9    General "is an independently elected constitutional officer" from the Louisiana Governor, *see* dkt.

10   738-15 at 2, that argument misapprehends the "legal control" test for documents – the issue is not

11   simply whether one entity is under the day-to-day operational control of the other (such as a parent-

12   wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate

13   (such as two different and separately incorporated entities), but rather whether there is a legal right

14   to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes

15   does not require the party to have actual managerial power over the foreign corporation, but rather

16   that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.

17   Here, the attorney-client relationship between the state Attorney General and the state agencies (a

18   relationship mandated by state law) necessitates close coordination.  While operational control may

19   be a factual situation which demonstrates a legal right to obtain the documents, the absence of such

20   "executive or functional control" is not determinative for evaluating "control" for purposes of

21   discovery.  By definition, the "legal control" issue for discovery arises when there are two legally

22   distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute

23   that party discovery covered that one entity.  As discussed above, courts have found "control" for

24   purposes of discovery where a party is clearly not in managerial control over the third-party, such

25   as a subsidiary having control over the documents of a parent corporation, or an individual

26   government officer having control over the documents of an entire agency.  Thus, arguing that the

27   Louisiana Attorney General "is a separate department under the executive branch," dkt. 738-15 at

28   2, is simply re-stating the issue to be decided, and not determinative of the issue.  The Louisiana

1   Attorney General's argument that these agencies "are legally distinct entities," erroneously conflates

2   the legal control issue with "operational control" or "functional independence" of each entity, and

3   thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

4   *Id.*

5       The Court recognizes that this is a somewhat unusual situation, in which a law enforcement

6   organization, the attorney general, is both a party to the case while also acting or able to act as

7   counsel for a third party.  However, this would not be the first time that a legal services provider, as

8   counsel for a party, is found to have control over third party documents for purposes of discovery.

9   *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena

10  recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida

11  lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas

12  to respond as to responsive materials over which Salas and his law firm had possession, custody or

13  control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control

14  over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not

15  holding broadly that there must be a finding of a legal right of access to and thus control over third

16  party client documents in every case involving a legal services provider as a party; rather, under the

17  particular facts here, and under the totality of circumstances viewed in light of applicable legal

18  standards, the Court finds that control exists here.

19  **XV.   MAINE**

20      In opposition to the control issue, the Maine Attorney General argues primarily the following

21  factors: (1) the Maine Attorney General is a separate entity and independent from the Maine

22  agencies; (2) the Maine Attorney General brought the lawsuit under its own independent law

23  enforcement capacity; and (3) that the statutes which require the Maine Attorney General to

24  represent Maine agencies does not afford the Maine Attorney General control or access to the Maine

25  agencies' documents.  [Dkt. 738-16 at 2].

26      In support of a finding of control with regard to these state agencies' documents, Meta argues

27  based primarily on the following factors: (1) the Maine Attorney General is the chief law officer of

28  the state and that the Maine Attorney General must appear for all Maine agencies in all civil actions

Case 4:23-cv-05448-YGR   Document 170-7   Filed 01/29/25   Page 122 of 801

1   in which the state is a party; (2) Maine agencies are proscriptively barred from obtaining counsel

2   other than the Maine Attorney General without consent from the Maine Attorney General; and (3)

3   the Maine Attorney General has already confirmed that it would represent the identified agencies in

4   responding to a Meta subpoena.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies:

5   Department of Economic & Community Development, Department of Education, Department of

6   Health & Human Services, Division of Administration, and Governor's Office.  *Id.*

7        After considering the factors argued in the briefs, the Court finds that the factors weigh in

8   favor of a finding that the Maine Attorney General does have legal control, for purposes of

9   discovery, over the Maine agencies in dispute.  The Maine Attorney General admits that the Maine

10   Attorney General is "the chief law officer of the State."  Dkt. 738-16 at 2 (quoting *Lund v. Pratt*,

11   308 A.2d 554, 558 (Me. 1973).  The statutory scheme in Maine requires that "[t]he Attorney General

12   or a deputy, assistant or staff attorney ***shall appear*** for the State . . . and agencies of the State in ***all***

13   ***civil actions*** and proceedings in which the State is a party or interested . . . in all the courts of the

14   State and in those actions and proceedings before any other tribunal when requested by the Governor

15   or by the Legislature or either House of the Legislature. All such actions and proceedings ***must*** be

16   prosecuted or defended by the Attorney General or under the Attorney General's direction."  Me.

17   Rev. Stat. tit. 5, § 191(3) (emphasis added).

18        Importantly, the Maine Attorney General's arguments do not negate the fact that (unlike

19   other states) there is no cited law or statute which empowers any of the Maine agencies at issue here

20   to employ or obtain counsel in this matter other than the Attorney General absent consent.  [Dkt.

21   738-13 at 2].  Under Maine's statutory scheme, "***[a]ll legal services*** required by those officers,

22   boards and commissions in matters relating to their official duties ***must be rendered by the Attorney***

23   ***General*** or under the Attorney General's direction. The officers or ***agencies of the State may not***

24   ***act at the expense of the State as counsel, nor employ private counsel*** except upon prior written

25   approval of the Attorney General."  Me. Rev. Stat. tit. 5, § 191(3)(B) (emphasis added).  Here, no

26   such consent has been proffered or even predicted.

27        The Court notes that the State Attorneys General have filed an Administrative Motion to file

28   supplemental information that Meta has recently served an intent to issue subpoenas to various state

agencies, including the Maine the Maine Department of Education and the Maine Department of Health & Human Services. [Dkt. 1031-4 at 550–633]. Significantly, the Maine Attorney General has confirmed that its office will definitely represent all of the state agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 15]. Accordingly, it appears that under the statutory scheme each agency will be represented by the Maine Attorney General in this matter for discovery. *See* Me. Rev. Stat. tit. 5, § 191(3). Thus, because the Maine Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Maine Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The absence of a general statute that authorizes the Maine Attorney General to access all Maine agencies' documents does not, by itself, mandate a conclusion that the Maine Attorney General lacks control, for the purposes of discovery, of the documents of the listed Maine agencies. The Maine Attorney General's argument that the absence of a statute denying "control of agency documents cannot equate to a conclusion that he [the Maine Attorney General] does have such control" misconstrues the legal control test – the absence or existence of a statute is not by itself "equating to a conclusion" or outcome determinative. To the extent a statute exists or is lacking is, however, a factor for the Court to consider, along with the other factors discussed herein.

With regard to statutory authorization to access documents, the situation in Maine is not as simplistic as the Maine Attorney General posits. First, the Maine Attorney General admits that agencies are sometimes expressly required by local law to provide records to the Attorney General. Dkt. 738-16 at 2 (citing Me. Rev. Stat. tit. 9-B, § 226(2)). Indeed, the cited statute requires the Maine Superintendent of Financial Institutions to disclose information upon written request by the Maine Attorney General. *See* Me. Rev. Stat. tit. 9-B, § 226(2). The Maine Attorney General's argument that "[c]ertain documents maintained by these agencies are confidential by statute" incorrectly equates "confidentiality" with a restriction on the Attorney General's right to access these documents as counsel for the agencies at issue. Dkt. 738-16 at 2 (citing Me. Rev. Stat. tit. 22, § 4008)). First, this cited statute relates to the Maine Department of Health and Human Services,

and thus is inapplicable to any of the other state agencies at issue. *See* Me. Rev. Stat. tit. 22, § 1-A. Second, the cited statute creates confidentiality restrictions preventing public disclosure of documents containing a child's personally identifying information in connection child protective activities and when a child is in the custody or care of that department. Me. Rev. Stat. Title 22, § 4008(1). Finally, and contrary to the Maine Attorney General's argument, the cited statute specifically states that these records "are available" to "legal counsel for the department" and thus the cited statute actually provides the Maine Attorney General an explicit legal right to obtain and access these documents of the Maine Department of Health and Human Services (one of the agencies at issue here) when acting as counsel for that agency. The Court thus finds that Title 22, § 4008(1) directly satisfies *Citric Acid*'s requirement of a showing of a legal right to access the documents of that state agency.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both counsel for a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Maine Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation. In acting as counsel, the Maine Attorney General would necessarily have access to and thus control over the

United States District Court
Northern District of California

1    relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at

2    *5–6 (finding state Attorney General has control over agency documents "based on his broad

3    statutory and common law powers to control and manage legal affairs on behalf of state agencies,

4    has a legal right to obtain responsive documents from the state agencies referenced in the

5    Complaint").

6          To the extent the Maine Attorney General argues that the Maine Attorney General "has a

7    unique role in Maine government, distinct from the executive branch," *see* dkt. 738-16  at 2, that

8    argument misapprehends the "legal control" test for documents – the issue is not simply whether

9    one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-

10   subsidiary relationship), and not simply whether the two entities are legally separate (such as two

11   different and separately incorporated entities), but rather whether there is a legal right to obtain the

12   documents as explained by *Citric Acid*.  While the Maine Attorney General is a separate entity and

13   brought the instant action in the exercise of "independent authority," dkt. 738-16 at 2, that fact alone

14   does not outweigh the implications flowing from the fact that the Maine Attorney General will act

15   as the agencies' counsel.  "'The control analysis for Rule 34 purposes does not require the party to

16   have actual managerial power over the foreign corporation, but rather that there be close

17   coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-

18   client relationship between the state Attorney General and the state agencies (a relationship

19   mandated by state law) necessitates close coordination.  While operational control may be a factual

20   situation which demonstrates a legal right to obtain the documents, the absence of such "executive

21   or functional control" is not determinative for evaluating "control" for purposes of discovery.  By

22   definition, the "legal control" issue for discovery arises when there are two legally distinct or

23   separate entities – otherwise, if only one entity were involved, there would be no dispute that party

24   discovery covered that one entity.  As discussed above, courts have found "control" for purposes of

25   discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary

26   having control over the documents of a parent corporation, or an individual government officer

27   having control over the documents of an entire agency.  Thus, arguing that "the agencies that Meta

28   has identified are administered by the Governor or officials she appoints.  The autonomy of the

[Maine] Attorney General from these officials and agencies is well-settled," dkt. 738-14 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Maine Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

The Maine Attorney General's argument that "[w]hen acting as counsel to an agency, he [the Maine Attorney General] has no more legal control of client documents than Meta's lawyers have of Meta's documents," is a variation on the argument rejected above (such as in the discussion of this issue with regard to California) that lawyers are somehow helpless or absolved of all duty to supervise and, if necessary, directly obtain documents from clients for discovery. *Id.* Contrary to the Maine Attorney General's argument "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Federal Rules of Civil Procedure contemplate and require that counsel take proactive steps, without the need for constant court intervention, to comply with and collaborate on discovery, including taking appropriate steps to collect (or supervise the collection) of documents from clients. The system for rational and reasonable discovery and disclosures under the Federal Rules would fall apart if lawyers were simply relieved of any legal duty or obligations to obtain documents for production in discovery from their clients. As discussed above, that legal duty is jurally related to and logically another facet of a legal right to obtain documents. Here, where the law requires the state Attorney General to represent the agencies at issue (and where the state Attorney General has confirmed that representation in this matter), there is no basis to avoid those obligations and their attendant legal rights.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the

1   opposing party there.  *Id.* at 356 n.5.  In that case, Maine is identified as one of the States which

2   reached agreement on the state agency control issue without requiring that court to expend resources

3   resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion resolved the

4   control issue against all the remaining objecting states and given that Maine was able to reach a

5   negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that

6   the Maine Attorney General and Meta were unable to reach a negotiated resolution of this dispute.

7   As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences,

8   they should make every effort to work out discovery disputes through reasonable, good faith

9   negotiations between able and experienced counsel, particularly where, as here, there is guidance in

10   precedent on the discovery issue at hand.

11   **XVI.   MARYLAND**

12           In opposition to the control issue, the Maryland Attorney General argues primarily the

13   following factors: (1) the Maryland Attorney General is a separate entity and independent from the

14   Maryland agencies; (2) the Maryland Attorney General brought the lawsuit under its own

15   independent law enforcement capacity; and (3) the Maryland Attorney General would have to utilize

16   public channels in order to obtain documents from the Maryland agencies, which does not amount

17   to control over the Maryland agencies' documents.  [Dkt. 738-17 at 2].

18           In support of a finding of control with regard to these state agencies' documents, Meta argues

19   primarily that Maryland agencies are proscriptively barred from obtaining counsel other than the

20   Maryland Attorney General without Maryland Attorney General approval – with few exceptions not

21   relevant to the listed Maryland agencies.  *Id.* at 3.  Here, Meta seeks discovery from the following

22   agencies: Center for School Safety, Department of Budget and Management, Department of

23   Commerce, Department of Health, Department of Human Services, Governor's Office, Higher

24   Education Commission, and State Department of Education.  *Id.*

25           After considering the factors argued in the briefs, the Court finds that the factors weigh in

26   favor of a finding that the Maryland Attorney General has legal control, for purposes of discovery,

27   over the Maryland agencies in dispute.  While the Maryland Attorney General is a separate entity

28   and while the Maryland Attorney General does bring the instant action exercising its own

1   independent authority, this does not outweigh the fact that the Maryland Attorney General will act

2   as the agencies' counsel.  First, the Maryland "Attorney General has general charge of the legal

3   business of the State." Md. Code, State Gov't § 6-106(a).  Second, the statutory scheme in Maryland

4   requires that "[t]he Attorney General is the legal adviser of and ***shall*** represent and otherwise

5   perform ***all of the legal work*** for each officer and ***unit of the State government***." Md. Code, State

6   Gov't § 6-106(b) (emphasis added).  Specific Maryland statutory schemes for agencies echo and

7   reinforce that the Maryland Attorney General is the legal representative for each of those agencies,

8   including agencies at issue here. *See e.g.*, Md. Code, Health-Gen. § 2-107 ("The Attorney General

9   is legal adviser to the Department [of Health]."); Md. Code, Econ. Dev. § 2-116 (Department of

10  Commerce); Md. Code, Human Serv. § 2-208 (Department of Human Services).  The Maryland

11  Constitution makes clear that the Governor is also to be represented by the Maryland Attorney

12  General.  Md. Const. art. 5, § 3(d) ("The Governor may not employ additional counsel [other than

13  the Maryland Attorney General], in any case whatever, unless authorized by the General

14  Assembly.").

15        Importantly, the Maryland Attorney General's arguments do not negate the fact that (unlike

16  other states) there is no cited law or statute which empowers any of the Maryland agencies at issue

17  here to employ or obtain counsel in this matter other than the Attorney General absent consent.

18  [Dkt. 738-13 at 2].  Agencies in Maryland may not employ other counsel without the Maryland

19  Attorney General's approval, and there is no such approval in the record.  Md. Code, State Gov't

20  § 6-106(c).  The Court notes that the State Attorneys General have filed an Administrative Motion

21  to file supplemental information that Meta has recently served an intent to issue subpoenas to various

22  state agencies, including the Maryland Center for School Safety and the Maryland Department of

23  Human Services.  [Dkt. 1031-4 at 634–717].  Neither of these state agencies are allowed to employ

24  legal counsel other than the Maryland Attorney General absent consent and thus by statute each will

25  likely be represented by the Maryland Attorney General in this matter for discovery. *See* Md. Code,

26  State Gov't. § 6-106(c). This arrangement indicates strongly that the state Attorney General, in

27  fulfilling its role as the legal adviser of each unit of the State government, would necessarily and

28  inherently have access to and control over the necessary documents for effective legal representation

1    of these state agencies.  Therefore, the Court concludes that the Maryland Attorney General has

2    legal control, for the purposes of discovery, over the documents held by the Maryland agencies

3    listed by Meta, including in particular the three agencies recently listed in the intent to issue

4    subpoenas.

5            Indeed, the Maryland Attorney General confirmed that its office could represent all of the

6    Maryland agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

7    [Dkt. 738-1 at 15–16].  Accordingly, it appears that under the statutory scheme each agency will

8    likely be represented by the Maryland Attorney General in this matter for discovery.  *See* Md. Code,

9    State Gov't. § 6-106.  Thus, because the Maryland Attorney General will likely be involved in

10   representing these state agencies in any event in this case, whether to respond to subpoenas or to

11   respond to party discovery.

12           Relatedly, the Maryland Attorney General has taken the position that communications

13   between the Maryland Attorney General and these state agencies would be covered by the attorney-

14   client privilege if such agencies are represented by the Maryland Attorney General.  [Dkt. 738-17

15   at 2].  To the extent that the Maryland Attorney General has attempted to subdivide its own office

16   between the enforcement team in this case and other attorneys within the Office of the State Attorney

17   General in order to somehow argue that the scope of attorney-client privilege is limited only to some

18   parts of the State Attorney General's office but not to other teams, that argument is not supported

19   by citation to law and is contrary to the weight of legal authority.  *Id.* at 2 n.2.  The scope of attorney-

20   client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-

21   client privilege) encompasses the entirety of a legal services organization due to well-known rules

22   of imputation of confidences to a legal services organization, including a public law office.  *See,*

23   *e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the

24   principle of loyalty to the client extends beyond the individual attorney and applies with equal force

25   to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed

26   disqualification,' . . . requires disqualification of all members of a law firm when any one of them

27   practicing alone would be disqualified because of a conflict of interest . . . .  The rule of imputed

28   disqualification applies to both private firms and public law firms such as a district attorney's office

United States District Court
Northern District of California

United States District Court
Northern District of California

1    or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also*

2    *Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the

3    general rule, and that we should presume knowledge is imputed to all members of a tainted

4    attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a

5    rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of

6    government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also*

7    *Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened

8    from any direct or indirect participation in the matter," vicarious disqualification of entire office

9    denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining

10   prosecutors' office but "the entire office in which that attorney works is not disqualified as long as

11   the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office

12   is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening

13   procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private

14   law firms and impute shared confidences among lawyers of the entire public law entity.  Even in

15   jurisdictions which do not automatically impute disqualification, and shared confidences, to an

16   entire public law office, those courts recognize that ethical screening or other procedures are

17   required out of recognition that actual (as opposed to imputed) sharing of confidences may occur

18   and such procedures are required to avoid dissemination of attorney-client privileged

19   communications within an entire public law organization.  This review of case law demonstrates

20   that no courts support the Maryland Attorney General's argument that different individual lawyers

21   in the Maryland Attorney General's office have *ex ante* separable, discrete attorney-client

22   relationships.

23        The Court rejects the Maryland Attorney General's attempt to simultaneously disclaim the

24   existence of an attorney-client privilege as between the "team" of attorneys currently working on

25   this case, while apparently attempting to preserve the ability to assert that the privilege applies to

26   communications between other lawyers in the Maryland Attorney General's Office and these

27   agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these

28   legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.  To the extent the Maryland Attorney General is asserting that the attorney-client privilege would apply to communications between the Maryland Attorney General's office and the agencies at issue, that further supports the conclusion of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.  Just as the *Perez* Court rejected the inconsistent approach to privilege there, here the Maryland Attorney General argues that "[t]he [Maryland Attorney General] attorneys that are counsel to independent state agencies are distinct from the [Maryland Attorney General] attorneys who are working on the instant matter.  The [Maryland Attorney General] attorneys comprising the enforcement team do not have an attorney-client relationship with any independent state agencies."  [Dkt 738-18 at 2 n.2].  The Maryland Attorney General's attempt to preserve the ability to assert the attorney-client privilege between the Maryland Attorney General's office and the agencies at issue further supports the conclusion of control.  It is illusory to argue that individual attorneys within the Maryland Attorney General's office have their own separate attorney-client relationships with the state agencies.  The Maryland Attorney General has already confirmed that their office could do so for discovery in this matter.  [Dkt. 738-1 at 13].  Assertion of the attorney client privilege requires, as a prerequisite, the existence of an attorney-client relationship and here the individual attorneys within the Maryland Attorney General's office are not treated like solo practitioners.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Maryland Attorney General from accessing the documents of the state agencies at issue for purposes of discovery.  The Maryland Attorney General's argument that the Maryland Attorney General must use either the Maryland Public Information Act, Md. Code, Gen. Prov. §§ 4-101 through 4-601, or a subpoena to obtain documents from state agencies who are their client is not a credible interpretation of the Maryland Public Information Act – there is no citation that a public records request is the only way for the Maryland Attorney General to get documents from state agencies they are representing in litigation.  [Dkt. 738-8 at 2].  If the Maryland Attorney General were correct,

then the Maryland Attorney General would have to submit a Public Information Act request every time they represent a state agency, to get documents from its own client - which is not merely impractical and not believable but also contrary to the principles of effective legal representation. As counsel, the Maryland Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved. The Maryland Public Information Act is not an impediment to that access, because that Act only applies to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents). Md. Code, Gen. Prov. § 4-103. Further, the Maryland Public Information Act nowhere states that this statute is the only means by which the Maryland Attorney General can obtain records from other state agencies – the statute merely sets up a permissive system for public inspection, not a restriction or limitation on access. Indeed, the Maryland Attorney General has cited no precedent requiring the Maryland Attorney General to use either a Public Information Act request or a subpoena to obtain documents from state agencies represented in litigation by the Maryland Attorney General. The Court finds this argument to be wholly unpersuasive. Finally, the argument that there is no statute specifically authorizing the Maryland Attorney General to obtain documents from state agencies assumes an overly restrictive view of the control test for documents. [Dkt. 738-17 at 2]. To the contrary, courts have recognized that control for purposes of document discovery is liberally construed. *E.g.*, *Miniace*, 2006 WL 335389, at *1; *Evans*, 2010 WL 1136216, at *1–2; *Inland Concrete Enterprises, Inc.*, 2011 WL 13209239, at *3–4.

The Maryland Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Maryland Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the

Complaint").  To the extent the Maryland Attorney General argues that "the [Maryland] Attorney General has no control over the state agencies previously identified by Meta, as typically, Maryland state agencies are part of the Executive Department and they report to the Governor," *see* dkt. 738-17 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  *See, e.g.*, *Diven v. Souders*, No. 1:21-CV-01276-BAH, 2024 WL 184345, at *3 (D. Md. Jan. 17, 2024) (finding named defendants (correctional officers) have control over documents of Maryland Department of Public Safety & Correctional Services).  Thus, arguing that the Maryland "Attorney General and the Governor are separate constitutional officers," dkt. 738-17 at 2, is simply re-stating the issue to be decided, and not determinative of the issue.  The Maryland Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Finally, the Maryland Attorney General does not cite any statutory or legal prohibition on the Maryland Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

## XVII.  MICHIGAN

In opposition to the control issue, the Michigan Attorney General argues primarily the following factors: (1) the Michigan Attorney General is a separate entity and independent from the Michigan agencies; and (2) the Michigan Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-18 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Michigan Attorney General must act as counsel for the Michigan agencies. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Education, Department of Health and Human Services, Department of Labor and Economic Opportunity, Department of Lifelong Education, Advancement, and Potential, Executive Office of the Governor, and State Budget Office. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in

131

United States District Court
Northern District of California

favor of a finding that the Michigan Attorney General does have legal control, for purposes of discovery, over the listed Michigan agencies. While the Michigan Attorney General is a separate entity and while the Michigan Attorney General does bring the instant action exercising its own independent authority, this does not outweigh the fact that the Michigan Attorney General will act as the agencies' counsel. First, the Michigan Attorney General admits that "[t]he Attorney General serves as counsel to the Governor and state agencies." Dkt. 738-17 at 2 (citing Mich. Comp. Laws § 14.28 ("The attorney general shall prosecute and defend all actions in the supreme court, in which the state shall be interested, or a party[.]"). Under Michigan's statutory scheme, "the attorney general shall also, when requested by the governor, or either branch of the legislature, and may, when in his own judgment the interests of the state require it, intervene in and appear for the people of this state in any other court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested." Mich. Comp. Laws § 14.28. As the Michigan Court of Appeals noted, "[u]nder our scheme of laws, the ***attorney general has the duty*** as a constitutional officer possessed with common law as well as statutory powers and duties ***to represent*** or furnish legal counsel to many interests-the State, ***its agencies***, the public interest and others designated by statute." *Att'y Gen. v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d 16, 29 (Mich. Ct. App. 2000) (quoting *State ex rel. Allain v. Mississippi Pub. Serv. Comm'n*, 418 So. 2d 779, 783 (Miss. 1982)) (emphasis added).

Importantly, the Michigan Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Michigan agencies at issue here to employ or obtain counsel in this matter other than the Attorney General absent consent. [Dkt. 738-13 at 2]. The Michigan Attorney General has the mandatory duty to defend agencies in Michigan in all suits relating to matters connected with their departments upon request of the Governor. Mich. Comp. Laws, § 14.29. Indeed, the Michigan Attorney General confirmed that its office could represent all of the Michigan agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 16–17]. Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Michigan Attorney General in this matter for discovery. *See* Mich. Comp. Laws, § 14.29. Thus, because the Michigan Attorney

1    General will likely be involved in representing these state agencies in any event in this case, whether

2    to respond to subpoenas or to respond to party discovery.

3         Relatedly, the Michigan Attorney General has taken the position that communications

4    between the Michigan Attorney General and these state agencies are subject to the attorney-client

5    privilege (with no limitations as to time frame). [Dkt. 738-18 at 2]. By definition, an attorney-client

6    relationship is a prerequisite to assertion of the attorney-client privilege. *See Graf*, 610 F.3d at 1156.

7    Thus, the Michigan Attorney General's admission that it has an existing (indeed pre-existing)

8    attorney-client relationship with the agencies at issue lends further support for a finding of a legal

9    right of access and thus control over the documents of these state agencies.

10        The Court recognizes that this is a somewhat unusual situation, in which a law enforcement

11   organization, the attorney general, is both a party to the case while also acting or able to act as

12   counsel for a third party. However, this would not be the first time that a legal services provider, as

13   a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*,

14   *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients

15   and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . .

16   . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond

17   as to responsive materials over which Salas and his law firm had possession, custody or control.").

18   Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over

19   documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. Here, the Michigan Attorney

20   General admits that "to the extent the Attorney General has any 'control' over a listed state agency,

21   it is exclusively in the attorney-client context." [Dkt. 738-18 at 2]. The Court is not holding broadly

22   that there must be a finding of a legal right of access to and thus control over third party client

23   documents in every case involving a legal services provider as a party; rather, under the particular

24   facts here, and under the totality of circumstances viewed in light of applicable legal standards, the

25   Court finds that control exists here.

26        The Michigan Attorney General's likely role as counsel for the agencies at issue would

27   inherently involve obtaining necessary documents for effective representation in litigation. In acting

28   as counsel, the Michigan Attorney General would necessarily have access to and thus control over

United States District Court
Northern District of California

the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Michigan Attorney General argues that the "the [Michigan] Attorney General has no relevant authority to direct state agencies' conduct, all of which conduct falls under the Governor's constitutionally distinct purview," *see* dkt. 738-18 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. *See Williams*, 2022 WL 22859198, at *2 (finding named defendants, corrections officers, have control over third-party agency Michigan Department of Correction (MDOC) documents, noting that: "Here, Defendants are represented by the Michigan Attorney General, which has demonstrated access to [third-party agency] MDOC documents and materials in many cases before this Court."). Thus, arguing that the "[Michigan] Governor—and

the agencies she oversees—are not under the [Michigan] Attorney General's authority," dkt. 738-18 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Michigan Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Indeed, at least one other federal court has previously found that the Michigan Attorney General has legal control over Michigan state agency materials. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Michigan Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Michigan, this Court is disappointed that the Michigan Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XVIII. MINNESOTA

In opposition to the control issue, the Minnesota Attorney General argues primarily the following factors: (1) the Minnesota Attorney General is a separate entity and independent from the Minnesota agencies; (2) the Minnesota Attorney General brought the lawsuit under its own independent law enforcement capacity; (3) the Minnesota agencies would create a "virtual veto" over the Minnesota Attorney General's independent responsibilities to bring enforcement actions; (4) the Minnesota agencies are not required to use the Minnesota Attorney General as legal counsel; (5) Minnesota agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records; (6) the Minnesota Attorney General may not able to obtain non-

1    public data from Minnesota agencies unless specifically authorized by statute or federal law; and

2    (7) the Minnesota Attorney General would have to utilize public channels in order to obtain

3    documents from the Minnesota agencies.  [Dkt. 738-19 at 2].

4        In support of a finding of control with regard to these state agencies' documents, Meta argues

5    primarily that Minnesota agencies are proscriptively barred from obtaining counsel other than the

6    Minnesota Attorney General without consent from the Minnesota Governor or if the Minnesota

7    Attorney General is an adverse party.  *Id.* at 3.  Here, Meta seeks discovery from the following

8    agencies: Department of Commerce, Department of Health, Department of Human Services,

9    Education Department, Employment and Economic Development Department, Governor's Office,

10   Office of Higher Education, and Department of Management and Budget.  *Id.*

11       The Court finds that the Minnesota Attorney General has control, for the purposes of

12   discovery, of the listed Minnesota agencies.  While the Minnesota Attorney General is a separate

13   entity and while the Minnesota Attorney General does bring the instant action exercising its own

14   independent authority, this does not outweigh the fact that the Minnesota Attorney General will act

15   as the agencies' counsel.  Under Minnesota's statutory scheme, "[t]he attorney general ***shall*** act as

16   the attorney for all state officers and ***all boards or commissions*** created by law in all matters

17   pertaining to their official duties."  Minn. Stat. § 8.06 (emphasis added).  Minnesota law requires

18   that "[t]he attorney general ***shall appear*** for the state in all causes in the supreme and ***federal courts***

19   wherein the state is directly interested."  Minn. Stat. § 8.01 (emphasis added).  Absent exceptions

20   which are not present or shown to exist here, "no additional counsel shall be employed and the legal

21   business of the state shall be performed exclusively by the attorney general and the attorney

22   general's assistants."  *Id.*

23       Importantly, the Minnesota Attorney General's arguments do not negate the fact that (unlike

24   other states) there is no cited law or statute which empowers any of the Minnesota agencies at issue

25   here to employ or obtain counsel in this matter other than the Attorney General absent consent.

26   [Dkt. 738-13 at 2].  Even in exceptional circumstances where different counsel may be employed,

27   "the ***attorney general*** shall thereupon be authorized to employ such counsel" and not the agencies.

28   Minn. Stat. § 8.06 (emphasis added).  Indeed, the Minnesota Attorney General confirmed that its

United States District Court
Northern District of California

office could represent all of the Minnesota agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 17–18]. Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Minnesota Attorney General in this matter for discovery. *See* Minn. Stat. §§ 8.01, 8.06. Thus, because the Minnesota Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Minnesota Attorney General has taken the position that, "to the extent a separate division" of the Attorney General's office "may be engaged by an agency," communications between the Minnesota Attorney General and these state agencies are subject to the attorney-client privilege. [Dkt. 738-19 at 2]. To the extent the Minnesota Attorney General has attempted to subdivide its own office between the "CP Section" of attorneys currently prosecuting this case and other attorneys within the state Attorney General in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Attorney General's office but not other teams, that argument is not supported by citation to law and is contrary to the weight of law. *Id.* The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . . The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of

Case 4:23-cv-05448-YGR   Document 170-7   Filed 01/29/25   Page 341 of 801

1    imputed knowledge in the context of government attorneys, which presumption could be rebutted

2    by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government

3    lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious

4    disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer

5    disqualified when joining prosecutors' office but "the entire office in which that attorney works is

6    not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of

7    the entire prosecuting office is not necessary absent special facts, such as a showing of actual

8    prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public

9    legal service organizations like private law firms and impute shared confidences among lawyers of

10   the entire public law entity.   Even in jurisdictions which do not automatically impute

11   disqualification, and shared confidences, to an entire public law office, those courts recognize that

12   ethical screening or other procedures are required out of recognition that actual (as opposed to

13   imputed) sharing of confidences may occur and such procedures are required to avoid dissemination

14   of attorney-client privileged communications within an entire public law organization.  This review

15   of case law demonstrates that no courts support the Minnesota Attorney General's argument that

16   different individual lawyers in the Minnesota Attorney General's office have *ex ante* separable,

17   discrete attorney-client relationships.

18        The Court rejects the Minnesota Attorney General's attempt to simultaneously disclaim the

19   existence of an attorney-client privilege as between the "team" of attorneys currently working on

20   this case, while apparently attempting to preserve the ability to assert that the privilege applies to

21   communications between other lawyers in the Minnesota Attorney General's Office and these

22   agencies.   "[T]o to the extent that [the State] asserts an attorney-client privilege with these

23   legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

24   that on one hand the [State] Attorney General represents these individuals, but that for discovery

25   purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*,

26   2014 WL 1796661, at *2.  To the extent the Minnesota Attorney General is asserting that the

27   attorney-client privilege would apply to communications between the Minnesota Attorney General's

28   office and the agencies at issue, that further supports the conclusion of control here.  Assertion of

United States District Court
Northern District of California

the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156. Just as the Court in *Perez* rejected the inconsistent approach to privilege there, here the Minnesota Attorney General argues that "[t]o the extent a separate [Minnesota Attorney General] division (walled-off from the CP Section) may be engaged by an agency to provide legal services, communications between the agency and that separate [Minnesota Attorney General] division would likely be privileged." [Dkt 738-19 at 2]. The Minnesota Attorney General's attempt to preserve the ability to assert the attorney-client privilege between the Minnesota Attorney General's office and the agencies at issue further supports the conclusion of control here. Here, it is illusory to argue that sub-teams attorneys within the Minnesota Attorney General's office have their own separate attorney-client relationships with the state agencies. The Minnesota Attorney General has already confirmed that their office could represent these agencies for discovery in this matter. [Dkt. 738-1 at 13]. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. Here, the Minnesota Attorney General admits that "to the extent the Attorney General has any 'control' over a listed state agency, it is exclusively in the attorney-client context." [Dkt. 738-18 at 2]. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    particular facts here, and under the totality of circumstances viewed in light of applicable legal

2    standards, the Court finds that control exists here.

3       The Minnesota Attorney General's likely role as counsel for the agencies at issue would

4    inherently involve obtaining necessary documents for effective representation in litigation. In acting

5    as counsel, the Minnesota Attorney General would necessarily have access to and thus control over

6    the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934,

7    at \*5–6 (finding state Attorney General has control over agency documents "based on his broad

8    statutory and common law powers to control and manage legal affairs on behalf of state agencies,

9    has a legal right to obtain responsive documents from the state agencies referenced in the

10    Complaint"). To the extent the Minnesota Attorney General argues that the "Minnesota's Governor

11    and [Minnesota Attorney General] operate as independent elected officials under the state

12    constitution," *see* dkt. 738-19 at 2, that argument misapprehends the "legal control" test for

13    documents – the issue is not simply whether one entity is under the day-to-day operational control

14    of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the

15    two entities are legally separate (such as two different and separately incorporated entities), but

16    rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The

17    control analysis for Rule 34 purposes does not require the party to have actual managerial power

18    over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude*

19    *Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state

20    Attorney General and the state agencies (a relationship mandated by state law) necessitates close

21    coordination. While operational control may be a factual situation which demonstrates a legal right

22    to obtain the documents, the absence of such "executive or functional control" is not determinative

23    for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for

24    discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity

25    were involved, there would be no dispute that party discovery covered that one entity. As discussed

26    above, courts have found "control" for purposes of discovery where a party is clearly not in

27    managerial control over the third-party, such as a subsidiary having control over the documents of

28    a parent corporation, or an individual government officer having control over the documents of an

United States District Court
Northern District of California

1    entire agency.  Thus, arguing that "[o]nly the Governor can compel agencies to act—including

2    searching for and producing documents in their possession, custody, or control—because the

3    [Minnesota] Governor, *not the [Minnesota Attorney General]*, has the authority to appoint agency

4    commissioners who serve at the Governor's pleasure," dkt. 738-19 at 2 (emphasis in original), is

5    simply re-stating the issue to be decided, and not determinative of the issue.  The Minnesota

6    Attorney General's arguments erroneously conflate the legal control issue with "operational

7    control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of

8    legal control of the documents for purposes of discovery.

9         Further, there is no statutory, legal, or administrative rule cited which prohibits the

10   Minnesota Attorney General from accessing the documents of the state agencies at issue for

11   purposes of discovery.  The Minnesota Attorney General's argument that "each agency has control

12   over its own data" and that therefore the Minnesota Attorney General must issue a public data

13   request or a subpoena to obtain data from state agencies who are their client is not a credible

14   interpretation of Minnesota law.  Dkt. 738-19 at 2 (citing Minn. Stat. § 13.05(9)).  There is no

15   citation to law holding that a public records request is the only way for the Minnesota Attorney

16   General to get documents from state agencies they are representing in litigation.  [Dkt. 738-19 at 2].

17   If the Minnesota Attorney General were correct, then the Minnesota Attorney General would have

18   to submit a Public Information Act request every time they represent a state agency, to get

19   documents from its own client – which is not merely impractical and not believable but also contrary

20   to the principles of effective legal representation.  As counsel, the Minnesota Attorney General will

21   have the normal type of direct access to the necessary documents from its own clients, without

22   resorting to public channels, ensuring efficient and comprehensive legal support for the agencies

23   involved.  The cited Minnesota statute on Data Practices is not an impediment to that access, because

24   that statute only applies to data which are to be produced for public inspection (and not for purposes

25   of litigation such as this case in which there is a Protective Order limiting public availability of

26   confidential documents).  Minn. Stat. § 13.01.  Further, the Minnesota statute nowhere states that

27   this statute is the only means by which the Minnesota Attorney General can obtain records from

28   other state agencies – the statute merely sets up a permissive system for public inspection, not a

1   restriction or limitation on access.  Indeed, the Minnesota Attorney General has cited no precedent

2   requiring the Minnesota Attorney General to use either a public request or a subpoena to obtain

3   documents from state agencies represented in litigation by the Minnesota Attorney General.  The

4   Court finds this argument to be wholly unpersuasive.

5       Significantly, the Minnesota Attorney General ignores that this public data statute

6   specifically exempts attorneys collecting data when those attorneys are acting as counsel for a

7   government entity, and the statute specifically mandates that such attorneys' uses and collections of

8   data from agencies are governed by statutes, rules, and professional responsibility standards for

9   discovery instead.  Minn. Stat. § 13.393 ("Notwithstanding the provisions of this chapter and section

10  15.17, the use, collection, storage, and dissemination of data by an attorney acting in a professional

11  capacity for a government entity shall be governed by statutes, rules, and professional standards

12  concerning discovery, production of documents, introduction of evidence, and professional

13  responsibility[.]").  The Minnesota statutory scheme thus directly provides the Minnesota Attorney

14  General an explicit legal right to obtain and access documents from the agencies at issue pursuant

15  to the normal rules and statutes for discovery, when acting as counsel for those agencies.  The Court

16  thus finds that Minn. Stat. § 13.393 directly satisfies *Citric Acid*'s requirement of a showing of a

17  legal right to access the documents of the state agencies at issue.

18      The Court rejects the Minnesota Attorney General's argument that there is no law "that

19  grants the [Minnesota Attorney General] blanket authority to obtain agency documents upon

20  demand" in light of this statute and in light of the fact that the control test under *Citric Acid* does

21  not require "blanket authority."  [Dkt. 738-19 at 2].

22      Next, the Minnesota Attorney General argues that "[r]equiring the [Minnesota Attorney

23  General] to produce agency documents would upend the constitutional division of powers because

24  the [Minnesota] Governor would be able to impermissibly control the [Minnesota Attorney

25  General's] litigation by, for example, instructing agencies to refuse to produce documents."  [Dkt.

26  738-19 at 2].  This is the same "virtual veto" argument advanced by several other states' Attorneys

27  General and discussed above.  As explained previously, the Court finds the "virtual veto" argument

28  to be speculative and unpersuasive.  This argument is based on an unfounded assumption that the

United States District Court
Northern District of California

Governor and state agencies would inexplicably obstruct a state's attorney general's independent law enforcement responsibilities. This argument rests entirely on an unreasonable, unfounded, hypothetical assumption that, despite this Court issuing an Order finding control, the Governor and state agencies would simply refuse to provide documents based on nothing more than an obstinate and unreasoned disagreement. The Minnesota Attorney General presented no facts, no affidavits, no prior examples of state agency refusals, and no testimony to support this feared response by the Governor or state agencies. Contrary to the unfounded assumption that state agencies will refuse to provide documents, the Court presumes, instead, that parties (including third parties such as the agencies at issue here) will act reasonably in the face of a court Order and will comply with the Federal Rules of Civil Procedure. The argument also directly contradicts the well-established legal principle and statutory scheme that a state attorney general, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.

## XIX.   MISSOURI

In opposition to the control issue, the Missouri Attorney General argues primarily the following factors: (1) the Missouri Attorney General is a separate entity and independent from the Missouri agencies; (2) the Missouri Attorney General brought the lawsuit under its own independent law enforcement capacity; (3) the Missouri Attorney General does not seeking relief on behalf of the Missouri agencies; (4) Missouri agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records; and (5) under Missouri case law, Missouri agencies are not required to produce records of another agencies and it is prohibited from disseminating records of any agency other than its own records. [Dkt. 738-20 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Missouri Attorney General is tasked with appearing in and defending any proceeding or tribunal in which the state's interests are involved. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Economic Development, Department of Elementary and Secondary Education, Department of Health and Senior Services, Department of Higher Education & Workforce Development, Department of Mental Health, Department of Social Services, Office of Administration, Office of the Child Advocate, and Governor's Office. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Missouri Attorney General has legal control, for purposes of discovery, over the documents of the listed Missouri agencies. While the Missouri Attorney General is a separate entity and while the Missouri Attorney General does bring the instant action exercising its own independent authority, this does not outweigh the fact that the Missouri Attorney General will act as the agencies' counsel. First, the Missouri Attorney General "may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved." Mo. Stat. § 27.060. It is self-evident that, when a Missouri agency is the subject or target of discovery, the state's interests are involved.

Importantly, the Missouri Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Missouri agencies at issue here to employ or obtain counsel in this matter other than the Attorney General. [Dkt. 738-13 at 2]. Indeed, under Missouri precedent, "[t]he Attorney General is authorized to represent the interests of the State generally." *Fogle v. State*, 295 S.W.3d 504, 510 (Mo. Ct. App. 2009). Indeed, the Missouri Attorney General confirmed that its office could represent all of the Missouri agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 18]. Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Missouri Attorney General in this matter for discovery. *See* Mo. Stat. § 27.060. Thus, because the Missouri Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Missouri Attorney General has taken the position that, "to the extent a separate division" of the Attorney General's office "may be engaged by an agency," communications between the Missouri Attorney General and these state agencies are subject to the attorney-client privilege. [Dkt. 738-20 at 2]. To the extent the Missouri Attorney General has attempted to subdivide its own office between the attorneys currently prosecuting this case and other attorneys within the state Attorney General in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Attorney General's office but not "section counsel," that argument is not supported by citation to law and is contrary to the weight of law. *Id.*

The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . . The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review

1  of case law demonstrates that no courts support the Missouri Attorney General's argument that

2  different individual lawyers in the Missouri Attorney General's office have *ex ante* separable,

3  discrete attorney-client relationships.

4        The Court rejects the Missouri Attorney General's attempt to simultaneously disclaim the

5  existence of an attorney-client privilege as between the attorneys currently working on this case,

6  while apparently attempting to preserve the ability to assert that the privilege applies to

7  communications between other lawyers in the Missouri Attorney General's Office and these

8  agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these

9  legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

10 that on one hand the [State] Attorney General represents these individuals, but that for discovery

11 purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*,

12 2014 WL 1796661, at *2.  To the extent the Missouri Attorney General is asserting that the attorney-

13 client privilege would apply to communications between the Missouri Attorney General's office

14 and the agencies at issue, that further supports the conclusion of control here.  Assertion of the

15 attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.

16 *See Graf*, 610 F.3d at 1156.  Just as the Court in *Perez* rejected the inconsistent approach to privilege

17 there, here the Missouri Attorney General argues that Meta's discovery is "so broad" as to

18 encompass communications between "sections of the [Missouri Attorney General] not participating

19 in this action" (at least, as of the date of this brief) and the agencies, and "there is the possibility that

20 those agencies, in conjunction with their Agency section counsel" could assert privilege.  [Dkt. 738-

21 20 at 2].  The Missouri Attorney General's attempt to preserve the ability to assert the attorney-

22 client privilege between the Missouri Attorney General's office and the agencies at issue further

23 supports the conclusion of control here.  Here, it is not convincing to argue that sub-teams attorneys

24 within the Missouri Attorney General's office have their own separate attorney-client relationships

25 with the state agencies.  The Missouri Attorney General has already confirmed that their office could

26 represent these agencies for discovery in this matter.  [Dkt. 738-20 at 18].  Assertion of the attorney-

27 client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*,

28 610 F.3d at 1156.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Further, there is no citation to any statutory or legal prohibition on the Missouri Attorney

2    General's representing the state agencies in this matter for purposes of discovery.  The Court

3    recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the

4    attorney general, is both a party to the case while also acting or able to act as counsel for a third

5    party.  However, this would not be the first time that a legal services provider, as a party, is found

6    to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL

7    691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in

8    this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule

9    34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive

10   materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court

11   has noted that "[i]n general, an attorney is presumed to have control over documents in its client's

12   possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be

13   a finding of a legal right of access to and thus control over third party client documents in every

14   case involving a legal services provider as a party; rather, under the particular facts here, and under

15   the totality of circumstances viewed in light of applicable legal standards, the Court finds that

16   control exists here.

17        The Missouri Attorney General's likely role as counsel for the agencies at issue would

18   inherently involve obtaining necessary documents for effective representation in litigation.  In acting

19   as counsel, the Missouri Attorney General would necessarily have access to and thus control over

20   the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934,

21   at *5–6 (finding state Attorney General has control over agency documents "based on his broad

22   statutory and common law powers to control and manage legal affairs on behalf of state agencies,

23   has a legal right to obtain responsive documents from the state agencies referenced in the

24   Complaint").  To the extent the Missouri Attorney General argues that the "[Missouri Attorney

25   General] is an elected official independent of the [Missouri] Governor," *see* dkt. 738-20 at 2, that

26   argument misapprehends the "legal control" test for documents – the issue is not simply whether

27   one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-

28   subsidiary relationship), and not simply whether the two entities are legally separate (such as two

United States District Court
Northern District of California

different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "[t]he Governor, not the [Missouri Attorney General], has executive control over other state agencies," dkt. 738-20 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Missouri Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Missouri Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The Missouri Attorney General's argument that "an agency is not in possession of another's records, and cannot produce that which it does not possess, it is error to compel one agency to produce another's records" is fundamentally a legally erroneous proposition, because the argument focuses solely on "possession" and presumes incorrectly that Federal Rule of Civil Procedure 34 lacks the word control as a disjunctive basis for requiring party discovery. [Dkt. 738-20 at 2]. The Missouri Attorney General's citation to and reliance on *Bedell* is inapposite. *Id.* (citing *Bedell v. Dir. of Revenue, State of Mo.*, 935 S.W.2d 94, 96 (Mo. Ct. App. 1996)). In *Bedell*, the

state court did not apply any version of the control test applicable under federal law such as *Citric Acid* – instead, the *Bedell* court focused exclusively on state law precedent limited to whether one agency "possessed" the documents of another agency. *Bedell*, 935 S.W.2d at 96. *Bedell* is legally irrelevant to the issue in dispute here, as well as presenting a factually distinguishable scenario.

Indeed, at least one other federal court has previously found that the Missouri Attorney General has legal control over Missouri state agency materials. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Missouri Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Missouri, this Court is disappointed that the Missouri Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XX. MONTANA

In opposition to the control issue, the Montana Attorney General argues primarily the following factors: (1) the Montana Attorney General is a separate entity and independent from the Montana agencies; and (2) the Montana Governor could choose to employ counsel different from the Montana Attorney General. [Dkt. 738-21 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Montana Attorney General is tasked with appearing in and defending any proceeding or tribunal in which the state's interests are involved. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Board of Public Education, Department of Commerce, Department of Public Health and Human Services, Governor's Office, Office of the Commissioner

United States District Court
Northern District of California

of Higher Education, and Office of Public Instruction. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Montana Attorney General has legal control, for purposes of discovery, over the documents of the listed Montana agencies. While the Montana Attorney General is a separate entity and while the Montana Attorney General does bring the instant action exercising its own independent authority, this does not outweigh the fact that the Montana Attorney General has broad authority to act as the agencies' counsel.

First, under the Montana Constitution the Montana Attorney General is the "legal officer of the state and shall have the duties and powers provided by law." Mont. Const. § 4(4). The Montana Supreme Court has held that Montana Court precedent supports the notion that the Montana Attorney has "**broad powers** . . . *as the first legal officer of the state*." *Montana Power Co. v. Montana Dep't of Pub. Serv. Regul.*, 709 P.2d 995, 1002 (Mont. 1985) (citing *State ex rel. Olsen v. Public Service Commission*, 283 P.2d 594 (Mont. 1955) [hereinafter *Olsen*]) (emphasis added). The Montana Supreme Court furthered that "the [Montana] Attorney General not only had the constitutional and statutory powers specifically enumerated for him, but ***broad common law duties***, when not restricted or limited by statute." *Id.* In *Olsen*, the Montana Supreme Court explained in fulsome detail the breadth of the powers of the state Attorney General:

> [T]his court has repeatedly held that the attorney general has common-law powers and duties. The Attorney General is the principal law officer of the state. His duties are general. His authority is co-extensive with public legal affairs of the whole community . . . . The office of Attorney General is of ancient origin. The powers and duties appertaining to it were recognized by the common law, and the common law has been a part of our system of jurisprudence from the organization of Montana territory to the present day . . . . It is the general consensus of opinion that in practically every state of this Union whose basis of jurisprudence is the common law, the office of Attorney General, as it existed in England, was adopted as a part of the governmental machinery, and that in the absence of express restrictions, the common-law duties attach themselves to the office so far as they are applicable and in harmony with our system of government . . . .
>
> The authorities substantially agree that, in addition to those conferred on it by statute, the office is clothed with all of the powers and duties pertaining thereto at common law; and, as the chief law officer of the State, the Attorney General, in the absence of express legislative restriction to the contrary, may exercise all such power and authority

as the public interests may from time to time require. In short, the Attorney General's powers are as broad as the common law unless restricted or modified by statute . . . .

Moreover, it is generally held that the attorney general, in addition to the powers and duties conferred and imposed upon him by statute, is clothed and charged with all the common-law powers and duties pertaining to his office as well, except in so far as they have been expressly restricted. The duties of the office are so numerous and varied that it has not been the policy of the state legislatures to attempt specifically to enumerate them; and it cannot be presumed, therefore, in the absence of an express inhibition, that the attorney general has not such authority as pertained to his office at common law. Accordingly, as the chief law officer of the state, he may, in the absence of some express legislative restriction to the contrary, exercise all such power and authority as public interests may, from time to time, require, and may institute, conduct, and maintain all such suits and proceedings as he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights . . . .

The common-law duties of the attorney general, as chief law officer of the state, when not restricted or limited by statute, are very numerous and varied. In England, the Attorney General was the chief legal adviser of the Crown and was intrusted [sic] with the management of all legal affairs and the prosecution of all suits, civil and criminal, in which the Crown was interested. . . . Such being the nature of the rights and duties that attached to the position at its inception, it is generally held that in the exercise of his common-law powers, an attorney general may not only control and manage all litigation in behalf of the state, but he may also intervene in all suits or proceedings which are of concern to the general public . . . .

Obviously there can be no dispute as to the right of an attorney general to represent the state in all litigation of a public character. The attorney general represents the public and may bring all proper suits to protect its rights.

*Olsen*, 283 P.2d at 598–99 (internal quotations and citations omitted; emphasis added).

It is self-evident that, when a Montana agency is the subject or target of discovery, in a case such as this, such a proceeding is litigation of a public character, involves the public interests, and involves the public legal affairs of the state. *See id.* Indeed, in the complaint here discusses, in several sections, alleged harms to Montana consumers and young Montanans which implicate issues of public character and the public interest. *See, e.g.*, *Montana v. Meta Platforms, Inc.*, No. 24-cv-00805, at Dkt. 1. Further, the multistate complaint expressly states that this action is in the public interest of the Filing States. *See* Multistate Complaint at ¶ 12.

Importantly, the Montana Attorney General's arguments do not negate the fact that (unlike

United States District Court
Northern District of California

other states) there is no cited law or statute which empowers any of the Montana agencies at issue here to employ or obtain counsel in this matter other than the Montana Attorney General.  [Dkt. 738-21 at 2].  Indeed, the Montana Attorney General confirmed that its office could represent all of the Montana agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 19].  Accordingly, it appears that, under the broad common law and constitutional duties of the Montana Attorney General, each agency will likely be represented by the Montana Attorney General in this matter for discovery.  *See* Mont. Const. § 4(4).  Thus, because the Montana Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Montana Attorney General argues that, "[b]ecause the Montana Attorney General's Office does not represent any of the six state entities at issue, its position is that pre-suit communications related to this matter between the [Montana Attorney General's] Office and those entities are not protected by the attorney-client privilege."  [Dkt. 738-21 at 2].  That statement, however, is silent as to (and thus appears artfully drafted to leave open the possibility) whether the Montana Attorney General will assert privilege with respect to post-suit communications.  The Court rejects the Montana Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege for pre-suit communications, while apparently attempting to preserve the ability to assert the privilege applies to post-suit communications.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  To the extent the Montana Attorney General implies its intention to assert that the attorney-client privilege would apply to communications between the Montana Attorney General's office and the agencies at issue, that would further supports the conclusion of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

Further, the Montana Attorney General does not cite any statutory or legal prohibition on

the Montana Attorney General's representing the state agencies in this matter for purposes of discovery. Indeed, the Montana Attorney General admits that "the Attorney General's Office has statutory and common-law responsibility and authority to represent these agencies in certain circumstances." [Dkt. 738-21 at 2]. Under *Olsen*¸ the broad common law power to represent the state's agencies would only be limited by statute – and none is argued here. *Olsen*, 283 P.2d at 599. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Montana Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation. In acting as counsel, the Montana Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Montana Attorney General argues that state Constitution establishes "constitutionally independent executive offices, which are each separately elected and operate with

their own independent constitutional authority—including the Attorney General," *see* dkt. 738-21 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "Montana law provides that state records 'are and remain the property of the public agency possessing the records,'" dkt. 738-21 at 2 (citing Mont. Code § 2-6-1013(1)), focuses on the irrelevant issue of "possession" and ignores the control issue to be decided. The Montana Attorney General's arguments also erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Montana Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The Montana Attorney General's argument that "even where the Attorney General *does* represent a state agency, the Office functions like an ordinary attorney serving its client, and thus

United States District Court
Northern District of California

United States District Court
Northern District of California

must obey the agency's litigation decisions" is essentially the same argument rejected above that counsel is helpless in the face of an intransigent client and somehow has no duties to the Court to work on discovery, including supervising the collection of documents. Dkt. 738-20 at 2 (emphasis in original). Lawyers are not entirely helpless or absolved of all duty to supervise and, if necessary, directly obtain documents from clients for discovery. Contrary to the Montana Attorney General's argument "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Federal Rules of Civil Procedure contemplate and require that counsel take proactive steps, without the need for constant court intervention, to comply with and collaborate on discovery, including taking appropriate steps to collect (or supervise the collection) of documents from clients. The system for rational and reasonable discovery and disclosures under the Federal Rules would fall apart if lawyers were simply relieved of any legal duty or obligations to obtain documents for production in discovery from their clients. As discussed above, that legal duty is jurally related to and logically another facet of a legal right to obtain documents. Here, the Montana Attorney General cites no law which permits them to avoid those obligations and their attendant legal rights.

For those reasons, the Court finds that the factors weigh in favor of a finding that the Montana Attorney General has legal control, for purposes of discovery, over the documents of the listed Montana agencies.

### XXI. NEBRASKA

In opposition to the control issue, the Nebraska Attorney General argues primarily the following factors: (1) the Nebraska Attorney General is a separate entity and independent from the Nebraska agencies; (2) the Nebraska Attorney General brought the lawsuit under its own independent law enforcement capacity; (3) the Nebraska Attorney General does not seek relief on behalf of the Nebraska agencies; and (4) Nebraska avers that "State agencies routinely refuse to provide information to [the Nebraska Department of Justice] Consumer Protection Bureau absent a third-party civil investigative demand, third-party subpoena, or a public records request[.]" [Dkt. 738-22 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues

based primarily on the following factors: (1) under Nebraska law, the Nebraska Attorney General has general control and supervision of all legal business of all Nebraska departments and bureaus, and (2) Nebraska agencies are proscriptively barred from obtaining counsel other than the Nebraska Attorney General without consent from the Nebraska Attorney General or Nebraska Governor. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Children's Commission, Department of Administrative Services, Department of Economic Development, Department of Education, Department of Health and Human Services, and Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Nebraska Attorney General does have legal control, for purposes of discovery, over the listed Nebraska agencies. While the Nebraska Attorney General is a separate entity and while the Nebraska Attorney General does bring the instant action in its own independent authority, this does not outweigh the legal right to access agencies' documents which result from the requirement that the Nebraska Attorney General must statutorily act as the Nebraska agencies' counsel.

Under Nebraska's statutory scheme, the Nebraska Attorney General has "the general control and supervision of all actions and legal proceedings in which the State of Nebraska may be a party or may be interested, and ***shall have charge and control of all the legal business of all departments*** and bureaus of the state, or of any office thereof, which requires the services of attorney or counsel in order to protect the interests of the state." Neb. Rev. Stat. § 84-202 (emphasis added). Additionally, "[t]he [Nebraska] Attorney General is authorized to appear for the state and prosecute and defend, in any court or before any officer, board or tribunal, any cause or matter, civil or criminal, in which the state may be a party or interested." Neb. Rev. Stat. § 84-203.

Further, there is no citation to any statutory or legal prohibition on the Nebraska Attorney General's representing the state agencies in this matter for purposes of discovery. Indeed, under Nebraska law, the Nebraska Attorney General shall "prosecute or defend for the state ***all civil*** or criminal actions and proceedings relating to any matter connected with any of such officers' departments if, after investigation, he or she is convinced there is sufficient legal merit to justify the proceeding" upon "the request of the Governor, head of any executive department, Secretary of

State, State Treasurer, Auditor of Public Accounts, Board of Educational Lands and Funds, State Department of Education, or Public Service Commission." Neb. Rev. Stat. § 84-205(5) (emphasis added). In any such actions, the state agencies "**shall not pay or contract to pay** from the funds of the state **any money for special attorneys** or counselors-at-law unless the employment of such special counsel is made upon the written authorization of the Governor or the Attorney General." *Id.* (emphasis added). The Nebraska statutory scheme makes clear the Nebraska legislature's strong preference that the Nebraska Attorney General represent state agencies in civil matters.

Indeed, the Nebraska Attorney General confirmed that its office could represent all but one of the agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 19–20]. With respect to the one exception (the Nebraska Governor), the briefs and submissions from the Nebraska Attorney General do not explain how (in light of the Nebraska statutory scheme) the Nebraska Governor would not be represented by the Attorney General. The Nebraska cites no statutory or legal provision which bars the Nebraska Attorney General from representing the Nebraska Governor. The Nebraska Attorney General concedes that "[w]hen a Nebraska state agency receives a subpoena, it **may choose** to seek assistance from the [Nebraska Department of Justice] Legal Services and Civil Litigation Bureaus, who can serve as outside counsel for certain agencies." Dkt. 738-22 at 2 (emphasis added). As discussed, no separate counsel has appeared for any Nebraska state agencies, despite the fact that litigation holds have been issued and the agencies have had notice of the pendency of discovery in this matter for some time. Accordingly, based on the statutory scheme and the record before the Court, the Nebraska Attorney General will likely represent these state agencies for purposes of discovery.

As part of the argument stressing the separation of the Attorney General's office from the state agencies, the Nebraska Attorney General relies on a "governmental structure" argument to subdivide the office of the Nebraska Attorney General for purposes of this dispute. Dkt. 738-22 at 2. The Nebraska Attorney General argues that "there is a critical distinction between the [Nebraska Department of Justice] when it acts affirmatively in its capacity as enforcer of state consumer protection law (as it does in this lawsuit) and the [Nebraska Department of Justice] when it acts defensively in its role as outside counsel for state agencies." *Id.* (uncited). The Nebraska Attorney

General argues that the "organizational structure" of the Nebraska Department of Justice "distinguishes between the [Nebraska Department of Justice's] Consumer Protection Burau, which represents the state and state consumers as enforcers of Nebraska's consumer protection laws, and the [Nebraska Department of Justice's] Legal Services and Civil Litigation Bureaus, which advise certain state agencies and occasionally represent them in court." *Id.* The Nebraska Attorney General asserts that these distinctions are germane to this "control" dispute without explaining how or why. Further, the Nebraska Attorney General cites no law which finds these administrative, operational groupings of lawyers within that office as relevant, much less critical, to the determination of "control" under Rule 34.

Consistent with the "structural" argument, the Nebraska Attorney General argues that communications between different sections of the Nebraska Attorney General are ethically walled off where there are conflicts of interest and, on that basis, argues for a finding of no control. [Dkt. 738-22 at 2]. The Nebraska Attorney General cites no law, regulation, or statute which requires the alleged ethical walls between different bureaus within the Attorney General's office to be established in cases such as this Multi-District Litigation, where there is no basis for a conflict of interest to exist between the Attorney General's office and any of the state agencies at issue. The mere citation to the general rule of professional conduct regarding avoiding conflicts of interest is, alone, not persuasive. [Dkt. 738-22 at 2 (citing Neb. R. of Prof. Cond. § 3-501.7)]. The fact that ethical walls were set up in prior (unexplained and uncited) cases, where no affidavit or evidence attests to any ethical wall being set up in this Multi-District Litigation. As discussed, litigation holds have been issued to the state agencies and there has been ample time for ethical walls to be established and for separate counsel to appear, if any were to appear. On the current record before the Court, these "structural" arguments regarding sub-teams within the Nebraska Attorney General's office do not suffice to overcome the finding of "control" for purposes of discovery, much like similar arguments regarding subdividing public law offices do not establish that there are separate, discrete attorney-client relationships within the Nebraska Attorney General's office and the agencies at issue for purposes of this Multi-District Litigation.

To the extent the Nebraska Attorney General has attempted to subdivide its own office

between the prosecution team in this case and other divisions of the state Attorney General in order to somehow argue that there is no "legal control," that argument is not supported by citation to law and is contrary to the weight of law. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.

The Nebraska Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Nebraska Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies,

1   has a legal right to obtain responsive documents from the state agencies referenced in the

2   Complaint"). The fact that there might be different sub-teams or different individual attorneys

3   working on responding to the state agency discovery requests, as compared to the attorneys working

4   on prosecuting this action, does not obviate the fact that these are all attorneys within the same

5   public law office. If, as here, the Attorney General's office is counsel for the agencies, then the

6   Attorney General's office will have a legal right to access the state agencies' documents, and there

7   is no law which alters that conclusion simply because different individual lawyers within the same

8   legal services organization have the direct communications and relationships with the state agencies.

9   Simply put, there is no cited law which determines whether specific individuals within an

10  organization themselves have individualized "control" under Rule 34 where they are seeking access

11  to the documents on behalf of the organization as a whole.

12          The Court recognizes that this is a somewhat unusual situation, in which a law enforcement

13  organization, the attorney general, is both a party to the case while also acting as counsel for a third

14  party. However, this would not be the first time that a legal services provider, as counsel for a party,

15  is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*,

16  2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and

17  defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .

18  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as

19  to responsive materials over which Salas and his law firm had possession, custody or control.").

20  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over

21  documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding

22  broadly that there must be a finding of a legal right of access to and thus control over third party

23  client documents in every case involving a legal services provider as a party; rather, under the

24  particular facts here, and under the totality of circumstances viewed in light of applicable legal

25  standards, the Court finds that control exists here.

26          The Nebraska Attorney General argues (without citation to caselaw) that "State agencies

27  routinely refuse to provide information to NE DOJ Consumer Protection Bureau absent a third-party

28  civil investigative demand, third-party subpoena, or a public records request, all of which would be

United States District Court
Northern District of California

**Add. 160**

United States District Court
Northern District of California

handled by the agency according to its protocols." [Dkt. 738-22 at 2]. As an initial matter, it is not surprising that, in cases where the Nebraska Attorney General is investigating an agency itself for potential violations of law, that agency would refuse to provide information absent formal process. But the fact that state agencies would sometimes require formal investigative demands or subpoenas in other cases says nothing about whether or not there is "control" for the documents at issue here. As noted, there is no basis to assume that the Nebraska Attorney General and the state agencies have any adversity or conflicts of interest with regard to this Multi-District Litigation. Indeed, the contrary is true given that the Nebraska Attorney General has declared that this action is in the public interest of the State of Nebraska. *See* Multistate Complaint at ¶ 12.

Further, this argument ignores that agencies' "routinely" requesting investigative demands or subpoenas or records requests in other cases (apparently where the Attorney General is adverse to the agencies) does not obviate the fact that, here where the Attorney General is counsel representing the agencies, such formal processes are not needed. The Nebraska Attorney General cites no law supporting the view that an investigative demand, subpoena, or public records request are the only ways for the Nebraska Attorney General to obtain documents from state agencies when they are clients. [Dkt. 738-25 at 2]. Indeed, the Nebraska Attorney General implicitly concedes that there are other avenues for that office to obtain documents from state agencies when this argument is limited by the word "routinely." *Id.* If the Nebraska Attorney General intends to imply that formal mechanisms for obtaining agency documents are the only mechanisms, then the Nebraska Attorney General would have to subpoena, or serve an investigative demand, or submit a public records request every time the lawyers of that office were representing a state agency, to get documents from their own client – which is not merely impractical but also contrary to the principles of effective legal representation. As counsel for the agencies (and not prosecuting or investigating the agencies), the Nebraska Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved consistent with the ethical obligations and applicable rules of professional conduct. To the extent the Nebraska Attorney General implies that the state agencies may have a "virtual veto" here, that argument is both unsupported by evidence

or facts germane to this case and is legally unpersuasive as discussed above. Indeed, as discussed herein, the Nebraska Attorney General argues too much by relying on these other formal procedures: if the Nebraska Attorney General is implying that its lawyers "routinely" obtain agency documents using legal procedures such as subpoenas, civil investigative demands, and public records requests, then that admission of a "routine" process may be viewed as constituting a legal right of access to the agencies' documents upon demand. In any event, the Court need not reach that issue to find "control" on the record presented here. Ultimately, the Nebraska Attorney General's argument about what may "routinely" happen in other (apparently adversarial) cases does not negate or inform what is actually happening in this case, on the record before the Court here.

The Nebraska Attorney General argues that, because Google sought documents from Nebraska state agencies by subpoena in connection with a case in the Eastern District of Virginia, that somehow suggests that state agencies should not be subject to party discovery here. [Dkt. 738-22 at 2 (citing *United States v. Google LLC*, 698 F. Supp. 3d 876 (E.D. Va. 2023)]. Apparently, the University of Nebraska at Omaha represented itself in responding to the subpoena in the *Google* case, while the Nebraska Department of Transportation was represented by the Nebraska Attorney General. The subpoenas issued in April 2023. [Dkts. 738-41 to -43]. A review of the docket from the *Google* Court shows that no motions to compel were filed and certainly none were decided prior to April 2023. *See United States v. Google LLC*, No. 23-cv-108, at Dkts. 1-167. The only discovery matters on that docket prior to April 2023 reflect stipulated and preliminary motions practice regarding the protective order, ESI protocol, and the discovery plan. *Id.* It is apparent that, in the circumstances of that case, Google chose not to pursue party discovery voluntarily, and instead tactically chose to seek documents from the state agencies by subpoena. There is no Order on the control issue decided by the *Google* Court. This Court declines the Nebraska Attorney General's suggestion to follow that "same process" here, where (unlike *Google*) Meta has chosen to litigate this issue and (again unlike in *Google*) the Nebraska Attorney General has also chosen to litigate its opposition to the control issue. While the parties here could have attempted to negotiate this dispute to follow the non-litigated process in *Google*, there is nothing legally instructive or persuasive in the voluntary process followed by the parties in *Google* which informs the "control" issue here

(other than the fact that the parties in *Google* conserved both their and that Court's resources by opting not to litigate the issue, unlike here).

Accordingly, it appears that under the statutory scheme each will be represented by the Nebraska Attorney General in this matter for discovery. Thus, because the Nebraska Attorney General appears likely to be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

**XXII. NEW JERSEY**

In opposition to the control issue, the New Jersey Attorney General argues primarily that the New Jersey Attorney General is a separate entity and independent from the New Jersey agencies. [Dkt. 738-23 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) New Jersey agencies are proscriptively barred from obtaining counsel other than the New Jersey Attorney General without consent from the New Jersey Governor; and (2) the New Jersey Attorney General has acknowledged that it will definitely represent all but two of the identified agencies (and that it could represent the remaining two agencies). *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Children & Families, Department of Education, Department of Health, Department of Human Services, Department of the Treasury, Economic Development Authority, Governor's Counsel on Mental Health Stigma, Office of the Governor, and Office of the Secretary of Higher Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the New Jersey Attorney General does have legal control, for purposes of discovery, over the identified New Jersey agencies. While the New Jersey Attorney General asserts its independence as a separate entity, this does not negate the legal and practical realities highlighted by Meta. Specifically, New Jersey agencies are barred from obtaining counsel other than the New Jersey Attorney General without the Governor's consent, which firmly establishes the Attorney General as their primary legal representative.

Under New Jersey's statutory scheme, the New Jersey Attorney General shall "[e]xamine and decide all legal matters submitted to him by the Governor or the Legislature and act for them in

United States District Court
Northern District of California

1  any matter in which they may be interested, and shall exclusively attend to and control all litigation

2  and controversies to which the State is a party or in which its rights and interests are involved[.]"

3  N.J. Stat. § 52:17A-4(c). Additionally, the New Jersey Attorney General shall "[a]ct as the sole

4  legal adviser, attorney or counsel[] . . . for all officers, departments, boards, bodies, commissions

5  and instrumentalities of the State Government in all matters other than those requiring the

6  performance of administrative functions entailing the enforcement, prosecution and hearing of

7  issues as imposed by law upon them; and represent them in all proceedings or actions of any kind

8  which may be brought for or against them in any court of this State[.]" N.J. Stat. § 52:17A-4(e).

9        Importantly, the New Jersey Attorney General's arguments do not negate the fact that (unlike

10  other states) there is no cited law or statute which empowers any of the New Jersey agencies at issue

11  here to employ or obtain counsel in this matter other than the Attorney General absent consent.

12  [Dkt. 738-23 at 2]. Under New Jersey law, "[n]o special counsel shall be employed for the State or

13  for or by any officer, department, board, body, commission or instrumentality of the State

14  Government except by authority of the Attorney-General, and then only with the approval of the

15  Governor, and provided that appropriations have been made therefor, unless the matter be of such

16  an emergency and shall be so declared by the Governor." N.J. Stat. § 52:17A-13. Indeed, the New

17  Jersey Attorney General confirmed that its office will definitely represent all but two agencies at

18  issue (and that it could represent the remaining two agencies) if Meta were to serve those agencies

19  with a subpoena in this matter. [Dkt. 738-1 at 36–37]. Accordingly, it appears that under the

20  statutory scheme almost every agency at issue will definitely be represented by the New Jersey

21  Attorney General in this matter for discovery. With regard to the  the New Jersey Economic

22  Development Authority and the New Jersey Office of the Governor, the New Jersey Attorney

23  General's indication that it could represent them is not explained in the context of the statutory

24  scheme. Here, there has been no evidence that the New Jersey Attorney General has authorized

25  separate counsel, no indication that the Governor's approval has been sought or granted, and no

26  evidence of any appropriations having been made for separate counsel. *See* N.J. Stat. § 52:17A-

27  4(e). As discussed, no separate counsel has appeared for any New Jersey state agencies, despite the

28  fact that litigation holds have been issued and the agencies have had notice of the pendency of

1   discovery in this matter for some time.  Accordingly, based on the record before the Court, the New

2   Jersey Attorney General will likely represent these two other state agencies for purposes of

3   discovery.

4        Relatedly, the New Jersey Attorney General has taken the position that the New Jersey

5   agencies do not share confidential information and do not "engage in the same functions, or have

6   the same management teams." [Dkt. 738-23 at 2].  That argument misapprehends the "legal control"

7   test for documents – the issue is not simply whether one entity is under the day-to-day operational

8   control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply

9   whether the two entities are legally separate (such as two different and separately incorporated

10   entities), but rather whether there is a legal right to obtain the documents as explained by *Citric*

11   *Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual

12   managerial power over the foreign corporation, but rather that there be close coordination between

13   them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship

14   between the state Attorney General and the state agencies (a relationship mandated by state law)

15   necessitates close coordination.  While operational control may be a factual situation which

16   demonstrates a legal right to obtain the documents, the absence of such "executive or functional

17   control" is not determinative for evaluating "control" for purposes of discovery.

18        By definition, the "legal control" issue for discovery arises when there are two legally

19   distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute

20   that party discovery covered that one entity.  The New Jersey Attorney General's reliance on the

21   separation between these agencies and the Department of Law and Public Safety, and the alleged

22   lack of "administrative control and oversight" is thus unpersuasive.  As discussed above, courts have

23   found "control" for purposes of discovery where a party is clearly not in administrative or

24   managerial control over the third-party, such as a subsidiary having control over the documents of

25   a parent corporation, or an individual government officer having control over the documents of an

26   entire agency.  The New Jersey Attorney General's arguments erroneously conflate the legal control

27   issue with "administrative control" or "generalized control" over each entity, and thus is insufficient

28   to rebut a finding of legal control of the documents for purposes of discovery.

United States District Court
Northern District of California

1    Further, there is no statutory, legal, or administrative rule cited which prohibits the New

2    Jersey Attorney General from accessing the documents of the state agencies at issue for purposes of

3    discovery.  The New Jersey Attorney General's argument that there is a lack of "unfettered access

4    to records of every agency" and reference in general to agencies' records laws is unpersuasive on

5    the issue of "control" for purposes of discovery.  [Dkt. 738-23 at 2].  First, the "control" test for

6    Rule 34 does not require unbounded, fully discretionary access to records of every agency at all

7    times under every conceivable set of circumstances – the question rather is whether there is a legal

8    right to access upon demand the documents at issue in this case.  Whether or not Meta has failed to

9    show "unfettered access" of every agency's records does not answer the "control" question for the

10   specific agencies' documents at issue here for Rule 34.

11   Second, the argument based on agencies' records laws is irrelevant for the same reasons

12   discussed herein with regard to similar arguments based on confidentiality laws of other states.  The

13   only statute actually cited by the New Jersey Attorney General relates to confidentiality of records

14   of child abuse reports within the New Jersey Department of Children and Families.  [Dkt. 738-23 at

15   2 (citing N.J. Stat. Ann. § 9:6-8.10a)].  As an initial matter, that statute is irrelevant to any of the

16   other agencies at issue and poses no barriers to the New Jersey Attorney General's access to those

17   other agencies' documents.  Further, that statute is limited to reports, investigations, and findings of

18   child abuse made pursuant to three specific New Jersey statutes, and thus poses no restriction on an

19   attorney accessing other documents of the New Jersey Department of Children and Families.

20   Because the issues being litigated in this Multi-District Litigation do not focus on specific reports

21   or investigations of instances of child abuse in New Jersey, the cited statute appears to be irrelevant

22   to the scope of discovery in this case.  More importantly, the cited statute does not bar access to

23   documents by an attorney representing the Department of Children and Families.  Contrary to the

24   New Jersey Attorney General's arguments, that statute expressly states that these child abuse records

25   "may be disclosed" in numerous listed circumstances, including disclosure to a "federal, State, or

26   local government entity, to the extent necessary for such entity to carry out its responsibilities under

27   law to protect children from abuse and neglect."  N.J. Stat. Ann. § 9:6-8.10a(1)(b)(20).  Here, the

28   Multistate Complaint (of which the New Jersey Attorney General is a party) asserts in multiple

166

United States District Court
Northern District of California

1    sections that Meta has harmed youth. *See, e.g.*, Multistate Complaint at ¶¶ 1-2 (Meta "has ignored

2    the sweeping damage these Platforms have caused to the mental and physical health of our nation's

3    youth . . . . Meta designed and deployed harmful and psychologically manipulative product features

4    to induce young users' compulsive and extended Platform use[.]"). Facially, the cited New Jersey

5    records statute would appear to grant an express legal right for the New Jersey Attorney General to

6    access these records from the Department of Children and Families, to the extent those records were

7    necessary to carry out its responsibilities to protect children from abuse and neglect. On this basis

8    alone, the Court finds that the cited statute, N.J. Stat. Ann. § 9:6-8.10a, satisfies *Citric Acid*'s

9    requirement of a legal right to access those documents of that agency by the New Jersey Attorney

10   General. For purposes of establishing "legal control" over documents, "[d]ecisions from within this

11   circuit have noted the importance of a legal right to access documents created by **statute**, affiliation

12   or employment." *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding

13   "legal control" and ordering party to obtain and produce transcript not within current possession

14   where federal regulation, 17 C.F.R. § 203.6, grants legal right to ask for and obtain transcript of

15   testimony from SEC); *see also In re ATM Fee Antitrust Litig.*, 233 F.R.D. at 545 (finding "a bank

16   holding company necessarily controls its subsidiary banks" and thus has "legal control" of

17   documents of bank by virtue of the Bank Holding Company Act, 12 U.S.C. § 1841(a)(1)).

18         The Court recognizes that this is a somewhat unusual situation, in which a law enforcement

19   organization, the Attorney General, is both a party to the case while also acting or able to act as

20   counsel for a third party. However, this would not be the first time that a legal services provider, as

21   a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*,

22   *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients

23   and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . .

24   . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond

25   as to responsive materials over which Salas and his law firm had possession, custody or control.").

26   Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over

27   documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. Here, the New Jersey

28   Attorney General admits that "to the extent the Attorney General has any 'control' over a listed state

1   agency, it is exclusively in the attorney-client context." [Dkt. 738-18 at 2]. The Court is not holding

2   broadly that there must be a finding of a legal right of access to and thus control over third party

3   client documents in every case involving a legal services provider as a party; rather, under the

4   particular facts here, and under the totality of circumstances viewed in light of applicable legal

5   standards, the Court finds that control exists here.

6          Further, the Court notes that the State Attorneys General have filed an Administrative

7   Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

8   to various state agencies. *See* Dkt. 1031-5. None of these state agencies are allowed to employ

9   legal counsel other than the New Jersey Attorney General and thus by statute each must be

10  represented by the New Jersey Attorney General in this matter for discovery. *See* N.J. Stat. §

11  52:17A-4(c). This arrangement indicates strongly that the state Attorney General, in fulfilling its

12  role as chief legal advisor, would necessarily and inherently have access to and control over the

13  necessary documents for effective legal representation of these state agencies. Therefore, the Court

14  concludes that the New Jersey Attorney General has legal control, for the purposes of discovery,

15  over the documents held by the New Jersey agencies listed by Meta, including in particular the three

16  agencies recently listed in the intent to issue subpoenas.

17         Instructive on the "control" issue is the New Jersey district court opinion in *Love v. NJ Dep't

18  of Corr.*, No. 2:15-CV-4404-SDW-SCM, 2017 WL 3477864 (D.N.J. Aug. 11, 2017), *opinion

19  clarified sub nom. Love v. New Jersey Dep't of Corr., No. 15CV4404 (SDW)(SCM)*, 2017 WL

20  4842379 (D.N.J. Oct. 26, 2017). In *Love*, the plaintiff sued several individual officers of a New

21  Jersey state prison and served document requests on each of them. The named defendants, all

22  employees of the New Jersey Department of Corrections and all represented by the New Jersey

23  Attorney General, objected and argued that they lacked control over the documents of the

24  Department of Corrections. The *Love* Court took notice "that the Attorney General is obligated to

25  defend State employees against civil claims; and anytime a defense is provided, such as here, 'the

26  State shall provide indemnification for the State Employee.' Therefore, the Court finds that State

27  has a significant stake in the outcome of this suit and that Mr. Love has met his burden to prove that

28  the Northern State Officers have 'control', albeit through their attorney, over the records and

**Add. 168**

1   information at-issue." *Id.* at *6. As in *Love*, here the New Jersey Attorney General both represents

2   itself and is obligated to represent the state agencies at issue, and the State of New Jersey has a

3   significant stake in the outcome of this Multi-District Litigation given that the Multistate Complaint

4   expressly states that "[t]his action is in the public interest of the Filing States." *See* Multistate

5   Complaint at ¶ 12.

6          Finally, the Court has recognized that the issue of control of state agency documents, when

7   a State or State Attorney General is a party, has been litigated and decided in a previous Multi-

8   District Litigation involving most of the same States and State Attorneys General as are involved in

9   this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals*

10  *(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States

11  which withdrew their objections to party discovery and negotiated a resolution of this issue with the

12  opposing party there. *Id.* at 356 n.5. In that case, New Jersey is identified as one of the States which

13  reached agreement on the state agency control issue without requiring that court to expend resources

14  resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the

15  control issue against all the remaining objecting states and given that New Jersey was able to reach

16  a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that

17  the New Jersey Attorney General and Meta were unable to reach a negotiated resolution of this

18  dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management

19  Conferences, they should make every effort to work out discovery disputes through reasonable,

20  good faith negotiations between able and experienced counsel, particularly where, as here, there is

21  guidance in precedent on the discovery issue at hand.

22  **XXIII. NEW YORK**

23         In opposition to the control issue, the New York Attorney General argues primarily the

24  following factors: (1) the New York Attorney General is a separate entity and independent from the

25  New York agencies; and (2) the New York Attorney General brought the lawsuit under its own

26  independent law enforcement capacity. [Dkt. 738-24 at 2].

27         In support of a finding of control with regard to these state agencies' documents, Meta argues

28  based primarily on the following factors: (1) with exceptions not particularly relevant here, the New

York Attorney General must act as counsel for the New York agencies, and (2) nothing in New York law prohibits the New York Attorney General from accessing agency documents. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Council on Children and Families, Department of Education, Department of Health, Department of State, Higher Education Services Corporation, Office of Children and Family Services, Office of Mental Health, Office of the Governor, and State Division of the Budget. *Id.* Meta states that it has agreed not to seek party discovery from the Empire State Development Corporation, and therefore, the Court **DENIES** Meta's motion with regard to that agency. *Id.* at 3 n.2.

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the New York Attorney General does have legal control, for purposes of discovery, over the listed New York agencies (excluding the Empire State Development Corporation, as discussed above). While the New York Attorney General is a separate entity and while the New York Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the New York General will act as the remaining agencies' counsel.

The statutory scheme in New York requires that the New York Attorney General "[p]rosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel, in order to protect the interest of the state[.]" N.Y. Exec. Law § 63(1).

The New York Attorney General does not cite to any statutory or legal prohibition on the New York Attorney General's representing the state agencies in this matter for purposes of discovery. Indeed, the New York Attorney General confirmed that its office could represent the agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 21]. Accordingly, it appears that under the statutory scheme each agency will be represented by the New York Attorney General in this matter for discovery.

Importantly, the New York Attorney General's arguments do not negate the fact that all of the New York agencies at issue here must notify the New York Attorney General if any property or

interest of the state must be defended: "[n]o action or proceeding affecting the property or interests of the state shall be instituted, defended or conducted by any department, bureau, board, council, officer, agency or instrumentality of the state, without a notice to the attorney-general apprising him of the said action or proceeding, the nature and purpose thereof, so that he may participate or join therein if in his opinion the interests of the state so warrant." N.Y. Exec. Law § 63(1). This arrangement indicates strongly that the New York Attorney General, in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The New York Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the New York Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies,

1   has a legal right to obtain responsive documents from the state agencies referenced in the
2   Complaint").

3          Further, the New York Attorney General argues that the New York Attorney General is a
4   separate and distinct elected entity with separate duties and responsibilities.  Dkt. 738-24 at 2 ("The
5   [New York Attorney General] NYAG is an independently-elected official, and unlike almost all
6   other executive branch officers, including the heads of the state entities Meta identified, does not
7   necessarily act pursuant to the directives of the [New York] Governor.").  However, this argument
8   misapprehends the "legal control" test for documents – the issue is not simply whether one entity is
9   under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary
10  relationship), and not simply whether the two entities are legally separate (such as two different and
11  separately incorporated entities), but rather whether there is a legal right to obtain the documents as
12  explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to
13  have actual managerial power over the foreign corporation, but rather that there be close
14  coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-
15  client relationship between the state Attorney General and the state agencies (a relationship
16  mandated by state law) necessitates close coordination.  While operational control may be a factual
17  situation which demonstrates a legal right to obtain the documents, the absence of such "executive
18  or functional control" is not determinative for evaluating "control" for purposes of discovery.  By
19  definition, the "legal control" issue for discovery arises when there are two legally distinct or
20  separate entities – otherwise, if only one entity were involved, there would be no dispute that party
21  discovery covered that one entity.  As discussed above, courts have found "control" for purposes of
22  discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary
23  having control over the documents of a parent corporation, or an individual government officer
24  having control over the documents of an entire agency.

25         Relatedly, the New York Attorney General argues that "[s]ome pre-suit [New York Attorney
26  General] communications with such entities, therefore, may be privileged. The [New York Attorney
27  General] does not, however, represent any of the state entities Meta has identified in this litigation,
28  so no pre-suit communications arising out of this litigation are attorney-client privileged."  [Dkt.

United States District Court
Northern District of California

738-24 at 2]. That statement, however, is silent as to (and thus appears artfully drafted to leave open the possibility) whether the New York Attorney General will assert privilege with respect to post-suit communications. The Court rejects the New York Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege for pre-suit communications, while apparently attempting to preserve the ability to assert the privilege applies to post-suit communications. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the New York Attorney General implies its intention to assert that the attorney-client privilege would apply to communications between the New York Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

The New York Attorney General's reliance on *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 263 (N.D.N.Y. 2006) [hereinafter *Boardman*], does not dictate a different result. [Dkt. 738-24 at 2]. The *Boardman* Court recognized that "control in the context of discovery is to be broadly construed." *Id.* at 267–68. The *Boardman* Court properly recognized that "[t]he burden of establishing control over the documents being sought rests with the demanding party." *Id.* Critically, the finding of lack of control by one New York agency over the documents of another agency resulted from an express failure by the moving party (Amtrak) to meet its burden: "Amtrak's contention that [state agency] DOT has possession, custody, and control of [second state agency] OSC's records *is supported by nothing more than hypotheses*." *Id.* (emphasis added). Here, by contrast, the record submitted to the Court is not mere hypotheses, as evident from the extended discussion in this Order. To the extent the New York Attorney General attempts to extrapolate from *Boardman* a general rule that no state agency can ever have control over the documents of another state agency, that argument is belied by *Boardman* itself: "The determination of control is often fact specific and thus generalizations, as [*Compagnie Francaise d'Assurance*

United States District Court
Northern District of California

*Pour le Com. Exterieur*]'s pronouncement seems to have done, are difficult to apply across the board." *Id.* at 267 (citing *Compagnie Francaise d'Assurance Pour le Com. Exterieur*, 105 F.R.D. 16).

The fact that several other New York courts have found a state agency has control over the documents over another agency for purposes of discovery confirms that the issue of "control" is often case and fact specific. *See, e.g.*, *Compagnie Francaise d'Assurance Pour le Com. Exterieur*, 105 F.R.D. at 35; *see also In re Opioid Litigation*, No. 400000/2017, 2019 WL 4120096, at *1 (N.Y. Sup. Ct. Aug. 14, 2019) (finding control and distinguishing *Boardman* "easily"); *see also Gross v. Lunduski*, 304 F.R.D. 136, 141–44 (W.D.N.Y. 2014) (distinguishing *Boardman* and finding named defendant, individual corrections officer, has "control" over documents of N.Y. Department of Correctional and Community Services in part because New York State Attorney General was representing both defendant and agency); *see also Guillory v. Skelly*, No. 12-CV-00847S F, 2014 WL 4542468, at *8–9 (W.D.N.Y. Sept. 11, 2014) (distinguishing *Boardman* and finding named defendants, individual corrections officers, have "control" over documents of N.Y. Department of Correctional and Community Services); *see also Siano Enders v. Boone*, No. 1:19-CV-948 (BKS/CFH), 2021 WL 3471558, at *3-4 (N.D.N.Y. Aug. 6, 2021) (finding named defendants, individual retired employees of N.Y. agency, have control over documents of their former employer-agency); *cf. also United States v. UBS Sec. LLC*, No. 118CV6369RPKPK, 2020 WL 7062789, at *4–7 (E.D.N.Y. Nov. 30, 2020) (finding that named party, the United States, has control over documents of agencies (HUD and Treasury)); *cf. also Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, No. 18CV4476LJLJW, 2023 WL 8804257, at *11 (S.D.N.Y. Dec. 30, 2023) (finding that named party, City of New York, has control over documents of city agencies (NYCAPS, DCAS, Fire Department of New York, "or any other City department or agency")).

Therefore, the Court concludes that the New York Attorney General has legal control, for the purposes of discovery, over the documents held by the New York agencies listed by Meta.

## XXIV. NORTH CAROLINA

In opposition to the control issue, the North Carolina Attorney General argues primarily the

1    following factors: (1) the North Carolina Attorney General is a separate entity and independent from

2    the North Carolina agencies; (2) the heads of North Carolina agencies are statutorily responsible for

3    the "legal custody of all books, papers, documents and other records of the department;" and (3) the

4    North Carolina Attorney General is not authorized to make decisions in areas which have been

5    specifically delegated to a designated department.  [Dkt. 738-25 at 2].

6         In support of a finding of control with regard to these state agencies' documents, Meta argues

7    based primarily on the following factors: (1) in general the North Carolina Attorney General is

8    required to represent all state agencies, and (2) North Carolina agencies are proscriptively barred

9    from obtaining counsel other than the North Carolina Attorney General, without consent from the

10   North Carolina Attorney General. *Id.* at 3.  Here, Meta seeks discovery from the following agencies:

11   Department of Commerce, Department of Health and Human Services, Department of Public

12   Instruction, Office of Governor, and Office of State Budget and Management.  *Id.*

13        After considering the factors argued in the briefs, the Court finds that the factors weigh in

14   favor of a finding that the North Carolina Attorney General has legal control, for purposes of

15   discovery, over the listed North Carolina agencies.  While the North Carolina Attorney General is a

16   separate entity from the state agencies, this does not outweigh the requirement that the North

17   Carolina Attorney General will act as the agencies' counsel and will thus have access to the

18   documents.

19        The statutory scheme in North Carolina requires the North Carolina Attorney General "[t]o

20   represent all State departments, agencies, institutions, commissions, bureaus or other organized

21   activities of the State which receive support in whole or in part from the State."  N.C. Gen. Stat.

22   § 114-2.  More importantly, North Carolina law prohibits state agencies from employing separate

23   counsel (subject to an exception not evident here): "No department, officer, agency, institution,

24   commission, bureau or other organized activity of the State which receives support in whole or in

25   part from the State shall employ private counsel, except with the approval of the Governor. The

26   Governor shall give his approval only if the Attorney General has advised him . . . that it is

27   impracticable for the Attorney General to render the legal services."  N.C. Gen. Stat. § 147-17.

28   There is nothing in the North Carolina Attorney General's submissions to this Court indicating that

the North Carolina Attorney General has advised the Governor that representing the agencies is impracticable here, and there is nothing in the record to indicate that the Governor has approved separate counsel being retained by the state agencies.  And given the circumstances of this case there is no basis to even suspect that the North Carolina Attorney General has a conflict of interest with any of the listed state agencies in relation to this Multi-District Litigation.  Further, as noted, no separate counsel has appeared for any state agencies in this case.

Indeed, the North Carolina Attorney General confirmed that its office could represent all but one of the listed agencies if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 22].  And as to that one agency (the North Carolina Department of Commerce), there is nothing in the record to indicate how or why that agency would be permitted to retain separate counsel for this case under § 147-17, and the North Carolina Attorney General's briefing does not adequately explain why they represent confusingly to the Court that they would not represent that agency.  When evaluating this issue, the Court determines that the plain language of the statute should control, as opposed to the unexplained statement of counsel.  The statutory scheme in North Carolina makes clear the North Carolina legislature's strong preference that state agencies be represented by the North Carolina Attorney General.  This arrangement indicates strongly that the North Carolina Attorney General, in fulfilling its statutory role to carry out its duties to represent all agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

Further, there is no statutory, legal, or administrative rule cited which prohibits the North Carolina Attorney General from accessing the documents of the state agencies at issue.  The North Carolina Attorney General argues that "agency documents, not all of which are public records, are under the legal control of separately elected constitutional officers and each agency has their own separate processes for responding to public records requests[.]"  [Dkt. 738-25 at 2].  This argument is based on an incorrect assumption that "public records" laws and processes are the only way in which the North Carolina Attorney General can obtain documents from the state agencies when they are clients of the lawyers of that office.  A public records law does not amount to a statutory or legal prohibition on the North Carolina Attorney General from accessing the documents in the scope of

its representation of the agencies as clients.  If the North Carolina Attorney General's supposition that, every time the North Carolina Attorney General seeks documents from state agencies, a public records Act requests would be routine and necessary, then the logical conclusion is that the public records law would be a routinely used legal right to access those documents and records of the agency subject to the Act.  At least one court has found that a state "public records" Freedom of Information Act constitutes a legal right to access documents from an agency for purposes of "control" under Rule 34.  *See Flagg*, 252 F.R.D. at 355–57 ("Because at least some of the text messages maintained by [(third party)] SkyTel are 'public records' within the meaning of Michigan's FOIA, it would be problematic, to say the least, to conclude that the [named defendant] City lacks a legal right to obtain these records as necessary to discharge its statutory duty of disclosure.").  However, the North Carolina Attorney General cites no law supporting the view that a public records request is the only way for the North Carolina Attorney General to get documents from state agencies when they are clients.  [Dkt. 738-25 at 2].  If the North Carolina Attorney General were correct, then the North Carolina Attorney General would have to submit a public records request every time the lawyers of that office were representing a state agency, to get documents from their own client – which is not merely impractical but also contrary to the principles of effective legal representation.  As counsel, the North Carolina Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved consistent with the ethical obligations and applicable rules of professional conduct.  The North Carolina open records law is not an impediment to that access, because public records requests apply to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents).

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena

1   recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida

2   lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas

3   to respond as to responsive materials over which Salas and his law firm had possession, custody or

4   control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control

5   over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not

6   holding broadly that there must be a finding of a legal right of access to and thus control over third

7   party client documents in every case involving a legal services provider as a party; rather, under the

8   particular facts here, and under the totality of circumstances viewed in light of applicable legal

9   standards, the Court finds that control exists here.

10         The North Carolina Attorney General's role as counsel for the agencies at issue inherently

11   involves obtaining necessary documents for effective representation in litigation.  In acting as

12   counsel, the North Carolina Attorney General would necessarily have access to and thus control

13   over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL

14   4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his

15   broad statutory and common law powers to control and manage legal affairs on behalf of state

16   agencies, has a legal right to obtain responsive documents from the state agencies referenced in the

17   Complaint").

18         To the extent the North Carolina Attorney General argues that the North Carolina Attorney

19   General is a "separate principal departments headed by the independently elected Governor," dkt.

20   738-25 at 2, that argument misapprehends the "legal control" test for documents – the issue is not

21   simply whether one entity is under the day-to-day operational control of the other (such as a parent-

22   wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate

23   (such as two different and separately incorporated entities), but rather whether there is a legal right

24   to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes

25   does not require the party to have actual managerial power over the foreign corporation, but rather

26   that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.

27   Here, the attorney-client relationship between the state Attorney General and the state agencies (a

28   relationship mandated by state law) necessitates close coordination.  While operational control may

United States District Court
Northern District of California

United States District Court
Northern District of California

be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the North Carolina Attorney General "does not represent any state agencies in this action and brings this action in the public interest under North Carolina's consumer protection laws[,]" dkt. 738-25 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The North Carolina Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

The Court is not persuaded by the North Carolina Attorney General's argument that North Carolina law does not authorize the Attorney General "to make decisions in areas which have been specifically delegated to a designated department," dkt. 738-25 at 2 (citing *Tice v. Dep'. of Transp.*, 312 S.E2d 241, 245 (N.C. Ct. App. 1984)). That argument does not mandate a different result over "control" for purposes of discovery. Nothing in North Carolina law "specifically delegates" to the listed state agencies the handling of discovery issues surrounding the production of documents in a civil matter. The fact that agencies may have their own internal procedures for handling public records requests is irrelevant, as noted above, because such public records procedures are not the only method by which the North Carolina Attorney General can obtain documents from state agencies in the course of representing them in litigation. Indeed, under North Carolina law, because the North Carolina Attorney General is specifically mandated to represent the state agencies in litigation, if anything the cited *Tice* case supports the view that handling this discovery issue is properly within the legislatively-mandated scope of duties of the North Carolina Attorney General. To the extent the *Tice* opinion reflects the concept that, for policy and operational duties, each

1  agency is structurally independent, again that is simply another irrelevant reiteration and confusion
2  of "managerial power" with "control" for purposes of discovery.

3  Furthermore, at least one other federal court has previously found that the North Carolina
4  Attorney General has legal control over North Carolina state agency materials.  *Generic*
5  *Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  While this Court reaches its own independent
6  conclusions consistent with the applicable legal standards discussed above and in light of the facts
7  and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District
8  Litigation is certainly consistent with, and to that extent further persuasively supports, the
9  conclusion here with regard to the North Carolina Attorney General's having control with regard to
10  documents of the state agencies at issue.  Given that the *Generic Pharmaceuticals (II)* opinion
11  resolved the control issue against all the objecting states including North Carolina, this Court is
12  disappointed that the North Carolina Attorney General and Meta here were unable to reach a
13  negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals*
14  *(II)*  As the Court has repeatedly encouraged the Parties at multiple Discovery Management
15  Conferences, they should make every effort to work out discovery disputes through reasonable,
16  good faith negotiations between able and experienced counsel, particularly where, as here, there is
17  guidance in precedent on the discovery issue at hand.

18  Therefore, the Court concludes that the North Carolina Attorney General has legal control,
19  for the purposes of discovery, over the documents held by the North Carolina agencies listed by
20  Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

21  **XXV.  NORTH DAKOTA**

22  In opposition to the control issue, the North Dakota Attorney General argues primarily the
23  following factors: (1) the North Dakota Attorney General is a separate entity and independent from
24  the North Dakota agencies;   (2) the North Dakota Attorney Generals powers are specifically
25  determined by the legislature and prescribed by law; (3) the North Dakota agencies' ability to share
26  information with other agencies or access records of other agencies is control by state law; (4) the
27  North Dakota Attorney General does not seek relief on behalf of North Dakota agencies; and (5) the
28  North Dakota Attorney General is not automatically required to represent North Dakota agencies.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    [Dkt. 738-26 at 2].

2         In support of a finding of control with regard to these state agencies' documents, Meta argues

3    based primarily on the following factors: (1) North Dakota agencies are proscriptively barred from

4    obtaining counsel other than the North Dakota Attorney General, without consent from the North

5    Dakota Attorney General; and (2) the North Dakota Attorney General is "expressly allowed to

6    'access and examine any record under the control of the state board of higher education' in the

7    course of representing that board." *Id.* at 3. Here, Meta seeks discovery from the following

8    agencies: the Department of Commerce, Department of Health and Human Services, Department of

9    Public Instruction, Department of Education Standards and Practices Board, Office of Management

10   and Budget, and Office of the Governor. *Id.*

11        After considering the factors argued in the briefs, the Court finds that the factors weigh in

12   favor of a finding that the North Dakota Attorney General has legal control, for purposes of

13   discovery, over the listed North Dakota agencies. While no specific statute exists that explicitly

14   grants the North Dakota Attorney General access to the documents from the North Dakota agencies,

15   the North Dakota Attorney General will act as counsel to these state agencies, subject to such request

16   which appears certain based on the record, and will thus have control over the documents. The

17   Court repeatedly asked the state Attorneys General whether they have spoken with the agencies at

18   issue, and they chose not to. No separate counsel has entered appearance for these state agencies.

19   Accordingly, the record before the Court is that all of the agencies at issue will be represented by

20   the North Dakota Attorney General.

21        The statutory scheme in North Dakota requires that the North Dakota Attorney General shall

22   "[a]ppear and defend all actions and proceedings against any state officer in the attorney general's

23   official capacity in any of the courts of this state or of the United States." N.D. Cent. Code § 54-

24   12-01. Indeed, the North Dakota Attorney General confirmed that its office could represent all of

25   the listed agencies if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-

26   1 at 22]. Importantly, the North Dakota Attorney General's arguments do not negate the fact that

27   all of the North Dakota agencies at issue here are barred by North Dakota law from obtaining counsel

28   other than the North Dakota Attorney General: "[a] state . . . agency may not employ legal counsel,

1    and no person may act as legal counsel in any matter, action, or proceeding in which the state . . .

2    agency is interested or is a party, except upon written appointment by the attorney general." N.D.

3    Cent. Code § 54-12-08.  This statutory scheme makes plain the North Dakota Legislature's strong

4    preference that the North Dakota Attorney General will represent state agencies in cases such as this

5    Multi-District Litigation.  As a result, this arrangement indicates strongly that the North Dakota

6    Attorney General, in fulfilling its statutory role to appear and defend all action for the state agencies,

7    would necessarily and inherently have access to and control over the necessary documents for

8    effective legal representation of these state agencies.  Therefore, the Court concludes that the North

9    Dakota Attorney General has legal control, for the purposes of discovery, over the documents held

10   by the North Dakota agencies listed by Meta, including in particular the three agencies recently

11   listed in the intent to issue subpoenas.

12   Further, there is no statutory, legal, or administrative rule cited which prohibits the North

13   Dakota Attorney General from accessing the documents of the state agencies at issue.  Meta argues

14   that North Dakota law specifically grants the North Dakota Attorney General the statutory right to

15   "access and examine any record under the control of the state board of higher education" when

16   appointed to represent that agency or an institution under the control of the state board of higher

17   education.  [Dkt. 738-26 at 3 (citing N.D. Cent. Code § 54-12-08(4)].  However, the North Dakota

18   State Board of Higher Education is in charge of the university system in North Dakota and does not

19   appear to be one of the agencies at issue in this case for discovery.  Accordingly, Meta's reliance on

20   the cited statute is irrelevant and fails to show a legal right of access for the documents of the

21   agencies at issue here.

22   The North Dakota Attorney General's role as counsel for the agencies at issue inherently

23   involves obtaining necessary documents for effective representation in litigation, as explained

24   above.  In acting as counsel, the North Dakota Attorney General would necessarily have access to

25   and thus control over the relevant documents needed to respond to discovery requests.  *See*

26   *Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency

27   documents "based on his broad statutory and common law powers to control and manage legal

28   affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state

United States District Court
Northern District of California

1   agencies referenced in the Complaint").

2          The Court recognizes that this is a somewhat unusual situation, in which a law enforcement

3   organization (the attorney general) is both a party to the case while also acting or able to act as

4   counsel for a third party.  However, this would not be the first time that a legal services provider, as

5   counsel for a party, is found to have control over third party documents for purposes of discovery.

6   *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena

7   recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida

8   lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas

9   to respond as to responsive materials over which Salas and his law firm had possession, custody or

10  control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control

11  over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not

12  holding broadly that there must be a finding of a legal right of access to and thus control over third

13  party client documents in every case involving a legal services provider as a party; rather, under the

14  particular facts here, and under the totality of circumstances viewed in light of applicable legal

15  standards, the Court finds that control exists here.

16         The North Dakota Attorney General argues that its powers are conferred by the North Dakota

17  Constitution, and because the North Dakota Constitution has not explicitly conferred access to

18  agency documents, the North Dakota Attorney General does not have legal control over the

19  documents.  [Dkt. 738-26 at 2].  However, the North Dakota Attorney General does not cite to any

20  statutory or legal prohibition on the North Dakota Attorney General's representing the state agencies

21  for purposes of discovery (and accessing their clients' documents in the course of such

22  representation).  To the extent the North Dakota Attorney General argues that the North Dakota

23  Attorney General separate and distinct elected entity with separate duties and responsibilities, *see*

24  dkt. 738-26 at 2, that argument misapprehends the "legal control" test for documents – the issue is

25  not simply whether one entity is under the day-to-day operational control of the other (such as a

26  parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally

27  separate (such as two different and separately incorporated entities), but rather whether there is a

28  legal right to obtain the documents as explained by *Citric Acid*.  .  "'The control analysis for Rule

United States District Court
Northern District of California

1    34 purposes does not require the party to have actual managerial power over the foreign corporation,

2    but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D.

3    at 638.  Here, the attorney-client relationship between the state Attorney General and the state

4    agencies (a relationship mandated by state law) necessitates close coordination.  While operational

5    control may be a factual situation which demonstrates a legal right to obtain the documents, the

6    absence of such "executive or functional control" is not determinative for evaluating "control" for

7    purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are

8    two legally distinct or separate entities – otherwise, if only one entity were involved, there would

9    be no dispute that party discovery covered that one entity.  As discussed above, courts have found

10   "control" for purposes of discovery where a party is clearly not in managerial control over the third-

11   party, such as a subsidiary having control over the documents of a parent corporation, or an

12   individual government officer having control over the documents of an entire agency.  Thus, arguing

13   that the North Dakota Attorney General "brought this action in a law enforcement capacity, pursuant

14   to statutory authority, to enjoin unlawful practices.  The [North Dakota Attorney General] alone

15   decides whether to bring such an action[,]" dkt. 738-26 at 2, is simply re-stating the issue to be

16   decided, and not determinative of the issue.  The North Dakota Attorney General's arguments

17   erroneously conflate the legal control issue with "operational control" or "functional independence"

18   of each entity, and thus is insufficient to rebut a finding of legal control of the documents for

19   purposes of discovery.

20        Relatedly, the North Dakota Attorney General has taken the position that communications

21   between the North Dakota Attorney General and these state agencies would be covered by the

22   attorney-client privilege.   Dkt. 738-26 at 2 ("Communications between other [North Dakota

23   Attorney General's] divisions and client state agencies may be privileged if it is an active litigation

24   record, attorney work product, or attorney consultation.").  To the extent the North Dakota Attorney

25   General has attempted to subdivide its own office between the team litigating this case and other

26   "agency counsel sections" in order to somehow argue that the scope of attorney-client privilege is

27   limited only as to some parts of the state North Dakota General's office but not other sub-teams,

28   that argument is not supported by citation to law and is contrary to the weight of law.  The scope of

attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"   The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that no courts support North Dakota's argument that different individual lawyers in the North Dakota Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the North Dakota Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "division" of attorneys currently working

on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in other "divisions" of the North Dakota Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the North Dakota Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the North Dakota Attorney General's office and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Instructive on the control issue is the District of North Dakota's opinion in *North Dakota v. United States*, No. 1:19-CV-150, 2021 WL 6278456 (D.N.D. Mar. 24, 2021). In that case, the State of North Dakota, represented by the North Dakota Attorney General, served document requests on the United States, and expressly argued that several federal agencies should be the subject of party discovery. *Id.* at *2. The United States objected, taking positions strikingly similar to the North Dakota Attorney General in this Multi-District Litigation, and argued that North Dakota should seek documents from such listed agencies by subpoena under Rule 45 instead. *Id.* After reviewing multiple cases involving whether federal agencies should be subject to party discovery when the United States is the named party, the North Dakota district court held that while those precedents "all involved circumstances quite different from those of this case, each involved the United States as a party, and each followed the principle that the United States' obligation to respond to discovery requests is not limited to an agency named in the action. This order need not, and therefore does not, consider whether North Dakota can recover for any acts of employees of agencies other than the USACE. Even if North Dakota's recovery is limited to negligent acts of USACE employees, that would not foreclose North Dakota from seeking discovery from other federal agencies who possess relevant information." *Id.* at *4. It is noteworthy that, in *North Dakota v. United States*, the North Dakota Attorney General argued that government agencies should be subject to party

1    discovery when the sovereign is a named party and succeeded in that argument when seeking

2    discovery from another sovereign.  *See id.* at *2–4. The fact that the North Dakota Attorney General

3    is now arguing the exact opposite position, when its sovereign is a party and its agencies are the

4    target of discovery, undercuts the persuasive force of the arguments presented.  The analogous result

5    in *North Dakota v. United States* supports the finding of "control" for purposes of discovery here.

6           Given the North Dakota federal court's decision in the analogous *North Dakota v. United

7    States* case (which the North Dakota Attorney General was involved in as counsel), this Court is

8    disappointed that the North Dakota Attorney General and Meta were unable to reach a negotiated

9    resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*.  As

10   the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences,

11   they should make every effort to work out discovery disputes through reasonable, good faith

12   negotiations between able and experienced counsel, particularly where, as here, there is guidance in

13   precedent on the discovery issue at hand.

14          Therefore, the Court concludes that the North Dakota Attorney General has legal control,

15   for the purposes of discovery, over the documents held by the North Dakota agencies listed by Meta.

16   **XXVI. OHIO**

17          In opposition to the control issue, the Ohio Attorney General's primary substantive argument

18   is that the Ohio Attorney General is a separate entity and independent from the Ohio agencies.  [Dkt.

19   738-27 at 2].

20          In support of a finding of control with regard to these state agencies' documents, Meta argues

21   based primarily on the following factors: (1) Ohio agencies are proscriptively barred from obtaining

22   counsel other than the Ohio Attorney General; and (2) Ohio state law mandates that Ohio agencies

23   furnish documents to the Ohio Attorney General.  *Id.* at 3.  Here, Meta seeks discovery from the

24   following agencies: the Department of Children and Youth, Department of Development,

25   Department of Education & Workforce, Department of Health, Department of Higher Education,

26   Department of Job and Family Services, Department of Mental Health & Addiction Services,

27   Department of Youth Services, Office of Budget and Management, and Office of Governor.  *Id.*

28          After considering the factors argued in the briefs, the Court finds that the factors weigh in

United States District Court
Northern District of California

favor of a finding that the Ohio Attorney General does have legal control, for purposes of discovery, over the listed Ohio agencies. While the Ohio Attorney General is a separate entity, this does not outweigh the requirement that the Ohio Attorney General will act as the agencies' counsel and that Ohio state law explicitly mandates that Ohio agencies furnish documents to the Ohio Attorney General.

There is no statutory, legal, or administrative rule cited which prohibits the Ohio Attorney General from accessing the documents of the state agencies at issue. To the contrary, "[p]ublic officers and their deputies, assistants, clerks, subordinates, and employees shall render and furnish to the attorney general, or to the attorney general's designated representatives when so requested, all information and assistance in their possession or within their power." Ohio Rev. Code § 1331.16(N). Unlike other states, the Ohio legislature explicitly created a legal right for the Ohio Attorney General to access state agencies' documents. For purposes of establishing "legal control" over documents, "[d]ecisions from within this circuit have noted the importance of a legal right to access documents created by *statute*, affiliation or employment." *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding "legal control" and ordering party to obtain and produce transcript not within current possession where federal regulation, 17 C.F.R. § 203.6, grants legal right to ask for and obtain transcript of testimony from SEC); *see also In re ATM Fee Antitrust Litig.*, 233 F.R.D. at 545 (finding "a bank holding company necessarily controls its subsidiary banks" and thus has "legal control" of documents of bank by virtue of the Bank Holding Company Act, 12 U.S.C. § 1841(a)(1)). Thus, the cited statute expressly grants the Ohio Attorney General an explicit legal right to obtain and access these documents of the agencies at issue here. The Court thus finds that Ohio Rev. Code § 1331.16(N) directly satisfies *Citric Acid*'s requirement of a showing of a legal right to access the documents of the state agencies here.

Further, and as a separate reason for finding "control" here, the Court notes that the statutory framework in Ohio (like other States) requires that the Ohio Attorney General serve as counsel for the state agencies at issue. As discussed above, the nature of the attorney-client relationship in this action and under the facts here support a finding of "control" with respect to discovery of the state agencies' documents.

1    First, the statutory scheme in Ohio requires that the Ohio Attorney General "is the chief law

2    officer for the state and all its departments[.]"  Ohio Rev. Code § 109.02.  "[T]he attorney general

3    is legal counsel for all state agencies."  *Tobacco Use Prevention & Control Found. Bd. of Trustees*

4    *v. Boyce*, 925 N.E.2d 641, 658 (Ohio Ct. App. 2009), *aff'd*, 941 N.E.2d 745 (Ohio 2010); *see also*

5    *Northeast Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d

6    999, 1009 (6th Cir. 2006) ("Under Ohio Rev. Code Ann. § 109.02, the Attorney General is 'the chief

7    law officer for the state and all its departments' and shall appear for the State in any tribunal in a

8    case in which the state is a party when required by the governor or the general assembly. The

9    Attorney General, then, is both the State's chief legal officer and a representative of the people and

10   the public interest[.]").  Indeed, the Ohio Attorney General confirmed that its office could represent

11   the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-

12   1 at 23–24].  Accordingly, it appears that under the statutory scheme each agency will be represented

13   by the Ohio Attorney General in this matter for discovery because of the intended subpoenas.

14   There is no citation to any statutory or legal prohibition on the Ohio Attorney General's

15   representing the state agencies in this matter for purposes of discovery.  Importantly, while the Ohio

16   Attorney General certified that it "could" represent these agencies for purposes of discovery in this

17   Multi-District Litigation, that statement must be viewed in light of the statutory scheme in Ohio

18   which forbids all of the Ohio agencies at issue from obtaining other counsel: "no state officer or

19   board, or head of a department or institution of the state shall employ, or be represented by, other

20   counsel or attorneys at law."  Ohio Rev. Code § 109.02.  This statutory scheme makes plain the

21   Ohio Legislature's mandate (and not mere preference) that the Ohio Attorney General will represent

22   state agencies in cases such as this Multi-District Litigation.  As a result, this arrangement indicates

23   strongly that the Ohio Attorney General, in fulfilling its statutory role for the state agencies, would

24   necessarily and inherently have access to and control over the necessary documents for effective

25   legal representation of these state agencies, since the Ohio Attorney General's office must have had

26   a long and deep history of working with and representing these agencies in light of the legislative

27   mandate in favor of representation.

28   The Ohio Attorney General's role as counsel for the agencies at issue inherently involves

United States District Court
Northern District of California

obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Ohio Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at \*5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Further, it is unavailing for the Ohio Attorney General to argue that the Ohio Attorney General is a separate and distinct elected entity with separate duties and responsibilities from these agencies.  Dkt. 738-27 at 2.  This argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  .  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is a party to the case while also acting as counsel for a third party.  However, this would not be the first time that a legal services provider, as a party, is found to have

1    control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649,

2    at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this

3    court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34

4    request for production to Salas in the Florida lawsuit required Salas to respond as to responsive

5    materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court

6    has noted that "[i]n general, an attorney is presumed to have control over documents in its client's

7    possession." *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be

8    a finding of a legal right of access to and thus control over third party client documents in every

9    case involving a legal services provider as a party; rather, under the particular facts here, and under

10   the totality of circumstances viewed in light of applicable legal standards, the Court finds that

11   control exists here.

12         Relatedly, the Ohio Attorney General argues that "[t]here is a distinction between the

13   attorneys from the Ohio Attorney General's office who have filed this lawsuit – all of whom are

14   assigned to the Consumer Protection Section within the office - and the attorneys from the same

15   office who may be engaged in responding to subpoenas related to this lawsuit on behalf of their

16   respective clients." [Dkt. 738-27 at 2].  To the extent the Ohio Attorney General has attempted to

17   subdivide its own office between the team litigating this case and other "agency counsel sections"

18   in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts

19   of the Ohio Attorney General's office but not other sub-teams (and more surprisingly, argues that

20   the privilege would be asserted as against attorneys in the Consumer Protection Section), that

21   argument is not supported by citation to law and is contrary to the weight of law.  The scope of

22   attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant

23   attorney-client privilege) encompasses the entirety of a legal services organization due to well-

24   known rules of imputation of confidences to a legal services organization, including a public law

25   office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies

26   to both private firms and public law firms such as a district attorney's office or the office of the state

27   public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d

28   at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we

*United States District Court*
*Northern District of California*

should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  Here, there is no indication or evidence of any such ethical screening, and it is simply not realistic or credible to presume that lawyers in the Ohio Attorney General's office representing these agencies for discovery in this Multi-District Litigation would fail to coordinate with the attorneys already involved in this Multi-District Litigation.  It lacks even more credibility for the Ohio Attorney General to argue that the attorney-client privilege would be asserted to prevent such communications between lawyers in that same office where there is no basis to assume any adversity as between any of the state agencies and the State (a party to this case) or the Ohio Attorney General (also a party, as relator, in this case).  This review of case law demonstrates that no courts support Ohio's argument that different individual lawyers in the Ohio Attorney General's office have *ex ante* separable, discrete attorney-client relationships which allow the privilege to be selectively asserted, even as against other lawyers in the Ohio Attorney General's office.

The Ohio Attorney General's citation to and reliance on *Monsanto* as support of the

United States District Court
Northern District of California

"separate entities" and "constitutional structure" arguments is not persuasive. [Dkt. 738-27 at 2 (citing *State of Ohio v. Monsanto Co.*, Hamilton C.P. No. A1801237 (Ohio Ct. Common Pleas Dec 2, 2020)]. The *Monsanto* opinion is a state court opinion which does not discuss *Citric Acid*, does not apply the relevant federal precedent, and relies as legal support on another Ohio state court opinion on the lack of interchangeability of different Ohio agencies under Ohio state law. *Id.*

By contrast, instructive here is the Southern District of Ohio's opinion in *Bivens v. Lisath*, No. 2:05-CV-0445, 2007 WL 2891416 (S.D. Ohio Sept. 28, 2007). In that civil rights case, an inmate sued various correctional officers and officers of an Ohio state prison, all of whom (as well as the non-party Ohio Department of Rehabilitation and Corrections) were represented by the Ohio Attorney General - which also apparently intervened in that case as a party as well. *Id*. The Court denied the request because "the documents which he [plaintiff] describes in his request (# 22) are documents which would appear to be under the possession or control of the defendants in this case. As a result, he need not subpoena those documents, but may simply request them through the normal discovery processes that are available to parties to litigation and identified in Federal Rules of Civil Procedure 26 through 37." *Bivens*, 2007 WL 2891416, at *6. In *Bivens*, despite the fact that the named individual defendant officers do not exercise executive or managerial oversight of the agency at issue, the Court found "control" for purposes of discovery. Just as in this Multi-District Litigation, in *Bivens* the Ohio Attorney General was both counsel to the named defendants, as well as the third-party agency, and was itself a party (as intervenor much like its status as relator party here). The analogous result in *Bivens* further supports the Court's finding of "control" here.

Indeed, at least one other federal court has previously found that the Ohio Attorney General has legal control over Ohio state agency materials. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Ohio Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states

1    including Ohio (which the Ohio Attorney General was involved in), and given the Ohio federal

2    court's decision finding control in the analogous *Bivens* case (which the Ohio Attorney General was

3    involved in both as counsel and a party), this Court is disappointed that the Ohio Attorney General

4    and Meta were unable to reach a negotiated resolution of this dispute, which other states were able

5    to do in *Generic Pharmaceuticals (II)*.  As the Court has repeatedly encouraged the Parties at

6    multiple Discovery Management Conferences, they should make every effort to work out discovery

7    disputes through reasonable, good faith negotiations between able and experienced counsel,

8    particularly where, as here, there is guidance in precedent (such as *Generic Pharmaceuticals (II)*

9    and *Bivens*) on the discovery issue at hand.

10        Therefore, the Court concludes that the Ohio Attorney General has legal control, for the

11   purposes of discovery, over the documents held by the Ohio agencies listed by Meta.

12   **XXVII. OREGON**

13        In opposition to the control issue, the Oregon Attorney General argues primarily the

14   following factors: (1) the Oregon Attorney General is a separate entity and independent from the

15   Oregon agencies; (2) the Oregon Attorney General's powers extends as far as set forth by statute or

16   Oregon common law and limited by statute or conferred upon some other official; and (3) the

17   Oregon Attorney General brought the lawsuit under its own independent law enforcement capacity.

18   [Dkt. 738-28 at 2].

19        In support of a finding of control with regard to these state agencies' documents, Meta argues

20   based primarily on the following factors: (1) that Oregon agencies are proscriptively barred from

21   obtaining counsel other than the Oregon Attorney General, without consent from the Oregon

22   Attorney General due to a conflict, and (2) that Oregon law affords the Oregon Attorney General

23   "[f]ull charge and control of all the legal business" of state agencies.  *Id.* at 3.  Here, Meta seeks

24   discovery from the following agencies: Business Oregon, the Office of the Governor, Department

25   of Administrative Services, Department of Consumer and Business Services, and Department of

26   Education.  *Id.*

27        After considering the factors argued in the briefs, the Court finds that the factors weigh in

28   favor of a finding that the Oregon Attorney General does have legal control, for purposes of

1    discovery, over the listed Oregon agencies. While the Oregon Attorney General is a separate entity

2    and while the Oregon Attorney General is acting pursuant to her statutory authority in bringing this

3    action, this does not outweigh the requirement that the Oregon Attorney General will act as the

4    agencies' counsel. The Oregon Attorney General's powers provide "full control" for rendering legal

5    services for Oregon agencies. The Oregon Attorney General does not indicate any sort of limitation

6    to such legal power conferred upon the office. Moreover, the fact that Oregon agencies are

7    proscriptively barred from obtaining counsel other than the Oregon Attorney General (other than in

8    situations involving a conflict) further reinforces the finding of control over the documents

9    necessary for effective legal representation. Therefore, the Court concludes that the Oregon

10   Attorney General has legal control, for the purposes of discovery, over the documents held by the

11   Oregon agencies listed by Meta.

12          The statutory scheme in Oregon requires that the Oregon Attorney General have "[g]eneral

13   control and supervision of all civil actions and legal proceedings in which the State of Oregon may

14   be a party or may be interested[,]" and have "*[f]ull charge and control of all the legal business* of

15   all departments, commissions and bureaus of the state, or of any office thereof, which requires the

16   services of an attorney or counsel in order to protect the interests of the state." Or. Rev. Stat.

17   § 180.220 (emphasis added). Indeed, the Oregon Attorney General confirmed that its office will

18   definitely represent all of the Oregon agencies at issue if Meta were to serve those agencies with a

19   subpoena in this matter. [Dkt. 738-1 at 24]. Importantly, the Oregon Attorney General's arguments

20   do not negate the fact that all of the Oregon agencies at issue here are barred by Oregon law from

21   obtaining counsel other than the Oregon Attorney General: "No state officer, board, commission, or

22   the head of a department or institution of the state shall employ or be represented *by any other*

23   *counsel* or attorney at law." Or. Rev. Stat. § 180.220 (emphasis added). This statutory arrangement

24   indicates strongly that the Oregon Legislature expressed its preference that the Oregon Attorney

25   General, in fulfilling its statutory role for the state agencies, would exercise such "full control" over

26   legal representation of agencies, which necessarily and inherently includes having access to and

27   control over the necessary documents for effective legal representation of these state agencies.

28          Further, there is no statutory, legal, or administrative rule cited which prohibits the Oregon

United States District Court
Northern District of California

**Add. 195**

Attorney General from accessing the documents of the state agencies at issue.  The Oregon Attorney General argues that "[t]here is no statute or case law that grants the Attorney General authority to compel another state agency to provide documents in a proceeding for which that agency is not a party."  [Dkt. 738-28 at 2].  However, the absence of an express statute granting access, by itself, does not amount to a legal prohibition for the Oregon Attorney General to access documents as part of its representation of the state agencies in this matter for purposes of discovery.  Indeed, the plenary statutory phrasing that this Attorney General will have both "general control and supervision" over civil actions and "full charge and control" over "all the legal business" of the agencies can reasonably be interpreted to include access to the documents of these agencies when they are clients being represented or defended in a civil action.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the attorney general) is both a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

There is no citation to any statutory or legal prohibition on the Oregon Attorney General's representing the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party.  However, this would not be

the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Relatedly, the Oregon Attorney General has taken the position that communications between the Oregon Attorney General and these state agencies "may include confidential communications protected by the attorney-client or common interest privileges." Dkt. 738-28 at 2 ("The Attorney General would assert privilege for confidential communications between the Attorney General and any of the identified agencies if the responsive document contained privileged communications."). To the extent the Oregon Attorney General has attempted to preserve the ability to assert that the privilege applies to communications between the Oregon Attorney General's Office and these agencies (by using conditional phrasing such as "may", such attempts support a finding of an attorney-client relationship and thus the kind of access that supports a finding of control for purposes of discovery. *Perez*, 2014 WL 1796661, at *2 Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

The Oregon Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Oregon Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

1   right to obtain responsive documents from the state agencies referenced in the Complaint").

2       Further, the Oregon Attorney General argues that the Oregon Attorney General is a separate

3   and distinct elected entity with separate duties and responsibilities. [Dkt. 738-28 at 2]. However,

4   this argument misapprehends the "legal control" test for documents – the issue is not simply whether

5   one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-

6   subsidiary relationship), and not simply whether the two entities are legally separate (such as two

7   different and separately incorporated entities), but rather whether there is a legal right to obtain the

8   documents as explained by *Citric Acid*. While operational control may be a factual situation which

9   demonstrates a legal right to obtain the documents, the absence of such "executive or functional

10  control" is not determinative for evaluating "control" for purposes of discovery. By definition, the

11  "legal control" issue for discovery arises when there are two legally distinct or separate entities –

12  otherwise, if only one entity were involved, there would be no dispute that party discovery covered

13  that one entity. Thus, arguing that the Oregon "Attorney General made the decision to pursue this

14  action as a matter of policy, independently of the Governor and other agencies," dkt. 738-28 at 2, is

15  simply re-stating the issue to be decided, and not determinative of the issue. The Oregon Attorney

16  General's arguments erroneously conflate the legal control issue with "operational control" or

17  "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control

18  of the documents for purposes of discovery.

19      "'The control analysis for Rule 34 purposes does not require the party to have actual

20  managerial power over the foreign corporation, but rather that there be close coordination between

21  them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship

22  between the Oregon Attorney General and the state agencies (a relationship mandated by state law)

23  necessitates close coordination. Therefore, the Court concludes that the Oregon Attorney General

24  has legal control, for the purposes of discovery, over the documents held by the Oregon agencies

25  listed by Meta, including in particular the three agencies recently listed in the intent to issue

26  subpoenas.

27      Indeed, at least one other federal court has previously found that the Oregon Attorney

28  General has legal control over Oregon state agency materials. *Generic Pharmaceuticals (II)*, 699

United States District Court
Northern District of California

F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Oregon Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Oregon, this Court is disappointed that the Oregon Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XXVIII. PENNSYLVANIA

In opposition to the control issue, the Pennsylvania Attorney General argues primarily the following factors: (1) the Pennsylvania Attorney General is a separate entity and independent from the Pennsylvania agencies; (2) the Pennsylvania Attorney General can only access Pennsylvania agency documents when the Pennsylvania Attorney General is utilizing its investigatory powers; (3) the Pennsylvania Attorney General's instant law suit is premised on harm done to Pennsylvania consumers and not the state; (4) the Pennsylvania Attorney General does not seek relief on behalf of the Pennsylvania agencies. [Dkt. 738-29 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) the Pennsylvania Attorney General must act as counsel for the Pennsylvania agencies; and (2) Pennsylvania law allows the Pennsylvania Attorney General to access Pennsylvania agency documents whenever necessary to carry out its functions. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Business Oregon, the Office of the Governor, Department of Administrative Services, Department of Consumer and Business Services, and Department of Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in

1 favor of a finding that the Pennsylvania Attorney General does have legal control, for purposes of

2 discovery, over the listed Pennsylvania agencies. While the Pennsylvania Attorney General asserts

3 that Pennsylvania agencies are independent, these arguments do not negate the fact that the Attorney

4 General is the chief legal advisor for the state government. Further, as discussed below, the

5 argument that the Pennsylvania Attorney General can only access agency documents for

6 investigations is not persuasive.

7 Here, unlike in several other states, the Court finds that there is an express right for the

8 Pennsylvania Attorney General to access state agencies' documents. For purposes of establishing

9 "legal control" over documents, "[d]ecisions from within this circuit have noted the importance of

10 a legal right to access documents created by *statute*, affiliation or employment." *In re Legato Sys.,*

11 *Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding "legal control" and ordering party to

12 obtain and produce transcript not within current possession where federal regulation, 17 C.F.R. §

13 203.6, grants legal right to ask for and obtain transcript of testimony from SEC); *see also In re ATM*

14 *Fee Antitrust Litig.*, 233 F.R.D. at 545 (finding "a bank holding company necessarily controls its

15 subsidiary banks" and thus has "legal control" of documents of bank by virtue of the Bank Holding

16 Company Act, 12 U.S.C. § 1841(a)(1)).

17 Here, there is an express statute granting the Pennsylvania Attorney General a legal right to

18 access the documents and materials of the six state agencies. Under Pennsylvania law, the

19 Pennsylvania Attorney General has the unfettered right to obtain documents from Pennsylvania state

20 agencies. Specifically, Pennsylvania law provides that "[t]he office of Attorney General *shall have*

21 *the right to access at all times to the books and papers of any Commonwealth agency* necessary

22 to carry out its duties under this act." 71 Pa. Stat. § 732-208 (emphasis added).

23 In opposing the arguments in favor of control, the Pennsylvania Attorney General argues

24 that they have no legal right or ability to obtain documents from the state agencies, and that the state

25 agencies could simply refuse to hand over documents to the Attorney General in response to the

26 document requests. Despite the plain wording of the statute, the Pennsylvania Attorney General

27 argues that this statute is limited only to situations in which the Pennsylvania Attorney General is

28 investigating a particular state agency. [Dkt. 738-29 at 2]. That assertion is wrong as a matter of

United States District Court
Northern District of California

United States District Court
Northern District of California

law. First, there is no such express limitation in the text of the statute. The plain text of a statute controls its interpretation. *In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1068 (N.D. Cal. 2023) (citing *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1105 (9th Cir. 2014); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)). Second, the Pennsylvania Attorney General cites nothing in the surrounding text of the statutory scheme of the Act to indicate that the Pennsylvania legislature implicitly intended to limit the scope of the Pennsylvania Attorney General's right to access agency papers only to direct investigations of those agencies by the state Attorneys General. *Smith v. Spizzirri*, 601 U.S. 472, 472 (2024) (rejecting party's argument to interpret Section 3 of the Federal Arbitration Act because "respondents' attempt to read 'stay' to include 'dismiss' cannot be squared with the surrounding statutory text"); *K Mart Corp.*, 486 U.S. at 291 (implicit limitations should not be read into a statute absent clear guidance from the rest of the Act or other compelling guidance from the legislature).

Further, the Pennsylvania Attorney General made exactly this same argument in another Multi-District Litigation involving a similar discovery dispute, and that court rejected this very same argument:

> Pennsylvania also argues that the [Special Discovery Master's Report and Recommendation] R&R incorrectly determined that the OAG [Office of Attorney General] had control over the state agency documents sought by Defendants because the OAG only has such power when it is either investigating potentially unlawful behavior by Commonwealth agencies or litigating claims on behalf of Commonwealth agencies. Neither is being done here. Pennsylvania argues that the Amended Fourth R&R effectively seeks to usurp the OAG's investigative authority, and would have the result of making each Commonwealth agency a party subject to Rule 26 discovery in every litigation brought by or against the OAG. If Defendants want the documents, Pennsylvania argues, they must serve them on the agencies as part of third-party discovery, and Pennsylvania represents that the OAG has offered to facilitate that discovery process . . . . Pennsylvania statutes address the relationship between the Office of the Attorney General and Commonwealth agencies with regard to the right to obtain documents. The key Pennsylvania statute, Section 208 of the Commonwealth Attorneys Act, provides in full that "[t]he Office of Attorney General shall have the right to access at all times to the books and papers of any Commonwealth agency necessary to carry out his duties under this act." The Pennsylvania Supreme Court has held that Section 208:
>
> "lists only one condition on the mandate of production: the material sought must be 'necessary' for execution of the OAG's duties. We

201

> recognize that the OAG has a broad array of duties involving Commonwealth agencies beyond criminal investigations, and that the [statute] is of correspondingly broad scope. Nevertheless the authorization remains qualified only by what is 'necessary.'"
>
> Although the Pennsylvania Supreme Court was ruling in the context of a grand jury investigation of a Commonwealth agency, the Court expressly affirmed that the statute is a broad one that extends beyond criminal investigations, qualified only by what is "necessary." Because Pennsylvania has put into this suit the relevance of documents from the agencies that paid for generic drugs, it is necessary to its duties in complying with the Federal Rules of Civil Procedure in the litigation of the MDL, and the OAG therefore has access to the documents under Pennsylvania law.

*Generic Pharmaceuticals (I)*, 571 F. Supp. 3d at 410–11 (quoting *In re Thirty-Third Statewide Investigating Grand Jury*, 86 A.3d 204, 216 (Pa. 2014)).

Here, the Pennsylvania Attorney General filed suit against Meta and the prosecution of this matter is, by definition, one of the Attorney General's duties. Responding to discovery is a necessary part of litigating this case, which the Pennsylvania Attorney General chose to initiate. Obtaining documents in order to respond to discovery requests is necessary to accomplish the Attorney General's duties in this case. Meta asserts that the documents sought from these agencies are relevant to (or at the very least, within the scope of discovery for) the issues disputed in this Multi-District Litigation, and the state Attorney General's make no argument that the documents are irrelevant to the case.

The fact that the Pennsylvania Attorney General is not seeking civil penalties, but is instead asserting harm to Pennsylvania consumers, is not dispositive of whether the documents are necessary for the Pennsylvania Attorney General to carry out its duties. [Dkt. 738-29 at 2]. To the extent the Pennsylvania agencies have relevant, responsive documents concerning the alleged harms to Pennsylvania consumers, the Pennsylvania Attorney General has by definition put those issues and documents relevant to such issues into this suit. And here, as in the *Generic Pharmaceuticals (I)* Multi-District Litigation, these agency documents are necessary for the Pennsylvania Attorney General's duties in complying with the Federal Rules of Civil Procedure in this Multi-District Litigation. 71 Pa. Stat. § 732-208 ("[t]he office of Attorney General shall have the right to access at all times to the books and papers of ***any Commonwealth agency necessary to carry out its duties under this act***.") (emphasis added).

Further, Pennsylvania law mandates that the Pennsylvania "Attorney General **shall represent** the Commonwealth and **all Commonwealth agencies**." 71 Pa. Stat. § 732-204 (emphasis added). Under Pennsylvania law, the Pennsylvania Attorney General's office will necessarily represent these state agencies in responding to Meta's discovery in this matter (regardless of whether the discovery is pursued procedurally under Rule 34 or under Rule 45), and thus the Pennsylvania Attorney General has an express statutory right under Pennsylvania law to obtain documents from these state agencies upon demand. The Court finds that searching for and producing relevant, non-privileged documents from the state agencies is necessary for the Pennsylvania Attorney General to carry out its duties in this Multi-District Litigation. *See id*. Even absent the express statutory right to obtain documents, the mandatory attorney-client relationship is sufficient to establish that the Pennsylvania Attorney General has legal control over the state agencies' documents here.

Relatedly, the Pennsylvania Attorney General has taken the position that, "should" the Pennsylvania Attorney General be retained by the state agencies with regard to responding to any subpoenas, communications between the Pennsylvania Attorney General and these state agencies would be covered by the attorney-client privilege. [Dkt. 738-9 at 2]. In order to minimize this assertion of privilege, the Pennsylvania Attorney General has attempted to subdivide its own office between the team litigating this case and "different attorneys than those involved in this enforcement action" in order to argue conclusively that the assertion of attorney-client privilege "would not change the possession, custody, or control analysis" without citation to any legal support. *Id.* The Court finds this argument is not supported by citation to law and is contrary to the weight of law. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . . The rule of

United States District Court
Northern District of California

1    imputed disqualification applies to both private firms and public law firms such as a district

2    attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d

3    at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious

4    disqualification is the general rule, and that we should presume knowledge is imputed to all

5    members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the

6    presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in

7    the context of government attorneys, which presumption could be rebutted by proper ethical

8    screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue

9    "should be screened from any direct or indirect participation in the matter," vicarious

10   disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer

11   disqualified when joining prosecutors' office but "the entire office in which that attorney works is

12   not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of

13   the entire prosecuting office is not necessary absent special facts, such as a showing of actual

14   prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public

15   legal service organizations like private law firms and impute shared confidences among lawyers of

16   the entire public law entity.  Even in jurisdictions which do not automatically impute

17   disqualification, and shared confidences, to an entire public law office, those courts recognize that

18   ethical screening or other procedures are required out of recognition that actual (as opposed to

19   imputed) sharing of confidences may occur and such procedures are required to avoid dissemination

20   of attorney-client privileged communications within an entire public law organization.  This review

21   of case law demonstrates that no courts support Pennsylvania's argument that different individual

22   lawyers in the Pennsylvania Attorney General's office have *ex ante* separable, discrete attorney-

23   client relationships.

24        The Court rejects Pennsylvania's attempt to simultaneously disclaim the existence of an

25   attorney-client privilege as between the attorneys "involved in this enforcement action" while

26   apparently attempting to preserve the ability to assert the privilege applies to communications

27   between other lawyers in the Attorney General's office and these agencies.  "[T]o to the extent that

28   [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official

1    capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney

2    General represents these individuals, but that for discovery purposes the [Plaintiff] United States

3    must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.  The fact that

4    the Pennsylvania Attorney General is attempting to preserve the ability to assert the attorney-client

5    privilege between the Pennsylvania Attorney General's office and the agencies at issue further

6    supports the conclusion of control here.  Assertion of the attorney client privilege requires, as a

7    prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

8         Indeed, the Pennsylvania Attorney General confirmed that its office could represent all of

9    the Pennsylvania agencies at issue, if Meta were to serve those agencies with a subpoena in this

10   matter.  [Dkt. 738-1 at 25].  Accordingly, it appears that under the statutory scheme each agency

11   will be represented by the Pennsylvania Attorney General in this matter for discovery.  71 Pa. Stat.

12   § 732-204.  Thus, as a matter of the efficient and rational administration of justice in this case,

13   because the Pennsylvania Attorney General will be involved in representing these state agencies in

14   any event in this case (whether to respond to subpoenas or to respond to party discovery), the Court

15   in its discretion determines that a finding of control is further supported by the simple and pragmatic

16   realities involved in these circumstances.

17        At oral argument, the Pennsylvania Attorney General (along with other states) raised the

18   same "virtual veto" argument raised by other states.  As discussed, this argument is based on an

19   unsupported hypothetical possibility that the state agencies could simply refuse to cooperate with

20   their statutorily-mandated lawyers (the Pennsylvania Attorney General's office) and refuse to

21   provide documents in response to the document requests.  From that, the Pennsylvania Attorney

22   General (consistent with other states) argues that the Attorney General's office would have no

23   mechanism or recourse if the agencies simply refused, and that this would put the Attorney

24   General's office in the untenable position of potentially being sanctioned for failure to obtain

25   documents from the state agencies.  *Id.*  This is a variation on the "virtual veto" argument, discussed

26   above, which the Court finds unpersuasive to rebut the finding of control.

27        First, the Pennsylvania Attorney General presented no evidence to support this hypothetical

28   risk that the Pennsylvania state agencies would simply refuse to provide documents, and presented

**Add. 205**

no evidence that these agencies have ever refused to cooperate in discovery in the past. Indeed, this hypothetical refusal by state agencies is a particularly weak argument in light of Pennsylvania's statutory scheme which gives the Pennsylvania Attorney General the express right to obtain agency documents. Second, this hypothetical raised by the Pennsylvania Attorney General (and other states) is not merely an unfounded "fear", this argument assumes that the state agencies would act unreasonably in defiance of a discovery Order such as the instant Order. It is not reasonable to base a legal conclusion on an unreasonable, unsupported hypothetical that imagines the worst possible behavior; rather, the law presumes that parties will act reasonably and rationally in response to court Orders. "We think that surely one must assume that litigants will obey court orders. Once we assume otherwise, then our system of jurisprudence is in serious trouble." *E. I. du Pont de Nemours & Co.*, 442 F. Supp. at 825; *see also Casas*, 2017 WL 1153336, at *6 (The Court recognized the existence of "the legal presumption that defendants had regularly discharged their duties and complied with the court's order.").

Third and perhaps most importantly, if the state agencies simply refused to comply, they would be subject to legal consequences. A Court has the inherent authority to enforce its own Orders in order to control the conduct of the proceedings, protect the "orderly administration of justice," and to maintain "the authority and dignity of the court." *Roadway Express, Inc.*, 447 U.S. at 764–67 (citations omitted). Because (as discussed herein) the Court finds that the Pennsylvania Attorney General's office has legal control of documents from the Pennsylvania state agencies (and thus discovery from the state agencies under Rule 34 is appropriate), then the state agencies would be in direct violation of this very Order if they should hypothetically choose to completely defy this very Order and refuse to provide documents to the Pennsylvania Attorney General. Meta could, in that situation, file a motion to compel and, should the state agencies continue to simply refuse to provide documents, this Court would have the inherent authority to issue sanctions (including monetary sanctions) against the state agencies for any such hypothetical refusal to abide by an Order of this Court. The Pennsylvania Attorney General's argument that the Court would choose to sanction their office in this situation presumes this Court would act in ignorance of the source of the non-compliance – if, as hypothetically theorized, it were the state agencies who were non-compliant

1    despite the best efforts of the state Attorney General to secure compliance, the Court is perspicacious

2    enough to understand that the fault would lie with the hypothetical state agency and not the

3    Pennsylvania Attorney General, and in the event some enforcement mechanism were needed (such

4    as the hypothetically feared sanctions), the Court would presumably have the wisdom to understand

5    how and where to focus any such enforcement Order. *Qualcomm*, 2010 WL 1336937, at *2–5;

6    *Optronic Techs., Inc.*, 2020 WL 2838806 at *5–7.

7          Therefore, unlike the factors in *Citric Acid*, the state agencies here would not be in a position

8    to obstinately refuse to provide documents in response to the document requests without incurring

9    risk of legal consequences.  Unlike in *Citric Acid*, the party here which is alleged to (and found to)

10    have control (the state Attorney General) does in fact have legal recourse to secure the compliance

11    of the controlled entities (the state agencies) should they simply refuse to turn over the documents.

12    This bolsters the Court's finding that the state Attorney General here does possess the "legal ability"

13    to obtain the documents from the state agencies, over and in addition to the statutory basis discussed

14    above.  *Cf. Citric Acid*, 191 F.3d at 1107 (lack of "legal ability" to obtain documents is a factor in

15    finding no "legal control")  The fact that legal recourse is available in this event is therefore a factor

16    which, according to *Citric Acid*, demonstrates that legal control exists in the factual circumstances

17    here.

18          As discussed above, the Court is not persuaded by the argument that the Pennsylvania

19    Attorney General lacks control over state agency documents, because an attorney in a court

20    proceeding can simply do nothing when faced with a client who (hypothetically here) refuses to

21    collect or provide documents for production in discovery.  As counsel for a party subject to

22    discovery, the Pennsylvania Attorney General has the legal authority and duty to take action to make

23    inquiry and collect the documents from the uncooperative state agencies directly, and cannot simply

24    sit on their hands in the face of an uncooperative client – this is would not be the first time an

25    attorney was faced with a client who was difficult to deal with in collecting documents for discovery.

26    *See, e.g.*, *Qualcomm*, 2010 WL 1336937, at *2–5.  Counsel in a litigation has legal duties to take

27    pro-active steps in supervising and searching for documents in discovery that go far beyond simply

28    acceding to a client who fails to (or worse, refuses to) produce or provide documents.  *Id.* (detailing

United States District Court
Northern District of California

"Discovery Errors" by counsel); *Rodman*, 2016 WL 5791210, at *3–4. Counsel cannot simply advise clients about document requests and leave it up to the client to decide whether or not to risk sanctions for failure to produce – in appropriate circumstances, counsel may need to personally conduct or directly supervise a client's collection, review, and production of responsive documents. *Optronic Techs., Inc.*, 2020 WL 2838806 at *5–7 ("The Court does not conclude that counsel must always personally conduct or directly supervise a client's collection, review, and production of responsive documents. However, in the circumstances presented here, the Court finds that [counsel] Sheppard Mullin did not make a reasonable effort . . . . [T]he Court orders Ningbo Sunny's new counsel of record to undertake an independent effort to ensure that Ningbo Sunny fully complies with Orion's post-judgment document requests."). The Court rejects as legally erroneous the Pennsylvania Attorney General's arguments, because they are based on a misunderstanding of counsel's role (and duties) in discovery and the available procedures under the Federal Rules for the proper conduct of discovery and the rational administration of justice. *See King*, Case No. 20-cv-04322-LGS-OTW, Dkt. 272, slip op. at 2 ("embroil[ing the judge] in day-to-day supervision of discovery [is] a result directly contrary to the overall scheme of the federal discovery rules.").

In addition to their duties to supervise the collection of documents and make inquiry of clients to ensure proper collection of documents is undertaken, attorneys representing clients in court proceedings have legal duties under the Federal Rules of Civil Procedure to work cooperatively to improve the administration of civil justice, both as officers of the Court and under their ethical obligations as members of the bar of this Court. *See* Fed. R. Civ. P. 1 advisory committee's note to 2015 amendment. "Rule 26(g) imposes ***an affirmative duty to engage in pretrial discovery in a responsible manner*** that is consistent with the spirit and purposes of Rules 26 through 37 . . . . The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that ***obliges each attorney*** to stop and think about the legitimacy of a discovery request, ***a response thereto, or an objection*** . . . . If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." *See* Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment.

As the Ninth Circuit has recognized, "legal duties" are jural correlatives and logically

antecedent to "legal rights" – and thus the Pennsylvania Attorney General's legal duties to undertake proactive efforts to collect documents from clients in discovery are the flip side to the legal right to access those documents. *Newman*, 287 F.3d at 790 n.5 ("The logical relationship between rights and duties has been the subject of considerable academic examination.  Wesley Hohfeld famously described rights and duties as 'jural correlatives'—different aspects of the same legal relation.  Oliver Wendell Holmes described rights as 'intellectual constructs used to describe the consequences of legal obligations. [sic] As he puts it [in The Common Law (1881)], 'legal duties are logically antecedent to legal rights.'") (internal citations omitted).  Here, the recognition that a state Attorney General, acting as counsel for the state agencies here, has legal duties to supervise the collection of (and possibly directly obtain) documents from those agencies for discovery lends further support to the conclusion that the state Attorney General has the legal right to access those documents.  That is, counsel's legal duty to ensure collection of documents from a client is a different aspect of (and correlates juridically to) a legal right to access those documents, and thus supports the conclusion of control for purposes of discovery.

The Pennsylvania Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Pennsylvania Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at \*5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").  To the extent the Pennsylvania Attorney General argues that these agencies are "separate entities under law" from the state Attorney General and are not supervised by the state Attorney General, *see* Dkt. 738-29 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The

United States District Court
Northern District of California

control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Pennsylvania Attorney General "neither governs nor is governed by another Commonwealth agency" is simply re-stating the issue, *id.* (citation omitted), and not determinative of the issue. Arguing that the Pennsylvania Attorney General is "an independent agency", *id.*, confuses and conflates the "legal control" issue for discovery with "operational control" or "functional independence" and thus constitutes a legally erroneous argument.

Meta has argued that state agencies are part of the government of the Commonwealth of Pennsylvania (the Plaintiff) and thus should be treated as parties for purposes of discovery based on that status. [Dkt. 685 at 6 n.4]. Semantically this position may have some facial appeal at a broad level. *See In re Redf Mktg., LLC*, No. 12-32462, 2015 WL 1137661, at *3 (Bankr. W.D.N.C. Mar. 10, 2015) ("state agencies are, as the term suggests, agents of the state."). If the Pennsylvania state agencies are agents of the state, then under *Hitachi*, that factor would militate in favor of finding "legal control." *Hitachi*, 2006 WL 2038248, at *1. However, determining whether a particular state agency is an agent of its sovereign state appears to involve a multi-factor analysis. *See Savage v. Glendale Union High School Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1040–41 (9th Cir. 2003) ("To determine whether a governmental entity is an arm of the state for Eleventh Amendment

purposes, we examine the following factors: (1) whether a money judgment would be satisfied out of state funds; (2) whether the entity performs central governmental functions; (3) whether the entity may sue or be sued; (4) whether the entity has the power to take property in its own name or only in the name of the state; and (5) the corporate status of the entity.").  Here, Meta has not cited law to establish whether "agency" for purposes of discovery is evaluated under the same legal standard as "agency" for purposes of sovereign immunity, and further Meta has provided only cursory argument to support a finding that each of the six Pennsylvania state agencies should be held to be agents of the Commonwealth of Pennsylvania for purposes of discovery under applicable legal standards.  Accordingly, while the Court notes this factor, it is non-dispositive on the record presented to the Court.

The Pennsylvania Attorney General has cited no statutory, legal, or administrative rule cited which prohibits the Pennsylvania Attorney General from accessing the documents of the state agencies at issue, and as discussed above, there is an express statute granting that access.  Nor is there citation to any statutory or legal prohibition on the Pennsylvania Attorney General's representing the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both counsel to a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party or counsel to a party; rather under the particular facts here and under the totality of circumstances viewed in light of

United States District Court
Northern District of California

United States District Court
Northern District of California

applicable legal standards, the Court finds that control exists here.

Indeed, at least one other federal court has previously found that the Pennsylvania Attorney General has legal control over Pennsylvania state agency materials. *Generic Pharmaceuticals (I)*, 571 F. Supp. 3d at 408; *see also* 2023 WL 6985587, at *3 (E.D. Pa. Oct. 20, 2023). While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed herein in light of the facts and circumstances presented here, the analysis in both opinions from the Pennsylvania federal district court in the *Generic Pharmaceuticals (I)* and *Generic Pharmaceuticals (II)* Multi-District Litigations are certainly consistent with (and to that extent further persuasively supports) the conclusion here with regard to the Pennsylvania Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (I)* Court resolved the control issue against all the objecting states including Pennsylvania, this Court is disappointed that the Pennsylvania Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where (as here) there is guidance in precedent on the discovery issue at hand.

## XXIX. RHODE ISLAND

In opposition to the control issue, the Rhode Island Attorney General argues primarily the following factors: (1) the Rhode Island Attorney General is a separate entity and independent from the Rhode Island agencies; and (2) the Rhode Island Attorney General only represents Rhode Island agencies if requested by said agency and if the Rhode Island Attorney General consents to act as legal counsel. [Dkt. 738-30 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) that the Rhode Island Attorney General is the legal representative of all state agencies, and (2) that no statute deprives the Rhode Island Attorney General from accessing Rhode Island agency documents. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Board of Governors for Higher Education; Department of Administration; Department of Behavioral Healthcare, Developmental Disabilities and Hospitals;

Department of Children, Youth, and Families; Department of Education; Department of Health; Department of Human Services; Executive Office of Health and Human Services; Office of the Governor; and Office of the Child Advocate. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Rhode Island Attorney General does have legal control, for purposes of discovery, over the listed Rhode Island agencies.

The statutory scheme in Rhode Island requires that "the attorney general, whenever requested, ***shall act*** as the legal adviser of . . . all state boards, divisions, departments, and commissions . . . and shall institute and prosecute, whenever necessary, all suits and proceedings which they may be authorized to commence, and ***shall appear for*** and defend the . . . boards, divisions, departments, commissions, commissioners, and officers, ***in all suits*** and proceedings which may be brought against them in their official capacity." 42 R.I. Gen. Laws § 42-9-6 (emphasis added).

Indeed, the Rhode Island Attorney General confirmed that its office could represent all the agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 25–26]. As discussed above, no separate counsel has entered appearance on behalf of the Rhode Island state agencies. Accordingly, it appears that under the statutory scheme each agency will be represented by the Rhode Island Attorney General in this matter for discovery. *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 17 (1st Cir. 2020) (the Rhode Island "attorney general . . . by law is obligated to act as legal advisor ***for all state agencies*** and officers acting in their official capacity and to defend them against suit, R.I. Gen. Laws § 42-9-6[.]") (emphasis added). Certainly, in the face of this statutory scheme, it is not surprising that the Rhode Island Attorney General cites no law which prohibits that office from representing the state agencies in this matter.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Rhode Island Attorney General from accessing the documents of the state agencies at issue. The Rhode Island Attorney General argues that the "Rhode Island laws that permit or require sharing of information do so in the context of affirmative investigations, actions, or projects." Dkt. 738-30 at 2 (citations omitted). However, several of these statutes relate to sharing information with agencies

United States District Court
Northern District of California

or commissions other than the Attorney General and are thus irrelevant to the control issue here. *See, e.g.*, Dkt. 738-30 at 2 (citing R.I. Gen. Laws § 42-119-8 (disclosure to the R.I. Commission on Women and Girls; § 42-26-11 (disclosure to "commission of the Public Safety Grant Administration Office")). Other cited statutes relate to disclosures from agencies not involved in this action or for statutory purposes unrelated to this Multi-District Litigation, and thus are not instructive on the control issue here. *See, e.g.*, Dkt. 738-30 at 2 (citing R.I. Gen. Laws § 42-45.1-12 (relating to Antiquities Act of R.I.); § 42-66-10 (relating to Office of Healthy Aging, not at issue in this Multi-District Litigation); § 42-66.7-9(b) (relating to long term care ombudsman, not at issue in this Multi-District Litigation)). Further, while these statutes provide for disclosure of information in the context of certain investigations or for identified purposes, none of these statutes state that they are the ***only*** method by which the Rhode Island Attorney General may obtain documents from state agencies. Indeed, the only cited statute which relates to an agency at issue in this case, *see* dkt. 738-30 at 2 (citing R.I. Gen. Laws § 42-72-8(b)), grants the Rhode Island Attorney General the unrestricted legal rights to access documents and information from the Rhode Island Department of Children, Youth, and Families, in circumstances involving either an investigation of (or prosecution of) criminal conduct by another person relating to a child or other children within the same family unit, or an investigation of (or prosecution of) false reporting of child abuse or neglect. *See* R.I. Gen. Laws §§ 42-72-8(b)(7), -8(b)(9). If the Rhode Island Attorney General were currently investigating any potential criminal charges against Meta relating to children (which is known only to the Rhode Island Attorney General at this time), then the Rhode Island Attorney General would have a legal right to access (and thus control) over the documents of the Rhode Island Department of Children, Youth, and Families. In any event, close reading of these statutes, ultimately, demonstrates that none of them explicitly or implicitly forbid the Rhode Island Attorney General from accessing documents for the purposes of discovery during its scope of legal representation of the state agencies.

The Rhode Island Attorney General argues that agencies "routinely require the [Rhode Island Attorney General's] Office to issue subpoenas in enforcement cases before producing documents to the Office." [Dkt. 738-30 at 2]. From this, the Rhode Island Attorney General appears

1     to be arguing that the only way to obtain documents from state agencies would be by subpoena here,

2     even if the Rhode Island Attorney General were representing those very same state agencies as

3     clients (and not as the subjects of investigations). An argument that a lawyer representing a Rhode

4     Island state agency (whether the state Attorney General or private counsel) would be forced to issue

5     a subpoena to obtain documents from their own client is nonsensical and impractical, as well as

6     contrary to the principles of effective legal representation. As counsel for a state agency, the Rhode

7     Island Attorney General will have the normal type of direct access to the necessary documents from

8     its own clients, ensuring efficient and comprehensive legal support for the agencies involved. Under

9     the statutory scheme, the Rhode Island Attorney General is regularly called upon to represent the

10     interests of state agencies, which inherently requires a level of access to agency documents

11     necessary to render legal representation effectively. The Rhode Island Attorney General cites no

12     precedent requiring any attorneys representing a Rhode Island state agency to use a subpoena to

13     obtain documents from their own clients. The Rhode Island Attorney General's role as counsel for

14     the agencies at issue inherently involves obtaining necessary documents for effective representation

15     in litigation. In acting as counsel, the Rhode Island Attorney General would necessarily have access

16     to and thus control over the relevant documents needed to respond to discovery requests. *See*

17     *Monsanto*, 2023 WL 4083934, at \*5–6 (finding state Attorney General has control over agency

18     documents "based on his broad statutory and common law powers to control and manage legal

19     affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state

20     agencies referenced in the Complaint").

21         Relatedly, the Rhode Island Attorney General has stated that the attorney client privileged

22     is not asserted for communications between the Rhode Island Attorney General and these state

23     agencies "unless the Office has explicitly agreed to represent a state agency." [Dkt. 738-30 at 2].

24     The fact that the agencies had not formally retained the Attorney General as of the date of the

25     submission of their brief does not alter the reality that, under the statutory scheme, they will be

26     retained by the Attorney General once discovery formally is initiated against them by Meta (whether

27     by Rule 45 subpoena or by party discovery pursuant to this Order). The fact that the Rhode Island

28     Attorney General implicitly acknowledges that it could be retained by these agencies (and thus the

attorney-client privilege would apply to communications with the agencies) further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further the Rhode Island Attorney General explicitly argues that communications between the state agencies and the Attorney General may be protected by the work product doctrine. [Dkt/ 738-30 at 2]. The fact that the Rhode Island Attorney General asserts that pre-suit communications with the state agencies may be protected by the work product doctrine is an implicit admission that these agencies may have been involved in pre-suit investigations, may have interests in the outcome of this case, and (at a minimum) worked with the Attorney General on this case in a pre-suit attorney-client relationship. As discussed above, case law recognizes that factors that support a finding of control include situations where the third party has an interest in the outcome of the matter and where the third party participated in the preparation of or prosecution of the matter behind the scenes as an unnamed party. *See, e.g.*, *Hitachi*, 2006 WL 1038248, at *1. Asserting the work product doctrine over communications with state agencies thus further supports a finding of control here.

The Court rejects the Rhode Island Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege over communications with the agencies at issue, while apparently attempting to preserve the ability to assert work product protection applies to communications between the Rhode Island Attorney General's Office and these agencies. "[I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both counsel to a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit

1   required Salas to respond as to responsive materials over which Salas and his law firm had

2   possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is

3   presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at

4   *2. The Court is not holding broadly that there must be a finding of a legal right of access to and

5   thus control over third party client documents in every case involving a legal services provider as a

6   party; rather, under the particular facts here, and under the totality of circumstances viewed in light

7   of applicable legal standards, the Court finds that control exists here.

8       Further, the Rhode Island Attorney General argues that the Rhode Island Attorney General

9   is a separate and distinct elected entity with separate duties and responsibilities. Dkt. 738-30 at 2

10  ("Rhode Island state agencies are represented by separate and distinct legal counsel, and Rhode

11  Island laws only delegate such a right or duty in limited circumstances."). However, this argument

12  misapprehends the "legal control" test for documents – the issue is not simply whether one entity is

13  under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary

14  relationship), and not simply whether the two entities are legally separate (such as two different and

15  separately incorporated entities), but rather whether there is a legal right to obtain the documents as

16  explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to

17  have actual managerial power over the foreign corporation, but rather that there be close

18  coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-

19  client relationship between the state Attorney General and the state agencies (a relationship

20  mandated by state law) necessitates close coordination. While operational control may be a factual

21  situation which demonstrates a legal right to obtain the documents, the absence of such "executive

22  or functional control" is not determinative for evaluating "control" for purposes of discovery. By

23  definition, the "legal control" issue for discovery arises when there are two legally distinct or

24  separate entities – otherwise, if only one entity were involved, there would be no dispute that party

25  discovery covered that one entity. As discussed above, courts have found "control" for purposes of

26  discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary

27  having control over the documents of a parent corporation, or an individual government officer

28  having control over the documents of an entire agency. The Rhode Island Attorney General's

1  arguments erroneously conflate the legal control issue with "operational control" or "functional

2  independence" of each entity, and thus is insufficient to rebut a finding of legal control of the

3  documents for purposes of discovery.

4       Therefore, the Court concludes that the Rhode Island Attorney General has legal control, for

5  the purposes of discovery, over the documents held by the Rhode Island agencies listed by Meta.

6  **XXX.  SOUTH CAROLINA**

7       In opposition to the control issue, the South Carolina Attorney General argues primarily the

8  following factors: (1) the South Carolina Attorney General is a separate entity and independent from

9  the South Carolina agencies; and (2) the South Carolina Attorney General brought the lawsuit under

10  its own independent law enforcement capacity.  [Dkt. 738-31 at 2].

11       In support of a finding of control with regard to these state agencies' documents, Meta argues

12  based primarily on the following factors: (1) that South Carolina agencies are proscriptively barred

13  from obtaining counsel other than the South Carolina Attorney General, without consent from the

14  South Carolina Attorney General, and (2) that the South Carolina Constitution and local law

15  provides the South Carolina Attorney General the ability to require all state agencies to provide

16  information in writing upon any subject.  *Id.* at 3.  Here, Meta seeks discovery from the following

17  agencies: the Commission on Higher Education, Department of Administration Executive Budget

18  Office, Department of Children's Advocacy, Department of Commerce, Department of Consumer

19  Affairs, Department of Education, Department of Health and Human Services, Department of

20  Mental Health, Department of Social Services, Education Oversight Committee, and Office of the

21  Governor.  *Id.*

22       After considering the factors argued in the briefs, the Court finds that the factors weigh in

23  favor of a finding that the South Carolina Attorney General does have legal control, for purposes of

24  discovery, over the listed South Carolina agencies.  While the South Carolina Attorney General is a

25  separate entity and while the South Carolina Attorney General does bring the instant action in its

26  own independent authority, this does not outweigh the requirement that the South Carolina Attorney

27  General will act as the agencies' counsel.

28       The statutory scheme in South Carolina requires that "the Attorney General **shall** conduct

United States District Court
Northern District of California

all litigation which may be necessary for **any department of the state government** or any of the boards connected therewith, and all these boards or departments are **forbidden to employ any counsel** for any purpose except through the Attorney General and upon his advice[.]"  S.C. Code § 1-7-80 (emphasis added).

Indeed, the South Carolina Attorney General confirmed that its office could represent the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 27–28].  Accordingly, under the statutory scheme each agency will be represented by the South Carolina Attorney General in this matter for discovery.

Importantly, the South Carolina Attorney General's arguments do not negate the fact that all of the South Carolina agencies at issue here are barred by South Carolina law from obtaining counsel other than the South Carolina Attorney General.  S.C. Code § 1-7-80; *see also* S.C. Code § 1-7-160 ("[a] department or agency of state government may not hire a classified or temporary attorney as an employee except upon the written approval of the Attorney General and at compensation approved by him.").  This arrangement indicates strongly that the South Carolina Attorney General, in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

Further, there is no statutory, legal, or administrative rule cited which prohibits the South Carolina Attorney General from accessing the documents of the state agencies at issue.  Indeed, the contrary is true.  South Carolina law permits the South Carolina Attorney General to access agencies' documents at the direction of the Governor.  *See The State of South Carolina v. Purdue Pharma L.P.*, No. 2017CP4004872, 2019 WL 3753945 (S.C.Com.Pl. July 05, 2019).  In *Purdue Pharma*, the South Carolina court found "unconvincing" the State of South Carolina's refusal to produce documents from certain agencies "on the ground that information in the possession, custody, or control of executive agencies other than the Attorney General, as well as the Public Employee Benefit Authority and Department of Health and Human Services (both of whom were expressly named in the Amended Complaint), is outside of the State's possession, custody, or control."  *Id.* at *1.  Based on the South Carolina Constitution, the *Purdue Pharma* court held that "[a]s the legal representative of the executive branch, the Attorney General, at the direction of the

United States District Court  
Northern District of California

Governor, has the ability to require '[a]ll State officers, agencies, and institutions within the Executive Branch' to 'give him information in writing upon any subject relating to the duties and functions of their respective offices, agencies, and institutions.'" *Id.* (quoting S.C. Const. Art. IV, § 17). Citing South Carolina Rule of Civil Procedure 34 (which is analogous to Fed. R. Civ. P. 34, and includes the same "possession, custody, or control" language), the *Purdue Pharma* court held that "the contested information nonetheless appears to be within the possession, custody or control of the Attorney General." *Id.*

Under *Citric Acid*, if there were a "legal mechanism" to obtain the documents (such as filing a breach of contract action, which by definition would require seeking assistance in enforcement from a judicial officer in a legal action), then there would have been a finding of "control" for purposes of discovery. 191 F.3d at 1107-08. Here, under the South Carolina Constitution and *Purdue Pharma*, there is a legal mechanism for the South Carolina Attorney General to obtain the agencies' documents. Under *Citric Acid*, the fact that enforcement was contingent on a court or judicial officer exercising authority to grant relief in a breach of contract case did not detract from the legal right to access; here analogously, the fact that direction from the Governor under the Constitution did not (in *Purdue Pharma*) detract from the Attorney General's legal right to access the agencies' documents. Based on the South Carolina Constitution and *Purdue Pharma*, the Court finds that there is a legal right for the South Carolina Attorney General to access the state agencies' documents upon demand, and thus "control" exists under Rule 34 for at least these reasons.

There is no citation to any statutory or legal prohibition on the South Carolina Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive

materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The South Carolina Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the South Carolina Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Relatedly, the South Carolina Attorney General has taken the position that communications between the South Carolina Attorney General and these state agencies "would be protected under the attorney-client privilege" if that office were retained by such agencies. [Dkt. 738-31 at 2]. The fact that the agencies had not formally retained the Attorney General as of the date of the submission of their brief does not alter the reality that, under the statutory scheme, they will be retained by the Attorney General once discovery formally is initiated against them by Meta (whether by Rule 45 subpoena or by party discovery pursuant to this Order). The fact that the South Carolina Attorney General admits could be retained by these agencies and thus the attorney-client privilege would apply to communications with the agencies further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further the South Carolina Attorney General, like other states, argues that responding to a subpoena "would be handled by different attorneys than those involved in this enforcement action"

United States District Court
Northern District of California

1    and that therefore this "would not change the possession, custody, or control analysis." *Id.* This

2    argument is not supported by citation to any law. The scope of attorney-client relationship (and the

3    duties flowing therefrom, including the scope of the attendant attorney-client privilege)

4    encompasses the entirety of a legal services organization due to well-known rules of imputation of

5    confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel.*

6    *Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and

7    public law firms such as a district attorney's office or the office of the state public defender.");

8    *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We

9    do not doubt that vicarious disqualification is the general rule, and that we should presume

10   knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that,

11   in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption

12   of imputed knowledge in the context of government attorneys, which presumption could be rebutted

13   by proper ethical screening; *cf. also Billings*, 441 S.E.2d at 266 (because individual government

14   lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious

15   disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer

16   disqualified when joining prosecutors' office but "the entire office in which that attorney works is

17   not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of

18   the entire prosecuting office is not necessary absent special facts, such as a showing of actual

19   prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public

20   legal service organizations like private law firms and impute shared confidences among lawyers of

21   the entire public law entity. Even in jurisdictions which do not automatically impute

22   disqualification, and shared confidences, to an entire public law office, those courts recognize that

23   ethical screening or other procedures are required out of recognition that actual (as opposed to

24   imputed) sharing of confidences may occur and such procedures are required to avoid dissemination

25   of attorney-client privileged communications within an entire public law organization. This review

26   of case law demonstrates that there is insufficient legal support for South Carolina's argument that

27   having different individual lawyers in the South Carolina Attorney General's office represent the

28   agencies for discovery somehow inexplicably "would not change" the "control" analysis. [Dkt.

222

1    738-31 at 2].

2        The Court rejects the South Carolina Attorney General's attempt to simultaneously disclaim

3    the existence of an attorney-client privilege as between the attorneys currently "involved in this

4    enforcement action," while apparently attempting to preserve the ability to assert that the privilege

5    applies to communications between other lawyers in the South Carolina Attorney General's Office

6    and these agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these

7    legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

8    that on one hand the [State] Attorney General represents these individuals, but that for discovery

9    purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*,

10   2014 WL 1796661, at *2.

11       To the extent the South Carolina Attorney General argues that the South Carolina Attorney

12   General is a separate and distinct elected entity with separate duties and responsibilities from the

13   state agencies, that argument is not persuasive.  Dkt. 738-31 at 2 ("The [South Carolina Attorney

14   General] does not share a common executive with any of these agencies, which stand independently

15   from the Attorney General's Office.").  This argument misapprehends the "legal control" test for

16   documents – the issue is not simply whether one entity is under the day-to-day operational control

17   of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the

18   two entities are legally separate (such as two different and separately incorporated entities), but

19   rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The

20   control analysis for Rule 34 purposes does not require the party to have actual managerial power

21   over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude*

22   *Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state

23   Attorney General and the state agencies (a relationship mandated by state law) necessitates close

24   coordination.  While operational control may be a factual situation which demonstrates a legal right

25   to obtain the documents, the absence of such "executive or functional control" is not determinative

26   for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for

27   discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity

28   were involved, there would be no dispute that party discovery covered that one entity.  As discussed

United States District Court
Northern District of California

Add. 223

above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the South Carolina Attorney General "brings an action on behalf of the State of South Carolina . . . and not as the legal representative or attorney of any department or agency of state government," dkt. 738-31 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The South Carolina Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, South Carolina is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that South Carolina was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the South Carolina Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Therefore, the Court concludes that the South Carolina Attorney General has legal control, for the purposes of discovery, over the documents held by the South Carolina agencies listed by

1    Meta.

2    **XXXI. SOUTH DAKOTA**

3    In opposition to the control issue, the South Dakota Attorney General argues primarily the

4    following factors: (1) the South Dakota Attorney General is a separate entity and independent from

5    the South Dakota agencies; (2) the South Dakota Attorney General is not automatically required to

6    represent South Dakota agencies, and once such representation occurs, South Dakota law grants the

7    South Dakota Attorney General access to the South Dakota agencies' documents.  [Dkt. 738-32 at

8    2].

9    In support of a finding of control with regard to these state agencies' documents, Meta argues

10   based primarily on the following factors: (1) the South Dakota Attorney General is South Dakota's

11   "representative in judicial proceedings;" and (2) no statute deprives the South Dakota Attorney

12   General from access to South Dakota agency documents.  *Id.* at 3.  Here, Meta seeks discovery from

13   the following agencies: the Board of Regents, Bureau of Finance and Management, Department of

14   Education, Department of Health, Department of Social Services, Governor's Office, and

15   Governor's Office of Economic Development.  *Id.*

16   The statutory scheme in South Dakota requires that "[i]t is the duty of the attorney general:

17   (1) To appear for the state and prosecute and defend all actions and proceedings, civil or criminal,

18   in the Supreme Court, in which the state shall be interested as a party; [and] (2) When requested by

19   the Governor or either branch of the Legislature, or whenever, in the judgment of the attorney

20   general, the welfare of the state demands, to appear for the state and prosecute or defend, in any

21   court or before any officer, ***any cause or matter, civil*** or criminal, in which the state may be a party

22   or interested[.]"  S.D. Codified Laws § 1-11-1 (emphasis added).

23   Indeed, the South Dakota Attorney General confirmed that its office could represent the

24   agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1

25   at 28–29].  As discussed above, no separate counsel has appeared for any of the state agencies at

26   issue.  Accordingly, it appears that under the statutory scheme each agency will be represented by

27   the South Dakota Attorney General in this matter for discovery.

28   Further, there is no statutory, legal, or administrative rule cited which prohibits the South

United States District Court
Northern District of California

Dakota Attorney General from accessing the documents of the state agencies at issue.  Indeed, the

contrary is true.  South Dakota law permits the South Dakota Attorney General to access agencies'

documents with consent of the Governor.  S.D. Codified Laws § 1-11-10 ("Under such resolution

or order of the Governor, or the attorney general's own relation with consent of the Governor, the

attorney general . . . shall have access to any and all books, blanks, . . . and materials and equipment

of the office, department, bureau, board, commission, or any other component part of the state

government or any branch, arm, or agency of the government[.]").  The South Dakota Attorney

General admits that there are other specific statutes giving the Attorney General the right to access

certain agencies' documents under certain conditions.  [Dkt. 738-32 at 2].  In *Citric Acid*, the lack

of control was based on a lack of "legal mechanism" to obtain the documents (such as filing a breach

of contract action, which by definition would require seeking assistance in enforcement from a

judicial officer in a legal action).  191 F.3d at 1107-08.  Here, under these statutes, there appear to

be legal mechanisms for the South Dakota Attorney General to obtain the documents – for example,

under Section 1-11-10, the Attorney General has the legal authority under its "own relation" to have

access to the records of any agency, with the assistance and consent of the Governor.  Under *Citric*

*Acid*, the fact that enforcement was contingent on a court or judicial officer exercising authority to

grant relief in a breach of contract case did not detract from the legal right to access; here

analogously, the fact that consent is required from the Governor under the statute should not detract

from the Attorney General's legal right to access the agencies' documents.

The South Dakota Attorney General does not provide any citation to any statutory or legal

prohibition on the South Dakota Attorney General's representing the state agencies in this matter

for purposes of discovery.  *See* Dkt. 738-32 at 2.  The Court recognizes that this is a somewhat

unusual situation, in which a law enforcement organization (the attorney general) is both a party to

the case while also acting or able to act as counsel for a third party.  However, this would not be the

first time that a legal services provider, as counsel for a party, is found to have control over third

party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas

individually and his law firm, the subpoena recipients and defendants in this court, are counsel of

record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production

to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Relatedly, the South Dakota Attorney General has taken the position that communications between the South Dakota Attorney General and these state agencies would be covered by the attorney-client privilege. [Dkt. 738-32 at 2]. The fact that the South Dakota Attorney General admits it "may appear on behalf of the state agencies" and thus "would assert" that communications with the agencies are privileged further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, South Dakota is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that South Dakota was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the South Dakota Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through

United States District Court
Northern District of California

1  reasonable, good faith negotiations between able and experienced counsel, particularly where, as

2  here, there is guidance in precedent on the discovery issue at hand.

3      Therefore, the Court concludes that the South Dakota Attorney General has legal control,

4  for the purposes of discovery, over the documents held by the South Dakota agencies listed by

5  Meta.

6  **XXXII. VIRGINIA**

7      In opposition to the control issue, the Virginia Attorney General argues primarily the

8  following factors: (1) the Virginia Attorney General is a separate entity and independent from the

9  Virginia agencies; and (2) the Virginia Attorney General brought the lawsuit under its own

10  independent law enforcement capacity.  [Dkt. 738-33 at 2].

11      In support of a finding of control with regard to these state agencies' documents, Meta argues

12  based primarily on the following factors: (1) the Virginia Attorney General is required to conduct

13  all legal services for Virginia agencies, and (2) Virginia law prohibits the Governor and agencies

14  from employing regular counsel.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies:

15  the Department of Behavioral Health and Developmental Services, Department of Education,

16  Department of Health, Department of Planning and Budget, Department of Social Services,

17  Economic Development Partnership, Foundation for Healthy Youth, Office of Children's Services,

18  and Office of the Governor.  *Id.*

19      After considering the factors argued in the briefs, the Court finds that the factors weigh in

20  favor of a finding that the Virginia Attorney General does have legal control, for purposes of

21  discovery, over the listed Virginia agencies. While the Virginia Attorney General is a separate entity

22  and while the Virginia Attorney General brought the instant action pursuant to its own authority,

23  this does not outweigh the requirement that the Virginia Attorney General will act as the agencies'

24  counsel.

25      The statutory scheme in Virginia requires that "[a]ll legal service in civil matters for the

26  Commonwealth, the ***Governor, and every*** state department, institution, division, commission,

27  board, bureau, ***agency***, entity, official, court, or judge, including the conduct of ***all civil litigation*** in

28  which any of them are interested, ***shall*** be rendered and performed by the Attorney General."  Va.

United States District Court
Northern District of California

Code § 2.2-507 (emphasis added).  Additionally, Virginia law requires that "[n]o regular counsel shall be employed for or by the Governor or any state department, institution, division, commission, board, bureau, agency, entity, or official." *Id.*

Indeed, the Virginia Attorney General confirmed that its office will definitely represent all the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 29–30].  Accordingly, under the statutory scheme each agency will be represented by the Virginia Attorney General in this matter for discovery (whether for party discovery under Rule 34 or for subpoenas under Rule 45).

Importantly, the Virginia Attorney General's arguments do not negate the fact that all of the Virginia agencies at issue here are barred by Virginia law from obtaining counsel other than the Virginia Attorney General, absent certain special conditions not present here.  Va. Code § 2.2-510 (requiring Governor approval, where it is impracticable or uneconomical for the Virginia Attorney General to render such services, or where the Virginia Attorney General must certify to the Governor that it is unable to render certain legal services).  Here, no separate counsel has entered appearance for any of the state agencies, and indeed based on the Virginia Attorney General's confirmation of representation, none is expected to.  This arrangement indicates strongly that the Virginia Attorney General, in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

Relatedly, the Virginia Attorney General has taken the position that communications between the Virginia Attorney General and these state agencies "could" be covered by the attorney-client privilege.  [Dkt. 738-33 at 2].  To the extent the Virginia Attorney General has attempted to subdivide its own office between the Attorney General's Consumer Protection Section litigating this case as opposed to "attorneys in other sections of the Department of Law" in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Virginia Attorney General's office but not other "sections," that argument is not supported by citation to law and is contrary to the weight of law.  The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety

United States District Court
Northern District of California

of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that there is insufficient legal support for Virginia's argument that different individual lawyers in the Virginia Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Virginia Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "section" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to

communications between other lawyers in the Virginia Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at \*2.  The fact that the Virginia Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Virginia Attorney General's office and the agencies at issue further supports the conclusion of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

The Virginia Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Virginia Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at \*5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Further, the Virginia Attorney General argues that the Virginia Attorney General and the Virginia Governor are "separately elected constitutional officers with distinct duties and independent authority."  Dkt. 738-33 at 2 (citations omitted).  However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship

United States District Court
Northern District of California

mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Virginia Attorney General brought this action "pursuant to the Attorney General's own authority to enforce the Virginia Consumer Protection Act[,]" dkt 738-33 (citing Va. Code § 59.1-203), is simply re-stating the issue to be decided, and not determinative of the issue. The Virginia Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Therefore, the Court concludes that the Virginia Attorney General has legal control, for the purposes of discovery, over the documents held by the Virginia agencies listed by Meta.

## XXXIII. WASHINGTON

In opposition to the control issue, the Washington Attorney General argues primarily the following factors: (1) the Washington Attorney General is a separate entity and independent from the Washington agencies; and (2) the Washington Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-34 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) the Washington Attorney General must act as counsel for the Washington agencies; and (2) the Washington Attorney General has already confirmed that it would represent the identified agencies in responding to a Meta subpoena. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Department of Children, Youth, and Families; Department of Health; Health Care Authority; Office of Financial Management Washington Office

United States District Court
Northern District of California

1    of the Governor; Board of Education; Board of Health; Department of Commerce; Department of

2    Health; and Department of Social and Health Services.  *Id.*

3            After considering the factors argued in the briefs, the Court finds that the factors weigh in

4    favor of a finding that the Washington Attorney General does have legal control, for purposes of

5    discovery, over the listed Washington agencies.  While the Washington Attorney General is a

6    separate entity and while the Washington Attorney General does bring the instant action in its own

7    independent authority, this does not outweigh the requirement that the Washington Attorney

8    General will act as the agencies' counsel.

9            The statutory scheme in Washington requires that "[t]he attorney general ***shall*** also represent

10   the state and all officials, departments, boards, commissions and ***agencies*** of the state in the courts,

11   and before all administrative tribunals or bodies of any nature, ***in all legal or quasi legal matters***,

12   hearings, or proceedings, and advise all officials, departments, boards, commissions, or agencies of

13   the state in all matters involving legal or quasi legal questions, except those declared by law to be

14   the duty of the prosecuting attorney of any county."  Wash. Rev. Code § 43.10.040 (emphasis

15   added).

16           Indeed, the Washington Attorney General confirmed that its office would definitely

17   represent all the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

18   [Dkt. 738-1 at 30].  Accordingly, under the statutory scheme each agency will be represented by the

19   Washington Attorney General in this matter for discovery (whether or not sought under Rule 34 or

20   under Rule 45).

21           Relatedly, the Washington Attorney General has taken the position that communications

22   between the Washington Attorney General and these state agencies would be covered by the

23   attorney-client privilege.  [Dkt. 738-34 at 2].  To the extent the Washington Attorney General has

24   attempted to subdivide its own office between the "CP Division" litigating this case and other "AGO

25   attorneys" in order to somehow argue that the scope of attorney-client privilege is limited only as to

26   some parts of the state Washington General's office but not other sub-teams, that argument is not

27   supported by citation to law and is contrary to the weight of law.  The scope of an attorney-client

28   relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client

privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . .  The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that no courts support Washington's argument that different individual lawyers in the Washington Attorney General's office have *ex ante*

1   separable, discrete attorney-client relationships.

2   The Court rejects the Washington Attorney General's attempt to simultaneously disclaim

3   the existence of an attorney-client privilege as between the "CP Division" of attorneys currently

4   working on this case, while apparently attempting to preserve the ability to assert that the privilege

5   applies to communications between other lawyers in the Washington Attorney General's Office and

6   these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these

7   legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue

8   that on one hand the [State] Attorney General represents these individuals, but that for discovery

9   purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*,

10  2014 WL 1796661, at *2. The fact that the Washington Attorney General is attempting to preserve

11  the ability to assert the attorney-client privilege between the Washington Attorney General's office

12  and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-

13  client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*,

14  610 F.3d at 1156.

15  The Washington Attorney General's role as counsel for the agencies at issue inherently

16  involves obtaining necessary documents for effective representation in litigation. In *Rhea*, the

17  Washington Attorney General was representing a state agency and was sanctioned by the

18  Washington District Court for failure to properly search for sources of information to provide

19  documents in discovery. *Rhea*, 2010 WL 5395009 at *6-7 (counsel 'has an obligation to not just

20  request documents of his client, but to search for sources of information.'"). In acting as counsel,

21  the Washington Attorney General has both discovery duties under the Federal Rules but also ethical

22  and professional duties which would necessarily provide access to and thus control over the relevant

23  documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6

24  (finding state Attorney General has control over agency documents "based on his broad statutory

25  and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

26  right to obtain responsive documents from the state agencies referenced in the Complaint").

27  Further, the Washington Attorney General argues that the Washington Attorney General is

28  a separate and distinct elected entity with separate duties and responsibilities. Dkt. 738-34 at 2

United States District Court
Northern District of California

United States District Court
Northern District of California

(citations omitted).  However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that the Washington Attorney General is not suing on behalf of or representing any state agency in this litigation and arguing that this action is brought under independent statutory authority, dkt. 738-34 at 2, is simply re-stating the issue to be decided, and not determinative of the issue.  The Washington Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Furthermore, the Western District of Washington's *Wilson v. Washington*, No. C16-5366 BHS, 2017 WL 518615 (W.D. Wash. Feb. 8, 2017), opinion on "control" involving Washington State agencies is instructive.  In *Wilson*, the plaintiffs sued the State of Washington, one specific agency, and an individual official of the state.  The defendants, represented by the Washington Attorney General, objected to document requests on that grounds "that they lack control or custody

of information sought by Plaintiff. Specifically, they argue that the requested information is held by state agencies **not listed as defendants**." *Id.* at *3. The Washington district judge ruled that "[t]his argument is unavailing." *Id.* (citing *Soto*, 162 F.R.D. at 619). Here, as in *Wilson*, the State of Washington is a named plaintiff (along with the Attorney General as relator). Here, as in *Wilson*, the Washington Attorney General argued that unnamed state agencies' documents are outside the control of the named parties. Here, as in *Wilson*, the Washington Attorney General is essentially repeating the same asserted arguments which the Washington federal district court rejected.

This is not the only instance in which a Washington district court rejected similar state agency arguments by the Washington Attorney General. In *Geo*, the State of Washington (represented, as here, by the Washington Attorney General) objected to document requests on the grounds that the Attorney General's Office lacked control over state agencies. *GEO Grp., Inc.*, 2018 WL 9457998, at *2. Geo sought documents from four agencies (including the Department of Social and Health Services and the Washington Governor's Office, both at issue in this case as well), and the Washington Attorney General argued lack of control because those agencies were not parties to the suit and the lawsuit was initiated as *parens patriae*. *Id.* In seeking to compel party discovery as against these state agencies, "GEO contends that the AGO has actual control over information held by state agencies because of the AGO's requisite relationship with them and statutory power to represent them." *Id.* The *Geo* Court found that "[i]n this Court's view, where the plaintiff is the State of Washington, discovery addressed to the State of Washington includes its agencies. Because the AGO is the law firm to the State of Washington, the AGO should respond to and produce discovery on behalf of the State of Washington, including its agencies." *Id.* at *3.

The *Geo* opinion distinguished precedent partially on the grounds that the litigation in *Geo* was initiated *parens patriae* whereas the litigation in the precedent was "effectively, an enforcement action on behalf of another agency" where the State was a nominal party. *Id.* (distinguishing *Boardman*, 233 F.R.D. at 265). However, the *Geo* opinion also distinguished *Boardman* on the grounds that the precedent "relied heavily analyzing the Constitution for the State of New York, a different state." *Id.* Further, the *Geo* opinion cited approvingly the *Wilson* opinion discussed above, and in *Wilson* the finding of control was not based on distinguishing litigation *parens patriae* versus

1    an agency enforcement action.  *Wilson*, 2017 WL 518615, at *3.

2         Finally, the Court has recognized that the issue of control of state agency documents, when

3    a State or State Attorney General is a party, has been litigated and decided in a previous Multi-

4    District Litigation involving most of the same States and State Attorneys General as are involved in

5    this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals*

6    *(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States

7    which withdrew their objections to party discovery and negotiated a resolution of this issue with the

8    opposing party there.  *Id.* at 356 n.5.  In that case, Washington is identified as one of the States

9    which reached agreement on the state agency control issue without requiring that court to expend

10   resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion

11   resolved the control issue against all the remaining objecting states and given that Washington was

12   able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is

13   disappointed that the Washington Attorney General and Meta were unable to reach a negotiated

14   resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery

15   Management Conferences, they should make every effort to work out discovery disputes through

16   reasonable, good faith negotiations between able and experienced counsel, particularly where, as

17   here, there is guidance in precedent on the discovery issue at hand.

18        Therefore, the Court concludes that the Washington Attorney General has legal control, for

19   the purposes of discovery, over the documents held by the Washington agencies listed by Meta.

20   **XXXIV. WEST VIRGINIA**

21        In opposition to the control issue, the West Virginia Attorney General argues primarily the

22   following factors: (1) the West Virginia Attorney General brought the lawsuit under its own

23   independent law enforcement capacity; and (2) the West Virginia Attorney General is a separate

24   entity and independent from the West Virginia agencies.  [Dkt. 738-35 at 2].

25        In support of a finding of control with regard to these state agencies' documents, Meta argues

26   based primarily on the following factors: the West Virginia Attorney General must act as counsel

27   for the West Virginia agencies absent the existence of statutory exemptions (not present here).  *Id.*

28   at 3.  Here, Meta seeks discovery from the following agencies: the Bureau for Children and Families,

United States District Court
Northern District of California

1    Department of Education, Department of Health and Human Resources, Development Office,

2    Governor's Office, State Budget Office, Department of Education. *Id.*

3         After considering the factors argued in the briefs, the Court finds that the factors weigh in

4    favor of a finding that the West Virginia Attorney General does have legal control, for purposes of

5    discovery, over the listed West Virginia agencies. While the West Virginia Attorney General is a

6    separate entity and while the West Virginia Attorney General does bring the instant action in its own

7    independent authority, this does not outweigh the requirement that the West Virginia Attorney

8    General will act as the agencies' counsel.

9         The statutory scheme in West Virginia requires that "[t]he attorney general shall give written

10   opinions and advice upon questions of law, and ***shall*** prosecute and defend suits, actions, and other

11   legal proceedings, and generally render and perform all other legal services, whenever required to

12   do so, in writing, by the governor . . . or any other state officer, board or commission, or the head of

13   any state educational, correctional, penal or eleemosynary institution[.]" W. Va. Code § 5-3-1

14   (emphasis added). Furthermore, "[t]he attorney general ***shall*** appear as counsel for the state ***in all***

15   ***causes*** pending in . . . ***any federal court***, in which the state is interested; . . . and when such

16   appearance is entered he shall take charge of and have control of such cause[.]" W. Va. Code § 5-

17   3-2 (emphasis added). As discussed above, no separate counsel has appeared for any of the agencies

18   here, and on the record presented, it appears that under the statutory scheme the West Virginia

19   Attorney General will represent these agencies.

20        Indeed, the West Virginia Attorney General confirmed that its office could represent the

21   agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1

22   at 31]. Accordingly, it appears that under the statutory scheme each agency will be represented by

23   the West Virginia Attorney General in this matter for discovery.

24        Further, there is no statutory, legal, or administrative rule cited which prohibits the West

25   Virginia Attorney General from accessing the documents of the state agencies at issue. Nor is there

26   citation to any statutory or legal prohibition on the West Virginia Attorney General's representing

27   the state agencies in this matter for purposes of discovery. The Court recognizes that this is a

28   somewhat unusual situation, in which a law enforcement organization (the attorney general) is both

United States District Court
Northern District of California

United States District Court
Northern District of California

a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Relatedly, the West Virginia Attorney General has taken the position that communications between the West Virginia Attorney General and these state agencies would be covered by the attorney-client privilege. [Dkt. 738-35 at 2]. To the extent the West Virginia Attorney General argues that his office "does not represent any other state agency" ***currently*** in this action, but also argues that "***when*** the AG is serving as legal counsel for a state agency" then the privilege applies, the West Virginia Attorney General plainly is attempting to preserve the ability to assert the attorney-client privilege between the West Virginia Attorney General's office and the agencies at issue - and that position further supports the conclusion of control here. Parsing whether the agencies ***at the moment of the writing of their brief*** may not have been represented by the West Virginia Attorney General, but keeping open the obvious likelihood that they ***will*** be represented for discovery under the statutory scheme in West Virginia, is a myopic argument which is not firmly grounded in reality and not persuasive. "[T]o the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at \*2. The fact that the West Virginia Attorney General

is attempting to preserve the ability to assert the attorney-client privilege between the West Virginia Attorney General's office and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156. And, as discussed above, "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. There is no showing here to rebut that presumption.

The West Virginia Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the West Virginia Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). Further, the West Virginia Attorney General argues that the West Virginia Attorney General is a separate and distinct elected entity with separate duties and responsibilities. Dkt. 738-35 at 2 (citations omitted). However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Further illuminating of the issue, the West Virginia federal court in *Baxley* found that a state agency (the West Virginia Division of Corrections and Rehabilitation) had control over documents of a third-party vendor (a medical contractor) such that the state agency was required to search for and produce documents from that third-party, overruling the state agency's objections that the third-party "is not a parent or subsidiary corporation of Defendants or in any way related thereto, and Defendants do not have custody of the responsive

documentation." *Baxley v. Jividen*, No. 3:18-CV-01526, 2020 WL 4282033, at \*3–5 (S.D.W. Va. July 27, 2020). Separateness of the entities involved is not determinative of the "control" issue.

Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. Thus, arguing that the West Virginia Attorney General is not suing on behalf of or representing any state agency in this litigation, and arguing that the "COPPA claim is not reliant on or related to any state agencies' claim(s)[,]" dkt. 738-35 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the lack of operational control is not alone determinative for evaluating "control." The West Virginia Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Therefore, the Court concludes that the West Virginia Attorney General has legal control, for the purposes of discovery, over the documents held by the West Virginia agencies listed by Meta.

## XXXV. WISCONSIN

In opposition to the control issue, the Wisconsin Attorney General's primary argument is that: the Wisconsin Attorney General only has powers prescribed by law and no such law proscribes the Wisconsin Attorney General to be able to access the documents of Wisconsin agencies. [Dkt. 738-36 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues

1    based primarily on the following factors: the Wisconsin Attorney General has already confirmed

2    that it is acting as counsel to the Wisconsin Governor in this litigation and that all but one of the

3    listed agencies are controlled by the Wisconsin Governor.  *Id.* at 3.  Here, Meta seeks discovery

4    from the following agencies: the Department of Administration, Department of Children and

5    Families, Department of Health, Department of Public Instruction, Department of Children's Mental

6    Health, and Office of the Governor.  *Id.*

7            After considering the briefing, the Court finds that the factors weigh in favor of a finding

8    that the Wisconsin Attorney General does have legal control, for the purposes of discovery, over the

9    listed Wisconsin agencies.  Specifically, it has legal control, for the purposes of discovery, over the

10   listed Wisconsin agencies that are controlled by the Wisconsin Governor because the Wisconsin

11   Attorney General is acting as counsel in this litigation for the Wisconsin Governor.  As discussed

12   above, no separate counsel has appeared for any Wisconsin agencies.  Accordingly, on the record

13   presented to the Court, it appears that the Wisconsin Attorney General (a) has admitted it has been

14   and will represent the Wisconsin Governor in this action, and (b) will represent the Wisconsin

15   agencies controlled by the Governor.

16           The statutory scheme in Wisconsin requires that the Wisconsin Attorney General through

17   the Wisconsin Department of Justice "***shall*** . . . appear for the state and prosecute or defend all

18   actions and proceedings, civil or criminal, in the court of appeals and the supreme court, in which

19   the state is interested or a party, and attend to and prosecute or defend all civil cases sent or remanded

20   to any circuit court in which the state is a party."  Wis. Stat. § 165.25(1) (emphasis added).

21   Additionally, the Wisconsin Attorney General "***shall*** . . . [i]f requested by the governor or either

22   house of the legislature, ***appear for and represent*** the state, ***any state department, agency***, official,

23   employee or agent, whether required to appear as a party or witness ***in any civil*** or criminal ***matter***,

24   and prosecute or defend in any court or before any officer, any cause or matter, civil or criminal, in

25   which the state or the people of this state may be interested."  Wis. Stat. § 165.25(1m) (emphasis

26   added).

27           Indeed, the Wisconsin Attorney General confirmed that its office could represent the

28   Wisconsin agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

[Dkt. 738-1 at 31–32]. Additionally, the Wisconsin Attorney General has (through artful language) confirmed that it has acted as counsel to the Governor in this litigation. Dkt. 738-36 at 2 ("Here, with respect to this litigation *and with the exception of the governor*, *the [Wisconsin Attorney General] has not acted as counsel* to any of the agencies identified by Meta in the Joint Chart.") (emphasis added). The Wisconsin Attorney General further concedes that all the agencies in the chart are run by a secretary (or in one instance, a director), who each are appointed by the Governor. *Id.* Under Wisconsin law, all secretaries "serve at the pleasure of the governor." Wis. Stat § 15.05(1)(a). Similarly, the director of the Office of Children's Mental Health is run by a director who shall likewise "serve at the pleasure of the governor." Wis. Stat. § 15.194(1). Because each of these agencies are run by appointees of the Governor and serve at the Governor's pleasure, their choices of counsel will clearly be determined by the Governor. And because the Wisconsin Attorney General has been and will represent the Governor in this case already and no other counsel has entered appearance for the state agencies, it is not surprising that the Wisconsin Attorney General would also thus represent these state agencies.

Accordingly, it appears that under the statutory scheme each agency will be represented by the Wisconsin Attorney General in this matter for discovery. While the Wisconsin Attorney General argues that there is no statute that expressly grants that office the right to access agencies' documents, the Wisconsin Attorney General cites no law which prohibits the Wisconsin Attorney General from accessing any agency documents. This arrangement indicates strongly that the Wisconsin Attorney General, in fulfilling its statutory role as counsel for the Governor and the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

Relatedly, the Wisconsin Attorney General has taken the position that communications between the Wisconsin Attorney General and these state agencies would be covered by the attorney-client privilege "where the AG is serving as legal counsel for a state agency." [Dkt. 738-36 at 2]. To the extent the Wisconsin Attorney General indicates that "a review will be undertaken to determine whether a legal privilege will apply," that indicates that the Wisconsin Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Wisconsin

United States District Court
Northern District of California

1    Attorney General's office and the agencies at issue, and that position further supports the conclusion

2    of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence

3    of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.  And, as discussed above, "[i]n

4    general, an attorney is presumed to have control over documents in its client's possession." *Perez*,

5    2014 WL 1796661, at *2.  There is no showing here to rebut that presumption.

6         The Wisconsin Attorney General cites no law which prohibits the Wisconsin Attorney

7    General from serving as counsel for the state agencies at issue.  Indeed, the Wisconsin Attorney

8    General's role as counsel for the agencies at issue inherently involves obtaining necessary

9    documents for effective representation in litigation.  In acting as counsel, the Wisconsin Attorney

10   General would necessarily have access to and thus control over the relevant documents needed to

11   respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney

12   General has control over agency documents "based on his broad statutory and common law powers

13   to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive

14   documents from the state agencies referenced in the Complaint").

15        Further, the Wisconsin Attorney General argues that the Wisconsin Attorney General is a

16   separate and distinct elected entity with "executive control over only one agency of state

17   government: the Wisconsin Department of Justice."  *See* Dkt. 738-36 at 2 (citations omitted).

18   However, this argument misapprehends the "legal control" test for documents – the issue is not

19   simply whether one entity is under the day-to-day "executive control" of the other (such as a parent-

20   wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate

21   (such as two different and separately incorporated entities), but rather whether there is a legal right

22   to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes

23   does not require the party to have actual managerial power over the foreign corporation, but rather

24   that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.

25   Here, the attorney-client relationship between the state Attorney General and the state agencies (a

26   relationship mandated by state law) necessitates close coordination.  While operational control may

27   be a factual situation which demonstrates a legal right to obtain the documents, the absence of such

28   "executive or functional control" is not determinative for evaluating "control" for purposes of

United States District Court
Northern District of California

discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.

The Western District of Wisconsin's opinion in *Perez v. Frank*, No. 06-C-248-C, 2006 WL 6040464, at *1 (W.D. Wis. Nov. 27, 2006), is instructive. In *Perez*, the plaintiff was suing several individual defendants who were officials within the Wisconsin Department of Corrections. *Id.* In that case, the plaintiff requested issuance of a subpoena for documents directed to the Department of Corrections. *Id.* The Wisconsin Court denied the request, tellingly, because "[b]efore I issue the requested subpoena to plaintiff, it will be necessary for him to advise the court why he believes the documents he wants *are not in the control of the defendants in light of the fact that they appear to be documents belonging to the Department of Corrections*. If the documents plaintiff seeks to inspect are in the control of the defendants, then he should request the production of documents pursuant to Fed. R. Civ. P. 34." *Id.* In *Perez*, the defendants were represented by the Wisconsin Attorney General. *Id.* Thus, the holding in *Perez*, known to the Wisconsin Attorney General's office, is that a Wisconsin federal judge has recognized that individuals, employed by a state agency, but none of whom are alleged to be in "executive control" of that agency, have sufficient apparent control of agency documents such that a subpoena is unnecessary and that party discovery is the appropriate procedural vehicle for document discovery. The *Perez* ruling thus by analogy persuasively supports this Court's conclusions on control regarding documents in this case for the Wisconsin agencies. *Cf. also Trane Co. v. Klutznick*, 87 F.R.D. 473, 476–78 (W.D. Wis. 1980) (finding named defendant, President of the United States, has control over information in the hands of non-party agencies such that supplemental interrogatory responses are ordered).

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in

this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Wisconsin is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Wisconsin was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Wisconsin Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Therefore, the Court concludes that the Wisconsin Attorney General has legal control, for the purposes of discovery, over the documents held by the Wisconsin agencies listed by Meta.

### ADMINISTRATIVE MOTIONS

As discussed above, the State Attorneys General filed an Administrative Motion for Leave to File Supplemental Information, a Second Administrative Motion for Leave to File Supplemental Information, and a Third Administrative Motion for Leave to File Supplemental Information. [Dkts. 1031, 1074, 1110]. All three seek leave to file information that Meta has served notices of its intent to serve subpoenas on some of the agencies at issue. *Id.* Meta's Response to the first Administrative Motion indicates that Meta does not object to the submission of these subpoenas as supplemental information and made clear its position that service of these subpoenas was being conducting without waiving Meta's position that the state agencies should be subject to party discovery. [Dkt. 1035 at 2]. As of the date of this Order, Meta takes no position with regard to the Second Administrative Motion, and the Court presumes that Meta's position would be the same as with respect to the First and Third Administrative Motion in any event. [Dkt. 1074 at 6; Dkt. 1110]. No opposition on the merits being filed, the Court **GRANTS** all three Administrative Motions.

**CONCLUSION**

The Court is disappointed that the Parties were incapable of reaching a negotiated resolution of this "control" issue, but rather required the Court to expend its valuable resources analyzing over thirty-five briefs on this "control" issue (where the State Attorneys General requested that the issues here required separate briefing for each State), conduct multiple hearings on this issue (where ultimately only a handful of the States presented oral argument), and prepare this admittedly length Order (where, as discussed above, a large number of the arguments overlapped and repeated, with only slight variations, from state to state). Indeed, rather than reaching negotiated resolution of this issue as in *Generic Pharmaceuticals (II)*, the Attorneys General of multiple states here preemptively declared at oral argument their intent to appeal any adverse ruling on "control" before they even saw this Order or this Court's reasoning (and where the Court did not rule from the bench).  The detailed discussion in this Order is intended, hopefully, to facilitate any later review.  The Court again reminds counsel for all Parties of their duties under Fed. R. Civ. P. 1 and 26 to work collaboratively for the efficient progress of this case, and to avoid unduly multiplying the proceedings.

For all reasons discussed herein, Meta's motion to compel the State Attorneys General to include the identified state agencies within the scope of party discovery is **GRANTED-IN-PART** and **DENIED-IN-PART** consistent with this Order.

The Parties (including counsel for the State Agencies) are **ORDERED** to promptly meet and confer regarding a mutually agreeable and reasonable date for the State Agencies to substantially complete their respective productions of documents in response to either the Rule 34 requests or, to the extent applicable, Rule 45 subpoenas.  The Parties shall include a summary report on the status of State Agency discovery in the Discovery Management Conference reports going forward.

**IT IS SO ORDERED.**

Dated: September 6, 2024

_____

PETER H. KANG
United States Magistrate Judge

248

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**California Northern District**

**Notice of Electronic Filing**

The following transaction was entered on 9/25/2024 at 8:42 AM and filed on 9/25/2024

| | |
|---|---|
| **Case Name:** | IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION |
| **Case Number:** | 4:22-md-03047-YGR |
| **Filer:** | |
| **Document Number:** | 1174(No document attached) |

**Docket Text:**
**[IN-CHAMBERS TEXT ONLY ORDER]: The Court has received both the [1167] State Attorneys General's Administrative Motion and [1173] Meta's opposition papers, and pursuant to Civil L.R. 7-11(c), the Administrative Motion is deemed submitted. The Court will rule on the Administrative Motion in due course. Unless and until the Administrative Motion is granted or otherwise ruled upon, the [1117] Order remains in full effect and the Court expects the Parties to abide with and follow the directives in that Order. Further, the Court expects the Parties will not rely on the pendency of the [1167] Administrative Motion or the fact that the [1117] Order is pending review by the presiding District Judge to delay or impede the progress of discovery, negotiations over discovery, and the timely production of discovery. All Parties have argued to this Court in different contexts that time is of the essence or that the deadlines in this MDL are tight. The Court expects counsel to continue to comply with their professional and ethical duties to work collaboratively and efficiently under this Court's Orders and as required by the Federal Rules of Civil Procedure to expeditiously and effectively move discovery forward without unnecessary, artificial, or undue delay. Signed by Judge Peter H. Kang on September 25, 2024. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (phklc2, COURT STAFF) (Filed on 9/25/2024)**

---

Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)

**4:22-md-03047-YGR Notice has been electronically mailed to:**

State of Georgia    apinson@law.ga.gov

Aaron Rihn    arihn@peircelaw.com

Abigail Burman    aburman@motleyrice.com

Adam D. Wahlquist    awahlquist@kmclaw.com

Adam E. Polk    apolk@girardsharp.com, 3768906420@filings.docketbird.com, avongoetz@girardsharp.com

Adam J. Levitt    alevitt@dicellolevitt.com, 5525369420@filings.docketbird.com

Aelish Marie Baig    AelishB@rgrdlaw.com, e_file_sd@rgrdlaw.com, pmitchell@rgrdlaw.com, sdavidson@rgrdlaw.com

Alan Borowsky    aborowsky@forthepeople.com

Alan M. Pickert    pickert@terrellhogan.com

Albert Quoc Giang    agiang@kslaw.com, albert-giang-6463@ecf.pacerpro.com, dochoa@kslaw.com

Alexandra Kory    alexandra.kory@atg.wa.gov, CPRreader@atg.wa.gov

Alexandra M. Walsh    awalsh@anapolweiss.com, acura@anapolweiss.com, agarcia@anapolweiss.com, amorales@anapolweiss.com, rcarmony@anapolweiss.com

Alexia M Diorio    alexia.diorio@atg.wa.gov

**Add. 249**

Alison Lynn Anderson     alanderson@bsfllp.com

Amy E. Keller     akeller@dicellolevitt.com, 3336248420@filings.docketbird.com

Amy R. Fiterman     amy.fiterman@faegredrinker.com

An V. Truong     atruong@simmonsfirm.com, ClassDocketing@ecf.courtdrive.com, ClassDocketing@simmonsfirm.com

Andre Michel Mura     amm@classlawgroup.com, 6947062420@filings.docketbird.com, ecf@classlawgroup.com

Andrea Pierson , Esq     andrea.pierson@faegredrinker.com, andrew.campbell@faegredrinker.com, bryan.pasciak@faegredrinker.com, deborah.miller@faegredrinker.com, tarifa.laddon@faegredrinker.com, TikTok-LAA-DesksiteFiling@faegredrinker.com

Andrew Allen Lemmon     andrew@lemmonlawfirm.com

Andrew Arthur Rainer     arainer@phaionline.org

Andrew C Smith     acsmith@vorys.com, tlavery@vorys.com

Andrew F. Kirtley     akirtley@cpmlegal.com, fthurston@cpmlegal.com, jtoomey@cpmlegal.com, pluc@cpmlegal.com

Andrew G Scott     ascott@pklaw.com

Andy D. Birchfield , Jr     andy.birchfield@beasleyallen.com, Melisa.Bruner@BeasleyAllen.com

Andy D. Birchfield Jr.     Andy.Birchfield@BeasleyAllen.com

Anna Schneider     anna.schneider@mt.gov, renee.franks@mt.gov

Anna Catherine Smith     annasmith@scag.gov

Anne Marie Murphy     amurphy@cpmlegal.com, bkittle@cpmlegal.com, elee-bellows@cpmlegal.com, jdiaz-marquez@cpmlegal.com, saparicio@cpmlegal.com

Annie Kouba     akouba@motleyrice.com, rbreakell@motleyrice.com

Annie Elizabeth Showalter     ashowalter@wc.com

Ansel Carpenter     acarpenter@cov.com

Anthony Petro     apetro@levinlegalgroup.com

Anthony J. Weibell     aweibell@mayerbrown.com, 8635108420@filings.docketbird.com, paldocket@mayerbrown.com

Anthony Kyle Bruster     akbruster@brusterpllc.com, akbruster@ecf.courtdrive.com, jpappas@brusterpllc.com, trector@brusterpllc.com

Arham Mughal     mughala@ag.louisiana.gov

Ariel Tal Teshuva     Ariel.Teshuva@mto.com, elena.holguin@mto.com, jenny.mendoza@mto.com, jose.hernandez@mto.com, raphael.sepulveda@mto.com, victor.tobar@mto.com

Arthur H. Bryant     abryant@clarksonlawfirm.com, bmurray@baileyglasser.com, crobinson@baileyglasser.com, jhammack@baileyglasser.com, mmcclay@baileyglasser.com, panderson@baileyglasser.com, wjohnson@baileyglasser.com

Ashley Margaret Simonsen     asimonsen@cov.com, docketing@cov.com, Echiulos@cov.com, mshuttlesworth@cov.com

Ashley Wall Hardin     ahardin@wc.com, rkirschenmann@wc.com

Athanasia Livas     alivas@cooperkirk.com

Austin P. Brane     abrane@wcllp.com, apriest@wcllp.com, pbradshaw@wcllp.com

B. Darren Burns     bdb@carneykelehan.com

Bailey J. Langner     blangner@kslaw.com, nrodriguez@kslaw.com, sbutler@kslaw.com, yherico@kslaw.com

Barry I. Dunn    bdunn@boesenlaw.com

Benjamin L. Bailey    bbailey@baileyglasser.com, kcharonko@baileyglasser.com, wjohnson@baileyglasser.com

Bernard Ardavan Eskandari    bernard.eskandari@doj.ca.gov

Bianca Miyata    bianca.miyata@coag.gov

Blair V. Kittle    bkittle@cpmlegal.com, shernandez@cpmlegal.com

Blake G Abbott    blake@akimlawfirm.com

Bradley D. Honnold    bhonnold@gohonlaw.com

Bradley D. Honnold    bhonnold@gohonlaw.com, blairm@gohonlaw.com, gquinlan@gohonlaw.com, mhise@gohonlaw.com, omadderom@gohonlaw.com, rmiller@gohonlaw.com

Brandon W. Smith    brandonsmith@forthepeople.com

Brendan Paul Ruddy    Brendan.Ruddy@doj.ca.gov, Tony.Tran@doj.ca.gov

Brent Patrick Ceryes    bceryes@sfspa.com

Bret Leigh Nance    bretleigh.nance@state.sd.us

Brian Danitz    bdanitz@cpmlegal.com, jtoomey@cpmlegal.com, pluc@cpmlegal.com, smartinez@cpmlegal.com

Brian M. Ercole    brian.ercole@morganlewis.com, peggy.martinez@morganlewis.com

Brian M. Willen    bwillen@wsgr.com, ageritano@wsgr.com, dgrubbs@wsgr.com

Brian W. Barnes    bbarnes@cooperkirk.com

Brittany Leigh Litzinger    blitzinger@kslaw.com

Bruce Edward Samuels    bsamuels@PSWfirm.com

Bruce Wyche Bannister    bbannister@bannisterwyatt.com

Bryan C. Yee    bryan.c.yee@hawaii.gov

Bryan D Pasciak    bryan.pasciak@faegredrinker.com

Calvin C. Fayard , Jr    calvinfayard@fayardlaw.com, wandaedwards@fayardlaw.com

Caren I Friedman    cfriedman@dpslawgroup.com

Cari Campen Laufenberg    claufenberg@kellerrohrback.com, cari-laufenberg-2758@ecf.pacerpro.com, dmarshall@kellerrohrback.com, dwilcher@kellerrohrback.com, sarah-skaggs-6083@ecf.pacerpro.com, sskaggs@kellerrohrback.com

Carlos Andre Benach    cbenach@irwinllc.com

Caroline Gieser    cgieser@shb.com

Carrie Goldberg    carrie@cagoldberglaw.com

Cary L. Joshi    cjoshi@baileyglasser.com

Catherine Mullaley    catherine.mullaley@skadden.com

Chaloea Williams    cwilliams@wc.com

Charles E. Schaffer    cschaffer@lfsblaw.com, vjennings@lfsblaw.com

Chris Springer    cspringer@kellerrohrback.com

**Add. 251**

Chris N. Ryder    cryder@kellerrohrback.com, saguirre@kellerrohrback.com, sogoloma@kellerrohrback.com

Christian James Pistilli    cpistilli@cov.com

Christopher Ayers    cayers@seegerweiss.com

Christopher Han    christopher.t.han@hawaii.gov

Christopher A. Seeger    cseeger@seegerweiss.com, dpsarks@seegerweiss.com, styjer@seegerweiss.com

Christopher Boyce Hood    chood@hgdlawfirm.com

Christopher C Chiou    cchiou@wsgr.com

Christopher D. Glover    chris.glover@beasleyallen.com

Christopher Glenn Lindblad    clindblad@nd.gov

Christopher L Ayers    cayers@seegerweiss.com

Christopher L. Rhoads    chris@rhoadsandrhoads.com

Christopher Londergan Springer    cspringer@kellerrohrback.com, cbrewer@kellerrohrback.com, gcappio@kellerrohrback.com, sarah-skaggs-6083@ecf.pacerpro.com, sskaggs@kellerrohrback.com

Christopher Michael D'Angelo    christopher.d'angelo@ag.ny.gov

Christopher Paul Gramling    cgramling@shb.com

Christopher Scott McRae    cmcrae@shb.com

Claire Elizabeth Kreider    ckreider@lawgarcia.com

Clark Cassidy Kirkland , Jr    ckirkland@scag.gov

Clinton Richardson    clinton.richardson@beasleyallen.com

Clinton A. Richardson    Clinton.Richardson@BeasleyAllen.com

Clinton K. Richardson    clinton.richardson@beasleyallen.com, kirsten.warren@beasleyallen.com

Colin P. Snider    colin.snider@nebraska.gov

Conrad Boyd Sturges , III    bsturges@dstattys.com

Corinne Gilchrist    corinne.gilchrist@atg.in.gov, emily.trent@atg.in.gov

Craig S Meuser    craigsmeuser@gmail.com

Cyrus Mehri    cmehri@findjustice.com

D. Blayne Honeycutt    dbhoneycutt@fayardlaw.com

DAVID G GILFILLAN    dgilfillan@carellabyrne.com

Daniel Edelstein    daniel.edelstein@ilag.gov

Daniel Keiser    daniel.keiser@ky.gov

Daniel Aaron Rihn    arihn@peircelaw.com, eciardi@peircelaw.com, mrossi@peircelaw.com

Daniel C. Levin    dlevin@lfsblaw.com, jlascio@lfsblaw.com

Daniel H Pfeifer    dpfeifer@pilawyers.com

Daniel John Ping    pingd@michigan.gov, balldayl@michigan.gov

Danny Parish    dparish@wolffardis.com

David Blayne Honeycutt    dbhoneycutt@fayardlaw.com, benita@fayardlaw.com

David Brian Fernandes    dfernandes@baronbudd.com, dfernandes@ecf.courtdrive.com, hwerkema@baronbudd.com, khewlett@baronbudd.com

David F. Abernethy    david.abernethy@faegredrinker.com

David H. Thompson    dthompson@cooperkirk.com, ccarroll@cooperkirk.com, gtaddei@cooperkirk.com, ktroilo@cooperkirk.com

David Patrick Dearing    David.Dearing@BeasleyAllen.com

David Paul Mattern    dmattern@kslaw.com, mnandarajgallo@kslaw.com

Dean Noburu Kawamoto    dkawamoto@kellerrohrback.com, cate-brewer-0141@ecf.pacerpro.com, cbrewer@kellerrohrback.com, dean-kawamoto-6396@ecf.pacerpro.com, sskaggs@kellerrohrback.com

Deborah R. Rosenthal    drosenthal@simmonsfirm.com, complexdocketing@simmonsfirm.com, jbryant@simmonsfirm.com, ttumino@simmonsfirm.com

Dena C. Sharp    dsharp@girardsharp.com, 8388361420@filings.docketbird.com, avongoetz@girardsharp.com

Derek W. Loeser    dloeser@kellerrohrback.com

Derek William Loeser    dloeser@kellerrohrback.com, cate-brewer-0141@ecf.pacerpro.com, cbrewer@kellerrohrback.com, derek-loeser-0264@ecf.pacerpro.com

Devin Lynn Bolton    dbolton@weitzlux.com

Diandra S. Debrosse Zimmermann    fu@dicellolevitt.com

Diandra S. Debrosse Zimmermann    fu@dicellolevitt.com

Donna Cecilia Valin    donna.valin@myfloridalegal.com, Diane.MargerMoore@myfloridalegal.com, Karen.Berger@myfloridalegal.com, Mandy.Mills@myfloridalegal.com, Michael.Dirckx@myfloridalegal.com, Miles.Vaughn@myfloridalegal.com, Patrice.Malloy@myfloridalegal.com, Patrick.Crotty@myfloridalegal.com, Tamara.redi@myfloridalegal.com

Douglas R. Plymale    drplymale@plymalelawfirm.com

E. Kenly Ames    kames@elpolaw.com

E. Powell Miller    epm@millerlawpc.com, aad@ecf.courtdrive.com, aad@millerlawpc.com

E. Scott Verhine    scott@verhine.biz, lisa@verhine.biz

E. Kate Patchen    kpatchen@cov.com

Ebony Bobbitt    ebobbitt@motleyrice.com

Edmund J O Meally    eomeally@pklaw.com

Edward K. Chin    ed@brusterpllc.com, jpappas@brusterpllc.com

Eli J. Hare    ehare@dicellolevitt.com

Elin Alm    ealm@nd.gov

Elizabeth Stern    estern@oag.state.md.us

Elizabeth Anne Orem    beth.orem@coag.gov

Elizabeth Joan Cabraser    ecabraser@lchb.com, elizabeth-cabraser-1441@ecf.pacerpro.com

Ellyn Hurd    ehurd@simmonsfirm.com, atrotta@simmonsfirm.com, pharmafilings@simmonsfirm.com

Emanuella Joanna Paulos    epaulos@levinlaw.com

**Add. 253**

Emanuella Joanna Paulos    epaulos@levinlaw.com, kdeaton@levinlaw.com

Emily Weissenberger    emily.weissenberger@faegredrinker.com, claren.sanjuan@faegredrinker.com, connie.gutierrez@faegredrinker.com, docketgeneral@faegredrinker.com, jeffrey.jackson@faegredrinker.com

Emily Catherine Jeffcott    ejeffcott@forthepeople.com, dtaylor@forthepeople.com, jautry@forthepeople.com, NNkeiti@ForThePeople.com

Emily Costello Kalanithi    emily.kalanithi@doj.ca.gov

Emily J. Beeson    ebeeson@wardblacklaw.com

Emily Jeanette Beeson    ebeeson@wardblacklaw.com, ecollins@wardblacklaw.com, kyoungblood@wardblacklaw.com

Emily Johnson Henn    ehenn@cov.com, docketing@cov.com, echiulos@cov.com, itran@cov.com

Emily Ward Roark    emily.roark@bryantpsc.com, christina@bryant.law, david@davidbryantlaw.com, kirsta.cruthis@bryantpsc.com

Erica Villanueva    evillanueva@fbm.com, calendar@fbm.com, kkelly@fbm.com

Erin Gee    egee@simmonsfirm.com

Esther E. Berezofsky    eberezofsky@motleyrice.com, hfonseca@motleyrice.com

Eugene K. Pettis    EPettis@hpslegal.com

Evan Taylor Rosemore    evan@southernmedlaw.com

Eve M. Elsen    eelsen@forthepeople.com

Ezekiel Wald    zsw@classlawgroup.com, 8299664420@filings.docketbird.com, dsk@classlawgroup.com, ecf@classlawgroup.com

Ezra Bronstein    ebronstein@findjustice.com

Faye Paul    faye.teller@mto.com

Felicia Craick    fcraick@kellerrohrback.com

Felicia Johnston Craick    fcraick@kellerrohrback.com, sskaggs@kellerrohrback.com

Francois Michel Blaudeau    francois@southernmedlaw.com

Frank C. Dudenhefer , Jr    fcdlaw@aol.com

Frank F Voler    fvoler@bernllp.com

Gabriel August Panek    gpanek@lchb.com, gabriel-panek-1553@ecf.pacerpro.com

Gabriel P Egli    gegli@shb.com

Garrett Heilman    gheilman@kellerrohrback.com

Geoffrey Drake    gdrake@kslaw.com, asambataro@kslaw.com, blangner@kslaw.com, bwheeler@kslaw.com, cameryn.coleman@kslaw.com, ghogan@kslaw.com, tharris@kslaw.com, tle@kslaw.com

Geri Howell    ghowell@shb.com

Glenn Draper    glenn@socialmediavictims.org, julie@socialmediavictims.org, SMI@socialmediavictims.org

Glenn S. Draper    glenn@bergmanlegal.com, glenn@socialmediavictims.org

Glenn S. Draper    glenn@socialmediavictims.org

Glenn S. Draper    glenn@socialmediavictims.org

**Add. 254**

Grahmn N. Morgan    grahmn.morgan@dinsmore.com

Greg Ladd    greg.ladd@ky.gov

Gregory K Wells    gwells@smwlawfirm.com

Gregory K. Wu    gwu@shb.com

Gregory Lawrence Halperin    ghalperin@cov.com

Gretchen Freeman Cappio    gcappio@kellerrohrback.com, bianca-nealious-3081@ecf.pacerpro.com, bnealious@kellerrohrback.com, cate-brewer-0141@ecf.pacerpro.com, debra-wilcher-6644@ecf.pacerpro.com, gretchen-freeman-cappio-5238@ecf.pacerpro.com

Hanan Malik    hanan.malik@ilag.gov

Hanne Jensen    hj@classlawgroup.com, 8299664420@filings.docketbird.com, dsk@classlawgroup.com

Harry W. Skene    hwskene@mac.com

Hillary Mara Nappi    hnappi@hrsclaw.com

Ian Bensberg    ibensberg@lchb.com, ian-bensberg-5570@ecf.pacerpro.com

Ian Connor Bifferato    cbifferato@tbf.legal, mferraro@tbf.legal, mstewart@tbf.legal

Isaac D. Chaput    ichaput@cov.com

Isaac Daniel Chaput    ichaput@cov.com, docketing@cov.com

J Gordon Cooney , Jr    gordon.cooney@morganlewis.com

Jade Haileselassie    jhaileselassie@motleyrice.com

James Van Buskirk    james.vanbuskirk@ag.state.mn.us

James Collins Ferrell    jferrell@jamesferrell-law.com

James D. Baskin , III    jbaskin@dicellolevitt.com, 5543918420@filings.docketbird.com

James E. Cecchi    jcecchi@carellabyrne.com, ltaylor@carellabyrne.com

James J. Bilsborrow    jbilsborrow@weitzlux.com

James Matthew Wagstaffe    wagstaffe@ammcglaw.com, Myers@WVBRlaw.com, pallister@wvbrlaw.com

James Mixon Griffin    jgriffin@griffinhumphries.com

James P. Frantz    jpf@frantzlawgroup.com

James Patrick Frantz    jpf@frantzlawgroup.com, hlo@frantzlawgroup.com, rosa@frantzlawgroup.com, wshinoff@frantzlawgroup.com

James R Marsh    jamesmarsh@marsh.law

James R. Dugan , II    jdugan@dugan-lawfirm.com, amcadam@dugan-lawfirm.com, bonnie@dugan-lawfirm.com, dscalia@dugan-lawfirm.com

James W. Lampkin , II    james.lampkin@beasleyallen.com

Janet Ward Black    jwblack@wardblacklaw.com

Janet Ward Black    jwblack@wardblacklaw.com, ecollins@wardblacklaw.com, jfloyd@wardblacklaw.com, kyoungblood@wardblacklaw.com

Jared Libet    jlibet@scag.gov

Jason David Russell    jason.russell@skadden.com, Colm.McInerney@skadden.com, DLMLCNYC@skadden.com, jason-

russell-9284@ecf.pacerpro.com, nandi.berglund@skadden.com

Jason L. Lichtman    jlichtman@lchb.com

Jason Louis Lichtman    jlichtman@lchb.com, jason-lichtman-9410@ecf.pacerpro.com

Jayne Conroy    jconroy@simmonsfirm.com, ClassDocketing@ecf.courtdrive.com, esternickle@simmonsfirm.com, jkraus@simmonsfirm.com

Jeffrey B. Pine    jpine@lynchpine.com

Jennie Lee Anderson    jennie.anderson@andrusanderson.com, 6951231420@filings.docketbird.com, audrey.siegel@andrusanderson.com, cinelawfirmemail@gmail.com, erin.lally@andrusanderson.com, evelyn.rodas@andrusanderson.com, mikaela.contreras@andrusanderson.com, nicole.shoener@andrusanderson.com

Jennifer Emmel    jennifer.emmel@beasleyallen.com

Jennifer K Emmel    jennifer.emmel@beasleyallen.com

Jennifer K. Emmel    Jennifer.Emmel@BeasleyAllen.com

Jennifer Michelle Stevenson    jstevenson@shb.com

Jennifer R Scullion    jscullion@seegerweiss.com

Jennifer Rebecca Scullion    JScullion@seegerweiss.com, SSiegel@SeegerWeiss.com

Jeremy S. McKenzie    jeremy@kmtrial.com

Jesse S Krompier    jesse.krompier@morganlewis.com

Jessica Davidson    Jessica.Davidson@skadden.com, brian.baggetta@skadden.com, jessica-davidson-1659@ecf.pacerpro.com, katrina.loffelman@skadden.com

Jessica C. Colombo    jcolombo@motleyrice.com

Jessica L Carroll    jcarroll@motleyrice.com

Jessica L. Grant    jgrant@shb.com, jessica-grant-7798@ecf.pacerpro.com, jrea@mofo.com

Jessica Lerer Fickling    jfickling@stromlaw.com

Jodi Westbrook Flowers    jflowers@motleyrice.com

Joel D. Wright    jwright@kmclaw.com

Joelle Gotwals    jgotwals@oag.state.va.us

John C. Vaglio    jvaglio@shb.com

John Christian Lewis    christian.lewis@ky.gov

John H. Beisner    John.Beisner@skadden.com, john-beisner-4715@ecf.pacerpro.com

John James DeBoy    jdeboy@cov.com

John Joseph Foley    jfoley@simmonsfirm.com, atrotta@simmonsfirm.com, pharmafilings@simmonsfirm.com

John Matthew Guard    john.guard@myfloridalegal.com

John Paul Markovs    john.markovs@montgomerycountymd.gov

John Randall Alphin    jalphin@stromlaw.com

John W. Barrett    jbarrett@baileyglasser.com, bmurray@baileyglasser.com, crobinson@baileyglasser.com, lwolfe@baileyglasser.com, panderson@baileyglasser.com

John Wayne Hogan    hogan@terrellhogan.com

**Add. 256**

Jonathan David Orent    jorent@motleyrice.com

Jonathan Hugh Blavin    jonathan.blavin@mto.com, dkt-filings@mto.com, irving.girshman@mto.com

Jonathan M. Sedgh    jsedgh@forthepeople.com

Jonathan P. Kieffer    jpkieffer@wcllp.com, apriest@wcllp.com, bdacus@wcllp.com

Jordan E. Jacobson    jjacobson@ktmc.com

Jordan P. Shuber    jshuber@dmkcg.com, sschiebel@dmkcg.com

Joseph Alexander Lawrence    alawrence@mofo.com, alex-lawrence-0487@ecf.pacerpro.com, amb7@mofo.com

Joseph Andrew Keyes    akeyes@wc.com

Joseph C. Peters    jpeters@wycopa.org

Joseph Chambers Tann    josephtann@josephtann.com

Joseph G. Petrosinelli    jpetrosinelli@wc.com

Joseph G. VanZandt    Joseph.VanZandt@BeasleyAllen.com

Joseph Glenn VanZandt    joseph.vanzandt@beasleyallen.com, angela.byrum@beasleyallen.com,
Clinton.Richardson@BeasleyAllen.com, Davis.Vaughn@BeasleyAllen.com, james.lampkin@beasleyallen.com,
Katie.Ronan@BeasleyAllen.com, kirsten.warren@beasleyallen.com, LaSonya.Lucas@BeasleyAllen.com,
Sydney.Everett@BeasleyAllen.com

Joseph Glenn VanZandt , II    Joseph.VanZandt@BeasleyAllen.com

Joseph H. Melter    jmeltzer@ktmc.com

Joseph H. Meltzer    jmeltzer@ktmc.com, 1472664420@filings.docketbird.com, chemsley@ktmc.com, jwotring@ktmc.com,
kmarrone@ktmc.com, pleadings@ktmc.com

Joseph J. Cappelli    jcappelli@bernllp.com

Joseph Kendrick Cunningham    jkc@lylesfirm.com

Joseph W. Cotchett    jcotchett@cpmlegal.com, aolivares@cpmlegal.com, ldelia@cpmlegal.com

Joshua Karsh    jkarsh@findjustice.com

Joshua Edward Olszewski-Jubelirer    joshua.olszewskijubelirer@doj.ca.gov

Joshua Michelangelo Stein    jstein@bsfllp.com

Justin Joseph Presnal    jpresnal@simmonsfirm.com

Justin Ross Kaufman    jkaufman@dpslawgroup.com

Justino D Petrarca    jpetrarca@edlawyer.com, lpowell@edlawyer.com, ngill@edlawyer.com

Karin Bornstein Swope    kswope@cpmlegal.com, jacosta@cpmlegal.com, karin-swope-6272@ecf.pacerpro.com

Kashif Taraq Chand    kashif.chand@law.njoag.gov

Kate Menard    kmenard@motleyrice.com

Katherine Massa    kmassa@forthepeople.com

Keil M. Mueller    kmueller@kellerrohrback.com

Kelly E Brilleaux    kbrilleaux@irwinllc.com

Kelly K. McNabb    kmcnabb@lchb.com

<div align="center">**Add. 257**</div>

Kelly Kristine McNabb      kmcnabb@lchb.com, kelly-mcnabb-1924@ecf.pacerpro.com

Kerrie Kennedy Ezekiel      kezekiel@stromlaw.com

Kevin James Whelan      kevin.whelan@ilag.gov

Kevin L Anderson      kander@ncdoj.gov

Kevin Mathew Loew      kloew@waterskraus.com

Kevin Robert Walsh      kevin.walsh@ohioago.gov

Kevin Scott Hannon      khannon@hannonlaw.com, cbennett@hannonlaw.com, jblum@hannonlaw.com, mjjanson@hannonlaw.com

Kimberly Jane Channick      kchannick@alexwalshlaw.com, awalsh@alexwalshlaw.com, tdimmick@alexwalshlaw.com

Kip McDonald      kip.mcdonald@faegredrinker.com

Kirk J. Goza      kgoza@gohonlaw.com

Kirk John Goza      KGOZA@GOHONLAW.COM, blairm@gohonlaw.com, gquinlan@gohonlaw.com, mhise@gohonlaw.com, omadderom@gohonlaw.com, RMILLER@GOHONLAW.COM

Kristen Renee Fournier      kfournier@kslaw.com

Kyle Christopher Herbert      kyle@herberttrial.com

Lacey Turley Most      laceym@wturley.com, davette@wturley.com

Laura Bernescu      laura.bernescu@skadden.com

Laura Marquez-Garrett      laura@socialmediavictims.org

Laura Marquez-Garrett      laura@socialmediavictims.org, julie@socialmediavictims.org, SMI@socialmediavictims.org

Laura Maria Lopez      laura.lopez@mto.com, juana.guevara@mto.com

Laurel K Lackey      laurel.k.lackey@wvago.gov

Lauren Bell      Lauren.Bell@mto.com

Lauren Bidra      lauren.bidra@ct.gov

Lauren Dickey      lauren.dickey@coag.gov

Lauren Gallo White      lwhite@wsgr.com, ageritano@wsgr.com, dgrubbs@wsgr.com, storrez@wsgr.com

Lennette Wen Lee      llee@kslaw.com, alanderos@kslaw.com, lennette-lee-4916@ecf.pacerpro.com

Leonidas E Stavrinakis      leon@lawleon.com

Lesley Elizabeth Weaver      lweaver@bfalaw.com, emily-aldridge-5965@ecf.pacerpro.com, lesley-weaver-4669@ecf.pacerpro.com

Leslie Agnes Brueckner , Ms      lbrueckner@baileyglasser.com, crobinson@baileyglasser.com

Lexi J. Hazam      lhazam@lchb.com

Lexi Joy Hazam      lhazam@lchb.com, jtarpeh@lchb.com, lexi-hazam-7782@ecf.pacerpro.com

Lindsey Catherine Barnhart      lbarnhart@cov.com, docketing@cov.com, echiulos@cov.com

Lucy Rose Malone      ldavis@wcllp.com

Lynn Lincoln Sarko      lsarko@kellerrohrback.com, cengle@kellerrohrback.com

M. Warren Butler    wbutler@starneslaw.com

Marc J. Bern    mbern@bernllp.com

Marc Joseph Mandich    marc@southernmedlaw.com

Margaret Nicole Fox    mfox@griffinhumphries.com

Maria Georges    mgeorges@cov.com

Marion Quirk    marion.quirk@delaware.gov

Marissa Roy    marissa.roy@doj.ca.gov, Tony.Tran@doj.ca.gov

Mark Abramowitz    mabramowitz@dlcfirm.com, 1064889420@filings.docketbird.com

Mark Snodgrass    Mark.Snodgrass@atg.in.gov

Mark A DiCello    mad@dicellolevitt.com, 2796968420@filings.docketbird.com

Mark A. Sentenac    msentenac@kslaw.com, kgrosenbacher@kslaw.com

Mark H Troutman    mtroutman@isaacwiles.com

Mark J. Dearman    mdearman@rgrdlaw.com, MDearman@ecf.courtdrive.com

Mark P. Bryant    mark.bryant@bryantpsc.com

Marlon Emil Kimpson    mkimpson@motleyrice.com, adwright@motleyrice.com

Mathew P. Jasinski    mjasinski@motleyrice.com, vlepine@motleyrice.com

Matthew C. Cocanougher    matthew.cocanougher@ky.gov

Matthew Charles Crowl    mcrowl@rshc-law.com

Matthew Edward DePaz    mdepaz@shb.com

Matthew K Donohue    mdonohue@wsgr.com, shannon.hill@wsgr.com

Matthew L. Hilt    mhilt@forthepeople.com

Matthew P Bergman    matt@socialmediavictims.org, julie@socialmediavictims.org, SMI@socialmediavictims.org

Matthew P. Bergman    matt@socialmediavictims.org

Matthew P. Legg    mlegg@bmbfclaw.com, esneeringer@bmbfclaw.com

Matthew Palmer Lambert    plambert@pbclawfirm.com, lstevens@pbclawfirm.com

Matthew Porter Legg    mlegg@bmbfclaw.com

Megan O'Neill    megan.oneill@doj.ca.gov

Megan B Greene    megan.greene@montgomerycountymd.gov

Megan Elizabeth Klein    mek@bhattorneys.com

Megan Louise Rodgers    mrodgers@cov.com, docketing@cov.com

Megan M Egli    megli@shb.com

Megan Marie Wold    mwold@cooperkirk.com

Megan Paris Rundlet    megan.rundlet@coag.gov

Melissa Devine    mdevine@law.ga.gov

**Add. 259**

Melissa L Yeates    myeates@ktmc.com, 5679347420@filings.docketbird.com, chemsley@ktmc.com, jjacobson@ktmc.com, jmeltzer@ktmc.com, jwotring@ktmc.com, ksheronas@ktmc.com, mcorson@ktmc.com

Meredith K. Lever    meredith@phaionline.org

Micah L. Hobbs    mhobbs@shb.com

Michael Schwalbert    michael.schwalbert@ago.mo.gov

Michael Vives    mvives@kslaw.com

Michael I. Levin    mlevin@levinlegalgroup.com

Michael Ian Levin-Gesundheit    mlevin@lchb.com, michael-levin-gesundheit-7686@ecf.pacerpro.com

Michael M. Weinkowitz    mweinkowitz@lfsblaw.com, pdandrea@lfsblaw.com, sdaloia@lfsblaw.com

Michael N. Hanna    mhanna@forthepeople.com

Michael T. Devine    michael.devine@maine.gov

Michael Xavier Imbroscio    mimbroscio@cov.com, ADenekas@cov.com, cking@cov.com, docketing@cov.com

Naomi E Leeds    naomi@cagoldberglaw.com

Narmeen K. Nkeiti    nnkeiti@forthepeople.com

Natalie Moyce    natalie.moyce@mto.com, julie.lunsford@mto.com

Nathan Nielson    nathan.nielson@ag.idaho.gov

Nathan E. Shafroth    nshafroth@cov.com, docketing@cov.com, echiulos@cov.com, ktrempy@cov.com, ncutright@cov.com, rlu@cov.com, rvantassell@cov.com

Nathan E. Whelihan    nathan.whelihan@azag.gov, Irma.Hentges@azag.gov, nyla.hunsinger@azag.gov

Nathaniel Kosslyn    nathaniel.kosslyn@ag.ny.gov

Nayha Arora    nayha.arora@doj.ca.gov

Neal A. Roberts    nroberts@protectuslaw.com

Nelson Drake    ndrake@motleyrice.com

Nestor Daniel Galarza    ngalarza@nsprlaw.com

Nicholas Elia    nelia@lfsblaw.com

Nicklas A. Akers    nicklas.akers@doj.ca.gov

Nicolle B. Brito    NBrito@rgrdlaw.com, e_file_fl@rgrdlaw.com, e_file_sd@rgrdlaw.com, khanson@rgrdlaw.com

Nina R Rose    nina.rose@skadden.com

Paige Nicole Boldt    pboldt@anapolweiss.com, rcarmony@alexwalshlaw.com

Panida Anna Anderson    panderson@baileyglasser.com

Patricia Brown Holmes    pholmes@rshc-law.com

Patrick C. Lynch    kcampagna@lynchpine.com

Patrick Graham Maiden    gmaiden@motleyrice.com

Patrick H. Reilly    patrick.reilly@faegredrinker.com

Paul Doolittle    pauld@akimlawfirm.com

**Add. 260**

Paul T Lyons    plyons@motleyrice.com, lmandara@motleyrice.com

Paul T. Lyons    p.lyons@phaionline.org

Paul William Schmidt    pschmidt@cov.com, docketing@cov.com

Paulette A. Petretti    ppetretti@edlawyer.com

Peter C. Schofield    pschofield@kmclaw.com

Peter Thomas Anderson    pete@kbaattorneys.com

Philip Green    pgreen@kslaw.com

Philip C. Federico    pfederico@sfspa.com

Phyllis Alene Jones    pajones@cov.com, docketing@cov.com

Previn Warren    pwarren@motleyrice.com, lmandara@motleyrice.com, salexander@motleyrice.com

Rachel E Berkley    rachel@hmtrial.com

Rania Kajan    rkajan@kslaw.com

Rebeca Martinez Sicari    rmartinez@nsprlaw.com

Rebeca Martinez Sicari    rmartinez@nsprlaw.com

Rebeca Martinez Sicari    rmartinez@nsprlaw.com

Richard Duane Harlow    harlowrd@doj.state.wi.us, burrba@doj.state.wi.us

Robert Arthur Young    byoung@elpolaw.com

Robert H. Klonoff    klonoff@usa.net

Robert Howard Klonoff    klonoff@usa.net, julie@socialmediavictims.org, SMI@socialmediavictims.org

Robert W Barton    bob.barton@taylorporter.com

Roland Tellis    rtellis@baronbudd.com, dfernandes@ecf.courtdrive.com, jcampbell@ecf.courtdrive.com,
mpifko@ecf.courtdrive.com

Ron Kilgard    rkilgard@kellerrohrback.com

Ron A Austin    raustin@ronaustinlaw.com, asilva@ronaustinlaw.com, ldixon@ronaustinlaw.com, tdavis@ronaustinlaw.com

Ron A. Austin    raustin@ronaustinlaw.com

Ronald E. Johnson , Jr    rjohnson@justicestartshere.com, amcmullen@justicestartshere.com,
semery@justicestartshere.com, sgoodrich@justicestartshere.com

Rory Brian Riley    briley@forthepeople.com

Rosalind Bienvenu    rbienvenu@dpslawgroup.com

Rose Leda Ehler    Rose.Ehler@mto.com, Dkt-filings@mto.com

Rowley John Rice    rowley.rice@mto.com, cherryl.tillotson@mto.com

Roxana Miller Pierce    rpierce@dicellolevitt.com

Ruth T. Rizkalla    rrizkalla@carlsonattorneys.com

Ruth Thi Rizkalla    rrizkalla@carlsonattorneys.com, amrodriguez@carlsonattorneys.com,
bdelacruz@carlsonattorneys.com, jclark@carlsonattorneys.com, troehrs@carlsonattorneys.com

Ryan J. Gavin    rgavin@forthepeople.com

# Add. 261

Ryan Thomas Costa    ryan.costa@delaware.gov

Salvatore C. Badala    sbadala@napolilaw.com, 1936354420@filings.docketbird.com

Samantha AlexandriaBooth Machock    smachock@wsgr.com, hvecino@wsgr.com, mmcnamara@wsgr.com

Samuel M. Sanguedolce    SMS@SangLaw.com

Sara J. Watkins    swatkins@peircelaw.com

Sara O. Couch    scouch@motleyrice.com

Sarah M. Dietz    sarah.dietz@ag.ks.gov, rebecca.schmidt@ag.ks.gov

Sarah R. London    slondon@lchb.com

Savannah W Smith    savannah.smith@taylorporter.com

Scott Barnhart    scott.barnhart@atg.in.gov, Leslie.Gebby@atg.in.gov

Scott J. Weiselberg    weiselberg@kolawyers.com

Serena Rami Saffarini    ssaffarini@cov.com

Seth T. Church    seth.church@dinsmore.com

Seth Vincent Harding    seth.harding@beasleyallen.com

Sharon S. Almonrode    ssa@millerlawpc.com, aad@ecf.courtdrive.com, aad@millerlawpc.com, def@ecf.courtdrive.com, def@millerlawpc.com, eeh@ecf.courtdrive.com, eeh@millerlawpc.com, ssa@ecf.courtdrive.com

Shawn Alexander Latchford    shawn@brusterpllc.com, jpappas@brusterpllc.com, slatchford@ecf.courtdrive.com, trector@brusterpllc.com

Shawn K. Jarecki , Esq    shawn.jarecki@gmail.com

Shawn Kincade Judge    sjudge@isaacwiles.com

Shawn M. Sassaman    ssassaman@bernllp.com

Shayna E. Sacks    ssacks@napolilaw.com

Sin-Ting Mary Liu    mliu@awkolaw.com, aandreieva@awkolaw.com, agreen@awkolaw.com, cduer@awkolaw.com, churt@awkolaw.com, cwarner@awkolaw.com, jlindsey@awkolaw.com, mweaver@awkolaw.com, SBaswell@awkolaw.com, SEchsner@awkolaw.com

Skylar Brooks Grove    skylar.grove@mto.com, aileen.beltran@mto.com

Stephanie Beth Schuster    stephanie.schuster@morganlewis.com

Stephen Nicholas Provazza    SProvazza@riag.ri.gov

Steve Vale    svale@protectuslaw.com

Steven Augustine Lopez    sal@classlawgroup.com, 9751096420@filings.docketbird.com, ajk@classlawgroup.com, ecf@classlawgroup.com

Steven Mitchell Thomas    smthomas@shb.com

Steven Neil Walden    swalden@carlsonattorneys.com

Susanna L. Southworth    ssouthworth@levinlaw.com

Sydney Everett    Sydney.Everett@BeasleyAllen.com

Sydney Lottes    sydney@socialmediavictims.org

**Add. 262**

TaCara D Harris      tharris@kslaw.com

Taeva Cantor Shefler      TShefler@rgrdlaw.com, AAvalos@rgrdlaw.com, e_file_sd@rgrdlaw.com, pmitchell@rgrdlaw.com, SKhandeshi@rgrdlaw.com

Tarifa B Laddon      tarifa.laddon@faegredrinker.com, liliana.hernandez@faegredrinker.com, lorena.lazheztter@faegredrinker.com

Teresa Griffin      teresa.griffin@faegredrinker.com

Terri L Parker      tparker@shb.com

Tess Shaw      tess.shaw@ct.gov

Thomas Huynh      thomas.huynh@law.njoag.gov

Thomas Wicker , IV      twicker@capitelliandwicker.com

Thomas E. Breth      tbreth@dmkcg.com

Thomas E. Pope      tpope@elrodpope.com

Thomas Eric Breth      tbreth@dmkcg.com

Thomas J Sullivan      tsullivan@shb.com

Thomas P. Cartmell      tcartmell@wcllp.com

Thomas Phillip Cartmell      tcartmell@wcllp.com, abrane@wcllp.com, apriest@wcllp.com, bdacus@wcllp.com, bwicklund@wcllp.com, jkieffer@wcllp.com, mcutler@wcllp.com, mgoldwasser@wcllp.com, pbradshaw@wcllp.com

Thomas W. King , III      tking@dmkcg.com, cberanty@dmkcg.com

Timothy Channing Hester      thester@cov.com

Timothy Ryan Murphy      tmurphy@attorneygeneral.gov

Tracy A. Finken      tfinken@anapolweiss.com

Tracy Ann Finken      tfinken@anapolweiss.com, azhen@anapolweiss.com, mohara@anapolweiss.com, nbell@anapolweiss.com, pplayolin@anapolweiss.com

Trevor Bruce Rockstad      trevor.rockstad@daviscrump.com, lynn.trexler@daviscrump.com, susan.gavagnie@daviscrump.com

Tristan Wade Gillespie      Gillespie.tristan@gmail.com

Tyler S. Graden      tgraden@ktmc.com

Victoria A. Degtyareva      victoria.degtyareva@mto.com, cherryl.tillotson@mto.com

Victoria Ann Butler      victoria.butler@myfloridalegal.com, jennifer.dasilva@myfloridalegal.com, zivile.rimkevicius@myfloridalegal.com

Vince Rabago      vince.rabago@azag.gov

Vincent A Sheheen      vsheheen@thesavagefirm.com

Wallace Herbert Jordan , Jr      Office@jordanlawsc.com

William Shinoff      wshinoff@frantzlawgroup.com

William B. Shinoff      wshinoff@frantzlawgroup.com, ahopkinson@frantzlawgroup.com, aweinstein@frantzlawgroup.com, awilliams@frantzlawgroup.com, ecanto@frantzlawgroup.com, hlo@frantzlawgroup.com, jparker@frantzlawgroup.com, mbustos@frantzlawgroup.com, ppacheco@frantzlawgroup.com, thauck@frantzlawgroup.com

William Lewis Garrison , Jr      lewis@hgdlawfirm.com

William Louis McKinney Bross , IV    william@hgdlawfirm.com

William W. Mercer    wwmercer@hollandhart.com

Yardena Rachel Zwang-Weissman    yardena.zwang-weissman@morganlewis.com

Yoona Park    ypark@kellerrohrback.com

Zachary David Griffin    zach@elrodpope.com

**4:22-md-03047-YGR Please see Local Rule 5-5; Notice has NOT been electronically mailed to:**

Burgettstown Area School District


Mt. Lebanon School District


Palisades School District


Rockcastle County School District


Adam Anaya
4457 Golden Eagle Loop NE
Rio Rancho, NM 87144

Alan Pickert
Terrell Hogan Yegelwel, P.A.
233 East Bay Street,
8th Floor
Jackson, FL 32202

Alberto Silva
Ron Austin Law
400 Manhattan Boulevard
Harvey, LA 70058

Andrew L. Campbell
Faegre Drinker Biddle & Reath LLP
300 N. Meridian Street
Suite 2500
Indianapolis, IN 46204

Arthur Bryant
Bailey & Glasser, LLP
1999 Harrison Street
Suite 660
Oakland, CA 94612

Austin Knudsen


Benjamin Taylor
Taylor & Gomez Law
2600 N. 44th. Street, B-101
Phoenix, AZ 85008

Christopher Chiou
Wilson Sonsini Goodrich & Rosati
633 West Fifth Street
Los Angeles, CA 90071-2048

Darla Gill


Dean Kawamoto

**Add. 264**

Keller Rohrback LLP - Seattle, WA
1201 3rd Ave., Ste. 3200
Seattle, WA 98101-3276

E. Scott Verhine
Verhine & Verhine PLLC
1013 Adams Street
Vicksburg, MS 39183

Elizabeth Harding

Emily Jeffcott
Morgan & Morgan
220 W. Garden St.
9th Floor
Pensacola, FL 32502

Gianna Blaudeau Mandich
Southern Med Law
2762 BM Montgomery Street
Suite 101
Homewood, AL 35209

James Frantz
Frantz Law Group, APLC
71 Stevenson Street
Suite 400
San Francisco, CA 94105

John Foley
Simmons Hanley Conroy LLC
One Court Street
Alton, IL 62002

Joshua Civin
Baltimore City Public Schools
200 E. North Avenue,
Suite 208
Baltimore, MD 21202

K. K.

Kaitlynn Buntich

Marc J. Mandich
Southern Med Law
2762 B M Mongomery St., Ste. 101

Michael D Fitzgerald
1 Industrial Way W
Building B
Eatontown, NJ 07724

Michael W. Kirk
Cooper & Kirk, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 2003

Peter J. Flowers
Foote Meyers Mielke & Flowers
3 North Second Street
Suite 300
St. Charles, IL 60174

**Add. 265**

Seth Harding
Beasley Allen Crow Methvin Portis & Miles LLC
234 Commerce Street
Montgomery, AL 36103

Stephanie Humphreys


Tiffany L. Delery
Ron Austin Law
400 Manhattan Boulevard
Harvey, LA 70058

Timothy Barnett


Wayne Hogan
Terrel Hogan Yegelwel, PA.
233 East Bay Street, 8th Floor
Jacksonville, FL 32202

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 22-md-03047-YGR (PHK) |
| | **ORDER DENYING MOTION TO STAY ENFORCEMENT OF SEPTEMBER 6, 2024 ORDER** |
| | Re: Dkt. 1167 |

Among the issues in this MDL, thirty-five state Attorneys General (AGs) have sued Meta. All discovery in the MDL has been referred to the undersigned. *See* Dkt. 426. The Court issued an Order on September 6, 2024 resolving a discovery dispute between the AGs and Meta. [Dkt. 1117]. More specifically, the Order resolved the Parties' dispute regarding the extent to which certain state agencies identified by Meta are subject to party discovery in this action. *Id.* On September 20, 2024, the AGs filed with the presiding District Judge a motion under Federal Rule of Civil Procedure 72(a) seeking relief from certain aspects of the Court's Order. [Dkt. 1168]. The AGs simultaneously filed with this Court the instant administrative motion requesting to stay enforcement of the September 6, 2024 Order pending District Court review. [Dkt. 1167]. Meta has filed an opposition to the motion to stay. [Dkt. 1173]. The Court finds the dispute suitable for resolution without oral argument. *See* Civil L.R. 7-1(b).

### LEGAL STANDARD

"A stay is not a matter of right" but is instead "an exercise of judicial discretion" that is "dependent upon the circumstances of the particular case." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672-73 (1926)); *see Maness v.*

United States District Court
Northern District of California

**Add. 267**

*Meyers*, 419 U.S. 449, 458 (1975) ("We begin with the basic proposition that all orders and judgments of courts must be complied with promptly. If a person to whom a court directs an order believes that order is incorrect the remedy is to appeal, but, absent a stay, he must comply promptly with the order pending appeal."). "It is well-established law that the filing of an objection to a magistrate judge's order on a non-dispositive motion does not automatically stay that order's operation." *PlayUp, Inc. v. Mintas*, 635 F. Supp. 3d 1087, 1093 (D. Nev. 2022) (collecting cases); *Alvarez v. Larose*, No. 3:20-cv-00782-DMS-AHG, 2020 WL 5632659, at *1 (S.D. Cal. Sept. 21, 2020) ("Filing an objection pursuant to Rule 72 does not automatically stay the magistrate judge's order.").

"A motion to stay a magistrate judge's order pending review by the assigned district judge is evaluated under the same standard as a motion to stay pending appeal." *Skillz Platform Inc. v. AviaGames Inc.*, No. 21-cv-02436-BLF, 2023 WL 7283886, at *1 (N.D. Cal. Nov. 2, 2023) (quoting *Forrest v. Facebook, Inc.*, No. 5:22-CV-03699-EJD, 2023 WL 1931356, at *1 (N.D. Cal. Jan. 18, 2023)); *see, e.g.*, *In re Rep. of Ecuador*, No. 11-mc-80171-CRB (NC), 2012 WL 13187177, at *2 (N.D. Cal. Mar. 30, 2012) ("The current motion is akin to a motion for stay pending appeal."). Under this standard, the Court considers four factors to determine whether a stay is appropriate: "(1) whether the stay applicant has made a strong showing that [they are] likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Mi Familia Vota v. Fontes*, 111 F.4th 976, 981 (9th Cir. 2024) (quoting *Nken*, 556 U.S. at 434). "The first two factors are the most critical." *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020) (quoting *Nken*, 556 U.S. at 434) (alterations omitted). The Court considers the remaining two factors only if the first two factors are satisfied. *Id.* (citing *Nken*, 556 U.S. at 435). In applying these factors, the Court adheres to a "sliding scale" approach under which "the required degree of irreparable harm increases as the probability of success decreases." *Id.* (quoting *Humane Soc'y of U.S. v. Gutierrez*, 523 F.3d 990, 991 (9th Cir. 2008)); *accord Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020).

Imposing a stay is an intrusion into the ordinary processes of administration and judicial

United States District Court
Northern District of California

1  review.  *Nken*, 556 U.S. at 427.  The party requesting a stay bears the burden of showing that the

2  circumstances justify an exercise of the Court's discretion.  *Lair v. Bullock*, 697 F.3d 1200, 1203

3  (9th Cir. 2012) (quoting *id.* at 433-34).  In the context of a motion to stay a magistrate judge's

4  non-dispositive discovery order, this burden "is a steep hill to climb."  *PlayUp*, 635 F. Supp. 3d at

5  1095.

## ANALYSIS

7       Applying the *Nken* factors here, the Court finds that the AGs have not met their burden of

8  showing that a stay is appropriate.

### 1.  Likelihood of Success on the Merits

10       The first *Nken* factor considers whether the AGs have made a "strong showing" that

11  success on the merits of their Rule 72(a) challenge is likely.  *Mi Familia Vota*, 111 F.4th at 981.

12  "[I]t is not enough that the likelihood of success on the merits is 'better than negligible' or that

13  there is a 'mere possibility of relief.'"  *Lair*, 697 F.3d at 1204 (quoting *Nken*, 556 U.S. at 434).

14  The Ninth Circuit has identified several largely interchangeable iterations of the applicable

15  standard, all of which require the moving party to show, at a minimum, that there is "a substantial

16  case for relief on the merits."  *Id.* at 1204 ("We have concluded that many of these formulations,

17  including 'reasonable probability,' 'fair prospect,' 'substantial case on the merits,' and 'serious

18  legal questions . . . raised,' are largely interchangeable.").

19       In evaluating the first *Nken* factor, the Court must be mindful of the standard of review that

20  applies to the underlying challenge.  *See Humane Soc'y of U.S. v. Gutierrez*, 558 F.3d 896, 897

21  (9th Cir. 2009) (accounting for the "narrow and deferential standard of review" in finding a failure

22  to demonstrate sufficient likelihood of success).  Here, the AGs have a filed a motion seeking

23  relief from a magistrate judge's non-dispositive discovery order.

24       Magistrate judges possess broad discretion in resolving discovery matters and their orders

25  on such issues are entitled to significant deference.  *See United States v. Abonce-Barrera*, 257

26  F.3d 959, 969 (9th Cir. 2001) ("[T]he text of the Magistrates Act suggests that

27  the magistrate judge's decision in such nondispositive matters is entitled to great deference by the

28  district court.").  "A non-dispositive order entered by a magistrate must be deferred to unless it is

United States District Court
Northern District of California

**Add. 269**

1     'clearly erroneous or contrary to law.'"  *Grimes v. City & Cnty. of S.F.*, 951 F.2d 236, 241 (9th

2     Cir. 1991) (citing Fed. R. Civ. P. 72(a); 28 U.S.C. § 636(b)(1)(A)).  This is a "formidable standard

3     of review."  *PlayUp*, 635 F. Supp. 3d at 1096; *see Winns v. Exela Enter. Sols., Inc.*, No. 4:20-cv-

4     06762-YGR, 2021 WL 5973049, at *1 (N.D. Cal. Nov. 4, 2021) ("Plaintiff has identified the

5     proper legal standard for reviewing a nondispositive order. This standard is not easily satisfied

6     because it affords the magistrate judge significant deference.").  As such, "a party seeking a stay

7     pending resolution of its objection to a magistrate judge's non-dispositive ruling is generally

8     unable to make a strong showing of likely success on the merits of the objection." *PlayUp*, 635 F.

9     Supp. 3d at 1096-97.

10           In the instant motion, the AGs argue that they have a "fair prospect" of persuading the

11    District Court that this Court's September 6, 2024 Order "misapprehends the role of AGs acting as

12    counsel to independent state agencies, misapplies controlling Ninth Circuit authority in shifting

13    the burden to the AGs to demonstrate their lack of control, and disregards the structure of state

14    governments and the substantial federal authority respecting states' sovereign structures."  [Dkt.

15    1167 at 3].  The AGs argue that the issue presented by their Rule 72(a) challenge—whether certain

16    state agencies may be subject to party discovery in civil enforcement actions brought by those

17    States' attorneys general—is a matter of first impression in this Circuit.  *Id.*  They likewise argue

18    that their challenge to this Court's Order implicates "constitutional questions."  *Id.*

19           On balance, the Court finds that the AGs have not made an adequate showing of likely

20    success on the merits.  The AGs essentially make the same arguments already raised in their

21    original briefing and oral argument to this Court on the underlying dispute which led to the

22    September 6, 2024 Order.  The Court extensively addressed each of these arguments in the 248-

23    page Order that is presently under District Court review.  *See Wit v. United Behavioral Health*,

24    No. 14-cv-02346-JCS, 2024 WL 1016069, at *2 (N.D. Cal. Feb. 6, 2024) ("UBH's arguments with

25    respect to the likelihood that its appeal will be successful mirror the arguments it made in its

26    briefing addressing the scope of the mandate. The Court rejected those arguments only after

27    considering the parties' extensive briefing and offering detailed reasoning for its conclusions.").

28           More specifically, the Court's September 6, 2024 Order did not misapprehend the role of

United States District Court
Northern District of California

4

the AGs as counsel to their respective state agencies. The AGs' sweeping reference to the agencies as "independent" is inaccurate. Some of the agencies are parties to this case and worked with their respective state AG prior to suit in preparation for this litigation. Some of the agencies are subject to state law requirements which allow the state AG to inspect and access the books and records of the agency; others are subject to open records laws under which the state AG has the legal right to access their records. Despite knowing of this discovery dispute for months, none of the state agencies chose to intervene, none have had separate counsel (from attorneys other than from the state AG's office) enter appearance, and none have appeared to date. In addition, many of the AGs have asserted the attorney-client privilege and work product doctrine with regard to pre-suit communications between the agencies and the applicable state AG's office.

Second, the September 6, 2024 Order did not shift the burden of proof to the AGs to demonstrate lack of legal control over the documents of the state agencies. The Order on its face set forth the burden of proof, imposed that burden on Meta, and applied the burden. This is demonstrated by the fact that the Order denied in part Meta's requests for relief. Where the AGs failed to adequately rebut Meta's showing (and where the Order discussed the facts relied upon by both Parties) is not the same thing as shifting the burden of proof.

Third, the September 6, 2024 Order did not disregard the structure of state governments. One of the reasons the Order exceeds 200 pages in length is because the AGs argued this very point and the Order analyzed each of thirty-five states' governmental structures. Further, the Order explains that, while notions of comity are recognized, it is ultimately federal law that governs the resolution of discovery disputes in federal court.

Fourth, the issue of a party's legal control over documents of a nonparty is not an issue of first impression in the Ninth Circuit. The September 6, 2024 Order applies and extensively analyzes Ninth Circuit precedent on this issue. The Order also extensively discusses district court decisions from throughout the Ninth Circuit deciding the issue of whether a state AG (or other governmental attorney's office) has legal control over state or local agency documents.

Finally, the alleged state constitutional issue raised by the AGs assumes that they lack legal control over state agency documents and that they all have the same "divided executive" structure.

5

United States District Court
Northern District of California

1    The September 6, 2024 Order explains how several states cited incorrectly to local law which

2    purported to limit the state AG's access to the documents at issue here, where upon examination

3    no such applicable restriction exists.  The Order explains how several AGs have express statutory

4    rights to access, inspect, and obtain documents from their state agencies.  The Order explains how

5    other courts have likewise concluded that multiple state AGs (including many of the same AGs

6    here) have legal control over their state agencies' documents for purposes of discovery without

7    violating principles of federalism.  The Order makes clear that its holding is limited to and based

8    on the record presented to the Court for the agencies at issue in the context of this MDL and not a

9    sweeping holding that ignores the structure of state governments.

10          Accordingly, the first factor does not support the imposition of a stay.

11          **2.   Irreparable Injury Absent Stay**

12          The second *Nken* factor addresses the extent to which the party requesting a stay would be

13   irreparably harmed absent a stay.  *Mi Familia Vota*, 111 F.4th at 981. The moving party must

14   demonstrate "that irreparable injury is likely to occur during the period before the appeal is likely

15   to be decided."  *Al Otro Lado*, 952 F.3d at 1007 (quoting *Nken*, 556 U.S. at 434).  Simply showing

16   some "possibility of irreparable injury" over the requisite interim period will not suffice.  *Id*.  A

17   party "cannot meet this burden by submitting conclusory factual assertions and speculative

18   arguments that are unsupported in the record."  *Doe #1*, 957 F.3d at 1059-60.

19          Here, the AGs allege that they are likely to suffer the following irreparable injuries if the

20   Court denies their motion to stay pending resolution of their Rule 72(a) challenge: (1) the Court's

21   September 6, 2024 Order, in the interim, "is apt to create conflicts between the AGs and state

22   executive agencies" because the Order "places the AGs in the impossible position of responding to

23   discovery seeking documents to which they have no legal right to access, significantly impedes the

24   functioning of state government, and imperils the ability of state AGs to bring enforcement actions

25   in federal court;" (2) "the burden imposed by Meta's sweeping discovery request is substantial;"

26   and (3) "if the AGs have to divert their attention to these extremely heavy and contested discovery

27   obligations, progress on other critical and undisputed discovery tasks will be delayed, making it

28   uncertain whether this enforcement action, aimed at protecting the most vulnerable of our citizens,

1    can remain on track." [Dkt. 1167 at 4].

2        The Court finds that the AGs have not made an adequate showing that this remaining

3    "critical" factor of irreparable harm supports a stay. To the extent that the AGs argue that

4    enforcement of the Court's September 6, 2024 Order is "apt" to create conflicts between the AGs

5    and agencies, the AGs provide no specific details or supporting evidence concerning these

6    hypothetical conflicts. *See Doe #1*, 957 F.3d at 1059-60; *Coalition on Homelessness v. City &*

7    *Cnty. of S.F.*, No. 22-cv-05502-DMR, 2023 WL 2775156, at *5 (N.D. Cal. Apr. 3, 2023). As

8    explained in the September 6, 2024 Order, other courts have found state AGs to have legal control

9    over their state agencies' documents and the subsequent history of those cases reveals no conflicts

10   between the AGs and the agencies.

11       To the extent that the AGs argue that Meta's discovery requests are burdensome and

12   complain that they will be forced to divert their attention and resources to processing the discovery

13   requests, it is well-settled that the ordinary burdens of discovery do not constitute an irreparable

14   injury. *See Al Otro Lado*, 952 F.3d at 1008 ("The key word in this consideration is irreparable.

15   Mere injuries, however substantial, in terms of money, time and energy necessarily expended . . .

16   are not enough."); *Nationwide Biweekly Admin. Inc. v. Owen*, 873 F.3d 716, 735 n.20 (9th Cir.

17   2017) ("Mere litigation expense, even substantial and unrecoupable cost, does not constitute

18   irreparable injury."). Further, under the AGs' view, Meta should seek the discovery at issue by

19   subpoenas issued to each of the agencies—it is already clear from the record that the AGs will be

20   (or in some cases, already are) representing the agencies in responding to those subpoenas which

21   Meta prudentially served already. Thus, the AGs' argument assumes incorrectly that Meta's

22   discovery will somehow go unanswered. The fact that the AGs will necessarily negotiate

23   objections as to burden in the context of responding to document requests as opposed to document

24   subpoenas and ultimately produce documents from the agencies either in response to document

25   requests or subpoenas entirely undercuts the "distraction" argument. And, as the September 6,

26   2024 Order recognized, the dispute resolved in that Order is limited to the issue of party

27   discovery. Other disputes on the merits of the discovery requests (such as overbreadth or

28   burdensomeness) are not yet ripe and are subject to this Court's normal discovery dispute

United States District Court
Northern District of California

1 resolution procedures, including the meet and confer requirements in the Court's Standing Order

2 for Discovery and other Orders and statements directing the Parties on how to handle discovery

3 disputes in this MDL.

4     Accordingly, the second factor does not support the imposition of a stay.

5     **3.  Remaining Factors**

6     As noted, the first two *Nken* factors are "the most critical."  *Mi Familia Vota*, 111 F.4th at

7 981.  Because the AGs have not satisfied either of the first two factors, the Court need not address

8 the remaining two factors.  *Al Otro Lado*, 952 F.3d at 1007 ("[T]he last two [*Nken* factors] are

9 reached only once an applicant satisfies the first two factors.") (alteration and internal quotation

10 marks omitted); *Doe #1*, 957 F.3d at 1061 ("[I]f a stay applicant cannot show irreparable harm, 'a

11 stay may not issue, regardless of the petitioner's proof regarding the other stay factors[.]'"); *Wit*,

12 2024 WL 1016069, at *2 ("Because UBH has not demonstrated it will suffer irreparable harm if

13 the Court denies its request for a stay, the Court need not reach the remaining *Nken* factors.").

14     Even if the Court were inclined to analyze the third and fourth factors, they do not appear

15 to be sufficient to reach a different conclusion here.  As to the third factor (harm to the opposing

16 party), Meta has already argued repeatedly that delay in the discovery from the state agencies

17 prejudices Meta's ability to obtain discovery relating to its defenses.  Indeed, both sides have

18 argued to this Court at various times that, essentially, time is of the essence, that the deadlines are

19 tight, or that the opposing side's tactics threaten to impact the overall fact discovery schedule.  As

20 noted previously, the Court encourages the Parties to reach compromise on discovery disputes in

21 order to avoid delay and expects the Parties to continue in those efforts even where motions and/or

22 appeals are pending.

23     As to the fourth factor (public interest), the AGs provide no explanation as to how the

24 September 6, 2024 Order hampers their prosecution of this case.  As noted, whether Meta seeks

25 the discovery from the state agencies by subpoena or by document requests, that discovery is

26 proceeding regardless.  The agencies are going to respond to the discovery one way or another.

27 The AGs are going to represent the state agencies in responding to the discovery.  Again, the only

28 way the September 6, 2024 Order could be construed as "hampering" this action is if somehow

United States District Court
Northern District of California

1   reversal of that Order denied Meta any discovery from the state agencies at all, which is not the

2   relief sought.  Further, as discussed in the Order, many federal district courts have found state AGs

3   to have legal control over their state agencies' documents, including in the context of an MDL.

4   None of those rulings have impacted any state's ability to pursue enforcement actions.  Finally, the

5   reference to federalism assumes, again, that the September 6, 2024 Order did not consider state

6   law (when it did, in detail, for each of the thirty-five states).

**CONCLUSION**

8       For the foregoing reasons, the AGs' motion to stay [Dkt. 1167] is **DENIED**.

9       **IT IS SO ORDERED.**

10  Dated: October 15, 2024

_____

PETER H. KANG
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 22-md-03047-YGR (PHK) |
| | **DISCOVERY MANAGEMENT ORDER NO. 12 FOLLOWING DISCOVERY MANAGEMENT CONFERENCE OF NOVEMBER 21, 2024** |
| This Document Relates to: All Actions | Upcoming DMC Dates: December 11, 2024 at 1:00 pm January 16, 2025 at 1:00 pm February 20, 2025 at 1:00 pm |

On November 21, 2024, this Court held a Discovery Management Conference ("DMC") in the above-captioned matter regarding the status of discovery. *See* Dkts. 1370, 1372. This Order memorializes and provides further guidance to the Parties, consistent with the Court's directions on the record at the November 21st DMC, regarding the deadlines and directives issued by the Court during that hearing (all of which are incorporated herein by reference).

## I. Interim Discovery Deadlines for State AG Cases

The Court has carefully considered the Parties' arguments and competing proposals regarding the schedule for their discovery plan and for the corresponding interim discovery deadlines governing the State AG cases against Meta. *See* Dkt. 1336 at 4-13. As stated at the November 21st DMC, the Court **ORDERS** the discovery deadlines in those cases modified as follows:

| EVENT OR DEADLINE | DATE |
|---|---|
| Start date for rolling productions of state agency documents requested pursuant to subpoenas | November 22, 2024 |

**Add. 276**

| Deadline for completion of conferrals re: Rule 34 state agency discovery | December 2, 2024 |
|---|---|
| Last date to file discovery letter briefs re: disputes concerning production of state agency documents (Rule 34 requests or subpoenas) | December 9, 2024 |
| Start date for rolling productions of state agency documents requested pursuant to Rule 34 | December 6, 2024 |
| Deadline for Rule 30(b)(6) subpoenas or notices to the State AGs and/or state agencies | December 13, 2024 |
| Substantial completion of production for State AG and state agency documents requested pursuant to Rule 45 subpoenas | December 23, 2024 |
| Last date for Parties to meet and confer re: scheduling of State AG and state agency Rule 30(b)(6) depositions (*and* to meet and confer re: any such disputes) | January 6, 2025 |
| Substantial completion of production for State AG and state agency documents requested pursuant to Rule 34 | January 10, 2025 |
| Last date for file discovery letter briefs re: disputes concerning scheduling or taking of any State AG and state agency Rule 30(b)(6) depositions | January 13, 2025 |
| Deadline for Parties to meet and confer to identify and commence scheduling State AG and state agency individual fact witness depositions (*and* to meet and confer re: any such disputes) | February 14, 2025 |
| Deadline for Meta to serve deposition notices for State AG and state agency individual fact witness depositions | February 21, 2025 |
| Last date to file discovery letter briefs re: any disputes concerning scheduling or taking of State AG and state agency fact witness depositions | February 21, 2025 |
| Dates for Rule 30(b)(6) depositions of State AGs and state agencies to be taken (unless otherwise agreed upon by the Parties) | February 3, 2025 through March 7, 2025 |
| Deadline for Meta to complete depositions of State AG and state agency fact witnesses | April 4, 2025 |

At the DMC, several of the State AGs (most notably, Arizona and Minnesota) raised concerns regarding their agencies' ability to meet the above deadlines due to insufficient funding, staffing, and technological capabilities. Meta, for its part, complained that multiple state agencies were refusing to provide hit reports. The Court admonishes the Parties to engage in prompt and

transparent negotiations for purposes of identifying reasonable search terms and custodians and exchanging hit reports. The Court has repeatedly advised the Parties to include their respective ESI vendors in such negotiations to address concerns and help resolve disputes regarding technological feasibility.

To the extent that state agencies have collected documents but refuse to provide Meta with search terms or hit reports, it is incumbent upon those agencies to tell Meta how the documents were collected. State agencies are expected to run and share hit reports on their own proposed search terms, at a minimum, assuming they used search terms. If state agencies collected documents for production using some other process, they are likewise expected to disclose transparently the processes used to locate the responsive documents. The Court strongly encourages Meta to work out informal deals with state agencies to facilitate document production, such as agreements to use "go get 'em" requests in lieu of search terms. The Court also strongly encourages the Parties to actively communicate and negotiate disputes regarding objections to document requests (whether by subpoena or Rule 34 requests) to avoid unnecessary delay.

## II.    State Agency "Holdouts"

As confirmed by the Parties, the following state agencies continue to refuse to meet and confer with Meta at all regarding search terms and custodians—in clear and direct contravention of this Court's Orders and Judge Gonzalez Rogers' Orders—because they apparently do not believe they are subject to party discovery in this case or the jurisdiction of this Court:

- California Office of the Governor
- California Governor's Office of Business and Economic Development
- California Department of Finance
- California Department of Public Health
- California Department of Consumer Affairs
- California Business, Consumer Services, and Housing Agency
- California Office of Data and Innovation
- South Carolina Office of the Governor

No counsel for these eight state agencies attended the November 21st DMC (either in

person or remotely). As such, the Court **ORDERED** the State AGs to provide this Court with the names, bar numbers, and pertinent contact information for all counsel responsible for and representing these eight state agencies who have taken the position that they are entitled to refuse to comply with the Orders issued in this case and that they are not subject to this Court's jurisdiction in this action for purposes of discovery. The California AG and the South Carolina AG each subsequently sent emails to the Court responding to the Court's Order in this regard, but they have not filed their responses on the docket. On or before **December 2, 2024**, both the California AG and the South Carolina AG **SHALL** file their responses on the docket.

### III. YouTube RFPs

The Parties report a dispute as to the adequacy of YouTube's amended responses to Request Nos. 62, 69, 71, 72, 76, and 79 in Plaintiffs' Request for Production ("RFP") Set 4. [Dkt. 1305].

#### RFP No. 62

RFP No. 62 seeks documents concerning YouTube's "crisis management or crisis communication structure, organization" and/or policies for responding to "investigations, lawsuits, media inquiries, or government inquiries" related to the safety of minor users. [Dkt. 1306-2 at 11]. Plaintiffs argue that information sought by this request—regarding how YouTube handles crises, investigations, lawsuits, and media and government inquiries, including who is involved, and the methods of communication—is highly relevant and crucial for Plaintiffs to establish "knowledge of relevant risks at YouTube's highest levels" and to select appropriate deponents. [Dkt. 1305 at 8].

YouTube, in its portion of the joint letter brief, argues that it "has already provided 30(b)(6) testimony, produced documents, and served an interrogatory response that together provide Plaintiffs with the information sought by this request in the most reliable and comprehensive form in which it is available." *Id.* at 11. Specifically, YouTube argues that: (1) Plaintiffs "elicited over four hours of testimony regarding YouTube's corporate structure" at a recent deposition, including testimony regarding the structure of the six teams directly responsible for YouTube's crisis management and the individuals within those teams; (2) YouTube produced

1   documents showing the structure of those six teams; and (3) YouTube provided "a detailed

2   summary of the reporting lines for each of YouTube's custodians" in response to Plaintiffs'

3   Interrogatory No. 1.  *Id.*  YouTube argues that Plaintiffs can readily ascertain the individuals

4   involved in crisis management and communications from the documents already produced.  *Id.*

5       At the November 21st DMC, Plaintiffs argued that YouTube still has not provided the

6   nonprivileged policies relating to crisis management or responding to investigations, lawsuits,

7   media inquiries, or government inquiries pertaining to the safety of minors.  YouTube, in

8   response, argued that no such policies exist.

9       Accordingly, the Court **ORDERS** YouTube to promptly produce all nonprivileged policies

10  (including any nonprivileged documents discussing such policies) responsive to Plaintiffs' request

11  at issue.  To the extent that YouTube does not possess any nonprivileged policies responsive to the

12  request, YouTube shall file a supplemental response to the request confirming that no such

13  policies exist.  YouTube shall log any otherwise responsive documents withheld on the grounds of

14  privilege on a timely privilege log.  The Court further **ORDERS** the Parties to meet and confer

15  regarding Plaintiffs' request for information regarding the methods of communication for these

16  crisis management teams, as it is clear that the Parties' dispute on this portion of the request is not

17  yet ripe.

18      RFP No. 69

19      RFP No. 69 seeks documents that "constitute, identify, or reflect" YouTube's "[p]olicies,

20  process, and criteria" used to "evaluate or determine compensation" for employees working in or

21  with units with responsibility for issues related to youth safety.  [Dkt. 1306-2 at 13].

22      Plaintiffs argue that "information regarding compensation, performance bonuses, and other

23  incentives that rewarded (or failed to reward) accomplishments by individuals responsible for

24  youth safety are relevant to the issue of whether YouTube prioritized user growth and engagement

25  over safety."  [Dkt. 1305 at 9].  Plaintiffs argue that YouTube's production thus far—"consisting

26  of five documents concerning generic Google-wide compensation policies"—is inadequate

27  because YouTube improperly limited its production to documents "sufficient to show" YouTube's

28  compensation policies and the documents produced do not show YouTube's compensation

United States District Court
Northern District of California

**Add. 280**

policies specifically directed at youth safety.  *Id.*  YouTube argues that Plaintiffs have failed to explain how compensation policies are relevant to this case.  *Id.* at 12.  In addition, YouTube argues that it has not produced compensation documents specific to youth safety because no such policies exist.  *Id.*

The Parties agree that this request does not seek compensation information for lower-level employees.  At the DMC, counsel for YouTube stated that no documents exist which discuss the process or criteria by which the companywide policies are applied to those employees working on youth safety.  Counsel for YouTube indicated they were in the process of confirming this.  Assuming this to be the case, the Court **ORDERS** counsel for YouTube to promptly serve a supplemental response to RFP No. 69 which states that no such documents exist.

Remaining RFPs

RFP Nos. 71, 72, 76, and 79 seeks documents concerning YouTube's policies for facilitating, documenting, processing, reporting, and retaining complaints related to the safety of youth users of the YouTube platform.  [Dkt. 1306-2 at 15-17, 20, 22].

The Parties confirm that their dispute on these requests is limited to: (1) whether YouTube should be required to produce final historical versions of internal policies for RFP Nos. 71, 72, 76, and 79; and (2) whether YouTube should be required to produce final historical versions of its public policies for RFP Nos. 72, 76, and 79.

As stated at the November 21st DMC, the Court **ORDERS** the Parties to meet and confer regarding this dispute and the specific policies at issue.  The Parties reported at the DMC that they are in the process of evaluating a proposed stipulation which would resolve this dispute and therefore they are directed to file a joint stipulation and proposed order regarding this dispute.

This **RESOLVES** Dkt. 1305.

IV.     **Meta Compensation Documents**

The PI/SD Plaintiffs ("Plaintiffs") move to compel Meta to produce documentation sufficient to show the compensation, bonus, and stock awards/options for eleven Meta witnesses.  [Dkt. 1318].  Meta has already agreed to produce performance reviews and self-evaluations for these same eleven deponents.  Plaintiffs argue that they also need documents showing specific

United States District Court
Northern District of California

compensation amounts for each deponent to be able to get a "complete picture" regarding the extent to which Meta prioritized user engagement and business growth at the expense of youth safety. Meta argues that Plaintiffs' request for specific dollar figures should be denied because: (1) the specific compensation any particular Meta employee received is irrelevant to Plaintiffs' claims and theories as they have articulated them; (2) the "generally applicable compensation policies" and individual performance reviews already produced by Meta, when taken together, give Plaintiffs the same information that they seek from the compensation documents; and (3) the request for compensation documents violates the deponents' California constitutional right to financial privacy.

At the November 21st DMC, Meta confirmed that it has produced performance reviews for at least two of the eleven deponents at issue and that Meta will be producing the remaining reviews on a rolling basis. Plaintiffs reported that they have not yet had an opportunity to review these materials, and thus, could not speak to Meta's argument that the documents provide a commensurate level of detail as the actual dollar figure for compensation. The Parties are **ORDERED** to continue to meet and confer on this issue as directed by this Court. The Parties shall file a joint stipulation and proposed order regarding this dispute.

This **RESOLVES** Dkt. 1318.

### V.     Miki Rothschild Deposition

At the November 21st DMC, the Parties raised a time-sensitive dispute regarding the clawback of three documents asserted to contain privileged communications, where that clawback has impacted and resulted in the last-minute cancellation of the noticed deposition of a senior-level Meta employee, Miki Rothschild. The Parties were directed to promptly file joint letter briefing on this dispute, which they have done. *See* Dkt. 1375.

The Parties **SHALL** promptly file on the docket a joint notice regarding the re-noticed date for Mr. Rothschild's deposition.

### VI.    California v. TikTok

In light of the recent Order relating the California AG's civil enforcement action against TikTok to this MDL, the Parties are **ORDERED** to provide a brief status update and contingent

discovery plan in the January Joint DMC Statement regarding how they plan to complete

discovery for TikTok in the event the case is not remanded.

**VII.    Housekeeping Issues**

The Parties are directed to reformat their monthly Joint DMC Statements going forward to

more clearly delineate issues that are ripe for discussion at the next DMC and issues that are

unripe.  As such, the Joint DMC Statement should be divided into four sections: (1) administrative

issues that the Parties would like to bring to the Court's attention which are not disputed and

which do not require Court action; (2) administrative issues that are disputed and/or require Court

action; (3) truly ripe discovery disputes for which joint letter briefing has already been filed or will

be filed imminently; and (4) unripe discovery disputes.  The Court reminds the Parties that any

disputes for which the joint letter briefing is filed less than one week prior to the DMC will be

addressed at that DMC in this Court's discretion.


**IT IS SO ORDERED.**

Dated:  November 26, 2024

_____

PETER H. KANG
United States Magistrate Judge

# IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

**California Northern District Court**

Case no. 4:22-md-03047-YGR (N.D. Cal.)
Filed date: December 27, 2024
Docket entry no.: 1489

Docket text:

> [IN-CHAMBERS TEXT ONLY ORDER]: The Court has received the 1471 administrative motion for leave to file a motion for discovery sanctions and the 1481 opposition thereto. The Court has determined that the administrative motion is suitable for resolution without oral argument and will issue an order in due course. See Civil L.R. 7-1(b).The Court notes that Meta filed its motion for discovery sanctions prior to the Court ruling on the administrative motion regarding the same. The 1485 Motion for Sanctions is therefore DENIED WITHOUT PREJUDICE on administrative grounds as premature without the Court passing on the merits at this time. Signed by Judge Peter H. Kang on 12/27/2024. (This is a text-only entry generated by the court. There is no document associated with this entry.) (phklc2, COURT STAFF) (Filed on 12/27/2024) Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 12/27/2024)

This PDF was generated on January 22, 2025 by PacerPro for a text-only docket entry.

https://app.pacerpro.com/cases/16947593

1   [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**
9                 **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11   People of the State of California, et al.          MDL No. 3047
         v.
12   Meta Platforms, Inc., Instagram, LLC, Meta         Case No.  4:22-md-03047-YGR
     Payments, Inc., Meta Platforms Technologies,                 4:23-cv-05448-YGR
13   LLC                                                          4:23-cv-05885-YGR
                                                                  4:24-cv-00805-YGR
14   ---------------------------------------------------

15   Office of the Attorney General, State of Florida,  **STATE ATTORNEYS GENERAL'S**
     Department of Legal Affairs                        **OPPOSED ADMINISTRATIVE MOTION**
16         v.                                           **FOR STAY**
     Meta Platforms, Inc., Instagram, LLC., Meta
17   Payments, Inc.                                     Judge: Hon. Yvonne Gonzalez Rogers

18   ---------------------------------------------------
                                                        Magistrate Judge: Hon. Peter H. Kang
19   State of Montana, *ex rel.* Austin Knudsen,
     Attorney General
20         v.
     Meta Platforms, Inc., Instagram, LLC, Facebook
21   Holdings, LLC, Facebook Operations, LLC,
     Meta Payments, Inc., Meta Platforms
22   Technologies, LLC, Siculus, Inc.

23   ---------------------------------------------------

24   IN RE: SOCIAL MEDIA ADOLESCENT
     ADDICTION/PERSONAL INJURY
25   PRODUCTS LIABILITY LITIGATION

26   THIS DOCUMENT RELATES TO:
     4:22-md-03047-YGR; 4:23-cv-05448; 4:23-cv-
27   05885; 4:24-cv-00805

28

                                       1

Pursuant to Civil L.R. 7-11, the State Attorneys General (AGs) move this Court to stay its order granting in part and denying in part Meta's request for party discovery, Doc. 1117, pending review by Judge Gonzalez Rogers. This Motion is filed contemporaneously with the AGs' Rule 72 objections to the discovery order ("AGs Objections"), filed as a Motion for Relief.

A magistrate judge may issue a stay under their inherent authority to stay their own order pending a challenge. *See PlayUp, Inc. v. Mintas*, 635 F. Supp. 3d 1087, 1094 (D. Nev. 2022) (citing *Nken v. Holder*, 556 U.S. 418, 426 (2009)). In considering whether to stay a magistrate judge's order pending Rule 72 objections, courts typically apply the same four-factor test used for a stay pending appeal. *Id*. (citation omitted). That test is: (1) whether the stay applicant has made a strong showing of likely success on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies. *Duncan v. Bonta*, 83 F.4th 803, 805 (9th Cir. 2023) (quoting *Nken*, 556 U.S. at 425–26).

The Ninth Circuit uses a sliding scale approach by which a stronger showing on one element can offset a weaker showing of another. *Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (citation omitted). The "relative hardships to the parties" provide the "critical element" in determining at what point on the continuum a stay pending review is justified. *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (citation omitted). The party requesting the stay bears the burden of demonstrating one is warranted. *Al Otro Lado*, 952 F.3d at 1006.

**A.  The AGs are likely to succeed on the merits.**

To obtain a stay, a movant need only demonstrate that its appeal has a "reasonable probability" or "fair prospect" of success. *Leiva-Perez*, 640 F.3d at 967 (citation omitted). The movant need not show "that it is more likely than not that [it] will win on the merits." *Id.* at 966. Alternatively, a movant can show that its appeal raises "serious" legal questions if the "balance of hardships tips sharply in its favor." *Golden Gate Rest. Ass'n v. City & Cnty. of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008). In this district, a "serious legal question" generally includes (1) a matter of first impression within the Ninth Circuit, (2) a constitutional question, or (3) a pressing legal issue which urges the Ninth Circuit to hear the case. *See e.g., Yeomans v. World*

1  *Fin. Grp. Ins. Agency, Inc.*, No. 19-CV-00792-EMC, 2021 WL 1772808, at *3 (N.D. Cal. Mar.

2  19, 2021) (quoting *Stiner v. Brookdale Senior Living, Inc.*, 383 F. Supp. 3d 949, 953-54 (N.D.

3  Cal. 2019)).

4  　　　The AGs' Objections satisfy this test under any analysis. *First*, the AG's objection meets

5  the "fair prospect" test on both issues presented: (1) that control of all state agencies cannot be

6  imputed to a state AG discharging their independent law enforcement function, and (2) that the

7  attorney-client relationship, if it did exist, does not provide attorneys the right to obtain and

8  produce documents on demand from their client. For the reasons fully articulated in the AG's

9  Objections, the AGs have a "fair prospect" of persuading Judge Gonzalez Rogers that the order

10  misapprehends the role of AGs acting as counsel to independent state agencies, misapplies

11  controlling Ninth Circuit authority in shifting the burden to the AGs to demonstrate their lack of

12  control, and disregards the structure of state governments and the substantial federal authority

13  respecting states' sovereign structures. Moreover, the order incorrectly holds that attorneys have

14  the legal right to obtain documents from clients, even to respond to discovery requests served in a

15  case to which the clients are not party.

16  　　　*Second*, the issues raised in the AGs' Objections are unequivocally "serious legal

17  questions." The Court's discovery order holding that the executive agencies of thirty-five

18  different states are subject to party discovery in this law enforcement action brought by the AGs

19  creates an issue of first impression in this Circuit. *See Maxcrest Ltd. v. United States*, No. 15-MC-

20  80270-JST, 2016 WL 6599463, at *2 (N.D. Cal. Nov. 7, 2016) (granting stay pending appeal on

21  novel issue of first impression in the Ninth Circuit)).

22  　　　*Third*, the AGs' Objections raise constitutional questions. The Court's order obligates

23  State AGs to exercise a form of control over the records of state agencies that they lack under the

24  divided executive structure of state constitutions. This violates the federalism principles at the

25  heart of our federal constitutional system. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460

26  (1991) ("Through the structure of its government, and the character of those who exercise

27  government authority, a State defines itself as a sovereign.").

28

**B.   A stay is necessary to avoid irreparable injury.**

A movant must show that irreparable injury is "likely to occur" during the period before the appeal is likely to be decided. *Al Otro Lado*, 952 F.3d at 1007 (citation omitted). The AGs more than meet that standard. *First,* the discovery order is apt to create conflicts between the AGs and state executive agencies. If allowed to stand, the order places the AGs in the impossible position of responding to discovery seeking documents to which they have no legal right to access, significantly impedes the functioning of state government, and imperils the ability of state AGs to bring enforcement actions in federal court.

*Second,* the burden imposed by Meta's sweeping discovery request is substantial: 275 agencies are the target of discovery and Meta has represented it plans to take between 70-165 depositions, depending on the ruling in this dispute. Doc. 1109, pp. 6-10, 7 n.5; Doc. 736-1, p. 32. And Meta seeks to impose this burden immediately while the Court considers the AGs' objections. Meta maintains that the consumer protection attorneys prosecuting this action bear the responsibility for coordinating substantial discovery. And, more puzzlingly, Meta suggests that the conferrals already underway with state agencies regarding Rule 45 subpoenas and potentially productions made in response to those subpoenas, are not to be considered in determining what information Meta actually seeks with its requests from the agencies.

*Third*, if the AGs have to divert their attention to these extremely heavy and contested discovery obligations, progress on other critical and undisputed discovery tasks will be delayed, making it uncertain whether this enforcement action, aimed at protecting the most vulnerable of our citizens, can remain on track. This will delay relief for youth and consumers in 35 states who the State AGs allege suffered and continue to suffer mental and physical health harms as a result of Meta's deceptive and unfair business practices.

**C.   Meta will suffer minimal harm should the Court stay the order.**

On the other hand, should the Court stay its order, Meta will suffer little harm. At issue is discovery Meta sought through one means (Rule 34 discovery); meanwhile Meta has sought and received such discovery through other means by issuing over 140 Rule 45 subpoenas to state agencies. Doc. 1120, pp. 13-14; Doc. 1110, pp. 2-8. A stay of the discovery order pending the

1    AGs' Objections would not halt Meta's discovery of the state agencies which is already underway

2    through voluminous Rule 45 subpoenas. Thus, "a stay pending appeal will not prejudice [Meta's]

3    ability to conduct discovery" and defend against this action. *Pokorny v. Quixtar Inc.*, No. 07-

4    00201 SC, 2008 WL 1787111, at *2 (N.D. Cal. Apr. 17, 2008).

5        And Meta's claim of injury from any brief stay while the District Court considers the AGs

6    Objections falls flat. Meta delayed in seeking targeted agency discovery through subpoenas for

7    nearly six months during the pendency of this dispute, despite this Court repeatedly pointing out

8    to Meta that it was making a tactical choice not to issue subpoenas during the pendency of the

9    dispute, even to the subset of agencies from which it most wanted information. TR 2/22/24 (Doc.

10   663, p. 37:8-23; TR 4/22/24 (Doc. 782), pp. 7:20-9:7; TR 5/6/24 (Doc. 822), pp. 101:4-15, 103:9-

11   25, 104:6-9; Doc. 1031.

12       **D. The public interest weighs heavily in favor of a stay.**

13       The public has a strong interest in the just and efficient vindication of the rights and

14   protections afforded by consumer protection laws, as well as in the proper functioning of state

15   government. *See Golden Gate Rest. Ass'n*, 512 F.3d at 1127 ("The public interest may be

16   declared in the form of a statute." (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary

17   Kay Kane, Federal Practice and Procedure § 2948.4, at 207 (2d ed. 1995))). The order hampers

18   this enforcement action, risks disrupting the relationships of independent state entities, and, in the

19   future, imperils states' ability to pursue affirmative enforcement actions on behalf of the public

20   and consumers in federal court.

21       Finally, the principles of federalism weigh in favor of a stay. Given that the order held that

22   Rule 34 is governed only by federal law even where state law might limit control or disclosure,

23   Doc. 1117, p.9, a stay while the state AGs object on state law grounds respects federalism and

24   state sovereignty.

25       **E. Conclusion**

26       For all these reasons, the state AGs ask this Court to stay its Order, Doc. 1117, pending

27   adjudication of their Motion for Relief.

28

STATE ATTORNEYS GENERAL'S ADMINISTRATIVE MOTION FOR STAY
4:23-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Dated: September 20, 2024

Respectfully submitted,

**KRIS MAYES**
Attorney General
State of Arizona

**ROB BONTA**
Attorney General
State of California

*/s/ Laura Dilweg*
Laura Dilweg (AZ No. 036066, CA No. 260663)
Chief Counsel - Consumer Protection and
Advocacy Section
Nathan Whelihan (AZ No. 037560, CA No.
293684), *pro hac vice*
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax:    (602) 542-4377
Laura.Dilweg@azag.gov
Nathan.Whelihan@azag.gov

*Attorneys for Plaintiff State of Arizona*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Bianca E. Miyata*
Bianca E. Miyata (CO Reg. No. 42012),
*pro hac vice*
Senior Assistant Attorney General
Lauren M. Dickey (CO Reg. No. 45773)
First Assistant Attorney General
Elizabeth Orem (CO Reg. No. 58309)
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
bianca.miyata@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.
Philip J. Weiser, Attorney General*

*/s/ Megan O'Neill*
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (CA SBN 244395)
Emily Kalanithi (SBN 256972)
Supervising Deputy Attorneys General
Nayha Arora (CA SBN 350467)
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer
(CA SBN 336428)
Marissa Roy (CA SBN 318773)
Brendan Ruddy (CA SBN 297896)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
megan.oneill@doj.ca.gov

*Attorneys for Plaintiff the People of the State
of California*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Lauren H. Bidra*
Lauren H. Bidra
(CT Juris No. 440552), *pro hac vice*
Special Counsel for Media and Technology
 Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5306
Fax: 860-808-5593
Lauren.Bidra@ct.gov
Krislyn.Launer@ct.gov

*Attorneys for Plaintiff State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Marion M. Quirk*
Owen Lefkon
Director of Fraud and Consumer Protection
Marion Quirk, *pro hac vice*
Director of Consumer Protection
Ryan T. Costa (DE Bar 5325), *pro hac vice*
Deputy Director of Consumer Protection
Deputy's Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8800
Marion.Quirk@delaware.gov

*Attorneys for Plaintiff State of Delaware*


**ASHLEY MOODY**
Attorney General
State of Florida

*/s/ Victoria Ann Butler*
Victoria Ann Butler (FL Bar No. 861250),
*pro hac vice*
Director of Consumer Protection Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Telephone: (813) 287-7950
Victoria.butler@myfloridalegal.com

John M. Guard (FL Bar No. 374600),
*pro hac vice*
Chief Deputy Attorney General
PL-01 The Capitol
Tallahassee, FL 32399
John.guard@myfloridalegal.com

Nicholas J. Weilhammer (FL Bar No. 479322),
*pro hac vice*
Associate Deputy Attorney General for
Enforcement
PL-01 The Capitol
Tallahassee, FL 32399
Telephone: (850) 414-3861
Nicholas.weilhammer@myfloridalegal.com

Donna Cecilia Valin (FL Bar No. 96687),
*pro hac vice*
Special Counsel, Assistant Attorney General
135 West Central Blvd.
Orlando, FL 32801
Telephone: (407) 316-4840
Donna.valin@myfloridalegal.com

Karen E. Berger (FL Bar No. 72991)
*pro hac vice*
Special Counsel, Assistant Attorney General
110 SE 6th Street, 10th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 712-4600
Karen.berger@myfloridalegal.com

*Attorneys for Office of the Attorney General,
State of Florida, Department of Legal Affairs*

1    **CHRISTOPHER M. CARR**                        **RAÚL R. LABRADOR**
2    Attorney General                               Attorney General
     State of Georgia                               State of Idaho
3
     */s/ Melissa M. Devine*                        */s/ Nathan Nielson*
4    Melissa M. Devine (GA Bar No. 403670),         Nathan H. Nielson (ID Bar No. 9234),
     *pro hac vice*                                 *pro hac vice*
5    Assistant Attorney General                     Deputy Attorney General
6    Office of the Attorney General of the State of  Attorney General's Office
     Georgia                                        P.O. Box 83720
7    2 Martin Luther King Jr. Drive, SE, Ste. 356   Boise, ID 83720-0010
     Atlanta, GA 30334                              (208) 334-2424
8    Phone: (404) 458-3765                          nathan.nielson@ag.idaho.gov
     Fax: (404) 651-9108
9    mdevine@law.ga.gov                             *Attorneys for Plaintiff State of Idaho*
10
     *Attorneys for Plaintiff State of Georgia*
11                                                  **THEODORE E. ROKITA**
                                                    Attorney General
12   **ANNE E. LOPEZ**                              State of Indiana
     Attorney General
13   State of Hawaiʻi                               */s/ Scott L. Barnhart*
                                                    Scott L. Barnhart (IN Atty No. 25474-82),
14   */s/ Christopher T. Han*                       *pro hac vice*
15   Bryan C. Yee (HI JD No. 4050),                 Chief Counsel and Director of Consumer
     *pro hac vice*                                 Protection
16   Supervising Deputy Attorney General            Corinne Gilchrist (IN Atty No. 27115-53),
     Christopher T. Han (HI JD No. 11311),          *pro hac vice*
17   *pro hac vice*                                 Section Chief, Consumer Litigation
18   Deputy Attorney General                        Mark M. Snodgrass (IN Atty No. 29495-49),
     Department of the Attorney General             *pro hac vice*
19   Commerce and Economic Development Division     Deputy Attorney General
     425 Queen Street                               Office of the Indiana Attorney General
20   Honolulu, Hawaiʻi 96813                        Indiana Government Center South
     Phone: (808) 586-1180                          302 West Washington St., 5th Floor
21   Bryan.c.yee@hawaii.gov                         Indianapolis, IN 46203
22   Christopher.t.han@hawaii.gov                   Telephone: (317) 232-6309
                                                    Scott.Barnhart@atg.in.gov
23   *Attorneys for Plaintiff State of Hawaiʻi*     Corinne.Gilchrist@atg.in.gov
                                                    Mark.Snodgrass@atg.in.gov
24
25                                                  *Attorneys for Plaintiff State of Indiana*
26
27
28

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Matthew Davies*
Susan Ellis, Chief, Consumer Protection Division
(IL Bar No. 6256460)
Greg Grzeskiewicz, Chief, Consumer Fraud
Bureau (IL Bar No. 6272322)
Jacob Gilbert, Deputy Chief, Consumer Fraud
Bureau (IL Bar No. 6306019)
Adam Sokol, Consumer Counsel, Consumer Fraud
Bureau (IL Bar No. 6216883)
Matthew Davies, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6299608), *pro
hac vice*
Emily María Migliore, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6336392)
Kevin Whelan, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6321715), *pro
hac vice*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-2218
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Adam.Sokol@ilag.gov
Matthew.Davies@ilag.gov
Emily.Migliore@ilag.gov
Kevin.Whelan@ilag.gov

*Attorneys for Plaintiff the People of the State of
Illinois*

**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/ Sarah M. Dietz*
Sarah Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*

**LIZ MURRILL**
Attorney General
State of Louisiana

*/s/ Asyl Nachabe*
Asyl Nachabe (LA Bar No. 38846),
*pro hac vice*
L. Christopher Styron (LA Bar No. 30747),
*pro hac vice*
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
NachabeA@ag.louisiana.gov
StyronC@ag.louisiana.gov

*Attorneys for State of Louisiana*

| | |
|---|---|
| **RUSSELL COLEMAN** | **AARON M. FREY** |
| Attorney General | Attorney General |
| Commonwealth of Kentucky | State of Maine |

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109),
*pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*pro hac vice*
Zachary Richards (KY Bar No. 99209),
*pro hac vice*
Daniel I. Keiser (KY Bar No. 100264),
*pro hac vice*
Matthew Cocanougher (KY Bar No. 94292), *pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Greg.Ladd@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Matthew.Cocanougher@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Michael Devine*
Michael Devine, Maine Bar No. 5048,
*pro hac vice*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8829
michael.devine@maine.gov

*Attorney for Plaintiff State of Maine*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Caitlin Micko*
Caitlin Micko (MN Bar No. 0395388)
*pro hac vice*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 724-9180
caitlin.micko@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota, by its Attorney General, Keith Ellison*

1   **ANTHONY G. BROWN**
    Attorney General
2   State of Maryland

3   /s/ *Elizabeth J. Stern*
4   Philip D. Ziperman (Maryland CPF No.
    9012190379), *pro hac vice*
5   Deputy Chief, Consumer Protection Division
    Elizabeth J. Stern (Maryland CPF No.
6   1112090003), *pro hac vice*
7   Assistant Attorney General
    Office of the Attorney General of Maryland
8   200 St. Paul Place
    Baltimore, MD 21202
9   Phone: (410) 576-6417 (Mr. Ziperman)
    Phone: (410) 576-7226 (Ms. Stern)
10  Fax: (410) 576-6566
11  pziperman@oag.state.md.us
    estern@oag.state.md.us
12
    *Attorneys for Plaintiff Office of the Attorney*
13  *General of Maryland*

14
    **DANA NESSEL**
15  Attorney General
16  State of Michigan

17  /s/ *Daniel J. Ping*
18  Daniel J. Ping (P81482), *pro hac vice*
    Assistant Attorney General
19  Michigan Department of Attorney General
    Corporate Oversight Division
20  P.O. Box 30736
    Lansing, MI 48909
21  517-335-7632
22  PingD@michigan.gov

23  *Attorneys for Plaintiff State of Michigan*

24

25

26

27

28

**ANDREW BAILEY**
Attorney General
State of Missouri

/s/ *Michael Schwalbert*
Michael Schwalbert, *pro hac vice*
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Attorney for Plaintiff State of Missouri, ex rel.*
*Andrew Bailey, Attorney General*

**AUSTIN KNUDSEN**
Attorney General
State of Montana

/s/ *Anna K. Schneider*
Anna K. Schneider
Montana Attorney General's Office
Special Assistant Attorney General
Senior Counsel
Office of Consumer Protection
P.O. Box 201405
Helena, MT 59620-1405
(406) 444-4500
anna.schneider@mt.gov

David H. Thompson, *pro hac vice*
Michael W. Kirk, *pro hac vice*
Brian W. Barnes, *pro hac vice*
Megan M. Wold, *pro hac vice*
Athanasia O. Livas, *pro hac vice*
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Council for Plaintiff, State of Montana*

**Add.295**
STATE ATTORNEYS GENERAL'S ADMINISTRATIVE MOTION FOR STAY
4:23-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1

**MICHAEL T. HILGERS**

2

Attorney General
State of Nebraska

3

/s/ Colin P. Snider

4

Colin P. Snider (NE #27724)
Assistant Attorney General

5

*pro hac vice*

6

Nebraska Attorney General's Office
2115 State Capitol Building

7

Lincoln, NE 68509
Phone: (402) 471-3840

8

Email: michaela.hohwieler@nebraska.gov
Email: colin.snider@nebraska.gov

9

10

*Attorneys for Plaintiff State of Nebraska*

11

12

**MATTHEW J. PLATKIN**
Attorney General

13

State of New Jersey

14

/s/ *Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008),

15

*pro hac vice*
Section Chief, Deputy Attorney General

16

New Jersey Office of the Attorney General,
Division of Law

17

124 Halsey Street, 5th Floor

18

Newark, NJ 07101
Tel: (973) 648-2052

19

Kashif.Chand@law.njoag.gov

20

*Attorney for Plaintiffs  Matthew J. Platkin, Attorney*

21

*General for the State of New Jersey, and Cari Fais,*
*Acting Director of the New Jersey Division of*

22

*Consumer Affairs*

23

24

25

26

27

28

**LETITIA JAMES**
Attorney General
State of New York

/s/ *Christopher D'Angelo*
Christopher D'Angelo, Chief Deputy Attorney
General, Economic Justice Division
(NY Bar No. 4348744), *pro hac vice*
Christopher.D'Angelo@ag.ny.gov
Clark Russell, Deputy Chief, Bureau of
Internet and Technology
(NY Bar No. 2848323), *pro hac vice*
Clark.Russell@ag.ny.gov
Nathaniel Kosslyn, Assistant Attorney General
(NY Bar No. 5773676), *pro hac vice*
Nathaniel.Kosslyn@ag.ny.gov
New York State Office of the Attorney
General
28 Liberty Street
New York, NY 10005
(212) 416-8262

*Attorneys for Plaintiff the People of the State*
*of New York*

STATE ATTORNEYS GENERAL'S ADMINISTRATIVE MOTION FOR STAY
4:23-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 296

**JOSHUA H. STEIN**
Attorney General
State of North Carolina

/s/ Kevin Anderson
Kevin Anderson (N.C. Bar No. 22635),
*pro hac vice*
Senior Counsel for Consumer Protection and
Multistate Litigation
Sarah G. Boyce
Deputy Attorney General & General Counsel
Jasmine S. McGhee
Senior Deputy Attorney General
Director, Consumer Protection Division
Josh Abram
Kunal Choksi
Special Deputy Attorneys General
Charles G. White
Assistant Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6006
Facsimile: (919) 716-6050
kander@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

**DAVE YOST**
Attorney General
State of Ohio

/s/ Kevin R. Walsh
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
*pro hac vice*
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

*Attorneys for State of Ohio, ex rel. Attorney
General Dave Yost*

**ELLEN F. ROSENBLUM**
Attorney General
State of Oregon

/s/ Jordan M. Roberts
Jordan M. Roberts (Oregon Bar No. 115010),
*pro hac vice*
Assistant Attorney General
Oregon Department of Justice
Consumer Protection Section
100 SW Market Street
Portland, Oregon 97201
Telephone:     (971) 673-1880
Facsimile:      (971) 673-1884
E-mail: jordan.m.roberts@doj.state.or.us

*Attorneys for State of Oregon, ex rel. Ellen
F. Rosenblum, Attorney General for the
State of Oregon*

1

**DREW H. WRIGLEY**
Attorney General
State of North Dakota

2

3

*/s/ Elin S. Alm*
Elin S. Alm, *pro hac vice*
(ND Bar No. 05924)
Director/Assistant Attorney General
Christopher G. Lindblad, *pro hac vice*
(ND Bar No. 06480)
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
ealm@nd.gov

clindblad@nd.gov
*Attorneys for Plaintiff State of North Dakota, ex rel.*
*Drew H. Wrigley, Attorney General*

4

5

6

7

8

9

10

11

12

13

14

**MICHELLE A. HENRY**
Attorney General
Commonwealth of Pennsylvania

15

16

*/s/ Timothy R. Murphy*
Timothy R. Murphy
Senior Deputy Attorney General
(PA Bar No. 321294), *pro hac vice*
Email: tmurphy@attorneygeneral.gov
Jonathan R. Burns
Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

17

18

19

20

21

22

23

24

*Attorneys for Plaintiff the Commonwealth of*
*Pennsylvania*

25

26

27

28

**ALAN WILSON**
Attorney General
State of South Carolina

*/s/ Anna C. Smith*
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975),
*pro hac vice*
Assistant Deputy Attorney General
Anna C. Smith (SC Bar No. 104749),
*pro hac vice*
Assistant Attorney General
Clark C. Kirkland, Jr. (CA SBN 272522)
Assistant Attorney General
**OFFICE OF THE ATTORNEY**
**GENERAL OF SOUTH CAROLINA**
P.O. Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-0536
annasmith@scag.gov

*Attorneys for Plaintiff the State of South*
*Carolina, ex rel. Alan M. Wilson, in His*
*Official Capacity as*
*Attorney General of the State of South*
*Carolina*

**MARTY J. JACKLEY**
Attorney General
State of South Dakota

*/s/ Jessica M. LaMie*
By: Jessica M. LaMie (SD Bar No. 4831),
*pro hac vice*
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Jessica.LaMie@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

STATE ATTORNEYS GENERAL'S ADMINISTRATIVE MOTION FOR STAY
4:23-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 298

1

2

**PETER F. NERONHA**
Attorney General
State of Rhode Island

3

4

*/s/ Stephen N. Provazza*
Stephen N. Provazza (R.I. Bar No. 10435),
*pro hac vice*

5

6

Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.

7

Providence, RI 02903
Phone: 401-274-4400

8

Email: SProvazza@riag.ri.gov

9

10

*Attorneys for Plaintiff State of Rhode Island*

11

**JASON S. MIYARES**
Attorney General

12

Commonwealth Of Virginia

13

*/s/ Joelle E. Gotwals*
Steven G. Popps

14

Chief Deputy Attorney General
Thomas J. Sanford

15

Deputy Attorney General
Richard S. Schweiker, Jr.

16

Senior Assistant Attorney General and Section

17

Chief
Joelle E. Gotwals (VSB No. 76779),

18

*pro hac vice*
Assistant Attorney General

19

Office of the Attorney General of Virginia

20

Consumer Protection Section
202 N. 9th Street

21

Richmond, Virginia 23219
Telephone:    (804) 786-8789

22

Facsimile:    (804) 786-0122

23

E-mail: jgotwals@oag.state.va.us

24

*Attorneys for the Plaintiff Commonwealth of*
*Virginia*

25

*ex rel. Jason S. Miyares, Attorney General*

26

27

28

**PATRICK MORRISEY**
Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267),
*pro hac vice*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia,*
*ex rel. Patrick Morrisey, Attorney General*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Colin R. Stroud*
Colin R. Stroud
Assistant Attorney General
WI State Bar #1119457, *pro hac vice*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-9224
stroudcr@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*

Add-299

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**ROBERT W. FERGUSON**
Attorney General
State of Washington

*/s/ Alexandra Kory*
Alexandra Kory (WA Bar No. 49889),
*pro hac vice*
Joseph Kanada (WA Bar No. 55055),
*pro hac vice*
Rabi Lahiri
Gardner Reed
Assistant Attorneys General
Washington State Office of the Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Alexandra.Kory@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

16

Add. 300

[*Submitting Counsel on Signature Page*]

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| People of the State of California, et al. | MDL No. 3047 |
| v. | |
| Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC | Case No. 4:22-md-03047-YGR<br>4:23-cv-05448-YGR<br>4:23-cv-05885-YGR<br>4:24-cv-00805-YGR |
| ---------------------------------------------------- | |
| Office of the Attorney General, State of Florida, Department of Legal Affairs | **DECLARATION OF BIANCA MIYATA IN SUPPORT OF STATE ATTORNEYS GENERAL'S ADMINISTRATIVE MOTION FOR STAY** |
| v. | |
| Meta Platforms, Inc., Instagram, LLC., Meta Payments, Inc. | Judge: Hon. Yvonne Gonzalez Rogers |
| ---------------------------------------------------- | Magistrate Judge: Hon. Peter H. Kang |
| State of Montana, *ex rel.* Austin Knudsen, Attorney General | |
| v. | |
| Meta Platforms, Inc., Instagram, LLC, Facebook Holdings, LLC, Facebook Operations, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC, Siculus, Inc. | |
| ---------------------------------------------------- | |
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | |
| THIS DOCUMENT RELATES TO:<br>4:22-md-03047; 4:23-cv-05448; 4:23-cv-05885;<br>4:24-cv-00805 | |

1

Add. 301

I, BIANCA MIYATA, declare and state as follows:

1.      I am a Senior Assistant Attorney General in the Consumer Protection Section of the Colorado Department of Law. I am a member of good standing of the State Bar of Colorado. I make this declaration based on my own personal knowledge. If called upon to testify, I could and would testify completely to the truth of the matters stated herein.

2.      I submit this declaration, as required by Civil Local Rule 7-11, in support of the State Attorneys General's Administrative Motion for Stay.

3.      On September 6, 2024, this Court issued its Order Granting-in-Part and Denying-in-Part Meta's Request for Party Discovery on Third-Party State Agencies Pursuant to Fed. R. Civ. P. 34 and Granting Meta's [sic][1] First, Second, and Third Administrative Motions for Leave to File Supplemental Information. Doc. 1117.

4.      The State AGs intend to file an objection to the Order through a Motion for Relief on September 20, 2024.

5.      The State AGs seek a stay of the Order pending Judge Gonzalez Rogers' resolution of their objection and Motion for Relief.

6.      On September 19, 2024, counsel for Meta wrote that they cannot consent to a stay due to concerns about undue delay and Meta's need to progress discovery from the State AGs.

7.      The State AGs submit this declaration in lieu of a stipulation because Meta has indicated that it cannot consent to a stay.

I declare under penalty of perjury that the foregoing is true and correct. Executed on September 20, 2024, in Denver, Colorado.

                                                            */s/ Bianca E. Miyata*
                                                            BIANCA E. MIYATA
                                                            Senior Assistant Attorney General

---

[1] The caption of the Order refers to "Meta's" Administrative Motions. In the Order, the Court granted the State AGs' three Administrative Motions for Leave to File Supplemental Information (Doc. 1031, 1074, and 1110). The reference to "Meta's" Motions appears to be a minor typographical error.

[*Submitting Counsel on Signature Page*]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| People of the State of California, et al.<br><br>v.<br><br>Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC<br><br>-------------------------------------------------<br><br>Office of the Attorney General, State of Florida, Department of Legal Affairs<br><br>v.<br><br>Meta Platforms, Inc., Instagram, LLC., Meta Payments, Inc.<br><br>-------------------------------------------------<br><br>State of Montana, *ex rel.* Austin Knudsen, Attorney General<br><br>v.<br><br>Meta Platforms, Inc., Instagram, LLC, Facebook Holdings, LLC, Facebook Operations, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC, Siculus, Inc.<br><br>-------------------------------------------------<br><br>IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>4:22-md-03047; 4:23-cv-05448; 4:23-cv-05885; 4:24-cv-00805 | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR<br>4:23-cv-05448-YGR<br>4:23-cv-05885-YGR<br>4:24-cv-00805-YGR<br><br>**[PROPOSED] ORDER GRANTING STATE ATTORNEYS GENERAL'S OPPOSED ADMINISTRATIVE MOTION FOR STAY**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

1       Pursuant to Civil L.R. 7-11 the Court grants the State Attorneys General's Motion for

2   Stay. This Court's Order Granting in Part and Denying in Part Meta's Request for Party

3   Discovery on Third-Party State Agencies, Doc. 1117, (aside from the portions of the Order

4   granting the State Attorneys General's three Administrative Motions for Leave to File

5   Supplemental Information) is hereby stayed until Judge Gonzalez Rogers enters an order on the

6   Motion for Relief.

7

8   **IT IS SO ORDERED.**

9    **DATED this ___ day of _____, 2024.**

10

11                                           _____

12                                           PETER H. KANG
                                             UNITED STATES MAGISTRATE JUDGE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                             2

1    [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                  **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11   People of the State of California, et al.

12           v.                                    MDL No. 3047
     Meta Platforms, Inc., Instagram, LLC, Meta
13   Payments, Inc., Meta Platforms Technologies,   Case No. 4:22-md-03047-YGR
     LLC                                                     4:23-cv-05448-YGR
14                                                           4:23-cv-05885-YGR
     ---------------------------------------------           4:24-cv-00805-YGR
15
     Office of the Attorney General, State of Florida,  **STATE ATTORNEYS GENERAL'S**
16   Department of Legal Affairs                        **MOTION FOR RELIEF FROM**
             v.                                         **NONDISPOSITIVE PRETRIAL ORDER OF**
17   Meta Platforms, Inc., Instagram, LLC., Meta        **MAGISTRATE JUDGE**
     Payments, Inc.
18
     ---------------------------------------------
19
     State of Montana, *ex rel.* Austin Knudsen,       Judge: Hon. Yvonne Gonzalez Rogers
20   Attorney General
             v.                                         Magistrate Judge: Hon. Peter H. Kang
21   Meta Platforms, Inc., Instagram, LLC, Facebook
     Holdings, LLC, Facebook Operations, LLC,
22   Meta Payments, Inc., Meta Platforms
     Technologies, LLC, Siculus, Inc.
23
     ---------------------------------------------
24
     IN RE: SOCIAL MEDIA ADOLESCENT
25   ADDICTION/PERSONAL INJURY
     PRODUCTS LIABILITY LITIGATION
26
     THIS DOCUMENT RELATES TO:
27   4:22-md-03047; 4:23-cv-05448; 4:23-cv-05885;
     4:24-cv-00805
28

---

1

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.305

1    The State Attorneys General, as chief law officers of their respective states, are charged

2  with enforcing state consumer protection laws that protect their citizens from unscrupulous

3  businesses. To do this effectively, they are empowered by state statute to pursue these actions

4  independently of any other state agency or officer. But Meta has sought to disrupt this balance of

5  internal state organization by insisting that the AGs themselves produce documents held by more

6  than 270 independent nonparty state agencies—including state governors—through party

7  discovery. By incorrectly concluding that the AGs, even when acting in their independent

8  enforcement capacity, have legal control over unrelated state agencies' documents, the order

9  granting in part Meta's request, Doc. 1117, is both "clearly erroneous" and "contrary to law."

10  Fed. R. Civ. P. 72(a). The order misapplies the Ninth Circuit's standard for determining legal

11  control of documents, *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999),

12  misapprehends the role of independent AGs, and ignores the overwhelming weight of federal

13  authority that respects state sovereignty. If allowed to stand, the order places the AGs in the

14  impossible position of responding to discovery seeking documents which they have no legal right

15  to access.

16    The order requires AGs to approach nonparty state agencies and officials for whom other

17  non-consumer protection attorneys employed by their offices *may* serve as counsel in unrelated

18  matters, demand to search their records, and seize whatever documents may be responsive to

19  Meta's sweeping party discovery requests. These nonparties have no role in investigating or

20  prosecuting this action, no right to any relief that may be secured by the AGs, and no firsthand

21  knowledge of the alleged acts and omissions that gave rise to the claims in this action. And if they

22  do not acquiesce to such unprecedented demands and seizures, the AGs risk being sanctioned by

23  this Court despite having no legal right to force any nonparty to comply with the Court's order

24  (except for those tools equally available to Meta, such as Rule 45 subpoenas).

25    At bottom, Meta seeks to force the AGs to serve as its agents for obtaining documents

26  from independent nonparties, rather than following through itself on Rule 45 subpoenas—

27  subpoenas that Meta has already issued to 141 state agencies and officials during the pendency of

28  this dispute, Doc. 1120, pp. 13-14; Doc. 1110, pp. 2-8, who are working with their own counsel

2

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.306

1    to respond. Such an order conflicts with the Ninth Circuit's authority on what constitutes

2    "control" of documents, unnecessarily erodes the core tenet of federalism by requiring the federal

3    courts to wade into the domain of how the states organize their executive agencies and authority,

4    and places extraordinary burdens on AGs pursuing consumer protection enforcement actions in

5    federal court that ultimately will impede their ability to prosecute such actions to protect the

6    public.

7    **I. Statement of the portions of the Magistrate Judge's order to which an objection is made**

8         The AGs object to the shared portions and conclusion of the order. Doc. 1117, pp. 1-42,

9    248. The AGs also each object to the portions of the order addressing their respective states.

10        Meta first indicated its intention to take discovery of nonparty state agencies in a January

11   25, 2024, discovery case management conference. Jan. 25, 2024 DMC Tr. at 139:24-141:9.  On

12   February 27, 2024, Meta issued its First Set of RFPs to the State AGs, defining the "Plaintiff" or

13   "You" as a broad swath of state entities including: "the executive . . . branch[], agencies, offices,

14   departments, divisions, commissions, committees, agents, employees, boards,  . . . [and]

15   administrators, . . . including but not limited to [certain enumerated agencies]." The parties

16   conferred about aspects of this issue and sought the Court's guidance at Discovery Management

17   Conferences in February and March. Feb. 22, 2024 DMC Tr. at 30:16-38:4; Mar. 21, 2024 DMC

18   Tr. at 5:13-18:9. Per the Magistrate Judge's Discovery Standing Order, the AGs submitted a

19   single 2.5-page letter brief expressing their joint position opposing the issuance of party discovery

20   requests to nonparties. Doc. 685. The Magistrate Judge later ordered each AG to submit a single

21   page letter brief articulating their state-specific positions and law. Mar. 21, 2024 DMC Tr. at 6:7-

22   9:4; Doc. 736. In response to the AGs' request, the Court allowed oral argument, but discouraged

23   State AGs from appearing, stating it hoped no more than eight State AGs would appear. Apr. 22,

24   2024 DMC Tr. at 7:6-11. Given the Magistrate Judge's stated preference for limited argument, six

25   AGs presented argument on this issue. *See generally* May 6, 2024 DMC Tr. Despite the

26   Magistrate Judge limiting page counts and discouraging argument, the order addressed a number

27   of issues that the AGs never briefed nor argued.

28

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 307

1  Even though the AGs informed Meta they did not represent the state agencies as early as

2  January 25, 2024, DMC Tr. at 141:14-143:16, Meta delayed issuing any Rule 45 subpoenas to

3  state agencies for nearly six months—until July 17, 2024. This delay came after the Magistrate

4  Judge repeatedly pointed out to Meta that it was making a tactical choice not to issue subpoenas

5  during the pendency of the dispute, even to the subset of agencies from which it most wanted

6  information. Feb. 22, 2024 DMC Tr. at 37:8-23; Apr. 22, 2024 DMC Tr. at 7:20-9:11; May 6,

7  2024 Hearing Tr. At 103:9-104:9. As of the date of the order, Meta represented that

8  approximately 40% of the agencies who had contacted Meta in response to subpoenas were

9  represented by State AGs, while the majority were presumably represented by counsel outside of

10  the State AGs. Doc. 1120 p. 14.

11  **II. Statement of the Court action requested**

12  The order holds that AGs who bring actions in their independent enforcement capacities

13  have control over documents in the custody of nonparty state agencies and officials that have no

14  role in the enforcement action, but whom the AGs' offices *may* represent in different capacities

15  on unrelated matters. This holding conflicts with the Ninth Circuit's binding precedent, is based

16  on a misreading of state laws, and ignores the overwhelming weight of federal authority on this

17  issue. The AGs ask the Court to hold that this conclusion is "clearly erroneous" and "contrary to

18  law." Fed. R. Civ. P. 72(a). Further, the AGs ask the Court to hold that Meta has failed to meet its

19  "burden of proving that the [AGs] ha[ve] such control," *United States v. Int'l Union of Petroleum*

20  *& Indus. Workers, AFL-CIO*, 870 F.2d 1450, 1452 (9th Cir. 1989), and deny Meta's request to

21  seek party discovery from state agencies under Rule 34.

22  The State AGs request oral argument on their common objections to the order. As of the

23  filing of this motion, 21 State AGs request oral argument to address the order's state-specific

24  conclusions.

25  **III. Statement of the reasons and authority supporting the motion**

26  **A. Common Arguments**

27  **1. The AGs are independent state officials that do not have "legal control" over the**

28  **documents of independent state agencies.**

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 308

1    Under the Federal Rules of Civil Procedure, in response to a valid discovery request, a

2    party must produce only what is within its "possession, custody, or control." Fed. R. Civ. P. 34.

3    Relevant here, Ninth Circuit authority holds that "[c]ontrol is defined as the legal right to obtain

4    documents upon demand." *In re Citric Acid Litig.*, 191 F.3d at 1107 (citation omitted). "[P]roof

5    of theoretical control is insufficient; a showing of actual control is required." *Id.* The Ninth

6    Circuit has expressly refused "to define 'control' in a manner that focuses on the party's practical

7    ability to obtain the requested documents." *Id.* As the Ninth Circuit explained, the legal control

8    test is the proper standard because "[o]rdering a party to produce documents that it does not have

9    the legal right to obtain will oftentimes be futile, precisely because the party has no certain way of

10   getting those documents." *Id.* at 1108. "The party seeking production of the documents . . . bears

11   the burden of proving that the opposing party has such control." *Int'l Union of Petroleum &*

12   *Indus. Workers, AFL-CIO,* 870 F.2d at 1452.

13   Here, the order relies entirely on a legally flawed foundational premise that the AGs have

14   the legal right to obtain agency documents on demand because an AG is "presumptively counsel

15   for its state agencies." Doc. 1117, p. 27. This is contrary to law for at least four independent

16   reasons: (1) it fundamentally misapprehends the role of AGs acting as outside counsel to

17   independent state agencies; (2) it misapplies controlling Ninth Circuit authority; (3) it disregards

18   federal authority respecting state sovereignty in this context; and (4) it disregards the structure of

19   state governments.

20   **a. The order fundamentally misapprehends the role of AGs acting as outside counsel**

21   **to independent state agencies.**

22   The order erroneously treats all state agencies and officials, and the AGs who may

23   represent them in unrelated matters, as a monolith. AGs have two distinct and separate roles. On

24   the one hand, AGs bring lawsuits, such as this one, in their independent enforcement capacities

25   under their states' respective consumer protection laws and under federal laws like COPPA. The

26   decisions to pursue these actions are typically made by AGs as statewide elected officials,[1]

27           [1] New Jersey's AG is appointed, not elected, *see* N.J. Const. Art. V, Sec. 4, Para. 3, but
28   nevertheless has the independence to interpret state law and decide which cases to prosecute or
                                                                                        (continued…)

---

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 309

1    independent of the governor and executive branch agencies. *See United States v. Am. Express*

2    *Co.*, No. 10CV04496, 2011 WL 13073683, at *2 (E.D.N.Y. July 29, 2011); *see also People ex*

3    *rel. Lockyer v. Superior Court*, 19 Cal. Rptr. 3d 324, 337 (Cal. Ct. App. 2004) ("[S]tate agencies,

4    in the ordinary course of their duties, are distinct and separate governmental entities, third parties

5    under the discovery statutes that can be compelled to produce documents only upon a

6    subpoena."). On the other hand, some AGs are statutorily mandated to counsel or represent

7    certain state agencies and other officials, at least some of the time in certain circumstances. *See*

8    *Am. Express Co.*, 2011 WL 13073683, at *2. Those agencies and officials are typically housed

9    within a state's executive branch and in many cases report to separately elected constitutional

10   officers, like the state's governor. In the first role, AGs act as independent elected officials; in the

11   second role, AGs act as counsel to their clients. *Id.* at *2-3. AGs have different authority, rights,

12   and obligations depending on the function they perform. As relevant here, when AGs are

13   exercising their independent enforcement authority, they are not acting as agency counsel and

14   certainly do not have any legal right to access documents. *See, e.g.*, Docs. 738-8 (GA); 738-16

15   (ME); 738-20 (MO); 738-22 (NE); 738-27 (OH).[2]

16       The order fails to grapple with these dual roles, including by holding that if one lawyer in

17   an AG's Office represents an agency, the entire office represents that agency. Doc. 1117, p. 39.

18   _____

19   defend. The Hawai'i AG is also appointed, not elected. Haw. Rev. Stat. § 26-31 ("each principal
     department shall be headed by a single executive, who shall be nominated and, by and with the
20   advice and consent of the senate, appointed by the governor[.]"). But the Hawai'i AG may not be
     removed by the Governor without the consent of the state senate. Haw. Rev. Stat. § 26-31. The
21   Maine Attorney General is elected by the state legislature. Me. Const. art. IX, § 11. So, these AGs
     exercise a similar level of independence from state governors as elected AGs. *Cf. Am. Express*
22   *Co.*, 2011 WL 13073683, at *2 n.5 (discussing independence of non-elected New Hampshire and
     Tennessee AGs).

23       [2] Indeed, in some cases, AGs' offices do not or would not represent the agencies in
     question. *See, e.g.*, Doc. 738-7 (FL AG requires agreement to represent agency); 738-13 (KS
24   agencies represented by independent counsel, not AG); 738-14 (KY AG does not represent
     agencies in question); 738-15 (most LA agencies, including those in question, represented by
25   independent counsel). In other cases, agencies are not required to seek representation by their
     state AG. *See, e.g.*, Docs. 738-3 (CA); 738-19 (MN); 738-24 (NY); 738-30 (RI). This is contrary
26   to what was said in the order. Doc. 1117 at 31 ("it appears that all (or virtually all) of the state
     Attorneys General will represent both the named plaintiff and the state agencies at issue…").
27   Only in certain states is agency representation mandatory. *See, e.g.*, Docs. 738-4 (CO); 738-9
     (HI). The order similarly misconstrues or disregards state laws which explicitly state that AGs do
28   not control agency documents, see, e.g., Docs. 738-6 (DE); 738-31 (SC).

Add. 310

1    That conclusion is contrary to a number of state laws and inconsistent with state sovereignty

2    because it disregards how state legislatures have chosen to organize AGs' offices. *Colorado v.*

3    *Warner Chilcott Holdings Co. III*, No. CV 05-2182, 2007 WL 9813287, at *4 (D.D.C. May 8,

4    2007) ("For reasons of federalism and comity, [courts] give great deference to the State and its

5    Legislature to define how governmental entities are to be separate and distinct and how they

6    relate to one another as a whole; this is 'uniquely an exercise in state sovereignty.'" (citation

7    omitted)). For example, some AGs' Offices can and do separately represent state agencies that are

8    adverse to one another, *see, e.g.*, Doc. 738-9 (HI), 738-23 (NJ), and can and do act adverse to

9    state agencies they may otherwise represent, *see, e.g.*, Doc. 738-8 (GA); 738-14 (KY); 738-24

10   (NY); 738-26 (ND), demonstrating that one lawyer's representation of an agency cannot

11   necessarily be imputed to the entire office.

12          Based on these erroneous applications of state law, and contrary to the Ninth Circuit's

13   holding in *Citric Acid*, the order holds that a federal court's inherent authority to manage

14   discovery allows it to require AGs acting in their independent enforcement capacity to access and

15   produce the documents of state agencies and other officials. *See* Doc. 1117, p. 9. This is legal

16   error. As is true here, those state agencies and officials are not parties to independent AG

17   enforcement actions and so are not bound by a court's discovery orders in those cases. *See*, *e.g.*,

18   *Sali v. Corona Reg'l Med. Ctr.*, 884 F.3d 1218, 1222 (9th Cir. 2018) (holding that "a nonparty's

19   attendance generally can be compelled only by subpoena" (citation omitted)). And the order fails

20   to identify any legal right that the AGs could assert to obtain the documents of such agencies. *See*

21   *In re Citric Acid Litig.*, 191 F.3d at 1108 ("Ordering a party to produce documents that it does not

22   have the legal right to obtain will oftentimes be futile, precisely because the party has no certain

23   way of getting those documents."). While AGs could perhaps submit open records requests or

24   subpoena state agencies to seek those documents, those paths are equally available to parties like

25   Meta, and in no way constitute a "right to obtain documents *on demand*" as required by *Citric*

26   *Acid*.[3] *Id.* at 1107 (emphasis added).

27          [3] The order cites *Flagg v. City of Detroit*, 252 F.R.D. 346, 355–57 (E.D. Mich. 2008),
     addressing a public records law and legal control. This case is inapplicable here, as it examines a
28   public entity's right to access documents from a nonparty contractor.

---
7

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.311

1    If the order is upheld, every state agency would be subject to burdensome party discovery

2    every time an AG initiated a consumer protection suit in federal court. Imagine a payday lender

3    sued by an AG demanding to access the governor's documents through party discovery. Under

4    the order, the AG would be required to obtain the documents, even if the governor declined to

5    provide access, merely because the AG *might* represent the governor in an entirely different

6    capacity. If the governor refused to provide the documents, the AG would risk sanctions from the

7    court for failing to produce party discovery. This cannot be the consequence of the AGs availing

8    themselves of the right to bring federal claims and related state claims in federal court and would

9    leave those enforcement actions "vulnerable to a virtual veto by one or more independent [state]

10   agencies." *United States v. Am. Tel. & Tel. Co.*, 461 F. Supp. 1314, 1336 (D.D.C. 1978).

11           **b. The order misapplies controlling Ninth Circuit authority.**

12           The order commits further legal error, in contravention of binding Ninth Circuit authority,

13   *Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870 F.2d at 1452, by improperly shifting

14   the burden away from the propounding party (Meta) and placing it on the AGs to establish a *lack*

15   of control. This legal error is repeated dozens of times throughout the order. *See*, *e.g.*, Doc. 1117,

16   pp. 47, 57, 61, 65, 78, 85, 89, 95, 100, 105, 111, 116, 120, 128, 141, 148, 154, 166, 176, 182, 188,

17   195-96, 213, 219, 225-26; *but see*, *id.*, p. 5 (noting, but not applying, proper burden). The fact that

18   AGs might not be legally *prohibited* from seeking state agency documents does not mean that the

19   AGs have the legal right to demand those documents and enforce their demands as required by

20   *Citric Acid*. This improper burden shifting also led the Magistrate Judge to erroneously conclude

21   that State AGs would represent agencies in responding to discovery in the vast majority of states

22   where agency representation is not mandatory, *see* Doc. 738-1 (Category 2), without any

23   evidence of how the agencies had exercised their discretion to select their counsel in responding

24   to the dozens of subpoenas that had been served, and before nearly half of the agencies had yet to

25   receive subpoenas. *See*, *e.g.*, Doc. 1117, pp. 51, 111, 144. As Meta appears to admit, the majority

26   of agency counsel with whom they have been negotiating their Rule 45 subpoenas do not work at

27   State AGs' offices. Doc. 1120, pp. 13-14 ("Meta calculates that, so far, over 40 percent of the

28   state entities that have been in contact with Meta's counsel regarding a subpoena are being

8

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.312

1    represented by the relevant State AG's Office.").

2          In any event, as discussed below, even if an AG were to act as outside counsel to a

3    nonparty agency, the attorney-client relationship in no way provides the AG as a law office with

4    the "legal right" to access nonparty clients' documents for requests propounded on the AG. *See*

5    *Am. Express Co.*, 2011 WL 13073683, at *3 ("[T]he State Attorneys General have no more power

6    to acquire documents from the non-party agencies than any law firm representing a client.").

7    Certainly, AGs cannot access nonparty documents any more than Meta's counsel in this matter,

8    Covington & Burling LLP, could legally access the documents of its numerous other nonparty

9    clients if the AGs were to seek those documents through discovery propounded on Meta or its

10   counsel. *See id*. ("Without question, the private firms here would strenuously object if in bringing

11   a law suit on behalf of one client (or even in their own name) their adversary sought documents

12   belonging to another client as party discovery.").

13         **c. The order disregards federal authority on state sovereignty.**

14         The order ignores the great weight of federal authority, relying instead on inapplicable and

15   unpersuasive cases.

16         The vast majority of federal courts to consider this issue in this context have held that

17   AGs lack legal control over independent state agency documents. *See In re Gold King Mine*

18   *Release in San Juan Cnty., Colorado*, 2021 WL 847971 at *3 (D.N.M. Mar. 5, 2021) ("The

19   United States has not cited any New Mexico law showing that the New Mexico Attorney General

20   has the power to compel other state agencies to produce documents."); *United States v. Novartis*

21   *Pharms. Corp.*, No. 11-8196, 2014 WL 6655703, at *9 (S.D.N.Y. Nov. 24, 2014) (holding that

22   "the mere fact that a state or a state agency sues does not mean that the records of all state

23   agencies may be discovered using Rule 34's tools"); *Am. Express Co.*, 2011 WL 13073683, at *2

24   ("[S]tate agencies—even those that are part of the executive branch—are neither subject to

25   common executive control nor interrelated with the State Attorneys General, and so should not be

26   aggregated together for discovery purposes."); *Warner Chilcott Holdings Co. III, Ltd.*, 2007 WL

27   9813287 at *4 (declining to order state AGs to produce discovery from state agencies because

28   AGs initiate actions "under their own authority" and agencies were not parties to litigation); *cf.*

1    *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 266 (N.D.N.Y. 2006)

2    (warning of absurd, unduly burdensome, and untenable results if state agencies were subject to

3    discovery requests any time the State of New York brought a lawsuit). State courts largely agree.

4    *See Commonwealth v. Ortho-McNeil-Janssen Pharmaceuticals, Inc.,* No. 2011-2811, 2012 WL

5    5392617, at *3 (Super. Ct. Mass. Oct. 5, 2012) (holding MA AG's office did not have control

6    over documents of other state agencies in enforcement action under state law); *People ex rel.*

7    *Lockyer*, 19 Cal. Rptr. 3d at 337.

8            Ignoring this weight of case law, the order relies heavily on two inapposite decisions: *In*

9    *re Generic Pharms. Pricing Antitrust Litig.*, 699 F. Supp. 3d 352, 355 (E.D. Pa. 2023), and

10   *Illinois ex rel. Raoul v. Monsanto Co.*, No. 22 C 5339, 2023 WL 4083934 (N.D. Ill. June 20,

11   2023). But *Generic Pharms* is an outlier decision and simply does not stand for the sweeping

12   proposition that AGs bringing independent enforcement actions have legal control over all state

13   agency documents. In *Generic Pharms*, various states brought antitrust actions against 20

14   pharmaceutical companies alleging a conspiracy to minimize competition in the generic drug

15   industry. When those companies sought party discovery from state legislatures and state agencies,

16   the Special Master found the request overbroad and limited it to a narrower set of requests. 699 F.

17   Supp. 3d at 355-56. On review, the District Court rejected in part and adopted in part the Special

18   Master's recommendation, concluding the AGs did control certain state agency documents. *Id*. at

19   357-61. The court concluded: (1) all of the states brought the antitrust actions in the name of the

20   state, not the name of the AG, and so acted in a representative capacity rather than as a party; (2)

21   generally, state agencies stood to benefit from the lawsuit; and (3) at least some states sought

22   damages on behalf of specific state agencies. *Id*. at 356-57, 360. None of that reasoning applies

23   here, where AGs bring these actions independently, to vindicate the interests of citizen

24   consumers, not state agencies.[4] Multistate Complaint, Doc. 73-2 ¶¶ 21 ("The Filing States bring

25   this action pursuant to the authority conferred on the State Attorneys General" to enforce "their

26   ───────────────
             [4] As addressed in the New Jersey specific portion of this motion, unlike the other states,
27   the New Jersey AG and the Acting Director of the Division of Consumer Affairs are both named
     plaintiffs in this matter. The analysis in this subsection therefore does not apply in full to New
     Jersey.
28

Add.314

1    respective states' Unfair and Deceptive Acts and Practices statutes.");[5] 12 ("Meta's unlawful acts

2    and practices affect a significant number of consumers in the Filing States."). Additionally, the

3    AGs do not seek damages on behalf of state agencies here. Doc. 685, p. 8. And even were those

4    critical distinctions not present, nothing about the limited discovery permitted in *Generic Pharms*

5    supports the unprecedented conclusion that AGs offices engaged in independent enforcement

6    actions have control of all documents of all state agencies.[6]

7            And *Monsanto* is distinguishable because the AG coordinated with interested agencies in

8    that case, named those agencies in the complaint, and sought damages that would compensate

9    some of those agencies. *Monsanto,* 2023 WL 4083934, at *2. There, the court held specifically

10   that the Illinois AG "has a legal right to obtain responsive documents *from the state agencies*

11   *referenced in the Complaint.*" *Id.* at *5 (emphasis added). Here, the AGs do not bring this lawsuit

12   on behalf of any state agencies or seek damages on behalf of state agencies. Doc. 685, p. 8.

13           **d. The order disregards the structure of state governments.**

14           The order errs by concluding that because the State AGs are parties in this case, party

15   discovery obligations extend to the entire state government. Doc. 1117, p. 17. This argument puts

16   form over substance, relying on the complaint's caption to find that this case is brought on behalf

17   of state governments,[7] even though the AGs specifically plead that they bring this case to protect

18   the interests of their states' consumers, not those of state agencies. Multistate Complaint, Doc.

19

20           [5] Not all states have brought claims under their Unfair and Deceptive Acts and Practices
     statutes.

21           [6] Additionally, the Third Circuit's definition of a "legal right to obtain documents on
     demand" is broader than that described in *Citric Acid*. Third Circuit precedent finds legal control

22   satisfied when a closely related corporate subsidiary party "can secure documents of the
     [nonparty] principal-parent to meet its own business needs and documents helpful for use in the

23   litigation," in effect, when the party has the practical ability to obtain documents from the
     nonparty. *See* Doc. 1117, p. 37 (citing *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140–41

24   (3d Cir. 1988)). Such "practical ability" reasoning is inconsistent with *Citric Acid*'s plain holding.
     *See id.* (noting it has been rejected by courts in the Northern District) (citing *Seifi v. Mercedes-

25   *Benz U.S.A., LLC*, No. 12-CV-05493TEH (JSC), 2014 WL 7187111, at *2 (N.D. Cal. Dec. 16,
     2014); *Dugan v. Lloyds TSB Bank, PLC*, No. 12CV02549WHANJV, 2013 WL 4758055, at *2

26   (N.D. Cal. Sept. 4, 2013)). The limited explanation of the AGs' purported legal right to obtain
     nonparty agency documents in *Generic Pharms*' reflects this different standard, and the decision

27   is therefore inapposite.

28           [7] Not all states are represented on the caption; in some instances, the AG alone is listed.

─────────────────────────────────
11

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.315

1   73-2 ¶¶ 21; 12.

2       In any event, this conclusion relies on two distinguishable cases holding that one *federal*

3   agency has control of another *federal* agency's documents. *Harvey Aluminum (Inc.) v. N.L.R.B.*,

4   335 F.2d 749, 754 (9th Cir. 1964) (holding that the National Labor Relations Board was required

5   to produce statements possessed by the Department of Labor and the Department of Justice);

6   *Bank Line v. United States*, 76 F. Supp. 801, 803–04 (S.D.N.Y. 1948) (holding that the

7   Department of Justice, Department of Treasury, and Department of Navy were "agencies of one

8   government, possessed, theoretically, at least, of a single will"). In reaching this conclusion, the

9   *Harvey Aluminum* court explained, "the Departments of Justice and Labor are not sovereign, and

10   though the Board may not be able to compel them to produce documents in their possession, the

11   President . . . may do so." 335 F.2d at 754. However, the AGs differ from the heads of federal

12   agencies in one critical regard: in the states' divided executive structures, AGs are independently

13   elected. While the President can order the United States Attorney General to produce documents,

14   the governor of a state cannot order the state's independently elected AG to produce documents.

15   And by that same logic, the independently elected AG cannot order an executive branch agency,

16   which reports to the governor, to produce its documents. *Cf. United States v. AT&T,* 461 F. Supp.

17   1314, 1334–36 (D.D.C. 1978) (granting party discovery of executive branch agencies in US DOJ

18   antitrust action, but denying party discovery of independent agencies).

19       **2. Even when acting as outside-agency counsel, AGs do not have "legal control" of**

20       **client-agency documents.**

21       In some circumstances, AGs may serve as outside counsel to various state agencies. The

22   order relies on this possibility to incorrectly hold that AGs will act as agency counsel in this

23   matter and to hold that the inherent nature of the attorney-client relationship grants the attorney

24   "legal control" over client documents to produce in litigation where the client is not a party. Doc.

25   1117, pp. 27, 31. This is contrary to law.

26       The AGs agree that attorneys have a duty to supervise their clients' collection of

27   documents in discovery, when those clients are named as parties to a lawsuit in which they are

28   represented by AGs. Doc. 1117, p. 25. But this non-controversial principle does not mean that

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.316

1    attorneys have "the legal right to access those documents." Doc. 1117, p. 27; *contra, e.g.*, *Am.*

2    *Express Co.*, 2011 WL 13073683, at *3 ("[T]he State Attorneys General have no more power to

3    acquire documents from the non-party agencies than any law firm representing a client."). The

4    order cites no Ninth Circuit caselaw supporting this proposition (and the AGs have found none),

5    instead citing to a single case standing for the general principle that "legal duties are logically

6    antecedent to legal rights." *Newman v. Sathyavagelswaran*, 287 F.3d 786, 790 n.5 (9th Cir. 2002).

7         While a lawyer has a duty to supervise even an uncooperative client's collection of

8    documents, there is no authority providing a lawyer with the legal right to access their client's

9    documents. Indeed, the professional duties of lawyers prohibit them from forcibly taking their

10   client's documents and providing them to another party. *See* ABA Model Rule of Professional

11   Conduct 1.2(a) ("[A] lawyer shall abide by a client's decisions concerning the objectives of

12   representation and . . . shall consult with the client as to the means by which they are to be

13   pursued."); *see also In re Perle*, 725 F.3d 1023, 1027 (9th Cir. 2013) ("Ordinarily, a lawyer is a

14   client's agent."). And for good reason—an attorney cannot effectively counsel a client if the

15   client does not trust the attorney to act in their best interest.

16        In reaching its erroneous conclusion, the order relies on out-of-circuit cases decided under

17   a "practical ability" test rejected by *Citric Acid* and which are otherwise inapposite. For example,

18   the order cites to a single unpublished case holding that "an attorney is presumed to have control

19   over documents in its client's possession." Doc. 1117, p. 31 (citing *Perez v. Perry*, No. SA-11-

20   CV-360-OLG-JES, 2014 WL 1796661, at *2 (W.D. Tex. May 6, 2014)). But that case relies on

21   the "practical ability" test and thus is inapplicable here. *See Perez*, 2014 WL 1796661, at *1.

22        To support the incorrect conclusion that AGs have control of client documents, the order

23   also relies on a series of inapposite prison civil rights cases. *See* Doc. 1117, pp. 28, 32-33. In

24   those cases, AG offices acted in their outside counsel capacity representing named prison official

25   defendants and courts imputed party or attorney control over documents of state departments of

26   corrections which employed the prison officials. *Id.* These cases are not binding, do not use the

27

28

---

13

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-04813-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.317

1  *Citric Acid* "on demand" test,[8] and moreover do not support the conclusion that AGs acting in

2  their independent enforcement capacity have control of all state agency documents.

3  **B. State Specific Arguments**

4      In addition to the common arguments made above, the following AGs argue that the order

5  erroneously interpreted their respective state laws.

6      **1. Arizona**

7      Even if this Court upholds the principle that the Arizona Attorney General's ("AGO")

8  representation of a state agency establishes control under the *Citric Acid* test, the order errs in its

9  application of this principle to the Arizona Department of Education ("ADE") and the Arizona

10  Governor's Office of Strategic Planning and Budgeting ("OSPB"). The order relies entirely on

11  Ariz. Rev. Stat. § 41-192 to conclude that AGO will represent these two agencies. (Doc. 1117, p.

12  44) But as AGO has explained, it does not, has not, and will not, represent either of these

13  agencies in this case under any circumstance. (*See* Doc. 738-7; TR 5/6/24 at 4-11.) It is unclear

14  why AGO's avowal to the Court is insufficient on this point.

15      While the order identifies that ADE is not statutorily exempt under Ariz. Rev. Stat. § 41-

16  192(D) and should, in theory, be barred from expending state funds to secure counsel, in reality

17  ADE *does* employ its own legal counsel. *E.g.*, Ariz. Dep't of Educ., Organization Chart, *available*

18  *at* https://www.azed.gov/sites/default/files/2023/01/ADEOrgChart.pdf (listing legal services).[9]

19  And, as indicated to the Court in oral argument, there is an ongoing legal conflict between ADE

20  and AGO. *See also, e.g.*, Ariz. Dep't of Educ., Horne sues Governor, Attorney General Seeks

21  declaration that schools obey voter protected English instruction method (Sept. 7, 2023),

22  https://www.azed.gov/communications/horne-sues-governor-attorney-general-seeks-declaration-

23

24      [8] *See, e.g.*, Doc. 1117 at 32, citing *Pulliam v. Lozano*, No. 1:07-CV-964-LJO-MJS, 2011 WL 335866, at *1 (E.D. Cal. Jan. 31, 2011) (in court's experience, prison employee defendants

25  "and/or the Attorney General can *generally* obtain" similar documents from defendants' employer prison agency) (emphasis added). A nonparty having "voluntarily furnish[ed]" a party "with

26  documents and information in the past" does not demonstrate the party's legal control. *Citric Acid*, 191 F.3d at 1108.

27      [9] This Court may take judicial notice of the documents on Arizona agency websites. *See*

28  Fed. R. Evid. 201(b)(2), (d); *State Montana Green Party v. Jacobsen*, 17 F.4th 919, 927 (9th Cir. 2021).

1  schools-obey-voter-protected.

2      Relatedly, while not explicitly enumerated as exempt under Ariz. Rev. Stat. § 41-192(D),

3  the OSPB is part of, and receives counsel through, the Governor's Office—which is exempt. *See,*

4  *e.g.*, OSPB, What We Do, *available at* https://azospb.gov/responsibilities.aspx. Moreover, OSPB

5  was created by the Governor via Executive Order as "an adjunct to the Governor's Office

6  reporting to the Governor." *See* Executive Order 90-22: Governor's Office of Strategic Planning

7  and Budgeting (signed Nov. 27, 1990), *available at* https://azmemory.azlibrary.gov/nodes/view/

8  44432?keywords. AGO therefore asks, at a minimum, that the Court overturn the order as it

9  applies to ADE and OSPB.

10     **2. California**

11     The order legally errs in holding that, even when acting in his independent law-

12  enforcement capacity, the Attorney General has a legal right to the documents of sister state

13  agencies led by independently elected state constitutional officers. The order runs roughshod over

14  California's dual-executive structure[10] and controlling law: "Each agency or department of the

15  state is established as a separate entity," and the Attorney General is therefore "not deemed to

16  have possession, custody or control over documents of any state agency." *Lockyer*, 19 Cal. Rptr.

17  3d at 337-38; *accord, e.g.*, *Chilcott Holdings*, 2007 WL 9813287, at *5. Nor does California law

18  provide the Attorney General with access to the records of sister state officers or agencies.

19  *Compare* Cal. Gov't Code § 8545.2 (granting access to State Auditor). Accordingly, the order is a

20  direct affront to California's sovereignty. *See, e.g.*, *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)

21  ("Through the structure of its government, . . . a State defines itself as a sovereign.").

22     The order commits further legal error by holding that, because the Attorney General may

23  sometimes act as outside counsel to state agencies, the Attorney General necessarily has "control"

24  over agencies' documents, even in this independent law-enforcement prosecution to which they

25  are not party. This contravenes *Citric Acid*, 191 F.3d at 1107 ("theoretical control is

26  insufficient"), and misapprehends California law, which allows state officers and agencies to

27     [10] California's Constitution "embodies a structure of divided executive power" among
independently elected officials. *Marine Forests Soc'y v. Cal. Coastal Com.*, 113 P.3d 1062, 1077

28  (Cal. 2005) (citing Cal. Const., art. V, §§ 2, 11 & art. IX, § 2).

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 319

1   retain their own in-house counsel, instead of mandating use of the Attorney General as outside

2   counsel in every case, Cal. Gov't Code §§ 11040(c)-(d), 11041(a), and which recognizes that

3   conflicts may arise requiring agencies to retain separate counsel, *D'Amico v. Bd. of Med. Exs.*, 11

4   Cal. 3d 1, 14, n.5 (1974). In sum, the order puts the Attorney General in an impossible position:

5   requiring him to produce that which he has no legal right to obtain. This is no abstract concern.

6   Following the order's issuance, Governor Newsom's Office, which is not a party, has declined to

7   provide the Attorney General with access to sister agency documents for purposes of responding

8   to discovery in this action.

9       **3. Colorado**

10       The order, as to Colorado, is clearly erroneous and contrary to law for three reasons.

11       *First*, by concluding the AG has control of agency documents because it is required to

12   represent agencies, the order misconstrues state law. Doc. 1117, p. 59. The order ignores that the

13   AG and its attorneys operate in distinct capacities authorized by distinct statutes. *Compare* C.R.S.

14   § 24-31-101(1)(*i*)(II) (the AG may "independently initiate and bring … actions to enforce" the

15   Colorado Consumer Protection Act (CCPA)); *to* § 24-31-101(1)(a) (the AG is "legal counsel …

16   of each … agency of state government"). Contrary to the order, the AG brings this suit solely in

17   its independent enforcement capacity, which state law distinguishes from the AG's representative

18   capacity. *See Salazar v. Davidson*, 79 P.3d 1221, 1229-30 (Colo. 2003) (acknowledging the

19   AG's ability to act in its enforcement capacity against agencies it otherwise represents). For this

20   reason, the order incorrectly concludes the AG will represent agencies "in this matter for

21   discovery." Doc. 1117, p. 60. Other attorneys who are employed by the AG, but who do not

22   enforce the CCPA in this or other enforcement actions initiated by the AG, will represent

23   agencies in this case *if those agencies are subpoenaed* as third parties. But under § 24-31-

24   101(1)(*i*)(II), the AG attorneys enforcing the CCPA do not and would not represent agencies "in

25   this matter," and agencies are not parties subject to discovery orders.

26       *Second*, the order misreads an information-sharing statute to support its holding regarding

27   control. Doc. 1117, p. 61 (construing C.R.S. § 6-1-116(4)). The order reasons that the provision,

28   which permits, but does not require, licensing agencies to share information with the AGs, shows

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 320

1    the legislature intended agencies to share documents, thus the statute does not prohibit the AG

2    from accessing documents when bringing enforcement actions. This is wrong. The legislature

3    created a mechanism to voluntarily share information by agreement precisely because the AG

4    does not have on-demand access to agency documents.

5            *Third*, the order misstates the AG's position by saying the AGs would assert privilege

6    over communications with the agencies and relying on that assertion as support for a conclusion

7    of control. Doc. 1117, p. 60. To the contrary, the AG stated that "when the AG independently

8    brings a CCPA action, the enforcement team's communications with third parties, including state

9    agencies, are generally *not* privileged...." which is consistent with the AG attorneys' position in

10   this case that they would not represent state agencies in this case, much less control their

11   documents by virtue of that representation. Doc. 738-4, p. 1 (emphasis added).

12           **4. Connecticut**

13           The Court should deny Meta's request to seek party discovery from any Connecticut state

14   agencies and the Governor's Office because the order fundamentally misconstrues the limits of

15   the authority conferred by statute to the Connecticut Office of the Attorney General ("CT AG").

16   Connecticut General Statutes § 3-125 prescribes the CT AG's duties as they relate to its defensive

17   representation of state entities, and does not instill the CT AG with blanket authority to access

18   documents controlled by the Governor or executive branch agencies. The CT AG possesses only

19   those powers statutorily enumerated. *See Blumenthal v. Barnes*, 261 Conn. 434, 463 (2002).

20   While "there is no statutory … rule cited which prohibits the [CT AG] from accessing the

21   relevant documents of any of the state agencies at issue[,]" Connecticut statute does not provide

22   the CT AG with legal control over state agency documents.[11] Doc. 1117, p. 65.

23           Contrary to the conclusion in the order, the CT AG indicated that upon receipt of a

24   subpoena, Connecticut agencies would have discretion to utilize in-house counsel or retain

25   outside counsel, which may include the CT AG. Doc. 738-1, pp. 6-7. The one exception is the

26   ───────────────

27   [11] Contrary to the conclusion in the order, *Generic Pharmaceuticals (II)* does not explicitly find that the CT AG has legal control over state agency materials. Doc. 1117, p 67; *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 358, 361.

28

Add. 321

1  Connecticut Department of Consumer Protection ("DCP"). While DCP is not a plaintiff in this

2  action, the CT AG indicated he would represent DCP if served with a subpoena. *Id.* at 6.

3  Connecticut statute requires that the Commissioner of DCP authorize the CT AG to bring

4  Connecticut Unfair Trade Practices Act enforcement actions. Conn. Gen. Stat. § 42-110m.

5  Connecticut statute does not create a similar relationship with any of the other identified

6  Connecticut entities. Importantly, even though DCP has a role in authorizing enforcement actions,

7  there still exists no Connecticut statute granting the CT AG control over DCP documents. *See*

8  *Barnes,* 261 Conn. at 463.

9  **5. Delaware**

10  Delaware is one of only two states with a statute that directly addresses the issue presented

11  – whether the AG has control of state agency documents when the AG is acting in her

12  independent enforcement capacity. The order materially misreads this statute, and the

13  applicability of Delaware law more generally, to erroneously conclude that the Delaware AG has

14  legal control over the documents of other state agencies and the Office of the Governor.[12]

15  Title 29, Section 2508(b) states that the Delaware AG does *not* have a right of access to the

16  documents of Delaware state agencies, or the Governor's Office, "for purposes of discovery in

17  any civil actions brought by . . . the Attorney General." Del. Code Ann. tit. 29, § 2508(b).

18  According to the synopsis of the bill, this language was expressly enacted to clarify:

19  
20  
21  
22  
> that the Attorney General's right of access under Title 29, Section 2508(b) to the . . . documents of the State does not apply for purposes of discovery in any civil litigation brought by . . . the Attorney General, except for the [DOJ's] own documents. *This Act is intended to ensure that state agencies, . . . [and] officers, . . . will have the discovery protections afforded to non-parties in such litigation by applicable rules of civil procedure or state or federal law*.

23  

24  Delaware Senate Bill 295 Detail, https://legis.delaware.gov/BillDetail?LegislationId=109498

25  (emphasis added).

26  _____

27  [12] Given the limited state-specific space available, the Delaware AG focuses on only the most substantial errors in the Magistrate Judge's ruling, but objects in full to the other errors, clearly erroneous interpretations, and unfair accusations regarding the Delaware AG's integrity

28  and ethics.  Doc. 1117, pp 68-76.

18

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add-322

1    Contrary to the statute's plain language and the express legislative intent, the order found

2    that Section 2508(b), "simply provides that the Delaware [AG] cannot rely on this statute as a

3    substitute for discovery in that action." Doc. 1117, p. 69. This finding is clearly erroneous and

4    must be reversed.[13]

5    The Order further found that, even if Section 2508(b) were correctly interpreted to restrict

6    the Delaware AG's access to documents for purposes of discovery, it would "not operate to

7    foreclose a finding of control under Rule 34" because "that state statute can not [sic] preempt

8    federal law…" Doc. 1117, p. 72-773. The issue, however, is not one of preemption.

9    Delaware concedes that Rule 34 governs, and the order is correct that the issue of control under

10   Rule 34 "requires determining if there is a 'legal right' to access or obtain the documents upon

11   demand." Doc. 1117, p. 72, *see* Doc. 738-6, p. 1 (citing *Deephaven Risk Arb. Trading Ltd. v.*

12   *UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *11 (Del. Ch. July 13, 2005)). To make this

13   determination for the Delaware AG, however, one must look to Delaware law. Section 2508(b)

14   plainly states that, for purposes of discovery, the Delaware AG does not have a legal right to

15   "***access***" or obtain documents from other state agencies or officers upon demand. Del. Code Ann.

16   tit. 29, § 2508(b). The order's findings to the contrary were "clearly erroneous" and "contrary to

17   law." F.R.C.P. 72(a). Accordingly, the order should be reversed.

18       **6. Florida**

19       The Florida AG does not have control in this matter over the non-party agencies or the

20   Governor (State Entities). It is legal error to conclude that the Florida AG "must statutorily act" as

21   counsel for State Entities for purposes of discovery, particularly here where the entities are not

22   parties to the AGs' independent enforcement action. *Cf.* Doc. 1117, p. 77 with 738-7, p. 2. Absent

23   a contractual agreement for representation, the Florida AG does not control, supervise, or

24   represent the separate State Entities or have control over their documents. Doc. 738-7, p. 2.

25

26

27   ───────────────

     [13] In deference to the Magistrate Judge's expressed preference for limited oral argument, the Delaware AG previously declined to present argument on this issue. Given the significance of the issue and the order's erroneous interpretation of Delaware law, the Delaware AG respectfully

28   requests the opportunity to present argument at this time.

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1    In this instance, no legal representation agreements exist between the State Entities and

2    the AG. Doc. 738-7, p. 2. When in need of legal services, the State Entities can use their legal

3    counsel, retain private counsel, or contract with the Florida AG. By statute, the Governor or

4    Department of Agriculture & Consumer Services may retain private attorney services without any

5    Florida AG oversight. § 287.059(2)(a), F.S. For the other agencies at issue here, the Florida AG

6    decides for each case whether it will be counsel. *See* §§ 16.535, 287.059(3), F.S. In addition, the

7    State Risk Management Trust Fund, operated through another agency, provides defense litigation

8    coverage. *See* Ch. 284, Fla. Stat. Typically, it is through that agency that the Florida AG is

9    retained to defend the agency named. Specifically, that agency shall "assign counsel" to any claim

10   submitted by a state agency, which may not be the Florida AG. § 284.385(1), F.S.

11   The general duty imposed by § 16.01(4)-(5), F.S., to appear in "in behalf of the state . . .

12   all suits or prosecutions . . . in which the state may be a party" does not require an attorney client

13   relationship on behalf of an agency, nor does it give power to the AG to have legal control over

14   its documents. Further, unlike the vacated *Freyre* decision on which the Magistrate relies, the

15   state is not a party to this proceeding: the Florida AG is the "sole named plaintiff" in Florida's

16   action. Doc. 1117, p. 30. None of the State Entities is a party to the Amended Complaint or

17   included in Florida's Rule 26 disclosures. Receipt of a request for State Entity discovery is not a

18   "suit[s] or prosecution[s]" under § 16.01(4)-(5), F.S. Even if it were, there is no determination

19   here that "intervention is deemed necessary and that . . . [the Attorney General] should come in

20   representing the State of Florida. . ." *Watson v. Caldwell*, 27 So. 2d 524, 529 (Fla. 1946).

21   Additionally, § 16.015, F.S., does not impose an all-encompassing legal duty on the Florida AG

22   to represent all state agencies for discovery. The entities all have in-house legal counsel, and no

23   determination has been made that Florida AG legal services are "required." Furthermore, the

24   Florida AG does not have a general legal right to obtain documents "upon demand" from the

25   State Entities. Likewise, there is no statutory requirement that the State Entities provide

26   documents to the AG.

27

28

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 324

### 7. Georgia

The Court errs when rejecting the Georgia Attorney General's Office's ("AGO") division of prosecuting attorneys from attorneys representing state agencies and officials ("agencies"). As we have explained, the AGO has both obligations as an independent constitutional officer (including statutory prosecutorial duties) *and* constitutional and statutory obligations to represent client agencies (though O.C.G.A. § 45-15-4 allows agencies to employ other counsel if the AGO consents). AGO attorneys in prosecuting divisions act in, and take into full account, the public interest, *see, e.g.,* O.C.G.A. § 10-1-397(b), irrespective any contrary agency positions. *See, e.g., Perdue v. Baker*, 277 Ga. 1, 6 (2003); *cf.* 1976 Ga. Op. Atty Gen. No. 76-93 (refusing agency's request to sue other agency as not in larger state interest). By contrast, other AGO attorneys advocate on behalf of their client agencies. Indeed, per the Georgia Supreme Court, unlike when representing agencies, the AGO is *not* controlled by ethical obligations to agencies when acting as a constitutional officer in the public interest, as the AGO is doing here. *Perdue*, 277 Ga. at 6.

To fulfill its obligations, the AGO separates attorneys into divisions based on assigned duties. These lawyers must operate independently, and segregate confidential materials produced in discovery and/or pursuant to subpoena or other investigative tool. This is with good reason—AGO prosecutorial duties and its clients' interests do not perfectly align. For example, AGO prosecutors are charged with investigating agencies that are simultaneously represented by AGO lawyers. *See, e.g.,* O.C.G.A. §§ 45-15-17 (investigating agencies), 50-18-73 (prosecuting Open Records Act violations); *see Bowers v. Bd. of Regents*, 259 Ga. 221 (1989). Notably, § 45-15-17 grants the AGO subpoena powers, which would be unnecessary if the AGO had "control" over agency documents. More fundamentally, deeming the AGO to have "control" over all documents would eviscerate necessary barriers and render the system unworkable. The State's constitutional structure, the Legislature's definition of AGO duties, and AGO compliance with those duties warrant deference. *See Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1343-44 (11th Cir. 1999).

### 8. Hawaii

Magistrate Judge Kang's ruling ignores the differences between the Hawaii Attorney General's ("HI AG") role as legal enforcer and its role as general counsel. In *State v. Klattenhoff*,

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.325

71 Haw. 598, 604, 801 P.2d 548, 551 (1990), the Hawaii Supreme Court recognized that the HI AG may simultaneously prosecute an individual in a criminal case and still represent that individual in a civil one through the creation of an internal firewall between divisions, both of which are supervised by the Attorney General. No one would argue, however, that the documents held by the deputy attorney general in the civil case were available to the deputy attorney general in the criminal one. There is a clear difference between these two roles, and one should not confuse the two merely because a single office performs them.

In its capacity as general counsel, HI AG does not have authority over its client agencies on key decisions. Although the HI AG may be legally obligated to represent the state agency pursuant to Haw. Rev. Stat. § 26-7, the client agency makes key litigation decisions, and the same analysis should apply to discovery requests. *See Chun v. Bd. of Trustees of Employees' Ret. Sys. of State of Hawaii*, 87 Haw. 152, 952 P.2d 1215 (1998) ("the Attorney General's statutory authority. . . does not authorize the Attorney General 'to assert his vision of state interest.'").

The Magistrate Judge's ruling misinterprets *Lobisch v. United States*, No. CV 20-00370 HG-KJM, 2021 WL 6497240 (D. Haw. Aug. 19, 2021). Contrary to the ruling's characterization that *Lobisch* did not involve a showing of control, the Plaintiff there argued that the Defendant United States had control over its military branches based on the statute in its letter brief to the Court. *See* Brief for Plaintiff at 3, *Lobisch* (Entry No. 87).

*In re Generic Pharms. Pricing Antitrust Litig.,* 699 F. Supp. 3d 352 (E.D. Pa. 2023), in addition to being non-binding, is clearly distinguishable. In *Generic Pharms. (II)*, Hawaii sought damages **on behalf of injured state agencies**. *See* Complaint at 431-32, ¶ 1440, *id.*, 2:19-cv-02407-CMR (Entry No. 1). Here, Hawaii only seeks penalties in its role as an enforcer.

### 9. Idaho

The Magistrate Judge's Order does not properly identify Plaintiff, Idaho Office of Attorney General's capacity in this matter. The Idaho Office of Attorney General brought its claim in this case under its authority granted to it by Congress through COPPA. *See* 15 U.S.C. § 6504 (a)(1). The Idaho Office of Attorney General's claim is not brought by Idaho State agencies,

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.326

1    nor could it be, as the right to allege a COPPA claim lies only with a state Attorney General.

2    Regardless, the Order relies on reasoning from cases where states were the named plaintiffs,

3    and/or in which the Attorney General brought the case on behalf of the state in its parens patriae

4    capacity, to find legal control over documents. This one-size-fits-all approach to concluding that

5    the Office has legal control over the documents at issue is wrong with respect to the Idaho Office

6    of Attorney General.

7        **10. Illinois**

8        The Magistrate erred with respect to: 1) Illinois law concerning the distinct capacities of

9    the AG in different kinds of cases; and 2) the facts concerning the Illinois AGs relationship with

10   agencies in this case.

11       ***First***, the Order fails to respect the legal distinction between the Illinois AG's

12   "enforcement" capacity and his "representational" capacity. Here, the AG is enforcing the Illinois

13   Consumer Fraud and Deceptive Business Practices Act on behalf of the "People of the State," 815

14   ILCS 505/7(a), not bringing or defending a claim on behalf of a state agency or the State of

15   Illinois. This stands in stark contrast to the *Monsanto* action cited in the Parties' briefs. In that

16   case, the court found the Illinois AG "controlled" certain state agencies' materials for purposes of

17   discovery because the suit was filed as a "joint effort," brought for the agencies' benefit, and with

18   the agencies' assistance. *See Monsanto*, 2023 U.S. Dist. LEXIS 106151 at *14-18. None of those

19   "representational" factors are implicated in this independent AG enforcement action.

20       ***Second***, the Order states, without support, that the AG will likely provide legal

21   representation *in this litigation* to all state agencies. Order at 94-95. In reality, the AG Brief

22   stressed that certain Illinois agencies possess the "discretion to utilize [their] in-house counsel or

23   retain outside counsel which could include the [OAG]" such that the AG "cannot speculate as to

24   how [those agencies] may choose to exercise [their] discretion." Doc. 738-11, p. 2. Indeed,

25   several state agencies served with Rule 45 subpoenas have *not* sought AG representation for their

26   responses. Disregarding this, the Order asserts that the Illinois AG "confirmed that its office

27   could represent the Illinois agencies at issue" and "appears likely to be involved in representing

28   these state agencies." Order at 94-95. Likewise, the Magistrate mistakenly concluded that the AG

23

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 327

took "the position that <u>any</u> past or future communications between the [AG] and these State agencies . . . would be covered by the attorney-client privilege." Order at 95 (emphasis added). This finding was directly contrary to the AGs' Brief which explicitly stated that, in the context of the AGs' enforcement efforts, "few, if any, pre-suit communications between the AG and State agencies would be subject to [attorney-client] privilege claims." Doc. 738-11, p. 2.

The Order is expressly based on these mistakes of law and fact and should be reversed.

**11. Indiana**

The Order's analysis as to Indiana ignores the clear text of Indiana's code, did not address applicable case law, misread and misapplied Indiana's position on privilege, and committed clear errors in the application of the *Citric Acid* test. Further, the order and Meta have failed to identify any relevant relationship between these agencies and the State's lawsuit. The order finds that INAG has legal control over agencies "which are not subject to an exception of mandatory representation." Doc. 1117, p. 98-99. But Indiana Code § 4-6-5-3 provides such an exception for each Indiana agency named by Meta[14]. Because agencies are permitted to employ legal counsel with consent of the Indiana Attorney General, agencies have a mechanism for employing their own counsel, and INAG's representation is not mandatory. Ind. Code § 4-6-5-3(a). Further, the order does not address caselaw interpreting this issue. *See Holcomb v. Bray,* 187 N.E. 3d 1268 (Ind. 2022) (Governor not required to obtain consent from attorney general before hiring counsel); *Banta v. Clark*, 398 N.E.2d 692 (1979) (attorney not excluded where written consent had been provided by INAG for outside counsel). The order also misinterpreted Indiana law regarding civil investigative demands, which are the formal *pre-suit* mechanism by which the INAG conducts investigations of violations of law by companies such as Meta. *See* Ind. Code § 4-6-3-3 (authorizing issuance to a person with documents relevant to an investigation, where "person" is defined to include "a state or local agency" in Ind. Code § 4-6-3-1). This tool would not be necessary if Indiana law provided INAG on demand access to any agency document at any time. Finally, Indiana's statement on privilege references the possible invocation of privilege for

---

[14] Meta has withdrawn its position as to the Indiana Economic Development Corporation and indicated it would pursue nonparty discovery to that entity. No R. 45 subpoena has been noticed to date.

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1    documents arising in a representative relationship that may be considered responsive to Meta's

2    RFPs, based on the breadth of the requests at issue and the possible inclusion of documents from

3    a prior representative relationship between an agency and the INAG. For purposes of this action,

4    there was not a representative relationship when Meta issued its RFPs to the Plaintiff States, as

5    the named agencies were not involved in the investigation, preparation, or litigation of this case.

6    The order incorrectly conflates INAG's role as outside litigation counsel with in-house counsel

7    access.

8        **12. Kansas**

9        The Court based its determination of whether the Kansas Attorney General represents

10   state agencies on two material misstatements of fact and law. First, the Court misread the Kansas

11   Attorney General's statements regarding representation of state agencies. The Court stated the

12   Kansas Attorney General "would definitely represent all of the Kansas agencies at issue if Meta

13   were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 13]." Doc. 1117, p.

14   104, and "the Kansas Attorney General has already confirmed that their office will do so for

15   discovery in this matter. [Dkt. 738-1 at 13]." Doc. 1117, p. 105. The opposite is true. The

16   document cited by the Court says the Kansas Attorney General would not represent these

17   agencies if served with a subpoena, because all identified agencies have their own in-house

18   counsel. Doc. 738-1, p. 13.

19       Second, the Court misquotes relevant Kansas statute. The Court cited K.S.A. § 75-703 to

20   suggest the Kansas Attorney General must, in all cases, represent state agencies in all actions.

21   Doc. 1117, p. 104. However, the Court failed to note this statute is only triggered "*at the request*

22   *of the governor, secretary of state, state treasurer, or state board of education*." K.S.A. § 75-703

23   (emphasis added). In this case, neither the governor, secretary of state, state treasurer, nor the

24   state board of education (or any other agency identified by Meta) have requested representation

25   for either themselves or any of their departments. The Kansas Attorney General does not

26   represent those agencies in typical practice and will not do so in this matter, unless specifically

27   requested by the individual agencies.

28

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.329

### 13. Kentucky

The Magistrate Judge's conclusion that the Kentucky Office of the Attorney General (KYOAG) has control over state agency documents is contrary to law. The Magistrate Judge incorrectly relies on the relationship created by Ky. Rev. Stat. § 15.020 to hold that the KYOAG has legal control over *all* Kentucky agencies' documents because the KYOAG is "the chief law officer of the Commonwealth" and shall appear in all cases "in which the Commonwealth has an interest." Doc. 1117, p. 110. However, Kentucky agencies "may employ . . . attorneys for legal services" and such attorneys "*shall* have authority to appear"[15] as counsel in cases or proceedings in which the agency is interested or affected and "*shall* attend to any litigation and legal business within and without the state." Ky. Rev. Stat. §§ 12.210 and 12.220 (emphasis added). The Order ignores the "shall" language of Chapter 12 and erroneously holds that these statutes do not "denigrate from Section 15.020" Doc. 1117, p. 111 when in reality, "to the extent [KRS 15.020] is in conflict with KRS 12.200 to 12.220," Ky. Rev. Stat. § 12.220 controls. Ky. Rev. Stat § 12.230. Practically, this statutory scheme reshapes the duties of the KYOAG by "authoriz[ing] the employment of other counsel for the departments and officers of the state to perform" those duties. *Johnson v. Commonwealth ex re. Meredith*, 165 S.W.2d 820, 829 (Ky. 1942). Further, the Magistrate Judge improperly conflates "cooperation" by agencies with the KYOAG under Ky. Rev. Stat. § 367.160 with the "legal right to obtain documents," Doc. 1117, p. 111 while ignoring that the statute explicitly grants the KYOAG access to the "material evidence and information" of *only two* specific agencies, neither of which is the subject of discovery from Meta. Ky. Rev. Stat. § 367.160. This grant of access would be superfluous if the "cooperation" language rendered all agency documents within the legal control of the KYOAG. The Order ignores the right of the legislature to delegate counsel duties and misconstrues cooperation as control. It is thus contrary to law and should be overturned.

The findings that there is an attorney-client relationship between the KYOAG and state agencies, and that the KYOAG is likely to represent state agencies in this matter, are clearly

---

[15] *See e.g., Commonwealth ex rel. Brown v. Stars Interactive Holding Ltd.*, 617 S.W.3d (Ky. 2020) (Governor's Executive Cabinet litigated independently of KYOAG counsel).

26

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.330

1  erroneous. This finding is clearly erroneous because it rests on zero supportive factual evidence

2  and ignores that, when served with third party subpoenas under Fed. R. Civ. P. 45, none of the

3  Kentucky state agencies solicited representation or counsel from the KYOAG.

4  **14. Louisiana**

5  The Court erroneously relied on La. R.S. 49:257(A) to find that the Louisiana Attorney

6  General's Office ("LA AGO") has legal control, for the purposes of discovery, over the state

7  agencies identified by Meta. La. R.S. 49:257(A) states, in part, "the attorney general shall

8  represent the state and all departments and agencies of state government in all litigation arising

9  out of or involving tort or contract." The Court found that consumer protection claims are torts

10  and therefore, trigger La. R.S. 49:257(A) and the LA AGO is the legal representative of state

11  agencies in this case. However, Meta has not identified any torts directly involving the identified

12  agencies in this litigation.

13  The state agencies listed by Meta are not parties to this suit. Additionally, the LA AGO

14  has not alleged that Meta committed any torts towards these state agencies, and Meta has not

15  alleged that these state agencies committed any torts against Meta. Using the Court's logic, every

16  time the LA AGO exercises its own independent authority under the Louisiana Unfair Trade

17  Practices and Consumer Protection Law, La. R.S. 51:1401, et seq. ("LUTPA"), the LA AGO

18  automatically obtains legal control of state agencies that have no connection to the LUTPA claim.

19  Even if this suit arises from a tort, it does not arise from a tort that directly involves the listed

20  state agencies and, therefore, La. R.S. 49:257(A) does not apply.

21  For the reasons above, the LA AGO does not have possession, custody, or control of any

22  documents of the state agencies identified by Meta.

23  **15. Maine**

24  The Order in two instances relied on clearly erroneous interpretations of Maine law to find

25  that the Attorney General has legal control of the Governor's and several executive branch

26  agencies' documents. First, the Order incorrectly held that, by statute, the Attorney General must

27  represent state agencies in this action. Doc. 1117, pp. 119, 123. However, the referenced statute

28  provides that the Attorney General shall represent state agencies in "civil actions and proceedings

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.331

1   . . . in all the courts of the State." *See* Me. Rev. Stat. Ann. tit. 5, § 191(3). In any other

2   proceeding, such as this one, the statute provides that the Attorney General shall represent

3   agencies if requested by the Governor or the Legislature. *Id*. Moreover, even though the statute

4   provides that the Attorney General shall represent state agencies in certain cases, he nonetheless

5   retains broad discretion to decline to do so. *See Superintendent of Ins. v. Att'y Gen.*, 558 A.2d

6   1197, 1200 (Me. 1989). Second, the Order incorrectly held that Me. Rev. Stat. Ann. tit. 22, §

7   4008(1) provides the Maine Attorney General an "explicit legal right to obtain and access these

8   documents of the Maine Department of Health and Human Services (one of the agencies at issue

9   here) when acting as counsel for that agency." Doc. 1117, p. 121. On the contrary, the referenced

10  provision provides that, "[w]ithin the department," records containing personally identifying

11  information that are obtained in connection with the department's child protective activities "are

12  available only to and may be used only by appropriate departmental personnel and legal counsel

13  for the department in carrying out their functions." Me. Rev. Stat. Ann. tit., § 4008(1). With

14  respect to this case, the Attorney General is not within the department and is not acting as legal

15  counsel to the department in carrying out its statutory child protective functions under Title 22.

16  Therefore, contrary to the Order's finding, this provision does not provide the Maine Attorney

17  General with legal control of the department's documents.

18      **16. Maryland**

19      The Magistrate Judge's Order misconstrues the capacity in which this case has been

20  brought by Plaintiff, Office of the Attorney General of Maryland (MOAG). The MOAG brought

21  this case solely in its own name and capacity, alleging only COPPA claims against Meta. The

22  MO AG's claims are not brought by the State or any other State agency, nor could they be, as the

23  right to allege a COPPA claim lies only with a state Attorney General. Regardless, the Order

24  relies on reasoning from cases where *states* were the named plaintiffs, and/or in which the

25  Attorney General brought the case on behalf of the state in its *parens patriae* capacity, to find

26  legal control over documents. This one-size-fits-all approach to concluding that the MOAG has

27  legal control over the documents at issue, is wrong with respect to the MOAG.

28

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 332

1    While there are Maryland statutes specifying that the Attorney General acts as legal

2    adviser to certain agencies, the Order ignores that such duty is fulfilled by designated MOAG

3    personnel who are *specifically hired* to act as counsel for a particular agency. The MOAG

4    enforcement attorneys do not act as legal adviser to independent state agencies and have no

5    attorney-client relationship with those agencies. Further, while the Order holds that "multiple

6    courts have found control over documents of a state agency based in part on the fact that the

7    governmental party was represented by and/or employed by the state Attorney General," Doc.

8    1117, p. 32, in each of the three cases cited by the Magistrate Judge, the party from whom

9    discovery was sought was an employee of a non-party agency from which documents were

10   sought. In this case neither the eight Maryland agencies nor their employees are parties. MOAG is

11   unaware of any case that holds a lawyer must produce documents simply because they are in the

12   hand of a non-party client of a different lawyer from the same firm. Rather, the correct approach

13   would be for Meta to seek the documents through Rule 45 subpoena, which it has done.[16]

14   **17. Michigan**

15   Despite recognizing that the Michigan Attorney General is both (1) an elected entity

16   separate from Michigan state agencies and (2) the exclusive plaintiff in this action under

17   Michigan's statutory scheme, the Magistrate Judge held that these facts do "not outweigh the fact

18   that the Michigan Attorney General will act as the agencies' counsel." Doc. 1117, p. 132.

19   This ruling comprised a critical error of law. In particular, it was error to mechanically

20   apply general attorney-client principles, because the Attorney General's "unique status" affords

21   an ability to serve as a party *or* agency counsel; this unique status "requires accommodation"

22   under the Rules of Professional Conduct. *Att'y Gen. v. Michigan Pub. Serv. Comm'n*, 625

23   N.W.2d 16, 28 (Mich. App. 2000). To the extent that the *Department* of Attorney General might

24   represent these agencies, the Attorney General's party status means that an independent staff

25   attorney—not the undersigned—will undertake that representation. *See id.* at 29 ("The unique

---

26   [16] In rejecting this approach, the Magistrate Judge relies exclusively on *In re South
27   Carolina Dep't of Parks, Recreation, & Tourism*, 103 F.4th 287, 289 (4th Cir. 2024). Doc 117, pp.
     40-41. However, in that case, once again, the Plaintiff was the State of South Carolina, and in its
     capacity as the State, the Circuit Court found it controlled the records of its state agencies. That is
28   not the case with MOAG.

Add.333

1    position of the attorney general requires that when his views differ from or [are] at odds with an

2    agency, then he must allow the assigned counsel . . . to represent the agency unfettered and

3    uninfluenced by the attorney general[].” (quotation omitted)).

4        Notwithstanding the Attorney General's unique status as a potential plaintiff, state

5    agencies are not subject to party discovery even by analogy to private law firms. Assuming

6    *arguendo* that a lawyer is presumed to have access to client documentation in some

7    circumstances, *Perez*, 2014 WL 1796661, at *2, that does not mean the lawyer maintains a right

8    of access in a completely distinct lawsuit on which the client was never consulted. In Michigan,

9    an attorney must consult with the client and obtain its consent to disclose client-possessed

10   documents “for the advantage of the lawyer or of a third person”—meaning the agency, not the

11   Michigan Attorney General, has custody and control of its own information vis-à-vis the instant

12   case. Mich. R. Prof. Conduct 1.6(b)(3); *see also* Mich. R. Prof. Conduct 1.7(b) & cmt.

13       By looking past the Attorney General's status as party-plaintiff in this case, and by

14   transposing a potential right of access within the confines of a given dispute onto a case in which

15   the agency client has no role or unique interest, the Magistrate Judge erred.

16       **18. Minnesota**

17       First, the order misunderstands the nature of this action, because the Minnesota AG is

18   acting as a civil prosecutor whose only “client” is the people of Minnesota, not any state agency.

19   *Ly v. Nystrom*, 615 N.W.2d 302, 313 (Minn. 2000). In such cases, “no client is readily

20   ascertainable,” the AG is “protect[ing] public rights” and works independently (not in “close

21   coordination” with agencies). *Energy Pol'y Advocs. v. Ellison*, 980 N.W.2d 146, 156 (Minn.

22   2022); *Curtis v. Altria Grp., Inc*., 813 N.W.2d 891, 900 (Minn. 2012). The order ignores the

23   Minnesota AG's unique constitutional role, Minn. Const. Art. V, § 1, and wrongly conflates its

24   independent law enforcement duties (where the public interest is the client) with its separate

25   outside legal services role (where agencies are clients).

26       Second, the order relies on the erroneous legal assumption that the AGs' Office is a “firm”

27   or “legal services organization.” Doc. 1117, pp. 137, 139. But as a government legal department,

28   the AGs' Office is not a “firm” or “legal services organization” under Minnesota's professional

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.334

1  standards. *Humphrey on Behalf of State v. McLaren*, 402 N.W.2d 535, 543 (Minn. 1987). And

2  Minnesota's Rules of Professional Conduct recognize the different and unique status of public

3  attorneys: "lawyers on an [AG's] staff 'may be authorized to represent several government

4  agencies in intragovernmental legal controversies in circumstances where a private lawyer could

5  not represent multiple private clients.'" *Id.* (quoting the Preamble); *Mpls. Police Officers Fed'n v.*

6  *Minneapolis*, 488 N.W.2d 817, 821 (Minn. Ct. App. 1992); Minn. R. Prof'l Conduct 1.11, cmt. 2.

7         Last, the order incorrectly claims that no Minnesota law prevents access by the AG to

8  agencies' data. Under Minnesota's Data Practices Act ("MGDPA"), "government entities" cannot

9  share "not public" data and must prevent unauthorized access, including intergovernmental

10  access. Minn. Stat. § 13.05, subds. 5(a), 9. The order also misconstrues Minn. Stat. § 13.393,

11  which merely ensures that the MGDPA "does not erode the protection of the attorney-client

12  privilege as applied to government law offices." *Energy Pol'y Advocates*, 980 N.W.2d at 155.

13  Contrary to the order, section 13.393 does not provide the AG an "explicit legal right" to obtain a

14  client-agency's data, and even if it did (and to be clear, it does not) any such right would be

15  confined to the AG's distinct outside counsel function, which again is *not* the capacity in which

16  the AG is acting in this case.

17         **19. Missouri**

18         Despite acknowledging that the Missouri Attorney General ("MOAG") "is a separate

19  entity" and "bring[s] the instant action exercising its own independent authority" rather than on

20  behalf of any specific agency, the Magistrate nonetheless concluded that the MOAG has legal

21  control of agency documents because MOAG "will act as the agencies' counsel" in this matter.

22  Doc. 1117, p. 144. That conclusion is both factually and legally erroneous. Contrary to the

23  conclusion in the order, the MOAG indicated that upon receipt of a subpoena, Missouri agencies

24  would have discretion to utilize in-house counsel or seek outside counsel, which may include the

25  MOAG. Doc. 738-1, p. 17. Indeed, notwithstanding Meta's issuance of subpoenas to Missouri

26  agencies, the MOAG is not representing those agencies with respect to those subpoenas.

27         More importantly, the Magistrate's decision erroneously interprets a statute that provides

28  that the MOAG "*may . . . appear*" on behalf of agencies in proceedings where the "state's

31

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.335

interests are involved." Mo. Rev. Stat. § 27.060 (emphasis added). "The word 'may' clearly connotes discretion." *Rudisill v. McDonough*, 601 U.S. 294, 310 (2024). The Magistrate's decision erroneously converts the MO AGs' *discretionary* right to intervene in certain actions into a *mandatory* obligation of not just legal representation but of custodial document control. This ignores not only blackletter rules of interpretation, but also agencies' inherent powers of representation separate from the MOAG. *See Kelly v. Hanson*, 931 S.W.2d 816, 818 (Mo. Ct. App. 1996) (permitting suit by agency represented by private counsel, notwithstanding Attorney General's objection, because "[s]tate officers have the capacity to bring suit to enforce their powers and duties under the Missouri Constitution"); *State ex rel. McKittrick v. Missouri Pub. Serv. Comm'n*, 175 S.W.2d 857, 862 (Mo. 1943) (ruling Attorney General could not intervene on behalf of agency).

### 20. Montana

The order's Montana-specific findings are "clearly erroneous" and "contrary to law," and should be set aside. Fed. R. Civ. P. 72. The order faults the Montana AG for not "cit[ing] any statutory or legal prohibition on … representing the state agencies in this matter for the purposes of discovery," but this both misconstrues the relevant standard and ignores Montana's briefing on this issue. Order, ECF 1117 at 152–53 (Sept. 6, 2024). The question is not whether the Montana AG is *prohibited* from representing the agencies but whether the Montana AG controls the agencies' documents, even when no attorney-client relationship has been established. The order ignores the law Montana cited on this point. First, the Montana agencies fall under the control of *other* constitutionally independent and separately elected executive officials. Exhibit 21, ECF 738-21 at 2 (Apr. 1, 2024). Second, state records "are and remain the property of the public agency possessing the records." Mont. Code Ann. § 2-6-1013(1). And third, even in response to a subpoena, the agencies are free to use in-house counsel or hire additional counsel other than the Montana AG. *Id*. § 2-15-201(4); *see* ECF 738-21 at 2. Under Montana state law and separation of powers principles, the Montana AG does not control these agencies' documents.

The order also fundamentally misunderstands the Montana caselaw it cites by considering quoted passages in isolation, without regard to their context and holdings. In *State ex rel. Olsen v.*

1   *Public Service Commission*, 129 Mont. 106, 283 P.2d 594 (1955), the Montana Supreme Court

2   held that the Montana AG could bring a case *against* a state agency because "the attorney general

3   is the proper party to determine the necessity and advisability of undertaking or prosecuting

4   actions" for the state. *Id*. at 117. The case does not hold that the Montana AG has control over

5   independent executive agencies' documents, nor does its reference to "broad common law duties"

6   permit such an inference. Common law duties cannot override the statutory authorities described,

7   *supra*. The agencies are under the control of other executive officials and their records are their

8   property alone. And *Montana Power Company v. Montana Department of Public Service*

9   *Regulation*, 218 Mont. 471, 709 P.2d 995 (1985), held that the Montana AG cannot make

10  litigation decisions on behalf of clients it represents, which supports Montana's position here.

11  Even though the agencies *may* engage the Montana AG to represent them as third parties, that

12  does not alter the agencies' state-law independence. The Montana AG does not control the

13  agencies or their documents.

14      **21. Nebraska**

15      In determining that the Nebraska Department of Justice ("NE DOJ") has "control" over

16  the state agencies in this case, the order fundamentally misunderstands the structure of

17  Nebraska's government. The order relies on the unremarkable notion that other attorneys at the

18  NE DOJ serve as legal counsel to state agencies and *may* be called upon by an agency to litigate

19  their cases. Neb. Rev. Stat. § 84-202. However, that statutory responsibility is irrelevant here. The

20  NE DOJ did not bring this action as counsel to any particular state agency. Instead, the NE DOJ

21  brings claims under its independent authority to enforce Nebraska's consumer protection laws.

22  Neb. Rev. Stat. § 59-1608; § 87-303.05 (NE UDTPA). In this role, the NE DOJ acts in the

23  interests of Nebraska's citizens, and not just in the interests of a single state agency. Just because

24  the NE DOJ may serve as counsel for a state agency does not subject every state agency to his

25  control. Nor does it mean that the NE DOJ can obtain documents from state agencies on demand.

26  State law is clear. Under the Nebraska Constitution, the "supreme executive power" and oversight

27  of the executive branch is vested in the Nebraska Governor. Neb. Const. art. IV, § 6. Each of the

28  agencies identified by Meta is under the direction of the governor or a governing board selected

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 337

by the Governor. Neb. Const. art. VII, § 3; Neb. Rev. Stat. § 43-4202, § 81-3114, § 81-1103. The Nebraska Attorney General is an *independently* elected constitutional officer. Neb. Const. art. IV, § 1. This should not permit a discovery order to rewrite the constitutional structure of Nebraska's government.

Further, the order draws the wrong conclusions from the NE DOJ's suggestion that the court look to the third-party subpoenas issued in *United States et al. v. Google LLC*, No. 1:23-cv-108-LMB (E.D. Va.), writing them off as not "legally instructive or meaningful." Doc. 1117, pp. 162-63. To the contrary, this Court should find it instructive that a major tech company in another state enforcement action decided to issue third-party subpoenas to state agencies instead of seeking documents through party discovery. The fact that the docket in *Google* reflects no dispute on this point, *id.*, suggests not only that Rule 45 subpoenas were the appropriate method to obtain state agency discovery, but also that that process can work exceedingly well. The same is true in this case, where two Nebraska state agencies have ready provided substantial initial productions to Meta. The NE DOJ sees no reason why that process should not continue to play itself out.

### 22. New Jersey

The Magistrate Judge's conclusion as to New Jersey is contrary to law for three reasons. First, the decision improperly conflates the NJ AG's counseling and enforcement roles. The NJ AG brings this suit with the Acting Director of the NJ Division of Consumer Affairs ("DCA") against Meta in his role as enforcer of the NJ Consumer Fraud Act ("CFA") and COPPA. Under state law, only the NJ AG and DCA can enforce these claims. *See* N.J.S.A. 52:17B-120, -124. Acting as enforcer does not give the NJ AG power to turn around and demand access to documents from agencies that the NJ AG is counseling.

Second, while the decision recognizes that certain NJ entities have authority to obtain counsel other than the NJ AG, *see, e.g.,* N.J.S.A. 34:1B-5(s); Executive Order 6, ¶ 10 (Florio, 1990), it improperly relied on the absence of outside counsel to justify its conclusion that the AG must have control of all agencies' documents at all times. But notice of potential discovery obligations and litigation holds do not ordinarily merit appearances by counsel. In addition, no other entity has asserted any claims in this suit, nor would any remedies accrue to them. *Cf. In re*

34

1   *Generic Pharms.*, *supra* at III.A.1. Thus, because no other state entity had reason to obtain

2   counsel, the Court's reliance on their failure to do so is premature and misleading.

3        Finally, the order mistakenly relied on *Love v. NJ Dep't of Corr.*, No. 2:15-CV-4404-

4   SDW-SCM, 2017 WL 3477864 (D.N.J. Aug. 11, 2017), to hold that the NJ AG has control over

5   every NJ entity's documents. Unlike here, in *Love*, the AG acted in a general counsel capacity, not

6   in an independent enforcement capacity; moreover, the state entity at issue in *Love* was both the

7   defendant and a percipient witness. None of that is applicable here.

8        Because these errors are fatal to the Magistrate Judge's analysis, NJ respectfully requests

9   that the Court vacate the order.

10   **23. New York**

11        The magistrate judge erred in holding that, under New York's statutory scheme, the Office

12   of the Attorney General (OAG) necessarily will represent each agency for discovery purposes.

13   Although Executive Law § 63(1) provides that OAG "[p]rosecute and defend all actions and

14   proceedings in which the state is interested," that provision does not require OAG representation

15   when an agency responds to a third-party discovery demand because an agency in that

16   circumstance is not prosecuting or defending an action or proceeding. Executive Law § 63(1) also

17   provides that OAG shall "have charge and control of all the legal business of the departments and

18   bureaus of the state… in order to protect the interests of the state," but Meta has not shown that

19   OAG representation of the relevant state agencies would protect the interests of the state. To the

20   contrary, it is routine for New York state agencies to represent themselves when served with

21   third-party subpoenas. *See, e.g., Cannon v. Corr. Med. Care, Inc.*, No. 915CV1417GLSDJS,

22   2017 WL 2790531, at *1 (N.D.N.Y. June 27, 2017).

23        Similarly, § 63(1) does not require an agency to notify OAG every time the agency

24   receives a document request, because a document request is not an "action or proceeding

25   affecting the property or interests of the state." *Id.* To the extent that the document request

26   pertains to an action or proceeding, it is in that action or proceeding (to which the agency is not a

27   party) that the property or interests will be decided. Furthermore, even when an agency does

28   notify OAG of a document request or subpoena, OAG representation of the agency is not

35

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 339

1    mandatory. Upon receiving a § 63(1) notice, OAG "*may* participate or join" in the matter if OAG

2    determines that the State's interests warrant the representation. *Id.* (emphasis added).

3         Meta has not demonstrated that any agency is required to notify the State, or that OAG

4    would determine that its representation is warranted if notification is given. Meta's contention

5    that OAG has a right to access agency documents is therefore too speculative to support the

6    magistrate judge's conclusion that OAG has a current legal right to obtain documents on demand

7    within the meaning of *Citric Acid*.

8         **24. North Carolina**

9         The Order concludes that the NCAG has control of agency documents because it

10   invariably represents them. This conclusion misunderstands state law because the "agencies"

11   identified by Meta (including the Governor) may be represented by three different counsel

12   depending on the circumstances: NCAG attorneys, in-house counsel, or private counsel.

13        The Order asserts that "the requirement that the [NCAG] will act as the agencies'

14   counsel" necessarily means the NCAG will have "access to the documents." Doc. 1117, p. 175.

15   But the order relies on, and misconstrues N.C.G.S. § 147-17 (emphasis added):

16

17        No department, officer, agency, institution, commission, bureau or other organized
         activity of the State which receives support in whole or in part from the State shall

18        employ *private counsel*, except with the approval of the Governor. The Governor
         shall give his approval only if the Attorney General has advised him . . . that it is

19        impracticable for the Attorney General to render the legal services. . . [T]he
         Governor may employ private counsel *as he may deem proper or necessary* to

20        represent the interest of the State, and may fix the compensation for their services.

21

22        *First*, this statute concerns *private counsel*, not, as the Order asserted, "separate counsel."

23   *See* Doc. 1117, pp. 175-76.  Consequently, while this statute bars most state agencies from hiring

24   outside counsel without the AG's permission, it does not bar state agencies from relying on their

25   own in-house lawyers. *See* N.C.G.S. § 114-2.3(d) (definition of "private counsel" does not

26   include attorneys who hold a "permanent budgeted position" within the agencies). State agencies

27   often rely on in-house counsel to handle tasks like responding to subpoenas or public records

28

---

36

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1    requests. They, unlike NCAG attorneys, necessarily have access to the agency's network and

2    physical files. This is why the NCAG represented to the court that it was unsure if it would (or

3    would not, based on past practice) represent the agencies in responding to a subpoena here; state

4    law does not forbid agencies from using their own attorneys for such tasks. *See* Doc. 738-1, p. 22.

5    *Second*, §147-17(a) explicitly excepts the Governor's office from restrictions on hiring private

6    counsel in the third sentence, which the Order ignores completely. *See Martin v. Thornburg,* 359

7    S.E.2d 472, 480 (N.C. 1987) ("Defendants contend that the second sentence of [§147-17(a)]

8    limits the power of the Governor to employ special counsel to only those cases where the

9    Attorney General certifies that it is impracticable for the Attorney General to render legal

10   services. We cannot agree.").

11       **25. North Dakota**

12       The Order erroneously draws an analog to *North Dakota v. U.S.,* No. 1:19-CV-150, 2021

13   WL 6278456 (D.N.D. Mar. 24, 2021). *North Dakota* is distinguishable from this case because

14   *North Dakota*'s FTCA administrative claim and complaint identified specific federal agencies

15   "who were aware of, involved in, or contributed to the alleged tortious conduct" at issue. *Id.* at

16   *2. The Complaint in this matter does not refer to any North Dakota agency other than the North

17   Dakota Attorney General ("NDAG"). Also, the cases cited in *North Dakota* involve discovery

18   sought from federal agencies that participated or engaged in joint investigations or decision-

19   making that led to the litigation or were directly answerable to the President. *Id.* at **3-5. Here,

20   nonparty state agencies did not participate in any investigation or litigation decisions. Further,

21   North Dakota does not have a unitary executive, rather its executive power is divided among

22   several separately elected officials. *See* N.D. Const. Art. V, § 2. Therefore, while most state

23   agencies answer to the Governor, NDAG and other constitutionally elected public officials do

24   not, and vice versa.

25       The Order's finding that the NDAG has control over state agency documents is contrary

26   to the separation of powers and duties established by the North Dakota Constitution. *Id*. North

27   Dakota's Constitution establishes the Governor, NDAG, and Superintendent of Public Instruction

28   as independently elected state officers. *Id*. ND AG's powers and duties are prescribed by state law

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add-341

1 and do not grant a right to access documents in the possession of other agencies on demand. *Id.*;

2 N.D. Cent. Code ch. 54-12. As the U.S. Supreme Court has recognized: "it is through the power

3 to 'structure ... its government, and the character of those who exercise government authority,

4 [that] a State defines itself as a sovereign.'" *Berger v. N. Carolina State Conf. of the NAACP*, 597

5 U.S. 179, 191 (2022) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). A federal court

6 must 'respect ... the place of the States in our federal system,' and respect for state sovereignty

7 must take into account the State's authority to structure its executive branch. *Cameron v. EMW*

8 *Women's Surgical Center, P. S. C.*, 595 U. S. 267, 277 (2022).

9       The legislature established the NDAG division bringing this action as a separate division

10 empowered to investigate and enforce laws, but not to act as counsel for other agencies. N.D.

11 Cent. Code § 54-12-17. Therefore, the conclusion that Plaintiff NDAG presumptively represents

12 and has attorney-client privilege with state agencies in this matter is clearly erroneous and

13 contrary to law.

14     **26. Ohio**

15       The Court's order cites R.C. 1331.16(N) as support that "Ohio state law explicitly

16 mandates that Ohio agencies furnish documents to the Ohio Attorney General" (p. 188).

17 However, R.C. 1331.01, *et seq.,* also known as the Valentine Act, specifically pertains to

18 monopoly and antitrust violations. *Kapenda v Parker,* 2019-Ohio-1736, ¶10 (10th Dist.) citing

19 *generally* R.C. Chapter 1331. The 10th District previously confirmed the clear language and

20 application of the Valentine Act in *Borden, Inc. v State*, 65 Ohio App. 2d, 1, 2 (10th Dist., 1979)

21 where it held "[t]his section empowers the Ohio Attorney General to obtain documentary

22 material, answers to written interrogatories, and to take testimony with regard to suspected

23 violations of R.C. 1331 (Antitrust), prior to the filing of any complaint alleging an antitrust

24 violation." Despite the sole applicability of 1331 to the Valentine Act, this Court erroneously held

25 that "the cited statute expressly grants the Ohio Attorney General an explicit legal right to obtain

26 and access these documents of the agencies at issue here." (p. 188).

27       Ohio's portion of the Complaint is brought under Ohio's consumer protection laws. The

28 Ohio Supreme Court has held that "the legislature created separate statutory schemes for antitrust

issues and for consumer sales practices." *Johnson v Microsoft Corp.* 2005-Ohio-4985, ¶25. This

Court's application of Ohio antitrust law to a consumer protection case ignores those separate

statutory schemes and contributes to its erroneous ruling contrary to well-established Ohio law.

The Court cites *Bivens v Lisath*, 2007 U.S. Dist. LEXIS 40048 (S.D. Ohio, June 1, 2007)[17], as

precedent for the Ohio Attorney General to have "control" over documents for purposes of

discovery. In *Bivens*, the inmate filed a §1983 action and named certain individual prison

employees in their official capacity as defendants, making the Department of Rehabilitation and

Correction a *de facto* party represented by the Attorney General. The *Bivens* court simply

provided guidance for the pro se plaintiff as to how to properly obtain documents through

discovery. The *Bivens* ruling does not expand the Attorney General's control of documents

beyond the state agency that it already represented for purposes of that case.

### 27. Oregon

Preliminarily, the order indicates that Meta seeks discovery from five Oregon agencies

when, in fact, Meta seeks discovery from eight. The order omits Oregon Department of Human

Services, the Oregon Health Authority, and the Oregon Higher Education Coordinating

Commission from the list of agencies from whom Meta seeks documents.

While the order properly quotes Oregon state law, the conclusions it reaches based on

those laws involve unsupportable leaps of logic, as explained in the common arguments above.

For those reasons, Oregon joins in the Motion for Relief.

### 28. Pennsylvania

Section 208 of the Commonwealth Attorneys Act ("CAA") grants the Pennsylvania

Attorney General ("AG") investigative authority over Commonwealth Agencies. *In re Thirty-*

*Third Statewide Investigating Grand Jury*, 86 A.3d 204, 216 (Pa. 2014). Like the non-binding

*Generic Pharmaceuticals I*, 571 F. Supp. 3d 406, 410-11 (E.D. Pa. 2021), the Order's logic

erroneously follows that because the AG filed suit on behalf of the Commonwealth and that falls

under one of its duties in Section 208 of CAA, the door opens to making every Commonwealth

---

[17] The Court erroneously cited the date of the decision as Sept. 28, 2007. That is the date of a later decision on other issues. *Bivens v. Lisath*, 2007 U.S. Dist. LEXIS 75750 (S.D. Ohio Sept. 28, 2007)

1   Agency a party subject to Rule 26 discovery. The General Assembly never intended this absurd

2   result when granting investigative power to the AG under Section 208. The Order misconstrued

3   the intent of Section 208, which does not give the AG control under all circumstances to agency

4   documents especially since it is not mandatory or "necessary" that the AG represent the agencies.

5         Section 204(c) of the CAA provides the AG with the option to represent the

6   Commonwealth Agencies. Specifically, Section 204(c) does state "[t]he Attorney General shall

7   represent the Commonwealth and all Commonwealth Agencies . . . in any action brought by or

8   against the Commonwealth or its agencies," but it also provides "[t]he Attorney General may,

9   upon determining that it is more efficient or otherwise is in the best interest of the

10   Commonwealth, authorize the General Counsel or the counsel for an independent agency to

11   initiate, conduct or defend any particular litigation or category of litigation in his stead." 71 Pa.

12   Stat. § 732-204(c). Therefore, the Order erred in not considering that the Attorney General has the

13   option to represent the six non-party state agencies and that under Pennsylvania law there is not a

14   mandatory attorney-client relationship sufficient to establish that the AG has control over the state

15   agencies' documents.

16       **29. Rhode Island**

17         Pursuant to statute, the Rhode Island Department of Attorney General ("RIAG") acts as

18   outside counsel to state agencies only when they request representation. R.I. Gen. Laws § 42-9-6

19   (RIAG "*whenever requested*, shall act as the legal adviser" to agencies (emphasis added)). This is

20   both a legal and practical reality: agencies in Rhode Island employ their own counsel who

21   routinely represent those agencies in court. *See, e.g., Kyros v. Rhode Island Dep't of Health*, 253

22   A.3d 879, 880 (R.I. 2021) (agency represented solely by in-house counsel); *Apex Dev. Co., LLC*

23   *v. Rhode Island Dep't of Transportation*, 291 A.3d 995, 996 (R.I. 2023) (same). Here, the Order

24   *completely omits* any reference to the "whenever requested" modifier in R.I. Gen. Laws § 42-9-6,

25   mistakenly assuming that RIAG will necessarily represent each agency responding to a Rule 45

26   subpoena. Order at 213. Here, agencies have already received subpoenas from Defendant and not

27   one has requested representation by RIAG and undersigned counsel has learned that at least two

28   agencies have completed their response. Perhaps even more indicative of a lack of control, a

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 344

1   Rhode Island court recently denied RIAG access to Division of Motor Vehicles documents, even

2   under process, in a case brought under the Deceptive Trade Practices Act. *State of Rhode Island*

3   *v. BTTR LLC et al.*, No. PC-2022-04492 (Oct. 28, 2022).

4          The Order also mistakenly assumes that RIAG representation of an agency in one matter

5   grants RIAG the ability to provide discovery to Defendant in this case. Order 213-217. The Order

6   states that statutorily authorized access by prosecutors in a criminal matter to certain records at

7   Department of Children, Youth, and Families ("DCYF") would give RIAG "control" over that

8   agencies' records for purposes of discovery in a wholly unrelated matter. *Id*. at 214 (citing R.I.

9   Gen. Laws § 42-72-8). However, the statute cited in the Order prohibits the disclosure of any

10  DCYF information "unless necessary" in connection with a criminal investigation and imposes

11  sanctions for unauthorized disclosure. *See* R.I. Gen. Laws § 42-72-8(b), (f). That there is a statute

12  authorizing access under specific circumstances (not present here) is evidence that otherwise

13  RIAG has no right of access to agency documents. *Finnimore & Fisher Inc. v. Town of New*

14  *Shoreham*, 291 A.3d 977, 984 (R.I. 2023) ("express enumeration of items in a statute indicates a

15  legislative intent to exclude all items not listed").

16         **30. South Carolina**

17         Judge Kang based his finding that the South Carolina Attorney General has legal control

18  over the documents of several South Carolina agencies on older and more general statutory

19  provisions, while ignoring completely the recent and explicit law passed to address this precise

20  situation.[18] *See* Doc. 1117, p. 224. Under the current laws of South Carolina, when the Attorney

21  General brings an enforcement action as he has against Meta, he acts in the "public interest of the

22  State of South Carolina and not as the legal representative or attorney of any department or

23  agency of state government[.]" 2024-25 Appropriation Act Part 1B Section 59.16.[19]

---

24         [18] While Judge Kang holds that the issue of Attorney General control over state agency
25  documents under Rule 34 is governed by federal law, his findings with regard to South Carolina
    appear based on certain provisions of South Carolina law and whether they create legal control
26  under *In re Citric Acid Litig.*, 191 F.3d 1090 (9th Cir. 1999).

27         [19] South Carolina's fiscal year ended in July 2024. Accordingly, since the original briefing
    on this matter, a new budget has passed and therefore, the citation to the law is slightly different
    than in the original brief. The law, however, is identical. *See* 2023-24 Appropriation Act 1B Section
28  59.19.

Add.345

1   "Departments, agencies, or boards are not parties to these actions, *and the documents or*

2   *electronically-stored information of such departments, agencies, or boards are not in the*

3   *possession, custody, or control of the Attorney General*." *Id.* (emphasis added).

4   　　　Judge Kang did not misapprehend this law or find it inapplicable. He simply omitted it

5   from his analysis despite South Carolina's briefing, *see* Doc. 736-31, relying instead on decades-

6   old laws that primarily deal with litigation on behalf of agencies or hiring legal counsel. *See* S.C.

7   Code Ann. §§ 1-7-80; 1-7-160. These provisions were central to the court's ruling regarding

8   control over agency documents in *State of South Carolina v. Purdue Pharma, L.P.*, No. 2017-CP-

9   40-04872, 2019 WL 3753945 (S.C. Com. Pl. July 05, 2019). However, that decision predated

10  (and indeed, caused) the proviso cited above. *Purdue Pharma* is simply no longer good law.

11  Judge Kang's ruling that "there is no statutory, legal, or administrative rule cited which prohibits

12  the South Carolina Attorney General from accessing the documents of the state agencies at issue,"

13  Doc. 1117, p. 219, cannot find legal purchase in the face of a clear and unequivocal statement by

14  South Carolina's lawmakers. "Where the statute's language is plain and unambiguous, and

15  conveys a clear and definite meaning, the rules of statutory interpretation are not needed and the

16  court has no right to impose another meaning." *Hodges v. Rainey*, 341 S.C. 79, 85, 533 S.E.2d

17  578, 581 (S.C. 2000) (internal citations omitted).

18  　　**31. South Dakota**

19  　　　The Magistrate Judge's decision defiles South Dakota's ("SD") statutory and

20  constitutional scheme. The SD Attorney general ("SDAG") is an independent entity. He is an

21  elected state officer. S.D. Const. Art. IV, §7. He is not required to litigate on behalf of the SD

22  governor or any subdivision of the state. The SDAG litigates on behalf of the people. The SDAG

23  "may bring a civil action," in the name of the state, as parens patriae on behalf of the natural

24  persons residing in the state…" SDCL §37-1-23. It is the duty of the attorney general:

25  　　　"When requested by the Governor or either branch of the Legislature, or whenever, in the

26  judgment of the attorney general, the welfare of the state demands, to appear for the state and

27  prosecute or defend… SDCL §1-11-1."

28

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 346

1      The clear use of a permissive "may" in SDCL §37-1-23 and disjunctive "or" in SDCL §1-

2  11-1 indicates that the SDAG is not required to litigate "except when the welfare of the state

3  demands." *Id*. Without such prerogative, the SDAG would be unable to institute and maintain a

4  uniform legal policy that protects the public. This responsibility often requires the SDAG to take

5  positions to which state officials or agencies object. They are independent by design.

6      SD's Constitution and statutes have denied the SDAG the legal right to obtain the

7  requested documents on demand. SD's Governor is also an independently elected official. S.D.

8  Const. Art. IV, §2. It's our Governor, not the SDAG, that can exercise control over subdivisions

9  of the state. Art. IV §8. It's our Governor that may require the requested documents per our

10  Constitution. Art. IV §3.

11      On the contrary, our law is clear that the SDAG is not permitted to obtain the requested

12  documents without the Governor's resolution, order or consent. SDCL §1-11-10. Proof of

13  theoretical control is insufficient; a showing of actual control is required. *In re Citric Acid Litig.*,

14  191 F.3d 1090, 1107 (9th Cir. 1999). Hence, the Magistrate Judge erred finding there to be a

15  mechanism to obtain the requested documents since the SDAG has no control over them.

16      **32. Virginia**

17      In determining that the Virginia Attorney General has "control" over the state agencies in

18  this matter, the order fundamentally misunderstands the structure of the Commonwealth's

19  government. The order relied upon the unremarkable fact that the Attorney General serves as

20  legal counsel to state agencies in their own "civil litigation." Va. Code § 2.2-507. That statutory

21  responsibility is irrelevant here. The Attorney General did not bring this action as counsel to any

22  state agency. Rather, the Attorney General brought these claims under his own independent

23  authority pursuant to Virginia Code § 2.2-517, defining his duties as Consumer Counsel, and

24  Virginia Code § 59.1-203(A), authorizing him to enforce the Virginia Consumer Protection Act

25  ("VCPA"). Specifically, Section 2.2-517(A) provides that within the Office of the Attorney

26  General, there is "a Division of Consumer Counsel . . . that *shall represent the interests of the*

27  *people as consumers.*" (Emphasis added). Similarly, the VCPA is "remedial legislation" to

28  protect "the consuming public." Va. Code § 59.1-198. The Attorney General's representation here

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.347

1   is to protect the "people as consumers," and the "consuming public," in contrast to the Attorney

2   General's distinct role as civil litigation counsel for separate state agencies.

3     Merely because the Attorney General might serve as counsel for a state agency if it were

4   to be involved in its own litigation does not subject *every* agency in the Commonwealth to the

5   Attorney General's control. Nor does it grant the Attorney General *legal authority* to obtain

6   documents "upon demand" from those agencies. *See Citric Acid*, 191 F.3d at 1107. State law is

7   clear; these agencies are "separate entities under the law." *Id.* In Virginia, the "executive power"

8   and oversight of the executive branch is vested in the Governor. Va. Const. art. V, §§ 1, 2, 7, 9;

9   Va. Code, Tit. 2.2, Chapt. 1. Each of the agencies identified by META is under the direction of

10   the Governor or a governing board selected pursuant to statute, not the Attorney General. *See,*

11   *e.g.,* Va. Code §§ 2.2-1500, 2.2-2235.1, 2.2-2648, 22.1-21, 32.1-16, 32.1-17, 32.1-357, 32.1-358,

12   37.2-301, 63.2-200, 63.2-201. Unlike in the federal system, the Virginia Attorney General is a

13   *separately* elected and independent constitutional officer. Va. Const. art. V, § 15; Va. Code, Tit.

14   2.2, Chapt. 5. This Court should not permit a discovery order to rewrite the constitutional

15   structure of the Commonwealth's government.

16     **33. Washington**

17     <u>Washington District Court Opinions Do Not Support a Finding of Legal Control in this</u>

18   <u>Case</u>. The order relies on *Washington v. GEO Grp., Inc.,* but ignores factors that make *GEO*

19   inapplicable. The state agencies' own actions in *GEO* were the bases of defendants' affirmative

20   defenses of laches and unclean hands. *Washington v. GEO Grp., Inc.,* 2018 WL 9457998 at *3

21   (W.D. Wash. Oct. 2, 2018). Here, Meta has given no indication that state agencies delayed

22   bringing claims or engaged in wrongdoing. Additionally, *GEO* involved the Minimum Wage Act

23   (MWA), a statute typically enforced by a state agency. Here, the AGO has its own statutory

24   enforcement authority, as argued below. Doc. 738-34. *Wilson v. Washington et al.* is also

25   distinguishable. In *Wilson*, both a state agency and an agency employee were defendants. The

26   court compelled documents from a third-party agency that oversaw the profession of the

27   defendant agency employee. *Wilson v. Washington et al.,* WL 518615, at 7. Here, no such

28   relationship exists. Further, like *GEO*, *Wilson* involved allegations of misconduct by state

Add. 348

1    agencies. *Wilson,* Dkt. 22 at 6-14.

2         The AGO Does Not Have Collective Legal Control of All Client Documents. The order's

3    disregard of an attorney-client privilege[20] between AGO attorneys and client agencies and the

4    order's conclusion that AGO attorneys have legal control of all client agencies' documents

5    ignores potential adversarial interests among agencies. Doc. 1117, pp. 234-235, 238. Nor is such

6    potential adversity hypothetical. In *Washington State University v. Pac-12 Conference* (Whitman

7    Co. Sup. Ct. No. 23-2-00273-38[21]), Washington State University litigated directly against the

8    University of Washington, with both being represented by the AGO.

9         **34. West Virginia**

10        As to West Virginia, the order is mistaken as both a factual and legal matter.

11        Factually, the order mistakenly assumes that the Attorney General always represents state

12   agencies. But "State executive branch and related entities may in some circumstances employ and

13   use lawyers who are not employees of the Attorney General." *State ex rel. McGraw v. Burton*,

14   569 S.E.2d 99, 116 (W. Va. 2002); *see, e.g.*, *B.P.J. v. W. Va. State Bd. of Educ.*, 98 F.4th 542 (4th

15   Cir. 2024) (separate counsel representing the Board of Education). Although separate counsel has

16   not appeared for any state agency in this case, that's only because no agencies are parties. The

17   Attorney General here represents the State alone. *See Burton*, 569 S.E.2d at 117 n.27 (contrasting

18   the Attorney General's role in representing agencies, when he "represent[s] the entity's position,"

19   with his role representing the State, when he "assert[s] the Attorney General's view").

20        Legally, the Attorney General's role as a sometimes-lawyer for state agencies does not

21   give him possession, custody, or control over those agencies' documents. Yes, the Attorney

22   General might request or advise a particular agency to turn over documents. But the ultimate

23   decision of whether to produce always lies with the agency. *See State ex rel. Caryl v. MacQueen*,

24        [20] To be clear, Washington has not claimed that communications between AGO
25   enforcement attorneys and state agencies or their attorneys are protected by attorney-client
     privilege. Rather, such communications "may be protected by the common interest doctrine AGO
     attorneys representing." Doc. 738-34.  The common interest doctrine is not a privilege in itself,
26   but is instead an exception to the waiver of an existing privilege, if one exists.

27        [21] Docket available at
     https://1.next.westlaw.com/Document/I73FC202A6F5111EE9CCDF6A41696CAC0/View/FullT
28   ext.html?transitionType=Default&contextData=(sc.Default)

Add.349

385 S.E.2d 646, 648 (W. Va. 1989) ("[L]ike any other client in an attorney-client relationship, [an agency] was not required to accept [the Attorney General's] advice."). This reality flows from the separation of powers in the West Virginia Constitution, under which the Governor controls the agencies and the Attorney General—a separately elected official—acts as their legal advisor. W. Va. Const., art. VII, § 1; *cf. State ex rel. Fahlgren Martin, Inc. v. McGraw*, 438 S.E.2d 338, 345 (1993) (explaining how the Attorney General does not have broad investigatory powers over state agencies). The order's approach destroys that separation. *See United States v. Am. Express Co.*, No. 10CV04496, 2011 WL 13073683, at *2 (E.D.N.Y. July 29, 2011). And it incorrectly presumes the Attorney General has authority to do whatever he is not expressly restrained from doing. West Virginia law is just the opposite. *See Cavalry SPV I, LLC v. Morrisey*, 752 S.E.2d 356, 363 (W. Va. 2013).

Lastly, the Attorney General was not asserting privilege. He was solely explaining how that privilege operates—and how it does *not* attach when, as here, "[t]he Attorney General independently brings a consumer protection action." Doc. 738-35, p. 2.

### 35. Wisconsin

In addition to the common arguments raised above, there are three distinct reasons it was clear error to conclude the Wisconsin Attorney General ("WI AG") has control over other state agencies' documents: (1) under Wisconsin law, the AG requires statutory authority to act, and no Wisconsin statute confers on him the power to obtain these records in this case; (2) contrary to the order, the WI AG is prosecuting this case in the name of the state and does not represent the Wisconsin governor; and (3) the WI AG cannot represent other agencies or constitutional officers except upon request, and no such request was made in this case.

**First**, in Wisconsin, "the attorney general's actions must be authorized by statute." *See State v. City of Oak Creek*, 2000 WI 9, ¶ 33, 232 Wis. 2d 612, 605 N.W.2d 526. Because no statute confers on the WI AG the power to obtain the records at issue, he lacks authority to obtain them.

Add.350

1    ***Second,*** the order incorrectly concluded the WI AG represents the governor in this case.[22]

2    The WI AG filed this action in the name of the state, not the governor or another official or

3    agency. Under Wis. Stat. § 165.25(1m),[23] which the order cites, the WI AG, "[i]f requested by the

4    governor," shall "represent the state, any state department, agency, official, employee, or agent

5    . . . [in] any cause or matter." While the governor can ask the WI AG to file a case on behalf of

6    him and/or another agency or official., *e.g., Evers v. Marklein*, 2024 WI 31, ¶ 2 n.1, 412 Wis. 2d

7    525, 8 N.W.3d 395, he did not do so here. The conclusion that the WI AG represents the governor

8    in this case is factually and legally wrong.

9        ***Third***, under Wis. Stat. § 165.25(6)(a)1, the WI AG *may* represent state agencies and/or

10   officials only upon request. No request to represent other agencies or officials under

11   § 165.25(6)(a)1 was made in connection with bringing this case. As the Wisconsin Supreme

12   Court has held, independent constitutional officers (e.g., the governor or the superintendent) must

13   be free to take legal positions contrary to the WI AG.[24] *See Koschkee v. Evers*, 2018 WI 82, ¶¶

14   13-14, 382 Wis. 2d 666, 913 N.W.2d 878. The practical consequence of the order—forcing WI

15   AG representation on independent constitutional officers—violates Wisconsin's constitutional

16   structure.

17       **IV. Conclusion**

18       The order incorrectly concludes that the AGs, acting in their independent enforcement

19   capacity, have legal control over unrelated state agencies' documents. If allowed to stand, the

20   order places the AGs in the impossible position of responding to discovery seeking documents to

21   which they do not have legal access, significantly impedes the functioning of state government,

22   _____

23       [22]  Contrary to the order, the WI AG did not "admit" he was representing the governor in this case. Doc. 1117, p. 243. Instead, in response to a request for briefing on whether "pre-suit

24   communications" may be privileged, *see* Doc. 716, p. 2, the WI AG observed that such communications with the governor regarding this litigation may be privileged.

25       [23] The order's citation to Wis. Stat. § 165.25(1) is inapposite. Doc. 1117, p. 243. That

26   statute, by its terms, applies only to certain matters pending in Wisconsin state courts.

27       [24] The order ignored the fact that the superintendent, an elected constitutional officer, heads the Department of Public Instruction (DPI). *See* Wis. Const. art. X, § 1; Wis. Stat. § 15.37. The order failed to distinguish between DPI and the other relevant Wisconsin agencies. Doc. 1117, p.

28   244.

Add.351

and imperils the ability of state AGs to bring enforcement actions in federal court. The AGs ask

the Court to hold that this conclusion is "clearly erroneous" and "contrary to law." Fed. R. Civ. P.

72(a). Further, the AGs ask the Court to hold that Meta has failed to meet its "burden of proving

that the [AGs] ha[ve] such control," *Int'l Union of Petroleum & Indus. Workers, AFL-CIO*, 870

F.2d at 1452, and to deny Meta's request to seek party discovery from state agencies under Rule

34.

48

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 352

Dated: September 20, 2024

Respectfully submitted,

**KRIS MAYES**
Attorney General
State of Arizona

**ROB BONTA**
Attorney General
State of California

*/s/ Laura Dilweg*
Laura Dilweg (AZ No. 036066, CA No. 260663)
Chief Counsel - Consumer Protection and
Advocacy Section
Nathan Whelihan (AZ No. 037560, CA No.
293684), *pro hac vice*
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax:    (602) 542-4377
Laura.Dilweg@azag.gov
Nathan.Whelihan@azag.gov

*Attorneys for Plaintiff State of Arizona*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Bianca E. Miyata*
Bianca E. Miyata (CO Reg. No. 42012),
*pro hac vice*
Senior Assistant Attorney General
Lauren M. Dickey (CO Reg. No. 45773)
First Assistant Attorney General
Elizabeth Orem (CO Reg. No. 58309)
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
bianca.miyata@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.
Philip J. Weiser, Attorney General*

*/s/ Megan O'Neill*
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (CA SBN 244395)
Emily Kalanithi (SBN 256972)
Supervising Deputy Attorneys General
Nayha Arora (CA SBN 350467)
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer
(CA SBN 336428)
Marissa Roy (CA SBN 318773)
Brendan Ruddy (CA SBN 297896)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
megan.oneill@doj.ca.gov

*Attorneys for Plaintiff the People of the State
of California*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.353

1

**WILLIAM TONG**
Attorney General
2
State of Connecticut

3
*/s/ Lauren H. Bidra*
4
Lauren H. Bidra
(CT Juris No. 440552), *pro hac vice*
5
Special Counsel for Media and Technology
Krislyn M. Launer
6
(CT Juris No. 440789), *pro hac vice*
7
Assistant Attorney General
Connecticut Office of the Attorney General
8
165 Capitol Avenue
Hartford, Connecticut 06106
9
Phone: 860-808-5306
Fax: 860-808-5593
10
Lauren.Bidra@ct.gov
11
Krislyn.Launer@ct.gov

12
*Attorneys for Plaintiff State of Connecticut*

13
**KATHLEEN JENNINGS**
14
Attorney General
State of Delaware
15
*/s/ Marion M. Quirk*
16
Owen Lefkon
Director of Fraud and Consumer Protection
17
Marion Quirk, *pro hac vice*
18
Director of Consumer Protection
Ryan T. Costa (DE Bar 5325), *pro hac vice*
19
Deputy Director of Consumer Protection
20
Deputy's Attorney General
Delaware Department of Justice
21
820 N. French Street, 5th Floor
Wilmington, DE 19801
22
Phone: (302) 683-8800
23
Marion.Quirk@delaware.gov

24
*Attorneys for Plaintiff State of Delaware*

25

26

27

28

**ASHLEY MOODY**
Attorney General
State of Florida

*/s/ Victoria Ann Butler*
Victoria Ann Butler (FL Bar No. 861250),
*pro hac vice*
Director of Consumer Protection Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Telephone: (813) 287-7950
Victoria.butler@myfloridalegal.com

John M. Guard (FL Bar No. 374600),
*pro hac vice*
Chief Deputy Attorney General
PL-01 The Capitol
Tallahassee, FL 32399
John.guard@myfloridalegal.com

Nicholas J. Weilhammer (FL Bar No. 479322),
*pro hac vice*
Associate Deputy Attorney General for
Enforcement
PL-01 The Capitol
Tallahassee, FL 32399
Telephone: (850) 414-3861
Nicholas.weilhammer@myfloridalegal.com

Donna Cecilia Valin (FL Bar No. 96687),
*pro hac vice*
Special Counsel, Assistant Attorney General
135 West Central Blvd.
Orlando, FL 32801
Telephone: (407) 316-4840
Donna.valin@myfloridalegal.com

Karen E. Berger (FL Bar No. 72991)
*pro hac vice*
Special Counsel, Assistant Attorney General
110 SE 6th Street, 10th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 712-4600
Karen.berger@myfloridalegal.com

*Attorneys for Office of the Attorney General,*
*State of Florida, Department of Legal Affairs*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 354

1

**CHRISTOPHER M. CARR**

2
Attorney General
State of Georgia

3

4
*/s/ Melissa M. Devine*
Melissa M. Devine (GA Bar No. 403670),
*pro hac vice*

5
Assistant Attorney General

6
Office of the Attorney General of the State of
Georgia

7
2 Martin Luther King Jr. Drive, SE, Ste. 356
Atlanta, GA 30334

8
Phone: (404) 458-3765
Fax: (404) 651-9108

9
mdevine@law.ga.gov

10

*Attorneys for Plaintiff State of Georgia*

11

12
**ANNE E. LOPEZ**
Attorney General

13
State of Hawai'i

14
*/s/ Christopher T. Han*

15
Bryan C. Yee (HI JD No. 4050),
*pro hac vice*

16
Supervising Deputy Attorney General
Christopher T. Han (HI JD No. 11311),

17
*pro hac vice*

18
Deputy Attorney General
Department of the Attorney General

19
Commerce and Economic Development Division
425 Queen Street

20
Honolulu, Hawai'i 96813
Phone: (808) 586-1180

21
Bryan.c.yee@hawaii.gov

22
Christopher.t.han@hawaii.gov

23
*Attorneys for Plaintiff State of Hawai'i*

24

25

26

27

28

**RAÚL R. LABRADOR**
Attorney General
State of Idaho

*/s/ Nathan Nielson*
Nathan H. Nielson (ID Bar No. 9234),
*pro hac vice*
Deputy Attorney General
Attorney General's Office
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2424
nathan.nielson@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Scott L. Barnhart*
Scott L. Barnhart (IN Atty No. 25474-82),
*pro hac vice*
Chief Counsel and Director of Consumer
Protection
Corinne Gilchrist (IN Atty No. 27115-53),
*pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49),
*pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

---

51

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add-355

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Matthew Davies*
Susan Ellis, Chief, Consumer Protection Division
(IL Bar No. 6256460)
Greg Grzeskiewicz, Chief, Consumer Fraud
Bureau (IL Bar No. 6272322)
Jacob Gilbert, Deputy Chief, Consumer Fraud
Bureau (IL Bar No. 6306019)
Adam Sokol, Consumer Counsel, Consumer Fraud
Bureau (IL Bar No. 6216883)
Matthew Davies, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6299608), *pro
hac vice*
Emily María Migliore, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6336392)
Kevin Whelan, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6321715), *pro
hac vice*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-2218
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Adam.Sokol@ilag.gov
Matthew.Davies@ilag.gov
Emily.Migliore@ilag.gov
Kevin.Whelan@ilag.gov

*Attorneys for Plaintiff the People of the State of
Illinois*

**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/ Sarah M. Dietz*
Sarah Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*


**LIZ MURRILL**
Attorney General
State of Louisiana

*/s/ Asyl Nachabe*
Asyl Nachabe (LA Bar No. 38846),
*pro hac vice*
L. Christopher Styron (LA Bar No. 30747),
*pro hac vice*
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
NachabeA@ag.louisiana.gov
StyronC@ag.louisiana.gov

*Attorneys for State of Louisiana*

Add. 356

1  **RUSSELL COLEMAN**                              **AARON M. FREY**
2  Attorney General                                 Attorney General
   Commonwealth of Kentucky                         State of Maine
3
   /s/ *J. Christian Lewis*                         /s/ *Michael Devine*
4  J. Christian Lewis (KY Bar No. 87109),           Michael Devine, Maine Bar No. 5048,
   *pro hac vice*                                    *pro hac vice*
5  Philip Heleringer (KY Bar No. 96748),            Assistant Attorney General
6  *pro hac vice*                                    Office of the Maine Attorney General
   Zachary Richards (KY Bar No. 99209),             6 State House Station
7  *pro hac vice*                                    Augusta, ME 04333
   Daniel I. Keiser (KY Bar No. 100264),            (207) 626-8829
8  *pro hac vice*                                    michael.devine@maine.gov
   Matthew Cocanougher (KY Bar No. 94292), *pro*
9  *hac vice*                                        *Attorney for Plaintiff State of Maine*
   Assistant Attorneys General
10 1024 Capital Center Drive, Ste. 200
   Frankfort, KY 40601                              **KEITH ELLISON**
11 Christian.Lewis@ky.gov                           Attorney General
12 Philip.Heleringer@ky.gov                         State of Minnesota
   Zach.Richards@ky.gov
13 Daniel.Keiser@ky.gov                             /s/ *Caitlin Micko*
14 Matthew.Cocanougher@ky.gov                       Caitlin Micko (MN Bar No. 0395388)
   Phone: (502) 696-5300                            *pro hac vice*
15 Fax: (502) 564-2698                              Assistant Attorney General
                                                    Office of the Minnesota Attorney General
16 *Attorneys for Plaintiff the Commonwealth of*     445 Minnesota Street, Suite 1200
   *Kentucky*                                        St. Paul, MN 55101-2130
17                                                   Tel: (651) 724-9180
18                                                   caitlin.micko@ag.state.mn.us
19
                                                    *Attorney for Plaintiff State of Minnesota, by its*
20                                                   *Attorney General, Keith Ellison*
21
22
23
24
25
26
27
28

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.357

1

**ANTHONY G. BROWN**
2    Attorney General
     State of Maryland
3
     /s/ *Elizabeth J. Stern*
4    Philip D. Ziperman (Maryland CPF No.
     9012190379), *pro hac vice*
5    Deputy Chief, Consumer Protection Division
     Elizabeth J. Stern (Maryland CPF No.
6    1112090003), *pro hac vice*
     Assistant Attorney General
7    Office of the Attorney General of Maryland
     200 St. Paul Place
8    Baltimore, MD 21202
     Phone: (410) 576-6417 (Mr. Ziperman)
9    Phone: (410) 576-7226 (Ms. Stern)
     Fax: (410) 576-6566
10   pziperman@oag.state.md.us
     estern@oag.state.md.us
11
12   *Attorneys for Plaintiff Office of the Attorney*
     *General of Maryland*
13

14
     **DANA NESSEL**
15   Attorney General
     State of Michigan
16
     /s/ *Daniel J. Ping*
17   Daniel J. Ping (P81482), *pro hac vice*
     Assistant Attorney General
18   Michigan Department of Attorney General
     Corporate Oversight Division
19   P.O. Box 30736
     Lansing, MI 48909
20   517-335-7632
     PingD@michigan.gov
21
22   *Attorneys for Plaintiff State of Michigan*

23

24

25

26

27

28

**ANDREW BAILEY**
Attorney General
State of Missouri

/s/ *Michael Schwalbert*
Michael Schwalbert, *pro hac vice*
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Attorney for Plaintiff State of Missouri, ex rel.*
*Andrew Bailey, Attorney General*


**AUSTIN KNUDSEN**
Attorney General
State of Montana

/s/ *Anna K. Schneider*
Anna K. Schneider
Montana Attorney General's Office
Special Assistant Attorney General
Senior Counsel
Office of Consumer Protection
P.O. Box 201405
Helena, MT 59620-1405
(406) 444-4500
anna.schneider@mt.gov

David H. Thompson
Michael W. Kirk
Brian W. Barnes
Megan M. Wold
Athanasia O. Livas
Cooper & Kirk, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com

*Council for Plaintiff, State of Montana*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.358

1

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

/s/ Colin P. Snider
Colin P. Snider (NE #27724)
Assistant Attorney General
*pro hac vice*
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
Phone: (402) 471-3840
Email: michaela.hohwieler@nebraska.gov
Email: colin.snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*


**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

/s/ *Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008),
*pro hac vice*
Section Chief, Deputy Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov

*Attorney for Plaintiffs  Matthew J. Platkin, Attorney
General for the State of New Jersey, and Cari Fais,
Acting Director of the New Jersey Division of
Consumer Affairs*

**LETITIA JAMES**
Attorney General
State of New York

/s/ *Christopher D'Angelo*
Christopher D'Angelo, Chief Deputy Attorney
General, Economic Justice Division
(NY Bar No. 4348744), *pro hac vice*
Christopher.D'Angelo@ag.ny.gov
Clark Russell, Deputy Chief, Bureau of
Internet and Technology
(NY Bar No. 2848323), *pro hac vice*
Clark.Russell@ag.ny.gov
Nathaniel Kosslyn, Assistant Attorney General
(NY Bar No. 5773676), *pro hac vice*
Nathaniel.Kosslyn@ag.ny.gov
New York State Office of the Attorney
General
28 Liberty Street
New York, NY 10005
(212) 416-8262

*Attorneys for Plaintiff the People of the State
of New York*

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

**Add. 359**

1 **JOSHUA H. STEIN**
Attorney General
2 State of North Carolina

3 _/s/ Kevin Anderson_
4 Kevin Anderson (N.C. Bar No. 22635),
_pro hac vice_
5 Senior Counsel for Consumer Protection and
Multistate Litigation
6 Sarah G. Boyce
7 Deputy Attorney General & General Counsel
Jasmine S. McGhee
8 Senior Deputy Attorney General
Director, Consumer Protection Division
9 Josh Abram
Kunal Choksi
10 Special Deputy Attorneys General
Charles G. White
11 Assistant Attorney General
N.C. Department of Justice
12 Post Office Box 629
Raleigh, North Carolina 27602
13 Telephone: (919) 716-6006
Facsimile: (919) 716-6050
14 kander@ncdoj.gov
15
16 _Attorneys for Plaintiff State of North Carolina_

**DAVE YOST**
Attorney General
State of Ohio

_/s/ Kevin R. Walsh_
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
_pro hac vice_
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

_Attorneys for State of Ohio, ex rel. Attorney_
_General Dave Yost_

17 **ELLEN F. ROSENBLUM**
Attorney General
18 State of Oregon

19 _/s/ Jordan M. Roberts_
20 Jordan M. Roberts (Oregon Bar No. 115010),
_pro hac vice_
21 Assistant Attorney General
Oregon Department of Justice
22 Consumer Protection Section
100 SW Market Street
23 Portland, Oregon 97201
Telephone:    (971) 673-1880
24 Facsimile:    (971) 673-1884
E-mail: jordan.m.roberts@doj.state.or.us
25
26 _Attorneys for State of Oregon, ex rel. Ellen_
_F. Rosenblum, Attorney General for the_
27 _State of Oregon_

28

---

56

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 360

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DREW H. WRIGLEY**
Attorney General
State of North Dakota

/s/ Elin S. Alm
Elin S. Alm, *pro hac vice*
(ND Bar No. 05924)
Director/Assistant Attorney General
Christopher G. Lindblad, *pro hac vice*
(ND Bar No. 06480)
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
ealm@nd.gov

clindblad@nd.gov
*Attorneys for Plaintiff State of North Dakota, ex rel.*
*Drew H. Wrigley, Attorney General*


**MICHELLE A. HENRY**
Attorney General
Commonwealth of Pennsylvania

/s/ Timothy R. Murphy
Timothy R. Murphy
Senior Deputy Attorney General
(PA Bar No. 321294), *pro hac vice*
Email: tmurphy@attorneygeneral.gov
Jonathan R. Burns
Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

*Attorneys for Plaintiff the Commonwealth of*
*Pennsylvania*

**ALAN WILSON**
Attorney General
State of South Carolina

/s/ Anna C. Smith
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975),
*pro hac vice*
Assistant Deputy Attorney General
Anna C. Smith (SC Bar No. 104749),
*pro hac vice*
Assistant Attorney General
Clark C. Kirkland, Jr. (CA SBN 272522)
Assistant Attorney General
**OFFICE OF THE ATTORNEY**
**GENERAL OF SOUTH CAROLINA**
P.O. Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-0536
annasmith@scag.gov

*Attorneys for Plaintiff the State of South*
*Carolina, ex rel. Alan M. Wilson, in His*
*Official Capacity as*
*Attorney General of the State of South*
*Carolina*


**MARTY J. JACKLEY**
Attorney General
State of South Dakota

/s/ Jessica M. LaMie
By: Jessica M. LaMie (SD Bar No. 4831),
*pro hac vice*
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Jessica.LaMie@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

57
MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add. 361

1

**PETER F. NERONHA**
Attorney General

2

State of Rhode Island

3

*/s/ Stephen N. Provazza*

4

Stephen N. Provazza (R.I. Bar No. 10435),
*pro hac vice*

5

Assistant Attorney General
Rhode Island Office of the Attorney General

6

150 South Main St.

7

Providence, RI 02903
Phone: 401-274-4400

8

Email: SProvazza@riag.ri.gov

9

*Attorneys for Plaintiff State of Rhode Island*

10

11

**JASON S. MIYARES**
Attorney General

12

Commonwealth Of Virginia

13

*/s/ Joelle E. Gotwals*
Steven G. Popps

14

Chief Deputy Attorney General
Thomas J. Sanford

15

Deputy Attorney General

16

Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Section

17

Chief
Joelle E. Gotwals (VSB No. 76779),

18

*pro hac vice*

19

Assistant Attorney General
Office of the Attorney General of Virginia

20

Consumer Protection Section
202 N. 9th Street

21

Richmond, Virginia 23219

22

Telephone:    (804) 786-8789
Facsimile:    (804) 786-0122

23

E-mail: jgotwals@oag.state.va.us

24

*Attorneys for the Plaintiff Commonwealth of Virginia*

25

*ex rel. Jason S. Miyares, Attorney General*

26

27

28

**PATRICK MORRISEY**
Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267),
*pro hac vice*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia, ex rel. Patrick Morrisey, Attorney General*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Colin R. Stroud*
Colin R. Stroud
Assistant Attorney General
WI State Bar #1119457, *pro hac vice*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-9224
stroudcr@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR; 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

Add.362

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ROBERT W. FERGUSON**
Attorney General
State of Washington

*/s/ Alexandra Kory*
Alexandra Kory (WA Bar No. 49889),
*pro hac vice*
Joseph Kanada (WA Bar No. 55055),
*pro hac vice*
Rabi Lahiri
Gardner Reed
Assistant Attorneys General
Washington State Office of the Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Alexandra.Kory@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE
4:22-md-03047-YGR: 4:23-cv-05448-YGR; 4:23-cv-05885-YGR; 4:24-cv-00805-YGR

1    [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8            **IN THE UNITED STATES DISTRICT COURT**
9            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| People of the State of California, et al. | MDL No. 3047 |
| v. | |
| Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC | Case No. 4:22-md-03047-YGR 4:23-cv-05448-YGR 4:23-cv-05885-YGR 4:24-cv-00805-YGR |
| ------------------------------------------------- | |
| Office of the Attorney General, State of Florida, Department of Legal Affairs | **[PROPOSED] ORDER GRANTING STATE ATTORNEYS GENERAL'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE** |
| v. | |
| Meta Platforms, Inc., Instagram, LLC., Meta Payments, Inc. | |
| ------------------------------------------------- | |
| State of Montana, *ex rel.* Austin Knudsen, Attorney General | Judge: Hon. Yvonne Gonzalez Rogers |
| v. | Magistrate Judge: Hon. Peter H. Kang |
| Meta Platforms, Inc., Instagram, LLC, Facebook Holdings, LLC, Facebook Operations, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC, Siculus, Inc. | |
| ------------------------------------------------- | |
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | |
| THIS DOCUMENT RELATES TO: 4:22-md-03047; 4:23-cv-05448; 4:23-cv-05885; 4:24-cv-00805 | |

1

**Add. 364**

The Court grants the state Attorneys General's Motion for Relief from Nondispositive Pretrial Order of Magistrate Judge Doc. 1117. This Court's Order Granting in Part and Denying in Part Meta's Request for Party Discovery on Third-Party State Agencies, Doc. 1117, is hereby reversed in part as to its conclusions regarding state agency discovery. The Court denies Meta's request to seek party discovery from state agencies under Rule 34.

**IT IS SO ORDERED.**

 **DATED this ___ day of _____, 2024.**

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

1  DREW H. WRIGLEY
2  Attorney General of North Dakota
   ELIN S. ALM, pro hac vice
3  CHRISTOPHER G. LINDBLAD, pro hac vice
   Office of Attorney General
4  1720 Burlington Drive, Suite C
   Bismarck, ND 58504-7736
5  Telephone (701) 328-5570
   E-mail: ealm@nd.gov
6
7  *Attorneys for Plaintiff State of North Dakota,*
   *ex rel. Drew H. Wrigley, Attorney General*
8
9              **IN THE UNITED STATES DISTRICT COURT**
           **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
10

| 11 | People of the State of California, et al. | |
|---|---|---|
| 12 | v. | MDL No. 3047 |
| 13 | Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC | Case No.: 4:23-cv-05448-YGR |
| 14 | ------------------------------------------------- | **NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE** |
| 15 | IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | |
| 16 | | Judge: Hon. Yvonne Gonzalez Rogers |
| 17 | THIS DOCUMENT RELATES TO: | Action Filed: 10/24/2023 |
| 18 | Case No. 4:23-cv-05448-YGR | |

19
20  To:     The Clerk of Court and All Parties of Record
21          Pursuant to Fed. R. Civ. P. Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure,
22  Plaintiff State of North Dakota, ex rel. Drew H. Wrigley, Attorney General hereby files this
23  Notice of Voluntary Dismissal Without Prejudice and voluntarily withdraws from this action
24  without prejudice and without costs to any party.
25
26
27
28

1  Dated: October 16, 2024

2  DREW H. WRIGLEY
   Attorney General
3  State of North Dakota

4

5  /s/ Elin S. Alm
   Elin S. Alm, pro hac vice
6  (ND Bar No. 05924)
   Director/Assistant Attorney General
7  Christopher G. Lindblad, pro hac vice
   (ND Bar No. 06480)
8  Assistant Attorney General
   Consumer Protection and Antitrust Division
9  Office of Attorney General
   1720 Burlington Drive, Suite C
10 Bismarck, ND 58504-7736
   Telephone (701) 328-5570
11 ealm@nd.gov
   clindblad@nd.gov
12

13 *Attorneys for Plaintiff State of North Dakota,*
   *ex rel. Drew H. Wrigley, Attorney General*
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1    [*Submitting Counsel on Signature Page*]

2

3

4

5

6

7

8              **IN THE UNITED STATES DISTRICT COURT**
9            **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

10

11   | People of the State of California, et al. | MDL No. 3047 |
12   | v. | |
     | Meta Platforms, Inc., Instagram, LLC, Meta | Case No. 4:22-md-03047-YGR |
13   | Payments, Inc., Meta Platforms Technologies, | 4:23-cv-05448-YGR |
     | LLC | 4:23-cv-05885-YGR |
14   | | 4:24-cv-00805-YGR |

----------------------------------------------------

15   Office of the Attorney General, State of Florida,
     Department of Legal Affairs
16        v.                                    **JOINT STIPULATION OF DISMISSAL**
     Meta Platforms, Inc., Instagram, LLC., Meta   **WITH PREJUDICE**
17   Payments, Inc.

18   ----------------------------------------------------

19   State of Montana, *ex rel.* Austin Knudsen,    Judge: Hon. Yvonne Gonzalez Rogers
     Attorney General
20        v.                                    Magistrate Judge: Hon. Peter H. Kang
     Meta Platforms, Inc., Instagram, LLC, Facebook
21   Holdings, LLC, Facebook Operations, LLC,
     Meta Payments, Inc., Meta Platforms
22   Technologies, LLC, Siculus, Inc.

23   ----------------------------------------------------

24   IN RE: SOCIAL MEDIA ADOLESCENT
     ADDICTION/PERSONAL INJURY
25   PRODUCTS LIABILITY LITIGATION

26   THIS DOCUMENT RELATES TO:
     *State of Georgia ex rel. Christopher M. Carr v.*
27   *Meta Platforms, Inc. et al.*, 4:23-cv-05448-YGR

28

1    **JOINT STIPULATION OF DISMISSAL WITH PREJUDICE**

2    Plaintiff the State of Georgia *ex rel.* Chrisopher M. Carr, Attorney General of the State of

3    Georgia ("Georgia AG"), and Defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments,

4    Inc. and Meta Platforms Technologies, LLC ("Defendants"), by and through their undersigned

5    counsel, hereby stipulate to the dismissal of the State of Georgia's complaint, with prejudice, in

6    accordance with Rule 41(a)(1)(A)(ii) of the Federal Rules of Civil Procedure, each party to bear

7    their own costs and fees. The parties further stipulate that the subpoenas that Defendants served

8    pursuant to Rule 45 upon the Georgia Department of Behavioral Health and Developmental

9    Disabilities and the Georgia Department of Education dated July 23, 2024, and the subpoenas that

10   Defendants served pursuant to Rule 45 upon the Georgia Board of Regents, the Georgia

11   Department of Public Health, the Georgia Department of Human Services, and the Georgia

12   Department of Family and Children Services dated August 28, 2024, are hereby all withdrawn

13   with immediate effect.

14

15   Dated: November 22, 2024          Respectfully submitted,

16

17                                     **CHRISTOPHER M. CARR**
                                        Attorney General
18                                      State of Georgia

19                                      */s/ Melissa M. Devine*
                                        Melissa M. Devine (GA Bar No. 403670), *pro hac vice*
20                                      Assistant Attorney General
                                        Office of the Attorney General of the State of Georgia
21                                      40 Capitol Sq. SW
                                        Atlanta, GA 30334
22                                      Phone: (404) 458-3765
                                        Fax: (404) 651-9108
23                                      mdevine@law.ga.gov

24
                                        *Attorneys for Plaintiff State of Georgia ex rel. Christopher*
25                                      *M. Carr, Attorney General of the State of Georgia*

26

27

28

1

**COVINGTON & BURLING LLP**

2

*/s/Ashley Simonsen*

3

Ashley Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP

4

1999 Avenue of the Stars
Los Angeles, CA 90067

5

Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749

6

Email: asimonsen@cov.com

7

Phyllis A. Jones, *pro hac vice*

8

Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP

9

One City Center
850 Tenth Street, NW

10

Washington, DC 20001-4956

11

Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291

12

Email: pajones@cov.com
Email: pschmidt@cov.com

13

*Attorneys for Defendants Meta Platforms, Inc.; Instagram,*

14

*LLC; Meta Payments, Inc.; and Meta Platforms*
*Technologies, LLC*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 22-md-3047-YGR |
| | MDL No. 3047 |
| | **CASE MANAGEMENT ORDER NO. 19** |
| This Document Relates to: | *Upcoming Case Management Conferences:* |
| All Actions | January 17, 2025 at 9:00 a.m. |
| | February 12, 2025 at 9:00 a.m./2:00 p.m. |
| | March 21, 2025 at 9:00 a.m./2:00 p.m. |
| | April 23, 2025 at 9:00 a.m. |
| | June 13, 2025 at 2:00 p.m. |

**TO ALL PARTIES AND COUNSEL OF RECORD:**

The Court held a further case management conference in the above-captioned matter on November 22, 2024. This order memorializes and expands upon the deadlines set and findings made by the Court during that conference.

**I.      EXPERT REPORT CERTIFICATION**

The Court previously discussed with the parties whether requiring experts to certify their obligations to the Court would improve this MDL's proceedings. (Dkt. No. 1159, Case Management Order No. 17 at 6.) The parties agreed and the Court **ORDERED** that the following certification language will be included in each expert report served in this case:

> The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

(Dkt. No. 1337, Agenda and Joint Statement for November 22, 2024, Case Management Conference at 2.)

**II.      STATE ATTORNEY GENERAL LEADERSHIP UPDATE**

The state attorneys general coalition have coordinated among themselves to set leadership. (*See* Dkt. No. 451, Case Management Order No. 6 at 5:4–7.) The states designated attorneys from

**Add. 371**

United States District Court
Northern District of California

1   the attorneys general offices of California, Colorado, and Kentucky as co-lead counsel for the

2   states. (*See* Dkt. No. 434, Joint Status Updates re Plaintiff States Leadership at 4:7–15).  The

3   states designated Bianca Miyata (Colorado) and Megan O'Neill (California) as liaison counsel.

4   (*Id.* at 4:16–20.)  The states informed the Court at the conference that Colorado attorney Krista

5   Batchelder has now assumed Ms. Miyata's position.

6   **III.**   ***Montana v. Meta Platforms, Inc., et al.***

7           The Court has previously discussed with the parties how best to apply the Court's recent

8   rulings to the complaint brought by the state of Montana.  (*See* Dkt. No. 728, Case Management

9   Order No. 12 at 4; Dkt. No. 1290, Case Management Order No. 18 at 5.)  The parties have agreed

10  to submit a stipulation agreeing to be bound by the Court's prior rulings while preserving rights to

11  appeal on issues overlapping with the Court's prior orders.  The parties are **Ordered** to submit

12  the stipulation by January 10, 2025.  As to issues unique to Montana's complaint, the parties

13  proposed and the Court accepted the following briefing schedule: Meta's motion is due December

14  20, 2024; Montana's opposition, January 24, 2025; and Meta's reply, February 7, 2025.  As

15  agreed, the parties will follow the Court's local rules as to the length of briefing.

16  **IV.**   ***California v. TikTok, Inc., et al.***

17          The Court recently granted TikTok's motion to relate the action *California v. TikTok, Inc.*

18  (No. 24-cv-7942) to this MDL.  (Dkt. No. 1355.)  A motion to remand was pending and will be

19  renoticed for this Court.  As agreed at the conference, TikTok's opposition will be due January 6,

20  2025, and California's reply, January 20, 2025, with a hearing on the motion for February 12,

21  2025.

22  **V.**   **Intercircuit Assignment**

23          The Court continues to seek approvals for intercircuit assignment for four bellwether cases

24  asserting *Lexecon* objections.  (*See* Dkt. No. 976, Case Management Order No. 15 at 1;

25  Dkt. No. 908, Defendants' Brief in Support of Unopposed Request for Judicial Intercircuit

26  Assignment.)  Because two of those cases, *McNeal* (No. 23-cv-01092) and *DeKalb County School*

27  *District* (No. 23-cv-05733), were directly filed into this MDL and lack a corresponding pending

28  case in each respective transferor forum, the Court cannot finalize its application to seek

2

authorization of intercircuit assignment for those two cases. The Court requested that the parties meet and confer to devise a solution. For instance, a stipulation from the parties that an action is filed in the transferor forum by the plaintiff which would be transferred in and substituted for the bellwether pending before this Court could suffice.

## VI. STATE AGENCY NON-COMPLIANCE WITH COURT ORDERS

The Court held brief discussion with the state attorney general representative from California regarding the non-compliance of a set of agencies in California and South Carolina.[1] California maintained its position that, under California law, the documents of certain state agencies are not proper for party discovery. California stressed that these agencies' refusal to comply with an order of this Court was not made "idly." As indicated at the conference, one cannot refuse compliance because they disagree with a court's decision and consequences will flow. The legal system provides avenues of recourse for such disagreement, notably, methods of appeal, when appropriate. The Court directed Meta to submit a brief as to what relief it was seeking.

## VII. ADMINISTRATIVE

Plaintiffs' co-lead counsel informed the Court that some members of plaintiffs' leadership plan to step down from their leadership positions at the end of this year. As part of the reapplication process, other plaintiff's counsel in this MDL may apply to fill those roles.

The Court **ORDERED**, at counsel's request, that defendants may file a general answer to the school district and local government entities' complaint, along with affirmative defenses, by December 6, 2024.

On April 26, 2024, plaintiffs filed a temporary sealing motion as to their consolidated addendum of allegations specific to Mark Zuckerberg. (Dkt. No. 795.) Meta defendants stipulated they do not seek to seal material in the addendum. (Dkt. No. 832.) Thus, plaintiffs' temporary sealing motion is **DENIED AS MOOT**.

---

[1] South Dakota, originally on the list of non-compliant states, submitted a stipulation explaining they are seeking to meet and confer with Meta on discovery and anticipate compliance. (Dkt. No. 1360.)

1    The case management conference set for December 10, 2024 at 9:00 a.m. is VACATED.

2    This terminates Dkt. No. 795 in Case No. 22-md-3047.

3    **IT IS SO ORDERED.**

4    Dated: November 26, 2024

5    _____

6    YVONNE GONZALEZ ROGERS
     UNITED STATES DISTRICT JUDGE

1   ROB BONTA
    Attorney General of California
2   NICKLAS A. AKERS (SBN 211222)
    Senior Assistant Attorney General
3   BERNARD A. ESKANDARI (SBN 244395)
    EMILY C. KALANITHI (SBN 256972)
4   Supervising Deputy Attorneys General
    BRENDAN RUDDY (SBN 297896)
5   MEGAN O'NEILL (SBN 343535)
    MARISSA ROY (SBN 318773)
6   NAYHA ARORA (SBN 350467)
    JOSHUA OLSZEWSKI-JUBELIRER (SBN 336428)
7   Deputy Attorneys General
      455 Golden Gate Avenue, Suite 11000
8     San Francisco, CA 94102-7004
      Telephone: (213) 269-6348
9     Fax: (415) 703-5480
      E-mail: bernard.eskandari@doj.ca.gov
10  *Attorneys for the People of the State of California*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                      OAKLAND DIVISION

14

15  | People of the State of California, et al. | MDL No. 3047 |
16  | | |
    | v. | Case No.: 4:22-md-03047-YGR |
17  | | |
    | Meta Platforms, Inc., Instagram, LLC, Meta | **NOTICE OF INFORMATION IN** |
18  | Payments, Inc., Meta Platforms Technologies, | **RESPONSE TO COURT DIRECTIVE** |
    | LLC | **REGARDING STATE-AGENCY** |
19  | | **DISCOVERY ISSUE** |
20  | | |
21  | IN RE: SOCIAL MEDIA ADOLESCENT | |
    | ADDICTION/PERSONAL INJURY | Judge: Hon. Yvonne Gonzalez Rogers |
22  | PRODUCTS LIABILITY LITIGATION | |
    | | Magistrate Judge: Hon. Peter H. Kang |
23  | THIS DOCUMENT RELATES TO: | |
24  | 4:23-cv-05448. | |
25

26

27

28

Notice of Information in Response to Court Directive
Regarding State-Agency Discovery Issue (Case No. 4:22-md-03047-YGR)

Add. 375

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL:**

In response to the Judge Kang's Minute Order (ECF No. 1370), Discovery Management Order (ECF No. 1380), and directive at the Discovery Management Conference on November 21, 2024, the People provide the following information for counsel responsible for directing seven (of eight) state agencies identified in the Minute Order (California Office of the Governor; California Governor's Office of Business and Economic Development; California Department of Finance; California Department of Public Health; California Department of Consumer Affairs; California Business, Consumer Services, and Housing Agency; California Office of Data and Innovation) regarding provision of access to state-agency documents:

> David Sapp (SBN #264464)
> Legal Affairs Secretary
> Office of Governor Gavin Newsom
> 1021 O Street, Suite 9000
> Sacramento, CA 95814
> (916) 445-6115

In connection with the filing of Mr. Sapp's information on the Court's docket, the Office of the California Governor includes the following accompanying statement and update:

The Attorney General's Office does not represent the Governor's Office or agencies within the Governor's Administration in these judicial proceedings, except insofar as certain agencies not at issue in the current dispute are participating as nonparties responding to Rule 45 subpoenas, but we ask that the Attorney General's Office transmit this statement to the Court.

We understand based on the district court's and magistrate's most recent statements and orders that both courts construe the discovery orders in this case to apply to the Governor's Office and its agencies. We believed in good faith that the courts' prior orders, which were directed to the "parties," (see, e.g., Dkt. No. 1292, at 2), did not apply to those entities, including the Governor's Office and agencies within the Governor's Administration, that are not parties to the case, have not been served with any document, have not entered an appearance, and are not represented by the Attorney General's Office in these proceedings. Because the courts' recent statements and orders make clear that they do view our agencies as "parties," however, we are finalizing our engagement of outside counsel to ensure we have an opportunity to be heard, for the first time, via a special appearance to present our position that our agencies are not properly before the Court and that we are not proper recipients of party discovery.

We are also reaching out to Meta to communicate our continued willingness to meet and confer on and produce non-party discovery, as we have advised Meta previously, or through some other arrangement similar to the resolution that appears to have been recently reached with South Carolina. It is our expectation that those discussions will enable Meta to obtain the documents it seeks far more quickly and efficiently than if this matter were to be litigated further.

For the Court's awareness, since the Governor's Office was first made aware of Meta's requests, we have consistently maintained our   position that, under the California Constitution, the

Notice of Information in Response to Court Directive
Regarding State Agency Discovery Issue (Case No. 4:22-md-03047-YGR)

Add. 376

Governor's Office and those agencies within the Governor's Administration are separate and independent entities from the Office of the Attorney General, and that the Attorney General has no access to or control over records of those agencies in the Governor's Administration either as a practical matter or legally under California law, particularly when we have not retained the Office of the Attorney to represent us in the judicial proceeding, as is the case here. That position is supported by well-settled California case law holding that when the Attorney General brings a civil action on behalf of the People of the State of California, the Attorney General is not "in possession, custody or control of documents created or possessed by nonparty state agencies" and cannot be compelled to produce such documents via party discovery. *People ex rel. Lockyer v. Superior Court* (2004) 122 Cal. App. 4th 1060, 1079-80. It has been important to the Governor's Office and the Governor's Administration to preserve our position to avoid the creation of a conflict in authority between the federal and state courts in California on this issue of the constitutional structure of California's government, because this issue concerns the separation of powers in California and applies to state litigation beyond this case.

We reiterate that the Governor's Office and those agencies within the Governor's Administration remain willing to meet and confer and produce records, as nonparties, in response to a proper Rule 45 subpoena, as we have previously communicated to Meta, or alternate arrangement. And, without waiving our position regarding party status, we are prepared to disclose search terms and custodians as part of such a meet and confer process. We intend to meet with Meta as soon as possible to discuss that path forward.

*          *          *

The Minute Order (ECF No. 1370) also identifies the California School Finance Authority (CSFA) as refusing to comply with the Court's orders. While reserving all rights and without waiving any objections, including to being considered a party for purposes of discovery in this action, the CSFA has taken the updated position that it is not refusing to comply and will produce documents responsive to Meta's document requests and is in the process of determining if any responsive documents exist. Consistent with the Court's direction, the People will facilitate further meet-and-confer efforts between Meta and CSFA.

Dated: December 2, 2024                              Respectfully submitted,

                                                     /s/ Bernard A. Eskandari
                                                     BERNARD A. ESKANDARI

                                                     *Counsel to the People of the State of California*

2

Notice of Information in Response to Court Directive Regarding State Agency Discovery Issue (Case No. 4:22-md-03047-YGR)

Add. 377

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE:  SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR |
| This Document Relates To:<br><br>ALL ACTIONS. | **STATUS UPDATE AND STATEMENT RE:  STATE AGENCY DISCOVERY**<br><br>Judge:  Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge:  Hon. Peter H. Kang |

Dear Judge Kang:

On behalf of California Governor Gavin Newsom and the executive branch agencies identified below, we respectfully request permission to submit the attached non-party status update and statement of position regarding Meta's discovery requests in the above-captioned case.

The Office of the Governor has retained our firm to advise and represent the Governor and six of the California agencies named in Meta's discovery requests.  Rather than further litigate the propriety of those requests, we have commenced meet and confer efforts with Paul Schmidt and Christopher Yeung, litigation counsel for Meta, regarding an agreement that we expect will provide Meta with responsive, relevant, non-privileged documents in a timely fashion, subject to appropriate objections.

We believe this should resolve the document discovery dispute that was the subject of the Court's September 6, 2024 Order (ECF 1117), but in order to ensure a complete record, the Governor and the agencies respectfully submit the attached statement in support of their position that the Office of the California Attorney General does not exercise control over their documents within the meaning of Rule 34 and the case law interpreting it, and that they are not parties to this litigation.  For the reasons stated in the letter brief, the Governor and the agencies respectfully request that the Court stay its September 6, 2024 discovery order with respect to the State of California to allow discovery to proceed pursuant to their meet and confer with Meta on this issue.

Dated:  December 9, 2024

Respectfully submitted,

OLSON REMCHO, LLP

By: /s/ Margaret R. Prinzing
      Margaret R. Prinzing (CA SBN 209482)
      Olson Remcho, LLP
      1901 Harrison Street, Suite 1550
      Oakland, CA  94612
      Phone:  (510) 346-6200
      Fax:  (510) 574-7061
      Email:  mprinzing@olsonremcho.com

Attorneys for Non-Parties
Office of the Governor
California Office of Data & Innovation
California Governor's Office of Business and
   Economic Development
California Department of Finance
California Department of Public Health
California Department of Consumer Affairs
California Business, Consumer Services and
   Housing Agency

# Olson | Remcho

December 9, 2024

The Honorable Peter H. Kang
United States Magistrate Judge
United States District Court, Northern District
450 Golden Gate Avenue, Fifteenth Floor, Courtroom F
San Francisco, CA 94102

**Re:** *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, **United States District Court Case No. 4:22-md-03047-YGR**

Dear Judge Kang:

In its September 6, 2024 order, the Court concluded that "the factors weigh in favor of a finding that the California Attorney General does have legal control, for purposes of discovery, over the California agencies in dispute." ECF 1117 at 49-50. The Court reasoned that the Governor's Office and state agencies within the Governor's Administration would necessarily agree to a demand or request from the Attorney General's Office to provide potentially responsive records, which may include privileged or otherwise sensitive information. *See id.* at 52-53.

The Court appears to have assumed that the Attorney General's Office would represent the Governor's Office and related state agencies in this action, which is not the case. *See id.* at 51, 53. Our office has been retained to represent the Governor and those agencies, and the Attorney General has made clear that he does not claim to represent them in this action or to have any control over their documents.

Any holding that the Attorney General does in fact control documents in the Governor's Office or the state agencies in his administration is inconsistent with the constitutional structure of our state government. Unlike the federal government, which has a unitary executive structure, California government has a constitutionally divided Executive Branch. Article V, section 1 of the California Constitution states that "the supreme executive power of this State is vested in the Governor." Although the Constitution provides that the Attorney General is "the chief law officer of the State," his or her authority is "*[s]ubject to the powers and duties of the Governor[.]*" Cal. Const. art. V, § 13, emphasis added. Thus, it is the Governor who controls the state agencies in the executive branch, and the Attorney General's authority in this case is subject to the powers and duties of the Governor, not the other way around.

It is true that as the "chief law officer of the State," the Attorney General is authorized to bring civil actions to enforce various state laws, as he has done here. *See, e.g.*, Cal. Bus. & Prof. Code §§ 17200, 17204, 17500. Such actions are brought in the name and by the authority of the People of the State of California, but that does not mean that the Attorney General can commandeer the State's other independent constitutional officers and offices, especially the Governor and executive branch agencies that report to the Governor. Unless specifically named as such, those independent officers and agencies are not parties to litigation brought on behalf of the State of California, and courts do not automatically obtain jurisdiction over them when the Attorney General brings such a case.

California case law makes this clear. In *People ex rel. Lockyer v. Superior Court*, 122 Cal. App. 4th 1060, 1076-80 (2004), the Court of Appeal of California specifically held that when the Attorney General brings an independent enforcement action, the Attorney General may not be ordered "to produce documents from nonparty state agencies . . . ." *Id.* at 1080. The Court of

**Long Beach**
555 E. Ocean Blvd, Ste. 420
Long Beach, CA 90802

**Sacramento**
555 Capitol Mall, Ste. 400
Sacramento, CA 95814

**Oakland**
1901 Harrison St., Ste. 1550
Oakland, CA 94612

Olson Remcho LLP · olsonremcho.com

Add. 380

The Honorable Peter H. Kang
December 9, 2024
Page 2

Appeal explained that Californians and their elected representatives have drawn divisions among various Executive Branch officers and agencies to define the structure of their government and, according to those divisions, the Attorney General is not "in possession, custody or control of documents created or possessed by nonparty state agencies." *Id.* at 1079. That is so both as a *legal* matter, because of the constitutional independence of the Attorney General, and as a *practical* matter; the Attorney General has no legal, physical, or technological means to directly procure or obtain records from an independent executive branch agency. An order allowing a litigant to obtain records of those nonparty agencies through party discovery would make each of those officers and agencies a party to every enforcement action brought by the Attorney General, whether or not they played any part in the subject matter of the suit or even agreed with the Attorney General's interpretation of the law. Such a holding would put the federal courts in conflict with California courts' own interpretation of California law, which provides that the Attorney General cannot direct non-party agencies to produce records pursuant to party discovery.

The Court's September 6 order relied on California Government Code sections 11040 to 11042, which charge the Attorney General with representing most state agencies in most judicial and administrative adjudicative proceedings. But those provisions are not to the contrary. California law provides that the Attorney General essentially acts as state agencies' *outside counsel* to promote efficiency and economy in state government by providing legal services to state agencies at hourly rates that fall below the average rates charged by private firms (thereby avoiding the need for each agency in state government to maintain full litigation capability in-house) and by ensuring sufficient revenue for the Attorney General's Office to support expertise across the range of issues and areas needed to competently represent state agencies. *See id.* § 11040(a).

Here, however, as noted, the Attorney General has not represented and does not, in fact, represent the Governor's Office or relevant agencies in this judicial proceeding – our firm does. In any event, this arrangement is not intended to give the Attorney General's Office control over the agencies' documents themselves. When the Attorney General's Office represents state agencies pursuant to Government Code sections 11040 to 11042, it acts as essentially an outside law firm. Just as a law firm would not be deemed to have "control" over records of a client represented by one practice group for purposes of separate litigation being handled by another practice group, the fact that one section within the Attorney General's Office may serve as outside counsel representing an agency in litigation does not mean that the Attorney General has general control over that agency's records for purposes of unrelated enforcement actions brought by the Attorney General.

Most importantly, even where the Attorney General does represent a state officer or agency in connection with a judicial proceeding, regardless of whether those state officers or agencies are parties to the litigation, they remain the client and can define the scope of requested representation. *See* Cal. R. Pro. Conduct 1.2. It does not mean that lawyers in the Attorney General's office may control the litigation or make decisions contrary to those of the officers and agencies they represent. And it means that when the Attorney General brings an enforcement action in his independent capacity, lawyers from Attorney General's office that may be representing other governmental agencies – including the Governor, who is the chief executive of the state – may not force their clients to participate as parties or appear in the action. California's highest court has made clear that the Attorney General's Office is subject to the California Rules of Professional Conduct, even when bringing an independent action on behalf of the People. *See generally People ex rel. Deukmejian v. Brown*, 29 Cal. 3d. 150, 157 (1981).

The Honorable Peter H. Kang
December 9, 2024
Page 3

The implication that the Attorney General' Office, acting as counsel, may compel the Governor's Office or state agencies to become parties to a case brought in the Attorney General's independent capacity – or otherwise turn over records to the Attorney General by bringing an independent enforcement action – flies in the face of well-settled California law regarding the professional obligations of public prosecutors.

The result should be no different in a federal forum: "[I]t is characteristic of our federal system that States retain autonomy to establish their own governmental processes." *Ariz. State Legis. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 816 (2015). Here, California has structured its government by establishing a divided executive branch, in which the Attorney General has independent authority to enforce certain state laws against private parties while having no power to control other independent constitutional officers, or to directly compel the production of documents from other state agencies. Again, that is clear as a matter of state law. *Lockyer*, 122 Cal. App. 4th at 1079-80.[1]

In its September 6 order, the Court recognized and relied upon the Ninth Circuit's holding that "'[c]ontrol is defined as the legal right to obtain documents upon demand'" and that it should conduct a "fact specific inquiry" in order to make that determination. ECF 1117 at 5-6 (quoting *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999)). But if control requires a "legal right" to obtain documents upon demand, that right must be established as a matter of state law, just as one company's legal control over a related company's records is ordinarily determined by reference to corporate governance documents. As demonstrated above, under California law, the Attorney General has no legal right to obtain documents upon demand from the Governor or the agencies at issue here. Instead, under the California Constitution, the Attorney General's authority is "[s]*ubject to the powers and duties of the Governor* . . . ." Cal. Const. art. V, § 13 (emphasis added). And, as noted, the Attorney General does not, in fact, represent the Governor's Office or relevant state agencies in this proceeding.

Thus, the fact-specific inquiry that the Court held must be made here yields the result that the Attorney General exercises *no* legal control over documents held by the Governor or the agencies, especially when the Attorney General does not, in fact, represent the non-party Governor's Office or agencies in this proceeding. Any other outcome is contrary to the Supreme Court's clear recognition of a state's right to define its governmental structure and authority:

> Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign. "It is obviously essential to the independence of the States, and to their peace and tranquility, that their power to prescribe the qualifications of their own officers . . . should be

---

[1] The general default of Attorney General Office representation of state agencies, as currently codified in Government Code sections 11040 to 11042, was operative when this case was decided. Accordingly, as a matter of state law, the fact that the Attorney General's Office would represent those agencies if they were parties to a judicial proceeding did not alter the conclusion that the Attorney General's Office could not compel production, or otherwise exercise control, over those non-party agencies.

The Honorable Peter H. Kang
December 9, 2024
Page 4

exclusive, and free from external interference, except so far as
plainly provided by the Constitution of the United States."

*Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)
(quoting *Taylor* v. *Beckham*, 178 U.S. 548, 570-71
(1900)).

Finally, it is important to keep in mind that a contrary ruling in a federal court order would have
consequences beyond the scope of this case.  Although the Governor and Attorney General are
currently both in the same political party and their offices have strong working relationships, that
is not always the case, and is not the case for certain states involved in this proceeding.  An
Attorney General from a different political party – or one who is potentially a political rival or
even planning to run (or actively running) against the sitting Governor – could demand access to
records in possession of the Governor's Office (or the Governor himself) or agencies within the
Governor's Administration by bringing an enforcement action against an unrelated third party.
Such a result would seriously undermine California's constitutional structure and the workings of
its government.

There is no need for that to happen here.  Counsel for the Governor's Office and the agencies
have commenced meet and confer efforts regarding an agreement whereby the Governor and the
agencies expect to produce documents in a timely manner subject to appropriate objections.  For
that reason, the Governor and the agencies at issue in this proceeding respectfully request that the
Court stay its September 6 order with respect to the State of California.

Respectfully submitted,

OLSON REMCHO, LLP

/s/ Margaret R. Prinzing
Attorneys for Non-Parties
Office of the Governor
California Office of Data & Innovation
California Governor's Office of Business and
   Economic Development
California Department of Finance
California Department of Public Health
California Department of Consumer Affairs
California Business, Consumer Services and
   Housing Agency

MRP:NL
(2,023,189v4)

**Add. 383**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

People of the State of California, *et al.*

v.                                                    MDL No. 3047

Meta Platforms, Inc., Instagram, LLC, Meta          Case No.: 4:22-md-03047-YGR

Payments, Inc., Meta Platforms Technologies, LLC    **NOTICE OF INFORMATION
                                                    REGARDING STATE-AGENCY
                                                    DISCOVERY ISSUE**

IN RE: SOCIAL MEDIA ADOLESCENT              Judge: Hon. Yvonne Gonzalez Rogers

ADDICTION/PERSONAL INJURY                   Magistrate Judge: Hon. Peter H. Kang
PRODUCTS LIABILITY LITIGATION
THIS DOCUMENT RELATES TO:

4:23-cv-05448.

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL:**

The Office of the Kansas Attorney General respectfully writes to inform the Court of a

matter impacting the progess of discovery in this case. The Office of the Kansas Governor,

which oversees five of the seven other Kansas state agencies identified in the Court's order

(Department for Aging and Disability Services; Department for Children and Families;

Department of Administration, Department of Commerce, and Department of Health and

Environment), has, of yet, not complied with the Court's September 6, 2024 discovery orders,

ECF 1117. The Office of the Attorney General has been in regular communication with both

Defendants and the Governor's office and has taken all steps reasonably within its power to

secure compliance with the Attorney General's discovery obligations according to the Court's

order.

1

**Add. 384**

Following the Court's order, the Attorney General provided both the Governor's office and the general counsels of all the relevant agencies with copies of this Court's order and initiated discussions regarding custodians and search terms. Understanding the Governor's ongoing objection to being subject to party discovery, the Attorney General also issued subpoenas under the Kansas Consumer Protection Act (KCPA) seeking the same information sought by Defendants' discovery requests. A copy can be provided to the court upon request.

On October 15, 2024, the Governor's counsel wrote a letter to the Attorney General stating they would respond only to a subpoena or open records request, and restated the Governor's objections to being subject to the Court's orders. A copy of this letter is attached to this filing as Exhibit A. Despite issuance of the aforementioned KCPA subpoenas on October 31, 2024, the Governor's agencies have not complied, arguing that the Attorney General's subpoena authority ends once a case is filed. A copy of this letter is attached as Exhibit B. Following its refusal to comply with the KCPA subpoena, the Attorney General engaged in repeated discussions with the Governor's Office in an attempt to obtain agency compliance with the Court's orders. On November 20, 2024, the Governor's counsel contacted the Attorney General and stated the agencies would only produce documents under a Fed. R. Civ. P. 45 subpoena.

In sum, despite multiple and ongoing attempts to secure the Governor's cooperation, the Attorney General has been unable to move the Governor to comply with this Court's orders. To date, the Governor's agencies have provided custodians and hit reports for search terms prepared by the Attorney General, but, thus far, no agency under the Governor's authority has provided the Attorney General with any responsive documents.[1]

---

[1] One agency not under the Governor's jurisdiction has provided documents, which the Attorney General will bates stamp before providing to Defendants.

Add. 385

<center>*       *       *</center>

The Governor's counsel, Justin Whitten, KS Bar No. 28344, has requested certain correspondence be provided to the Court. Mr. Whitten's letter is attached to this filing as Exhibit C.

The Office of the Attorney General maintains its position, previously presented, that agencies not under the administrative control of the Attorney General or not otherwise intimately connected with the State's case should not be subject to party discovery under the Rules of Civil Procedure. Nonetheless, it understands the Court's previous orders on the matter and understands that, as officers of the court, the Office's attorneys are bound to comply with that order unless or until overturned or amended by higher authority. Consequently, the Office of the Attorney General has made all reasonable efforts to gain compliance with that order from the affected State agencies.[2]

Dated: December 11, 2024

                                   Respectfully submitted,

                                   **KRIS W. KOBACH**
                                   Attorney General
                                   State of Kansas

                                   /s/ *Sarah Dietz*
                                   _____
                                   Sarah Dietz (KS Bar No. 27457)
                                   Kaley Schrader (KS Bar No. 27700)
                                   Assistant Attorneys General
                                   120 SW 10th Avenue
                                   Topeka, Kansas 66612
                                   Tel: 785-296-3751
                                   Kaley.schrader@ag.ks.gov
                                   Sarah.dietz@ag.ks.gov

---

[2] Among the agencies' many complaints are that, even if they were to comply, the burden of reviewing the documents would overwhelm their small legal staffs. The Office of the Attorney General has offered to bear the costs of this review and is presently talking to several firms who potentially could perform the necessary work.

<center>3</center>

<center>**Add. 386**</center>



Capitol Building
Room 241 South
Topeka, KS 66612

Phone: (785) 296-3232
governor.kansas.gov

Office of the Governor

Laura Kelly, Governor

October 15, 2024

Sarah Dietz
Assistant Attorney General
Officer of Kansas Attorney General Kris Kobach

RE: Discovery in Meta Litigation, *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, 22-md-03047-YGR

Dear Ms. Sarah Dietz,

The Kansas Attorney General does not have custody or control, legal or physical, of documents in the possession, custody, or control of the Office of the Governor. I understand there is a decision from a federal magistrate judge in California that may hold otherwise. *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, 22-md-03047-YGR, Order Sept. 6, 2024, pg. 104 ("the Court finds that the factors weigh in favor of finding that the Kansas Attorney General has legal control, for the purposes of discovery, over the listed Kansas agencies.").

Nothing in this response is intended nor may be interpreted as acquiescence by the Office of the Kansas Governor or any other Kansas agency, apart from the Kansas Attorney General, to the jurisdiction of the court in that case. The Governor did not: initiate that suit, request your office investigate or initiate that suit, enter an appearance in that suit, participate in that suit, nor request your office's representation in that suit. Simply put, the Governor is not a party to that suit.

Moreover, I do not read the magistrate's order as making the Governor a party – nor could it in the absence of appropriate service or motion practice under FRCP 19. The magistrate's order may impose a legal fiction on the Attorney General as to its document control capabilities, but it does not, with respect, impose a legal obligation for production on a non-party such as the Kansas Governor.

As you know the Governor and the Attorney General are legally distinct, separate, elected constitutional officers of our executive branch of government. Kansas Const. art 1, sec. 3. And as a separate legal entity, the Governor will not consent to party discovery in the above-referenced suit. We will comply with a reasonable third-party subpoena or a reasonable request for records under the Kansas Open Records Act.

Our goal is not to be obstinate, but as I believe you can understand, we cannot countenance a position that fundamentally erodes the independence of the Office of the Kansas Governor, especially in a case in which the Governor was not consulted, is not represented, and is not a party. This is not meant as an attack, but you must

1

**Add. 387**



EXHIBIT

A

understand how we balk at the audacity of a claim that our Attorney General somehow controls our records and we must turn them over in a case we have nothing to do with. The aims of your suit appear laudable, and as you know, the Kansas Attorney General has been empowered explicitly by our legislature to bring the suit in accordance with your enforcement prerogative of the Kansas Consumer Protection Act, K.S.A. 50-628,50-632. The Kansas Governor does not enforce the Kansas Consumer Protection Act, nor did the Kansas Governor file a related complaint under the Kansas Consumer Protection Act.

If the parties believed the Kansas Governor to be party, they should have followed the necessary rules of federal civil procedure for joinder of a required party. That the Attorney General of Kansas has joined the suit does not *ipso facto* join all state agencies and executive officers to the suit. Such a position is wholly untenable and inconsistent with the structure of our executive branch and the statute at issue in this case, which vest the Attorney General, not the Governor's Office, with enforcement powers under the Kansas Consumer Protection Act.

Moreover, at no time prior to this discussion of discovery have the parties attempted to treat the Governor as a party – we have not been served with any documents, invited to any scheduling conferences, invited to supply any briefing, or otherwise treated as party. You are aware that when agencies or executive officers like the Governor or the legislature are sued, we may seek representation from your office in accordance with K.S.A. 75-702(b). No such request has been made here by the Office of the Kansas Governor. The court wrote "the Kansas Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation." Order at 107. The reality is that currently, you are not "counsel for the agencies at issue," including the Governor's Office. You will become counsel if requested by the Governor's Office, which we will only do if we become a party or if we are served with a subpoena. But at this time, no request for representation has been made and thus no counsel relationship exists as would serve as a basis for you to obtain documents consistent with the court's order.

Again, the Governor is not a party to this suit, nor has she been treated as a party. Accordingly, we decline to engage in party discovery. As stated, we will comply with a reasonable third-party subpoena or a reasonable request for records under the Kansas Open Records Act.

Lastly, we do not want to see you sanctioned for failing to comply with an order you cannot comply with while respecting the structure of our government. Using your office as a clearinghouse for discovery of nearly all executive branch entities may seem administratively efficient but sweeps so broadly in impact, that it is, in my opinion, an unconscionable discovery position and represents a gross misunderstanding of the structure of our state government. We understand that the court's position is not your position, and I mention it to communicate solidarity that: 1) such a sweeping grant of custodial powers would need to be expressly provided for in state statute - note, our state statutes already expressly indicate no such broad grant of authority as evidenced by our state's open records act, which imposes record production obligations on "each public agency," K.S.A. 45-220, as opposed to merely funneling all records request through the Attorney General; 2) as our interactions now show, there actually is no efficiency gained by what should have been discovery through existing third-party discovery avenues likes subpoenas; and 3) efficiency in discovery, if it exists at all here, will never be of such magnitude as to warrant dissolution of the legal boundaries inherent in our executive branch offices that have existed for over a century.

2

**Add. 388**

Respectfully,

Justin Whitten
Chief Counsel for Kansas Governor Laura Kelly

**Add. 389**



Capitol Building
Room 241 South
Topeka, KS 66612

**Kansas**
Office of the Governor

Phone: (785) 296-3232
governor.kansas.gov

Laura Kelly, Governor

November 14, 2024

Sarah Dietz
Assistant Attorney General
Office of Kansas Attorney General Kris Kobach

RE: Subpoena issued under K.S.A. 50-631 as proxy for Discovery in Meta Litigation, *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, 22-md-03047-YGR

Dear Ms. Sarah Dietz,

We are providing you with our objections to the subpoena we received from your office on November 1, 2024, pursuant to K.S.A. 50-631.

We ask that you withdraw your subpoena as we believe it is an *ultra vires* exercise of subpoena power under the Kansas Consumer Protection Act, K.S.A. 50-631, once a complaint has been filed, as is the case here when the complaint was filed on October 24, 2023. Without waiving any right for us to seek to quash the subpoena, in the alternative, we ask that you modify your subpoena as follows: 1) limiting the timeframe of the request from when Governor Kelly took office on January 14, 2019 to when the complaint in the above-reference litigation was filed on October 24, 2023; 2) limiting the requests to only those germane to alleged violations of the Kansas Consumer Protection Act, which we believe would be withdrawing all but request no. 8.

Further, we discussed the idea of using Boolean search terms as a proxy for complying with the subpoena, we ask that you limit the Boolean search terms as identified herein. Your proposed 57 Boolean searches resulted in 9,572 Outlook items, not including attachments, which far exceeds our ability to review and would create an undue burden on our office. Our proposed modification would entail using 22 of your 57 Boolean searches resulting in a less burdensome 424 responsive items, not including attachments.

Please note we are not intending to be obstructionist in that we believe the Attorney General's Office and Governor's Office are aligned in the legal concerns regarding party discovery in the above-referenced litigation. And we intend to assist where appropriate and reasonable. Nevertheless, to preserve all defenses and rights of our client and to ensure your request does not unduly burden the resources of our office at the expense of service to our client, we wish to make you aware of the following objections:

1. Where, as here, the Attorney General has joined a complaint alleging violations of the Kansas Consumer Protection Act, the investigatory subpoena power under that act is not available for use as a proxy for responding to discovery for what should have been a Rule 45 subpoena from the federal court.

At the outset, we note that unlike a discovery subpoena which would impose a burden on the Governor's Office to object in accordance with K.S.A. 60-245(c), an administrative subpoena such as the one you issued under K.S.A. 50-631 puts the burden on you to substantiate the subpoena furthers your investigation. *See, e.g., People ex rel. MacFarlane v. Am. Banco Corp.*, 194 Colo. 32, 38, 570 P.2d 825, 829 (1977)("The attorney general's subpoena, under the Colorado Consumer Protection Act, affords greater protection because the burden of

1

**Add. 390**



EXHIBIT

B

seeking court review is upon the attorney general. He must carry the burden of satisfying the court that reasonable grounds exist to believe the subpoena is necessary to terminate or prevent a deceptive trade practice. The court, therefore, is the protective barrier between the naked demand of the subpoena to produce and an enforceable court order.").

We did not locate any Kansas appellate case discussing the scope of the Attorney General's subpoena power under K.S.A. 50-631, but in looking at similar statutes in other jurisdictions, I have found support for the proposition that this administrative/investigatory subpoena ends once a lawsuit is initiated.

In *Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 337, 752 S.E.2d 356, 368 (2013), the West Virginia Attorney General received complaints of violations of the West Virginia Consumer Credit and Protection Act and issued investigative subpoenas. The Attorney General's statutory subpoena power was as follows:

> If the attorney general has probable cause to believe that a person has engaged in an act which is subject to action by the attorney general, he may, and shall upon request of the commissioner, make an investigation to determine if the act has been committed and, to the extent necessary for this purpose, may administer oaths or affirmations, and, upon his own motion or upon request of any party, may subpoena witnesses, compel their attendance, adduce evidence, and require the production of any matter which is relevant to the investigation, including the existence, description, nature, custody, condition and location of any books, records, documents or other tangible things and the identity and location of persons having knowledge of relevant facts, or any other matter reasonably calculated to lead to the discovery of admissible evidence. *Id.* at 332.

The court elaborated on the distinction between investigatory subpoena power and adjudicatory subpoena power, noting that once a complaint has been filed, investigatory subpoena power for violations alleged in the complaint cease.

> Once a complaint has been filed formally charging a party with statutory misconduct, however, the Attorney General no longer may rely upon his powers of investigation to elicit information to establish those specific consumer protection violations that form the basis of the complaint. Rather, upon the commencement of enforcement proceedings through the filing of a civil action by the Attorney General, the Attorney General's investigatory powers end as to those matters addressed in the complaint and are supplanted by the rules of discovery applicable to civil proceedings generally. *Id.* at 337.

*See also People ex rel. MacFarlane v. Am. Banco Corp.*, 194 Colo. 32, 38, 570 P.2d 825, 829 (1977) (noting that an attorney general vested with administrative subpoena power under a consumer protection statute "reflects a compromise that attempts to balance the public's interest in effective investigation at the *preliminary stage* against the individual's interest in being free from governmental intermeddling.") (emphasis added).

As you know, K.S.A. 50-631(a) provides "If, by the attorney general's own inquiries or as a result of complaints, the attorney general has reason to believe that a supplier has engaged in, is engaging in or is about to engage in an act or practice that violates this act, the attorney general, or any deputy attorney general or assistant attorney general, may administer oaths and affirmations, subpoena witnesses or matter and collect evidence." There is no time limitation in this provision, which may support some argument that the power survives past the filing of complaint. However, I don't think that argument carries the day. Clearly the plain language "has reason to believe that a supplier has engaged in, is engaging in or is about to engage in an act or practice that violates this act" indicates investigative intent in that it seeks to detect past or probable violations.

2

**Add. 391**

It does not speak to enforcement of violations post-complaint. Coupled with the civil remedy procedures under K.S.A. 50-632 such as an injunction, and the civil discovery mechanisms under K.S.A. Chapter 60, I think the mechanism for discovery post-complaint is party discovery or subpoenas from the court. The appropriate action would be either you or Meta issuing a Rule 45 subpoena.

Moreover, if the subpoena power was intended to persist past the investigatory process, we think the Legislature could have so provided. But it did not, likely leaving such post-investigation discovery to the long-established discovery processes of civil procedure.

We think that the power to subpoena records under K.S.A. 50-631 ceased upon your filing or joining of the complaint, at which time the proper discovery vehicle for further information was party discovery and Rule 45 subpoenas. The subpoena you issued to our office on November 1, 2024, was not in furtherance of an investigation. In fact, a comparison of the subpoena the Governor's Office received from the Attorney General shows the subpoena is near identical to the Rule 45 subpoena served by Meta on the Department for Children and Families. What the Governor's Office received is essentially Meta's Rule 45 discovery subpoena reproduced by the Attorney General as an investigatory subpoena under the Kansas Consumer Protection Act.

The Attorney General Office's presumably completed its investigation which led to the two counts of the violation of the Kansas Consumer Protection Act that it alleged in the complaint filed in the above-referenced litigation. Now, having been confronted with a legally dubious discovery order in federal court in the Northern District of California, the Attorney General attempts compliance with the order through use of its investigatory subpoena power. But the train on the investigation already left the station; the Attorney General is not investigating a violation. Rather, it is responding to discovery about an investigation completed as the precursor to it joining the above-referenced lawsuit.

Administrative subpoenas survive constitutional challenge for unreasonable search and seizure only if they meet the touchstone of reasonableness. *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208, 66 S. Ct. 494, 505, 90 L. Ed. 614 (1946) ("The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable."); *see also People ex rel. MacFarlane v. Am. Banco Corp.*, 194 Colo. 32, 38, 570 P.2d 825, 829 (1977) ("In our view, the protections afforded persons served with an attorney general's subpoena are as full and as meaningful as those afforded persons served with a grand jury subpoena. Under both, the person from whom information is sought may refuse to submit to the demands of the subpoena if it is unreasonable.").

Here, it is unreasonable for the Attorney General to attempt to command production of documents sought in discovery from Meta (not even the Attorney General) of an already filed case under the guise of an investigatory subpoena from the Attorney General.

2. Even if the Kansas Consumer Protection Act permits the Attorney General to issue a subpoena post-investigation pursuant to K.S.A. 50-631, the subpoena issued is overly broad and unduly burdensome for the following reasons outlined below.

As applicable to all reasons, the resources of the Governor's Office are limited, consisting of a Chief Counsel and Deputy Chief Counsel and no legal support. So, while serving the legal needs of the Kansas Governor, we simply do not have a lot of additional bandwidth to conduct an extensive review of records. Further, we are technologically limited in that we do not have a centralized way of searching text messages, and I am not sure of our ability to search network drives. We can, as we have explained, perform simple Boolean searches of e-mails, and we are willing to conduct reasonable Boolean searches of e-mails. Moreover, any records that are retrieved will require legal review for any privilege before being produced to your office. As noted, there are

3

**Add. 392**

two attorneys for the Governor's Office, and we simply do not have the capacity for large scale document review.

a. The subpoena seeks records from January 1, 2012, but Governor Kelly is not the custodian of records prior to her becoming Governor on January 14, 2019.

K.S.A. 75-104(e), generally, provides that the Governor's records at the end of the administration are transferred to the custody of the state historical society. It further provides "During the lifetime of the former governor, no person shall have access to any such records, correspondence or other papers which are not required to be disclosed under K.S.A. 45-221 and amendments thereto, except upon consent of the former governor, and the former governor shall be considered the official custodian of such records, correspondence and other papers which are not required to be disclosed."

Meta's instructions in its first set of requests for production said "unless otherwise specified, the time period for these request is January 1, 2015, to the date of production of documents." The subpoena from the Attorney General contained the exact same instruction at paragraph 9 of the instructions. Asking for nearly a decade's worth of records is too much, especially in light of the resource limitations identified above and the fact that Governor Kelly's administration is not the custodian of records of the prior administrations. We ask that you modify your subpoena so that it ranges from January 14, 2019, the date Governor Kelly assumed office, and the earlier of either the date the Kansas Attorney General completed its investigation and determined Meta had violated the Kansas Consumer Protection Act or the date the complaint initiating the action at issue was filed. Asking for records beyond the date of the AG's determination or complaint creates additional unwarranted burden on our resources and has no relevance to the AG's findings regarding violations or enforcement of the Kansas Consumer Protection Act.

For records prior to Governor Kelly's administration – January 1, 2015, to January 13, 2019 – we ask that you please direct your request to the Kansas historical society.

b. The subpoena is overly broad and creates an undue burden on the Governor's Office

The subpoena contains 22 categories of requests **in addition to** 20 subcategories in request no 3., 3 subcategories in request no. 5, 8 sub-categories in request no. 5.c, 6 subcategories in request no. 12, and 2 subcategories in request no 22. As noted above, the Governor's Office resources are limited, and we are not in a position to comply by the requested time frame of November 21 (20 days from date of receipt).

You originally provided a list of 57! different Boolean searches to be run across the mailboxes of the 15 custodians we identified. We ran this search for the time period from when Governor Kelly took office, January 14, 2019, to the date the complaint against Meta was filed, October 24, 2023. Later, on November 8, 2024, you provided 195!! different Boolean searches.

Our Office of Information Technology Services reports the following responsive items to the 57-search list you provided:

| Search Criteria | No. Items |
| --- | --- |
| ("mental health") NEAR(7) ("youth") | 3576 |
| ("mental health") NEAR(7) ("child") | 3392 |
| ("mental health") NEAR(7) ("adolescent") | 513 |
| ("Facebook") NEAR(7) ("youth") | 224 |

4

**Add. 393**

| | |
|---|---|
| ("social media") NEAR(7) ("child") | 216 |
| ("mental health") NEAR(7) ("teen") | 197 |
| ("mental health") NEAR(7) ("social media") | 183 |
| ("wellbeing") NEAR(7) ("youth") | 162 |
| ("social media") NEAR(7) ("budget") | 155 |
| ("social media") NEAR(7) ("youth") | 148 |
| ("Facebook") NEAR(7) ("mental health") | 99 |
| ("complaint") NEAR(7) ("budget") | 75 |
| ("suicide") NEAR(7) ("social media") | 72 |
| ("social media") NEAR(7) ("behavior") | 69 |
| ("Facebook") NEAR(7) ("suicide") | 67 |
| ("complaint") NEAR(7) ("social media") | 59 |
| ("social media") NEAR(7) ("harm") | 58 |
| ("social media") NEAR(7) ("kid") | 53 |
| ("social media") NEAR(7) ("benefit") | 47 |
| ("anxiety") NEAR(7) ("social media") | 44 |
| ("mental health") NEAR(7) ("kid") | 37 |
| ("depression") NEAR(7) ("social media") | 26 |
| ("self-harm") NEAR(7) ("youth") | 24 |
| ("social media") NEAR(7) ("teen") | 17 |
| ("Facebook") NEAR(7) ("addiction") | 14 |
| ("Instagram") NEAR(7) ("youth") | 8 |
| ("social media") NEAR(7) ("filter") | 7 |
| ("addiction") NEAR(7) ("social media") | 6 |
| ("Instagram") NEAR(7) ("suicide") | 6 |
| ("Instagram") NEAR(7) ("mental health") | 5 |
| ("complaint") NEAR(7) ("cellphone") | 3 |
| ("Facebook") NEAR(7) ("anxiety") | 3 |
| ("social media") NEAR(7) ("adolescent") | 2 |
| ("wellbeing") NEAR(7) ("teen") | 2 |
| ("digital advertisement") NEAR(7) ("social media") | 1 |
| ("Instagram") NEAR(7) ("anxiety") | 1 |
| ("Instagram") NEAR(7) ("depression") | 1 |
| ("compulsive use") NEAR(7) ("social media") | 0 |
| ("digital advertisement") NEAR(7) ("facebook") | 0 |
| ("digital advertisement") NEAR(7) ("instagram") | 0 |
| ("Facebook") NEAR(7) ("compulsive use") | 0 |
| ("Facebook") NEAR(7) ("depression") | 0 |
| ("Facebook") NEAR(7) ("self-harm") | 0 |
| ("Facebook") NEAR(7) ("sleep disturb") | 0 |
| ("Instagram") NEAR(7) ("addiction") | 0 |
| ("Instagram") NEAR(7) ("compulsive use") | 0 |
| ("Instagram") NEAR(7) ("self-harm") | 0 |
| ("Instagram") NEAR(7) ("sleep disturb") | 0 |
| ("mental health") NEAR(7) ("young user") | 0 |

5

**Add. 394**

| | |
|---|---|
| ("self-harm") NEAR(7) ("social media") | 0 |
| ("sleep disturb") NEAR(7) ("social media") | 0 |
| ("sleep disturb") NEAR(7) ("youth") | 0 |
| ("social media") NEAR(7) ("compulsive") | 0 |
| ("social media") NEAR(7) ("physical health") | 0 |
| ("social media") NEAR(7) ("psychological health") | 0 |
| ("social media") NEAR(7) ("social health") | 0 |
| ("social media") NEAR(7) ("young user") | 0 |

Note: the NEAR(7) means 5 words separate the two end words, which we believe was comparable to "w/5" [within 5 words] search between the two end words. These items are outlook data files, most likely e-mails, and the count of responsive hits does not account for e-mail attachments, which would add attorney review time. This is a total of 9,572 items, not including attachments, and there is no way the Governor's Office legal team can review this number of items without it substantially interfering with our ability to provide counsel to our client Governor Kelly and the Governor's Office.

K.S.A. 60-245(c)(1) imposes a duty on the issuer of the subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." In determining whether to enforce a subpoena, district courts are empowered to weigh equitable criteria as reasonableness and oppressiveness – it is a balancing of hardships and benefits. *Cessna Aircraft Co.  Kansas Comm'n on C.R.*, 229 Kan. 15, 31, 622 P.2d 124, 137 (1981). In *Cessna Aircraft Co.*, the Kansas Supreme Court noted the Kansas Commission on Civil Rights did not have "unlimited subpoena powers and can subject an entire facility to demands and whims without some showing of relevancy to the *investigation*." *Id.* at 28 (emphasis added). Here, the investigation is done, and the complaint filed. There can be no credible argument that the Attorney General filed first and sought support after the fact, as that would raise ethical concerns as to whether the filing of the complaint was supported by facts at the time it was filed – the law does not countenance a file first, investigate later approach.

In reviewing the list above, we believe these would be more applicable search terms and reasonable number of items for review:

| | |
|---|---|
| ("complaint") NEAR(7) ("social media") | 59 |
| ("social media") NEAR(7) ("harm") | 58 |
| ("social media") NEAR(7) ("kid") | 53 |
| ("social media") NEAR(7) ("benefit") | 47 |
| ("anxiety") NEAR(7) ("social media") | 44 |
| ("mental health") NEAR(7) ("kid") | 37 |
| ("depression") NEAR(7) ("social media") | 26 |
| ("self-harm") NEAR(7) ("youth") | 24 |
| ("social media") NEAR(7) ("teen") | 17 |
| ("Facebook") NEAR(7) ("addiction") | 14 |
| ("Instagram") NEAR(7) ("youth") | 8 |
| ("social media") NEAR(7) ("filter") | 7 |
| ("addiction") NEAR(7) ("social media") | 6 |
| ("Instagram") NEAR(7) ("suicide") | 6 |
| ("Instagram") NEAR(7) ("mental health") | 5 |

6

**Add. 395**

| | |
|---|---|
| ("complaint") NEAR(7) ("cellphone") | 3 |
| ("Facebook") NEAR(7) ("anxiety") | 3 |
| ("social media") NEAR(7) ("adolescent") | 2 |
| ("wellbeing") NEAR(7) ("teen") | 2 |
| ("digital advertisement") NEAR(7) ("social media") | 1 |
| ("Instagram") NEAR(7) ("anxiety") | 1 |
| ("Instagram") NEAR(7) ("depression") | 1 |

This represents a far more reasonable 424 items, consistent with your obligation to ensure no undue burden on our office.

        c.   The subpoena's requests are not reasonably relevant to an investigation of a Kansas Consumer Protection Act violation.

"To be valid, administrative subpoenas must satisfy three requirements: (1) The inquiry is one that the agency or board is authorized to make, (2) the demand must not be too indefinite, and (3) the information sought must be reasonably relevant to the purpose of the inquiry." *Hansa Ctr. for Optimum Health, LLC v. State,* 52 Kan. App. 2d 503, Syl. 4, 369 P.3d 977, 978 (2016).

Here, the Attorney General has issued this administrative subpoena under K.S.A. 50-631, which is limited to investigations of violations of the Kansas Consumer Protection Act. Yet, the subpoena requests the following documents:

Request No. 7: Policies proposed, recommended, or enacted by the Kansas Governor's Office regarding screen time and acceptable use of cell phones, computers, tablets, or other electronic devices by Young Users.

Unless the Attorney General is investigating these current or proposed policies, such policies are not relevant to alleged violations of the Kansas Consumer Protection Act.

Request No. 9: Complaints to the Kansas Governor's Office by teachers or school districts regarding budget crises from inflation, underfunding, unfunded mandates, and other causes.

Such complaints about "budget crises" have no bearing on an alleged violation of the Kansas Consumer Protection Act.

Request No. 10: Documents related to state assessments in Kansas, including reports and analyses regarding the history of K-12 state assessment or standardized testing scores, performance by schools and/or districts, and any other measures of school performance.

Measures of school performance are not relevant to an alleged violation of the Kansas Consumer Protection Act.

Request No. 11: Legislation or policies proposed by, proposed on behalf of, or testified on by the Kansas Governor's Office, regardless of such legislation or policies were enacted, regarding Young User's use of Social Media Platforms.

**Add. 396**

Proposed legislation or policies are not going to violate the Kansas Consumer Protection Act, which is itself a creature of statute. Legislation can override or supplement existing legislation. This request has no bearing on an alleged violation of the Kansas Consumer Protection Act.

Request No. 12: Mental, social, emotional, or behavioral health services provided by the Kansas Governor's Office to Young Users during the Relevant Period, including:

  a. Counseling or therapy;
  b. Psychiatric services;
  c. Crisis intervention;
  d. Inpatient short-term and long-term programs;
  e. Resource centers; and
  f. Services for Young Users dealing with substance abuse or addiction issues.

The provision of mental health services has no bearing on an alleged violation of the Kansas Consumer Protection Act.

The above are a few examples. And rather than relist the numerous requests in your subpoena, we will suffice with identifying which request we do think germane to an alleged violation of the Kansas Consumer Protection Act: Request No. 8, seeking "complaints to the Kansas Governor's Office by teachers or school districts regarding social media or cell phone use by Young Users and/or the need for acceptable use or other policies to address Young Users' use of social media or cell phones."

Respectfully,

Justin Whitten
Chief Counsel for Kansas Governor Laura Kelly

**Add. 397**



Capitol Building
Room 241 South
Topeka, KS 66612

# Kansas
### Office of the Governor

Phone: (785) 296-3232
governor.kansas.gov

Laura Kelly, Governor

December 6, 2024

Hon. Judge Yvonne Gonzalez Rogers
United States District Court, Northern District of California
Oakland Courthouse
1301 Clay Street
Oakland CA 94612

Hon.  Magistrate Judge Peter H. Kang
United States District Court, Northern District of California
San Francisco Courthouse
450 Golden Gate Ave,
San Francisco, CA 94102

Dear Honorable Judge Rogers and Honorable Judge Kang:

The Office of Kansas Governor Laura Kelly respectfully asks for time to expeditiously
obtain local counsel to enter a limited appearance to file objections to any order of this
Court holding that either: 1) the Kansas Governor is represented by the Kansas Attorney
General in this matter; or 2) that the Kansas Attorney General has control over the Kansas
Governor's documents. This request is made respectfully and without waiving any right to
subsequently object to jurisdiction.  Governor Kelly also respectfully requests that any
questions regarding interpretation of Kansas law as to document control and/or the
existence of an attorney-client relationship be submitted as certified questions from this
Court to the Kansas Supreme Court in accordance with the Uniform Certification of
Questions of Law Act, as adopted in Kansas Statutes Annotated K.S.A. 60-3201, et seq.

A holding that the Kansas Attorney General controls the documents of a separately elected
state-constitutional officer would be a seismic shift in the structure and function of Kansas
state government, which recognizes the Kansas Governor and the Kansas Attorney General
as legally distinct entities. *See, e.g.,* Kansas Constitution Article 1, Section 1 (providing in
part "[t]he constitutional officers of the executive department shall be the governor,
lieutenant governor, secretary of state, and attorney general, who shall have such
qualifications as are provided by law. Such officers shall be chosen by the electors of this
state …"); *see also First Baptist Church v. Kelly*, 455 F. Supp. 3d 1078, 1083 (D. Kan. 2020)
(illustrating legally distinct offices of the Governor and the Attorney General in case where
the Kansas Governor was sued in her official capacity; Kansas Attorney General was not
sued); *see also State ex rel. Schmidt v. Kelly*, 309 Kan. 887, 888, 441 P.3d 67, 70 (2019) (
illustrating in an action where Kansas Attorney General on relation of the state sued the
Kansas Governor, that the Kansas Attorney General, Kansas Governor, and the State are
not a single entity.)

# Add. 398



EXHIBIT

C

Moreover, I am not aware of any state law vesting the Kansas Attorney General with custodianship of the Kansas Governor's records; in fact, there is authority suggesting the opposite. *See, e.g.,* Kan. Stat. Annot. 45-220 (providing in the context of production of records in response to open records request that the obligation runs to "each public agency," as opposed to a central repository like the Kansas Attorney General); *see also* Kan. Stat. Annot. 75-104 (providing for the retention and disposition of records of the Governor without any mention of the Kansas Attorney General and specifically noting in subsection (e) and (f) custodianship of certain records either by the former Governor or the Kansas Historical Society).

Further, at no point has an attorney-client relationship existed between the Kansas Governor and the Kansas Attorney General in this matter. Counsels for both entities have been clear with each other on that point. Kansas Statute Annotated 75-702 vests the attorney general with the power to control the state's prosecution in the federal courts. But that provision does not force-place an attorney-client relationship in a situation such as here where the prosecution is by the Kansas Attorney General under the specific Kansas Consumer Protection Act, which vests prosecution authority solely with the Attorney General, not the "state" to wit: the Governor's Office or other state agencies. *See, e.g.,* Kan. Stat. Annot. 50-628 (specifically identifying Kansas Attorney General as entity responsible for enforcement of the Kansas Consumer Protection Act; *see also* Kan. Stat. Annot. 50-632 (identifying Kansas Attorney General and county or district attorney as only entities empowered to bring action for certain forms of relief such as damages or injunction under the Kansas Consumer Protection Act). Simply put, the Governor has no role in the Attorney General's prosecution of the Kansas Consumer Protection Act; in the absence of any involvement, there is no need for an attorney-client relationship on the matter.

In this case, the Kansas Governor has not been represented nor had an opportunity to be heard on these issues of extreme impact to the autonomy and rights of the Kansas Governor. Such issues cannot be fairly decided without input from the Kansas Governor. Moreover, respect for the dual sovereign structure of our state and federal government favors that such questions be decided by the Kansas Supreme Court. Accordingly, we respectfully request an opportunity to retain local counsel and to be heard on these issues and that certified questions regarding document control and the existence of an attorney-client relationship as between the Kansas Governor and the Kansas Attorney General be submitted to the Kansas Supreme Court. We also respectfully ask that any order affecting the Kansas Governor's Office be stayed until after the Kansas Governor has had a chance to be heard on the matter.

Respectfully,

/s/ Justin Whitten

Justin Whitten
Chief Counsel for Kansas Governor Laura Kelly
300 SW 10th Avenue, Room 541-E| Topeka, KS 66612
Justin.h.whitten@ks.gov
Cell (785) 581-3419
Kansas Bar 28344, Missouri Bar 65275

**Add. 399**

Ashley M. Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: + 1 (424) 332-4800
Facsimile: +1 (650) 632-4800
Email: asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc.;*
*Instagram, LLC; Meta Payments, Inc.; and*
*Meta Platforms Technologies, LLC*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc., et al.* | MDL No. 3047<br><br>Case Nos. 4:22-md-03047-YGR-PHK<br><br>4:23-cv-05448-YGR<br><br>**META DEFENDANTS' NOTICE OF MOTION AND MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES**<br><br>Date: January 31, 2025<br>Time: 1:00 PM<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |

META DEFENDANTS' NOTICE OF MOTION AND MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

**NOTICE OF MOTION AND MOTION FOR SANCTIONS**

PLEASE TAKE NOTICE THAT, at 1:00 PM on January 31, 2025[1], before the Honorable Peter H. Kang, in Courtroom F, Floor 15, of the United States District Court, Northern District of California, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC (collectively, "Meta") will and hereby do move this Court, under Federal Rule of Civil Procedure 37 and the Court's inherent authority, and pursuant to the leave granted at the December 11, 2024 Discovery Management Conference ("DMC"),[2] for an order imposing discovery sanctions on 14 Plaintiff States.

This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, any Reply or other papers submitted in connection with the Motion, the accompanying Declaration of Ashley M. Simonsen, and any other matters presented at the time of the hearing.

Dated:  December 23, 2024                    Respectfully submitted,

**COVINGTON & BURLING LLP**

---

[1] On December 18, 2024, Meta filed an Administrative Motion (ECF 1471) seeking an expedited briefing schedule on this Motion that would have the States' opposition due January 3, 2025, Meta's reply due January 10, 2025, and the Motion heard at the January 16, 2025 DMC. Since the Court has not yet ruled on Meta's Administrative Motion, Meta has noticed this Motion for Friday, January 31, 2025 at 1:00 PM – the first Friday (when Magistrate Judge Kang holds Law and Motion hearings) after the earliest notice date of January 27, 2025 under the Local Rules. In light of the States' opposition to Meta's Administrative Motion (ECF 1481), Meta reached out to the States on December 23, 2024 to propose an alternative proposed briefing schedule that would afford the States four additional days, until Tuesday, January 7, 2025, to prepare their opposition (while shortening Meta's time to prepare its reply, to Monday, January 13, 2025), while still allowing the Motion to be heard at the January 16, 2025 DMC. Understandably given the holidays, Meta has not heard back from the States on Meta's proposal; but if the Parties are able to reach agreement on this alternative proposed briefing schedule, Meta would prepare and file later this week a stipulation and proposed order to set that briefing schedule and to resolve the Administrative Motion as moot. Subject to the Court's preference and availability to review the briefing on Meta's Motion in advance of the January 16, 2025 DMC, Meta would be amenable to the Court entering the alternative proposed briefing schedule above (rather than the proposed schedule set forth in Meta's Administrative Motion), should the Court wish to afford the States additional time to prepare their opposition.

[2] *See* 12/11/24 DMC Tr. at 113:2–4 ("I understand [Meta's] concern and at some point, you know, you come to the Court with whatever relief you think you need at whatever point"); *id.* at 115:23-25 ("certainly procedurally [Meta] [is] free to do whatever they want and [the States are] free to obviously brief the issues in opposition"); *see also id.* at 114:1–3, 114:5–12, 114:19–22.

_/s/ Ashley M. Simonsen_
Ashley M. Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: + 1 (424) 332-4800
Facsimile: +1 (650) 632-4800
Email:  asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc.;*
*Instagram, LLC; Meta Payments, Inc.; and*
*Meta Platforms Technologies, LLC*

*Additional counsel listed on signature page*

META DEFENDANTS' NOTICE OF MOTION AND MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

## <u>TABLE OF CONTENTS</u>

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................. 1

I.    INTRODUCTION ........................................................................................................ 1

II.    BACKGROUND ......................................................................................................... 2

III.   LEGAL STANDARD ................................................................................................. 5

IV.   ARGUMENT .............................................................................................................. 5

    A.    Numerous States and Agencies Have Failed to Comply with Court Orders. ......... 6

        1.    States' and Agencies' Failure to Meet Court-Ordered Deadlines. ............. 6

        2.    States' and Agencies' Failures to Constructively and Promptly Negotiate. 7

        3.    States' and Agencies' Refusal to Produce Pre-2015 Documents. .............. 9

        4.    Prejudice to Meta. ........................................................................................ 9

    B.    The Court Should Impose Discovery Sanctions for States' Noncompliance. ...... 10

        1.    The Court Should Find that States Violated Court Orders. ..................... 10

        2.    The Court Should Require States to Use Meta's Custodian and Search Term Proposals. ........................................................................................ 10

        3.    The Court Should Require States to Produce All Responsive, Non-Privileged Documents Returned by the Searches, Overruling the States' Objections Without Further Litigation. ..................................................... 11

        4.    The Court Should Require Production of States' Pre-2015 Documents or Prohibit the States from Relying on Pre-2015 Documents or Conduct In Support of Their Claims. ............................................................................ 12

        5.    If States Fail to Complete Productions by January 10, 2025, Meta Should Be Granted Seven Further Hours of 30(b)(6) Deposition Time, and the States Required to Adequately Prepare. ...................................................... 13

        6.    The Court Should Direct States to Procure External eDiscovery Vendors Necessary to Complete Productions Promptly If they Assert Technical or Resource Constraints. ................................................................................ 13

        7.    The Court Should Impose Monetary Sanctions for Continued Failure to Comply. ....................................................................................................... 14

    C.    The Court Should Award Reasonable Fees and Costs. ......................................... 15

V.    CONCLUSION ........................................................................................................ 15

META DEFENDANTS' NOTICE OF MOTION AND MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Akkawi v. Sadr*,
  2023 WL 1869179 (E.D. Cal. Feb. 9, 2023) ..................................................................12

*David v. Hooker, Ltd.*,
  560 F.2d 412 (9th Cir. 1977) ........................................................................................15

*Falstaff Brewing Corp. v. Miller Brewing Co.*,
  702 F.2d 770 (9th Cir. 1983) ........................................................................................14

*Gay v. Parsons*,
  2024 WL 4224893 (N.D. Cal. Sept. 17, 2024) ...............................................................5

*Glob. Freight, Inc. v. Tremell*,
  633 F. Supp. 3d 985 (E.D. Mich. 2022).........................................................................11

*Grimes v. City & Cnty. of San Francisco*,
  951 F.2d 236 (9th Cir. 1991) ...................................................................................14, 15

*Guifu Li v. A Perfect Day Franchise, Inc*,
  281 F.R.D. 373 (N.D. Cal. 2012)..............................................................................12, 13

*Innospan Corp. v. Intuit Inc.*,
  2011 WL 2669465 (N.D. Cal. July 7, 2011).....................................................................5

*In re Lithium Ion Batteries Antitrust Litig.*,
  2018 WL 11264985 (N.D. Cal. July 2, 2018) (Gonzalez Rogers, J.)...............................13

*McMillion v. Rash Curtis & Assocs.*,
  2017 WL 8948951 (N.D. Cal. Sept. 7, 2017) .................................................................11

*In re Phenylpropanolamine (PPA) Products Liability Litig.*,
  460 F.3d 1217 (9th Cir. 2006) ..................................................................................9, 10

*Rusoff v. Happy Grp., Inc.*,
  2023 WL 114224 (N.D. Cal. Jan. 5, 2023)......................................................................11

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
  2005 WL 8173278 (S.D. Cal., Aug. 19, 2005) ...............................................................12

*Tacori Enterprises v. Beverlly Jewellery Co.*,
  253 F.R.D. 577 (C.D. Cal. 2008).....................................................................................13

*The Sunrider Corp. v. Bountiful Biotech Corp.*,
  2010 WL 4590766 (C.D. Cal. Oct. 8, 2010)....................................................................13

META DEFENDANTS' NOTICE OF MOTION AND MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

*VYSE Gelatin Co. v. Hicks*,
    2020 WL 12182759 (N.D. Ill. Feb. 11, 2020) ......................................................................11

*Williams v. City of Long Beach*,
    2022 WL 444840 (C.D. Cal. Feb. 14, 2022).........................................................................5

*Woodway USA, Inc. v. LifeCORE Fitness, Inc.*,
    2024 WL 890547 (S.D. Cal. Feb. 29, 2024) ......................................................................12

**Statutes**

28 U.S.C. § 636 .........................................................................................................................5

**Other Authorities**

Fed. R. Civ. P. 34 ...........................................................................................................1, 3, 6, 14

Fed. R. Civ. P. 37 ....................................................................................................... *passim*

Fed. R. Civ. P. 45 ..........................................................................................................3, 14

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

It has been more than three months since this Court ordered the MDL State plaintiffs and their agencies to comply with Rule 34 discovery and engage in prompt conferrals over productions that Meta has been seeking for close to a year.  In that time, every State has violated at least one of this Court's orders to comply with discovery.  These delay tactics have seriously hindered Meta's ability to obtain Court-ordered discovery from state agencies on a timeline that is consistent with the accelerated case schedule the States demanded.

The State's dilatory conduct has forced Meta to devote meaningful resources to costly and protracted negotiations, with Meta conservatively estimating that it has corresponded with individual MDL States by phone or email over 2,000 times so far since the Court's September 6 order.  In these negotiations, and despite the States' widespread intransigence and lack of transparency, Meta has worked hard to find potential compromises, including by (i) affirmatively proposing search terms and custodians and then substantially narrowing its proposals based on agencies' (often unsubstantiated) claims of burden, (ii) voluntarily agreeing to remove more than 50 agencies from the search term process, and (iii) working with individual agencies to identify alternative methods of targeted collection and production where appropriate.  Those efforts have resulted in agreements regarding search parameters with 12 of 26 remaining States[3] with consumer protection claims as of the time of this filing—most after the Court raised Meta's ability to seek sanctions against noncompliant States at the last DMC, *see* 12/11/24 DMC Tr. at 113:2–4, 115:23-25.  The remaining 14 States ("Sanction States"),[4] which are at issue in this Motion, have not fully complied with the Court's directives or cooperated with Meta to meet their discovery obligations.  This delay has resulted in Meta receiving little state agency discovery, with less than three weeks remaining until substantial completion.

---

[3] Two states are in the process of dismissing their claims and therefore are not addressed in this Motion. To the extent those two states do not dismiss their claims, Meta reserves all rights to seek sanctions for their noncompliance with the Court's directives and failure to produce Court-ordered discovery.  Meta also reserves all rights to seek sanctions against the 12 states that have reached agreement if it becomes necessary to do so in the future—*e.g.*, if they fail to produce documents by the Court-ordered deadlines.

[4] The Sanction States at issue in this Motion are Arizona, California, Colorado, Delaware, Hawai'i, Illinois, Indiana, Kansas, Minnesota, Nebraska, New York, Ohio, Pennsylvania, and South Dakota.

The Sanction States' pattern of noncompliance and delay has imposed large and unnecessary costs on Meta, frustrated Meta's ability to fairly progress this case, and justifies the following sanctions:

1. The Court should enter a finding that there have been serial violations of Court-ordered deadlines, including to create a record for Judge Gonzalez Rogers, should Meta seek separate, appropriate remedies from the District Court. *See* ECF 1291, 1299, 1380, 969; 12/11/24 DMC Tr. at 120:19–121:2, 144:17–145:8, 169:16–17, 172:3–4

2. Agencies in the 14 Sanction States that have failed to comply with Court deadlines for custodian and search term negotiations should be required to run Meta's proposed search terms across the agency custodians proposed by Meta.

3. Those agencies should also be required to produce all responsive, non-privileged documents returned by the searches, without applying any further narrowing based on the States' (often improper) objections to Meta's RFPs (and without requiring Meta to litigate those objections).

4. Agencies in ten states that are either refusing or have not committed to produce documents from before 2015—despite alleging a "Relevant Time[]" that starts "no later than 2012," Compl. (Case No. 4:23-cv-5448, ECF 1) ¶ 9, and aggressively pursuing and winning a Court Order setting a January 1, 2012 start date for the "Relevant Time" applicable to discovery from Meta (ECF No. 969)—should be either (a) ordered to produce those documents by the substantial completion deadline or (b) prohibited from relying on Meta's pre-2015 documents or conduct to support their case.

5. If an agency claims that technical or resource constraints prevent it from substantially completing productions in a timely way, then to ensure prompt production, and to end the agencies' serial delays, they should be required to procure external eDiscovery vendors—at their own cost—to complete the collection and production by the substantial completion deadline.

6. If any agency in the Sanction States fails to complete the required productions by the January 10, 2025 substantial completion deadline, Meta should be provided an additional seven hours of 30(b)(6) deposition time, and the States should be required—in addition to completing those productions—to adequately prepare such 30(b)(6) witnesses to discuss the topics covered by Meta's RFPs, so that Meta has the opportunity to ask questions to fill the gaps created by the States' lack of productions.

7. The Court should impose daily monetary sanctions on the States that continue not to comply with any Order by this Court awarding this relief—*e.g.*, by failing to run Meta's proposed search terms and custodians, or to meet substantial completion deadlines—which would double every week of continued noncompliance.

8. As required by Rule 37 upon finding an unjustified violation, the Court should award fees and costs.

## II.     BACKGROUND

On February 27, 2024, Meta served discovery requests seeking documents and other information from the States and certain constituent agencies that engage in work relevant to this lawsuit—*e.g.*, departments of health, education, human services, and Governor's offices. *See* Simonsen Decl. ¶ 2. Although the States agreed to produce limited discovery from their Attorneys General's ("AGs") offices, they uniformly refused to produce documents from agencies, instead taking the erroneous position that

the AGs had no obligation or ability to produce discovery from their States' agencies, even though they were suing on behalf of their respective States (and therefore the agencies). *Id.* As a result, the States refused to engage with Meta on agency discovery for months. *Id.*

On September 6, 2024, following extensive briefing and oral argument at multiple hearings, the Court issued a 248-page order largely rejecting the MDL States' position and finding that the vast majority of agencies from which Meta sought discovery were subject to party discovery under Rule 34. *See generally* ECF 1117 ("September 6 Order"). The Court made clear in this Order, and subsequent ones, that it expected the MDL States to move "to avoid unduly multiplying the proceedings," and work promptly to "substantially complete their respective productions of documents in response to either the Rule 34 requests or, to the extent applicable, Rule 45 subpoenas." *Id.*

The States have done the opposite since. Instead of conferring promptly as this Court directed, *id.*, they waited 11 days. Simonsen Decl. ¶ 14. They sought a stay of the Court's order. When that failed, they continued to delay, prompting the Court to enter multiple Orders imposing specific deadlines to try to ensure compliance, including a November 1 deadline for search term and custodian proposals and a December 2 deadline to complete conferrals informed by document hit reports and other transparency. A few States have expressed open defiance of the Court, only to backpedal when faced with the prospect of sanctions. *See* 11/22/24 CMC Tr. at 30:16–18 ("I do not take lightly anybody's failure to comply with a federal court order. Something will happen . . . . I guarantee you, I will not let this stand."). The majority have more tacitly defied the Court, claiming in the run-up to or at hearings when confronted by the Court that they would comply, only to then violate the Court's compliance deadlines. This has resulted in repeated violations of Court orders and directives. Specifically:

- Eight of the Sanction States—Arizona, California, Colorado, Delaware, Illinois, Minnesota, New York, and Pennsylvania—were ordered to provide search terms and custodians for all agencies by November 1, 2024. *See* ECF 1291, 1299. All eight failed to do so.

- Seven of the Sanction States—Arizona, California, Colorado, Illinois, Minnesota, New York, and Pennsylvania—still have agencies that have not provided search terms, custodians, hit reports, or transparency about their alternative search methods, even though this Court directed the conclusion of conferrals informed by that information by December 2, *see* ECF 1380;

- All 14 Sanction States have agencies that have failed to come to agreement with Meta on search terms and custodians in violation of the Court-ordered deadline of completing these negotiations by December 2 (ECF No. 1380), and despite Meta's concessions, compromises, and outreach;

META DEFENDANTS' NOTICE OF MOTION AND MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

- One State—Kansas—has not produced a single agency document to date, nearly four months after the Court's September 6 Order and despite the court-ordered deadline to begin rolling production of agency documents by December 6, 2024, *see* ECF No. 1380 at 2;

- 45 agencies from the Sanction States failed to provide hit reports to inform ongoing discovery negotiations by the Court-ordered December 16 deadline, 12/11/24 DMC Tr. at 120:19–121:2, 144:17–145:8, 169:16–17, 172:3–4;

- Ten of the 14 Sanction States—Arizona, Delaware, Hawai'i, Illinois, Indiana, Nebraska, New York, Ohio, Pennsylvania, and South Dakota—have either refused or failed to confirm that they will produce documents from before 2015; and

- Certain agencies from New York, California, and Kansas continue to take the position that they are not bound by this Court's September 6 Order at all.

In the face of the States' and agencies' defiance of the Court's Orders and refusal to engage in discovery, Meta has taken costly efforts to move the process swiftly and to compromise. Meta conservatively estimates that it has corresponded with States and/or agencies by phone or email over 2,000 times on these issues since the September 6 Order. Simonsen Decl. ¶ 8. Meta has devoted significant resources to this project; dozens of outside counsel have spent significant time working on it. *Id.* Meta has not intentionally delayed this discovery, and its correspondence with the States and agencies has (despite the volume and variation necessitated by the States' approach) been prompt. *Id.* ¶ 9. Meta also worked hard to reach agreements where possible, including giving up significant ground in negotiations. *Id.* For instance, Meta affirmatively proposed search terms and custodians and then substantially narrowed its proposals based on agencies' (often unsubstantiated) claims of burden. *Id.* Meta also voluntarily removed from the search term process more than 50 agencies. *Id.* And Meta has worked with individual agencies to identify alternative methods of collection and production. *Id.* Meta's efforts have resulted in total agreement on search parameters with 12 States and 54 of the 134 agencies identified in footnotes 2, 3, and 4 of the Parties' December 9 briefing with which it previously disagreed (ECF 1430). Put simply, Meta is not the reason the Sanction States have failed to reach agreement; it is those States' intransigence and refusal to meet Court-ordered deadlines and other basic discovery requirements.

The result of the States' delays and noncompliance with Court Orders is that Meta has received an exceptionally low volume of discovery with less than three weeks remaining to the substantial completion deadline. By contrast to Meta's approximately two million documents (of approximately nine million pages), as of the day before this filing, the Sanction States as a whole have produced a paltry 32,604

documents, with their agencies producing only 21,317 documents of that volume. *Id.* ¶ 10.[5] Meta has not received *any* agency documents from one State (Kansas), and nine have only produced volumes in the tens or hundreds (Arizona, California, Colorado, Delaware, Hawai'i, Illinois, Indiana, New York, and Pennsylvania). *Id.* ¶ 10.

## III.    LEGAL STANDARD

"[T]he authority of Magistrate Judges to impose discovery sanctions is established by 28 U.S.C. § 636 and recognized by prior Ninth Circuit decisions." *Gay v. Parsons*, 2024 WL 4224893, at *2 (N.D. Cal. Sept. 17, 2024) (Kang, M.J.) (quoting *Grimes v. City & Cnty. of San Francisco*, 951 F.2d 236, 240 (9th Cir. 1991)) (cleaned up). Magistrate judges may enter nondispositive discovery sanctions as orders (rather than reports and recommendations). *Id.*

FRCP 37 provides that "[i]f a party or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery . . . , the court where the action is pending may issue further just orders." Fed. R. Civ. P. 37(b)(2)(A). Courts can also issue sanctions for willful discovery misconduct under their inherent authority. *See Innospan Corp. v. Intuit Inc.*, 2011 WL 2669465, at *2 (N.D. Cal. July 7, 2011) (citing *Anheuser–Bush v. Natural Beverage Distributors*, 69 F.3d 337, 348 (9th Cir. 1995)). "Whether exercising its inherent power, or acting pursuant to Federal Rule of Civil Procedure 37, a district court has wide discretion in sanctioning a party for discovery abuses." *Williams v. City of Long Beach*, 2022 WL 444840, at *1 (C.D. Cal. Feb. 14, 2022) (cleaned up). Rule 37 provides that, once noncompliance with a discovery order has been found, "[i]nstead of or in addition to the orders above, the court *must* order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C) (emphasis added).

## IV.    ARGUMENT

The Sanction States have failed to comply with the Court's orders and have delayed compliance at virtually every step, creating unnecessary burdens on the Court and Meta, and resulting in deficient document discovery that should already be substantially complete as of November 5. As a result, sanctions

---

[5] Certain documents have metadata suggesting they were produced on behalf of more than one State.

are warranted. Meta has spent the past several months—and massive resources—attempting to resolve these issues. Because the States have failed to comply with Court Orders, and with Meta now experiencing daily prejudice, sanctions are warranted under Rule 37(b) (or the Court's inherent authority).

**A.** **Numerous States and Agencies Have Failed to Comply with Court Orders.**

Dozens of state agencies that this Court ordered to comply with Rule 34 discovery have failed to do so, including by repeatedly failing to meet Court-ordered deadlines to propose search terms and custodians, provide hit reports, and engage in and conclude search-term negotiations.

1. <u>States' and Agencies' Failure to Meet Court-Ordered Deadlines.</u>

The agencies subject to this Motion have failed to comply with the Court's discovery Orders in at least three key ways. ***First***, eight of the Sanction States were designated as discovery "holdouts" after effectively refusing to engage with Meta for nearly two months after the September 6 Order and were ordered to propose agency search terms and custodians by November 1, 2024. *See* ECF 1291 at 2, 1299 at 10 (ruling that "holdout" States "**SHALL** identify custodians and propose search terms by **November 1, 2024**."). All eight of those States failed to provide search terms and custodians for all of their agencies by the November 1 court-ordered deadline. Simonsen Decl. ¶ 3. Putting aside the deadline for "holdout" states, certain agencies of Arizona, California, Colorado, Illinois, Minnesota, New York, and Pennsylvania *still* have not provided search terms, custodians, hit reports, or transparency about alternative search methods used during document collection almost ***four months*** after the Court's September 6 agency discovery ruling. *Id.* ¶ 4. Remarkably, Pennsylvania has not provided custodians for *any* of its agencies with less than three weeks to go until the substantial completion deadline. *Id.* These States and agencies have violated Court orders. *See* ECF 1291 at 2, 1299 at 10, 1380 at 2.

***Second***, the Sanction States failed to conclude search term negotiations by the Court-ordered deadline of December 2. ECF 1380 at 2. Although Meta made significant efforts to reach agreements with each of the States—including by making concessions such as voluntarily removing dozens of agencies from the search term negotiation process—none of the Sanction States completed conferrals by December 2 or provided the Court-ordered information necessary to do so. Simonsen Decl. ¶¶ 5, 13.

***Third***, just two weeks later, 45 agencies from 10 of the Sanction States violated this Court's Orders at the December 11 DMC to provide hit reports on Meta's most recent proposals by December 16.[6] *See* 12/11/24 DMC Tr. at 120:19–121:2 ("repeat[ing]" the "admonition" that "[w]hen you're doing negotiations over search terms, you should be voluntarily providing hit reports to each other"); 144:17–145:8; 169:16–17; 172:3–4; ECF 1380 (requiring "the Parties to engage in prompt and transparent negotiations for purposes of identifying reasonable search terms and custodians and exchanging hit reports"); *see also* Simonsen Decl. ¶ 6. Counsel for some South Dakota agencies represented that they were not even aware of the December 16 deadline, illustrating both that South Dakota violated the Court's September 6 Order (and Orders that the AGs should facilitate these negotiations), and underscoring South Dakota's (and other States') blasé approach to these negotiations and the Court's directives. *Id.* ¶ 6.

## 2.   States' and Agencies' Failures to Constructively and Promptly Negotiate.

The Sanction States have disregarded numerous other Court directives. Most acutely, notwithstanding the Court's and the District Court's admonitions that "time is of the essence," ECF 1292, 1299, the States have delayed negotiations. In the September 6 Order, the Court ordered the Parties to "promptly meet and confer" on a schedule for the agencies to "substantially complete their respective productions of documents," September 6 Order at 248, but the States uniformly failed to make themselves available to meet and confer about agency discovery for 11 days after that Order issued. Simonsen Decl.

---

[6] **AZ**: Department of Health Services, Board of Education; **CO**: Behavioral Health Administration, Department of Education, Department of Higher Education, Department of Human Services, Governor's Office, State Planning and Budgeting; **DE**: Department of Education, Department of Services for Children, Youth, and Their Families, Office of the Governor; **HI**: Department of Budget and Finance, Department of Business, Economic Development, and Tourism, Department of Commerce and Consumer Affairs, Department of Education, Department of Health, Department of Human Services, Office of the Governor, State Council on Mental Health; **IL**: Board of Education, Department for Children and Family Services, Department of Human Services, Department of Public Health, Office of the Governor; **KS**: Board of Regents, Department of Aging and Disability Services, Department of Children and Family Services, Department of Education, Department of Health & Environment, Governor's Office; **MN**: Department of Human Services, Department of Education; **NE**: Department of Health and Human Services, Department of Education, Governor's Office, Children's Commission; **NY**: Office of the Governor, State Division of Budget; **SD**: Department of Education, Department of Health, Department of Social Services, Board of Regents, Office of the Governor, Bureau of Finance and Management; Attorney General's Office.

¶ 14.  Counsel for some South Dakota agencies joined conferrals with Meta *for the first time* on December 16 despite requests for meet-and-confers by Meta on November 6 and 13 and December 2.  *Id.*

In addition, certain agencies in New York, California, and Kansas have continued to take the position that they are not bound by this Court's Orders *at all*,[7] *id.* ¶ 15 —a position this Court previously observed threatened "the rule of law," 11/21/24 DMC Tr. at 39:25–40:3.  Even now, eleven agencies have maintained in their communications with Meta that they are not subject to party discovery as this Court ordered.  *Supra* n.7  To be clear, this position defies the Court's contrary Orders regarding discovery.

Other States have delayed in obtaining the tools necessary to provide meaningful discovery in this case.  For example, on November 26, Arizona rejected Meta's suggestion that the AG either host agency data on the AG's eDiscovery platforms or hire an outside eDiscovery vendor to facilitate the discovery process, writing that the AG "d[id] not understand what 'data' [Meta] think[s] our office is capable of hosting" or "how or why nonparty state agencies should be expected to expend tax payer dollars hiring discovery vendors (if they are even able to do so)."  *Id.*, Ex. A.  But after being admonished for not providing hit reports to inform discussions, and failing to provide any schedule by December 18 for completing discovery as this Court directed (ECF No. 1479), Arizona revealed on December 18 that it had finally "engaged a discovery vendor."  ECF No. 1472 at 14.  Illinois revealed that it had not even *begun* its "export of custodial mailboxes" until *December 16*—3.5 months after this Court ordered Illinois to provide agency discovery, and 1.5 months after this Court's November 1 deadline for Illinois to propose custodians for all Illinois agencies (which Illinois failed to meet).  Kansas recently disclosed that it is just now taking steps to hire outside vendors to assist in providing discovery.  There is no reason why it should have taken months, multiple violations of court orders, and admonishments by this Court for States like Arizona and Illinois to take the steps necessary to comply with this Court's September 6 Order.

---

[7] Those agencies are as follows.  **NY**: Governor's Office, Division of Budget; **CA**: Office of the Governor, Governor's Office of Business and Economic Development, Office of Data & Innovation, Department of Finance, Department of Public Health, Department of Consumer Affairs, Business, Consumer Services and Housing Agency; **KS**: Governor's Office, Department for Aging & Disability Services.

3.   States' and Agencies' Refusal to Produce Pre-2015 Documents.

Ten Sanction States have either refused or failed to confirm that they will produce documents created before 2015 from their agencies.[8]  Yet these same States alleged a "Relevant Time[]" beginning "no later than 2012" (Multistate Compl. (Case No. 4:23-cv-5448, ECF 1) ¶ 19) and obtained a ruling from this Court ordering a general Relevant Time Period for Meta's document discovery that dates back to January 1, 2012, *see* ECF 969 at 4–5.  Indeed, this Court ordered that start date expressly because the State AGs had selected it as the earliest relevant start date for CIDs to Meta in connection with their pre-suit investigation.  *See* DMO 7 at 969; 6/20/24 DMC Tr. at 49:8-50:3.  Meta complied, producing more than two million documents (totaling around nine million pages) as of this month.

4.   Prejudice to Meta.

"Prejudice from an unreasonable delay in discovery responses is presumed," and failure to adequately respond to a discovery request or "to produce documents as ordered is sufficient prejudice for purposes of ordering discovery sanctions."  *In re Phenylpropanolamine (PPA) Products Liability Litig.*, 460 F.3d 1217, 1236 (9th Cir. 2006).  Meta has experienced at least three forms of prejudice from the States' noncompliance with the Court's orders.  *First*, the States' noncompliance has significantly delayed progression of the case.  Many States and agencies are over six weeks past the original substantial completion deadline and weeks away from the January 10 deadline, but have yet even to *begin* their document review, even as the case moves closer to the end of fact discovery and as more Meta witnesses are produced for deposition each day and questioned by States' attorneys who are failing to comply with their own discovery obligations.  The prejudice will only compound as the case moves forward, with future contingent deadlines, such as depositions of the States' witnesses, impacted.

*Second*, Meta has had to undertake burdensome efforts to negotiate with the States that would have been unnecessary had all agencies fully and in good faith engaged in discovery efforts and complied with the Court's orders.  Conservatively, Meta estimates that it has corresponded with individual MDL States over 2,000 times since the September 6 Order.  *Id.* ¶ 8.  Much of that effort would not have been

---

[8]  These States are: Arizona, Delaware, Hawai'i, Illinois, Indiana, Nebraska, New York, Ohio, Pennsylvania, and South Dakota.

META DEFENDANTS' NOTICE OF MOTION AND MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

necessary had the States and agencies simply engaged in discovery and followed court orders as parties do every day—for example, much of the correspondence would not have been necessary if the States had provided the information required by Court-ordered deadlines, and much of the rest came from negotiations that would have been unnecessary if the States had not delayed.

*Third*, Meta has been required to expend resources necessary to litigate issues that should have been settled without Court intervention. Meta should not have had to brief, and the Court should not have had to hear, disputes that boiled down to whether agencies needed to comply with the Court's orders.

### B. The Court Should Impose Discovery Sanctions for States' Noncompliance.

Because the Sanction States have failed to comply with this Court's orders, they should face discovery sanctions to bring them into compliance and ameliorate the prejudice to Meta. *See, e.g.*, *In re PPA*, 460 F.3d at 1236 (failure to comply with orders to produce documents is ground for discovery sanctions). Meta proposes below a measured and proportionate set of discovery sanctions that accomplish these goals. Meta's Proposed Order includes a chart reflecting the specific relief related to each agency.

#### 1. The Court Should Find that States Violated Court Orders.

The Court should find that the Sanction States violated this Court's discovery orders. That finding is, as explained above, amply warranted. *Supra* III.A; *see* ECF 1291, 1299, 1380, 969; 12/11/24 DMC Tr. at 120:19–121:2, 144:17–145:8, 169:16–17, 172:3–4. It also permits an award of reasonable fees and costs. *Infra* III.C. And it would create a record to assist Judge Gonzalez Rogers in ruling on a motion for sanctions presented to her, which she has directed Meta to file. *See* ECF 1383 at 3.

#### 2. The Court Should Require States to Use Meta's Custodian and Search Term Proposals.

One of the Sanction States' primary violations of the Court's orders is their failure to propose and negotiate custodians and search terms. *See supra* III.A.1. The Court should therefore order that: (1) all agencies that have failed to propose or negotiate custodians must use Meta's proposed custodians; (2) all agencies that have failed to propose or meaningfully negotiate search terms must use the search terms that Meta most recently proposed to that agency (as detailed more fully in the Parties' December 20 joint letter briefing, ECF 1482); and (3) all agencies that have objected to Meta's search terms proposal on burden

grounds but failed to provide Court-ordered hit reports corresponding to those search terms for all proposed custodians must use Meta's most recent proposed search terms.[9]

Meta has proposed reasonable search terms and custodians, and has worked hard to narrow them for the agencies at issue notwithstanding the agencies' failure to provide Court-ordered information necessary to inform negotiations. Accordingly, there is good cause to enter Meta's proposed search terms and custodians on the merits. But there is also cause to require adoption of Meta's proposed search terms and custodians as a discovery sanction. *See, e.g.*, *VYSE Gelatin Co. v. Hicks*, 2020 WL 12182759, at *6 (N.D. Ill. Feb. 11, 2020) (sanctioned party "waived their objections to the discovery requests when they did not provide a timely response"). Magistrate judges regularly impose custodians and search terms even in routine discovery disputes (as the Court has done in this case). *See, e.g.*, *Rusoff v. Happy Grp., Inc.*, 2023 WL 114224, at *8 (N.D. Cal. Jan. 5, 2023) (settling discovery dispute by selecting among competing search terms and custodians); *McMillion v. Rash Curtis & Assocs.*, 2017 WL 8948951, at *1 (N.D. Cal. Sept. 7, 2017) (denying appeal of MJ's order to produce documents held by custodians responsive to search terms). Here, the States' noncompliance warrants an order imposing Meta's proposals. *Cf. Glob. Freight, Inc. v. Tremell*, 633 F. Supp. 3d 985, 996 (E.D. Mich. 2022) (ordering party "to provide full and complete responses to these production requests, along with copies of the documents requested, on or before March 14, 2022, without objection and without promises of production at some future date").

3.  The Court Should Require States to Produce All Responsive, Non-Privileged Documents Returned by the Searches, Overruling the States' Objections Without Further Litigation.

For any of the Sanction States addressed in Section 2 above, the Court should deem any objections to Meta's RFPs waived or overruled without further briefing—requiring that the State produce all responsive, non-privileged documents, without applying any narrowing based on the States' objections, and without requiring Meta to engage in yet further litigation over the impropriety of those objections. This sanction flows naturally from the imposition of Meta's proposed search terms and custodians: If those search terms and custodians are imposed, the States have no valid basis to refuse to produce responsive, non-privileged documents returned from those searches. The States should not be permitted

---

[9] The full list of agencies that would be subject to this sanction is reflected in the Proposed Order.

to run out the clock on objection disputes with their noncompliance, only to turn around and stand on those objections after capitulating or being ordered to comply with the Court's Orders.

For example, the States should not be permitted to apply any narrowing in their responsiveness review based on their relevance objections; they should not be permitted to restrict the time period for which they produce documents based on their time-period objections; and they should not be permitted to withhold documents their experts *may* eventually rely on based on their objection that such "documents are not required to be disclosed until the parties' exchange of expert reports."[10]  The objections should be overruled as a sanction, without requiring Meta and the Court to incur additional expenditure of unnecessary resources litigating the propriety of the objections.  Due to these States' intransigence on running search terms or making document productions, there is simply no time left to litigate those objections.  Deeming the objections to RFPs waived or overruled is both an exercise of the Court's power to manage discovery, *Akkawi v. Sadr*, 2023 WL 1869179, at *3 (E.D. Cal. Feb. 9, 2023) (deeming objections waived), and also an appropriate evidentiary sanction for the States' misconduct, *cf. Guifu Li v. A Perfect Day Franchise, Inc*, 281 F.R.D. 373, 393 (N.D. Cal. 2012) (deeming facts alleged in the complaint established for trial, subject to rebuttal by the non-moving party).

4.     The Court Should Require Production of States' Pre-2015 Documents or Prohibit the States from Relying on Pre-2015 Documents or Conduct In Support of Their Claims.

As noted, agencies from ten Sanction States have refused to produce any pre-2015 documents, despite the general Relevant Time Period for Meta dating back to January 1 2012.  *See supra* III.A.3.  Because these agencies have refused to produce documents from this same time-frame that they argued is relevant (and for which Meta was correspondingly required to produce documents), those States should either be required to produce these documents (by January 10, 2025) or they should be barred from relying on documents or conduct by Meta during that period.  Imposing this sanction ensures an even playing field.  Indeed, courts routinely impose evidentiary sanctions for discovery violations that prohibit reliance

---

[10] *See, e.g.*, *Woodway USA, Inc. v. LifeCORE Fitness, Inc.*, 2024 WL 890547, at *11 (S.D. Cal. Feb. 29, 2024) ("Plaintiff is not allowed to withhold [responsive] documents until it is ready to produce its expert report."); *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, 2005 WL 8173278, at *6 (S.D. Cal., Aug. 19, 2005) (same).

META DEFENDANTS' NOTICE OF MOTION AND MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

on evidence related to those violations. *See, e.g.*, *Guifu Li*, 281 F.R.D. at 394 (barring party from relying on witness's testimony and "other corporate deponent[s] on the [same topic]" for failure to produce deponent); *Tacori Enterprises v. Beverlly Jewellery Co.*, 253 F.R.D. 577, 584 (C.D. Cal. 2008) ("[A]n appropriate sanction, reasonably related to the subject of the discovery that was frustrated by sanctionable conduct, would be to preclude [a party] from presenting evidence regarding these four topics.").

5. <u>If States Fail to Complete Productions by January 10, 2025, Meta Should Be Granted Seven Further Hours of 30(b)(6) Deposition Time, and the States Required to Adequately Prepare.</u>

Meta is prejudiced by the States' and agencies' failure to produce documents in a timely way—as a result of the noncompliance with Court orders described above. If any Sanction State's agencies fail to substantially complete their productions by January 10, 2025, the Court should grant Meta seven hours of deposition time beyond those that will be provided, so that Meta can utilize that time to probe more fully the topics covered by its RFPs and for which the States have not substantially completed document production. In addition, each State should be required to adequately prepare such 30(b)(6) witnesses to competently testify to the topics covered by Meta's RFPs, so that Meta can at least explore the topics covered by those RFPs in a deposition. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 11264985, at *1-2 (N.D. Cal. July 2, 2018) (Gonzalez Rogers, J.) (discussing, with approval, Magistrate Judge's order for party to appear for a 30(b)(6) deposition). If the Sanction States have failed to substantially complete agency productions by the deadline, such sanction is warranted. *Cf. The Sunrider Corp. v. Bountiful Biotech Corp.*, 2010 WL 4590766, at *22 (C.D. Cal. Oct. 8, 2010) (ordering additional discovery to supplement where party "willfully disregarded" discovery obligation). For clarity, the agencies would still be obligated to complete their productions promptly in addition to these depositions, as 30(b)(6) testimony is not an adequate replacement for such production.

6. <u>The Court Should Direct States to Procure External eDiscovery Vendors Necessary to Complete Productions Promptly If they Assert Technical or Resource Constraints.</u>

The Court should direct the States to procure external eDiscovery vendors, at their own expense, in order to ensure their tardy productions are complete by no later than January 10, 2025, to the extent that they've indicated they cannot comply with discovery obligations due to a lack of technical capability. The

States' slow-walking of discovery must end.  They must proceed expeditiously to collection and production, and given the States' noncompliance, they should not be permitted to escape their obligations by gesturing to technical or resource limitations of their systems or personnel.  The States chose to bring suit, represented to the Court that they were prepared to move forward expeditiously, and sought an expedited case schedule.  This Court has ruled they have discovery obligations—just as any party does. Meta has expended enormous effort to produce more than two million documents of more than nine million pages, in addition to voluminous data productions, all of which required major investments of both technical and human resources to complete on time.  If the States cannot adequately participate in discovery with their existing systems, they must procure vendors who can.[11]  Hiring external vendors that can fully and promptly meet discovery obligations when an entity cannot do so themselves is commonplace in modern litigation, so doing that same thing as a discovery sanction is certainly warranted.

       7.     <u>The Court Should Impose Monetary Sanctions for Continued Failure to Comply.</u>

Courts  may impose prospective monetary sanctions to compel parties to comply with discovery orders.  *See Grimes*, 951 F.2d at 240–41 (approving prospective monetary sanctions under Rule 37); *Falstaff Brewing Corp. v. Miller Brewing Co.*, 702 F.2d 770, 783 n.10 (9th Cir. 1983) ("As in civil contempt, discovery sanctions may be imposed to compel compliance with an order . . . .").

Here, the Court should impose daily monetary sanctions on Sanction States until they begin fully complying with the Court's discovery orders.  Daily monetary sanctions should accrue (as of the date of any Order by this Court awarding this relief) for any of the following ongoing violations: (a) failure to propose or reach agreement on search terms and custodians (or to run Meta's proposed search terms and custodians, if ordered); and (b) failure to meet substantial completion deadlines for Rule 34 and/or Rule 45 requests.  Many States and agencies have shown that they will not comply with Court orders unless they are compelled to do so by sanctions or the threat of sanctions.  For example, certain New York agencies (including the Governor's Office) told Meta that they were not subject to this Court's Orders, refused to engaged in discovery discussions unless Meta either issued a new subpoena or withdrew the motion that led to this Court's September 6 Order, and prior to the December DMC, "filed procedurally

---

[11] The States have already retained an eDiscovery vendor to host productions made by Meta.

improper letters with the Court, identifying themselves as 'nonparties' to this action, rehashing arguments that [the New York] AG does not exercise control over agency documents, insisting that they are not subject to the jurisdiction of this Court, and . . . requesting that the Court stay enforcement of its September 6, 2024 Order regarding document production." *See* ECF 1479 (citing ECF 1443). These agencies began to back away only after this Court invited Meta to move for sanctions in response. *See supra* II–III.A. Until a State's agencies come into compliance, that State should face a daily monetary sanction to "enforce compliance with a valid discovery order." *Grimes*, 951 F.2d at 241. This Court has discretion to fix the amount of these monetary sanctions, *id.*; a reasonable sanction is $200 per day, to double every week.

### C.     The Court Should Award Reasonable Fees and Costs.

Once noncompliance with a discovery order has been found, the court "must" order reasonable fees and costs "unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(b)(2)(C). "[I]f a failure to comply has occurred, it becomes encumbent [sic] upon the disobedient party to show that his failure is justified or that special circumstances would make an award of expenses unjust." *David v. Hooker, Ltd.*, 560 F.2d 412, 419 (9th Cir. 1977). Here, given the violation of the Court's Orders, the Rule requires awarding Meta reasonable costs and fees.[12] It is the States' burden to show that their noncompliance was justified, and Meta will address any arguments they raise. But the States cannot meet their burden. Much of the noncompliance is the result of willful decisions to defy court Orders because States disagree with them. Most of it came from intentional attempts to avoid "the ordinary burdens of discovery." ECF 1213 at 7. And many of the belated, halfhearted attempts at compliance that *did* occur came only after threats of sanctions.

### V.     CONCLUSION

For the reasons set forth above, Meta respectfully requests that the Court impose the relief described in this Motion.

---

[12] Meta will submit a declaration documenting the fees it has incurred as a direct result of the States' non-compliance in a subsequent submission following the Court's ruling on this Motion.

Dated:  December 23, 2024

Respectfully submitted,

**COVINGTON & BURLING LLP**

  */s/ Ashley M. Simonsen*
Ashley M. Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: + 1 (424) 332-4800
Facsimile: +1 (650) 632-4800
Email:  asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email:  pajones@cov.com
Email:  pschmidt@cov.com

Emily Johnson Henn (State Bar. No. 269482)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: + 1 (650) 632-4700
Facsimile: +1 (650) 632-4800
Email:  ehenn@cov.com

Isaac D. Chaput (State Bar No. 326923)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: +1 (415) 591-6000
Facsimile: +1 (415) 591-6091
Email:  ichaput@cov.com

Gregory L. Halperin, *pro hac vice*
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018-1405
Telephone: +1 (212) 841-1000

**Add. 421**

Facsimile: +1 (212) 841-1010
Email:  ghalperin@cov.com

*Attorneys for Defendants Meta Platforms, Inc.;*
*Instagram, LLC; Meta Payments, Inc.; and*
*Meta Platforms Technologies, LLC*

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| THIS DOCUMENT RELATES TO: | Case Nos.:  4:22-md-03047-YGR-PHK |
| *People of the State of California, et al. v. Meta Platforms, Inc., et al.* | 4:23-cv-05448-YGR |
| | **DECLARATION OF ASHLEY M. SIMONSEN IN SUPPORT OF META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES** |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| | Magistrate Judge: Hon. Peter H. Kang |

19
20
21
22
23
24
25
26
27
28

## DECLARATION OF ASHLEY M. SIMONSEN

I, Ashley M. Simonsen, declare and state as follows:

1.     I am an attorney with the law firm Covington & Burling, LLP and represent Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC (collectively, "Meta") in the above-captioned case.  The declaration is based on my personal knowledge. If called upon to do so, I could and would competently testify as follows.

2.     On February 27, 2024, Meta served discovery requests seeking documents and other information from the States and certain of their constituent agencies that engage in work relevant to this lawsuit—*e.g.*, state departments of health, mental and behavioral health, education, and human services, and Governor's offices.  The States uniformly refused to produce documents from their constituent agencies, instead taking the position that the attorneys general ("AGs") had no obligation or ability to produce discovery from their states' agencies.  As a result, the States refused to engage with Meta on agency discovery for months.

3.     Eight of the 14 Sanction States ordered to do so failed to provide search terms and custodians for all agencies by the November 1, 2024 Court-ordered deadline. ECF 1291 at 2, 1299 at 10, 1380 at 2.  Those States are Arizona, California, Colorado, Delaware, Illinois, Minnesota, New York, and Pennsylvania.

4.     Certain Sanction States—Arizona, California, Colorado, Illinois, Minnesota, New York, and Pennsylvania—have agencies that have not provided search terms, custodians, hit reports, or transparency about their alternative search methods.  Pennsylvania has not provided custodians for any of its agencies.

5.     14 States have agencies that have failed to come to agreement with Meta on search terms and custodians in violation of the December 2, 2024, Court-ordered deadline for completing these negotiations.  ECF 1380 at 2.  Those States are Arizona, California, Colorado, Delaware, Hawai'i, Illinois, Indiana, Kansas, Minnesota, Nebraska, New York, Ohio, Pennsylvania, and South Dakota

6.     45 agencies from the Sanction States failed to provide hit reports by the Court-ordered December 16, 2024 deadline. 12/11/24 DMC Tr. at 120:19–121:2.  Those agencies are: **AZ:** Department of Health Services, Board of Education; **CO:** Behavioral Health Administration, Department of

Education, Department of Higher Education, Department of Human Services, Governor's Office, State Planning and Budgeting; **DE:** Department of Education, Department of Services for Children, Youth, and Their Families, Office of the Governor; **HI:** Department of Budget and Finance, Department of Business, Economic Development, and Tourism, Department of Commerce and Consumer Affairs, Department of Education, Department of Health, Department of Human Services, Office of the Governor, State Council on Mental Health; **IL:** Board of Education, Department for Children and Family Services, Department of Human Services, Department of Public Health, Office of the Governor; **KS:** Board of Regents, Department of Aging and Disability Services, Department of Children and Family Services, Department of Education, Department of Health & Environment, Governor's Office; **MN:** Department of Human Services, Department of Education; **NE:** Department of Health and Human Services, Department of Education, Governor's Office, Children's Commission; **NY:** Office of the Governor, State Division of Budget; **SD:** Department of Education, Department of Health, Department of Social Services, Board of Regents, Office of the Governor, Bureau of Finance and Management; Attorney General's Office. Counsel for some South Dakota agencies represented that they were not aware of the December 16 deadline.

7.      Agencies in ten States—Arizona, Delaware, Hawai'i, Illinois, Indiana, Nebraska, New York, Ohio, Pennsylvania, and South Dakota—have either refused or failed to confirm that they will produce documents from before 2015.

8.      I estimate that, conservatively, attorneys at Covington have corresponded with individual MDL States by phone or email over 2,000 times so far since the Court's September 6, 2024 Order regarding Meta's discovery requests to the States and agencies. Dozens of Covington attorneys have spent significant time working on these issues.

9.      Meta has not intentionally delayed this discovery, and its correspondence with the States and agencies has been prompt. Meta also has worked hard to reach agreements where possible, including giving up significant ground in negotiations. Meta affirmatively proposed search terms and custodians, and substantially narrowed its proposals based on agencies' claims of burden. Meta has worked with individual agencies to identify alternative methods of targeted collections and productions where appropriate.

DECLARATION OF ASHLEY M. SIMONSEN IN SUPPORT OF META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

10. Meta has produced more than two million documents consisting of more than nine million pages in this litigation. The States have produced 32,604 documents, with agencies producing 21,317 of that volume as of December 22, 2024.

11. To date, Meta has not received any agency documents from Kansas, and nine Sanction States have produced volumes numbering only in the tens or hundreds of documents (Arizona, California, Colorado, Delaware, Hawai'i, Illinois, Indiana, New York, and Pennsylvania).

12. 12 of States have been able to negotiate sufficiently to reach agreements on search terms and custodians.

13. Meta agreed to remove more than 50 agencies from the search term negotiation process or rely on targeted searches.

14. The States uniformly failed to make themselves available to meet-and-confers about agency discovery for 11 days after the Court's September 6, 2024 Order (ECF 1117) issued. Counsel for some South Dakota agencies joined conferrals with Meta for the first time on December 16, 2024, despite requests for meet-and-confers by Meta on November 6, November 13, and December 2, 2024.

15. Certain agencies of New York, California, and Kansas have continued to take the position that some agencies are not bound by this Court's September 6, 2024 Order (ECF No. 1117) at all. Those agencies are: **NY**: Governor's Office, State Division of Budget; **CA**: Office of the Governor, Governor's Office of Business and Economic Development, Office of Data & Innovation, Department of Finance, Department of Public Health, Department of Consumer Affairs, Business, Consumer Services and Housing Agency; **KS**: Governor's Office, Department for Aging & Disability Services.

16. Agency disputes still exist for the 14 of Sanction States. They are Arizona, California, Colorado, Delaware, Hawai'i, Illinois, Indiana, Kansas, Minnesota, Nebraska, New York, Ohio, Pennsylvania, and South Dakota.

17. Attached as **Exhibit A** is a true and correct copy of an email sent from Arizona's counsel to my firm on November 26, 2024.

1        I declare under penalty of perjury of the laws of the United States that the foregoing is true and

2   correct.  Executed on December 23, 2024.

3                          By:       */s/ Ashley M. Simonsen*

4                                Ashley M. Simonsen

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF ASHLEY M. SIMONSEN IN SUPPORT OF MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

Add.427

# EXHIBIT A

| From: | Dilweg, Laura <Laura.Dilweg@azag.gov> |
|---|---|
| **Sent:** | Monday, November 25, 2024 8:53 PM |
| **To:** | Yeung, Christopher; Whelihan, Nathan |
| **Cc:** | Hunsinger, Nyla; Simonsen, Ashley M; Schmidt, Paul; Halperin, Gregory; Grigsby, Stacey; Hester, Timothy; 'Social Media MDL State AGs Lead Counsel'; Xenakis, Nicholas; Ermilus, Jae; Djoukeng, Fran |
| **Subject:** | RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ |

[EXTERNAL]

Chris,

I do not understand what "data" you think our office is capable of hosting. Or how or why nonparty state agencies should be expected to expend tax payer dollars hiring discovery vendors (if they are even able to do so). The mere suggestion underscores the immediate need for an end to the endless demands your client seems intent on making. Which other states have agreed to do anything like this?

If that is the position Meta is taking, I would appreciate a tech person who is versed in discussing the reality of government agency discovery and speaking to what Meta is actually asking the agencies to do.

Thank you,
Laura

**Laura Dilweg**
Chief Counsel
Consumer Protection & Advocacy Section



Arizona Attorney General Kris Mayes
2005 N. Central Ave.
Phoenix, AZ 85004
Desk: (602) 542-5487
Laura.Dilweg@azag.gov
http://www.azag.gov

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Monday, November 25, 2024 9:41 PM
**To:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Laura,

1
**Add. 429**

We've suggested multiple times to Arizona that it should consider (as we understand other AGs are doing) hosting the data on the AGs' ediscovery platforms, or retaining an ediscovery vendor, to assist with running searches and providing hit reports. Is Arizona unwilling to do so?

Separately, so that I can line up the right person to attend tomorrow, what tech issue does Arizona wish to discuss?

Best,

Chris

**From:** Dilweg, Laura <Laura.Dilweg@azag.gov>
**Sent:** Monday, November 25, 2024 11:31 PM
**To:** Yeung, Christopher <cyeung@cov.com>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]
Will do.

As we advised you and the Court at last week's DMC, Arizona's agencies do not have the technical capabilities and software that would allow them to provide traditional hit reports. We provided you additional information in the letter we sent today regarding the agencies' attempts to run the search terms proposed by Meta on November 8 and at COB last Friday. As the Court stated last week, it would be helpful if a tech person from Covington is available to attend the conference tomorrow to speak to Meta's position.

Thank you,
Laura

**Laura Dilweg**
Chief Counsel
Consumer Protection & Advocacy Section



Arizona Attorney General Kris Mayes
2005 N. Central Ave.
Phoenix, AZ 85004
Desk: (602) 542-5487
Laura.Dilweg@azag.gov
http://www.azag.gov

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Monday, November 25, 2024 9:21 PM
**To:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy

2

**Add. 430**

<thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Laura,

Please send me the invitation and I will invite the relevant attendees.

I'm not sure I would call my four-paragraph email pointing out some of the factual errors in Arizona's 7-page single-spaced letter as "bickering." But to move the ball forward, Judge Kang made it abundantly clear at the DMC that Arizona needs to provide Meta with hit reports so that an informed discussion can occur. Do you anticipate providing those hit reports prior to tomorrow's call?

Best,

Chris

---

**From:** Dilweg, Laura <Laura.Dilweg@azag.gov>
**Sent:** Monday, November 25, 2024 10:48 PM
**To:** Yeung, Christopher <cyeung@cov.com>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]
We will circulate a meeting invite in the morning. Besides you and Paul, who should that invitation include?

I believe that Judge Kang made clear at the hearing last Thursday that the type of bickering you offer below is not helpful, and that Meta needs to come to the table to negotiate in good faith a limitation on the scope and timeframe for the discovery it seeks from nonparties. It is not a request from Arizona, but an order of the court.

Please also be prepared to respond to my inquiry regarding any agreements Meta has reached with other state agencies.

Thank you,
Laura

**Laura Dilweg**
Chief Counsel
Consumer Protection & Advocacy Section


Arizona Attorney General Kris Mayes
2005 N. Central Ave.
Phoenix, AZ 85004
Desk: (602) 542-5487
Laura.Dilweg@azag.gov
http://www.azag.gov

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Monday, November 25, 2024 8:05 PM
**To:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Laura,

We are available to speak tomorrow at 1 pm MST / 3 pm ET.  Please either circulate a dial-in, or let me know whom we should invite.

We can discuss your letter on the next call, but suffice it to say we disagree with your recitation of the events, and your claim that Meta is more interested in delay than actually obtaining discovery to which it is entitled.  I remind you that Arizona not only resisted providing agency discovery when Meta first raised the issue at the beginning of the year, but also after Judge Kang issued his September 6 order compelling Arizona to provide it as party discovery.  Indeed, even after Arizona was expressly ordered to disclose proposed agency search terms and custodians to Meta by November 1, ECF Nos. 1291 and 1299, Arizona failed to comply, providing terms and custodians for <u>none</u> of the agencies mentioned in your letter by the court-ordered deadline.  Twenty days later, as of the November 21 DMC, we only had proposed search terms for one of those four agencies.

In the face of this delay, Meta has sought to move the process forward, including by proposing an initial set of search terms, followed by a revision that takes into account the general feedback that we heard from Arizona and some other states.  But despite Judge Kang's clear statements, including at last week's DMC, that Arizona (and other states) must provide Meta with hit reports, we still don't have any actual hit report from any Arizona agency.

In short, having delayed the agency discovery process for months, Arizona is no position to seek to limit the discovery that Meta is entitled to obtain because of the deadlines associated with this case.

Best,

Chris

---

**From:** Dilweg, Laura <Laura.Dilweg@azag.gov>
**Sent:** Monday, November 25, 2024 9:04 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>; Yeung, Christopher <cyeung@cov.com>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]
Counsel,

Please see the attached letter of today's date.

Given the holiday week, it is challenging to arrange a time for a meet and confer between our office, yours, and counsel for the various state agencies. If tomorrow at 1pm Arizona time (MST) will not work for you, please provide alternative dates but understand that it is very likely that agency counsel may not be able to attend.

Would you please also advise if Meta has reached agreement with any agencies in other states regarding search terms?

Thank you,
Laura

**Laura Dilweg**
Chief Counsel
Consumer Protection & Advocacy Section



Arizona Attorney General Kris Mayes
2005 N. Central Ave.
Phoenix, AZ 85004
Desk: (602) 542-5487
Laura.Dilweg@azag.gov
http://www.azag.gov

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Monday, November 25, 2024 3:52 PM
**To:** 'Yeung, Christopher' <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Hello Chris,

We would like to get something on the calendar so that we can meet and confer this week; would your side be available for a meeting tomorrow at 1pm Arizona (mountain) time?

Thanks,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Friday, November 22, 2024 4:29 PM

**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

Thank you.  If I'm reading the proposal correctly, ADE appears to be proposing running some of Meta's proposed social media/device terms and some of Meta's proposed harm/wellbeing terms together, with an AND connector.  As we've previously mentioned, that does not work for us as a concept; among other things, it would not be designed to capture responsive documents about the various other causes of teen mental health issues that have nothing to do with social media.

As for custodians, ADE proposes limiting the searches to just the past two years.  It is not clear to us why that is appropriate, where the States have insisted that the "relevant time period" for discovery spans at least a 12-year period.  As an initial step, can you please provide us with the years that each of the proposed ADE custodians have been at ADE?

We have separately emailed you with an alternate proposal with a request for hit reports so that we can have an informed discussion about search terms, consistent with the sentiments that Judge Kang expressed at yesterday's DMC.  I am reattaching that email.  I look forward to hearing from you.

Best,

Chris

---

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Friday, November 22, 2024 4:24 PM
**To:** Yeung, Christopher <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]
Hello Again Chris, All,

I am forwarding on what I received yesterday from Counsel for and at the Arizona Department of Education (ADE) which, again, our office does not represent.

They tell me that the attached terms "are agreeable to ADE provided the search is restricted to January 1, 2022 through the present which covers the period of Superintendent Horne's time in office and is also restricted to the people identified on the litigation hold excluding myself and the IT people who are Amanda Riske and Beth Neeley."

I believe that this means ADE is proposing the following custodians be used in conjunction with the attached terms:

Tom Horne, Superintendent of Public Instruction
Margaret Garcia Dugan, Deputy Superintendent
Art Harding, Chief Operations Officer
Edward Cota, Chief Strategy Officer
Sid Bailey, Arizona Educator Leadership
Catherine Barrett, Academic Achievement
Colette Chapman, ESS/Child and Adult Programs
Joseph Guzman, Accountability
Debbie Jackson, Deputy Operations Officer
Mike Kurtenbach, DAS School Safety
Mila Makal, Director Character Education
Rick Medina, Community Relations Manager
Doug Nick, Communications Director
Camilla Strongin, Director of Legislative Affairs
Bobby Bravo, Deputy Director Legislative Affairs
Michelle Udall, School Improvement
John Ward, ESA Executive Director
Jim Waring, Fed./State Liaison and Community Outreach


Thanks,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Whelihan, Nathan
**Sent:** Tuesday, November 19, 2024 5:28 PM
**To:** 'Yeung, Christopher' <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; 'Simonsen, Ashley M' <asimonsen@cov.com>; 'Schmidt, Paul' <pschmidt@cov.com>; 'Halperin, Gregory' <GHalperin@cov.com>; 'Grigsby, Stacey' <SGrigsby@cov.com>; 'Hester, Timothy' <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; 'Xenakis, Nicholas' <NXenakis@cov.com>; 'Ermilus, Jae' <JErmilus@cov.com>; 'Djoukeng, Fran' <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ


Hello Again Chris, All,

I have received lit hold info from the Arizona Department of Child Safety and have updated and attached for your review the weekly lit hold report. Counsel for DCS want me to make it clear that these recipients do not necessarily represent custodians of any potentially responsive DCS records, and that such custodians cannot be identified or proposed until Meta provides a response to DCS' objections to the subpoena, and clarification regarding what exactly Meta seeks from DCS. Please let us know if you have now had a chance to review the response that DCS originally sent to Ms. Patchen on 8/7/24, and which we sent to you again, per below emails, on November 12 after you requested it on the night of November 11.

As to the issue of litigation holds, as we understand it, only the Arizona Board of Education remains outstanding; BoE continues to work on issuing a lit hold but their agency counsel has told me that the BoE staff through whom any litigation hold must be authorized and processed have been out of the office/out of town attending work-related

# Add. 435

conferences and meetings. If I receive an update from the BoE before the week is out, I will supplement the weekly update later this week.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Whelihan, Nathan
**Sent:** Friday, November 15, 2024 10:06 AM
**To:** 'Yeung, Christopher' <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Hi Chris,

Based on your email below and our mutual understanding that 1) OSPB has provided proposals; 2) Meta has agreed to consider deprioritizing OEO, and 3) DCS would need Meta's cooperation before it can provide proposals, there are three agencies about which Meta is inquiring, the BoE, DHS, and ADE. Please find below the proposal from BoE as well as updates from DHS and ADE.

Here is the **Arizona Board of Education's (BOE)** response as to search terms and custodians as well as their status as to litigation holds:

1. Name and title of custodians used in the Arizona Board of Education's (BoE) search for documents responsive to the subpoena.

   - Sean Ross, Executive Director
   - Bruce DuPlanty, Deputy Director

2. The BoE has already run a search based on the following terms:
   - Meta
   - Facebook
   - Instagram
   - Snapchat
   - Snap
   - TikTok
   - YouTube
   - BeReal
   - Discord
   - GroupMe

- Kik
- Pinterest
- Omegle
- Reddit
- Twitch
- Tumblr
- WhatsApp
- Twitter
- YikYak
- "social media"
- "mental health"

3. BoE is still in process of issuing a litigation hold. BoE staff have been out-of-town attending to work-related matters.

Counsel for BoE has also stated that she is working on sending me the responsive documents that BoE has already gathered and I will get those to you as soon as they are conveyed to me.

The **Department of Health Services (DHS)** has informed me that they can provide their proposals for search terms and custodians by next Wednesday, 11/20.

The **Arizona Department of Education (ADE)** is running search terms including those proposed to ADE by Meta, has advised me that those searches are time consuming from a technical perspective, and is working towards a proposal as to search terms and custodians, but has not yet provided me with a date certain by which the agency will be able to make such a proposal. I will continue to follow up with ADE and let you know of any developments.

I have also provided you, attached, with the weekly lit hold update tracking sheet.

Thanks,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Wednesday, November 13, 2024 10:47 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

I'll try to be brief to further the goal of reaching an efficient resolution of the issues. You write that "the agencies have all agreed to provide search terms and custodians." When does Arizona expect to provide search terms and custodians for all agencies that Judge Kang deemed within the AZ AG's control in ECF No. 1117, other than for OEO and DCS?

With respect to DCS, when I said that Ms. Patchen was unable to locate anything "from DCS" following a search of her emails from August 7, 2024, that included anything from any Attorney General representing DCS. Again, I do not know what happened, but it does not appear that we ever received DCS's email from August 7, 2024 attaching written objections. But now that we have a copy of DCS's written objections, we will consider the agency's request for a written narrowing of the subpoenaed topics. In the meantime, when do you expect to provide us with information about the individual recipients of litigation holds at DCS?

Best,

Chris

---

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Wednesday, November 13, 2024 6:22 PM
**To:** Yeung, Christopher <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]
Hi Chris,

Thank you for the information as to DHS, we may have made an error in our notes on the issue; we now understand that Meta met with DHS once over the summer and refused to narrow the subpoena issued to DHS in any way.

Please find attached the email from Jennifer Ortman, an Arizona AAG, on behalf of the Arizona Department of Child Safety to Covington's Kate Patchen which appears to have been correctly addressed to the email address provided by Ms. Patchen in her cover letter dated July 24, 2024. Jenifer Ortman confirmed that she did not receive any indication that the email was undeliverable, and DCS further confirmed that the internal DCS Records email box, cc'd on Ms. Ortman's August 7th email, received the email on August 7th. We are unable to understand why Ms. Patchen is unable to locate the email other than to speculate that she did not look for things from the Arizona Attorney General on behalf of DCS but only for things "from DCS" as you state below. We have always made it clear to Meta that agency counsel in our office would represent DCS were they to receive a subpoena in this matter.

As to the larger issue here:

1. We do not understand what you propose to confer about with respect to the parties' reading of the various orders that have come out over the last few weeks, or what the issue is that you intend to brief on this front. Do you seek an advisory opinion from Judge Kang about the proper reading of the various orders on the issue? There is no "discovery dispute" over the reading of those orders as the agencies have all agreed to provide search terms and custodians and Meta has now provided the agencies with a terms proposal.

2. You continue to point to the passage of the November 1 deadline, but have never provided any proposed resolution to this "issue." We obviously cannot go back in time so the only thing we can do at this point is move forward so that the agencies can comply with the substantial completion deadline set by the Court. When we met and conferred last week, we reached agreement that the subpoenaed agencies would provide Meta with

the search terms and custodians they had used or would use in searching for responsive records, and that our office would confirm when they would provide those. Near COB last Friday, you provided us for the first time with a very long list of search terms and an added request that the agencies run those searches and also provide Meta with hit reports. Before we or the agencies even had a chance to digest the additional request, on the evening of the following Monday, a state holiday, you demanded that we engage in an H.2 conference on unspecified issues. You have now clarified that what you want to discuss is a "concrete timeline by which Meta will receive proposed terms and custodians, and when the Arizona AG will provide hit reports for Meta's proposed terms." We are happy to have a discussion with you about this request, including the additional request for hit reports that you have not yet discussed with us or the agencies, but it is neither a dispute at this point nor the proper subject of an H.2 conference, especially not one absent state agency counsel.

If you have in mind a "concrete timeline" or "concrete plan" that Meta would consider an "acceptable path forward," please share that with us. Regardless, we will continue to reach out to the Arizona state agencies in order to assess their ability to run the searches you have proposed and provide hit reports, and to see if we can determine the exact timelines by which they can provide Meta with proposals for custodians and counter-proposals on search terms (Or in the case of BoE, provide the custodians and search terms they have already run in looking for responsive records.) I must also remind you, however, that Counsel for the Arizona Department of Child Safety has made it clear that they need Meta's cooperation, in the form of a writing, in order for their client agency to be able to provide a meaningful proposal as to custodians or a counter-proposal as to search terms. Please let us know if Meta intends to engage with DCS on this point and we will be glad to facilitate a separate dialogue.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Tuesday, November 12, 2024 9:55 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

Apologies for the fast-follow. I did want to clarify one thing about the prior discussions about the subpoena issued to DHS. As I've previously told you before, while there was an initial call with the agency to discuss the documents whose production DHS should prioritize in connection with the subpoena, there was no agreement to narrow the subpoena to the DHS to only three years. To the extent DHS intends only to provide discovery for a three-year period, that is not correct.

Best,

Chris

**From:** Yeung, Christopher
**Sent:** Tuesday, November 12, 2024 11:37 PM
**To:** 'Whelihan, Nathan' <Nathan.Whelihan@azag.gov>
**Cc:** 'Dilweg, Laura' <Laura.Dilweg@azag.gov>; 'Hunsinger, Nyla' <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

As a quick follow-up on the AZ DCS's written objections, for whatever reason, it does not appear that we ever received the objections before today. Ms. Patchen has searched her emails from August 7, 2024 that contain an attachment, and was not able to locate anything from the AZ DCS.

Best,

Chris

**From:** Yeung, Christopher
**Sent:** Tuesday, November 12, 2024 10:21 PM
**To:** 'Whelihan, Nathan' <Nathan.Whelihan@azag.gov>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

Thank you for providing us with a copy of the DCS's written objections.

On your question about what might be the subject of letter briefing, the following seems apparent from your emails:

1. The parties still disagree about whether the Court's orders required the Arizona AG to propose search terms and custodians for subpoenaed agencies by November 1. Based on our emails and phone calls, it appears we are at an impasse on this issue, and the issue can be letter briefed for the November DMC as Judge Kang contemplated in his order. *See* ECF No. 1291.
2. The parties' dispute over item 1 aside, the Arizona AG has expressed a willingness to propose search terms and custodians for at least three of the four subpoenaed agencies identified in your email below. We appreciate this progress, but the Arizona AG has yet to provide any concrete timeline by which Meta will receive proposed terms and custodians, and when the Arizona AG will provide hit reports for Meta's proposed terms so that negotiations can proceed. This is not an acceptable path forward at this juncture; as we discussed on our last call, we need a concrete plan from the Arizona AG to remedy its failure to propose search terms and custodians by November 1.

To be clear, we believe that the parties should continue to work to see if there is a solution to (in our view) the Arizona AG's failure to propose custodians and search terms by the court-ordered deadline. But given the time and process

12
# Add. 440

involved to even get to this point, and Judge Kang's directives in ECF No. 1291 about the timing of letter briefing, we think the disputed issues should be letter briefed in parallel, in case the parties are not able to resolve their dispute prior to the November DMC and need Judge Kang's guidance.

Please let us know your availability for an H.2 conferral tomorrow.

Best,

Chris

---

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Tuesday, November 12, 2024 8:25 PM
**To:** Yeung, Christopher <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]

Chris,

To address your first point below, as requested, I have attached the objections to the Rule 45 subpoena served on the Arizona Department of Child Safety that I understand to have been emailed on behalf of DCS to Covington on August 7, 2024. It appears the letter was addressed to Covington's Kate Patchen, who also signed Meta's subpoena to DCS back in July.

To address your second point below, I must reiterate that the Arizona Attorney General's Office is not in violation of any of the operative orders. We disagree that the AZ agencies that received subpoenas are required to provide Meta with lists of search terms or custodians, but are instead to proceed with responding to the Rule 45 subpoenas they were issued, as ordered by Judge Gonzalez Rogers. However, in an attempt to move forward with substantial compliance with those subpoenas on the schedule ordered by Judge Kang, we arranged for counsel for the agencies to be available to confer with you last Thursday regarding their progress in responding to the subpoenas and their ability to provide the search terms and custodians they have used or will use to find responsive documents. Each of the agencies have agreed to work with Meta towards finalizing search terms and custodians. The only two agencies that have not already made proposals on these points or affirmatively agreed to provide Meta with such proposals in the near future made it clear during that meeting that this is because they were *unable* to do so. In the case of OEO this is because the agency is not likely to keep any relevant or responsive records. In the case of DCS, this is because Meta's requests to the agency need to be narrowed before it would be possible for DCS to propose search terms or custodians that would not cover every employee and all records of the agency over the course of the last 12-years; DCS conveyed the underlying issue to Covington on August 7, 2024 and received no response.

Here is how we understand things to stand on a per agency basis:

Agencies that have not received Rule 45 subpoenas:
- **OSPB**, which remains represented by Counsel for the Governor's Office (which Meta issued a Rule 45 subpoena to for the first time just last week), provided a proposal to Meta for search terms and custodians on November 1, in accordance with the relevant orders. Meta provided a counter-proposal to OSPB last Friday, November 8. This proposal incorporated almost all of the terms proposed by OSPB and proposed that OSPB run approximately 400 additional terms organized into 48 groupings of terms which themselves are split into four "term categories", and also proposed that these term categories be run in multiple sets in conjunction with one

another. Given that OSPB received these terms late in the afternoon on Friday, and that Monday was Veteran's Day and a state holiday in Arizona, OSPB has had just one full business day to consider and respond to this counterproposal.

- **OEO** has not proposed search terms or custodians because it does not believe that OEO is likely to keep any responsive records; Meta has agreed to consider "deprioritizing" OEO.

Agencies that received Rule 45 Subpoenas:

- **ADE**, which remains represented by Counsel at ADE, agreed to propose search terms and custodians during our call last Thursday. I am awaiting confirmation from ADE as to the custodians they would wish to propose, and what search terms they would now like to propose. Given that Meta proposed terms to ADE on Friday afternoon, ADE may need additional time to consider those before proposing its own search terms and custodians. ADE has had just one full business day to consider Meta's proposal as to search terms.
- **BoE** agreed to provide Meta with the custodians and terms it ran to search for documents in response to the Rule 45 subpoena that Meta served on the Board, and it is my understanding that BoE may be able to get those to you (through myself) by the end of this week. BoE also received Meta's proposed search terms Friday afternoon and have had just one full business day to consider Meta's proposal.
- **DHS** said they would be willing to run search terms and propose custodians and expressed concerns about the volume of records that could result from such searches. DHS previously met and conferred with your office to narrow the scope of the subpoena to a three-year period. DHS also received Meta's proposed search terms Friday afternoon and have had just one full business day to consider Meta's proposal.
- **DCS**, as we have discussed in previous emails, would need Meta, in writing, to narrow what it is seeking so as to not include all records kept by the agency over the course of the last 12-years before it could propose its own custodians and search terms. DCS also received Meta's proposed search terms Friday afternoon and have had just one full business day to consider Meta's proposal.

We left our conference last Thursday with the understanding that we had reached agreement that the four Rule 45 subpoena agencies identified above would provide Meta with search terms and custodians as outlined above, and that our office would follow up with them to determine a date by which they could each do so. Thus, we do not understand what issue you believe could possibly require briefing, or what other resolution (that we have not yet discussed) you are proposing. Please advise, as we would like to be able to advise the agencies whether they should proceed with the discovery plan we agreed upon last week.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Monday, November 11, 2024 7:33 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>; Dilweg, Laura <Laura.Dilweg@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

# Add. 442

Nathan,

I write to follow-up about two items.

*First*, on our November 7 call, the Department of Child Safety stated that it had served Meta with written objections to Meta's subpoena on August 7, 2024. Can you please let us know to whom they sent those written objections, or provide us with a copy of them? We have been unable to locate a copy of the Department of Child Safety's objections.

*Second*, in terms of next steps, we appreciate that you now are working with several of the Arizona agencies whom Judge Kang deemed within the Arizona AG's control to propose search terms and custodians. But already we are ten days past the court-ordered November 1 deadline for Arizona to make its search term and custodian proposal, and we have only received a proposal for a single Arizona agency. Arizona also has not provided us with a date by which it will provide us with proposed search terms and custodians for the rest of its at-issue agencies (other than the OEO, which Meta is considering de-prioritizing). As such, we will need to convene an H.2 conferral tomorrow or Wednesday to see if the issue of Arizona's non-compliance with the Court's orders needs to be letter briefed before the November DMC. Please let us know what times you are available for an H.2 conferral, and please be prepared to provide us with dates by which we should be receiving proposed search terms and custodians for the remainder of the at-issue Arizona agencies.

Best,

Chris

---

**From:** Yeung, Christopher
**Sent:** Friday, November 8, 2024 11:06 PM
**To:** 'Whelihan, Nathan' <Nathan.Whelihan@azag.gov>; Dilweg, Laura <Laura.Dilweg@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

I don't believe your email captures how the call unfolded accurately. But because I think we are generally on the same page about where we are, rather than engage in an extended back-and-forth about how we got there, I write only to say that any suggestion that we were not willing, ready, and able to discuss the scope of the subpoena to DCS in good faith. Indeed, as you note, during the call, we agree that DCS would not need to search individual case files for the children that it services.

You write that "Meta is interested in 'aggregate data'". To avoid ay confusion, my reference to "aggregate data" was intended only as an illustrative contrast to the individual case files that DCS would not need to search.

You also write that "Meta is not seeking research performed by DCS (because as Counsel for DCS explained DCS does not carry out such research), but rather, is seeking research that DCS consults at a systemic level." To clarify, we would be interested in research performed by DCS if any existed. We also are interested in receiving responsive research that DCS possesses, whether "DCS consults" such research "at a systemic level" or not.

Thank you for providing the identifies of two proposed DCS custodians. We still, however, do not have information about individual litigation hold recipients at DCS. Can you please provide such litigation hold information? It will help us evaluate the sufficiency of the proposed DCS custodians.

In terms of any Arizona production, I will separately follow-up with the names of those who should receive access.

Best,

Chris

---

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Friday, November 8, 2024 7:03 PM
**To:** Yeung, Christopher <cyeung@cov.com>; Dilweg, Laura <Laura.Dilweg@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

<mark>[EXTERNAL]</mark>
Chris,

Thank you for sending along proposed search terms, I have forwarded them on to the respective agencies and we will get back to you sometime next week after we have had a chance to review them.

Also, for the record, while I think we are close to being on the same page as to what transpired on yesterday's call, we would offer the following clarifications and corrections.

Counsel for the Department of Child Safety appeared in good faith in an attempt to negotiate a narrowing of the subpoena, in light of the comprehensive written objections it served on August 7, to which Meta never responded. Counsel is not requiring that Meta "reissue" a Rule 45 subpoena or that Meta "start over", as you stated during the call. In fact, DCS is currently working on gathering potentially responsive documents for an initial production. Counsel for DCS did ask for you to either respond to DCS's written objections or provide written clarification/specifics as to what Meta is looking for, after you clarified yesterday, for the first time, that you would not be seeking the information contained in the individual case files for every child DCS serves or has served over the past 12-years, whether those files are maintained in DCS's Guardian database or elsewhere. DCS counsel also stated that without such clarification, it is difficult to identify custodians beyond the two DCS custodians of records with whom counsel have been working to attempt to identify potentially relevant documents. In addition, DCS counsel explained why the subpoena as written would encompass searching practically every record that the department keeps, and explained the mission and daily work of DCS, including that DCS exists to protect children subjected to abuse and neglect (not to conduct general research on the causes of child mental health issues) and to that end, is involved in 8,000-10,000 cases in active litigation that call for the production of hundreds of thousands of documents on a monthly basis. DCS counsel was prepared to negotiate specific requests contained in the subpoena, including identifying requests that call for the production of documents not in DCS's possession, but when they attempted to seek clarification on Request 22, you repeatedly directed the conversation to the subject of litigation holds.

It is our understanding that you agreed to the following with respect to the DCS subpoena:

- Meta is not expecting DCS to search individual case files, including those maintained in the Guardian database or elsewhere.
- Meta is interested in "aggregate data."
- Meta is not seeking research performed by DCS (because as Counsel for DCS explained DCS does not carry out such research), but rather, is seeking research that DCS consults at a systemic level.
- Meta will provide proposed search terms to DCS (which it has now done). As DCS counsel explained, it is difficult to come up with search terms in the absence of Meta providing any clarification or narrowing of its requests in

the three months since DCS served written objections. As you state below, DCS counsel expressed a willingness to work with and evaluate any search terms that Meta might be willing to propose to DCS.

- Meta will accept links to publicly available responsive documents.

Regarding the litigation holds and custodians, DCS counsel confirmed that a litigation hold was sent to DCS in late August, which DCS further distributed in late September. Specifically, the litigation hold was sent to DCS on August 26 and further disseminated by DCS on September 30. DCS can provide the names of two custodians of records at this time (see below), and as explained during the call, DCS can provide additional custodians once further clarification is provided as to what Meta is seeking from DCS.

**Mark Ewy**
Program Administrator for Legal Services
Arizona Department of Child Safety

**Steven Hintze**
Program Administrator
Enterprise Business Intelligence and Business Analysis
Department of Child Safety

Also, while you are correct that we did not discuss OSPB's proposed search terms and custodians, and Counsel for OSPB was unable to attend the call, we are not certain that the only reason for the lack of discussion was due to the lack of their attendance; our understanding is that Meta was also not prepared to provide any counter-proposal to OSPB at yesterday's meeting. In any case, you have now provided that counter-proposal and it has been communicated to counsel for OSPB.

Finally, I am working on getting you what I have from ADE that has been collected in response to Meta's Rule 45 subpoena issued to ADE. For the record, it is still the case that neither I nor anyone at AGO represent ADE in this matter, who remains represented by Maria Syms with ADE, but because I have been able to receive voluntary cooperation from ADE to this point, I am working in good faith and in accordance with orders as they currently stand to facilitate the production of this material. I repeat my request for clarification as to who at Covington you would like the file share link sent to. If I do not receive clarification I will assume it is all of the Covington attorneys on this email chain. I will most likely be able to get this out to you on Tuesday after the holiday.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Friday, November 8, 2024 3:20 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>; Dilweg, Laura <Laura.Dilweg@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas

<NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

I attach proposed search terms as you requested. As you can see, for the sake of moving this along more efficiently, we have proposed terms for each of the agencies subject to Judge Kang's September 6 order. We did want to add a few additional notes:

- As you know, the OSPB is the only agency that provided us with terms previously. While we appreciate the proposal, the terms were underinclusive in our view. The "Other Agency" combinations apply to OSPB, and should include the ones in the OSPB proposal, except the "Individual search phrases" that OSPB proposed. We ask that the "Individual search phrases" also be separately run by OSPB.
- While we consider the request to drop the Office of Economic Opportunity from discovery, there is no need to run search terms against that agency (including because, as I understand it, the agency is not sure which custodians to propose).

Please let us know if you have any questions or would like to discuss. In accordance with the ESI Protocol in this action, we also ask that we be provided with search term hit reports for any proposed agency custodians. Meta reserves all rights.

Best,

Chris

---

**From:** Yeung, Christopher
**Sent:** Friday, November 8, 2024 1:04 AM
**To:** 'Whelihan, Nathan' <Nathan.Whelihan@azag.gov>; Dilweg, Laura <Laura.Dilweg@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

Thank you. So that we are on the same page, you agreed to work with the Board of Education, the Department of Education, and the Department of Health Services to get us search terms and custodians for our review. For the Department of Child Safety, the request was that Meta either reissue a narrowed subpoena, respond in writing to their written objections with narrowed requests, or provide proposed search terms for consideration. The Office of Economic Opportunity provided some additional information about their agency, and asked that we drop them from discovery. No one from OSPB was in attendance, so we did not discuss that agency substantively.

As we noted on the call, while we appreciate that we should be receiving proposed terms and custodians for several more Arizona agencies soon, we remain concerned about the timing of such disclosures, especially in light of the passage of the court-ordered November 1 deadline for such disclosures that Judge Kang set. We are considering next steps, and reserve all rights.

Best,

Chris

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Thursday, November 7, 2024 7:45 PM
**To:** Yeung, Christopher <cyeung@cov.com>; Dilweg, Laura <Laura.Dilweg@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]
Hi Chris,

Thank you for your time on the call that took place earlier this afternoon. I think we were able to make significant and substantial progress.

I am sending along the ordered weekly update on litigation holds in the attached Excel spreadsheet in order to get what I currently have into your hands now; if I get any additional information from DCS or BoE before the week is out I will get that to you as soon as it is conveyed to me, but I think it sounds like lit hold information for those agencies is not likely to be in my hands by tomorrow. You still have the lit hold/custodians from OSPB that I attached last Friday.

Tomorrow I will take a closer look at the ESI protocol and what I have received from ADE and work towards acting as the facilitator to get to you what the Arizona Department of Education (ADE) collected in response to the Rule 45 subpoena it was issued. I think to this point the Arizona AG has only produced documents through lead states, so once I get things ready for production I may be reaching out with questions as to the preferred mechanics for production – although I assume a secure file transfer from us to the people on this email at Covington should work in skimming the ESI protocol.

Will be in touch again soon.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Thursday, November 7, 2024 1:51 PM
**To:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Laura,

Thank you.  I wanted to clarify the precise disputed issue.  Judge Kang ordered the Arizona AG to propose search terms and custodians for the agencies covered by his September 6 order by November 1.  ECF No. 1291, 1299.  On November 1, the Arizona AG provided proposed search terms and custodians for only one such agency.  For such Arizona agencies who also received subpoenas from Meta, the Arizona AG took the position that an October 30, 2024 order by Judge Gonzalez Rogers (ECF No. 1292) "divides the agencies at issue in Arizona (and elsewhere) into two separate buckets and orders different courses of action for those that have received Rule 45 subpoenas as opposed to those that have not."  November 2, 2024 email from N. Whelihan.  As you know, Meta disagrees, and views the Arizona AGs' failure to propose search terms and custodians for the subpoenaed agencies that Judge Kang deemed within the Arizona AG's control to be in violation of Court orders, including ECF Nos. 1291 and 1299.

Accordingly, the issue in dispute for discussion today is whether the Arizona AG has complied with the Court's orders.  We think the Arizona AG has not, but we are willing to discuss the issue.  We also are willing to discuss what the Arizona agencies have to say about search terms and custodians.  But to be clear, the disputed issue is the Arizona AG's failure to comply with a court-ordered deadline to provide agency search terms and custodians by November 1.

In terms of the timing of an H.2, Judge Kang's order contemplated the parties letter briefing disputes like this one in time for the November DMC.  ECF No. 1291.  We can discuss more today, but if an H.2 still is necessary at the conclusion of today's call, we believe it should be scheduled in a manner consistent with that timing, and to avoid further delay.

Meta reserves all rights.

Best,

Chris

---

**From:** Dilweg, Laura <Laura.Dilweg@azag.gov>
**Sent:** Thursday, November 7, 2024 2:43 PM
**To:** Yeung, Christopher <cyeung@cov.com>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]
Chris,

We understand the discovery dispute to be discussed today to be whether four of the six Arizona agencies at issue in Judge Kang's orders (Department of Child Safety, Department of Education, Department of Health Services, and State Board of Education) are required to provide Meta with search terms and custodians in light of Judge Gonzalez Rogers' October 30 order. If we are unable to negotiate a resolution of that dispute today, we are amenable to engaging in a further H.2 meeting on the issue, but cannot commit to a meeting on Monday or Tuesday of next week given that Monday is a state holiday and we do not yet know whether (or which) agency counsel will need to be involved in the discussion and what their availability is. We can discuss further this afternoon as needed.

Thank you,
Laura

**Laura Dilweg**
Chief Counsel
Consumer Protection & Advocacy Section



Arizona Attorney General Kris Mayes
2005 N. Central Ave.
Phoenix, AZ 85004
Desk: (602) 542-5487
Laura.Dilweg@azag.gov
http://www.azag.gov

CONFIDENTIALITY NOTICE:  This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information.  Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Wednesday, November 6, 2024 9:37 PM
**To:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Laura,

We did propose a resolution from the start: hours after the Arizona AG failed to provide search terms and custodians in accordance with Judge Kang's orders, on November 1, we asked the Arizona AG to "[p]lease provide us with search terms and custodians for all AZ agencies that Judge Kang deemed within the AG's control immediately."  And since the issue in dispute is whether the Arizona AG has complied with the Court's orders, our discussion with the Arizona AG seems sufficient to involve all parties involved in the dispute.

In any event, our goal is to reach an "efficient resolution" consistent with the orders of Judges Kang and Gonzalez Rogers.  Rather than debating whether we can deem tomorrow's call to be an H.2 or not, we propose proceeding with tomorrow's call, and at the same time scheduling a follow-up call on Monday or Tuesday that can be deemed an H.2 if we are unable to resolve our issues tomorrow, so that letter briefing on any remaining disputes can be submitted prior to the November DMC as Judge Kang contemplated.  *See* ECF No. 1291.  Please provide us with your availability for such a follow-up call on Monday or Tuesday.

Best,

Chris

---

**From:** Dilweg, Laura <Laura.Dilweg@azag.gov>
**Sent:** Wednesday, November 6, 2024 5:27 PM
**To:** Yeung, Christopher <cyeung@cov.com>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]
Chris,

We do not agree that an email exchange between your office and ours in which Meta disagreed with our reading of Judge Gonzalez Rogers' October 30 order constitutes "reasonably diligent efforts to confer and attempt to negotiate a resolution" of a dispute. Meta has never proposed a resolution to any supposed dispute, and has never provided "counsel for all parties (or third parties [i.e. the affected AZ agencies]) involved in the dispute" an opportunity to negotiate any such resolution.

We have arranged to have counsel for the agencies, including the agencies that have received Rule 45 subpoenas, available for a meet and confer call tomorrow. We hope that Meta will come prepared to engage in a good faith conference to resolve any outstanding disputes, as contemplated by Judge Kang in his standing order. We can discuss the necessity of an H.2 conference after that occurs.

Thank you,
Laura

**Laura Dilweg**
Chief Counsel
Consumer Protection & Advocacy Section



Arizona Attorney General Kris Mayes
2005 N. Central Ave.
Phoenix, AZ 85004
Desk: (602) 542-5487
Laura.Dilweg@azag.gov
http://www.azag.gov

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Wednesday, November 6, 2024 12:41 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; Xenakis, Nicholas <NXenakis@cov.com>; Ermilus, Jae <JErmilus@cov.com>; Djoukeng, Fran <FDjoukeng@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

I disagree with your assessment. The Arizona AG failed to provide proposed search terms and custodians, and individual litigation hold information, for nearly all state agencies covered by Judge Kang's September 6 order, despite multiple Court orders specifically requiring the Arizona AG to disclose such information to Meta by November 1, 2024. *See* ECF Nos. 1292, 1299. Since then, consistent with H.1's provision permitting conferral "by . . . e-mail," we have exchanged six emails where the Arizona AG has made clear that it would not be providing search terms and custodians, and individual litigation hold information, for Arizona agencies that Meta subpoenaed, and we have made clear that the Arizona AG's failure to provide such information violates court orders. Accordingly, we believe that we have satisfied H.1's conferral requirements on this issue, and will be deeming Thursday's conferral an H.2.

We look forward to speaking with you and agency counsel on Thursday.

Best,

Chris

---

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Wednesday, November 6, 2024 2:15 PM
**To:** Yeung, Christopher <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

<mark>[EXTERNAL]</mark>
Hi Chris,

Thank you for sending out the invite for Thursday afternoon. We will take care of forwarding the invitation to those who will attend on our side.

We cannot agree to treat Thursday's conferral as an H.2 conference. While we have communicated that we disagree with Meta's assertions that we are in "non-compliance with the Court's orders on state agency discovery" we believe we have not yet followed the procedures laid out by H.1 whereby "Counsel for all Parties (or third parties) involved in the dispute shall undertake reasonably diligent efforts to confer and attempt to negotiate a resolution of the dispute". We do not believe that we, or the Arizona agencies and their counsel, have been afforded any opportunity to confer with Meta in an attempt to negotiate a resolution of any dispute. Only after counsel for the parties or third parties have engaged in such an effort may a party make a request for an H.2 conference. We have not reached that point yet.

We have arranged for counsel for the various agencies to be present tomorrow and look forward to a meaningful meet and confer.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Tuesday, November 5, 2024 6:10 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

We obviously disagree with your version of how we got where we are. But in any event, we are available to meet and confer at 2:30 pm AZ time / 4:30 ET on Thursday. We will circulate a calendar invite to the AZ AG attorneys in this email chain, but please let us know who else we should invite.

Please treat Thursday's conferral as the H.2 conferral on Arizona's non-compliance with the Court's orders on state agency discovery. In particular, we have yet to receive proposed search terms and custodians, and individual litigation hold information, for nearly all state agencies covered by Judge Kang's September 6 order, despite the Arizona AG being expressly ordered to provide such information by November 1, 2024. *See* ECF Nos. 1291, 1299. We fundamentally disagree with your position that Judge Gonzalez Rogers' October 30 order excuses the Arizona AG from proposing search terms and custodians for agencies whom Meta subpoenaed, and believe that the parties are at an impasse on the issue.

Additionally, if we are unable to resolve the dispute at the H.2 conference on Thursday, we would like to discuss a letter briefing exchange schedule that would result in the submission of letter briefs by November 15 so that Judge Kang can consider the issue at the next DMC, as provided in his order. *See* ECF No. 1291.

Best,

Chris

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Tuesday, November 5, 2024 7:07 PM
**To:** Yeung, Christopher <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

<mark>[EXTERNAL]</mark>
Chris,

Obviously, our understanding of the orders that have been issued, including Magistrate Kang's most recent order, are at odds. In any case, we will continue to endeavor to "facilitate productions for and negotiations on behalf of" the six Arizona agencies at issue to the extent that we are able to do so.

I am at something of a loss as to what you mean when you say "Your suggestion that Meta wait until receiving documents from the four subpoenaed agencies deemed within the Arizona AG's control also is contrary to an "[e]fficient resolution of this issue." We have not suggested that Meta wait for anything. In fact, we believe that Meta would already be in possession of documents from at least some Arizona agencies had it not held the Rule 45 subpoenas in abeyance in September, or had it more actively engaged with agencies regarding the subpoenas after issuing them in July and August, or had it issued those subpoenas in the first instance at the beginning of this calendar year when this first became an issue and when Arizona and other states offered to identify appropriate parties and facilitate the issuance of such subpoenas.

As things now stand, we believe that the most efficient resolution of the issue as to the agencies who have received subpoenas would be to follow the directive in ECF No. 1292 that "Meta and the AGs shall ***immediately resume and continue document productions*** based on the contents of and responses to" Rule 45 subpoenas, to the extent those subpoenas have been issued to agencies in Arizona.

To that end, we would like to facilitate a call this Thursday afternoon at either 2:30 or 4:30pm (Arizona/Mountain Time). For Meta's convenience, we hope that this call can serve the dual purpose of discussing how to best resume document production in response to Rule 45 subpoenas for the four agencies that have received subpoenas, and also, by discussing

search terms and custodians, satisfy our obligation to meet and confer regarding proposed search terms and proposed custodians as ordered by Magistrate Kang. Please advise us if you would be amenable to either of the proposed times.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Monday, November 4, 2024 12:23 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

Arizona's position is directly contrary to Judge Kang's order that it provide, by November 1, search terms and custodians for all six agencies previously deemed within the Arizona AG's control in Judge Kang's September 6 order. ECF No. 1291. Your assertion that ECF No. 1292 somehow altered that obligation misreads the order; among other things, ECF 1292 expressly states that Judge Kang's September 6 order "is not stayed," and directs the AGs to "facilitate productions for and negotiations on behalf of the agencies." ECF No. 1292. And after ECF 1292 was issued, Judge Kang again confirmed that Arizona "**SHALL** identify custodians and propose search terms by **November 1, 2024**." ECF No. 1299 (emphasis in original). Tellingly, your email ignores Judge Kang's latest order.

Your suggestion that Meta wait until receiving documents from the four subpoenaed agencies deemed within the Arizona AG's control also is contrary to an "[e]fficient resolution of this issue." ECF No. 1292. No Arizona agency has produced any documents to Meta to date. In response to subpoenas, the Arizona Board of Education served objections nearly two weeks after Judge Kang's September 6 order deemed the agency within the AG's control, and disclosed that the agency would not be producing any documents. The only substantive discussion that Meta had with any of those four agencies were separate preliminary calls with the Department of Health Services (August 29) and Department of Education (September 6), in which the parties discussed what documents to prioritize for production, but that never resulted in any actual productions, or agreements about what a complete production would look like from these agencies. While the four subpoenaed Arizona agencies should produce the documents that they have collected in response to the subpoenas immediately, we believe that the Arizona AG should facilitate a call with them now so that we can understand what efforts they are taking, and what documents to expect from them.

Please provide us with some times this week that the Arizona AG and counsel for each of the six Arizona agencies deemed within the Arizona AG's control are available to meet and confer. To facilitate such a call, we note that Judge Kang stated that "[t]o the extent possible, the State AG and any agency counsel shall appoint a lead negotiator for their side, to expedite negotiations." ECF No. 1299. We can discuss on the call your request that the Office of Economic Opportunity be dropped from discovery, but we request the other agencies from whom we have yet to receive any

proposed custodian, search term, and litigation hold information provide that information in advance of the call: the Department of Child Safety; Department of Education; Department of Health Services; and State Board of Education.

Best,

Chris

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Saturday, November 2, 2024 7:42 PM
**To:** Yeung, Christopher <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]
Chris,

We disagree with Meta's reading of ECF 1292 entered by Judge Gonzalez Rogers. It is apparent to us that her order divides the agencies at issue in Arizona (and elsewhere) into two separate buckets and orders different courses of action for those that have received Rule 45 subpoenas as opposed to those that have not. As to the agencies that have received subpoenas, the parties are to immediately resume document productions "based on the contents of and responses to those Rule 45 subpoenas." As to the agencies that have not received subpoenas, the parties are to "comply with Magistrate Judge Kang's orders regarding timing and procedures to complete this discovery, including finalizing relevant custodians, search terms, and the scope of relevant documents."

As I am sure you are aware, the Arizona agencies that have received subpoenas all responded to those subpoenas over the course of the summer, and although it is now my understanding that Meta chose not to follow up after receiving the responses and objections it received from at least two Arizona agencies, multiple Arizona agencies are in the process of producing the records they collected in response to Meta's subpoenas. If Meta has an issue with the responses they have received or will receive, AGO will facilitate negotiations between Meta and those agencies as ordered by Judge Gonzalez Rogers. ("The AGs shall facilitate productions for and negotiations on behalf of the agencies in their respective states and Meta shall not unilaterally cease ongoing negotiations with agencies during the pendency of this Court's review.")

We have complied with the orders of the court and repeat our request for dates and times next week to meet and confer regarding the search terms and custodians of the AZ agencies that were not issued subpoenas so that we can more effectively coordinate possible times with the multiple involved parties on our side.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy

Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov

**Add. 454**



http://www.azag.gov

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Friday, November 1, 2024 8:59 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

Nathan,

Thank you for the response.  Unfortunately, it falls far short of complying with the orders of the Court.  Nothing in ECF 1292 absolves the AZ AG of proposing search terms and custodians for all agencies that Judge Kang deemed within the AZ AG's control in his September 6 order – whether the agency received a Rule 45 subpoena or not.  Indeed, ECF 1292 explicitly held that Judge Kang's order "is not stayed" and that "[t]he AGs shall facilitate productions for and on behalf of the agencies in their respective states."  ECF No. 1292.  And today, Judge Kang confirmed once again that AZ (and 13 other "holdout" states) "**SHALL** identify custodians and propose search terms by **November 1, 2024**."  ECF No. 1299; *see also* ECF No. 1291 ("By November 1, 2024, each State AG for Arizona . . . shall provide to Meta a proposed list of state agency custodians likely to possess information relevant to this litigation or responsive to Meta's discovery requests served on the State AGs, along with a proposed set of search terms to be used to locate such responsive documents.").

Please provide us with search terms and custodians for all AZ agencies that Judge Kang deemed within the AG's control immediately.  Please also coordinate a meet and confer with the AZ AG and AZ agencies (including those that Meta subpoenaed) in a manner that is consistent with Judge Kang's orders, and let us know some times when the AG and those agency counsel (or their appointed lead negotiator) is available next week for a call.  *See* ECF No. 1299 ("All counsel (for Meta, the States, and the agencies) shall cooperate and coordinate scheduling of and participation in meet and confers so as to have all Parties present at one time, instead of requiring Meta to schedule and conduct hundreds of separate meet and confers across all of the agencies. To the extent possible, the State AG and any agency counsel shall appoint a lead negotiator for their side, to expedite negotiations.").

Meta reserves all rights.

Best,

Chris

---

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Friday, November 1, 2024 10:05 PM
**To:** Yeung, Christopher <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer - AZ

[EXTERNAL]

Hi Chris, All,

I am writing on behalf of the Arizona Attorney General's Office to provide Meta with a weekly update on litigation hold information which you can find attached to this email as an Excel file. I believe the attachment speaks for itself but please let me know if you have any questions.

Furthermore, I write in an attempt to convey "a proposed list of state agency custodians likely to possess information relevant to this litigation" with respect to the Arizona Office of Economic Opportunity ("OEO") and the Governor's Office of Strategic Planning and Budgeting ("OSPB"), in accordance with ECF 1292 and given that these are the Arizona agencies to which Rule 45 subpoenas were not issued.

**Arizona Office of Economic Opportunity**
As background, the Arizona Office of Economic Opportunity coordinates workforce development strategy and evaluation, monitors the state's tax and regulatory competitiveness, and produces labor market, economic and demographic research and analysis.  Its mission is to strengthen Arizona's workforce and economy.  OEO is not a mental health agency and does not study the effects of social media on youth.

Given this background, and upon review of the RFPs at issue, OEO does not believe it has any records relevant to this litigation.  OEO has not been able to identify any individual custodian(s) who is likely to possess information relevant to this litigation or responsive to the RFPs.  As a result, OEO is unable at this time to offer any custodians or search terms, as there would be no custodial records against which such terms could be run.

**Governor's Office of Strategic Planning and Budgeting**
As our office has previously represented to Meta, Magistrate Kang, and Judge Gonzalez Rogers, the Arizona Attorney General does not represent OSPB. For all intents and purposes, OSPB is a part of the Governor's Office, over which Magistrate Kang's ruling recognized our office to lack control. Despite Magistrate Kang's finding that our office does represent and control OSPB, it remains a simple reality that AGO does not represent or control OSPB.

That said, please find attached the response AGO received from the Office of Governor Katie Hobbs on this issue.

Finally, please provide us with windows of times you will be available to meet and confer next week.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

**From:** Whelihan, Nathan
**Sent:** Friday, October 4, 2024 3:22 PM
**To:** 'Yeung, Christopher' <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; 'Simonsen, Ashley M' <asimonsen@cov.com>; 'Schmidt, Paul' <pschmidt@cov.com>; 'Halperin, Gregory' <GHalperin@cov.com>; 'Grigsby, Stacey' <SGrigsby@cov.com>; 'Hester, Timothy' <thester@cov.com>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

Hi Chris,

Thank you (as well as Jae and John) for taking the time to meet and confer with us yesterday, we appreciate you meeting with Laura and myself for the first time and explaining your positions to us.

As we now understand your position, Meta believes that the "proper place to start" (and/or "first step" and/or an "essential step" in) the process of complying with Judge Kang's order, would be for the Arizona Attorney General to, by today's date, provide a firm commitment to opt-into "Meta's proposed process" by providing a proposal for a date certain by which our office can do all of the following:

1) Compile and provide to Meta, for Meta's review, a list of custodians for each of the 6 state agencies over which we have been found to have control of for the purposes of discovery in this matter;

2) Compile and provide to Meta, for Meta's review, a list of search terms for these 6 agencies (including both any search terms that may have been run already by agencies attempting to comply with the Rule 45 subpoenas that Meta previously served, and is now holding in abeyance, as well as a presumably "universal" list of prospectively proposed search terms);

3) Identify to Meta any RFPs that we believe may not be addressed by the above described custodian and search term proposal, and;

4) Come up with a separate proposal or separate proposals "for identifying potentially responsive documents to such RFPs across all agencies whose documents are within the AGs' control (including any proposed narrowing)"

As a justification for this proposed process, you conveyed to us yesterday that Meta cannot be comfortable with a production from the Arizona Attorney General's Office unless the above process is first agreed to and carried out. And, although you made it clear that Meta's position is also that Arizona agencies should be dual-tracking efforts to search for, collect, and produce documents in advance of the completion of Meta's proposed process, we still fail to understand *why* Meta is pre-emptively uncomfortable and how it would make sense for Arizona agencies to begin searching for and producing documents to Meta when Meta has already pre-determined that it would not be comfortable with such a production, and when we have not yet had the occasion to discuss other practical matters, including but not limited to, the potential narrowing of RFPs and what we believe would be a critical discussion as to the specific way in which Meta considers the Rule 45 subpoenas issued to 4 of the 6 Arizona agencies to be a "subset" of the 49 Arizona RFPs. (Given that you have now made it clear to us that you will not consider a response to the Rule 45 subpoenas to be a sufficient response)

Nevertheless, we now more fully understand and appreciate your proposed process and would like the opportunity to consider whether or not the Arizona Attorney General's Office would be willing and able to opt-in. Unfortunately, there is no way that we can make a firm commitment by Meta's proposed deadline of today. In order to determine if we would be able to agree to your process we would need more time to reach out to counsel for each of the 6 Arizona agencies, determine the feasibility of what Meta proposes, and then gauge how much time we anticipate it would take us to execute the process as to various agencies.

As such, please let us know if Meta would consider providing an extension to Meta's proposed deadline as to the Arizona Attorney General's Office so that we may be able to fully consider and respond to your proposal.

Also, I wanted to let you know that I will be on vacation and out of the country for all of the next two weeks, and so will be relying on Laura, unable to join calls, and/or delayed in my responses to communications.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Whelihan, Nathan
**Sent:** Tuesday, October 1, 2024 1:35 PM
**To:** 'Yeung, Christopher' <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

Hi Chris,

We find it unfortunate the extent to which you disagree with the statements in our email below, remain interested in an explanation of how conferring with Meta regarding agency custodians and search terms is necessary or warranted under the circumstances, and disagree with some of the characterizations of events to date in your email. Nevertheless, we continue to look forward to the opportunity to meet and confer so that we might be able to work with you towards a mutually agreeable and reasonable date for the Arizona agencies at issue to substantially complete their respective productions of documents.

We are available Thursday at 1:30 PM AZ Time (4:30 EST), I will have a meeting invite sent out shortly.

Thank You,

**Nathan Whelihan**
**Assistant Attorney General**
**Consumer Protection & Advocacy**



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Monday, September 30, 2024 7:50 PM
**To:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

Nathan,

Thank you for your email.  We are available to meet and confer on Thursday from 11:30 – 12:30 MT / 1:30 – 2:30 ET, and 2:30 – 3:30 MT / 4:30 ET to 5:30 ET.  Please let us know what time works for you.

We disagree with a number of the statements in your email.

First, the AZ AG has had ample "opportunity to meet and confer" with us.  Starting two days after Judge Kang's order, we reached out multiple times to the AGs of all MDL states asking to meet and confer as Judge Kang directed.  We also conducted two videoconferences to which all AGs were invited – including an H2 conference where we specifically asked to discuss whether "the state AGs agree to a document production process that involves negotiated state agency custodians and search terms".  While certain lead AGs led the discussion on both of those calls, on each we specifically asked all other AGs to respond to our questions and to state their positions.

Second, we do not understand the burden that the AZ AG is claiming with respect to disclosing custodians and search terms.  Are AZ agencies utilizing search terms and custodians to collect documents that are responsive to Meta's RFPs?  If they are, then there should be little additional burden in compiling these search parameters and disclosing them to Meta.

Please confirm prior to our call whether the AZ agencies are using search terms and custodians to collect responsive documents for production.  If AZ agencies are not using a process that involves search terms and custodians, then it sounds like we will remain at impasse with the AZ AG.  Indeed, a process that involves search terms and custodians is the same type of process that the AGs insisted that Meta utilize for its custodial document production.

Third, you seek to justify withholding custodian and search term information on the basis that "Meta would have no idea who any of the custodians within the various state agencies are, and Meta will not be conducting the searches."  That rationale improperly seeks to use the existing opacity of the AZ AG's search process to justify keeping its search process a secret.  We also do not understand why different discovery rules should apply to the AZ AG than the defendant that it decided to sue; as you know, we made extensive disclosures to Plaintiffs (including the AGs) with respect to both Meta custodians and also search terms, including sharing information with Plaintiffs about why Meta selected the custodians it did and why they were likely to have uniquely relevant information (and why certain of Plaintiffs' proposed custodians were not).

Meta reserves all rights.

Best,

Chris

**From:** Whelihan, Nathan <Nathan.Whelihan@azag.gov>
**Sent:** Monday, September 30, 2024 12:32 PM
**To:** Yeung, Christopher <cyeung@cov.com>
**Cc:** Dilweg, Laura <Laura.Dilweg@azag.gov>; Hunsinger, Nyla <Nyla.Hunsinger@azag.gov>; Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

<mark>[EXTERNAL]</mark>
Hello Chris,

The undersigned represents plaintiff State of Arizona, *ex rel.* Attorney General Kristin K. Mayes. We write to respond to your recent request that each State AG decide by October 4 whether it wishes to "opt in" to Meta's "proposed process."

We have not yet had an opportunity to meet and confer with you, as ordered by Judge Kang, regarding a mutually agreeable and reasonable date for the six Arizona agencies at issue to substantially complete their respective productions of documents. In spite of that, we have been working diligently to coordinate with counsel for the subject Arizona agencies and would welcome an opportunity to confer with you regarding the timing of production. We are available throughout the afternoon of Thursday, October 3, Arizona time, to discuss the same.

As to your request that the individual State AGs provide Meta with a list of agency custodians and search terms before the agencies proceed with searching for, collecting, and producing the requested documents, we do not understand the value in that. Meta would have no idea who any of the custodians within the various state agencies are, and Meta will not be conducting the searches. The burden, expense, and time it would take to compile this information far outweighs any utility it might have.

You insisted in your September 11 correspondence that "'streamlining' the discovery process means that the State AGs should do what follows from Judge Kang's order: collect, review, and produce state agency documents responsive to Meta's RFPs." Arizona is working to do just that, and can complete that process without first telling Meta how and from whom those records will be collected.

Please advise of your availability to confer as ordered by Judge Kang.

Thank You,

**Nathan Whelihan**
Assistant Attorney General
Consumer Protection & Advocacy



Arizona Attorney General Kris Mayes
2005 N. Central Avenue
Phoenix, AZ 85004
Desk: 602-542-7748
nathan.whelihan@azag.gov
http://www.azag.gov

**Laura Dilweg**
Chief Counsel
Consumer Protection & Advocacy Section



Arizona Attorney General Kris Mayes
2005 N. Central Ave.
Phoenix, AZ 85004
Desk: (602) 542-5487
Laura.Dilweg@azag.gov
http://www.azag.gov

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Tuesday, September 24, 2024 7:06 PM
**To:** Marissa Roy <Marissa.Roy@doj.ca.gov>; Emily Kalanithi <Emily.Kalanithi@doj.ca.gov>; Bianca Miyata <Bianca.Miyata@coag.gov>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>; PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM; Dilweg, Laura <Laura.Dilweg@azag.gov>; Whelihan, Nathan <Nathan.Whelihan@azag.gov>; Nicklas Akers <Nicklas.Akers@doj.ca.gov>; Bernard Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill <Megan.Oneill@doj.ca.gov>; Joshua Olszewski-Jubelirer <Joshua.OlszewskiJubelirer@doj.ca.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>; Megan Rundlet

<Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>; Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk <Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler <Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer <Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger <Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>; Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon <Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>; Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan <Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass <Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>; Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine <michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman <pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider <Anna.Schneider@mt.gov>; Dthompson@cooperkirk.Com; Alivas@cooperkirk.Com; Megan Wold <mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com>; mkirk@cooperkirk.com; Colin Snider <Colin.Snider@nebraska.gov>; Kashif Chand <Kashif.Chand@law.njoag.gov>; Thomas Huynh <Thomas.Huynh@law.njoag.gov>; Gina Pittore <Gina.Pittore@law.njoag.gov>; Verna Pradaxay <Verna.Pradaxay@law.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo <Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn <Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad <clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>; Melissa Szozda Smith <Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh <Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy <tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza <sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland <ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey <laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com; MWeinkowitz@lfsblaw.com; myeates@ktmc.com; pwarren@motleyrice.com; lhazam@lchb.com; jennie@andrusanderson.com; Alexandra Kory <Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

All,

Thank you for the H2 conference today.  To memorialize where we landed on the call:

<u>State Agency Search Terms/Custodians</u>

- The parties are at an impasse on the first step of the AGs' compliance with Judge Kang's order.  Meta believes that the process should begin with a custodian and search term proposal from each AG for the agencies within each's state.  If, along with making such custodians and search term proposals, the AGs have individual RFPs that they wish to narrow, the AGs should propose that narrowing.  The AGs disagree, and believe that the first step should be for Meta to propose narrower RFPs, before meeting and conferring with the AGs of each state about the best way to obtain that narrowed discovery from the agencies.

- The State AGs asked Meta to consider extending the October 1 due date for the letter briefing on the issue at impasse, both because of other briefing deadlines in this case, and to see if any individual State AGs are willing

33

to agree to Meta's proposed process while the parties brief the issue.  Meta is willing to agree to the following letter-briefing schedule:

- o  Friday, October 4, 2024 – Deadline for individual State AGs to opt in to Meta's proposed process by providing a date certain by which the State AG would propose to Meta (a) a list of state agency custodians; (b) universal search terms to apply across the proposed state agency custodians; and (c) identification of any RFPs that are not addressed by the custodian and search term proposal, and a proposal for identifying potentially responsive documents to such RFPs across all agencies whose documents are within the AGs' control (including any proposed narrowing).
- o  Wednesday, October 9, 2024 – For any State AG who has not opted into Meta's proposed process, the parties exchange their respective sections of the letter brief.
- o  Friday, October 11, 2024 – Final letter briefing due

- Please let us know if this briefing schedule is acceptable to the AGs.

Litigation Hold Notices

- The State AGs agreed to provide by the end of next week (October 4, 2024) a list of all individual recipients at state agencies who have received litigation hold notices, their respective state agency affiliations, and the date they received the litigation hold notice.  We ask that the list also include each recipient's title.  If that is an issue, please let us know.

Best,

Chris

---

**From:** Marissa Roy <Marissa.Roy@doj.ca.gov>
**Sent:** Friday, September 20, 2024 4:02 PM
**To:** Yeung, Christopher <cyeung@cov.com>; Emily Kalanithi <Emily.Kalanithi@doj.ca.gov>; Bianca Miyata <Bianca.Miyata@coag.gov>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>; PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM; Laura Dilweg <Laura.Dilweg@azag.gov>; Nathan Whelihan <nathan.whelihan@azag.gov>; Nicklas Akers <Nicklas.Akers@doj.ca.gov>; Bernard Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill <Megan.Oneill@doj.ca.gov>; Joshua Olszewski-Jubelirer <Joshua.OlszewskiJubelirer@doj.ca.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>; Megan Rundlet <Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>; Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk <Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler <Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer <Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger <Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>; Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon <Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>; Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan <Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass <Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>; Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine <michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman <pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider <Anna.Schneider@mt.gov>; Dthompson@cooperkirk.Com; Alivas@cooperkirk.Com; Megan Wold <mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com>; mkirk@cooperkirk.com; Colin Snider <Colin.Snider@nebraska.gov>; Kashif Chand <Kashif.Chand@law.njoag.gov>; Thomas Huynh <Thomas.Huynh@law.njoag.gov>; Gina Pittore

<Gina.Pittore@law.njoag.gov>; Verna Pradaxay <Verna.Pradaxay@law.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo <Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn <Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad <clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>; Melissa Szozda Smith <Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh <Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy <tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza <sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland <ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey <laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com; MWeinkowitz@lfsblaw.com; myeates@ktmc.com; pwarren@motleyrice.com; lhazam@lchb.com; jennie@andrusanderson.com; Alexandra Kory <Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

[EXTERNAL]
11-12 p.m. PT

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Friday, September 20, 2024 12:58 PM
**To:** Marissa Roy <Marissa.Roy@doj.ca.gov>; Emily Kalanithi <Emily.Kalanithi@doj.ca.gov>; Bianca Miyata <Bianca.Miyata@coag.gov>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>; PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM; Laura Dilweg <Laura.Dilweg@azag.gov>; Nathan Whelihan <nathan.whelihan@azag.gov>; Nicklas Akers <Nicklas.Akers@doj.ca.gov>; Bernard Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill <Megan.Oneill@doj.ca.gov>; Joshua Olszewski-Jubelirer <Joshua.OlszewskiJubelirer@doj.ca.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>; Megan Rundlet <Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>; Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk <Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler <Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer <Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger <Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>; Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon <Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>; Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan <Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass <Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>; Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine <michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman <pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider <Anna.Schneider@mt.gov>; Dthompson@cooperkirk.com; Alivas@cooperkirk.Com; Megan Wold <mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com>; mkirk@cooperkirk.com; Colin Snider <Colin.Snider@nebraska.gov>; Kashif Chand <Kashif.Chand@law.njoag.gov>; Thomas Huynh <Thomas.Huynh@law.njoag.gov>; Gina Pittore <Gina.Pittore@law.njoag.gov>; Verna Pradaxay <Verna.Pradaxay@ag.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo <Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn <Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad <clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>;

Melissa Szozda Smith <Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh <Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy <tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza <sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland <ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey <laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com; MWeinkowitz@lfsblaw.com; myeates@ktmc.com; pwarren@motleyrice.com; lhazam@lchb.com; jennie@andrusanderson.com; Alexandra Kory <Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>;
**Cc:** Simonesen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

> **EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Marissa,

Thank you for your email.  Just to clarify, are the State AGs available from 11-12 ET or PT on September 24 for the H2 conference?

Best,

Chris

**From:** Marissa Roy <Marissa.Roy@doj.ca.gov>
**Sent:** Friday, September 20, 2024 2:54 PM
**To:** Yeung, Christopher <cyeung@cov.com>; Emily Kalanithi <Emily.Kalanithi@doj.ca.gov>; Bianca Miyata <Bianca.Miyata@coag.gov>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>; PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM; Laura Dilweg <Laura.Dilweg@azag.gov>; Nathan Whelihan <nathan.whelihan@azag.gov>; Nicklas Akers <Nicklas.Akers@doj.ca.gov>; Bernard Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill <Megan.Oneill@doj.ca.gov>; Joshua Olszewski-Jubelirer <Joshua.OlszewskiJubelirer@doj.ca.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>; Megan Rundlet <Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>; Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk <Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler <Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer <Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger <Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>; Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon <Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>; Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan <Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass <Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>; Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine <michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman <pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider <Anna.Schneider@mt.gov>; Dthompson@cooperkirk.Com; Alivas@cooperkirk.Com; Megan Wold <mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com>; mkirk@cooperkirk.com; Colin Snider <Colin.Snider@nebraska.gov>; Kashif Chand <Kashif.Chand@law.njoag.gov>; Thomas Huynh <Thomas.Huynh@law.njoag.gov>; Gina Pittore

<Gina.Pittore@law.njoag.gov>; Verna Pradaxay <Verna.Pradaxay@law.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo <Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn <Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad <clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>; Melissa Szozda Smith <Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh <Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy <tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza <sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland <ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey <laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com; MWeinkowitz@lfsblaw.com; myeates@ktmc.com; pwarren@motleyrice.com; lhazam@lchb.com; jennie@andrusanderson.com; Alexandra Kory <Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

<mark>[EXTERNAL]</mark>
Counsel,

We have received your request for an H2. The State AGs are available to meet 11-12 p.m. on Tuesday September 24th. Please let us know if that would work for Meta.  Our goal is to facilitate discovery in the most efficient manner.  Even with this H2 scheduled, we believe we can make progress and perhaps eliminate some of the issues in dispute. To that end, below are our initial responses to the questions you've raised, as well as some thoughts on next steps.

Regarding your request for custodians and search terms, while the lead State AGs often play a coordinating role, they do not represent all 35 State AGs and cannot represent the positions of the 275 state agencies, including with respect to how documents or stored or the feasibility of custodial document searching. While we understand that Meta does not wish to have 275 meet and confers, we suggest as a compromise meeting and conferring on a state-by-state basis. To help that process, the lead State AGs will provide Meta with a single point of contact for each of the State AGs so that this process can commence.

With respect to the 140 agencies that have already received Rule 45 subpoenas, will Meta commit to identifying with specificity which documents it is seeking above and beyond those sought by the subpoenas?  It is not sufficient for Meta to point to its overbroad and very general RFPs, as those give the agencies no guidance regarding what documents Meta is actually seeking.  The agencies who received the subpoenas have already begun searching for documents based on conferrals with Meta's counsel, and in some cases have already produced documents.  It would be highly inefficient and burdensome to suspend that process and start over – particularly without any practical articulation from Meta regarding what additional documents it seeks to have produced.

As discussed on our Tuesday call, without waiving our arguments as to the state agencies generally, we are in the process of identifying state agencies that are highly unlikely to have any responsive documents at all.  We plan to provide that information to Meta next week and appreciate your willingness to consider the information we provide as we work together to move the discovery process forward.

Finally, the lead State AGs are coordinating with the other State AGs to gather information on state agency litigation holds that have been issued.  We will provide that information to Meta when it is available to us.  In response to your last question, the State AGs will ensure that each affected state agency (or its counsel) has received Magistrate Judge Kang's ruling so that the agencies can take appropriate preservation steps.

We are available to talk informally regarding these issues before the H2.

Best,
Marissa

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Friday, September 20, 2024 9:09 AM
**To:** Emily Kalanithi <Emily.Kalanithi@doj.ca.gov>; Bianca Miyata <Bianca.Miyata@coag.gov>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>; PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM; Laura Dilweg <Laura.Dilweg@azag.gov>; Nathan Whelihan <nathan.whelihan@azag.gov>; Nicklas Akers <Nicklas.Akers@doj.ca.gov>; Bernard Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill <Megan.Oneill@doj.ca.gov>; Joshua Olszewski-Jubelirer <Joshua.OlszewskiJubelirer@doj.ca.gov>; Marissa Roy <Marissa.Roy@doj.ca.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>; Megan Rundlet <Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>; Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk <Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler <Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer <Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger <Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>; Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon <Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>; Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan <Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass <Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>; Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine <michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman <pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider <Anna.Schneider@mt.gov>; Dthompson@cooperkirk.Com; Alivas@cooperkirk.Com; Megan Wold <mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com>; mkirk@cooperkirk.com; Colin Snider <Colin.Snider@nebraska.gov>; Kashif Chand <Kashif.Chand@law.njoag.gov>; Thomas Huynh <Thomas.Huynh@law.njoag.gov>; Gina Pittore <Gina.Pittore@law.njoag.gov>; Verna Pradaxay <Verna.Pradaxay@law.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo <Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn <Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad <clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>; Melissa Szozda Smith <Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh <Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy <tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza <sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland <ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey <laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com; MWeinkowitz@lfsblaw.com; myeates@ktmc.com; pwarren@motleyrice.com; lhazam@lchb.com; jennie@andrusanderson.com; Alexandra Kory <Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

**EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

All,

38

**Add. 466**

Just a reminder, please let us know by COB today your availability for the H2 conference that we requested on Tuesday on the topics set forth in my 9/17/24 email below.  We still have not received any responses from any Plaintiff AG.

Best,

Chris

---

**From:** Yeung, Christopher
**Sent:** Thursday, September 19, 2024 1:30 PM
**To:** 'Emily Kalanithi' <Emily.Kalanithi@doj.ca.gov>; 'Bianca Miyata' <Bianca.Miyata@coag.gov>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; 'PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM' <PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM>; 'Laura Dilweg' <Laura.Dilweg@azag.gov>; 'Nathan Whelihan' <nathan.whelihan@azag.gov>; 'Nicklas Akers' <Nicklas.Akers@doj.ca.gov>; 'Bernard Eskandari' <Bernard.Eskandari@doj.ca.gov>; 'Megan O'Neill' <Megan.Oneill@doj.ca.gov>; 'Joshua Olszewski-Jubelirer' <Joshua.OlszewskiJubelirer@doj.ca.gov>; 'Marissa Roy' <Marissa.Roy@doj.ca.gov>; 'Lauren Dickey' <Lauren.Dickey@coag.gov>; 'Megan Rundlet' <Megan.Rundlet@coag.gov>; 'Beth Orem' <Beth.Orem@coag.gov>; 'Lauren Bidra' <lauren.bidra@ct.gov>; 'Krislyn Launer' <Krislyn.Launer@ct.gov>; 'Ashley Meskill' <Ashley.Meskill@ct.gov>; 'Marion Quirk' <Marion.Quirk@delaware.gov>; 'Dashiell Radosti' <Dashiell.Radosti@delaware.gov>; 'Victoria Butler' <Victoria.Butler@myfloridalegal.com>; 'John Guard' <John.Guard@myfloridalegal.com>; 'Nicholas Weilhammer' <Nicholas.Weilhammer@myfloridalegal.com>; 'Donna Valin' <Donna.Valin@myfloridalegal.com>; 'Karen Berger' <Karen.Berger@myfloridalegal.com>; 'Melissa Devine' <mdevine@law.ga.gov>; 'Bryan Yee' <Bryan.c.yee@hawaii.gov>; 'Christopher Han' <christopher.t.han@hawaii.gov>; 'Nathan Nielson' <nathan.nielson@ag.idaho.gov>; 'Stephanie Guyon' <Stephanie.Guyon@ag.idaho.gov>; 'Susan Ellis' <Susan.Ellis@ilag.gov>; 'Greg Grzeskiewicz' <Greg.Grzeskiewicz@ilag.gov>; 'Jacob Gilbert' <Jacob.gilbert@ilag.gov>; 'Daniel Edelstein' <Daniel.Edelstein@ilag.gov>; 'Kevin Whelan' <Kevin.Whelan@ilag.gov>; 'Adam Sokol' <Adam.Sokol@ilag.gov>; 'Emily Migliore' <Emily.Migliore@ilag.gov>; 'Scott Barnhart' <Scott.Barnhart@atg.in.gov>; 'Corinne Gilchrist' <Corinne.Gilchrist@atg.in.gov>; 'Mark Snodgrass' <Mark.Snodgrass@atg.in.gov>; 'Sarah Dietz' <Sarah.Dietz@ag.ks.gov>; 'Christian Lewis' <Christian.Lewis@ky.gov>; 'Philip Heleringer' <Philip.Heleringer@ky.gov>; 'Zach Richards' <Zach.Richards@ky.gov>; 'Daniel Keiser' <daniel.keiser@ky.gov>; 'Arham Mughal' <mughala@ag.louisiana.gov>; 'Chris Styron' <StyronL@ag.louisiana.gov>; 'Michael Devine' <michael.devine@maine.gov>; 'Laura Lee Barry Wommack' <LauraLee.BarryWommack@maine.gov>; 'Philip Ziperman' <pziperman@oag.state.md.us>; 'Elizabeth Stern' <estern@oag.state.md.us>; 'Daniel Ping' <pingd@michigan.gov>; 'Caitlin Micko' <Caitlin.Micko@ag.state.mn.us>; 'Michael Schwalbert' <michael.schwalbert@ago.mo.gov>; 'Anna Schneider' <Anna.Schneider@mt.gov>; 'Dthompson@cooperkirk.Com' <Dthompson@cooperkirk.com>; 'Alivas@cooperkirk.Com' <Alivas@cooperkirk.Com>; 'Megan Wold' <mwold@cooperkirk.com>; 'Brian Barnes' <bbarnes@cooperkirk.com>; 'mkirk@cooperkirk.com' <mkirk@cooperkirk.com>; 'Colin Snider' <Colin.Snider@nebraska.gov>; 'Kashif Chand' <Kashif.Chand@law.njoag.gov>; 'Thomas Huynh' <Thomas.Huynh@law.njoag.gov>; 'Gina Pittore' <Gina.Pittore@law.njoag.gov>; 'Verna Pradaxay' <Verna.Pradaxay@law.njoag.gov>; 'Mandy Wang' <Mandy.Wang@law.njoag.gov>; 'Chris D'Angelo' <Christopher.D'Angelo@ag.ny.gov>; 'Clark Russell' <Clark.Russell@ag.ny.gov>; 'Nathaniel Kosslyn' <Nathaniel.Kosslyn@ag.ny.gov>; 'Kevin Anderson' <kander@ncdoj.gov>; 'Elin Alm' <ealm@nd.gov>; 'Christopher Lindblad' <clindblad@nd.gov>; 'Melissa Wright' <Melissa.Wright@ohioago.gov>; 'Melissa Szozda Smith' <Melissa.S.Smith@ohioago.gov>; 'Michael Ziegler' <Michael.Ziegler@ohioago.gov>; 'Kevin Walsh' <Kevin.Walsh@ohioago.gov>; 'Jordan Roberts' <Jordan.M.Roberts@doj.state.or.us>; 'Tim Murphy' <tmurphy@attorneygeneral.gov>; 'Jonathan Burns' <jburns@attorneygeneral.gov>; 'Stephen Provazza' <sprovazza@riag.ri.gov>; 'Jared Libet' <jlibet@scag.gov>; 'Anna Smith' <AnnaSmith@scag.gov>; 'Clark Kirkland' <ckirkland@scag.gov>; 'Jessica LaMie' <Jessica.LaMie@state.sd.us>; 'Joelle Gotwals' <jgotwals@oag.state.va.us>; 'Joe Kanada' <Joe.Kanada@atg.wa.gov>; 'Alexia Diorio' <Alexia.Diorio@atg.wa.gov>; 'Laurel Lackey' <laurel.k.lackey@wvago.gov>; 'smmdlschooldistrictbellwethergroup@lfsblaw.com' <smmdlschooldistrictbellwethergroup@lfsblaw.com>; 'MWeinkowitz@lfsblaw.com' <MWeinkowitz@lfsblaw.com>; 'myeates@ktmc.com' <myeates@ktmc.com>; 'pwarren@motleyrice.com' <pwarren@motleyrice.com>; 'lhazam@lchb.com' <lhazam@lchb.com>; 'jennie@andrusanderson.com' <jennie@andrusanderson.com>; 'Alexandra

Kory' <Alexandra.Kory@atg.wa.gov>; 'Colin Stroud' <stroudcr@doj.state.wi.us>; 'Matthew Davies' <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

All,

We have not received any response to our request to schedule an H2 conference.  Please provide us by COB tomorrow with times that work for you.

Best,

Chris

---

**From:** Yeung, Christopher
**Sent:** Tuesday, September 17, 2024 10:33 PM
**To:** 'Emily Kalanithi' <Emily.Kalanithi@doj.ca.gov>; 'Bianca Miyata' <Bianca.Miyata@coag.gov>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; 'PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM' <PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM>; 'Laura Dilweg' <Laura.Dilweg@azag.gov>; 'Nathan Whelihan' <nathan.whelihan@azag.gov>; 'Nicklas Akers' <Nicklas.Akers@doj.ca.gov>; 'Bernard Eskandari' <Bernard.Eskandari@doj.ca.gov>; 'Megan O'Neill' <Megan.Oneill@doj.ca.gov>; 'Joshua Olszewski-Jubelirer' <Joshua.OlszewskiJubelirer@doj.ca.gov>; 'Marissa Roy' <Marissa.Roy@doj.ca.gov>; 'Lauren Dickey' <Lauren.Dickey@coag.gov>; 'Megan Rundlet' <Megan.Rundlet@coag.gov>; 'Beth Orem' <Beth.Orem@coag.gov>; 'Lauren Bidra' <lauren.bidra@ct.gov>; 'Krislyn Launer' <Krislyn.Launer@ct.gov>; 'Ashley Meskill' <Ashley.Meskill@ct.gov>; 'Marion Quirk' <Marion.Quirk@delaware.gov>; 'Dashiell Radosti' <Dashiell.Radosti@delaware.gov>; 'Victoria Butler' <Victoria.Butler@myfloridalegal.com>; 'John Guard' <John.Guard@myfloridalegal.com>; 'Nicholas Weilhammer' <Nicholas.Weilhammer@myfloridalegal.com>; 'Donna Valin' <Donna.Valin@myfloridalegal.com>; 'Karen Berger' <Karen.Berger@myfloridalegal.com>; 'Melissa Devine' <mdevine@law.ga.gov>; 'Bryan Yee' <Bryan.c.yee@hawaii.gov>; 'Christopher Han' <christopher.t.han@hawaii.gov>; 'Nathan Nielson' <nathan.nielson@ag.idaho.gov>; 'Stephanie Guyon' <Stephanie.Guyon@ag.idaho.gov>; 'Susan Ellis' <Susan.Ellis@ilag.gov>; 'Greg Grzeskiewicz' <Greg.Grzeskiewicz@ilag.gov>; 'Jacob Gilbert' <Jacob.gilbert@ilag.gov>; 'Daniel Edelstein' <Daniel.Edelstein@ilag.gov>; 'Kevin Whelan' <Kevin.Whelan@ilag.gov>; 'Adam Sokol' <Adam.Sokol@ilag.gov>; 'Emily Migliore' <Emily.Migliore@ilag.gov>; 'Scott Barnhart' <Scott.Barnhart@atg.in.gov>; 'Corinne Gilchrist' <Corinne.Gilchrist@atg.in.gov>; 'Mark Snodgrass' <Mark.Snodgrass@atg.in.gov>; 'Sarah Dietz' <Sarah.Dietz@ag.ks.gov>; 'Christian Lewis' <Christian.Lewis@ky.gov>; 'Philip Heleringer' <Philip.Heleringer@ky.gov>; 'Zach Richards' <Zach.Richards@ky.gov>; 'Daniel Keiser' <daniel.keiser@ky.gov>; 'Arham Mughal' <mughala@ag.louisiana.gov>; 'Chris Styron' <StyronL@ag.louisiana.gov>; 'Michael Devine' <michael.devine@maine.gov>; 'Laura Lee Barry Wommack' <LauraLee.BarryWommack@maine.gov>; 'Philip Ziperman' <pziperman@oag.state.md.us>; 'Elizabeth Stern' <estern@oag.state.md.us>; 'Daniel Ping' <pingd@michigan.gov>; 'Caitlin Micko' <Caitlin.Micko@ag.state.mn.us>; 'Michael Schwalbert' <michael.schwalbert@ago.mo.gov>; 'Anna Schneider' <Anna.Schneider@mt.gov>; 'Dthompson@cooperkirk.Com' <Dthompson@cooperkirk.Com>; 'Alivas@cooperkirk.Com' <Alivas@cooperkirk.Com>; 'Megan Wold' <mwold@cooperkirk.com>; 'Brian Barnes' <bbarnes@cooperkirk.com>; 'mkirk@cooperkirk.com' <mkirk@cooperkirk.com>; 'Colin Snider' <Colin.Snider@nebraska.gov>; 'Kashif Chand' <Kashif.Chand@law.njoag.gov>; 'Thomas Huynh' <Thomas.Huynh@law.njoag.gov>; 'Gina Pittore' <Gina.Pittore@law.njoag.gov>; 'Verna Pradaxay' <Verna.Pradaxay@law.njoag.gov>; 'Mandy Wang' <Mandy.Wang@law.njoag.gov>; 'Chris D'Angelo' <Christopher.D'Angelo@ag.ny.gov>; 'Clark Russell' <Clark.Russell@ag.ny.gov>; 'Nathaniel Kosslyn' <Nathaniel.Kosslyn@ag.ny.gov>; 'Kevin Anderson' <kander@ncdoj.gov>; 'Elin Alm' <ealm@nd.gov>; 'Christopher Lindblad' <clindblad@nd.gov>; 'Melissa Wright' <Melissa.Wright@ohioago.gov>; 'Melissa Szozda Smith' <Melissa.S.Smith@ohioago.gov>; 'Michael Ziegler' <Michael.Ziegler@ohioago.gov>; 'Kevin Walsh' <Kevin.Walsh@ohioago.gov>; 'Jordan Roberts' <Jordan.M.Roberts@doj.state.or.us>; 'Tim Murphy'

<tmurphy@attorneygeneral.gov>; 'Jonathan Burns' <jburns@attorneygeneral.gov>; 'Stephen Provazza'
<sprovazza@riag.ri.gov>; 'Jared Libet' <jlibet@scag.gov>; 'Anna Smith' <AnnaSmith@scag.gov>; 'Clark Kirkland'
<ckirkland@scag.gov>; 'Jessica LaMie' <Jessica.LaMie@state.sd.us>; 'Joelle Gotwals' <jgotwals@oag.state.va.us>; 'Joe
Kanada' <Joe.Kanada@atg.wa.gov>; 'Alexia Diorio' <Alexia.Diorio@atg.wa.gov>; 'Laurel Lackey'
<laurel.k.lackey@wvago.gov>; 'smmdlschooldistrictbellwethergroup@lfsblaw.com'
<smmdlschooldistrictbellwethergroup@lfsblaw.com>; 'MWeinkowitz@lfsblaw.com' <MWeinkowitz@lfsblaw.com>;
'myeates@ktmc.com' <myeates@ktmc.com>; 'pwarren@motleyrice.com' <pwarren@motleyrice.com>;
'lhazam@lchb.com' <lhazam@lchb.com>; 'jennie@andrusanderson.com' <jennie@andrusanderson.com>; 'Alexandra
Kory' <Alexandra.Kory@atg.wa.gov>; 'Colin Stroud' <stroudcr@doj.state.wi.us>; 'Matthew Davies'
<matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory
<GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

All,

Following our call, we request an H2 conference on the following topics.  Please provide us with times that work for you.

- Will the state AGs agree to a document production process that involves negotiated state agency custodians and
  search terms?  We believe that this is the appropriate way to proceed and do not see an alternative way to
  proceed that will ensure we obtain reasonably responsive documents.  We will continue to consider this
  question on our end in the interim, but given where we and you presently are, think we need the Court's
  guidance on this point.

- Will the state AGs agree to let us know of the state agency custodians to which they or individual agencies have
  sent notice of the litigation or specific hold notices, and when?  For any state agency for which the state AGs are
  unable to provide such individual custodian information, will the state AGs agree to identify the agency, confirm
  that the AGs have sent notice of the litigation or specific hold notices to the agency, and when?

- Will the state AGs agree to impose a hold, or ask the agencies to impose a hold, on appropriate custodians at
  each agency covered by Judge Kang's ruling?

Best,

Chris

---

**From:** Yeung, Christopher
**Sent:** Monday, September 16, 2024 5:14 PM
**To:** 'Emily Kalanithi' <Emily.Kalanithi@doj.ca.gov>; 'Bianca Miyata' <Bianca.Miyata@coag.gov>; 'Social Media MDL State
AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; 'PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM'
<PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM>; 'Laura Dilweg' <Laura.Dilweg@azag.gov>; 'Nathan
Whelihan' <nathan.whelihan@azag.gov>; 'Nicklas Akers' <Nicklas.Akers@doj.ca.gov>; 'Bernard Eskandari'
<Bernard.Eskandari@doj.ca.gov>; 'Megan O'Neill' <Megan.Oneill@doj.ca.gov>; 'Joshua Olszewski-Jubelirer'
<Joshua.OlszewskiJubelirer@doj.ca.gov>; 'Marissa Roy' <Marissa.Roy@doj.ca.gov>; 'Lauren Dickey'
<Lauren.Dickey@coag.gov>; 'Megan Rundlet' <Megan.Rundlet@coag.gov>; 'Beth Orem' <Beth.Orem@coag.gov>;
'Lauren Bidra' <lauren.bidra@ct.gov>; 'Krislyn Launer' <Krislyn.Launer@ct.gov>; 'Ashley Meskill'
<Ashley.Meskill@ct.gov>; 'Marion Quirk' <Marion.Quirk@delaware.gov>; 'Dashiell Radosti'
<Dashiell.Radosti@delaware.gov>; 'Victoria Butler' <Victoria.Butler@myfloridalegal.com>; 'John Guard'
<John.Guard@myfloridalegal.com>; 'Nicholas Weilhammer' <Nicholas.Weilhammer@myfloridalegal.com>; 'Donna Valin'
<Donna.Valin@myfloridalegal.com>; 'Karen Berger' <Karen.Berger@myfloridalegal.com>; 'Melissa Devine'
<mdevine@law.ga.gov>; 'Bryan Yee' <Bryan.c.yee@hawaii.gov>; 'Christopher Han' <christopher.t.han@hawaii.gov>;
'Nathan Nielson' <nathan.nielson@ag.idaho.gov>; 'Stephanie Guyon' <Stephanie.Guyon@ag.idaho.gov>; 'Susan Ellis'
<Susan.Ellis@ilag.gov>; 'Greg Grzeskiewicz' <Greg.Grzeskiewicz@ilag.gov>; 'Jacob Gilbert' <Jacob.gilbert@ilag.gov>;

**Add. 469**

'Daniel Edelstein' <Daniel.Edelstein@ilag.gov>; 'Kevin Whelan' <Kevin.Whelan@ilag.gov>; 'Adam Sokol' <Adam.Sokol@ilag.gov>; 'Emily Migliore' <Emily.Migliore@ilag.gov>; 'Scott Barnhart' <Scott.Barnhart@atg.in.gov>; 'Corinne Gilchrist' <Corinne.Gilchrist@atg.in.gov>; 'Mark Snodgrass' <Mark.Snodgrass@atg.in.gov>; 'Sarah Dietz' <Sarah.Dietz@ag.ks.gov>; 'Christian Lewis' <Christian.Lewis@ky.gov>; 'Philip Heleringer' <Philip.Heleringer@ky.gov>; 'Zach Richards' <Zach.Richards@ky.gov>; 'Daniel Keiser' <daniel.keiser@ky.gov>; 'Arham Mughal' <mughala@ag.louisiana.gov>; 'Chris Styron' <StyronL@ag.louisiana.gov>; 'Michael Devine' <michael.devine@maine.gov>; 'Laura Lee Barry Wommack' <LauraLee.BarryWommack@maine.gov>; 'Philip Ziperman' <pziperman@oag.state.md.us>; 'Elizabeth Stern' <estern@oag.state.md.us>; 'Daniel Ping' <pingd@michigan.gov>; 'Caitlin Micko' <Caitlin.Micko@ag.state.mn.us>; 'Michael Schwalbert' <michael.schwalbert@ago.mo.gov>; 'Anna Schneider' <Anna.Schneider@mt.gov>; 'Dthompson@cooperkirk.Com' <Dthompson@cooperkirk.Com>; 'Alivas@cooperkirk.Com' <Alivas@cooperkirk.Com>; 'Megan Wold' <mwold@cooperkirk.com>; 'Brian Barnes' <bbarnes@cooperkirk.com>; 'mkirk@cooperkirk.com' <mkirk@cooperkirk.com>; 'Colin Snider' <Colin.Snider@nebraska.gov>; 'Kashif Chand' <Kashif.Chand@law.njoag.gov>; 'Thomas Huynh' <Thomas.Huynh@law.njoag.gov>; 'Gina Pittore' <Gina.Pittore@law.njoag.gov>; 'Verna Pradaxay' <Verna.Pradaxay@law.njoag.gov>; 'Mandy Wang' <Mandy.Wang@law.njoag.gov>; 'Chris D'Angelo' <Christopher.D.Angelo@ag.ny.gov>; 'Clark Russell' <Clark.Russell@ag.ny.gov>; 'Nathaniel Kosslyn' <Nathaniel.Kosslyn@ag.ny.gov>; 'Kevin Anderson' <kander@ncdoj.gov>; 'Elin Alm' <ealm@nd.gov>; 'Christopher Lindblad' <clindblad@nd.gov>; 'Melissa Wright' <Melissa.Wright@ohioago.gov>; 'Melissa Szozda Smith' <Melissa.S.Smith@ohioago.gov>; 'Michael Ziegler' <Michael.Ziegler@ohioago.gov>; 'Kevin Walsh' <Kevin.Walsh@ohioago.gov>; 'Jordan Roberts' <Jordan.M.Roberts@doj.state.or.us>; 'Tim Murphy' <tmurphy@attorneygeneral.gov>; 'Jonathan Burns' <jburns@attorneygeneral.gov>; 'Stephen Provazza' <sprovazza@riag.ri.gov>; 'Jared Libet' <jlibet@scag.gov>; 'Anna Smith' <AnnaSmith@scag.gov>; 'Clark Kirkland' <ckirkland@scag.gov>; 'Jessica LaMie' <Jessica.LaMie@state.sd.us>; 'Joelle Gotwals' <jgotwals@oag.state.va.us>; 'Joe Kanada' <Joe.Kanada@atg.wa.gov>; 'Alexia Diorio' <Alexia.Diorio@atg.wa.gov>; 'Laurel Lackey' <laurel.k.lackey@wvago.gov>; 'smmdlschooldistrictbellwethergroup@lfsblaw.com' <smmdlschooldistrictbellwethergroup@lfsblaw.com>; 'MWeinkowitz@lfsblaw.com' <MWeinkowitz@lfsblaw.com>; 'myeates@ktmc.com' <myeates@ktmc.com>; 'pwarren@motleyrice.com' <pwarren@motleyrice.com>; 'lhazam@lchb.com' <lhazam@lchb.com>; 'jennie@andrusanderson.com' <jennie@andrusanderson.com>; 'Alexandra Kory' <Alexandra.Kory@atg.wa.gov>; 'Colin Stroud' <stroudcr@doj.state.wi.us>; 'Matthew Davies' <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

Counsel,

We did not receive any list of individuals at state agencies who have been issued litigation holds, and when those holds were issued.  Please be prepared to discuss Plaintiffs' failure to provide that information at tomorrow's meet and confer call.

We also have not received the statement by Governor Newsom that was read into the record.  Please provide us with a copy.  If Plaintiffs are unwilling to provide us with a copy of the statement, please state the basis for withholding it.

Finally, in light of Governor Newsom's statement suggesting that California would not be complying with Judge Kang's order and that other states may join California as well, we ask that you identify tomorrow whether any other state governor is taking the same position.

Best,

Chris

**From:** Yeung, Christopher
**Sent:** Friday, September 13, 2024 10:59 PM
**To:** 'Emily Kalanithi' <Emily.Kalanithi@doj.ca.gov>; 'Bianca Miyata' <Bianca.Miyata@coag.gov>; 'Social Media MDL State AGs Lead Counsel' <SM.MDLAGLeads@coag.gov>; 'PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM' <PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM>; 'Laura Dilweg' <Laura.Dilweg@azag.gov>; 'Nathan Whelihan' <nathan.whelihan@azag.gov>; 'Nicklas Akers' <Nicklas.Akers@doj.ca.gov>; 'Bernard Eskandari' <Bernard.Eskandari@doj.ca.gov>; 'Megan O'Neill' <Megan.Oneill@doj.ca.gov>; 'Joshua Olszewski-Jubelirer' <Joshua.OlszewskiJubelirer@doj.ca.gov>; 'Marissa Roy' <Marissa.Roy@doj.ca.gov>; 'Lauren Dickey' <Lauren.Dickey@coag.gov>; 'Megan Rundlet' <Megan.Rundlet@coag.gov>; 'Beth Orem' <Beth.Orem@coag.gov>; 'Lauren Bidra' <lauren.bidra@ct.gov>; 'Krislyn Launer' <Krislyn.Launer@ct.gov>; 'Ashley Meskill' <Ashley.Meskill@ct.gov>; 'Marion Quirk' <Marion.Quirk@delaware.gov>; 'Dashiell Radosti' <Dashiell.Radosti@delaware.gov>; 'Victoria Butler' <Victoria.Butler@myfloridalegal.com>; 'John Guard' <John.Guard@myfloridalegal.com>; 'Nicholas Weilhammer' <Nicholas.Weilhammer@myfloridalegal.com>; 'Donna Valin' <Donna.Valin@myfloridalegal.com>; 'Karen Berger' <Karen.Berger@myfloridalegal.com>; 'Melissa Devine' <mdevine@law.ga.gov>; 'Bryan Yee' <Bryan.c.yee@hawaii.gov>; 'Christopher Han' <christopher.t.han@hawaii.gov>; 'Nathan Nielson' <nathan.nielson@ag.idaho.gov>; 'Stephanie Guyon' <Stephanie.Guyon@ag.idaho.gov>; 'Susan Ellis' <Susan.Ellis@ilag.gov>; 'Greg Grzeskiewicz' <Greg.Grzeskiewicz@ilag.gov>; 'Jacob Gilbert' <Jacob.gilbert@ilag.gov>; 'Daniel Edelstein' <Daniel.Edelstein@ilag.gov>; 'Kevin Whelan' <Kevin.Whelan@ilag.gov>; 'Adam Sokol' <Adam.Sokol@ilag.gov>; 'Emily Migliore' <Emily.Migliore@ilag.gov>; 'Scott Barnhart' <Scott.Barnhart@atg.in.gov>; 'Corinne Gilchrist' <Corinne.Gilchrist@atg.in.gov>; 'Mark Snodgrass' <Mark.Snodgrass@atg.in.gov>; 'Sarah Dietz' <Sarah.Dietz@ag.ks.gov>; 'Christian Lewis' <Christian.Lewis@ky.gov>; 'Philip Heleringer' <Philip.Heleringer@ky.gov>; 'Zach Richards' <Zach.Richards@ky.gov>; 'Daniel Keiser' <daniel.keiser@ky.gov>; 'Arham Mughal' <mughala@ag.louisiana.gov>; 'Chris Styron' <StyronL@ag.louisiana.gov>; 'Michael Devine' <michael.devine@maine.gov>; 'Laura Lee Barry Wommack' <LauraLee.BarryWommack@maine.gov>; 'Philip Ziperman' <pziperman@oag.state.md.us>; 'Elizabeth Stern' <estern@oag.state.md.us>; 'Daniel Ping' <pingd@michigan.gov>; 'Caitlin Micko' <Caitlin.Micko@ag.state.mn.us>; 'Michael Schwalbert' <michael.schwalbert@ago.mo.gov>; 'Anna Schneider' <Anna.Schneider@mt.gov>; 'Dthompson@cooperkirk.Com' <Dthompson@cooperkirk.Com>; 'Alivas@cooperkirk.Com' <Alivas@cooperkirk.Com>; 'Megan Wold' <mwold@cooperkirk.com>; 'Brian Barnes' <bbarnes@cooperkirk.com>; 'mkirk@cooperkirk.com' <mkirk@cooperkirk.com>; 'Colin Snider' <Colin.Snider@nebraska.gov>; 'Kashif Chand' <Kashif.Chand@law.njoag.gov>; 'Thomas Huynh' <Thomas.Huynh@law.njoag.gov>; 'Gina Pittore' <Gina.Pittore@law.njoag.gov>; 'Verna Pradaxay' <Verna.Pradaxay@law.njoag.gov>; 'Mandy Wang' <Mandy.Wang@law.njoag.gov>; 'Chris D'Angelo' <Christopher.D'Angelo@ag.ny.gov>; 'Clark Russell' <Clark.Russell@ag.ny.gov>; 'Nathaniel Kosslyn' <Nathaniel.Kosslyn@ag.ny.gov>; 'Kevin Anderson' <kander@ncdoj.gov>; 'Elin Alm' <ealm@nd.gov>; 'Christopher Lindblad' <clindblad@nd.gov>; 'Melissa Wright' <Melissa.Wright@ohioago.gov>; 'Melissa Szozda Smith' <Melissa.S.Smith@ohioago.gov>; 'Michael Ziegler' <Michael.Ziegler@ohioago.gov>; 'Kevin Walsh' <Kevin.Walsh@ohioago.gov>; 'Jordan Roberts' <Jordan.M.Roberts@doj.state.or.us>; 'Tim Murphy' <tmurphy@attorneygeneral.gov>; 'Jonathan Burns' <jburns@attorneygeneral.gov>; 'Stephen Provazza' <sprovazza@riag.ri.gov>; 'Jared Libet' <jlibet@scag.gov>; 'Anna Smith' <AnnaSmith@scag.gov>; 'Clark Kirkland' <ckirkland@scag.gov>; 'Jessica LaMie' <Jessica.LaMie@state.sd.us>; 'Joelle Gotwals' <jgotwals@oag.state.va.us>; 'Joe Kanada' <Joe.Kanada@atg.wa.gov>; 'Alexia Diorio' <Alexia.Diorio@atg.wa.gov>; 'Laurel Lackey' <laurel.k.lackey@wvago.gov>; 'smmdlschooldistrictbellwethergroup@lfsblaw.com' <smmdlschooldistrictbellwethergroup@lfsblaw.com>; 'MWeinkowitz@lfsblaw.com' <MWeinkowitz@lfsblaw.com>; 'myeates@ktmc.com' <myeates@ktmc.com>; 'pwarren@motleyrice.com' <pwarren@motleyrice.com>; 'lhazam@lchb.com' <lhazam@lchb.com>; 'jennie@andrusanderson.com' <jennie@andrusanderson.com>; 'Alexandra Kory' <Alexandra.Kory@atg.wa.gov>; 'Colin Stroud' <stroudcr@doj.state.wi.us>; 'Matthew Davies' <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

Emily,

43

**Add. 471**

Further to the below, we can meet and confer at 1:30 PT on Tuesday.  I circulated a calendar invite with dial-in information to you, Bianca, and the Social Media MDL State AGs Lead Counsel listserv, but please feel free to forward the invite to anyone else from the AGs who wishes to attend.

Additionally, I am following up on our request regarding state agency litigation hold recipients.  Will the AGs be providing us today with a list of all of the individuals at state agencies who have been issued litigation holds, and when those holds were issued?  Please also confirm that each state's Governor and Governor's office is preserving potentially relevant documents.

Finally, I understand that the AGs read a statement by Governor Newsom into the record at today's CMC.  Please provide us with a copy of that statement.

Best,

Chris

---

**From:** Yeung, Christopher
**Sent:** Wednesday, September 11, 2024 10:43 PM
**To:** 'Emily Kalanithi' <Emily.Kalanithi@doj.ca.gov>; Bianca Miyata <Bianca.Miyata@coag.gov>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>; PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM; Laura Dilweg <Laura.Dilweg@azag.gov>; Nathan Whelihan <nathan.whelihan@azag.gov>; Nicklas Akers <Nicklas.Akers@doj.ca.gov>; Bernard Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill <Megan.Oneill@doj.ca.gov>; Joshua Olszewski-Jubelirer <Joshua.OlszewskiJubelirer@doj.ca.gov>; Marissa Roy <Marissa.Roy@doj.ca.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>; Megan Rundlet <Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>; Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk <Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler <Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer <Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger <Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>; Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon <Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>; Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan <Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass <Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>; Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine <michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman <pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider <Anna.Schneider@mt.gov>; Dthompson@cooperkirk.Com; Alivas@cooperkirk.Com; Megan Wold <mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com>; mkirk@cooperkirk.com; Colin Snider <Colin.Snider@nebraska.gov>; Kashif Chand <Kashif.Chand@law.njoag.gov>; Thomas Huynh <Thomas.Huynh@law.njoag.gov>; Gina Pittore <Gina.Pittore@law.njoag.gov>; Verna Pradaxay <Verna.Pradaxay@law.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo <Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn <Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad <clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>; Melissa Szozda Smith <Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh <Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy <tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza

# Add. 472

<sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland <ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey <laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com; MWeinkowitz@lfsblaw.com; myeates@ktmc.com; pwarren@motleyrice.com; lhazam@lchb.com; jennie@andrusanderson.com; Alexandra Kory <Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

Emily,

We have a fundamental disagreement about the implications of Judge Kang's order.  As you know, "the primary issue in dispute [was] whether the named State Plaintiffs have 'control' for purposes of discovery over their respective state agencies' documents."  ECF No. 1117 at 2.  As framed by the Court, the order "resolve[s] whether and which named State Plaintiffs have control over their respective state agencies' documents – and thus whether such documents are to be sought in discovery by requests for production under Rule 34 (party discovery) or by subpoenas under Rule 45 (third party discovery)."  *Id*.  And as you know, the Court ruled that the documents of nearly all of the state agencies at issue were in the control of the state's AG, and thus subject to production by the AGs as parties to the litigation under Rule 34.

Meta served Rule 34 RFPs on the AGs over six months ago, and the AGs lodged their objections soon thereafter.  Rule 34 discovery does not provide an opportunity for those in direct possession of documents under the AGs' control to separately lodge objections months later.  Nor does Rule 34 discovery require Meta to separately meet and confer with those in direct possession of documents under the AGs' control.  Rather, Rule 34 requires the State AGs to collect, review, and produce documents responsive to Meta's RFPs that are within the State AGs' possession, custody, or control–which includes state agency documents per Judge Kang's order.

Your email also reads too much into Judge Kang's meet and confer directive.  Judge Kang directed "[t]he Parties (including counsel for the State Agencies) . . . to promptly meet and confer regarding a mutually agreeable and reasonable date for the State Agencies to substantially complete their respective productions of documents in response to either the Rule 34 requests or, to the extent applicable, Rule 45 subpoenas."  *Id*. at 248.  Judge Kang did not order Meta to meet individually with state agencies whose documents were under AG control about any objections or engage in any agency-specific meet and confers about Rule 34 RFPs.  Indeed, Judge Kang's order makes clear that having each agency make individual agency objections, and requiring the parties to conduct agency-specific meet and confers, "is not conducive to the just and efficient administration of justice."  *Id*. at 40-41 (discussing "concern[s]" with requiring Meta "to issue over 250 individual subpoenas [to state agencies], and then negotiate the scope of each subpoena after receiving written responses and objections to each" which could lead to the presentation of "over 200 allegedly separate disputes over these subpoenas to this Court").

"Streamlining" the discovery process means that the State AGs should do what follows from Judge Kang's order: collect, review, and produce state agency documents responsive to Meta's RFPs.  If the State AGs continue to refuse to do so– and insist that Meta engage in over one hundred agency-specific discussions about agency-specific objections and production issues as if agency documents are third-party documents outside of the AGs' control–we will need to raise the issue with the Court tomorrow.  Meta reserves all rights.

Best,

Chris

---

**From:** Emily Kalanithi <Emily.Kalanithi@doj.ca.gov>
**Sent:** Wednesday, September 11, 2024 6:23 PM

**To:** Yeung, Christopher <cyeung@cov.com>; Bianca Miyata <Bianca.Miyata@coag.gov>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>; PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM; Laura Dilweg <Laura.Dilweg@azag.gov>; Nathan Whelihan <nathan.whelihan@azag.gov>; Nicklas Akers <Nicklas.Akers@doj.ca.gov>; Bernard Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill <Megan.Oneill@doj.ca.gov>; Joshua Olszewski-Jubelirer <Joshua.OlszewskiJubelirer@doj.ca.gov>; Marissa Roy <Marissa.Roy@doj.ca.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>; Megan Rundlet <Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>; Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk <Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler <Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer <Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger <Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>; Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon <Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>; Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan <Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass <Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>; Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine <michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman <pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider <Anna.Schneider@mt.gov>; Dthompson@cooperkirk.Com; Alivas@cooperkirk.Com; Megan Wold <mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com>; mkirk@cooperkirk.com; Colin Snider <Colin.Snider@nebraska.gov>; Kashif Chand <Kashif.Chand@law.njoag.gov>; Thomas Huynh <Thomas.Huynh@law.njoag.gov>; Gina Pittore <Gina.Pittore@law.njoag.gov>; Verna Pradaxay <Verna.Pradaxay@law.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo <Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn <Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad <clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>; Melissa Szozda Smith <Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh <Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy <tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza <sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland <ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey <laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com; MWeinkowitz@lfsblaw.com; myeates@ktmc.com; pwarren@motleyrice.com; lhazam@lchb.com; jennie@andrusanderson.com; Alexandra Kory <Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

[EXTERNAL]
Chris,

We write in response to your email regarding state agency discovery. You begin by stating that Meta's document requests to state agencies have been pending for six months. As you know, however, we received Magistrate Kang's order less than a week ago, and will soon be filing objections and a motion to stay the order. Without waiving our objections to the propriety of subjecting these non-party agencies to party discovery, while we are willing to meet and confer, the State AGs – and the 275 separately represented state agencies from whom Meta claims to want discovery – will need an opportunity to lodge any individual objections and to engage in agency-specific meet and confers.

Meet and confers on RFPs start by discussing what the party serving discovery is actually looking for and what the recipient has that can be produced without a burden that is disproportionate to the needs of the case.  In serving Rule 45 subpoenas in this case, Meta has already identified a logical starting point for this streamlining.  Accordingly, we expect that at a minimum, the parties can agree to limit state agency discovery to the agencies that have been served Rule 45 subpoenas and to the requests contained in those subpoenas (as modified by any agreements that Meta has already reached with those state agencies).  It would be extraordinarily burdensome and inefficient to restart this process and to disregard the agreements that have already been reached on various agencies' collection and production of documents.  In addition to this, we look forward to hearing other ideas Meta has for streamlining this discovery process to ensure any burden is proportionate, particularly here where the requested documents have little bearing on the claims or defenses in the case.

Should the parties be unable to find any compromise on streamlining, it will be necessary to engage in individual meet and confers with each State AG and agency counsel regarding the relevance of Meta's requests vis a vis the  work of their agencies.  In fact, Magistrate Kang's order assumes that state agency counsel will be involved in such meet and confers (see September 6, 2024 order at p. 248).

Finally, your suggestion of starting with the identification of custodians is neither efficient nor appropriate here.  As discussed in the context of the AGs' responses to Meta's RFPs, targeted searches are likely the proper method for identifying responsive documents, particularly as the state agencies are not percipient witnesses to the conduct underlying the claims and defenses in this action.

With respect to depositions, the Court set limits for depositions of both defendants and bellwether plaintiffs in March, when document productions were just beginning and, at that time, set aside the issue of limits for depositions of the AGs until it resolved the state agency discovery issue.  We believe it is appropriate to confer regarding those limits and can do so in conjunction with our conferral on state agency issues.

We are available to confer on both issues on Tuesday at 9:30 PT or 1:30 PT. Please advise if you are available at either time.

Best,
Emily

**Emily C. Kalanithi** | Supervising Deputy Attorney General l Consumer Protection
California Department of Justice | 455 Golden Gate Ave, 11th Fl, San Francisco, CA 94102
(415) 510-3468 | emily.kalanithi@doj.ca.gov

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Tuesday, September 10, 2024 2:46 PM
**To:** Bianca Miyata <Bianca.Miyata@coag.gov>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>; PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM; Laura Dilweg <Laura.Dilweg@azag.gov>; Nathan Whelihan <nathan.whelihan@azag.gov>; Nicklas Akers <Nicklas.Akers@doj.ca.gov>; Bernard Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill <Megan.Oneill@doj.ca.gov>; Joshua Olszewski-Jubelirer <Joshua.OlszewskiJubelirer@doj.ca.gov>; Marissa Roy <Marissa.Roy@doj.ca.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>; Megan Rundlet <Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>; Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk <Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler <Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer <Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger <Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>; Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon <Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>;

Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan
<Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott
Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass
<Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip
Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>;
Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine
<michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman
<pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin
Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider
<Anna.Schneider@mt.gov>; Dthompson@cooperkirk.Com; Alivas@cooperkirk.com; Megan Wold
<mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com; mkirk@cooperkirk.com; Colin Snider
<Colin.Snider@nebraska.gov>; Kashif Chand <Kashif.Chand@law.njoag.gov>; Thomas Huynh
<Thomas.Huynh@law.njoag.gov>; Gina Pittore <Gina.Pittore@law.njoag.gov>; Verna Pradaxay
<Verna.Pradaxay@law.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo
<Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn
<Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad
<clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>; Melissa Szozda Smith
<Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh
<Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy
<tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza
<sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland
<ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe
Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey
<laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com; MWeinkowitz@lfsblaw.com;
myeates@ktmc.com; pwarren@motleyrice.com; lhazam@lchb.com; jennie@andrusanderson.com; Alexandra Kory
<Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory
<GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** RE: MDL 3047 - State Agency Discovery Meet and Confer

EXTERNAL EMAIL: This message was sent from outside DOJ. Please do not click links or open attachments that appear suspicious.

Bianca,

While we would prefer to meet this week and not delay, we are available on Monday from 10 am - 12 pm ET, 1:30 - 2
pm ET, and 4 – 6 pm ET, and Tuesday from 10 am – 12:30 pm ET. and then 3 – 5:30 pm ET.  Please let us know what
works for you.

In the meantime, it has now been over six months since Meta served RFPs requesting documents that included state
agency documents, and document productions are to be substantially completed by November 5, 2024 under the most
recent scheduling order.  As such, please let us know if the State AGs are willing to agree to the following schedule for
substantially completing the production of state agency documents:

- State AGs propose initial custodians for each agency and universal search terms by September 13,
  2024.
- Meta proposes additional custodians and search terms by September 27, 2024.
- The parties meet and confer in an attempt to resolve any custodian and search term disputes by
  October 4, 2024.
- State AGs substantially complete document productions, including of all state agency documents
  responsive to Meta's RFPs that are in the AGs' "legal control" as provided in Magistrate Judge Kang's
  order, by November 5, 2024.

Additionally, by Friday, September 13, 2024, please provide us with a list of all state agencies that have been issued litigation holds, and when those holds were issued.

Please note that Meta expects each State AG to fulfill party discovery obligations with respect to the collection, review, and production of responsive documents in its custody – including documents in the files of state agencies that Magistrate Judge Kang deemed within State AG control.  To the extent that any state agency whose documents have been deemed in any State AG's control also received an overlapping subpoena from Meta (e.g., subpoenas issued in non-school district cases), any objections, limitations, restrictions, or accommodations that have been requested or suggested with respect to such subpoena (e.g., objections on the basis of burden to third parties, refusal to search for responsive ESI, etc.) will not apply to the State AGs' party discovery obligations.

Finally, we have received the AGs' request that we confer on the number of depositions this week.  While we are available to confer about depositions, we are not sure we can reach final agreement without some sense of the productions the AGs will make.  More fundamentally, if the AGs are already ready to confer this week about depositions, which of course is a type of discovery that would follow the State AGs' meeting their document production obligations, they should certainly be ready to meet this week – and not wait until next week – to discuss that precursor production.

Best,

Chris

---

**From:** Bianca Miyata <Bianca.Miyata@coag.gov>
**Sent:** Sunday, September 8, 2024 11:25 AM
**To:** Yeung, Christopher <cyeung@cov.com>; Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>; PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM; Laura Dilweg <Laura.Dilweg@azag.gov>; Nathan Whelihan <nathan.whelihan@azag.gov>; Nicklas Akers <Nicklas.Akers@doj.ca.gov>; Barney Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill <Megan.Oneill@doj.ca.gov>; Josh Olszewski <Joshua.Olszewskijubelirer@doj.ca.gov>; Marissa Roy <Marissa.Roy@doj.ca.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>; Megan Rundlet <Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>; Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk <Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler <Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer <Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger <Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>; Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon <Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>; Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan <Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass <Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>; Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine <michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman <pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider <Anna.Schneider@mt.gov>; Dthompson@cooperkirk.Com; Alivas@cooperkirk.Com; Megan Wold <mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com>; mkirk@cooperkirk.com; Colin Snider <Colin.Snider@nebraska.gov>; Kashif Chand <Kashif.Chand@law.njoag.gov>; Thomas Huynh <Thomas.Huynh@law.njoag.gov>; Gina Pittore <Gina.Pittore@law.njoag.gov>; Verna Pradaxay <Verna.Pradaxay@law.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo <Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn <Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad

<clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>; Melissa Szozda Smith
<Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh
<Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy
<tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza
<sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland
<ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe
Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey
<laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com>; MWeinkowitz@lfsblaw.com>;
myeates@ktmc.com; pwarren@motleyrice.com; lhazam@lchb.com; jennie@andrusanderson.com; Alexandra Kory
<Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory
<GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** Re: MDL 3047 - State Agency Discovery Meet and Confer

[EXTERNAL]
Hi Chris,

Thanks for your email. We are still digesting the Court's order and will circle back with our availability once we have had
a chance to confer internally with the State AG coalition.

Best,
Bianca

---

**From:** Yeung, Christopher <cyeung@cov.com>
**Sent:** Sunday, September 8, 2024 8:17:25 AM
**To:** Social Media MDL State AGs Lead Counsel <SM.MDLAGLeads@coag.gov>;
PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM <PLTFSOCIALMEDIASERVICE@LISTSERV.MOTLEYRICE.COM>;
Laura Dilweg <Laura.Dilweg@azag.gov>; Nathan Whelihan <nathan.whelihan@azag.gov>; Nicklas Akers
<Nicklas.Akers@doj.ca.gov>; Barney Eskandari <Bernard.Eskandari@doj.ca.gov>; Megan O'Neill
<Megan.Oneill@doj.ca.gov>; Josh Olszewski <Joshua.Olszewskijubelirer@doj.ca.gov>; Marissa Roy
<Marissa.Roy@doj.ca.gov>; Bianca Miyata <Bianca.Miyata@coag.gov>; Lauren Dickey <Lauren.Dickey@coag.gov>;
Megan Rundlet <Megan.Rundlet@coag.gov>; Beth Orem <Beth.Orem@coag.gov>; Lauren Bidra <lauren.bidra@ct.gov>;
Krislyn Launer <Krislyn.Launer@ct.gov>; Ashley Meskill <Ashley.Meskill@ct.gov>; Marion Quirk
<Marion.Quirk@delaware.gov>; Dashiell Radosti <Dashiell.Radosti@delaware.gov>; Victoria Butler
<Victoria.Butler@myfloridalegal.com>; John Guard <John.Guard@myfloridalegal.com>; Nicholas Weilhammer
<Nicholas.Weilhammer@myfloridalegal.com>; Donna Valin <Donna.Valin@myfloridalegal.com>; Karen Berger
<Karen.Berger@myfloridalegal.com>; Melissa Devine <mdevine@law.ga.gov>; Bryan Yee <Bryan.c.yee@hawaii.gov>;
Christopher Han <christopher.t.han@hawaii.gov>; Nathan Nielson <nathan.nielson@ag.idaho.gov>; Stephanie Guyon
<Stephanie.Guyon@ag.idaho.gov>; Susan Ellis <Susan.Ellis@ilag.gov>; Greg Grzeskiewicz <Greg.Grzeskiewicz@ilag.gov>;
Jacob Gilbert <Jacob.gilbert@ilag.gov>; Daniel Edelstein <Daniel.Edelstein@ilag.gov>; Kevin Whelan
<Kevin.Whelan@ilag.gov>; Adam Sokol <Adam.Sokol@ilag.gov>; Emily Migliore <Emily.Migliore@ilag.gov>; Scott
Barnhart <Scott.Barnhart@atg.in.gov>; Corinne Gilchrist <Corinne.Gilchrist@atg.in.gov>; Mark Snodgrass
<Mark.Snodgrass@atg.in.gov>; Sarah Dietz <Sarah.Dietz@ag.ks.gov>; Christian Lewis <Christian.Lewis@ky.gov>; Philip
Heleringer <Philip.Heleringer@ky.gov>; Zach Richards <Zach.Richards@ky.gov>; Daniel Keiser <daniel.keiser@ky.gov>;
Arham Mughal <mughala@ag.louisiana.gov>; Chris Styron <StyronL@ag.louisiana.gov>; Michael Devine
<michael.devine@maine.gov>; Laura Lee Barry Wommack <LauraLee.BarryWommack@maine.gov>; Philip Ziperman
<pziperman@oag.state.md.us>; Elizabeth Stern <estern@oag.state.md.us>; Daniel Ping <pingd@michigan.gov>; Caitlin
Micko <Caitlin.Micko@ag.state.mn.us>; Michael Schwalbert <michael.schwalbert@ago.mo.gov>; Anna Schneider
<Anna.Schneider@mt.gov>; Dthompson@cooperkirk.Com <Dthompson@cooperkirk.com>; Alivas@cooperkirk.Com
<Alivas@cooperkirk.Com>; Megan Wold <mwold@cooperkirk.com>; Brian Barnes <bbarnes@cooperkirk.com>;
mkirk@cooperkirk.com <mkirk@cooperkirk.com>; Colin Snider <Colin.Snider@nebraska.gov>; Kashif Chand
<Kashif.Chand@law.njoag.gov>; Thomas Huynh <Thomas.Huynh@law.njoag.gov>; Gina Pittore

<Gina.Pittore@law.njoag.gov>; Verna Pradaxay <Verna.Pradaxay@law.njoag.gov>; Mandy Wang <Mandy.Wang@law.njoag.gov>; Chris D'Angelo <Christopher.D'Angelo@ag.ny.gov>; Clark Russell <Clark.Russell@ag.ny.gov>; Nathaniel Kosslyn <Nathaniel.Kosslyn@ag.ny.gov>; Kevin Anderson <kander@ncdoj.gov>; Elin Alm <ealm@nd.gov>; Christopher Lindblad <clindblad@nd.gov>; Melissa Wright <Melissa.Wright@ohioago.gov>; Melissa Szozda Smith <Melissa.S.Smith@ohioago.gov>; Michael Ziegler <Michael.Ziegler@ohioago.gov>; Kevin Walsh <Kevin.Walsh@ohioago.gov>; Jordan Roberts <Jordan.M.Roberts@doj.state.or.us>; Tim Murphy <tmurphy@attorneygeneral.gov>; Jonathan Burns <jburns@attorneygeneral.gov>; Stephen Provazza <sprovazza@riag.ri.gov>; Jared Libet <jlibet@scag.gov>; Anna Smith <AnnaSmith@scag.gov>; Clark Kirkland <ckirkland@scag.gov>; Jessica LaMie <Jessica.LaMie@state.sd.us>; Joelle Gotwals <jgotwals@oag.state.va.us>; Joe Kanada <Joe.Kanada@atg.wa.gov>; Alexia Diorio <Alexia.Diorio@atg.wa.gov>; Laurel Lackey <laurel.k.lackey@wvago.gov>; smmdlschooldistrictbellwethergroup@lfsblaw.com <smmdlschooldistrictbellwethergroup@lfsblaw.com>; MWeinkowitz@lfsblaw.com <MWeinkowitz@lfsblaw.com>; myeates@ktmc.com <myeates@ktmc.com>; pwarren@motleyrice.com <pwarren@motleyrice.com>; lhazam@lchb.com <lhazam@lchb.com>; jennie@andrusanderson.com <jennie@andrusanderson.com>; Alexandra Kory <Alexandra.Kory@atg.wa.gov>; Colin Stroud <stroudcr@doj.state.wi.us>; Matthew Davies <matthew.davies@ilag.gov>
**Cc:** Simonsen, Ashley M <asimonsen@cov.com>; Schmidt, Paul <pschmidt@cov.com>; Halperin, Gregory <GHalperin@cov.com>; Grigsby, Stacey <SGrigsby@cov.com>; Hester, Timothy <thester@cov.com>
**Subject:** MDL 3047 - State Agency Discovery Meet and Confer

Counsel,

As you know, Magistrate Judge Kang's order on Friday, ECF No. 1117 (attached), on State AG control of state agency documents directed the parties to promptly meet and confer regarding a deadline for the substantial completion of the production of the state agencies' documents.  Please let us know your availability to meet and confer on Monday, Tuesday, or Wednesday, and be prepared to discuss that substantial completion deadline, as well as interim deadlines for (1) identifying custodians from each agency, (2) agreeing to a universal set of search terms to be run across those agencies' documents, and (3) substantially completing productions from all state agency custodians.  We are available on Monday (4-6 ET), Tuesday (11:30 – 12:30, 1:30-5:30 ET), or Wednesday (12-1:30, 2:45-5:30 ET).

Best,

Chris

**Christopher Y. L. Yeung**

Covington & Burling LLP
The New York Times Building, 620 Eighth Avenue
New York, NY 10018-1405
T +1 212 841 1262 | cyeung@cov.com
www.cov.com

# COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged

# Add. 479

information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

**Add. 480**

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| THIS DOCUMENT RELATES TO: | Case Nos.:  4:22-md-03047-YGR-PHK |
| *People of the State of California, et al. v. Meta Platforms, Inc., et al.* | 4:23-cv-05448-YGR |
| | **[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES** |
| | Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |

1    Pursuant to Federal Rule of Civil Procedure 37(b), the Court GRANTS Meta's Motion for

2    Discovery Sanctions Regarding State Agencies.  The Court finds that the agencies listed in the chart below

3    violated its discovery orders, and that the States of which those agencies are a part therefore violated those

4    discovery orders.  In particular, the Court finds that the agencies and States listed below violated the

5    Court's September 6, 2024 Order (ECF 1117) finding that these agencies are subject to party discovery

6    and ordering them promptly to confer with Meta to resolve Meta's discovery requests to them.  In addition,

7    the Court finds that the agencies listed in Column D violated the Court's Orders at ECF 1291, 1299, 1380,

8    and 969, and the Orders issued orally at the December 11, 2024 Discovery Management Conference, by

9    failing to meet the deadlines imposed by those Orders and/or failing promptly and sufficiently to confer

10   and negotiate to comply with those Orders.  The Court further finds that the agencies listed in Column E

11   below violated the Court's Order that the general relevant time period for discovery concerning Meta

12   begins January 1, 2012 (ECF 969 at 5) by refusing to produce documents from before 2015.

13   The Court awards sanctions as laid out in the following chart.

14   For the agencies indicated in Column C, the Court sanctions the agency at issue by finding a

15   violation of the Court's orders, as described above.

16   For the agencies indicated in Column D, the Court sanctions the agency at issue as follows: (1) the

17   agency is ordered to run Meta's most recently proposed search terms and custodians to determine the

18   scope of their document productions in response to Meta's requests for production ("RFPs"); (2) the

19   States' and agencies' objections to Meta's RFPs are deemed overruled and/or waived and the States and

20   agencies may not rely on those objections to limit their productions in response to Meta's RFPs; (3) if the

21   agency fails to complete its productions in response to Meta's RFPs by January 10, 2025, that agency is

22   ordered to immediately procure an eDiscovery vendor, at the State's cost, that is capable of promptly

23   collecting, reviewing, and producing the documents; and (4) if the agency fails to complete its productions

24   in response to Meta's RFPs by January 10, 2025, Meta shall have an additional seven hours of 30(b)(6)

25   deposition time beyond that previously granted, and the State of which the agency is part shall (in addition

26   to completing those document productions) prepare its 30(b)(6) witnesses to competently testify about the

27   topics that would otherwise have been covered by the agencies' (deficient) document productions.

28   For the agencies indicated in Column E, the State of which the agency is part is prohibited from

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

citing or relying on documents or conduct of Meta from before 2015 at summary judgment or trial.

For the agencies indicated in Column F, the Court awards reasonable fees and costs to Meta pursuant to Rule 37(b); Meta shall submit a proposed award of fees and costs for the Court to examine.

For the agencies indicated in Column G, the Court awards a monetary sanction for each day that the agency continues to not fully comply with all Court orders, including this one. That award shall be $200 per day, to double each week. Once the agency believes it is in compliance, it may file a notice with the Court so stating under penalty of perjury and explaining how it is in compliance.

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| State | Agency | Finding of violation of court order | Required to Run Meta's Custodians and Search Terms; Objections Overruled; Produce 30(b)(6) Deponent; and Procure eDiscovery Vendor | Prohibited from Relying on Pre-2015 Documents and Conduct | Fees and Costs | Prospective Monetary Sanctions |
| AZ | Department of Child Safety | X | X | X | X | X |
| AZ | Department of Education | X | X | X | X | X |
| AZ | Board of Education | X | X | X | X | X |

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| State | Agency | Finding of violation of court order | Required to Run Meta's Custodians and Search Terms; Objections Overruled; Produce 30(b)(6) Deponent; and Procure eDiscovery Vendor | Prohibited from Relying on Pre-2015 Documents and Conduct | Fees and Costs | Prospective Monetary Sanctions |
| AZ | Department of Health Services | X | X | X | X | X |
| CA | Department of Health Care Services | X | X |  | X | X |
| CA | Health and Human Services Agency | X | X |  | X | X |
| CA | Mental Health Services Oversight and Accountability Commission | X | X |  | X | X |
| CO | Colorado Behavioral Health Administration | X | X |  | X | X |
| CO | Colorado Department of Education | X | X |  | X | X |
| CO | Colorado Department of Higher Education | X | X |  | X | X |
| CO | Colorado Department of | X | X |  | X | X |

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| State | Agency | Finding of violation of court order | Required to Run Meta's Custodians and Search Terms; Objections Overruled; Produce 30(b)(6) Deponent; and Procure eDiscovery Vendor | Prohibited from Relying on Pre-2015 Documents and Conduct | Fees and Costs | Prospective Monetary Sanctions |
| | Human Services | | | | | |
| **CO** | Colorado Governor's Office | X | X | | X | X |
| **CO** | Colorado Office of State Planning and Budgeting (OSPB) | X | X | | X | X |
| **DE** | Department of Education (DOE) | X | X | X | X | X |
| **DE** | Department of Services for Children, Youth and Families (DSCYF) | X | X | X | X | X |
| **DE** | Office of the Governor (OGOV) | X | X | X | X | X |
| **HI** | Department of Education | X | X | X | X | X |
| **HI** | Department of Health | X | X | X | X | X |

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| State | Agency | Finding of violation of court order | Required to Run Meta's Custodians and Search Terms; Objections Overruled; Produce 30(b)(6) Deponent; and Procure eDiscovery Vendor | Prohibited from Relying on Pre-2015 Documents and Conduct | Fees and Costs | Prospective Monetary Sanctions |
| HI | Department of Human Services | X | X | X | X | X |
| HI | Budget and Finance | X | X | X | X | X |
| HI | Department of Business, Economic Development, and Tourism | X | X | X | X | X |
| HI | Department of Commerce and Consumer Affairs | X | X | X | X | X |
| HI | Office of the Governor | X | X | X | X | X |
| HI | State Council on Mental Health | X | X | X | X | X |
| IL | Board of Education | X | X | X | X | X |
| IL | Department of Children and Family Services | X | X | X | X | X |
| IL | Department of Human Services | X | X | X | X | X |

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

| State | Agency | Finding of violation of court order | Required to Run Meta's Custodians and Search Terms; Objections Overruled; Produce 30(b)(6) Deponent; and Procure eDiscovery Vendor | Prohibited from Relying on Pre-2015 Documents and Conduct | Fees and Costs | Prospective Monetary Sanctions |
|---|---|---|---|---|---|---|
| **A** | **B** | **C** | **D** | **E** | **F** | **G** |
| **IL** | Department of Public Health | X | X | X | X | X |
| **IL** | Office of the Governor | X | X | X | X | X |
| **IN** | Department of Education (DOE) | X | X | X | X | X |
| **IN** | Department of Health (DOH) | X | X | X | X | X |
| **IN** | Indiana Department of Child Services (DCS) | X | X | X | X | X |
| **IN** | Family and Social Services Administration (FSSA) | X | X | X | X | X |
| **KS** | Board of Regents | X | X | | X | X |
| **KS** | Department for Aging and Disability Services | X | X | | X | X |
| **KS** | Department of Children and Family Services | X | X | | X | X |

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| State | Agency | Finding of violation of court order | Required to Run Meta's Custodians and Search Terms; Objections Overruled; Produce 30(b)(6) Deponent; and Procure eDiscovery Vendor | Prohibited from Relying on Pre-2015 Documents and Conduct | Fees and Costs | Prospective Monetary Sanctions |
| KS | Department of Education | X | X | | X | X |
| KS | Department of Health & Environment | X | X | | X | X |
| KS | Governor's Office | X | X | | X | X |
| MN | Department of Human Services | X | X | | X | X |
| MN | Department of Education | X | X | | X | X |
| NE | Department of Health and Human Services (DHHS) | X | X | X | X | X |
| NE | Department of Education (DOE) | X | X | X | X | X |
| NE | Children's Commission | X | X | X | X | X |
| NE | Governor's Office | X | X | X | X | X |

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| State | Agency | Finding of violation of court order | Required to Run Meta's Custodians and Search Terms; Objections Overruled; Produce 30(b)(6) Deponent; and Procure eDiscovery Vendor | Prohibited from Relying on Pre-2015 Documents and Conduct | Fees and Costs | Prospective Monetary Sanctions |
| NY | Council on Children and Families | X | X | X | X | X |
| NY | Department of Education | X | X | X | X | X |
| NY | Department of Health | X | X | X | X | X |
| NY | Office of Children and Family Services | X | X | X | X | X |
| NY | Office of Mental Health | X | X | X | X | X |
| NY | Office of the Governor | X | X | X | X | X |
| NY | State Division of the Budget | X | X | X | X | X |
| OH | Department of Children and Youth | X | X | X | X | X |
| OH | Department of Education and Workforce | X | X | X | X | X |

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| State | Agency | Finding of violation of court order | Required to Run Meta's Custodians and Search Terms; Objections Overruled; Produce 30(b)(6) Deponent; and Procure eDiscovery Vendor | Prohibited from Relying on Pre-2015 Documents and Conduct | Fees and Costs | Prospective Monetary Sanctions |
| OH | Department of Health | X | X | X | X | X |
| OH | Department of Higher Education | X | X | X | X | X |
| OH | Department of Job and Family Services | X | X | X | X | X |
| OH | Department of Mental Health & Addiction Services | X | X | X | X | X |
| OH | Department of Youth Services | X | X | X | X | X |
| OH | Office of the Governor | X | X | X | X | X |
| PA | Department of Communities and Economic Development | X | X | X | X | X |
| PA | Department of Education (DOE) | X | X | X | X | X |
| PA | Department of Health (DOH) | X | X | X | X | X |

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

| A | B | C | D | E | F | G |
|---|---|---|---|---|---|---|
| State | Agency | Finding of violation of court order | Required to Run Meta's Custodians and Search Terms; Objections Overruled; Produce 30(b)(6) Deponent; and Procure eDiscovery Vendor | Prohibited from Relying on Pre-2015 Documents and Conduct | Fees and Costs | Prospective Monetary Sanctions |
| PA | Department of Human Services (DHS) | X | X | X | X | X |
| PA | Governor's Office | X | X | X | X | X |
| PA | Office of the Budget | X | X | X | X | X |
| SD | Board of Regents | X | X | X | X | X |
| SD | Bureau of Finance and Management | X | X | X | X | X |
| SD | Department of Education | X | X | X | X | X |
| SD | Department of Health | X | X | X | X | X |
| SD | Department of Social Services | X | X | X | X | X |
| SD | Governor's Office | X | X | X | X | X |
| SD | AG's office | X | X | X | X | X |

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

**IT IS SO ORDERED.**

DATED: _____

_____
Hon. Peter H. Kang
United States Magistrate Judge

[PROPOSED] ORDER GRANTING META'S MOTION FOR DISCOVERY SANCTIONS REGARDING STATE AGENCIES

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc., et al.* | MDL No. 3047<br><br>Case Nos.:    4:22-md-03047-YGR (PHK)<br>               4:23-cv-05448-YGR<br><br>**JOINT STATUS REPORT ON STATE AGENCIES' PRODUCTION OF DOCUMENTS**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |

Dear Judge Kang:

      Pursuant to ECF No. 1495, Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC (collectively, "Meta") and the State Attorneys General ("State AGs") respectfully submit the attached joint one-page status reports regarding discovery of documents of certain state agencies in 25 States: Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Dakota, Washington, and Wisconsin.[1]

---

[1] Meta reports that the Parties resolved their disputes regarding discovery of state agency documents in nine of these States in advance of the December 20, 2024 joint letter briefing: Connecticut, Kentucky, Louisiana, Maine, New Jersey, North Carolina, Oregon, Rhode Island, South Carolina, Virginia, Washington, and Wisconsin. Subsequent to the December 20, 2024 joint letter briefing, the Parties fully resolved their disputes regarding discovery of state agency documents in three States: Indiana, Kansas, and South Dakota. Two States are discussing dismissal of their cases: Michigan and Missouri. As set forth more fully herein, some disputes remain outstanding in eleven States: Arizona, California, Colorado, Delaware, Hawai'i, Illinois, Minnesota, Nebraska, New York, Ohio, and Pennsylvania.

Ten states were not ordered to submit scheduling proposals and therefore were not addressed in the Court's December 31 Order and are not included here. Four States dismissed their cases: Florida, Georgia, Montana, and North Dakota. Three States reached agreement with Meta on search parameters in advance of the December 11 Discovery Management Conference that precipitated the scheduling submissions: Oregon, South Carolina, and Virginia. Three States are asserting only COPPA claims, and therefore are not subject to the discovery disputes at issue: Idaho, Maryland, and West Virginia.

Dated: January 6, 2025

Respectfully submitted,

**COVINGTON & BURLING LLP**

*/s/Ashley Simonsen*
Ashley Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Michael X. Imbroscio, *pro hac vice*
Stephen Petkis, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com
Email: mimbroscio@cov.com
Email: spetkis@cov.com

Paul W. Schmidt, *pro hac vice*
Christopher Y.L. Yeung, *pro hac vice*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: + 1 (212) 841-1262
Facsimile: + 1 (202) 662-6291
Email: pschmidt@cov.com
Email: cyeung@cov.com

*Attorneys for Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC*

**Add. 494**

**KRIS MAYES**
Attorney General
State of Arizona

*/s/ Laura Dilweg*
Laura Dilweg (AZ No. 036066, CA No. 260663)
Chief Counsel - Consumer Protection and Advocacy Section
Nathan Whelihan (AZ No. 037560, CA No. 293684), *pro hac vice*
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax:    (602) 542-4377
Laura.Dilweg@azag.gov
Nathan.Whelihan@azag.gov

*Attorneys for Plaintiff State of Arizona*


**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Krista F. Batchelder*
Krista Batchelder, CO Reg. No. 45066, *pro hac vice*
Deputy Solicitor General
Shannon Stevenson, CO Reg. No. 35542, *pro hac vice*
Solicitor General
Elizabeth Orem, CO Reg. No. 58309
Danny Rheiner, CO Reg. No. 48821
Assistant Attorney Generals
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6384
krista.batchelder@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel. Philip J. Weiser, Attorney General*


**ROB BONTA**
Attorney General
State of California

*/s/ Anna Ferrari*
R. Matthew Wise (CA SBN 238485)
Lara Haddad (CA SBN 319630)
Supervising Deputy Attorneys General
Anna Ferrari (CA SBN 261579)
Deputy Attorney General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
Anna.Ferrari@doj.ca.gov

*Attorneys for the California Health and Human Services Agency, the Department of Health Care Services, and the Mental Health Services Oversight and Accountability Commission*


**MARGARET R. PRINZING** (CA SBN 209482)
Olson Remcho, LLP
1901 Harrison Street, Suite 1550
Oakland, CA 94612
Phone: (510) 346-6200
Fax: (510) 574-7061
Email: mprinzing@olsonremcho.com

*Attorneys for Non-Parties*
*Office of the Governor*
*California Office of Data & Innovation*
*California Governor's Office of Business and Economic Development*
*California Department of Finance*
*California Department of Public Health*
*California Department of Consumer Affairs and*
*California Business, Consumer Services and Housing Agency*

**Add. 495**

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Lauren H. Bidra*
Lauren H. Bidra
(CT Juris No. 440552), *pro hac vice*
Special Counsel for Media and Technology
 Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5306
Fax: 860-808-5593
Lauren.Bidra@ct.gov
Krislyn.Launer@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Marion Quirk*
Marion Quirk (DE Bar 4136), *pro hac vice*
Director of Consumer Protection
Ryan Costa (DE Bar 5325), pro hac vice
Deputy Director of Consumer Protection
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8810
Marion.Quirk@delaware.gov
Ryan.Costa@delaware.gov

*Attorneys for Plaintiff State of Delaware*

**ANNE E. LOPEZ**
Attorney General
State of Hawai'i

*/s/ Christopher T. Han*
Bryan C. Yee (HI JD No. 4050),
*pro hac vice*

**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Mark Snodgrass*
Scott L. Barnhart (IN Atty No. 25474-82),
*pro hac vice*
Chief Counsel and Director of Consumer
Protection
Corinne Gilchrist (IN Atty No. 27115-53),
*pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49),
*pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/ Sarah M. Dietz*
Sarah Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*

**LIZ MURRILL**
Attorney General
State of Louisiana

*/s/ Asyl Nachabe*

4

**Add. 496**

Supervising Deputy Attorney General
Christopher T. Han (HI JD No. 11311),
*pro hac vice*
Deputy Attorney General
Department of the Attorney General
Commerce and Economic Development Division
425 Queen Street
Honolulu, Hawai'i 96813
Phone: (808) 586-1180
Bryan.c.yee@hawaii.gov
Christopher.t.han@hawaii.gov

*Attorneys for Plaintiff State of Hawai'i*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Kevin Whelan*
Susan Ellis, Chief, Consumer Protection Division
(IL Bar No. 6256460)
Greg Grzeskiewicz, Chief, Consumer Fraud
Bureau (IL Bar No. 6272322)
Jacob Gilbert, Deputy Chief, Consumer Fraud
Bureau (IL Bar No. 6306019)
Adam Sokol, Consumer Counsel, Consumer Fraud
Bureau (IL Bar No. 6216883)
Matthew Davies, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6299608), *pro
hac vice*
Emily María Migliore, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6336392)
Kevin Whelan, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6321715), *pro
hac vice*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-2218
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Adam.Sokol@ilag.gov
Matthew.Davies@ilag.gov
Emily.Migliore@ilag.gov
Kevin.Whelan@ilag.gov

Asyl Nachabe (LA Bar No. 38846),
*pro hac vice*
L. Christopher Styron (LA Bar No. 30747),
*pro hac vice*
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
NachabeA@ag.louisiana.gov
StyronC@ag.louisiana.gov

*Attorneys for State of Louisiana*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Michael Devine*
Michael Devine, Maine Bar No. 5048,
*pro hac vice*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8829
michael.devine@maine.gov

*Attorney for Plaintiff State of Maine*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Caitlin Micko*
Caitlin Micko (MN Bar No. 0395388)
*pro hac vice*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 724-9180
caitlin.micko@ag.state.mn.us

5

**Add. 497**

*Attorneys for Plaintiff the People of the State of Illinois*

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ Philip Heleringer*
J. Christian Lewis (KY Bar No. 87109),
*Pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*Pro hac vice*
Zachary Richards (KY Bar No. 99209),
*Pro hac vice*
Daniel I. Keiser (KY Bar No. 100264),
*Pro hac vice*
Matthew Cocanougher (KY Bar No. 94292),
*Pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
CHRISTIAN.LEWIS@KY.GOV
PHILIP.HELERINGER@KY.GOV
ZACH.RICHARDS@KY.GOV
DANIEL.KEISER@KY.GOV
MATTHEW.COCANOUGHER@KY.GOV
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482), *pro hac vice*
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
517-335-7632
PingD@michigan.gov

*Attorney for Plaintiff State of Minnesota, by its Attorney General, Keith Ellison*

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

*/s/ Colin P. Snider*
Colin P. Snider (NE #27724)
Assistant Attorney General
*pro hac vice*
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
Phone: (402) 471-3840
Email: michaela.hohwieler@nebraska.gov
Email: colin.snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Christopher D'Angelo*
Christopher D'Angelo, Chief Deputy Attorney General, Economic Justice Division
(NY Bar No. 4348744), *pro hac vice*
Christopher.D'Angelo@ag.ny.gov
Clark Russell, Deputy Chief, Bureau of Internet and Technology
(NY Bar No. 2848323), *pro hac vice*
Clark.Russell@ag.ny.gov
Nathaniel Kosslyn, Assistant Attorney General
(NY Bar No. 5773676), *pro hac vice*
Nathaniel.Kosslyn@ag.ny.gov
New York Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8262

*Attorneys for Plaintiff the People of the State of New York*

6

**Add. 498**

*Attorney for Plaintiff State of Michigan*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Thomas Huynh*
Kashif T. Chand (NJ Bar No. 016752008),
*Pro hac vice*
Section Chief, Deputy Attorney General
Thomas Huynh (NJ Bar No. 200942017),
*Pro hac vice*
Assistant Section Chief, Deputy Attorney General
Verna J. Pradaxay (NJ Bar No. 335822021),
*Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021),
*Pro hac vice*
Deputy Attorneys General

New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs New Jersey Attorney General and the New Jersey Division of Consumer Affairs Matthew J. Platkin, Attorney General for the State of New Jersey, and Cari Fais, Director of the New Jersey Division of Consumer Affairs*

**MICHELLE A. HENRY**
Attorney General
Commonwealth of Pennsylvania

*/s/ Jonathan R. Burns*
Timothy R. Murphy
Senior Deputy Attorney General
(PA Bar No. 321294), *pro hac vice*
Email: tmurphy@attorneygeneral.gov
Jonathan R. Burns

**DAVE YOST**
Attorney General
State of Ohio

*/s/ Kevin R. Walsh*
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
*pro hac vice*
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

*Attorneys for State of Ohio, ex rel. Attorney General Dave Yost*

**JOSHUA H. STEIN**
Attorney General
State of North Carolina

*/s/ Charles G. White*
Charles G. White (N.C. State Bar No. 57735)
Special Deputy Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6889
cwhite@ncdoj.gov

*Attorney for Plaintiff, State North Carolina*

**MARTY J. JACKLEY**
Attorney General
State of South Dakota

7

**Add. 499**

Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

**ROBERT W. FERGUSON**
Attorney General
State of Washington

/s/ Alexandra Kory
Alexandra Kory (WA Bar No. 49889),
*pro hac vice*
Joseph Kanada (WA Bar No. 55055),
*pro hac vice*
Rabi Lahiri
Gardner Reed
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Alexandra.Kory@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

/s/ Stephen N. Provazza
Stephen N. Provazza (R.I. Bar No. 10435),
*pro hac vice*
Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

/s/ Jessica M. LaMie
By: Jessica M. LaMie (SD Bar No. 4831),
*pro hac vice*
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Jessica.LaMie@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

/s/ Colin R. Stroud
Colin R. Stroud
Assistant Attorney General
WI State Bar #1119457, *pro hac vice*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-9224
stroudcr@doj.state.wi.us

*Attorney for Plaintiff State of Wisconsin*

8

**Add. 500**

**SECTION I: STATES WITH NO OUTSTANDING AGENCY DISCOVERY DISPUTES**

**Connecticut**

Negotiations regarding search terms and custodians for the relevant Connecticut agencies were finalized on December 20, 2024. The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Connecticut.

Add. 501

**Indiana**

    Negotiations regarding search terms and custodians for the following Indiana agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Department of Child Services
2. Department of Health
3. Department of Education
4. Indiana Family and Social Services Administration

**Add. 502**

## Kansas

Negotiations regarding search terms and custodians for the following Kansas agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Board of Regents
2. Department of Aging and Disability Services
3. Department of Children and Family Services
4. Department of Education
5. Department of Health & Environment
6. Governor's Office

**Add. 503**

**Kentucky**

Negotiations regarding search terms and custodians for the relevant Kentucky agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Kentucky.

Add. 504

**Louisiana**

Negotiations regarding search terms and custodians for the relevant Louisiana agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Louisiana.

**Add. 505**

### Maine

Negotiations regarding search terms and custodians for the relevant Maine agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Maine.

**Add. 506**

**New Jersey**

Negotiations regarding search terms and custodians for the relevant New Jersey agencies were finalized on December 19, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving New Jersey.

**Add. 507**

**North Carolina**

Negotiations regarding search terms and custodians for the relevant North Carolina agencies were finalized on December 20, 2024. The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving North Carolina.

**Add. 508**

**Rhode Island**

Negotiations regarding search terms and custodians for the relevant Rhode Island agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Rhode Island.

9

### South Dakota

Negotiations regarding search terms and custodians for the following South Dakota agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Department of Education
2. Department of Health
3. Department of Social Services
4. Board of Regents
5. Office of the Governor
6. Bureau of Finance and Management

**Add. 510**

**Washington**

Negotiations regarding search terms and custodians for the relevant Washington agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Washington.

**Add. 511**

**Wisconsin**

Negotiations regarding search terms and custodians for the relevant Wisconsin agencies were finalized on December 19, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Wisconsin.

Add. 512

## SECTION II: STATES THAT INTEND TO DISMISS THEIR CASES

### Michigan

Michigan has agreed in principle to dismiss its case, subject to the parties memorializing their agreement in writing. The parties are discussing the terms of such dismissal.

13

**Add. 513**

**Missouri**

Missouri has agreed in principle to dismiss its case, subject to the parties memorializing their agreement in writing. The parties are discussing the terms of such dismissal.

**Add. 514**

## SECTION III: STATES WITH OUTSTANDING AGENCY DISCOVERY DISPUTES

### Arizona

Negotiations regarding search terms and custodians for the following Arizona agencies have been finalized, and any disputes involving those agencies contained in the joint discovery letter brief filed on December 20, 2024 have been resolved:

1. Arizona Department of Education

Disputes involving the following Arizona agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Arizona Board of Education: Disputes remain regarding search terms and reasonable number of documents for review.
2. Arizona Department of Child Safety: Disputes remain regarding search terms and reasonable number of documents for review.
3. Arizona Department of Health Services: Disputes remain regarding search terms and reasonable number of documents for review.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 13, 2025

Time:  11:00 AM MT

Location:  2005 N. Central Avenue Phoenix, AZ 85004

Attendees:  For Meta – Michael N. Kennedy, Partner, Covington & Burling LLP

For Arizona – Nathan Whelihan, Assistant Attorney General, Consumer Protection and Advocacy Section

Laura Dilweg, Section Chief Counsel, Consumer Protection and Advocacy Section

Kirsten Wright, CFP Division Chief, Department of Child Safety

Heather Pellegrino, Section Chief Counsel, Civil & Criminal Litigation & Advice Section, Department of Child Safety

Anna Dahlquist, Unit Chief Counsel, CFP/CLA, Department of Child Safety

Patricia LaMagna, Health Unit Chief Counsel, Department of Health Services

Victoria Bergin, Assistant Attorney General, SGD/EHS, Board of Education

15

## Add. 515

**California**

Negotiations regarding search terms and custodians for the following California agencies have been finalized, and any disputes involving those agencies contained in the joint discovery letter brief filed on December 20, 2024 have been resolved:

1. Office of Data and Innovation
2. Business, Consumer Services, and Housing Agency

California agencies have begun to produce documents.  Nevertheless, disputes involving the following California agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. California Department of Health Care Services: Disputes remain about custodians and search terms.
2. Mental Health Services Oversight and Accountability Commission: Disputes remain about custodians and search terms.
3. Health and Human Services Agency: Disputes remain about custodians and search terms.
4. Department of Consumer Affairs:  Disputes remain about custodians and search terms.
5. Department of Finance:  Disputes remain about custodians and search terms.
6. Department of Public Health:  Disputes remain about custodians and search terms.
7. Office of the Governor:  Disputes remain about custodians and search terms.
8. Governor's Office of Business and Economic Development: Disputes remain about custodians and search terms, or in the alternative, targeted searches.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 14, 2025

Time:  10:00 AM PT

Location:  Covington & Burling LLP, Salesforce Tower, 415 Mission St Suite 5400, San Francisco, CA 94105

Attendees:  For Meta – Christopher Yeung, Partner, Covington & Burling LLP

For California – For California's Executive Agencies – Margaret R. Prinzing, Partner

For other California agencies – Anna Ferrari, Deputy Attorney General

For the California Attorney General's office – David Beglin, Deputy Attorney General

16

**Add. 516**

**Colorado**

Disputes involving the following Colorado agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Behavioral Health Administration: Disputes remain about custodians, search terms, and the applicable time period.
2. Department of Education: Disputes remain about custodians, search terms, and the applicable time period.
3. Department of Higher Education: Disputes remain about custodians, search terms, and the applicable time period.
4. Department of Human Services: Disputes remain about custodians, search terms, and the applicable time period.
5. Governor's Office: Disputes remain about custodians, search terms, and the applicable time period.
6. State Planning and Budgeting: Disputes remain about custodians, search terms, and the applicable time period.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 13, 2025

Time:  1:00 PM

Location:  Denver, Colorado

Attendees:  For Meta – Christopher Y. L. Yeung, Partner, Covington & Burling LLP

For Colorado – Jen Sullivan, Deputy Attorney General

Krista Batchelder, Deputy Solicitor General – Appearing on behalf of the

Consumer Protection Section of the Colorado AG office

Counsel for BHA: Aaron Pratt, Second Assistant Attorney General*

Counsel for CDE: Joe Peters, Senior Assistant Attorney General*

Counsel for CDHE: Lauren Peach, First Assistant Attorney General*

Counsel for CDHS: Ann Pogue, First Assistant Attorney General*

Counsel for the Colorado Governor's Office and OSPB: LeeAnn Morrill, First Assistant Attorney General*

*Or counsel appearing with knowledge and necessary delegated authority

17

**Add. 517**

**Delaware**

Disputes involving the following Delaware agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1.   Delaware Department of Education: Disputes remain regarding search terms and hit report timeliness.

2.   Delaware Department of Services for Children, Youth & Their Families: Disputes remain regarding search terms and hit report timeliness.

3.   Delaware Office of the Governor: Disputes remain regarding custodians, search terms, and applicable time period.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  Friday, January 10, 2025

Time:  12:00 PM ET

Location:  Covington & Burling, New York Times Building, 620 Eighth Avenue, New York, NY

Attendees:  For Meta – José E. Arvelo, Of Counsel, Covington & Burling LLP

For Delaware – Marion Quirk (Director of Consumer Protection, DE DOJ); Shaun Kelly (Counsel to OGOV); Ryan Costa (Deputy Director of Consumer Protection, DE DOJ) (attending virtually); Ralph Durstein III (Counsel to DE DOE & DE DSCYF) (attending virtually).

**Add. 518**

**Hawaii**

Negotiations regarding search terms and custodians for the following Hawai'i agencies have been finalized, and any disputes involving those agencies contained in the joint discovery letter brief filed on December 20, 2024 have been resolved:

1.  Department of Education

Disputes involving the following Hawai'i agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1.  Department of Human Services: Disputes remain regarding search terms, reasonable number of documents for review, and time period.

2.  Department of Health: Disputes remain regarding search terms, reasonable number of documents for review, and time period.

3.  State Council on Mental Health: Disputes remain regarding applicable time period.

4.  Department of Budget and Finance: Disputes remain regarding applicable time period

5.  Office of the Governor: Disputes remain regarding applicable time period.

6.  Department of Commerce and Consumer Affairs: Disputes remain regarding applicable time period.

7.  Department of Business, Economic Development, and Tourism: Disputes remain regarding applicable time period.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:   January 14, 2025

Time:   11:00 AM PT

Location:   San Francisco, California

Attendees:      For Meta – Christopher Y.L. Yeung, Partner, Covington & Burling LLP

For Hawai'i – Christopher Han, Deputy Attorney General

**Add. 519**

**Illinois**

Negotiations regarding search terms and custodians for the following Illinois agencies have been finalized, and any disputes involving those agencies contained in the joint discovery letter brief filed on December 20, 2024 have been resolved:

1. Department of Human Services
2. Department of Public Health
3. Office of the Governor
4. State Board of Education

Disputes involving the following Illinois agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Department of Children and Family Services: Search terms, custodians, applicable time period, hit report completeness, hit report timeliness.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 10, 2025

Time:  2:00 PM CST

Location:  Office of the Illinois Attorney General, 115 S. LaSalle St., 26th Floor, Chicago, IL 60603.

Attendees:  For Meta – Michael N. Kennedy, Partner, Covington & Burling LLP

For Illinois – Matthew C. Davies, Assistant Attorney General, Consumer Fraud Bureau, Office of the Illinois Attorney General; Michelle Camp, Special Assistant to the General Counsel, Illinois Department of Children and Family Services

**Add. 520**

## Minnesota

Negotiations regarding search terms and custodians for the following Minnesota agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Minnesota Department of Education

Disputes involving the following Minnesota agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Minnesota Department of Human Services: Search terms and custodians.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

<u>Date</u>:  January 13, 2025

<u>Time</u>:  1:00 PM CT

<u>Location</u>:  Chicago, Illinois

<u>Attendees</u>:  For Meta – Stephen Petkis, Partner, Covington & Burling LLP

For Minnesota AGO – Caitlin Micko, Assistant Attorney General, Office of the Minnesota Attorney General

For DHS – Aaron Winter, Assistant Attorney General, Office of the Minnesota Attorney General

21

**Add. 521**

## Nebraska

Negotiations regarding search terms and custodians for the following Nebraska agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Nebraska Children's Commission
2. Nebraska Department of Education

Disputes involving the following Nebraska agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Nebraska Governor's Office: Search terms and applicable time period.
2. Nebraska Department of Health and Human Services: Search terms and custodians.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 13, 2025

Time:  2:00 PM CST

Location:  Chicago, Illinois

Attendees:  For Meta – Stephen Petkis, Partner, Covington & Burling LLP

For Nebraska – Anna Anderson, Assistant Attorney General, Office of Attorney General

For Nebraska Governor's Office – Maureen Larsen, Legal Counsel

For Nebraska Department of Health and Human Services – Ryan Patrick, Counsel

Add. 522

**New York**

Disputes involving the following New York agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Council on Children and Families: Search terms, custodians, applicable time period, reasonable number of documents for review.
2. Department of Education: Search terms, custodians, applicable time period, reasonable number of documents for review.
3. Department of Health: Search terms, custodians, applicable time period, reasonable number of documents for review.
4. Office of Children and Family Services: Search terms, custodians, applicable time period, reasonable number of documents for review.
5. Office of Mental Health: Search terms, custodians, applicable time period, reasonable number of documents for review.
6. Office of the Governor: Search terms, custodians, applicable time period, reasonable number of documents for review.
7. State Division of Budget: Search terms, custodians, applicable time period, reasonable number of documents for review, or in the alternative, targeted searches.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 10, 2025

Time:  10:00 AM ET

Location:  Covington and Burling LLP, 620 Eighth Avenue, New York, NY 10018

Attendees:  For Meta – Christopher Y. L. Yeung, Partner, Covington & Burling LLP

For New York – Kevin Wallace, Senior Enforcement Counsel, Economic Justice Division, New York Office of the Attorney General.

For the Office of the Governor, Council on Children and Families, Department of Health, Office of Children and Family Services, Office of Mental Health, and State Division of Budget – Faith Gay, Partner, Selendy Gay; Claire O'Brien, Associate, Selendy Gay

23

**Add. 523**

**Ohio**

Negotiations regarding search terms and custodians for the following Ohio agencies have been finalized as of January 6, 2025, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Department of Children and Youth
2. Department of Education and Workforce
3. Department of Higher Education
4. Department of Job and Family Services
5. Department of Mental Health & Addiction Services
6. Department of Youth Services

Disputes involving the following Ohio agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Department of Health: Search terms and custodians.
2. Office of the Governor: Custodians.

In an attempt to resolve these outstanding disputes, Meta and the Department of Health will conduct an in-person meet and confer as set forth below:

<u>Date</u>: January 14, 2025

<u>Time</u>: 10:00 AM ET

<u>Location</u>: Covington and Burling, One City Center, 850 Tenth Street, NW, Washington, DC, 20014.

<u>Attendees</u>: For Meta – Michael N. Kennedy, Partner, Covington & Burling LLP

For Ohio Department of Health – Kevin R. Walsh, Senior Assistant Attorney General; Tyler J. Herrmann, General Counsel, Ohio Department of Health

In an attempt to resolve these outstanding disputes, Meta has proposed that it and the Office of the Governor will conduct an in-person meet and confer as set forth below:

<u>Date</u>: January 10, 2025

<u>Time</u>: 12:00 PM CST

<u>Location</u>: Chicago O'Hare International Airport, exact location TBD.

<u>Attendees</u>: For Meta – Michael N. Kennedy, Partner, Covington & Burling LLP

For Office of the Governor – Shawn J. Organ, Organ Law LLP

24

**Add. 524**

**Pennsylvania**

Disputes involving the following Pennsylvania agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Pennsylvania Department of Communities and Economic Development: Disputes remain regarding custodians.
2. Pennsylvania Department of Education: Disputes remain regarding custodians.
3. Pennsylvania Department of Health: Disputes remain regarding custodians.
4. Pennsylvania Department of Human Services: Disputes remain regarding custodians.
5. Pennsylvania Governor's Office: Disputes remain regarding custodians.
6. Pennsylvania Office of the Budget: Disputes remain regarding custodians.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date: Tuesday, January 14, 2025

Time: 2:00-3:00 PM ET

Location: 1650 Arch Street, 25th Floor, Philadelphia, PA 19103

Attendees: For Meta – José E. Arvelo (Of Counsel).

         For Pennsylvania's Office of General Counsel – Jonathan D. Koltash (Deputy General Counsel)

         For Pennsylvania's Office of Attorney General – Jonathan R. Burns (Deputy Attorney General)

**Add. 525**

## **ATTESTATION**

      I, Ashley M. Simonsen, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: January 6, 2025

<div align="right">

By: */s/ Ashley M. Simonsen*       
Ashley M. Simonsen

</div>

**Add. 526**

[*Parties and Counsel Listed on Signature Pages*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR (PHK)<br><br>**AGENDA AND JOINT STATEMENT FOR JANUARY 17, 2025, CASE MANAGEMENT CONFERENCE**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

Add. 527

**I.**      <u>**Agenda for Case Management Conference ("CMC")**</u>

The Parties offer the below proposed agenda for the CMC scheduled for January 17, 2025:

- Meta: Meta's Administrative Motion to Relate Insurance Coverage Matter (§ IV(D))

- PI/SD Plaintiffs and Defendants: Parties' proposals regarding inter-circuit assignments for directly-filed bellwether cases asserting *Lexecon* objections (§ V(A))

- PI/SD Plaintiffs: Plaintiffs' proposal to narrow Personal Injury ("PI") and School District ("SD") bellwether discovery pools (§ V(B))

- Meta: Relief sought with respect to California and South Carolina (§ V(C))

- State AGs: Dismissals while State AGs' objection to state agency order is pending (§ V(D))

- Meta: Anticipated request to place State AGs on separate trial track (§ V(E))

**II.**      <u>**Joint JCCP Update**</u>

At the last JCCP status conference, held December 17, 2024, Judge Kuhl (1) issued guidance and rulings with respect to various PI bellwether discovery issues; (2) issued a tentative schedule, including deadlines for general causation expert reports (April 18, 2025) and *Sargon* motions on general causation experts (July 28, 2025), and a first trial date of November 25, 2025; and (3) stated that a tentative ruling on the parties' competing proposed jury instructions on negligence and causation would be forthcoming. Judge Kuhl invited the parties to submit comments on the Court's tentative schedule in their joint statement for the next CMC, which will occur on January 15; a copy of the parties' joint statement will be emailed to the Judge Gonzalez Rogers after it is submitted on January 13. The JCCP Court's December 17, 2024 Minute Order and tentative schedule are attached as **Exhibits A** and **B**.

There are 17 plaintiffs remaining in the JCCP PI bellwether discovery pool, following voluntary dismissals by three bellwether plaintiffs. In total, Defendants anticipate noticing 68 depositions of bellwether plaintiffs, family members, or treating physicians. To date, the parties have cooperatively scheduled 56 of those depositions to take place between December 2024 and February 2025. Depositions commenced on December 20. As of January 10, 12 depositions have been completed.

As the Court is aware, Judge Kuhl sustained demurrers as to representative SD plaintiffs

1  from four states.  Thereafter, the court stayed the remaining SD cases in the JCCP pending

2  plaintiffs' appeal.  On January 6, the JCCP SD plaintiffs from all states other than the four states

3  at issue on the demurrer (approximately 400 SDs in total) filed a motion to lift the stay to allow

4  SD plaintiffs the opportunity to voluntarily dismiss their cases and re-file in this MDL.

5  Defendants intend to oppose that motion.

6      On January 8, Judge Kuhl issued an order (*see* **Exhibit C**) overruling Defendants'

7  demurrer to 7 JCCP plaintiffs' non-product negligent failure to warn claims under California law.

8  **III.**  **Joint Discovery Update**

9      A copy of the following submissions and orders, filed or issued after the last MDL CMC

10  held on November 22, will be sent by email to Judge Gonzalez Rogers after this CMC Statement

11  is filed: Discovery Management Order No. 12 (November 26, 2024, ECF 1380); Parties'

12  Discovery Management Conference ("DMC") Statement for December 11, 2024 DMC

13  (December 4, 2024, ECF 1408); Discovery Management Order No. 13 (December 20, 2024, ECF

14  1479); Order re Schedule for State Agency Document Production (December 31, 2024, ECF

15  1495); Parties' joint DMC Statement for January 16, 2025 DMC (January 10, 2025, ECF 1512).

16  **IV.**  **Joint Update on Appeals and Other Matters**

17      **A.**  **Defendants' Motions for Certification for Interlocutory Appeal**

18      On December 16, 2024, Defendants filed motions to certify for interlocutory appeal the

19  Court's School District Motion to Dismiss ("MTD") Orders.  *See* ECF 1460, 1462.  The PI/SD

20  Plaintiffs intend to oppose the motions.  Plaintiffs' oppositions are due January 14, 2025,

21  Defendants' replies are due January 28, 2025, and the motions will be heard at the February 12,

22  2025 CMC.  *See* ECF 1490.

23      **B.**  **State AGs' Anticipated 1292 Motion and Response to Defendants' 1292**

24          **Motion**

25      Meta filed a notice of conditional joinder in a supplemental motion filed by Snap and

26  YouTube to certify the Court's October 15, 2024 Order (ECF 1214).  ECF 1462, 1463.  The AGs

27  intend to file a response and a motion to certify the Court's order dismissing their unfairness

28  claims under Section 230.  The PI/SD Plaintiffs intend to oppose this motion given the rulings

1    contained in these orders on PI/SD Plaintiffs' consumer protection and misrepresentation claims.

2        **C.    Notices of Appeal of Failure-to-Warn MTD Orders at ECF 1214 and 1267**

3        On November 14, 2024, Meta filed a notice of appeal of the MTD Orders at ECF 1214

4    and 1267.  ECF 1330.  Since that time, TikTok has joined Meta's appeal (ECF 1389), and the

5    AGs and PI/SD Plaintiffs have filed Notices of Conditional Cross-Appeals (ECF 1386, 1388) and

6    motions in the Ninth Circuit to dismiss Meta's and TikTok's appeals.  Briefing on the MTDs, and

7    any cross-MTDs the conditional cross-appeals, will be completed as of January 28, 2025.  The

8    appeals have been consolidated, and deadlines for merits briefing are stayed pending resolution of

9    the MTDs.

10       **D.    Meta's Administrative Motion to Relate Insurance Coverage Matter**

11       On January 7, Meta filed an administrative motion (ECF 1504) to consider whether a

12   coverage action it filed on December 30 in N.D. Cal., in response to a declaratory relief action

13   filed in Delaware by two of Meta's insurers, should be related to this MDL.  The insurers in

14   Delaware seek to avoid their duty to defend Meta in the MDL on the purported grounds that

15   Plaintiffs supposedly do not seek damages "because of" bodily injury, and that Plaintiffs' injuries

16   supposedly were expected or intended.  Meta's coverage action asks this Court to suspend

17   litigation between Meta and its insurers, including in Delaware.  The coverage action therefore

18   satisfies the relatedness requirements under L.R. 3-12(a).

19   **V.    Parties' Additional Submissions**

20       **A.    InterCircuit Assignments for Bellwether Cases Asserting *Lexecon* Objections**

21       The Parties agree with this Court's suggested path to facilitate the intercircuit assignment

22   of two bellwether cases asserting *Lexecon* objections that were directly filed in this MDL.  ECF

23   1383 at 3.  The Parties will prepare a stipulation setting forth the following: Plaintiffs Dymand

24   McNeal (No. 23-cv-01092) and DeKalb County School District (No. 23-cv-05733) will re-file

25   their cases in E.D. Pa. and the N.D. Ga., respectively.  Defendants will then tag the cases for

26   transfer, without Plaintiffs' opposition, to this MDL.  Upon transfer, Plaintiffs will dismiss

27   without prejudice the original, directly-filed cases, as replaced by the two newly-transferred

28   actions.

AGENDA AND JOINT STATEMENT FOR JANUARY 17,
2025, CASE MANAGEMENT CONFERENCE
4:22-md-03047-YGR

### B.   PI/SD Plaintiffs' Proposal for Narrowing Bellwether Discovery Pools

**PI/SD Plaintiffs' Position.**  As previewed during the October (Hr'g Tr. 29:7-32:11) and November (Hr'g Tr. 7:23-8:8) CMCs, the Parties have been meeting and conferred regarding the potential narrowing of the PI and SD bellwether discovery pools before experts disclosures.  In light of the Court's guidance, the PI/SD Plaintiffs proposed that each side strike 2 bellwether cases from the cases it originally selected for the bellwether discovery pools one week after the Court's approval.  The remaining discovery pools would then include 7 PI bellwether cases[1] and 8 SD bellwether cases for remaining fact and expert discovery. On May 23, 2025 at 12:00 p.m. (CMO No. 18, ECF 1290), the Court would then select 5 cases from each bellwether discovery pool to form the bellwether trial pools, for a total of 10, consistent with Step 2 of the bellwether selection process outlined in CMO No. 10, at 4-5 (ECF 604).

Defendants are opposed to any narrowing of the bellwether pools prior to expert disclosures and have proposed, at most, each side striking one of the other side's SD bellwether picks. As previously explained to the Court, Plaintiffs' proposal to narrow the bellwether discovery pools now was made for efficiency purposes and to reduce the burdens for each side arising from conducting expert discovery on a total of 24 bellwethers.  Defendants hypothesize a parade of horribles that would ensue from this approach, but their concerns are hyperbole. Winnowing the pools in the limited manner Plaintiffs propose occurring now would not inhibit representative bellwether cases from being tried because it would only limit the discovery pool, not determine the ultimate trial pool. Thus the Court and the Parties would still have guidance from case-specific expert reports prior to additional narrowing to arrive at the trial pool (and to be clear, such guidance would in any event only be available from *Plaintiffs'* experts' reports under the Court's schedule (ECF 1290)).  Plaintiffs' proposal that each side strike its own picks also addresses the concern acknowledged *by Meta* at the prior CMC (Hr'g Tr. 30:17-31:21) that

---

[1] Plaintiffs advised Defendants that Plaintiff Hawthorne has decided to dismiss her action with prejudice.  Plaintiff Hawthorne just recently reached majority at which point she necessarily had to decide independently whether to continue her claim. As Plaintiffs advised Defendants, her father has recently been hospitalized with a life-threatening situation. No negative information recently came to light and Defendants' insinuation as to Plaintiff Hawthorne's motive to dismiss her case is baseless.

**Add. 531**

1    instead striking the other side's picks would result in the Parties simply targeting the strongest of

2    each other's picks.  Defendants are now in possession of hundreds of thousands of documents

3    from the bellwether Plaintiffs, and Meta's argument that Plaintiffs have more information on their

4    clients does not favor one method over the other. Plaintiffs' proposal that each Party would only

5    be permitted to strike its own picks is a self-executing process that avoids gamesmanship.

6         In addition, there is nothing about narrowing the discovery pools now that would cause a

7    plaintiff to decide to voluntarily dismiss their case.  While voluntary dismissals—or settlements—

8    may occur at any stage of litigation, PI Plaintiff bellwether depositions are scheduled and counsel

9    are not anticipating additional dismissals. If the Court nonetheless believes it necessary to address

10   Plaintiff Hawthorne's voluntary dismissal, Defendants could be permitted to veto one of

11   Plaintiffs' two strikes, meaning Plaintiffs would have to keep the vetoed strike and instead strike

12   another.

13        For the above reasons, Plaintiffs' proposal that each side strike 2 bellwether cases from

14   the cases it originally selected for the bellwether discovery pool should be adopted.

15        **Defendants' Position.**  Plaintiffs' proposal for narrowing the PI bellwether discovery

16   pool would contravene the existing Court-ordered process for exercising strikes; limit the Court's

17   ability to fashion representative trial pools; and deprive the Court and the Parties of guidance

18   from expert reports before the pool is narrowed.  As to the SD cases, where expert discovery is

19   expected to impose significant expense on the Parties, if the Court is inclined to allow additional

20   strikes before expert reports are due, each side should be allowed to strike one additional case

21   (beyond the single strike already allowed at bellwether trial selection), regardless of which Party

22   selected the case.  In addition, for every PI or SD bellwether case that Plaintiffs voluntarily

23   dismiss, Defendants should be permitted to strike one additional case (from the entire discovery

24   bellwether pool) during bellwether trial selection.

25        *First*, Plaintiffs' proposed approach to narrowing the bellwether discovery pools—by

26   having each side strike two of *its own picks* from each pool, and removing the Parties' ability to

27   exercise their existing strike on the other side's picks—is contrary to the method this Court

28   already ordered for selecting bellwether trial pools, and the opposite of how pool strikes

- 6 -

**Add. 532**

1   ordinarily are exercised in MDLs.  This Court previously ordered that each side could exercise

2   one strike of its choice during trial bellwether selection, regardless of which side originally

3   selected the case.  CMO 10 (ECF 604) at 4-5.  Plaintiffs' proposal would eliminate those strikes

4   entirely, depriving Defendants of the ability to exercise *any* strikes of Plaintiffs' picks.  There is

5   good reason why MDL courts do not limit parties to strikes of only that party's original picks:

6   plaintiffs have unique information about which of their clients is most likely to proceed to trial

7   (an insight their document productions shed no light on for Defendants); and the corresponding

8   ability to voluntarily dismiss any case.  This effectively allows them to unilaterally strike any

9   defense pick they no longer wish to pursue.  Plaintiffs' proposed approach therefore inflicts a

10  one-sided disadvantage on Defendants, by forcing them to eliminate some of their own picks and

11  precluding them from eliminating any of Plaintiffs', while Plaintiffs retain the ability to

12  voluntarily dismiss, at any time, any defense picks.

13          Indeed, on January 3—after some significant negative information came to light about an

14  individual Plaintiff's father—Plaintiffs informed Defendants that they plan to dismiss one of

15  Defendants' original bellwether picks (*Hawthorne*), saying that the Plaintiff's father is facing an

16  unspecified medical issue and "the Plaintiffs' immediate priority is Mr. Hawthorne's health."

17  Especially given that dismissal, the Court should reject a proposal that would exacerbate

18  Defendants' disadvantage by requiring them to strike another of their own picks now, and barring

19  them from striking any of Plaintiffs' picks.  If anything, the Court should, during trial bellwether

20  selection, permit Defendants to strike one additional case for every bellwether case Plaintiffs

21  voluntarily dismiss.  That would counter-balance *Hawthorne* (and any other cases) falling out of

22  the bellwether pool at Plaintiffs' election, maintaining a representative pool.[2]

23          *Second*, Plaintiffs' proposed approach would curtail the Court's ability to exercise its

24  _____

25  [2] Plaintiffs suggest Defendants should instead be permitted merely to veto one of the two strikes that  Plaintiffs would, under their proposal, be permitted to exercise on Plaintiffs' own picks - but

26  with Plaintiffs then permitted to strike a different one of their picks.  But that would not offset the prejudice to Defendants from Plaintiffs having already (effectively) stricken one of Defendants'

27  picks, because it would result in an imbalanced pool consisting (under Plaintiffs' approach) of 4 Plaintiff picks and only 3 Defendant picks.

28

**Add. 533**

1  discretion to narrow the bellwether discovery pools "organic[ally]" to form representative trial

2  pools. 3/22/24 CMC Tr. at 16:9-12. It would shrink the already-small PI bellwether discovery

3  pool (originally consisting of 12 cases) to only 7 cases,[3] in turn reducing the number of cases this

4  Court may remove from the pool—from 5 cases (under CMO 10), to only 2 cases.

5      *Third*, Plaintiffs' approach would prevent the Parties and Court from having the benefit of

6  expert reports *before* the discovery pools are narrowed to trial pools. This is the third time the PI

7  Plaintiffs have suggested moving bellwether trial selection *before* expert reports are due. *See*

8  2/23/24 CMC Tr. at 92:8-16; 10/25/24 CMC Tr. at 29:7-13. In both prior instances, the Court

9  clearly stated that it had purposefully set expert report deadlines to occur *before* bellwether trial

10  selection, to ensure the Parties and Court have fulsome information about all bellwethers before

11  cases are selected for the trial pool—including expert opinions regarding causation. *See* 2/23/24

12  CMC Tr. at 92:19-93:15; 10/25/24 CMC Tr. at 29:16-24. Nothing has changed that would

13  justify a new approach.

14      **C.**    **Relief Sought by Meta with Respect to California and South Carolina**

15      **Meta's Position.** At the November 22 CMC, the Court addressed the refusal of certain

16  agencies in California and South Carolina to engage in the Court-ordered meet-and-confer

17  process on Meta's requests for production of documents ("RFPs"). Following the CMC, the

18  Court issued CMO 19, noting that "one cannot refuse compliance because they disagree with a

19  court's decision and consequences will flow," ECF 1383 at 3, and directed Meta to submit a brief

20  as to what relief it was seeking. *Id.*

21      Meta has not yet submitted such a brief because, since the November 22 CMC, it has

22  continued to negotiate in good faith with the agencies at issue in an effort to resolve document

23  issues. These negotiations have involved substantial efforts and meaningful concessions on

24  Meta's part. Meta has reached agreements with the SC agencies on a document production

25  process that they will follow to meet their discovery obligations. Discussions with CA are still

26  

---

[3] The PI bellwether pool will now consist of only 11 cases, following the January 3 decision by
bellwether Plaintiff Hawthorne to dismiss her case. Notably, 3 JCCP bellwethers dismissed their

27  

28  cases on the eve of depositions, raising the specter of additional MDL dismissals as depositions
approach.

ongoing, including an in-person conferral that is scheduled for January 14.  Accordingly, Meta

does not at this time intend to seek sanctions from the District Court against CA or SC for these

specific agencies' earlier non-compliance, but reserves the right to do so in the future should

negotiations fail to yield a suitable resolution.

**California Executive Agencies' Position.**  On December 18, 2024, Meta served Rule 45

subpoenas on the California Executive Agencies; the agencies accepted service and have already

begun producing responsive documents on the schedule ordered by Magistrate Judge Kang.  The

California Executive Agencies have been meeting and conferring with Meta regarding the scope

and breadth of search terms and appropriate limiters that are tailored to the issues in the case, and

will continue to meet and confer in an effort to reach agreement.  In the meanwhile, the California

Executive Agencies continue to produce responsive, non-privileged documents.

**South Carolina AG's Position.**  The South Carolina Attorney General's Office reached

an agreement with Meta for obtaining the requested documents from the South Carolina

Governor's Office and other agencies.  We are in the process of reviewing those documents and

plan to produce the relevant and non-privileged documents within our deadline for substantial

completion.  The previous dispute over obtaining their documents is moot.

**D.       Dismissals While State AGs' Objection to State Agency Order Is Pending**

There were originally 35 State AGs with lawsuits pending in this MDL.  On September 6,

2024, Magistrate Judge Kang issued an order granting in part, and denying in part, Meta's motion

to compel discovery from state agencies.  ECF 1117.  The State AGs filed their objection on

September 20, 2024, and the Court heard argument on October 25, 2024.  Resolution of the AGs'

objection remains pending.  Since the order, four States—North Dakota, Georgia, Montana, and

Florida—have dismissed their cases against Meta (with two of them refiling in state court but

without COPPA claims).  Other State AGs—including Michigan and Missouri—are likewise

considering dismissing some or all of their claims against Meta as a result of the state agency

discovery order.  Another State—Maine—is in discussions with Meta about dismissing its state-

law claims (and asserting only a COPPA claim).  These dismissals, if effectuated, would leave 25

states that are still subject to the agency discovery at issue (all but the 4 states that would be

**Add. 535**

1    asserting only COPPA claims).

2         **E.     Meta's Anticipated Request to Place State AGs on Separate Trial Track**

3         **Meta's Position.**  Meta has undertaken enormous efforts to obtain from the States subject

4    to agency discovery compliance with the Court's discovery orders.  This has been challenging, as

5    the States and their agencies have repeatedly violated the Court's orders and missed deadlines for

6    proposing, negotiating, or agreeing on search terms and custodians for Meta's RFPs, *see* ECF

7    1291, 1292, 1299, 1380, 1479, among other issues, delaying progress.  As Meta proceeds to

8    depositions of State witnesses, the States have made clear that they will continue to resist

9    reasonable discovery.  Setting aside the extensive resources this has caused Meta to expend, this

10   delay has prejudiced Meta's ability to progress the States' cases.  For example, as of December

11   23, Meta had received only 32,604 documents total from 14 of the States at issue.[4]  Nine of those

12   14 States had produced volumes in only the tens or hundreds of documents; one had produced

13   none.  A number of States still have not agreed on basic parameters for document discovery,

14   including some that—after improperly delaying discovery for months—are now seeking to avoid

15   it on the purported ground that there is no time left.  Even those States that have agreed on

16   parameters are not required to substantially complete document productions until late January or

17   early February (ECF 1495.1)—nearly three months after Meta substantially completed its

18   production of documents, which now total 2 million.

19        The States' prior anemic production efforts, statements from individual State counsel

---

20   [4] That the *State AGs* substantially completed their (limited) productions last summer is beside the

21   point.  Most of the relevant documents will come from the agencies—documents the State AGs
     outright refused *for months* to provide.  Far from having "marginal relevance" the agency

22   discovery Meta seeks is central to Meta's defense, as Magistrate Judge Kang has repeatedly
     recognized.  *See, e.g.*, 12/11/24 DMC Tr. at 156:3-21 ("the scope of discovery is certainly broader

23   than the scope of plaintiffs' claims," and "part of [Meta's] theory of defense is that there are these

24   alternate stressors," which are "within … the realm of discoverable information" from agencies).
     The States' continued mischaracterization of Meta's discovery as "extraordinarily broad" is thus

25   also incorrect, and ignores the enormous concessions Meta has made in negotiations by (i)
     proposing reasonable search terms and custodians to States that failed, despite being ordered, to

26   make those proposals; (ii) substantially narrowing Meta's proposals based on agencies' claims of
     burden (which those agencies must substantiate); (iii) removing more than 50 agencies from the

27   search term process; and (iv) working with agencies to identify alternative methods of targeted

28   collections.

AGENDA AND JOINT STATEMENT FOR JANUARY 17,
2025, CASE MANAGEMENT CONFERENCE
4:22-md-03047-YGR

**Add. 536**

about their inability to comply with future deadlines, and past violations of prior substantial

completion deadlines all raise substantial questions about whether the States will meet the most

recent deadlines set by Magistrate Judge Kang.  But even if they do so, Meta already has been

prejudiced.  To illustrate, whereas the States had roughly five months between Meta's substantial

completion deadline and the States' deadline to depose Meta witnesses, Meta will have only

approximately two months to prepare for and complete potentially 100 State depositions.

(Because of the multitude of States suing, even a modest number of State depositions, such as

three per State, leads to a large number of total depositions.)  And this compressed deposition

period will occur at a time when the States are conducting a high volume of Meta witness

depositions, including the most senior Meta witnesses.

Meta has a pending request to seek relief from Magistrate Judge Kang for the States'

violations of the Court's orders (ECF 1471).  However, Judge Kang has made clear that requests

for relief from the schedule must be made with the District Court.  *See* 12/11/24 DMC Tr. at

114:1-22.  Accordingly, Meta seeks the Court's guidance on a timetable for seeking such relief—

which will include expanding the time for Meta to complete State depositions and,

correspondingly, the time by which the States may proceed to trial—so the Court may hear

argument if it wishes at the February CMC.  By then, the Parties will know whether at least some

States have met their late January/early February substantial completion obligations, the volume

of documents Meta will need to analyze to prepare for depositions, and the extent to which the

States' discovery positions have prejudiced Meta's ability to complete depositions.

**State AGs' Position.**  Meta's allegations are at best misleading and at worst patently

false.  The State AGs substantially completed production of documents from their own offices on

August 30, 2024, nearly four months ago, which is in no way an "anemic" effort.  And despite the

fact that Meta is seeking extraordinarily broad discovery with at best marginal relevance to the

issues in this case, the State AGs have worked diligently and collaboratively with state agency

counsel to satisfy Magistrate Judge Kang's orders regarding agency discovery.  The State AGs

and relevant agencies have made and continue to make significant progress in completing this

discovery; state agencies have generally begun document productions and are moving towards

**Add. 537**

1    substantial completion.

2           The State AGs are evaluating Meta's request regarding the discovery and trial schedule–

3    including Meta's detailed argument above, which the State AGs dispute. The State AGs will be

4    prepared to discuss Meta's request in person at the CMC.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AGENDA AND JOINT STATEMENT FOR JANUARY 17,
2025, CASE MANAGEMENT CONFERENCE
4:22-md-03047-YGR

**Add. 538**

| | |
|---|---|
| 1 | Respectfully submitted, |
| 2 | DATED: January 10, 2025 |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

By: */s/ Lexi J. Hazam*
LEXI J. HAZAM
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339
Telephone: 415-956-1000
lhazam@lchb.com

PREVIN WARREN
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
Telephone: 202-386-9610
pwarren@motleyrice.com

Co-Lead Counsel

CHRISTOPHER A. SEEGER
**SEEGER WEISS, LLP**
55 CHALLENGER ROAD, 6TH FLOOR
RIDGEFIELD PARK, NJ 07660
Telephone: 973-639-9100
cseeger@seegerweiss.com

Counsel to Co-Lead Counsel

JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**
155 MONTGOMERY STREET, SUITE 900
SAN FRANCISCO, CA 94104
Telephone: 415-986-1400
jennie@andrusanderson.com

Liaison Counsel

EMILY C. JEFFCOTT
**MORGAN & MORGAN**
633 WEST FIFTH STREET, SUITE 2652
LOS ANGELES, CA 90071
Telephone: 213-787-8590
ejeffcott@forthepeople.com

JOSEPH VANZANDT
**BEASLEY ALLEN**
234 COMMERCE STREET

**Add. 539**

1 MONTGOMERY, LA 36103
 Telephone: 334-269-2343
2 joseph.vanzandt@beasleyallen.com

3 Federal/State Liaisons

4

5 MATTHEW BERGMAN
 GLENN DRAPER
6 **SOCIAL MEDIA VICTIMS LAW CENTER**
 821 SECOND AVENUE, SUITE 2100
7 SEATTLE, WA 98104
 Telephone: 206-741-4862
8 matt@socialmediavictims.org
 glenn@socialmediavictims.org
9

10 JAMES J. BILSBORROW
 **WEITZ & LUXENBERG, PC**
11 700 BROADWAY
 NEW YORK, NY 10003
12 Telephone: 212-558-5500
 jbilsborrow@weitzlux.com
13

14 JAYNE CONROY
 **SIMMONS HANLY CONROY, LLC**
15 112 MADISON AVE, 7TH FLOOR
 NEW YORK, NY 10016
16 Telephone: 917-882-5522
 jconroy@simmonsfirm.com
17

18 ANDRE MURA
 **GIBBS LAW GROUP, LLP**
19 1111 BROADWAY, SUITE 2100
 OAKLAND, CA 94607
20 Telephone: 510-350-9717
 amm@classlawgroup.com
21

22 ALEXANDRA WALSH
 **WALSH LAW**
23 1050 Connecticut Ave, NW, Suite 500
 Washington D.C. 20036
24 Telephone: 202-780-3014
 awalsh@alexwalshlaw.com
25

26 MICHAEL M. WEINKOWITZ
 **LEVIN SEDRAN & BERMAN, LLP**
27 510 WALNUT STREET
 SUITE 500
28 PHILADELPHIA, PA 19106

- 14 -

AGENDA AND JOINT STATEMENT FOR JANUARY 17,
2025, CASE MANAGEMENT CONFERENCE
4:22-MD-03047-YGR

**Add. 540**

1

Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

2

3

Plaintiffs' Steering Committee Leadership

4

RON AUSTIN
**RON AUSTIN LAW**

5

400 MANHATTAN BLVD.
HARVEY, LA 70058

6

Telephone: 504-227–8100
raustin@ronaustinlaw.com

7

8

PAIGE BOLDT
**WALSH LAW**

9

4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257

10

Telephone: 210-448-0500
PBoldt@alexwalshlaw.com

11

12

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**

13

4740 Grand Avenue, Suite 300
Kansas City, MO 64112

14

Telephone: 816-701-1100
tcartmell@wcllp.com

15

16

SARAH EMERY
**HENDY JOHNSON VAUGHN EMERY PSC**

17

600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KT 40202

18

Telephone: 859-600-6725
semery@justicestartshere.com

19

20

CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**

21

16 Court St.
Brooklyn, NY 11241

22

Telephone: 646-666-8908
carrie@cagoldberglaw.com

23

24

RONALD E. JOHNSON, JR.
**HENDY JOHNSON VAUGHN EMERY PSC**

25

600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KT 40202

26

Telephone: 859-578-4444
rjohnson@justicestartshere.com

27

28

SIN-TING MARY LIU

- 15 -

**Add. 541**

1    **AYLSTOCK WITKIN KREIS &
     OVERHOLTZ, PLLC**
2    17 EAST MAIN STREET, SUITE 200
     PENSACOLA, FL 32502
3    Telephone: 510-698-9566
     mliu@awkolaw.com
4

5    JAMES MARSH
     **MARSH LAW FIRM PLLC**
6    31 HUDSON YARDS, 11TH FLOOR
     NEW YORK, NY 10001-2170
7    Telephone: 212-372-3030
     jamesmarsh@marshlaw.com
8

9    JOSEPH E. MELTER
     **KESSLER TOPAZ MELTZER & CHECK
10   LLP**
     280 KING OF PRUSSIA ROAD
11   RADNOR, PA 19087
     Telephone: 610-667-7706
12   jmeltzer@ktmc.com
13

14   HILLARY NAPPI
     **HACH & ROSE LLP**
15   112 Madison Avenue, 10th Floor
     New York, New York 10016
16   Telephone: 212-213-8311
     hnappi@hrsclaw.com
17

18   EMMIE PAULOS
     **LEVIN PAPANTONIO RAFFERTY**
19   316 SOUTH BAYLEN STREET, SUITE 600
     PENSACOLA, FL 32502
20   Telephone: 850-435-7107
     epaulos@levinlaw.com
21

22   RUTH THI RIZKALLA
     **THE CARLSON LAW FIRM, PC**
23   1500 ROSECRANS AVE., STE. 500
     MANHATTAN BEACH, CA 90266
24   Telephone: 415-308-1915
     rrizkalla@carlsonattorneys.com
25

26   ROLAND TELLIS
     DAVID FERNANDES
27   **BARON & BUDD, P.C.**
     15910 Ventura Boulevard, Suite 1600
28   Encino, CA 91436

AGENDA AND JOINT STATEMENT FOR JANUARY 17,
2025, CASE MANAGEMENT CONFERENCE
4:22-MD-03047-YGR

1   Telephone: 818-839-2333
    rtellis@baronbudd.com
2   dfernandes@baronbudd.com

3
    MELISSA YEATES
4   **KESSLER TOPAZ MELTZER & CHECK LLP**
5   280 KING OF PRUSSIA ROAD
    RADNOR, PA 19087
6   Telephone: 610-667-7706
    myeates@ktmc.com
7
8   DIANDRA "FU" DEBROSSE
    ZIMMERMANN
9   **DICELLO LEVITT**
    505 20th St North
10  Suite 1500
    Birmingham, Alabama 35203
11  Telephone: 205-855-5700
    fu@dicellolevitt.com
12
13  Plaintiffs' Steering Committee Membership

14  *Attorneys for Individual Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 17 -

**Add. 543**

1    **PHILIP J. WEISER**
     Attorney General
2    State of Colorado

3    */s/ Krista Batchelder*
4    Krista Batchelder (CO Reg.45066),
     pro hac vice
5    Deputy Solicitor General
     Shannon Stevenson (CO Reg. 35542),
6    pro hac vice
7    Solicitor General
     Elizabeth Orem (CO Reg. 58309), pro hac vice
8    Assistant Attorney General
     Colorado Department of Law
9    Ralph L. Carr Judicial Center
     Consumer Protection Section
10   1300 Broadway, 7th Floor
     Denver, CO 80203
11   Phone: (720) 508-6384
12   krista.batchelder@coag.gov
     Shannon.stevenson@coag.gov
13   Elizabeth.orem@coag.gov

14   *Attorneys for Plaintiff State of Colorado, ex rel.*
15   *Philip J. Weiser, Attorney General*

16
     **ROB BONTA**
17   Attorney General
     State of California
18

19   */s/ Megan O'Neill*
     Nicklas A. Akers (CA SBN 211222)
20   Senior Assistant Attorney General
     Bernard Eskandari (SBN 244395)
21   Emily Kalanithi (SBN 256972)
     Supervising Deputy Attorneys General
22   Nayha Arora (CA SBN 350467)
     Megan O'Neill (CA SBN 343535)
23   Joshua Olszewski-Jubelirer (CA SBN 336428)
     Marissa Roy (CA SBN 318773)
24   Brendan Ruddy (CA SBN 297896)
     Deputy Attorneys General
25   California Department of Justice
     Office of the Attorney General
26   455 Golden Gate Ave., Suite 11000
     San Francisco, CA 94102-7004
27   Phone: (415) 510-4400
28

AGENDA AND JOINT STATEMENT FOR JANUARY 17,
2025, CASE MANAGEMENT CONFERENCE
4:22-MD-03047-YGR

**Add. 544**

Fax: (415) 703-5480
Megan.Oneill@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*


**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ Philip Heleringer*
J. Christian Lewis (KY Bar No. 87109),
*Pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*Pro hac vice*
Zachary Richards (KY Bar No. 99209),
*Pro hac vice*
Daniel I. Keiser (KY Bar No. 100264),
*Pro hac vice*
Matthew Cocanougher (KY Bar No. 94292),
*Pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
CHRISTIAN.LEWIS@KY.GOV
PHILIP.HELERINGER@KY.GOV
ZACH.RICHARDS@KY.GOV
DANIEL.KEISER@KY.GOV
MATTHEW.COCANOUGHER@KY.GOV
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*


**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Thomas Huynh*
Kashif T. Chand (NJ Bar No. 016752008),
*Pro hac vice*
Section Chief, Deputy Attorney General
Thomas Huynh (NJ Bar No. 200942017),
*Pro hac vice*
Assistant Section Chief, Deputy Attorney

- 19 -

**Add. 545**

1    General
2    Verna J. Pradaxay (NJ Bar No. 335822021),
     *Pro hac vice*
3    Mandy K. Wang (NJ Bar No. 373452021),
     *Pro hac vice*
4    Deputy Attorneys General
     New Jersey Office of the Attorney General,
5    Division of Law
     124 Halsey Street, 5th Floor
6    Newark, NJ 07101
     Tel: (973) 648-2052
7    Kashif.Chand@law.njoag.gov
8    Thomas.Huynh@law.njoag.gov
     Verna.Pradaxay@law.njoag.gov
9    Mandy.Wang@law.njoag.gov

10   *Attorneys for Plaintiffs New Jersey Attorney*
     *General and the New Jersey Division of*
11   *Consumer Affairs Matthew J. Platkin, Attorney*
     *General for the State of New Jersey, and Cari*
12   *Fais, Acting Director of the New Jersey Division*
     *of Consumer Affairs*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 20 -

**Add. 546**

1   COVINGTON & BURLING LLP

2   By:  */s/ Ashley M. Simonsen*

3   Ashley M. Simonsen, SBN 275203
    COVINGTON & BURLING LLP

4   1999 Avenue of the Stars
    Los Angeles, CA 90067

5   Telephone: (424) 332-4800
    Facsimile: + 1 (424) 332-4749

6   Email: asimonsen@cov.com

7
    Phyllis A. Jones, *pro hac vice*

8   Paul W. Schmidt, *pro hac vice*
    COVINGTON & BURLING LLP

9   One City Center
    850 Tenth Street, NW

10  Washington, DC 20001-4956
    Telephone: + 1 (202) 662-6000

11  Facsimile: + 1 (202) 662-6291
    Email: pajones@cov.com

12

13  *Attorney for Defendants Meta Platforms, Inc.*
    *f/k/a Facebook, Inc.; Facebook Holdings,*

14  *LLC; Facebook Operations, LLC; Facebook*
    *Payments, Inc.; Facebook Technologies, LLC;*

15  *Instagram, LLC; Siculus, Inc.; and Mark Elliot*
    *Zuckerberg*

16

17  KING & SPALDING LLP

18  By: */s/ Geoffrey M. Drake*

19  Geoffrey M. Drake, *pro hac vice*
    TaCara D. Harris, *pro hac vice*

20  1180 Peachtree Street, NE, Suite 1600
    Atlanta, GA 30309-3521

21  Telephone: (404) 572-4600
    Facsimile: (404) 572-5100

22  Email: gdrake@kslaw.com
             tharris@kslaw.com

23

24  Kristen R. Fournier, *pro hac vice*
    KING & SPALDING LLP

25  1185 Avenue of the Americas, 34th Floor
    New York, NY 10036-2601

26  Telephone: (212) 556-2100
    Facsimile: (212) 556-2222

27  Email: kfournier@kslaw.com
    David P. Mattern, *pro hac vice*

28

- 21 -

**Add. 547**

1    KING & SPALDING LLP
     1700 Pennsylvania Avenue, NW, Suite 900
2    Washington, DC 20006-4707
     Telephone: (202) 737-0500
3    Facsimile: (202) 626-3737
     Email: dmattern@kslaw.com
4

5    Bailey J. Langner (SBN 307753)
     KING & SPALDING LLP
6    50 California Street, Suite 3300
     San Francisco, CA 94111
7    Telephone: (415) 318-1200
     Facsimile: (415) 318-1300
8    Email: blangner@kslaw.com

9
     Andrea Roberts Pierson, *pro hac vice*
10   FAEGRE DRINKER LLP
     300 N. Meridian Street, Suite 2500
11   Indianapolis, IN 46204
     Telephone: + 1 (317) 237-0300
12   Facsimile: + 1 (317) 237-1000
     Email: andrea.pierson@faegredrinker.com
13

14   Amy R. Fiterman, *pro hac vice*
     FAEGRE DRINKER LLP
15   2200 Wells Fargo Center
     90 South Seventh Street
16   Minneapolis, MN 55402
     Telephone: +1 (612) 766-7768
17   Facsimile: +1 (612) 766-1600
     Email: amy.fiterman@faegredrinker.com
18

19
     *Attorneys for Defendants TikTok Inc., ByteDance*
20   *Inc., TikTok Ltd., ByteDance Ltd., and TikTok*
     *LLC*
21

22
     MUNGER, TOLLES & OLSON LLP
23   By: */s/ Jonathan H. Blavin*
     Jonathan H. Blavin, SBN 230269
24   MUNGER, TOLLES & OLSON LLP
     560 Mission Street, 27th Floor
25   San Francisco, CA 94105-3089
     Telephone: (415) 512-4000
26   Facsimile: (415) 512-4077
     Email: jonathan.blavin@mto.com
27

28   Rose L. Ehler (SBN 29652)

- 22 -
**Add. 548**

1   Victoria A. Degtyareva (SBN 284199)
2   Laura M. Lopez, (SBN 313450)
    Ariel T. Teshuva (SBN 324238)
3   MUNGER, TOLLES & OLSON LLP
    350 South Grand Avenue, 50th Floor
4   Los Angeles, CA 90071-3426
    Telephone: (213) 683-9100
5   Facsimile: (213) 687-3702
    Email: rose.ehler@mto.com
6   Email: victoria.degtyareva@mto.com
7   Email: Ariel.Teshuva@mto.com

8   Lauren A. Bell (*pro hac vice forthcoming*)
    MUNGER, TOLLES & OLSON LLP
9   601 Massachusetts Ave., NW St.,
    Suite 500 E
10  Washington, D.C. 20001-5369
    Telephone: (202) 220-1100
11  Facsimile: (202) 220-2300
12  Email: lauren.bell@mto.com

13  *Attorneys for Defendant Snap Inc.*

14  WILSON SONSINI GOODRICH & ROSATI
15  Professional Corporation
    By: */s/ Brian M. Willen*
16  Brian M. Willen (*pro hac vice*)
    WILSON SONSINI GOODRICH & ROSATI
17  1301 Avenue of the Americas, 40th Floor
    New York, New York 10019
18  Telephone: (212) 999-5800
19  Facsimile: (212) 999-5899
    Email: bwillen@wsgr.com
20
    Lauren Gallo White (SBN 309075)
21  Samantha A. Machock (SBN 298852)
22  WILSON SONSINI GOODRICH & ROSATI
    One Market Plaza, Spear Tower, Suite 3300
23  San Francisco, CA 94105
    Telephone: (415) 947-2000
24  Facsimile: (415) 947-2099
    Email: lwhite@wsgr.com
25  Email: smachock@wsgr.com
26
    Christopher Chiou (SBN 233587)
27  Matthew K. Donohue (SBN 302144)
    WILSON SONSINI GOODRICH & ROSATI
28  953 East Third Street, Suite 100

AGENDA AND JOINT STATEMENT FOR JANUARY 17, 2025, CASE MANAGEMENT CONFERENCE
4:22-MD-03047-YGR

**Add. 549**

1    Los Angeles, CA 90013
     Telephone: (323) 210-2900
2    Facsimile: (866) 974-7329
     Email: cchiou@wsgr.com
3    Email: mdonohue@wsgr.com

4
     *Attorneys for Defendants YouTube, LLC and*
5    *Google LLC*

6    WILLIAMS & CONNOLLY LLP
     By: /s/ Joseph G. Petrosinelli
7    Joseph G. Petrosinelli (*pro hac vice*)
     jpetrosinelli@wc.com
8    Ashley W. Hardin (*pro hac vice*)
     ahardin@wc.com
9    680 Maine Avenue, SW
     Washington, DC 20024
10   Telephone.: 202-434-5000
     Fax: 202-434-5029
11

12   *Attorneys for Defendants YouTube, LLC and*
     *Google LLC*
13

14   MORGAN, LEWIS & BOCKIUS LLP
     By: /s/ Yardena R. Zwang-Weissman
15   Yardena R. Zwang-Weissman (SBN 247111)
     300 South Grand Avenue, 22nd Floor
16   Los Angeles, CA 90071-3132
     Tel.: 213.612.7238
17   Email: yardena.zwang-
     weissman@morganlewis.com
18

19   Brian Ercole (*pro hac vice*)
     600 Brickell Avenue, Suite 1600
20   Miami, FL 33131-3075
     Tel.: 305.415.3416
21   Email: brian.ercole@morganlewis.com

22
     Stephanie Schuster (*pro hac vice*)
23   1111 Pennsylvania Avenue NW
     NW Washington, DC 20004-2541
24   Tel.: 202.373.6595
     Email: stephanie.schuster@morganlewis.com
25

26   *Attorneys for Defendants YouTube, LLC and*
     *Google LLC*
27

28

                                    - 24 -
                                  **Add. 550**

1     **ATTESTATION**

2         I, Lexi J. Hazam, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence

3     to the filing of this document has been obtained from each signatory hereto.

4     Dated: January 10, 2025

                                          By: /s/ *Lexi J. Hazam*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AGENDA AND JOINT STATEMENT FOR JANUARY 17, 2025, CASE MANAGEMENT CONFERENCE
4:22-MD-03047-YGR

**Add. 551**

1  Donna Cecilia Valin
   *pro hac vice*
2  Special Counsel, Assistant Attorney General
   Florida Bar No. 96687
3  Office of the Attorney General
   Consumer Protection Division
4  135 West Central Blvd.
   Orlando, FL 32801
5  Tel.: (407) 316-4840
   Donna.Valin@myfloridalegal.com
6
   *Attorney for Office of the Attorney General,*
7  *State of Florida, Department of Legal Affairs*

8  *Additional counsel listed on signature pages*

9

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                      OAKLAND DIVISION

13  *Office of the Attorney General, State of Florida,*      MDL No. 3047
14  *Department of Legal Affairs*
                                                            Case No. 4:23-cv-05885-YGR
15            *v.*

16  *Meta Platforms, Inc., Instagram LLC, and Meta*
17  *Payments, Inc.*

18                                                          **NOTICE OF VOLUNTARY DISMISSAL**
                                                            **WITHOUT PREJUDICE**
19  -------------------------------------------------

20  IN RE: SOCIAL MEDIA ADOLESCENT
21
    ADDICTION/PERSONAL INJURY
22
    PRODUCTS LIABILITY LITIGATION
23

24

25  THIS DOCUMENT RELATES TO:
    4:23-cv-05885
26

27

28

Add. 552

To: Clerk of Court and All Parties of Record

Pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Plaintiff, the Office of the Attorney General, State of Florida, Department of Legal Affairs, hereby files this Notice of Voluntary Dismissal Without Prejudice, without costs to any party.

Respectfully Submitted,

**ASHLEY MOODY**
**Attorney General of the State of Florida**

*/s/ Donna Cecilia Valin*
Donna Cecilia Valin (FL Bar No. 96687),
*pro hac vice*
Special Counsel, Assistant Attorney General FL
135 West Central Blvd.
Orlando, FL 32801
Tel.: (407) 316-4840
Donna.Valin@myfloridalegal.com

Victoria Ann Butler (FL Bar No. 861250).
*pro hac vice*
Director of Consumer Protection Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Tel.: (813) 287-7950
Victoria.Butler@myfloridalegal.com

John M. Guard (FL Bar No. 374600),
*pro hac vice*
Chief Deputy Attorney General PL-01
The Capitol
Tallahassee, FL 32399
John.Guard@myfloridalegal.com

Nicholas J. Weilhammer (FL Bar No. 479322),
*pro hac vice*
Associate Deputy Attorney General for Enforcement
PL-01 The Capitol Tallahassee, FL
32399
Tel.: (850) 414-3861
Nicholas.Weilhammer@myfloridalegal.com

1

Karen E. Berger (FL Bar No. 72991),
*pro hac vice*

2

Special Counsel, Assistant Attorney General
110 SE 6th Street, 10th Floor

3

Fort Lauderdale, FL 33301

4

Tel.: (954) 712-4600
Karen.berger@myfloridalegal.com

5

6

*Attorneys for Office of the Attorney General, State of Florida, Department of Legal Affairs*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of Voluntary Dismissal Without Prejudice
23-cv-05448-YGR

**Add. 554**

1  Anna K. Schneider
2  Montana Attorney General's Office, Bureau Chief
   Montana Bar No. 13963
3  Office of Consumer Protection
   P.O. Box 201405
4  Helena, MT 59620-1405
   (406) 444-4500
5  anna.schneider@mt.gov

6  David H. Thompson*
   (DC Bar No. 450503)
7  Michael W. Kirk*
   (DC Bar No. 424648)
8  Brian W. Barnes*
   (DC Bar No. 1018419)
9  Megan M. Wold*
   (DC Bar No. 198005)
10 Athanasia O. Livas*
   (DC Bar No. 90011199)
11 COOPER & KIRK, PLLC
12 1523 New Hampshire Ave., N.W.
   Washington, D.C. 20036
13 Tel: (202) 220-9600
   Fax: (202) 220-9601
14 dthompson@cooperkirk.com
15 mkirk@cooperkirk.com
   bbarnes@cooperkirk.com
16 mwold@cooperkirk.com
17 alivas@cooperkirk.com

18 *Counsel for Plaintiff State of Montana*
   *Admitted pro hac vice*
19

## UNITED STATES DISTRICT COURT
20 ## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION
21

22 | *State of Montana, ex rel. Austin Knudsen Attorney General* | MDL No. 3047 |
23 | *v.* | |
| *Meta Platforms, Inc., et al.* | Case No. 4:24-cv-00805-YGR |
24 | ---------------------------------------------------- | **NOTICE OF VOLUNTARY DISMISSAL WITHOUT PREJUDICE** |
25 | IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | |
26 | THIS DOCUMENT RELATES TO: 4:24-cv-00805 | |
27

28

---
1

To: Clerk of Court and All Parties of Record

Pursuant to Rule 41(a)(1)(A)(i) of the Federal Rules of Civil Procedure, Plaintiff, the State of Montana, hereby files this Notice of Voluntary Dismissal Without Prejudice, without costs to any party.

Dated: December 16, 2024

Respectfully submitted,

**AUSTIN KNUDSEN**
**ATTORNEY GENERAL**

By: /s/ Anna K. Schneider
Anna K. Schneider
Montana Bar No. 13963
Montana Attorney General's Office
Bureau Chief
Office of Consumer Protection
P.O. Box 201405
Helena, MT 59620-1405
(406) 444-4500
anna.schneider@mt.gov

/s/ David H. Thompson
David H. Thompson*
(DC Bar No. 450503)
Michael W. Kirk*
(DC Bar No. 424648)
Brian W. Barnes*
(DC Bar No. 1018419)
Megan M. Wold*
(DC Bar No. 198005)
Athanasia O. Livas*
(DC Bar No. 90011199)
COOPER & KIRK, PLLC
1523 New Hampshire Ave., N.W.
Washington, D.C. 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
dthompson@cooperkirk.com
mkirk@cooperkirk.com
bbarnes@cooperkirk.com
mwold@cooperkirk.com
alivas@cooperkirk.com

*Counsel for Plaintiff State of Montana*
* Admitted *pro hac vice*

2

1  [*Counsel Listed on Signature Pages*]

2

3

4

5

6

7

8  UNITED STATES DISTRICT COURT

9  NORTHERN DISTRICT OF CALIFORNIA

10  OAKLAND DIVISION

11

12  *People of the State of California, et al.*

13          *v.*

14  *Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC*

15

16  - - - - - - - - - - - - - - - - - - - - - - - - -

17  *Office of the Attorney General, State of Florida Department of Legal Affairs*

18          *v.*

19

20  *Meta Platforms, Inc., Instagram LLC*

21  - - - - - - - - - - - - - - - - - - - - - - - - -

22  IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

23

24  THIS DOCUMENT RELATES TO:

25  4:23-cv-05448

MDL No. 3047

Case No. 4:23-cv-05448-YGR

4:23-cv-05885-YGR

Honorable Yvonne Gonzalez Rogers

**DEFENDANT META PLATFORMS, INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO PLAINTIFF THE PEOPLE OF THE STATE OF CALIFORNIA**

26

27

28

1

**Add. 557**

**META DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS
TO PLAINTIFF THE PEOPLE OF THE STATE OF CALIFORNIA**

Defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., and Meta Platforms Technologies, LLC (collectively, "Defendants"), pursuant to Federal Rules of Civil Procedure 26 and 34, hereby propound the following First Set of Requests for Production of Documents to The People of the State of California ("Plaintiff"). These Requests are to be responded to fully and separately as required by the Federal Rules of Civil Procedure.

Defendants request that Plaintiff serve its responses to these Requests upon counsel for Defendants at Covington & Burling LLC; 1999 Avenue of the Stars, Los Angeles, California, 90067-4643 within thirty (30) days. The following Definitions and Instructions are applicable to these Requests:

## DEFINITIONS

1.      The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

2.      "Document" or "documents" shall have the broadest meaning ascribed to it by the Federal Rules of Civil Procedure, and includes, without limitation electronically stored information ("ESI") (including, without limitation, electronic databases and the data therein, all electronic messages or communications, electronic word processing documents, electronically stored voicemail, webpages, and social media posts) in accordance with any order in this case governing ESI at the time of production. Different versions of the same documents, including, but not limited to, drafts or documents with handwritten notations or marks not found in the original or on other copies are different documents.

3.      "Relating" or "related to" means and includes referring to, concerning, referencing, mentioning, associated with, constituting, discussing, containing, embodying, recording, reflecting, identifying, summarizing, incorporating, and/or dealing with or pertaining to in any way.

4.      "Identification" or "identify" when used in reference to:

2

**Add. 558**

      a.    a natural individual, requests that individual's full name, occupation, current or last known residential and business addresses, and current or last known residential and business telephone numbers;

      b.    a document, requests the nature of the document (*e.g.*, letter or memorandum), its title, its date, the name(s) of its authors and recipients, and its present location or custodian;

      c.    a communication, requests the identification of any document(s) that evidence the communication, an identification of the person(s) participating in the communication, and the date, and substance of the communication.

5.    "Complaint" refers to the Civil Enforcement Complaint in this matter filed by Plaintiff on October 24, 2023, in the United States District Court for the Northern District of California.

6.    "Plaintiff", "You", "you", "Your" and "your" means the State of California, including but not limited to the executive and legislative branches, agencies, offices, departments, divisions, commissions, committees, agents, employees, boards, instrumentalities, vendors (to the extent the State of California has possession, custody, or control over them), administrators, and other persons or entities acting on behalf of the State of California, including but not limited to the California Business, Consumer Services, and Housing Agency, California Department of Child Support Services, California Department of Consumer Affairs, California Department of Education, California Department of Finance, California Department of Health Care Services, California Department of Public Health, California Office of the Governor, California Legislature, California Governor's Office of Business and Economic Development, California Health and Human Services Agency, California Mental Health Services Oversight and Accountability Commission, California Office of Data and Innovation, California School Finance Authority, California Attorney General, and any other related entities.

7.    "Defendants" refers to Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., and Meta Platforms Technologies, LLC.

8.    "And" includes "or", and vice versa.

# Add. 559

9.    The singular form of a word or term includes the plural, and vice versa.

10.    The present tense of a verb includes the past tense, and vice versa.

11.    The use of the article "the" shall not be construed as limiting the scope of any request.

12.    "Including" means "including without limitation".

13.    "Any" includes "all", and vice versa.

14.    The capitalized version of a word or term includes the lower case version of a word or term, and vice versa.

15.    "Social Media Platforms" means a digital service that facilitates interactions between two or more distinct but interdependent sets of users, including but not limited to Facebook, Instagram, Snapchat, TikTok, YouTube, Twitter (or "X"), Pinterest, LinkedIn, BeReal, Lapse, Reddit, Threads, VSCO, Goodreads, Quora, Discord, Twitch, and Tumbler.

16.    "Defendants' Platforms" means Facebook and Instagram.

17.    "Young Users" adopts the meaning given to that term in the Complaint, specifically people under the age of eighteen years.

18.    "Mental Health" and "well-being" are defined consistent with those terms' usage in the Complaint.

All words, terms, and phrases not specifically defined herein are to be given their normal and customary meaning in the context in which they are used in these Requests.

**INSTRUCTIONS**

1.    Plaintiff is requested to furnish all documents and information in Plaintiff's possession, custody, or control, to the extent not privileged.  Documents held by any office, department, agency, board, commission, or instrumentality of the state are within Plaintiff's possession, custody, or control.

2.    In accordance with Federal Rule of Civil Procedure 26(b)(5), if Plaintiff objects to furnishing any of the documents or information requested by these Requests on the grounds of

4

**Add. 560**

attorney-client privilege, work product, other privilege, or otherwise then, with respect to each such document:

   a. state the nature of the privilege claimed;

   b. state the date of each communication supporting the privilege claim;

   c. state the location, if any, of such supporting communication;

   d. identify by name and title all participants in the supporting communication;

   e. state the specific grounds on which the objection is based;

   f. identify the specific request calling for such information;

  3. If Plaintiff objects to any Request on the grounds that it is vague or ambiguous, state: (i) the portions or terms of such Request that Plaintiff claims to be vague or ambiguous; and (ii) the interpretation of the Request pursuant to which Plaintiff provides a response.

  4. These Requests are deemed to be continuing in nature and require Plaintiff to timely serve supplemental responses or productions in accordance with Rule 26(e) of the Federal Rules of Civil Procedure, up to and including the time of a trial or hearing in this matter. All supplemental responses shall include the date upon which and the manner in which such further or different information was acquired or became known to Plaintiff.

  5. If Plaintiff cannot fully respond to a particular Request after exercising due diligence to make inquiry and to secure the necessary information, provide a response to the extent possible, specifying Plaintiff's inability to respond to the remainder and providing whatever information or knowledge Plaintiff has concerning the portion not responded to.

  6. Each page of a produced document shall have a legible, unique page identifier ("Bates Number") and confidentiality legend (where applicable) on the face of the image at a location that does not obliterate, conceal, or interfere with any information from the source document. Redactions should be clearly marked or stamped on the page in such a way that it is clear from review that a portion of the image has been redacted.

  7. All responsive and non-privileged electronic documents shall be produced in the format ordered by the Court in its forthcoming ESI order.

**Add. 561**

8. All responsive electronic documents shall be produced in a format agreed upon by the parties, to include at least native versions of Excel spreadsheets and presentation files, with a Bates-stamped placeholder image.

9. Unless otherwise specified, the time period for these Requests is January 1, 2015 to the date of production of the Documents.

## REQUESTS FOR PRODUCTION

1. All Documents referenced in or used to prepare the Complaint.

**RESPONSE:**

2. All Documents Relating to the alleged relationship between Social Media Platforms and Young Users' Mental Health and Wellbeing.

**RESPONSE:**

3. All Documents Relating to the relationship between Social Media Platforms and the harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

4. All Communications between Plaintiff and any federal, state, or local official, agency, body, actor, or political subdivision Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

6

## Add. 562

5. All Communications between Plaintiff and any lobbyists (i.e., persons who communicate directly or indirectly with state government officials for the purpose of influencing action by the official for compensation) Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

6. All Communications between Plaintiff and any public or private school, school board, or parent-teacher association in California Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

7. All posts on any Social Media Platform or public statements in any forum, in which Plaintiff discusses topics Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

8. All posts on any Social Media Platform or public statements in any forum, in which Plaintiff encouraged Young Users' use of Social Media Platforms or otherwise stated that such usage could be beneficial for Young Users' Mental Health and Wellbeing.

**RESPONSE:**

7

**Add. 563**

9.      All Communications between Plaintiff and any group or organization that advocates for Young Users' Mental Health and Wellbeing.

**RESPONSE:**


10.      All Communications between Plaintiff and any group or organization that advocates against Young Users' use of Social Media Platforms and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**


11.      All Documents Relating to consumer complaints (including the name and address of the sender, name and address of the recipient, date received, description of the comment, complaint, or inquiry, and any response) about Young Users' use of Social Media Platforms, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction), including but not limited to Communications between Plaintiff and any California citizens, voters, consumers, or their relatives.  This includes any Documents Relating to town hall events hosted by Plaintiff to discuss Social Media Platforms and other technology affecting Young Users.

**RESPONSE:**


12.      All Communications between Plaintiff and any media source Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).  This includes but is not limited to transcripts from television, radio, Social Media Platforms, and podcast interviews.

**RESPONSE:**

8

13.    All Documents Relating to meetings, presentations, or proposals Related to the awareness of, the alleged abuse of, use of, misuse of, and/or alleged addiction to Social Media Platforms by Young Users.

**RESPONSE:**

14.    All minutes, agendas, notes, and other records, including audio and/or visual recordings, of or from any public or non-public meeting Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

15.    All Documents Relating to Communications with any Defendant in this case (excluding court Documents filed or served in this case) Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

16.    All Documents Relating to Communications with any company owning or operating a Social Media Platform Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

9

**Add. 565**

17.    All Documents Relating to Plaintiff's efforts to prevent Young Users from using any Social Media Platform.

**RESPONSE:**

18.    All Documents Relating to Plaintiff's efforts to encourage or promote the use of Social Media Platforms, including but not limited to the use of Social Media Platforms by Young Users.

**RESPONSE:**

19.    All Documents Relating to Plaintiff's efforts to suspend, revoke, fine, or otherwise sanction Defendants or any other company owning or operating a Social Media Platform.

**RESPONSE:**

20.    All Documents Relating to any proposed legislation or proposed policies, regardless of whether such legislation or policies were passed, regarding Young Users' use of Social Media Platforms or Young Users' Mental Health and Wellbeing.

**RESPONSE:**

21.    All Documents that Plaintiff contends show Defendants possessed knowledge of material facts to which the public did not have access, as alleged in Plaintiff's Complaint.

**RESPONSE:**

22.    All Documents Relating to Defendants' knowledge of the truth or falsity of any representation by Defendants that Plaintiff contends is false or misleading.

**RESPONSE:**

23.    All Documents Relating to the extent to which California residents received any representation by Defendants that Plaintiff contends is false or misleading.

10

**Add. 566**

**RESPONSE:**

24.    All Documents Relating to the extent to which California residents relied on any representation by Defendants that Plaintiff contends is false or misleading.

**RESPONSE:**

25.    All Documents Relating to the investigation referenced in paragraph 842 of the Complaint, including but not limited to transcripts of interviews and affidavits and declarations of witnesses.

**RESPONSE:**

26.    All Documents Relating to research, testing, study, investigation, or any other efforts undertaken by Plaintiff or any Person or group acting on behalf of Plaintiff Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

27.    All Documents Plaintiff has received from a third party Relating to this action or any investigation by Plaintiff Relating to the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

28.    All Documents Related to programs, initiatives, or actions proposed or taken by Plaintiff or any other government entity to address Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or the conduct and harms alleged in the Complaint

**Add. 567**

(including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

29.    All Documents Relating to the U.S. Surgeon General's May 2023 Advisory entitled "Social Media and Youth Mental Health."

**RESPONSE:**

30.    All Documents Relating to the movie referenced in paragraph 420 of the Complaint.

**RESPONSE:**

31.    All Documents, including but not limited to reports, studies, surveys, and articles, Relating to the causes or contributing factors to Young Users' Mental Health and Wellbeing issues, including causes other than the use of Social Media Platforms.

**RESPONSE:**

32.    All Documents, including but not limited to reports, studies, surveys, and articles, Relating to time spent by Young Users on Social Media Platforms.

**RESPONSE:**

33.    All Documents, including but not limited to reports, studies, surveys, and articles, Relating to the causes or contributing factors to Young Users' use of Social Media Platforms.

**RESPONSE:**

34.    All Documents, including but not limited to reports, studies, surveys, and articles, Relating to the impact of video games, cell phone usage, messaging, and other electronics usage apart from usage of Social Media Platforms on Young Users' Mental Health and Wellbeing.

**Add. 568**

**RESPONSE:**

35.    All Documents, including but not limited to reports, studies, surveys, and articles, Relating to the impact of the COVID-19 pandemic and/or remote learning on Young Users' Mental Health and Wellbeing.

**RESPONSE:**

36.    All Documents, including but not limited to reports, studies, surveys, and articles, Relating to the impact of social, economic, and political issues and/or factors on Young Users' Mental Health and Wellbeing.

**RESPONSE:**

37.    All Documents, including but not limited to reports, studies, surveys, and articles, Relating to the allegation that addiction to Social Media Platforms is a recognized medical condition.

**RESPONSE:**

38.    All Documents Relating to the features of Defendants' Platforms identified in the Complaint, including "push notifications," "algorithmic recommendation and sequencing," "public display and quantification of engagement metrics such as Likes," "ephemeral presentation of social content," "infinite scroll," "autoplay formats," "audiovisual and haptic alerts," "permitting and encouraging users to create multiple accounts," and "face and body image manipulation filters."

**RESPONSE:**

39.    All Documents, including but not limited to reports, studies, surveys, and articles, Relating to any impact that the features of Defendants' Platforms identified in the Complaint, including "algorithmic recommendation and sequencing," "public display and quantification of

**Add. 569**

engagement metrics such as Likes," "push notifications," "ephemeral presentation of social content," "infinite scroll," "autoplay formats," "audiovisual and haptic alerts," "permitting and encouraging users to create multiple accounts," and "face and body image manipulation filters," have on Young Users' Mental Health and Wellbeing.

**RESPONSE:**

40.    All Documents, including but not limited to reports, studies, surveys, and articles, Relating to the value or benefits of Social Media Platforms, including but not limited to the value or benefits for Young Users.

**RESPONSE:**

41.    All Documents Relating to the investigation by Plaintiff into operators of Social Media Platforms, other than Defendants' Platforms, for possible violation of California's consumer protection laws, including but not limited to any Communications or statements made about such investigation, and the results or conclusions reached from the investigation.

**RESPONSE:**

42.    All Documents that Plaintiff contends support a causal connection between Young Users' use of Social Media Platforms and Young Users' Mental Health and Wellbeing, and/or the harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction).

**RESPONSE:**

43.    All Documents Relating to the relief Plaintiff seeks from Defendants in this action, including any calculations, formulas, methodologies, or estimates thereof (even if preliminary or partial).

**RESPONSE:**

14

**Add. 570**

44.    All final, approved budgets from the State of California for fiscal years from January 1, 2015 to the present.

**RESPONSE:**

45.    All Documents Related to any requested or approved budgets and/or fiscal expenditures to address Young Users' Mental Health issues and/or Young Users' use of Social Media Platforms or any harms allegedly caused from such use.

**RESPONSE:**

Respectfully submitted,

Dated: February 27, 2024

COVINGTON & BURLING LLP

By: */s/ Ashley M. Simonsen*

Ashley M. Simonsen, SBN 275203
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants Meta Platforms,
Inc. f/k/a Facebook, Inc.; Facebook
Holdings, LLC; Facebook Operations, LLC;*

15

*Facebook Payments, Inc.; Facebook
Technologies, LLC; Instagram, LLC;
Siculus, Inc.; and Mark Elliot Zuckerberg*

16

**Add. 572**

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2024, a true and correct copy of Defendants' First Requests for Production to Plaintiff The People of the State of California were served upon the following by email:

Nicklas A. Akers
Senior Assistant Attorney General
Bernard Eskandari
Supervising Deputy Attorney General
Megan O'Neill
Joshua Olszewski-Jubelirer
Marissa Roy
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
nicklas.akers@doj.ca.gov
bernard.eskandari@doj.ca.gov
megan.oneill@doj.ca.gov
joshua.olszewskijubelirer@doj.ca.gov
marissa.roy@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

By:    */s/ Ashley M. Simonsen*
       Ashley M. Simonsen

*Attorney for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg*

17

**Add. 573**

**COVINGTON**

BEIJING  BOSTON  BRUSSELS  DUBAI  FRANKFURT
JOHANNESBURG  LONDON  LOS ANGELES  NEW YORK
PALO ALTO  SAN FRANCISCO  SEOUL  SHANGHAI  WASHINGTON

Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
T  +1 415 591 6000

DELIVERED VIA PROCESS SERVER                    July 17, 2024

California Department of Child Support Services
11150 International Drive
Rancho Cordova, CA 95670

      **Re:  People of the State of California v. Meta Platforms, Inc.,**
          **4:23-cv-05448**

Dear Sir/Madam:

Enclosed please find a subpoena being served upon you in connection with the above-captioned litigation currently pending in the U.S. District Court for the Northern District of California. I represent Defendants Meta Platforms, Inc.; Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LC and Mark Zuckerberg (collectively, the "Meta Defendants") in this matter.

The document subpoena requests the production of specific documents identified in the attached subpoena (see Attachment A to the subpoena), which are requested to be produced by 10 am on August 19, 2024. We are willing to work with you on the time, date, location, method and manner of document production, as well as answer any questions or concerns you may have regarding subpoena compliance. It is sufficient compliance with this subpoena if you electronically transmit a copy of the requested documents to the undersigned. As such, please contact me at kpatchen@cov.com and 415-591-6031, to discuss document production and subpoena compliance, unless you are already represented by counsel in connection with this matter.

The Court is currently considering whether the California Attorney General's Office has control over California Department of Child Support Services information for the purposes of discovery in this action. If the Court rules that the California Attorney General's Office has control over California Department of Child Support Services' information, the California Attorney General has pending discovery requests that seek this agency's documents. By serving this subpoena, Meta does not waive its position in the state agency dispute, nor does Meta in any way waive rights to compel the California Attorney General to produce California Department of Child Support Services' information as part of discovery in this action. However, to avoid further delay in the production of information from the California Department of Child Support Services, Meta is serving the attached subpoena to request the timely production of this information.

Your anticipated time and assistance with this matter is greatly appreciated.

**COVINGTON**

California Department of Child Support Services
July 17, 2024
Page 2

Best regards,

/s/ *E. Kate Patchen*

E. Kate Patchen

Enclosed:  Subpoena, Attachment A, and Attachment B

1  [*Counsel Listed on Signature Pages*]

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10

11  IN RE: SOCIAL MEDIA ADOLESCENT
    ADDICTION/PERSONAL INJURY              Case No. 4:22:MD-03047-YGR
12  PRODUCTS LIABILITY LITIGATION
                                           MDL No. 3047
13  - - - - - - - - - - - - - - - - - - - -

14  THIS DOCUMENT RELATES TO:
                                           **META DEFENDANTS' NOTICE OF**
    *People of the State of California, et al. v. Meta*   **INTENT TO SERVE SUBPOENAS**
15  *Platforms, Inc. et al.*,

16  Case No.: 4:23-cv-05448

17

18          Pursuant to Federal Rule of Civil Procedure 45(a)(4), Defendants Meta Platforms,

19  Inc. f/k/a Facebook, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms

20  Technologies, LLC provide notice that they intend to serve the attached subpoenas to:

21

22          1.  California Office of the Governor;

23          2.  California Office of Data & Innovation;

24          3.  California Governor's Office of Business and Economic Development;

25          4.  California Department of Finance;

26          5.  California Department of Public Health;

27          6.  California Department of Consumer Affairs; and

28
                                           1
                                    **Add. 576**

7.  California Business, Consumer Services and Housing Agency.

As agreed with the California agencies, Meta serves the attached subpoenas as a courtesy only to assist with facilitating discovery-related negotiations with the listed agencies, without waiving Meta's position on the status of the listed agencies as being subject to party discovery pursuant to Judge Kang's Order of September 6, 2024 (ECF No. 1117). Meta reserves all rights, including the right to revert back to seeking Rule 34 discovery from the listed agencies in accordance with Judge Kang's September 6 order should our negotiations fail to yield an agreement. The California agencies receiving such subpoenas in turn agreed that they will not use the facts of the subpoenas against Meta in the event we do not reach the agreement contemplated in our proposal or some other mutually agreed-on terms.

Respectfully submitted,

 Dated: December 18, 2024

COVINGTON & BURLING LLP

By: */s/ Ashley M. Simonsen*

Ashley M. Simonsen, SBN 275203
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants*

1

**CERTIFICATE OF SERVICE**

2     I hereby certify that on December 18, 2024, a true and correct copy of Notice of Intent to

3 Serve Subpoenas, were served upon the following by email:

4     Laura Dilweg
      Consumer Protection Section Chief Counsel
5     Nathan Whelihan, *pro hac vice*
      Assistant Attorney General
6     Arizona Attorney General's Office
      2005 North Central Avenue
7     Phoenix, AZ 85004
      Phone: (602) 542-3725
8     Fax:          (602) 542-4377
      Laura.Dilweg@azag.gov
9     Nathan.Whelihan@azag.gov

10     *Attorneys for Plaintiff State of Arizona,*
      *ex rel. Kristin K. Mayes, Attorney General*
11

12     Nicklas A. Akers
      Senior Assistant Attorney General
13     Bernard Eskandari
      Supervising Deputy Attorney General
14     Megan O'Neill
      Joshua Olszewski-Jubelirer
15     Marissa Roy
      Deputy Attorneys General
16     California Department of Justice
      Office of the Attorney General
17     455 Golden Gate Ave., Suite 11000
      San Francisco, CA 94102-7004
18     Phone: (415) 510-4400
      Fax: (415) 703-5480
19     nicklas.akers@doj.ca.gov
      bernard.eskandari@doj.ca.gov
20     megan.oneill@doj.ca.gov
      joshua.olszewskijubelirer@doj.ca.gov
21     marissa.roy@doj.ca.gov

22     *Attorneys for Plaintiff the People of the State of California*

23

24

25

26

27

28

3

**Add. 578**

Lauren M. Dickey
First Assistant Attorney General
Megan Paris Rundlet
Senior Assistant Solicitor General
Elizabeth Orem
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
lauren.dickey@coag.gov
megan.rundlet@coag.gov
beth.orem@coag.gov

*Attorneys for the State of Colorado*


Lauren H. Bidra
Special Counsel for Media and Technology
Krislyn M. Launer
Ashley H. Meskill
Assistant Attorneys General
Connecticut Office of the Attorney General 165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5306
Fax: 860-808-5593
Lauren.Bidra@ct.gov
Krislyn.Launer@ct.gov
Ashley.Meskill@ct.gov

 *Attorneys for Plaintiff State of Connecticut*


Marion Quirk
Director of Consumer Protection
Ryan Thomas Costa
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8800
Marion.quirk@delaware.gov
Ryan.costa@delaware.gov

 *Attorneys for Plaintiff State of Delaware*

Bryan C. Yee
Supervising Deputy Attorney General
Christopher T. Han
Deputy Attorney General
Department of the Attorney General
Commerce and Economic Development Division
425 Queen Street
Honolulu, Hawaiʻi 96813
Phone: (808) 586-1180
Bryan.c.yee@hawaii.gov
Christopher.t.han@hawaii.gov

*Attorneys for Plaintiff State of Hawaii*

Nathan H. Nielson
Stephanie N. Guyon
Deputy Attorneys General
Attorney General's Office
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2424
nathan.nielson@ag.idaho.gov
stephanie.guyon@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

Susan Ellis
Chief, Consumer Protection Division
Greg Grzeskiewicz
Chief, Consumer Fraud Bureau
Jacob Gilbert
Deputy Chief, Consumer Fraud Bureau
Daniel Edelstein
Supervising Attorney, Consumer Fraud Bureau
Kevin Whelan
Supervising Attorney, Consumer Fraud Bureau
Matthew Davies
Assistant Attorney General, Consumer Fraud Bureau
Adam Sokol
Senior Assistant Attorney General, Consumer Fraud Bureau Emily María Migliore,
Assistant Attorney General, Consumer Fraud Bureau
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-8554
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Daniel.Edelstein@ilag.gov
Kevin.Whelan@ilag.gov
Adam.Sokol@ilag.gov
Emily.Migliore@ilag.gov

*Attorneys for Plaintiff the People of the State of Illinois*


Scott L. Barnhart
Chief Counsel and Director of Consumer Protection
Corinne Gilchrist
Section Chief, Consumer Litigation
Mark M. Snodgrass
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

Sarah M. Dietz
Assistant Attorney General
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
Fax: (785) 296-3131
sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*


J. Christian Lewis
Philip Heleringer
Zachary Richards
Daniel I. Keiser
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth
of Kentucky*


Arham Mughal
L. Christopher Styron
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
MughalA@ag.louisiana.gov
StyronL@ag.louisiana.gov

*Attorneys for State of Louisiana*

Michael Devine
Laura Lee Barry Wommack
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
michael.devine@maine.gov
lauralee.barrywommack@maine.gov

*Attorneys for Plaintiff State of Maine*


Philip D. Ziperman
Deputy Chief, Consumer Protection Division
Elizabeth J. Stern
Assistant Attorney General
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6417 (Mr. Ziperman)
Phone: (410) 576-7226 (Ms. Stern)
Fax: (410) 576-6566
pziperman@oag.state.md.us
estern@oag.state.md.us

*Attorneys for Plaintiff Office of the Attorney General of Maryland*


Daniel J. Ping
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
517-335-7632
PingD@michigan.gov

*Attorneys for Plaintiff State of Michigan*


Caitlin M. Micko
Assistant Attorney General
Consumer Protection Division
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 724-9180
caitlin.micko@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota, by its Attorney General, Keith Ellison*

8

**Add. 583**

Michael Schwalbert
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Attorney for Plaintiff State of Missouri, ex rel.*
*Andrew Bailey, Attorney General*


Anna Schneider                          David H. Thompson
Office of Consumer Protection           Cooper & Kirk PLLC
Department Of Justice P.O. Box 200151   1523 New Hampshire Avenue Nw
Helena, MT 59620-0151                   Washington, DC 20036
406-444-5791                            (202) 220-9600 Fax: (202) 220-9601
Anna.Schneider@mt.Gov                   Dthompson@cooperkirk.Com

Athanasia Livas                         Megan Marie Wold
Cooper & Kirk, PLLC                     Cooper & Kirk, PLLC
1523 New Hampshire Avenue, N.W.         1523 New Hampshire Ave., Nw
Washington, DC 20036                    Washington, DC 20036
202-220-9600                            202-220-9650
Alivas@cooperkirk.Com                   Mwold@cooperkirk.Com

Brian W. Barnes                         Michael W. Kirk
Cooper and Kirk, PLLC                   ATTORNEY TO BE NOTICED
1523 New Hampshire, Nw                  Cooper & Kirk, PLLC
Washington, DC 20036                    1523 New Hampshire Avenue, Nw
202-220-9623                            Washington, Dc 2003
Bbarnes@cooperkirk.Com                  202.220.9600
                                        mkirk@cooperkirk.com

*Attorneys for Plaintiff State Montana*


Anna Anderson
Assistant Attorney General
Consumer Protection Bureau
Office of Attorney General
2115 State Capitol
Lincoln, NE 68509
402-471-6034
anna.anderson@nebraska.gov

*Attorney for Plaintiff State of Nebraska*

Kashif T. Chand
Section Chief, Deputy Attorney General
Thomas Huynh
Assistant Section Chief, Deputy Attorney General
Gina F. Pittore
Verna J. Pradaxay
Mandy K. Wang
Deputy Attorneys General
New Jersey Office of the Attorney General, Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Gina.Pittore@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

  *Attorneys for Plaintiffs State of New Jersey and
the New Jersey Division of Consumer Affairs*


Alex Finkelstein
Kevin Wallace
Nathaniel Kosslyn
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8262
Alex.finkelstein@ag.ny.gov
Kevin.wallace@ag.ny.gov
Nathaniel.Kosslyn@ag.ny.gov

*Attorneys for Plaintiff the People of the State
of New York*


Kevin Anderson
Senior Counsel
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6006
Facsimile: (919) 716-6050
kander@ncdoj.gov

  *Attorneys for Plaintiff State of North Carolina*


Melissa G. Wright
Section Chief, Consumer Protection Section
Melissa S. Smith
Asst. Section Chief, Consumer Protection
Section
Michael S. Ziegler

10

**Add. 585**

Principal Assistant Attorney General
Kevin R. Walsh, *pro hac vice*
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031
Melissa.Wright@ohioago.gov
Melissa.S.Smith@ohioago.gov
Michael.Ziegler@ohioago.gov
Kevin.Walsh@ohioago.gov

*Attorneys for State of Ohio, ex rel. Attorney General Dave Yost*


John Dunbar
Katherine McKeon
Oregon Department of Justice
Consumer Protection Section
100 SW Market Street
Portland, Oregon 97201
Telephone: (971) 673-1880
Facsimile: (971) 673-1884
John.Dunbar@doj.oregon.gov
Kate.McKeon@doj.oregon.gov

*Attorneys for State of Oregon, ex rel.*
*Ellen F. Rosenblum, Attorney General*
*for the State of Oregon*


Timothy R. Murphy
Senior Deputy Attorney General
Jonathan R. Burns
Deputy Attorney General
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530
tmurphy@attorneygeneral.gov
jburns@attorneygeneral.gov

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*


Stephen N. Provazza
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400

11

**Add. 586**

SProvazza@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

Jared Q. Libet
Assistant Deputy Attorney General
Anna C. Smith
Assistant Attorney General
Clark C. Kirkland, Jr.
Assistant Attorney General
P.O. Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-0536
jlibet@scag.gov
annasmith@scag.gov
ckirkland@scag.gov

*Attorneys for Plaintiff the State of South*
*Carolina, ex rel. Alan M. Wilson, in His*
*Official Capacity as Attorney General*
*of the State of South Carolina*

Aaron Salberg
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Aaron.salberg@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

Joelle E. Gotwals
Assistant Attorney General
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-8789
Facsimile: (804) 786-0122
jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth*
*of Virginia ex rel. Jason S. Miyares,*
*Attorney General*

Joseph Kanada
Alexandra Kory
Alexia M. Diorio
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Joe.Kanada@atg.wa.gov
Alexandra.kory@atg.wa.gov
Alexia.diorio@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

Colin R. Stroud
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-2950
stroudcr@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*

Laurel K. Lackey
Assistant Attorney General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia,*
*ex rel. Patrick Morrisey, Attorney General*

By: */s/ Ashley M. Simonsen*
        Ashley M. Simonsen

*Attorney for Defendants Meta Platforms,*
*Inc. f/k/a Facebook, Inc.; Instagram, LLC;*
*Meta Payments, Inc.; and Meta Platforms*
*Technologies, LLC*

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | |
|---|---|
| People of the State of California, et al. | ) |
| _Plaintiff_ | ) |
| v. | ) Civil Action No. 4:23-cv-05448 |
| Meta Platforms, Inc., et al. | ) |
| _Defendant_ | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: California Department of Child Support Services
11150 International Drive, Rancho Cordova, CA 95670

_(Name of person to whom this subpoena is directed)_

☑ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A.

| Place: Shook, Hardy & Bacon, Attn: Jennifer Blues Kenyon<br>555 Mission Street, Suite 2300<br>San Francisco, CA 94105 | Date and Time:<br><br>10 a.m. on August 19, 2024 |
|---|---|

❐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 07/17/2024

|  |  |
|---|---|
| _CLERK OF COURT_ | OR |
| | /s/ Ashley Simonsen |
| _Signature of Clerk or Deputy Clerk_ | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
Meta Platforms, Inc. f/k/a Facebook, Inc.; Instagram, LLC, Meta Payments, Inc.,
Meta Platforms Technologies, LLC; and Mark Zuckerberg, _____ who issues or requests this subpoena, are:
Ashley Simonsen, Covington & Burling LLP, 1999 Avenue of the Stars, Los Angeles, CA 90067, 424-332-4782, asimonsen@cov.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  4:23-cv-01615

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

| Print | Save As... | Add Attachment | | Reset |

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:

**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or

**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person

**(i)** is a party or a party's officer; or

**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:

**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and

**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**

The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## DEFINITIONS AND INSTRUCTIONS TO ATTACHMENT A

### DEFINITIONS

1.      The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

2.      "Document" or "documents" shall have the broadest meaning ascribed to it by the Federal Rules of Civil Procedure, and includes, without limitation electronically stored information ("ESI") (including, without limitation, electronic databases and the data therein, all electronic messages or communications, electronic word processing documents, electronically stored voicemail, webpages, and social media posts) in accordance with any order in this case governing ESI at the time of production. Different versions of the same documents, including, but not limited to, drafts or documents with handwritten notations or marks not found in the original or on other copies are different documents.

3.      "You", "you", "Your" and "your" means the California Department of Child Support Services.

4.      "Relating" or "related to" means and includes referring to, concerning, referencing, mentioning, associated with, constituting, discussing, containing, embodying, recording, reflecting, identifying, summarizing, incorporating, and/or dealing with or pertaining to in any way.

5.      "And" includes "or", and vice versa.

6.      The singular form of a word or term includes the plural, and vice versa.

7.      The present tense of a verb includes the past tense, and vice versa.

8.      The use of the article "the" shall not be construed as limiting the scope of any request.

1

9.      "Including" means "including without limitation."

10.     "Any" includes "all", and vice versa.

11.     The capitalized version of a word or term includes the lower case version of a word or term, and vice versa.

12.     "Social Media Platforms" or "Platforms" means a digital service that facilitates interactions between two or more distinct but interdependent sets of users, including but not limited to Facebook, Instagram, Snapchat, TikTok, YouTube, Twitter (or "X"), Pinterest, LinkedIn, BeReal, Lapse, Reddit, Threads, VSCO, Goodreads, Quora, Discord, Twitch, and Tumblr.

13.     "Young Users" means users of Social Platforms who are under 18 years of age when using the Platform(s).

All words, terms, and phrases not specifically defined herein are to be given their normal and customary meaning in the context in which they are used in these Requests.

## **INSTRUCTIONS**

1.      These Requests are intended to cover any and all documents in your possession, custody, or control, to the extent not privileged.  Documents held by any office, department, board, commission, or instrumentality of the California Department of Child Support Services are within your possession, custody, or control.

2.      In accordance with ESI Protocol attached hereto as Attachment B, if you object to furnishing any of the documents or information requested by these Requests on the grounds of attorney-client privilege, work product, other privilege, or otherwise then, with respect to each such document:

      a.   state the nature of the privilege claimed;

      b.   state the date of each communication supporting the privilege claim;

    c.   identify all participants in the supporting communication;

    d.   state the specific grounds on which the objection is based; and

    e.   identify the specific request calling for such information;

2.      If you object to any Request on the grounds that it is vague or ambiguous, state: (i) the portions or terms of such Request that you claim to be vague or ambiguous; and (ii) the interpretation of the Request pursuant to which you provide a response.

3.      Each request shall be deemed continuing, so as to require supplemental or mandatory responses should you obtain additional responsive information subsequent to your initial responses.

4.      If you cannot fully respond to a particular Request after exercising due diligence to make inquiry and to secure the necessary information, provide a response to the extent possible, specifying your inability to respond to the remainder and providing whatever information or knowledge you have concerning the portion not responded to.

5.      Each page of a produced document shall have a legible, unique page identifier ("Bates Number") and confidentiality legend (where applicable) on the face of the image at a location that does not obliterate, conceal, or interfere with any information from the source document.  Redactions should be clearly marked or stamped on the page in such a way that it is clear from review that a portion of the image has been redacted.

6.      All responsive and non-privileged electronic documents shall be produced in the format ordered by the Court in its ESI order.

7.      All responsive electronic documents shall be produced in a format agreed upon by the parties, to include at least native versions of Excel spreadsheets and presentation files, with a Bates-stamped placeholder image.

8.      Unless otherwise specified, the time period for these Requests is January 1, 2012 to the date of production of the Documents.

## ATTACHMENT A

1. Research, investigations, studies, surveys, reports, evaluations, or analyses concerning the mental, social, emotional, or behavioral health of persons ages 13 to 18.

2. Research, investigations, studies, surveys, reports, evaluations, or analyses related to Social Media Platforms, including the importance of Social Media Platforms and the use of Social Media Platforms by Young Users and the potential benefits and harms created by the use of Social Media Platforms.

3. Research, investigations, studies, surveys, reports, evaluations, or analyses concerning the mental, social, emotional, or behavioral health of Young Users, including those related to the effects of:
    a. Social Media Platforms usage;
    b. Video games usage;
    c. Cell phone usage;
    d. Messaging usage;
    e. Usage of other electronics apart from usage of Social Media Platforms;
    f. COVID-19 and/or remote learning;
    g. Use of drugs or alcohol;
    h. The opioid and fentanyl epidemic;
    i. Poverty, homelessness, lack of health insurance, and/or food insecurity;
    j. Physical health including nutrition, exercise, weight management, sleeping habits, and sexual activity;
    k. Family trauma or deaths;
    l. Academic pressure;
    m. Violence, including school violence, domestic violence, gun violence, gun control and/or mass shootings;
    n. Bullying or verbal abuse apart from usage of Social Media Platforms;
    o. Political polarization;
    p. Natural disasters;
    q. Climate change;
    r. Discrimination and inequity;
    s. Global warfare and conflict; and
    t. Any other potential causes of harms to the mental, social, emotional, or behavioral health of Young Users.

4. Youth Risk Behavior Surveys conducted by the California Department of Child Support Services or on its behalf.

5. Research, investigations, studies, surveys, reports, evaluations, or analyses related to:
    a. Features of Social Media Platforms that are psychologically or physically harmful to Young Users;
    b. Features of Social Media Platforms that promote compulsive, prolonged, or unhealthy use by Young Users;
    c. The impact of features of Social Media Platforms, including:

## Add. 595

(1) Algorithmic recommendation and sequencing;
(2) Image filters;
(3) Use of multiple user accounts;
(4) Infinite scroll;
(5) Ephemeral content features;
(6) Autoplay;
(7) Quantification and display of likes; or
(8) Audiovisual and haptic alerts.

6. Programs, initiatives, efforts, or actions proposed or taken by the California Department of Child Support Services to address Young Users' use of Social Media Platforms, including any program, initiative, effort, or action to prevent, limit, encourage, or promote the use of Social Media Platforms by Young Users.

7. Policies proposed, recommended, or enacted by the California Department of Child Support Services regarding screen time and acceptable use of cell phones, computers, tablets, or other electronic devices by Young Users.

8. Complaints to the California Department of Child Support Services by teachers or school districts regarding social media or cell phone use by Young Users and/or the need for acceptable use or other policies to address Young Users' use of social media or cell phones.

9. Complaints to the California Department of Child Support Services by teachers or school districts regarding budget crises from inflation, underfunding, unfunded mandates, and other causes.

10. Documents related to state assessments in California, including reports and analyses regarding the history of K-12 state assessment or standardized testing scores, performance by schools and/or school districts, and any other measures of school performance.

11. Legislation or policies proposed by, proposed on behalf of, or testified on by the California Department of Child Support Services, regardless of whether such legislation or policies were enacted, regarding Young Users' use of Social Media Platforms.

12. Mental, social, emotional, or behavioral health services provided by the California Department of Child Support Services to Young Users during the Relevant Period, including:
    a. Counseling or therapy;
    b. Psychiatric services;
    c. Crisis intervention;
    d. Inpatient short-term and long-term programs;
    e. Resource centers; and
    f. Services for Young Users dealing with substance abuse or addiction issues.

13. Any and all California Department of Child Support Services grants to address Young Users' mental health, including information about when, where, why, and how any disbursements were paid, any schedules or plans for future disbursements, policies governing evaluation or approval of such disbursements, records of how the disbursements were used, and all agendas, minutes, notes, or recordings from meetings related to such grant.

14. Public or non-public meetings held by the California Department of Child Support Services related to Social Media Platforms and use of Social Media Platforms by Young Users, including but not limited to, notices, meeting notes, PowerPoint presentations, internal memoranda, summaries, personal notes, or attendee lists.

15. Policies, procedures, and practices related to the California Department of Child Support Services' use of Social Media Platforms, including communication of information or promotion of California Department of Child Support Services' programs, initiatives, efforts, or actions on Social Media Platforms.

16. California Department of Child Support Services' communications and/or collaboration with any Social Media Platform on any program, initiative or other action related to, or directed at, Young Users.

17. California Department of Child Support Services' communications with any third party related to Young Users and/or Social Media Platforms.

18. Budgeted and actual expenditures by the California Department of Child Support Services during the Relevant Period related to Young Users' use of Social Media Platforms.

19. Budgeted and actual expenditures by the California Department of Child Support Services during the Relevant Period related to treatment of teen mental, social, emotional, or behavioral health issues.

20. Policies, procedures, and practices applicable to the California Department of Child Support Services and California Department of Child Support Services employees regarding the use of Social Media Platforms, including any changes to these policies during the Relevant Period.

21. Studies, programs, initiatives, efforts, or actions proposed or taken by the California Department of Child Support Services that sought to provide or promote internet access or phones, computers, tablets, or other electronic devices to Young Users.

22. California Department of Child Support Services' budget and actual expenditures during the Relevant Period, including expenditures on:
    a. Digital advertisements by the California Department of Child Support Services on Social Media Platforms;
    b. Digital advertisements by the California Department of Child Support Services purchased through Social Media Platforms.

**Add. 597**

**ATTACHMENT B**

1
2
3
4
5

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: *Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*<br><br>This document relates to:<br>ALL ACTIONS | MDL No. 3047<br>Case No. 4:22-md-03047-YGR<br><br>Honorable Yvonne Gonzalez Rogers<br>Honorable Peter H. Kang<br><br>**STIPULATION AND [PROPOSED] ORDER GOVERNING THE PRODUCTION OF ELECTRONICALLY STORED INFORMATION AND HARD COPY DOCUMENTS** |

## 1.     PURPOSE

This Order Governing the Production of Electronically Stored Information and Hard Copy Documents ("ESI Order") will govern discovery of electronically stored information and any hard copy documents in this Litigation as a supplement to the Federal Rules of Civil Procedure, this District's Guidelines for the Discovery of Electronically Stored Information, and any other applicable orders and rules. "This Litigation" includes all actions currently in MDL No. 3047, *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability*, or hereafter added or transferred to MDL No. 3047, and all actions later remanded to their respective transferor courts.

## 2.     DEFINITIONS

a)  "Document" is defined to be synonymous in meaning and equal in scope to the usage of this term in Rules 26 and 34 of the Federal Rules of Civil Procedure and shall include Hard-Copy Documents and ESI.

b) "Electronically stored information" or "ESI," as used herein has the same meaning as in Federal Rules of Civil Procedure 26 and 34.

c) "Hard-Copy Document" means Documents existing in paper form at the time of collection.

d) "Searchable Text" means the native text extracted from an Electronic Document and any Optical Character Recognition text ("OCR text") generated from a Hard-Copy Document or electronic image.

**3.     COOPERATION**

The Parties are aware of the importance the Court places on cooperation and commit to cooperate in good faith throughout this Litigation consistent with this Court's Guidelines for the Discovery of ESI and this Court's Rules of Professional Conduct. The Parties will endeavor to cooperate in good faith and be reasonably transparent in all aspects of the discovery process.

**4.     LIAISON**

The Parties will identify Discovery Liaisons to each other who are and will be knowledgeable about and responsible for discussing their respective ESI.  Any Party is free to change their designated Discovery Liaison by providing written notice to the other Parties. Each Party's Discovery Liaison must: (a) be prepared to meet and confer on discovery-related matters and to participate in discovery dispute resolution; (b) be knowledgeable about the Party's discovery efforts; (c) be, or have reasonable access to those who are, familiar with the Party's electronic systems and capabilities in order to explain those systems and answer relevant questions; and (d) be, or have reasonable access to those who are knowledgeable about the technical aspects of discovery, including electronic document storage, organization, and format issues, and relevant information retrieval technology, including search methodology.

**5.     IDENTIFICATION OF CUSTODIANS AND DATA SOURCES**

The parties will disclose information about custodians and custodial and non-custodial data sources likely to possess relevant or responsive information in accordance with Fed. R. Civ. P. 26 and this District's ESI Guidelines. The Parties will participate in Rule 26(f) discussions guided by this District's Checklist for Rule 26(f) Meet and Confer Regarding Electronically

1  Stored Information. After responses to Requests for Production under Fed. R. Civ. P. 34 have

2  been served, the parties will meet and confer regarding those custodians and custodial and non-

3  custodial data sources from which Documents and ESI will be collected for search and review for

4  potential production in this litigation. The custodian and data source exchanges will include brief

5  explanations of the rationale for their selections; for example, for custodians, their current job

6  titles and descriptions of their work, and for data sources, location information and description.

7  **6.    INACCESSIBLE OR UNUSABLE ESI**

8  If a Producing Party asserts that certain requested ESI is inaccessible or not "reasonably

9  accessible," otherwise unnecessary, or if the Receiving Party asserts that, following production,

10  certain ESI is not reasonably useable, the parties shall meet and confer to discuss resolving such

11  assertions. The parties will exchange sufficient information to enable the parties to confer in good

12  faith. If the parties cannot resolve any such disputes after such a meet and confer has taken place,

13  the issue shall be presented to the Court for resolution.

14  **7.    KNOWN RESPONSIVE DOCUMENTS**

15  Documents or ESI identified in a custodial or non-custodial file, or in a discrete folder or

16  collection, that are known to a Producing Party through reasonable investigation to be responsive

17  to a discovery request shall be collected for review without regard to whether the responsive

18  content was located via any search methodology developed in accordance with this Order, and

19  nothing about such review shall prevent the Producing Party from redacting or withholding and

20  logging such documents for applicable privileges.

21  **8.    SEARCH METHODOLOGIES**

22  The Parties shall adopt reasonable and proportionate methodologies to identify, search,

23  collect, cull, review, and produce ESI as required under applicable legal standards. The Parties

24  recognize and agree that each Party may use one or more methodologies to identify, search,

25  collect, cull, review, and produce responsive and non-privileged ESI, including the use of

26  keyword search terms and/or the use of technology assisted review ("TAR") as discussed further

27  herein. The Parties further recognize that different data sets may implicate different

28  methodologies to identify, search, collect, cull, review, and produce responsive and non-

privileged ESI. The Parties therefore agree to meet and confer in good faith regarding any

potential disputes over their respective ESI productions.

## 9.   HIT REPORTS AND SEARCH TERMS

If a Producing Party uses search terms to identify, search, or cull potentially responsive

ESI, the Producing Party shall disclose the search terms to the Requesting Party. The Parties shall

meet and confer regarding any disputes over the disclosed search terms. In the event that a

Producing Party claims burden with respect to modified and/or additional search terms proposed

by a Requesting Party, the Producing Party shall provide a hit report for the terms at issue using

industry-standard processing tools, such as NUIX or other similar tools. The Producing Party

shall provide a hit report for the document collection where the terms were applied, including the

following with respect to each proposed or modified search term in the collection:

a)   The number of documents with hits for that term; and

b)   The number of unique documents, i.e., documents which do not have hits for any other
term.

If, after reviewing a hit report from a Producing Party, a Requesting Party so chooses, it

may reasonably request a further hit report which includes:

c)   The number of family members, including the documents with hits, of the documents
with hits for that term; and

d)   The number of unique family members of the documents with hits for that term.

If the ESI tool for the Producing Party is capable without undue burden of providing the

number of family members and unique family members, then the Producing Party shall provide

such further hit report. The Parties (including the person most knowledgeable about the

capabilities of the Producing Party's ESI tool and the Requesting Party's person most

knowledgeable about technical issues from its ESI service provider) shall meet and confer

regarding any disputes over whether the Producing Party's ESI tool has the capability or not to

provider either number of family members or number of unique family members.

The Parties shall meet and confer to resolve disagreements over the search terms or their

application. To the extent the Parties are unable to reach agreement on the application of, or

1  procedures for, any search or filtering processes, the Parties shall fully comply with the

2  provisions of this Court's Discovery Standing Order regarding the procedure for raising discovery

3  disputes with the Court, including the meet and confer and certification requirements therein.

4      **10.    TECHNOLOGY ASSISTED REVIEW (TAR)**

5          A Producing Party may use TAR (technology-assisted review) during the culling and

6  review process of ESI, which may be applied in addition to search terms. If a Producing Party

7  uses TAR to cull, filter out, or exclude documents from that Party's production, that Producing

8  Party shall do the following:

9      • If a Producing Party chooses to apply both search terms and TAR to a review set,

10         the Producing Party will disclose the search terms to all other Party/Parties.

11     • Disclose the name of the TAR tool or service used to all other Party/Parties.

12     **11.    VALIDATION**

13         Each Producing Party shall take reasonable steps to validate its review process (i.e., using

14  quality control measures to determine whether its production is missing relevant ESI or contains

15  substantial amounts of irrelevant ESI) and make any necessary adjustments or corrections to its

16  process. If, after reviewing a Producing Party's production, a Requesting Party reasonably

17  requests additional information regarding the validation method(s) used by the Producing Party,

18  the Producing Party will disclose the level of end-to-end recall (the percentage of responsive

19  Documents in the collection which were identified as responsive by that Producing Party's

20  methodology). If there remain disputes between the Parties regarding validation, the Parties shall

21  meet and confer to resolve such disputes in good faith, including a reasonable discussion

22  regarding the tool used and the parameters used to obtain or calculate the level of recall.

23     **12.    UNSEARCHABLE DOCUMENTS**

24         The Producing Party shall use reasonable efforts to identify and review potentially

25  responsive documents for which text-based search technologies are fundamentally ineffective.

26     **13.    SYSTEM FILES**

27         Each Party will use its best efforts to filter out common system files and application

28  executable files using the national software reference library ("NSRL") NIST hash set list. The

Parties also may filter out stand-alone files identified as zero bytes in size. Additional culling of file types based on file header information may be applied to the following, provided these files are not known to be otherwise attached, embedded in, or included with an otherwise responsive document, or are not themselves reasonably known to contain information responsive or contain responsive data or are used to interface with users or interact with or access individual or aggregated user data: Application Package File, Backup Files, Batch Files, Binary Disc Image, C++ File Formats, Cascading Style Sheet, Configuration File, Database File, Dictionary Files, Dynamic Link Library, Event Log Files, Executable Files, Hypertext Cascading Stylesheet, Java Archive Files, JavaScript Files, JavaScript Source Code and Class Files, Macintosh Resource Fork Files, Package Manager Files, Program Files, Program Installers, Python Script Files, Shell Script Files, System or Temporary Files, Thumbnail Cache Files, Troff Files, Truetype Font Files, Windows Cabinet File, Windows Command Files, Windows File Shortcut, Windows Help Files, Windows Metafiles and Enhanced Metafiles, Windows Spool Files, Windows System File.

## 14.    DEDUPLICATION

Each Producing Party shall make reasonable efforts to globally deduplicate exact duplicate Documents within that Producing Party's ESI data set across all custodial and non-custodial sources at the family level using either MD5 hash values or SHA hash values or any other agreed-upon (and disclosed) industry-standard deduplication technology. The Parties shall reach agreement on such other deduplication technology and shall reach agreement on how their deduplication tools shall identify exact duplicates of documents in a manner that is consistent with the disclosed tools and technologies a Producing Party is using. The Parties shall reach agreement on how to identify exact duplicates of emails using industry-standard commercially available software tools or services, which may for example calculate hash values of emails based on concatenated values of agreed-upon email fields and/or hash values of attachments, or which may use any other method the Parties agree upon. Having further met and conferred in keeping with the previous sentence, the Parties shall calculate deduplication hash values for emails on the concatenated values set forth in and in accordance with the documentation specifications of the disclosed deduplication tools to be used in this Litigation (i.e., RelativityOne, Relativity Server,

1 and Nuix); however, if Nuix is used, the Producing Party shall select the optional field "Include

2 Bcc" as an additional field to add to the default ones.

3      The Parties shall not withhold from production near-duplicates without meeting and

4 conferring on this issue.

5      The names of all custodians who were either identified as custodians for purposes of

6 collection for this matter (or otherwise known by the Producing Party to have been in possession

7 or custody of a document prior to deduplication) will be populated in the ALL CUSTODIANS

8 metadata field for the produced version of a document that has duplicates removed from

9 production. The original file paths (if any exist) of a document prior to deduplication will be

10 populated in the ALL FILE PATHS metadata field of the produced document.

11     **15.**    **EMAIL THREADING**

12      The Parties may use analytics technology to identify email threads and shall produce the

13 unique most inclusive copy and related family members. Where multiple email messages are part

14 of a single chain or "thread," a Party is only required to produce the most inclusive copy of an

15 email message(s) ("Last In Time Email(s)") and need not produce earlier, lesser inclusive email

16 messages or "thread members," provided that the tool or software service being used to perform

17 threading is disclosed. A Producing Party may exclude from production lesser inclusive copies of

18 the most inclusive email message in the thread, where the entire body of each of those lesser

19 inclusive copies is included within the Last in Time Email. The Producing Party will honor

20 reasonable requests to produce lesser inclusive copies of a Last In Time Email or other earlier

21 chains of emails otherwise excluded by email thread suppression.

22      The Parties shall treat new or different email chains or threads pursuant to further

23 agreement on safeguards or guidelines for defining emails threads which reasonably take into

24 account the capabilities of the email threading/dethreading/hyperthreading tools used by each

25 Defendant (which shall be disclosed to Plaintiffs).

26     **16.**    **SOURCE CODE**

27      The Parties will meet and confer to address the production and/or inspection of source

28 code and entering into a separate order governing the same if needed.

**17. PRODUCTION FORMATS**

The Parties agree to produce documents and data in the formats described in **Appendix 1** to this ESI Order. If particular documents or categories of documents identified in response to document requests warrant a different format, the Parties will cooperate to arrange for the mutually acceptable production of such documents. The Parties further agree not to degrade the searchability of documents as part of the document production process.

In addition, the Parties agree that the production and production format of social media and/or user account information is not covered by this agreement and to meet and confer on the production and production format, including metadata, for social media and/or user account information.

**18. PHASING**

Once the Parties begin propounding discovery requests pursuant to Fed. R. Civ. P. 34, the Parties agree to meet and confer regarding appropriate phasing for the production of ESI.

**19. MISCELLANEOUS PROVISIONS**

a) **Production of Plaintiffs ESI and Case-Specific Materials**. Subject to any further agreement among the Parties or Order of the Court, the Parties shall produce case-specific documents (i.e., documents specific to the claim of a given Plaintiff, produced by Plaintiffs or Defendants) for any Plaintiff in discovery pools or other selections designed to inform bellwether selection, including those selected for a bellwether trial, in accordance with the production format specified herein, provided, however, that the Producing Party may elect to produce such materials in their native format. To the extent production of case-specific documents for any Plaintiff selected for a bellwether trial presents an issue for any Party, the Parties shall reasonably confer, and may present any disputes to the Court or its designee. The Parties shall further agree to confer concerning the production format and associated matters (*e.g.*, hosting platform) for case-specific documents produced in the cases of other Plaintiffs. Nothing herein shall limit Defendant's right to seek discovery from any Plaintiff.

b) **Translations Of Produced Materials**. The Producing Party has no obligation to

1  create a translation of the Documents or any portion thereof. For any foreign-language

2  documents responsive to document requests that a Party reasonably knows as the

3  result of a reasonable investigation have been translated into the English language

4  using human translators or through machine translation for its own purposes, except to

5  the extent such translation is protected by attorney-client or work-product privileges,

6  the Producing Party shall produce the translation of the original document with the

7  original. The parties will meet and confer as necessary concerning procedures for

8  using translations at depositions and at trial. In the event the Parties cannot reach

9  agreement, the matter may be submitted to the Court for determination.

10  c) **Third-Party Documents**.  A Party that issues a Non-Party subpoena ("Issuing Party")

11  shall include a copy of this Order with the subpoena and state that (1) the subpoenaed

12  Non-Party should produce Documents in response to the subpoena to all Parties; and

13  (2) the Parties to this Litigation have requested that Third Parties produce Documents

14  in accordance with the specifications set forth herein. If the subpoenaed Non-Party

15  produces Documents to the Issuing Party but does not produce those Documents to

16  other Parties, the Issuing Party shall produce such Documents to those other Parties

17  within 14 days of receiving the Documents, except where the Documents are to be

18  used in a deposition, in which case the Issuing Party shall produce such Documents to

19  all other Parties no later than three (3) days prior to the deposition, or as soon as

20  reasonably practicable if such production occurs thereafter. Nothing in this Order is

21  intended or may be interpreted to narrow, expand, or otherwise affect the rights of the

22  Parties or Third Parties to object to a subpoena. If the Non-Party production is not

23  Bates-stamped, the Parties will meet and confer to agree upon a format for designating

24  the documents with a unique Bates Number prefix.

25  d) **Documents Produced by Parties – Presumption of Authenticity**.  In order to reduce

26  the number of requests for admission, this Order establishes a rebuttable presumption

27  that documents produced by the Parties are authentic, if said documents were either

28  created or authored by the producing Party, or any of its employees, agents, or

contractors, so long as the employees', agents', or contractors' work was performed in connection with a project or assignment sponsored by the producing Party. No further evidence to establish authenticity need be provided. Nothing in this paragraph shall be deemed to waive any other evidentiary objection a party may have, including but not limited to hearsay, foundation/personal knowledge, or relevance.

e) **Re-productions.** Notwithstanding any provisions to the contrary, re-production of discrete sets of documents from another litigation, arbitration, government inquiry, or other matter may be re-produced in the same manner and form as originally produced in the other matter, provided however that a party will re-produce documents in a different format for good cause shown. This provision does not waive the right of a party to object to any requests for reproduction of production files from another litigation, arbitration, government inquiry, or other matter.

f) **Modification**. This ESI Order may be modified by a Stipulated Order of the Parties or by the Court for good cause shown.

g) **Good Faith**. The Parties will act in good faith as required by law and use these procedures to identify and reduce the potential for disputes.

h) **Continuing Obligations**. The Parties recognize that discovery shall be an iterative and cooperative process. The Parties will continue to meet and confer regarding any issues as reasonably necessary and appropriate. This Order does not address or resolve any objections to the Parties' respective discovery requests.

i) **Reservation of Rights**. The Parties agree that any topic not addressed herein is neither a waiver nor acknowledgement of agreement by either Party.

**IT IS SO STIPULATED**, through Counsel of Record.

| 1 | DATED: March 15, 2024 | Respectfully submitted, |
|---|---|---|

2

*/s/ Lexi J. Hazam*
LEXI J. HAZAM

3 **LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**

4 275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339

5 Telephone: 415-956-1000
lhazam@lchb.com

6

7

8 PREVIN WARREN
**MOTLEY RICE LLC**

9 401 9th Street NW Suite 630
Washington DC 20004

10 T: 202-386-9610
pwarren@motleyrice.com

11

12 Co-Lead Counsel

13 CHRISTOPHER A. SEEGER
**SEEGER WEISS, LLP**

14 55 CHALLENGER ROAD, 6TH FLOOR
RIDGEFIELD PARK, NJ 07660

15 Telephone: 973-639-9100
Facsimile: 973-679-8656

16 cseeger@seegerweiss.com

17

18 Counsel to Co-Lead Counsel

19 JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**

20 155 MONTGOMERY STREET, SUITE 900
SAN FRANCISCO, CA 94104

21 Telephone: 415-986-1400
jennie@andrusanderson.com

22

23 Liaison Counsel

24 MATTHEW BERGMAN
GLENN DRAPER

25 **SOCIAL MEDIA VICTIMS LAW CENTER**
821 SECOND AVENUE, SUITE 2100

26 SEATTLE, WA 98104
Telephone: 206-741-4862

27 matt@socialmediavictims.org
glenn@socialmediavictims.org

28

STIP. & [~~PROPOSED~~] ORDER GOVERNING THE
PRODUCTION OF ESI & HARD COPY DOCUMENTS — - 11 -    3:22-MD-03047-YGR; MDL NO. 3047

**Add. 609**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 BROADWAY
NEW YORK, NY 10003
Telephone: 212-558-5500
Facsimile: 212-344-5461
jbilsborrow@weitzlux.com
PAIGE BOLDT
**WATTS GUERRA LLP**
4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
T: 210-448-0500
PBoldt@WattsGuerra.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
T: 816-701 1100
tcartmell@wcllp.com

JAYNE CONROY
**SIMMONS HANLY CONROY, LLC**
112 MADISON AVE, 7TH FLOOR
NEW YORK, NY 10016
Telephone: 917-882-5522
jconroy@simmonsfirm.com
CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
T: (646) 666-8908
carrie@cagoldberglaw.com

SIN-TING MARY LIU
**AYLSTOCK WITKIN KREIS &**
**OVERHOLTZ, PLLC**
17 EAST MAIN STREET, SUITE 200
PENSACOLA, FL 32502
Telephone: 510-698-9566
mliu@awkolaw.com

ANDRE MURA
**GIBBS LAW GROUP, LLP**
1111 BROADWAY, SUITE 2100
OAKLAND, CA 94607
Telephone: 510-350-9717
amm@classlawgroup.com

1

2

3 EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**

4 316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FL 32502

5 Telephone: 850-435-7107
epaulos@levinlaw.com

6

7 ROLAND TELLIS
DAVID FERNANDES

8 **BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600

9 Encino, CA 91436
Telephone: (818) 839-2333

10 Facsimile: (818) 986-9698
rtellis@baronbudd.com

11 dfernandes@baronbudd.com

12
ALEXANDRA WALSH

13 **WALSH LAW**
1050 Connecticut Ave, NW, Suite 500

14 Washington D.C. 20036
T: 202-780-3014

15 awalsh@alexwalshlaw.com

16
MICHAEL M. WEINKOWITZ

17 **LEVIN SEDRAN & BERMAN, LLP**
510 WALNUT STREET

18 SUITE 500
PHILADELPHIA, PA 19106

19 Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

20

21 DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**

22 505 20th St North
Suite 1500

23 Birmingham, Alabama 35203
Telephone: 205.855.5700

24 fu@dicellolevitt.com

25

26

27

28

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: 212.213.8311
hnappi@hrsclaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 HUDSON YARDS, 11TH FLOOR
NEW YORK, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

*Attorneys for Individual Plaintiffs*

**ROB BONTA**
Attorney General
State of California

 */s/ Megan O'Neill*
Nick A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (SBN 244395)
Supervising Deputy Attorney General
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer
(CA SBN 336428)
Marissa Roy (CA SBN 318773)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
Bernard.Eskandari@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

1

2                **RUSSELL COLEMAN**
               Attorney General

3                Commonwealth of Kentucky

4                */s/ J. Christian Lewis*
               J. Christian Lewis (KY Bar No. 87109),

5                *Pro hac vice*

6                Philip Heleringer (KY Bar No. 96748),
               *Pro hac vice*

7                Zachary Richards (KY Bar No. 99209),
               *Pro hac vice app. forthcoming*

8                Daniel I. Keiser (KY Bar No. 100264),
               *Pro hac vice*

9                Matthew Cocanougher (KY Bar No. 94292),
               *Pro hac vice*

10                Assistant Attorneys General

11                1024 Capital Center Drive, Suite 200
               Frankfort, KY 40601

12                CHRISTIAN.LEWIS@KY.GOV
               PHILIP.HELERINGER@KY.GOV

13                ZACH.RICHARDS@KY.GOV
               DANIEL.KEISER@KY.GOV

14                MATTHEW.COCANOUGHER@KY.GOV

15                Phone: (502) 696-5300
               Fax: (502) 564-2698

16

17                *Attorneys for Plaintiff the Commonwealth of*
               *Kentucky*

18

19

20

21

22

23

24

25

26

27

28

1          COVINGTON & BURLING LLP

2          By: */s/ Ashley M. Simonsen*

3          Ashley M. Simonsen, SBN 275203
            COVINGTON & BURLING LLP

4          1999 Avenue of the Stars
            Los Angeles, CA 90067

5          Telephone: (424) 332-4800
            Facsimile: + 1 (424) 332-4749

6          Email: asimonsen@cov.com

7

8          Phyllis A. Jones, *pro hac vice*
            Paul W. Schmidt, *pro hac vice*

9          COVINGTON & BURLING LLP
            One City Center

10         850 Tenth Street, NW
           Washington, DC 20001-4956

11         Telephone: + 1 (202) 662-6000
           Facsimile: + 1 (202) 662-6291

12         Email: pajones@cov.com

13         *Attorney for Defendants Meta Platforms, Inc.*

14         *f/k/a Facebook, Inc.; Facebook Holdings,*
           *LLC; Facebook Operations, LLC; Facebook*

15         *Payments, Inc.; Facebook Technologies, LLC;*
           *Instagram, LLC; Siculus, Inc.; and Mark Elliot*

16         *Zuckerberg*

17         FAEGRE DRINKER LLP

18         *By: /s/ Andrea Roberts Pierson*
           Andrea Roberts Pierson, pro hac vice

19         FAEGRE DRINKER LLP
           300 N. Meridian Street, Suite 2500

20         Indianapolis, IN 46204
           Telephone: + 1 (317) 237-0300

21         Facsimile: + 1 (317) 237-1000
           Email: andrea.pierson@faegredrinker.com

22

23         Amy R. Fiterman, pro hac vice
           FAEGRE DRINKER LLP

24         2200 Wells Fargo Center
           90 South Seventh Street

25         Minneapolis MN 55402
           Telephone: +1 (612) 766 7768

26         Facsimile: + 1 (612) 766 1600
           Email: amy.fiterman@faegredrinker.com

27

28         Geoffrey M. Drake, pro hac vice

**Add. 614**

1    KING & SPALDING LLP
     1180 Peachtree Street, NE, Suite 1600
2    Atlanta, GA  30309
     Telephone: +1 (404) 572 4726
3    Email: gdrake@kslaw.com

4
     David P. Mattern, pro hac vice
5    KING & SPALDING LLP
     1700 Pennsylvania Avenue, NW, Suite 900
6    Washington, D.C.  20006
     Telephone: +1 (202) 626 2946
7    Email: dmattern@kslaw.com

8
     *Attorneys for Defendants TikTok Inc. and*
9    *ByteDance Inc.*

10   MUNGER, TOLLES & OLSEN LLP
     By: */s/ Jonathan H. Blavin*
11   Jonathan H. Blavin, SBN 230269
     MUNGER, TOLLES & OLSON LLP
12   560 Mission Street, 27th Floor
     San Francisco, CA 94105-3089
13   Telephone: (415) 512-4000
     Facsimile: (415) 512-4077
14   Email: jonathan.blavin@mto.com
15
16   Rose L. Ehler (SBN 29652)
     Victoria A. Degtyareva (SBN 284199)
17   Laura M. Lopez, (SBN 313450)
     Ariel T. Teshuva (SBN 324238)
18   MUNGER, TOLLES & OLSON LLP
     350 South Grand Avenue, 50th Floor
19   Los Angeles, CA 90071-3426
     Telephone: (213) 683-9100
20   Facsimile: (213) 687-3702
     Email: rose.ehler@mto.com
21   Email: victoria.degtyareva@mto.com
     Email: Ariel.Teshuva@mto.com
22
23
     Lauren A. Bell (*pro hac vice forthcoming*)
24   MUNGER, TOLLES & OLSON LLP
     601 Massachusetts Ave., NW St.,
25   Suite 500 E
     Washington, D.C. 20001-5369
26   Telephone: (202) 220-1100
     Facsimile: (202) 220-2300
27   Email: lauren.bell@mto.com
28

STIP. & [PROPOSED] ORDER GOVERNING THE          - 17 -          3:22-MD-03047-YGR; MDL NO. 3047
PRODUCTION OF ESI & HARD COPY DOCUMENTS

1        *Attorneys for Defendant Snap Inc.*

2        WILSON SONSINI GOODRICH & ROSATI
3        Professional Corporation
         By: */s/ Brian M. Willen*
4        Brian M. Willen (*pro hac vice*)
         WILSON SONSINI GOODRICH & ROSATI
5        1301 Avenue of the Americas, 40th Floor
         New York, New York 10019
6        Telephone: (212) 999-5800
         Facsimile: (212) 999-5899
7        Email: bwillen@wsgr.com

8
         Lauren Gallo White
9        Samantha A. Machock
         WILSON SONSINI GOODRICH & ROSATI
10       One Market Plaza, Spear Tower, Suite 3300
         San Francisco, CA 94105
11       Telephone: (415) 947-2000
         Facsimile: (415) 947-2099
12       Email: lwhite@wsgr.com
         Email: smachock@wsgr.com
13

14       Christopher Chiou
15       WILSON SONSINI GOODRICH & ROSATI
         953 East Third Street, Suite 100
16       Los Angeles, CA 90013
         Telephone:  (323) 210-2900
17       Facsimile:  (866) 974-7329
         Email: cchiou@wsgr.com
18

19       *Attorneys for Defendants YouTube, LLC, Google
         LLC, and Alphabet Inc.*
20
         WILLIAMS & CONNOLLY LLP
21       By: */s/ Joseph G. Petrosinelli*
         Joseph G. Petrosinelli (*pro hac vice*)
22       jpetrosinelli@wc.com
         Ashley W. Hardin (*pro hac vice*)
23       ahardin@wc.com
         680 Maine Avenue, SW
24       Washington, DC 20024
         Telephone.: 202-434-5000
25       Fax: 202-434-5029
26

27       *Attorneys for Defendants YouTube, LLC, Google
         LLC, and Alphabet Inc.*
28

1

MORGAN, LEWIS & BOCKIUS LLP
By: */s/ Stephanie Schuster*
Stephanie Schuster (*pro hac vice*)
stephanie.schuster@morganlewis.com
1111 Pennsylvania Avenue NW
NW Washington, DC 20004-2541
Tel.: 202.373.6595

Yardena R. Zwang-Weissman (SBN 247111)
yardena.zwang-weissman@morganlewis.com
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132
Tel.: 213.612.7238

Brian Ercole (*pro hac vice*)
brian.ercole@morganlewis.com
600 Brickell Avenue, Suite 1600
Miami, FL 33131-3075
Tel.: 305.415.3416

*Attorneys for Defendants YouTube, LLC and Google LLC*

**IT IS ORDERED** that the foregoing Agreement is approved.

Dated: _____March 18, 2024_____        _____

MAGISTRATE JUDGE PETER H. KANG

**APPENDIX 1: PRODUCTION FORMAT**

1) **Production Components.** Except as otherwise provided below, ESI must be produced in accordance with the following specifications:

    a) an ASCII delimited data file (.DAT) using standard delimiters;

    b) an image load file (.OPT) that can be loaded into commercially acceptable production software (*e.g.* Concordance);

    c) single page black-and-white TIFF images, or JPEG images when color is specified herein, or native files with single page placeholder TIFF images depending on the applicable production format for each type of file;

    d) and document level .TXT files for all documents containing extracted full text or OCR text.

    e) Family relationships between emails and their attachments, embedded files and their source document, and connected hardcopy documents will be maintained in production. Attachments should be consecutively produced with their parent.

    f) If a particular document warrants a different production format, the Parties will cooperate in good faith to arrange for a mutually acceptable production format.

2) **Production Media and Access Controls.** Productions must be encrypted and produced through secure electronic means, such as secure file sharing methods (*e.g.* FTP), or on CD, DVD, flash drive or external hard drive ("Production Media"). Each piece of Production Media must identify a production number corresponding to the production volume (*e.g.* "VOL001"). Each piece of Production Media must also identify: (a) the case caption; (b) the following label: "This media contains material subject to Court Ordered security measures"; (c) the Producing Party's name; (d) the production date; (e) the Bates Number range of the materials contained on the Production Media.

Nothing in this ESI Order will preclude or impair any and all protections provided the Parties by any Protective Order(s) agreed and entered into by the Parties. Parties will use best efforts to avoid the unnecessary copying or transmittal of produced documents. If questions arise, the Parties will meet and confer to ensure security concerns are addressed prior to the exchange of

any documents.

**3) Data Load Files/Image Load Files.** Each TIFF in a production must be referenced in the corresponding image load file. The total number of documents referenced in a production's data load file should match the total number of designated document breaks in the image load file(s) in the production. The total number of pages referenced in a production's image load file should match the total number of TIFF files in the production. All images must be assigned a unique Bates number that is sequential within a given document and across the production sets. The Bates Numbers in the image load file must match the corresponding documents' beginning Bates numbers in the data load file. The total number of documents in a production should match the total number of records in the data load file. Load files must not vary in format or structure within a production, or from one production to another except by agreement of the Parties.

**4) Metadata Fields.** Each of the metadata and coding fields set forth below that can be extracted should be produced for each document, except that if the field contains privileged information, that privileged information may be redacted. However, to the extent that metadata does not exist, is not available for any documents produced, this provision shall not be read to require any Party to extract, capture, collect, manually populate, or produce such metadata, with the exception of the following: (a) BEGBATES, (b) ENDBATES, (c) BEGATTACH, (d) ENDATTACH, (e) PRODVOL, (f) ALL CUSTODIANS, (g) CONFIDENTIALITY, (h) REDACTIONS, (i) REDACTION TYPE, (j) HASHVALUE, (k) NATIVEFILEPATH, and (l) TEXTFILEPATH, which should be populated by the Party or the Party's vendor. The Parties will make reasonable efforts to ensure that metadata fields automatically extracted from the documents correspond directly to the information that exists in the original documents.

| Field Name | Field Description |
|---|---|
| BEGBATES | Beginning Bates number for a particular document as stamped on the first production image for that document |
| ENDBATES | Ending Bates number as stamped on the last |

| Field Name | Field Description |
|---|---|
|  | production image for a particular document |
| BEGATTACH | First production Bates number of the first document in a family |
| ENDATTACH | Last production Bates number of the last document in a family |
| ATTACHCOUNT | Number of attachments to an e-mail or embedded parent, as generated by commercially available discovery processing tools. |
| ATTACHNAMES | Names of each individual Attachment, separated by semicolons. |
| PRODVOL | Production volume |
| ALLCUSTODIANS | List of all custodians associated with Document, i.e. "Custodian" + "Other Custodian" values delimited by semicolon. |
| ALLFILEPATHS | All original path(s) to the individual source file(s) when available in the ordinary course of business to and processable by the parties and their ESI vendors of choice. Includes path up to and including internal path of containers. |
| CONFIDENTIALITY | Confidentiality designation assigned to the document consistent with the Stipulated Protective Order governing this Litigation |
| NATIVEFILEPATH | Native File Link (Native Files only) |
| TEXTFILEPATH | Path to extracted text/OCR file for the document |
| HASHVALUE | MD5 hash value of the document |
| DOCUMENT TYPE | Descriptor for the type of document: "E-document" for electronic documents not attached to e-mails; "E-mail" for all e-mails; "E-attachment" for files that were attachments to e-mails; and "Physical" for hard copy physical documents that have been scanned and converted to an electronic image. |
| AUTHOR | Any value populated in the Author field of the |

| Field Name | Field Description |
|---|---|
|  | document properties |
| DOCDATE | Date the document was created according to filesystem information (format: MM/DD/YYYY) |
| DATELASTMODIFIED | Date when document was last modified according to filesystem information (format: MM/DD/YYYY) |
| LAST MODIFIED BY | Last person who modified (saved) a document, as generated by commercially available discovery processing tools. |
| TRACK CHANGES | Y if a document with track changes value, otherwise N or empty, if available separately from the HASHIDDENDATA flag |
| COMMENTS | Y if a document with comments, otherwise N or empty, if available separately from the HASHIDDENDATA flag |
| HASHIDDENDATA | Y if a document with hidden content value, otherwise N or empty |
| FILENAME | Filename of an electronic document |
| TITLE | Any value populated in the Title field of the document properties |
| DOCEXT | File extension of document pulled from the document properties |
| FROM | The sender of the email |
| TO | All recipients that were included on the "To" line of the email |
| CC | All recipients that were included on the "CC" line of the email |
| BCC | All recipients that were included on the "BCC" line of the email |
| DATETIMERECEIVED | Date and time email was received (format: MM/DD/YYYY HH:MM) |
| DATETIMESENT | Date and time email was sent (format: MM/DD/YYYY HH:MM) |

| Field Name | Field Description |
|------------|-------------------|
| TIMEZONE | The timezone used to process the document |
| EMAILSUBJECT | Subject line of email pulled from the document properties |
| THREADID | If a threading tool is used for emails, the thread id generated by the threading tool. |
| REDACTION TYPE[1] | General category of redaction reason as agreed to by the parties. For example, PII, SCA, CODE, and/or PRIV. If more than one, separate reasons by semicolons. |
| REDACTIONS | Y if a document is redacted, otherwise N or empty |

**5)** **TIFFs.** Unless excepted below, single page, black and white, Group IV TIFFs should be provided, at least 300 dots per inch (dpi) for all documents. Each TIFF image must be named according to a unique corresponding Bates number associated with the document. Each image must be branded according to the Bates number and the agreed upon confidentiality designation. Original document orientation should be maintained (i.e., portrait to portrait and landscape to landscape). Where the TIFF image is unreadable or has materially degraded the quality of the original, the Producing Party shall provide a higher quality TIFF image or the native or original file. In addition, the Parties shall take reasonable efforts to process word processing documents (*e.g.*, MS Word) with track changes and/or comments unhidden on the TIFF image.

**6)** **Color.** Word processing documents containing tracked changes shall be produced in color, as single-page, 300 dpi JPG images with JPG compression and a high quality setting as to not degrade the original image. The Producing Party shall comply with good faith by the Requesting Party to provide replacement color images for documents originally produced in black and white. A Party making such a request shall make the request by individual Bates

---

[1] The Parties will provide specific information on any privilege(s) asserted in their privilege logs, in an overlay, or the redaction boxes. The "Redaction Reason" field is informational only for redaction type and shall not in any way limit a party's right to assert attorney-client privilege, attorney-work product privilege, and/or any other applicable privilege or protection.

number(s) and shall limit requests made pursuant to this paragraph to a reasonable number of documents.

**7)** **Text Files.** A single multi-page text file must be provided for each document, and the filename should match its respective TIFF filename for the first page of that document. Extracted text shall be generated with commercially acceptable technology set to include all comments, revisions, tracked changes, speaker's notes and text from documents with comments or tracked changes, and hidden and very hidden worksheets, slides, columns and rows. When possible, the text of native files should be extracted directly from the native file. Parties will perform optical character recognition ("OCR") on foreign language documents using the appropriate settings for languages reasonably anticipated to be in the production following a meet and confer with the Requesting Party to identify those languages. Text files will not contain the redacted portions of the documents. A commercially acceptable technology for OCR should be used for all scanned, hard copy documents and for documents with redactions other than Excel files and other spreadsheets which shall be redacted in native format. Text extracted from emails should include the following header information where available: (1) the individuals to whom the communication was directed ("To"), (2) the author of the email communication ("From"), (3) who was copied and blind copied on such email ("CC" and "BCC"), (4) the subject line of the email ("RE" or "Subject"), and (5) the date and time of the email. To the extent the text extraction technology the Parties are using can be configured to include the text of any URLs or links, the Parties shall utilize that setting.

**8)** **Native files.** Spreadsheets (*e.g.* MS Excel), and un-redacted presentations (e.g. Microsoft PowerPoint,) will be produced in native format to the extent that they are produced in this Litigation, audio, video, and multi-media files will be produced in native format. The Parties will meet and confer on the production of other file types, such as proprietary files, etc. Native files will be produced with a link in the NATIVEFILEPATH field, along with extracted text (where extracted text is available) and applicable metadata fields set forth in paragraph 4 above. A Bates numbered TIFF placeholder indicating that the document was provided in native format must accompany every native file. Where redaction makes production of native-format

files other than spreadsheets or presentations infeasible, the Parties will confer to determine a reasonably usable form for the production, but spreadsheets shall presumptively be redacted in native, and presentations presumptively redacted in image form, in these cases without the need for further conferring.

**9)     Production Format for Hard Copy Documents.** Documents that exist in hardcopy will be scanned to *.tiff image format and produced in accordance with the specifications set forth herein. Hard copy documents that are not text-searchable shall be made searchable by OCR prior to production.  In scanning paper documents, distinct documents should not be merged into a single record, and single documents should not be split into multiple records (i.e., paper documents should be logically unitized). In the case of an organized compilation of separate documents (for example, a binder containing several separate documents behind numbered tabs), the document behind each tab should be scanned separately, but the relationship among the documents in the compilation should be reflected in the proper coding of the beginning and ending document and attachment fields. The Parties will make their best efforts to unitize the documents correctly. If relevant documents are maintained in a file, folder, envelope, binder, notebook or similar container used to store documents, all contents therein shall be reviewed for production and privilege. Document pages which have affixed notes, such as Post-it notes, should be imaged with and without the note attached.

**10)     Confidentiality Designation.** All images will be stamped with the appropriate confidentiality designations in accordance with the Stipulated Protective Order entered in this Litigation. Each document produced in native format will have its confidentiality designation identified in the filename of the native file and indicated on its corresponding TIFF placeholder.

**11)     Bates Numbering**. Bates numbering should be a consistent length across the production, contain no special characters, and be numerically sequential within a given document.  If a Bates number or set of Bates numbers is skipped, the skipped number or set of numbers should be noted with a placeholder.  Attachments to documents will be assigned Bates numbers that directly follow the Bates numbers on the documents to which they were attached.

In addition, wherever possible, each image will have its assigned Bates number electronically "burned" onto the image.

**12)** **Databases and Other Structured Data.** To the extent that responsive information is stored in a database, or database management system, or proprietary system or application which has is directed to data storage as one of its primary functions, the Producing Party will identify the database and platform to the Requesting Party. The Producing Party shall produce exports and reports about such responsive information stored in such database, where such exports and reports shall be in a reasonably usable form, and information may be produced in CSV format, tab-delimited text format, Microsoft Excel format, or Microsoft Access format. If there are future disputes over the production of information from a database, the Parties shall meet and confer in good faith in an attempt to reach any further agreements (if needed) on the data to be produced and the format and scope of the production. The Producing Party will provide reasonable amounts of information about the databases to facilitate that discussion.

**13)** **Hyperlinks.** Document(s) and/or folder(s) of documents that are hyperlinked inside a responsive document (including hyperlinked inside emails) within a Producing Party's custody, possession, or control, do not need to be produced in the first instance as part of the same family group as the Document residing at the location to which that hyperlink points. If there are particular hyperlinks identified by the Requesting Party in produced documents, the Requesting Party may submit a list of hyperlinks to a particular Producing Party for potentially relevant documents by identifying the Bates number and URL or link text for each requested link to the Producing Party, and the Producing Party will engage in reasonable efforts to locate the hyperlinked document at that location and either identify it by Bates number or provide any responsive, non-produced, and non-privileged documents. The number of hyperlinks a Requesting Party may identify to a Producing Party shall not be excessive and shall be reasonable, proportional to the needs of the case, and not unduly burdensome.

**14)** **Embedded Objects.** The Parties agree non-substantive embedded objects, including, but not limited to, logos, icons, emoticons, and footers, may be culled from a document set (but not a document) and need not be produced as separate documents by a

Producing Party (i.e., such embedded objects will be produced within the document itself, rather than as separate documents). Embedded files, except for images (including but not limited to, logos, icons, emoticons), are to be produced as family groups. Embedded files should be assigned Bates numbers that directly follow the Bates numbers on the documents within which they are embedded.

**15)** **Production of Family Groups and Relationships**. If any member of a family group is produced, all members of that group must also be produced or else logged as privileged, and no such member shall be withheld from production as a duplicate.

**16)** **Dynamic Fields**. Documents with dynamic fields for file names, dates, and times will be imaged to show the field code (e.g., "[FILENAME]") where possible, rather than the values for such fields existing at the time the file is processed.

**17)** **Time Zone**. The time zone used to process a document, including its metadata, shall be disclosed in the TIMEZONE metadata field consistent with Appendix 1, and shall be standardized for each Defendant across productions.

**18)** **Redactions**.

a)      A Producing Party may redact (i) information subject to the attorney client privilege or the work product protection (PRIV); (ii) information that cannot be disclosed pursuant to the Stored Communications Act (SCA); (iii) source code subject to separate agreement applicable to production of source code (CODE); (iv) personal identifying information (PII) including phone numbers, personal addresses, personal email addresses, the month and day of birth, driver's license numbers, and other PII agreed to by the Parties (for example, the Parties shall complete their meet and confer on whether or not to redact users' ages and years of birth). In any event, there shall be no redaction of illnesses, injuries, and medical diagnoses. To the extent a document or pleading contains PII, the Parties shall designate such documents at the appropriate Confidentiality level under the Protective Order and shall comply with Fed. R. Civ. P. 5.2 with regard to filings with the Court.

b)      No redactions for relevance may be made within a produced document or ESI item. If, during the course of discovery, the Parties identify other kinds of information that any

Party has a reasonable basis for redacting, the Parties will meet and confer on a case-by-case basis regarding that information before such redactions are made. If the Parties cannot agree, they may seek resolution from the Court.

c)    The Producing Party will indicate, on the face of the redaction, the asserted reason(s) for the redaction (PII, SCA, CODE, and/or PRIV) and the REDACTION TYPE metadata field shall indicate that the document contains redactions and the reason(s) for the redaction.

d)    Notwithstanding the foregoing, this provision shall not be read to prohibit redactions permitted under any applicable U.S. law or Protective Order.

e)    Where a responsive document contains both redacted and non-redacted content, the Parties shall produce the non-redacted portions of the document and the OCR text corresponding to the non-redacted portions.

f)    Native Redactions. Spreadsheet files requiring redaction, including without limitation Microsoft Excel files, shall be redacted and produced natively (unless the Parties agree to production in some other format). In addition, a Producing Party may natively redact other files that cannot be properly imaged for redaction.

g)    All images of redacted files shall be processed to show all comments, revision marks, speaker notes, marks made in track changes, or other user-entered data which are visible in a normal view of the document in its native application, unless such material is redacted and marked as redacted in accordance with this section. Where possible, any occurrences of date/time auto-field items, including in headers and footers, will be removed and replaced with the term AUTODATE to prevent the current date from being printed. Email header information (e.g., date and/or subject line) shall not be redacted unless it is independently privileged. The Parties shall honor reasonable requests for the production of particular redacted documents in other formats where the image is not reasonably usable.

h)    Color.  Redacted versions of documents that would have been produced in color in their un-redacted form shall be produced in color as detailed herein.

1      **19)      Exception Files**. The Parties will use reasonable efforts to address processing

2    exceptions.

3      **20)      Mobile and Handheld Device Documents and Data**. If responsive and unique

4    data that can reasonably be extracted and produced in the formats described herein is identified

5    on a mobile or handheld device, that data shall be produced in accordance with the generic

6    provisions of this protocol. To the extent that responsive data identified on a mobile or handheld

7    device is not susceptible to normal production protocols, the Parties will meet and confer to

8    address the identification, production, and production format of any responsive documents and

9    data contained on any mobile or handheld device.

STIP. & [~~PROPOSED~~] ORDER GOVERNING THE
PRODUCTION OF ESI & HARD COPY DOCUMENTS          - 11 -          3:22-MD-03047-YGR; MDL NO. 3047

**Add. 628**



**U.S. Department of Justice**

Antitrust Division

*Liberty Square Building*
*450 5ᵗʰ Street, N.W.*
*Washington, DC 20530*

September 20, 2024

**VIA ECF**
Honorable Leda Dunn Wettre, U.S.M.J.
U.S. District Court for the District of New Jersey
Martin Luther King Jr. Bldg. & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

> **Re:**   ***United States of America, et al. v. Apple Inc.,*** **No. 2:24-cv-04055 (JXN-LDW)**
> **Joint Letter Regarding Disputes Over the Protective Order, ESI Protocol,**
> **and Source Code Protocol**

Dear Judge Wettre:

Plaintiffs and Defendant respectfully submit this joint letter pursuant to the Court's Order dated August 7, 2024 (ECF No. 94).  The parties have met and conferred on numerous occasions since the issuance of the Order and over the previous several months.  This letter outlines the areas of dispute over the Protective Order, ESI Protocol, and Source Code Protocol.  Accompanying this letter are Plaintiffs' and Defendant's proposed Protective Orders (Exhibits A and B, respectively), the proposed ESI Protocol with Plaintiffs' and Defendants' separate positions identified (Exhibit C), and the proposed Source Code Protocol with Plaintiffs' and Defendants' separate positions identified (Exhibit D).

## I.   GLOBAL ISSUE (Definition of "Party" and "Parties")[1]

### A.  Plaintiffs' Position

The Antitrust Division of the U.S. Department of Justice and the respective Attorneys General of the Plaintiff States initiated this antitrust enforcement action as plaintiff prosecutors. Consistent with this prosecutorial role, in these discovery-related protocols, Plaintiffs define the "Parties" as "the Antitrust Division of the United States Department of Justice, the Attorney

---

[1] The issue concerning the definition of "Parties" applies to all three protocols. It is the only matter in dispute on the Data Source Code Protocol. *See* Ex. D §2(n).

1

**Add. 629**

Generals for the Plaintiff States, and Defendant."[2] Apple insists that the parties for purposes of these orders means "the United States" as a whole and "the Plaintiff States" as a whole. For these discovery protocols, the Court should adopt Plaintiffs' definition as commensurate with the actual scope of Plaintiffs' preservation and discovery obligations in this case.

Apple's position—that it is entitled to seek "party" discovery from potentially every federal and every state agency—is unfounded, premature, and unduly burdensome. Apple offers no justification for why extensive party discovery of hundreds of federal and state agencies is relevant and proportional to the needs of the case, why non-party discovery would not suffice, or how any potential evidentiary value would justify the burden involved. Nor can it, because Apple fails to identify any particular federal or state agency from whom it may seek discovery or the concrete nature and scope of such discovery.[3]

### 1. Party Discovery Obligations Do Not Extend to the Entirety of Government

The Federal Rules, case law, and common sense dictate that discovery obligations do not extend to the entirety of a government every time a prosecuting agency files suit. The Federal Rules limit party discovery to materials in the parties' "possession, custody, or control." FED.R.CIV.P. 34(a)(1). In civil cases brought by the federal government, courts routinely conclude that materials in the "possession, custody, or control" of the United States are limited to the prosecution team and any agencies that jointly participated in, or significantly contributed to, the case:

> The United States acting as plaintiff prosecutor does not open up the entire federal government to party discovery. . . . Rather, the custody or control of discoverable materials extends to the materials in possession of the federal agency that is engaged in a joint or combined effort to prosecute a matter.

*United States v. Xlear Inc.*, 2022 WL 5246717, at *2 (D. Utah Oct. 6, 2022) (cleaned up); *Deane v. Dynasplint Sys., Inc.*, 2015 WL 1638022 at *4 (E.D. La. Apr. 13, 2015) (collecting more than a dozen cases explaining that discovery extends to another agency only "when the Justice Department is engaged in a joint effort with that other agency or when the other agency is so closely aligned with the Justice Department as to be part of the prosecuting government team or has contributed significantly to the investigation or prosecution"). Criminal cases similarly limit party discovery against the United States to materials in the possession, custody, and control of the prosecution team. *United States v. Cano*, 934 F.3d 1002, 1023 (9th Cir. 2019) ("[A] federal prosecutor need not comb the files of every federal agency").

---

[2] Ex. A, §A.2.l; Ex. C §1.8; Ex. D §2(n).

[3] Discovery has not been commenced. Should the scope of Party discovery arise in the context of contested discovery requests, Plaintiffs will fully brief the issue.

2

# Add. 630

The proposals before the Court—especially the ESI Protocol—impose broad-based discovery obligations on the "Parties." The ESI Protocol requires "[e]ach Party" to "preserve potentially relevant and discoverable Documents and ESI," including text messages, voicemails, video files, and documents in collaborative platforms. These obligations properly encompass the U.S. Department of Justice's Antitrust Division and the State Antitrust Divisions of the Offices of the Attorney General for the twenty Plaintiff States.[4] But these obligations do not extend to the NASA, the Library of Congress, or the hundreds of other federal agencies that are not prosecuting this action. Nor do these obligations cover state agencies like the fifty-plus New Jersey State agencies besides its prosecutor.

## 2. Apple's Caselaw Is Unavailing

Apple leans on *United States v. American Telephone & Telegraph Co.* in its bid for whole-of-government discovery. 461 F. Supp. 1314 (D.D.C. 1978) ("*AT&T*"). But *AT&T* is limited to its "peculiar facts," *id.* at 1334, which are not present here. In *AT&T*, "the nature and extent of the [federal] regulation to which defendants are subject" and the "Government's own policies" were squarely at issue, because the prosecutors had coordinated with "government executives involved in economic policy," "the White House," and "various [other] government departments." *Id.* For those reasons, the court concluded that the case was "likely to involve the documents and the activities of a great number of government departments" and therefore a broad definition of "Plaintiff" fit the needs of the case. *Id.* Mindful that the ruling "might encourage other litigants in other cases to rummage through the files of the entire government, and so paralyze both the work of numerous agencies and that of the courts," the court limited its holding to "these peculiar facts." *Id.*

Those facts are not present here. This case does not involve a cross-agency investigative effort or implicate the records of many government agencies. There are no specific federal agencies or employees on the Parties' initial disclosures. And, here, as in *AT&T*, authorizing party discovery on the entire government would risk grave adverse consequences.

Similarly, the Attorneys General brought this action in their independent law enforcement capacity representing the people of their states. They are neither seeking relief for state agencies nor asserting damages claims. Numerous courts conclude that state agencies "are not to be treated as parties to [an] action for the purposes of discovery." *See Colorado v. Warner Chilcott Holdings Co. III*, 2007 WL 9813287, at *4 (D.D.C. May 8, 2007) ("[W]here two government agencies are neither interrelated nor subject to common executive control, they will not be aggregated together for purposes of discovery."); *United States v. Am. Express Co.*, 2011 WL 13073683, at *2 (E.D.N.Y. July 29, 2011) ("[T]he decision to pursue an enforcement action against Amex was one of policy, made independently of the State Governors and state agencies. . . . for purposes of this litigation and discovery, the state agencies [with one exception] are not parties"); *United States v. Novartis Pharms. Corp.*, 2014 WL 6655703, at *9 (S.D.N.Y. Nov. 24, 2014) ("[T]he mere fact

---

[4] The "State Antitrust Divisions" are the units, departments, or subdivisions within the Offices of the Attorney General of each respective Plaintiff State that are responsible for enforcing the laws and claims asserted in this litigation.

that a state or a state agency sues does not mean that the records of all state agencies may be discovered using Rule 34's tools."). Apple's definition of "Party" is neither appropriate nor proportional.

### B. Defendant's Position

Plaintiffs' proposed definition of "Party" would dramatically and unjustifiably narrow the scope of Plaintiffs' discovery obligations. Apple seeks to define "Party" or "Parties"—quite naturally—as the parties to this lawsuit—that is, "any individual Plaintiff or the Defendant in the above captioned action." *See* Dkt. 51. That would define the term "Parties" to include the United States of America, each of the Plaintiff States, and Apple Inc. Apple's definition is consistent with both common sense and how the term "Party" has been defined in similar discovery protocols in government antitrust cases. *See, e.g.*, *FTC v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC, Dkt. 160 at § 2.11 (W.D. Wash. Feb. 13, 2024); *Texas v. Google LLC*, No. 4:20-cv-00957-SDJ, Dkt. 101 at 5 (E.D. Tex. Apr. 14, 2021); *United States v. UnitedHealth Grp., Inc.*, No. 1:22-cv-00481 (CJN), Dkt. 28 at 3 (D.D.C. Mar. 9, 2022); *United States v. Visa Inc.*, No. 4:20-cv-07810-JSW, Dkt. 49 at 3 (N.D. Cal. Nov. 25, 2020).

Plaintiffs rejected that straightforward definition. Instead, Plaintiffs insist on defining "Parties" to include **only** "the Antitrust Division of the United States' Department of Justice, the Attorneys General for the Plaintiff States, and Defendant in this Action." That makes no sense. Neither the Antitrust Division nor any state attorney general is a named plaintiff in this case. Rather, they are merely divisions of governmental agencies tasked by the United States and Plaintiff States with litigating this case. Insisting that the Plaintiff parties be limited in this way is akin to Apple insisting that the term "Defendant" include only the law firms or in-house counsel representing Apple in this case. Such a construction is illogical, and the Court should reject it. The term "Parties" should be defined by the entities named in the caption—no more, no less.

Plaintiffs' efforts to artificially limit the scope of who constitutes a "Party" appears driven by their desire to restrict the scope of their discovery obligations. Apple intends to seek discovery from the various federal and state agencies that have relevant information. Because the United States and Plaintiff States are named parties, Apple will serve those requests as "party" discovery. Apparently anticipating that, Plaintiffs seek to define the term "Party" narrowly to avoid obligations to preserve, collect, review, and produce documents from various federal and state agencies.

That effort runs aground on common sense and ample precedent. *United States v. Am. Tel. & Tel. Co.* addressed this same question: "who is the plaintiff?" 461 F. Supp. 1314, 1330 (D.D.C. 1978). There, the United States argued that "plaintiff" meant only the Department of Justice and that all other agencies and governmental departments were not parties and, therefore, subject only to third-party discovery under Federal Rule of Civil Procedure 45. *Id.* In rejecting the government's position, the court recognized that "th[e] action, as its caption indicates, was brought not on behalf of the Department of Justice but on behalf of the United States of America." *Id.* at 1333. Particularly in the context of an antitrust case that was "national in scope," involved "broad economic policy," and was likely to implicate "the documents and the activities of a great number of government departments," the court noted that "it simply ma[de] no sense to hold that the Department of Justice, which essentially is a law office, alone comprises the United States." *Id.*

4

## Add. 632

at 1333-34.  Thus, the court held that "the United States, having filed the action, cannot claim to be merely the Department of Justice." *Id.* at 1334; *see also United States v. Atrium Village Assocs.*, 1988 WL 2778, at *1 (N.D. Ill. Jan. 12, 1988) ("[A] fair reading of [*AT&T*] is that it is unrealistic to view the Department of Justice as the sole plaintiff when the United States brings a federal law enforcement action."); *North Dakota v. United States*, 2021 WL 6278456, at *4-6 (D.N.D. Mar. 24, 2021) (noting that "the United States' obligation to respond to discovery requests is not limited to an agency named in the action" and that North Dakota was not foreclosed "from seeking discovery from other federal agencies who possess relevant information" under Rule 34).[5]

The same is true for state attorneys general bringing cases on behalf of their states.  *See Washington v. GEO Grp., Inc.*, 2018 WL 9457998, at *3 (W.D. Wash. Oct. 2, 2018) ("[W]here the plaintiff is the State of Washington, discovery addressed to the State of Washington includes its agencies.  Because the [Attorney General's Office] is the law firm of the State of Washington, [it] should respond and produce discovery on behalf of the State of Washington, including its agencies.").  Plaintiff States cannot avoid their obligations to preserve and produce relevant documents from state agencies through narrow wordsmithing.  *Cf. In re Generic Pharms. Pricing Antitrust Litig.*, 699 F. Supp. 3d 352, 357-61 (E.D. Pa. 2023) (ordering several state attorneys general to produce documents from other state agencies under Rule 34 in a "wide-ranging" antitrust lawsuit); *In re Social Media Adolescent Addiction/Personal Injury Prods. Liability Litig.*, 2024 WL 4125618, at *24-129 (N.D. Cal. Sept. 6, 2024) (granting Meta's motion to compel production of state-agency documents under Rule 34 from thirty-four plaintiff states involved).

Plaintiffs brought this case on behalf of the United States and each of the Plaintiff States.  Plaintiffs must now carry the discovery and preservation obligations that go along with naming those entities as parties to the litigation.

## II.   PROTECTIVE ORDER

### A.  Plaintiffs' Position

Plaintiffs' Proposed Protective Order ("PPO"): (1) provides for one category of designation, Confidential, where Confidential Information could be disclosed only to four

---

[5]  Plaintiffs' cases are not to the contrary.  In *Deane v. Dynasplint Sys., Inc.*, a civil case alleging illegal Medicare reimbursements, each of the "more than a dozen cases" cited by the court were criminal cases, *see* 2015 WL 1638022, at *4 (E.D. La. Apr. 13, 2015), where discovery rules are more limited.  Far from definitively limiting party discovery to the prosecuting agency, the court opined that "the scope of the government's obligation to produce documents … turn[s] on the extent to which the prosecutor has knowledge of and access to the documents.'"  *Deane*, 2015 WL 1638022, at *4 (quoting *United States v. Libby*, 429 F. Supp. 2d 1, 6 (D.D.C. 2006)).  The court held that for purposes of party discovery, the parties included not only the Department of Justice and U.S. Attorney's Office, but also the Department of Health and Human Services and Centers for Medicare & Medicaid Services.  *Id.* at *5.  Similarly, in *United States v. Xlear Inc.*, the court noted that obtaining agency discovery through a government plaintiff can be appropriate for "[p]racticality reasons" where "Rule 45 subpoenas would 'likely be more time-consuming and could result in delay of the litigation.'"  2022 WL 5246717, at *2 (D. Utah Oct. 6, 2022) (quoting *North Dakota*, 2021 WL 6278456, at *5)).

## Add. 633

designated Apple In-House Attorneys who are identified to Plaintiffs and not involved in business decisions; (2) precludes disclosure to Apple non-lawyer officers, directors, or employees; and (3) requires a Receiving Party to comply with applicable data security and breach response notification laws and practices, consistent with prior antitrust litigation involving the United States and Plaintiff States. Apple's proposal essentially renders Confidential Information non-confidential. Such information would be broadly shared with Apple's officers, directors, and employees, and all of Apple's in-house counsel—more than 500 attorneys. There would be no practical limits on their ability to use this information to participate in business decision-making that impacts Apple's customers and competitors. These provisions do not meaningfully protect non-parties' Confidential Information. In addition, Apple's data security and breach proposals impose onerous burdens on Plaintiffs that are inconsistent with prior practice.

Plaintiffs request that the Court allow non-parties fourteen days to submit their own positions concerning the disclosure of Confidential Information.

### 1. Disclosure to Defendant's In-House Attorneys (PPO § I.21.e)

#### a. Plaintiffs' Proposal Provides Meaningful Protection Against Disclosure of Non-Party Confidential Information to Apple's In-House Attorneys

After months of negotiations, less than two weeks before this filing, Apple changed its position to reject the parties' apparent agreement that Confidential Information would be limited to four Apple In-House Attorney disclosed to Plaintiffs and not involved in business decisions. Apple noted on September 10 that the distinctions between the persons to whom Confidential Information and Highly Confidential Information could be disclosed had largely collapsed. Plaintiffs agreed and revised Plaintiffs' PPO to provide for only a single designation, Confidential. Apple preserved a two-designation structure that allowed disclosure of Confidential Information to an unlimited number of its In-House Attorneys whether they participate in competitive decision-making or not. Plaintiffs reject this last-minute and ill-advised change.

Plaintiffs' PPO protects Confidential non-party information while allowing Apple's In-House Attorneys to assist in their client's defense. In reviewing protective orders, courts balance the risk of inadvertent disclosure of commercially sensitive information to competitors against the needs of the party seeking discovery to prosecute or to defend the case. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992). Courts grant in-house counsel access to confidential information only after determining that those recipients do not participate in competitive decision-making. *See F.T.C. v. Whole Foods Mkt.*, 2007 WL 2059741, at *2 (D.D.C. July 6, 2007) (summarizing *U.S. Steel Corp. v. United States*, 730 F.2d 1465 (Fed. Cir. 1984), which "would preclude access to information to anyone who was positioned to advise the client as to business decisions that the client would make regarding, for example, pricing, marketing, or design issues when that party granted access has seen how a competitor has made those decisions"). "The primary concern underlying the 'competitive decision-making test' is that confidential information will be used or disclosed inadvertently because of the lawyer's role in the client's business decisions." *United States v. AB Electrolux*, 139 F. Supp. 3d 390, 392 (D.D.C. 2015).

**Add. 634**

The potential harm to non-parties is real. During Plaintiffs' pre-Complaint investigations, Apple's customers and competitors produced competitively sensitive information, including contracts, business strategies and plans, presentations to executives, and internal financial projections, and more will be produced during discovery. Non-parties strongly oppose allowing Apple's In-House Attorneys' access to their Confidential Information, expressing alarm that they may inadvertently rely on their Confidential Information when advising Apple about business decisions.

Apple raised similar concerns in a recent government antitrust enforcement action against Google. Apple sought to "prevent disclosure of certain highly confidential Apple materials to in-house counsel for Google," because Google was Apple's competitor "in the development of mobile operating system software, app stores, and mobile devices," and its agreements with Google were at issue in the case. Non-Party Apple Inc.'s Position Statement on Protective Order in *United States v. Google*, 1:20-cv-03010 (D.D.C. Nov. 20, 2020), ECF 47 at 2. Apple argued that disclosure of competitively sensitive information "would directly implicate future business dealings between Apple and Google, provide Google with a substantial advantage over Apple in negotiations, and potentially disadvantage competitor[s] … that negotiate with Apple[.]" *Id.* The same is true here, where Apple is the defendant, and its customers and competitors are non-parties.

Courts credit these concerns, recognizing the inherent risk of permitting in-house counsel access to confidential information of customers or competitors. The risk of inadvertent disclosure is higher for in-house counsel than outside counsel because compartmentalization of protected information is "a feat beyond the compass of ordinary minds," and an "individual cannot rid himself of the knowledge he has gained; he cannot perform a prefrontal lobotomy on himself…." *F.T.C. v. Advocate Health Care Network*, 162 F. Supp. 3d 666, 669-70 (N.D. Ill. Feb. 29, 2016). *See Sullivan Mktg. v. Valassis Commc'ns*, 1994 WL 177795, at *3 (S.D.N.Y. May 5, 1994); *F.T.C. v. Exxon Corp.*, 636 F.2d 1336, 1350 (D.C. Cir. 1980).

Apple makes no effort to limit disclosure to In-House Attorneys with no role in business decisions. Even a narrowed version of Apple's proposal that would allow some subset of unnamed In-House Attorneys to access Confidential Information would not avoid the risk of harm to non-parties, as In-House Attorneys routinely move from legal to business roles.

### b. Apple Has Not Shown Prejudice

Apple has not shown that it would suffer prejudice by the limitations Plaintiffs propose, much less that such prejudice outweighs any risk of inadvertent disclosure. *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.*, 237 F.R.D. 405, 406–14 (N.D. Ill. 2006); *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 546 F. Supp. 2d 951, 953 (S.D. Cal. 2008).

Disclosure to In-House Attorneys is not a legal or practical imperative, and antitrust cases frequently proceed with protective orders that are limited to outside counsel only. *United States v. Anthem*, 1:16-cv-01493 (D.D.C. Sep. 15, 2016), ECF 129 at 10-11; *United States v. US Airways*, 1:13-cv-01236 (D.D.C. Aug. 30, 2013), ECF 55 at 8-9; *United States v. BCBS of Michigan*, 2:10-cv-14155 (E.D. Mich. May 10, 2012), ECF 169 at 6-8; *United States v. Dean Foods*, 2:10-cv-59 (E.D. Wis. May 20, 2010), ECF 30 at 7-9. That Apple's experienced outside antitrust counsel will

7

**Add. 635**

have access to all Confidential Information is sufficient. *Advoc. Heath Care Network*, 162 F. Supp. 3d at 674; *Blackbird Tech LCC v. Serv. Lighting & Elec. Supplies*, 2016 WL 2904592, at *5 (D. Del. May 18, 2016).

Plaintiffs' proposal to allow access to Confidential Information to four In-House Attorneys who are not involved in business decisions safeguards Confidential Information and follows established precedent for protective orders in antitrust cases and this District's model Confidentiality Order. *Whole Foods Mkt.,* 2007 WL 2059741, at *1; *AB Electrolux*, 139 F. Supp. 3d at 391; *Philips N. Am. v. Glob. Med. Imaging*, 343 F.R.D. 59, 61 (N.D. Ill. 2022); *United States v. Sungard Data Sys.*, 173 F. Supp. 2d 20, 21 (D.D.C. 2001); *Brown Bag Software*, 960 F.2d at 1471; *United States v. Aetna*, 2016 WL 8738421, at *1 (D.D.C. Sept. 14, 2016); *United States v. UnitedHealth Group*, 1:22-cv-00481 (D.D.C. Mar. 9, 2022), ECF 28 at 10-11.[6]

If the Court is inclined to establish two tiers, then the Highly Confidential designation should impose even greater restrictions, limiting disclosure to outside counsel only. *United States v. Google*, 1:20-cv-03010 (D.D.C. Jan. 21, 2021), ECF 98 at 13-17; *United States v. Sabre Corp.*, 19-cv-1548 (D. Del. Sep. 10, 2019), ECF 24 at 11-12 (entered ECF 26); *New York v. Deutsche Telekom AG*, 19-cv-05434 (S.D.N.Y. Aug. 14, 2019), ECF 185 at 12-14; *United States v. Bazaarvoice*, 13-cv-00133 (N.D. Cal. Mar. 4, 2013), ECF 35 at 12-13; *United States v. Am. Express Co.*, 10-cv-4496 (E.D.N.Y. Apr. 7, 2011), ECF 102 at 10-13. Apple itself made this request in the Google case, arguing, "There is substantial risk that disclosure of Apple's highly confidential material to employees of Google, including in-house counsel, would result in material harm to Apple." Non-Party Apple Inc.'s Position Statement on Protective Order in *United States v. Google*, 1:20-cv-03010 (D.D.C. Nov. 20, 2020), ECF 47 at 1.

## 2. Disclosure to Defendant's Non-Lawyer Officers, Directors, or Employees (PPO § I.21.f)

Apple proposes disclosures of Confidential non-party information to "representatives of Apple who are officers, directors, or employees of Apple, as well as their immediate staff, to whom [Apple deems] such disclosure is reasonably necessary," placing sensitive non-party information in the hands of Apple's most senior decision-makers. Allowing these individuals unfettered access to Confidential Information—including "confidential research or commercial information"—is highly prejudicial to non-parties. The risk that such information may influence Apple's decision-makers is severe when they have direct access to that information. These concerns are amplified here where Apple may use its market dominance to thwart or punish companies that produce competitively sensitive information.

Courts regularly enter protective orders that preclude broad disclosure to a defendant's officers, directors, and employees in antitrust enforcement actions brought by the United States. *See United States v. Google*, 1:20-cv-03010 (D.D.C. Jan. 21, 2021), ECF 98 at 13-17; *United States v. JetBlue Airways*, 1:23-cv-10511 (D. Mass. Mar. 20, 2023), ECF 63-1 at 13-16 (entered ECF 65); *United States v. Assa Abloy*, 1:22-cv-02791 (D.D.C. Oct. 3, 2022), ECF 33 at 10-11; *United*

---

[6] Apple's same outside counsel at Kirkland & Ellis entered into the stipulated protective order on behalf of UnitedHealth.

*States v. Booz Allen Hamilton Holding Corp.*, 1:22-cv-01603 (D. Md. July 18, 2022), ECF 71 at 9-11; *United States v. UnitedHealth Group*, 1:22-cv-00481 (D.D.C. Mar. 9, 2022), ECF 28 at 10-11.

Apple's proposal allows virtually unlimited access to Confidential Information to any officer, director or employee to whom it alone thinks "such disclosure is reasonably necessary," failing to put in place any guardrails and without consideration for competitive harm that would arise from sharing non-parties' confidential research or commercial information directly with Apple's business decision-makers. Apple has not shown prejudice, let alone how such prejudice outweighs the substantial risk of harm to non-parties.

### 3.  Data Security (PPO § L.37-42)

Apple proposes to impose extensive data security and breach response obligations that, to Plaintiffs' knowledge, have never been imposed on the Department of Justice or State Attorneys General in antitrust litigation. Apple proposes, among other things, that the United States and Plaintiff States "implement an information security management system . . . which shall comply with at least one of the then-current versions" of several standards applicable mainly to non-governmental entities. Ex. B ¶ 37. If a data breach potentially affects protected materials, Apple would require written notification within 48 hours, require the Parties to meet and confer over additional security measures, and require collateral discovery into any potential data breach. Apple also proposes that a data breach may require a stay or extension of litigation discovery while any data breach is investigated. Ex. B ¶ 40. Because these provisions appear in its Proposed Protective Order, Apple's proposal necessarily would require the Court to police Plaintiffs' compliance with data security and data breach protocols.

Apple's proposal is neither workable nor necessary. As governmental entities, Plaintiffs are bound by specific and varied laws and policies governing data security and breach response. The Federal Information Security Modernization Act of 2014 (FISMA) requires federal agencies to implement, maintain, and document information security programs, including establishing security controls, conducting security assessments, and reporting security incidents and breaches in accordance with established protocols. The Department of Justice also complies with the cybersecurity and privacy standards in National Institute of Standards and Technology (NIST) Special Publication (SP) 800-53 Revision 5, Security and Privacy Controls for Information Systems and Organizations, with deviations or Plans of Action and Milestones and risk acceptance managed through applicable DOJ policies and procedures.

The States are bound by laws and policies governing data security and data breach obligations. New Jersey, for example, follows the New Jersey Statewide Information Security Manual, which requires all State information systems and services to implement, at a minimum, Moderate level controls in accordance with NIST SP 800-53 Revision 5. New York's Information Security Policy No:NYS-P03-002 provides a robust framework of policies and procedures agencies must follow to ensure the physical and digital security of information. State laws govern and establish incident and breach reporting obligations and include, for example, New Jersey's Identity Theft Prevention Act (ITPA), N.J.S.A. 56:8-161 to 56:8-166; California Civil Code § 1798.29; the Minnesota Government Data Practices Act, Minn. Stat. § 13.01 *et seq.*; and New York's NYS Technology Law § 208.

Government bodies make legislative and administrative judgments about how to implement laws and policies to best suit their needs and the needs of their constituents. It would be impractical and disruptive to override Plaintiffs' authority as sovereign governments to instead impose a standard of Apple's choosing.

Plaintiffs acknowledge they will comply with applicable laws and policies that establish the framework under which the Department of Justice and State Attorneys General will maintain data security and respond to an incident or breach. Ex. A ¶ 34. National security and law enforcement equities may prohibit the Department of Justice from notifying affected persons within a certain time frame and disclosing certain information regarding a breach, as Apple proposes. The Department of Justice also cannot disclose sensitive information regarding government information systems, including any vulnerabilities that may have involved a breach. This Protective Order should not impose requirements that could be inconsistent with applicable federal or state laws or policies or potentially jeopardize national security, law enforcement, and other government equities.

The only case Apple cites in which the government was subject to additional data security protections is *United States v. Anthem, Inc.*, 2024 WL 2982908, at *1-2 (S.D.N.Y. June 12, 2024), but there the government agency was planning to host discovery data through a bespoke system for the litigation, and the agency's only objection was that the cost of additional security protections was not justified. Apple's remaining cases are class actions and private disputes that are not informative on the appropriate provisions for a data breach in this government enforcement action. *See, e.g., Floyd v. Amazon.com, Inc.*, 2023 WL 8701667 (W.D. Wash. Dec. 15, 2023). In recent private antitrust cases, Apple has also stipulated to protective orders that do not contain the invasive data security and incident or breach response obligations Apple demands here. *AliveCor, Inc. v. Apple Inc.*, 4:21-cv-03958 (N.D. Cal. Sep. 9, 2022), ECF 93; *Saurikit, LLC v. Apple Inc.*, 4:20-cv-08733 (N.D. Cal. June 24, 2021), ECF 53; *Cameron v. Apple, Inc.*, 4:11-cv-06714 (N.D. Cal. Jan. 21, 2021), ECF 381; *Epic Games, Inc. v. Apple, Inc*., 4:20-cv-05640 (N.D. Cal. Oct. 1, 2020), ECF 110.

## B. Defendant's Position

Plaintiffs' single-tier confidentiality proposal and limitations on disclosure are unduly burdensome, a deviation from typical practice in this District, depart from the approach the DOJ has agreed to and apparently found workable in other technology antitrust cases of similar size and complexity, impose prejudicial restrictions on Apple's litigation strategy, and carry a substantial risk of over-designation. Under Plaintiffs approach, documents would be subject to only a single designation of "Confidential" that operates in practice akin to an "attorneys' eyes only" provision. This single tier would permit only a narrow subset of four in-house counsel to review *any* documents designated Confidential regardless of the degree of sensitivity of the information. Plaintiffs brought this litigation, which Apple must now defend. Plaintiffs cannot now seek to artificially hamstring Apple's defense by foreclosing meaningful engagement and review of key documents by the Apple employees and in-house counsel most knowledgeable about Apple's business. Of course, such disclosures should be subject to reasonable limits, which Apple's proposed two-tier approach provides. Having two tiers of confidentiality, each with tailored

## Add. 638

categories for access provides flexibility in terms of who can access what materials depending on their sensitivity.

### 1. Confidentiality Designation Tiers[7]

For over four months, Plaintiffs agreed with Apple's position and negotiated a protective order that included two tiers of confidentiality: (i) Confidential; and (ii) Highly Confidential – Attorneys Eyes Only. This approach is consistent with this District's Model Discovery Confidentiality Order, *see* NJ R UDSCT App. S ("Model"), and the designations used during the Government's investigation of Apple. In the eleventh hour of negotiations, Plaintiffs abruptly insisted insisting on a single confidentiality tier without further discussion the day before the Parties were set to exchange final positions.

Two-tier protective orders are appropriate when heightened protection is necessary for particularly sensitive business information. As reflected in the Model, the baseline "Confidential" tier encompasses categories of lower-level proprietary information, whereas the "Highly Confidential – Attorneys Eyes Only" tier further restricts access to highly sensitive and competitive business information. Model at ¶¶ 1-2.

In the context of technology antitrust cases, courts routinely allow two-tiered designations and heightened protection for information such as competitively sensitive trade secrets, development and planning for future products, technical details concerning proprietary technology, and information regarding internal business strategy. *See, e.g., FTC v. Amazon.com, Inc.*, No. 2:23-cv-01495-JHC, Dkt. 160 (W.D. Wash. Feb. 13, 2024); *United States v. Google LLC*, No. 1:23-cv-00108-LMB-JFA, Dkt. 203 (E.D. Va. May 11, 2023).

Plaintiffs' single-tier approach is unjustified and unfairly prejudices Apple. For example, without two tiers of confidentiality, the multitude of third parties that will produce documents in this case will in all likelihood designate all materials as Confidential, which, under Plaintiffs' proposal, would greatly restrict the individuals who could review that information. That approach would impose significant limitations on who at Apple can view *any* third-party materials, regardless of whether they are competitively sensitive, negatively impacting Apple's ability to consult with its lawyers and prepare its defense. Contrary to Plaintiffs' position, and discussed more fully below, Apple does not seek unfettered access for its employees or in-house counsel to either tier of information. Each tier includes safeguards tailored to the sensitivity of the information.

Apple requests that the Court adopt its two-tiered proposal, which is the standard in this jurisdiction and consistent with other recent antitrust tech cases and the Parties' practice during the investigation.

---

[7] *See* Ex. B §§ A.2(b), (f), ¶ 22.

11

**Add. 639**

### 2.   Access to Confidential Materials[8]

Under the two-tiered approach to which the Parties originally agreed, Plaintiffs seek to prohibit all Apple officers, directors, or employees—and all but four Apple in-house counsel— from accessing the vast majority of materials likely to be used by the Government in prosecuting its case. Plaintiffs' position is untenable.

Forbidding all but four Apple in-house counsel from reviewing any Confidential materials is highly prejudicial and would prevent essential Apple employees and in-house counsel from assisting in the company's defense against a case attacking a broad swath of products, services, and design decisions. Indeed, Plaintiffs' own cited case recognizes that "[t]o deny outside counsel access to the lawyers most familiar with their clients' business … and who will have a much deeper and complete understanding of the documents being produced … is to make [defendants] fight with one hand behind their backs." *United States v. Sungard Data Sys., Inc.*, 173 F. Supp. 2d 20, 21 (D.D.C. 2001). What's true for in-house counsel applies also to Apple employees, whose technical knowledge and expertise are needed by outside counsel to evaluate Plaintiffs' claims implicating Apple's advanced, proprietary technology. *See Motorola, Inc. v. Lemko Corp.*, 2010 WL 2179170, at *5 (N.D. Ill. June 1, 2010) (recognizing "legitimate need for … outside counsel to be able to consult with client representatives other than lawyers").

As such, Apple proposes that employees and counsel be allowed to view Confidential materials, with key limitations preventing unfettered access. Specifically, Apple proposes that Confidential materials my only be disclosed to Apple officers, directors, employees, and in-house counsel, as well as their immediate staff, where such disclosure is ***reasonably necessary*** for this Action, and provided that ***each individual agrees to be bound by the Protective Order***. Even tighter access limitations would apply to Highly Confidential materials.[9]

The Model and precedent support Apple's position. The Model allows disclosure of Confidential materials to relevant in-house counsel and the parties' representatives where such disclosure is "necessary" to the litigation. *See* Model at ¶ 4(g). Similarly, in *United States v. Google LLC*, the protective order permits disclosure of confidential information to "the officers, directors, and employees (including In-House Counsel) of Defendant to whom disclosure is reasonably necessary for this litigation." No. 1:23-cv-00108-LMB-JFA, Dkt. 203 at 20 (E.D. Va. May 11, 2023). *See also Motorola, Inc. v. Lemko Corp.*, No. 1:08-cv-05427, Dkt. 96 at 5-6 (N.D. Ill. Apr. 3, 2009) (allowing disclosure of Confidential information to employees "required in good faith to provide assistance"); *In re Lantus Direct Purchaser Antitrust Litig.*, No. 1:16-cv-12652, Dkt. 98 at 12 (D. Mass Apr. 27, 2020) (similar).

---

[8]  Ex. B ¶ 21.

[9]  Specifically, unless they are a witness or deponent who the Receiving Party has "a good faith belief" authored or received the document or had involvement or responsibilities regarding the subject matter, Apple employees would not have access to Highly Confidential materials under Apple's proposal. Additionally, in-house counsel access is limited to four individuals not involved in business decisions.

12

**Add. 640**

Plaintiffs' own cases recognize the importance of allowing at least in-house counsel access to confidential information where necessary. *See Sungard*, 173 F. Supp. 2d at 21. And Plaintiffs have not demonstrated how disclosure of Confidential information to in-house attorneys whose responsibilities are largely "legal and security-related" would pose a risk of spillage when all "will be subject to non-disclosure / non-use restrictions under the Court's protective order." *Motorola*, 2010 WL 2179170, at *4.

The Court should adopt the access proposal outlined in Apple's approach, which allows certain necessary Apple employees and in-house counsel (as well as outside counsel for Apple and counsel for Plaintiffs) to access Confidential materials, and limits Highly Confidential materials to just outside counsel and a limited number of Apple in-house attorneys.[10]

### 3. Data Security[11]

Apple's proposal includes industry-standard data security provisions to protect against unauthorized access to sensitive data and mitigate risk after a data breach. Plaintiffs claim they only can agree to comply with a vague reference to "applicable security, privacy, data protection, and breach response and notification laws, rules, regulations, policies, and directives"[12] and refuse to agree to Apple's proposed security provisions without articulating why such provisions are burdensome or prejudicial. Data breaches pose significant threats, and Apple's proposed measures aim to safeguard all materials disclosed in this action, including those produced by non-parties.

Data security is at the core of Apple's business. Apple prioritizes the protection of users' data, partners' business data, and its own trade secrets, business strategy, and financial information. Discovery in this case will likely implicate and involve production from all these categories, for both Apple and third parties. Data security, moreover, is a significant concern with real-world implications. For example, organized criminal groups and hostile state actors perpetrate data security attacks with growing frequency. Data breaches have increased year-over-year, including a striking 20% jump from 2022 to 2023.[13] Indeed, 2024 "is on pace to be the biggest year in the history of law firm data breach reports" with 21 law firms filing breach reports to state attorneys general offices in the first five months.[14] And the government is not immune from data breaches. A White House report indicated that in 2023, federal agencies suffered 11 "major" data security incidents and that the Department of Justice itself reported "multiple incidents," including

---

[11] Ex. B § L.

[12] Ex. A § L.

[13] *See* Stuart Madnick, *Why Data Breaches Spiked in 2023*, HARVARD BUS. REV., Feb. 19, 2024, available at, https://hbr.org/2024/02/why-data-breaches-spiked-in-2023 (last visited on Sept. 12, 2024).

[14] Dan Roe, *Law Firm Data Breach Reports Show No Signs of Slowing in 2024*, AM. LAWYER, May 23, 2024, available at https://www.law.com/americanlawyer/2024/05/23/law-firm-data-breach-reports-show-no-signs-of-slowing-in-2024/?slreturn=20240816121021 (last visited Sept. 16, 2024).

**Add. 641**

one that impacted "case-specific data analytics support for the Civil Division and several United States Attorneys' Offices."[15] The federal judiciary has also recognized the need to implement additional safeguards for court records due to "recent disclosure of widespread cybersecurity breaches of both private sector and government computer systems…."[16]

In light of this mounting threat,[17] Apple's proposed data security protections are common sense and necessary. Courts have approved protective orders including provisions consistent with the protections Apple seeks.[18] *See, e.g.*, *In re Insulin Pricing Litig.*, No. 17-699, Dkt. 299 at 12 (D.N.J. Jan. 23, 2020) ("Protected Material…shall be maintained in secure litigation support site(s) that applies standard industry practices regarding data security."); *Park v. Sam's East, Inc.*, No. 20-cv-03119, Dkt. 46 § 6 (D.N.J. Sept. 23, 2021) (requiring "secure data storage systems, established security policies, and security training for employees, contractors and experts," as well as "data encryption …, data access controls, and physical security"); *Apple Inc. v. Rivos, Inc.*, No. 5:22-cv-2637, Dkt. 113 at 14 (N.D. Cal. Oct. 31, 2022) (requiring parties to implement an information security management system that complies with an industry or government cybersecurity framework, encrypt materials in transit, implement MFA, and follow certain procedures in response to a data breach); *Sheet Metal Workers' Nat'l Pension Fund v. Bayer Aktiengesellschaft*, No. 3:20-cv-04737, Dkt. 138 at 19-20 (N.D. Cal. Oct. 6, 2022) (requiring storage in a site or source that applies "standard industry practices regarding data security," among other measures); *Anderson v. Gen. Motors, LLC*, Case No., 2:22-cv-00353, Dkt. 38 at 8 (E.D. Cal. Sept. 6, 2022) (similar).

In *Floyd v. Amazon.com, Inc.*, the court ordered data security protections nearly identical to those Apple proposes here. 2023 WL 8701667, at * 1-3 (W.D. Wash. Dec. 15, 2023). The court required plaintiff to "implement data management systems complying with established data security frameworks" and MFA. *Id.* Moreover, it adopted a list of reasonable remedial actions to be taken in the event of a data breach, similar to the actions proposed here. *Id.* The *Floyd* court reasoned that defendants' proposed "commonplace" security measures appropriately safeguarded

---

[15] Federal Information Security Modernization Act of 2014 Annual Report Fiscal Year 2023, pp. 20, 22, available at https://www.whitehouse.gov/wp-content/uploads/2024/06/FY23-FISMA-Report.pdf (last visited Sept. 12, 2024).

[16] https://www.uscourts.gov/news/2021/01/06/judiciary-addresses-cybersecurity-breach-extra-safeguards-protect-sensitive-court (articulating the need for additional security measures and quoting James C. Duff, Secretary of the Judicial Conference of the United States, stating "The federal Judiciary's foremost concern must be the integrity of and public trust in the operation and administration of its courts. . . .").

[17] Robert Hilson, *Why the archaic process for eDiscovery is vulnerable to hacking and data breach*, Logikcull (Feb. 8, 2017), https://www.logikcull.com/blog/archaic-process-e-discovery-vulnerable-hacking-data-breach#:~:text=It's%20an%20incredibly%20risky%20process,channels%20expose%20information%20to%20breach (last visited on Sept. 12, 2024).

[18] Plaintiffs note that the Model does not yet include a data security provision. This is unsurprising and not dispositive given the technically complex and rapidly evolving nature of cybersecurity risks and corresponding safeguards. Courts are issuing data security orders with more frequency.

14

**Add. 642**

confidential material without unduly burdening the plaintiff or third parties.  *Id.* at *1, 3.  The court noted that defendants' proposals for managing a potential data breach were not "burdensome or unworkable," but rather allowed flexibility to "craft an appropriate response based on the particular circumstances of a data breach."  *Id.* at *2.

Apple proposes the implementation of security measures complying with a recognized cybersecurity framework, such as that of the Center for Internet Security or another well-recognized industry or government cybersecurity framework.  These are frameworks with which many vendors and companies already comply, and any burden is minimal.  Plaintiffs' refusal to stipulate to these minimum standards is concerning and unwarranted.

To mitigate the risk of unauthorized access, Apple also proposes encryption of produced materials and implementation of multi-factor authentication ("MFA"), measures regularly used in data security practice.  MFA has been called the "single most important thing Americans can do to stay safe online," and is a simple, highly effective security mechanism.[19]  In fact, the federal judiciary recently requested funding to implement enterprise-wide MFA.[20]

Additionally, Apple's proposal facilitates prompt mitigation and remediation of a data breach, including notifying the producing party and providing steps to mitigate the breach.  Apple's proposal requires that the receiving party comply with the producing party's reasonable requests to investigate, remediate, and mitigate the effects of the breach, provide information that is reasonably requested and relates to the breach, and meet and confer regarding any necessary adjustments.  In contrast to Plaintiffs' mere agreement to comply with the law, these provisions set clear expectations on basic steps for investigation after a breach.  None of these provisions imposes significant burdens, and taken together, they provide strong protections from real and serious data security threats.

Notably, the government has been required to implement more stringent security measures than what Apple proposes here.  *See, e.g.*, *United States v. Anthem, Inc.*, 2024 WL 2982908, *3 (S.D.N.Y. June 12, 2024) (requiring the government implement "robust" protections). In *Anthem*, the government agreed to, among other things: house data on a bespoke platform, not connected to the internet; transfer data via encrypted physical storage; and implement a HITRUST-certified security system. *Id.* The court further required that the government add additional cybersecurity protections, including tracking and logging activity on the platform and adopting data loss prevention controls. *Id.*

To the extent Plaintiffs expect Apple to take it on faith that current laws or policies— whatever those may be—mandate sufficient protection for produced data, that is insufficient.  In recent years, both federal and state governments have failed to adequately protect data produced in litigation or otherwise.  *See, e.g.*, *Anthem*, 2024 WL 2982908, at *3 (noting that "given the

---

[19]  Jen Easterly, *Next Level MFA: FIDO Authentication*, Cybersecurity & Infrastructure Security Agency, Oct. 18, 2022, https://www.cisa.gov/news-events/news/next-level-mfa-fido-authentication (last visited Sept. 12, 2024).

[20]  *See The Judiciary Fiscal Year 2023 Congressional Budget Request: Judiciary Information Technology Fund*, The Administration Office of the U.S. Courts (Mar. 2022).

previous breach [by the government's vendor], Anthem's concern for the security of the data is reasonable"); Notice of Data Breach, Rob Bonta, Cal. Off. Atty. Gen. (July 8, 2022) (notifying citizens that their personal information was disclosed by the California Department of Justice).

In light of these risks, Apple and this Court "can not [sic] rely on the representations of lawyers for the government to conclude that their proposed safeguards are sufficient." *Anthem*, 2024 WL 2982908, at *4. Apple proposes reasonable protections and remedial procedures consistent with widely recognized data security standards of care and protective orders in recent cases, and asks that the Court adopt its proposal.

## III.   ESI PROTOCOL

### A.  Plaintiffs' Position (ESI § IV.10)

Plaintiffs' ESI Protocol requires a Producing Party to provide metadata for relevant linked documents from communications within the production. It appropriately requires the Producing Party to provide this information. Under Apple's proposal, no information about linked documents is provided unless requested. Apple requires that the Requesting Party ask for any information about specific linked documents—inverting standard discovery burdens. Plaintiffs' proposal incorporates Apple's proposal, but also requires a Producing Party to provide metadata about relevant linked files in the first instance, instead of requiring the Requesting Party to seek additional information about specific documents after production occurs.

Apple contends Plaintiffs' separate proposal ("Plaintiffs' Proposal") is unduly burdensome without engaging with it. Apple has never responded to multiple, repeated requests for information about its concerns with Plaintiffs' Proposal.[21] It has not shared simple information that could allow the parties to collaborate or compromise. Contrary to Apple's contentions, nothing in Plaintiffs' Proposal requires collection of documents from a Party's files and servers. Yet Apple's cases and position suggest it does. Apple offers only the cursory conclusion that Plaintiffs' Proposal is manual and therefore burdensome. That is inadequate. "A party resisting discovery on the grounds of burden or expense bears the burden of showing specifically how the request is burdensome." *IQVIA, INC. v. Veeva Sys., Inc.*, 2019 WL 3069203, at *5 (D.N.J. July 11, 2019) (requiring linking of documents). Apple fails to make this showing.

### 1.  Linked Documents Are Critical to Business Today

Linked documents (such as iCloud.com or Box.com files) are collaborative files that enable people to work together on a document. Linked documents are critical to contemporary business. Often, the most important documents in a company are not created by an individual contributor, but reflect collaboration and input from many people and potentially many teams. The most important documents are often linked documents.

This is especially true for Apple. Apple employees routinely transmit and share linked documents. There are hyperlinks to tens of thousands of collaborative documents in Apple's pre-

---

[21] Plaintiffs' Letter to Alexia Brancato (Sept. 14, 2024) ("Sept. Letter").

Complaint productions. Apple appears to handle entire projects on collaborative platforms, and relevant Apple communications link to files in collaborative platforms, such as Quip.com, iCloud.com, and Slack.com.

Apple does not dispute that its linked documents contain relevant information and are important to its business.

## 2. Plaintiffs' Proposal Is Narrowly Drawn

Plaintiffs' Proposal recognizes the importance of linked documents but is crafted to reduce the burdens on a Producing Party by requiring reasonable and limited productions. For example:

- Plaintiffs' Proposal does not require production of any additional linked documents that are not already identified for production. It only requires production of metadata to enable cross-referencing of relevant linked documents in the production.

- Plaintiffs' Proposal does not apply to all linked documents that are identified, preserved, or collected. It only applies to linked documents within the production, i.e., relevant, responsive documents.

- Even then, Plaintiffs' Proposal does not require hyperlink metadata for all linked documents within the production. It only requires metadata for linked documents in the production where the hyperlink also appears relevant based on the face of the communication.

These significant limits are intended to ensure that the value of the linked document information is high and the burden is proportionate and tailored to the needs of the case.

## 3. Plaintiffs' Proposal Is Reasonable and Proportional

Plaintiffs' Proposal only requests metadata for relevant linked documents from communications within the production—without requesting the documents themselves. The proposal itself builds in significant limits and proportionality analysis.

The proportionality factors favor Plaintiffs' Proposal. Rule 26(b)(1) proportionality assesses the "importance of the issues at stake." Here, this landmark antitrust action raises issues of national importance for consumers nationwide. *See, e.g., Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955) (recognizing "the public interest in vigilant enforcement of the antitrust laws"); FED.R.CIV.P. 26 advisory committee's note (recognizing the importance of "cases in public policy spheres" and injunctive cases "that seek[] to vindicate vitally important personal or public values").

The "parties' resources" favor Plaintiffs' Proposal. FED.R.CIV.P. 26(b)(1). Apple is a sophisticated technology company and one of the largest publicly traded companies in the world. There is no doubt that Apple, the company that created some of these communication and

17

**Add. 645**

collaboration platforms (like iCloud, iMessages, and Apple Mail), can comply with its discovery obligations by producing linked document metadata. Apple's vast monetary resources and unique technology expertise are features in the proportionality analysis.[22] Any solutions Apple implements to automatically pull linked document metadata in this case would benefit Apple's other cases—and any cost to Apple for doing so should be amortized across Apple's docket of thousands of cases from the past decade.

### 4. Apple Fails to Show Undue Burden

Apple protests that Plaintiffs' Proposal is unduly burdensome because it is not automatic. But access to an automatic tool is not the end of the inquiry. Like any sophisticated, repeat litigant, Apple cannot fail to invest in necessary tools for modern eDiscovery and then evade compliance by claiming that the process is unduly burdensome without those tools.

Sophisticated parties regularly produce linked documents. For example, Google recently agreed to produce all links from its emails to collaborative documents on its proprietary collaborative platforms, and Ticketmaster and Live Nation agreed to produce linked documents and metadata in OneDrive, SharePoint, and Teams. *See* Letter Agreement, *United States v. Google*, 1:20-cv-03010 (D.D.C. Jan. 15, 2021); Order Governing ESI Discovery, ECF 249 at 12, *United States v. Live Nation*, 1:24-cv-03973 (S.D.N.Y. Aug. 28, 2024).

Plaintiffs did not seek all linked documents here because Apple represented this would not be feasible. While Plaintiffs are not aware of identical ESI protocols, other courts have largely rejected far broader requests for linked documents, without the tailoring evident here.[23] Cases involving far broader proposals say little about Plaintiffs' carefully crafted proposal.

To establish undue burden, Apple must offer specifics that it has not provided. "The application of proportionality should be based on information rather than speculation."[24] "Burden and expense should be supported by hard information and not by unsupported assertions."[25] But Apple has not responded to Plaintiffs' repeated requests for information about its concerns with Plaintiffs' Proposal.[26] Apple has not provided basic information, such as what processing and

---

[22] *See* The Sedona Conference, *Commentary on Proportionality in Electronic Discovery*, 18 Sedona Conf. J. 141, 172 (2017) ( "Sedona, *Proportionality*").

[23] *See In re Insulin Pricing Litig.*, 2024 WL 2808083, at *7-8 (D.N.J. May 28, 2024) (plaintiffs sought "family-complete" linked documents, requiring collection of *all* linked documents, regardless or relevance or value); *Nichols v. Noom, Inc.*, 2021 WL 948646 (S.D.N.Y. Mar. 11, 2021) (plaintiffs sought *all* linked documents regardless of relevance or value); *see In re StubHub Refund Litig.*, 2024 WL 2305604, at *1-3 (N.D. Cal. May 20, 2024) (defendants identified and matched collected documents to their hyperlinks already).

[24] Sedona, *Proportionality* 162 (Principle 4).

[25] *Id.* at 167; *see* FED.R.CIV.P. 34(b)(2)(B) (responding party must "state with specificity the grounds for objecting to the request, including the reasons").

[26] Sept. Letter.

**Add. 646**

review tools it will use or where hyperlinks are stored on Apple's collaborative platforms.[27]
Missing information like this is critical to Apple's claims of burden and technical infeasibility.

Apple's primary, disingenuous argument is that it lacks an automated tool to accomplish
Plaintiffs' Proposal. But simple eDiscovery tools can automatically extract hyperlinks, and those
tools can be configured to extract hyperlinks from only specific platforms (like box.com) or with
specific text (like document IDs).[28] Similarly, matching metadata is common and straightforward
in any large-scale litigation. Matching hyperlinks in communications with their shared documents
involves matching metadata. eDiscovery service providers and in-house discovery teams regularly
and automatically match metadata of all kinds. And collaborative platforms—like box.com—can
store and export shared links for all collaborative documents.[29]

Apple has multiple, feasible options to fulfill its discovery obligations under Plaintiffs'
Proposal, and it has failed to establish otherwise.

### B.  Defendant's Position

#### 1.  Production of Linked Files and Collaborative Work Environments[30]

The Parties dispute the proper way to handle producing hyperlinks contained in responsive
documents.  Apple's proposal allows for the receiving party to make reasonable requests for the
producing party to identify and, if found, produce hyperlinks contained in produced documents.
While Plaintiffs seemingly have agreed to Apple's compromise to search for requested documents,
Plaintiffs insist that in addition the Parties must identify ***all*** corresponding hyperlinks within
produced documents and provide metadata and logs for those files.  The Court should adopt
Apple's proposal because there is no automated process to collect and associate documents or
hyperlinks in the way Plaintiffs request.

Unpacking Plaintiffs' proposal reveals just how burdensome it is.  In the absence of an
automated tool, their suggested process requires that during pre-production review of documents
the parties: (1) manually identify all hyperlinks in documents that are to be produced; (2) evaluate
each hyperlink within the document to determine whether it links to another document; (3) make
a determination whether the linked document is potentially relevant; (4) manually populate a
metadata field with each hyperlink address for a document determined to be potentially relevant;
(5) conduct a manual search to see if the documents corresponding to those hyperlinks are also in
the production universe; and (6) manually populate a metadata field with a corresponding bates

---

[27] *Id.*

[28] For example, regular expression ("RegEx") searches enable parties to automatically extract
hyperlinks. RegEx searches are tools commonly available in eDiscovery platforms, and parties
commonly use RegEx searches to identify PII for potential redactions.

[29] *See, e.g.*, Box.com Shared Link Report, https://support.box.com/hc/en-us/articles/4415098138899-Shared-Links-Report (last updated June 25, 2024).

[30]  Ex. C § V.10.

number if the document was produced; or (7) for documents not produced, create a log of the hyperlinked addresses.  This is unduly burdensome.

In contrast, Apple's common-sense proposal allows for the receiving party to identify hyperlinks contained in produced documents and make reasonable requests for the producing party to search for a corresponding relevant link and, if found, produce that document.

The Court should adopt Apple's proposal because Apple does not have an automated tool capable of implementing Plaintiffs' proposal and to Apple's knowledge no such off-the-shelf tool exists in the market.  Courts have found that "hyperlinks are not the same as traditional attachments."  *In re Insulin Pricing Litig.*, 2024 WL 2808083, at *7 (D.N.J. May 28, 2024); *see also Nichols v. Noom Inc.*, 2021 WL 948646, at *4 (S.D.N.Y. Mar. 11, 2021) (noting that hyperlinks are not the same as attachments).  Because hyperlinks are not attachments, collecting, processing, reviewing, or producing them as "family" members with the documents in which they are transmitted is not technologically feasible absent an automated tool.

In the absence of automated tools, courts have adopted approaches similar to Apple's proposal, where the parties make reasonable requests to search for and produce hyperlinked documents.  Like Apple, the defendants in *In re Insulin* also did not have an automated tool and thus objected to the plaintiff's proposal to search, collect, associate, and produce hyperlinks.  2024 WL 2808083, at *7.  The court agreed with defendants and found that because defendants' "tools are either not feasible whatsoever or unduly burdensome to apply to their respective data environments" the defendants were not required to collect hyperlinks.  *Id.*; *see also In re StubHub Refund Litig.*, 2024 WL 2305604, at *1 (N.D. Cal. May 20, 2024) (removing requirement that hyperlinked documents be produced in document family groups when there is no automated tool); *In re Meta Pixel Healthcare Litig.*, 2023 WL 4361131, at *1 (N.D. Cal. June 2, 2023) (finding "parties should consider reasonable requests for production for hyperlinked documents on a case-by-case basis.  Such requests should not be made as a matter of routine"); *Nichols*, 2021 WL 948646, at *1 (noting that defendant "has already agreed to produce a reasonable number of linked documents at Plaintiffs' request" and refusing to require defendant to collect all hyperlinks).

Notably, the government recently agreed to provisions substantially similar to Apple's proposal in other recent antitrust litigations.  *See e.g.*, *United States v. Google LLC*, No. 1:23-cv-00108-LMB, Dkt. 142 at 26 (E.D. Va. Apr. 20, 2023) (stipulating to language nearly identical to Apple's proposal); *see also Texas v. Google LLC*, No. 4:20-cv-00957-SDJ, Dkt. 183 at 24 (E.D. Tex.  Dec. 13, 2023) (same).  Instead of similarly agreeing to a straight-forward approach here, Plaintiffs insist upon requiring Apple to manually search for and provide additional information on top of what Apple has already agreed to provide.

Plaintiffs' proposal is unduly burdensome and inefficient.  Plaintiffs' proposal will significantly disrupt and delay Apple's workflow for processing, review, and production of documents.  Creating this manual workflow will only serve to complicate an already complex review and slow down Apple's ability to review and produce documents.  Courts frequently refuse to impose this kind of burden.  *See In re Meta Pixel*, 2023 WL 4361131, at *1 (refusing to require defendants to use a tool or process that would "disrupt [its] standardized workflow for ESI-related discovery processing across all of its platforms and systems," and holding the "ESI protocol should

make clear that hyperlinked documents are not treated as conventional attachments….”); *In re StubHub Refund Litig.*, 2024 WL 2305604, at *2 (finding that the “non-existence of commercially available software that can implement the hyperlink requirement tips strongly” in removing the requirement to collect hyperlinks).

Curiously, Plaintiffs argue that Apple must divert money and resources from its business and enter the eDiscovery space to develop tools to assist litigants with collecting and producing hyperlinks. Plaintiffs cite no authority for such a bold assertion. It is well settled that parties need only produce documents as they are stored in the “usual course of business,” and courts do not require parties to invent new technology to respond to discovery requests and make unduly burdensome requests less burdensome. Fed. R. Civ. P. 34(b)(2)(E)(i); *see Nichols*, 2021 WL 948646, at *4 (rejecting plaintiffs’ proposal that would require defendant’s programmers to develop a tool to search and associate hyperlinks).

The one case on which Plaintiffs rely supports Apple’s proposal.[31] In *United States v. LiveNation*, the parties agreed that “to the e*xtent reasonably feasible and capable of being done automatically*, the producing party shall use its best efforts using *available technical solutions* to produce the document corresponding with each identified link.” No. 1:24-cv-03973, at 12 (S.D.N.Y. Aug. 28, 2024) (emphasis added).[32] As Apple has repeatedly explained, Plaintiffs’ proposal is not reasonably feasible nor capable of being done automatically.

Finally, Plaintiffs mischaracterize Apple’s proposal as somehow attempting to evade its discovery obligations. This is false. Apple has never indicated that it would not search, collect, or produce responsive information from appropriate data sources. Given current technical limitations, Apple, like many companies, simply cannot pair the pointer email or messages and hyperlinked documents on the back end.

---

[31] Plaintiffs cite a Letter Agreement in *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. Jan. 15, 2021), but Apple was unable to locate this letter on the docket and, regardless, the ESI Protocol filed in that matter did not provide for the production of hyperlink files. *See United States v. Google LLC*, No. 1:20-cv-03010-APM, Dkt. 99 (D.D.C. Jan. 21, 2021). Moreover, Plaintiffs explain that Google agreed to produce hyperlinks for OneDrive, SharePoint, and Teams, which are part of  Microsoft’s suite and may have an automatic tool to connect links to their messages.

[32] The protocol in *LiveNation* also states that “[t]o the *extent reasonably feasible and capable of being done automatically*, for each Linked Attachment, the producing party will use *available technical solutions* to attempt to populate the LINKEDPARENTIDS field with the document control numbers … [and] the producing party will *employ commercially reasonable efforts* to provide an overlay file populating these two fields …  to the *extent feasible with available technical solutions*.” *LiveNation*, No. 1:24-cv-03973, at 12 (emphasis added).

**Add. 649**

Respectfully submitted,

/s/   Jonathan H. Lasken
Jonathan H. Lasken
Assistant Chief, Civil Conduct Task Force
United States Department of Justice
450 Fifth Street, NW, Suite 4000
Washington, D.C. 20530
Telephone: (202) 598-6517
Email: jonathan.lasken@usdoj.gov

PHILIP R. SELLINGER
United States Attorney

/s/   J. Andrew Ruymann
J. Andrew Ruymann
Assistant United States Attorney
U.S. Attorney's Office
402 East State Street, Room 430
Trenton, NJ 08608
Telephone: (609) 989-0563
Email: John.Ruymann@usdoj.gov

MATTHEW J. PLATKIN
Attorney General of New Jersey

/s/   Isabella R. Pitt
Isabella R. Pitt (NJ Bar No. 071002013)
Deputy Attorney General
Assistant Section Chief of Antitrust
New Jersey Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
Telephone: (973) 648-3070
Isabella.Pitt@law.njoag.gov

*Attorney for Plaintiff State of New Jersey,*
*Arizona, California, Washington D.C.,*
*Connecticut, Indiana, Maine,*
*Massachusetts, Michigan, Minnesota,*
*Nevada, New Hampshire, New York, North*
*Dakota, Oklahoma, Oregon, Tennessee,*
*Vermont, Washington, and Wisconsin*

/s/   Liza M. Walsh
Liza M. Walsh
Douglas E. Arpert
WALSH PIZZI O'REILLY FALANGA LLP
Three Gateway Center
100 Mulberry Street, 15th Floor
Newark, New Jersey 07102
Tel.: (973) 757-1100
Email: lwalsh@walsh.law
Email: darpert@walsh.law

/s/  Crais S. Primis
Craig S. Primis, P.C.
Winn Allen, P.C.
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
Tel.: (202) 389-5000
Email: craig.primis@kirkland.com
Email: winn.allen@kirkland.com

/s/   Devora W. Allon
Devora W. Allon, P.C.
Alexia R. Brancato
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800
Email: devora.allon@kirkland.com

*Attorneys for Defendant Apple Inc.*

**Add. 650**

PHILIP R. SELLINGER
United States Attorney

BY: JONATHAN LASKEN
Assistant Chief
Civil Conduct Task Force
United States Department of Justice
Antitrust Division
450 Fifth Street NW, Suite 8600
Washington, DC 20530
*Attorney for Plaintiff United States of America*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA et al., <br><br> *Plaintiff*, <br><br> v. <br><br> APPLE INC. <br><br> *Defendants*. | Case No. 2:24-cv-04055-JXN-LDW |

### CERTIFICATE OF SERVICE

I hereby certify that the above letter and this Certificate of Service were served upon defendant's counsel, Liza M. Walsh, Esq., Craig S. Primis, Esq., Devora W. Allon, Esq., and K. Winn Allen, Esq., 1301 Pennsylvania Avenue, NW, Washington, D.C., 20004, by CM/ECF on September 20, 2024.

BY: *s/ Jonathan H. Lasken*
Jonathan H. Lasken
Assistant Chief
Civil Conduct Task force
United States Department of Justice
Antitrust Division
*Attorney for Plaintiff United States*

Add. 651

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

| | | |
|---|---|---|
| **DISTRICT OF COLUMBIA,** | ) | |
| Plaintiff | ) | **Case No. 2023-CAB-006550** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Neal E. Kravitz** |
| **META PLATFORMS, INC.,** *et al.*, | ) | |
| Defendants | ) | |

### ORDER DENYING WITHOUT PREJUDICE DEFENDANTS' MOTION TO COMPEL DISCOVERY

The defendants, Meta Platforms, Inc. and Instagram, LLC (collectively, "Meta"), have filed a motion to compel responses to its requests for the production of documents, stating that the plaintiff, the District of Columbia (the "District"), has refused to search for and produce responsive documents in the possession, custody, and control of the District's own executive branch agencies, including the D.C. Office of Human Services, the D.C. Department of Health, the D.C. Office of the State Superintendent of Education, the D.C. Youth Advisory Council, the D.C. Child and Family Services Agency, the D.C. State Board of Education, and the D.C. Department of Behavioral Health. Meta argues that the Office of the Attorney General ("OAG"), which brought this case in the name of the District, has an obligation under Rule 34 of the Superior Court Rules of Civil Procedure to collect and produce responsive documents from the District's agencies. Meta argues further that the District's insistence that Meta pursue the agencies' documents through the service of third-party subpoenas on the agencies would unfairly subject it to claims of undue burdensomeness under Rule 45 with which it would not have to contend under Rule 34.

OAG has filed an opposition to Meta's motion. OAG argues that it brought the case pursuant to its independent statutory authority to bring a case in the name of the District of

Columbia based on the Attorney General's determination that prosecuting the case is in the public interest, *see* D.C. Code § 1-301.81(a)(1), and that in this affirmative litigation context it does not have "possession, custody, or control" of documents held by the District's executive branch agencies. *Cf.* Super. Ct. Civ. R. 34(a)(1) (requiring a party's production of documents within the party's "possession, custody, or control" and responsive to another party's request for the production of documents). In particular, OAG argues that it lacks "control" over documents held by non-party District agencies because those agencies are under the executive control of the Mayor and OAG thus has no legal authority to compel the agencies to search for and produce documents. Meta has filed a reply.

The court held a hearing on Meta's motion on December 16, 2024. The court heard oral arguments from counsel on both sides and considered two emails received by the parties from Michael Krainak, the General Counsel of the D.C. Office of Risk Management. Apparently speaking on behalf of the Executive Office of the Mayor, Mr. Krainak stated, among other things, that the District's executive branch agencies would provide documents to OAG on request if OAG recognized the Mayor as the chief executive and the ultimate client in this and all matters brought in the name of the District. Counsel for OAG made clear at the hearing that OAG would not so recognize the Mayor.

The court is constrained to conclude on the current record that Meta has not established OAG's legal authority to compel the District's executive branch agencies to search for and produce documents responsive to Meta's document requests. The court therefore does not find that OAG has "control" of the agencies' records within the meaning of Rule 34(a)(1), and Meta's motion to compel discovery will be denied.

2

**Add. 653**

The court nonetheless wishes to reiterate what it stated on the record at the hearing on December 16, 2024. Meta has a legitimate interest in obtaining full discovery in this case, including relevant documents in the possession, custody, and control of the District's executive branch agencies, and its interest should not be compromised as a result of whatever struggle over executive authority may be ongoing between the Mayor and the Attorney General. Moreover, to the extent this ruling causes Meta to resort to the Rule 45 subpoena process in seeking the agencies' records, the court expects OAG to live up to its word that as counsel for the District's agencies it will do its best to facilitate the agencies' prompt production of documents responsive to Meta's subpoenas and will not interpose burdensomeness arguments it would not raise were Meta's discovery of agency documents proceeding under Rule 34.

For all of these reasons, it is this 18th day of December 2024

**ORDERED** that Meta's motion is **denied** without prejudice to its renewal in the event the Rule 45 subpoena process turns out to be unsatisfactory and Meta believes it can establish OAG's control over documents in the possession of the District's executive agencies.

Neal E. Kravitz, Associate Judge
(Signed in Chambers)

Copies to:
Adam R. Teitelbaum, Esq.
Kevin J. Vermillion, Esq.
Jorge A. Bonilla Lopez, Esq.
Jimmy R. Rock, Esq.
Theo Benjamin, Esq.
Emily Penkowski Perez, Esq.
John Deboy, Esq.
Timothy C. Hester, Esq.

3

**Add. 654**

Pages 1 - 80

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: SOCIAL MEDIA ADOLESCENT )
ADDICTION/PERSONAL INJURY     ) **NO. 22-MD-03047 YGR**
PRODUCTS LIABILITY LITIGATION.)
_____ )
OFFICE OF THE ATTORNEY GENERAL)
STATE OF FLORIDA, DEPARTMENT  )
OF LEGAL AFFAIRS,             )
          Plaintiffs, )
   v.                         ) **NO. 23-CV-05885 YGR**
                              )
META PLATFORMS, INC.,         )
INSTAGRAM LLC,                )
          Defendants.  )
_____ )

Oakland, California
Friday, September 13, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                    FLORIDA OFFICE OF THE ATTORNEY GENERAL
                    Consumer Protection
                    135 West Central Boulevard
                    Orlando, FL 32801
          BY:  **DONNA C. VALIN, ESQ.**
               **KAREN E. BERGER, ESQ.**

                    LIEFF, CABRASER, HEIMANN AND BERNSTEIN
                    275 Battery Street, 29th Floor
                    San Francisco, CA 94111
          BY:  **LEXI J. HAZAM, ESQ.**
               **MICHAEL I. LEVIN-GESUNDHEIT, ESQ.**

          **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

Remotely Reported:  Marla F. Knox , CSR No. 14421, RMR, CRR
                    United States Official Reporter

```
1   APPEARANCES:   (continued)

2   For Plaintiffs:

3                        LIEFF, CABRASER, HEIMANN AND BERNSTEIN
                         250 Hudson Street, 8th Floor
4                        New York, NY 10013
                    BY:  KELLY K. McNABB, ESQ.
5
                         MOTLEY RICE, LLC
6                        401 9th Street Northwest, Suite 630
                         Washington, DC 20004
7                   BY:  PREVIN WARREN, ESQ.
                         NELSON DRAKE, ESQ.
8
                         MOTLEY RICE, LLC
9                        28 Bridgeside Boulevard
                         Mt. Pleasant, SC 29464
10                  BY:  JESSICA CARROLL, ESQ.

11                       ANDRUS ANDERSON, LLP
                         155 Montgomery Street, Suite 900
12                       San Francisco, CA 94104
                    BY:  JENNIE L. ANDERSON, ESQ.
13
                         BEASLEY ALLEN LAW FIRM
14                       218 Commerce Street
                         Montgomery, Alabama  36104
15                  BY:  CLINTON K. RICHARDSON, ESQ.

16                       KESSLER, TOPAZ, MELTZER, AND CHECK, LLP
                         280 King of Prussia Road
17                       Radnor, PA 19087
                    BY:  MELISSA L. YEATES, ESQ.
18
                         LEVIN, SEDRAN AND BERMAN, LLP
19                       510 Walnut Street, Suite 500
                         Philadelphia, PA 19106
20                  BY:  MICHAEL M. WEINKOWITZ, ESQ.

21                       COLORADO DEPARTMENT OF LAW
                         1300 Broadway, 6th Floor
22                       Denver, CO 80203
                    BY:  BIANCA MIYATA, ESQ.
23

24          (APPEARANCES CONTINUED ON THE FOLLOWING PAGE)

25
```

```
 1    APPEARANCES:   (continued)

 2    For Plaintiffs:

 3                        CALIFORNIA DEPARTMENT OF JUSTICE
                          455 Golden Gate Avenue, 11th Floor
 4                        San Francisco, CA 94102
                     BY:  MEGAN O'NEILL, ESQ.
 5                        EMILY KALANITHI, ESQ.

 6                        CALIFORNIA DEPARTMENT OF JUSTICE
                          1515 Clay Street, Suite 2000
 7                        Oakland, CA 94612
                     BY:  JOSHUA E. OLSZEWSKI-JUBELIRER, ESQ.
 8
                          KENTUCKY OFFICE OF THE ATTORNEY GENERAL
 9                        OFFICE OF CONSUMER PROTECTION
                          1024 Capital Center Drive, Suite 200
10                        Frankfort, KY 40601
                     BY:  JOHN C. LEWIS, ESQ.
11
                          BOIES SCHILLER FLEXNER LLP
12                        2029 Century Park East, Suite 1520
                          Los Angeles, California  90067
13                   BY:  ALISON L. ANDERSON, ESQ.

14                        BOIES SCHILLER FLEXNER LLP
                          44 Montgomery Street, 41st Floor
15                        San Francisco, California  94104
                     BY:  JOSHUA M. STEIN, ESQ.
16                        NICHOLAS A. SANTOS, ESQ.

17                        NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
                          DIVISION OF LAW
18                        124 Halsey Street, P.O. Box 45029
                          Newark, NJ 07102
19                   BY:  VERNA PRADAXAY, ESQ.

20
      For Defendants:
21                        WILSON, SONSINI, GOODRICH & ROSATI
                          12235 El Camino Real
22                        San Diego, CA 92130
                     BY:  SAMANTHA A. MACHOCK, ESQ.
23

24              (APPEARANCES CONTINUED ON THE FOLLOWING PAGE)

25
```

**APPEARANCES:**  (continued)

For Defendants:

                    COVINGTON AND BURLING, LLP
                    One City Center, 850 Tenth Street, Northwest
                    Washington, DC 20001
            BY:  **PAUL W. SCHMIDT, ESQ.**
                 **TIMOTHY C. HESTER, ESQ.**

                    COVINGTON AND BURLING, LLP
                    1999 Avenue of the Stars, Suite 3500
                    Los Angeles, CA 90067
            BY:  **ASHLEY M. SIMONSEN, ESQ.**

                    MUNGER, TOLLES AND OLSON, LLP
                    560 Mission Street, 27th Floor
                    San Francisco, CA 94105
            BY:  **JONATHAN H. BLAVIN, ESQ.**

                    KING & SPALDING, LLP
                    1180 Peachtree Street, Northeast, Suite 1600
                    Atlanta, GA 30309
            BY:  **GEOFFREY DRAKE, ESQ.**

                    SKADDEN ARPS SLATE MEAGHER & FLOM
                    1440 New York Avenue, N.W.
                    Washington, D.C.  20005
            BY:  **JOHN H. BEISNER, ESQ.**

                    WILLIAMS & CONNOLLY LLP
                    680 Maine Avenue, SW
                    Washington, D.C.  20024
            BY:  **JOSEPH A. KEYES, ESQ.**

| | |
|---|---|
| 1 | **Friday - September 13, 2024**                    **2:42 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---oOo--- |
| 4 | **THE CLERK:** Court is now in session.  The Honorable |
| 5 | Yvonne Gonzalez Rogers now presiding. |
| 6 | **THE COURT:** Good afternoon, everyone. |
| 7 | **THE CLERK:** Thank you.  Please be seated. |
| 8 | (Pause in the proceedings.) |
| 9 | **THE CLERK:** These proceedings are being court reported |
| 10 | by this court.  Any other recording of this proceeding, either |
| 11 | by video, audio, including screenshots or other copying of the |
| 12 | hearing is strictly prohibited. |
| 13 | Your Honor, now calling the civil matters 22-MD-3047-YGR, |
| 14 | In Re: Social Media Adolescent Addiction Personal Injury |
| 15 | Products Liability Litigation; and 23-CV-5885-YGR, Office of |
| 16 | the Attorney General, State of Florida, Department of Legal |
| 17 | Affairs versus Meta Platforms, Incorporated, et al. |
| 18 | Parties' appearances will be included in today's minutes. |
| 19 | Thank you. |
| 20 | **THE COURT:** All right.  Thank you.  I forgot my |
| 21 | binder.  I will be right back. |
| 22 | (Pause in proceedings.) |
| 23 | **THE COURT:** Okay.  I need to start with a logistical |
| 24 | issue which is that the stipulation regarding using the Zoom |
| 25 | platform has expired. |

```
 1        So, at this point my perspective would be that unless I
 2   hear an objection, we will continue to use the Zoom platform
 3   and there's a lot of interest, there are a lot of lawyers.  It
 4   seems to me an appropriate thing to do and there is nothing
 5   evidentiary.
 6        So, if there is an objection, speak now.
 7                          (No response.)
 8        THE COURT:  The record will reflect there is no
 9   objection noted, and there are a lot of lawyers in the
10   courtroom.
11        Okay.  Why don't we go ahead and start with the argument
12   on the Florida complaint.
13                     (Pause in the proceedings.)
14        THE COURT:  Appearances, please.
15        MR. HESTER:  Good afternoon, Your Honor, Timothy
16   Hester on behalf of the Meta Defendants.
17        THE COURT:  Appearances.
18        MS. VALIN:  Donna Valin, Florida Attorney General.
19        THE COURT:  Okay.  Let's start with you Mr. Hester it
20   is your motion.
21        MR. HESTER:  Yes, Your Honor.  I thought I would begin
22   by just setting the table as to why this issue arises.
23        When the Court gave the State of Florida leave to amend
24   its complaint, the State re-filed in the Middle District of
25   Florida and it also asserted a lexicon objection.
```

**Add. 660**

 1    say, Your Honor, the lurking issue here is, of course, our
 2    ability to progress discovery while this issue is pending while
 3    we do have the concern that a lot is being asked of Your Honor
 4    to look through this material.  It would not be surprising if
 5    it would be very quick -- let me say it differently -- if
 6    Your Honor was able to rule within a week of our submissions,
 7    which we are not asking for.
 8        And so, we intend to proceed under Judge Kang's order.  I
 9    don't think that issue is before the Court.  We talked and my
10    understanding is there will be a request for a stay before
11    Judge Kang that hasn't been made yet even though we were before
12    him yesterday, but we will oppose that request.  Our concern is
13    progressing the case.
14        **THE COURT:**  So, the difference is, is that if I don't
15    agree with the AGs, I can deny this in one page.  I certainly
16    am not going to regurgitate everything that Judge Kang did.
17        **MS. MIYATA:**  Understood, Your Honor.
18        **MR. SCHMIDT:**  Thank you.
19        **THE COURT:**  I will tell you what I tell all litigants.
20    Discovery orders are not appealable.  Do not expect analysis.
21    You will get a decision.  And that is all you will get.
22        **MR. SCHMIDT:**  Thank you, Your Honor.
23        **MS. O'NEILL:**  Good afternoon, Your Honor, Megan
24    O'Neill on behalf of the People of the State of California with
25    hopefully a quick note and request.

```
 1          The California Department of Justice has been in

 2    communication with Governor Newsom's office, and I have been

 3    authorized to convey the position of the California Governor's

 4    Office.

 5          The Governor's Office and the agencies under its control

 6    will not comply with the order regarding State agencies and

 7    will not provide the Attorney General with access to documents

 8    because the Governor's Office does.  It is not a party to this

 9    litigation and the Court lacks jurisdiction over it.

10          The Governor's Office would like the opportunity to

11    formally present its position through a submission to the

12    Court.  I have been informed that the Colorado Governor's

13    Office does as well, and I also understand that State agencies

14    and elected officers from other states in the multistate

15    coalition are similarly situated and may also like the

16    opportunity to be heard.

17          If the Court has guidance as to the form or timing of

18    this -- these submissions, we can then inform the Governor's

19    Office and other interested agencies of that guidance.

20          This could potentially take the form of a statement of

21    interest and could be submitted simultaneously or at the same

22    time as the State AG's objections next Friday.  Again, we would

23    ask the Court's guidance as to the proper form of these

24    submissions.

25              MR. SCHMIDT:  This is the first time we are hearing
```

Add. 662

1  this statement.  I think it is notable that the statement is

2  being made through an AG lawyer.  The suggestion that there is

3  some distinction is only being communicated to us in the court

4  through an AG lawyer.

5      It goes to, I think, the central point of Judge Kang's

6  ruling.  It's reinforced by the complaint.  The complaint from

7  California is brought on behalf of the People of the State of

8  California.  There is a fundamental ability -- a fundamental

9  question about their ability to proceed on their claims, which

10 is harm to the citizens of California -- and that's true for

11 other states too -- if what they are saying is we can have the

12 AG stand before the Court and communicate the view that we

13 don't belong in this court, but they don't speak for us; that

14 we are not part of their lawsuit.

15     That has to affect either the discovery we get or their

16 ability to proceed in these cases.

17          MS. O'NEILL:  Your Honor, if I may respond briefly, to

18 be clear, I do not represent the Governor's Office; and I have

19 just been authorized to convey this message.

20          THE COURT:  Well, who does?

21          MS. O'NEILL:  Excuse me?

22          THE COURT:  Who does?

23          MS. O'NEILL:  In this particular matter I do not know

24 exactly who will be representing the Governor's Office.

25          THE COURT:  Who generally represents the Governor?

Pages 1 - 200

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE: SOCIAL MEDIA ADOLESCENT )
ADDICTION/PERSONAL INJURY )
PRODUCTS LIABILITY LITIGATION. )
                              )
                              )    NO. 4:22-MD-03047-YGR
_____ )

                          Oakland, California
                          Friday, October 25, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                LIEFF, CABRASER, HEIMANN AND BERNSTEIN
                275 Battery Street, 29th Floor
                San Francisco, CA 94111
        BY:  **LEXI J. HAZAM, ESQ.**

                MOTLEY RICE, LLC
                401 9th Street Northwest, Suite 630
                Washington, DC 20004
        BY:  **PREVIN WARREN, ESQ.**

                ANDRUS ANDERSON, LLP
                155 Montgomery Street, Suite 900
                San Francisco, CA 94104
        BY:  **JENNIE L. ANDERSON, ESQ.**

                LEVIN, SEDRAN AND BERMAN, LLP
                510 Walnut Street, Suite 500
                Philadelphia, PA 19106
        BY:  **MICHAEL M. WEINKOWITZ, ESQ.**

                COLORADO DEPARTMENT OF LAW
                1300 Broadway, 6th Floor
                Denver, CO 80203
        BY:  **BIANCA MIYATA, ESQ.**

(Appearances continued on following page.)

```
APPEARANCES (CONT.'D)

For Plaintiffs:
                    OFFICE OF THE ATTORNEY GENERAL
                    455 Golden Gate Avenue, 11th Floor
                    San Francisco, CA 94102
          BY:  MEGAN O'NEILL, ESQ.

                    CALIFORNIA DEPARTMENT OF JUSTICE
                    1515 Clay Street, Suite 2000
                    Oakland, CA 94612
          BY:  JOSHUA E. OLSZEWSKI-JUBELIRER, ESQ.

                    BEASLEY, ALLEN, CROW, METHVIN,
                    PORTIS & MILES, PC
                    234 Commerce Street
                    Montgomery, AL 36103
          BY:  JOSEPH G. VANZANDT, ESQ.
               CLINTON K. RICHARDSON, ESQ.

                    FLORIDA OFFICE OF THE ATTORNEY GENERAL
                    Consumer Protection
                    135 West Central Boulevard
                    Orlando, FL 32801
          BY:  DONNA C. VALIN, ESQ.

                    PENNSYVANIA OFFICE OF ATTORNEY GENERAL
                    Mezzanine Level, 1251 Waterfront Pl #201,
                    Pittsburgh, PA 15222
          BY:  JONATHAN BURNS, ESQ.

                    KESSLER, TOPAZ, MELTZER & CHECK, LLP
                    280 King of Prussia Road
                    Radnor, PA 19087
          BY:  TYLER S. GRADEN, ESQ.

                    COLORADO DEPARTMENT OF LAW
                    1300 Broadway Street
                    Denver, CO 80203
          BY:  SHANNON W. STEVENSON, ESQ.

                    NEW JERSEY DIVISION OF LAW
                    Data Privacy & Cybersecurity Section
                    124 Halsey Street, 5th Floor
                    Newark, NJ 07101
          BY:  KASHIF T. CHAND, ESQ.
               THOMAS HUYNH, ESQ.

(Appearances continued on following page.)
```

**APPEARANCES (CONT.'D):**

For Plaintiffs:

                NEW JERSEY DIVISION OF LAW
                25 Market Street
                Trenton, NJ 08611
     BY:  **VERNA J. PRADAXAY, ESQ.**

                OFFICE OF THE ATTORNEY GENERAL
                Kentucky State Capitol
                700 Capital Avenue, Suite 118
                Frankfort, Kentucky 40601
     BY:  **JACK HEYBURN, ESQ.**

                ARIZONA ATTORNEY GENERAL'S OFFICE
                Consumer Protection and Advocacy
                2005 North Central Avenue
                Phoenix, AZ 85004
     BY:  **NATHAN E. WHELIHAN, ESQ.**

                OFFICE OF THE ATTORNEY GENERAL
                165 Capitol Avenue
                Hartford, CT 06106
     BY:  **KRISLYN LAUNER, ESQ.**

                DELAWARE DEPARTMENT OF JUSTICE
                820 North French Street
                Carvel State Office Building
                Suite 5th Floor
                Wilmington, DE 19801
     BY:  **RYAN T. COSTA, ESQ.**

                OFFICE OF THE INDIANA ATTORNEY GENERAL
                Consumer Protection
                302 West Washington Street
                Suite IGCS, 5th Floor
                Indianapolis, IN 46204
     BY:  **CORINNE GILCHRIST, ESQ.**

                COOPER & KIRK, PLLC
                1523 New Hampshire Avenue, Northwest
                Washington, DC 20036
     BY:  **MEGAN M. WOLD, ESQ.**

(Appearances continued on following page.)

```
APPEARANCES (CONT.'D):

For Plaintiffs:
                    OFFICE OF THE ATTORNEY GENERAL
                    1885 North 3rd Street
                    Baton Rouge, LA 70802
            BY:  LONNIE C. STYRON, ESQ.

                    MARYLAND ATTORNEY GENERAL'S OFFICE
                    Saint Paul Plaza, 200 Saint Paul Place,
                    Baltimore, MD 21202
            BY:  PHILIP D. ZIPERMAN, ESQ.

                    NORTH CAROLINA DEPARTMENT OF JUSTICE
                    Consumer Protection Division
                    P.O. Box 629
                    Raleigh, NC 27602
            BY:  CHARLES G. WHITE, III, ESQ.

                    RHODE ISLAND OFFICE OF THE ATTORNEY GENERAL
                    150 South Main Street
                    Providence, RI 02903
            BY:  STEPHEN N. PROVAZZA, ESQ.

                    SOUTH CAROLINA ATTORNEY GENERAL'S OFFICE
                    P.O. Box 11549
                    Columbia, SC 29211
            BY:  CLARK C. KIRKLAND, JR.

                    OFFICE OF THE ATTORNEY GENERAL
                    202 North 9th Street
                    Richmond, VA 23219
            BY:  JOELLE GOTWALS, ESQ.

                    WISCONSIN DEPARTMENT OF JUSTICE
                    Public Protection Unit
                    P.O. Box 7857, 17 West Main Street
                    Madison, WI 53707
            BY:  COLIN R. STROUD, ESQ.

                    OHIO ATTORNEY GENERAL'S OFFICE
                    615 West Superior Avenue, Suite 11th Floor
                    Cleveland, OH 44113
            BY:  KEVIN R. WALSH, ESQ.

 (Appearances continued on following page.)
```

(Appearances continued on following page.)

```
APPEARANCES (CONT.'D):

For Plaintiffs:
                    WEST VIRGINIA ATTORNEY GENERAL'S OFFICE
                    State Capitol Complex
                    1900 Kanawha Boulevard
                    Building 6, Suite 401
                    Charleston, WV 25305
              BY:   ANN L. HAIGHT, ESQ.

                    BOIS, SCHILLER, FLEXNER, LLP
                    44 Montgomery Street, 41st Floor
                    San Francisco, CA 94104
              BY:   JOSHUA M. STEIN, ESQ.
                    NICHOLAS ANTONIO SANTOS, ESQ.
                    DILLON YANG, ESQ.

                    GIBBS LAW GROUP, LLP
                    1111 Broadway, Suite 2100
                    Oakland, CA 94607
              BY:   ANNA KATZ, ESQ.
                    TAYLER WALTERS, ESQ.

                    OFFICE OF THE ATTORNEY GENERAL
                    28 Liberty Street
                    New York, NY 10005
              BY:   KEVIN C. WALLACE, ESQ.

                    QUINN, EMANUEL, URQHART, OLIVER & HEDGES
                    50 California Street, 22nd Floor
                    San Francisco, CA 94111
              BY:   EMILY C. KALANITHI

                    OFFICE OF THE ATTORNEY GENERAL
                    445 Minnesota Street
                    St Paul, MN 55101
              BY:   CAITLIN M. MICKO, ESQ.

For Defendants:
                    COVINGTON AND BURLING, LLP
                    The New York Times Building
                    620 Eighth Ave
                    New York, NY 10018
              BY:   GREGORY L. HALPERIN, ESQ.
                    CHRISTOPHER YEUNG, ESQ.

(Appearances continued on following page.)
```

**APPEARANCES (CONT.'D):**

For Defendants:

COVINGTON AND BURLING, LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067
BY: **ASHLEY M. SIMONSEN, ESQ.**
**ANSEL CARPENTER, ESQ.**
**GAVIN W. JACKSON, ESQ.**

COVINGTON AND BURLING, LLP
One CityCenter
850 Tenth Street, Northwest
Washington, DC 20001
BY: **MICHAEL X. IMBROSCIO, ESQ.**

MUNGER, TOLLES AND OLSON, LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
BY: **JONATHAN H. BLAVIN, ESQ.**

KING & SPALDING, LLP
1180 Peachtree Street Northeast, Suite 1600
Atlanta, GA 30309
BY: **GEOFFREY DRAKE, ESQ.**

WILSON, SONSINI, GOODRICH & ROSATI, PC
12235 El Camino Real
San Diego, CA 92130
BY: **SAMANTHA A. BOOTH MACHOCK, ESQ.**

COVINGTON AND BURLING, LLP
620 Eighth Ave
New York, NY 10018
BY: **GREGORY L. HALPERIN, ESQ.**

COVINGTON AND BURLING, LLP
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067
BY: **ASHLEY M. SIMONSEN, ESQ.**

MUNGER, TOLLES AND OLSON, LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
BY: **JONATHAN H. BLAVIN, ESQ.**

(Appearances continued on following page.)

**APPEARANCES (CONT.'D):**

For Defendants:

            KING & SPALDING, LLP
            1180 Peachtree Street Northeast, Suite 1600
            Atlanta, GA 30309
      **BY:  GEOFFREY DRAKE, ESQ.**

            SKADDEN, ARPS, SLATE, MEAGHER & FLOM
            1440 New York Avenue, Northwest
            Washington, DC 20005
      **BY:  JOHN H. BEISNER, ESQ.**

            KING & SPALDING
            1700 Pennsylvania Avenue, Northwest
            Washington, DC 20006
      **BY:  DAVID P. MATTERN, ESQ.**

REPORTED REMOTELY BY:  Stephen W. Franklin, RMR, CRR, CPE
                Official United States Reporter

| | |
|---|---|
1  **Friday, October 25, 2024**                              **9:01 a.m.**

2                    **P R O C E E D I N G S**

3                          ---o0o---

4        **THE COURT:**  Good morning, everyone.

5        **THE COURTROOM DEPUTY:**  Calling case 4:22-MD-3047-YGR,

6  In Re:  Social Media Adolescent Addiction Personal Injury

7  Products Liability Litigation.  The list of counsel making an

8  appearance will be attached to the minutes.

9        **THE COURT:**  Okay.  A lot to do today.  Given how much

10  we have to do, we may end up taking a break so that the court

11  reporter doesn't get mad at me and stop working.  We do have a

12  court reporter who is remote with us.

13      So earlier this week -- you may or may not know, I think

14  you probably do, you all are in the know -- the judges had our

15  annual MDL conference, and I always try to take a few things

16  away from that conference to help me better -- do a better job,

17  I hope.  We share a lot.  We learn a lot.  And so we're going

18  to talk about some ideas, changes, decisions with respect to

19  that issue.

20      The first is, in preparation for these proceedings, I

21  always read your joint case management statement and request

22  for an agenda, and I understand from your MDL colleagues that,

23  in general, the process is a disaster.  That everybody wants to

24  say their peace, that people want to relitigate, that it takes

25  hours and hours and hours to do, which is a total shame,

1    office since I was last up here, and we are not aware of any

2    civil investigation into state agencies.  We have -- the

3    Attorney General's office does occasionally investigate state

4    agencies criminally, and the means of obtaining documents in

5    those cases would be a search warrant, which, of course,

6    requires probable cause to believe that a crime has been

7    committed.

8         **THE COURT:**  So the AG has never gotten documents from

9    a single agency?

10         **MR. OLSZEWSKI-JUBELIRER:**  In the course of

11   investigating, occasionally the AG will voluntarily ask

12   agencies to provide documents to assist in the investigation.

13   If --

14         **THE COURT:**  And I assume they're provided?

15         **MR. OLSZEWSKI-JUBELIRER:**  Sometimes they are

16   provided.  I'm not --

17         **THE COURT:**  Are you aware of any circumstance where

18   they were not?

19         **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, I cannot say

20   for sure.  I would have to double-check with my colleagues on

21   one particular instance that I'm thinking of.

22       I will say in this case, since the order has come out we

23   have asked the agencies subject -- that are at issue in this

24   case, at issue, for access to those documents, and they have

25   all refused.  That's entirely consistent with *Lockyer's*

1    instruction that the People are not -- do not have control over

2    their documents.

3        I will say, at the end of the road, as *Lockyer* says, the

4    fact that those agencies will not provide documents to us is

5    not the end of the road for Meta's desires to obtain those

6    documents.

7        **THE COURT:** If I decide that you are under an order

8    to provide them and you do not get them or you do not produce

9    them, then my option are sanctions, and those sanctions at the

10   extreme are that you are -- your allegations are stricken from

11   the complaint.

12       **MR. OLSZEWSKI-JUBELIRER:** Absolutely, Your Honor.

13   And that is the exact position that courts like *American*

14   *Express, Warner Chilcott*, which considered an action by the

15   California Attorney General and found that the California

16   Attorney General did not have control over state agency

17   documents, that's the exact virtual veto concern that cases,

18   those cases have been concerned with.  We do not -- the

19   Attorney General has -- is independently elected and

20   independently accountable to the People to protect their

21   interests.  The legislature --

22       **THE COURT:** Where does the money go?

23       **MR. OLSZEWSKI-JUBELIRER:** The money in UCL and FAL

24   cases goes -- half of it goes to the county in which the action

25   was filed, half of it goes to the general fund.  I'm sorry, not

1    to the general fund, apologies.  To the general fund.  But by

2    statute, both of those monies to the county and to the general

3    fund "shall be for the exclusive use by the Attorney General,

4    the district attorney, county counsel and the city attorney for

5    the enforcement of consumer protection laws."

6              THE COURT:  How does it work in an MDL?

7              MR. OLSZEWSKI-JUBELIRER:  In an MDL?  In terms of

8    where does some of the money go to?  Like which county?

9              THE COURT:  Right.

10             MR. OLSZEWSKI-JUBELIRER:  Your Honor, I have thought

11   about that question.  I haven't asked others in my office.

12   Certainly the Court we are standing and sitting right here is

13   in Alameda County, and my supposition would be that half of it

14   would go to Alameda County.  But again, that is for the

15   exclusive use of the Attorney General and the district attorney

16   or other prosecutors for the enforcement of consumer protection

17   laws.

18        We also have a disgorgement remedy, Your Honor, and those

19   disgorgement monies are paid into a special consumer

20   restitution fund, which is only to be paid out to consumers who

21   are entitled to restitution in other consumer protection cases,

22   but where defendants do not have sufficient funds to pay

23   judgments.

24        If I may make just a couple of other points, Your Honor.

25             THE COURT:  Sure.

Pages 1 - 149

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA            )
ADOLESCENT ADDICTION/PERSONAL   )
INJURY PRODUCTS LIABILITY       )
LITIGATION                      )
                                )   **NO. 22-MD-03047 YGR (PHK)**
                                )
_____ )

                        San Francisco, California
                        Thursday, October 24, 2024


**APPEARANCES:**

For Plaintiffs:
                    SEEGER WEISS LLP
                    55 Challenger Road, Floor 6
                    Ridgefield Park, New Jersey 07660
            BY:  **AUDREY C. SIEGEL, ATTORNEY AT LAW**

                    LIEFF, CABRASER, HEIMANN
                      & BERNSTEIN LLP
                    275 Battery Street, 29th Floor
                    San Francisco, California 94111
            BY:  **LEXI J. HAZAM**
                 **MICHAEL LEVIN-GESUNDHEIT**
                 **ATTORNEYS AT LAW**

                    MOTLEY RICE LLC
                    401 9th Street NW, Suite 630
                    Washington, D.C. 20004
            BY:  **PREVIN WARREN, ATTORNEY AT LAW**
                 **ABIGAIL BURMAN, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**



REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:
                         MOTLEY RICE LLC
 3                       28 Bridgeside Boulevard
                         Mount Pleasant, South Carolina 29464
 4              BY:  JESSICA L. CARROLL, ATTORNEY AT LAW

 5                       GIBBS LAW GROUP LLP
                         1111 Broadway, Suite 2100
 6                       Oakland, California 94607
                BY:  ANDRE MICHEL MURA, ATTORNEY AT LAW

 7

 8   For Attorneys General:
                         NATIONAL ASSOCIATION
 9                          OF ATTORNEYS GENERAL
                         1850 M Street NW, 12th Floor
10                       Washington, D.C. 20036
                BY:  ANN HAIGHT, DEPUTY ATTORNEY GENERAL

11

     For Plaintiff State of Arizona:
12                       OFFICE OF THE ATTORNEY GENERAL
                         2005 North Central Avenue
13                       Phoenix, Arizona 85004-1592
                BY:  NATHAN E. WHELIHAN
14                     ASSISTANT ATTORNEY GENERAL

15   For Plaintiff State of California:
                         CALIFORNIA DEPARTMENT OF JUSTICE
16                       455 Golden Gate Avenue - 11th Floor
                         San Francisco, California 94102
17              BY:  MEGAN O'NEILL
                     DEPUTY ATTORNEY GENERAL
18                   EMILY C. KALANITHI
                     SUPERVISING DEPUTY ATTORNEY GENERAL

19

20   For Plaintiff State of Colorado:
                         COLORADO DEPARTMENT OF LAW
21                       1300 Broadway - 6th floor
                         Denver, Colorado 80203
22              BY:  BIANCA MIYATA
                     SENIOR ASSISTANT ATTORNEY GENERAL

23

24           (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25
```

Add. 676

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiff State of Connecticut:
                          CONNECTICUT OFFICE OF THE ATTORNEY
3                           GENERAL
                          165 Capitol Avenue
4                         Hartford, Connecticut 06106
                    BY:  **KRISLYN M. LAUNER**
5                        **ASSISTANT ATTORNEY GENERAL**

6    For Plaintiff Commonwealth of Kentucky:
                          KENTUCKY OFFICE OF THE ATTORNEY GENERAL
7                         Office of Consumer Protection
                          1024 Capital Center Drive - Suite 200
8                         Frankfort, Kentucky 40601
                    BY:  **MATTHEW COCANOUGHER**
9                        **ASSISTANT ATTORNEY GENERAL**

10   For Plaintiff State of New Jersey:
                          NEW JERSEY OFFICE OF THE
11                          ATTORNEY GENERAL
                          Division of Law
12                        124 Halsey Street
                          Box 45029
13                  BY:  **THOMAS HUYNH**
                         **VERNA PRADAXAY**
14                       **DEPUTY ATTORNEYS GENERAL**

15   For Plaintiff State of New York:
                          DEWEY & LEBOEUF LLP
16                        1301 Avenue of the Americas
                          New York, New York 10019-6092
17                  BY:  **KEVIN C. WALLACE, ATTORNEY AT LAW**

18   For Plaintiff State of Minnesota:
                          MINNESOTA OFFICE OF THE ATTORNEY GENERAL
19                        445 Minnesota Street, Suite 1400
                          St Paul, Minnesota 55101
20                  BY:  **CAITLIN M. MICKO**
                         **ASSISTANT ATTORNEY GENERAL**
21
     For Plaintiff State of Pennsylvania:
22                        PENNSYLVANIA OFFICE OF THE
                            ATTORNEY GENERAL
23                        Strawberry Square, 16th Floor
                          Harrisburg, Pennsylvania 17120
24                  BY:  **JONATHAN BURNS, DEPUTY ATTORNEY GENERAL**

25           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**Add. 677**

```
 1   APPEARANCES:  (CONTINUED)

 2   For Government Entity Subcommittee:
                         KESSLER TOPAZ MELTZER CHECK LLP
 3                       280 King of Prussia Road
                         Radnor, Pennsylvania 19087
 4               BY:  TYLER S. GRADEN, ATTORNEY AT LAW

 5                       LEVIN SEDRAN & BERMAN LLP
                         510 Walnut Street, Suite 500
 6                       Philadelphia, Pennsylvania 19106-3697
                 BY:  MICHAEL WEINKOWITZ, ATTORNEY AT LAW
 7

 8   For Federal/State Liaison:
                         BEASLEY ALLEN LAW FIRM
 9                       218 Commerce Street
                         Montgomery, Alabama 36104
10               BY:  CLINTON RICHARDSON, ATTORNEY AT LAW
                     JOSEPH VANZANDT, ATTORNEY AT LAW
11

12   For Defendant Meta:
                         COVINGTON & BURLING LLP
13                       1999 Avenue of the Stars - Suite 3500
                         Los Angeles, California 90025
14               BY:  ASHLEY M. SIMONSEN, ATTORNEY AT LAW

15                       COVINGTON & BURLING LLP
                         620 Eighth Ave
16                       New York, New York 10018
                 BY:  CHRISTOPHER Y.L. YEUNG, ATTORNEY AT LAW
17                   GREGORY L. HALPERIN, ATTORNEY AT LAW

18                       MUNGER, TOLLES & OLSON LLP
                         355 South Grand Avenue, 35th Floor
19                       Los Angeles, California 90071
                 BY:  ROWLEY J. RICE, ATTORNEY AT LAW
20                   ARIEL T. TESHUVA, ATTORNEY AT LAW

21                       SKADDEN, ARPS, SLATE, MEAGHER
                           & FLOM LLP
22                       500 Boylston Street
                         Boston, Massachusetts 02116
23               BY:  CATHERINE I. MULLALEY, ATTORNEY AT LAW

24          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25
```

Add. 678

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant TikTok:

3                          KING & SPALDING LLP
                          50 California Street, Suite 3300
                          San Francisco, California 94111
4                **BY:  BAILEY J. LANGNER, ATTORNEY AT LAW**

5                          KING & SPALDING LLP
                          1180 Peachtree Street
6                          Atlanta, Georgia 30309
                 **BY:  GEOFFREY DRAKE, ATTORNEY AT LAW**

7
                          KING & SPALDING LLP
8                          1700 Pennsylvania Avenue, N.W.
                          Washington, D.C. 20006
9                **BY:  DAVID P. MATTERN, ATTORNEY AT LAW**

10

11   For Defendant YouTube:
                          WILSON, SONSINI, GOODRICH & ROSATI
12                          650 Page Mill Road
                          Palo Alto, California 94304
13               **BY:  ANDREW KRAMER, ATTORNEY AT LAW**

14
                          WILSON, SONSINI, GOODRICH & ROSATI
15                          One Market Street
                          Spear Tower, Suite 3300
16                          San Francisco, California 94105
                 **BY:  LAUREN GALLO WHITE, ATTORNEY AT LAW**

17

18

19

20

21

22

23

24

25

**Add. 679**

```
 1   Thursday - October 24, 2024                        1:10 p.m.

 2                    P R O C E E D I N G S

 3                          ---o0o---

 4        THE CLERK:  You can remain as you are.  Court will

 5   come to order.

 6        All right.  The United States District Court for the

 7   Northern District of California is now in session.

 8   The Honorable Magistrate Judge Peter Kang presiding.

 9        We are calling matter 4:22-md-3047-YGR, In Re Social Media

10   Adolescent Addiction/Personal Injury Products Liability

11   Litigation.

12        THE COURT:  Good afternoon.

13        ALL:  Good afternoon.

14        THE COURT:  All right.  So my plan, unless you want to

15   do some preliminary stuff, is to just start to march through

16   the DMC statement.

17        He's nodding?

18        Okay.  So, but the things that were separately letter

19   briefed, I'm going to hold those till the end.

20        MS. MIYATA:  Your Honor, I do have a preliminary

21   matter --

22        THE COURT:  Sure.

23        MS. MIYATA:  -- that is not on the statement as a ripe

24   matter --

25        THE COURT:  Okay.
```

PROCEEDINGS

1    of four states, yes.

2            THE COURT:  I know we've got counsel for California

3    here.

4        Can you confirm that just for the record.

5            MS. O'NEILL:  Megan O'Neill for the State of

6    California.

7        I can confirm that.

8            THE COURT:  Okay.  And then is there somebody from

9    Michigan or Pennsylvania here?

10                        (No response.)

11            THE COURT:  I take it not.

12        So I'll take your --

13            MS. MIYATA:  I do not believe so, no.

14            THE COURT:  I'll take your representation that --

15            MS. MIYATA:  Thank you.

16            THE COURT:  -- they are taking the same position.

17        Okay.  So I find that that is not a sufficient basis to

18    refuse to provide proposals for search terms and custodians.

19    So I'm going to order that California, Michigan, Colorado, and

20    Pennsylvania also engage in the meet-and-confer process and the

21    deadlines I set for submitting proposals and finalizing the

22    search terms and custodians issue.

23            MS. MIYATA:  Your Honor, if I may just make a record

24    on this issue.

25        I certainly don't want to turn back to ground that we've

PROCEEDINGS

 1    already tread numerous times, but I will say, you know, for us

 2    standing here as consumer protection counsel, of course

 3    the Court, you know, may enter that order, but I do have to

 4    represent, as we stand here today, we do not believe that we

 5    have the ability to comply with that order.

 6        I do not have the information or the knowledge of what

 7    would even give rise to reasonable search terms or what

 8    custodians within the agency may be appropriate.  And while I

 9    can certainly go to our -- go to the agency -- go to counsel

10    for the agencies and ask for that information, if they say,

11    "No, I will not provide that to you," I do not have a legal

12    mechanism to compel them to give that to me or a legal

13    mechanism to enforce that request.

14        **THE COURT:**  I think I made clear in my order there are

15    other legal mechanisms, including this Court, that can -- if

16    Meta chooses, they can try to follow.

17        **MR. YEUNG:**  Just to be clear, when she says "agency

18    counsel from Colorado," the ones that reached out to me are all

19    Assistant Attorney Generals --

20        **THE COURT:**  Okay.

21        **MR. YEUNG:**  -- or Deputy Assistant Attorney Generals.

22        **THE COURT:**  Right now we're not at the point of

23    enforcing of the order.  I just issued the order.

24        **MR. YEUNG:**  Thank you.

25        **THE COURT:**  So let's get to see whether or not any of

PROCEEDINGS

```
 1   the agencies change their minds in light of this, and we can

 2   proceed there.

 3       I think Meta knows well enough what steps, hopefully,

 4   don't need to be taken but could be taken if there's a failure

 5   to comply with a court order.  Okay?

 6           MR. YEUNG:  Thank you.

 7           THE COURT:  All right.  Does that resolve everything

 8   in this letter brief?

 9           MR. YEUNG:  For this particular letter brief?

10           THE COURT:  Yeah.

11           MR. YEUNG:  I think so.

12           THE COURT:  All right.  So can you provide a joint

13   proposed order, just make sure everybody's okay with the

14   language, and then submit it?

15           MR. YEUNG:  Yeah.  Okay.

16           THE COURT:  Okay.

17           MS. MIYATA:  And, Your Honor, by when would you like

18   to see that proposed order?

19           THE COURT:  Today's Thursday.  I mean, Monday.

20           MR. YEUNG:  Okay.

21           THE COURT:  In fact, for all the proposed orders, if I

22   didn't set deadlines, you know, Monday, I think, is a good

23   date.

24       Okay.  So I think that's everything.  Is there anything we

25   didn't cover that somebody wants to raise with me?
```

Add. 683

PROCEEDINGS

1              MS. SIMONSEN:  Nothing from the defendants,

2    Your Honor.

3              THE COURT:  Anything from the plaintiffs?

4              MS. MIYATA:  Nothing from the State AGs.

5              THE COURT:  All right.  So we are adjourned until the

6    next hearing.  Thank you.

7              THE CLERK:  Court stands in recess.

8              (Proceedings adjourned at 4:42 p.m.)

9                          ---o0o---

10

11              <u>CERTIFICATE OF REPORTER</u>

12         I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    DATE:  Monday, October 28, 2024

16

17

18                    *Ana Dub*

19    _____

20         Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

21         CSR No. 7445, Official United States Reporter

22

23

24

25

Pages 1 - 148

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE SOCIAL MEDIA ADOLESCENT    )
ADDICTION/PERSONAL INJURY        )
PRODUCTS LIABILITY LITIGATION.   )
                                 )    **NO. 4:22-md-03047-YGR (PHK)**
                                 )
_____  )

San Francisco, California
Thursday, November 21, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    WAGSTAFF & CARTMELL LLP
                    4740 Grand Avenue, Suite 300
                    Kansas City, Missouri  64112
            BY:     **THOMAS P. CARTMELL**
                    **ATTORNEY AT LAW**

                    LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                    275 Battery Street - 29th Floor
                    San Francisco, California  94111
            BY:     **LEXI J. HAZAM**
                    **MICHAEL LEVIN-GESUNDHEIT**
                    **ATTORNEYS AT LAW**


        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


STENOGRAPHICALLY REPORTED BY:
Kelly L. Shainline
CSR No. 13476, RPR, CRR
Official Reporter

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiffs:

3                             LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
                              250 Hudson Street - 8th Floor
                              New York, New York 10013
4                    BY:   **PATRICK ANDREWS**
                           **ATTORNEY AT LAW**

5
                              MOTLEY RICE LLC
6                             One Corporate Center
                              20 Church Street - 17th Floor
7                             Hartford, Connecticut  06103
                     BY:   **JESSICA C. COLOMBO**
8                          **ATTORNEY AT LAW**

9                             MOTLEY RICE LLC
                              401 9th Street N.W., Suite 630
10                            Washington, DC  20004
                     BY:   **PREVIN WARREN**
11                         **ATTORNEY AT LAW**

12                            SEEGER WEISS LLP
                              55 Challenger Road, 6th Floor
13                            Ridgefield Park, New Jersey  07660
                     BY:   **JENNIFER R. SCULLION**
14                         **AUDREY C. SIEGEL**
                           **ATTORNEYS AT LAW**

15

16   For Plaintiff Commonwealth of Kentucky:

17                            OFFICE OF THE KENTUCKY ATTORNEY GENERAL
                              Office of Consumer Protection
18                            1024 Capital Drive, Suite 200
                              Frankfort, Kentucky  40601
19                   BY:   **MATTHEW C. COCANOUGHER**
                           **ATTORNEY AT LAW**

20

21            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

22

23

24

25

1   **APPEARANCES**:   (CONTINUED)

2

    For Plaintiff People of the State of California:
3

4                               CALIFORNIA DEPARTMENT OF JUSTICE
                                Attorney General's Office
5                               455 Golden Gate Avenue, 11th Floor
                                San Francisco, California  94102
6                     BY:  **MEGAN O'NEILL**
                          **DEPUTY ATTORNEY GENERAL**
7
                                QUINN, EMANUEL, URQUHART & SULLIVAN LLP
8                               50 California Street - 22nd Floor
                                San Francisco, California  94111
9                     BY:  **EMILY C. KALANITHI**
                          **ATTORNEY AT LAW**
10

11  For Plaintiff State of Arizona:

12                              ARIZONA ATTORNEY GENERAL'S OFFICE
                                Consumer Protection and Advocacy
13                              2005 N. Central Avenue
                                Phoenix, Arizona  85004
14                    BY:  **NATHAN E. WHELIHAN**
                          **ATTORNEY AT LAW**
15
    For Plaintiff State of New Jersey:
16

17                              NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
                                Division of Law
                                124 Halsey Street
18                              P.O. Box 45029
                                Newark, New Jersey  07102
19                    BY:  **THOMAS HUYNH**
                          **ATTORNEY AT LAW**
20

21             **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

22

23

24

25

**Add. 687**

**APPEARANCES**:   **(CONTINUED)**

For Plaintiff State of Minnesota:

                         MINNESOTA ATTORNEY GENERAL'S OFFICE
                         445 Minnesota Street, Suite 1200
                         St. Paul, Minnesota  55101
              BY:  **CAITLIN MICKO**
                   **ATTORNEY AT LAW**

For Meta Defendants:
                         COVINGTON & BURLING LLP
                         1999 Avenue of the Stars - Suite 3500
                         Los Angeles, California  90067
              BY:  **ASHLEY SIMONSEN**
                   **ATTORNEY AT LAW**

                         COVINGTON & BURLING LLP
                         One City Center
                         850 Tenth Street, NW
                         Washington, D.C.  20001
              BY:  **PAUL SCHMIDT**
                   **MICHAEL IMBROSCIO**
                   **ATTORNEYS AT LAW**

                         COVINGTON & BURLING LLP
                         The New York Times Building
                         620 Eighth Avenue
                         New York, New York  10018
              BY:  **CHRISTOPHER YEUNG**
                   **ATTORNEY AT LAW**

                         COVINGTON & BURLING LLP
                         Salesforce Tower
                         415 Mission Street - Suite 5400
                         San Francisco, California  94105
              BY:  **SERENA R. SAFFARINI**
                   **ATTORNEY AT LAW**

              **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**Add. 688**

1    **APPEARANCES**:   (CONTINUED)

2

    For Defendant Snap, Inc.:

3
                         MUNGER, TOLLES & OLSON LLP
4                        560 Mission Street - 27th Floor
                         San Francisco, California  94105
5               BY:  **JONATHAN H. BLAVIN**
                     **ATTORNEY AT LAW**
6
                         MUNGER, TOLLES & OLSON LLP
7                        350 South Grand Avenue - 50th Floor
                         Los Angeles, California  90071
8               BY:  **FAYE PAUL TELLER**
                     **ATTORNEY AT LAW**
9

10
    For Defendant TikTok, Inc., and ByteDance, Inc.:
11
                         KING & SPALDING LLP
12                       1180 Peachtree Street
                         Atlanta, Georgia  30309
13              BY:  **GEOFFREY DRAKE**
                     **ATTORNEY AT LAW**
14
                         KING & SPALDING LLP
15                       50 California Street - Suite 3300
                         San Francisco, California  94111
16              BY:  **BAILEY J. LANGNER**
                     **ATTORNEY AT LAW**
17
    For Defendant YouTube, LLC:
18
                         WILSON, SONSINI, GOODRICH & ROSATI, P.C.
19                       953 East Third Street, Suite 100
                         Los Angeles, California  90013
20              BY:  **MATTHEW K. DONOHUE**
                     **ATTORNEY AT LAW**
21

22

23

24

25

**Add. 689**

```
 1   Thursday - November 21, 2024                      1:02 p.m.

 2                      P R O C E E D I N G S

 3                           ---oOo---

 4       THE CLERK:  Now calling 22-md-3047, In Re Social Media

 5   Adolescent Addiction and Personal Injury Products Liability

 6   Litigation.

 7       Counsel, when speaking, please approach and state your

 8   appearance for the court reporter very clearly before you start

 9   your argument.  Thank you.

10       THE COURT:  Okay.  Good afternoon, all.

11       ALL:  Good afternoon.

12       THE COURT:  So let's do this first:  Let's go through

13   the -- do the parties have a difference of opinion on what the

14   interim deadlines should be for completing the State agency

15   discovery?

16       Let me take down these dates, and then -- well, why don't

17   you take them down first, and then we'll go from there.

18       So completion of conferrals regarding Rule 34 State agency

19   discovery, November 22, 2024.  Start date, start date for

20   rolling productions of State agency documents requested

21   pursuant to subpoenas -- okay, this is not in your chart --

22   start date November 22.

23       Last day to file discovery letter briefs regarding

24   disputes over State agency documents, whether sought by request

25   for production or subpoenas, December 2nd.
```

1    **THE COURT:**  I mean, that happens in discovery all the

2    time.  Okay?  You send a letter -- you have a meet and confer.

3    You send a letter that says, "You agreed to this" -- right? --

4    "and if you disagree with the way we summarized it, let us know

5    immediately."

6    **MR. WHELIHAN:**  The problem is we need clarification of

7    what "aggregate data" means.  We don't --

8    **THE COURT:**  But there are different issues here;

9    right?  Like, for example, if a big issue is, like, if they

10   don't want -- you don't want to give and they don't want

11   individual child case files, that's a short letter or e-mail.

12   All right?  You don't have to do it all in one if it's going to

13   be a holdup.  That's all I'm saying.

14   I don't care how you get it done, but you've got to get it

15   done.  Okay?

16   **MR. YEUNG:**  This is not an issue that is unique to

17   this type of agency in Arizona.  The other agencies we've had

18   discussions with on this point have been fine taking our oral

19   representation.

20   I believe it's actually now in the DM -- one of the

21   statements, either the CMC or DMC statement, that we are not

22   looking for individual case files.  So we've been trying to

23   work with them.  We've had 50 conferrals -- I looked it up --

24   50 conferrals -- over 50 conferrals with states in November.

25   That's --

1    **THE COURT:**  I expected a lot because there are a lot

2    of agencies you're going through.

3    **MR. YEUNG:**  Of course.  And there's -- and they are

4    doing that and that's why it's taking some time.  And, you

5    know, we're doing -- we're hopeful -- we're hoping that we can

6    do this orally via representations, which is what many folks

7    have been able to do; but if they want a letter, they want

8    something in writing, we are preparing that as we speak.

9    **THE COURT:**  With all deliberate speed.  Okay?

10    **MR. YEUNG:**  Yes.

11    **THE COURT:**  All right.  So are there -- go back to

12    my -- we got off track again.

13    Are there states or agencies that are simply refusing to

14    provide custodians or search terms?

15    **MR. YEUNG:**  So we can go to California next.

16    California has given me custodians for three agencies, no

17    search terms so far, no commitment to provide custodians for

18    any other agency.

19    **MS. O'NEILL:**  Your Honor, Megan O'Neill for the

20    California Department of Justice.

21    Just to briefly recap, yes, Meta issued Rule 45 subpoenas

22    to five California agencies.  Three of those agencies have

23    agreed to provide search terms and custodians.  Meta agreed to

24    deprioritize one of those agencies.

25    One has not yet provided as much terms and custodians, but

1    the AG's Office is working to facilitate conferrals on this

2    issue, and we hope that a conferral will take place soon.

3        The remainder of the California agencies have taken the

4    position that they will not provide documents to the AG's

5    Office for party discovery in this case.

6        We have still -- the AG's Office has still --

7            **THE COURT:**  Stop there.  How many agencies and which

8    are they?

9            **MS. O'NEILL:**  There are eight agencies.  I need a

10   minute to provide the exact list.  If I can have the Court's

11   indulgence to gather that.

12           **THE COURT:**  Do you know which agencies they are?

13           **MR. YEUNG:**  I'll have to look at the -- look at my

14   computer.

15           **MS. O'NEILL:**  I have the list now.

16           **THE COURT:**  Okay.

17           **MS. O'NEILL:**  The California School of Finance

18   Authority, the California Office of the Governor --

19           **THE COURT:**  Slow down.

20           **MS. O'NEILL:**  Apologies.

21           **THE COURT:**  Okay.

22           **MS. O'NEILL:**  The California Governor's Office of

23   Business and Economic Development.

24           **THE COURT:**  Okay.

25           **MS. O'NEILL:**  The California Department of Finance.

1          **THE COURT:**  Okay.

2          **MS. O'NEILL:**  The California Department of Public

3    Health, the California Department of Consumer Affairs, the

4    California Business Consumer Services and Housing Agency.

5          **THE COURT:**  Consumer Services and Housing Agency?

6          **MS. O'NEILL:**  Yes, that's right.

7     And then California Office of Data and Innovation.

8     And I will just say, Your Honor, that the AG's Office has

9    been attempting to facilitate conferrals with these agencies

10   and Meta, and we have suggested to Meta that they issue 45

11   subpoenas to those agencies.

12         **THE COURT:**  So I appreciate your offer to, quote,

13   "help facilitate discussions," but at this point, in light of

14   my order, subpoenas are not needed.  And so what is the stated

15   position of these eight agencies?  Are they simply disagreeing

16   with my order?

17         **MS. O'NEILL:**  My understanding is that the position of

18   these agencies is that they are not parties to this litigation

19   and, therefore, are not subject to the jurisdiction of this

20   Court and its orders and, therefore, they are not providing

21   documents to the AG's --

22         **THE COURT:**  Is there counsel for any of those agencies

23   here?

24         **MS. O'NEILL:**  I don't believe so.

25         **THE COURT:**  What does it mean in our system of

 1   government for an agency in the face of an order from a federal

 2   judge to say, "We simply are not going to comply with it"?  How

 3   does that -- how does that -- what happened to the rule of law?

 4        **MS. O'NEILL:**  Your Honor, I don't represent the

 5   agencies and I'm not really able to comment more fulsomely on

 6   their position.

 7        **THE COURT:**  By tomorrow you are ordered to submit to

 8   me a list of every counsel for each of these agencies who is

 9   responsible for taking this position.  I want their name.  I

10   want their State Bar number.  I want their addresses, their

11   contact information.

12        **MS. O'NEILL:**  Understood, Your Honor.

13        **THE COURT:**  I have conferred with

14   Judge Gonzalez Rogers on this.  The reason I'm going through

15   this list to find out what agencies and states are not

16   complying with the orders -- it's not just my order, it's her

17   order as well -- is she will be considering sanctions.  Okay?

18        So it's up to you-all in conferral with your colleagues to

19   figure out if that's the path you want to go down.  All right?

20   And it's her who's going to be considering sanctions.  It's not

21   just me considering discovery sanctions.  All right?  Do you

22   understand?

23        **MS. O'NEILL:**  I understand, Your Honor.

24        **THE COURT:**  Do you agree with those agencies that they

25   can just defy my order?

**Add. 695**

1          **MS. O'NEILL:**  Your Honor, it's not my position --

2          **THE COURT:**  Have you told their counsel that they are

3     in defiance of my order and in defiance of

4     Judge Gonzalez Rogers' order?

5          **MS. O'NEILL:**  Your Honor, we have informed them of the

6     order.  We have provided all of the information that's

7     necessary for them to make their decisions.

8          **THE COURT:**  That's not my question.  Have you told

9     them that they are in defiance of both my order and her order?

10          **MS. O'NEILL:**  I have not told them that, no.

11          **THE COURT:**  Has anyone in your office told them that?

12          **MS. O'NEILL:**  Not that I'm aware of, but I am not

13     aware of all the conversations that have happened.

14          **THE COURT:**  This is very troubling to me.

15       Okay.  Are there any other State agencies or AGs that are

16     not complying with providing custodians or search terms at all?

17          **MR. YEUNG:**  Yeah.  I'll run through the list that I

18     have.

19       Delaware is going to give us --

20          **THE COURT:**  That's not my question.  If people are in

21     negotiations with you or said they're going to give you stuff,

22     that's not my question.

23          **MR. YEUNG:**  Okay.

24          **THE COURT:**  I want to know are there agencies or

25     states as a whole that are simply refusing to provide

**Add. 696**

 1    custodians or search terms at all.

 2            MR. YEUNG:  So Minnesota has taken the position that

 3    the agencies for whom Meta has subpoenaed, that they're not

 4    subject to the search term/custodian process.

 5            THE COURT:  That you have subpoenaed?

 6            MR. YEUNG:  We subpoenaed -- the agencies we

 7    subpoenaed back before Your Honor issued the September 6th

 8    order to move discovery along, those agencies are -- the

 9    Minnesota -- my understanding is that Minnesota is taking the

10    position that search terms and custodians do not need to be

11    provided for those subpoenaed agencies.

12            THE COURT:  I don't understand that.  Okay.

13            MR. YEUNG:  Well, that's --

14            MS. MICKO:  Caitlin Micko on behalf of the State of

15    Minnesota.

16        It's a little bit more complicated than that, Your Honor.

17    The Department of Human Services is one of the agencies that

18    was issued a Rule 45 subpoena.  They negotiated the scope of

19    the Rule 45 subpoena back in August; and in doing so, explained

20    to Meta that it was too burdensome to run search terms and

21    custodians.  They memorialized that negotiation in an e-mail

22    that went unanswered by Meta, and they started to prepare their

23    production pursuant to the Rule 45 subpoena when Meta put it in

24    abeyance.

25        As soon as Judge Gonzalez Rogers ordered that they

UNITED STATES DISTRICT COURT    *CERTIFIED COPY*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| IN RE: SOCIAL MEDIA | ) | **Further Case Management** |
| ADOLESCENT ADDICTION/ | ) | |
| PERSONAL INJURY PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | NO. C 22-03047 YGR |
| | ) | |
| | ) | |
| ALL ACTIONS | ) | Pages 1 - 40 |
| | ) | |
| _____ | ) | Oakland, California |
| | | Friday, November 22, 2024 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

For Plaintiffs:          Lieff, Cabraser, Heimann &
                              Bernstein
                           275 Battery Street, 30th Floor
                           San Francisco, California  94111
                  BY:  LEXI J. HAZAM, ATTORNEY AT LAW

                           Seeger Weiss LLP
                           55 Challenger Road, Sixth Floor
                           Ridgefield Park, New Jersey  07660
                  BY:  AUDREY SIEGEL, ATTORNEY AT LAW

            (Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

Add. 698

```
 1                    A P P E A R A N C E S (CONT'D.)

 2

 3    For Plaintiffs:          Motley Rice LLC
                               401 9th Street NW Suite 630
 4                             Washington, DC  20004
                          BY:  PREVIN WARREN, ATTORNEY AT LAW
 5

 6                             Gibbs Law Group
                               1111 Broadway, Suite 2100
 7                             Oakland, California  94607
                          BY:  ANDRE MURA, ATTORNEY AT LAW
 8

 9                             Kessler Topaz Meltzer Check LLP
                               280 King of Prussia Road
10                             Radnor, Pennsylvania  19087
                          BY:  MELISSA L. YEATES, ATTORNEY AT LAW
11

12    For Plaintiff Abraham:   Boies Schiller Flexner LLP
                               44 Montgomery Street, 41st Floor
13                             San Francisco, California  94104
                          BY:  NICHOLAS A. SANTOS, ATTORNEY AT LAW
14

15

16    For Plaintiff State      California Department of Justice
      of California:           1515 Clay Street, 20th Floor
17                             Oakland, California  94612-0550
                          BY:  EMILY KALANTHI,
18                             JOSHUA E. OLSZEWSKI-JUBELIRER,
                               BRENDAN RUDDY,
19                               DEPUTY ATTORNEYS GENERAL

20

21    For Plaintiff State of   Colorado Department of Law
      Colorado:                1300 Broadway, 6th Floor
22                             Denver, Colorado  80203
                          BY:  KRISTA BATCHELDER,
23                               DEPUTY SOLICITOR GENERAL

24

25
```

**Add. 699**

```
1                  A P P E A R A N C E S  (CONT'D.)

2

3      For Plaintiff           Office of the Kentucky Attorney
       Commonwealth of            General
4      Kentucky:               1024 Capital Center Drive, Suite 200
                               Frankfort, Kentucky  40601
5                         BY:  MATTHEW COCANOUGHER,
                                 ASSISTANT ATTORNEY GENERAL
6
       For New Jersey          New Jersey Office of the Attorney
7      Plaintiffs:               General, Division of Law
                               124 Halsey Street, 5th Floor
8                              Newark, New Jersey  07101
                          BY:  THOMAS HUYNH,
9                              VERNA J. PRADAXAY,
                                 DEPUTY ATTORNEYS GENERAL
10
       For Plaintiff State of  Office of the Indiana Attorney
11     Indiana:                  General Consumer Protection
                               302 W Washington Street
12                             Suite IGCS, 5th Floor
                               Indianapolis, Indiana  46204
13                        BY:  CORINNE GILCHRIST, SECTION CHIEF
                                 CONSUMER LITIGATION
14
       For Plaintiff State     Office of the Attorney General
15     of South Dakota:          South Dakota
                               1302 E. Highway 14, Suite 1
16                             Pierre, South Dakota  57501
                          BY:  AARON SALBERG,
17                               ASSISTANT ATTORNEY GENERAL

18

19     For Plaintiff State of  Office of the Arizona Attorney General
       Arizona:                Consumer Protection and Advocacy
20                               Section
                               2005 N. Central Avenue
21                             Phoenix, Arizona 85004
                          BY:  NATHAN WHELIHAN,
22                               ASSISTANT ATTORNEY GENERAL

23

24

25
```

**Add. 700**

```
 1                A P P E A R A N C E S  (CONT'D.)

 2

 3    For the Meta          Covington & Burling LLP
      Defendants:           One City Center
 4                          850 Tenth Street, NW
                            Washington, DC  20001-4956
 5                    BY:   MICHAEL X. IMBROSCIO,
                            PAUL W. SCHMIDT,
 6                          ASHLEY M. SIMONSEN, ATTORNEYS AT LAW

 7                          Covington & Burling LLP
                            620 Eighth Avenue
 8                          New York, New York  10018
                      BY:   GREGORY L. HALPERIN, ATTORNEY AT LAW
 9
                            Davis Polk & Wardwell LLP
10                          450 Lexington Avenue
                            New York, New York  10017
11                    BY:   JAMES P. ROUHANDEH, ATTORNEY AT LAW

12
      For Defendant Snap    Munger, Tolles & Olson
13    Inc.:                 560 Mission Street, 27th Floor
                            San Francisco, California  94105
14                    BY:   JONATHAN H. BLAVIN, ATTORNEY AT LAW

15

16    For Defendant TikTok  King & Spalding LLP
      Inc.; ByteDance, Inc.: 1180 Peachtree Street, N.E.
17                          Suite 1600
                            Atlanta, Georgia  30309-3521
18                    BY:   GEOFFREY M. DRAKE, ATTORNEY AT LAW

19                          O'Melveny & Myers LLP
                            1625 Eye Street NW
20                          Washington, DC  20006
                      BY:   MARTHA F. HUTTON, ATTORNEY AT LAW
21
      For Defendant Alphabet  Wilson, Sonsini, Goodrich & Rosati
22    Inc.; Google, LLC;    953 East Third Street, Suite 100
      YouTube, Inc.:        Los Angeles, California  90013
23                    BY:   MATTHEW K. DONOHUE, ATTORNEY AT LAW

24

25
```

**Add. 701**

```
 1                A P P E A R A N C E S  (CONT'D.)

 2

 3    For Defendant Alphabet   Williams & Connolly LLP
      Inc.; Google, LLC;       680 Main Avenue, SW
 4    YouTube, Inc.:           Washington, DC  20024
                         BY:   JOSEPH G. PETROSINELLI,
 5                               ATTORNEY AT LAW

 6

 7

 8

 9

10                          --oOo--

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1    Friday, November 22, 2024                          9:00 a.m.
 2                    P R O C E E D I N G S
 3              (Reported remotely via Zoom Webinar)
 4                          --o0o--
 5         THE CLERK:  Morning, everyone.  These proceedings are
 6    being court-reported by this Court.  Any other recording of
 7    this proceeding, either by video, audio, including screen
 8    shots or other copying of the hearing is strictly prohibited.
 9         Your Honor, now calling the civil matter 22-MD-3047-YGR,
10    In Re: Social Media Adolescent Addiction Personal Injury
11    Products Liability Litigation.
12         Today's appearances will be included in posting of the
13    minutes.
14         Thank you.
15         THE COURT:  All right.  Good morning.
16         Okay.  So let's start with your agenda, and then we can
17    move to other miscellaneous issues that -- that I have as
18    well.
19         So -- I don't care.  Anybody at the mic?  Just one of you
20    on each side.
21         The first issue with respect to the expert certification
22    language, we'll put it in the formal order, but so ordered.
23    And thanks for doing that.
24         We'll -- you know, we'll see if we think it makes a
25    difference.  Lawyers always tell me that of course they're
```

Add. 703

1       So perhaps what needs happen is that a case needs to be

2   filed there with a stipulation by the parties that it will be

3   transferred in and perhaps that gets -- that case gets

4   substituted for the one that's currently sitting here.  I

5   don't know.

6       But if we wait -- if it's chosen and -- and I don't

7   actually have a case there and then I remand it, it's going to

8   be months before I can get potential authorization to -- to

9   try it there.

10          **MR. WARREN:**  Understood, Your Honor.  That's a very

11  helpful flag and, of course, a procedural issue we -- I don't

12  think either party had foreseen.  So what I would suggest we

13  do is the counsel for those two particular bellwethers and

14  leadership can meet and confer with defendants about whether

15  there are creative solutions that we can come up with to try

16  and sort that out and -- and avoid headaches for Your Honor.

17          **MS. SIMONSEN:**  Likewise.  Ashley Simonsen for the

18  defendants.

19          **THE COURT:**  Go ahead.

20          **MR. DRAKE:**  Geoffrey Drake for the TikTok defendants.

21      I agree.  We'll look at that.  I think -- I think we'll

22  also want to look at -- although I haven't consulted with my

23  colleagues about that -- some of the confusion may come

24  from -- it's not -- not clear to me exactly how the *Lexicon*

25  objection works for a case that was filed directly before Your

**Add. 704**

1  Honor or in this Court, so -- want to look at as well.

2          **THE COURT:**  I -- I agree?

3          **MR. DRAKE:**  Agree.  Okay.

4          **THE COURT:**  But -- anyway, we -- it is -- again, I'm

5  glad we're ahead of the curve on this, because it's -- it's

6  put the issue at the forefront, so --

7          **MR. DRAKE:**  Yes.

8          **THE COURT:**  -- we just need to sort through it.

9          **MR. WARREN:**  Thank you, Your Honor.  We will do that

10  expeditiously.

11          **THE COURT:**  Okay.

12      Okay.  So let's talk about the -- do I have anybody here

13  from -- who's prepared to speak on the eight California

14  agencies that are refusing to comply with the order, or South

15  Carolina or South Dakota?

16          **MS. KALANTHI:**  Yes, Your Honor.  Good morning.  Emily

17  Kalanthi for the People of the State of California.

18          **THE COURT:**  Hold on just a minute.

19          **MR. SCHMIDT:**  Paul Schmidt again for Meta.

20          **THE COURT:**  And, Ms. Kalanthi, who do you represent?

21          **MS. KALANTHI:**  I represent the People of the State of

22  California.  I'm with the California Attorney General's

23  Office, so represent the party -- the plaintiff here.

24          **THE COURT:**  Okay.

25      So do you represent the School Finance Authority, the

1    governor, the Governor's Office, the Department of Finance,

2    the Department of Public Health, the Department of Consumer

3    Affairs, the Business Consumer Services and Housing Agency,

4    and the Office of Data and Innovation?

5        **MS. KALANTHI:**  I do not, Your Honor.  I --

6        **THE COURT:**  Is there anybody here who does?

7        **MS. KALANTHI:**  I don't believe there's counsel for

8    those agencies in the courtroom.  The agencies have been made

9    aware of this Court's orders, the magistrate judge's orders on

10   state agency discovery.  I think they are clear as to what

11   those orders say.

12       And as an officer of the court, I can represent that the

13   position, as I understand it, is that they are not providing

14   the Attorney General's Office with access to their documents

15   for purposes of party discovery.

16       They are standing on well-settled California law which

17   holds that when the Attorney General brings a case in the name

18   of the People of the State of California, that state agency

19   documents are not proper for party discovery.  It's not --

20       **THE COURT:**  It is not as settled as they think it is.

21   Judge Kang has asked for specific people's information.

22       **MS. KALANTHI:**  That's correct, Your Honor.

23       **THE COURT:**  And you can tell them to expect that they

24   will be ordered into court.  And if necessary, contempt

25   proceedings will begin.

```
 1          MS. KALANTHI:  I understand, Your Honor.  And just to

 2     make it as clear as I can, this is, as far as I understand it,

 3     not a decision that's being made idly.

 4          THE COURT:  Believe me, I will not make my decisions

 5     idly either.  If they would like to come in and begin those

 6     proceedings, we can do that 2025.

 7          MS. KALANTHI:  Understood.  By -- what I understand

 8     to be the case is that this is the dual executive kind of

 9     inaction so the Attorney General as a separate executive

10     officer from the governor's office --

11          THE COURT:  Arguments have been made.

12          MS. KALANTHI:  Understood, Your Honor.

13          THE COURT:  Right?

14          MS. KALANTHI:  Yes.

15          THE COURT:  Arguments have been made.

16       So I do not take lightly anybody's failure to comply with

17     a federal court order.  Something will happen.  I don't know

18     what.  But I guarantee you, I will not let this stand.

19          MS. KALANTHI:  Understood, Your Honor.

20       And I believe the reason these agencies have not thus far

21     appeared is simply because this has come up in the context of

22     party discovery.  They're not parties to this action, and

23     judge -- Magistrate Judge Kang's order didn't hold otherwise.

24       And, you know, to the extent they would be brought in via

25     a Rule 45 subpoena or another mechanism, you know, I'm -- I'm
```

 1    certain they would appear.  So it's -- I just want to reassure

 2    the Court that this is not an issue of lack of respect for the

 3    rule of law or it's the -- the kind of very real sovereignty

 4    issues that are now kind of at play with the federal court

 5    order and the California precedent.

 6        THE COURT:  Yeah, they have no California order.

 7    There is no California order, so --

 8      Mr. Schmidt?

 9        MR. SCHMIDT:  Yes, Your Honor.  I'll just say simply

10    we appreciate the Court addressing this issue.  It is -- and

11    the broader issue of state Attorney General compliance with

12    Judge Kang's order is a pretty serious issue for us in terms

13    of our ability to fairly defend ourselves in these cases and

14    get fair discovery in these cases.

15      We've already been impaired in terms of the time -- the

16    delay that's already incurred.  We don't see how they can keep

17    to the schedule as it exists.  That's even more of a problem

18    as we go on.  So for all of those reasons, we appreciate the

19    Court addressing this.

20      We are -- we've had a very large number of states who are

21    noncompliant with Judge Kang's deadlines who now have new

22    deadlines.

23      We've committed to continuing to work with them, and we'll

24    continue to do so while seeking appropriate relief from Judge

25    Kang.

1    And we're open to talking further with California if

2    that's fruitful, but at -- at some point, I don't see how they

3    can proceed with their claims if they're not complying with

4    court rules.

5         **THE COURT:**  That is certainly one course.  So like I

6    said, I don't know what the remedy is yet.

7    I understand one of the complaints is that they believe

8    Meta is seeking discovery that is incredibly overbroad, and

9    that may be the case.  But, the -- the action is not to say

10   "it's overbroad and so we will do nothing."

11   The -- the response is to go to Judge Kang and say "this

12   is overbroad," so that he can narrow it to an appropriate --

13   to the appropriate scope.

14   I understand that this is complicated.  Refusing to comply

15   with a court order is not the appropriate response.  Period.

16   So they'll have to deal with that.  Or I'll throw you out

17   of the case.  Or I'll issue contempt.  There are -- I have

18   lots of options available to me, and I will not hesitate to

19   use them.

20   I hope they're watching.

21        **MS. KALANTHI:**  I understand, Your Honor.

22   And I appreciate my colleague's bringing in the concept of

23   what Meta has been looking for here and Your Honor also

24   mentioning that, and it is our belief that that has kind of

25   gotten lost in this back and forth, the fact that there is

```
1   exceedingly broad party discovery that is now being required

2   of these state agencies without any showing so far of

3   proportionately and -- and --

4        THE COURT:  There is a magistrate judge who has spent

5   incredible -- hundreds of hours working on this.  They have a

6   problem; that's the solution.  Not pretending that they can

7   not comply with the court order.

8        MS. KALANTHI:  Understood, Your Honor.  And I believe

9   it was a decision that was not taken lightly --

10       THE COURT:  It doesn't matter to me.  The decision --

11  if that's the decision that's made, there will be

12  consequences, period.

13       MS. KALANTHI:  Understood, Your Honor.

14       THE COURT:  All right.  You're standing.  Who are

15  you?

16       MR. COCANOUGHER:  Good morning, Your Honor.  Matt

17  Cocanougher from the Kentucky Attorney General's Office.

18     I just wanted to let --

19       THE COURT:  Hold on.  Let me find your name, sir.

20       MR. COCANOUGHER:  It may be "Matthew."

21       MR. SCHMIDT:  Third page, Your Honor.  Third from the

22  bottom.

23       THE COURT:  Oh, I see it now.

24     Okay.

25       MR. COCANOUGHER:  I just wanted to let Your Honor
```

 1    know that South Dakota is on the line.

 2              THE COURT:  On the line what?  Oh, you mean someone

 3    from the South Dakota --

 4              MR. COCANOUGHER:  Attorney General's Office, Your

 5    Honor.

 6         They do not believe they fall within this group of states,

 7    and so there is an attorney from the South Dakota

 8    Attorney General's Office who is appearing either

 9    telephonically or by video.

10              THE COURT:  Okay.  You can let him in.

11         Do you have the name?

12              THE CLERK:  Could I have the name, Counsel?

13              MR. COCANOUGHER:  Aaron Salberg or Salsberg?

14    A-A-R-O-N S-A-L --

15              THE CLERK:  Yes, Your Honor.

16         (Mr. Salberg entered the hearing room via Zoom webinar.)

17              MR. SCHMIDT:  If I may, I'll just move over so I can

18    see Counsel.

19              THE COURT:  Mr. Schmidt, if you go to that -- oh, and

20    there's a microphone, too.  That's fine.  You can use that --

21                   (Simultaneous colloquy.)

22              THE COURT:  No, the middle one's fine.  Just make

23    sure to use the microphone.

24              MR. SCHMIDT:  Okay.

25              THE COURT:  So he's not on the platform yet.

```
 1                    (Pause in the proceedings.)

 2          MR. SALBERG:  Your Honor, can you hear me?

 3          THE COURT:  I can, sir.

 4          MR. SALBERG:  Having little bit of technical

 5   difficulties.

 6          THE COURT:  So do you have video or not?

 7          MR. SALBERG:  I -- I'm trying, Your Honor.

 8                    (Pause in the proceedings.)

 9          THE COURT:  I can see you.

10          MR. SALBERG:  Permission to speak, Your Honor?

11          THE COURT:  Yes.

12      I will let you know, that I visited your fair state in

13   June -- first time ever -- with the Defender Services

14   Committee.  It was a terrific week of meetings there.

15          MR. SALBERG:  Good to hear, Your Honor.

16          THE COURT:  Go ahead.

17          MR. SALBERG:  Thank you, Your Honor.  Aaron Salberg

18   representing the South Dakota Attorney General's Office.

19      The -- we're here today because Meta alleges that the

20   Bureau of Finance Management and the governor's office isn't

21   complying with the order.

22      Neither one has refused to cooperate.  And we're certainly

23   not thumbing their nose -- our nose at any agency.  They don't

24   have a attorney present today.  She -- we learned about this

25   last night.  She is out sick today, but I have been in contact
```

**Add. 712**

Pages 1 - 179

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE PETER H. KANG, MAGISTRATE Judge

IN RE:  SOCIAL MEDIA ADOLESCENT )
ADDICTION/PERSONAL INJURY        ) No. 22-MD-03047 YGR (PHK)
PRODUCTS LIABILITY LITIGATION    )
                                 ) San Francisco, California
                                 ) Wednesday
_____  ) December 11, 2024

**<u>TRANSCRIPT OF PROCEEDINGS</u>**

**<u>APPEARANCES</u>:**

**For Plaintiffs:**        LIEFF CABRASER HEIMANN AND BERNSTEIN, LLP
                           275 Battery Street
                           29th Floor
                           San Francisco, California 94111
                   BY:  **LEXI J. HAZAM**, ESQ.


                           BEASLEY ALLEN CROW METHVIN PORTIS
                             & MILES, P.C.
                           218 Commerce Street
                           Montgomery, Alabama 36103
                   BY:  **JOSEPH VANZANDT, ESQ.**
                        **CLINTON RICHARDSON, ESQ.**


                           WEITZ AND LUXENBERG, P.C.
                           700 Broadway
                           New York, New York 10003
                   BY:  **JAMES BILSBORROW, ESQ.**


                           SIMMONS HANLY CONROY, LLP
                           One Court Street
                           Alton, Illinois 62002
                   BY:  **ELLYN HURD, ESQ.**

           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


*Reported By:*   **Debra L. Pas, CSR 11916, CRR, RMR, RPR**
           *Official Reporter - US District Court*
           *Computerized Transcription By Eclipse*

**APPEARANCES:   (CONTINUED)**

**For Plaintiffs:**

                    GIBBS LAW GROUP, LLP
                    1111 Broadway
                    Suite 2100
                    Oakland, California 94607
        BY:  **ANDRE MICHEL MURA, ESQ.**

**For Plaintiff State of California:**

                    CALIFORNIA DEPARTMENT OF JUSTICE
                    455 Golden Gate Avenue
                    11th Floor
                    San Francisco, California 94102
        BY:  **MEGAN O'NEILL**
               **EMILY COSTELLO KALINITHI, ESQ.**
               **DEPUTY ATTORNEYS GENERAL**

**For Plaintiff California Department of Health Care Services:**

                    CALIFORNIA DEPARTMENT OF JUSTICE
                    455 Golden Gate Avenue.
                    Suite 11000
                    San Francisco, California 94102
        BY:  **ANNA THERESA FERRARI, ESQ.**

**For Plaintiff California Business, Consumer Services and Housing Agency:**

                    OLSON REMCHO, LLP
                    1901 Harrison Street
                    Suite 1550
                    Oakland, California 94612
        BY:  **MARGARET PRINZING, ESQ.**

**For Plaintiff State of Louisiana:**

                    LOUISIANA DEPARTMENT OF JUSTICE
                    Consumer Protection
                    1885 N. Third Street
                    Baton Rouge, Louisiana 70802
        BY:  **ASYL NACHABE, ESQ.**

**APPEARANCES:    (CONTINUED)**

**For Plaintiff State of Montana:**
                        COOPER AND KIRK, PLLC
                        1523 New Hampshire, NW
                        Washington, DC 20036
                **BY:  BRIAN W. BARNES, ESQ.**


**For Plaintiff State of Wisconsin:**
                        WISCONSIN DEPARTMENT OF JUSTICE
                        Public Protection Unit
                        P.O. Box 7857
                        17 West Main Street
                        Madison, Wisconsin 53707
                **BY:  COLIN R. STROUD**
                      **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of Michigan:**
                        MICHIGAN DEPARTMENT OF ATTORNEY GENERAL
                        Corporate Oversight Division
                        525 W. Ottawa
                        Lansing, Michigan 48909
                **BY:  DANIEL JOHN PING**
                      **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of Minnesota:**
                        MINNESOTA ATTORNEY GENERAL'S OFFICE
                        445 Minnesota Street
                        Suite 1200
                        St. Paul, Minnesota 55101
                **BY:  JASON PLEGGENKUHLE**
                      **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of New York:**
                        OFFICE OF THE STATE ATTORNEY GENERAL
                        New York State
                        28 Liberty Street
                        New York, New York 10005
                **BY:  KEVIN C. WALLACE**
                      **SENIOR ENFORCEMENT COUNSEL**

**APPEARANCES:   (CONTINUED)**

**For Plaintiff State of Ohio:**

OHIO ATTORNEY GENERAL'S OFFICE
615 W. Superior Avenue
Suite 11th Floor
Cleveland, Ohio 44113
**BY:  KEVIN ROBERT WALSH**
**ASSISTANT ATTORNEY GENERAL**

**For Plaintiff State of Illinois:**

ILLINOIS ATTORNEY GENERAL'S OFFICE
115 S. LaSalle Street
Consumer Fraud - 26th Floor
Chicago, Illinois 60603
**BY:  MATTHEW CHARLES DAVIES**
**ASSISTANT ATTORNEY GENERAL**

**For Plaintiff State of Arizona:**

ARIZONA ATTORNEY GENERAL'S OFFICE
Consumer Protection and Advocacy
2005 N. Central Avenue
Phoenix, Arizona 85004
**BY:  NATHAN E. WHELIHAN**
**ASSISTANT ATTORNEY GENERAL**

**For Plaintiff State of Kentucky:**

KENTUCKY OFFICE OF THE ATTORNEY GENERAL
Office of Consumer Protection
1024 Capital Center Drive
Suite 200
Frankfort, Kentucky 40601
**BY:  PHILIP HELERINGER, ESQ.**

**For Plaintiff State of Delaware:**

DELAWARE DEPARTMENT OF JUSTICE
820 N. French Street
Carvel State Office Building
5th Floor
Wilmington, Delaware 19801
**BY:  RYAN THOMAS COSTA, ESQ.**

**APPEARANCES:   (CONTINUED)**

**For Plaintiff State of Indiana:**
                          OFFICE OF THE INDIANA ATTORNEY GENERAL
                          Consumer Protection
                          302 W. Washington Street
                          Ste IGCS, 5th Floor
                          Indianapolis, Indiana 46204
            **BY:  CORINNE GILCHRIST, ESQ.**


**For Plaintiff State of Rhode Island:**
                          RHODE ISLAND OFFICE Of THE
                           ATTORNEY GENERAL
                          150 South Main Street
                          Providence, Rhode Island 02903
            **BY:  STEPHEN PROVAZZA, ESQ.**


**For Plaintiff State of Kansas:**
                          KANSAS ATTORNEY GENERAL'S OFFICE
                          120 SW 10th Avenue
                          Topeka, Kansas 66612
            **BY:  KALEY SCHRADER, ESQ.**


**For Plaintiff State of New Jersey:**
                          NEW JERSEY ATTORNEY GENERAL'S OFFICE
                          Division of Law
                          124 Halsey Street
                          Fifth Floor
                          Newark, New Jersey 07101
            **BY:  THOMAS HUYNH**
                 **DEPUTY ATTORNEY GENERAL**


**For Plaintiff State of Colorado:**
                          COLORADO DEPARTMENT OF LAW
                          1300 Broadway
                          Sixth Floor
                          Denver, Colorado 80203
            **BY:  KRISTA BATCHELDER**
                 **SENIOR ASSISTANT ATTORNEY GENERAL**

**APPEARANCES:   (CONTINUED)**

**For Plaintiff State of South Dakota:**
                        OFFICE OF THE ATTORNEY GENERAL
                        2000 E. 52nd Street, N.
                        Sioux Falls, South Dakota 57104
              **BY:  AARON DEAN SALBERG, ESQ.**


**For Plaintiff State of Washington:**
                        OFFICE OF THE ATTORNEY GENERAL
                        800 Fifth Avenue
                        Suite 2000
                        Seattle, Washington 98104
              **BY:  ALEXANDRA KORY**
                    **ASSISTANT ATTORNEY GENERAL**


**For Plaintiff State of Nebraska:**
                        NEBRASKA ATTORNEY GENERAL
                        2115 State Capitol
                        Lincoln, Nebraska 68509
              **BY:  ANNA M. ANDERSON, ESQ.**
                    **ASSISTANT ATTORNEY GENERAL**


**For Defendant Meta Platforms, Incorporated:**
                        COVINGTON & BURLING, LLP
                        1999 Avenue of the Stars
                        Suite 3500
                        Los Angeles, California 90025
              **BY:  ASHLEY M. SIMONSEN, ESQ.**


                        COVINGTON & BURLING, LLP
                        The New York Times Building
                        620 Eighth Avenue
                        New York, New York 10018
              **BY:  CHRISTOPHER YEUNG, ESQ.**

**APPEARANCES:   (CONTINUED)**

**For Defendant Meta Platforms, Incorporated:**
                        COVINGTON & BURLING, LLP
                        One City Center
                        850 Tenth Street, NW
                        Washington, D.C. 20001
                **BY:  MICHAEL IMBROSCIO, ESQ.ESQ.**
                     **STEPHEN PETKIS, ESQ.**
                     **KHARI  LISTON CYRUS, ESQ.**


**For Defendant Snap, Inc.:**
                        MUNGER, TOLLES & OLSON LLP
                        350 South Grand Avenue
                        50th Floor
                        Los Angeles, California 90071
                **BY:  ARIEL TESHUVA, ESQ.**


**For Defendant TikTok:**
                        KING & SPALDING LLP
                        50 California Street
                        Suite 300
                        San Francisco, California
                **BY:  BAILEY LANGNER, ESQ.**


                        KING AND SPALDING LLP
                        1180 Peachtree Street
                        Atlanta, Georgia 30309
                **BY:  GEOFFREY DRAKE, ESQ.**
                     **RANIA KAJAN, ESQ.**


**For Defendant YouTube:**
                        WILSON SONSINI GOODRICH and ROSATI, PC
                        One Market Plaza
                        Spear Tower, Suite 3300
                        San Francisco, California 94105
                **BY:  LAUREN GALLO WHITE, ESQ.**


                        -   -   -

```
 1                      P R O C E E D I N G S

 2   WEDNESDAY, DECEMBER 11, 2024                      1:21 P.M.

 3                          ---oOo---

 4        THE CLERK:  Now calling 22-MD-3047, In Re Social Media

 5   Adolescent Addiction and Personal Injury Products Liability

 6   Litigation.

 7        Counsel, when speaking, please approach the podium and

 8   state your name for the record.

 9        THE COURT:  Good afternoon all.

10   (Counsel greet the Court.)

11        THE COURT:  Full house today.  Look at this.

12        Okay.  So let's take care of some easy stuff first.  So

13   with regard to the parties' stipulation with regard

14   compensation information for Meta deponents, we all noted there

15   are two different stipulations filed on the docket.  One is at

16   docket 1437, and the other one is at docket 1438.  And they may

17   be slightly different.  I couldn't -- we didn't have time to

18   run a compare.

19        Which one is the stipulation the parties want the Court to

20   entertain and then presumably agree to?

21        MS. SIMONSEN:  Good morning, Your Honor.  Ashley

22   Simonsen for the Meta defendants.

23        I believe I saw that plaintiffs' counsel filed the two

24   stipulations this morning, and I think I saw that the second

25   one was labeled a corrected stipulation.
```

1   and the -- the process was that Meta would provide us with

2   search terms, which we received on Monday, and the clients are

3   working with those search terms now.

4           **THE COURT:**  Okay.

5           **MS. PRINZING:**  We conferred right before this session,

6   and we will report to them back at the end of the week with

7   how -- what progress we're able to make.

8           **THE COURT:**  Are you going to provide hit reports?

9           **MS. PRINZING:**  We are working to provide hit reports.

10  But since we just received the search terms on Monday, it would

11  not -- it's simply not possible to provide hit terms in that

12  abbreviated period of time.

13          **THE COURT:**  I'm sure your colleagues have told you my

14  previous directions in this case on how negotiations like these

15  should go.  It is productive to be transparent and to provide

16  hit reports when you can, as quickly as you can.

17          **MS. PRINZING:**  That's absolutely our intention to do

18  so.

19          **THE COURT:**  Okay.

20          **MS. PRINZING:**  Again, subject to the meet-and-confer

21  discussions that we're having.

22          **THE COURT:**  Okay.  But your -- you've blown the

23  deadlines; right?  I mean, that's -- that's the problem I have

24  here.

25          Well, are they -- are they, in fact, engaging with you and

```
 1   are they -- despite having preserved their positions, are they

 2   trying to work things through with you or not?

 3        MR. SCHMIDT:  We don't know yet.  We had a productive

 4   discussion Friday that was driven by us.  That followed an

 5   earlier discussion.  We gave them our views on Monday in

 6   writing, and we're waiting to hear back.  So I don't know.

 7        What I can say is that there has been -- there has not

 8   been compliance with the terms of Your Honor's rulings.  And

 9   this is an instance, which is why I would have preferred that

10   it not be raised with the Court in the setting where we are

11   trying to be above and beyond reasonable with them, and now the

12   suggestion is we didn't give them terms early enough or

13   something like that.  That's just not fair.

14        THE COURT:  Okay.  What I want by Tuesday of next

15   week, very short, a one-page letter evenly divided between you

16   two parties with a plan to get this done as between -- a

17   schedule, that's all I want -- all right? -- to get this done

18   as between the two of you.  Okay?  And I'm expecting it to be

19   an agreed-upon schedule if -- because we're running out of time

20   and you've got to get this done.  Okay?

21        MS. PRINZING:  Understood, Your Honor.

22        THE COURT:  All right.

23        MR. SCHMIDT:  And we, obviously, need to hear back

24   this week to be able to even have a hope of doing that.

25        THE COURT:  If you can get them the letter before
```

1    Friday to get that ball rolling, you should, if you can.  But

2    you should start negotiating immediately that schedule to get

3    this all done.  Okay?

4         MS. PRINZING:  Absolutely, Your Honor.

5         I do -- for the purpose of the record, we were retained

6    recently, but our clients have been reaching out to Meta

7    throughout October, November.

8         THE COURT:  Glad counsel is involved.  I'm hoping --

9    I'm going to be optimistic that you're able to work things out

10   on an expedited basis given the schedule in this case.

11        MS. PRINZING:  Understood, Your Honor.

12        THE COURT:  I don't think you were here at the last

13   discovery management conference, but the very clear directive

14   from Judge Gonzalez Rogers is to get this discovery done.

15   Okay?  And that means everybody is going to have to make

16   compromises and work hard to get it done.  I understand that,

17   but that's where we are.  Okay?

18        MS. PRINZING:  Understood.

19        MR. SCHMIDT:  And, Your Honor, just on that point.  We

20   have a pending direction from Judge Gonzalez Rogers on this

21   issue that we are working on and we've talked with the State

22   about.  I don't understand that to be affected in any way by

23   Your Honor's ruling.

24        THE COURT:  It is not.  It is not.  And your briefing

25   on the joint letter brief with regard to specifically the

 1  New York Governor and the State Division of Budget, was -- is

 2  it sort of a recommendation or something to Judge Gonzalez

 3  Rogers, if I'm remembering correctly, for me to refer the

 4  agencies to Judge Gonzalez Rogers for further proceedings.

 5      I mean, in the interests of time, I don't need to do --

 6  you just do it directly.  Go to her.

 7          MR. SCHMIDT:  Okay.

 8          THE COURT:  You know, this is not an issue where --

 9  you know, procedurally it's not the way we do report

10  recommendations in this court anyways.

11      So she's going to -- she's already made clear she wants to

12  hear from you on what kind of relief you think you're entitled

13  to with regard to people who are simply not engaging at all,

14  and you should approach her with that.

15          MR. SCHMIDT:  And I take it we would do the same as to

16  the Kansas Governor.

17          THE COURT:  Anybody -- I think it applies to anybody.

18  She will clarify if I'm wrong or if you're wrong, but you're

19  free to approach her and say, you know, this is what -- I'm not

20  here to give you legal advice on how to approach her.

21          MR. SCHMIDT:  Understood, Your Honor.

22          THE COURT:  Okay.  All right.  That's the first

23  category of agencies.

24      The second category is the ones where it's -- I think what

25  Meta has referred to as the second category of agencies that

1    are listed in Footnote 2 of Docket 1430, which is:  Agencies

2    which have not provided some or all of the following -- some of

3    the following:  Search terms, custodians, hit reports or

4    transparency about alternative search methods.

5        And there is a bunch of different states and a bunch of

6    different agencies within those states.

7            **MS. O'NEILL:**  Your Honor --

8            **THE COURT:**  Everybody --

9            **MS. O'NEILL:**  Excuse me.  I didn't mean to interrupt.

10           **THE COURT:**  Everybody has Docket 1430 on the list of

11   agencies in Footnote 2.

12       Is there anybody here representing any of those agencies

13   or from those states who wants to take issue with the fact that

14   they are listed as part of this category?

15           **MS. O'NEILL:**  Your Honor, may I be briefly heard?

16           **THE COURT:**  Sure.

17           **MS. O'NEILL:**  Megan O'Neill again from the State AGs.

18           **THE COURT:**  Sure.

19           **MS. O'NEILL:**  I wanted to just request whether the

20   Court might be willing to entertain overall argument on

21   cross-cutting issues from the State AGs.

22       There are, of course, counsel from many State AGs and

23   certain agencies here to discuss State specific issues, but we

24   thought it would be helpful for the Court to present certain

25   issues that cut across even categories two and three, and I

 1  would be prepared to do so.

 2      **THE COURT:**  Okay.  Before we get there, I just want to

 3  make sure that the list in Footnote 2 is undisputed at this

 4  point.

 5      **MS. O'NEILL:**  Sure.  I would defer to my fellow State

 6  AG counsel.

 7      **THE COURT:**  Here they come.

 8      **MS. O'NEILL:**  Trying to streamline things for you,

 9  Your Honor, but I know it can't always be done.

10      **MS. BATCHELDER:**  Thank you, Your Honor.  Krista

11  Batchelder appearing on behalf of plaintiffs, but State of

12  Colorado.

13      So we do disagree with being put in this bucket of having

14  not provided search terms, custodians, hit reports or

15  transparency about alternative search methods that may be

16  employing the agencies that are listed here, the Behavioral

17  Health Administration, Department of Education, the Governor's

18  Office, and the Office of State Planning and Budgeting.

19      With regards to the Behavioral Health Administration, they

20  were served a Rule 45 subpoena on July 17th, and they produced

21  those documents on September 18th.  On September 23rd -- so

22  after the production.  That subpoena was held in abeyance.  And

23  then on November 14th counsel for Meta met-and-conferred with

24  counsel for the Behavioral Health Administration, and we agreed

25  to supplement our response if Meta had reason to believe that

 1    the prior production was incomplete.  And then we then agreed

 2    to run search terms through its principal agency, CDHS.  And

 3    CDHS has not produced anything to date, but did put a

 4    litigation hold in place on November 8th.

 5        With regards to the other agencies that were listed, we

 6    did provide search terms -- search terms for each of those

 7    agencies, as well as custodians.  We have not been able to

 8    provide hit reports.

 9        And this was explained to Meta that because our agencies

10    use Google Vault, we are limited to the number of characters

11    that we can actually include in a search string.  It's cut off

12    at 2,000.  And it also does the limiters in a different way.

13    It says "about" as opposed to a slash.  And so it makes it very

14    difficult.

15        And so we went back to Meta asking for some guidance on

16    how they would like us to change the search terms that we were

17    working with in order to fit within that 2000 word -- or

18    character limit, and we have not been able to reach an

19    agreement on that.

20        But I will say that we have been working actively with

21    Meta in order to get documents to them.  We have productions

22    ready.  We have already produced for one of -- at least one of

23    our agencies.

24        And I think at the end of the day the goal is to get them

25    the documents they are looking for.  It's just a matter of

 1    doing it in a way that is manageable for the agencies.

 2            **THE COURT:**  Okay.

 3            **MR. SCHMIDT:**  Very quickly, Your Honor.

 4        The agency discussed first, Behavioral Health, has

 5    produced 262 documents total.  We heard an argument earlier

 6    that 30,000 was not burdensome.  262.  They gave no custodians,

 7    no search terms, and they wouldn't tell us -- they didn't give

 8    us the transparency Your Honor directed.

 9        The Department of Higher Education did do custodians and

10    terms, but not hit reports, as we heard.

11        The another ones did not do one or the other, and I can

12    walk through those in detail.

13            **THE COURT:**  Okay.  What I'm hearing is with regard to

14    Behavioral Health Administration, tell me if I'm wrong, they

15    are willing to run search terms through CDHS.

16            **MS. BATCHELDER:**  That is correct, because they are

17    under CDHS.

18            **THE COURT:**  Okay.  So by next Wednesday, a week from

19    today, I want a one-page letter, evenly divided between the

20    parties, that sets forth the schedule to get this done.  It

21    sounds like you're talking.  Just get it done.  Okay.

22            **MS. BATCHELDER:**  Okay.  Thank you, Your Honor.

23            **MR. YEUNG:**  Can I add thing to this?  Christopher

24    Yeung for Meta.

25        In connection with this briefing, counsel for the Colorado

```
 1   agencies at issue said that they were willing to run Meta's
 2   proposed search terms, which we propose, on the -- on a number
 3   of the agencies subject to working out some technical issues,
 4   like she talked about "about" limiters.
 5        Our expectation is if we can work through the technical
 6   issue of what is exactly the way you need to phrase a limiter,
 7   you know, what types of wild cards are permitted, things like
 8   that, that they would run the terms that we propose just like
 9   they said they would.
10        THE COURT:  Did you say you would?
11        MS. BATCHELDER:  Yes, we did.
12        THE COURT:  Okay.
13        MS. BATCHELDER:  And I believe that was part of our
14   submission to Your Honor in the declaration.
15        THE COURT:  Okay.  Then, I mean, again --
16        MR. YEUNG:  Thank you.
17        THE COURT:  You should hold each other to your
18   statements.  Obviously, if -- it will expedite things if Meta
19   knows that there's a way to modify the search terms.  You
20   shouldn't be hesitant to do that if it's reasonable.
21        Do you understand that?  Mr. Yeung?
22        MR. YEUNG:  Yes, Your Honor.  I understand.
23        We're going to -- we will confer about ways of modifying
24   the terms in order to make them technologically feasible for
25   them.
```

 1              **THE COURT:**  Well, not only that.  But if they -- in

 2      the process of this working it out you need to modify the --

 3      substantively modify a couple of the search terms or some of

 4      the search terms --

 5              **MR. YEUNG:**  Understood.

 6              **THE COURT:**  -- I don't think you should be hesitant to

 7      do that.  Okay?

 8              **MR. YEUNG:**  Understood.  I mean, if something is not

 9      running correctly, we will certainly modify it.

10              **THE COURT:**  Okay.  All right.  Who is next?

11              **MR. WALSH:**  Your Honor, Kevin Walsh with the State of

12      Ohio.

13          Ohio is listed as a state that did provide -- provided

14      search terms without custodians for at least some agencies.  We

15      provided custodians for every agency.  I think we even --

16              **THE COURT:**  I don't see Ohio agencies listed in

17      Footnote 2.

18              **MR. WALSH:**  Yeah, we're down there.

19              **THE COURT:**  Are you?

20              **MR. WALSH:**  It's kind of buried in the middle.

21      Department of Children and Youth, right below the New York

22      line.

23              **THE COURT:**  That's Footnote 3.

24              **MR. WALSH:**  Page 4?

25              **THE COURT:**  Yeah.  You're in what I call category

```
 1    three.  You're in the Footnote 3 group.

 2          MR. WALSH:  We're in both.

 3          THE COURT:  I don't see you in Footnote 2.  Are they

 4    in Footnote 2?

 5          MR. YEUNG:  No, I don't think so.

 6       Kevin, this is Footnote 2 (indicating).  You may have an

 7    earlier draft.

 8          MR. WALSH:  Okay.  I have an earlier draft.  I'm

 9    sorry, Your Honor.

10          THE COURT:  Okay.

11          MR. WALSH:  Wait.  So am I -- is this -- do you have

12    me in the footnote where we're not running search terms?

13          MR. YEUNG:  We have you in Footnote 3.

14          THE COURT:  You're in the footnote of the agencies

15    that are -- that basically have provided partial information,

16    but not --

17          MR. WALLACE:  Your Honor, Kevin Wallace for the

18    New York Attorney General.

19       I think the confusion is it's item two in Meta's list and

20    there is two footnotes that drop from it.  So Footnote 3 is

21    inside of category two within what they are listing.  I just

22    think it's a categorization question for all of us.

23          MR. YEUNG:  I think Kevin actually does have a -- I

24    have an older draft, because the Footnote 2 is much longer and

25    there was movement, as the AGs know.
```

1          **THE COURT:**  Well, while you're up here, let's --

2          **MR. WALSH:**  Yeah.  Right.  Okay.

3          **THE COURT:**  If you're in discussions and you haven't

4    provided search terms and you're not -- you're trying to engage

5    and you're trying to work things out, by next Wednesday I want

6    you both to submit a jointly submitted one-page letter that

7    sets forth the schedule for just getting it done.

8          **MR. WALSH:**  Okay.  Okay.  And our agencies are trying

9    to provide hit counts.  They have provided hit counts, every

10   one of them.  They just can't keep up.  It takes them so long

11   to get a hit count.  By the time we do that, we're -- the

12   negotiation is then moot.

13         **THE COURT:**  Okay.  So work out a schedule.  Meta --

14   you know, if you need to work out time in the schedule for hit

15   counts to be provided and then all that.

16         **MR. WALSH:**  Okay.

17         **THE COURT:**  Work it out amongst yourselves.  It sounds

18   like you're talking, so I encourage that.  Get it done.  Okay?

19         **MR. WALSH:**  Thank you, Your Honor.

20         **MR. YEUNG:**  Christopher Yeung for Meta.  Just one

21   clarification.

22         On November 26 the Governor's Office, who had been engaged

23   with us in discussions through Mr. Walsh here, retained new

24   counsel and new counsel essentially restarted the process.

25   Rejected the discussions that we had previously with Mr. Walsh

 1    and, you know, narrowed the search to one single piece of

 2    legislation and has -- you know, that has set us back

 3    significantly with respect to the Governor's Office.

 4        So I would ask -- I just wanted to make that -- put that

 5    on the record.  The schedule that we set and that we'll confer

 6    with Mr. Walsh on should, I think, apply to everybody,

 7    including the Governor's Office, who I understand retained new

 8    counsel.

 9            **THE COURT:**  You have been ordered to coordinate with

10    everybody; right?  So, you know, even if they have separate

11    counsel, you're supposed help coordinate and facilitate that.

12            **MR. WALSH:**  Okay.

13            **THE COURT:**  And I'm disappointed to hear that some new

14    counsel comes in and tries to restart everything.  It's your

15    side of the "V" that has accused Meta of trying to do

16    everything from scratch again.  So that -- that --

17            **MR. WALSH:**  And that is true.  Mr. Yeung is right.  A

18    couple weeks ago the Governor's counsel -- Governor hired

19    outside counsel to deal with this and we do not represent them

20    for purposes of --

21            **THE COURT:**  You've been ordered to help coordinate and

22    facilitate.  So I assume it doesn't stop you from picking up

23    the phone and trying to talk them through where things are and

24    where -- the directions I've been giving.  Okay?

25            **MR. WALSH:**  Okay.

```
 1                    MR. YEUNG:  Thank you, Your Honor.

 2                    MR. WALSH:  And is that one -- it's a half a page

 3      each?  One-page letter?

 4                    THE COURT:  It's just a schedule.  I don't want

 5      argument.  I want you to work out a schedule just to get this

 6      done.

 7                    MR. WALSH:  Thank you.

 8                    THE COURT:  All right.  Who is next?

 9                    MR. HUYNH:  Good afternoon, Your Honor.  Thomas Huynh

10      for the New Jersey Attorney General and the Division of

11      Consumer Affairs.

12                    THE COURT:  So you're not representing the Department

13      of Health, Department of Treasury, the Governor's Office?

14                    MR. HUYNH:  Oh, did you want only --

15                    THE COURT:  Well, since we're -- I don't want you to

16      come up twice.

17                    MR. HUYNH:  Oh, I'm sorry.  I could go back down, if

18      that would be more convenient for Your Honor.

19                    THE COURT:  Well, I --

20                    MR. HUYNH:  Oh, I should clarify.  So I represent the

21      Attorney General's Office, too.

22                    THE COURT:  Yes, okay.

23                    MR. HUYNH:  And the Attorney General's Office has been

24      facilitating negotiations with Meta for these agencies, so I am

25      equipped to talk about them.
```

1          **THE COURT:**  Okay.  So have these agencies failed to

2     provide -- they may have said they were going to, failed to

3     provide hit reports, custodians, search terms, transparency?

4          **MR. HUYNH:**  So, Your Honor, we would respectively try

5     to correct the record with regards to the categorization

6     Footnote 2.

7          So with regards to the Department of Health, New Jersey

8     actually provided the custodian for the Department of Health,

9     Jennie Blackney, program manager for Family Health Services, on

10    October 17, 2024.  We note that this was in supplementation to

11    an email that we originally sent other custodians to.  So it

12    may have been missed by Meta for that respect.

13         The reason we selected her is because with regards to the

14    Department of Health --

15         **THE COURT:**  Are you providing -- are the New Jersey

16    agencies here -- Department of Health, Department of Treasury,

17    Governor's Office -- prepared to provide custodians, proposed

18    search terms, hit reports and be transparent if you're

19    proposing alternative methods?

20         **MR. HUYNH:**  Yes.  With regards to the Department of

21    Health and Department of Treasury, we have already provided

22    custodians.

23         **THE COURT:**  Okay.

24         **MR. HUYNH:**  Then we've also provided hit reports for

25    some of the search terms.  We have been working with Meta to

```
 1    try and understand some of the technical limitations

 2    involving Microsoft Purview --

 3         (Court reporter clarification.)

 4         MR. HUYNH:  ...regarding Microsoft Purview, which we

 5    have been using to generate the hit reports.

 6         With regards to the Governor's Office, they provided us

 7    with hit reports last night and they ran it on the with five

 8    search, which was the original search that we were

 9    contemplating.  We're going back to them to discuss further

10    about the additional proximity limiters that we have been

11    discussing with Meta.

12         MR. PETKIS:  Your Honor, Stephen Petkis from Covington

13    on behalf of Meta.

14         To just respond briefly.  The categorization in Footnote 2

15    encompasses not just situations where we received no engagement

16    on custodians, but also situations, like the Department of

17    Health, where we've nominally received a name, but the agency

18    has taken the position that it refuses to run custodian search

19    terms and hit reports.

20         There's a reason why these agencies weren't put in

21    Footnote 1, which is the total non-engagement bucket.

22         So the position that New Jersey was taken on the

23    Department of Health is that we'll give you one name.  We won't

24    run any search terms, custodians.  We won't give you any

25    custodial --
```

```
 1          (Court reporter clarification.)

 2              MR. PETKIS:  Apologies.

 3              THE COURT:  He's very excited.

 4              MR. PETKIS:  Well, so, I think -- I think, Your Honor,

 5     I can be very brief in this.

 6          The problem is that there is a lack of agreement on

 7     whether or not to actually utilize that custodial name for the

 8     purpose of providing discovery.  For now, all we have is the

 9     name and a complete refusal to do so.

10              THE COURT:  So, okay.  Has there been a refusal to

11     negotiate additional or different custodians or explain why

12     this one custodian is enough?

13              MR. HUYNH:  Judge, we would respectfully push back to

14     that because we did actually run hit reports on the Department

15     of Health's custodian that we identified, and we did that for

16     the within 50, within 100, within 150 proximity limiters.

17          We have discussed with counsel, though, that we have some

18     concerns some of the ways that the Department may have run

19     that.  So we are happy to work with the Department and further

20     triage their technical prowess or the technical execution of

21     these search terms.

22          But, no, there isn't a refusal to run the search terms,

23     Your Honor.

24              THE COURT:  No, no.  That wasn't my question.

25          Is the refusal to engage on negotiating why your one
```

1    proposed custodian is enough versus whether they should be

2    allowed to identify and get more custodians?

3         **MR. HUYNH:**  Oh, no.  Of course not, Your Honor.  We

4    would be willing to hear Meta out about other custodians as

5    well.

6         We just provided this particular custodian because based

7    upon our conversations with counsel for the agency, they said

8    that this particular custodian was best suited, given that she

9    was program manager for the one program that within Department

10   of Health was child-facing, whereas the others were more really

11   adult-facing.

12        **MR. PETKIS:**  Your Honor, two brief responses on that.

13        First of all, the issue is actually worse, I think, than

14   we're discussing now because the issue is not whether or not to

15   only use that custodian or use a number of additional

16   custodians.

17        The Department of Health, which has a number of

18   initiatives and focuses that are relevant to this litigation,

19   has taken the position that it can only do a targeted

20   collection and production -- we've received 47 documents -- and

21   that they will not provide custodial documents from the

22   Department of Health.

23        If they are saying now that they will run the terms on

24   that custodian, that's news to me.

25        But the second point is --

1          **THE COURT:** Are you running search terms and are you

2    going to provide hit reports on that -- at least that one

3    custodian?

4          **MR. HUYNH:** Judge, we've already provided hit reports.

5    As I discussed earlier, there are some concerns we have about

6    how the agency performed the hit report, but we are willing.

7          **THE COURT:** Okay. And are you willing to run search

8    terms against other custodians, if any others are identified?

9          **MR. HUYNH:** Depending on negotiations with Meta, we

10   are willing to consider that, Your Honor.

11         **MR. PETKIS:** Your Honor, it's -- it's, frankly,

12   difficult for us to negotiate given that we don't have insight

13   into who at the Department of Health might be working on these

14   issues.

15         But, further, just two very quick points. We received the

16   hit count for the first time yesterday, and the hit counts for

17   this custodian for every single string that Meta proposed and

18   every single permutation of proximity limitation was zero

19   documents.

20         **THE COURT:** Okay. Well, that's clearly not a very

21   valuable hit report, is it?

22         **MR. HUYNH:** Judge, so that's with regards to the

23   proximity limiters.

24         But we actually had also run hit reports again using "and"

25   as well, which generated a lot more documents than we were at

1    the time willing to produce because it would have been tens of

2    thousands or hundreds of thousands potentially.

3        So we are running hit reports against the Department of

4    Health.

5            **THE COURT:**  It sounds like you need to be much more

6    transparent about what hit reports you're running, what results

7    you're getting, who you're running them against and negotiate

8    all that.

9        Because I'm hearing from counsel for Meta is that there

10   was at least some communication from that agency that they

11   weren't going to run any hit reports at all.  They weren't

12   going to run any search terms at all.

13           **MR. PETKIS:**  Just a quick correction, Your Honor.

14       It's not so much that they would not run hit reports,

15   although that is true that we didn't know that until they

16   provided them yesterday.

17       And briefly with respect to the "and" connectors earlier,

18   the problem is that -- not the hit reports, but that they are

19   not agreeing to utilize the hit reports and the actual

20   custodians for the purposes of providing discovery.

21       In other words, they want to just do the targeted

22   collection and not actually provide custodial documents that

23   result from the hits.

24           **THE COURT:**  Is that -- is that your --

25           **MR. HUYNH:**  Judge, may I respond?

```
 1              THE COURT:  Yes.

 2              MR. HUYNH:  So Thomas Huynh for New Jersey again.

 3        So with regards to that, our initial position is that

 4   based upon what we provide in the targeted document production

 5   to Meta, we wanted to work with them to see if there is a gap

 6   left over that it would be appropriate for, say, a custodial

 7   search or search terms.

 8        The proposition is not that we would never be willing to

 9   run hit reports or search terms, Your Honor.

10              MR. PETKIS:  Your Honor, we received 47 documents from

11   the New Jersey Department of Health.

12              THE COURT:  Yeah.  So, okay.  Two things.

13        If you're going to propose that use -- that use

14   alternative search methods other than search terms to comply

15   with your duties to search for and produce documents, you've

16   got to be transparent about how you did it and what the method

17   was and how you got them and who you got them from -- all

18   right? -- and let Meta know and negotiate that.  But it sounds

19   like if it's only 47 documents, it doesn't sound like a very

20   comprehensive search at all.

21        So what I'm saying is going forward I'm going to encourage

22   you all to focus on finalizing the search terms and hit reports

23   and getting the documents produced pursuant to the search terms

24   search, right, with custodians that you negotiate are

25   appropriate.  Okay?  It may be one.  It may be more.  I don't
```

```
 1    know.  I don't know who in the agency is relevant.  That's

 2    something for you to work out.  Okay?

 3              MR. PETKIS:  Thank you, Your Honor.

 4              MR. HUYNH:  Thank you, Your Honor.

 5              THE COURT:  Again, by next Wednesday I want a one-page

 6    letter brief with a schedule from you both on how to get this

 7    done.  Okay?

 8              MR. HUYNH:  Judge, may I clarify?  So with regards to

 9    the schedule, you just want dates; right?  Nothing else.

10              THE COURT:  I want dates, but I'm going to hold you to

11    them.  Okay?

12              MR. HUYNH:  Of course.

13              THE COURT:  And I don't want dates that are going to

14    impact -- where it's going to impact, you know, the rest of

15    discovery.

16        So if people are going into this thinking they are going

17    to negotiate dates that stretch out into March, you're sadly

18    mistaken.  Okay?

19        So you've got to get this done expeditiously.  Okay?

20    You've had months to work on this stuff.

21              MR. HUYNH:  Understood, Your Honor.  We shall do so.

22    Thank you.

23              MR. SCHMIDT:  Your Honor, may I just ask a

24    clarification about these letter briefs?

25        One concern that we have -- well, two concerns.  One
```

```
 1    concern that we have on our end is, kind of conservatively,

 2    we're now past three deadlines that Your Honor has set for

 3    something to happen next week that should have happened

 4    December 2nd, should have happened November 1st, should have

 5    happened promptly after Your Honor's September order.  That

 6    puts us in a really tough position.

 7         We've got to be able to come back to the Court and not

 8    just say schedule, but if they dig in, be able to say they have

 9    to do our terms.  Because otherwise we're just right back where

10    we were in September and where we have been since --

11         THE COURT:  If for some reason you can't come to

12    agreement on the schedule, nothing stops you from filing a

13    motion asking for appropriate relief.

14         MR. SCHMIDT:  Okay.

15         THE COURT:  All right?  I mean, I'm not saying that

16    this is a replacement for that, but I -- what I -- because the

17    reason I'm putting -- I'm dealing with these as a category is

18    these appear, at least to me from what I'm hearing, to be

19    counsel and the agencies that are trying -- at least sound like

20    they are trying to work things out with you.

21         MR. SCHMIDT:  Right.

22         THE COURT:  And so in the spirit of, you know, hope

23    springs eternal that you can all work things out without having

24    to get to the point where you file a motion under Rule 37 or

25    otherwise -- all right? -- let's try to get there before we
```

```
 1   pull that trigger.

 2        But, again, you know, it's -- you know, I understand your

 3   concern and at some point, you know, you come to the Court with

 4   whatever relief you think you need at whatever point -- all

 5   right? -- and either I grant it or I don't.

 6        MR. SCHMIDT:  And I do want to underscore on that,

 7   part of what we're facing is we're now being told in

 8   meet-and-confer discussions:  We can't do anything like what

 9   you want in the time frame available.  Where the timing is

10   being used against us in these negotiations.

11        We've asked in our letter brief -- if we come back for

12   relief, we'll ask for some kind of recommendation that these

13   states be taken off the trial calendar.

14        THE COURT:  So on that, on that point, I think -- if

15   it's -- that's something you should go directly to Judge

16   Gonzalez Rogers on because I don't control her trial calendar.

17   And so if that's the relief you're asking for, she's the one to

18   ask it of.

19        MR. SCHMIDT:  We'll be guided by that.

20        The reason we framed it to Your Honor in terms of a

21   recommendation is just because she may want Your Honor's views

22   on where the state of discovery is and where the responsibility

23   lies, but we can take that to her.

24        THE COURT:  So I was going to say, to give you some

25   guidance here, I mean -- you know, I mean, you know the law as
```

```
 1    well as I do.  I mean, there are certain things I can do in
 2    terms of discovery sanctions that don't go to trial scheduling
 3    and overall case management.  That's not within my purview;
 4    right?
 5        And you're certainly -- I mean, you can be as creative as
 6    you want, I suppose, to try to figure out what kind of relief
 7    you can ask from me in terms of what I'm doing in the case,
 8    right, and whether some kind of sanction, such as maybe, you
 9    know, reducing number of hours for deposition available to one
10    side or the other as a sanction, or something like that; right?
11    I mean, I'm sure there must be a myriad of examples of
12    discovery sanctions in the case law that you can look to.
13              MS. O'NEILL:  If I can --
14              MR. SCHMIDT:  I guess hearing that one remedy, we
15    would probably request as a finding as to the fact that there
16    have been serial violations of Court ordered deadlines, because
17    that, I think, would be the predicate for Judge Gonzalez Rogers
18    acting.
19              THE COURT:  I'm sure you would certainly put that in
20    any briefing for relief to me on a discovery issue where you're
21    asking for relief.  It would certainly be in -- it would be in
22    the recorded, so thank you.
23              MS. O'NEILL:  May I briefly be heard on this, Your
24    Honor?
25              THE COURT:  Okay.
```

```
 1              MS. O'NEILL:  Megan O'Neill for the State AGs --

 2              THE COURT:  But I'm not entertaining motions for

 3    sanctions.

 4              MS. O'NEILL:  Understood.  And I just want to briefly

 5    make a record that we, of course, do not believe that any of

 6    these remedies that Meta's counsel has just mentioned are

 7    warranted.

 8         As you have seen, the state agencies are really working

 9    hard, working cooperatively to -- to get this discovery done,

10    and we feel that it is Meta who has been injecting delay into

11    the process.

12         And I won't go on and on about this, but I do want to just

13    make that record; that we feel like the state agencies have

14    been doing their best and working around the clock.  And these

15    kind of remedies, whether they are discovery remedies or

16    remedies that go beyond, are simply unwarranted when the

17    agencies are working expeditiously and cooperatively to get

18    this discovery done.

19              THE COURT:  I've made -- certainly don't take any

20    comments I made.  I've made no decision.  I'm certainly not

21    voicing any opinion on any ultimate issue on sanctions of any

22    kind.

23         I'm just reacting to counsel's comments, that certainly

24    procedurally they are free to do whatever they want and you're

25    free to obviously brief the issues in opposition.
```

```
 1              MS. O'NEILL:  Understood.

 2              THE COURT:  And they may be fully unjustified.

 3              MS. O'NEILL:  Understood.

 4              MR. SCHMIDT:  May I be just heard briefly on that

 5     point, because it's just -- it's not accurate from our point of

 6     view.  It's not accurate as to Meta.

 7          We've reached agreement with four states right up to the

 8     deadline where they violated.  We've still reached agreement

 9     with them.  We've limited our discovery for a broad range of

10     agencies.  That governs 22 states, the vast majority of states.

11     Governs 63 agencies.  Where they haven't met their search term

12     obligations, we've done that.  We've proposed search terms, two

13     rounds of those.

14          We've tailored and narrowed search terms, and we've worked

15     with them when they have given us incomplete hit reports.

16     Those are facts.  Those are undisputed.

17          Also undisputed is that there are court orders telling

18     them to do certain things.  They go back to us raising this

19     dispute in February where Your Honor found that the manner they

20     briefed this delayed it.  Telling them in September be quick.

21     Instead they appealed and asked for stays that were denied.

22     Telling them November 1st.  Telling them December 2nd.  Those

23     are objective facts, too.

24          And to say that this is Meta's fault is irreconcilable

25     with what's happened in the real world.
```

1          **MS. O'NEILL:**  Your Honor, I need to respond briefly.

2     I will keep it brief.

3          Throughout this process --

4          **THE COURT:**  I opened the door to this discussion.

5          **MS. O'NEILL:**  Meta has -- I will keep this brief.

6     Meta has insisted that all of the state agencies at issue

7     here engage in expansive one-size-fits-all discovery.  And I

8     understand why Meta wants to do that.  It's streamlined.  It

9     makes sense.  For them.  But it's not appropriate for the

10    circumstances that we're in, where different state agencies are

11    of different sizes, have different technological

12    sophistication, have different mandates.

13         Meta's insistence on this, again, one-size-fits-all

14    approach has caused delay in reaching agreements and completing

15    discovery and resulted in the agencies expending enormous

16    amounts of time and resources on negotiations rather than on

17    getting documents to Meta.

18         Meta has refused to meaningfully engage with the state's

19    proposals to narrow search terms, use targeted searches,

20    deprioritize agencies, and to explain what is sought beyond

21    Rule 45 subpoenas.

22         I'm happy to expand.  I understand that you do not wish me

23    to, so I will leave it at that.

24         **THE COURT:**  This is not an issue that's before me

25    today.  Actually, you both are starting to say things that was

```
1   in the briefing.
2        Look, we're not at the point of specific remedies for any
3   violations of court orders at this point, but I do -- I don't
4   know how much more clear I can be.  I'm setting -- let's put it
5   this way.
6        I'm ordering -- for those of you just waiting to talk --
7   all right? -- I'm going to be ordering everyone to be providing
8   a one-page schedule to get this done and, boy, you know, I am
9   going to hold you to that.  And Meta is fully within their
10  rights to seek relief if those schedules are not adhered to.
11  Okay?
12           MR. SCHMIDT:  All I would say, Your Honor, is that
13  argument was rejected by Your Honor in September, and they are
14  still fighting Your Honor's order.
15           MS. O'NEILL:  And Meta is engaging in the same tactics
16  as it was before.
17           THE COURT:  Okay.  So let's move on.
18       Do -- given my comment that I'm going to order all the
19  agencies who are waiting to talk to me to submit a one-page
20  schedule for getting things done with Meta, do you need
21  anything specific to raise with me?
22           MR. WALLACE:  Just -- Kevin Wallace for New York.
23       I take it the instruction, then, is for states and
24  agencies that are engaging that -- advance those negotiations
25  and have our schedule for you by Wednesday.
```

1      **THE COURT:**  Yes.

2      **MR. WALLACE:**  I don't have anything else to add about

3  the stays of the New York negotiations.

4      **MR. SCHMIDT:**  We would like to know who those states

5  are.  Because if they are not here, then they should be bound

6  by our terms as of this moment, in our view.

7      **THE COURT:**  So Colorado, we already went through.

8  Connecticut?  Anyone from Connecticut higher?

9  Okay.  So are you committed to coming up with a schedule

10  and abiding by it?

11      **MS. SHAW:**  Good afternoon, Your Honor.  Tess Shaw on

12  behalf of the Connecticut Attorney General's Office.

13  Yes, Your Honor.  The Attorney General's Office is

14  committed to submitting that one-page schedule.

15  And if I may briefly, for the record, clarify that in

16  Meta's briefing in Footnote Number 3 it mischaracterizes the

17  Connecticut Commission for Educational Technology as an agency

18  or commission that has not fully complied.  And I would like to

19  put on the record, Your Honor, that the Commission has fully

20  complied with its Rule 45 subpoena and, in addition, it has

21  provided search terms and custodians.

22      **MR. YEUNG:**  Christopher Yeung for Meta.

23  They have not provided us with hit reports, even though we

24  asked for them.  That's why they are in that bucket or in that

25  footnote.

```
 1              THE COURT:  Can they get hit reports out?

 2              MS. SHAW:  Your Honor, I do not have that information

 3    with me.  I can consult with them.

 4              THE COURT:  You need to.  All right?  So, again, you

 5    really need to tell your agencies to get hit reports out when

 6    they can.  Okay?

 7              MS. SHAW:  Yes, Your Honor.  Okay.  Thank you.

 8              MR. SCHMIDT:  Your Honor, can we have a date certain

 9    for that?

10        I mean, this -- this is the problem.  Until we appear

11    before Your Honor, everything happens in the day before.  May

12    we have a date certain for Connecticut?

13              THE COURT:  The Commission on Educational Technology,

14    I mean --

15              MR. SCHMIDT:  May we get them Friday?

16              THE COURT:  Can you get them hit reports on Friday?

17              MS. SHAW:  Your Honor, I will need to consult with the

18    Commission.

19              THE COURT:  Well, how about this?  You're ordered to

20    provide the hit reports by Monday.  By Monday.  Okay?

21              MS. SHAW:  Okay.

22              THE COURT:  And you should be negotiating the schedule

23    with Meta, like, immediately, too.  Okay?

24              MS. SHAW:  Understood.

25              THE COURT:  Okay.  And all the directions I have been
```

Pages 1 - 93

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE: SOCIAL MEDIA          )
ADOLESCENT ADDICTION/PERSONAL )
INJURY PRODUCTS LIABILITY     )   NO. 22-MD-03047 YGR (PHK)
LITIGATION                    )
                              )
_____)


                         San Francisco, California
                         Thursday, January 16, 2025


            **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiffs:
                    ANDRUS ANDERSON LLP
                    155 Montgomery Street, Suite 900
                    San Francisco, California 94104
              BY:   **JENNIE LEE ANDERSON, ATTORNEY AT LAW**

                    SEEGER WEISS LLP
                    55 Challenger Road, Sixth Floor
                    Ridgefield Park, New Jersey 07660
              BY:   **JENNIFER R. SCULLION, ATTORNEY AT LAW**
                    **CHRISTOPHER L. AYERS, ATTORNEY AT LAW**

                    LIEFF, CABRASER, HEIMANN
                      & BERNSTEIN LLP
                    275 Battery Street, 29th Floor
                    San Francisco, California 94111
              BY:   **LEXI J. HAZAM, ATTORNEY AT LAW**
                    **MICHAEL LEVIN-GESUNDHEIT ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              Official U.S. Reporter, CSR No. 7445

Add. 752

**APPEARANCES:** (CONTINUED)

For the Plaintiffs:

                    MOTLEY RICE LLC
                    401 9th Street NW, Suite 630
                    Washington, D.C. 20004
         BY:  **PREVIN WARREN, ATTORNEY AT LAW**

                    MOTLEY RICE LLC
                    28 Bridgeside Boulevard
                    Mount Pleasant, South Carolina 29464
         BY:  **ANNIE E. KOUBA, ATTORNEY AT LAW**

                    GIBBS LAW GROUP LLP
                    1111 Broadway, Suite 2100
                    Oakland, California 94607
         BY:  **ANDRE MICHEL MURA, ATTORNEY AT LAW**

                    WEITZ & LUXENBERG, P.C.
                    700 Broadway
                    New York, New York 10003
         BY:  **AARON FREEDMAN, ATTORNEY AT LAW**

For School District Plaintiffs:
                    LEVIN SEDRAN & BERMAN LLP
                    510 Walnut Street, Suite 500
                    Philadelphia, Pennsylvania 19106-3697
         BY:  **MICHAEL M. WEINKOWITZ, ATTORNEY AT LAW**

For Plaintiff State of Arizona:
                    ARIZONA ATTORNEY GENERAL'S OFFICE
                    2005 North Central Avenue
                    Phoenix, Arizona 85004
         BY:  **NATHAN E. WHELIHAN**
             **ASSISTANT ATTORNEY GENERAL**

For Plaintiff State of California:
                    CALIFORNIA DEPARTMENT OF JUSTICE
                    455 Golden Gate Avenue, 11th Floor
                    San Francisco, California 94102
         BY:  **MEGAN O'NEILL, DEPUTY ATTORNEY GENERAL**
             **EMILY C. KALANITHI**
             **SUPERVISING DEPUTY ATTORNEY GENERAL**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:** (CONTINUED)

For Plaintiff State of California:
           CALIFORNIA DEPARTMENT OF JUSTICE
           OFFICE OF THE ATTORNEY GENERAL
           1515 Clay Street, Suite 2000
           Oakland, California 94612
        BY:  **JOSHUA OLSZEWSKI-JUBELIRER**
           **DEPUTY ATTORNEY GENERAL**

For Plaintiff California Department of Health Care Services:
           CALIFORNIA DEPARTMENT OF JUSTICE
           455 Golden Gate Avenue, Suite 11000
           San Francisco, California  94102
        BY:  **BRENDAN P. RUDDY**
           **ANNA T. FERRARI**
           **DEPUTY ATTORNEYS GENERAL**

For Plaintiff California Business, Consumer Services and
Housing Agency:
           OLSON REMCHO
           1901 Harrison Street, Suite 1550
           Oakland, California 94612-3597
        BY:  **MARGARET R. PRINZING, ATTORNEY AT LAW**

For Plaintiff State of Colorado:
           OFFICE OF THE ATTORNEY GENERAL
           COLORADO DEPARTMENT OF LAW
           Business and Licensing
           Ralph L. Carr Judicial Building
           1300 Broadway, Eighth Floor
           Denver, Colorado 80203
        BY:  **KRISTA BATCHELDER**
           **ASSISTANT ATTORNEY GENERAL**

For Plaintiffs State of Colorado Governor's Office and the
Office of State Planning and Budget:
           OFFICE OF THE ATTORNEY GENERAL
           COLORADO DEPARTMENT OF LAW
           Ralph L. Carr Judicial Building
           1300 Broadway, Eighth Floor
           Denver, Colorado 80203
        BY:  **JENNIFER SULLIVAN, ATTORNEY AT LAW**

      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiff State of Illinois:
                          ILLINOIS ATTORNEY GENERAL'S OFFICE
 3                        115 South LaSalle Street
                          Consumer Fraud, 26th Floor
 4                        Chicago, Illinois 60603
                     BY:  MATTHEW CHARLES DAVIES
 5                        ASSISTANT ATTORNEY GENERAL

 6   For Plaintiff Department of Children and Family Services:
                          ILLINOIS DEPARTMENT OF CHILDREN
 7                          AND FAMILY SERVICES
                          1911/1921 South Indiana
 8                        Chicago, Illinois  60616
                     BY:  MICHELLE G. CAMP
 9                        ASSISTANT TO THE GENERAL COUNSEL

10   For Plaintiff Commonwealth of Kentucky:
                          KENTUCKY OFFICE OF THE
11                          ATTORNEY GENERAL
                          Office of Consumer Protection
12                        1024 Capital Center Drive, Suite 200
                          Frankfort, Kentucky 40601
13                   BY:  DANIEL I. KEISER
                          ZACHARY J. RICHARDS
14                        PHILIP HELERINGER
                          ASSISTANT ATTORNEYS GENERAL
15
     For Plaintiff State of New Jersey:
16                        NEW JERSEY OFFICE OF THE
                            ATTORNEY GENERAL
17                        Division of Law
                          124 Halsey Street
18                        Box 45029
                          Newark, New Jersey 07101
19                   BY:  VERNA PRADAXAY
                          DEPUTY ATTORNEY GENERAL
20
     For Plaintiff State of New York:
21                        OFFICE OF THE ATTORNEY GENERAL
                          NEW YORK STATE
22                        28 Liberty Street
                          New York, New York 10005
23                   BY:  KEVIN C. WALLACE
                          SENIOR ENFORCEMENT COUNSEL
24

25           (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

**Add. 755**

```
1   APPEARANCES:  (CONTINUED)

2   For the Office of the New York State Governor:
                        SELENDY GAY PLLC
3                       1290 Avenue of the Americas
                        New York, New York 10104
4              BY:  CLAIRE O'BRIEN, ATTORNEY AT LAW

5   For Plaintiff State of Minnesota:
                        MINNESOTA OFFICE OF THE ATTORNEY GENERAL
6                       445 Minnesota Street, Suite 1400
                        St Paul, Minnesota 55101
7              BY:  CAITLIN M. MICKO
                   ASSISTANT ATTORNEY GENERAL
8
    For Plaintiff State of Pennsylvania:
9                       PENNSYLVANIA OFFICE OF THE
                            ATTORNEY GENERAL
10                      Strawberry Square, 16th Floor
                        Harrisburg, Pennsylvania 17120
11             BY:  JONATHAN BURNS, DEPUTY ATTORNEY GENERAL

12
    For Defendant Meta Platforms Incorporated:
13                      COVINGTON & BURLING LLP
                        1999 Avenue of the Stars, Suite 3500
14                      Los Angeles, California 90025
               BY:  ASHLEY M. SIMONSEN, ATTORNEY AT LAW
15
                        COVINGTON & BURLING LLP
16                      One City Center
                        850 Tenth Street, NW
17                      Washington, D.C.  20001
               BY:  MICHAEL X. IMBROSCIO, ATTORNEY AT LAW
18                  STEPHEN PETKIS, ATTORNEY AT LAW
                    MICHAEL N. KENNEDY, ATTORNEY AT LAW
19
                        COVINGTON & BURLING LLP
20                      The New York Times Building
                        620 Eighth Avenue
21                      New York, New York 10018
               BY:  CHRISTOPHER Y.L. YEUNG, ATTORNEY AT LAW
22                  PAUL W. SCHMIDT, ATTORNEY AT LAW

23             (APPEARANCES CONTINUED ON FOLLOWING PAGE)

24

25
```

```
 1   APPEARANCES:  (CONTINUED)

 2   For Defendant Meta Platforms Incorporated:
                         COVINGTON & BURLING LLP
 3                       Sales Force Tower
                         415 Mission Street, Suite 5400
 4                       San Francisco, California 94105
                     BY:  ISAAC D. CHAPUT, ATTORNEY AT LAW
 5
                         SHOOK, HARDY & BACON LLP
 6                       2555 Grand Boulevard
                         Kansas City, Missouri  64108
 7                   BY:  MEGAN M. EGLI, ATTORNEY AT LAW

 8

 9   For Defendant Snap, Inc.:
                         MUNGER, TOLLES & OLSON LLP
10                       560 Mission Street, 27th Floor
                         San Francisco, California  94105
11                   BY:  JONATHAN H. BLAVIN, ATTORNEY AT LAW

12                       MUNGER, TOLLES & OLSON LLP
                         355 South Grand Avenue, 35th Floor
13                       Los Angeles, California 90071
                     BY:  LAURA M. LOPEZ, ATTORNEY AT LAW
14                        FAYE PAUL TELLER, ATTORNEY AT LAW

15   For Defendant TikTok:
                         KING & SPALDING LLP
16                       1180 Peachtree Street
                         Atlanta, Georgia 30309
17                   BY:  GEOFFREY DRAKE, ATTORNEY AT LAW

18                       KING & SPALDING LLP
                         50 California Street, Suite 3300
19                       San Francisco, California 94111
                     BY:  BAILEY J. LANGNER, ATTORNEY AT LAW
20
                         O'MELVENY & MYERS LLP
21                       1999 Avenue of the Stars
                         Los Angeles, California 90067
22                   BY:  LAUREN F. KAPLAN, ATTORNEY AT LAW

23            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

24

25
```

1    **APPEARANCES:**  (CONTINUED)

2    For Defendant YouTube:

3                             WILSON, SONSINI, GOODRICH & ROSATI
                         One Market Street
                         Spear Tower, Suite 3300

4                             San Francisco, California 94105
        BY:  **LAUREN GALLO WHITE, ATTORNEY AT LAW**

5                    **JENNA K. STOKES, ATTORNEY AT LAW**

6                             WILSON, SONSINI, GOODRICH & ROSATI
                         Columbia Center

7                             701 5th Avenue, Suite 5100
                         Seattle, Washington 98104

8            BY:  **McKINNEY WHEELER, ATTORNEY AT LAW**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**<u>Thursday - January 16, 2025</u>**                        **<u>1:21 p.m.</u>**

<div align="center"><u>P R O C E E D I N G S</u></div>

<div align="center">---o0o---</div>

      **THE COURTROOM DEPUTY:**  Now calling 22-MD-3047,
In Re Social Media Adolescent Addiction and Personal Injury
Products Liability Litigation.

      Counsel, when speaking, please state your name clearly for
the record and speak as slowly as you can for the court
reporter today.  Thank you.

      **THE COURT:**  Good afternoon, everyone.

      **ALL:**  Good afternoon, Your Honor.

      **THE COURT:**  So you-all teed up a bunch of issues for
me.  So I'm going to -- first of all, just so you're all clear,
I am not going to hear any argument on Docket 1547, which is
the discovery letter dispute regarding Snap's assertion of
privilege in connection with 14 redacted documents.  My
intention is to rule on that on the papers as I did with the
other privilege dispute.  Is that understood?  So whoever was
preparing to argue that, you can step down.

      And then what I'm -- given -- I think I told you this at
the last one.  I'm on criminal duty this month.  So given the
shortness of time available, what I'm going to do is, instead
of having what are normal kind of free-ranging oral argument,
I'm going to tell you what my plan is, at least as a tentative,
for each of the motions you've teed up.  I'm going to give you

<div align="center">**Add. 759**</div>

1    red herring and it's irrelevant.

2         The 30(b)(6) notice is addressed to each state as a state,

3    as a party; it's not addressed to the agencies.  And so as the

4    responding party to the deposition notice, it is up to each

5    state, as a party, to decide whom they want to pony up and

6    present as the representative witness for each topic.  And so

7    it may be an agency person; it may not be an agency person.  It

8    may require talking to an agency person; it may not require

9    talking to an agency person.

10        But this is not -- they're not trying to get at discovery

11   from an agency by these notices.  They're asking the state to

12   provide a witness.  And it's up to the state to decide who they

13   want to provide.  It's totally within your control.  Okay?

14        **MR. RICHARDS:**  Okay.  I would just ask, Your Honor,

15   there's an underlying question here about the bindingness of

16   the testimony from a state agency.  I think it also relates to

17   the overbreadth issue that we've raised just on the plethora of

18   topics in the notice.

19        And so insofar as the state AGs would be putting up

20   witnesses from other agencies who might have agency-specific

21   information, it would be helpful to understand the bindingness

22   of that testimony on the litigants.

23        **THE COURT:**  Again, that's not how Rule 30(b)(6)

24   works.  You present a witness on behalf of the state --

25   right? -- the party, to testify on behalf of the state.  It may

**PROCEEDINGS**

```
 1   or may not be an agency person; it may be -- it may be
 2   somebody -- it could be -- I mean, I've seen cases where people
 3   put up expert witnesses.  It could be whoever you choose.
 4        That person has to then be prepared to answer questions on
 5   that particular topic.  Now, of course, it is often the case
 6   that sometimes the topics are so broad that it requires an
 7   encyclopedic knowledge of an individual and it's -- they may
 8   not know everything that comes up at the deposition; but they
 9   do need -- they're under an obligation to be prepared to answer
10   questions on that topic.
11        And so it is -- to the extent they're able to answer after
12   adequate preparation, then that is binding in the sense that
13   they're representing the state and they were prepared by the
14   state to talk on that topic.  I don't care whether they're an
15   agency person or not.  It's up to you whether they're an agency
16   person or not.  It's not up to Meta.  It's not up to me.
17        And if the answer is "Well, that's such a detailed
18   question, there's no way to prepare to answer that but we'll
19   try to get" -- the usual thing -- "we'll try to get you that
20   answer later," that's usually what happens.  And sometimes the
21   answer is "We looked into that and we just don't know.  As a
22   party, we take no position on that."  Right?  Because it's
23   just -- it's a weird detail that nobody has ever looked into or
24   is incapable of knowing.  I mean, it really depends on the
25   question.  All right?
```

1    But in terms of bindingness, the way 30(b)(6) works is you

2    pick the witness who's going to bind -- quote, "bind,"

3    represent the party on a particular topic; and it could be --

4    it looks like it could be multiple people, each one with a

5    different set of topics.  Right?  And it's up to you to prepare

6    them adequately.

7         **MR. RICHARDS:**  I would just also -- I think we -- the

8    state AGs have, you know, compared the -- you know, reviewed

9    Your Honor's order from September 6th and looked at the

10   language of Rule 30 and Rule 34; and I think this, you know,

11   concerns the language in Rule 30 about reasonably available and

12   the difference in scope under those two rules.

13        And so I think our position would be that soliciting the

14   information which might be within the agency's knowledge would

15   go -- would not be reasonably available to the AGs just based

16   on the way those topics are written.

17        **THE COURT:**  Again, you're misunderstanding.  This is

18   where I said I think it's a red herring; it's a misnomer.

19        Under Rule 30(b)(6), the party here -- it's not the

20   state AG -- I mean, there's a couple of states where the AG is

21   the party, but for the most part, the state is the party;

22   right?  And the state has a responsibility as a party to

23   identify a person to testify on behalf of that party with

24   regard to that issue.  Right?

25        And it is often the case in very large corporations, very

PROCEEDINGS

```
 1   large entities, whoever that person is, they may need to talk

 2   to multiple people and review multiple documents to be prepared

 3   to testify on that topic.  Right?  But that's not some untoward

 4   way of getting discovery from those people who they talk to to

 5   prepare for.  That's the normal process.  Right?

 6            MR. RICHARDS:  I understand that, Your Honor.  And I

 7   would just -- you know, and not to reargue the briefing, but

 8   I think -- we're not aware of any situation where a state has

 9   been designated in this way, where multiple agencies have been

10   wrapped up.

11        The definition, you know, of the responding parties in the

12   notice does apply to those agencies in your September 6 order.

13   And our review of the case law, including cases Meta cited,

14   we're not aware of any situation where multiple agencies are

15   wrapped up into one 30(b)(6) notice, even if the party is a

16   state.

17        In those instances in the cases we've reviewed, they're

18   distinguishable because the agencies have either received a

19   notice themselves or, in the corporate context, the facts have

20   been so different and the notices, again, in those cases have

21   been to one entity.  So we're not aware of any case law or --

22   you know, that says that multiple entities could be wrapped up

23   in that one 30(b)(6) notice.

24            THE COURT:  That happens all the time.  You send a

25   depo notice, a 30(b)(6) depo notice to a conglomerate, General
```

1    Electric, and they've got to pony up a witness to speak on

2    behalf of the conglomerate.

3         I mean, it may require talking to other people to prepare.

4    That's the whole purposes of Rule 30(b)(6).  As a party, you're

5    supposed to find someone who can be prepared.  We're not

6    dealing with California state law where it's got to be the

7    person most knowledgeable.  Right?  You've got an obligation to

8    prepare the person -- reasonably, of course -- right? -- to

9    answer questions on the topic.  Right?

10        And so, again, it's not -- there's no wrapping up of

11   people -- of agencies as a party here.  That's why I think the

12   argument and that line of discussion is really orthogonal to

13   this because under Rule 30(b)(6), the witness is just supposed

14   to talk to whoever they need to.  Again, it may not be an

15   agency.  They may just be able to prepare to answer the

16   question based on review of some documents.  I don't know.

17   Right?  And it's going to depend topic by topic.

18        But I think trying to posit that this is an attempt to get

19   at depositions of agencies is -- starts with the wrong

20   supposition -- right? -- because, again, it's up to you to

21   decide how to prepare the witnesses best -- right? -- and it

22   may or may not include agencies.

23             MR. RICHARDS:  I understand that, Your Honor.

24        And I would just also say that, you know, perhaps using

25   your General Electric example, the states don't view themselves

1  as such a monolithic entity.

2      And just to use Kentucky as an example, you know, as

3  opposed to, like, the federal government or something like

4  that, these are dual executives.  Kentucky is a state that has

5  one party of a Governor and one party of an Attorney General.

6  And so we think sort of forcing them to come together and make

7  a statement on behalf of the state or take a position on behalf

8  of the state, as an entity, would not account for that

9  dual executive function and the fact that there might not be a

10  coherent statement to provide on behalf of the state *qua* state.

11      **THE COURT:**  Well, I think partially that argument has

12  been rejected in the previous motion.  I know it's under

13  Rule 34, but that concept was previously rejected.

14      And, again, here, the state is the entity that's the

15  party.  Right?  And, again, as a party -- because I took out

16  the contention topics, most of what's left is just factual.

17  And as a party, you have to be able to answer factual questions

18  if you know -- right? -- if the party knows.  Right?

19      And sometimes a party as an entity, a corporation, a large

20  entity, a government entity, takes a position that it doesn't

21  know -- right? -- or it takes no position, or it's done a

22  reasonable investigation and can't find that information.

23  Right?  Again, it's going to be very question specific and it's

24  going to be very topic specific.

25      And, again, I'm going to leave it up to you to, you know,

1  negotiate and talk about overbreadth because that's a different

2  issue. Right? And, again, that's going to be very specific to

3  each question, I think.

4       **MR. PETKIS:** Your Honor, if I could, just because

5  time is short in terms of getting these depositions taken, I'd

6  hate to have to come back to Your Honor for further guidance on

7  this issue.

8      Obviously, we've put a lot of work into -- both the Court

9  and the parties, into the document discovery. It is Meta's

10  intention, just that so we're not hiding the ball, to use

11  documents that we've obtained in discovery during these

12  30(b)(6) depositions.

13      You know, my fear is that without sufficient guidance, the

14  position that many state representatives might take, when

15  presented with a document, say, from the Department of Health

16  or Department of Education, is to say, "Well, I'm not educated

17  on that. That's the Department of Education or that's the

18  Department of Health. It's not the state."

19      And for these depositions to be meaningful, it's -- again,

20  it's not that we're taking a deposition of the agency because

21  if we had wanted that, we would have done that via 30(b)(6),

22  but we do expect the states to be educated on the information

23  they've produced pursuant to Your Honor's orders.

24       **THE COURT:** Well, I mean, again, yeah, so generally,

25  they need to be prepared to testify on the topic as noticed.

PROCEEDINGS

```
 1        If there are specific documents you know -- and everybody

 2   knows what the hot documents are.  If there are specific

 3   documents that you know you're going to want to ask a witness

 4   about -- a party witness about at deposition, you could amend

 5   the notice to include "Be prepared to talk on this topic,

 6   including but not limited to what's in Document Bates Number

 7   XYZ."  Right?  And that way, you've got your record that you

 8   wanted a witness who could talk about this specific document if

 9   it's that important.

10        MR. PETKIS:  Understood.  I mean, I think we have,

11   you know, grave concerns about identifying our deposition

12   exhibits in advance; but I hear Your Honor, that, you know, we

13   will do our best in the further negotiations.

14        THE COURT:  Part of the rules of federal procedure in

15   the discovery process -- the modern discovery process is to

16   avoid litigation by ambush; and so --

17        MR. PETKIS:  Understood.

18        THE COURT:  -- at some point the documents -- the

19   exhibits that are interesting to the parties become known

20   through the course of depositions anyway; and to some extent,

21   you already probably know what documents you're going to use to

22   a large extent.

23        MR. PETKIS:  Well, I would agree with you in a normal

24   case, Your Honor.  I will just note that we're expecting

25   documents to come in very late in this case, including after
```

*CERTIFIED COPY*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

IN RE: SOCIAL MEDIA          )    **Further Case Management**
ADOLESCENT ADDICTION/         )    **Conference**
PERSONAL INJURY PRODUCTS      )
LIABILITY LITIGATION          )    NO. C 22-03047 YGR
                              )
                              )
ALL ACTIONS                   )    Pages 1 - 30
                              )
_____ )    Oakland, California
                                   Friday, January 17, 2025


<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>



APPEARANCES:

For Plaintiffs:          Lieff, Cabraser, Heimann &
                           Bernstein
                         275 Battery Street, 30th Floor
                         San Francisco, California  94111
                    BY:  LEXI J. HAZAM, ATTORNEY AT LAW

                         Andrus Anderson LLP
                         155 Montgomery Street, Suite 900
                         San Francisco, California  94104
                    BY:  JENNIE LEE ANDERSON, ATTORNEY AT LAW


            (Appearances continued next page)



Reported By:        Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

Add. 768

```
 1                    A P P E A R A N C E S  (CONT'D.)

 2

 3    For Plaintiffs:        Motley Rice LLC
                             401 9th Street NW Suite 630
 4                           Washington, DC  20004
                        BY:  PREVIN WARREN, ATTORNEY AT LAW
 5
                             Motley Rice LLC
 6                           28 Bridgeside Boulevard
                             Mt. Pleasant, South Carolina  29464
 7                      BY:  ANNIE E. KOUBA, ATTORNEY AT LAW

 8

 9                           Levin Sedran & Berman LLP
                             510 Walnut Street, Suite 500
10                           Philadelphia, Pennsyvlania  19106
                        BY:  MICHAEL M. WEINKOWITZ, ATTORNEY AT LAW
11
                             Kessler Topaz Meltzer Check LLP
12                           280 King of Prussia Road
                             Radnor, Pennsylvania  19087
13                      BY:  MELISSA L. YEATES, ATTORNEY AT LAW

14    For Plaintiff Abraham:  Boies Schiller Flexner LLP
                             44 Montgomery Street, 41st Floor
15                           San Francisco, California  94104
                        BY:  NICHOLAS A. SANTOS,
16                           JOSHUA STEIN, ATTORNEYS AT LAW

17

18    For Plaintiff State    California Department of Justice
      of California:          1515 Clay Street, 20th Floor
                             Oakland, California  94612-0550
19                      BY:  MEGAN O'NEILL,
                             JOSHUA E. OLSZEWSKI-JUBELIRER,
20                           BRENDAN RUDDY,
                              DEPUTY ATTORNEYS GENERAL
21

22    For Plaintiff State of  Colorado Department of Law
      Colorado:               1300 Broadway, 6th Floor
23                           Denver, Colorado  80203
                        BY:  KRISTA BATCHELDER,
24                            DEPUTY SOLICITOR GENERAL

25
```

**A P P E A R A N C E S (CONT'D.)**

```
 1

 2

 3   For State of New York:   New York State Office of the Attorney
                              General
 4                           28 Liberty Street, 23rd Floor
                             New York, New York  10005
 5                  BY:      KEVIN C. WALLACE, ATTORNEY AT LAW

 6   For Plaintiff            Office of the Kentucky Attorney
     Commonwealth of           General
 7   Kentucky:                1024 Capital Center Drive, Suite 200
                              Frankfort, Kentucky  40601
 8                  BY:      PHILIP R. HELERINGER,
                               ASSISTANT ATTORNEY GENERAL
 9

10   For New Jersey           New Jersey Office of the Attorney
     Plaintiffs:                General, Division of Law
11                            124 Halsey Street, 5th Floor
                              Newark, New Jersey  07101
12                  BY:      VERNA J. PRADAXAY,
                               DEPUTY ATTORNEY GENERAL

13   For Plaintiff State of   Office of the Arizona Attorney General
     Arizona:                 Consumer Protection and Advocacy
14                              Section
                              2005 N. Central Avenue
15                            Phoenix, Arizona 85004
                    BY:      NATHAN WHELIHAN,
16                             ASSISTANT ATTORNEY GENERAL

17   For the Meta             Covington & Burling LLP
     Defendants:              One City Center
18                            850 Tenth Street, NW
                              Washington, DC  20001-4956
19                  BY:      PAUL W. SCHMIDT,
                              ASHLEY M. SIMONSEN, ATTORNEYS AT LAW
20

21   For Defendant Snap       Munger, Tolles & Olson
     Inc.:                    560 Mission Street, 27th Floor
22                            San Francisco, California  94105
                    BY:      JONATHAN H. BLAVIN, ATTORNEY AT LAW
23

24

25
```

**Add. 770**

```
1                    A P P E A R A N C E S  (CONT'D.)

2

3    For Defendant TikTok    King & Spalding LLP
     Inc.; ByteDance, Inc.:  1180 Peachtree Street, N.E.
4                            Suite 1600
                             Atlanta, Georgia  30309-3521
5                      BY:   GEOFFREY M. DRAKE, ATTORNEY AT LAW

6                            O'Melveny & Myers LLP
                             400 South Hope Street, Suite 1900
7                            Los Angeles, California  90071
                       BY:   LAUREN KAPLAN, ATTORNEY AT LAW
8

9    For Defendant Alphabet  Wilson, Sonsini, Goodrich & Rosati
     Inc.; Google, LLC;      One Market Plaza
10                           Spear Tower, Suite 3300
     YouTube, Inc.:          San Francisco, California  94105-1126
11                     BY:   JENNA K. STOKES, ATTORNEY AT LAW

12   For Defendant Alphabet  Williams & Connolly LLP
     Inc.; Google, LLC;      680 Main Avenue, SW
13   YouTube, Inc.:          Washington, DC  20024
                       BY:   JOSEPH G. PETROSINELLI,
14                             ATTORNEY AT LAW

15

16   ALSO PRESENT:           Brocksted Mandalas Federico
                             2850 Quarry Lake Drive, Suite 220
17                           Baltimore, Maryland  21209
                       BY:   MATTHEW P. LEGG, ATTORNEY AT LAW
18

19                           Hendy Johnson Vaughn
                             2380 Grandview Drive
20                           Fort Mitchell, Kentucky  41017
                       BY:   SARAH EMERY, ATTORNEY AT LAW
21

22

23                           --OOO--

24

25
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

**Add. 771**

```
 1    Friday, January 17, 2025                        9:00 a.m.
 2                      P R O C E E D I N G S
 3                          --o0o--
 4
 5         THE CLERK:  Your Honor, we're calling MDL 22-03047 In
 6    Re: Social Media Adolescent Addiction, slash, Personal Jury
 7    Products Liability litigation.
 8       Please step forward and state your appearances for the
 9    record, please.
10         THE COURT:  Okay.  Nikki, I didn't hear that last
11    part, but what we do is we just docket --
12         THE CLERK:  Okay.
13         THE COURT:  -- the list so that we don't spend any
14    time --
15         THE CLERK:  Perfect.
16         THE COURT:  -- having everybody make individual
17    appearances.
18       As you come to the mic, if you'll please remember to
19    restate your name for the record.
20       Okay.  We had a debate in chambers about whether it's
21    still okay to say "Happy New Year."  I'm going to say "Happy
22    New Year."  I usually do -- like, for me, cut off is MLK Day.
23                      (Laughter.)
24         THE COURT:  So Happy New Year.
25       Appreciate your indulgent last month in terms of moving
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

# Add. 772

1   that CMC.  I reviewed your case management order.  And it

2   seems as if things will go relatively quickly today.  But

3   let's just get started from the top.

4       So I have and I did receive an email from Judge Kuhl,

5   who's doing an incredible job, especially given the fires down

6   there, who still had carved out time to send me an update

7   about what was going in LA.

8       I know at least, Ms. Simonsen, you're from LA.  There are

9   others of you I think from LA, so our prayers and thoughts go

10  out to all of you and all your neighbors and everyone.

11      I've got family down there myself, so it's a really

12  difficult situation.

13      We've reached out to the chief ourselves here in the

14  Northern District and are ready to stand by and help to any --

15  to the extent that we can.

16      So it takes -- takes all of us to get through these

17  tragedies.

18      In any event, so the first part of your statement related

19  to what was going on in the JCCP.

20      Does anybody else want to add anything?  Is there anything

21  else I need to know?

22      I -- I understand she's got her schedule with respect to

23  the state equivalent of *Daubert*s on general causation.

24      Again, we're just coordinating.  I don't think that

25  there's anything that impacts this schedule, but happy to hear

```
1    if there's more that you want to say.

2                    (No response.)

3          MS. SIMONSEN:  Good morning, Your Honor.  Ashley

4    Simonsen, Covington & Burling, for the Meta defendants.

5       I don't think there's much to add.  Judge Kuhl did confirm

6    when we were at the JCCP CMC on Wednesday that the first-phase

7    experts to be disclosed on April 18th will be focused on the

8    question of general scientific medical causation.

9          THE COURT:  Right.  And it's not all causation.  It's

10   just that kind of one slice that we're all kind of focused on,

11   is my understanding.

12         MS. SIMONSEN:  That is my understanding as well.

13         MS. HAZAM:  Your Honor, it is plaintiffs'

14   understanding that the reports or the disclosures due in April

15   which are simultaneous are for general causation and not all

16   general liability questions, if that makes sense.

17         THE COURT:  Yes.  That's what I understood.

18      And in terms of impact on this schedule, again, I don't

19   see that there is anything -- an impact, but it's more

20   informative than anything else.

21         MS. HAZAM:  Nothing for plaintiffs, Your Honor.

22         MS. SIMONSEN:  Agreed, Your Honor.

23         THE COURT:  Okay.

24      All right.  So then the next issue on the agenda related

25   to the administrative motion to relate the coverage cases.
```

 1    When I -- when I read the motion and the objection, the reason

 2    that I issued the text order that I did was because I just

 3    wanted you all to talk to each other.

 4        It wasn't clear that there was -- that people were talking

 5    to each other.  I now have now a slew of -- of filings on the

 6    docket, which is, again, the reason why I sent another text

 7    message or text entry to everyone that I don't usually have

 8    argument on these motions.

 9        We decide these motions all the time as a matter of

10    course.  And so that everybody is aware and so that I am

11    transparent, my issue is always is this more efficient for the

12    court generally or not?  Is it related or not?  Are there --

13    is there overlap or not?

14        Those are the questions that I'm always asking.  So I will

15    look at it and I will decide and you will hear back from me.

16            **MS. SIMONSEN:**  Thank you, Your Honor.

17            **THE COURT:**  Okay.  Thank you.

18        Next, you gave me an update on the intercircuit assignment

19    issues regarding the cases that were actually -- that were

20    direct filed and not actually filed in the -- in the original

21    districts.

22        So when is that going to happen so that I can let the

23    administrator know and we can work on trying to -- to get the

24    intercircuit assignment process moving again?

25            **MS. HAZAM:**  Your Honor, that process is being handled

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1   by plaintiffs' counsel in those particular cases who I

2   understand has been conferring with defense counsel about the

3   appropriate stipulation.  I don't have a specific date for you

4   presently, but I believe it would be as soon as possible.

5       I don't know if defense counsel has any further

6   information.

7           **MR. DRAKE:**  Geoffrey Drake, King & Spalding, for the

8   TikTok defendants.  Good morning, Your Honor.

9           **THE COURT:**  Good morning.

10          **MR. DRAKE:**  I don't have any more specific update,

11  but I agree with Ms. Hazam and we should -- why don't we

12  aspire to get that stipulation taken care of next week and

13  then we can get the filings done and the rest of the

14  administrative process in movement.

15          **THE COURT:**  Okay.  If somebody could just -- maybe,

16  Ms. Simonsen, if you could send a chamber's email copy --

17  Ms. Anderson -- just so that we know it's there.  And then we

18  can take some additional steps.

19      We get so many emails, so many filings, that I would like

20  someone to just pull it out and let us know so that we can get

21  to and track down what we need to track down.  And then we can

22  get the process moving again.

23          **MS. SIMONSEN:**  Will do, Your Honor.

24          **MR. DRAKE:**  Sounds good.

25          **THE COURT:**  Okay.  Great.  Thank you.

```
 1        There was a request in the statement to narrow the
 2   bellwether discovery pools.  I then saw that that request was
 3   withdrawn.  Is that correct?  And if so, sounds like there's
 4   nothing to discuss.
 5        MS. HAZAM:  Lexi Hazam for plaintiffs.
 6        Yes, that's correct, Your Honor.  That request was
 7   withdrawn, and I -- I do not believe that there is anything
 8   more to discuss at the present time.
 9        THE COURT:  Okay.  Anything from the defense?
10        MR. DRAKE:  We concur with that, Your Honor.
11        THE COURT:  Okay.  Great.  See how fast we're moving?
12             (Laughter.)
13        THE COURT:  Okay.  I then got the update regarding
14   discovery with the AGs.  You should know that I know that I've
15   not ruled on that motion.  And it's on the list to be ruled
16   on.  I mean, I -- I don't know what else to tell you.  There's
17   lots of people who are waiting for me to do some things, and
18   we are getting through it all as fast as we can.  Okay?
19        Is there anybody who wants to say anything more on that
20   issue?  I'm assuming you had -- from all of the filings, you
21   had a lot of discussion about that with Judge Kang yesterday.
22        MR. SCHMIDT:  Yes, we did, Your Honor.
23        I'm sorry.  Paul Schmidt for Meta defendants.  Apologize.
24        I'm pleased to report we've largely resolved the document
25   discovery issues.  We think Judge Kang gave guidance that also
```

1    resolves the 30(b)(6) issues.  But we'll see how that plays

2    out in the depositions.

3        In terms of the docket issues, yesterday at the start of

4    the day, we had agreements with every state in whole or in

5    part with the exception of three agencies.  That's the "in

6    part."

7        And I think we resolved one of those, and the other two

8    are before Judge Kang, so it's a very, very narrow dispute.

9        And that resolution includes -- relevant to some of the

10   statements Your Honor has made in an order that Your Honor

11   issued that includes California and the California agencies

12   that were noncompliant, and it includes South Carolina and the

13   South Carolina agencies that were noncompliant.

14       Your Honor had asked us to submit some requested relief as

15   to those agencies.

16       We are -- biggest interest, of course, is getting

17   documents, being able to progress the case.  So Your Honor's

18   order I think was really, really quite helpful in terms of us

19   reaching that agreement, and we're happy to have reached that

20   agreement.

21           **THE COURT:**  Yeah.  In terms of -- I'm sorry.  Go

22   ahead.

23           **MS. BATCHELDER:**  Krista Batchelder with the state

24   attorneys general.

25           **THE COURT:**  Let me -- let me -- with the Colorado --

```
 1            MS. BATCHELDER:  Colorado, correct.

 2            THE COURT:  We have lots of different states, so --

 3            MS. BATCHELDER:  Sorry.

 4            THE COURT:  That's okay.

 5            MS. BATCHELDER:  So Counsel's correct that we have --

 6   that the state AGs have managed to cobble together an ability

 7   to comply with the Court's September order with regards to

 8   document discovery.

 9        However, the -- Magistrate Kang did rely on the issue of

10   control in the September order in order to pull that into our

11   issues with the 30(b)(6) depositions and we feel actually

12   pushed that order further.  And so this issue is still very

13   much ripe, very much an issue for the coalition.

14        Since the September order just related to the document

15   piece, six states have left the coalition, and while I'm not

16   authorized to speak on behalf of the four states that -- that

17   have dismissed outright, prior to that order, we were a

18   unified coalition working towards litigating this case.

19   Following the order, they dismissed.

20        And so it is very much a ripe issue and one that is of

21   importance to not just the members of this coalition who are

22   litigating the case but also the state agencies who have been

23   pulled in as outside parties because they are aware that we

24   have appealed and that this order is outstanding.

25            MR. SCHMIDT:  May I say two things on that, Your
```

1    Honor?

2         **THE COURT:**  You may.

3         **MR. SCHMIDT:**  As to the 30(b)(6) ruling, I don't know

4    that that's before Your Honor.  But I also don't think it's

5    accurate the way it was characterized.

6         What I heard Judge Kang say on the 30(b)(6) issues is the

7    states are the parties.  They need to put up witnesses who can

8    testify about their knowledge, which is a pretty unremarkable

9    proposition.

10        In the course of arguing that, several of the AGs, as they

11   have repeatedly done, reasserted arguments that he had

12   rejected, and he rejected them again.

13        But I don't know that the 30(b)(6) ruling is -- is quite

14   as Counsel described it.

15        As to the six states that have -- have left, that is

16   accurate.  I think the number is four have left, and two are

17   in the process of leaving.

18        From our perspective, it's pretty notable that when

19   parties bring claims and are subject to the normal obligations

20   of discovery and they immediately abandon those claims, that

21   says something about those claims.

22        That, to us, is the only relevance of -- of them leaving.

23        **THE COURT:**  Okay.

24        Like I said, I understand it's still an issue.

25        **MS. BATCHELDER:**  Yeah.

```
 1         And if I may, Your Honor, I would point out that finding
 2    that the states are the parties is -- is exactly what
 3    Magistrate Kang did not ultimately rule on in the original
 4    September 6th order.  It was primarily with regards to control
 5    of the documents.  And I believe it was explicitly stated that
 6    he was not taking it so far as to find that these states, as a
 7    whole, are the party.
 8         But following yesterday's hearing, he made it very clear
 9    on the record that he is finding that the states are the
10    parties.  And that is where the -- the crux of this issue
11    lies.
12              MR. SCHMIDT:  That's how they pled their complaint,
13    Your Honor, in the name of the State of California, in the
14    name of the State of Colorado.
15              THE COURT:  Okay.
16              MR. OLSZEWSKI-JUBELIRER:  Excuse me, Your Honor.
17              THE COURT:  Your name, please?
18              MR. OLSZEWSKI-JUBELIRER:  Josh Olszewski-Jubelirer
19    for the People of the State of California.
20         Just to correct the record, the complaint with respect to
21    the California Attorney General's Office is pled on behalf of
22    the People of the State of California, not the state of
23    California.  This is a law enforcement action brought by the
24    Attorney General.  Excuse me.
25         On behalf of the people, not on behalf of the state or any
```

**Add. 781**

1    agencies.

2         **MR. SCHMIDT:**  From our perspective, the state is the

3    people, and that's consistent with how they've pled their

4    claims.

5         **THE COURT:**  Okay.

6         **MR. SCHMIDT:**  Thank you, Your Honor.

7         **MR. OLSZEWSKI-JUBELIRER:**  Thank you.

8         **THE COURT:**  So one further issue on that, there is a

9    request to place the AGs on a separate trial track.

10        And with respect to that request, I can't -- I guess -- I

11   can't make an informed decision until I know whether there has

12   been substantial completion or not and when substantial

13   completion is being afforded.

14        It seems to me that the other plaintiffs are far ahead of

15   the states and that because of this issue, it may make sense

16   to push the states back, but thoughts on that topic.

17        **MR. SCHMIDT:**  Yeah, we have the same -- we grapple

18   with the same point, that we think we're already there but we

19   don't know -- in terms of the delay we've already incurred,

20   but we don't know how much more will be there.  And so what

21   we've been talking with the states about is trying to find

22   some sweet spot briefing where we do have some information, as

23   Your Honor flagged on substantial completion.

24        We had productive conferrals on that point.  What we would

25   propose, recognizing this is an unusual briefing schedule and

1    we'll do -- we'll do whatever is useful to the Court, is that

2    the defendants file a 15-page -- proper briefs of double --

3    double-spaced on February 3rd, plaintiffs respond on

4    February 7th, and we reply on February 10th with a five-page

5    reply.  And that would let it be ready for the February CMC,

6    if that's suitable to Your Honor, or Your Honor could readily

7    roll it till the March CMC.

8        The challenge we have is that we now have different

9    substantial completion dates for the states.  They tend to

10   fall at the end of January or the beginning of February, so we

11   tried to pick that as a sweet spot when we could get

12   not-too-far-term guidance because I think the immediate thing

13   it impacts is when we do the state depositions by also so we

14   would have some date on substantial completion.

15           MS. O'NEILL:  Megan O'Neill for the state AGs.

16       If I may respond, Mr. Schmidt is correct that we have

17   agreed to a briefing schedule, but I do just want to point out

18   a few things.

19       First, we, of course, are going to oppose Meta's request

20   for a trial track extension.  We don't think that's necessary.

21       Just want to point out that the AGs substantially

22   completed production of documents from our offices way back

23   several months ago, last year, in August actually.

24       And there is this difficulty of the substantial completion

25   dates.  Not all of those dates will have run by the time we

```
 1    have proposed that briefing, so --

 2           THE COURT:  So when -- when is the -- is there a list

 3    of dates somewhere as to when substantial completion is

 4    supposed to have occurred?

 5           MS. O'NEILL:  There is, Your Honor.  I don't have the

 6    docket number, but my understanding is that substantial

 7    completion for some states begins as early as today but for

 8    some, runs as late as February 10th, I believe.

 9           THE COURT:  Is that your understanding, Mr. Schmidt?

10           MR. SCHMIDT:  Yes.

11           THE COURT:  And can someone find me the docket so I

12    can look at the list?

13           MR. SCHMIDT:  It's ECF, I believe, 1495 -- 1495.1.

14           THE COURT:  1495.

15           MR. SCHMIDT:  .1.

16           THE COURT:  .1.

17           MR. SCHMIDT:  I think it was an attachment to an

18    order where Judge Kang annotated the parties' proposals on

19    scheduling state to state.

20           THE COURT:  And when are depositions supposed to have

21    occurred?

22           MR. SCHMIDT:  Pretty much right away, which is our

23    concern.  We're looking at depositions February and March

24    before the April 4th deadline, which is why we will benefit

25    from some near-term guidance because that's the first deadline
```

```
 1    that's going to be a real difficulty.
 2           MS. O'NEILL:  Your Honor, and I will just point out
 3    that, as we've said, the substantial completion dates are
 4    rolling, and we believe that the depositions can be similarly
 5    rolling.  But, again, we agreed to this briefing if it is
 6    acceptable to your -- to Your Honor.
 7           MR. SCHMIDT:  And, Your Honor, one -- one small
 8    thing.  The -- because of the way the parties submitted
 9    proposed dates state by state and Judge Kang ruled on that
10    basis, it's a bit of a burden to track through the attachments
11    to figure out the dates.
12        If it would help, we'll confer with the states and submit
13    a joint filing that just lists every state and the date.
14           MS. O'NEILL:  Yeah.
15           THE COURT:  Oh, so what I was about to pull up is not
16    a list.  It's a -- it's a -- it's multiple pages.
17           MR. SCHMIDT:  Yeah, it's a series of -- I think some
18    are two -- but mostly one-page submissions the parties made
19    with proposed dates where Judge Kang annotated it state by
20    state, so it's going to be a large number of states with
21    annotations.
22        If it would help, we could put in just a simple list of
23    the dates.
24           THE COURT:  That would be helpful for me.
25        And then have you negotiated the dates of depositions?
```

1    So, one, I need to know when the substantial completion dates

2    are.  Two, I need to know what the proposed dates are with

3    respect to all of the various states' depositions.

4        The states argue in the CMC statement that the relevance

5    of all of those other productions is low.  And I don't know

6    one way or the other.

7        So if -- if the relevance is marginal, then that suggests

8    that I shouldn't move trial dates.  If it's substantially much

9    more relevant to a defense for something else, then that would

10   impact my decision-making, so I'll also need to know that

11   information.

12       I don't know that you're going to have all that

13   information for me by the 3rd.

14           MR. SCHMIDT:  We will not have -- I don't think we'll

15   have deposition dates.  What we do have also in that series of

16   orders is meet-and-confer dates for the states regarding

17   depositions, so it might be useful if we also included those

18   dates on a separate sheet in the joint submission we make to

19   the Court so the Court has that sense.

20           THE COURT:  Okay.  And then has the issue of

21   relevance been litigated in front of Judge Kang?

22           MR. SCHMIDT:  Yes.  And he's ruled against the

23   states.

24           THE COURT:  Well, I've got folks over here on the

25   right side shaking their head vociferously "no."

1          **MR. SCHMIDT:**  Okay.

2          **MS. O'NEILL:**  Your Honor, we've had disputes over

3  search terms and custodians that have largely been agreed upon

4  through the negotiations.

5     But the issue of the relevance and burden has not directly

6  been litigated.

7          **MR. SCHMIDT:**  The reason I disagree with that, Your

8  Honor, is we have not -- granularly, that is correct --

9  litigated those issues.

10     On a few occasions including not yesterday but the CMC --

11  the DMC before, a state presented the argument that I think

12  was what Your Honor was referring to that the core or a big

13  piece of discovery we want that these agencies will have,

14  which is what they have to say about social media and what

15  they have to say about alternate causes of teen mental health

16  issues.

17     He did not make a relevance finding, but he made a

18  discoverability finding on that that, that was in fact

19  discoverable and rejected the argument that discovery should

20  be limited in that way.

21          **MS. O'NEILL:**  And, Your Honor, that is only one small

22  part of the issues with relevance and proportionately and

23  burden that the state AGs and agencies have with Meta's

24  request.

25          **THE COURT:**  Okay.  But all of those things are being

**Add. 787**

1    litigate or resolved by negotiation?

2         MS. O'NEILL:  Your Honor, you're correct.  The search

3    terms and custodians that the states -- state agencies are

4    running have, with one exception, been agreed upon by the

5    parties.  And the last dispute was submitted to Magistrate

6    Judge Kang yesterday.

7         THE COURT:  Okay.

8         MR. SCHMIDT:  But the point -- if I may, Your Honor,

9    the point I would want to make is there have been broad-scale

10   objections.  The states have made, like, the alternate cause

11   objection I -- I alluded to.  They made a broad-sweeping --

12   they get a different, much narrower time period for their

13   discovery than they demanded from us.

14      Judge Kang spoke to that issue yesterday against them.

15   Some of these broad-based objections have been addressed by

16   Judge Kang.  They continue to be reasserted in different

17   contexts, but he has spoken on some of the cross-cutting

18   issues.

19        MS. O'NEILL:  I will just say that Judge Kang --

20   Magistrate Judge Kang has not made -- even on the issue that

21   Mr. Schmidt was discussing regarding alternative cause,

22   discoverability, of course, is not the same thing as relevance

23   and proportionately.  And those examinations have not been

24   made by Judge Kang.  And as your -- as we have discussed, we

25   have come to agreements among the parties and among the

```
 1      agencies as to what kind of terms are going to be run.

 2          But those particular issues have not been litigated or

 3      decided by Magistrate Judge Kang.

 4              MR. SCHMIDT:  And I agree with that.  I tried to make

 5      that clear in what I said.  He has ruled on discoverability,

 6      and admissibility usually comes before trial, if not earlier.

 7              THE COURT:  Okay.

 8          So let me -- let me look at your list before I give you a

 9      schedule.  I am currently heading into back-to-back trials and

10      am trying to figure out whether I'm going to be able to

11      maintain your February 12th date.  Currently we are set in the

12      morning, and I'm in trial.

13          Now, I think most trials should resolve.  And sometimes

14      they resolve on the eve of trial, as you all know.  So that

15      may -- you know, I may still see you on the 12th.  If that

16      trial does not resolve, I will not see you on the 12th.

17          So I'm looking for some, you know, alternative time to see

18      you.  But in the interim -- so I'm just giving you a heads-up

19      that that might have to change.

20          I could advance you a week, but that doesn't really help.

21      And -- the schedule's just really tight right now.

22          So get me that information.  Let me also talk to Judge

23      Kang.  And as I'm looking -- I mean, right now, you've got a

24      close of fact discovery April 4th.

25          Well, at least that's for -- is that for all sides?
```

1          **MR. SCHMIDT:**  Yes, Your Honor.

2          **MS. O'NEILL:**  Yes, Your Honor.

3          **THE COURT:**  And are the AGs going to be able to

4     comply with the depo notice and get substantial completion

5     prior to that date?

6          **MS. O'NEILL:**  My understanding is that all of the AGs

7     and agencies are working toward those dates.  I don't have

8     very detailed information for each of those agencies as I

9     stand here today, but we are working towards those dates and

10    think that they can hold.

11         **MR. SCHMIDT:**  And on the defense side, we're

12    understandably skeptical given where we are to date and

13    reinforcing that as we've been negotiating, we have been told

14    by a large number of states that if they have to do any

15    meaningful production, they will not be able to -- to meet the

16    dates.  I think some of those states have indicated the same

17    on the record before Judge Kang.

18         **THE COURT:**  Okay.

19         Well, it may be that given my trial schedule, I'll have to

20    ask him to make some recommendations because he'll be able to

21    spend more time with you and get more of the detail.  So I

22    really hate giving dates that aren't based on some, you know,

23    rational basis of why we're giving the dates, and I don't like

24    to move dates unless there's a reason to do that.  So I'll be

25    in touch on the issues.

```
1              MR. SCHMIDT:  Okay.

2              MS. O'NEILL:  Thank you, Your Honor.

3              MR. SCHMIDT:  And if it works for Your Honor, we'll

4    get those -- and it works for the states, we'll get those

5    lists to you Tuesday.

6              THE COURT:  That would be great.

7              MS. O'NEILL:  And just to clarify to make sure that I

8    understand exactly what Your Honor would like, I have that

9    we're -- we'll be providing a list of dates for substantial

10   completion for each of the states, along with dates for

11   meet-and-confers for depositions.

12       And is there anything else that would be helpful to Your

13   Honor?

14             THE COURT:  I -- all I'm looking for, final dates on

15   all these discovery issues --

16             MS. O'NEILL:  Okay.

17             MR. SCHMIDT:  Okay.

18             THE COURT:  -- in one chart and one place so that I

19   don't have to create it myself.

20             MS. O'NEILL:  Understood.  We can definitely do that.

21             THE COURT:  Okay.  Terrific.  All right.  Great.

22       Okay.  Those are all the issues that I had on our list.  I

23   know Judge Kang and I try to do back-to-back conferences to

24   minimize your travel to the Bay Area and make things more

25   efficient.
```

```
 1        This has been a pretty short conference, but my view,
 2   there's no reason to have a long conference if one doesn't
 3   need a long conference.  We all have things to do.
 4        Is there anything else that anybody wants to talk about?
 5             MS. O'NEILL:  (Shakes head.)
 6             MR. SCHMIDT:  No.
 7             THE COURT:  Okay.  There are -- I see someone
 8   standing.
 9        There are a couple of people in the audience, I
10   understand, who are seeking appointment to the plaintiffs' --
11   and I'm happy to meet you if you're here.
12        Mr. Legg?  Ms. Emery?
13             MR. RUDDY:  Good morning, Your Honor.  Brendan Ruddy
14   on behalf of the People of the State of California in regards
15   to the action -- excuse me -- People v. TikTok, Inc., et al.
16        We -- just because Your Honor raised the possibility of
17   having to change the date of the February case management
18   conference, that date is also the hearing date for a motion to
19   remand, that -- the opposition brief has come in, and the
20   reply brief should be filed shortly.
21        I know Your Honor typically rules on the paper for those
22   matters, and I understand Your Honor's schedule.  The people
23   just wanted to remind Your Honor that that is on the calendar
24   for that date and are anxious to return to state court.
25             THE COURT:  Okay.  Thanks for the reminder.
```

```
 1            MR. RUDDY:  Yeah.

 2            MR. WARREN:  Good morning, Your Honor.  Previn Warren

 3    for the personal injury and school district plaintiffs.

 4         Following up on Mr. Ruddy's comment, I believe February

 5    12th is also the hearing date for certain motions brought

 6    under 1292.

 7         Plaintiffs would have no objection to having those heard,

 8    you know, at the next case management conference, whenever

 9    that gets scheduled.

10            THE COURT:  Yeah, those ones I knew were set.

11         Again, if I can keep it on, then I intend to keep it on.

12    It's just a question of -- just a question of whether or not

13    I'm in trial.

14            MR. WARREN:  Understood.  Thank you, Your Honor.

15            THE COURT:  Okay.

16         Mr. Legg here?  You want to come forward.

17         And then let's see, who else do I have?  Ms. Emery.

18            MR. LEGG:  Morning, Your Honor.

19            THE COURT:  Good morning.

20            MR. LEGG:  Matt Legg.  It's nice to meet you, and I'm

21    here to answer any questions you might have.

22            THE COURT:  Well, I didn't have any questions, but

23    you are here.  Do you want to add anything to your

24    application?

25         I understand that -- that the chairs are -- are supportive
```

```
 1      of elevating you to the -- to the leadership.

 2              MR. LEGG:  Yep.  Nothing to add.  This case is

 3      obviously important to me, and I'm fully committed to it

 4      and -- and appreciate being here.

 5              THE COURT:  And then my -- let's see.  You're working

 6      on which of the various teams?

 7              MR. LEGG:  I'm sorry, Your Honor?

 8              THE COURT:  I was just looking back at your -- at

 9      your application.  So you're from Baltimore.

10              MR. LEGG:  I'm from Baltimore, and I represent 2 of

11      the 12 bellwether school districts.

12              THE COURT:  Right.  Okay.

13          And how is Mr. Warren and Ms. Hazam doing in your view?

14              MR. LEGG:  I think they're -- they are doing a

15      remarkable job.

16                          (Laughter.)

17              THE COURT:  Okay.

18          Ms. Emery, how about you?

19              MS. EMERY:  Nothing to add to my application, Your

20      Honor.  I'm just very grateful to you last year -- school

21      district committee.  I valued that experience immensely.  I've

22      enjoyed work on this litigation and look forward to continuing

23      to do so regardless of how you rule.

24          Just very much appreciate that.  And echo the compliments

25      to both Mr. Warren and Ms. Hazam as well as to Mike Weinkowitz
```

```
1   and -- of course, my [sic] name is blanking -- Melissa -- on

2   how they've been running the school district side of things.

3          THE COURT:  And, you know, I had a conversation with

4   the coleads yesterday about the -- about the applications.

5   And perhaps it was -- I didn't draft my order properly.  I

6   always felt like the school district leadership group was part

7   of the steering committee membership.  But I guess there's

8   some uncertainty about that, so I will clarify it.

9       I've always felt like you're a part of it but will make it

10  explicit that that subcommittee is in fact part of the -- part

11  of the plaintiffs' steering committee membership.  So thank

12  you for all you're doing.

13      And you'll hear from me on -- on all the applications, but

14  you'll hear back from me soon.

15          MS. EMERY:  Thank you, Your Honor.

16          MR. LEGG:  Thank you, Your Honor.

17          THE COURT:  You're welcome.

18          MR. STEIN:  Your Honor, Josh Stein from Boies

19  Schiller Flexner on behalf of the Abraham plaintiff.

20      Mr. Boies was planning to attend today.  We informed

21  Ms. Hazam that he was hoping to attend to answer any questions

22  the Court may have.

23      Ms. Hazam responded that the Court typically informs

24  applicants if they do have any questions.  And -- and with

25  that information, he is -- is not attending today, as you can
```

1    see.  But he's happy to answer any questions that you might

2    have directly.

3          **THE COURT:**  I appreciate hearing that.  I -- like,

4    obviously didn't see him on the list.  That's why I called up

5    the two that I did see.  There are a number of people.  I

6    have, you know, a three-page single-spaced document here with

7    everybody's names and the applications, et cetera.  And not

8    everybody who's seeking reappointment or appointment is here.

9          I'm probably not inclined at this point to -- to include

10   Mr. Boies and the Schiller firm -- Boies Schiller firm in the

11   leadership for many of the same reasons I indicated with

12   respect to the class action.

13         So, you know, I'm still thinking about it, but the answer

14   is probably no.

15         **MR. STEIN:**  Understood, Your Honor.

16         I think with the dates coming up in February and April

17   with respect to discovery, our chief concern is being bound

18   within the four corners of that discovery after it's completed

19   without any sort of meaningful participation.

20         **THE COURT:**  Well, the -- that's all the more reason

21   to say no, which is then you'll have the time to litigate

22   that.  And you can litigate it within the context of your own

23   lawsuit.

24         **MR. STEIN:**  I appreciate that, Your Honor.  And --

25   and we'd be happy to help alongside leadership but also do it

```
 1    the way you just described.
 2              THE COURT:  Okay.
 3              MR. STEIN:  Thank you, Your Honor.
 4              THE COURT:  Thank you.
 5         All right.  Anything else?
 6              MS. HAZAM:  Your Honor, Lexi Hazam for plaintiffs.
 7         I just wanted to make the Court aware that there were some
 8    applicants who could not attend today.  One of them, Felicia
 9    Craig, is available via Zoom should you wish to speak to her.
10         Just informing you of that.
11              THE COURT:  Okay.
12              MS. HAZAM:  Thank you.
13              THE COURT:  Thank you.
14         Okay.  Open mic.  Anybody else want to come to the
15    microphone?  No?
16         All right.  Well, then I'm going to take this extra time
17    and go work on more orders --
18                             (Laughter.)
19              THE COURT:  -- so that I can get to your orders.  And
20    appreciate everything that everyone's doing.
21         Be safe.  And we'll see you in about a month.
22              (Proceedings were concluded at 9:38 A.M.)
23                             --o0o--
24
25
```

**Add. 797**

1

2                    **CERTIFICATE OF REPORTER**

3

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6    I further certify that I am neither counsel for, related to,

7    nor employed by any of the parties to the action in which this

8    hearing was taken, and further that I am not financially nor

9    otherwise interested in the outcome of the action.

10

11    _____

12          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

13                    Friday, January 24, 2025

14

15

16

17

18

19

20

21

22

23

24

25

Add. 798