James P. Rouhandeh, *pro hac vice*
Antonio J. Perez-Marques, *pro hac vice*
Caroline Stern, *pro hac vice*
Kathryn S. Benedict, *pro hac vice pending*
Corey M. Meyer, *pro hac vice*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:    rouhandeh@davispolk.com
          antonio.perez@davispolk.com
          caroline.stern@davispolk.com
          kathryn.benedict@davispolk.com
          corey.meyer@davispolk.com

*Attorneys for Defendants Meta Platforms, Inc. and Instagram, LLC*

*Additional counsel listed on signature pages*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc., et al.* | MDL No. 3047<br><br>Case Nos. 4:22-md-03047-YGR-PHK<br>4:23-cv-05448-YGR<br><br>**META'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date:  April 15, 2026<br>Time: 1:00 PM<br>Place: Courtroom 1, 4th Floor |

**[PUBLIC REDACTED VERSION]**

1    ## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

2         PLEASE TAKE NOTICE THAT, at 1:00 PM on April 15, 2026, before the Honorable

3    Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4 of the United States District Court for the

4    Northern District of California, located at 1301 Clay Street, Oakland, California, 94612, Defendants

5    Meta Platforms, Inc. and Instagram, LLC (hereinafter, "Meta") will and hereby do move this Court,

6    under Federal Rule of Civil Procedure 56, for an order granting summary judgment in favor of Meta

7    on all claims by the Plaintiff State Attorneys General ("AGs").  This Motion is based upon this Notice

8    of Motion and Motion, the accompanying Memorandum of Points and Authorities, any Reply or

9    other papers submitted in connection with the Motion, the accompanying Declaration of James P.

10   Rouhandeh and all exhibits thereto, and on such other written and oral argument as may be presented

11   to the Court.

12   ## STATEMENT OF RELIEF SOUGHT

13        Meta seeks entry of summary judgment in its favor on all causes of action that the Plaintiff

14   AGs assert against it.

15

16   Dated:  January 30, 2026                    Respectfully submitted,

17                                               DAVIS POLK & WARDWELL LLP

18                                                 */s/ James P. Rouhandeh*

19                                               James P. Rouhandeh, *pro hac vice*
                                                 Antonio J. Perez-Marques, *pro hac vice*
20                                               Caroline Stern, *pro hac vice*
                                                 Kathryn S. Benedict, *pro hac vice pending*
21                                               Corey M. Meyer, *pro hac vice*
                                                 450 Lexington Avenue
22                                               New York, New York 10017
                                                 Telephone: (212) 450-4000
23                                               Facsimile: (212) 701-5800
                                                 rouhandeh@davispolk.com
24                                               antonio.perez@davispolk.com
                                                 caroline.stern@davispolk.com
25                                               kathryn.benedict@davispolk.com
                                                 corey.meyer@davispolk.com
26
                                                 *Attorneys for Defendants Meta Platforms, Inc.*
27                                               *and Instagram, LLC*

28                                               *Additional counsel listed on signature pages*

# TABLE OF CONTENTS

PAGE

BACKGROUND ................................................................................................................ 2

    I.    Deceptive Acts and Practices Claims .................................................................. 3

        A.    Statements Referencing Social Media Addiction ...................................... 3

        B.    Other Statements Underlying the AGs' Deception Claims ....................... 3

    II.    Unfairness and Unconscionability Claims ......................................................... 5

    III.    COPPA Claim ...................................................................................................... 5

    IV.    Procedural History ............................................................................................. 7

LEGAL STANDARD ........................................................................................................ 8

ARGUMENT .................................................................................................................... 8

    I.    Meta Is Entitled to Summary Judgment on the AGs' Deceptive Acts and Practices Claims ................................................................................................. 8

        A.    The Alleged Statements Concerning Whether Meta's Platforms Are "Addictive" Are Inactionable Because the AGs Have No Evidence That the Statements Are False, the Speakers Knew That They Were False, or the Statements Tended to or Were Likely to Deceive Consumers .............................................................................................. 8

            1.    No Evidence That Statements Regarding Addiction Were False ......................................................................................... 9

            2.    Even If There Were Evidence of Addiction, the AGs Cannot Prove That Meta's Statements Regarding Addiction Were Knowingly False ......................................................... 13

            3.    The AGs Have No Evidence That the Statements Regarding Alleged Addiction Had a Tendency or Were Likely to Mislead Consumers ........................................................... 15

        B.    Meta Is Entitled to Summary Judgment as to All Alleged Statements for Multiple Additional Reasons ............................................................. 17

            1.    The *Noerr-Pennington* Doctrine Immunizes Statements Made to Congress and the Coroner's Court ........................................... 17

            2.    Meta Is Entitled to Summary Judgment as to Alleged Misrepresentations Under 16 States' Laws Because They Were Not Made in Connection with a Consumer Transaction, or in the Conduct of Trade or Commerce ..................................... 21

i

3.   The Undisputed Facts Demonstrate That Numerous Statements Are Opinions ............................................. 25

4.   Numerous Alleged Statements Are Nonactionable Statements of Aspiration or Objectives .......................................... 27

5.   Meta Is Entitled to Summary Judgment As to Statements That Fall Outside the Applicable Statute of Limitations Period .......... 28

II.   Meta Is Entitled to Summary Judgment on the AGs' Unfairness Claims ........... 29

A.   Section 230 and the First Amendment Bar the AGs' Unfairness Claims ................................................................. 29

1.   Section 230 Bars These Claims Because They Seek to Impose a Duty on Meta For Its Role and Conduct As a Publisher of Third-Party Content ............................................. 30

2.   The First Amendment Also Bars the AGs' Unfairness Claims Because They Seek to Regulate Meta's Expressive Activities ..... 32

B.   The AGs' Unfairness Claims Also Fail Because the AGs Have Not Met Their Evidentiary Burdens ................................. 34

1.   The AGs Have No Evidence That the Features Cause Harm ....... 34

2.   The Unfairness Claims by Kansas, Nebraska, and New Jersey Fail Because These AGs Have Not Met Their Unique Evidentiary Burdens ............................................. 38

3.   Colorado and Kentucky's Unfairness Claims, and the AGs' Requests for Civil Penalties, Also Fail Because They Have No Admissible Evidence of Meta's Intent ................................. 39

III.   Meta Is Entitled to Summary Judgment on the AGs' Requests for Disgorgement ......................................................... 39

A.   CA, IN, KY, NC, and NY Are Not Permitted to Seek Disgorgement ...... 40

B.   Even for States That Can Seek Disgorgement in State Courts Under State Law, Their Claims Fail Under Federal Law of Equity .................... 41

C.   The AGs Lack Evidence to Support a Claim for Disgorgement ............. 43

D.   The AGs' Claims for Disgorgement and Civil Penalties Are Limited by Extraterritoriality and Statutes of Limitations ..................... 44

IV.   Meta Is Entitled to Summary Judgment on the AGs' COPPA Claim ................. 44

A.   Instagram and Facebook Are General Audience Websites ...................... 45

1.   The FTC Expressly Recognizes That Facebook Is a General Audience Site, and the FTC's Logic Applies Equally to Instagram ....................................................... 46

2.   The AGs' Evidence Fails to Show That Meta Targeted U13s ...... 46

ii

|       |      | 3. | The AGs Cannot Show U13-Directedness Under Any Factors the FTC Traditionally Considers | 48 |

        3.    The AGs Cannot Show U13-Directedness Under Any Factors the FTC Traditionally Considers ................................................... 48

    B.    The AGs Have Failed to Adduce Evidence That Meta Has Actual Knowledge of Collecting Personal Information from U13s ..................... 48

        1.    "Actual Knowledge" Requires an Operator to in Fact Know That It Is Collecting Personal Information from a U13 ............... 48

        2.    The AGs Have No Evidence of Meta's Actual Knowledge of Any U13 From an AG's State on Facebook or Instagram ........... 49

    C.    The AGs' COPPA Claim Is Untimely ....................................................... 51

    D.    The AGs Are Not Entitled to Disgorgement as a Matter of Law or Fact .................................................................................................... 52

CONCLUSION .......................................................................................................... 54

# TABLE OF AUTHORITIES

PAGE(S)

<u>CASES</u>

*303 Creative LLC v. Elenis*,
   600 U.S. 570 (2023) ................................................................. 33, 34

*Abel v. Plan. & Zoning Comm'n of Town of New Canaan*,
   998 A.2d 1149 (Conn. 2010) ................................................... 44

*Aboushaban v. Am. Signature, Inc.*,
   2021 WL 798874 (E.D. Va. Feb. 1, 2021) ............................ 14

*Acevedo Granados v. Garland*,
   992 F.3d 755 (9th Cir. 2021) .................................................. 10

*Aesthetics in Jewelry, Inc. v. Brown, ex rel. Brown*,
   339 S.W.3d 489 (Ky. App. 2011) .......................................... 39

*Alexander v. Cahill*,
   598 F.3d 79 (2d Cir. 2010) .................................................... 28

*Alpine Bank v. Hubbell*,
   555 F.3d 1097 (10th Cir. 2009) ............................................. A3

*Amarel v. Connell*,
   102 F.3d 1494 (9th Cir. 1996) ............................................... 21

*Anderson v. Apple Inc.*,
   500 F. Supp. 3d 993 (N.D. Cal. 2020) ................................. 53

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)............................................................... 47

*Angelilli v. Activision Blizzard, Inc.*,
   781 F. Supp. 3d 691 (N.D. Ill. 2025) ................................... 32, 47

*Avery v. State Farm Mut. Auto. Ins. Co.*,
   835 N.E.2d 801 (Ill. 2005)..................................................... 44, A3

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009), *as amended* (Sept. 28, 2009) ................................. 32

*Batson v. Live Nation Ent., Inc.*,
   746 F.3d 827 (7th Cir. 2014) ................................................. 37, 28, A4

*Beardsall v. CVS Pharmacy, Inc.*,
   953 F.3d 969 (7th Cir. 2020) ................................................. 15

*BCR Carpentry LLC v. FCA US, LLC*,
   2024 WL 4570734 (D.N.J. Oct. 24, 2024) ........................... A5

iv

*Benson v. Newell Brands, Inc.*,
   2025 WL 3454980 (N.D. Ill. Dec. 1, 2025) ............................................................... 17

*In re Beyond Meat, Inc., Protein Content Mktg. & Sales Practices Litig.*,
   718 F. Supp. 3d 800 (N.D. Ill. June 20, 2025) ........................................................ A5

*Bikila v. Vibram USA, Inc.*,
   218 F. Supp. 3d 1206 (W.D. Wash. 2016) ............................................................... 52

*Bland v. Abbott Lab'ys, Inc.*,
   2012 WL 32577 (W.D. Ky. Jan. 6, 2012) ............................................................... A3

*Bogard v. TikTok Inc.*,
   2025 WL 3637035 (N.D. Cal. Dec. 15, 2025) ......................................................... 33

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011) .............................................................................................. 33

*Bustamante v. KIND, LLC*,
   100 F.4th 419 (2d Cir. 2024) ......................................................................... 15, 17

*Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*,
   818 F.2d 1466 (9th Cir. 1987) ............................................................................. 46

*Calise v. Meta*,
   103 F.4th 732 (9th Cir. 2024) ............................................................................. 30

*Capitol Cadillac Olds, Inc. v. Roberts*,
   813 S.W.2d 287 (Ky. 1991) ........................................................................... A1, A5

*Carcano v. JBSS, LLC*,
   684 S.E.2d 41 (N.C. App. 2009) ........................................................................... 22

*Carol Studios, Inc. v. Doo Young Hong*,
   2013 WL 6592747 (Ill. Ct. App. Dec. 13, 2013) ............................................... 22, 24

*Castaneda v. Amazon.com, Inc.*,
   679 F. Supp. 3d 739 (N.D. Ill. 2023) ..................................................................... A1

*Catholdi-Jankowski v. CVS Health Corp.*,
   656 F. Supp. 3d 412 (W.D.N.Y. 2023) .................................................................... 9

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .............................................................................................. 7

*Chowning v. Kohl's Dep't Stores, Inc.*,
   733 F. App'x 404 (9th Cir. 2018) ........................................................................ 40

*City of Columbia v. Omni Outdoor Advert., Inc.*,
   499 U.S. 365 (1991) ............................................................................................ 18

*Cleary Bldg. Corp. v. David A. Dame, Inc.*,
   674 F. Supp. 2d 1257 (D. Colo. 2009) ................................................................. 22

*Clemens v. DaimlerChrysler Corp.*,
    534 F.3d 1017 (9th Cir. 2008) ........................................................................ 15

*In re Cohen*,
    185 B.R. 180 (Bankr. D.N.J. 1995), *aff'd*, 106 F.3d 52 (3d Cir. 1997).............................. A1-A2

*Colgate v. JUUL Labs, Inc.*,
    402 F. Supp. 3d 728 (N.D. Cal. 2019) ............................................................... 37

*Com. ex rel. Zimmerman v. Nickel*,
    26 Pa. D. & C. 3d 115 (Pa. Com. Pl. 1983) ........................................................ A4

*Comm. to Protect our Agric. Water v. Occidental Oil & Gas Co.*,
    235 F. Supp. 3d 1132 (E.D. Cal. 2017) ............................................................ 18

*Connecticut v. Aurobindo Pharma USA, Inc.*,
    2025 WL 1207566 (D. Conn. Apr. 25, 2025) ........................................................ 42

*Connick v. Suzuki Motor Co.*,
    174 Ill. 2d 482 (1996) ............................................................................ A1

*Cook v. Fam. Motors, LLC*,
    2022 WL 3269946 (W.D. Mo. Aug. 10, 2022) ....................................................... 23

*Cooper v. GGGR Invs., LLC*,
    334 B.R. 179 (E.D. Va. 2005) ..................................................................... A3

*Coppola Const. Co. v. Hofman Enters. Ltd. P'ship*,
    2010 WL 4723453 (Conn. Super. Ct. Nov. 2, 2010) ................................................. 22

*Cusmano v. Weather Shield Mfg., Inc.*,
    2007 WL 1742431 (Colo. Dist. Ct. Mar. 15, 2007) .................................................. 9

*Dachauer v. NBTY, Inc.*,
    2017 WL 2304209 (N.D. Cal. May 26, 2017), *aff'd*, 913 F.3d 844 (9th Cir. 2019) ................. 14

*Dagley v. Haag Eng'g Co.*,
    18 S.W.3d 787 (Tex. App. 2000) ................................................................... 23

*Dana v. Heartland Mgmt. Co., Inc.*,
    301 P.3d 772 (Kan. Ct. App. 2013) ................................................................ A5

*Darosa v. Kaiser Found. Health Plan*,
    2008 WL 4790725 (N.D. Cal. Oct. 31, 2008) ....................................................... 37

*Davis v. Avvo, Inc.*,
    345 F. Supp. 3d 534 (S.D.N.Y. 2018) ........................................................... 25-26

*Davis v. HSBC Bank Nevada, N.A.*,
    691 F.3d 1152 (9th Cir. 2012) .................................................................... 38

*Day v. GEICO Cas. Co.*,
    2024 WL 1244481 (N.D. Cal. Mar. 21, 2024) ....................................................... 36

*de Lacour v. Colgate-Palmolive Co.*,
   2024 WL 36820 (S.D.N.Y. Jan. 3, 2024) ................................................................. 17

*D'Ercole Sales, Inc. v. Fruehauf Corp.*,
   501 A.2d 990 (N.J. Super. Ct. App. Div. 1985) ...................................................... A5

*Dermansky v. Young Turks, Inc.*,
   2023 WL 8884364 (C.D. Cal. Nov. 3, 2023) ........................................................... 45

*Doe v. Grindr*,
   128 F.4th 1148 (9th Cir. 2025) .......................................................................... 30, 31

*Doe v. Pa. Dep't of Corr.*,
   585 F. Supp. 3d 797 (W.D. Pa. 2022) ..................................................................... 11

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019) ........................................................................... 30, 32

*Dyson, Inc. v. Oreck Corp.*,
   2009 WL 537074 (E.D. La. Mar. 4, 2009) .............................................................. A3

*EarthInfo, Inc. v. Hydrosphere Res. Consultants, Inc.*,
   900 P.2d 113 (Colo. 1995) ...................................................................................... 43

*Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*,
   880 F.3d 1109 (9th Cir. 2018) ................................................................................. 52

*Edgenet, Inc. v. GS1 AISBL*,
   742 F. Supp. 2d 997 (E.D. Wis. 2010) ............................................................... 22, 23

*Fields v. Twitter, Inc.*,
   200 F. Supp. 3d 964 (N.D. Cal. 2016) .................................................................... 31

*In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab. Litig.*,
   689 F. Supp. 3d 760 (C.D. Cal. 2023) .................................................................... 41

*Fox Broad. Co. v. Dish Network LLC*,
   160 F. Supp. 3d 1139 (C.D. Cal. 2015) .................................................................. 54

*FTC v. DIRECTV, Inc.*,
   2018 WL 3911196 (N.D. Cal. Aug. 16, 2018) .................................................... 16, 17

*FTC v. Innovative Designs, Inc.*,
   489 F. Supp. 3d 378 (W.D. Pa. 2020), *aff'd*, 2021 WL 3086188 (3d Cir. July 22, 2021) ........... 9

*FTC v. LendingClub Corp.*,
   2018 WL 11436309 (N.D. Cal. Oct. 3, 2018) ..................................................... 35, 36

*FTC v. Neovi, Inc.*,
   604 F.3d 1150 (9th Cir. 2010) ................................................................................. 36

*FTC v. Sperry & Hutchinson Co.*,
   405 U.S. 233 (1972) ............................................................................................ 37-38

*Fuentes v. Woodhouse Ford, Inc.*,
  2004 WL 1243589 (Neb. Ct. App. June 8, 2004) ................................................................ A5

*Gillette v. Delmore*,
  886 F.2d 1194 (9th Cir. 1989) .......................................................................................... 26

*Glob. Hookah Distribs. v. Avior, Inc.*,
  2024 WL 4448815 (W.D. Wash. Sept. 30, 2024) ............................................................... A3

*In re GNC Corp.*,
  789 F.3d 505 (4th Cir. 2015) ..................................................................................... 14, 16

*Gonzales v. Assocs. Fin. Serv. Co. of Kan.*,
  967 P.2d 312 (Kan. 1998) ................................................................................................ A1

*Graddy v. Sec'y of Health & Human Servs.*,
  2017 WL 11286536 (Fed. Cl. Aug. 31, 2017) .................................................................. 13

*Grausz v. Kroger Co.*,
  2020 WL 12688138 (S.D. Cal. Mar. 3, 2020) ................................................................... A3

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
  68 F. Supp. 2d 1064 (D. Minn. 1999) ............................................................................... 24

*Guaranty Tr. Co. v. York*,
  326 U.S. 99 (1945) ..................................................................................................... 41, 53

*Hammons v. Univ. of Md. Med. Sys. Corp.*,
  649 F. Supp. 3d 104 (D. Md. 2023) .................................................................................. 11

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
  2017 WL 10399343 (C.D. Cal. Nov. 17, 2017) ................................................................ 16

*Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*,
  668 F. Supp. 3d 1025 (C.D. Cal. 2023) ............................................................................ 52

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. 204 (2024) ......................................................................................................... 53

*Horizon Pharma, Inc. v. Dr. Reddy's Lab'ys, Inc.*,
  2017 WL 5451748 (D.N.J. Nov. 14, 2017) ....................................................................... 45

*Hughes v. Ester C Co.*,
  330 F. Supp. 3d 862 (E.D.N.Y. 2018) .............................................................................. 15

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Bos.*,
  515 U.S. 557 (1995) ................................................................................................... 33, 34

*Huynh v. Quora, Inc.*,
  508 F. Supp. 3d 633 (N.D. Cal. 2020) .............................................................................. 41

*Iglesias-Iglesias v. Garland*,
  2022 WL 898597 (9th Cir. Mar. 28, 2022) ....................................................................... 10

*Illinois ex rel. Hartigan v. Lann*,
    587 N.E.2d 521 (Ill. Ct. App. 1992) ........................................................ 42

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
    589 U.S. 178. (2020) ............................................................. 49, 50, 53

*Int'l Bhd. of Teamsters Loc. 456 Health & Welfare Tr. Fund v. Quest Diagnostics Inc.*,
    2012 WL 13202126 (E.D.N.Y. Apr. 19, 2012) ........................................ 24

*In re Int'l Harvester Co.*,
    104 F.T.C. 949 (1984) ........................................................................ 38

*I.T. v. ChoicePoint LLC*,
    2025 WL 2495079 (W.D. Wash. Aug. 29, 2025) .................................... 21

*Ivie v. Kraft Foods Glob., Inc.*,
    2015 WL 183910 (N.D. Cal. Jan. 14, 2015) ........................................... 40

*Jays Foods, Inc. v. Frito-Lay, Inc.*,
    664 F. Supp. 364 (N.D. Ill. 1987) ........................................................ 38

*Jeffrey C. Brown PLLC v. Gold Star Taxi & Transp. Serv. Corp.*,
    2020 WL 4743502 (Minn. Ct. App. Aug. 17, 2020) .............................. 22

*Joe Hand Promotions, Inc. v. Mills*,
    567 F. Supp. 2d 719 (D.N.J. 2008) ...................................................... 21

*In re Johnson*,
    477 B.R. 156 (B.A.P. 10th Cir. 2012) .................................................. 15

*JTS Choice Enters., Inc. v. E.I. DuPont De Nemours & Co.*,
    2014 WL 793525 (D. Colo. Feb. 26, 2014) ............................... 14, 17, A1

*Kain v. Bluemound E. Indus. Park, Inc.*,
    635 N.W.2d 640 (Wis. Ct. App. 2001) .................................................. A6

*Kansas v. Crane*,
    534 U.S. 407 (2002) ............................................................................ 10

*Key v. Qualcomm Inc.*,
    129 F.4th 1129 (9th Cir. 2025) ............................................................ 42

*Kindred v. McLeod*,
    2010 WL 4814360 (W.D. Va. Nov. 19, 2010) ........................................ A6

*King v. Nat'l Gen. Ins. Co.*,
    2025 WL 2494366 (N.D. Cal. Aug. 29, 2025) ........................................ 42

*Knowles v. Arris Int'l PLC*,
    2019 WL 3934781 (N.D. Cal. Aug. 20, 2019), *aff'd*, 847 F. App'x 512 (9th Cir. 2021) .......... 28

*Kokesh v. SEC*,
    581 U.S. 455 (2017) ...................................................................... 44, 53

ix

*Kosta v. Del Monte Foods, Inc.*,
   308 F.R.D. 217 (N.D. Cal. 2015) ............................................................. 16

*Kottle v. Nw. Kidney Ctrs.*,
   146 F.3d 1056 (9th Cir. 1998) ................................................................. 18

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
   2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ............................................... 8

*Laake v. Benefits Comm.*,
   2019 WL 823575 (S.D. Ohio Feb. 21, 2019) ............................................. 11

*Lambert v. Downtown Garage, Inc.*,
   262 Va. 707 (2001) ................................................................................ A2

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994) ............................................................................... 40

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021) ................................................................. 32

*LensCrafters, Inc. v. VisionWorld, Inc.*,
   943 F. Supp. 1481 (D. Minn. 1996).......................................................... A3

*In re Lewis*,
   495 B.R. 281 (N.D. Ill. 2011) .................................................................. 42

