# EXHIBIT 7

# Senate Judiciary Committee Holds Hearing on Censorship and the 2020 Election

CQ Transcriptions

November 17, 2020 Tuesday

Copyright  2020 CQ-Roll Call, Inc.        All Rights Reserved

All materials herein are protected by United States copyright law and may not be reproduced, distributed, transmitted, displayed, published or broadcast without the prior written permission of CQ Transcriptions. You may not alter or remove any trademark, copyright or other notice from copies of the content.

## Body

Senate Judiciary Committee Holds Hearing On Censorship And The 2020 Election

November 17, 2020 10:00 A.M.

SPEAKERS:

SEN. LINDSEY GRAHAM (R-S.C.), CHAIRMAN

SEN. CHARLES E. GRASSLEY (R-IOWA)

SEN. JOHN CORNYN (R-TEXAS)

SEN. MIKE LEE (R-UTAH)

SEN. TED CRUZ (R-TEXAS)

SEN. BEN SASSE (R-NEB.)

SEN. JOSH HAWLEY (R-MO.)

SEN. THOM TILLIS (R-N.C.)

SEN. JONI ERNST (R-IOWA)

SEN. MICHAEL D. CRAPO (R-IDAHO)

SEN. JOHN KENNEDY (R-LA.)

SEN. MARSHA BLACKBURN (R-TENN.)

SEN. DIANNE FEINSTEIN (D-CALIF.), RANKING MEMBER

SEN. PATRICK J. LEAHY (D-VT.)

SEN. RICHARD J. DURBIN (D-ILL.)

SEN. SHELDON WHITEHOUSE (D-R.I.)

SEN. AMY KLOBUCHAR (D-MINN.)

Senate Judiciary Committee Holds Hearing on Censorship and the 2020 Election

SEN. CHRIS COONS (D-DEL.)

SEN. RICHARD BLUMENTHAL (D-CONN.)

SEN. MAZIE K. HIRONO (D-HAWAII)

SEN. CORY BOOKER (D-N.J.)

SEN. KAMALA HARRIS (D-CALIF.)

[*]GRAHAM: Good morning, everybody. I think we have Senator Blumenthal remotely. Is that correct?

BLUMENTHAL: Mr. Chairman.

GRAHAM: Is it okay, Senator Blumenthal, if we move forward?

BLUMENTHAL: Absolutely. Thanks very much.

GRAHAM: Okay, I'll make a brief opening statement. And this is about censorship, suppression and the 2020 election, sort of a deep dive when it comes to Twitter and Facebook about the platforms and the decisions they make, how they make them, can we do better? Do we need to do better?

So the first thing I want to talk about here is health risk associated with social media. A 2018 Pew Research Center survey of nearly 750 13- to 17-year-olds found that 45 percent are online almost constantly, and 97 percent use social media platforms such as YouTube, Facebook, Instagram or Snapchat. So why are we having this hearing? The products that these two companies offer, people like and they use. So the bottom line is, they've probably been more successful than their wildest dreams, and they're having to make decisions that offend people on the left and the right, and what we're trying to do is look at section 230 and to see if it needs to be modified or changed because section 230 basically allows social media platforms like Twitter and Facebook to pass on information without legal liability.

If a newspaper does something you don't like, you think they've slandered you in a certain way, you can sue them. If a news program does something that you think is out of line, even as a politician with a high bar, you can sue them. These companies have liability protection when it comes to the content that their users engage in. You can sue the person who gave the tweet, but you can't sue Twitter who gave that person access to the world in terms of what they said. And we've got to find a way to make sure that when Twitter and Facebook make a decision about what's reliable and what's not, what to keep up and what to take down, that there is transparency in the system. And I think section 230 has to be changed because we can't get there from here without change.

But in 2019, a study of more than 6,500 12- to 15-year-olds in the U.S. found that those that spent more than three hours a day using social media might be at heightened risk for mental health problems. Another study, 12,000 13 to 16-year-olds in England found that using social media more than three times a day predicated poor mental health-- predicted poor mental health and well-being in teens. Other studies also have observed links between high levels of social media use, depression or anxiety. The average millennial checks their phone 157 times daily. I don't know how members of the Senate, I don't know where we fall.

Social media is designed to sustain users' attention with a mix of good user interface design and psychology, creating an addictive mix for users. It's called the slot machine effect, a technique which utilizes a pull to refresh and scrolling mechanisms on newsfeeds similar to a slot machine. The like button, a feature to provide social validation through a positive feedback loop by measuring and comparing the number of likes a user's content obtains.

Gamifying social interactions, employing gamification to engage users and keep them coming back. For example, streaks is the one causing the most concern and using elongating redlines to display the number of days since two users interacted. Guess what these technologies do is try to keep us engaged. The more we engage the technology, the more advertising benefit to the company. Is that a good business practice? Maybe so. Does it create a health hazard over time? Something to look at.

