[*Submitting Counsel on Signature Page*]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| | Case No. 4:22-md-03047-YGR |
| THIS DOCUMENT RELATES TO: | **REPLY IN SUPPORT OF STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| 4:23-cv-05448 | Judge: Hon. Yvonne Gonzalez Rogers |
| | Magistrate Judge: Hon. Peter H. Kang |
| | Date: April 15, 2026 Time: 1:00 pm |
| | Place: Courtroom 1, 4th Floor |

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................... 1

II.   ARGUMENT ......................................................................................................... 2

    A.    The State AGs have standing to sue Meta for its COPPA violations. ............................ 2

    B.    The State AGs' COPPA claim is not barred by the statute of limitations or laches. ....... 4

    C.    Both Meta Platforms, Inc. and Instagram, LLC are operators of Instagram................... 6

        1.    Meta has failed to present any evidence establishing a material dispute of fact that Meta Platforms, Inc. is and has been an operator of Instagram since the acquisition of Instagram. ........................................................................................... 6

        2.    Meta's argument that Instagram, LLC was not an operator of Instagram is similarly belied by extensive undisputed evidence. ................................................................. 8

        3.    The evidence and law establish that Instagram, LLC and Meta Platforms are a common enterprise in the operation of Instagram........................................................ 9

            a.    Meta's legal arguments lack merit. ........................................................................ 9

            b.    Meta has not raised a dispute of material fact regarding Meta Platforms' and Instagram, LLC's joint operation of Instagram....................................................... 11

    D.    The State AGs are entitled to summary judgment regarding Meta's collection of personal information from users. ................................................................................. 11

        1.    The collection of personal information is an element of a COPPA claim and a material fact that cannot be disputed by Meta. ....................................................... 12

        2.    Meta collects personal information as defined by COPPA and the COPPA Rule. ... 12

    E.    The State AGs are entitled to summary judgment on Meta's failure to provide COPPA's protections to any children on its platforms. ................................................. 14

    F.    Summary judgment should be granted on Meta's liability for its use of children's personal information to train its machine learning and generative AI models. ............. 17

        1.    Meta was on notice of this claim........................................................................... 17

        2.    Meta's actual knowledge standard is not supported by law..................................... 18

        3.    Meta acquires actual knowledge of certain U13 users............................................. 20

        4.    Meta does not dispute that actual knowledge includes willful blindness. ................ 25

        5.    Meta's training of machine learning and generative AI tools violates COPPA. ....... 27

            a.    The COPPA statute prohibits the continued use of personal  information that was collected prior to obtaining actual knowledge of an underage user............... 27

ii

b.   The FTC provided sufficient notice when it promulgated the COPPA Rule......... 29

c.   The FTC Rule's provision including "maintain" is proper. ................................... 30

6.   Meta trains its machine learning and generative AI models on personal information. ....................................................................................................................... 30

7.   The State AGs have shown that Meta trained its models on children's personal information. ....................................................................................................................... 33

III.      CONCLUSION ................................................................................................................... 35

**TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................................ 12

*Auer v. Robbins*,
519 U.S. 452 (1997) ................................................................................................................ 29

*Big Lagoon Rancheria v. California*,
789 F.3d 947 (9th Cir. 2015) .................................................................................................. 30

*Boden v. St. Elizabeth Med. Ctr., Inc.*,
2018 WL 4855210 (E.D. Ky. Oct. 5, 2018) ............................................................................ 15

*Chanel, Inc. v. US880*,
2011 WL 13244270 (N.D. Cal. July 5, 2011) ........................................................................... 8

*Coleman v. Quaker Oats Co.*,
232 F.3d 1271 (9th Cir. 2000) ................................................................................................ 17

*Columbia Ins. Co. v. seescandy.com*,
185 F.R.D. 573 (N.D. Cal. 1999) .............................................................................................. 8

*Commw. of Puerto Rico ex rel. Quiros v. Bramkamp*,
654 F.2d 212, 217 (2d Cir. 1981) ............................................................................................. 4

*Consumer Fin. Prot. Bureau v. Gordon*,
819 F.3d 1179 (9th Cir. 2016) ................................................................................................ 10

*Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*,
No. 15-CV-5211 (CM), 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ..................................... 11

*Consumer Fin. Prot. Bureau v. Think Fin., LLC*,
No. CV-17-127-GF-BMM, 2018 WL 3707911 (D. Mont. Aug. 3, 2018) ................................ 11

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) ................................................................................................................ 29

*Eichman v. Fotomat Corp.*,
880 F.2d 149 (9th Cir. 1989) .................................................................................................... 4

*Embrex, Inc. v. Serv. Eng'g Corp.*,
1998 WL 35235446 (E.D.N.C. June 23, 1998) ....................................................................... 30

*Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*,
249 F.3d 1132 (9th Cir. 2001) .................................................................................................. 3

*FTC v. Network Servs. Depot, Inc.*,
617 F.3d 1127 (9th Cir. 2010) ................................................................................................ 11

*Gates v. MCT Grp.*,
93 F. Supp. 3d 1182 (S.D. Cal. 2015) ..................................................................................... 20

*Glob. Tech Appliances*, Inc., v. Seb S.A.,
  563 U.S. 754 (2011) .................................................................................................... 25

*Guenther v. Lockheed Martin Corp.*,
  972 F.3d 1043 (9th Cir. 2020) ................................................................................... 18

*Harris v. Cnty. of Orange*,
  17 F.4th 849 (9th Cir. 2021) ...................................................................................... 33

*Harrison v. United States*,
  708 F.2d 1023 (5th Cir. 1983) ................................................................................... 20

*In re Amaranth Nat. Gas Commodities Litig.*,
  587 F. Supp. 2d 513 (S.D.N.Y. 2008) ....................................................................... 11

*In re Amaranth Nat. Gas Commodities Litig.*,
  612 F. Supp. 2d 376 (S.D.N.Y. 2009) ....................................................................... 11

*In re Robbins*,
  91 B.R. 879 (W.D. Mo. 1988) .................................................................................... 19

*In re Shoup*,
  290 B.R. 768 (Bankr. C.D. Cal. 2003) ....................................................................... 28

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  2012 WL 6708866 (N.D. Cal. Dec. 26, 2012) ........................................................... 18

*Intel Corporation Investment Policy Committee v. Sulyma*,
  589 U.S. 178 (2020) .................................................................................................... 21

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
  304 F.3d 829 (9th Cir. 2002) ........................................................................................ 6

*Kanaan v. Yaqub*,
  799 F. Supp. 3d 960 (N.D. Cal. 2025) ......................................................... 11, 14, 16

*M.W. by & Through Hope W. v. United States Dep't of Army*,
  2017 WL 10456732 (N.D. Cal. Dec. 15, 2017) ......................................................... 29

*Merit Mgmt. Grp., LP v. FTI Consulting, Inc.*,
  583 U.S. 366 (2018) .................................................................................................... 27

*Miller v. Glenn Miller Prods. Inc.*,
  454 F.3d 975 (9th Cir. 2006) ........................................................................................ 6

*Missouri ex rel. Koster v. Harris*,
  847 F.3d 646 (9th Cir. 2017) ........................................................................................ 4

*Murphy Co. v. Biden*,
  65 F.4th 1122 (9th Cir. 2023) ..................................................................................... 10

*Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*,
  863 F.2d 1420 (9th Cir. 1988) ................................................................................... 30

*Nat'l Ass'n of Mfrs. v. Dep't of Def*,
  583 U.S. 109 (2018) .................................................................................................... 28

*Newton v. Equilon Enters., LLC*,
  411 F. Supp. 3d 856 (N.D. Cal. 2019) ........................................................................... 5

*Nw. Ass'n of Indep. Sch. v. Labrador*,
  165 F.4th 1243 (9th Cir. 2026) ..................................................................................... 13

*Pennsylvania v. Think Fin., Inc.*,
  2016 WL 183289 (E.D. Pa. Jan. 14, 2016) ................................................................... 11

*Pesci v. McDonald*,
  2015 WL 12672094 (C.D. Cal. Oct. 22, 2015) ............................................................. 18

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
  457 F.3d 963 (9th Cir. 2006) ................................................................................... 17, 18

*Radzanower v. Touche Ross & Co.*,
  426 U.S. 148 (1976) ...................................................................................................... 10

*Rockwell Intern. Corp. v. SDL, Inc.*,
  103 F.Supp.2d 1192 (N.D. Cal. 2000) .......................................................................... 19

*Rustico v. Intuitive Surgical, Inc.*,
  424 F. Supp. 3d 720 (N.D. Cal. 2019) ........................................................................... 5

*S.E.C. v. Rind*,
  991 F.2d 1486 (9th Cir. 1993) ........................................................................................ 4

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944) ................................................................................................. 14, 29

*State Farm Fire & Cas. Co. v. Geary*,
  699 F. Supp. 756 (N.D. Cal. 1987) ............................................................................... 12

*Successor Agency to Former Emeryville Redevelopment Agency & City of Emeryville v. Swagelok Co.*,
  2023 WL 3805256 (N.D. Cal. June 1, 2023) ................................................................ 17

*Swanger v. Warrior Run School Dist.*,
  346 F.Supp.3d 689 (M.D. Penn. 2018) ......................................................................... 19

*U.S. ex rel. Schutte v. SuperValu, Inc.*,
  598 U.S. 739 (2023) ................................................................................................. 19, 22

*U.S. v. Jewell*,
  532 F.2d 697 (9th Cir. 1976) ......................................................................................... 19

*United States v. Bonilla–Montenegro*,
  331 F.3d 1047 (9th Cir. 2003) ........................................................................................ 1

*United States v. Brown*,
  333 U.S. 18 (1948) ......................................................................................................... 19

*Universal Health Servs., Inc. v. U.S.*,
  579 U.S. 176 (2016) ......................................................................................................... 19

*Utah Div. of Cons. Prot. v. Stevens*,
  398 F. Supp. 3d 1139 (D. Utah 2019) ............................................................................... 3

*Washington v. GEO Grp., Inc.*,
  2019 WL 2084463 (W.D. Wash. May 13, 2019) ............................................................... 5

**Statutes**

12 U.S.C. § 5538 ............................................................................................................... 10

15 U.S.C. § 6404 ................................................................................................................. 9

15 U.S.C. § 6501 .......................................................................................................... passim

15 U.S.C. § 6502 ............................................................................................ 5, 9, 27, 28

15 U.S.C. § 6504 .................................................................................................. 4, 9, 10

15 U.S.C. § 6505 ...................................................................................................... 9, 10

28 U.S.C. § 1658 ......................................................................................................... 4, 5

**Other Authorities**

144 Cong. Rec. 12787 (1998) ......................................................................................... 27

64 Fed. Reg. 22750 (April 27, 1999) .............................................................................. 29

64 Fed. Reg. 59888 (Nov. 3, 1999) ........................................................................... 13, 18

64 Fed. Reg. 59891 (Nov. 3, 1999) .................................................................................. 9

64 Fed. Reg. 59898 (Nov. 3, 1999) ................................................................................ 29

78 Fed. Reg. 3972 (Jan. 17, 2013) .................................................................................. 13

89 Fed. Reg. 2034 (Jan. 11, 2024) .................................................................................. 13

**Rules**

Fed. R. Civ. P. 36(b) ....................................................................................................... 16

**Regulations**

16 C.F.R. § 312.10 ........................................................................................................... 15

16 C.F.R. § 312.2 ............................................................................................. 12, 13, 14, 22

16 C.F.R. § 312.5 ............................................................................................................. 15

16 C.F.R. § 312.8 ............................................................................................................. 15

REPLY IN SUPPORT OF STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4:22-md-03047-YGR; 4:23-cv-05448-YGR

## I.    INTRODUCTION

In its Opposition, Meta throws everything but the proverbial kitchen sink at the State AGs' COPPA claims. But its arguments lack basis in both the law and the facts of this case. With respect to standing, the AGs are not required to prove that Meta violated COPPA with respect to any particular child in their state, and in any case, Meta's own data identifies such children. The State AGs have met all other requirements for standing, including those applicable to *parens patriae* actions. Further, the State AGs' suit is not barred by laches, which does not apply to government enforcers, or by any applicable statute of limitations. And both Meta Platforms, Inc. and Instagram, LLC are "operators" of Meta's platforms under COPPA. Finally, the State AGs' Motion regarding Meta's collection of personal information and failure to provide COPPA's protections is an appropriate subject for summary judgment: while Meta's Opposition fails to create genuine disputes of material fact (or creates, at most, disputes about immaterial facts), the Motion seeks to establish elements of COPPA and material facts that the State AGs must prove in order to succeed on their claims. A ruling in the State AGs' favor will thus simplify the issues for trial.

