# EXHIBIT 4

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

Case No.
IN RE:  SOCIAL MEDIA ADOLESCENT   4:22-MD-03047-YGR
ADDICTION/PERSONAL INJURY
PRODUCTS LIABILITY LITIGATION

MDL No. 3047

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

This Document Relates To:

ALL ACTIONS

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF
ALLISON L. HARTNETT

Held At:        Covington & Burling LLP
                Salesforce Tower
                4415 Mission Street
                San Francisco, California

                June 16th, 2025
                9:59 a.m.

Reported By:
MAUREEN O. POLLARD, CSR #14449, RDR

Page 20

Q.    The defendants listed in each are Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC.

Do you see that?

A.    Yeah.

Q.    We'll just look at the one for Meta Platforms, which is Exhibit 1.

A.    Okay.

Q.    And I'll represent that all of these are the same except for the name of the defendant.

A.    Okay.

Q.    Have you seen this deposition notice before?

A.    Yes, I have.

Q.    And you're designated to testify as to certain topics on this notice today, right?

A.    Yes, that's right.

Q.    And you're designated to testify as to Topics 2 through 6 except for Topic 4(h), is that right?

A.    That's correct.

Q.    And you're designated to testify on those topics on behalf of all four companies, right?

A.    That's right.

MR. OLSZEWSKI-JUBELIRER:    Okay.    And

CONFIDENTIAL

just to state on the record, Meta and the state AGs have agreed that we would not take the company's corporate testimony on Topic 4(h) today, and I will reschedule that testimony for a different date.

MR. CHAPUT:  And there will be a separate witness, just for clarity.

MR. OLSZEWSKI-JUBELIRER:  Right.  Thank you.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Are you qualified to testify on the topics for which you're designated?

A.    Yes, I am.

Q.    What qualifies you to testify on those topics?

A.    I'd say two things.  One, they're relevant to my work at Meta, and then, two, I have prepared with subject matter experts internally where I need more detail.

Q.    We'll get into that in just a sec.

So without disclosing the substance of your conversations with counsel, did you also meet with counsel to prepare for today's deposition?

A.    Yes, I did.

Q.    How long have you met with counsel to

prepare for the deposition?

A.    I think -- this is an estimate -- overall probably like 20 to 30 hours over the last month or so.

Q.    And about how many times did you meet with counsel?

A.    We met at least as many times as subject matter experts that are in my notes, so, I mean, I think it's at least 20 times.

Q.    Did you meet with each of those subject matter experts listed in your notes?

A.    Yes, I did.

Q.    Okay.  Did you meet with anyone else other than the subject matter experts who are listed in your notes to prepare for the deposition?

A.    Just counsel.

Q.    Okay.  Did you review any documents to prepare for today's deposition?

A.    Yes, we did.

Q.    Which documents did you review?

A.    They're in this binder.  Do you want me to go through and look at these, or...

Q.    So you're referring to a binder that you brought here with you today?

A.    Yes.

CONFIDENTIAL

Page 23

MR. OLSZEWSKI-JUBELIRER:  Okay.  I'll represent that we were given a copy of this binder less than 30 minutes before the scheduled start of this deposition, and then the binder was briefly taken away to check whether there were documents inadvertently included, and the binder was returned to us about 20 minutes ago now.

Q.    Okay.  So the documents that you reviewed are only the documents that are contained in that binder that you brought with you today?

A.    These are ones I reviewed in preparation for deposition, yes.

Q.    Did you review any other documents in preparation for the deposition?

A.    No.

Q.    How many documents are in the binder?

A.    Sorry, I don't know.  Do you want me to count them?

Q.    I think they have tabs.  There's nine tabs.

A.    Okay.

THE WITNESS:  Sorry, I don't know, is it one document per tab?

MR. CHAPUT:  Yes.

Page 26

front of you?

        A.    Yes.

              MR. OLSZEWSKI-JUBELIRER:  Can we mark
        that as -- that will be Exhibit 6.

                  (Whereupon, Meta-Hartnett-6 was
              marked for identification.)

              THE WITNESS:  There's an index of the
        notes, and there are two different --

              MR. OLSZEWSKI-JUBELIRER:  There are two
        different documents?

              THE WITNESS:  This is just an index of
        the notes.

              MR. OLSZEWSKI-JUBELIRER:  Okay.

              THE WITNESS:  But they are meant there
        in two piles.

              MR. OLSZEWSKI-JUBELIRER:  We can mark
        the index as Exhibit 7, then.

                  (Whereupon, Meta-Hartnett-7 was
              marked for identification.)

BY MR. OLSZEWSKI-JUBELIRER:

        Q.    Who wrote your notes?

        A.    I wrote my notes.

        Q.    How did you decide what to include in
your notes?

        A.    I decided -- let me -- I was taking

Page 27

down as, like, relatively verbatim as I could what subject matter experts were telling me when I was speaking to them.  And then I did review the notes with counsel to determine -- like to check that they were accurate.

Q.    So you asked your counsel whether your notes were accurate as a representation of your conversations with --

A.    The counsel sat in the conversations. And there were some mistakes I made in the notes, like sometimes I would type something down wrong, yeah, and we all listened to it.

Q.    Okay.  And the notes -- you intend to rely on the notes to testify on behalf of the company, right?

A.    I do.

Q.    And everything in the notes is accurate as to the company's knowledge?

A.    Yes, to the best of my knowledge speaking with the subject matter experts.

Q.    All right.  Let's talk about how Meta collects and uses data from people.

A.    Okay.

Q.    It's my understanding Meta can collect lots of different kinds of data.  Unless I tell you

CONFIDENTIAL

Page 28

otherwise, right now we're going to be focusing on something I'll talk about as personal information, and for these discussions we'll talk about personal information as these categories:  An e-mail address, an image of a person's face, sound of a person's voice, a cookie ID, an internet protocol address or an IP address, a process or a device serial number or other unique personal identifier that can be used to recognize a user over time and across different online services, information concerning a user combined with that persistent identifier, or precise geolocation information.

