# Exhibit 63

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY      ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION  )
_____ )
SUPERIOR COURT OF THE STATE OF CALIFORNIA
        FOR THE COUNTY OF LOS ANGELES
            SPRING STREET COURTHOUSE
COORDINATION PROCEEDING        )
SPECIAL TITLE [RULE 3.400]     ) Lead Case No.
                               ) 22STCV21355
SOCIAL MEDIA CASES             )
_____ )
                               )
This Document Relates to:      )
                               )
STATE OF TENNESSEE,            )
ex rel. JONATHAN SKRMETTI,     )
ATTORNEY GENERAL and REPORTER, )
v.                             )
META PLATFORMS, INC., and      )
INSTAGRAM, LLC,                )
Case No. 23-1364-IV            )
_____ )

Monday, March 10, 2025
CONFIDENTIAL - PROTECTIVE ORDER MATERIAL
Video-Recorded Oral Deposition of
SUSAN LI held at the offices of Covington &
Burling LLP, 3000 El Camino Real, 5 Palo Alto
Square, Suite 1000, Palo Alto, California,
commencing at 9:05 a.m. PST on the above
date, before Michael E. Miller, Fellow of the
Academy of Professional Reporters, Certified
Court Reporter, Registered Diplomate
Reporter, Certified Realtime Reporter and
California CSR #13649.

GOLKOW - VERITEXT
877.370.DEPS | fax 917.591.5672
deps@golkow.com

CONFIDENTIAL

Page 41

we -- standard process would be to take the kind of prior version because the 10-K is published annually, the Q, the 10-Qs are published quarterly, so there are frequent drafting processes, and to -- the finance -- the relevant finance and legal teams will go through and review the risk factors and decide where there are places where we may want to edit or augment, you know, from prior -- prior drafts, places where we may need to make updates.

I would say that we tend to err on the side of being more comprehensive rather than sort of holding an extremely strict materiality threshold just because we really want to err on the side of investors having more transparency, you know, about -- about all of the possible risks in the landscape.

Q.     Okay.  Let's turn to the next page, page 15.

A.     Yes.

Q.     And can you please read the first risk under the heading Risks Related to Our Product Offerings, so that bolded,

CONFIDENTIAL

Page 42

italicized language?

A.      Oh.   This reads:   If we fail to retain existing users or add new users, or if our users decrease their level of engagement with our products, our revenue, financial results, and business may be significantly harmed.

Q.      Thank you.

And can you read the first two sentences of the next paragraph.

A.      Okay.   This reads:   The size of our active user base and our users' level of engagement across our products are critical to our success.   Our financial performance has been and will continue to be significantly determined by our success in adding, retaining, and engaging active users of our products that deliver ad impressions, particularly for Facebook and Instagram.

Q.      Thank you.

And, Ms. Li, in your own words, can you explain to the jury this risk?

A.      Yeah.   Fundamentally, the family of apps products that we build are, you know, products where we -- the -- you

CONFIDENTIAL

Page 43

know, where the long-run business health is very much correlated with the long-run product health of the products.

So if we build products that people don't use, don't find useful, don't find engaging, don't find interesting, don't want to come use, then we will have no product offering and there -- you know, and that -- we will have a worse product offering and thereby -- thereby a worse business.

And so one of the risks that we are flagging or highlighting here for investors is that, you know, building products that are actively useful is basically a critical part of the long-term sort of product and business strategy.

Q.    And just one follow-up.  You mentioned the family of apps.  Could you explain what that means?

A.    Oh, sure.  When we say the family of apps, we refer to primarily Facebook, Instagram, WhatsApp, Messenger and, today, Threads.

Q.    So Meta tells investors in its 10-K here that its revenue and financial

CONFIDENTIAL

Page 44

results may be harmed if it doesn't retain existing users or add new users, right?

A.    That's definitely a -- for us, the sort of long-run product usage and long-run business results are very -- you know, those go hand in hand.

Q.    Meaning the long-run -- the product usage goes hand in hand with Meta's long-run business results, right?  That's what you said?

A.    Yeah, those two things, I think, are closely aligned.

Q.    Okay.  And that's true because more users on the apps leads to more opportunities to generate advertising revenue, right?

A.    That's the -- that's the -- sorry.

For us, you know, we make money by showing ads on -- not all parts of the family of apps, but there are parts of the family of apps that we monetize and parts that we don't.  But for us, that's the business.

