# Exhibit 94

# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| *PEOPLE OF THE STATE OF CALIFORNIA, et al.,*<br>Plaintiffs,<br><br>v.<br><br>*META PLATFORMS, INC, Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC.,*<br>Defendants<br><br><br>IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>4:23-cv-05448 | MDL No. 3047<br><br>Case No. 4:23-cv-05448-YGR<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

# TRIAL REPORT OF COLIN GRAY
## May 16, 2025

helpful to nudge them towards other topics at the right moment." (Castaneda Ex. 33 at 7). Both of these tools are good in principle, but their execution was flawed.

109.    Importantly, Meta offered these tools only as opt-in settings, not defaults.[45] Opt-in settings are far less effective than defaults, requiring users to go against the friction of the platform design (e.g. META3047MDL-031-00024886). Multiple witnesses recognized this phenomenon at their depositions (e.g., Volichenko Dep. 105:25-107:1 ("[H]umans, we kind of stick to the status quo. So if it's off, it'll be – it'll stay off for, like, 99 percent of people.")). Even Mark Zuckerberg stated this in internal documents: "[S]tats show us that most people just use whatever the default setting or filter is." (Zuckerberg Ex. 32 at 2).

110.    Meta employees also expressed that, by requiring users to affirmatively turn these features on, the adoption rate for these tools would be extremely low. (Volichenko Dep. 112:3-9 ("[T]he difference in adoption between opt-out and opt-in can be massive, right?").[46] Indeed, at one point, the team running these two features had to reduce its adoption "goal" from 0.6% to 0.25%—meaning, success would have meant 99.75% of teenage users did *not* activate *either* feature. (Volichenko Ex. 3; Castaneda (Vol. II) Dep. 441:21-442:6). Success for the Take A Break feature on its own was only 0.18% of weekly active teen Instagram users, and for Alternative Topics a mere 0.07%. (Volichenko Dep. 101:19-102:114). As one Meta witness acknowledged: "[T]hose are not ambitious goals." (Volichenko Dep. 102:21-25).

111.    Testimony from at least two Meta witnesses indicates that they were aware that few teens were expected to use these tools and their impact on teen well-being would be negligible at best. One testified that, prior to launch, he knew the features would not decrease time spent on the platform by users and would therefore have "no ecosystem regression" (Castaneda Ex. 30 at p.63) related to that metric or to ad revenue (Castaneda (Vol. II) Dep.

---

[45] One Meta witness testified that the team could not even test these as opt-out defaults, because it would "just look[] really bad" to test such a feature then not implement it. (Volichenko Dep. 104:104-25); see also META3047MDL-035-00001018 at 13) ("If the test is picked up by press/regulators, difficult to reverse")).

[46] Bad defaults that rely on users opting in are effective for companies because users are less likely to change default options (Kesan & Shah, 2006), assuming—based on user experience best practices and knowledge of human psychology—that default options are considered to be "preferred," if they are even discovered and contemplated at all.

HIGHLY CONFIDENTIAL (COMPETITOR)                    49

420:9-421:17; Castaneda Dep. Ex. 31 at 5). In other words, even though the stated goal was to encourage teens to use Instagram less, at least some employees anticipated these features would not have this effect. (Volichenko Dep. 114:5-116:15).

112.    As significantly, multiple Meta employees indicated it was feasible to improve utilization of this feature beyond making it a true default. Volichenko explained: "I think initially we had some problems with how easy it was to ignore it, right? So, like … when you get a nudge, you can – you can do a few things. You can dismiss it. You can close the app…And so each one of those things can be made easier or more difficult for the user, right, by adjusting, you know, the font on the button, the size of the button, how prominent it is … You can make it in a way that it's not dismissible at all." (Volichenko Dep. 110:3-111:1). As former Meta senior engineering leader Arturo Bejar likewise explained: "Very few people go to settings, and even less people go into the menus that the settings offer. And so if you want somebody to use a feature, you put it in the front page. You make it responsive to touch on the user interfaces. You point people at it. There is [sic] many things that are well-understood in the industry that you can do in order to drive feature discovery and usage." (Bejar (Vol. II) Dep. 546:25-547:8).

113.    The above plausibly explains much of the low usage rate for these tools. The Take a Break Reminder has less than a fifth a percent adoption rate among teens. (META3047-MDL-040-00654288). The Quiet Mode tool, launched by Instagram until 2023, has an approximate 2% adoption rate by teens. (META3047MDL-007-0373649). According to Bejar, Meta knew that, if they made their safety features opt-in on Instagram, the adoption rate would be very low. (Bejar Vol. I Dep. 168:2-169:3).

114.    Offering tools that are known not to have any measurable effect, while claiming they will reduce problematic use, is known as "ethics washing" (Bietti, 2020). The above tools, introduced in response to public criticism, are presented as evidence of responsible design, but they place the burden of self-regulation on users without meaningfully addressing the structural design patterns—such as **infinite scroll** and **recapture notifications**—that drive overuse and harm.