# Exhibit E

SUPERIOR COURT FOR THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

DEPARTMENT 12 - HONORABLE CAROLYN B. KUHL, JUDGE PRESIDING

| | |
|---|---|
| COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.550]<br><br>SOCIAL MEDIA CASES<br>______________________________<br><br>(LEAD CASE: CHRISTINA ARLINGTON SMITH, ET AL., V. TIKTOK INC., ET AL., CASE NO. 22STCV21355)<br><br>THIS DOCUMENT RELATES TO:<br>P.F., ET AL. V. META PLATFORMS, ET AL., CASE NO. 23SMCV03371 | JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5255 |

REPORTER'S DAILY TRANSCRIPT OF PROCEEDINGS

THURSDAY, MARCH 5, 2026

(APPEARANCES OF COUNSEL ON FOLLOWING PAGES)

- - -

REPORTED BY: CARRIE A. CAMPBELL, CSR NO. 13921, RDR, CRR
COURT-APPROVED REPORTER PRO TEMPORE
PAGES 4724-5007

**Q. So the jury's got a feel, how much time, what was -- what was your commitment there?**
A. Yeah. So there, the commitment was initially a few hours a week. It grew during the time that I was there. Basically the question was, did I have enough time to do the responsibilities that I had during that time, which was to help the well-being team with the work that they were doing on safety.
**Q. All right. We'll get into that in more detail, but I want to get the time ideas down first.**
**Did you work on issues related to the safety of kids on Instagram and Facebook?**
A. Yes, I did.
**Q. Were you responsible -- you, Arturo Bejar, were you responsible for evaluating whether Meta was adequately protecting kids?**
A. Yes, I was.
**Q. Were you responsible in your jobs for advising Meta's senior leadership on how to protect kids?**
A. Yes, I was.
**Q. Based on what you observed, was safety a priority at Meta?**
A. Absolutely not.
**Q. The jury's heard a lot about the safety tools that Meta has launched to address things like addiction and problematic use.**
**Have you looked at those safety tools?**
A. Yes, I have tested those safety tools.

**Q. What are the elements of Meta's platform designed to encourage excessive and compulsive use?**

A. So there are a number of things that all work together for this.

The first one is infinite scroll, right? So never-ending stream of things.

The second one is playing videos automatically, so not to click on the video to play. Just start playing the video.

The third one is something that notices, like, what you interact with, what you look at, and then delivers more of it. So the sort of algorithmic recommendation that then propels that infinite stream with stuff that might catch your attention.

And then if you step away from the product, they have all of these notifications that are designed to bring you back in and then start sort of scrolling again.

And then the other thing -- another thing that's really profound to this is sort of the social aspect to this. Because it's -- a really powerful hook to keep coming back is, if that's where all the other people are or the other kids are, then you're going to come back to see what they're doing. But then in the process of doing so, you fall into the other features again.

**Q. Those social features, are those things like likes and the social counts and things?**

A. Yeah, likes, social counts. There's -- there's

A. Yeah, you have to have engineers. The engineers, product managers, research, and particularly within, for example, Instagram, that's the number that's going to do the changes that makes things better for Instagram. And so that number is really important in terms of how effective you can deploy different features that can address different harms.

**Q. All right. I want to talk to you about some of the warnings, some of the tests that you've done, some things of that nature. And in the process, I want to make it real clear and ask you to please make sure we don't answer any of these questions based upon content, but we only answer these based upon features.**

**Is that okay?**

A. Absolutely.

**Q. All right. Great.**

**During your second stint at Meta, were there discussions internally about Instagram causing mental health harms to kids, tying it to features?**

A. Yes, there were.

**Q. In your view, was Meta transparent with the public and with the users about what it knew about the way these features could harm kids?**

A. No. Meta absolutely was not transparent about the way these features could harm kids.

**Q. In the congressional testimony, were they transparent?**

A. No, they weren't transparent in the

congressional testimony.

**Q. On their website, that you knew of, were they transparent?**

A. No, they're not transparent. The language is very misleading.

**Q. You characterized it as misleading.**

**What do you mean?**

A. So the first six years I was there, one of the things that I worked on was making sure that if a -- if the company said something about, like, a feature or some security issue or some other issue, that it was accurate, that you could really back that up with the way things worked and with the data that we had about those issues.