*Lieberson v. Johnson & Johnson Consumer Companies, Inc.*,
   865 F. Supp. 2d 529 (D.N.J. 2011) .......................................................... A3

*Liu v. SEC*,
   591 U.S. 71 (2020) ............................................................................ 42, 53

*Lopez v. Garland*,
   116 F.4th 1032 (9th Cir. 2024) ................................................................ 46

*Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ..................................................................... 13

*L.W. ex rel. Doe v. Snap Inc.*,
   675 F. Supp. 3d 1087 (S.D. Cal. 2023) ..................................................... 31

*Malhotra v. Steinberg*,
   770 F.3d 853 (9th Cir. 2014) ................................................................... 50

*MacNaughton v. Young Living Essential Oils, LC.*,
   67 F.4th 89 (2d Cir. 2023) ...................................................................... A3

*Marshall v. Miller*,
   276 S.E.2d 397 (N.C. 1981) .................................................................... A4

*McCarthy v. WPB Partners, LLC*,
   2016 WL 4014581 (D.N.H. July 26, 2016) ................................................ 23

*McClure v. Am. Fam. Mut. Ins. Co.*,
   223 F.3d 845 (8th Cir. 2000) ................................................................ 9

*McCollum v. CBS, Inc.*,
   249 Cal. Rptr. 187 (Cal. Ct. App. 1988) ............................................ 34

*McGinity v. Procter & Gamble Co.*,
   69 F.4th 1093 (9th Cir. 2023) ............................................................ 15

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974) ..................................................................... 33, 34

*Milkovich v. Lorain J. Co.*,
   497 U.S. 1 (1990) ........................................................................ 25, 27

*Miller v. Glenn Miller Prods., Inc.*,
   454 F.3d 975 (9th Cir. 2006) ............................................................ 51

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024) ............................................................. 32, 33, 34

*Moore v. Trader Joe's Co.*,
   4 F.4th 874 (9th Cir. 2021) ............................................................... 14

*Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*,
   536 F. App'x 558 (6th Cir. 2013) ...................................................... A3

*Motors, Inc. v. Times Mirror Co.*,
   162 Cal. Rptr. 543 (Cal. Ct. App. 1980) ........................................... A4

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
   127 F.4th 516 (4th Cir. 2025), *petition for cert. denied*, 146 S. Ct. 287 (2025) ........................ 31

*Mullins v. Premier Nutrition Corp.*,
   178 F. Supp. 3d 867 (N.D. Cal. 2016) ............................................. 13

*Naiser v. Unilever U.S., Inc.*,
   975 F. Supp. 2d 727 (W.D. Ky. 2013) ............................................. A3

*Nelson v. Am. Fam. Mut. Ins. Co.*,
   262 F. Supp. 3d 835 (D. Minn. 2017) ............................................. A2

*Netchoice v. Brown*,
   2025 WL 3267786 (D. Md. Nov. 24, 2025) ..................................... 38

*NetChoice, LLC v. Bonta*,
   113 F.4th 1101 (9th Cir. 2024) ......................................................... 26

*New Mexico ex rel. Balderas v. Tiny Lab Prods.*,
   457 F. Supp. 3d 1103 (D.N.M. 2020) .............................................. 49

*New Mexico ex rel. Balderas v. Tiny Lab Prods.*,
   516 F. Supp. 3d 1293 (D.N.M. 2021) .............................................. 45

xi

*New York ex rel. James v. Trump*,
   237 N.Y.S.3d 443 (N.Y. App. Div. 2025) ............................................................................ 42

*New York ex rel. Spitzer v. Direct Revenue, LLC*,
   2008 WL 1849855 (N.Y. Sup. Ct. Mar. 12, 2008) ............................................................... 41

*Niz-Chavez v. Garland*,
   593 U.S. 155 (2021) ............................................................................................................ 45

*NN&R, Inc. v. One Beacon Ins. Grp.*,
   2006 WL 1765077 (D.N.J. June 26, 2006) .......................................................................... 14

*Nola Spice Designs, LLC v. Haydel Enters. Inc.*,
   969 F. Supp. 2d 688 (E.D. La. 2013), *aff'd*, 783 F.3d 527 (5th Cir. 2015) ........................ A4

*Ordosgoitti v. Werner Enters., Inc.*,
   2021 WL 826504 (D. Neb. Mar. 4, 2021) ........................................................................... A4

*Ormsby v. Imhoff & Assocs., P.C.*,
   2014 WL 4248264 (D. Kan. Aug. 27, 2014) ...................................................................... A3

*Osborn v. Griffin*,
   865 F.3d 417 (6th Cir. 2017) ............................................................................................... 52

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976) ............................................................................................................ 44

*People v. Johnson & Johnson*,
   292 Cal. Rptr. 3d 424 (Cal. Ct. App. 2022),
   *as modified on denial of reh'g* (Apr. 27, 2022) ............................................................ A2, A6

*People v. Overstock.com, Inc.*,
   219 Cal. Rptr. 3d 65 (Cal. Ct. App. 2017), *as modified* (June 23, 2017) ........................... A6

*People ex rel. Spitzer v. Cnty. Bank of Rehoboth Beach*,
   846 N.Y.S.2d 436 (N.Y. App. Div. 2007) ........................................................................... A6

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
   153 F.4th 795 (9th Cir. 2025) ............................................................................................. 26

*Pick v. Kay*,
   2020 WL 12919340 (C.D. Cal. July 7, 2020),
   *aff'd*, 2022 WL 193197 (9th Cir. Jan. 21, 2022) ................................................................ 20

*Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*,
   946 F. Supp. 2d 957 (N.D. Cal. 2013) ................................................................................. 26

*In re Plum Baby Food Litig.*,
   2024 WL 1354447 (N.D. Cal. Mar. 28, 2024) .................................................................... 36

*Progressive West Ins. Co. v. Sup. Ct.*,
   37 Cal. Rptr. 3d 434 (Cal. Ct. App. 2005) ......................................................................... A4

xii

*Reed v. NBTY, Inc.*,
  2014 WL 12284044 (C.D. Cal. Nov. 18, 2014) .................................................. 14

*Repro-Med Sys., Inc. v. EMED Techs. Corp.*,
  2019 WL 1427978 (E.D. Cal. Mar. 29, 2019) .................................................. 16

*In re Rezulin Prods. Liab. Litig.*,
  369 F. Supp. 2d 398 (S.D.N.Y. 2005) .................................................. 13

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
  62 P.3d 142 (Colo. 2003).................................................. 9, A2

*Rimini St., Inc. v. Oracle Int'l Corp.*,
  2017 WL 4227939 (D. Nev. Sept. 22, 2017) .................................................. 26, 28

*Roberts v. U.S. Jaycees*,
  468 U.S. 609 .................................................. 38

*Ruiz v. Bradford Exch., Ltd.*,
  153 F.4th 907 (9th Cir. 2025) .................................................. 41

*Sanders v. Brown*,
  504 F.3d 903 (9th Cir. 2007) .................................................. 18

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*,
  580 U.S. 328 (2017) .................................................. 52

*Scanlan v. Sunbeam Prods., Inc.*,
  690 F. App'x 319 (6th Cir. 2017) .................................................. A1, A5

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996) .................................................. 43

*SEC v. Liu*,
  2022 WL 3645063 (9th Cir. Aug. 24, 2022) .................................................. 43

*SEC v. Platforms Wireless Int'l Corp.*,
  617 F.3d 1072 (9th Cir. 2010) .................................................. 52

*SEC v. Davenport*,
  2025 WL 1914897 (C.D. Cal. Apr. 24, 2025) .................................................. 43

*S.H. v. Diocese of Brooklyn*,
  167 N.Y.S.3d 171 (N.Y. App. Div. 2022) .................................................. 44

*Silver v. Pep Boys-Manny, Moe & Jack of Del., Inc.*,
  2018 WL 1535285 (D.N.J. Mar. 29, 2018) .................................................. 21, 25

*Slane v. Emoto*,
  582 F. Supp. 2d 1067 (W.D. Wis. 2008) .................................................. 24

*In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*,
  753 F. Supp. 3d 849 (N.D. Cal. 2024) .................................................. *passim*

*In re Soc. Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*,
    702 F. Supp. 3d 809 (N.D. Cal. 2023) .................................................................. *passim*

*Solow v. Aspect Res., LLC*,
    2004 WL 2694916 (Del. Ch. Oct. 19, 2004) ........................................................ A3

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) ...................................................................... 41, 42, 53

*In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*,
    758 F. Supp. 2d 1077 (S.D. Cal. 2010) ................................................................ 11

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ............................................................................................. 33

*Sosa v. DIRECTV, Inc.*,
    437 F.3d 923 (9th Cir. 2006) ............................................................................... 18

*Sovereign Bank v. Licata*,
    977 A.2d 228 (Conn. 2009) ................................................................................. 22

*State v. Minn Sch. of Bus.*,
    935 N.W.2d 124 (Minn. 2019) ............................................................................ 43

*State v. The Castle Law Grp., LLC*,
    2017 WL 3449241 (Colo. Dist. Ct. Apr. 4, 2017),
    *aff'd in part, rev'd in part on other grounds*, 457 P.3d 699 (Colo. App. 2019) ........ 43

*State v. City & Cnty. of Milwaukee*,
    138 N.W. 1006 (Wis. 1912) ................................................................................. A6

*State v. Classic Pool & Patio, Inc.*,
    777 N.E.2d 1162 (Ind. Ct. App. 2002) ................................................................ A6

*State v. TikTok Inc.*,
    245 N.E.3d 681 (Ind. Ct. App. 2024) .................................................................. A3

*State ex rel. Brady v. Pettinaro Enters.*,
    870 A.2d 513 (Del. Ch. 2005) ............................................................................. A6

*State ex rel. Coffman v. Robert J. Hopp & Assocs., LLC*,
    442 P.3d 986, *as modified* (Nov. 1, 2018) ......................................................... A1

*State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*,
    755 N.W.2d 583 (Neb. 2008) .............................................................................. A4

*State ex rel. Stovall v. DVM Enterprises, Inc.*,
    62 P.3d 653 (Kan. 2003) ..................................................................................... A5

*State ex rel. Weiser v. Dykman*,
    2020 WL 14045543 (Colo. App. 2020) ............................................................... A6

*State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*,
    777 S.E.2d 176 (S.C. 2015) ........................................................ A3, A4, A6

*Sullivan v. Oracle Corp.*,
    254 P.3d 237 (Cal. 2011) ............................................................................ 44

*In re Syngenta AG MIR 162 Corn Litig.*,
    131 F. Supp. 3d 1177 (D. Kan. 2015) ....................................................... 23

*Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*,
    256 F.3d 879 (9th Cir. 2001) ..................................................................... 45

*Tanner v. Int'l Isocyanate Inst., Inc.*,
    2008 WL 11374393 (N.D. Ala. June 9, 2008) .......................................... 18

*Target Const., Inc. v. Baker Pile Driving & Site Work, LLC*,
    2012 WL 5878855 (E.D. La. Nov. 20, 2012) ..................................... A1, A5

*Teller v. Bill Hayes, Ltd.*,
    213 A.D.2d 141 (N.Y. App. 1995) .............................................................. 22

*Tidenberg v. Bidz.com*,
    2009 WL 605249 (C.D. Mar. 4, 2009) ...................................................... 44

*Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*,
    465 F.3d 1102 (9th Cir. 2006) ................................................................... 51

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    497 F.3d 144 (2d Cir. 2007) ......................................................................... 9

*Tufts v. Newmar Corp.*,
    53 F. Supp. 2d 1171 (D. Kan. 1999) ......................................................... A1

*Tuosto v. Philip Morris USA Inc.*,
    2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007) ..................................... 18, 19

*Ulbrich v. Growth*,
    78 A.3d 76 (Conn. 2013) ............................................................................ A4

*Union Underwear Co., Inc. v. Barnhart*,
    50 S.W.3d 188 (Ky. 2001) .......................................................................... 44

*United Concrete & Const., Inc. v. Red-D-Mix Concrete, Inc.*,
    349 Wis. 2d 587 (Wis. 2013) ...................................................................... A3

*United States Bank Nat'l Ass'n v. PHL Variable Ins. Co.*,
    2013 WL 791462 (S.D.N.Y. Mar. 5, 2013) ............................................... A3

*United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*,
    2019 WL 3282619 (C.D. Cal. July 16, 2019),
    *rev'd on other grounds*, 854 F. App'x 840 (9th Cir. 2021) ...................... 11

*United States v. Long*,
    562 F.3d 325 (5th Cir. 2009) ............................................................ 11

*United States v. Woodson*,
    693 F.3d 440 (4th Cir. 2012) ............................................................ 10

*Ventura Content, Ltd. v. Motherless, Inc.*,
    885 F.3d 597 (9th Cir. 2018) ............................................................ 49

*In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*,
    424 F. Supp. 3d 781 (N.D. Cal. 2020) .............................................. 13

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976) .......................................................................... 26

*Watson v. Progressive Direct Ins. Co.*,
    2022 WL 18027628 (E.D. Ky. Dec. 30, 2022) .................................. 39

*Weaver v. Champion Petfoods USA Inc.*,
    3 F.4th 927 (7th Cir. 2021) ............................................................... 15

*XYZ Two Way Radio Serv. v. Uber Techs., Inc.*,
    214 F. Supp. 3d 179 (E.D.N.Y. 2016) .............................................. 28

*York v. InTrust Bank, N.A.*,
    962 P.2d 405 (Kan. 1998) ................................................................. A2

*Young v. Murphy*,
    615 F.3d 59 (1st Cir. 2010) ............................................................... 11

*Zellmer v. Meta Platforms*,
    104 F.4th 1117 (9th Cir. 2024) ......................................................... 47

*ZL Techs., Inc. v. Gartner, Inc.*,
    709 F. Supp 2d 789 (N.D. Cal. 2010), *aff'd*, 433 F. App'x 547 (9th Cir. 2011) ....................... 25

*Zorba Contractors, Inc. v. Hous. Auth., City of Newark*,
    362 N.J. Super. 124 (App. Div. 2003) .............................................. A1

### STATUTES & RULES

15 U.S.C. § 45 ................................................................................... 36, A4

15 U.S.C. § 6501 ............................................................................... *passim*

15 U.S.C. § 6502 ............................................................................. 2, 44, 49

15 U.S.C. § 6504 ......................................................................... 45, 49, 52, 53

15 U.S.C. § 6505 ...................................................................................... 53

16 C.F.R. § 312 ................................................................................. *passim*

28 U.S.C. § 1658 .................................................................................................. 51

47 U.S.C. § 230 .................................................................................................... 1

230 ILCS 10 *et seq.* ............................................................................................ 37

705 ILCS 405/4-1 *et seq.* ................................................................................... 37

814 ILCS 505/7 .................................................................................................. A6

815 ILCS 505/2 .................................................................................................. A3

815 ILCS 510/2(a) .............................................................................................. A2

Cal. Bus. & Prof. Code § 17208 ........................................................................ A6

Cal. Civ. Proc. Code § 338 ................................................................................ A6

Cal. Gov. Code § 12527.6 ................................................................................... 43

Colo. Rev. Ann. § 6-1-105 ........................................................................... A2, A4

Colo. Rev. Ann. § 6-1-115 ................................................................................. A6

Conn. Gen. Stat. § 42-110 ............................................................................ A3, A6

Del. Code Ann. tit. 6, § 2506 ............................................................................. A6

Del. Code Ann. tit. 6, § 2511 ............................................................................. A4

Del. Code Ann. tit. 6, § 2522 ....................................................................... A2, A6

Del. Code Ann. tit. 6, § 2532 ............................................................................. A2

Ind. Code § 24-5-0.5-2 ....................................................................................... A6

Ind. Code § 24-5-0.5-3 ....................................................................................... A2

Ind. Code § 24-5-0.5-4 ................................................................................. 40, A6

Ind. Code § 24-5-0.5-5 ....................................................................................... A6

Ind. Code § 24-5-0.5-8 ....................................................................................... A6

Kan. Stat. Ann. § 50-626 .................................................................................... A2

Kan. Stat. Ann. § 50-627 .................................................................................... A5

Ky. Rev. Stat. § 48.005 ....................................................................................... 42

Ky. Rev. Stat. § 367.170 ..................................................................................... A3

Ky. Rev. Stat. § 367.200 ..................................................................................... 40

La. Stat. Ann.§ 51:1405 ...................................................................................... A3

La. Stat. Ann.§ 51:1407 ............................................................................................... A6

Minn. Stat. § 8.31 ........................................................................................................ 42

Minn. Stat. § 8.37 ........................................................................................................ A2

Minn. Stat. § 325D.44 ................................................................................................. A2

Neb. Rev. Stat. § 59-1602 ........................................................................................... A3

Neb. Rev. Stat. § 87-302 ....................................................................................... A2, A3

Neb. Rev. Stat. § 87-303 ............................................................................................. A6

N.C.G.S. § 75-15.1 ................................................................................................ 40, A3

N.C.G.S. § 75-15.2 ...................................................................................................... A6

N.J. Stat. Ann. § 56.8-2 .............................................................................................. A2

N.Y. C.P.L.R. § 214(2) ............................................................................................... A6

N.Y. Exec. Law 63(12) ................................................................................... 41, A3, A4

N.Y. Gen. Bus. Law § 349 .......................................................................................... A3

N.Y. Gen. Bus. Law § 350 .......................................................................................... A3

73 Pa. Stat. and Cons. Stat. § 201-2 ........................................................................... A2

73 Pa. Stat. and Cons. Stat. § 201-3 ........................................................................... A3

73 Pa. Stat. and Cons. Stat. § 201-8 ........................................................................... A6

S.C. Code Ann. § 39-5-20 ........................................................................................... A3

S.C. Code Ann. § 39-5-110 ......................................................................................... A6

S.C. Code Ann. § 39-5-150 ......................................................................................... A6

Va. Code § 59.1-200(A) ......................................................................................... A2, A3

Va. Code § 59.1-206(A) ............................................................................................... A6

Wis. Stat. § 100.18(11) ............................................................................................... A6

OTHER AUTHORITIES

64 Fed. Reg. 59888 (Nov. 3, 1999) ..................................................................... 46, 48

71 Fed. Reg. 13247 (Mar. 15, 2006) ......................................................................... 48

78 Fed. Reg. 3972 (Jan. 17, 2013) ..................................................................... 47, 51

90 Fed. Reg. 16918 (Apr. 22, 2025) ......................................................................... 47

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2     The AGs assert sweeping claims against Meta based on a theory that Meta allegedly deceived

3     consumers by making false statements about whether its platforms are addictive and were designed

4     that way.  The AGs have adduced no admissible evidence to prove this core claim or any of their

5     other claims.

6     *First*, although the AGs identify more than 130 purportedly deceptive statements, only *six* of

7     these statements reference so-called social media addiction.  The AGs have no evidence that any of

8     these six statements were false or misleading—most fundamentally, because "social media

9     addiction" is not an established psychiatric condition.  The dearth of evidence on this issue dooms

10    the AGs' addiction allegations that form the core of this litigation, as Meta cannot have deceived

11    consumers regarding a psychiatric condition that has not been proven to exist.  Moreover, even if the

12    AGs have some basis to put this issue in dispute, they cannot show that the speakers of statements

13    regarding addiction knew they were making a false statement when they expressed their own views

14    on the state of the science in an area where—at best—there is no consensus.  If the AGs are correct—

15    and the issue of addiction is in dispute—expressions of opinion on either side of the debate cannot

16    be knowingly false as required under the laws of numerous states.  The AGs also have no evidence

17    that these six statements tended—or were likely—to mislead consumers.  Finally, the remaining

18    allegedly deceptive statements identified in their Complaint, none of which concerns addiction, are

19    not actionable on multiple independent grounds.

20    *Second*, the AGs' unfairness and unconscionability claims are premised on three discrete

21    features of Meta's platforms—the "Daily Limit" and "Take a Break" time restriction features; the

22    multiple accounts function on Instagram; and appearance-altering filters.  While this Court allowed

23    these claims to proceed at the motion to dismiss stage, it is now clear, post-discovery, that the claims

24    are barred by Section 230 of the Communications Decency Act, 47 U.S.C. § 230 (2018) ("Section

25    230"), and the First Amendment.  All three of these features facilitate the sharing and viewing of

26    third-party content and thus constitute protected publishing tools under Ninth Circuit Section 230

27    precedent, and the claims target Meta's expressive activity in violation of the First Amendment.

28

1    And—even if their claims were not barred—the AGs have adduced no evidence of any harm resulting

2    from these features.

3          *Third*, the AGs have no evidence to support their claim that Meta has violated the Children's

4    Online Privacy and Protection Act ("COPPA") by collecting personal information from children

5    under the age of 13 ("U13").  COPPA applies only to an operator (1) of a website or online service

6    that is "directed to [users or children under 13]," or (2) who has "actual knowledge" that it is

7    collecting or maintaining personal information from U13 users. 15 U.S.C. § 6502(a)(1) (1998).  The

8    AGs lack the evidence necessary to establish either prong of this test.  Meta's platforms are not

9    directed at U13 users.  Rather, they are general audience websites directed to teen and adult users.

10   And the AGs have no evidence that Meta knowingly collected protected personal information from

11   any U13s in the AGs' states, as required by the statute.

12         *Fourth*, the AGs are limited and, for many states, precluded entirely in their ability to recover

13   monetary remedies.  The disgorgement they seek is unavailable under the AG states' consumer

14   protection laws and COPPA, and certain AGs have no evidence of the mental states required to obtain

15   civil penalties.  Moreover, to the extent any AGs could recover monetary remedies, any amount they

16   could recover is limited by state statutes of limitations and a presumption against extraterritoriality.

17                                      **BACKGROUND**[1]

18         The AGs bring three categories of claims against Meta: (i) state law consumer protection

19   claims premised purportedly on deception (together, the "deception claims"); (ii) state law consumer

20   protection claims premised on purportedly unfair and unconscionable acts and practices, relating to

21   three specific features of Meta's platforms (together, the "unfairness claims"); and (iii) a joint claim

22   under COPPA, alleging, *inter alia*, that Meta has collected, used, or shared personal information

23

---

24   [1] Throughout this brief, "¶ __" refers to the AGs' Amended Complaint, filed on June 9, 2025
     ("Compl.") (ECF No. 207).  Statements identified in the AGs' Expert Report of Adam L. Alter, Ph.D,
25   are cited in the form of a letter followed by a number (e.g., "A2"), consistent with the numbering
     used in that report.  "Row __" refers to the numbered rows of the table on pages 8 to 13 of the AGs'
26   January 7, 2026 Fourth Supplemental Response to Meta's First Request for Interrogatories, attached
     as Exhibit 5, in which the AGs improperly identified alleged misrepresentations and omissions that
27   had not been identified in the Complaint.  "App. __" refers to the numbered rows in Appendix A,
     attached hereto.
28

1   about children under the age of 13.

2   **I. Deceptive Acts and Practices Claims**

3   To support their deception claims, the AGs have identified 113 purportedly false or deceptive

4   misrepresentations by Meta or its employees.

5   **A. Statements Referencing Social Media Addiction**

6   The AGs have identified only six statements relating to alleged addiction. *See infra* Part I.A.

7   Although the AGs refer throughout their complaint to "compulsive" use, Compl. ¶¶ 2, 116, 118-19,

8   170, 193, 528, 574, 846-47, 850, they do not allege a single statement by Meta regarding compulsive

9   use, let alone one that was deceptive. And they have abandoned their failure to warn and pure

10  omissions claims,[2] thereby barring them from proceeding to trial on the theory that Meta should have

11  disclosed that its products result in compulsive use.