Senate Judiciary Committee Holds Hearing on Censorship and the 2020 Election

Now the other aspect of this debate is are these companies newspapers? Are they TV stations? Do they have the power of media organizations that have rules and regulations and the current media platforms do not? There are rules about what a television station can do. There are rules about what a newspaper can do. And what I want to try to find out is if you're not a newspaper at Twitter or Facebook, then why do you have editorial control over the New York Post?

They decided--and maybe for a good reason; I don't know--that the New York Post articles about Hunter Biden needed to be flagged, excluded from distribution or made hard to find. That to me seems like you're the ultimate editor. The editorial decision at the New York Post to run the story was overridden by Twitter and Facebook in different fashions to prevent its dissemination. Now if that's not making an editorial decision, I don't know what would be. It's one thing when we do it in our private lives. Nikki Haley made a post about her concerns about mail-in balloting. It was flagged as something--a claim, this hasn't been legitimized. Let me read it to you.

The next question to ask is why is it a crime to raise doubts about the Holocaust? Why should anyone who writes about such doubts be imprisoned while insulting the Prophet is allowed? Now that's the Ayatollah. He's opining that raising doubts about the Holocaust shouldn't be a crime, and he is openly called for the destruction of Israel, his regime has, and his tweet was basically allowed to flourish. Here's what Nikki Haley said. Despite what the media tells us, election fraud does happen, and policies like balloting harvesting and mailing ballots to people who don't request them makes it easier--makes that easier. That needs to stop. This claim about election fraud is disputed.

Well, that's her opinion. She believes, like I do, that mail-in balloting is ripe for fraud if you can't verify the signature and if we just send mail ballots out to the world that are not requested, and you don't have a signature verification system that can be trusted, you have in fact led to harvesting of ballots for nefarious purposes. The question for us as a country, at what point do the decisions by these organizations cross a line? At what point do they have to assume responsibility that section 230 shields them from?

And to the people who are about to testify, I consider your products to have changed the world, mostly for the good. We're able to interact among ourselves. We're able to talk to each other and share life experiences. We're able to in real-time communicate to our neighbors and our friends and those who oppose us what we think with technology that just makes it instantaneous and can literally light up the world.

Section 230 was developed to allow these technologies to flourish. Early on, if you could sue Twitter or Facebook for content on a Facebook posting or a tweet, and they were liable for what somebody else said or what they felt or did, then the company would have probably never been in existence. The companies are trying to help us deal with child pornography. We have the EARN IT Act that to be able to maintain liability protections when it comes to sexual exploitation of media sites, social media sites by sexual predators, this committee has passed a bill saying you can only maintain that liability protection if, in fact, you use best business practices.

And that's where I think we need to be going.

[*]GRAHAM: My hope is that we change section 230 to incentivize social media platforms to come up with standards that are transparent and opaque, that will allow us to make judgments about their judgments, that the fact checkers be known, that the community standards, who sets them, what are their biases, and give some direction to these companies because they have almost an impossible task. They're literally trying to engage in telling us what's reliable and what's not based on cable news commentary or tweets from politicians for average citizens.

Nobody in a free society has ever had that responsibility before, and the question is how do you control that responsibility. I don't want the government to take over the job of telling America what tweets are legitimate and what are not. I don't want the government deciding what content to take up and put down. I think we're all in that category. But when you have companies that have the power of governments, have far more power than traditional media outlets, something has to give.

And I'm hoping in this hearing today that we can find a baseline of agreement that section 230 needs to be changed, that my bias would be to allow the industry itself to develop best business practices to protect the sites

against terrorism and child exploitation and other concerns, that we look at the business practices of these companies through a help prism that some of their practices need to be modified because it can become addictive.

You know, we thought tobacco was a good thing for a long time to the point that we send it to our soldiers in combat. The more we realized about the addictive nature of tobacco, the more we changed our mind about telling the public about the product. So, whether or not we do that with social media platforms, that these platforms can be addictive if used too often, I don't know if we need to go there. But I do know that section 230, as it exists today, has got to give.

And I think there's Republican and Democrat concern about the power that's being used by social media outlets to tell us what we can see and what we can't, what's true and what's not, to the extent that section 230, in my view, has to be rewritten. So, that's the purpose of this hearing, is to find a way forward to bring about change. And when it comes to social media platforms and section 230, change is going to come.

With that, Senator Blumenthal?

BLUMENTHAL: Thank you very, very much, Mr. Chairman. And thank you for having this hearing today. And I look forward to cooperating with you not only in this hearing but in the upcoming Congress on our EARN IT bill, and other measures because you're absolutely right. Change must come to social media.

The fact is we meet today in an unprecedented and precarious moment in American history. Daily, the president shocked our conscience and shakes the very foundations of our democracy using a powerful megaphone, social media. The president has used this megaphone to spread vicious falsehoods in an apparent attempt overturn the will of voters.

Every day he posts new threats and conspiracy theories about mail-in ballots and voting machines, lies that contradict his own election security officials and his lawyers. He uses this megaphone potentially to block a peaceful transition of power.