Substantively, Meta urges this Court to adopt an unprecedented interpretation of COPPA that is contrary to the FTC's properly promulgated regulations, undermines the purpose of the statute, and would lead to absurd results. Meta posits that it can use or even **sell** the personal information that it collects from users under the age of 13 ("U13s" or "children"), so long as it did not have "actual knowledge" that the child was under 13 at the moment the information was collected from the child. If this tortured interpretation were not enough, Meta further contends that an online service lacks "actual knowledge" that a child is under 13 in almost every conceivable circumstance, including when the child enters their age as under 13 or announces on their profile that they are underage.  The Court should reject Meta's strained interpretation that would effectively render COPPA a nullity.  *See, e.g.*, *United States v. Bonilla–Montenegro*, 331 F.3d 1047, 1051 (9th Cir. 2003) ("[W]e must strive to give effect to the plain, common-sense meaning of the enactment without resorting to an interpretation that 'def[ies] common sense.'") (internal citations omitted). Meta's remaining arguments to avoid liability are unavailing—the undisputed facts show that Meta

used the personal information of known children to train its machine learning and generative AI models.

## II.    ARGUMENT

### A. The State AGs have standing to sue Meta for its COPPA violations.

The State AGs have standing to bring suit against Meta for violating COPPA. Contrary to Meta's arguments, the State AGs have presented sufficient evidence of concrete injury to children in their states whose information Meta collected and used, and the State AGs have an interest apart from those of private parties.

**Concrete Injury.** Meta does not contest that the unlawful collection of children's personal information without providing COPPA's protections is a sufficiently concrete injury for standing purposes. Instead, it focuses on whether the State AGs have established this injury for any residents in each State AG's state.

The State AGs have established that Meta's practices have impacted a large number of U13 users in the states represented in this litigation. In 2020 to 2024 alone, Meta checkpointed more than 1.8 million U.S. users for being under 13 and disabled more than 1.3 million. *See* State AGs' Motion for Partial Summary Judgment, ECF 2695 ("State AGs' Motion"), Ex. 16. After those accounts were checkpointed and even disabled, Meta used personal information from these children for its machine learning and generative AI model training, violating those children's privacy rights. *See* State AGs' Motion at 27. Meta does not provide **any** evidence to raise a genuine dispute that these more than 1 million U.S. children were located in each of the 29 states at issue.

Even under Meta's theory of the specific kind of evidence the State AGs must provide to demonstrate standing, the State AGs prevail. Internal data that Meta produced in this case identifies children who were affected by Meta's COPPA violations in each state of the AGs suing here. *See* State AGs' Opposition to Meta's Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment, ECF 2779 ("State AGs' Opposition"), Ex. 129, Second Corrected Trial Report of Patrick McDaniel ("McDaniel Rpt.") at 115–17, 123–32, 147–49, 152, 157–58, 171–79 (Tables 9−11, 21, 23, 25, 27, 41–42, 46, 49, 58–60); Ex. 5, Trial Report of Ryan Sheatsley ("Sheatsley Rpt.") at [51-55, 62-65, 67-69, 83-85, 87-88, 93, 110-113 (Tables 7-9, 19, 21, 23, 25, 39–40, 44,

47, 58–60 (59 and 60 mislabeled as "Table 59575859" and "Table 6060")].[1] For example, the limited state-by-state data Meta produced in this action from just a recent 90 day period shows tens of thousands of users who had their account disabled for being under 13 in each of the relevant states, but Meta continued collecting and using personal information from the those children by failing to remove accounts they knew to belong to the same children through Meta's integrity soft-matching models, including nearly 2,400 in California alone. *See* State AGs' Opposition, Ex. 129, McDaniel Rpt. at 177–178, Table 60 (mislabeled as "Table 6062"); Ex. 5, Sheatsley Rpt. at [112-113, Table 60 (mislabeled as "Table 6060")].

Unlike *Utah Div. of Cons. Prot. v. Stevens*, 398 F. Supp. 3d 1139 (D. Utah 2019), where the parties agreed the company did not have any past or current Utah customers, the State AGs' COPPA claims arise from the information being collected from children in each of their states. This is a direct, ongoing injury to a large number of children in the states bringing this claim. As such, the concrete injury standard is satisfied.

**Interest Apart from Private Parties.** The State AGs also have articulated an interest apart from the interests of particular private parties, as required for *parens patriae* standing. The State AGs' interests diverge from the interests of private individuals who are or may be affected by Meta's COPPA violations in several significant ways. First, children who will start using Meta's platform in the future are not represented in any actual or potential private litigation. Moreover, many active litigants may no longer be children or may have ceased using Instagram or Facebook altogether, circumstances that will incentivize those litigants to prioritize monetary relief for their

---

[1] The State AGs cite to evidence from their Opposition to Meta's Motion for Summary Judgment here because Meta first raised its standing argument after the State AGs filed their Motion for Partial Summary Judgment. This evidence is already in the record and is appropriate for the Court's consideration. *See Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1135–37 (9th Cir. 2001) (finding that court should consider motions and oppositions in ruling on dueling cross-motions for summary judgment.). Further, the State AGs' substitute expert, Dr. Ryan Sheatsley, presents the same data analysis as in Dr. McDaniel's report, with the addition of data Meta subsequently produced. *See* Ex. 5, Trial Report of Ryan Sheatsley. For each citation to Dr. McDaniel's report, the Reply will provide the page and table numbers from the Sheatsley report in brackets. Only some of the data that Meta produced included a state-by-state breakdown, so the state-by-state numbers in these analyses are likely significantly underinclusive.

own injuries above or in place of strong injunctive relief for others. In these circumstances, *parens patriae* standing is appropriate. *Commw. of Puerto Rico ex rel. Quiros v. Bramkamp*, 654 F.2d 212, 217 (2d Cir. 1981).

In addition to the evidence and data discussed above, numerous studies, conducted by Meta and third parties, have consistently shown that **millions** of U.S. children regularly use Facebook and Instagram. *See* State AGs' Opposition, Ex. 1, Alter Rpt. ¶¶ 509−11, 571−73, all of which demonstrate that "a sufficiently substantial segment" of the states' populations are affected by Meta's violations. *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017).

Finally, Meta's argument that the State AGs do not have a cause of action under COPPA must also be rejected. After conducting an investigation, the State AGs discovered evidence of COPPA violations on Meta's platforms. *See* State AGs Amended Complaint, ECF 207 ("Compl."), ¶¶ 642−745 (Instagram), 813−21 (Facebook). The State AGs further developed that evidence throughout discovery. The Court need not wade into the question of whether 15 U.S.C. § 6504(a)(1) may constitutionally authorize suit absent injury, as Meta suggests, because the AGs have evidence—not merely "reason to believe," 15 USC § 6504(a)(1)—that Meta's practices adversely affect their residents, including based on the data discussed above. In all, the State AGs have established all the requisite elements of standing, and they may bring suit under COPPA.

**B. The State AGs' COPPA claim is not barred by the statute of limitations or laches.**

Meta incorrectly claims that 28 U.S.C. § 1658, which establishes a four-year statute of limitations for actions arising under federal statutes, applies to the State AGs' COPPA claim. As described in the State AGs' Opposition, under the *nullum tempus occurrit regi* doctrine, "actions by government officials are not subject to state, or indeed any other, limitations periods" when suit is brought to vindicate public rights or interests, as here, unless there is "clear showing of congressional intent" that those periods apply. *S.E.C. v. Rind,* 991 F.2d 1486, 1491 (9th Cir. 1993). And even if a statute of limitations did apply, Meta's violations of COPPA continue into the present, such that the statute of limitations is tolled. *See Eichman v. Fotomat Corp.*, 880 F.2d 149, 169 (9th Cir. 1989).

Moreover, the parties' tolling agreement, which tolled claims as of December 20, 2021, covers the State AGs' COPPA claims. *See* State AGs' Opposition, Ex. 166, July 2022 Tolling Agreement at 1, and Ex. 80, Second Amendment to the Tolling Agreement at 1. Despite Meta's argument to the contrary, there is no dispute that COPPA is a "civil claim" under a "consumer protection law[]." State AGs' Opposition, Ex. 166; s*ee* 15 U.S.C. § 6502(c) (defining violation of COPPA regulations as an "unfair or deceptive act or practice"); *see also* Gooler Dec. Ex. C, https://www.ftc.gov/legal-library/browse/rules/childrens-online-privacy-protection-rule-coppa (the FTC's web page for the COPPA Rule is tagged "consumer protection"). There is also no dispute that the parties intended COPPA to be covered in this tolling agreement, as the initial investigative subpoena sent in this matter included questions specifically related to COPPA. *See* Ex. 1, Investigative Subpoena, Questions 2 and 3 (documents related to U13s on Meta's platforms). Thus, even assuming that § 1658 does apply to impose a four-year limitation period, the AGs can at least pursue claims dating back to December 20, 2017. This period encompasses Meta's conduct in violating COPPA, including its checkpointing and disabling of U13 accounts, its operation of the Instagram platform, and its use of U13 data in machine learning and generative AI model training.[2]

Likewise, laches cannot bar the State AGs from enforcing the law when suing in their sovereign capacity to protect the public interest. *See Washington v. GEO Grp., Inc.*, 2019 WL 2084463, at *3−4 (W.D. Wash. May 13, 2019), *adhered to on denial of reconsideration*, 2019 WL 2224932 (W.D. Wash. May 23, 2019). Even if laches were available in general against government enforcers, it is not applicable here. Because there is no applicable statute of limitations, Meta's argument that laches applies because some evidence predates the statute of limitations is incorrect.

---

[2] Meta points to the AGs' citation to evidence from before 2017, such as Instagram's terms of service and Meta employee rosters. *See* Meta's Opposition at 17. Yet reliance on specific pieces of evidence from outside a limitations period does not render the claim itself outside of the period. *See Newton v. Equilon Enters., LLC*, 411 F. Supp. 3d 856, 866−67 (N.D. Cal. 2019) (permitting evidence outside of the statute of limitations to support a continuing violation claim). Moreover, Meta took actions that constitute COPPA violations at issue in the State AGs' motion within the limitations period. That those actions and violations may have also occurred before 2017 may be relevant for penalty counting but is not grounds to grant summary judgment on the basis of the statute of limitations. *C.f. Rustico v. Intuitive Surgical, Inc.*, 424 F. Supp. 3d 720, 740 (N.D. Cal. 2019) (denying summary judgment when entirety of plaintiff's claims fell outside of statute of limitations).

Further, Meta has not offered evidence to support the elements of laches, including unreasonable delay and prejudice. *See Miller v. Glenn Miller Prods. Inc.*, 454 F.3d 975, 997 (9th Cir. 2006); *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 838 (9th Cir. 2002).

### C. Both Meta Platforms, Inc. and Instagram, LLC are operators of Instagram.

#### 1. Meta has failed to present any evidence establishing a material dispute of fact that Meta Platforms, Inc. is and has been an operator of Instagram since the acquisition of Instagram.