A.    Okay.

Q.    Do you understand those topics?

A.    Yes, I do.  I might need you to repeat them for me from time to time.

Q.    Okay.  Does Meta collect personal information from people who have accounts on its platforms?

A.    Yes, it does.  It collects some of the pieces of information you have listed, yeah.

Q.    Okay.  From people who have accounts on Facebook and Instagram, right?

A.    Sorry.

So, yes, Meta collects personal

CONFIDENTIAL

Page 38

to say.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And all else being equal, users who see more relevant content are more likely to come back for more, is that right?

MR. CHAPUT:  Objection.  Form, scope.

THE WITNESS:  Is it fair to say users who see more relevant content come back for more?  Again, I think it's like a very high level statement, but I'm not speaking on, like, any -- I'm not speaking on any precise data on, like, increase in personalization and retention, but just as a general statement, yes, I think that's fair to say.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And if users come back for more content, that also presents Meta with more opportunities to show the user ads, is that right?

MR. CHAPUT:  Objection.  Form, scope.

THE WITNESS:  That is correct.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  So we'll get into the differences between -- you said the differences in ways ads are targeted at various times based on the

CONFIDENTIAL

Page 39

age of the users in a moment, but let's just talk about how Meta knows what age its users are.

So prior to December of 2019, Meta did not require new users of Instagram to enter their age to create an account, correct?

A.    That's correct.

Q.    Okay.  And prior to the time in December 2019 when Meta required new users of Instagram to enter their age to create an account, did Meta ask those users what their age was at all?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Sorry, can you repeat the question?  I was just reviewing my notes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Prior to when Meta started collecting users' age on signup in December 2019 on Instagram, did Meta ask new users of Instagram to say what their age was at all?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Not that I'm aware of.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Did it ask -- did Meta ask those users in this period prior to December 2019, new users of Instagram, to state that they were over 13?

MR. CHAPUT:  Object to the form.

CONFIDENTIAL

Page 40

THE WITNESS:  Meta did ask all users of Instagram to follow the terms of service, and the terms of service required that users be over 13.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    How did users, new users, agree to the terms of service?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  Yes.  I don't have the precise notes on exactly what the flow looked like, but my understanding is that users agreed to the terms of service within their signup for an account.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Was there -- do you know what the text was that was displayed to new users to ask for their agreement to the terms of service in this period before December 2019?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I do not have that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Were users required to read the terms of service before they checked a box agreeing to the terms of service?

Page 41

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Do you know how -- if users were even displayed the terms of service in this period --

MR. CHAPUT:  Object --

BY MR. OLSZEWSKI-JUBELIRER:

Q.    -- before they agreed to them?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I don't know.  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    There was a period of time in which Meta started requiring existing users of Instagram to enter their age, is that right?

A.    That is right.

Q.    And when did that happen?

A.    Beginning in May 2022, Meta -- yes, May 2022 Instagram users started to be asked to give their age, if they were preexisting users.

Q.    Okay.  And when users give their age to Meta on account signup, or in this flow when Meta asked users to indicate their age, Meta calls that the stated age?

A.    Yes.

CONFIDENTIAL

Page 44

stated age from users, for Facebook there was a period where when new users would create accounts on Facebook, Meta's system defaulted to a birth date that would make the user 25 years old, is that right?

A.     Yes, that's right.

Q.     And what period -- during what period of time did Meta default to an age that would make the user 25 years old when they signed up for Facebook?

A.     I think it was 2017 to 2019.

Q.     And prior to the default of 25 years old for new users on Facebook, did Meta default to a different age for new users who signed up for Facebook?

A.     So that is -- it's not straightforward to answer simply because there were prior to 2017 multiple different versions of the age collection flow that were tested on Facebook that varied depending on the exact interface the user was using. So there's Facebook app, Facebook desktop, there's a version of Facebook that's a light version for low data use internet, and those had different age collection flows.

So each of those data collected age

CONFIDENTIAL

Page 45

differently.

Q.    Did any of those age collection flows default to a particular age?

A.    I do not know.

Q.    Okay.  And you prepared to testify on behalf of the company -- you prepared to testify on behalf of the company with respect to how Meta has collected stated age from its users, right?

A.    Yes.

Q.    For Facebook and Instagram?

A.    Yes.

Q.    Going back to 2012?

A.    Yes.

Q.    So just going back to -- well, let's talk about Instagram users.

A.    Okay.

Q.    Instagram users started being required to state their age when signing up in December 2019, right?

A.    Sorry, can you say that again?

Q.    Instagram users started being required to state their age when signing up in December 2019, right?

A.    That's correct.

Q.    At that time did Meta default to a

CONFIDENTIAL

Page 46

particular age when collecting those users' stated age?

A.    Starting in December 2019 the Instagram -- when it began, Instagram age collection always defaulted to today's date, the date the user was looking at the form.  So I wouldn't characterize that as defaulting to a certain age.

Q.    Was that different than how Facebook was collecting stated age at that time?

A.    At the -- I can't speak to, like, the absolute precise moment of Facebook December 2019, but Facebook -- very close in time to that, Facebook signup also looked at today's date.  Both Instagram and Facebook were populated with today's date at some point in 2019.

Q.    Let's look at document F3, please.

(Whereupon, Meta-Hartnett-8 was marked for identification.)

MR. CHAPUT:  What exhibit is this, Counsel?

THE STENOGRAPHER:  8.

MR. OLSZEWSKI-JUBELIRER:  I think it's 8.  Thank you, Madam Court Reporter.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Do you recognize this document,

CONFIDENTIAL

Page 47

Ms. Hartnett?