And, you know, in order to have

CONFIDENTIAL

Page 45

the opportunity to do that there needs to be a product experience that, again, people actually use and engage with.

Q.    Right.  So again, just more users on the apps leads to more opportunities to gain revenue, correct?

A.    I mean, over the long run, broadly.

Q.    And more engagement by users on the apps leads to that same result, correct?

A.    Again, over the long run, those things are broadly in line, yes.

Q.    I want to look at the bullet points that are listed here on page 15 through 16.

A.    Okay.

Q.    And in particular, I'll point you to the sentence right before those bullet points start on 15.

A.    Yes.

Q.    It says -- or excuse me.

The document is identifying factors that can negatively affect user retention, growth and engagement, right?

Do you see that there?

Page 47

on page 16.

Can you read that first bullet point?

A.    Yes.  This reads:  There are decreases in user sentiment due to questions about the quality or usefulness of our products or our user data practices, concerns about the nature of content made available on our products, or concerns related to privacy, safety, security, well-being or other factors.

Q.    So, Ms. Li, in your own words, what does this factor mean?

A.    I mean, broadly again, there are -- this factor really covers a lot of -- a lot in one sentence, but what I would say is broadly, if people don't feel like we are building products that -- where they feel like their, you know, privacy is safeguarded in the way that they want it to be or they feel like they are seeing content they don't want to see or if they feel like they feel worse, you know, about using the products, then, you know, that's -- those make our products less good and less useful and, you

CONFIDENTIAL

Page 48

know, people will engage with them less if that's the case.

Q.    So in other words, if users are feeling more negatively toward Meta for any of these reasons, that might negatively affect user retention, growth and engagement, right?

MS. JONES:  Let me object to the characterization.

You can answer.

A.    Maybe being a little bit more specific, I think what this bullet is getting to is if users are feeling negative about the -- like the product experience, then they -- then they -- for any of these reasons, then they will engage with the products less.

BY MS. O'NEILL:

Q.    Can we turn to page 17, and can you read the first bullet on that page, please.

A.    The first bullet on page 17?

Q.    That's right, yeah.

A.    Okay.

We, developers whose products

Page 57

significantly less, then that is also worse for the business.

BY MS. O'NEILL:

Q.    Okay.  Can you read the next risk on page 17.  So this is the bolded, italicized language starting "We generate substantially"?

A.    Yes.

We generate substantially all of our revenue from advertising.  The loss of marketers, or reduction in spending by marketers, could seriously harm our business.

Q.    And in your own words, can you explain this risk, please?

A.    Most of our revenue comes from advertisers who choose to spend money on the platform, and if they chose not to spend money on the platform, then we would generate less revenue.

Q.    Can you read the first sentence in the paragraph that follows, starting "Substantially all"?

A.    Substantially all of our revenue is currently generated from marketers advertising on Facebook and Instagram.

CONFIDENTIAL

Page 58

Q.    And just to be crystal clear about this, this is a true statement, right? Substantially all of Meta's revenue is generated from advertisements on Facebook and Instagram?

A.    Yes, that is true.

Q.    And, to your knowledge, this has always been true for Meta?

A.    It has not always been true for -- not always been true of Instagram, sorry, just because Instagram is a later addition to the portfolio of family of apps.

So for some period of time in the company's history, this would have been true of Facebook only.

Q.    So just -- I think I understand what you're getting at.

A.    I'm sorry, yes.

Q.    So before Meta purchased Instagram, substantially all of its revenue was generated by advertisements on Facebook, right?

A.    That's right.

Q.    And when Meta purchased Instagram, substantially all of its revenue

CONFIDENTIAL

Page 86

impressions.  Some will choose to purchase based on the -- you know, whatever the underlying business action they're looking for is, again, if it's installing an app, if it's completing an e-commerce transaction, if it's, you know, a messaging conversation.

In general, we find that advertisers, maybe not too surprisingly, prefer to pay for the thing that's closest to what they are actually -- the outcome they're actually looking for, you know, typically a purchase or transaction of some kind.

So it's -- which is an evolution from, you know, the early kind of days of Internet advertising businesses when advertisers typically weren't able to measure that outcome and so might have purchased impressions only.

But the evolution from impression-based ads to business outcome-based ads has been pretty significant for advertisers.