And when I looked at the website and some of the statements, they make these, like, really high-level claims that are extremely broad, and that's not what the data was internally about the things that they were saying. Or they would be playing word games using things that sounded reasonable, but they're not really conveying the harm that is happening.

And so I really felt that they were creating a very misleading picture of how safe these products are in a way that I think is something that we all have to work through.

**Q. Did you find that to be accidental, or did you see evidence of that being intentional? A choice?**

A. There's no word that they put on their website

as long as you don't risk anybody's identity. Like, we need to know in aggregate, like, how well the safety -- how these products works.

**Q. So she was responsible for leaking internal documents out to the media. They exploded.**

**And then ultimately did she go to Congress and testify as a whistleblower?**

A. She did, yes.

**Q. And after her testimony, Mr. Zuckerberg issued what?**

A. He wrote a note that was first aimed at all of the people that were inside the company, like myself, and then that note that he wrote was also published to the outside.

**Q. Okay. And when Mr. Zuckerberg put this note internally, did you read it?**

A. Yes, I did.

**Q. And without going into too much detail about it, did you find it to be genuine and authentic in what it was saying about what was happening at the company?**

A. No. I found it to be the opposite of that.

He said a number of things about safety and about children that were so, like, the opposite of the reality, wrapping it around this argument of, like -- I mean, it doesn't -- why would we do research if we're not going to use it.

And I'm sitting in a team going, like, it's exactly what's happening. So there was -- I felt like

it was profoundly misleading of everybody who worked at the company, and most importantly, profoundly misleading of everybody else in the world who was being impacted by all of these issues.

**Q. So when Frances Haugen leaked the documents, the documents are starting to get published in the media, she testifies at Congress.**

**Were her leaks and was her testimony about teen mental health and the Meta Platforms?**

A. Yes.

**Q. And --**

MS. JONES: Excuse me, your Honor. Forgive me for being a little slow on the objection.

I think to the extent that Mr. Bejar is testifying about the contents of Ms. Haugen's testimony before Congress, that would be hearsay.

MR. LANIER: I'm not going to go into any depth at all. I'm just trying to set up the subject matter so that we're able to address his interactions with Mr. Zuckerberg.

THE COURT: All right. So I'll allow the answer to stand.

MR. LANIER: Thank you, Judge.

QUESTIONS BY MR. LANIER:

**Q. And so we have the testimony in front of Congress after the leaks. Mr. Zuckerberg sends out the e-mail to the company. You found that e-mail to be -- what's a polite way of saying...**

SUPERIOR COURT FOR THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

DEPARTMENT 12 - HONORABLE CAROLYN B. KUHL, JUDGE PRESIDING

| | |
|---|---|
| COORDINATION PROCEEDING<br>SPECIAL TITLE [RULE 3.550]<br><br>SOCIAL MEDIA CASES<br>________________________________<br><br>(Lead Case: Christina Arlington Smith, et al., v. TikTok Inc., et al., Case No. 22STCV21355)<br><br>THIS DOCUMENT RELATES TO:<br>P.F., et al. V. Meta Platforms, et al., Case No. 23SMCV03371 | JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5255 |

I, CARRIE A. CAMPBELL, OFFICIAL PRO TEMPORE REPORTER OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF LOS ANGELES, DO HEREBY CERTIFY THAT THE FOREGOING PAGES, 4724 - 5007 INCLUSIVE, COMPRISE A FULL, TRUE AND CORRECT TRANSCRIPT OF THE PROCEEDINGS HELD IN DEPARTMENT 9 ON MARCH 5, 2026, IN THE MATTER OF THE ABOVE-ENTITLED CAUSE.

DATED THIS 5TH OF MARCH, 2026.

________________________________
CARRIE A. CAMPBELL, CSR NO. 13921
NCRA REGISTERED DIPLOMATE REPORTER
CERTIFIED REALTIME REPORTER
CALIFORNIA CERTIFIED SHORTHAND REPORTER #13921
MISSOURI CERTIFIED COURT REPORTER #859
ILLINOIS CERTIFIED SHORTHAND REPORTER #084-004229
TEXAS CERTIFIED SHORTHAND REPORTER #9328
KANSAS CERTIFIED COURT REPORTER #1715
NEW JERSEY CERTIFIED COURT REPORTER #30XI00242600
LOUISIANA CERTIFIED COURT REPORTER #2021012
NOTARY PUBLIC