12  **B. Other Statements Underlying the AGs' Deception Claims**

13  The remainder of the alleged misstatements fall into several buckets. *First*, 32 of the

14  statements were made by Meta or its executives during congressional testimony[3] or proceedings[4]

15  before the Barnet Coroner's Court in the United Kingdom, rendering them not actionable as a matter

16  of law. *See infra* Part I.B.1. These statements were part of legislative testimony that was intended

17  to defer or shape Congress's forthcoming regulatory proposals or testimony for a specific proceeding.

18  *Second*, 95 statements were not directed to consumers, but rather were made internally to other Meta

19

20

21  ────────────────

22  [2] *See* ECF No. 2550 at 3 ("The AGs' deception claims do not impose a duty to disclose or compel speech[.]"); *see also* ECF No. 118.1 (Opening-Answer Brief of the State AGs) at 23, *California v. Meta Platforms Inc.*, No. 24-7032 (9th Cir. June 23, 2025) (conceding that they "did not advance a failure-to-warn cause of action"); Oral Argument at 31:07-31:52; 32:26-36:39, *California v. Meta Platforms Inc.*, No. 24-7032 (9th Cir. Jan. 6, 2025), https://www.ca9.uscourts.gov/media/video/?20260106/24-7032/ (confirming that they are not advancing any claims based on omission theories).

25  [3] *See* Ex. 1 at 7 (Row 8), 7-8 (¶ 335 / C2), 10 (¶ 128), 10 (¶ 336), 10 (Row 9), 11 (¶ 592), 12 (¶ 792), 14 (¶ 648), 15 (¶ 669), 15 (¶ 712), 15 (D1), 15 (Row 10), 18 (¶ 85), 25 (A9), 28 (¶¶ 603-04), 29 (¶¶ 185, 334, 368 / C9), 38 (¶ 375 / B2), 39 (¶ 192 / B6), 45 (¶ 643); Ex. 2 at 49 (¶ 465), 56 (¶ 419 / C4), 56, 72 (¶ 191 / B4), 56-57 (¶ 137), 76 (¶¶ 438, 685 / D8), 100 (¶ 415 / C1); Ex. 3 at 8 (D4), 8 (D5), 8 (¶ 743), 9-10 (¶ 562), 13 (¶ 427 / B1); Ex. 4 at 9 (B3).

28  [4] *See* Ex. 6 at 3 (¶ 565).

1  employees,[5] while others were made to non-consumer audiences on earnings calls,[6] during

2  proceedings before the Barnet Coroner's Court,[7] to Congress,[8] at industry conferences,[9] or on Meta's

3  website.[10]  *See infra* Part I.B.2.  *Third*, four of the statements[11] are statements of opinion, reflecting

4  the personal views or opinions of the executives who made them.  *See infra* Part I.B.3.  *Fourth*, 57

5  statements made by Meta or its executives related to the safety of Meta's platforms,[12] the positive

6  impact of Meta's platforms on users,[13] goals for Meta's tools,[14] or Meta's prioritization of community

7  safety and well-being.[15]  *See infra* Part I.B.4.  These statements did not include any specific,

8

---

9  [5] *See* ¶ 135; Ex. 7 at -3421 (¶ 136); Ex. 8 at -0355 (¶ 265); Ex. 9 at -2792 (¶ 285); Ex. 10 at -7314
10 (¶ 286); Ex. 11 at -7534 (¶ 294); Ex. 12 at -2162 (¶¶ 438, 685); Ex. 13 at -7224 (¶ 561); Ex. 14
   at -0569 (¶ 571); Ex. 15 at -0445 (¶ 729).

11 [6] *See* Ex. 16 at 5 (¶ 122), Ex. 17 at 6 (¶ 123).

12 [7] *See supra* n.4.

   [8] *See supra* n.3.

13 [9] *See* Ex. 18 at 2 (¶ 125 / A2); Ex. 19 at 1 (¶ 265 / A5).

14 [10] *See* Ex. 20 at 1 (¶ 129), 3 (Row 11); Ex. 21 at 2 (¶ 130); Ex. 22 at 1 (¶ 131); Ex. 23 at 2-3 (¶ 167),
   4 (¶ 187); Ex. 24 at 1 (¶ 188 / C10); Ex. 25 at 1 (¶ 222); Ex. 26 at 1 (¶ 223 / A3); Ex. 27 at 1 (¶ 284);
15 Ex. 28 at 2 (¶ 331); Ex. 29 at 1-2 (¶ 464 / C5), 2 (Row 25); ¶ 473; Ex. 30 at -9929 (¶ 490), -9930
   (¶ 481); Ex. 31 at 2 (¶ 499); Ex. 32 at 1 (¶ 598 / C3), 2 (¶¶ 595-96), 6 (Row 7); Ex. 33 at 3 (¶ 729);
16 Ex. 34 at 3 (Row 28), 4 (A6); Ex. 35 at 1 (A7);  Ex. 36 at 2 (A8); Ex. 37 at 1 (B8); Ex. 38 at 1 (Row
   13), 5 (B9); Ex. 39 at 4 (¶ 473), 4 (C6); Ex. 40 at 1 (C7); Ex. 41 at 4 (C8); Ex. 42 at 2 (D2); Ex. 43
17 at 3 (D7), 4 (Row 6); Ex. 44 at 4 (Row 1); Ex. 45 at 1 (Row 3), Ex. 46 at 2 (Row 5); Ex. 47 at 4-5
   (Row 12); Ex. 48 at 2 (Row 14); Ex. 49 at 2 (Row 15); Ex. 50 at 4 (Row 16); Ex. 51 at 3 (Row 17);
18 Ex. 52 at 4 (Row 18); Ex. 53 at 79 (Row 19), 80 (Row 20); Ex. 54 at 2 (Row 22); Ex. 55 at 3 (Row
   23); Ex. 56 at 1 (Row 24).

19 [11] *See* Ex. 2 at 49 (¶ 465), 100 (¶ 415 / C1), 56 (¶ 419 / C4); Ex. 3 at 13 (¶ 427 / B1).

20 [12] *See* Ex. 1 at 10 (¶ 128); Ex. 2 at 49 (¶ 465); Ex. 3 at 13 (¶ 427 / B1); Ex. 6 at 3 (¶ 565); Ex. 16 at 5
   (¶ 122); Ex. 20 at 1 (¶ 129); Ex. 21 at 2 (¶ 130); Ex. 22 at 1 (¶ 131); ¶ 473; Ex. 34 at 3 (Row 28);
21 Ex. 57 at 1 (Row 27).

22 [13] *See* ¶ 287; Ex. 1 at 11 (¶ 592); Ex. 2 at 56 (¶ 419 / C4), 100 (¶ 415 / C1); Ex. 3 at 9-10 (¶ 562);
   Ex. 13 at -7224 (¶ 561); Ex. 58 at 2-3 (¶ 126).

23 [14] *See* Ex. 1 at 39 (¶ 192 / B6); Ex. 2 at 56 (¶ 191); Ex. 20 at 3 (Row 11); Ex. 28 at 2 (¶ 331); Ex. 29
   at 2 (Row 25); Ex. 34 at 3 (Row 28); Ex. 37 at 1 (B8); Ex. 38 at 5 (B9); Ex. 44 at 4 (Row 1); Ex. 43
24 at 4 (Row 6); Ex. 45 at 1 (Row 3); Ex. 46 at 2 (Row 5); Ex. 48 at 2 (Row 14); Ex. 52 at 4 (Row 18);
   Ex. 53 at 80 (Row 20); Ex. 54 at 2 (Row 22); Ex. 57 at 1 (Row 27); Ex. 59 at 5 (¶ 168 / B7); Ex. 60
25 at 1 (Row 2); Ex. 61 at 2 (Row 4); Ex. 62 at 2 (Row 21); Ex. 63 at 3-4 (¶ 169); Ex. 64 at -0074
   (¶ 173), at -0074 (¶ 174); ¶ 829.

26 [15] *See* Ex. 1 at 7 (Row 8), 15 (Row 10); Ex. 3 at 8 (D5); Ex. 7 at -3421 (¶ 136); Ex. 17 at 6 (¶ 123);
27 Ex. 18 at 2 (¶ 125 / A2); Ex. 19 at 1 (¶ 265 / A5); Ex. 25 at 1 (¶ 222); Ex. 26 at 1 (¶ 223 / A3); Ex. 28
   at 2 (¶ 331); Ex. 34 at 4 (A6); Ex. 48 at 2 (Row 14); Ex. 53 at 79 (Row 19); Ex. 66 at -0183 (¶ 127
28 / A4); Ex. 67 at 3 (¶ 448); Ex. 68 at 2 (¶ 425 / A1); Ex. 69 at 6-7 (¶ 138); ¶ 287; ¶ 473.

4

measurable claims directed towards consumers.  *Fifth*, 12 statements and three Community Standards Enforcement Reports ("CSERs")[16] were made outside one or more relevant statute of limitations periods.  *See infra* Part I.B.5.

## II.   Unfairness and Unconscionability Claims

The AGs' unfairness claims relate to three features: (i) the "Take a Break" and "Daily Limit" time restriction features available on Instagram and Facebook; (ii) Instagram's multiple accounts feature; and (iii) third-party appearance-altering filters available on Facebook and Instagram.

Users are not required to use any of these features.  No user is required to use the "Take a Break" or "Daily Limit" features, *see, e.g.*, Ex. 71 (Otaru Dep.) at 30:15-31:3, users are not automatically registered for multiple accounts, and no user is required to filter his or her images.[17]

Moreover, all three features are publishing tools with respect to third-party content and contain Meta's expressive activity.  *See infra* Part II.A.

## III.   COPPA Claim

The AGs bring a joint federal claim under COPPA, which imposes privacy and parental consent requirements on website and online service operators relating to the collection and use of defined categories of personal information from children under the age of 13 ("U13s").  *See* 15 U.S.C. §§ 6501-02 (1998); 16 C.F.R. §§ 312.1-312.3.

Meta's services, which have more than three billion daily active users, are used primarily by adults.  Ex. 74 at 64.[18]  Over 90% of Facebook users and over 80% of Instagram users are over the

---

[16] *See* Ex. 13 at -7224 (¶ 561); Ex. 18 at 2 (¶ 125 / A2); Ex. 25 at 1 (¶ 222); Ex. 28 at 2 (¶ 331); Ex. 29 at 1-2 (¶ 464 / C5), 2 (Row 25); Ex. 35 at 1 (A7); Ex. 42 at 2 (D2); Ex. 44 at 1, 4 (Row 1); Ex. 55 at 3 (Row 23); Ex. 70 at 4 (¶ 374 / B5); ¶ 135; Meta's CSERs published May 15, 2018, November 15, 2018, and May 23, 2019.

[17] At the motion to dismiss stage, this Court stated that the only surviving theory of liability as to Instagram's multiple accounts feature was that it could "serve as an end-run around other features such as those related to time restrictions."  *See In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 884 (N.D. Cal. 2024) ("*Social Media II*").  The AGs' allegations concerning appearance-altering filters are centered on filters mimicking the effects of cosmetic surgery.  Compl. ¶¶ 333-68.  Instagram, however, has never permitted first-party cosmetic surgery filters.  Ex. 72 at -5359.

[18] Although Meta researched the U13 market when it considered launching an Instagram Kids platform, it is undisputed that the purpose of this research was to explore the possibility of creating

age of 18.  Ex. 73 (Venkataraman Rebuttal Rep.) ¶¶ 61-63; Ex. 74 at 64.  Indeed, although Meta generates $164.5 billion of annual revenue, "[s]ubstantially all" of which derives from advertising on Facebook and Instagram, Ex. 74 at 59-60, ███████████████████████████

████████████████████████████████████████████████████

█████  Ex. 73 (Venkataraman Rebuttal Rep.) ¶¶ 77-78, 82.

Meta takes multiple steps not to have U13s on its platforms.  The Terms of Service for both Facebook and Instagram have prohibited U13s from joining the platform since at least 2012.  *See* Ex. 76 (Hartnett Dep.) at 39:22-40:14, 74:18-21, 106:3-7, 243:24-244:2; Ex. 78 (Memon Rebuttal Rep.) ¶ 65; Ex. 79 (McDaniel Rep.) ¶¶ 104, 106; Ex. 75 (Davis Dep.) at 112:4-9; Ex. 73 (Venkataraman Rebuttal Rep.) ¶ 61.  Even if some content on the platforms may appeal to different ages, it does not appeal disproportionately to U13s.  *See, e.g.*, Ex. 73 (Venkataraman Rebuttal Rep.) ¶¶ 126-27, 130-34, 136, 138-42, 149, 161-65, 178.

Moreover, it is undisputed that both Facebook and Instagram delete user accounts that are suspected of belonging to U13s.  Ex. 76 (Hartnett Dep.) at 106:3-7, 243:24-244:2.  If an existing user's account is flagged as potentially belonging to a U13, Meta reviews the account, generally through human review, to determine whether the account may belong to a U13 user, in which case the account is placed in an age "checkpoint."  *Id.* at 103:11-18.[19]  When an account has been checkpointed, the user is locked from accessing it, *id.* at 103:17-18, and the checkpointed user must upload identification to prove his or her age within 30 days, *id.* at 104:13-16; 106:5.  If the user fails to upload this identification or his or her appeal fails, the account is permanently disabled and scheduled for deletion.  *Id.* at 106:3-7; Ex. 77 (Hartnett Dep.) at 299:14-301:13.[20]  The AGs have no evidence to the contrary.

---

a COPPA-compliant site for U13s, rather than directing the existing platform to U13s.  *See* Ex. 75 (Davis Dep.) at 226:10-227:15.

[19] If an existing user self-reports as being under the age of 13, his or her account is automatically checkpointed, without any human review.  Ex. 76 (Hartnett Dep.) at 105:1-4.  Further, certain flagged accounts do not go to human review if there is insufficient information on which to base any age determination.  *Id.* at 190:22-191:7.

[20] Meta may temporarily retain data from accounts scheduled for deletion due to "the possibility of needing to do [related] legal discovery[.]"  Ex. 77 (Hartnett Dep.) at 300:10-12.

1    Because Meta instructs its human reviewers to "err on the side of [determining that a user is

2    under 13] if [they are] unsure[,]" Ex. 76 (Hartnett Dep.) at 105:20-21, and reviewers have limited

3    information from which to base their decision, *see* Ex. 80 at -0370, "a checkpointed account . . . is

4    not equivalent to an underage user[,]" Ex. 76 (Hartnett Dep.) at 168:16-18.  Moreover, even after an

5    account has been deleted, Meta "d[oes not] know" that the account belonged to an "underaged

6    user[.]"  *Id.* at 168:21-24.  Rather, "[Meta] just know[s] [the user] did not appeal or did not appeal

7    successfully."  *Id.*

8    **IV.  Procedural History**

9    On October 24, 2023, 33 AGs filed a complaint against Meta asserting 54 causes of action,

10   including one claim under COPPA and 53 claims under various state consumer protection laws.  ECF

11   No. 1.  Meta filed a motion to dismiss on December 22, 2023.  ECF No. 83.  On October 15, 2024,

12   this Court issued an order granting in part and denying in part Meta's motion to dismiss.  *See In re*

13   *Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849 (N.D. Cal.

14   2024) ("*Social Media II*").[21]  The Court dismissed the AGs' unfairness claims based on five platform

15   features,[22] as barred by Section 230, *id.* at 880-83, and denied Meta's motion to dismiss the AGs': (i)

16   unfairness claims relating to the three remaining features, discussed *supra* at 5, *id.* at 883-85; (ii)

17   deception claims, *id.* at 889-95; and (iii) COPPA claim, declining to grant a "piecemeal" motion to

18   dismiss based solely on the "child-directed" aspect of the AGs' claim, *id.* at 875-78.[23]

19

20   [21] As this Court is well aware, this case is part of a multi-district litigation involving hundreds of
21   interrelated cases brought against social media company defendants.  In November 2023, this Court
     issued an order granting in part and denying in part the social media company defendants' motions
22   to dismiss certain priority claims brought by individual plaintiffs, *Social Media I*, which the Court
     incorporated by reference in *Social Media II*, 753 F. Supp. 3d at 880-84, 930 (granting in part and
23   denying in part Meta's Section 230 motion "utilizing the same approach the Court employed in *Social*
     *Media I*, 702 F. Supp. 3d at 824-35").

24   [22] Specifically: "infinite scroll and autoplay; ephemeral content; how Meta designed and deployed
     audiovisual and vibration notifications and alerts; the quantification and display of likes; and how
25   Meta algorithmically served content to young users."  *Social Media II*, 753 F. Supp. 3d at 884.

26   [23] Eleven AGs later voluntarily dismissed their consumer protection claims against Meta.  *See* ECF
     Nos. 124 (North Dakota), 144 (Georgia), 169 (Michigan), 203 (Missouri), Compl. (excluding state
27   law consumer protection claims by Arizona, Hawai'i, Maine, Ohio, Oregon, Rhode Island, and
     Washington).  Accordingly, 37 claims (36 state law claims and the COPPA claim) by 29 AGs
28   remain.  *See generally* Compl.

1    The parties have engaged in extensive discovery following this Court's motion to dismiss

2    ruling, during which Meta has produced over 2,610,000 documents, responded to 565 requests for

3    production, 34 interrogatories, and 48 requests for admission, and taken or defended the depositions

4    of over 250 witnesses.

5                                          **LEGAL STANDARD**

6    On a motion for summary judgment, the moving party need only identify "an absence of

7    evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

8    Once the moving party has done so, the burden shifts to the nonmoving party. *Id.* at 324. If the

9    nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect

10   to which she has the burden of proof," then "[t]he moving party is entitled to a judgment as a matter

11   of law." *Id.* at 323 (quotations omitted).

12                                           **ARGUMENT**

13   **I.    Meta Is Entitled to Summary Judgment on the AGs' Deceptive Acts and Practices**
     **Claims[24]**

14        **A.    The Alleged Statements Concerning Whether Meta's Platforms Are "Addictive"**
             **Are Inactionable Because the AGs Have No Evidence That the Statements Are**

15           **False, the Speakers Knew That They Were False, or the Statements Tended to or**
             **Were Likely to Deceive Consumers**

16        The crux of the AGs' deception claims is that Meta misled consumers about whether its

17   platforms are "addictive" or induce "compulsive and extended use." Compl. ¶ 846. The AGs have

18   identified only six statements that reference addiction and *none that refer to alleged compulsive or*

19   *extended use*:[25]

20   - Adam Mosseri testifying to Congress in 2021, "Senator, respectfully, I don't believe the
       research suggests that our products are addictive." Ex. 3 at 13 (¶ 427 / B1);

21

22   - Antigone Davis testifying to Congress in 2021, "I disagree with calling our product
       addictive" and "that is not actually how we build our products." Ex. 1 at 38-39 (¶ 375 / B2,

23     B6);

24   _____

25   [24] This section sets forth various grounds upon which categories of the alleged statements are
     nonactionable. *See, e.g.*, *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, 2014 WL 572290, at

26   *6-11 (N.D. Cal. Feb. 11, 2014) (evaluating allegedly deceptive statements by category and granting
     summary judgment as to those that were nonactionable).

27   [25] Because the AGs have dropped any pure omissions or failure to warn claims they cannot proceed
     on a theory of deception regarding compulsive use.

28

- Mark Zuckerberg testifying to Congress in 2021, "Congressman, no. I don't agree with that." when asked by a member of Congress, "Do you agree that you make money off of creating an addiction to your platforms?" Ex. 2 at 72 (¶ 191 / B4);

- Mark Zuckerberg testifying to Congress in 2020, "[W]e certainly do not design the product in [an addictive] way." Ex. 4 at 9 (B3);

- Meta telling the BBC in 2018 that "at no stage does wanting something to be addictive factor into" Meta's platform design process, Ex. 70 at 4 (¶ 374 / B5); and

- Unpublished, internal talking points stating that Facebook is not "[d]esigned to [b]e [a]ddictive"; it is "designed to be meaningful[.]" Ex. 13 at -7224 (¶ 561).

Defendants are entitled to summary judgment for three independent reasons. The AGs have (i) no evidence that the foregoing statements were false, (ii) no evidence that any of the speakers knew or believed they were making a misrepresentation and (iii) no evidence that any of the foregoing statements were likely to or had a tendency to deceive consumers.[26]

### 1. No Evidence That Statements Regarding Addiction Were False

The AGs cannot prove that Meta's platforms are addictive.

A statement is deceptive only if it is false or if the speaker lacked a reasonable basis for making the assertion. *FTC v. Innovative Designs, Inc.*, 489 F. Supp. 3d 378, 401 (W.D. Pa. 2020), *aff'd,* 2021 WL 3086188 (3d Cir. July 22, 2021). To prove that a statement is false when made,[27] plaintiffs must present evidence that the statement, "analyze[d] . . . in [its] full context,"[28] was demonstrably false or untrue, *see McClure v. Am. Fam. Mut. Ins. Co.*, 223 F.3d 845, 854-55 (8th Cir. 2000) (affirming summary judgment); *Cusmano v. Weather Shield Mfg., Inc.*, 2007 WL 1742431

---

[26] Two states (CA, IN) require that a defendant knew or should have known a statement was false or misleading, but do not have a specific intent requirement. App. 3. Seven (CO, IL, KS, KY, NJ, LA, and VA), require proof that the defendant intended to deceive, cause harm, or induce reliance on the part of consumers in order to establish liability. App. 1-2. Four (IL, IN, LA, PA) require proof that the defendant intended to deceive or defraud to recover civil penalties. *See* App. 22. These states also necessarily require that a defendant knew or should have known the falsity of a statement or the existence of an omitted fact, proof of which is also required for six states to recover civil penalties (CT, DE, IN, NC, SC, VA). App. 23-24.

[27] Three states (CO, KS, and MN) require such proof for deception claims, App. 4, and five states (DE, IL, IN, NE, and PA) require such proof under certain statutory provisions on which the AGs base their claims, *id.* at 5.

[28] *Catholdi-Jankowski v. CVS Health Corp.*, 656 F. Supp. 3d 412, 428 (W.D.N.Y. 2023) (quoting *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007)).

9

1    (Colo. Dist. Ct. Mar. 15, 2007) (granting judgment).  A plaintiff must present evidence that the

2    statement was false on its face when it was made.  *See Rhino Linings USA, Inc. v. Rocky Mountain*

3    *Rhino Lining, Inc.*, 62 P.3d 142, 149-50 (Colo. 2003).

4         *First*, "social media addiction" is not a recognized medical or psychiatric condition.  In fact,

5    multiple state witnesses have conceded this very point.[29]  After having studied the issue, neither the

6    American Psychiatric Association's ("APA") Diagnostic and Statistical Manual of Mental Disorders

7    ("DSM") nor the World Health Organization's ("WHO") International Classification of Diseases

8    ("ICD") lists social media addiction as a recognized medical or psychiatric condition.[30]  The DSM is

9    published by the APA—the leading psychiatric organization globally—to set forth all recognized

10   mental disorders,[31] and is the most widely accepted authoritative guide used by healthcare

11   professionals in the United States for the diagnosis of mental disorders.[32]  Courts—including the U.S.