Now, Mr. Zuckerberg and Mr. Dorsey, you have built terrifying tools of persuasion and muniple--manipulation with power far exceeding the robber barons of the last Gilded Age. You have profited usually by strip mining data about our private lives and promoting hate speech and voter suppression. You have an immense civic and moral responsibility to ensure these instruments of influence do not irreparably harm our country.

I recognize the steps, they're really baby steps, that you've taken so far. The destructive incendiary misinformation is still a scourge on both your platforms and on others. In fact, Google has been given a pass from today's hearing. It's been rewarded by this committee for its timidity, doing even less than you have done to live up to its responsibilities.

The recent actions you have taken, in fact, are simply to check the truth of what appears on platforms. Often it is voter suppression and incendiary malicious misinformation, and you've tried to slow its insidious spread. That's not censorship. That's moral and civic responsibility.

Now, I believe, and I hope the chairman agrees, that a series of hearings on big tech is long-overdue on antitrust issues, on privacy concerns, and section 230. I have urged, in fact, a breakup of tech giants because they've misused their bigness and power, breaking off, for example, WhatsApp and Instagram, rigorous privacy protection because consumers should have control over their own data and, indeed, section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court.

But this hearing is certainly not the serious proceeding that we need. It may become a political sideshow, a public tar and feathering. My colleagues seem to want to ignore the foreign disinformation campaigns intended to interfere in our democracy, and calls for murder of FBI Director Wray and Dr. Fauci. We--what we've seen here are fighting words and hate speech that certainly deserve no free expression protection.

Senate Judiciary Committee Holds Hearing on Censorship and the 2020 Election

The fact is that the purpose of today's hearing seems as much to bully or browbeat you, Mr. Zuckerberg and Mr. Dorsey, from taking even more responsible action by threatening cuts to section 230. Censorship is really a misnomer for this hearing.

What you've done is to label and to fact check to avoid amplifying misinformation and to, in effect, impose those labels to alert people that what they are consuming may misinform them. And Facebook took down ads for Biden in Michigan and the ACLU in Colorado for mistaken information about voting. In short, there was action that affected both sides.

I have fought for section 230 reform for 16 years from my time as Connecticut's attorney general when I took on the scourge of registered sex offenders grooming children on Facebook and MySpace. With Senator Portman, I have led passage of the only successful revision so far to section 230, the Stop Enabling Sex Traffickers Act, known as SESTA. And Chairman Graham and I have authored the only bill to reform Section 230 that has actually moved out of--out of a committee. The section--the EARN IT Act pass this committee unanimously.

Change is going to come, no question. Change is on the way, and I intend to bring aggressive and targeted reform to section 230. But I am not, nor should we be on this committee, interested in being a member of the speech police. There are real harms and real victims here. And in some ways, this hearing is a betrayal of those real harms and the real victims of them. Those harms have been caused by big tech because you have failed your responsibility, as have others in this industry.

I want to see real reform that will enable these abuses to be reformed, because your platforms have embraced abuse and weaponized child predators, violent white supremacists, and human traffickers. And I've heard heart-wrenching stories from the victims.

[*]BLUMENTHAL: You've set back civil rights protections for Muslim Americans who live in fear of armed militias organized by white--by private online groups. You have set back consumers in competition, making that kind of antitrust action very, very important. The American public deserves and demands real reform and accountability, national consumer privacy rules, antitrust principles that curb predatory power and reforms as section 230 that shut--that stopped shutting the courthouse door to victims. I look forward to an opportunity for real change, and I think you can meet this moment by putting your power and your money on the right side of history. Thanks, Mr. Chairman.

GRAHAM: Well, thank you. A lot to unpack there. Senator Blumenthal has been great to work with. I'll continue to work with you. If we keep control of the committee, Senator Grassley would be the chairman next year, and I would encourage him to have the hearings that Senator Blumenthal referenced, that this is an ongoing conversation to get it right to the extent that we can get it right. Mr. Dorsey from Twitter, are you with us, Mr. Dorsey?

DORSEY: I am. Do you hear me?

GRAHAM: Thank you. The floor is yours.

DORSEY: Thank you to the members of the Judiciary Committee for the opportunity to speak with the American people about Twitter and your concerns around censorship and suppression of a specific news article, and generally what we saw in the 2020 U.S. elections conversation.

We were called here today because of an enforcement decision we made against the New York Post based on a policy we created in 2018 to prevent Twitter from being used to spread hacked materials. This resulted in us blocking people from sharing a New York Post article publicly or privately. We made a quick interpretation, using no other evidence, that the materials in the article were obtained through hacking, and according to our policy we blocked them from being spread. Upon further consideration, we admitted this action was wrong and corrected it within 24 hours.

We informed the New York Post of our error and policy update and how to unlock their account by deleting the original violating tweet, which freed them to tweet the exact same content and news article again. They chose not