Meta concedes that Meta Platforms, Inc. ("Meta Platforms") is the current "operator" of Facebook and has been at all times relevant to this action. *See* Meta's Opposition to the State AGs' Motion for Partial Summary Judgment, ECF 2781 ("Meta's Opposition") at 19. It also concedes that Meta Platforms is the "operator" of Instagram, beginning at the latest on December 1, 2025. *See id.* at 19−20. Yet, without disputing the facts set forth in the State AGs' Motion, Meta baselessly contends that the State AGs have neither sought a ruling nor sufficiently proven that Meta Platforms was an operator of Instagram prior to that date. In fact, the State AGs clearly identified 2012 as the start of the relevant time period—with supporting evidence—no less than six times in their Motion. *See* State AGs' Motion at 2, 18−20. For its part, Meta has consistently identified "Meta Platforms, Inc." as the entity "responsible for the development and operations of Instagram" well before December 2025. *Id.*, Ex. 26, Meta Defs. Resp. & Objs. to Pls' R30(b)(6) Written Questions, July 25, 2024, at No. 48; *see also id.*, Ex. 7, Meta's Responses to FTC Civil Investigative Demand, March 14, 2022, META3047MDL-053-00012709 at -716. And it is indisputable that the collection of personal information has been fundamental to the core operations of both Facebook and Instagram since 2012. *See, e.g.,* Gooler Dec., Ex. A, Instagram, *Terms of Use* ("Providing our Service **requires collecting and using your information**. The Privacy Policy explains how we collect, use, and **share information across the Meta Products**. . . . You **must agree** to the Privacy Policy to use Instagram.") (emphasis added). Accordingly, Instagram's own Terms of Use (which have contained substantially identical language since April 2018) admit that Meta Platforms collects and maintains personal information acquired through the Instagram platform pursuant to "an agreement between [the user] and Meta Platforms, Inc." *See id.*; Gooler Dec. Ex. E,

https://web.archive.org/web/20180423111907/https://help.instagram.com/58106616 5581870/ (Apr 23, 2018).

Furthermore, because COPPA defines an "operator" as an entity that "operates a website . . . and . . . collects or maintains personal information from or about the users of or visitors to such website or online service, **or on whose behalf** such information is collected or maintained," 15 U.S.C. § 6501(2)(A) (emphasis added), Meta Platforms would be an operator even if it only collected data indirectly through affiliates or partners (such as Instagram, LLC). The State AGs' Motion cites numerous admissions that Facebook and Instagram are online platforms that collect extensive personal information from their users, both directly and through entities operating on their behalf, and share that information across organizational divisions. *See* State AGs' Motion at 15-17; Exhibit 2, Hartnett 30(b)(6) Dep. [hereinafter "Hartnett Dep."] 28:17−34:8, 59:13−60:18.[3] Accordingly, there is no dispute that Meta Platforms has collected personal information throughout the relevant period, in significant part via the websites and apps that were expressly operated by Instagram, LLC.

Indeed, the State AGs cited to undisputed evidence that Meta Platforms and its predecessor Facebook, Inc. collected and maintained extensive user information through and in concert with Instagram, LLC, thus causing both organizations to cleanly fit the plain meaning of a COPPA operator. *See* 15 U.S.C. § 6501(2)(A). Unified staff rosters and other employment records from 2015 onward show that most personnel responsible for the operation of Instagram, including all Instagram executives and dozens of employees assigned to the "DATA(Instagram)" and "Research(Instagram)" cost centers, were employed by Meta Platforms or Facebook, Inc. *See* State AG's Motion at 15−16, Ex. 30−37. Further, the contact email specified on the domain registration record for Instagram.com is a @fb.com address—the domain used by most of Meta Platforms' employees' for their primary email addresses—which establishes Meta Platforms' control over the website through which all users interacted with and submitted their personal information to the Instagram platform. *See id.*; State AG's Motion, Diaz Declaration, Ex. A, Instagram.com WHOIS

---

[3] This deposition was cited at Ex. 2 in the State AGs' Motion. This Reply adds additional testimony to respond to Meta's Opposition, which is provided in a new exhibit to the Reply.

info; *see also Chanel, Inc. v. US880*, 2011 WL 13244270, at *11 (N.D. Cal. July 5, 2011); *Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 579 (N.D. Cal. 1999) (using email address to tie alias to defendants). Thus, contrary to Meta's contentions, the State AGs have provided significant undisputed evidence of Meta Platform's operation of Instagram prior to 2025—and specifically its extensive processing of Instagram users' personal information.

Even in its Opposition, Meta concedes as much. Meta admits that Instagram's Head of Public Policy actually worked for Meta Platforms, not Instagram, LLC, in 2016. *See* Meta's Opposition at 25. Meta also expressly states that a companywide staff roster from 2015 refers "to Instagram the platform . . . which Meta Platforms (not Instagram, LLC) operates," and that "[t]he other documents the AGs cite . . . relate to the various ways in which *Meta Platforms* has worked on the Instagram platform." *Id*. Meta cannot credibly claim that Instagram had no independent existence outside of Meta Platforms since the platform was acquired in 2012, while simultaneously asserting that Meta Platforms did not operate the platform during this period.

### 2. Meta's argument that Instagram, LLC was not an operator of Instagram is similarly belied by extensive undisputed evidence.

The undisputed evidence shows that Instagram, LLC was an operator of the Instagram platform at all times since its acquisition in 2012. Instagram's 2018 Terms of Service (unchanged since 2013) identifies Instagram, LLC as the owner and operator of Instagram, and explicitly discusses data collection at length—meaning that Instagram, LLC expressly admitted it was an operator of Instagram from at least January 2013 to April 2018. *See* State AGs' Motion at 12–13, Ex. 27–28. Regardless of which entity collected personal information, at least during this period, it must have been collected "on behalf of" Instagram, LLC, the "owne[r] and controlle[r]" of Instagram. *Id.* Instagram, LLC has likewise owned the domain of the website through which Instagram users submit their information to the platform since 2012, and continues to do so to this day. *See* State AG's Motion, Diaz Declaration, Ex. A., Instagram.com WHOIS info (identifying Instagram, LLC, as the holder of the domain registration for the site); Gooler Dec. Ex. D, https://www.bigdomaindata.com/whois-history/instagram.com (showing that the same has been true since December 21, 2012). Additionally, Instagram, LLC has consistently employed staff

explicitly tasked with handling user data for research purposes, *see* State AG's Motion Ex. 33, META3047MDL-098-00035791, row 151, and these activities establish precisely the kind of "interest in the data collected" that the FTC determined makes an affiliate an "operator" pursuant to COPPA (a fact that Meta's selective quoting of the Federal Register omitted). *See* 64 Fed. Reg. 59891 (Nov. 3, 1999). Instagram, LLC's long-term ownership of the trademarks by which users know and recognize Instagram is thus only one of many pieces of undisputed evidence that it has played an essential role in the collection of personal information from Instagram users since its acquisition in 2012. *See* State AGs' Motion at 13, Gooler Dec. Ex. D−F and Ex. 29.

### 3. The evidence and law establish that Instagram, LLC and Meta Platforms are a common enterprise in the operation of Instagram.

The common enterprise doctrine provides an additional, independent basis for finding that Instagram, LLC is an operator under COPPA.

### a. Meta's legal arguments lack merit.

Meta first argues that the common enterprise doctrine cannot apply as a matter of statutory interpretation. As the Court has already noted, "a violation of the COPPA Rule 'shall be treated as a violation of a [FTC] rule defining an unfair or deceptive act or practice." ECF 1214 at 18 (quoting 15 U.S.C. § 6502(c)). And as the State AGs explained in their Motion, the common enterprise doctrine is commonly invoked in cases involving violations of FTC rules. *See* State AGs' Motion at 13–14. To avoid the inescapable result that the doctrine also applies to COPPA, Meta asserts, without explanation, that § 6502(c)'s language making this treatment "subject to . . . § 6505" (a provision granting the FTC enforcement authority over COPPA) somehow constrains the AGs' authority to invoke this well-established doctrine. But Meta cannot point to any language that actually imposes such a limit. *See* Meta's Opposition at 22–23. Meta points to COPPA's grant of enforcement authority to the State AGs in § 6404, but that section simply says that state AGs have the "authority to enforce compliance with [any FTC] regulation," placing no limitations on that authority or its potential targets. 15 U.S.C. § 6504. Similarly, § 6505 specifies that enforcement power is restricted to the FTC "except as otherwise provided [in] this chapter"— broadly inclusive phrasing that incorporates all other exceptions in the surrounding statutory

scheme, including § 6504. 15 U.S.C. § 6505(a); *c.f. id.* at § 6505(b)(5) (showing that Congress chose to limit the latter clause "except as provided in [a specific] section," while imposing no such limit on how § 6505(a) can be overridden); *see Murphy Co. v. Biden*, 65 F.4th 1122, 1140 (9th Cir. 2023) ("Under the canon of *generalia specialibus non derogant*, a 'narrow, precise, and specific' statutory provision is not overridden by another provision 'covering a more generalized spectrum' of issues." (cleaned up) (quoting *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153−54 (1976)).

Contrary to Meta's argument that the FTC rejected applying common enterprise liability as to COPPA, *see* Meta Opposition at 23, the FTC simply emphasized that affiliation must be assessed with respect to the data at issue rather than based on corporate form. As discussed above, from 2012 to 2018, Instagram, LLC was unambiguously identified as the operator of Instagram, both contractually through its Terms of Service and technically through website registration. *See supra* Section II.C.2. Accordingly, Meta's ability to collect user information via Instagram is heavily dependent on infrastructure maintained by Instagram, LLC—thus giving the latter a clear interest in the resulting data throughout the relevant time period.

Meta also asserts that courts' application of the common enterprise doctrine to claims under the Mortgage Assistance Relief Services Rule ("MARS") and the Commodity Exchange Act ("CEA") is irrelevant to COPPA. Meta glosses over the substance of these decisions, instead arguing generally that they should be disregarded because the relevant grants of authority to state AGs originated in "separate statutory provisions" that differed slightly in form—though not in substantive effect—from the grant of authority in COPPA. *See* Meta's Opposition at 23-24. But just as with COPPA, a violation of the MARS Rule "shall be treated as . . . a violation of a rule under section 18 of the Federal Trade Commission Act (15 U.S.C. § 57a) regarding unfair or deceptive acts or practices," *compare* 12 U.S.C. § 5538(a)(1) *with* 15 U.S.C. § 6504(a)(1), and the State AGs have the power to bring a cause of action to directly enforce the MARS Rule and COPPA. *Compare* 12 U.S.C. § 5538 (b)(1) *with* 15 U.S.C. § 6504(b)(1); *see also Consumer Fin. Prot. Bureau v. Gordon*, 819 F.3d 1179, 1192–93 nn.7–8 (9th Cir. 2016) ("[C]ourts generally interpret similar language in different statutes in a like manner when the two statutes address a similar subject

matter.") (internal citations omitted); *Consumer Fin. Prot. Bureau v. Think Fin., LLC*, No. CV-17-127-GF-BMM, 2018 WL 3707911, at *7 (D. Mont. Aug. 3, 2018) (applying that logic to extend "common enterprise" doctrine to Consumer Financial Protection Act enforcement actions). The CEA and MARS cases thus provide persuasive authority, rooted in closely analogous statutes, for the Court to apply the common enterprise doctrine here.[4]

### b. Meta has not raised a dispute of material fact regarding Meta Platforms' and Instagram, LLC's joint operation of Instagram.

Meta cannot genuinely dispute the application of common enterprise liability as a factual matter, because the evidence discussed in the State AGs Motion, pp. 13–18, and above, *supra* Section II.C.1, demonstrates Meta Platforms and Instagram, LLC's extensive pooling of assets, resources, and funds; joint ownership and management; and collective participation in the common venture operating the Instagram platform. *See FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142–43 (9th Cir. 2010). As discussed above, both Meta Platforms and Instagram, LLC play critical roles in collecting and maintaining data, including personal information collected from children. *See supra* Section II.C.1–2. Thus, both entities clearly exhibit the level of joint participation that Meta acknowledges to be the defining element of a common enterprise relationship. *See* Meta Opposition at 24.

### D. The State AGs are entitled to summary judgment regarding Meta's collection of personal information from users.

Partial summary judgment is appropriate on discrete factual issues and elements of a claim. "Rule 56(a) allows a court to enter summary judgment on . . . a 'part of each claim or defense.'" *Kanaan v. Yaqub*, 799 F. Supp. 3d 960, 964 (N.D. Cal. 2025). There is no dispute that Meta has collected personal information under COPPA for all users (logged out or in) from 2012 to the present. *See* Ex. 2, Harnett Dep. 28:17–34:8. The State AGs are entitled to partial summary

---

[4] Meta's cases do not change the analysis. *In re Amaranth Nat. Gas Commodities Litig.*, 612 F. Supp. 2d 376, 386 (S.D.N.Y. 2009) concerned claims brought by private individuals, and the same court noted in a prior order that common enterprise liability was routinely applied in cases brought by public regulatory entities. *See In re Amaranth Nat. Gas Commodities Litig.*, 587 F. Supp. 2d 513, 539 n. 162 (S.D.N.Y. 2008). And *Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016) has been criticized as being out of step with the prevailing rule. *See Think Fin., LLC*, 2018 WL 3707911, at *7; *Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, No. 15-CV-5211 (CM), 2016 WL 7188792, at *16 (S.D.N.Y. Dec. 2, 2016).

judgment because (1) the collection of this personal information is both an element of a COPPA claim and a material fact necessary for the State AGs' COPPA claim, and (2) Meta collects personal information as defined by COPPA and the COPPA Rule.