A.    I have not seen this before.

Q.    Okay.  This is an e-mail thread, is that right?

A.    Yeah.

Q.    Between Meta employees?

A.    Yes.

Q.    Okay.  And this is a document with Bates number META3047MDL-072-00434143, is that right?

A.    Yes, that's right.

Q.    Okay.  And this is an e-mail from December 11, 2019, right?

A.    Correct.

Q.    And the subject line is, "Re: Acquisition age management launch proposal"?

A.    Yes.

Q.    This is the time period when Meta was changing how it collected stated age from new users, right?

A.    Yes.

Q.    Do you see -- can you turn to the page that ends Bates number 434147?  It should be the fifth page of the document.

Do you see that?

CONFIDENTIAL

Page 58

THE WITNESS:  It's accurate for 2023 to the present -- or, sorry, before 2020- -- yeah, 2023 to the present.  The only data that Meta uses to show teens an ad is age and city level or higher location.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Meta does not use -- you testified before about that Meta uses users' activity on the app to decide which ads to show users, is that right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  For under 18 users Meta uses age and city level or higher location.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Meta does not do anything to decide which ads are more likely to be shown to those users beyond just random a assignment based on ads that are targeted to users of that age and that city?

A.    That's right.

MR. CHAPUT:  Object to the form.

THE WITNESS:  That is right.  The ads are far less relevant to teens because we only use those pieces of data.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    All right.  Let's see.  People can

CONFIDENTIAL

Page 59

visit public Facebook and Instagram pages without having a Facebook or Instagram account, right?

A. I believe it's accurate to say that people can do that. It's not -- you can't visit all pages on Facebook or Instagram, but there are specific public Facebook or Instagram pages people can visit.

Q. Public pages that are posted by accounts on Facebook and Instagram, right?

MR. CHAPUT: Object to form. Scope.

THE WITNESS: Yes, that's right.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Does Meta collect personal information from people who visit public Facebook and Instagram pages without being logged into a Facebook or Instagram account?

MR. CHAPUT: Object to form.

THE WITNESS: So I know you gave me the list of personal -- how you're defining "personal information." Meta would not -- we do not call that list personal information. So my answer would be, no, we don't, but let me give you precisely what we do collect.

We consider this data activity data

CONFIDENTIAL

Page 60

that only gives us information on how did the user use that logged-out page. We collect IP address, device ID, cookie data, and then clicks. Yeah, we don't consider that personal data.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. So you mentioned things like IP address, cookie data, device ID, is that right?

A. That's right.

Q. And Meta collects those things from users who visit public Facebook and Instagram pages without being logged in, right?

A. Yes, that's right. I'm speaking specifically about the registration pages, which is the -- which is the most common logged-out page that a user would visit. I think we should follow up if it's exact same data collection on like a public profile. Yeah.

Q. You don't know what data Meta collects from people who visit a public Facebook profile, for example, without being logged in?

MR. CHAPUT: Object to form. Characterization, scope.

THE WITNESS: I don't -- I just don't have the precise distinction in my notes on

CONFIDENTIAL

Page 61

registration page versus an other non-registration page, so we can follow up on that. That's information we will have. I just don't have that personalized distinction.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. Same question for a public Instagram page, you don't know what data Meta collects from users who visit a public Instagram page without being logged in?

MR. CHAPUT: Same objections.

THE WITNESS: I know what data we collect on the public Instagram registration page. I think we can just get the answer to this question if it is exactly the same on a non-registration page.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. But you don't have that answer --

A. I just don't have it, yeah.

Q. -- today?

A. I don't have it today.

Q. Okay. The data that you do know that Meta collects from people who visit public Facebook

CONFIDENTIAL

Page 62

and Instagram pages, how does Meta use that data?

A.     There's really two use cases.  The first is to optimize the page, make it usable, so we -- for example, the log-in screen, we are looking at how does someone use -- like are they clicking. We're using that to make sure that the screen is usable.

And then the second use case is for security purposes.  We're using data to look at if there's, like, malicious attacks trying to get into the registration pages.

Q.    So your notes refer to a use case called "growth analysis," is that right?

A.    Yes, that's right.

Q.    Okay.  And your notes say, We want to build our logged-out pages in a way that helps the product grow?

A.    Yes.  That's the first use case that I was describing, yeah.

Q.    So changing the design of Meta's products so that more users will sign up, is that right?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  I think that -- I think

that is fair to say.

BY MR. OLSZEWSKI-JUBELIRER:

Q. And your notes also say before 2020 it was possible for other teams in the company to use logged-out data?

A. Yeah. What this is referring to is the specific controls that were on the data, internal controls, so before -- the subject matter expert I was speaking to described this. For any dataset at Meta there are, like, access controls, certain teams at the company can access or not access.

Before 2020 there were not access controls that exist today. We are -- the only teams at the company that can access this data are security and growth. It doesn't mean the subject matter expert didn't know, like he did not know that the data was actually accessed or used, and it has -- and it was not used for advertising, but just referring to that there were not the same controls before 2020.

Q. The subject matter expert you're talking about is ███████████ is that right?

A. Yes, that's right.

Q. Who is █████████

A. He is an engineer -- he's an engineer

CONFIDENTIAL

Page 101

A.    Okay.

Q.    But, okay, so for Facebook and Instagram, from 2019 through April 1, 2024, Meta had several different ways that it found and removed under 13 users on Facebook and Instagram, right?

A.    Yes, that's right.

Q.    Okay.  One of those ways is online reporting, right?

A.    That's right.

Q.    So people -- users on Facebook and Instagram or people who don't have accounts on Facebook and Instagram can report a child under 13 on the platform to Meta?

A.    Yes, that's right.

Q.    Okay.  Another -- and Meta has processes to review the reports and decide what to do with them, right?

A.    That's right.

Q.    Okay.  We'll talk about that in a little bit.

Another process that Meta has used in that period for identifying users who may be children on Facebook and Instagram is internal reviews?