Q.    Okay.  And just to like sort out those different types of ways that advertisers might pay for ads, there's --

CONFIDENTIAL

Page 87

some advertisers pay based on impressions, which represents the number of times that a user views the ad, right?

A.    Yes, that would be what impression-based ads are.

Q.    Okay.

A.    But again, it's not super -- again, if you have the ability to measure the thing you want, you probably won't buy based on impressions.  You'll probably buy based on the thing you want.

Q.    Understood.

One other way that advertisers might pay for ads is based on the number of clicks that users -- number of times that users click on ads, right?

A.    Those are click-based ads.  Those probably -- unfortunately, I haven't looked at the latest sort of breakdown in a long time.  But we -- again, similar to impression-based ads, we've really shifted to a world where advertisers are paying for some kind of underlying business outcome, which is fairly -- which is somewhat rarely merely clicking or looking at their ad.

CONFIDENTIAL

Page 88

Q.    Are those sometimes referred to as conversion events?

A.    As what --

Q.    Conversion events?

A.    The --

Q.    The purchasing of an item or putting something in a cart, are those referred to as conversion events?

A.    Yes.  Whatever the advertisers' actual desired outcome is would be the conversion event.

Q.    How does targeting the ads affect the price that marketers pay for advertisements?

A.    This is -- this is sort of complicated.  I mean, it -- it doesn't directly, but the way in which the advertising ecosystem works is, you know, if you show an ad to a person who is more likely to engage with it, then that is likely to result in a better outcome for the marketers.

So as an example, like I have young kids.  I was shown an ad for umbrellas that change color in the rain, and I have since purchased probably 25 umbrellas that

Page 89

change color in the rain.

So I was a very well-identified user for this company, and, you know, they made a lot of money selling me umbrellas. But it's great because I think they've brought a lot of delight to five-year-olds with these umbrellas.

So that's -- you know, it's -- it's not the targeting itself that they pay more for per se. It's that when the ad is well targeted, then they generate more business outcomes, as in the case that I described.

Q.    And going back to the different, you know, kinds of ways that advertisers can pay for ads, can you estimate what proportion of advertisers pay for outcome-based ads versus impression- or click-based ads?

A.    I apologize. I'm just not super close to this anymore. And there are also some complexities in the way that we package the ad offerings.

But my general understanding is that the majority of ad revenue is coming

Page 90

from advertisers who are optimizing for outcomes over impressions.

Q.      Okay.

A.      Even though they may be paying on a per-impression basis because of some of the ways that these ads get billed.

Q.      I want to direct you to a sentence -- I'm going to have you hunt for a sentence again.  Sorry.

In the second paragraph, toward the bottom, that starts "We calculate average."

A.      In this paragraph, you mean?

Q.      In this paragraph that -- the paragraph that starts "We recognize revenue."

A.      We calculate average price per ad as total advertising revenue divided by the number of ads delivered, representing the average price paid per ad by a marketer regardless of their desired objective, such as impression or action.

Q.      Okay.  So I think I'm understanding that kind of like the ARPP number, the average revenue per person, this average price per ad is, again, calculated

CONFIDENTIAL

Page 96

again, within the infrastructure team.  They would have the best understanding of, you know, how much capacity is being used in each region.

Q.    And who leads that infrastructure team?

A.    Santosh Janardhan, spelled J-A-N-A-R-D-H-A-N.

Q.    Thank you.

Let's turn to page 100.  Okay. The first table on this page sets forth: Revenue disaggregated by revenue source and segment, right?

A.    Yes.

Q.    And this is for 2022 to 2024, right?

A.    Yes.

Q.    Okay.  What was Meta's advertising revenue in 2024?

A.    $160.633 billion.

Q.    Okay.  And what was Meta's total revenue for 2024?

A.    $164.5 billion.

Q.    So again, as we discussed before, advertising revenue constitutes the

vast majority of Meta's revenue, right?

A.    Yes.

Q.    Okay.  And the second table disaggregates revenue by geography, right?

A.    Yes.

Q.    And more specifically, based on the addresses of customers, correct?

A.    Yes.  And thank you for clarifying that, because this is a different definition of geography than when we were looking at the average revenue per person.

Q.    Can you explain that difference?

A.    When we were looking at the geographic breakdown of -- actually, I don't think we were -- I can't remember if we were looking at a geographic breakdown.

But what you're seeing here when we say customer, we mean where the advertiser is located.