12   Supreme Court and the Ninth Circuit—routinely refer to the DSM as an authority to inform the

13   definition and diagnosis of mental disorders.[33]  The DSM recognizes various substance-related

---

14
15   [29] Even the states' own witnesses have conceded they are not aware of any evidence of social media
     addiction as a recognized or diagnosable condition.  *See, e.g.*, Ex. 82 (Hartston Dep.) at 326:20-25
16   ███████████████████████████████████████████████████████████████████████; *id.*
     at 300:15-21 ██████████████████████████████████████████████
17   ██████████████████████████████████████████████████████ Ex. 83 (Wolfe Dep.) at 60:2-8
18   ████████████████████████████████████████████████████████████████████████████

19   [30] *See generally* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders*, (5th
20   ed. 2013) ("DSM-5"); World Health Org., *International Statistical Classification of Diseases and
     Related Health Problems*, (11th ed. 2019).

21   [31] *See About APA*, Am. Psychiatric Ass'n, https://www.psychiatry.org/about-apa (last visited Jan. 30,
     2026); *See What is the DSM?*, Am. Psychiatric Ass'n, https://www.psychiatry.org/patients-
22   families/what-is-the-dsm (last visited Jan. 26, 2026).

23   [32] *See What is the DSM?*, *supra* n.31.; *see also Acevedo Granados v. Garland*, 992 F.3d 755, 760 n.1
     (9th Cir. 2021) (describing the DSM as an "authoritative guide to the diagnosis of mental disorders");
24   *United States v. Wooden*, 693 F.3d 440, 452 n.4 (4th Cir. 2012) ("The DSM is widely recognized as
     'the authoritative reference used in diagnosing mental disorders.'" (quoting *Young v. Murphy*, 615
25   F.3d 59, 61 n.1 (1st Cir. 2010))).  The DSM has been recognized as an authoritative source in leading
     peer reviewed medical journals.  *See, e.g.*, Tania Moretta & Elisa Wegmann, *Toward the
26   Classification of Social Media Use Disorder: Clinical Characterization and Proposed Diagnostic
     Criteria*, 21 Addictive Behavs. Reps. (2025).  Even these peer reviewed articles note that social media
27   addiction is not "an official disorder" in the DSM-5 or ICD.  *See id.* at 2.

28   [33] *See, e.g.*, *Kansas v. Crane*, 534 U.S. 407, 411 (2002) (citing to the DSM-4's criteria for
     exhibitionism and antisocial personality disorder); *Acevedo Granados*, 992 F.3d at 759-60 (9th Cir.

disorders, as well as a singular behavioral disorder—gambling disorder—but it does not recognize social media addiction. *See* DSM-5, *supra* n.30, at 481.[34]  Similarly, WHO maintains the ICD to provide a comprehensive classification of all recognized diseases, disorders, and other health conditions based on the latest medical knowledge to provide a consensus on health-related conditions globally.[35]  The ICD is the global standard for diagnostic health information[36] and is also relied on by healthcare professionals and courts for defining and diagnosing diseases, including mental disorders.[37]  Currently, the ICD uses 55,000 unique codes to classify all recognized medical diseases and diagnoses.[38]  Social media addiction is not one of them.  The fact that neither of the two definitive authorities for diagnosing mental disorders recognizes the existence of social media addiction— after having studied the issue and the literature—is fatal to the AGs' core claims, especially given the lack of admissible evidence to the contrary.[39]

_____

2021) (referring to the DSM-5 to define intellectual disability); *Iglesias-Iglesias v. Garland*, 2022 WL 898597, at *1 (9th Cir. Mar. 28, 2022) (referring to the DSM-5 to define psychotic disorders); *United States v. Long*, 562 F.3d 325, 334-3 & 334 n.22 (5th Cir. 2009) (referring to the DSM-4's criteria for schizotypal personality disorder and taking judicial notice of the criteria).

[34] In fact, DSM-5 states that "groups of repetitive behaviors, which some term *behavioral addictions* . . . are not included because at this time there is insufficient peer-reviewed evidence to establish the diagnostic criteria and course descriptions needed to identify these behaviors as mental disorders." DSM-5, *supra* n.30, at 481; Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 543 (5th ed. Text Rev. 2022) ("DSM-5-TR").

[35] *See ICD-11 Implementation*, World Health Org., https://www.who.int/standards/classifications/frequently-asked-questions/icd-11-implementation (last updated Feb. 12, 2025).

[36] *United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs.*, 2019 WL 3282619, at *18 n.12 (C.D. Cal. July 16, 2019) ("The ICD . . . is the "international standard diagnostic tool for epidemiology, health management, and clinical purposes." (internal citations omitted)), *rev'd on other grounds*, 854 F. App'x 840 (9th Cir. 2021).

[37] *Doe v. Pa. Dep't of Corr.*, 585 F. Supp. 3d 797, 801 (W.D. Pa. 2022) (referring to both the ICD and DSM as authority recognizing gender dysphoria as a medical condition); *Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp. 3d 104, 109 (D. Md. 2023) (same); *Laake v. Benefits Comm.,* 2019 WL 823575, at *4 (S.D. Ohio Feb. 21, 2019) (acknowledging that Chronic Pain Syndrome is recognized in the ICD in determining whether plaintiff's disability benefits were improperly denied); *see also* Moretta & Wegmann *supra* n.32, at 2 (acknowledging the ICD as an authoritative source for classifying mental disorders).

[38] *See WHO Releases New International Classification of Diseases (ICD 11)*, World Health Org. (June 18, 2018), https://www.who.int/news/item/18-06-2018-who-releases-new-international-classification-of-diseases-(icd-11).

[39] The "prediction" by plaintiffs' addiction expert that the next volume of the DSM is likely to include social media addiction as a recognized mental disorder, Ex. 81 (Zicherman Rep.) ¶ 25, does not save the AGs' claims.  The statements at issue must be judged at the time they were made.  *See, e.g., In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp.

*Second*, the APA affirmatively made the decision *not* to include social media addiction in the DSM-5—while simultaneously recognizing internet gaming disorder as a condition for further study—concluding that "[e]xcessive use of the Internet not involving playing of online games (e.g., excessive use of social media, such as Facebook . . . ) is not considered analogous to Internet gaming disorder and future research on other excessive uses of the Internet would need to follow similar guidelines as suggested herein."  DSM-5, *supra* n.30, at 797-98.[40]  Conditions for further study are described by the DSM-5 as "*not intended for clinical use; only the criteria sets and disorders in Section II of DSM-5 are officially recognized and can be used for clinical purposes.*"  DSM-5, *supra* n.30, at 783.  Notably, social media addiction is one step removed from this category of conditions for further study.  Moreover, the APA reaffirmed the same limitations of the Internet Gaming Addiction criteria when it updated the DSM-5 in 2022.  *See* DSM-5-TR, *supra* n.34, at 916; *see also id.* at 914 (Internet Gaming Disorder is not "intended to include other recreational or social Internet use.").[41]

*Third*, WHO, which similarly went through an extensive review in its standard process of updating the ICD,[42] did not include social media addiction in its list of thousands of medical conditions in the latest version.  WHO maintains an online platform that allows clinicians, statisticians, researchers, national institutions, and others to submit proposals, which are reviewed by scientific experts and classification experts.  World Health Org., *International Classification of Diseases for Mortality and Morbidity Statistics – Reference Guide* 326 (11th Rev. 2022).  WHO's most recent revision of the ICD (ICD-11) was based on a more than ten-year process, *id.* at 349, with

---

2d 1077, 1090 (S.D. Cal. 2010) (dismissing UCL claims where plaintiffs failed to show "representations were false or misleading *at the time they were made*" (emphasis added)).

[40] Internet gaming disorder is also listed as a "Condition[] for Further Study" in the DSM-5-TR, which it describes as "proposed conditions" where it was "ultimately determined that there was insufficient evidence to warrant inclusion of these proposals as official mental disorder diagnoses." DSM-5-TR, *supra* n.34, at 20, 903.  Accordingly, if internet gaming disorder is not an appropriate diagnosis and social media addiction has not even been found to be sufficiently analogous to internet gaming disorder, then it cannot be said that the latter is an appropriate diagnosis.

[41] Contrary to opinions from the AGs' experts, a webpage on the APA website that has not been peer-reviewed is not evidence of APA recognition or akin to a formal APA statement.  *See* Ex. 81 (Zicherman Rep.) ¶ 22.

[42] *See ICD-11 Implementation*, *supra* n.35.

contributions from "[o]ver 270 institutions, health workers, epidemiologists, allied health care, health information managers, patients and statisticians from all continents." *WHO Releases New International Classification of Diseases (ICD 11)*, *supra* n.38.

*Fourth*, plaintiffs point to no other authoritative source of evidence of addiction:

- the AGs have no "gold standard" evidence of social media causing clinical addiction. *See, e.g.*, *Mullins v. Premier Nutrition Corp.*, 178 F. Supp. 3d 867, 882 (N.D. Cal. 2016) ("Randomized clinical trials are 'the gold standard for determining the relationship of an agent to a health outcome.'" (quoting Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* 555 (3d ed. 2011)));

- the AGs have no epidemiological evidence that social media causes any clinical addiction. *See In re Viagra (Sildenafil Citrate) & Cialis (Tadalafil) Prods. Liab. Litig.*, 424 F. Supp. 3d 781, 793-94 (N.D. Cal. 2020) (recognizing that "epidemiology studies are probative of general causation" under certain circumstances "[w]here the study properly accounts for potential confounding factors and concludes that exposure to the agent is what increases the probability of contracting the disease," but they "typically only expressly address whether an association exists between agents . . . and outcomes."); and

- the AGs point to no literature review by an authoritative medical or scientific organization. *See Graddy v. Sec'y of Health & Hum. Servs.*, 2017 WL 11286536 at *2, 31 (Fed. Cl. Aug. 31, 2017) (dismissing claim that MMR vaccine caused autism in petitioner's son due to insufficient proof of causation, and looking to other epidemiological studies rejecting expert's hypothesis, including an "impressive" study "undertaken by The Cochrane Collaboration, a recognized world leader in performing systematic reviews of epidemiology and medical science studies," which found that the "MMR vaccination was not likely to be associated with autism"); *In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 402 (S.D.N.Y. 2005) ("General causation is established by demonstrating, often through a review of scientific and medical literature, that exposure to a substance can cause a particular disease." (quoting Fed. Jud. Ctr., *Ref. Manual on Scientific Evid.*, 439, 444 (2d ed. 2000)).

*Fifth*, the AGs' expert opinions were prepared solely for purposes of this lawsuit, were not previously published in a peer reviewed journal, and did not follow the appropriate scientific methodologies for their proposed conclusions. *See Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 597-98 (9th Cir. 1996) (affirming exclusion of expert); ECF 2295 at 91-98 (Defs Mot. to Exclude General Causation Testimony of Pls' Experts).

## 2. Even If There Were Evidence of Addiction, the AGs Cannot Prove That Meta's Statements Regarding Addiction Were Knowingly False

Meta is entitled to summary judgment for a second—and independent—reason with respect

to statements regarding addiction.  As an initial matter, if a statement is not false, the speaker cannot possess knowledge, actual or constructive, to the contrary.  *See, e.g.*, *Aboushaban v. Am. Signature, Inc.*, 2021 WL 798874, at *3 (E.D. Va. Feb. 1, 2021).  If, however, there were some way to demonstrate that the statements regarding addiction were false, the statements would still not be actionable under numerous state laws, *see supra* n.26, absent evidence that the speakers themselves believed or had reason to believe that Meta's platforms were addictive.  *See, e.g.*, *NN&R, Inc. v. One Beacon Ins. Grp.*, 2006 WL 1765077, at *13 (D.N.J. June 26, 2006) (granting summary judgment for a corporate defendant on a NJ CFA claim because the defendant's employee did not have personal knowledge of the statement's falsity and thus, was "at best negligent in performing his duties"); *JTS Choice Enters., Inc. v. E.I. DuPont De Nemours & Co.*, 2014 WL 793525, at *7 (D. Colo. Feb. 26, 2014) ("[A] plaintiff must show that the individual who made the false statement knew it was false or was recklessly indifferent to the falsity of his comments; it is not enough to show that the statement was false based upon all of the knowledge imputed to a corporation.").

Assuming that the AGs had some proof of addiction—that would mean (at most) that the evidence regarding social media addiction is in dispute.  Where there is a lack of consensus as to whether Meta's platforms are addictive, the AGs cannot prove that Meta's alleged statements regarding that topic were *knowingly false* when made.  *See In re GNC Corp.*, 789 F.3d 505, 515-16 (4th Cir. 2015) (dismissing consumer protection claims under CA, IL, NY, NJ, and PA law because plaintiffs "failed to allege that the challenged representations are literally false" since "the scientific evidence . . . is equivocal"); *Dachauer v. NBTY, Inc.*, 2017 WL 2304209, at *2 (N.D. Cal. May 26, 2017) ("[A] plaintiff who comes forward only with evidence that the science is debatable has failed to meet his burden at summary judgment."), *aff'd*, 913 F.3d 844 (9th Cir. 2019); *Reed v. NBTY, Inc.*, 2014 WL 12284044, at *14-15 (C.D. Cal. Nov. 18, 2014) ("Inconclusive findings and unsettled science are insufficient to meet Plaintiffs['] burden of raising a question of fact on the issue of falsity" because "a reasonable jury could not find that the advertising claims are false.").  In other words, assuming that a basis existed to support the existence of social media addiction, it cannot be said that a party who expresses their view on that dispute—one way or another—is liable for knowingly

making a false statement.

### 3. The AGs Have No Evidence That the Statements Regarding Alleged Addiction Had a Tendency or Were Likely to Mislead Consumers

The third, independent reason that the statements regarding addiction are inactionable is that the AGs cannot prove that the statements had a tendency to or were likely to mislead consumers.[43] In assessing likelihood of consumer deception, the majority of MDL states with deception claims[44] follow the objective "reasonable consumer" standard. This requires plaintiffs to demonstrate "a probability that a significant portion of the general consuming public or of targeted consumers, acting reasonably" were likely to be misled by the alleged misrepresentation. *Bustamante v. KIND, LLC*, 100 F.4th 419, 426 (2d Cir. 2024) (quoting *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093 (9th Cir. 2023)).

The AGs must put forth extrinsic evidence that the statements regarding addiction were likely to deceive consumers. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 976 (7th Cir. 2020) (holding that, under the consumer protection laws of CA, IL, NJ, NC, and NY, extrinsic evidence "is *necessary* where the [representation] is not clearly misleading on its face"). Extrinsic evidence of a likelihood of deception is "ordinarily in the form of [consumer] survey[s.]" *Hughes v. Ester C Co.*, 330 F. Supp. 3d 862, 872 (E.D.N.Y. 2018). Courts on occasion accept market research, widespread anecdotal evidence, or a combination of such evidence and expert testimony about how actual consumers interpret and understand the alleged misrepresentations. *See Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934-35 (7th Cir. 2021) (affirming summary judgment on WI consumer protection claims because plaintiff did not "offer consumer surveys or market research showing that a reasonable consumer would interpret 'biologically appropriate' to mean BPA-free"). Isolated examples, even of actual deception, are insufficient. *Clemens v. DaimlerChrysler Corp.*, 534 F.3d

---

[43] Similarly, a speaker cannot intend to deceive another by representing what he believes to be entirely truthful and non-misleading facts. *See In re Johnson*, 477 B.R. 156, 172 (B.A.P. 10th Cir. 2012) ("Lacking an awareness that he is deceiving the other party, either about the fact . . . or about . . . his knowledge . . ., he cannot possess an intent to deceive.").

[44] *See, e.g.*, *Moore v. Trader Joe's Co.*, 4 F.4th 874, 881 (9th Cir. 2021) ("Under the consumer protection laws of California [Cal. Bus. & Prof. Code §§ 17200, 17500], New York [N.Y. Gen. Bus. Law §§ 349, 350], and North Carolina," the plaintiff "must demonstrate that a 'reasonable consumer' is likely to be misled by the representation.").

1   1017, 1026 (9th Cir. 2008).  So, too, is evidence that merely speculates about how hypothetical

2   consumers would understand a representation.  *See FTC v. DIRECTV, Inc.*, 2018 WL 3911196, at

3   *12 (N.D. Cal. Aug. 16, 2018) (granting judgment and according "minimal weight" to the FTC's

4   expert who "acknowledged doing no study or survey to determine whether customers *in fact held*

5   *[the] belief*" asserted (emphasis added)).

6        The AGs failed to conduct a consumer survey or put forth any other evidence of the actual

7   understanding of consumers.  Instead, they rely [solely] on a report[45] of their expert, Adam Alter,

8   who opines that certain alleged misrepresentations have a tendency to mislead.  *See generally* Ex. 84

9   (Alter Rep.).  Alter's report is insufficient.  It "merely speculates what [] hypothetical consumer[s]

10  would do" and how they would interpret Meta's statements, which courts routinely reject.  *Harbor*

11  *Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 2017 WL 10399343, at *3 (C.D. Cal. Nov. 17,

12  2017); *see also In re GNC Corp.*, 789 F.3d at 514 (affirming dismissal and holding that, under the

13  consumer protection laws of CA, IL, NY, NJ, and PA, plaintiff "must produce extrinsic evidence of

14  actual  consumer  confusion—it  is  not  enough  for  a  court  to  determine  after  the  fact  that  a

15  representation could have misled hypothetical consumers.").[46]

16       Alter does not assess how *actual* consumers understood Meta's statements on addiction,

17  having conducted "no copy testing or other empirical testing of how consumers perceive" Meta's

18  statements.  *DIRECTV, Inc.*, 2018 WL 3911196, at *11; Ex. 85 (Alter Dep.) at 227:5-15 ███████

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████  *id.* at 317:25-

22  318:6 ███████████████████████████████████████████████████████████████████████

---

23  [45] Meta's position is that Alter's report must be excluded on *Daubert* grounds.  *See* Meta's Mot. to
24  Exclude Expert Testimony of Adam Alter (Jan. 30, 2026).  Solely for purposes of Meta's motion for
    summary judgment, however, Meta's argument here assumes the report is not struck in its entirety.
25  [46] *Repro-Med Sys., Inc. v. EMED Techs. Corp.*, 2019 WL 1427978, at *7 (E.D. Cal. Mar. 29, 2019)
26  ("Without consumer survey information or other specific examples of consumers being misled, the
    vague anecdotal evidence alone . . . is insufficient to prove that the public is likely to be misled.");
27  *Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 230 (N.D. Cal. 2015) (Gonzalez Rogers, J.) (expert
    declaration that did not "survey[] any consumers who purchased products" was insufficient to
28  constitute evidence that labeling statements are "deceptive and material").

1 ████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████

4 ████████████████████████████ Ex. 84 (Alter Rep.) ¶¶ 202, 233-36, 259.  But this type of

5 analysis—relying on internal documents that do not assess actual consumer data to ascertain how a

6 reasonable consumer would interpret a representation—is routinely rejected by courts where, as here,

7 there is no corroborative evidence of how actual consumers understand a specific phrase or statement.

8 *See Bustamante*, 100 F.4th at 433-34 (granting summary judgment because neither "plaintiffs'

9 deposition testimony[,]" "[defendant's] internal documents[,]" nor a "dictionary definition"

10 represented "a reasonable consumer's understanding of [defendant's representation]"); *de Lacour v.*

11 *Colgate-Palmolive Co.*, 2024 WL 36820, at *7 (S.D.N.Y. Jan. 3, 2024) (same); *DIRECTV, Inc.*, 2018

12 WL 3911196 at *16-18 (similar, on Rule 52(c) motion).  While the internal documents Alter reviewed

13 included documentation of users' experiences on the platform, such documentation does not reflect

14 a significant portion of consumers' "understanding of" what the term addiction "meant to them."  *Cf.*

15 *Benson v. Newell Brands, Inc.*, 2025 WL 3454980, at *21 (N.D. Ill. Dec. 1, 2025) (discussing internal

16 "market research survey" that asked actual consumers "which of the following options came closest

17 to their understanding of the [challenged representation]").

18       In sum, the AGs have no evidence—no consumer surveys, market research, or other

19 consumer-data-driven evidence—showing that consumers were capable of being misled—let alone

20 actually misled—by the statements regarding addiction.  This lack of evidence is fatal to the AGs'

21 deception claims.  *See JTS Choice*, 2014 WL 793525, at *8.

22     **B.  Meta Is Entitled to Summary Judgment as to All Alleged Statements for Multiple Additional Reasons**

23         **1.  The *Noerr-Pennington* Doctrine Immunizes Statements Made to Congress and the Coroner's Court**

25       The AGs seek to hold Meta liable for 32 allegedly deceptive statements[47] made to Congress

26 and the Barnet Coroner's Court.  Those statements are nonactionable under the *Noerr-Pennington*

27 _____

28 [47] *See supra* nn.3, 4.

1    doctrine because the statements constitute protected petitioning activity.

2          *Noerr-Pennington* provides that "those who petition any department of the government for

3    redress are generally immune from statutory liability for their petitioning conduct."  *Sosa v.*

4    *DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).  The Ninth Circuit defines petitioning activity

5    broadly to encompass legislative lobbying, administrative proceedings, conduct before a court,

6    entering into contracts with the government, and even acting in accordance with settlement terms.

7    *See, e.g.*, *Sanders v. Brown*, 504 F.3d 903, 912-14 (9th Cir. 2007); *Kottle v. Nw. Kidney Ctrs.*, 146

8    F.3d 1056, 1059 (9th Cir. 1998).

9          While courts have acknowledged an "extraordinarily narrow"[48] exception where a

10   defendant's conduct is "not genuinely aimed at procuring favorable government action," *City of*

11   *Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991), any "representation to Congress"

12   made "in an effort to prevent remedial congressional action" falls outside the exception and therefore

13   remains immune.  *Tanner v. Int'l Isocyanate Inst., Inc.*, 2008 WL 11374393, at *21 (N.D. Ala. June

14   9, 2008).  Regarding congressional testimony specifically, the protection extends to "all advocacy

15   intended to influence government action," including "allegedly false statements[,]"  *Tuosto v. Philip*

16   *Morris USA Inc.*, 2007 WL 2398507, at *5 (S.D.N.Y. Aug. 21, 2007); *see also Comm. to Protect our*

17   *Agric. Water v. Occidental Oil & Gas Co.*, 235 F. Supp. 3d 1132, 1155 (E.D. Cal. 2017) (protection

18   extends to alleged "[m]isrepresentations made during otherwise protected petitioning conduct").

19          ***Meta's Petitioning of Congress.***    The congressional testimony at issue[49] constitutes

20   petitioning activity because Meta sought to shape Congress' forthcoming regulatory proposals.[50]

21          The AGs seek to hold Meta liable for statements made at a March 2021 hearing before the

22

23   [48] *Kottle*, 146 F.3d at 1061.

24   [49] *See supra* n.3.

25   [50] *See, e.g.*, Ex. 2 at 49 (recommending changes to Section 230 to hold social media companies
     accountable for content that harms children); Ex. 1 at 8 (welcoming collaboration with lawmakers to
26   promote safety and well-being on Meta's platforms); Ex. 3 at 7 (welcoming collaboration with
     lawmakers to promote youth safety and well-being on Instagram), 44 (calling for "industry wide
27   regulation" and stating that he wants his team to work together with legislators); Ex. 4 at 8 (suggesting
     "updat[ing] some of the rules [for] the internet around [content]" and advocating for "regulation
28   around transparency").