### 1. The collection of personal information is an element of a COPPA claim and a material fact that cannot be disputed by Meta.

The collection of personal information is both an element of COPPA and a material fact. As Meta concedes, for the State AGs to succeed on their COPPA claim, they must establish that Meta collects (or uses) data constituting personal information under COPPA. *See* Meta's Opposition at 27. Meta's collection of personal information from all users will satisfy that element on the State AGs' directed-at-children and actual knowledge theories and "affect the outcome of the suit under governing law." *See* Meta's Opposition at 28 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Since Meta collected personal information from all of its users, it must have collected personal information all child users. Partial summary judgment is appropriate on individual elements of a claim where, as here, there is no dispute of material fact. *See, e.g.*, *State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987).

### 2. Meta collects personal information as defined by COPPA and the COPPA Rule.

Meta never denies collecting the information discussed in the State AGs' Motion. Instead, it seeks to impermissibly narrow the definition of "personal information" in the COPPA statute, 15 U.S.C. § 6501(8), arguing that the FTC exceeded its authority in interpreting that definition in the COPPA Rule, *see* 16 C.F.R. § 312.2. However, the "personal information" that Meta collects unambiguously fits within the COPPA statute and Rule's definitions, the latter of which was properly promulgated.

Meta cites the COPPA statute and focuses on 15 U.S.C. § 6501(8)(F): "The term 'personal information' means individually identifiable information about an individual collected online, **including-- . . . (F) any other identifier that the Commission determines permits the physical or online contacting of a specific individual**." 15 U.S.C. § 6501(8) (emphasis added). It then reasons that subsection (F) prevents the FTC from including under the definition of "personal

information" anything that Meta believes would not "permit the physical or online contacting of a specific individual." *See* Meta's Opposition at 29−30.

But the Court need not even look to subsection (F) to conclude that the information at issue is "personal information." As Meta concedes, the COPPA statute defines "personal information" as individually identifiable information, "**including**" certain enumerated types of information, such as the information in subsection (F). The list is therefore not exhaustive and does not cap the types of information that may be considered "personal information" under COPPA. *See Nw. Ass'n of Indep. Sch. v. Labrador*, 165 F.4th 1243, 1255 (9th Cir. 2026) (reasoning the word "includes" does "not ordinarily introduce an exhaustive list"). Because the additional examples of personal information in the COPPA Rule constitute "individually identifiable information," the Court does not need to reach Meta's arguments regarding the FTC's authority to determine further categories pursuant to subsection (F).

But even if the Court looks to subsection (F), the State AGs still prevail. The FTC used this authorization to specify that "personal information" also includes: photographs, videos, or audio files with a child's image or voice; geolocation; biometric identifiers; persistent identifiers such as an IP address; and information collected online from a child combined with an identifier. 16 C.F.R. § 312.2(1)–(11). In creating these definitions, the FTC explained that photographs are "inherently personal" and may contain geolocation data or be paired with facial recognition technology that could permit physical or online contacting of an individual. 78 Fed. Reg. 3972, 3981 (Jan. 17, 2013). It reasoned similarly for video and audio. *Id.* It also explained that IP addresses associated with "other individually identifiable information," or "information about a child's hobbies or toys" associated with an identifier, "could be used to locate an individual either online or offline" and therefore fit within the statutory framework. 64 Fed. Reg. 59888, 59892 (Nov. 3, 1999).[5] The FTC

_____

[5] *See also* 89 Fed. Reg. 2034, 2043 (Jan. 11, 2024) (explaining that, based on the COPPA statute's examples of "individually identifiable information," including phone numbers, and home or email addresses, the definition necessarily is not limited to information that only permits contacting one specific person, and includes information that permits contacting a device, such as a home phone, that could be shared by multiple people in a home).

had the proper authority to define "personal information" as it did, and it relied on its specialized experience to determine that these categories of information permit the physical or online contacting of individuals. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

As described in the State AGs' Motion, the types of personal information Meta collected include those described both in the COPPA statute and Rule: email addresses (15 U.S.C. § 6501(8)(C); 16 C.F.R. § 312.2); phone numbers (15 U.S.C. § 6501(8)(D); 16 C.F.R. § 312.2(5)); images of a child's face (16 C.F.R. § 312.2(8)); the sound of a child's voice (16 C.F.R. § 312.2(8)); cookie IDs (16 C.F.R. § 312.2(7)); IP addresses (16 C.F.R. § 312.2(7)); information that the user provides on their profile, such as content created by the user (16 C.F.R. § 312.2(11)); and information that reflects the user's interactions on the platform, such as likes, the videos they watch, and who they interact with, which is stored with other identifiers (16 C.F.R. § 312.2(11)). *See* Ex. 2, Hartnett Dep.  28:17–34:8. Meta has collected some of these types of personal information since 2012 from users of Instagram and Facebook. *Id*. at 30:1–4.

Meta attempts to distract from the central question of whether Meta collects this personal information from all users. Regardless of whether Meta collects personal information pursuant to the definitions in the COPPA statute or the COPPA Rule, Meta does not deny that it collects such information.

### E. The State AGs are entitled to summary judgment on Meta's failure to provide COPPA's protections to any children on its platforms.

Meta argues that the State AGs' request for partial summary judgment on the element that Meta does not provide COPPA's required protections for children on Facebook or Instagram is premature. Despite the attempts to complicate this issue, there is no dispute of fact that Meta does not provide these protections, and establishing this now will streamline the trial. *See Kanaan*, 799 F. Supp. 3d at 964.

In particular, summary judgment on this element will simplify the more technical aspects of the COPPA claim for the factfinder, allowing them to focus on the key questions in dispute: whether Facebook and Instagram are directed to children, and whether Meta had actual knowledge of children under 13 on those platforms. This is not a request like in *Boden v. St. Elizabeth Med.*

*Ctr., Inc.*, 2018 WL 4855210, at *4 (E.D. Ky. Oct. 5, 2018), the only case to which Meta cites in support of its position that summary judgment is improper. Here, unlike in *Boden*, the State AGs are not arguing in the alternative, such that a decision on their Motion might be unnecessary. On the contrary, summary judgement on this element will save the factfinder from needing to hear evidence as to elements of COPPA that the parties do not genuinely dispute.

Meta also erroneously suggests that, upon learning that users are children, it could delete those children's data at some later point and never have to seek parental consent or provide notice, regardless of how Meta used the data in the meantime or how long it held on to it. *See* Meta's Opposition at 32. However, COPPA applies where the operator has "actual knowledge" that it is collecting or maintaining personal information from a child. COPPA's protections apply once the operator knows the user is U13, even if data was initially collected previously. *See* 16 C.F.R § 312.5(a)(1) (requiring parental consent "before any collection, **use**, or disclosure of personal information from children"). Meta continued using children's personal information to train its models even after determining those users were U13 and "disabling" their accounts. Meta retained this data up to 15 months, far longer than "reasonably necessary" for the purpose for which it was collected, and allowed it to be used for training its models in this period, failing to use "reasonable measures to protect against unauthorized . . . use of[] the information" or to "protect [its] confidentiality, security, and integrity." 16 C.F.R. §§ 312.10, 312.8. And in any event, there is no dispute of fact that Meta continued collecting personal information from users who had hard-linked and soft-matched accounts that Meta took no action against, even while disabling and eventually deleting other of the children's linked accounts. *See* State AGs' Motion, Section IV.B.1.c, IV.B.2. Meta has failed to dispute that it never sought or obtained parental consent or provided the required notice under COPPA, as it admitted in its responses to Requests for Admission 6, 18, and 19. *See* State AG's Motion, Ex. 24, 25.

Meta next argues that COPPA's data review and refusal requirements do not apply to it. It reasons that these obligations only attach when an operator has actual knowledge of users under 13 on its platform. Because it argues it does not have actual knowledge, it concludes that this element cannot be established. However, as discussed below, Meta's arguments on this point are unavailing.

*See infra* Sections II.F.2–4. And regardless, establishing this now will streamline the trial, including if Meta's platforms are found to be directed to children. *See Kanaan*, 799 F. Supp. 3d at 964.

Meta also takes issue with the State AGs' citation to its RFA responses Nos. 7, 20, and 21.[6] But Meta's impermissible and halfhearted attempt to amend its admissions with respect to these protections fails. Meta cites to "amended" RFA responses it served just four days before the deadline for the State AGs' Motion for Partial Summary Judgment and well outside the end of fact discovery. The State AGs relied on the previous responses (Exhibits 24 and 25 to the State AGs' Motion), which were served in February and May 2025, in shaping discovery and to prepare their Motion. Meta cannot unilaterally amend or withdraw its admissions. Such a change requires leave of court "on motion," Fed. R. Civ. P. 36(b), and Meta has never made such a motion or sought a stipulation. In any case, its "amended" responses simply add even more objections and qualifiers to distract from the direct answer that Meta does not provide these specific protections.

Regardless, even if Meta were permitted to amend its RFA responses, it still has not pointed to any admissible evidence that it has provided COPPA's protections to any children on its platforms. Nor could it do so, since that position would contradict its RFA responses, which conclusively establish that it did not provide these protections. This failure only emphasizes the necessity of summary judgment on this issue. The Court should not countenance Meta's attempt to confuse the factfinder and make what is simple seem complicated. Summary judgment will streamline the issues by alleviating the need to prove the negative that Meta has already admitted.[7]

---

[6] Meta did not challenge or attempt to amend the other RFA responses cited in the State AGs' Motion at Nos. 6, 18, and 19, regarding verifiable parental consent and clear and comprehensive notice to parents.

[7] Meta also argues that because the State AGs are not seeking summary judgment on a directed to children theory, they cannot seek summary judgment on these elements based on that theory. This is incorrect. The State AGs' Motion moved for summary judgment on these elements for the entirety of their COPPA claim, including based on both directed to children and actual knowledge theories. *See* State AGs' Motion at 11-20.

**F. Summary judgment should be granted on Meta's liability for its use of children's personal information to train its machine learning and generative AI models.**

**1. Meta was on notice of this claim.**

Meta argues that the State AGs should be precluded from making this argument at the summary judgment stage. However, this claim was timely raised. The State AGs' Complaint includes references to training Meta's models on user data. Compl. at ¶¶ 165–175. The Complaint describes Meta's use of young users' "personal data to train its recommendation algorithms" (¶ 175), and alleges that Meta uses the personal information of children under 13 (¶ 852) without complying with COPPA, *see id.* at ¶¶ 165–175, 852, 855 ("Meta has failed to obtain verifiable parental consent prior to collecting or using any personal information of children, in violation of Section 312.5 of the COPPA Rule, 16 C.F.R. § 312.5.").

The State AGs discovered specific evidence supporting this theory in a 30(b)(6) deposition on June 26, 2025. *See* Ex. 12. On August 29, 2025, Meta provided an errata sheet that substantially changed much of the relevant testimony on this issue. *See* Ex. 11, Backstrom Errata. In response, on October 6, 2025, the State AGs served amended responses to Meta's contention interrogatory describing Meta's use of children's personal information to train its machine learning and generative AI models. *See* Ex. 14, State AGs' Amended Responses at 6–10.

*Pickern v. Pier 1 Imports* is inapposite. There, a plaintiff pleaded an ADA claim but did not specify which barriers they were alleging until their summary judgment opposition, and did not provide timely notice of the alleged barriers in another form. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006); *see also Successor Agency to Former Emeryville Redevelopment Agency & City of Emeryville v. Swagelok Co.*, 2023 WL 3805256, at *14 (N.D. Cal. June 1, 2023) (noting that courts can consider new theories at summary judgment where defendants are on notice and moving party does not introduce new facts or claims).