A.    Internal -- I don't think that's the

CONFIDENTIAL

Page 102

precise term.  You might mean internal escalation, is the --

Q.    That's the term here that's used, yeah, sure.  Internal escalation, right?

A.    Yep.

Q.    And that is referring to Meta has human reviewers who review accounts or content that are reported for other reasons other than for belonging to an underage user, right?

A.    That's right.

Q.    And in the process of that review if they notice some strong indication that the account belongs to a child under 13, they can escalate that into the underage review?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That is accurate.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And that policy allowing escalations, internal escalations, when did that begin on Facebook and Instagram?

MR. CHAPUT:  Object to the form.

(Witness reviewing document.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You're looking at your notes, right?

A.    Yeah.  Looking at my notes, I don't

CONFIDENTIAL

Page 103

have the date that that policy or that process began.  Checking.

(Witness reviewing document.)

A.    Yeah, I don't have that date.

Q.    Okay.  Another way that Meta detects underage users is user self-reports, is that right?

A.    User self-reports, yes.

Q.    So that refers to when users edit their date of birth, their stated age, right?

A.    That's correct.

Q.    And if they edit their date of birth to stated age as under 13, Meta places those users' accounts in an age checkpoint, right?

A.    That's correct.

Q.    The age checkpoint is where a user is prohibited from accessing the account, right?

A.    Yes.  If you're in an age checkpoint, you can't access your account.

Q.    And Meta places users in an age checkpoint when it determines that the user is under 13, right?

MR. CHAPUT:  Object to the characterization.

THE WITNESS:  No.  That's not accurate. Meta places users in an age checkpoint when

CONFIDENTIAL

Page 104

a human reviewer has reviewed the account after there's -- you know, the account has come in for human review from the sources you described, and then a human reviewer reviews the account and determines if there -- either if they -- if they think the account may be under 13, and we instruct the human reviewers to err on the side of if you were uncertain, mark it as possible.  And so the user is then checkpointed, so there's uncertainty in the checkpoint.

Then the user has the opportunity to appeal the checkpoint with -- by providing ID, by certifying, yeah, identifying themselves.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You just testified that when users self-report that they're under 13, Meta checkpoints those accounts, right?

A.    That's right.

Q.    And that process does not involve human review, right?

A.    That's -- it is reviewed after -- the appeal involves human review, yeah.

CONFIDENTIAL

Page 105

Q.    Okay.  But there's no human review between a user stating their age as under 13 and being sent to the checkpoint, right?

A.    That's right.

Q.    Okay.  You talked about appeals, right?

A.    (Nodding in the affirmative.)

Q.    So after a user is placed in the checkpoint, the user can appeal Meta's decision to place them in the checkpoint?

A.    That's accurate.

Q.    And the decision to place them in the checkpoint is based on Meta's determination that they're likely under 13, right?

MR. CHAPUT:  Object to the characterization.

THE WITNESS:  Yeah, it is not precisely that they're likely under 13, it is if they could be under 13 or if you have doubt. That's the instructions for the reviewer, is you err on the side of your doubt -- err on the side of young if you're unsure.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Just based on talking about the review proc- -- appeal process, the appeal process involves users being able to submit their ID to Meta

to verify that they are over 13, right?

A.    That's correct.

Q.    Okay.  And there's a time limit on how long the user has to submit their ID?

A.    Yes.  The user has 30 days.  If they don't, then the appeal is considered failed and the account is deleted.

Q.    Okay.  The account -- we'll talk about it later, but there's some time period after the 30 days when Meta schedules the account for deletion, right?

A.    That's right.

Q.    It's not immediately deleted after 30 days?

A.    Yes.  Deletion is -- when I'm using the term "deleted," it is a process.  Deletion is a process, yeah.

Q.    Okay.  But the deletion process -- we can talk about that later.

Okay.  When a user changes their age from under 18 to over 18, Meta requires them to verify their age, right?

A.    That's right.

MR. CHAPUT:  Sorry, just object to the form.  I'm not sure if there's an issue

CONFIDENTIAL

Page 107

with how the court reporter has transcribed it.

Counsel, would you mind just reasking the question?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    If a user on Meta's platform changes their age from under 18 to over 18, Meta requires those users to verify their age, right?

A.    Under 18 to over 18, yes, that requires a verification.

Q.    And Meta presents different options to those users of how they can verify their age, right?

A.    Yes, that's right.

Q.    One of those options is submitting a video selfie to a company called Yoti?

A.    Yeah.  Just a slight nuance.  The user submits a video selfie to Meta and Meta shares it with Yoti.

Q.    Okay.  And Yoti is a company that has a model that estimates the age of users, right?

A.    That's correct.

Q.    It analyzes those video selfie and estimates their age, right?

A.    Yes, that is right.

Q.    And in that process when Yoti estimates

CONFIDENTIAL

Page 108

the user as under 13 and provides that estimate to Meta, Meta puts the user in an age checkpoint, right?

A.    Yes, that's accurate.

Q.    So Meta relies on Yoti's determination that a user is under 13 in order to enforce its policy against users under 13 being on its platforms, right?

MR. CHAPUT:  Object to the characterization.

THE WITNESS:  So, no, I don't -- I don't think that's accurate.  It's just in the specific instance when a user is using Yoti to verify their age, then Meta will interpret the signal from Yoti, but that's not how Meta generally -- like Meta does not generally rely on Yoti to enforce that policy.  It's just in that specific instance we'll use the data from Yoti.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Meta uses the data from Yoti in order to enforce its policy that those users may not be on the platform, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  That the user -- those

CONFIDENTIAL

Page 109

specific users, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  So Meta relies on Yoti's determination that the user is under 13 in order to checkpoint those users, right?

A.    Yeah.

MR. CHAPUT:  Object to the characterization.  Asked and answered.

THE WITNESS:  Meta relies on data from Yoti to checkpoint users where Yoti passes us a signal that the user may be under 13.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Another way that Meta -- just stepping back, another way that Meta detects and removes under 13 users is something that's sometimes called cross-platform checks?