So most notably, you have revenue from advertisers in China, whereas if you were to look at a customer base -- a user-based breakdown, you would see that we don't operate our services in China.

CONFIDENTIAL

Page 138

asked and answered.

You can go ahead.  Excuse me.

A.    The overall assessment of these six -- of how we did relative to the six goals factors into the company -- company bonus multiplier.

MS. O'NEILL:  I'm going to hand you what is document K and we've marked as Exhibit 7, and this is Bates-stamped META3047MDL-065-00471611.

(Whereupon, Meta-Li-7, E-mail(s) re: Q1 progress toward IG engagement and time spent goals, META3047MDL-065-00471611 - META3047MDL-065-00471612, was marked for identification.)

BY MS. O'NEILL:

Q.    Ms. Li, do you recognize this document, at least in the same way that we've been discussing?

A.    Yeah, I don't recall it, but have no reason to doubt that it's accurate.

Q.    And this is an e-mail chain between you and Jenni Romanek, right?

CONFIDENTIAL

Page 139

A.    Yes.

Q.    And it's from March 2017?

A.    Yes.

Q.    And who is Ms. Romanek?

A.    I believe she is in the Instagram either product analytics or data science organization.

Q.    And let's look at the second page of this document.  So if you turn over to the back of this, there's an e-mail from you, and you're asking Ms. Romanek about the company's progress toward Instagram monthly average person and time spent goals, right?

A.    Yes.

Q.    And are these the same kind of goals that we discussed earlier, just for 2017?

A.    I'm not -- it would probably be more accurate if there was a way for me to verify that, but I think generally it seems like it's -- you know, I would say -- I mean, it seems like I was probably generally tracking towards the 2017 version of this -- of this process.

Q.    Okay.  And looking on the first

CONFIDENTIAL

Page 140

page at the bottom e-mail, Ms. Romanek responds that:  We've been crushing it on user growth.

Right?

A.    Yes, that is the response.

Q.    And she reports that the company has even revised upwards the H1 monthly active person goal, right?

A.    I might rephrase that to say the team has revised it upwards.

Q.    Okay.  And by team, you mean the Instagram team?

A.    Yes.

Q.    Okay.  And Ms. Romanek says, in the next paragraph, that the time spent goal for the first half was 28.4 minutes, right?

A.    Yes.

Q.    And what does that figure mean?  Is it 28.4 minutes per user per day?

A.    I actually don't -- don't know for sure.

Q.    Okay.  Ms. Romanek mentions that they're currently at 26.9 minutes and that they're ahead of target, right?

A.    That's what it says.

Page 141

Q.    You then, on your e-mail right above this, you ask Ms. Romanek whether there was also a US teens goal, right?

A.    Yes.

Q.    And this was a goal of reaching a certain amount of US monthly active teen users, right?

A.    I --

Q.    Or --

A.    Sorry.  Go ahead.

Q.    No, I'm sorry, I interrupted you.  I think it's actually daily active users?

A.    Yes.  This would -- since I'm asking her if this exists, it wouldn't have been part of my process, but it's sort of like do they have a -- within Instagram.

Q.    A teen goal for US teen active users, right?

A.    Yes.

Q.    Okay.  And Ms. Romanek responds to you at the top that their US teens goal was 12.1 million, right?

A.    Yes, that's what it says.

Q.    So these -- you believe that

these are goals that the Instagram team has set, correct?

A.    I -- again, I'm not totally certain, but they're just, again, we're kind of going back in history a lot here, but these are aren't part of my -- like my company process.  Otherwise, I -- presumably, if they had been, it would have -- I wouldn't be asking her sort of midway if there was such a goal.  But I think it's me inquiring how -- you know, what -- how they're doing towards their product goals.

Q.    And why are you inquiring about their goals?

A.    I -- I mean, I honestly don't recall exactly what the impetus for that would have been.  As you can probably see on this e-mail, I, in fact, did have a baby on this day.

Q.    Oh, gosh.  Wow.

A.    I said I was due in three days, but that is the delivery date of my second child.

Q.    Goodness.

A.    So there's probably a lot going

CONFIDENTIAL

Page 283

A.    Hi.

Q.    I just have a few more documents that I'm going to go over with you. Let's get the first one. We're going to mark it as Exhibit 29.

A.    Okay.

(Whereupon, Meta-Li-29, May '21 Revenue Update, META3047MDL-074-00126415 - META3047MDL-074-00126433, was marked for identification.)