U.S. House Subcommittees on Communications and Technology and on Consumer Protection and Commerce.[51]  That hearing was held to consider legislative action, including possible reforms to Section 230, aimed at addressing misinformation on social media.  *See* Ex. 2 at 5-6.  At that hearing, legislators repeatedly raised the issue of harm to children from social media in questions to Mr. Zuckerberg.[52]  For example, Mr. Zuckerberg was asked what changes he would recommend to Section 230 to ensure social media companies are held accountable when children are harmed using their platforms.  *Id.* at 49.  Mr. Zuckerberg's challenged statements—all in response to questions from legislators—were directed at shaping any potential future legislation.  *See id.* at 49 (¶ 465).  He suggested amending Section 230 to mandate transparency reports and touted Meta's own prevalence reports as a model.  *Id.*  The AGs allege that Mr. Zuckerberg's characterization of these prevalence metrics, *id.*, and his other testimony related to harm to children[53] were deceptive.  But his answers were accurate, and, in any case, they were directed at shaping legislative reform—the precise topic of the Committee's hearing—and are thus inactionable.  *Tuosto*, 2007 WL 2398507, at *5.

As for the September and December 2021 hearings before the U.S. Senate Subcommittee on Consumer Protection, Product Safety, and Data Security, the undisputed facts reflect that, several weeks beforehand, Senators Richard Blumenthal and Marsha Blackburn, Chair and Ranking Member of the Subcommittee, respectively, asked Meta by letter to make a senior executive available to discuss the topics of "better educat[ing] parents on the risks from social media platforms and . . . develop[ing] legislative solutions to better protect children."[54]  The AGs allege Ms. Davis made several deceptive statements in describing Meta's practices and policies for protecting children at the September hearing.[55]  Ms. Davis's testimony was accurate, but regardless, she made these statements

---

[51] One statement by Mr. Zuckerberg that the AGs allege to be deceptive was made in a November 17, 2020 Hearing before the Senate Committee on the Judiciary.  *See* Ex. 4 at 9 (B3).

[52] *See* Ex. 2 at 9-10, 48-49, 52-53, 56-57, 59, 70-72, 90-91, 96, 100, 110-12, 118-19, 121.

[53] *See* Ex. 2 at 49 (¶ 465), 56 (¶ 419 / C4), 56, 72 (¶ 191/ B4), 56-57 (¶ 137), 76 (¶¶ 438, 685 / D8), 100 (¶ 415 / C1); Ex. 4 at 9.

[54] Letter from Sen. Blumenthal & Sen. Blackburn to Mark Zuckerberg (Aug. 4, 2021) at 2, https://www.blumenthal.senate.gov/imo/media/doc/8.4.21%20-%20Facebook%20-%20Mental%20Health%20and%20Kids%20Letter.pdf (last visited Jan. 28, 2026).

[55] *See* Ex. 1 at 7 (Row 8), 7-8 (¶ 335 / C2), 10 (¶ 128), 10 (¶ 336), 10 (Row 9), 11 (¶ 592), 12 (¶ 792), 14 (¶ 648), 15 (¶ 669), 15 (¶ 712), 15 (D1), 15 (Row 10), 18 (¶ 85), 25 (A9), 28 (¶¶ 603-04), 29 (¶¶

while expressing a desire to collaborate with lawmakers on the anticipated legislative proposals, an effort to influence that legislation—classic protected petitioning activity.  *See* Ex. 1 at 8.  And at the December 2021 hearing before that same subcommittee, which was again directed at gathering information for potential legislative reforms to promote children's safety on social media, Mr. Mosseri testified that there "should be an industry body that will determine the best practices" when it comes to "how to verify age, how to build age appropriate experiences, and how to build parental controls," and that body "should receive input from . . . *regulators*" to create standards.  Ex. 3 at 6 (emphasis added).  Moreover, the questions to and at-issue responses from Ms. Davis and Mr. Mosseri during the September and December 2021 hearings exclusively concern the safety of Meta's products, technology, and policies for children, all directed at informing anticipated forthcoming legislation—consistent with protected petitioning.[56]

Mr. Zuckerberg, Ms. Davis, and Mr. Mosseri's testimony was indisputably an effort to shape government action in accordance with Meta's existing policies.  Accordingly, the Court should apply *Noerr-Pennington* to all such statements.

***Meta's Petitioning of the Barnet Coroner's Court.***   A Meta executive's testimony to the Barnet Coroner's Court in the United Kingdom that Instagram's content was "safe[,]" Compl. ¶ 565, is similarly not actionable under *Noerr-Pennington*.  *Noerr-Pennington* applies with equal force to petitioning of foreign government bodies.[57]  The testimony at issue was given during the investigation phase of a coronial inquest by the Barnet Coroner's Court, before the release of its final report.[58]  Testifying in court is "pure petitioning activity" that falls "within *Noerr-Pennington's* grant of

---

[56] *See* statements cited *supra* n.55.

185, 334, 368 / C9), 38 (¶ 375 / B2), 39 (¶ 192 / B6), 45 (¶ 643); Ex. 3 at 8 (D4), 8 (D5), 8 (¶ 743), 9-10 (¶ 562), 13 (¶ 427 / B1).

[57] Petitioning immunity under *Noerr-Pennington* applies to efforts to influence foreign governments to the same extent it applies to U.S. government branches.  *See, e.g.*, *Amarel v. Connell*, 102 F.3d 1494, 1520 (9th Cir. 1996); Antitrust Div., U.S. Dep't of Justice, *Antitrust Guide for International Operations* 63 at Case N (Jan. 26, 1977); Antitrust Div., U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for International Enforcement and Cooperation* § 4.2.4 (2017).

[58] Miriam Burrell, *Meta Executive to Give Evidence to Molly Russell Inquest*, The Standard (Sept. 23, 2022), https://www.standard.co.uk/news/uk/molly-russell-inquest-meta-facebook-instagram-social-media-b1027589.html.

1   immunity." *Pick v. Kay*, 2020 WL 12919340, at *5 (C.D. Cal. July 7, 2020), *aff'd*, 2022 WL 193197

2   (9th Cir. Jan. 21, 2022).

3           **2.    Meta Is Entitled to Summary Judgment as to Alleged Misrepresentations Under 16 States' Laws Because They Were Not Made in Connection with a Consumer Transaction, or in the Conduct of Trade or Commerce**

4

5           There is no evidence that 95 of the allegedly deceptive statements were made in connection

6   with business, commerce, trade, or a consumer *transaction* as required under 16 of the 18 states'

7   consumer protection statutes.  The undisputed evidence demonstrates that some of these statements

8   were not even made *publicly* let alone to consumers, as required by these statutes.  Instead, they come

9   from Meta's talking points or other internal documents that were never published.  Moreover, the

10  AGs have failed to offer evidence that any of the statements that Meta made publicly during

11  (1) earning calls, (2) technology conferences, (3) judicial proceedings, and (4) congressional

12  testimony satisfy the foregoing statutory requirements, because there is no evidence that any of these

13  statements were directed to consumers.

14                          **i.    Statutory Standards**

15          ***In connection with a consumer transaction.***  Five states' statutes (DE, IN, KS, NJ, and VA)

16  require misrepresentations to be made in connection with a "consumer transaction" or "sale or

17  advertisement" of merchandise to be actionable.  *See* App. 6.  The AGs have failed to show these

18  statements were "material to" and "made to induce" a consumer transaction (i.e., signing up to use

19  Meta's platforms), as required by these statutes.  *See, e.g.*, *Silver v. Pep Boys-Manny, Moe & Jack of*

20  *Del., Inc.*, 2018 WL 1535285, at *6 (D.N.J. Mar. 29, 2018); *Joe Hand Promotions, Inc. v. Mills*, 567

21  F. Supp. 2d 719, 724 (D.N.J. 2008) (finding alleged misrepresentations made after plaintiffs had

22  already purchased services were not made to induce).  That the AGs point to the public availability

23  of the statements at issue is insufficient without any allegations that such statements were made to

24  induce transactions or that they could "possibly have been material to" consumer transactions with

25  Meta.  *See, e.g.*, *Pep Boys*, 2018 WL 1535285, at *6 (allegation that statement was "publicly available

26  on the internet" insufficient); *I.T. v. ChoicePoint LLC*, 2025 WL 2495079, at *8 (W.D. Wash. Aug.

27  29, 2025) ("mere existence" of marketing statements on a company's website insufficient under IN

28

consumer protection statute).  Even publicly available statements made to third parties do not satisfy these statutes because they were not made to consumers to induce them to enter into a transaction. *See Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d 997, 1030-31 (E.D. Wis. 2010) (finding statements made to "members of the 'product data community'" serving as "advisers, participants, or interested parties" in transactions were not made in connection with a consumer transaction under NJ CFA).

**In the course of business.**  Six states (CO, DE, IL, MN, NE, and NY) require misrepresentations to be made "in the course of business," *see* App. 7, which requires a showing that the statement was made to someone with whom the speaker regularly conducted business in the type of transaction at issue.  *See, e.g.*, *Cleary Bldg. Corp. v. David A. Dame, Inc.,* 674 F. Supp. 2d 1257, 1270-71 (D. Colo. 2009); *Jeffrey C. Brown PLLC v. Gold Star Taxi & Transp. Serv. Corp.*, 2020 WL 4743502, at *3 (Minn. Ct. App. Aug. 17, 2020).

**In the conduct of trade or commerce.**  Nine states (CT, IL, KY, LA, NC, NE, NY, PA, and SC) require statements to be made in the conduct of "trade or commerce."  *See* App. 8.  This requires plaintiffs to show that there is (i) a "business purpose behind the activity," and (ii) an "exchange of valuable consideration."  *Social Media II*, 753 F. Supp. 3d at 911.  To show a business purpose under element (i), the plaintiffs must offer evidence that the statement (a) was related to something more than a "one-time transaction," *see, e.g.*, *Coppola Const. Co. v. Hofman Enters. Ltd. P'ship*, 2010 WL 4723453, at *4 (Conn. Super. Ct. Nov. 2, 2010); *Teller v. Bill Hayes, Ltd.*, 213 A.D.2d 141, 148 (N.Y. App. 1995) (finding a "single-shot transaction" insufficient), and (b) was "addressed to the [consumer] market directly," *see, e.g.*, *Carol Studios, Inc. v. Doo Young Hong*, 2013 WL 6592747, at *9 (Ill. Ct. App. Dec. 13, 2013) (statement made by construction companies to other developers, not to the consumer market, was insufficient); *Carcano v. JBSS, LLC*, 684 S.E.2d 41, 52 (N.C. App. 2009) (marketing statements directed by defendants to private plaintiffs were not "in or affecting commerce" because they "had no impact on consumers or the marketplace").  Connecticut also requires that the statement occurred "within the scope of [the defendant's] primary business."  *See Sovereign Bank v. Licata*, 977 A.2d 228, 238 (Conn. App. Ct. 2009).

### ii.  Alleged Statements

Meta is entitled to summary judgment because the AGs have failed to offer any evidence to

22

1    show that the following statements satisfy the foregoing statutory requirements.

2    **Ten statements in Meta's talking points and other internal documents.**[59]   There is no

3    evidence these statements were communicated to a consumer, as required by these statutes.   *See*

4    *Edgenet, Inc. v. GS1 AISBL*, 742 F. Supp. 2d at 1030-31.   For example, Meta's talking point about

5    the requirement for users "to prove they are over 13[,]" was only made in an email thread among

6    Meta employees for internal consideration and preparation for an Instagram "Q&A poll."   *See* Ex.

7    12 at -2162-63 (¶¶ 438, 685).

8    **Two statements made on earnings calls.**[60]   The evidence demonstrates that these statements

9    were directed to investors, not consumers, and did not induce consumers or occur in the course of

10    Meta's consumer-facing business.   *See, e.g.*, *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp.

11    3d 1177, 1241 (D. Kan. 2015) (finding statements made during an earnings call "were not made 'in

12    connection with the sale or advertisement'" of goods or services and "were not directed to

13    [defendant's] purchasers, at least on their face"); *Dagley v. Haag Eng'g Co.*, 18 S.W.3d 787, 791-92

14    (Tex. App. 2000) (affirming grant of summary judgment on claims under Texas DTPA where the

15    speaker made alleged misrepresentations to the insurer, not consumers).   For example, the only

16    available evidence demonstrates that Sheryl Sandberg stated that "[we] have to keep people safe and

17    give them control over their experience on our apps.   And we are[,]" on an earnings call, Ex. 16 at 5

18    (¶ 122), and such earnings calls are directed to investors, not consumers.   *See, e.g.*, *In re Syngenta*,

19    131 F. Supp. 3d at 1241.

20    **One statement made to the Barnet Coroner's Court.**[61]   The evidence demonstrates that this

21    statement was made to judges, not consumers.   *See, e.g.*, *McCarthy v. WPB Partners, LLC*, 2016 WL

22    4014581, at *6 (D.N.H. July 26, 2016) (finding statements made during a judicial proceeding "were

23    not directed toward a consumer"); *Cook v. Fam. Motors, LLC*, 2022 WL 3269946, at *6-7 (W.D.

24    Mo. Aug. 10, 2022) (finding a statement "made in connection with a pending lawsuit" was not made

---

26    [59] *See supra* n.5.

27    [60] *See supra* n.6.

28    [61] *See supra* n.4.   As discussed above, *supra* Part I.B.i, this statement is also nonactionable under the *Noerr-Pennington* doctrine.

"'in connection with a consumer transaction'").  For example, the AGs have offered no evidence to show that Meta executive Elizabeth Lagone was addressing consumers when she said that "such content was 'safe' for children to see[,]" Ex. 6 at 3 (¶ 565), to the coronial court during the coronial inquest into M.R.'s death.

*Thirty-one statements made to Congress.*[62]  These statements were directed to members of Congress, not consumers.  *See, e.g.*, *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064, 1069 (D. Minn. 1999).[63]  For instance, Mr. Zuckerberg made the statement "that Meta's 'prevalence' numbers serve as a 'model' for companies' transparency efforts[,]" Compl. ¶ 465, to Congress in response to a question about Meta's transparency efforts.  *See* Ex. 2 at 49 (¶ 465).

*Two statements made at technology conferences.*[64]  The evidence demonstrates that these statements were made to other members of the technology industry, not to the consumer market.  *See, e.g.*, *Int'l Bhd. of Teamsters Loc. 456 Health & Welfare Tr. Fund v. Quest Diagnostics Inc.*, 2012 WL 13202126, at *20 (E.D.N.Y. Apr. 19, 2012) (statements "directed to other businesses, not to consumers" were not made "in the conduct of any business, trade or commerce"); *Doo Young Hong*, 2013 WL 6592747, at *9; *Slane v. Emoto*, 582 F. Supp. 2d 1067, 1086 (W.D. Wis. 2008) ("The mere fact that [defendant] was touting the marvels of the [good] at a seminar . . . is not enough to show that in making the representation, [defendant] intended to . . . induce [plaintiff] to purchase the [item].").  The AGs have offered no evidence that the conferences at issue here—a WIRED conference and CornellTech event at Bloomberg, *see* Ex. 18 at 2 (¶ 125 / A2); Ex. 19 at 1 (¶ 265 / A5)—included consumers.  In fact, the CornellTech event is aimed at "conven[ing] leading figures in global technology" and "bring[ing] together Bloomberg employees and . . . the Cornell Tech community with . . . New York's greater technology community."  *CornellTech @ Bloomberg Speaker Series*, Bloomberg, https://www.bloomberg.com/company/values/tech-at-bloomberg/features/cornell-tech-at-bloomberg-livestream (last visited Jan. 26, 2026).  For example,

---

[62] *See supra* n.3.

[63] This constitutes an independent reason that such statements are nonactionable.  As discussed above, *supra* Part I.B.1, these statements are also nonactionable under the *Noerr-Pennington* doctrine.

[64] *See supra* n.9.

the evidence demonstrates that Meta executive Eva Chen made the statement that "[m]aking the community a safer place, a place where people feel good, is a huge priority for Instagram[,]" Ex. 18 at 2 (¶ 125), to other members of the technology industry, not consumers, at the CornellTech event at Bloomberg.

     ***Forty-nine general statements on Meta's website.***[65]  These statements, which come from blog posts on Meta's website, reports published by Meta, and general Instagram webpages, were not made to induce consumers to sign up for Meta's platforms and do not provide the sort of information, like terms of service, that consumers might need to read (or would be material) before signing up for Meta's platforms.  The mere public availability of these statements does not save the AGs from their failure to show for instance, that statements like "It's our responsibility to foster a safe and supportive community for everyone," *see* Ex. 21 at 2 (¶ 130), were provided to users upon their use of Facebook or Instagram, that users read these statements before using Meta's platforms, or that users were "aware of the . . . existence" of these statements before contemplating litigation in this matter."  *See Pep Boys*, 2018 WL 1535285, at *6 (finding public statement on Internet not made in "connection with the sale or advertisement" of goods without evidence it was "provided to [plaintiff] in conjunction with her purchase of auto parts . . . that she read the [statement] before making her purchase, or even that she was aware of the [statement's] existence before contemplating litigation in this matter").

### 3. The Undisputed Facts Demonstrate That Numerous Statements Are Opinions

     Four opinion statements alleged to be deceptive[66] are protected by the First Amendment. Statements of pure opinion—those that cannot be proven false—are protected under the First Amendment, *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19-20 (1990), and may not form the basis of a civil lawsuit, *ZL Techs., Inc. v. Gartner, Inc.*, 709 F. Supp 2d 789, 795-98 (N.D. Cal. 2010) (holding that an agency's product ratings were non-actionable opinions because they were unambiguously presented as subjective views), *aff'd*, 433 F. App'x 547 (9th Cir. 2011).  While "opinions stated in

---

[65] *See supra* n.10.

[66] *See supra* n.11.

commercial speech are protected only if [they are] not misleading," when opinions are noncommercial, "it is irrelevant whether or not they are misleading because they are protected [by the First Amendment] in any event," *Davis v. Avvo, Inc.*, 345 F. Supp. 3d 534, 540-41 (S.D.N.Y. 2018) (holding that allegedly misleading ratings of attorneys were noncommercial opinions protected by the First Amendment). Additionally, this Court has held that "[w]hether a statement is a fact or opinion is a question of law for the court to decide." *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 970 (N.D. Cal. 2013). To distinguish between an opinion and an assertion of fact, courts consider "whether a reasonable person would be likely to understand the remark as an expression of the source's opinion or as a statement of existing fact." *Rimini St., Inc. v. Oracle Int'l Corp.*, 2017 WL 4227939, at *7 (D. Nev. Sept. 22, 2017).

*First*, the allegedly deceptive statements are noncommercial speech because the statements at issue pertain to a controversial matter of public concern[67]—alleged harm to teens and children caused by social media use—and not any pending or potential commercial transaction.[68] The Ninth Circuit has held that "opin[ing] on potential speech-based harms to children" is not commercial speech under the First Amendment. *See NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1120 (9th Cir. 2024); *see also Pharm. Rsch. & Manufacturers of Am. v. Stolfi*, 153 F.4th 795, 818 (9th Cir. 2025) (holding that subjective, ideological opinion statements that identify harmful online content are noncommercial speech protected by the First Amendment).

*Second*, the allegedly deceptive statements, *see supra* n.11, are opinions because a reasonable person would understand them as expressions of the speaker's opinion rather than assertions of fact. Meta's opinion statements include statements by executives articulating their personal views on the safety of Meta's products, interpretations of research, and ideas about policy reform. *See supra* n.11. For example, in his March 2021 congressional hearing before the U.S. House Subcommittees on

---

[67] *See Gillette v. Delmore*, 886 F.2d 1194, 1197 (9th Cir. 1989) (holding that "[s]peech that can fairly be considered as relating to any matter of political, social, or other concern to the community is constitutionally protected").

[68] *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 762 (1976) (characterizing commercial speech as speech which does "no more than propose a commercial transaction").

Communications and Technology and on Consumer Protection and Commerce, *see* Ex. 2, Mr. Zuckerberg was asked for his *personal* views on research findings and product safety.[69]    He responded in kind using qualifiers such as "I don't *think*"[70] and "I don't *believe*."[71]  While use of such qualifiers does not on its own transform a fact into an opinion, *Milkovich*, 497 U.S. at 18-19, Mr. Zuckerberg's statements could not imply a provable assertion of fact because the research about social media's impact on teen's health is—at best—inconclusive.[72]   In that same testimony, in response to a question about how he would reform Section 230, Mr. Zuckerberg stated that Meta's prevalence figures should serve as an industry model.  *See* Ex. 2 at 49 (¶ 465).  Rather than stating an objective fact, Mr. Zuckerberg was giving his subjective assessment of the quality of the company's transparency efforts.  *See id*.  And Mr. Mosseri's allegedly deceptive statement that he "[does not] believe that research suggests that our products are addictive" during his December 2021 hearing before a Senate subcommittee was also an opinion.[73]

### 4.  Numerous Alleged Statements Are Nonactionable Statements of Aspiration or Objectives

Four categories of statements are what courts routinely consider puffery: (1) 11 statements about the safety of Meta's platforms,[74] (2) seven statements about the positive impact of Meta's platforms,[75] (3) 25 statements about goals for Meta's tools,[76] and (4) 19 statements about Meta's prioritization of community safety and well-being.[77]  The AGs have failed to carry their burden, after

---

[69] *See* Ex. 2 at 56 (¶ 419 / C4), 100 (¶ 415 / C1).

[70] *See id.* at 56 (¶ 419 / C4) (emphasis added).

[71] *See id.* at 100 (¶ 415 / C1) (emphasis added).

[72] Fadi J. Hamati, *Beyond Dogmatism: A Pluralistic Framework to Conceptualize Social Media Use in Children and Adolescents*, Psychiatric Times (Feb. 27, 2025), https://www.psychiatrictimes.com/view/beyond-dogmatism-a-pluralistic-framework-to-conceptualize-social-media-use-in-children-and-adolescents; *see also*, Claire Cain Miller, *Everyone Says Social Media Is Bad for Teens.  Proving It Is Another Thing,* N.Y. Times: The Upshot (June 17, 2023), https://www.nytimes.com/2023/06/17/upshot/social-media-teen-mental-health.html.

[73] *See* Ex. 3 at 13 (¶ 427 / B1).

[74] *See supra* n.12.

[75] *See supra* n.13.

[76] *See supra* n.14.

[77] *See supra* n.15.

extensive discovery and development of the record following the motion to dismiss, "to identify any specific, measurable claim" in these statements that would render them anything more than vague, generalized, or hyperbolic statements that courts treat as nonactionable puffery.  *See Knowles v. Arris Int'l PLC*, 2019 WL 3934781, at *12-13 (N.D. Cal. Aug. 20, 2019), *aff'd*, 847 F. App'x 512 (9th Cir. 2021) (granting summary judgment for defendant on grounds of puffery because plaintiff did not "identify any specific, measurable claim in [the defendant's] statement").[78]  Indeed, statements with a "boastful" or "self-congratulatory" tone or "couched in aspirational terms . . . that cannot be proven true or false" are classic examples of what courts view as mere puffing.  *See XYZ Two Way Radio Serv. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 184 (E.D.N.Y. 2016) (treating as nonactionable puffery a statement from Uber that "we're able to create and maintain a safe and respectful environment for riders").

Puffery is nonactionable under all the applicable state laws here.  Sixteen of the 18 states explicitly treat puffery as nonactionable under their consumer protection laws (CA, CO, CT, DE, IL, IN, KS, LA, MN, NC, NJ, NY, PA, SC, VA, and WI).  App. 9.  The other two states—KY and NE— have permitted puffery defenses in analogous contexts.  App. 10.