A party may proceed on a different theory of liability, even one not alleged in the complaint, if the party "make[s] known during discovery their intention to pursue recovery on the" theory. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000). Here, even though the theory was included in the Complaint, the State AGs also promptly provided notice in a supplemental

interrogatory response detailing examples of situations in which Meta had actual knowledge it was collecting personal information from children after the State AGs discovered these specific facts. They also put Meta on notice that these were issues in the case since at least January 10, 2025, when they served a 30(b)(6) notice requesting testimony on Meta's "[u]se[ of] personal information, information derived from personal information, or other data collected from Child or Teen Users in training or developing algorithms or models," and an RFA on February 14, 2025 requesting that Meta admit that it does not check whether it has used children's data to train its models when it discovers them and deletes their accounts. *See* Ex. 3, State AGs 30(b)(6) Notice, Topic 4(h); Ex. 4, State AGs' First Set of Requests for Admissions, Request No. 17.

Courts routinely reject arguments based on *Pickern* and related ADA cases when notice of the factual theory is provided through discovery. *See Pesci v. McDonald*,  2015 WL 12672094, at *11 (C.D. Cal. Oct. 22, 2015) (notice provided in an interrogatory response and deposition); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 2012 WL 6708866, at *3 (N.D. Cal. Dec. 26, 2012), *aff'd*, 637 F. App'x 981 (9th Cir. 2016). While the State AGs used information learned in discovery to provide more specific details in its Motion for Partial Summary Judgment, Meta was on notice of this claim long before that filing. This claim is timely.

### 2. Meta's actual knowledge standard is not supported by law.

Meta has not raised a dispute of material fact regarding its actual knowledge of certain children on its platforms. Actual knowledge does not, as Meta's arguments demand, require that a plaintiff prove a defendant's knowledge to a 100% certainty. *See Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043, 1054 (9th Cir. 2020). Meta's arguments are also at odds with FTC guidance. The FTC has explained, for example, that "actual knowledge will be present where an operator learns of a child's age or grade from the child's registration at the site or from a concerned parent who has learned that his child is participating at the site." *Children's Online Privacy Protection Rule*, 64 Fed. Reg. 59888, 59892 (Nov. 3, 1999). Likewise, "operators may acquire actual knowledge that they are dealing with children under 13" where they ask "age identifying" questions that "do not directly ask age or grade." *Id*. Meta, prior to this litigation, agreed with this guidance: in a comment to the FTC's 2012 COPPA rulemaking, the company acknowledged that it obtains

actual knowledge of the age of users based on information entered as part of account creation. *See* Gooler Dec. Ex. A*, Erin M. Egan, *RE: COPPA Rule Review, 16 CFR Part 312, Project No. P104503* at 12, FTC.gov, https://www.ftc.gov/os/comments/copparulereview2012/561789-00100-84302.pdf. Meta now appears to argue that in such circumstances it would not have actual knowledge because it cannot know **without a doubt** the user is under 13. However, this reliance on a mere theoretical possibility that a user is 13 or older—a possibility that will be present in the online context for essentially **all** users who do not have an independent, offline relationship with the operator—would undermine the entire concept of actual knowledge in COPPA.

Finally, contrary to Meta's position, actual knowledge does not require a human being at the company to see some piece of data. An interpretation of a statute that would produce an absurd result should be rejected. *See United States v. Brown*, 333 U.S. 18, 27 (1948). Meta's apparent interpretation—that, even though COPPA's scope is limited to online services, which function mostly autonomously, an operator's human employee must actually see and believe the relevant data showing that a user is U13, even when the user has entered their age in a form specifically provided by the operator for registering users' ages—is unsupportable.

Meta's arguments also cannot be squared with how courts treat the actual knowledge standard. Indeed, courts routinely hold that actual knowledge does not require the kind of complete or unqualified certainty Meta demands. *See, e.g., U.S. ex rel. Schutte v. SuperValu, Inc.* 598 U.S. 739, 751 (2023) ("'A defendant can have 'actual knowledge' that a condition is material without the Government expressly calling it a condition of payment.'") (*quoting Universal Health Servs., Inc. v. U.S.*, 579 U.S. 176, 191 (2016)); *Swanger v. Warrior Run School Dist.*, 346 F.Supp.3d 689, 705 (M.D. Penn. 2018) ("actual knowledge does not require absolute certainty that harassment has occurred"); *Rockwell Intern. Corp. v. SDL, Inc.*, 103 F.Supp.2d 1192, 1197 (N.D. Cal. 2000) (explaining that showing actual knowledge of infringement requires "more than a mere suspicion but less than absolute assurance"); *In re Robbins*, 91 B.R. 879, 886 (W.D. Mo. 1988) (actual knowledge "is not necessarily absolute certainty"); *see also U.S. v. Jewell*, 532 F.2d 697, 706 n.6 (9th Cir. 1976) (Kennedy, J., dissenting) ("The use of the term 'actual knowledge' in this manner is misleading in suggesting the possibility of achieving a state of total certainty, and that only such

knowledge is 'actual.' In fact, we commonly act on less than complete information and in this world may never know one-hundred-percent certainty.").

Meta cites *Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983) to argue that to prove an operator's "actual knowledge" that it is collecting personal information from a U13, the operator must in fact be doing so: one cannot "know" a fact that is not true. *See* Meta's Opposition at 37. However, *Harrison* never mentions "actual knowledge" or COPPA. Instead, it dealt with a complicated medical negligence claim where plaintiff sought advice from a number of providers but was unable to determine the cause of her medical issue. *See Harrison* at 1024–27. Nor does *Gates v. MCT Grp.*, 93 F. Supp. 3d 1182, 1189 (S.D. Cal. 2015) support Meta's position. *Gates* did not apply an "actual knowledge" standard, and its passing reference to whether one can know something that is not true, after acknowledging that "knowledge is irrelevant," was dicta. *Gates*, at 1189. Neither case supports the proposition that if some hypothetical portion of users whose accounts Meta has checkpointed and disabled for being under 13 might theoretically have been adults, this somehow negates Meta's actual knowledge of the hundreds of thousands of users whose accounts it has disabled for being underage.

### 3. Meta acquires actual knowledge of certain U13 users.

The State AGs' Motion cites four specific categories of U13 users of which Meta has actual knowledge of their age. Meta has not raised a dispute of material fact regarding its actual knowledge regarding any of these categories:

- **Users whose accounts Meta checkpoints or disables after the user changes their date of birth to an age under 13; and users whose accounts Meta disables for being underage, including after the user provides an identification document showing they are under 13.**

For these categories, Meta suggests that ████████████████████████████ ██████████████████████████████████ as a reason why it does not have actual knowledge that these users—who have admitted they are children—are U13, even after the users have failed to appeal the checkpoint, such as by providing an ID confirming their age under 13. Meta's evidence fails to create a material dispute of fact. Meta presents no evidence that any users, much less a significant number, who ████████████████████ Meta Ex. 6 at 22, ████████

███████████████████████████████████ at all times in the six years since Meta started checkpointing users for changing their date of birth in early 2020. The 2025 document Meta cites discusses this suspicion as a "recent[] f[i]nd[ing]" and says that the "[l]ength of time this has been going on is unclear." Meta's Opposition at 38-39 (citing Meta Ex. 6 at 22). And the only other evidence it cites is a document that on its face does not say what Meta claims. *See* Meta's Opposition at 39 (citing Meta Ex. 11). That document says nothing about ████████████. Instead, it notes that Meta had discovered, and resolved in 2022, a vulnerability where a ████████████████████████████████████████████████ ████████████ Meta Ex. 11 (emphasis added). The document does not say that ████████ ████████████████████████████████████████████████, a separate process that triggers human review before checkpointing. This is insufficient to create a genuine dispute of fact that Meta had actual knowledge of the hundreds of thousands of users who admitted to Meta that they were under 13.

The Court should disregard a version of the facts that is unreasonable. If a party's "denial of knowledge is 'blatantly contradicted by the record,' 'a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" *Intel Corporation Investment Policy Committee v. Sulyma*, 589 U.S. 178, 190 (2020). While Meta has actual knowledge when the user tells it that they are under 13, that knowledge could be later dispelled if Meta learns the user was not a child, such as by showing that the age disclosure ████████████████ ████ But the ████████████████████████████████████ cannot result in operators being able to ignore all disclosures of U13 age. Moreover, Meta provides no explanation how the provision of an ID showing the user is U13 could be ████████████████████████.

In its comment to the FTC, *see supra* at 18-19, Meta concedes that it obtains actual knowledge of the age of users based on information entered as part of account creation. *See* Gooler Dec., Ex. A.  Meta relies on stated age to determine that visitors are **not** children and allow them

on its platform. *See* Meta's Opposition at 38 n. 21.[8] Meta cannot have it both ways, claiming that age disclosures provide the company with knowledge only when it serves them.

- **Users whose accounts Meta checkpoints or disables when Meta's human reviewers discover the user admits they are** ███████████████████████████ ███████████████████████████████

For this category, Meta also focuses on the rare exception to the rule, and does not put forward facts that dispute the State AGs' recounting of Meta's review process, through which it becomes aware of numerous users who blatantly admit ██████████████ that they are U13 or ████████████████████████████████████. As described in the State AGs' Motion, Meta's human reviewers review a subset of accounts reported to be U13, in order to determine if the user has admitted their age ██████████████ (on Instagram only), or if █████████ ████████████████████. *See* State AGs' Motion at 3, Ex. 8, Hartnett Dep. Ex. 6, at 4–5; Ex. 7, Meta's Responses to FTC Civil Investigative Demand, META3047MDL-053-00012709 at –719-720. For example, under Meta's policies, if a ██████ ████████████████████████████████████ Meta's reviewer will checkpoint that user. *See* State AGs' Motion at Ex. 7, -720. Meta offers no argument why, in such cases, it has not obtained actual knowledge of the user's age.

In short, a user's self-reported age ██████████ or Meta's determination that the ██████ ██████ that they are under 13—pursuant to a policy that required that, depending on the time period, ████████████████████████████████████ ████████████████████████—provides Meta "awareness" and "understanding" that the user is under 13. *See* Ex. 2, Hartnett Dep. 184:18–186:8, 189:23–194:25; *SuperValu Inc.*, 598 U.S. at 751. This commonsense conclusion is consistent with FTC guidance on this issue. *See* State AGs' Motion for Partial Summary Judgment, Gooler Declaration, Ex. J, FTC, Complying with COPPA: Frequently Asked Questions, FAQ H-6 ("[Y]ou may be

---

[8] The COPPA Rule also emphasizes the importance of underage admissions in detecting children. Mixed audience sites may not collect user data "prior to collecting age information or using another means that is reasonably calculated, in light of available technology, to determine whether the visitor is a child." 16 CFR § 312.2.

considered to have actual knowledge where a child announces her age under certain circumstances, for example, if you monitor user posts.").

- **Users whose accounts are hard-linked or soft-matched to a checkpointed or disabled account.**

For users whose accounts are hard-linked or soft-matched to a checkpointed or disabled account, Meta recycles its arguments for the above categories, which are incorrect for the reasons discussed above. Because Meta does have actual knowledge of the age of these categories of users, it necessarily follows that Meta also has actual knowledge regarding the hard-linked and soft-matched accounts connected to those checkpointed and disabled accounts.

Meta does not provide any contrary evidence that raises a genuine dispute of material fact. None of the documents it cites show that any accounts that were hard-linked to accounts that were checkpointed and disabled for being under 13 actually belonged to anyone other than the same users. Instead, it cites documents showing that ████████████████ who decide to *unlink* accounts claim to do so ████████████████████████████████████. *See* Meta's Opposition at 42–43. The cited evidence does not show how many users unlink accounts at all, much less for this particular reason. Nor does it show how many users hard-link their accounts to other people's accounts and keep them linked. The other documents are similarly unavailing. *See* Meta's Opposition at Ex. 17 (describing users, mostly from India, who had different ages on their hard-linked accounts that they needed to reconcile, and noting that these different ages "may or may not be evasion attempts" from Meta's restrictions on 13–15 year old accounts, and that "[i]t is possible that users do not understand the implications and consequences of age selection during account linking"); *id.* at Ex. 18 (describing evidence on "[h]ow many parents (in the US) might *potentially* be hardlinking their own accounts to their *teen*'s accounts") (emphasis added). Neither of these documents create a genuine dispute about whether hard-linked accounts are in fact controlled by the same child.