A.    Yes.

Q.    And that refers to -- I'll just -- let's step into it.

Users commonly have multiple accounts on Meta's platforms, right?

A.    That's right.

Q.    So a user could have both an Instagram account and a Facebook account?

A.    That's right.

CONFIDENTIAL

Page 110

Q.    Or two Instagram accounts?

A.    Yes.

Q.    Two Facebook accounts?

A.    Yes.

Q.    Or more accounts on any number of platforms, right?

A.    Yes, that's right.

Q.    Okay.  And Meta provides a feature called Accounts Center, right?

A.    Yes, that's right.

Q.    Accounts Center allows users to connect their accounts in Meta's systems?

A.    Yes.

Q.    Okay.  And the purpose is so that users can centrally manage their Facebook, Instagram, and other Meta accounts, right?

A.    Yes, that's right.

Q.    Okay.  And in terms of cross-platform checks for enforcing Meta's policy against users being under the age of 13, Meta uses those links from Accounts Center in order to enforce its policy, right?

A.    Yes, that's right.

Q.    So if a user has an account that is linked through Accounts Center to another account

CONFIDENTIAL

Page 111

and one of those accounts is placed in the age checkpoint, as of a certain time Meta started also placing the other accounts that are linked through Accounts Center into the same age checkpoint, right?

A.    Yeah, tiny technical nuance.   The checkpoint only refers to the account where the original review originated.   The other accounts are just inaccessible, but they're not considered, like, in the checkpoint.

The checkpoint is the user experience, but they're inaccessible, and a user would just be directed if they tried to access those accounts to check out the checkpoint.

Q.    So from 2012 through April 2024, are there any other processes that Meta used to identify users who were under 13 on Facebook?

A.    Can you specify like just what are the ones that you are counting as having been done in that time period?

Q.    So I think we've talked about user reporting.

A.    Yep.

Q.    Internal escalation?

A.    Mm-hmm.

Q.    And you testified before you don't know

CONFIDENTIAL

Page 112

when that started, right?

A.    I do not.

Q.    Signals from Yoti?

A.    The date that Yoti was implemented is in that time period, yeah.

Q.    User self-reporting?

A.    Yeah.

Q.    And cross-platform checks?

A.    Yes.  That is the right list, yes.

Q.    Okay.  But beyond that, Meta has not used any other method to identify users under 13 in the period from 2012 to April 2024?

A.    No.

Q.    Okay.  And the same question for Instagram.  Beyond those categories, Meta has not used any other process to identify users on Instagram from 2012 to April 2024?

A.    Instagram has the same -- has had the same general processes as Facebook.  There is a nuance with the user interface.  Instagram -- in the user reports Instagram experimented with off-platform and in-app user reporting, but it's all user reporting.

Q.    Okay.  And just to go back to user self-reporting, before December 2019 Meta didn't

CONFIDENTIAL

Page 114

least prior to 2020.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And to prepare on this topic --
you're prepared to testify as to Meta's practices
for finding and removing underage users on Facebook
and Instagram from 2012 to --

A.    Yes.

Q.    -- April 2024?

MR. CHAPUT:  Object to the form, and to
the characterization.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And you don't know the answer to that
question, right, when Meta started using hard links
through Accounts Center to propagate underage
enforcements from Facebook to Instagram?

A.    I only know that it was prior to 2020.

Q.    Okay.  Who would know when Meta started
using hard link signals from Accounts Center to
propagate underage enforcements from Facebook to
Instagram?

A.    The person that I spoke to who have the
information, it was prior to 2020 from, you can see
in my notes, ███████████.  He might be able to
tell us who would know.  Yeah, he didn't -- it looks
from my notes that he did not know the precise date,

CONFIDENTIAL

Page 115

but he might know who he inherited it from.

Q.    Okay.  Who is ████████████████? 

A.    He is an engineer who worked on this flow at the time.

Q.    And "this flow" is the underage --

A.    The flow is underage enforcement, and specifically the cross-app propagation.  He worked specifically on that.

Q.    Is he currently employed at Meta?

A.    Yes.

Q.    What does he do now?

A.    I don't know his current role.

Q.    There's another method that Meta uses to detect underage users listed in your notes, right?

A.    Mm-hmm, yes.

Q.    Proactive detection?

A.    Yes.

Q.    Can you tell me about that?

A.    Yes.  So today and beginning in early -- I think, yeah, beginning in October 2024, Meta uses a heuristic-based method to proactively detect accounts that we would like humans to review. So it works similar to as if a user had reported. It's sent to human review.

CONFIDENTIAL

Page 116

Meta has been working on proactive detection via model or heuristic-based methods for several years, but the heuristic-based method is now live.

Q.    Okay.   And what does the heuristic-based method look at?

A.    The heuristic method looks at signals on accounts, on Instagram and Facebook, that the account might be under 13.  It looks at information in the profile essentially, yeah.

Q.    "Information in the profile," meaning information in the user's bio?

A.    Correct, or in their content, in their photos.

Q.    In their photos as well?

A.    Yes.

Q.    What information in the photos does the heuristic look at?

A.    It is -- well, let me be clear.  The heuristic is not looking at the photos because the heuristic can't do that.  The human reviewer is looking at the photos after the account goes to human review.

So the heuristic is just like pretty simple rules based and it's using, like, written

content in the bio or in captions.

Q.    In captions on photographs?

A.    Let me just be precise that we use that now.

(Witness reviewing document.)

A.    The heuristic uses explicit and implicit statements of age.  I will have to check exactly which surfaces it looks like at for the explicit and implicit statements of age.  I know that it definitely looks at profile bio.

We're in a continuous improvement process for the heuristic, so I am not precisely sure all of the surfaces that it uses today.  We are experimenting because we are trying to make the heuristic as effective as possible.