BY MS. O'NEILL:

Q.    Do you recognize this document?

A.    I don't recall this specific document, but my team regularly prepares updates of this nature.

Q.    And is this prepared -- this kind of update prepared on a monthly basis?

A.    I am certain that there's a quarterly version. I'm not certain there's always a monthly version.

Q.    And you usually receive this update?

A.    Yes.

Q.    And who else receives this

CONFIDENTIAL

Page 284

update, this kind of update?

A.      At this level of granularity, I think it is mostly people who are working in the finance or the relevant monetization organizations.  A much shorter summary version of this will be shared with the leadership team broadly.

Q.      Okay.  I want to turn to page 11 of this document, okay?  And do you see a section header called Teen and Young Adult Ad Load?

A.      I do.

Q.      Okay.  And then I'm going to read that next sentence.

It says:  In an effort to address broad engagement declines on Facebook app generally and win back sessions with younger populations specifically, Facebook app is reducing ad load for teens ages 13 through 17, and young adults, 18 through 24, in high-value countries, US, Canada and most of Western Europe.

Is that right?

A.      That's what it says, yes.

Q.      Okay.  So here, Meta was trying

CONFIDENTIAL

Page 285

to address engagement declines among teens and young adults on Facebook, right?

A.    I don't remember the specific efforts, just it's from May 21st, but that is what this says.

Q.    Okay.  Let's read the next section.  Can you actually read the next -- or excuse me, the next sentence starting "These two cohorts"?

A.    These two cohorts demonstrate disproportionate engagement hurt, i.e., sessions loss, from ads versus the no ads holdout.  Teens at 6.1% sessions loss and YA at 3.7%.

Q.    So this document is discussing reducing ad load for teens because the teen cohort demonstrated disproportionate sessions loss due to ads, right?

A.    That's what it says.

Q.    Let's look at the last paragraph.  It says:  Long-term, i.e., over 18 months, we expect these ad load reductions to recover plus 3.2% sessions in the teen cohort and plus 1.2 sessions in the YA cohort.

CONFIDENTIAL

Page 286

Did I read that correctly?

A.    Yes.

Q.    So this document is saying that Meta expected that this ad load reduction would recover 3.2% sessions in the teens cohort, right?

A.    That -- yes, that's what it says.

Q.    Okay.  And then looking at the very last sentence, the document says:  In the near term in H1, the Facebook Inc. post-budget revenue impact is estimated at negative .2%.

Right?

A.    Yes.

Q.    So Meta expected that this ad load reduction would have a near-term impact of negative .2%, right?

A.    In H1, yes.

Q.    So Meta's expectation here -- the company's expectation was that teen users of Facebook would use the platform more frequently if the ad load was decreased, right?

A.    Yes.

CONFIDENTIAL

Page 287

Q.    And Meta was willing to do this despite the expected near-term negative revenue impact, right?

A.    We quite frequently make ad load -- like, tune ad load decisions in this way, so it's not sort of -- this is not that -- not that unusual.

Q.    We can put that away and move to the next document.

Actually, I guess I have one more question, just to follow up on that.

Meta was expecting a long-term positive revenue impact from this ad load reduction, right?

A.    I don't think there's any specific expectation that's represented here. The sort of -- you know, if -- I think the thing that we are almost always trying to optimize for with ad load optimizations of this kind is trying to make sure that, basically, the aggregate user experience is, you know, useful and positive for the people using it and that, you know, that results in sort of long run, them having a better experience on the product, and of course,

CONFIDENTIAL

Page 288

that gives us the opportunity over the long run to -- to align sort of the ability to show ads with that.

MS. O'NEILL:  Okay.  Let's take a look at the next document.  We're going to mark that as Exhibit 30, and it's Bates-stamped META3047MDL-074-00130390.

(Whereupon, Meta-Li-30, July '21 Revenue Update, META3047MDL-074-00130390 - META3047MDL-074-00130404, was marked for identification.)

BY MS. O'NEILL:

Q.     Do you recognize this document?

A.     Again, I don't remember this specific one, but this appears to be the July 21st version of the previous document that we looked at.

Q.     Okay.  And can you turn to page 13, please.

A.     Yes.

Q.     And toward the bottom you'll see a headline or header that reads:  Impacts of Facebook App Teen/YA -- or young adult --