### 5.  Meta Is Entitled to Summary Judgment As to Statements That Fall Outside the Applicable Statute of Limitations Period

Meta is entitled to summary judgment on the AGs' deception claims as to statements that fall outside the applicable statutes of limitations.  The statute of limitations is measured from December 20, 2021 for statements related to "the provision, design, operation, and promotion" of Instagram pursuant to a Tolling Agreement, Ex. 86, and from June 1, 2023 for such statements related to Facebook pursuant to an amendment to the same, Ex. 87.

Six statements[79] fall outside the three-year limitations period applicable to all the statements

---

[78] Moreover, as discussed *supra* Part I.B.3, statements of opinion are protected from liability by the First Amendment.  *See, e.g.*, *Rimini St.*, 2017 WL 4227939, at *7 ("[S]tatements of opinion are protected by the First Amendment."); *Alexander v. Cahill*, 598 F.3d 79, 94 (2d Cir. 2010) (finding that a law could not impose liability for advertising "gimmicks," such as suggesting lawyers can "run to a house so quickly they appear as blurs," because there is "no evidence that consumers have, in fact, been misled by these or similar advertisements").

[79] *See, e.g.*, Ex. 13 at -7224 (¶ 561); Ex. 18 at 2 (¶ 125 / A2); Ex. 25 at 1 (¶ 222); Ex. 28 at 2 (¶ 331); Ex. 70 at 4 (¶ 374 / B5); ¶ 135.

at issue under the laws of five states under the Tolling Agreement: CA (only for False Advertising Law claims), CO, NY, SC, and WI. *See* App. 25. Six statements and three CSERs[80] specifically directed at Facebook fall outside the same three-year limitations period for the same states' claims under the Amended Tolling Agreement, as well as the four-year limitations period applicable to two claims: CA (UCL claim) and NE (UDTPA claim) under the Amended Tolling Agreement. *See* App. 26. And one statement and two CSERs[81] specifically directed at Facebook fall outside of the five-year limitations period applicable to the claims of DE and IN. *See* App. 27.

To the extent any alleged statements do not fall into any of the categories above,[82] those statements are not actionable because there is no evidence that those statements were false or misleading. *See supra* Part I.A.3 (explaining that where a statement is not false, the AGs must put forth extrinsic evidence demonstrating actual consumer understanding). Accordingly, summary judgment on the deception claims should be granted to Meta in full.

## II.  Meta Is Entitled to Summary Judgment on the AGs' Unfairness Claims

The unfairness claims that remain in the case after the motion to dismiss rulings relate to three specific features: (i) the time restrictions offered on Meta's platforms (specifically, the "Daily Limit" and "Take a Break" features); (ii) Instagram's multiple accounts function, which allows each user to register up to five accounts; and (iii) appearance-altering filters. *See Social Media II*, 753 F. Supp. 3d at 883-85. Summary judgment must be granted on these claims because they are barred by Section 230 of the Communications Decency Act ("Section 230") and the First Amendment. Even if the claims were not barred, the AGs have failed to adduce any admissible evidence to support them.

### A.  Section 230 and the First Amendment Bar the AGs' Unfairness Claims

The duty the AGs' unfairness claims seek to impose based on these three features stems from Meta's role and conduct as a publisher of third-party content. The AGs have no evidence otherwise,

---

[80]  *See, e.g.*, Ex. 29 at 1-2 (¶ 464 / C5), 2 (Row 25); Ex. 35 at 1 (A7); Ex. 42 at 2 (D2); Ex. 44 at 1, 4 (Row 1); Ex. 55 at 3 (Row 23); Meta's CSERs published May 15, 2018, November 15, 2018, and May 23, 2019.

[81]  *See, e.g.*, Ex. 44 at 1, 4 (Row 1); Meta's CSERs published May 15, 2018 and November 15, 2018.

[82]  Ex. 88 at 1 (¶¶ 438, 685 / D9); Ex. 89 at 4 (¶ 664); Ex. 90 at 1 (Row 26).

and therefore their claims are barred by Section 230.  The AGs' claims are also barred by the First Amendment because they would impose liability on Meta for its constitutionally protected speech.

### 1. Section 230 Bars These Claims Because They Seek to Impose a Duty on Meta For Its Role and Conduct As a Publisher of Third-Party Content

Section 230 immunity applies when a claim involves "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009), *as amended* (Sept. 28, 2009).  This Court has already held that Meta is an interactive computer service provider (prong (1)).  *See Social Media I*, 702 F. Supp. 3d at 825.  Accordingly, the only question is whether the "duty" that the AGs allege Meta has violated "derives from [Meta's] status or conduct as a 'publisher'" of third-party content (prongs (2) and (3)), *Barnes*, 570 F.3d at 1107; *see also Calise v. Meta*, 103 F.4th 732, 740 (9th Cir. 2024) ("*Barnes* requires courts to examine each claim to determine whether a plaintiff's 'theory of liability would treat a defendant as a publisher or speaker of third-party content.'" (emphasis omitted) (quoting *Barnes*, 570 F.3d at 1101)).  As with the AGs' claims premised on the features this Court has already held are immune under Section 230, *see Social Media II*, 753 F. Supp. 3d at 880-83, the remaining features are neutral publishing tools that facilitate sharing and viewing third-party content. *See Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1099 (9th Cir. 2019).  Because the AGs' claims seek to impose liability based on Meta's role and conduct as a publisher of third-party content, prongs (2) and (3) are also met, and Section 230 immunity bars the claims.  *See Doe v. Grindr*, 128 F.4th 1148, 1152-53 (9th Cir. 2025) (defective design claims barred where "the challenged features . . . [were] not independent of Grindr's role as a facilitator and publisher of third-party content").  The mere fact that Meta "generates revenue by maintaining the interest of users" does not abrogate the statute's protections.  *See Social Media I*, 702 F. Supp. 3d at 834.

*First*, the **time restriction features** are tools through which users can control their own consumption of third-party content, and any claims based on their alleged inadequacy therefore necessarily seek to hold Meta liable in its role or conduct as a publisher of third-party content.  It is undisputed that the AGs' unfairness claims based on the time restriction features stem from users' consumption of third-party content.  *See Social Media II*, 753 F. Supp. 3d at 897 (describing

30

1    allegations based on the "Daily Limit" feature as being focused on harm where "the minor has

2    developed—by the platform's own design—a compulsive habit to click through and continue use.").

3    Claims based on alleged harms resulting from over-consumption of third-party content because of

4    the way a website makes third-party content available are necessarily barred by Section 230, *see M.P.*

5    *ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025) ("[A] newspaper company

6    does not cease to be a publisher simply because it prioritizes engagement in sorting its content."),

7    *petition for cert. denied*, 146 S. Ct. 287 (2025), and the alleged harms relating to time restriction

8    features are inseparable from third-party content, *see Grindr*, 128 F.4th at 1152-53.

9         *Second*, **Instagram's multiple accounts feature** operates as a tool through which users

10   control how they view third-party content.  In its motion to dismiss ruling, this Court recognized that

11   courts, including in this District, have held that similar "'decisions regarding the structure and

12   operation of [a] website—such as permitt[ing] users to register under multiple screen names'—

13   reflect, in part, 'choices about what content can appear on the website and in what form' and thus fall

14   within the purview of traditional publisher functions.'"  *Social Media II*, 753 F. Supp. 3d at 884

15   (quoting *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 972 (N.D. Cal. 2016) (internal quotation marks

16   and citations omitted)).  The Court indicated that the only surviving theory of liability as to the

17   multiple accounts feature was that the feature "can serve as an end-run around other features such as

18   those related to time restrictions," and, as such, "given the procedural posture . . . [was] unwilling to

19   make a global decision on this issue." *Id.*  The AGs have no evidence that the multiple accounts

20   feature in fact serves as an end-run around the time restriction features.  Moreover, dismissing claims

21   targeting alleged harms stemming from the multiple accounts feature is entirely consistent with

22   Section 230 precedent.  *See id.*; *see also L.W. ex rel. Doe v. Snap Inc.*, 675 F. Supp. 3d 1087 (S.D.

23   Cal. 2023) (dismissing claims that Snapchat's design features—including users' ability to create

24   multiple accounts—were inherently dangerous as barred by Section 230 because "all of Plaintiffs'

25   theories of liability . . . are intertwined with Defendants' publishing activities").  As with the claims

26   based on time restriction features, claims based on Instagram's multiple account features "necessarily

27   implicate[]" Meta's publishing decisions, such that they cannot be disentangled from the alleged

28

1    harm caused by third-party content.  *See Grindr*, 128 F.4th at 1152-53.

2          *Third*, the AGs' claims premised on **appearance-altering filters** are similarly barred by

3    Section 230.  This Court previously held that unfairness claims based on these filters survived Meta's

4    motion to dismiss on Section 230 grounds only to the extent that the AGs allege "that children are

5    harmed simply by creating and then seeing their own altered images."  *Social Media II*, 753 F. Supp.

6    3d at 884.  Post-discovery, it is clear that the duty the AGs allege Meta has violated with respect to

7    such filters "derives from [Meta's] status or conduct as a 'publisher'" of third-party content.  *Barnes*,

8    570 F.3d at 1107.  The filters available on Meta's platforms are either developed by Meta ("first-party

9    filters") or by third-party developers ("third-party filters").  To the extent the AGs' filter-related

10   unfairness claims are based on first-party filters, Instagram does not permit first-party filters

11   mimicking the effects of cosmetic surgery, which are the types of filters at the crux of the AGs'

12   filter-related unfairness claims, *see* Compl. ¶¶ 333-68.  And claims seeking to hold Meta liable for

13   harms allegedly caused by third-party appearance-altering filters are plainly barred by Section 230

14   because they necessarily seek to treat Meta as a publisher of third-party content.  *See Angelilli v.*

15   *Activision Blizzard, Inc.*, 781 F. Supp. 3d 691, 699 (N.D. Ill. 2025) (finding Roblox cannot be liable

16   for third-party user created games under Section 230 "even though Roblox provides users with tools

17   to create these games").[83]

18          ## 2.  The First Amendment Also Bars the AGs' Unfairness Claims Because They Seek to Regulate Meta's Expressive Activities

19          Additionally, the First Amendment bars the AGs' unfairness claims.  Meta, as a publisher of

20   third-party content, has a First Amendment right to "present[] a curated compilation of speech

21   originally created by others."  *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024).  This editorial

22   First Amendment right prohibits this Court from regulating Meta's expressive activities when it is

23   ───────────────────

24   [83] *See* Ex. 72 at -5359 ("Instagram does not produce any first party cosmetic surgery effects").  As of
     2020, Instagram offered only 410 first-party filters, compared to 643,000 third-party filters.  *See id.*

25   at -5361.  Moreover, the AGs have no admissible evidence that appearance-altering filters
     themselves—as distinguished from the filtered third-party *content*—are harmful.  Meta's first-party

26   appearance-altering filters are publishing "tools meant to facilitate the communication and content
     of others," *Dyroff*, 934 F.3d at 1098.  And, unlike the filter at issue in *Lemmon v. Snap, Inc.*, the AGs

27   have not put forth any evidence to establish that Meta's first-party appearance-altering filters are
     inherently dangerous or implicate a duty independent of Meta's duty as a publisher.  *See* 995 F.3d

28   1085, 1094 (9th Cir. 2021).

1   "mak[ing] choices about what third-party speech to display and how to display it."  *See id.* at 716;

2   *see also Bogard v. TikTok Inc.*, 2025 WL 3637035, at *20 (N.D. Cal. Dec. 15, 2025) (finding that

3   publishing activities immunized by Section 230 are also protected under the First Amendment).  The

4   First Amendment also gives publishers a protected right in determining who can speak on its

5   platform.  *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (newspaper cannot be

6   required to provide a platform for a political candidate); *see also Hurley v. Irish-American Gay,*

7   *Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 559 (1995) (parade organizers cannot be

8   compelled to include groups).  Moreover, a publisher does not lose its First Amendment protections

9   just because it seeks to make its platform more engaging for its users.  *See Sorrell v. IMS Health Inc.*,

10  564 U.S. 552, 577-78 (2011) ("That the State finds expression too persuasive does not permit it to

11  quiet the speech or burden its messengers.").

12          Further, even if this Court were to accept the AGs' allegations of harm stemming from these

13  features, that would not erode Meta's entitlement to First Amendment protection.  *See Brown v. Ent.*

14  *Merchants Ass'n*, 564 U.S. 786, 794-95 (2011) (First Amendment protection remains even if content

15  is deemed harmful to minors); *303 Creative LLC v. Elenis*, 600 U.S. 570, 586 (2023) ("[T]he First

16  Amendment protects an individual's right to speak his mind regardless of whether the government

17  considers his speech sensible and well intentioned or deeply 'misguided.'").

18          Meta's time restriction features represent a choice by Meta concerning how users can elect to

19  control their access to third-party content on its platforms.[84]  Because the AGs challenge the time

20  restriction features on the basis that they are inadequate, the remedy the AGs presumably seek—the

21  development of a mandatory new time restriction feature—would require Meta to speak, in violation

22  of the First Amendment.  The First Amendment applies both to decisions regarding whether to speak

23  and "what not to say."  *See Hurley*, 515 U.S. at 573.  Accordingly, the AGs' claims seek to compel

24  Meta to exercise editorial control in violation of the First Amendment.  *See id.*

25  _____

26  [84] This Court previously noted that the time restrictions features "do[] not alter what the platform is
    able to publish for those that choose to visit it," and therefore, do not receive First Amendment

27  protection.  *Social Media I*, 702 F. Supp. 3d at 836.  However, the Supreme Court's subsequent
    opinion in *Moody* indicates that such features should receive First Amendment protection because

28  they represent a "choice[] about . . . how to display" third-party content.  603 U.S. at 716.

Instagram's multiple accounts feature is also protected.  Because Meta has a First Amendment right to determine *who* may create an account, *see Miami Herald*, 418 U.S. at 258; *Hurley*, 515 U.S. at 570, 559, it necessarily follows that Meta also has a First Amendment right to determine *how many* accounts a user can create, *see Moody*, 603 U.S. at 731 (finding social media platforms receive First Amendment protections because they "curate their feeds by combining 'multifarious voices' to create a distinctive expressive offering." (quoting *Hurley*, 515 U.S. at 569)).  Because the First Amendment protects Instagram's multiple accounts feature, the AGs' claims must fail.  *See Moody*, 603 U.S. at 731 ("Deciding on the third-party speech that will be included or excluded from a compilation . . . is expressive activity of its own.").

Moreover, if the Court finds that the appearance-altering filters are Meta's speech, they must be entitled to First Amendment protections.  Although this Court previously found that the appearance-altering filters were not protected under the First Amendment due to Meta's characterization of the filters as "neutral, non-expressive tools," *Social Media I*, 702 F. Supp. 3d at 836, to the extent the Court finds that the filters are Meta's own content for purposes of Section 230, the filters are entitled to the same First Amendment protection afforded to the artwork of a graphic designer, *303 Creative LLC*, 600 U.S. at 587 (a website is speech of its designer where, as stipulated, it contains original "'images, words, symbols, and other modes of expression'"); *McCollum v. CBS, Inc.*, 249 Cal. Rptr. 187, 192 (Cal. Ct. App. 1988) (The "First Amendment guarantees of freedom of speech and expression extend to all artistic and literary expression[.]").

**B.  The AGs' Unfairness Claims Also Fail Because the AGs Have Not Met Their Evidentiary Burdens**

The AGs' unfairness claims premised on the three remaining features separately fail because the AGs have no evidence that these features violate the applicable state consumer protection laws.

### 1.  The AGs Have No Evidence That the Features Cause Harm

Nearly all the AGs' consumer protection claims require them to provide proof that the three relevant features caused or were likely to cause substantial injury or harm to users, but these AGs have no evidence to demonstrate that these features have caused, or are even capable of causing, such harm.  Moreover, to the extent the AGs allege that the purported harm is that the features contribute to social media addiction, the AGs have no evidence that social media addiction exists among youth

34

1    users of Meta's platforms, *see supra* Part I.A, nor have they provided studies or other evidence

2    showing that these features in fact cause such an addiction.

3        *First*, the AGs' theory with respect to Meta's time restriction features is that these features do

4    not adequately enable users to restrict the amount of time they spend on its platforms.  Compl. ¶¶ 578,

5    582.  Although the AGs may wish these time restriction features were more effective, their existence

6    does not result in more harm than if they did not exist at all.  In evaluating claims under the unfairness

7    and unconscionability statutes underlying the AGs' claims, no court has required consideration of

8    whether alternative designs might be plausible, or whether such plausible alternatives might

9    theoretically be more effective.  Rather, the sole question for the Court is whether the time restriction

10    features, as designed, cause or are likely to cause harm, or substantial injury, to users.  *See, e.g.*, *FTC*

11    *v. LendingClub Corp.*, 2018 WL 11436309, at *12 (N.D. Cal. Oct. 3, 2018) (dismissing unfairness

12    claim for lack of "sufficient facts alleging substantial injury").  They do not.

13        *Second*, the AGs' theory with respect to Instagram's multiple accounts feature is that the

14    feature contributes to social media addiction among youth users by encouraging these users to

15    "continuously engage with Instagram[,]" Compl. ¶ 370, and "multipl[ying] the number of

16    unexhausted personalized Feeds vying for young users' attention[,]" which in turn results in "a higher

17    probability of [teen users] being exposed to harmful content[,]" *id.* ¶ 371.  However, the AGs have

18    no evidence demonstrating that the multiple accounts feature in fact results in the harms alleged, or

19    that this feature specifically causes or has caused social media "addiction" among young users.

20        *Third*, as set forth *supra* Part II.A.1, the AGs' only surviving theory of liability regarding

21    appearance-altering filters is that, when using first-party filters, users are harmed "'simply by creating

22    and then seeing their own altered images[,]'" regardless of whether those images are then published.

23    *Social Media II*, 753 F. Supp. 3d at 883-84 (quoting *Social Media I*, 702 F. Supp. 3d at 830).

24    Instagram does not permit first-party cosmetic surgery filters, upon which the AGs' claims are

25    focused, *see supra* n.83, and the AGs have no evidence that the use of any other first-party

26    appearance-altering filters on unpublished content—such as a filter which adds cat ears to a person

27    in an unpublished photograph—in fact causes, or is capable of causing, harm, separate and apart from

28

1  any harm that might be caused by users viewing published, filtered images on Meta's platforms.[85]

2  ### i. Delaware and New York

3  Delaware and New York, which look to Section 5 of the FTC Act, 15 U.S.C. § 45, *see* App.

4  11, have no evidence that any of the features: (i) causes or is likely to cause substantial injury to

5  consumers, (ii) which is not reasonably avoidable by consumers, *and* (iii) not outweighed by

6  countervailing benefits.  *See, e.g.*, *LendingClub Corp.*, 2018 WL 11436309, at *11.

7  Substantial injury occurs when a practice or act causes a "'small harm to a large number of

8  people, or if it raises a significant risk of concrete harm.'"  *Id.* at *12 (quoting *FTC v. Neovi, Inc.*,

9  604 F.3d 1150, 1157 (9th Cir. 2010)).  The AGs have not identified *any* harm to users resulting from

10  these features, much less the specific, concrete harm required by the statute, nor have they shown

11  how the features cause any social media addiction among youths.  Summary judgment is warranted

12  on this basis alone.[86]  All three features are also reasonably avoidable.  *See Davis v. HSBC Bank*

13  *Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012) (injury from annual fee was reasonably avoidable

14  where advertisement and application contained disclaimers and plaintiff "could have aborted his

15  application upon reading the terms and conditions").  No individual is required to use Instagram or

16  Facebook.  Moreover, no user is required to use the time restriction features offered on Meta's

17  platforms.  *See, e.g.*, Ex. 71 (Otaru Dep.) at 30:15-31:3 ████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████████████

19  ███████████.  In fact, the AGs' view that users don't utilize Meta's time restriction features enough

20  underscores that the features are avoidable.  Compl. ¶ 585.[87]  Similarly, Instagram users must

---

[85] As explained *supra* Part II.A.1, any unfairness claims premised on filtered third-party images published on the platform are nonactionable under Section 230.

[86] California's claim fails for the same reason.  California courts have historically engaged in a balancing test, weighing the harm to consumers resulting from the purportedly unfair act or practice against its utility.  *See* App. 13.  Because the AGs cannot prove the existence of *any* harm to consumers, much less harm outweighing the features' utility, summary judgment must be granted. *See Day v. GEICO Casualty Co.*, 2024 WL 1244481, at *8-9 (N.D. Cal. Mar. 21, 2024) (granting summary judgment on CA UCL claim where plaintiff had no evidence of unfairness); *In re Plum Baby Food Litig.*, 2024 WL 1354447, at *7 (N.D. Cal. Mar. 28, 2024) (applying balancing test and finding that defendant's actions did not violate unfair prong of the CA UCL) (Gonzalez Rogers, J.).

[87] While the AGs may wish the time restriction tools were *less* avoidable, the FTC Act test focuses on substantial injury to consumers resulting from a purportedly unfair act or practice, *not* theoretical harm to consumers resulting from the *absence* of a possibly beneficial act or practice.  *Cf. Neovi*, 604

36

1   affirmatively create additional accounts, and no user is required to filter his or her images.  Finally,

2   as set forth above, *supra* n.86, any harm caused by such features is outweighed by the countervailing

3   benefits.  Accordingly, summary judgment is appropriate.

4   ### ii.  CT, IL, IN, LA, MN, NC, NE (CPA Claim), PA, and SC

5   Nine additional state law unfairness claims fail because they have no proof regarding any

6   element of the *Sperry* test.[88]  *See* App. 12; *see also FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233,

7   244 n.5 (1972).  Under *Sperry*, a court considers whether a practice "[(i)] offends public policy;

8   [(ii)] is immoral, unethical, oppressive, or unscrupulous, or [(iii)] causes substantial injury to

9   consumers."  *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 758 (N.D. Cal. 2019).

10   *First*, the AGs have no admissible evidence that the features offend public policy.  The AGs

11   cite "[t]he protection of minors from the harms of addiction and related afflictions a[s]

12   well-established objectives underlying public policy" in their states, Compl. ¶ 850, but none of the

13   AGs have identified any state laws embodying an established public policy of protecting minors from

14   the specific harms of social media addiction.  *See Darosa v. Kaiser Found. Health Plan*, 2008 WL

15   4790725, at *3 (N.D. Cal. Oct. 31, 2008) (denying wrongful termination claim where plaintiff

16   "pointed to no specific statutory language, constitutional provision, or administrative regulation []

17   establish[ing] a fundamental policy that defendant has violated").[89]   And the AGs have no evidence

---

20   F.3d at 1157 (that "more than half the total value of all the checks drawn . . . came from accounts later frozen for fraud" is a "concrete and quantifiable finding . . . sufficient to show substantial harm" to consumers at summary judgment stage).

88   Most of these states' unfairness statutes contain language incorporating the *Sperry* factors, incorporate one or more of the *Sperry* factors in their definitions of unfairness, or permit courts to consider decisions interpreting Section 5 of the FTC Act as persuasive authority in determining whether a practice is "unfair."  *See, e.g., Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 830 (7th Cir. 2014).  While acknowledging that "[t]here is no statutory definition for unfair, abusive or deceptive in Indiana law," Indiana refers to Section 5 of the FTC Act as an "analogous federal statute" in its proposed jury instructions and cites *Sperry* in addressing the definition of unfairness.  ECF No. 2313-1 at 67, n.242.  Even assuming the *Sperry* test applies, the AGs have no admissible evidence to meet the standard.