Meta itself recognizes that users telling Meta which accounts belong to them through hard-linking provides the company with knowledge that the user controls those accounts. *See* State AGs' Motion at Ex. 9, META3047MDL-155-00009593. In particular, Meta's subject matter expert on

cross-platform underage enforcement—with whom Meta's 30(b)(6) witness Allison Hartnett consulted for her testimony—admitted that accounts hard-linked to accounts that were disabled for being under 13 "are accounts that we *know* to be owned by underage users." *See* State AGs Motion at Hartnett Dep. Ex. 6 at 6–8; Ex. 9, META3047MDL-155-00009593; Ex. 2, Hartnett Dep. 214:20–221:9. According to Meta's subject matter expert, beginning to disable these hard-linked accounts in December 2021 was "an important part of . . . having defendable efforts," noting that "if we know that a user is underage and they've also **explicitly admitted to owning several accounts by hardlinking them** via the account centre, we must enforce on all of them, not just the account that's been reviewed." State AGs Motion at Ex. 9, META3047MDL-155-00009593 (emphasis added).

With respect to soft-matching, as Meta confirms, Meta's Opposition at 43, Meta's models can and do predict the common owner of multiple accounts with high levels of precision. Meta relies on the awareness provided by these "integrity" models in the most high-stakes situations, for example, to disable multiple accounts belonging to users it has determined violated its policies against child safety, frauds, scams, or terrorism. *See* State AGs' Motion at Ex. 2, Harnett Dep. 296:12–297:5. Meta cannot explain why these models, which provide a 99% or higher probability that two accounts belong to the same user, do not provide it with actual knowledge that the accounts belong to the same user. Instead, Meta misrepresents the record by pointing to the lower precision of certain models that it uses in other situations, **not** the integrity models that the State AGs' experts used for their analysis of U13 users on Meta's platforms. *See* Meta's Opposition at 43 (citing Meta Opposition Ex. 6 at 13) (discussing the accuracy of soft-matching models used for providing numbers of people with accounts across Meta's platforms).[9] Meta's data from a recent three-month period show that it predicts tens of thousands of accounts belong to users who also have an account that Meta has disabled for being underage using its high-precision integrity models. *See* Ex. 17,

---

[9] Ms. Hartnett testified that this section of her notes, which Meta cites here, was from a conversation with an employee about "family metric reporting" (Meta's public reporting of the number of people with accounts across Meta's "family" of apps), but then mistakenly suggested that there was just a single soft-matching model used for both that analytics function as well as integrity. *See* Ex. 2, Hartnett Dep. 232:17–233:23; *see also id.*, Hartnett Dep. 222:14–21. Ms. Hartnett clarified the next day that after speaking with the subject matter experts on soft-matching again, in fact Meta uses different integrity models and analytic models. *See id.*, Hartnett Dep. 290:18-292:11.

Corrected Expert Report of Patrick McDaniel at 172–81; Ex. 5, Sheatsley Rpt. at [109–118]; *see also* Ex. 17, Corrected McDaniel Rpt. at 209-10; Ex. 5, Sheatsley Rpt. at 40-41 (discussing use of integrity model data for analysis); Ex. 15, Blanaru 30(b)(6) Dep. 17:6-21; Ex. 16, Blanaru 30(b)(6) Dep. Ex. 1 at 2 (listing productions from Meta's soft-matching integrity models that were used in expert analysis). Meta cannot claim that the same models provide enough awareness of which accounts belong to the same user to disable accounts belonging to scammers, but also claim, without evidence, that those models are meaningless when it comes to which accounts belong to U13 users.

### 4. Meta does not dispute that actual knowledge includes willful blindness.

Finally, Meta argues that it has no duty to investigate the age of its users. This is a strawman argument—the doctrine of willful blindness simply holds that "persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts" and are in any event "just as culpable as those who have actual knowledge." *Glob. Tech Appliances*, Inc., v. Seb S.A., 563 U.S. 754, 766 (2011). The parties agree that willful blindness can establish actual knowledge under COPPA, and that there are two requirements to show willful blindness: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id*. at 769; *see* Meta's Opposition at 44.

Meta fails to create a genuine dispute that it was, at a minimum, willfully blind to certain child users on its platforms. It contends that it subjectively believed that hard-linked and soft-matched accounts "did not **necessarily** belong to the same users and . . . that those users were not **necessarily** [children]." *See* Meta's Opposition at 44 (emphasis shifted). Even if the Court were to credit that representation of its belief, that is not inconsistent with its belief that hard-linked and soft-matched accounts had a "high probability" of belonging to children. Moreover, to dispute this point, Meta points only to the testimony of its 30(b)(6) witness, Ms. Hartnett, claiming that a reasonable fact finder could credit her testimony (because she prepared to testify on behalf of the company by consulting with subject matter experts) over the beliefs expressed by "employees on certain documents." Meta's Opposition at 44. Meta neglects to mention that some of those

documents were authored by one of the very experts that Meta claims Ms. Hartnett's testimony is based on. *See* State AG's Motion at Ex. 2, Hartnett Dep. 214:20–221:9; Ex. 9 META3047MDL-155-00009593. Nor do Ms. Hartnett's notes of her conversations with those experts, to which Meta also points, include anything that would contradict its belief that accounts hard-linked and soft-matched (using its integrity models) to accounts detected as belonging to underage users have a "high probability" of belonging to those same users. Meta's Opposition at 44 (citing Hartnett Ex. 6 at 6–8, 10–13).

Meta also took deliberate steps to avoid learning the age of these accounts' users. It deliberately "deprioritized u13 enforcement," failing to consistently enforce on hard-linked underage accounts for more than a year after a September 2020 warning. State AGs' Motion at 25 (quoting Ex. 43, META3047MDL-034-00455332 at –5338). Nor did it have its U13 reviewers assess whether linked accounts belonged to the same U13 user. *See* Ex. 2, Hartnett Dep. 202:6–204:7. Efforts to understand why users in general might *un*link their accounts, or stray findings potentially suggesting that some parents might have linked their accounts to their teen children, Meta's Opposition at 44–45, are not efforts to determine whether accounts that are hard-linked or soft-matched to underage users belong to those users. Meta did not simply avoid learning whether linked accounts belong to the same users—it **knew** they did, but avoided using or consulting that data to disable underage accounts, even while at the same time it used the same data to disable accounts found to have violated other policies. *See* Ex. 2, Hartnett Dep. 296:12-297:16; State AG's Motion, Ex. 41, META3047MDL-146-00072994 at -72995-96 (describing hard-link and soft-match enforcements for various violations other than underage accounts).

Meta's argument about its failure to use its soft-matching data to identify and disable multiple accounts belonging to underage users also fails to create a material dispute of fact. Meta's Opposition at 45. Ms. Hartnett testified, based on her conversation with the relevant subject matter expert, that Meta considered using soft-matching to enforce its underage policies, but she **did not know** why they decided not to. See Ex. 2, Hartnett Dep. 236:17–237:2. In any event, even on its own merits, Meta's discussion of the potential for false positives from soft-match enforcement says nothing about why Meta decided not to even review accounts that its integrity models predicted

with high probability to belong to the same users as accounts it had already disabled for belonging to U13s.

### 5.  Meta's training of machine learning and generative AI tools violates COPPA.

Meta concedes that FTC regulations and longstanding guidance prohibit the continued use of personal information from children once the operator obtains actual knowledge that it was collected from a child under 13. *See* Meta's Opposition at 14. However, it wrongly argues that the FTC exceeded its authority in imposing obligations for operators that "maintain" personal information from children, where it obtains actual knowledge of their age only after collecting that information. *See* Meta's Opposition at 50–51.

### a.  The COPPA statute prohibits the continued use of personal  information that was collected prior to obtaining actual knowledge of an underage user.

Meta argues that the COPPA statute does not authorize regulations as to the use of a child's personal information that was collected prior to obtaining actual knowledge that the user was U13. *See* Meta's Opposition at 46–48.  This interpretation does not follow from the text of the statute.

COPPA requires the FTC to regulate the use of personal information collected from children, not just the collection of the information itself. The title of the statutory section granting the FTC regulatory authority specifically refers to the "[r]egulation of unfair and deceptive acts and practices in connection with collection **and use** of personal information from and about children on the Internet." 15 USC § 6502 (emphasis added); *see also Merit Mgmt. Grp., LP v. FTI Consulting, Inc.,* 583 U.S. 366, 380 (2018) ("Although section headings cannot limit the plain meaning of a statutory text, they supply cues as to what Congress intended.") (internal citations omitted). And COPPA's legislative intent included goals that were not limited to regulating personal information at the time of collection, such as enhancing parental involvement in children's online activities to protect "the privacy of children in the online environment" and enhancing "parental involvement to help protect the safety of children in online fora." 144 Cong. Rec. 12787 (1998) (statement of Sen. Bryan).

Further, COPPA specifically directs the FTC to issue regulations that regulate the use of information by operators after it is collected, including, for example, requiring "the opportunity at

any time" for parents "to refuse to permit the operator's further use or maintenance in retrievable form . . . of personal information from that child." 15 USC § 6502(b)(1)(B)(ii). This provision has no requirement that the operator have actual knowledge of the user's age at the time the personal information was collected. The statute's prohibition of "collect[ing] personal information from a child in a manner that violates the regulations," 15 USC § 6502(a)(1), must therefore be read, in the context of these provisions, to encompass failing to comply with regulatory duties concerning the already-collected personal information of children. In contrast, reading § 6502(a) as Meta urges, to limit COPPA's obligations to users known to be children at the moment of collection, would permit an operator to, despite learning that a user is a child, freely use that child's previously collected personal information for sale or any other purpose. This reading would be contrary to the purpose of COPPA, and should be disregarded, even if—as is not the case here—the statute's language otherwise supported Meta's position. *See In re Shoup*, 290 B.R. 768, 774 (Bankr. C.D. Cal. 2003), *aff'd*, 307 B.R. 164 (C.D. Cal. 2004) ("[A] court may look beyond unambiguous statutory text and consider other evidence of intent if a literal interpretation leads to a result that is absurd or contrary to legislative intent.").

Moreover, COPPA defines "operators" to "mean[] any person who operates a website located on the Internet or an online service and who collects **or maintains** personal information from or about the users of or visitors to such website or online service, or on whose behalf such information is collected **or maintained**." 15 USC § 6501(1)(a) (emphasis added). If COPPA only authorized regulation of the initial collection of personal information from children, rather than what online services did with that information after it was collected, there would be no reason to include services that merely "maintain[] personal information" in the definition of "operator." Meta's interpretation renders "or maintains" meaningless surplusage. *See, e.g.*, *Nat'l Ass'n of Mfrs. v. Dep't of Def*, 583 U.S. 109, 127 (2018).

Meta's reading of the statute is also at odds with the FTC's reasoned interpretation dating back to the earliest days of the regulatory scheme. In the 1999 Statement of Basis and Purpose for the first COPPA Rule, the FTC found that "because the Act required parental consent prior to any collection, use, and/or disclosure, the parental consent requirement applied to the subsequent use

or disclosure of information already in possession of an operator as of the effective date of the proposed Rule." *See* 64 Fed. Reg. 59898 (Nov. 3, 1999), Gooler Declaration, Ex. B, https://www.govinfo.gov/content/pkg/FR-1999-11-03/html/99-27740.htm. The FTC's guidance that operators who later obtain actual knowledge that a user is a child must either comply (i.e., obtain parental consent) or delete the child's data is entitled to both *Skidmore* and *Auer* deference. *See Skidmore,* 323 U.S. at 140 (providing for deference to agency's interpretation of statutes); *Auer v. Robbins*, 519 U.S. 452, 457 (1997) (providing for deference to agency interpretation based on a permissible construction of the statute where Congress has not "directly spoken to the precise question at issue"). The Court should not disturb the FTC's reasoned and well-supported consideration of these issues.