Q.    Okay.  I think we'll come back to that.

Okay.  So let's talk about how Meta reviews reports of users being under 13.

And before we get into that, let's talk about how people can submit reports --

A.    Okay.

Q.    -- of someone being under 13 on Facebook and Instagram.

There's a web form where people can submit reports of underage users on Facebook and

Instagram, right?

A.    That's right.

Q.    And there's different forms for Facebook and Instagram?

A.    There are different -- you know, actually, I don't know if there are different forms for Facebook and Instagram.

(Whereupon, Meta-Hartnett-12 was marked for identification.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You have a document that's Bates numbered META3047MDL-014-00169674.

A.    Yes.

Q.    We'll do this as Exhibit 11 -- Exhibit 12.

Do you recognize this?

A.    Yep.

Q.    What is it?

A.    This is the underage reporting form on Facebook.

Q.    Okay.  And this form asks for five pieces of information, right?

A.    Yes.

Q.    It asks for the URL of the child's profile?

CONFIDENTIAL

Page 119

A.    Yes.

Q.    The full name of the child, is that right?

A.    Full name of the person, yes.

Q.    The actual age of the child?

A.    Yes.

Q.    And there's a drop-down menu where the person can select an age that they think the child is?

A.    Yes.

Q.    There's a box called "Other"?

A.    Mm-hmm.

Q.    Do you know what that is asking for?

A.    That's asking for any other information you'd like to provide.

Q.    And then it asks for the person reporting's contact e-mail address, right?

A.    Yes.

Q.    And this form has been available for reporting a child on Facebook since 2012?

A.    I'm reviewing my notes.  I'm just trying to get the date right.

(Witness reviewing document.)

A.    I can't find this in my notes, but it is my understanding that this form has been

they were to roll out the IG SURF reporting flow to 100 percent of users, right?

MR. CHAPUT:  Objection.  Scope.

(Witness reviewing document.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Can I point to a sentence in the first e-mail?

A.    Yeah go ahead.

Q.    You've read the whole e-mail, right?

A.    Yes.

Q.    Okay.  So in the first e-mail there's a sentence that reads, "It will cost us roughly an $1 per underage user we find on the app if we roll out SURF widely in future quarters," right?

A.    That's what it says.

Q.    Okay.  So that's an estimate that Meta would have to spend an additional $1 for every child under 13 it identified on the app if it rolled out the improved underage reporting flow widely to Instagram users, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I think what that's saying is a total of $1 instead of additional.  But otherwise, yes.

///

CONFIDENTIAL

Page 168

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.   So it would cost a dollar per child -- Meta would have to spend a dollar per child to identify them if it rolled out this improved underage reporting form on Instagram, right?

MR. CHAPUT:   Object to form.   Scope.

THE WITNESS:   Yeah, I wouldn't characterize it as a dollar per child. It's a dollar per checkpointed account. That's what that is saying.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.   A dollar per underage user, right?

MR. CHAPUT:   Object to the form. Characterization, scope.

THE WITNESS:   Again, no, a checkpointed account doesn't -- it is not equivalent to an underage user.   There is only a certain percentage of checkpointed accounts that end up being disabled.

Even when they are disabled, we don't know that they're underage users.   We just know they did not appeal or did not appeal successfully.

///

CONFIDENTIAL

Page 169

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Do you know -- how do you know that it's not referring to additional underage users who are -- ultimately are removed from the platform?

MR. CHAPUT:  Object to the form.
Scope.

THE WITNESS:  I don't precisely know because I haven't seen the exact spreadsheet of what this is referring to, but it is -- my read of this e-mail chain, what I am thinking is that this refers to checkpoint, but I'm not sure.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Because you've never seen this document before, right?

A.    I have not seen this document before.

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And the next sentence reads, "The question at hand is the tradeoff of removed u13 versus ops capacity & cost," right?

A.    That is the next sentence.

Q.    Okay.  And the tradeoff Meta was considering about whether to roll out this underage reporting flow was additional removed u13 users

real post that really reflects the age the user.

We do not have that dataset for under 13, and we don't retain any data for under 13. If we in labeling the birthday posts see that a -- we believe that a user may be under 13, then we -- that goes for internal escalation as we talked about before, and then we don't retain any of that data. So we can't actually assess the classifier performance on the 13 boundary.

Q. So Meta doesn't know how accurate it is at predicting whether users who are under 13 are adults?

MR. CHAPUT: Object to the form.

THE WITNESS: We do not have any -- so the model is meant to predict over or under 18, and we have no data related to under 13 on that model.

BY MR. OLSZEWSKI-JUBELIRER:

Q. The model is meant to predict whether a user is a teen or over 18, right?

A. Correct.

Q. It's not meant to predict whether a user is under 13 or -- is under 13, right?

A. Correct.

Q. Okay. Let's see, another automation

CONFIDENTIAL

Page 179

policy is previously manually reviewed, is that right?

A.    Yes.

Q.    So that means if a report -- an account had been reported previously and had gone through the human review process and it was not checkpointed at the end of the human review process, if it was reported again Meta would automatically ignore the report, right?

A.    That's what that means.

Q.    Okay.  And the one below that, it says, No media or no bio associated with a profile. Right?

A.    Yes, that's right.

Q.    Okay.  And that says -- that means on Facebook if an account is reported and it has no photos and no bio, the report is automatically ignored by Meta systems, right?

A.    Yeah, this is -- we can follow up, but what this is saying is if there's no data associated, like there's no content on the account, there's nothing to review, then it's ignored.  I noted "no media or no bio."  That might be like an imprecise note, but it's essentially like there's nothing to review, it's a blank account.

CONFIDENTIAL

Page 180

Q.   Okay.   "No media" means what?   Photos or all posts?

A.   All media.   The user hasn't created any media.

Q.   Okay.   No text posts?

A.   Yeah, that's what that refers to.

Q.   Okay.   Does it include whether the user has made comments on other people's posts?

A.   I don't know.

MR. CHAPUT:  Objection.  Scope.