89   Only Illinois cites specific state laws embodying this public policy goal, pointing to three state laws designed to discourage youth drug and alcohol addiction and youth gambling addiction.  *See* Compl. ¶ 954 (citing "Juvenile Court Act of 1987, Article IV ('Addicted Minors')").  But by the AGs' own allegations, these laws are entirely unrelated to social media use and therefore inapposite.  *See id.* (identifying public policy goals of "reducing juvenile addiction to drugs" and "'[c]ompulsive

that these features cause substantial injury, much less "addiction."[90]  *See supra* Part I.A.  Four AGs also assert that the features violate the public policy of "protecting the privacy and safety of minors online as embodied in COPPA[.]"  *See* Compl. ¶ 896 (CT); *see also id.* ¶¶ 873 (CA), 909 (DE), 955 (IL).  But the AGs' unfairness claims are not predicated on data collection or privacy violations, and the AGs have no evidence that these features resulted in the collection of personal information from users whom Meta knew to be under the age of 13.  Accordingly, there is no public policy violation.

*Second*, the next prong of the *Sperry* test—whether the conduct is immoral, unethical, oppressive, or unscrupulous—is "largely duplicative[,]" and the FTC has "never relied on the third element . . . as an independent basis for a finding of unfairness[.]"  *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1076 (1984).[91]  Regardless, the AGs have no evidence to satisfy this prong.  Even if they had such evidence, the "immoral, unethical, oppressive, or unscrupulous" standard is unconstitutionally vague, such that Meta was not provided with fair notice that its conduct was forbidden.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 629; *Netchoice v. Brown, et al.*, 2025 WL 3267786, at *19 (D. Md. Nov. 24, 2025) (finding "unclear terms" void for vagueness because they "force[] [entities] to 'guess at [the standard's] contours'" (alteration in original)).

*Third*, because courts assess "substantial injury" according to the same standard applied under Section 5 of the FTC Act, *see Batson*, 746 F.3d at 834, the AGs cannot show that the features are substantially injurious.  *See supra* Part II.B.1.i.

Because there is no evidence as to any prong of the *Sperry* test, the claims must fail.

### 2.  The Unfairness Claims by Kansas, Nebraska, and New Jersey Fail Because These AGs Have Not Met Their Unique Evidentiary Burdens

KS, NE, and NJ's claims also fail because these AGs have not adduced evidence necessary

---

gambling' and prohibiting minors from casino gambling") (citing 705 ILCS 405/4-1 *et seq.*; Juvenile Drug Court Treatment Act, 705 ILCS 410; Illinois Gambling Act, 230 ILCS 10 *et seq.*)).

[90] Even if the AGs had identified any specific state laws embodying such a policy (and they have not), the alleged theory of harm from appearance-altering filters on a user's own unpublished images bears *no* relationship to the AGs' theory of social media addiction.  *See* Compl. ¶¶ 333-68; *see also Social Media II*, 753 F. Supp. 3d at 883-84.

[91] While states are not bound by this guidance, nearly all states which have adopted the *Sperry* test consider it as persuasive authority.  *See, e.g., Jays Foods, Inc. v. Frito-Lay, Inc.*, 664 F. Supp. 364, 369-70 (N.D. Ill. 1987).

to meet the unique requirements of their unfairness and unconscionability statutes, which broadly prohibit practices that involve "deceptive bargaining conduct and unequal bargaining power," are "so one-sided as to be unconscionable" or represent a "material[] departure from standards of good faith, honesty in fact and fair dealing in the public marketplace." *See* App. 19-21. The features do not meet any of these standards. Rather, they are common features of websites and social media platforms, and it would be nonsensical to hold Meta liable for implementing features that allow users to have greater control over their use of Meta's platforms, including through setting limits on use of those platforms, creating additional accounts, and applying filters to their photographs and videos.

### 3. Colorado and Kentucky's Unfairness Claims, and the AGs' Requests for Civil Penalties, Also Fail Because They Have No Admissible Evidence of Meta's Intent

Colorado and Kentucky's claims fail for the additional reason that the AGs have no admissible evidence of intent, as required under those states' laws.[92] *See* App. 14-15. Neither state has any evidence that Meta knowingly or recklessly intended for the relevant features to cause social media addiction or other harm among youth users, or any evidence that Meta's actions in implementing such features were grossly negligent or intended to cause addiction or similar harms. Accordingly, summary judgment is appropriate as to their claims. *Cf. Aesthetics in Jewelry, Inc. v. Brown, ex rel. Brown*, 339 S.W.3d 489, 495-96 (Ky. Ct. App. 2011) (affirming grant of motion for directed verdict in favor of defendant where there was no evidence of intent).[93]

## III. Meta Is Entitled to Summary Judgment on the AGs' Requests for Disgorgement

Nine AGs—CA, CO, CT, IL, IN, KY, MN, NC, and NY—seek disgorgement under their consumer protection laws. These claims fail for three reasons. First, the consumer protection laws

---

[92] IL, KS, and LA's claims also fail because they have no evidence of intent, as required under those states' unfairness or unconscionability statutes. *See* App. 16-18. Those states' claims fail on this basis in addition to the reasons set forth above. *See supra* Parts I.B.1.ii, I.B.2. Moreover, to the extent CT, DE, IL, IN, LA, NC, PA, SC or VA seek civil penalties in connection with their unfairness claims, these AGs have failed to adduce evidence regarding the requisite intent for entitlement to any or an additional award of civil penalties. *See* App. 22-24.

[93] Kentucky's claim separately fails because it has no evidence that Meta "misuse[d] [its] superior resources or bargaining power to enforce grossly unfair terms or conditions . . . after formation of a contract." *See Watson v. Progressive Direct Ins. Co.*, 2022 WL 18027628, at *6 (E.D. Ky. Dec. 30, 2022) (internal quotations omitted).

of five states (CA, IN, KY, NC, and NY) do not provide for disgorgement, or even catchall equitable relief. Second, even for the three states (CT, IL, MN) that provide for catchall equitable relief, the AGs' disgorgement requests are precluded because the AGs have failed to allege that they lack an adequate remedy at law, and the disgorgement does not conform to federal limitations on equitable relief. Third, even if any of the AGs could seek disgorgement, they lack evidence that any of the alleged conduct has caused Meta to become unjustly enriched, as required by all nine states.

In addition, should the Court allow any of the AGs' claims for disgorgement to proceed, such claims, as well as any civil penalties, are limited by territorial restrictions on the reach of state law and applicable statutes of limitations.

### A. CA, IN, KY, NC, and NY Are Not Permitted to Seek Disgorgement

Five AGs' claims for disgorgement fail because the applicable consumer protection laws do not empower them to seek disgorgement of Meta's profits.

***IN, KY, and NC.*** These states' laws do not provide for disgorgement as a remedy or expressly grant the AGs any right to obtain catch-all equitable relief.[94] The AGs seek the equitable remedy of disgorgement of Meta's profits, not recovery of consumer payments, so the remedy they seek is not permitted by the applicable state laws.

***California.*** California never pleaded a request for disgorgement and therefore should be precluded from seeking it as a remedy, Compl. ¶ 1171(B)(2). Moreover, at the time of filing, California law was clear that "[n]onrestitutionary disgorgement is unavailable in UCL actions," *Chowning v. Kohl's Dept. Stores, Inc.*, 733 F. App'x 404, 406 (9th Cir. 2018), and under the California False Advertising Law, *Ivie v. Kraft Foods Glob., Inc.*, 2015 WL 183910, *2 (N.D. Cal. Jan. 14, 2015). Even assuming the subsequently enacted Cal. Gov't Code § 12527.6 applies, it is not a basis for disgorging profits for conduct prior to the effective date, January 1, 2024, and the

---

[94] Ind. Code § 24-5-0.5-4(c)(2) (allowing the AG to "order the supplier to make payment of the money unlawfully received from the aggrieved consumers to be held in escrow for distribution to aggrieved consumers."); Ky. Rev. Stat. § 367.200 (permitting a remedy that "restore[s] to any person in interest any moneys or property . . . which may have been paid out as a result of any practice declared to be unlawful"); N.C.G.S. § 75-15.1 (authorizing "the restoration of any moneys or property obtained by any defendant as a result of such violation.").

1    Complaint does not allege any conduct after that date.  *See Landgraf v. USI Film Prods.*, 511 U.S.

2    244, 282-86 (1994) (applying presumption against retroactivity to compensatory damages provision).

3        *New York.*  New York's Attorney General statute does not explicitly provide the remedy of

4    disgorgement, and federal equitable principles preclude it.  N.Y. Exec. Law 63(12) (permitting the

5    Attorney General to get an injunction, restitution, damages, and other relief the court "may deem

6    proper").  Under New York's Executive Law and General Business Law, the AG cannot seek "the

7    general disgorgement of profits received from sources other than the public."  *People ex rel. Spitzer*

8    *v. Direct Revenue, LLC*, 2008 WL 1849855, at *7 (N.Y. Sup. Ct. Mar. 12, 2008).  Accordingly, where

9    a party, like Meta here, "earned all of its profits from advertising clients" but did not "take[] or

10   receive[] anything of value from any customer," claims for disgorgement will not lie.  *Id.* at *8.

11       **B.  Even for States That Can Seek Disgorgement in State Courts Under State Law,
            Their Claims Fail Under Federal Law of Equity**

12       The AGs have already conceded that they are requesting equitable disgorgement.  *See* ECF

13   669 (Feb. 23, 2024 Case Management Conference Tr.) at 78:14-17 ("It's the states' position that this

14   action is equitable and that our request for relief is equitable.").  However, federal equitable principles

15   control here and preclude all the AGs from recovering the disgorgement they seek in federal court.

16   *See Guar. Tr. Co. of N.Y. v. York*, 326 U.S. 99, 105-06 (1945); *Sonner v. Premier Nutrition Corp.*,

17   971 F.3d 834, 843 (9th Cir. 2020).

18       The AGs are not entitled to disgorgement because they have an adequate remedy at law.  *Ruiz*

19   *v. Bradford Exch., Ltd.*, 153 F.4th 907, 910 (9th Cir. 2025).

20       None of the AGs has alleged that they lack an adequate remedy at law or have otherwise

21   proven why their available legal remedies are inadequate.  *See In re Ford Motor Co. DPS6 Powershift*

22   *Transmission Prods. Liab. Litig.*, 689 F. Supp. 3d 760, 777 (C.D. Cal. 2023) ("The Ninth Circuit has

23   recently emphasized that, as a matter of federal law, a plaintiff seeking equitable relief must allege

24   and prove that there is no adequate remedy at law.").  That alone is a sufficient basis for the Court to

25   reject any claim for equitable monetary relief.  *See Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 662

26   (N.D. Cal. 2020) (granting summary judgment for defendants on the basis that "[m]ost importantly,

27   [plaintiff] fail[ed] to allege or demonstrate that any remedy at law is inadequate").

28

1    Moreover, several of the AGs have adequate remedies at law in the form of damages, but

2    either chose not to bring such claims or abandoned them during discovery.[95]   Illinois and North

3    Carolina could have sought to assert claims for damages under the statutes they invoke but chose not

4    to.  *See People ex rel. Hartigan v. Lann*, 587 N.E.2d 521, 524 (Ill. Ct. App. 1992) (noting that the

5    Illinois Consumer Fraud Act "expressly authorizes the Attorney General to enjoin illegal practices

6    and to collect actual damages"); *Connecticut v. Aurobindo Pharma USA, Inc.*, 2025 WL 1207566, at

7    *14 (D. Conn. Apr. 25, 2025) (finding that North Carolina's broad definition of "person"—who can

8    recover damages—under NCUPTA could include the AG).  Moreover, Minnesota, New York, and

9    Connecticut brought damages claims that they later abandoned in their interrogatory responses.

10   Compl. ¶¶ 1171(B)(4)(a) (CT), 1171(B)(15)(a)(iii) (MN), 1171(B)(19)(b) (NY); Ex. 65 (AGs' Supp.

11   Resp. to Meta's 1st Interrog.) at 18-20.  Those strategic decisions do not establish the inadequacy of

12   legal remedies.  *See Sonner*, 971 F.3d at 845.

13   Even if the AGs were entitled to some form of equitable monetary relief in their own *state*

14   courts, the AGs' request for disgorgement here exceeds federal constraints on equitable remedies in

15   *federal* court.  *Liu v. SEC*, 591 U.S. 71, 82-85 (2020).  Many of the state consumer protection laws

16   would not constitute equitable relief under federal law because they allow disgorged funds to "be

17   deposited in Treasury funds instead of disbursing them to victims."[96]  *Id.* at 85.

18

19

---

20   [95] This court also may consider whether the AGs have adequate remedies at law outside of their consumer protection statutes.  *See Key v. Qualcomm Inc.*, 129 F.4th 1129, 1142 (9th Cir. 2025)

21   (holding that an antitrust statute was an adequate remedy at law, and therefore, the plaintiffs' claim for restitution under the UCL could not stand); *see also Sonner*, 971 F.3d at 838, 844 (holding that

22   plaintiff had an adequate remedy at law for her UCL restitution claim because she could have brought an action under another statute for the same amount in damages).  And, it is irrelevant that other

23   causes of action might have different elements that make consumer protection claims more attractive or bar recovery entirely.  *See, e.g.*, *King v. Nat'l Gen. Ins. Co.*, 2025 WL 2494366, at *7 (N.D. Cal.

24   Aug. 29, 2025) ("[D]ifferences in proof between the claims do not make a legal remedy inadequate." Nor does a failure to prove a legal claim "make that remedy inadequate.").

25   [96] For example, Colorado, Illinois, Minnesota, and New York do not require that the disgorged funds be returned to injured consumers.  *See In re Lewis*, 495 B.R. 281, 288 (N.D. Ill. 2011); *People ex rel.*

26   *Alvarez v. Rd. Am. Auto., Inc.*, 2014 IL App. (1st) 120825-U, ¶ 22 (Ill. App. Ct. Nov. 19, 2014); Minn. Stat. § 8.31, subd. 2c; *id.* § 8.37, subd. 3-5; *People ex rel. James v. Trump*, 237 N.Y.S.3d 443,

27   507 (N.Y. App. Div. 2025) (Moulton, J., concurring).  Kentucky is required to return funds to injured consumers only when the judgment requires it.  *See* Ky. Rev. Stat. § 48.005(4).

28

1    **C.  The AGs Lack Evidence to Support a Claim for Disgorgement**

2        If the AGs could receive disgorgement, they must prove both (i) that the challenged conduct

3    caused Meta's alleged unjust enrichment, and (ii) the proportion of profits that were derived from the

4    challenged conduct.  The AGs cannot establish either prong.  To establish that Meta was unjustly

5    enriched, the AGs must prove that users would not have used Meta's services in the absence of the

6    challenged conduct, and establish a causal link between the challenged conduct and any alleged

7    unjust enrichment.[97]  *See SEC v. Davenport*, 2025 WL 1914897, at *17 (C.D. Cal. Apr. 24, 2025)

8    (finding an award of disgorgement appropriate where "the evidence at trial demonstrated that their

9    payments . . . were causally connected with their fraudulent activities."); *State v. The Castle Law*

10   *Grp., LLC*, 2017 WL 3449241, at *38 (Colo. Dist. Ct. Apr. 4, 2017) ("[T]o be entitled to

11   disgorgement the[] [plaintiffs] need to prove the . . . Defendants were unjustly enriched by [the

12   challenged conduct], and they have failed to do so."), *aff'd in part, rev'd in part on other grounds*,

13   457 P.3d 699 (Colo. App. 2019).[98]  The AGs have set forth no evidence that any of the challenged

14   features or alleged deceptive statements were the cause of any profits at all.

15       The AGs also cannot meet their burden of determining a "reasonable approximation of profits

16   causally connected" to Meta's alleged violations to recover disgorgement.  *See SEC v. First Jersey*

17   *Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996); *SEC v. Liu*, 2022 WL 3645063, at *2 (9th Cir. Aug.

18   24, 2022) ("The SEC bears the ultimate burden of persuasion that its disgorgement figure reasonably

19   approximates the amount of unjust enrichment" (internal quotation marks and citations omitted)).

20   The AGs have put forth no evidence to approximate any profits causally connected to Meta's alleged

21   violations or otherwise determine which profits were legally and purportedly illegally derived.  *See,*

22   _____

23   [97] The AGs' damages expert ████████████████████████████████████████

24   ███████████████████████████████████████████████████████████████████████
     ████████████████ Ex. 91 (Saba Rep.) ¶ 17(e).

25   [98] Minnesota similarly requires proving a "causal nexus" between harm suffered by consumers and
     the allegedly deceptive or unfair conduct.  *See State v. Minn. Sch. of Bus.*, 935 N.W.2d 124, 137-40
26   (Minn. 2019) (noting that on remand, the defendants could still "assert . . . that [their]
     misrepresentations did not cause a prospective student" to pay tuition).  But the AGs have presented
27   no evidence from any allegedly affected consumers or otherwise regarding harm, and therefore,
     cannot recover disgorgement under Minnesota law.  *See id.* at 138.
28

43

1    *e.g.*, *EarthInfo, Inc. v. Hydrosphere Res. Consultants, Inc.*, 900 P.2d 113, 120-21 (Colo. 1995).

2    ### D. The AGs' Claims for Disgorgement and Civil Penalties Are Limited by Extraterritoriality and Statutes of Limitations

3    Any disgorgement or civil penalties sought by the AGs of CA, CT, DE, IL, KY, NE, NY, SC,

4    and WI, if recoverable at all, must be limited to harms within their respective state boundaries because

5    their state laws apply presumptions against extraterritoriality that their consumer protection laws do

6    not overcome. *See Sullivan v. Oracle Corp.*, 254 P.3d 237, 248 (Cal. 2011); *Tidenberg v. Bidz.com*,

7    2009 WL 605249, at \*4-5 (C.D. Cal. Mar. 4, 2009); *Abel v. Plan. & Zoning Comm'n of Town of New*

8    *Canaan*, 998 A.2d 1149, 1159 (Conn. 2010); *Avery v. State Farm Mut. Auto Ins. Co.*, 835 N.E.2d

9    801, 852 (Ill. 2005); *Union Underwear Co., Inc. v. Barnhart*, 50 S.W.3d 188, 190 (Ky. 2001); *S. H.*

10   *v. Diocese of Brooklyn*, 167 N.Y.S.3d 171, 177 (N.Y. App. Div. 2022).[99]

11   Relatedly, to the extent that *any* AG is seeking disgorgement or civil penalties for violations

12   based on individuals outside the state, it cannot assert *parens patriae* standing to do so. States can

13   assert *parens patriae* standing only with respect to their own residents. *See Pennsylvania v. New*

14   *Jersey*, 426 U.S. 660, 665 (1976).

15   The AGs also cannot recover civil penalties or disgorgement for alleged conduct outside the

16   applicable statutes of limitations. *See Kokesh v. SEC*, 581 U.S. 455, 465 (2017); *see supra* Part I.B.5.

17   ## IV. Meta Is Entitled to Summary Judgment on the AGs' COPPA Claim

18   Meta is entitled to summary judgment on the AGs' COPPA claim because the AGs lack

19   evidence needed to prove their claim. COPPA imposes privacy and parental consent requirements

20   related to the collection and use of certain personal information from U13s. *See* 15 U.S.C. §§ 6501-

21   02; 16 C.F.R. §§ 312.1-312.3. COPPA's requirements apply only to an operator of a website or

22   online service that (1) is "directed to [U13s]," or (2) has "actual knowledge" that it is collecting or

23   maintaining personal information from a U13. 15 U.S.C. § 6502(a)(1). But the AGs can show

24

---

25   [99] Additionally, nearly all the AGs seeking disgorgement (CA, CO, CT, IL, IN, MN, NC, NY), and many states seeking only civil penalties (DE, NE, NJ, PA, VA, WI), conceded the territorial limits

26   on their enforcement power as amici in their attempt to preserve the FTC's power to obtain equitable monetary relief under § 13(b). *See* Brief for Illinois et al. as Amici Curiae Supporting Respondent,

27   *AMG Cap. Mgmt., LLC v. Fed. Trade Comm'n*, 593 U.S. 67, \*6-7 (2020) (No. 19-508) (arguing that it was crucial the FTC maintained its equitable monetary relief powers because state AGs "usually

28   must show that the defendant's conduct affected consumers within its borders.").

neither: on (1), the undisputed facts demonstrate that Facebook and Instagram are general audience websites;[100] and on (2), the AGs have no evidence that Meta knowingly collected the personal information of any specific U13 from any of the AGs' states.[101]   Moreover, Meta is also entitled to summary judgment because the AGs' COPPA claim is time-barred and because the law prohibits them from obtaining their sole requested monetary remedy.

### A.  Instagram and Facebook Are General Audience Websites

As the undisputed facts attest, Meta's platforms are not directed to U13s and thus are "general audience" websites under COPPA's implementing regulations, 16 C.F.R. § 312 (the "COPPA Rule").  *See* 64 Fed. Reg. 59888, 59889 (Nov. 3, 1999).  To be "directed to [U13s]," a website or a portion thereof must be "targeted to children."  15 U.S.C. § 6501(10)(A).  No court has interpreted this phrase, so this Court should apply its "ordinary meaning."  *Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021).   To "target" means "to set as a goal," *Target*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/target; *see also Horizon Pharma, Inc. v. Dr. Reddy's Lab'ys, Inc.*, 2017 WL 5451748, at *5 (D.N.J. Nov. 14, 2017).

To prove U13-directedness, the AGs must accordingly show that the platforms are *targeted* to U13s—meaning developed with the *goal* of achieving a U13 audience—not just incidentally of interest to them.  *New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 516 F. Supp. 3d 1293, 1298 (D.N.M. 2021).   But the undisputed evidence reflects that both platforms have prohibited U13-account creation since 2012 and remove accounts even *suspected* of belonging to U13s.  *See* Ex. 76 (Hartnett Dep.) at 39:22-40:14 (stating that Meta's Terms of Service prohibit U13s), 106:3-7,

---

[100] At the motion to dismiss stage, this Court declined Meta's invitation to decide whether its platforms are general audience websites on the ground that "[m]otions to dismiss should not be used for piecemeal purposes."  *Social Media II*, 753 F. Supp. 3d at 875.  That principle does not apply at this current stage.  *See, e.g., Dermansky v. Young Turks, Inc.*, 2023 WL 8884364, at *2 (C.D. Cal. Nov. 3, 2023) (While "Rule 12(b)(6) does not provide a mechanism for dismissing only a portion of a claim[,] . . . *[t]his stands in stark contrast to Rule 56, which expressly allows a party to move for summary judgment on 'part of each claim or defense'*" (emphasis added)).

[101] If an AG cannot show that Meta collected personal information from a U13 in its State then that AG's claim fails.  A state has *parens patriae* standing to sue only on behalf of its *own* residents.  *See Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001). And COPPA also makes clear that a state has no cause of action unless its own residents have been harmed.  15 U.S.C. § 6504(a)(1).