### b. The FTC provided sufficient notice when it promulgated the COPPA Rule.

Meta next argues that the FTC's "adoption of the 'maintaining' provision was procedurally defective under both the Administrative Procedure Act ('APA') and the Due Process clause." *See* Meta's Opposition at 48. Meta's procedural argument is untimely: under the APA, Meta must bring any challenges as to deficiencies with the FTC's rulemaking process within six years of when the company obtained "a complete and present cause of action," and is too late to do so now. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 810–811 (2024) (internal quotation omitted). Meta's argument is also moot: the FTC has engaged in additional rulemakings and amended COPPA over the decades, and Meta does not argue that it was deprived of notice as to this provision on any subsequent rulemaking. *See M.W. by & Through Hope W. v. United States Dep't of Army*, 2017 WL 10456732, at *5 (N.D. Cal. Dec. 15, 2017) (holding that a challenge to a regulation is moot when the government "changes or repeals the regulation at issue").

The rulemaking was also permissible: unlike the cases Meta cites, the changed language between the Notice of Proposed Rulemaking ("NPRM") and the final rule was a logical outgrowth of the NPRM, which contemplated obligations around the maintenance of personal information of children without requiring knowledge of their age at the time of collection. *See* 64 Fed. Reg. 22750, 22758 (April 27, 1999) (proposing 16 C.F.R. § 312.8's obligations that "the

operator must establish and maintain reasonable procedures to protect the confidentiality, security, and integrity of personal information collected from children"); *Nat. Res. Def. Council, Inc. v. U.S. E.P.A.*, 863 F.2d 1420, 1429 (9th Cir. 1988) (holding that a final rule can deviate from a proposed rule where it is a "logical outgrowth" from the proposed rule, based on whether "interested parties reasonably could have anticipated the final rulemaking from the draft").

### c. The FTC Rule's provision including "maintain" is proper.

Meta's substantive challenge is impermissible, as it has not joined the federal government as a party. *Embrex, Inc. v. Serv. Eng'g Corp.*, 1998 WL 35235446, at *7 (E.D.N.C. June 23, 1998) ("Pursuant to 5 U.S.C. § 703, any challenge to the actions of an agency of the United States requires that agency's participation."); *Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015), *as amended on denial of reh'g* (July 8, 2015) (denying a challenge to agency decisions because defendant has "not brought an APA action in this case, nor has it joined the United States, the Secretary of the Interior, or any other federal government official").

Even if the Court allows these arguments to proceed, Meta's substantive arguments are unavailing. *See supra* at II.F.5.a. Meta's cases concern regulations that exceed expressly limited grants of authority, *see* Meta's Opposition at 50–51, which is inapposite to the operative language and statutory intent here. As discussed above, under Meta's interpretation of COPPA, it can continue to maintain, use, disclose to others, or even sell the personal information of children, **after** it discovers a user is a child, without permitting parents the right to delete that information and without complying with COPPA's data security requirements. This narrow interpretation directly contradicts the language and purpose of COPPA, and should be rejected.

### 6. Meta trains its machine learning and generative AI models on personal information.

Meta again argues that the FTC's definition of "personal information" is impermissibly broad. That argument is incorrect, for the reasons discussed above. *See supra* at II.D. Meta then contends that even if the FTC's definition is used, the State AGs have not shown as a matter of undisputed fact that Meta trains its models on these types of data. This argument must also fail. The

State AGs' Motion included four categories of personal information used in Meta's machine learning and generative AI models:

- **Photos and videos, including selfies, for generative AI and machine learning models.**

It is uncontroverted that Meta uses photos and videos of its users in training its models. Meta uses publicly shared photos (including selfies), videos, and text on Instagram and Facebook to train its generative AI models. *See* Ex. 12, Backstrom 30(b)(6) Dep. 36:19-39:25. The scale of the data used to train the model is massive. See *id*. at Backstrom Dep. 36:13-17 ("I don't know exactly how many [images], but I would not be surprised if it was in the billions."). Meta's Chief Product Officer, Chris Cox, confirmed that the reason Meta's photo generation model produces "really amazing quality images" is because "Instagram is the dataset that was used to train it," a "great repositor[y] of incredible imagery" including photos of people. *See* State AGs' Motion for Partial Summary Judgment, Gooler Dec. Ex. L. Meta offers nothing to dispute this evidence.

For the machine learning models, Mr. Backstrom testified that feed ranking models are trained on data from users' feeds, which include a variety of posts, including photos and videos. *See* Ex. 13, Backtrom Dep. (Dec. 10, 2025) 111:19-113:19. He clarified that Meta's models train mostly on the metadata of the posts, but that they also use the raw pixels for some of the models that feed into ranking. *Id*. These models take the pixels of a photo and then try to predict the topic of the photo. *Id.* While Meta claims that pixel data is not used in a myopic slice of the feed-ranking process, the evidence Meta cites shows that pixel data is used in the broader ranking process. Meta's assertion to the contrary—that Meta's models do **not** train on pixel data—is flatly contradicted by the very evidence it cites and should thus be disregarded.

- **User behavior, interests derived from user behavior, and other user characteristics (age, gender), used in combination with user IDs.**

There is no dispute that Meta uses user behavior, interests derived from user behavior, and other user characteristics such as age and gender, indexed to user IDs, in its models, and Meta does not argue otherwise in its Opposition. Meta's argument about whether the models train on User IDs themselves creates, at most, an immaterial dispute of fact. *See* Meta's Opposition at 52 (citing Backstrom depositions); *but see* State AG's Motion at 6 (citing Ex. 19, META3047MDL-014-

00405380 at –386–87) (listing "UserID" as the first piece of training data). Mr. Backstrom conceded that IDs are used to retrieve individual users' historical interactions, such as the number of likes a user has given to another user, including to power its "feed ranking models." *See* Ex. 13, Backstrom Dep. (Dec. 10, 2025) 113:7–114:12; 116:16–117:10. There is no dispute, therefore, that Meta trains its models on information about users, including about their historical interactions, and that information is "combine[d] with" user IDs. 15 USC § 6501(8)(G); 16 CFR § 312.2.

Nor does Meta cite any evidence to dispute that those user IDs are themselves a type of "identifier" described in 15 USC § 6501(8)(G). Meta cannot dispute that they are "individually identifiable," 15 USC § 6501(8), since Meta admits they are used to retrieve information about individual users. Meta's Opposition at 52. Contrary to Meta's suggestion, *id.*, those IDs can be used by third-parties to identify and contact the accounts of individual users, much like usernames and other types of "online contact information." 15 USC § 6501(12); *see* Ex. 6, META3047MDL-191-00000085 ("our features in IGML [Instagram's machine learning content ranking/recommendation system] are all keyed on User IGID [Instagram ID]"); Ex. 7, META3047MDL-047-00906617-619 (discussing public ability, which in 2023 did not even require being logged into an account, to scrape data from Instagram, including "full_name" and "username," by entering "any IGID"); Ex. 8, META3047MDL-287-00005522 at tab "Final Org Pillar Review (Source," rows 495 & 497, columns D, G, and H; tab "-", row 600, columns H, I, J, U, and AL (discussing various uses of users' "FBID" [Facebook ID] to pull their data for model features); Ex. 9, META3047MDL-050-00029338 ("I suspect there are dozens or hundreds of different ways to look someone up given their UID" [User ID] such as adding the "fbid" to the end of "facebook.com/.").

- **Usernames and IP addresses**

Meta does not dispute that its Instagram search model, which recommends usernames based on a user's search, ██████████████████████████████████ ██████████████████ *See* Meta's Opposition at 52; State AGs Motion, Ex. 21, META3047MDL-118-00000439 at -650. Similarly, Meta does not dispute that it uses general locations of users derived from IP addresses to train recommendation models, and uses "[a] representation of the

user's most frequently used IP address" to train a model used to recommend Instagram Stories to users. *See* Ex. 12, Backstrom 30(b)(6) Dep. 19:12–24:9; Ex. 21, META3047MDL-118-00000459 at –637. Even if Meta disputes whether the "representations" of usernames and IP addresses are sufficiently individually identifiable such that they still constitute "personal information," Meta does not dispute that it uses usernames and IP addresses in producing these features that are used for training Meta's models. This use of children's usernames and IP addresses, without parental consent, violates COPPA.

### 7. The State AGs have shown that Meta trained its models on children's personal information.

Meta's final argument is that the State AGs have not proven that a specific child's data was trained by its models. Citing *Harris v. Cnty. of Orange*, 17 F.4th 849, 857 n.4 (9th Cir. 2021), Meta argues that the "theoretical possibility" of training its machine learning or generative AI models on U13 data is insufficient for summary judgment.

However, the State AGs have established that Meta trains its models on this personal information. When one of a user's accounts is checkpointed and disabled for being under 13, their additional accounts that were hard-linked (before December 2021) or soft-matched are allowed to remain on the platforms as normal. See Ex. 2, Hartnett Dep. 211:14–212:11, 223:11–225:4, 226:12–227:23; State AGs' Motion at Ex. 8, Hartnett Dep. Ex. 6 at 6–8. Meta continued to collect personal information from these hard-linked or soft-matched accounts and trained its models on it.

Further, when Meta checkpoints an account, that user is locked out of the account and unable to access it for a 30-day period in which the account holder may appeal. *See* Ex. 2, Hartnett Dep. 103:15–106:17. Meta admitted, in binding 30(b)(6) testimony, that during this period, the account's data is still used to train Meta's models. Ex. 12, Backstrom 30(b)(6) Dep. 30:7–22; Ex. 20, Backstrom 30(b)(6) Amended Errata at 2. Meta's arguments that it does not **collect** additional information from users during this period is beside the point. As this evidence shows, Meta **uses** personal information during this time. Meta has not—and cannot—argue otherwise.

When a user fails a checkpoint, their account is disabled. Even when an account is disabled—for example when a user provides an identification document showing that they are

under 13—but that account is not yet deleted, the account's data can still be used to train Meta's models. Far from "at most a matter of days," as Meta contends, it is undisputed that before April 2024, this "disabled" period was up to **one year**, and even now, it is a 45-day period. *See* Ex. 13, Backstrom Dep. (Dec. 10, 2025) 142:1–6; Ex. 2, Hartnett Dep. 299:9–24, 300:21–301:13. Just as with checkpointed accounts, disabled user data is available to train Meta's machine learning and generative AI models before the data is deleted. *See id.* at Ex. 12, Backstrom 30(b)(6) Dep. 24:11–16, 17:23–19:10; Ex. 13, Backstrom Dep. (Dec. 10, 2025) 71:10–72:24; 143:21–145:2; 146:22–147:13; 155:4–156:9.

Finally, Meta admits that it uses batch training that uses checkpointed and disabled user data, even when users have not been active on the platforms for 30 to 90 days. *See* Ex. 13, Backstrom Dep. (Dec. 10, 2025) 71:10–72:24. Whether this training had a large or small impact on the models does not matter—COPPA prohibits use of the data without parental consent, regardless of how impactful that use is to an operator. Again, Meta provides no evidence contradicting these undisputed facts.

Meta's 30(b)(6) witness testified, and internal Meta documents show, that Meta trained on photos of users. *See* Ex. 12, Backstrom 30(b)(6) Dep. 37:7-38:11; Ex. 10, META3047MDL-044-00025293 at -302 ("Publicly shared posts on Instagram and Facebook - including photos and text - were part of the data used to train the generative AI models underlying the features we announced at Connect."). As described above, the scale of the data used to train the model is massive. *See id.* at Backstrom 30(b)(6) Dep. 36:13–17. Because the only step Meta took to prevent its models from training on data of known children was to eventually flag that data as not for business use after the deletion process started, *see* Ex. 13, Backstrom Dep. (December 10, 2025) 155:4–156:22)—at times six months or a year after Meta disabled the account for being underage—the only reasonable inference is that children's selfies were used to train Meta's models, despite Meta's actual knowledge that they were under 13.

## III.    CONCLUSION

For the foregoing reasons, as well as the reasons stated in the State AGs' Motion for Partial Summary Judgment and Opposition to Meta's Motion for Summary Judgment, the State AGs are entitled to summary judgment on portions of their COPPA claims.