THE WITNESS:  I don't know.  We can get back to you on that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.   Does it include whether users have sent each other direct messages?

MR. CHAPUT:  Objection.  Scope.

THE WITNESS:  I'm not sure.  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   You see below that on Instagram your notes also refer to automations on Instagram, right, from the pre-October 2024 period?

A.   Yes.

Q.   Okay.   And the same ones we've talked about are there, right?

CONFIDENTIAL

Page 181

A.    Yes.

Q.    Okay.  So let's talk about how the human review process actually works.

So if the account is not automatically ignored by Meta's automation policy, then it goes into this human review queue, right?

A.    That's right.

Q.    And the human -- in this queue the report waits to be reviewed by one of Meta's contract reviewers, right?

A.    Yes.  I actually don't know if the human reviewer are contract or employees, but they're likely mostly contract.  But there's probably a mix of employees and contract on this queue.

Q.    And while the report is waiting to be reviewed, the user still has access to their account, right?

A.    That's right.

Q.    Okay.  They can continue to post content, right?

A.    Yes.  The checkpoint does not happen until after review.

Q.    Okay.  And while the report is waiting for review Meta continues to collect personal

CONFIDENTIAL

Page 205

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 3:26. We're back on the record.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   So before we took a break we were looking at Exhibit 20 --

A.   4.

Q.   -- 24, which was that age problems handover spreadsheet, right?

A.   Yes.

Q.   So I can represent to you that the metadata that was provided to us from Meta indicates that the document was from the custodial file of someone named █████████

Do you know who ████████ is?

A.   Vaguely.  He's product or eng.  He's one of those two functions.

Q.   "Eng" is engineering?

A.   Yes, engineering.

Q.   And the author of the document is ████████████@meta.com.

A.   Okay, that is someone that I spoke to.

Q.   And ████████████ is the subject matter expert you spoke to about cross-app enforcement?

CONFIDENTIAL

Page 206

A.    Yes.

Q.    And specifically in the context of cross-app enforcement for underage reports, right?

A.    Yes, that's right.

Q.    Okay.  So we'll move on from that document.

So just to take a step back here, if a parent discovers that their child has an account on Facebook or Instagram, the way the parent can tell Meta to take down the account is by filing a report, right?

A.    That's right.

Q.    And the reports from parents of underage users are treated the same way as any other reports of any of Meta's underage reporting forms, right?

MR. CHAPUT:  Objection.  Form.

THE WITNESS:  You're asking if there's a difference if the person who reports is a parent versus not a parent, or is there any difference in how the report is treated?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Yes.

A.    No.

Q.    They're treated the same way?

CONFIDENTIAL

Page 207

A.    Yes.

Q.    And so, for example, if a parent tells Meta by filing a report that their child has a -- their child who is under the age of 13 has an account on Facebook or Instagram but the account does not have a bio or photos, Meta would ignore that report, right?

MR. CHAPUT:   Object to form.

THE WITNESS:   That's theoretically true.   Meta also doesn't have a way of verifying that the person who reported it is really a parent.

So the point of ignoring a report if there's no bio or photos is that there's simply no information for Meta to go on, and the reporter indicating that they're a parent doesn't give us any incremental information.   We don't know if that person is a parent.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    But Meta -- sorry, go ahead.

A.    It is -- I think I've spoken about this a little bit, but a very, very high percentage of the reports are false, and the contact form contains a lot of false data, so we don't have any indication

CONFIDENTIAL

Page 208

that the parent -- that a person indicating that they're a parent, that they are a parent.

Q.    Meta asks whether the reporter is a parent, right?

A.    Right.

MR. CHAPUT:  Object to form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    But Meta doesn't use that information in reviewing the report, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  I'm not sure.  I'm not sure.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You don't know whether Meta uses the information that a reporter is a parent in reviewing the report?

MR. CHAPUT:  Object to form.  Asked and answered.

THE WITNESS:  I'm not aware of any way Meta uses that information.

I'm also saying that I'm not aware of any way Meta would validate that the person was a parent just because they indicated that in the form.

///

CONFIDENTIAL

Page 209

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And Meta asks reporters to provide their own e-mail address, right?

A.    Yes.  And I can't remember if that was in both flows, but I can look at the documents.  I remember it definitely being on the Facebook flow. I can look it up.

Q.    And Meta doesn't follow up with reporters to ask for more information based on -- by contacting them at their e-mail address, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Not that I'm aware of. There could be some specific exceptions in the past, but, yeah, as far as I know, not as normal practice.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Right.

So, for example, if someone indicated they were a parent of a child on Instagram and reported the child's account and -- Meta would not contact that parent by e-mailing them at the e-mail address they provided, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Not as a normal practice.

///

CONFIDENTIAL

Page 210

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You said a large number of the reports are false.

A.    (Nodding in the affirmative.)

Q.    By "false," you mean they were ultimately not checkpointed, right?

A.    Either that they were not checkpointed or that they turned out to be -- they could have also been checkpointed but then appealed.  The -- and then ID verified that they are over 13.

We've seen, like, very significant abuse of this flow because users know that it's a flow that ultimately ends at an account being taken down.  It is an attack factor for public, like often celebrity accounts, for other users to get them taken down.

So we see, like, Kim Kardashian being reported every single day many times.  So, yeah, that's what I'm speaking about.

Q.    Meta doesn't review every report about Kim Kardashian's account for being underage, right?

A.    Meta does not human review every report for Kim Kardashian, yeah.

Q.    Do you know what percentage of reports are -- that go into the checkpoint are ultimately

Page 211

successfully appealed?

MR. CHAPUT:  Object to the form.
Scope.

THE WITNESS:  I don't have that data
point.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  You don't know or Meta doesn't
know?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Who at Meta would know?