243:24244:2; Ex. 78 (Memon Rebuttal Rep.) ¶ 65; Ex. 79 (McDaniel Rep.) ¶¶ 104, 106; Ex. 75 (Davis Dep.) at 112:4-9.  It would be illogical for Meta to block and try to remove U13s if the goal of the platforms were to achieve a U13 audience.[102]  And it simply strains credulity that platforms that host content generated by billions of users are *targeted* toward the tiny minority of underage users who evade Meta's prohibitions against joining.  *See Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) ("[I]f the factual context makes the non-moving party's claim *implausible*, that party must come forward with more persuasive evidence than would otherwise be necessary to show that there is a genuine issue for trial." (emphasis in original)).

### 1. The FTC Expressly Recognizes That Facebook Is a General Audience Site, and the FTC's Logic Applies Equally to Instagram

The AGs' theory further contradicts FTC guidance since 2013 recognizing Facebook as a general audience site.  *See* 78 Fed. Reg. 3972, 3982 n.124 (Jan. 17, 2013) (noting COPPA rule amendment would not apply to activity "on general audience sites such as Facebook").  The Ninth Circuit has affirmed that courts "may look to agency interpretations for guidance," *Lopez v. Garland*, 116 F.4th 1032, 1036 (9th Cir. 2024), and the AGs have presented no evidence that challenges Facebook's classification then or now.  The AGs also cannot explain why the FTC's opinion is not equally applicable to Instagram, which—like Facebook—is restricted to users 13 and over.  Ex. 76 (Hartnett Dep.) at 39:22-40:14, 74:18-21; Ex. 73 (Venkataraman Rebuttal Rep.) ¶ 61.  The Court should adopt the FTC's position that Meta's platforms are general audience websites.

### 2. The AGs' Evidence Fails to Show That Meta Targeted U13s

The AGs cherry-pick examples of five third-party accounts on each of Facebook and Instagram that appear to be parent-managed accounts or accounts that feature content potentially appealing to U13s to bolster their factually unsupported theory.  *See* Ex. 84 (Alter Rep.) ¶¶ 515-25; 576-85.  But no reasonable jury could find that the ten total accounts and pages that the AGs' putative

---

[102] The AGs posit there was something improper about Meta's research into the U13 market, Ex. 84 (Alter Rep.) ¶¶ 444-53, but it is undisputed that its purpose was to explore creating a *COPPA-compliant*, separate, U13-directed, Instagram Kids platform, not to evade COPPA's protections, *see* Ex. 75 (Davis Dep.) at 226:10-227:15.

expert analyzes, *see id.*, out of *billions* on Facebook and Instagram, prove that either platform is U13-directed.  This is, at most, the paradigmatic "scintilla of evidence" that cannot defeat a motion for summary judgment.  *Zellmer v. Meta Platforms*, 104 F.4th 1117, 1122 (9th Cir. 2024) (quoting *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)).

The AGs speculate that the existence of third-party content[103] that could appeal to U13s betrays Meta's motive to reach U13s.  But the FTC's own guidance explains that a platform "is not necessarily [U13]-directed merely because it includes content that is appropriate for [U13s]," 90 Fed. Reg. 16918, 16921 (Apr. 22, 2025), and recognizes that "[g]eneral audience [w]eb sites . . . may attract a substantial number of [U13s]" without qualifying as U13-directed, 71 Fed. Reg. 13247, 13252 (Mar. 15, 2006).  The AGs' reliance on general interest topics such as, for example, pop culture, movies, music, and sports, to prove U13-directedness thus must be rejected as insufficient. Ex. 84 (Alter Rep.) ¶¶ 417, 420, 493.  Indeed, under the AGs' theory, it would be difficult to imagine what website would *not* be considered U13-directed.[104]  Instead, the AGs must show content on the platform appeals disproportionately to U13s, and this they cannot do.

Finally, the Court should reject the AGs' attempt to manufacture liability via the novel theory that individual accounts or pages can be a "portion" of a website for COPPA purposes.  *See* 64 Fed. Reg. 59888, 59893 (Nov. 3, 1999) (U13-directedness depends on the "overall character of the site"); *cf.* 15 U.S.C. § 6501(1)(A)(ii) (providing that a "portion" of a website can be U13-directed).  No court has adopted this theory, and it would expose operators to potential liability every time a third party posted content arguably appealing to U13s, even without the operator's knowledge or consent. Not only does such a theory run straight into Section 230, *see supra* Part II.A.1, but adopting it would transform COPPA into a strict-liability statute contrary to Congressional intent.  *See Angelilli*, 781 F. Supp. 3d at 704.

---

[103] In interpreting COPPA, this Court declined to adopt at the motion to dismiss stage Meta's position that, under Section 230, third-party content should not be considered in the U13-directedness inquiry, *Social Media II*, 753 F. Supp. 3d at 877, discussed in further detail *supra* Part II.A.1.  Meta preserves and reserves its rights with respect to this issue of statutory interpretation.

[104] For example, each NBA team's webpage could be considered targeted to U13s because basketball is popular with people of all ages.  *See* Ex. 73 (Venkataraman Rebuttal Rep.) ¶¶ 1.a.iv, 42, 103.

47

### 3. The AGs Cannot Show U13-Directedness Under Any Factors the FTC Traditionally Considers

The Court should also conclude that Facebook and Instagram are general audience sites if it chooses to consult the factors that the FTC considers when it evaluates U13-directedness.  *See* 16 C.F.R. § 312.2.  The undisputed evidence shows that all eight of the FTC's factors either favor Meta or are neutral.  Specifically:

- ***Subject Matter (Factor 1).***  The vast majority of content on the platforms appeals to users of all ages, and the AGs have no evidence that any content is *targeted* uniquely to U13s—rather than also appealing to, for example, teens, parents of young children, and adults nostalgic for their own childhoods.  *See, e.g.*, Ex. 73 (Venkataraman Rebuttal Rep.) ¶¶ 126, 149, 162-65, 178.

- ***Visual Content; Animated Characters or Child-Oriented Subjects; Music or Other Audio; Age of Models; Celebrities (Factors 2-6).***  The presence of animated content or children's media is insufficient to show U13-directedness, as even superficially childish content or features have widespread teen and adult appeal.  *Id.* ¶¶ 130-34 (animation), 136 (stickers), 127 (emojis), 137, 161 (games), 138-42 (face filters).

- ***Advertising Directed to U13s (Factor 7).***  Because U13s are not allowed on Facebook or Instagram, advertisers cannot target U13s *at all*.  *Id.* ¶76. ██████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████  *Id.* ¶¶ 77-78, 82.  Even assuming some ads inadvertently reached unknown U13s (of which the AGs have no evidence), the AGs have no evidence that such ads made up any more than a tiny portion of the $164.5 billion in annual revenue that Meta generates, "substantially all" of which derives from advertising on Facebook and Instagram.  Ex. 74 at 59-60.

- ***Evidence Regarding Audience Composition (Factor 8).***  U13s are not allowed on the platforms, and the overwhelming majority of the platforms' billions of users have stated ages of *over 18*.  Ex. 73 (Venkataraman Rebuttal Rep.) ¶¶ 61-63 (Over 90% of Facebook users, and over 80% of Instagram users, are over 18); Ex. 74 at 64 (Meta's products have over 3 billion daily active users).

Because there is no genuine dispute that Meta's platforms are general audience websites, the Court should enter summary judgment in Meta's favor.

### B. The AGs Have Failed to Adduce Evidence That Meta Has Actual Knowledge of Collecting Personal Information from U13s

Meta is entitled to summary judgment because the AGs also lack proof that Meta had "actual knowledge" that it was collecting personal information from U13 in an AG's state.

### 1. "Actual Knowledge" Requires an Operator to in Fact Know That It Is Collecting Personal Information from a U13

The AGs cannot meet the demanding actual knowledge test applicable to a COPPA claim,

and thus Meta is entitled to summary judgment.  An operator of a general audience website can be liable under COPPA only if it has "actual knowledge that it is collecting personal information from a [U13]."  15 U.S.C. § 6502(a)(1); 16 C.F.R. § 312.3.  While "actual knowledge" is not defined in the COPPA statute or regulations, *see* 15 U.S.C. § 6501; 16 C.F.R. § 312.2, its plain meaning requires "knowledge that is actual, not merely a possible inference from ambiguous circumstances," *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 609 (9th Cir. 2018).  This distinguishes "actual knowledge" from "constructive knowledge."  *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 185 (2020).  Operators accordingly are under no duty to investigate the age of visitors to their general audience websites.  *See* Fed. Trade Comm'n, *Complying with COPPA: Frequently Asked Questions* H.1,         https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.  An operator has "actual knowledge" under COPPA only when it has a "direct and clear awareness, as opposed to an awareness attributed to them based on what they reasonably should have known," that it is collecting data from a U13.  *New Mexico ex rel. Balderas v. Tiny Lab Prods*, 457 F. Supp. 3d 1103, 1113 (D.N.M. 2020).

## 2. The AGs Have No Evidence of Meta's Actual Knowledge of Any U13 From an AG's State on Facebook or Instagram

To survive summary judgment, each AG must have evidence (1) that Meta had actual knowledge of specific U13 users of Facebook and Instagram (2) that were residents of that AG's specific state.  *See* 15 U.S.C. § 6504(a)(1) (permitting states to bring suit under COPPA to vindicate the interests of "residents of that State"); *see also supra* n.101.  But the AGs have no evidence that Meta actually knew that a Facebook or Instagram user from an AG state—and certainly not from *each* AG's state—was U13, and yet (contrary to its own policies and procedures) continued to collect personal information from that user.  Summary judgment should be granted for Meta.

Meta's "checkpointing" and deletion of users suspected of being U13 is insufficient to meet the high bar of "actual knowledge" under COPPA.  When an account is flagged as potentially belonging to a U13, Meta reviews the account, generally by sending it to a human reviewer, to

1    determine whether to "checkpoint" the account.[105]  *See* Ex. 76 (Hartnett Dep.) at 103:11-18.  If the

2    reviewer thinks the account user may be a U13, they place the account in a "checkpoint," during

3    which time the user is locked out from accessing it.  *Id.* at 103:17-18.  Meta instructs its human

4    reviewers to "err on the side of [U13] if [they are] unsure," *id.* at 105:20-21, and reviewers have

5    limited information from which to base their decision, *see* Ex. 80 at -0370 (instructing Instagram

6    human reviewers to look at a users' bio and profile photos).  For these reasons, "a checkpointed

7    account . . . is not equivalent to an underage user," Ex. 76 (Hartnett Dep.) at 168:16-18, and it is not

8    evidence that Meta actually knew that any "checkpointed" account belonged to a U13.

9         Checkpointed users have 30 days to appeal by providing an ID proving their age.  *Id.* at

10    104:13-16; 106:5.  If they fail to appeal or their appeal fails, their accounts are disabled and scheduled

11    for deletion.  *Id.* at 106:3-7; Ex. 77 (Hartnett Dep.) at 299:14-301:13.[106]  But even when an account

12    is deleted, Meta "d[oes not] know they're underaged users . . . [Meta] just know[s] that they did not

13    appeal or did not appeal successfully."  *Id.* at 168:21-24.  This "generalized suspicion . . . doesn't

14    constitute [actual] knowledge" as a matter of law.  *See Malhotra v. Steinberg*, 770 F.3d 853, 860 (9th

15    Cir. 2014) (holding plaintiff lacked actual knowledge of kickback scheme when plaintiff "had

16    suspicions" generally but "did not know of a single kickback").

17         Nor can the AGs show actual knowledge by identifying models that roughly predict the

18    presence of unknown U13s on Instagram and Facebook.  A party's awareness that its behavior is

19    statistically likely to eventually impact someone somewhere is not evidence sufficient to show actual

20    knowledge.  *See Sulyma*, 589 U.S. at 185 (Neither "potential" nor "possible" knowledge suffices to

21    show "actual knowledge.").  While the AGs may point to internal communications showing that Meta

22    researchers estimated that certain percentages of U13s were likely to have Facebook or Instagram

23    

24    ───────────────

    [105] Unless a user self-reports as being U13, in which case the account is automatically checkpointed
    without any human review.  Ex. 76 (Hartnett Dep.) at 105:1-4.

25    [106] The AGs' putative expert Patrick McDaniel quibbles with the length of time it takes Meta to delete

26    such information.  *See* Ex. 79 (McDaniel Rep.) ¶¶ 355-67.  But the COPPA Rule permits the retention
    of potential U13 data to "take precautions against liability" or to "[r]espond to judicial process."  16

27    C.F.R. § 312.5(c)(6)(ii)-(iii).  Meta temporarily retains data from accounts scheduled for deletion
    "for the possibility of needing to do [related] legal discovery," in compliance with COPPA.  Ex. 77

28    (Hartnett Dep.) at 300:10-12.

1    accounts, *see* Ex. 79 (McDaniel Rep.) ¶ 81, these documents show—at most—that certain Meta

2    employees had a general suspicion.  This is entirely insufficient to prove "actual knowledge."  *See*

3    *Malhotra*, 770 F.3d at 860; *cf. Ventura Content*, 885 F.3d at 609 (holding website operator did not

4    have "actual knowledge" that the specific material on the site was infringing, even when it more

5    generally "kn[ew] that infringement was probably occurring on its website").

6         Meta is accordingly entitled to summary judgment because there is no evidence that it has

7    "actual knowledge" of any U13 from the AG states.

8         **C. The AGs' COPPA Claim Is Untimely**

9         Meta is also entitled to summary judgment because the AGs' COPPA claim is untimely.  The

10   default statute of limitations for "civil action[s] arising under an Act of Congress enacted after

11   [December 1, 1990]," which applies to the AGs' COPPA claim,  bars actions "commenced later than

12   4 years after the cause of action accrues."  28 U.S.C. § 1658(a).  Here, the statute of limitations on

13   the AGs' COPPA claim began to run more than four years before the AGs filed the original complaint

14   in October 2023.[107]  The AGs improperly allege COPPA violations as early as 2012, *see* Ex. 84 (Alter

15   Rep.) ¶¶ 456, 462, 531—over *10 years* before the AGs filed suit—but all allegations relating to events

16   prior to October 2019 are time-barred.

17        The AGs' COPPA claim for equitable relief is further barred by the doctrine of laches, which

18   applies here because (1) the AGs unreasonably delayed filing suit, and (2) Meta was prejudiced

19   thereby.  *See, e.g.*, *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (per curiam).

20   The period for evaluating delay starts when the AGs "knew or should have known" about their

21   potential claim that there were U13s on Meta's platforms who were not being provided COPPA

22   notice.  *See Tillamook Country Smoker, Inc. v. Tillamook Cnty. Creamery Ass'n*, 465 F.3d 1102,

23   1108 (9th Cir. 2006).  Laches presumptively bars a claim "if *any part* of the claimed wrongful conduct

24   occurred beyond the limitations period[.]"  *Miller*, 454 F.3d at 997 (emphasis added).

25        Here, the AGs' own evidence reveals that their COPPA claim was untimely by at least six

26   years as of the date the AGs filed this action in October 2023.  *See* ECF No. 1.  The AGs cite public

27   _____

28   [107] COPPA falls outside the scope of the tolled claims.  *See* Ex. 86 (Tolling Agreement) at 1.

1   reporting about the incidence of alleged U13s on Facebook and Instagram from as early as 2011 and

2   2012.  Ex. 84 (Alter Rep.) ¶¶ 456, 531-32.  The AGs accordingly knew or should have known of the

3   facts that give rise to their asserted COPPA claim by no later than 2012, because—under their theory

4   of the case—the mere existence of reports on the presence of possible U13s suffices for COPPA

5   liability.  *See id.*  Because the AGs' COPPA claim is untimely—and because the AGs cannot show

6   that their delay did not prejudice Meta[108]—laches precludes equitable relief.

7          **D.  The AGs Are Not Entitled to Disgorgement as a Matter of Law or Fact**

8          Finally, disgorgement—the only monetary remedy the AGs seek—is unavailable.

9          First, COPPA does not permit the AGs to seek disgorgement.  COPPA authorizes states to

10  bring suits to, in relevant part, "obtain damage, restitution, or other compensation" on behalf of their

11  residents, 15 U.S.C. § 6504(a)(1)(C); or "obtain such other relief as the court may consider to be

12  appropriate," *id.* § 6504(a)(1)(D).[109]  Neither provision permits the punitive relief sought.

13         Subsection (a)(1)(C) authorizes relief only when limited to the compensation of victims for

14  their losses.  But the AGs' requested remedy is intended not to compensate alleged victims but to

15  *deprive Meta of its profits*.  *See SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*, 580

16  U.S. 328, 341 (2017) (contrasting remedies that "seek[] to compensate the victim for its loss" from

17  those that "sought disgorgement of ill-gotten profits"); *SEC v. Platforms Wireless*, 617 F.3d 1072,

18  1097 (9th Cir. 2010) ("[T]he purpose of a disgorgement remedy is to prevent unjust enrichment . . . ,

19  _____

20  [108] Even if Meta had the burden of establishing prejudice, it is undisputed that Meta has suffered both "expectations-based prejudice and evidentiary prejudice."  *See Eat Right Foods Ltd. v. Whole Foods Mkt., Inc.*, 880 F.3d 1109, 1119-21 (9th Cir. 2018).  As to the former, Meta undertook significant
21  investments in targeting teen users, which (under the AGs' theory) is a *per se* COPPA violation because investments directed to teens are inherently also targeted to U13s.  *See* Ex. 84 (Alter Rep.)
22  ¶ 492; *Harman Int'l Indus., Inc. v. Jem Accessories, Inc.*, 668 F. Supp. 3d 1025, 1044 (C.D. Cal. 2023), *aff'd*, No. 23-55774, 2024 WL 4750497 (9th Cir. Nov. 12, 2024) (finding expectations-based
23  prejudice where defendant invested in line of allegedly infringing products during period of delay). As to the latter, certain individuals who would be best positioned to speak to Meta's activities in 2011
24  and 2012 are no longer with the company.  *See, e.g.*, Ex. 75 (Davis Dep.) at 46:1-7, 225:5-7 (stating that employees with knowledge relevant to the AGs' COPPA claim no longer worked at Meta); *see*
25  *Bikila v. Vibram USA, Inc.*, 218 F. Supp. 3d 1206, 1213-14 (W.D. Wash. 2016) (finding evidentiary prejudice where "key witnesses on [defendant's] side are no longer employed or no longer have
26  detailed recollections").

27  [109] The statute also lists "damages," but the AGs are not seeking damages or restitution under COPPA.  Ex. 92 (AGs' Resp. to Meta's 1st Interrog.) at 17-18; Ex. 93 (AGs' Resp. to Meta's 2nd
28  Interrog.) at 22-23.

*not to compensate victims*." (emphasis added)); *Osborn v. Griffin*, 865 F.3d 417, 453 (6th Cir. 2017) (similar). It therefore falls outside the scope of 15 U.S.C. § 6504(a)(1)(C).

Disgorgement is also unavailable under 15 U.S.C. § 6504(a)(1)(D) because the AGs' requested relief exceeds both COPPA's text and the bounds of equity.[110] In crafting COPPA's remedial scheme, Congress authorized the FTC to obtain civil penalties, but not states. *Compare* 15 U.S.C. § 6505(d) *with id.* § 6504(a)(1). This is strong evidence that Congress did not intend to allow states to pursue punitive remedies. *See Sulyma*, 589 U.S. at 186 (explaining the presumption "that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another"). The remedies that Congress *did* enumerate for states—injunctions, orders to enforce compliance, and compensatory relief, 15 U.S.C. § 6504(a)(1)—go no further than what is needed to remedy harm to persons injured by COPPA violations; they do not punish actors for COPPA noncompliance. *Cf. Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 218-19 (2024) (looking for "an obvious link" connecting listed remedies to limit the scope of a catchall relief clause). By contrast, the disgorgement remedy sought by the AGs is impermissibly punitive. The AGs seek relief for alleged violations of "public laws," rather than on behalf of "an aggrieved individual." *Kokesh v. SEC*, 581 U.S. 455, 463 (2017). And a hallmark of a punitive, rather than remedial, measure is the government's choice to retain proceeds for itself rather than distribute them to alleged victims. *Id.* at 465. Such a remedy is a "punitive sanction" that exceeds the bounds of equity. *Liu v. SEC*, 591 U.S. 71, 79 (2020).

Second, disgorgement is unavailable here because the AGs have adequate remedies available at law. The AGs have not even *alleged* that the legal remedies contemplated in COPPA would be inadequate. *See generally* Compl. For that reason alone, the AGs' requests for equitable relief must be dismissed. *See supra* Part III.B; *see also Sonner*, 971 F.3d at 844; *Anderson v. Apple Inc.*, 500 F.

---

[110] When plaintiffs invoke a federal court's equitable authority, they must accept the traditional equitable limitations that come with it. *See Sonner*, 971 F.3d 834, 840 ("Equitable relief in a federal court is of course subject to restrictions . . . ." (quoting *Guaranty Tr. Co. of New York v. York*, 326 U.S. 99, 105-06 (1945))); *Liu v. SEC*, 591 U.S. 71, 80-81 (2020) (disgorgement is an equitable remedy).

1    Supp. 3d 993, 1009 (N.D. Cal. 2020) ("Under *Sonner*, the plaintiffs are required, at a minimum, to

2    plead that they lack an adequate remedy at law[.]").

3          Third and finally, the AGs fail to meet their burden of providing at least a "reasonable

4    approximation of profits causally connected to the [alleged] violation." *Platforms Wireless*, 617 F.3d

5    at 1096. Their putative damages expert, Carl Saba, makes *no attempt* to calculate the revenues or

6    profits Meta earned from alleged COPPA violations. *See* Ex. 91 (Saba Rep.) ¶¶ 23-65 (purporting to

7    calculate the number of U13s on Facebook and Instagram without *any* discussion or calculation of

8    alleged Meta revenues or profits from the same). For this reason alone, the Court must grant summary

9    judgment in Meta's favor that the AGs are precluded from seeking disgorgement under COPPA. *See*

10   *Fox Broad. Co. v. Dish Network LLC*, 160 F. Supp. 3d 1139, 1181 (C.D. Cal. 2015) (granting

11   summary judgment on basis that disgorgement was unavailable when plaintiff failed to produce

12   evidence of revenues causally connected to alleged wrongdoing).

13                                        <u>**CONCLUSION**</u>

14         For the foregoing reasons, Meta respectfully requests that the Court grant its motion for

15   summary judgment.

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated:  January 30, 2026

Respectfully submitted,

DAVIS POLK & WARDWELL LLP

*/s/ James P. Rouhandeh*

James P. Rouhandeh, *pro hac vice*
Antonio J. Perez-Marques, *pro hac vice*
Caroline Stern, *pro hac vice*
Kathryn S. Benedict, *pro hac vice pending*
Corey M. Meyer, *pro hac vice*
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
rouhandeh@davispolk.com
antonio.perez@davispolk.com
caroline.stern@davispolk.com
kathryn.benedict@davispolk.com
corey.meyer@davispolk.com

COVINGTON & BURLING LLP

Ashley M. Simonsen, SBN 275203
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-2749
asimonsen@cov.com

Paul W. Schmidt, *pro hac vice*
Phyllis A. Jones, *pro hac vice*
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
pschmidt@cov.com
pajones@cov.com

*Attorneys for Defendants Meta Platforms, Inc.
and Instagram, LLC*

1

## **ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

2

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

3

4     Dated:  January 30, 2026                    */s/ James P. Rouhandeh*

5                                                                James P. Rouhandeh

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28