Respectfully submitted,

**KRIS MAYES**
Attorney General
State of Arizona

*/s/ Reagan Healey*
Reagan Healey (AZ No. 038733), pro hac vice
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax: (602) 542-4377
Reagan.Healey@azag.gov
*Attorneys for Plaintiff State of Arizona, ex rel.*
*Kris Mayes, Attorney General*


**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Krista Batchelder*
Krista Batchelder, (CO Reg.45066), *pro hac vice*
Deputy Solicitor General
Shannon Stevenson (CO Reg. 35542), *pro hac vice*
Solicitor General
Elizabeth Orem (CO Reg. 58309), *pro hac vice*
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6384
krista.batchelder@coag.gov
Shannon.stevenson@coag.gov
Elizabeth.orem@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.*
*Philip J. Weiser, Attorney General*

**ROB BONTA**
Attorney General
State of California

*/s/ Megan O'Neill*
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (CA SBN 244395)
Emily Kalanithi (CA SBN 256972)
Supervising Deputy Attorneys General
Megan O'Neill (CA SBN 343535)
Nayha Arora (CA SBN 350467)
Joshua Olszewski-Jubelirer
(CA SBN 336428)
Marissa Roy (CA SBN 318773)
Brendan Ruddy (CA SBN 297896)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
megan.oneill@doj.ca.gov


*Attorneys for Plaintiff the People of the State*
*of California*

**RAÚL R. LABRADOR**
Attorney General
State of Idaho

*/s/ James J. Simeri*
James J. Simeri (ID Bar No. 12332)
pro hac vice
Deputy Attorney General
Attorney General's Office
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2424
james.simeri@ag.idaho.gov

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Rebecca Borné*
Rebecca Borné
(CT Juris No. 446982), pro hac vice
Tess E. Schneider
(CT Juris No. 444175), *pro hac vice*
Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Assistant Attorneys General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5400
Fax: 860-808-5593
Rebecca.Borne@ct.gov
Tess.Schneider@ct.gov
Krislyn.Launer@ct.gov

*Attorneys for Plaintiff State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Ryan Costa*
Marion Quirk (DE Bar 4136), *pro hac vice*
Director of Consumer Protection
Ryan Costa (DE Bar 5325), *pro hac vice*
Deputy Director of Consumer Protection
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8811
Marion.Quirk@delaware.gov
Ryan.Costa@delaware.gov

*Attorneys for Plaintiff State of Delaware,*
*ex rel. Kathleen Jennings, Attorney General*
*for the State of Delaware*

*Attorneys for Plaintiff State of Idaho*
**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Scott L. Barnhart*
Scott L. Barnhart (IN Atty No. 25474-82),
*pro hac vice*
Chief Counsel and Director of Consumer
Protection
Corinne Gilchrist (IN Atty No. 27115-53),
*pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49),
*pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*


**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/ Sarah M. Dietz*
Sarah M. Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice*
Kaley Schrader, Assistant Attorney General
(KS Bar No. 27700), *pro hac vice*
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
Fax: (785) 296-3131
Email: sarah.dietz@ag.ks.gov

*Attorneys for Plaintiff State of Kansas*

REPLY IN SUPPORT OF STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4:22-MD-03047-YGR; 4:23-CV-05448-YGR

**ANNE E. LOPEZ**
Attorney General
State of Hawai'i

/s/ Douglas S. Chin
Christopher J.I. Leong (HI JD No. 9662), *pro hac vice*
Supervising Deputy Attorney General
Kelcie K. Nagata (HI JD No. 10649), *pro hac vice*
Deputy Attorney General
Department of the Attorney General
Commerce and Economic Development Division
425 Queen Street
Honolulu, Hawai'i 96813
Phone: (808) 586-1180
Christopher.ji.leong@hawaii.gov
Kelcie.k.nagata@hawaii.gov
Douglas S. Chin (HI JD No. 6465), *pro hac vice*
John W. Kelly (HI JD No. 9907), *pro hac vice*
Special Deputy Attorney General
Starn O'Toole Marcus & Fisher
733 Bishop Street, Suite 1900
Honolulu, Hawai'i 96813
Phone: (808) 537-6100
dchin@starnlaw.com
jkelly@starnlaw.com

*Attorneys for Plaintiff State of Hawai'i*


**KWAME RAOUL**
Attorney General
State of Illinois

/s/ Matthew Davies
Susan Ellis, Chief, Consumer Protection
Division (IL Bar No. 6256460), *pro hac vice*
Greg Grzeskiewicz, Chief, Consumer
Fraud Bureau (IL Bar No. 6272322), *pro hac vice*
Jacob Gilbert, Deputy Chief, Consumer Fraud
Bureau (IL Bar No. 6306019), *pro hac vice*
Matthew Davies, Supervising Attorney,
Consumer Fraud Bureau (IL Bar No. 6299608),
*pro hac vice*
Daniel B. Roth, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6290613),
*pro hac vice*
Meera Khan, Assistant Attorney General,

**LIZ MURRILL**
Attorney General
State of Louisiana

/s/ Asyl Nachabe
Asyl Nachabe (LA Bar No. 38846)
*Pro hac vice*
Assistant Attorney General
Louisiana Department of Justice
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
NachabeA@ag.louisiana.gov

*Attorney for State of Louisiana*


**AARON M. FREY**
Attorney General
State of Maine

/s/ Michael Devine
Michael Devine, Maine Bar No. 5048,
*pro hac vice*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
michael.devine@maine.gov

*Attorney for Plaintiff State of Maine*

Consumer Fraud Bureau (IL Bar No. 6345895),
*pro hac vice*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-8554
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Matthew.Davies@ilag.gov
Emily.Migliore@ilag.gov
Daniel.Roth@ilag.gov
Meera.Khan@ilag.gov


*Attorneys for Plaintiff the People of the State of Illinois*



**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ Matthew Cocanougher*
J. Christian Lewis (KY Bar No. 87109),
*pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*pro hac vice*
Zachary Richards (KY Bar No. 99209),
*pro hac vice app. forthcoming*
Daniel I. Keiser (KY Bar No. 100264),
*pro hac vice*
Matthew Cocanougher (KY Bar No. 94292),
*pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Matthew.Cocanougher@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Caitlin Micko*
Caitlin Micko (MN Bar No. 0395388),
*pro hac vice*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 724-9180
caitlin.micko@ag.state.mn.us


*Attorney for Plaintiff State of Minnesota, by its Attorney General, Keith Ellison*



**JENNIFER DAVENPORT**
Acting Attorney General
State of New Jersey

By: */s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008),
*Pro hac vice*
Assistant Attorney General
Thomas Huynh (NJ Bar No. 200942017),
*Pro hac vice*
Assistant Section Chief, Deputy Attorney General
Verna J. Pradaxay (NJ Bar No. 335822021),
*Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021),
*Pro hac vice*
Deputy Attorneys General
New Jersey Office of the Attorney General, Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs Jennifer Davenport, Acting Attorney General for the State of New Jersey, and Jeremy E. Hollander, Acting*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

/s/ *Elizabeth J. Stern*
Philip D. Ziperman (Maryland CPF No. 9012190379), *pro hac vice*
Deputy Chief, Consumer Protection Division
Elizabeth J. Stern (Maryland CPF No. 1112090003), *pro hac vice*
Assistant Attorney General
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6417 (Mr. Ziperman)
Phone: (410) 576-7226 (Ms. Stern)
Fax: (410) 576-6566
pziperman@oag.state.md.us
estern@oag.state.md.us

*Attorneys for Plaintiff Office of the Attorney General of Maryland*

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

/s/ *Anna M. Anderson*
Anna M. Anderson (NE #28080),
*pro hac vice*
Benjamin J. Swanson (NE #27675),
*pro hac vice*
Assistant Attorneys General
Nebraska Attorney General's Office
1445 K Street, Room 2115
Lincoln, NE 68509
(402) 471-6034
anna.anderson@nebraska.gov
benjamin.swanson@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*

*Director of the New Jersey Division of Consumer Affairs*

**LETITIA JAMES**
Attorney General
State of New York

/s/ Nathaniel Kosslyn
Nathaniel Kosslyn, Assistant Attorney General
(NY Bar No. 5773676), *pro hac vice*
nathaniel.kosslyn@ag.ny.gov
Alex Finkelstein, Assistant Attorney General
(NY Bar No. 5609623), *pro hac vice*
alex.finkelstein@ag.ny.gov
New York Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8000

**DAVE YOST**
Attorney General
State of Ohio

/s/ *Kevin R. Walsh*
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
*pro hac vice*
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

*Attorneys for State of Ohio, ex rel. Attorney General Dave Yost*

**JEFF JACKSON**
Attorney General
State of North Carolina

*/s/ Charles White*
Charles G. White (N.C. State Bar No. 57735), *pro hac vice*
Assistant Attorney General
Kunal Choksi
Senior Deputy Attorney General
Josh Abram
Special Deputy Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6889
Facsimile: (919) 716-6050
E-mail: cwhite@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*


**DAVE SUNDAY**
Attorney General
Commonwealth of Pennsylvania

*/s/ Jonathan R. Burns*
Jonathan R. Burns
Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*


**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Stephen N. Provazza*
Stephen N. Provazza (R.I. Bar No. 10435), *pro hac vice*
Assistant Attorney General
Rhode Island Office of the Attorney General

**DAN RAYFIELD**
Attorney General
State of Oregon

/s/ John Dunbar
John J. Dunbar (Oregon Bar No. 842100)
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, Oregon 97201
Telephone: (971) 673-1880
Facsimile: (971) 673-1884
E-mail: john.dunbar@doj.oregon.gov

*Attorneys for State of Oregon ex rel. Dan Rayfield, Attorney General*


**ALAN WILSON**
Attorney General
State of South Carolina

*/s/ Anna C. Smith*
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975),
*pro hac vice*
Assistant Deputy Attorney General
Anna C. Smith (SC Bar No. 104749),
*pro hac vice*
Assistant Attorney General
Office of the South Carolina Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
jlibet@scag.gov
annasmith@scag.gov
803-734-0536

*Attorneys for Plaintiff the State of South Carolina, ex rel. Alan M. Wilson, in His Official Capacity as Attorney General of the State of South Carolina*

REPLY IN SUPPORT OF STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4:22-md-03047-YGR; 4:23-cv-05448-YGR

150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

*Attorney for Plaintiff State of Rhode Island*

**JAY JONES**
Attorney General
Commonwealth Of Virginia

*/s/ Joelle E. Gotwals*
Travis G. Hill
Chief Deputy Attorney General
Helen O. Hardiman
Deputy Attorney General
Richard S. Schweiker, Jr.
Senior Assistant Attorney General and
Section Chief
Joelle E. Gotwals (VSB No. 76779),
Senior Assistant Attorney General
*pro hac vice*
Chandler P. Crenshaw (VSB No. 93452)
Assistant Attorney General
*pro hac vice*
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-8789
Facsimile: (804) 786-0122
E-mail: jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth of Virginia ex rel. Jay Jones, Attorney General*

**MARTY J. JACKLEY**
Attorney General
State of South Dakota

*/s/ Amanda Miiller*
By: Amanda Miiller (SD Bar No. 4271)
Deputy Attorney General
South Dakota Office of the Attorney General
1302 East SD Hwy 1889, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: Amanda.Miiller@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

**JOHN B. MCCUSKLEY**
Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267),
*pro hac vice*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia, ex rel. Patrick Morrisey, Attorney General*

REPLY IN SUPPORT OF STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4:22-md-03047-YGR; 4:23-CV-05448-YGR

**NICHOLAS W. BROWN**
Attorney General State of Washington

*/s/ Claire McNamara*
Claire McNamara (WA Bar No. 50097)
Gardner Reed (WA Bar No. 55630)
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 340-6783
claire.mcnamara@atg.wa.gov
gardner.reed@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Brittany Copper*
Brittany A. Copper
Assistant Attorney General
WI State Bar # 1142446, *pro hac vice*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1795
Brittany.copper@wisdoj.gov

*Attorneys for Plaintiff State of Wisconsin*

### ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

DATED: March 27, 2026.

*/s/ Megan O'Neill*
Megan O'Neill

### ATTESTATION

I, Matthew Cocanougher, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED: March 27, 2026

*/s/ Matthew Cocanougher*
Matthew Cocanougher