A.    ███████.

Q.    All right.  Let's talk about account
linking.  So we've talked about hard linking, right?

A.    Yes, we talked about that.

Q.    And hard linking is when a user tells
Meta that they have more than one account on the
platform, right?

A.    Yeah, that's right.

Q.    Okay.  And Meta since December 2021
used that information to propagate its enforcement
on underage accounts across --

MR. CHAPUT:  Object --

///

CONFIDENTIAL

Page 212

BY MR. OLSZEWSKI-JUBELIRER:

Q.    -- accounts that are linked together?

MR. CHAPUT:  Object to form.
Characterization.

THE WITNESS:  Meta has done that at least since late 2021.  When I spoke to ███, he said that it began prior to late 2021 -- sorry, prior to 2020, there was some period where it broke, and then he fixed it, so at least since late 2021 it has been in use.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And prior to 2020, that -- let's see...

Prior to 2020 Meta did not -- sorry, scratch that.

When two accounts are hard linked together, Meta knows that they're operated by the same person, right?

MR. CHAPUT:  Object to form.
Characterization.

THE WITNESS:  Actually, no.  So even if accounts are hard linked together, what it means -- all we can say is, like, it means that those people know each other or have

Page 213

the logins.

It's actually fairly common for the accounts to be linked together, that they're not operated by the same people but they might share a device, which is very common in the family, particularly outside the US.

So, no, often we say that hard-linked accounts actually are not controlled by the same person.  Some of the time they are.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    How often in the US are hard-linked accounts -- how often do hard-linked accounts in the US not belong to the same person?

MR. CHAPUT:  Object to form.  Scope.

A.    I don't have that precise data, but that is something that is knowable.  I don't have it.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    How does Meta know that?

A.    Meta -- I do not know, like, the precise studies that we have done, but speaking at a general level, Meta will do research on different parts of its services, and we have done research on that question, on, like, do hard-linked accounts

CONFIDENTIAL

Page 214

actually belong to the same people.

And I can't point to a precise study, but I know that they do not always belong to the same people. I don't have the precise data in front of me.

Q. Have you ever seen this data that asked that question?

A. I have -- the results of that kind of study have been described to me.

Q. Who described them to you?

A. I don't know.

MR. CHAPUT: Objection. Scope.

THE WITNESS: I don't know. I don't remember.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Who would know at Meta?

A. Let's see, I would start with -- I'd probably start with ████████ actually, who is someone I spoke to who is an analyst in growth.

Q. Okay. Let's do B3, please. That's a document with the Bates number META3047MDL-155-00009593.

(Whereupon, Meta-Hartnett-25 was marked for identification.)

MR. CHAPUT: What exhibit?

CONFIDENTIAL

Page 245

So I want to check how we use a piece of information that we have on new account creation.

Q.   Okay.  All right.

A.   By "contact point," I mean e-mail or phone number.

Q.   Okay.

MR. OLSZEWSKI-JUBELIRER:  Why don't we take a ten-minute break.

THE VIDEOGRAPHER:  The time is 4:17. We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 4:33. We're back on the record.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   So let's talk about inauthentic reports of underage users.

A.   Okay.

Q.   You've talked about abuse as a reporting form, right?

A.   Yes.

Q.   Has Meta's underage reporting form been the subject of scripting attacks?

A.   Yes.

Q.   And aside from scripting attacks you talked about, are there other ways that -- is Meta

CONFIDENTIAL

Page 246

aware of other sources of inauthentic reports of child users on its platforms?

A.    Yes, just individual reports also are -- can be inauthentic.

Q.    Okay.  Those are from people maliciously reporting another account, right?

A.    Yes, that's our understanding.

Q.    Okay.  And you gave examples of celebrities being reported for being underage?

A.    Yes.

Q.    And your notes also talk about the IDF being reported?

A.    Yeah, that's currently the most reported account.

Q.    For being underage?

A.    Correct.

Q.    And that's the Israeli Defense Forces?

A.    Yes.

Q.    Okay.  The IDF account is an Israeli account?

A.    I don't actually know who owns that account.  I don't know.

Q.    Okay.  All right.  Is Meta aware of how many reports of underage users are inauthentic?

A.    It is -- so I can give estimates.

Page 247

The -- the way -- one way of looking at this is what percentage of reports are ultimately checkpointed.

Again, as I've said, a checkpoint does not mean that the user will end up being underage. It means that the human reviewer thought that there was doubt, like they might be underage.

In the US, 14 percent of the reports that are reviewed by humans are ultimately checkpointed.

Q.    And conversely, if an account is not checkpointed, it doesn't mean that the user is not underage, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I can't definitively state either way.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Right.  It just means that if an account is not checkpointed after being reviewed -- after an underage report is filed against the account and it's being reviewed through Meta's review process, it just means that Meta's review process did not decide to checkpoint the account, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  The intention of the

CONFIDENTIAL

Page 248

review process is that the human reviewer is doing their best to determine if they think the account is under 13 or has a chance of being under 13.  So that's the best data that we have.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And we've talked about today various steps in that review process, right?

A.    We've talked about that, yes.

Q.    And at various steps in the review process, if -- for various reasons a reviewer is being instructed to ignore reports, right?

MR. CHAPUT:  Object to the form. Vague, mischaracterizes the testimony, scope.

THE WITNESS:  We've talked about the decision tree -- we talked about the decision tree, I believe it was 2020 that you showed me, and there are certain parts of the decision tree where a user based on some data then clears the report, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Clears --

A.    Ignore, like says ignore this report, yeah.

CONFIDENTIAL

Page 276

CERTIFICATE OF COURT REPORTER

I, MAUREEN O'CONNOR POLLARD, Registered Diplomate Reporter, CSR No. 14449 for the State of California, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Dated this 17th day of June, 2025.

<%21527,Signature%>

_____

MAUREEN O'CONNOR POLLARD

CSR No. 14449