# Exhibit 6

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
FOR THE TWENTIETH JUDICIAL DISTRICT AT NASHVILLE

STATE OF TENNESSEE, ex rel. JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER,

Plaintiff,

vs.

META PLATFORMS, INC., and INSTAGRAM, LLC,

Defendants.

Case No. 23-1364-IV

--------------------------------

TRIAL TRANSCRIPT

Pages 3991 - 4369

Day 14

Before Chancellor Russell T. Perkins

August 11, 2026

8:15 a.m.

Reported by:
Harpeth Court Reporters
Franklin, Tennessee
Emily L. Sipe, RPR, LCR
Patricia A. Nilsen, RMR, CRR, LCR

INDEX

TESTIMONY OF ANNEKE BUFFONE
Cross-Examination (cont'd)
By Mr. Parkinson 4026

Redirect Examination
By Mr. Cartmell 4209

Recross-Examination
By Mr. Parkinson 4229

Further Redirect Examination
By Mr. Cartmell 4236

TESTIMONY OF DR. JASON SATTIZAHN
Direct Examination
By Mr. Phelps 4237

So this is like a prophylactic anticipatory brief. I'm not going to file a responsive bench brief when I haven't objected.

MR. PHELPS: Well, that hasn't stopped you guys this whole trial.

We'll keep -- we can keep going; I just don't -- I just don't want you guys to be surprised that that's where I'm going next. I'm just trying to be honest that that's where we're going next.

So we can do it; I'm fine with doing it.

THE COURT: We'll have jury-outs.

MR. PHELPS: Okay.

(Jury present)

BY MR. PHELPS:

**Q. Okay. Are you ready to proceed?**

A. Let's do it.

**Q. Dr. Sattizahn, why don't you turn in your binder to what's been marked PX04642. And let me know when you've had a chance to see it.**

A. Do you know which binder it's in?

**Q. Two.**

**I don't, but Emma does. I wrote it down with the last witness. 4642.**

A. All right. I'm there.

**Q. You've seen it before.**

**Dr. Sattizahn, what is this document? Just at a high level. I think we might be talking about this with the judge in a second, but just at a high level, could you tell us what this document is?**

A. This was a document that was given to research -- shared, you know, to all of us researchers after Frances Haugen's whistleblower disclosure in 2021.

**Q. Okay.**

A. So -- sorry. I didn't mean to cut you off.

**Q. No, I cut you off.**

**Are you familiar with this document?**

A. I am. I was given this directly, and used this repeatedly at the company.

**Q. Okay.**

A. Viewed it, et cetera.

**Q. Does this appear to be a true and accurate copy of a document that you received within the scope of your employment at Meta?**

A. Just going to go through it one more time, just in case...

Yeah. That's correct.

**Q. Did you end up having to use this document, or kind of the concepts within this document, have those in mind while conducting research during your**

**time at Meta?**

A. I did. Yes.

**Q. Okay. And is this an important document in terms of understanding some of the issues that we've just been talking about, about the culture of research post Frances Haugen disclosure?**

A. It is, yeah. Especially in terms of my own experiences as a researcher and how I was interpreting what was going on.

MR. PHELPS: Your Honor, the State would offer PX04642 into evidence.

MR. PARKINSON: Your Honor, we have some objections.

THE COURT: All right.

MR. PARKINSON: The first is -- I'm happy to do it here.

The first is Rule 401, just looking at the face of the document and the product that it's about. We have a 403 objection that I'm happy to articulate outside of the view of the jury, with apologies to them; and we also have a very serious 502 objection, again, based on the face of the document.

THE COURT: All right. Let's talk.

(The following is a bench conference)

MR. PARKINSON: Your Honor, if we can start with objection Rule 401.

This is a document about Reality Labs, the entire document. In fact, not only does it say it on the cover, this is about -- if we look at every page, it's marked "Reality Labs." This is about research at Reality Labs. This symbol is the Reality Labs symbol.

So that's a 401 issue. Reality Labs is not at issue in this case. The State made a conscious decision not to put Reality Labs or virtual reality at all in issue in this case.

That compounds into a 403 issue, because it's obvious what we're doing here. We're trying to suggest to the jury that because Reality Labs had this document about Reality Labs research and virtual reality, that Instagram must have been deleting research as well, which is not something that this gentleman knows anything about.

And then finally, we have a 502 objection. This is privileged. And any argument that it's been made public is an argument about error in other litigations that do not compel this Court to make the same error.

And I believe that we heard Mr. Phelps

acknowledge that there was a lot that went wrong in New Mexico with the way this testimony with this witness came in, stuff about people being murdered on Facebook Marketplace. This would be making the same error.

MR. PHELPS: Let me address just the Reality Labs point a bit, and then I might turn the privilege issue over to Mr. Davis.

In terms of -- your Honor instructed the jury on the first day, I think, before the jury was impaneled, that you can look at direct evidence or you can look at circumstantial evidence. Direct evidence, you see raindrops outside your door, it's raining; and circumstantial evidence, if you see someone coming in from outside with an umbrella and a raincoat, even if the doors -- or the windows aren't open, you can make an inference.

It's not direct evidence of Instagram; I agree with that. It's a Reality Labs document. Mr. Parkinson is right.

But it is probative of what was going on at Instagram in terms of research. It's the same company. He's talking about -- he's talked all day about the integration between the two teams. It's the same mantra; it's the same directive coming down

from on high. So I think it's totally probative in terms of that circumstantial evidence, your Honor, that you instructed the jury about on Day One of this trial.

And that's why it was allowed in New Mexico, and I think evidence like this was also allowed in LA, although I don't -- I know that this document wasn't, and Mr. Sattizahn wasn't a witness there.

But this evidence was -- and frankly, and I think Mr. Parkinson would have to acknowledge, they did a lot more in terms of going into Facebook Marketplace and Facebook Faith, and all of this, than we've done here, because I've been trying to steer clear of that issue.

So it's the circumstantial evidence that's probative, and -- you know, I'm happy to address questions on that now, or we can turn to the privilege issue as well.

THE COURT: Okay. Privilege.

MR. DAVIS: Adam Davis for the State.

Part of what makes this tricky is that they're trying to prevent him from laying some of the foundation that would explain why this is not privileged. But that's part of why I put the brief

in.

The New Mexico court allowed all of this testimony about his interactions with attorneys because the Court correctly realized that this was business advice, not legal advice.

And so where this document fits in to that is it's then telling researchers how to make sure things are privileged, because they want to make sure that the research doesn't become public. And that's exactly what he testified to Congress; that's what he testified in New Mexico. So that's what we put in our papers.

I think if he were given the opportunity, he would give similar testimony here; but he hasn't even had the opportunity to lay the foundation as to how there was a lawyer assigned to every research team, and they were deleting, they were editing, they were guiding the research.

And this document is one part of that scheme to keep the research out of the public eye. So that is why the New Mexico court ruled that this was not privileged, and it was because it was business advice, not legal advice.

And then the New Mexico court did also rule that the privilege had been waived, because

these issues are out in the public eye and have not been sufficiently protected.

MR. PHELPS: Could I make one other point on relevance, your Honor, which is: Meta made a big deal about how we're not going to see research from after 2021 in their opening argument. That's what they told the jury. So I think, insofar as there was any dispute on the relevance of this issue, they kicked open the door to that when they said "You're not going to see these documents from this later time period."

I've laid a ton of foundation -- maybe too much foundation -- for that issue and that culture shift. So I just think it comes in for that, and to address that issue as well.

MR. PARKINSON: Can I just respond on the relevance and the 401 and 403 grounds?

So I think that Mr. Phelps has been very candid, but I think he gave away the game, and the reference was made to this being circumstantial evidence, not direct evidence, with Instagram. That was said on the record.

And this isn't like the rain analogy, because in the rain analogy, the question that your Honor posed to the jury was, "Suppose you're trying

to figure out if it's raining." You could look at evidence of rain falling down, or someone being wet.

The question in this case is about Instagram, and evidence about what was happening at Reality Labs, a different division of the company -- that, by the way, did not have the same management structure; that is not accurate.

It's like using evidence of another criminal conviction and saying that's circumstantial evidence of this person doing a bad thing, in a totally 'nother context, a totally 'nother time.

It is extraordinarily prejudicial. And so to collapse and say, "Oh, it's just circumstantial evidence of what was happening," no. It's character and behavior evidence, to suggest a pattern and practice.

And I thought I was going to have to make a plea that that's what's happening here, but Mr. Phelps just confirmed it when he said "This shows that there's -- the reason there's no research at Instagram post2021 is because this suggests that Instagram was deleting all the research."

That is -- trying to find the right adjectives. That is so incorrect. There are so many documents that are internal research from

Instagram from post2021, and the idea that this document would allow this jury to think, "Oh, they must have just been deleting everything at Instagram," I have an army of document reviewers who would tell your Honor the burdens that we have gone to to produce 2021, 2022, 2023, and 2024 data and documents from Instagram.

So I think everything we've just heard is the -- they are going to tell the jury that this Reality Labs document means the reason that there's nothing that exists is it was deleted. And that is not true, and it is highly prejudicial. It's not probative of what's happening at Instagram.

And that is exactly the prejudice.

MR. DAVIS: Just one quick thing.

Whether that document comes in or not, he needs to be able to lay the foundation that this policy that we're talking about, in terms of involving attorneys throughout the company, applied to Instagram, applied to virtual reality, applied throughout the company.

MR. PHELPS: Your Honor, what's going to happen is -- and this is what happened in New Mexico -- Mr. Parkinson is going to get up there and basically say Dr. Sattizahn is a liar. He's

going to say that this is a fabrication, that this is a tall tale. I think the first question he asked Dr. Sattizahn in New Mexico is, "That's a great story. Is any of it true?"

Well, we need to be able to show the jury documents that directed him to do exactly what he's telling the jury he did.

THE COURT: I'll tell you what I'm concerned about. I'm concerned about what happened in this area being extrapolated to the whole company, without a foundation. That's what I'm concerned about.

This may come in, if we can keep it limited. But --

MR. PHELPS: Understood.

THE COURT: -- extrapolating it to the whole company seems problematic. It seems a bridge too far for this witness.

MR. PHELPS: I can just leave it to his experience and what he experienced this document to be.

THE COURT: Anything else?

MR. PARKINSON: No. Thank you, your Honor.

(Jury present)

BY MR. PHELPS:
**Q. Still having fun?**
A. I think so.
THE COURT: Don't let anything we said over here stop you from objecting, stop you from asking for a jury-out. Okay?
MR. PHELPS: Understood. Thank you, your Honor.
THE COURT: We've got to have this opportunity to get things hashed out before it goes before the jury.
MR. PARKINSON: Thank you, your Honor.
MR. PHELPS: Yep.
BY MR. PHELPS:
**Q. I think the last question I had asked you, Dr. Sattizahn, was, is this an important document -- you're still looking at 4642; is that right?**
A. Correct. I have it open to that.
**Q. The last question I had asked you, is this an important document in terms of some of the issues that you've been describing to the jury in terms of your own personal experiences as a researcher within Meta.**
A. Yes. And I affirmed that that was true.
**Q. Okay.**

MR. PHELPS: Your Honor, the State would offer PX04642 into evidence.

MR. PARKINSON: Your Honor, same -- I thought we just talked about this. Foundation to anything relevant to this case.

THE COURT: It will be for identification purposes only at this moment.

MR. PHELPS: It will be for... ?

THE COURT: For ID only, at this moment.

MR. PHELPS: Does that mean we can publish it, your Honor?

THE COURT: Let's talk about it without the document first.

MR. PHELPS: Understood. Thank you, your Honor.

BY MR. PHELPS:

**Q. Dr. Sattizahn, what is this document?**

A. This is a document -- it was guidance for research that occurred after Frances Haugen's whistleblowing disclosure in September. So this was a couple months later. And this was -- I put "Guidance" in air quotes -- is these were instructions that were given to us researchers of how research now needs to be run.

**Q. Okay. And I really want to focus you on your**

I have concerns about it. I have concerns about him trying to extrapolate it to other divisions, as to -- and he's quick to do that; he did it last time. So I just want to talk about his division; what, if any, restrictions on his research were given; and try to leave it at that.

And we'll have this marked for identification purposes.

(Jury present)

BY MR. PHELPS:

**Q. Dr. Sattizahn, are you ready to proceed?**

A. Let's do it.

**Q. Great.**

**At a high level, can you tell me about the restrictions that were put into place in terms of user experience research that you were conducting after the Frances Haugen whistleblowing?**

THE COURT: As to his area.

BY MR. PHELPS:

**Q. As to your -- as to the teams you were working on.**

A. Sure. I can kind of set sort of high level, and give examples of specific things.

Generally -- and I described this the same way to the Senate -- is that what we experienced was

what we call -- what I refer to as a funnel of manipulation.

So what that was was that at every step of research, whether that is thinking of an idea, whether that is creating the methods that you use -- so if it's a type of survey or a type of interview, whether it's the type of data you can collect from that -- so if it's on a certain type of harm, emotional well-being, even like sexual harm, all the way to the reports that you could write and then who you share it with, what was happening is at every single step, there was someone who had oversight and was telling me what I could or could not do.

There are -- for instance, documents that I shared with Congress that explicitly show that after collecting data on emotional harm and sexual harm, I was forced to take those questions out in order to continue the research.

And so whether you start at the top of the funnel, which is, "Hey, what kind of stuff can I ask," all the way to "What am I actually collecting," to "Who can I share this data with," now I wasn't able to make that choice. I was being told what I could or could not do at each of those stages.

**Q. Let me just kind of march through that and make sure we have a clear picture. After the Frances Haugen disclosures --**

THE COURT: Maybe we should go on, and maybe we should mark at this time PX02254 for identification purposes.

MR. PHELPS: Okay.

BY MR. PHELPS:

**Q. Dr. Sattizahn, I want to ask you -- I want to talk to you about the -- at some point you said you were excited and hopeful to become a researcher at Meta, right?**

A. Correct.

**Q. That was 2018.**

**And we know that -- we saw a picture of you testifying in front of Congress in 2025; is that right?**

A. That's correct.

**Q. I want to talk to you about how you got from Point A to Point B a little bit, if that's okay.**

A. Okay.

**Q. The first question is, if you had -- before we get there, if you had -- it sounds like you had significant concerns about the way research was being handled and the way Meta was communicating**

management, legal personnel; that we could not write these things down.

**Q. Are there any references in this document to some of these instructions about research you'd been receiving?**

A. There are.

**Q. Okay. Let's look at page 208 and 209. And I want to refer you to March -- if we can just set it up, Vince, so it's like March 2022, we capture that at the bottom of 208, and we could just see the note at the top of 209.**

**Let me know when we kind of -- let's just -- okay.**

**On the top of page 209, do you see a reference to "one on one with Kristin"?**

A. I do, yes.

**Q. First of all, who is Kristin?**

A. Yeah. Kristin Zobel was my -- we called her like a legal POC, but this was a lawyer that was basically assigned to me, to watch over all of the work that I did.

**Q. Okay. Do you have any personal disdain for Ms. Zobel?**

A. No. Actually, I'd consider us friends -- well, I did. She lived in Chicago near me. We

talked about Chicago restaurants. She planned a dessert swap with my girlfriend, to like swap desserts for fun. So I actually had a pretty good relationship with her.

**Q. Okay. How does this note here -- it's a little cryptic. How does this note here fit into what you've been explaining to the jury about the culture shift in terms of research pre and post Haugen?**

A. Yeah. So this -- just for context, March of 2022 was after I had started doing research in Reality Labs, so that's virtual reality and working on this sort of wide platform. And even though we had already been doing research that included this, I was told under "One on one, Kristin, legal," on the third subbullet point, it says "Avoid all discussion of personal experiences in VR. Eliminate" -- sorry for the typo -- "chances of personal divulgence, and use hypotheticals to discuss specific scenarios."

The translation of that is I cannot ask people about specifically Meta VR experiences anymore. I have to say, "Oh, this was an experience you had in -- maybe just generally in social media." I can't have a question anymore that says, "Oh,

when you had this harm in Instagram in VR"; it has to be, "Oh, hypothetically, if you were in social media, in a video game experience, what would have happened?"

And the reason I was told that was the case was they didn't want to have a paper trail showing that we knew of specific harms happening on, specifically, Meta's products and platforms.

**Q. Okay. Look at page -- let's change to page 23. January 16, 2024.**

**Let me know when you're there.**

A. Yep, you're good.

**Q. Is this another example of what we've been talking about in terms of your ability to do research-shifting post Haugen?**

A. It is.

**Q. Tell the jury why. Explain it.**

A. So again, we have here, "Kristin one on one." And if you go down a few bullet points -- oh, yeah, it's up there too -- it says "On platform survey approach."

So this was -- I had been fighting to launch a survey on Meta's actual products. And I was told I couldn't use this method called OpenText.

What that means is that you basically just

ask people, like "What happened?" So you time the survey question to, "Hey, we think that you experienced a bad thing. We're going to ask you some questions about it." But then afterwards, we just want to ask you, like, "What happened? Who were you interacting with? What did they say to you?" We need to actually collect more expansive data to know like what wrong is actually happening on the platform.

And when I went to Kristin, I was told we cannot have any OpenText questions. This is a research method that you just cannot do anymore, even though I'd been using those at my tenure at PlayStation, earlier at Meta.

**Q. In your experience, what impact did that type of guidance have on your ability to keep users safe in terms of the products you were working on?**

A. It made -- it meant that I wasn't collecting the data in order to keep them safe. At some point you have to expand your knowledge. You have to ask people. You have to talk to people: What is actually happening on the platform? And this wasn't happening.

And just to note, too, that's not even the only note here that's referring to changes in

methods I can use.

**Q. So there were multiple examples within this one entry; is that what you're saying?**

A. Yeah. If you look at the bottom -- sorry, it's kind of cut off for me over there.

If you look at the bottom, there's this bullet point that says "bad actor UXR." This is the type of study I used to do at Meta, where you actually reach out and talk to people that do bad things; people that you know might be harassing someone or bullying someone. And you sit with them and you interview them, to figure out, "Did you mean to do this? How did this happen? How can we actually use your knowledge to make it a safer platform?"

And the reason it just says "bad actor UXR" is because I asked her if I could just do a study on it, and she said no. It was "You're not allowed to understand that. Even though you've collected that data in the past, you cannot do that type of study."

And so I didn't write anything else down, because I was like -- well, the answer is no, so...

**Q. Is that an example of find it, fix it?**

A. No.

**Q. Why not?**

A. Spring of 2023 was -- like for me, that was the final straw, where I didn't -- to my earlier point, I thought that things were irreconcilable with how Meta was operating.

**Q. What happened?**

A. In a study, I was told to erase data on child sexual exploitation.

**Q. Okay. Tell me more about that.**

THE COURT: By whom?

BY MR. PHELPS:

**Q. By whom?**

A. By my manager and by legal counsel.

**Q. Okay. What -- you were working on the virtual reality labs; is that right?**

A. Correct.

**Q. Why was that an important moment for you?**

A. This was important because at that point, you know, if my job is to collect data to keep children and adults safe, and you use that knowledge to build something safer, and you are actively being told by a family who invited me into their home to learn about their struggles. And you not only cut them off in the middle of them sharing this -- this vulnerable experience with you, and then they tell you to delete the data afterwards, what does a

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
FOR THE TWENTIETH JUDICIAL DISTRICT AT NASHVILLE

---

STATE OF TENNESSEE, ex rel.
JONATHAN SKRMETTI, ATTORNEY GENERAL
and REPORTER,

Plaintiff,

vs. Case No. 23-1364-IV

META PLATFORMS, INC., and
INSTAGRAM, LLC,

Defendants.

---

# TRIAL TRANSCRIPT
(Pages 4370 - 4776)

Day 15

Before Chancellor Russell T. Perkins

August 12, 2026

8:15 a.m.

---

Reported by:
Harpeth Court Reporters
Franklin, Tennessee
Julie Lyle, RPR, LCR
Emily L. Sipe, RPR, LCR

INDEX

TESTIMONY OF DR. JASON SATTIZAHN
Continued Direct Examination
By Mr. Phelps 4396

Cross-Examination
By Mr. Parkinson 4410

Redirect Examination
By Mr. Phelps 4507

Recross Examination
By Mr. Parkinson 4515

TESTIMONY OF LOTTE RUBAEK
Direct Examination
By Mr. Phelps 4534

Cross-Examination
By Ms. Paul 4627

Redirect Examination
By Mr. Phelps 4652

VIDEO DEPOSITION OF RAVI SINHA 4670

VIDEO DEPOSITION OF NICK CLEGG 4703

The above-styled cause came on for trial on August 12, 2026, at 8:15 a.m., before Chancellor Russell T. Perkins, at 1 Public Square, Nashville, Tennessee, when the following proceedings were had, to wit:

P R O C E E D I N G S

(Outside the presence of jury.)

THE COURT: Good morning, everybody.

IN UNISON: Good morning, Your Honor.

THE COURT: I'm ready to hear from the parties.

MR. PHELPS: Good morning, Your Honor, Brian Phelps.

We left off yesterday talking about Dr. Sattizahn, and I was talking about a bench brief we had filed and some exhibits that I was going to ask for Your Honor to kind of think about a little bit more.

We went back and read the transcript. I think we kind of got what we needed from that to kind of understand the concerns that Your Honor articulated. Our ambition is not to go backwards in the outline and get those documents in.

So I just kind of wanted to come back and say that, after we looked at the transcript,

we're happy to kind of save everyone some time this morning and not do a deep dive on that issue.

The only thing that I wanted to say -- and this is just really premature and planting a seed -- is that, you know, it's possible that Meta's line of attack against Dr. Sattizahn is that this is effectively all a figment of his imagination. That was the -- the sort of cross that happened in New Mexico is that he was sort of making a lot of this up.

If Meta opens the door to that, I think the fact that we have proof that he actually received these directions from his bosses is something we may -- we may argue that they opened the door to if they say that he never received those directions.

But that's -- you know, we're obviously going to have to see how the cross-examination is going to develop, and we can take it up at that time.

So I think, with that, unless -- Mr. Parkinson, you know, feel free to respond if you'd like to. But that's kind of the State's position at this point. We're not seeking any relief right now.

in-home, where we were sitting with the family. And I was told to erase data related to child sexual exploitation.

So they had described one of the sons in the house being propositioned for nude photos, images of himself, descriptions of sexual acts, things of that nature.

**Q. Put us -- put our -- put us in your shoes and paint a picture of what that moment was like for you.**

A. Sure. The -- pardon me.

An in-home interview is a pretty intimate and vulnerable thing because, as a researcher, you're essentially being invited into a stranger's home. They use Meta's products. They use social media. They use Instagram. They use virtual reality.

And you sit in their home. You have an interviewer who is a contractor who's speaking in German. You have it live translated to yourself. And so all the interviewers -- all of the researchers are listening to the interview, and you have the mother and one of her children sitting in front of you, talking about how they use Meta's products.

In this specific case, the -- one of her sons

was talking about how he uses virtual reality and how he saw his younger brother experiencing these sexual harms.

And the mother was getting really into the interview, and the interviewer was working with her to get more information for her to learn about her son, so asking, you know, I didn't know that this could happen on that product. I didn't know you were talking to strangers. I didn't even know that was possible. Please tell me more.

And bless his heart, the interviewer wanted to keep going with it because, as a researcher, you would keep pulling on these threads. You would say, This is important; we need to learn about this.

And at some point during his line of questioning, I saw him get a message on his computer, and he immediately said, All right. We have to shut down this line of questioning. We're not going to do this any further. We're not going to talk about that anymore. We're going to move on to a different topic.

And afterwards, management and legal followed up with me to make sure that that information, that data, had been erased.

The mother was very sweet to me. She gave me

a hug when I left. She could tell that I was pretty distraught, and she was too. And, you know, we both sort of just consoled each other a little bit. We left.

And after that, we weren't allowed to report on this data internally at all.

**Q. Why were you distraught?**

A. It's -- I mean, on one end, it's -- you know, I talked about this a lot yesterday. It means that we erased data to keep children safe, and adults safe too.

It's just not there. That is something that is not research. It's the antithesis. It's the opposite of science. But, also, the human aspect of this is you're sitting in a room with a mom and one of her sons talking about how the family is suffering sexual harm. Just the gall it takes to say we don't want to learn about that, when even she is actively saying I want to learn about this to protect my family. To shut that down and move on, I think, is -- is beyond the pale.

**Q. Focusing less on the incident, I want to focus more on kind of your lived experience.**

**How did your mindset shift after that incident as far as being an employee at Meta?**

Q. Uh-huh.

Why don't we look at your prior testimony. This will be PX4757.

A. Okay. This is from the New Mexico trial?

Q. Correct.

A. Pardon me.

Q. 4757.

A. Sure. I'm there.

Q. If you could look at transcript page 4296. 4296, and I'd like to direct you to lines 13 to 18.

And I asked you, "Okay. So to go back to chapters at this point, a woman threatens you by pointing to a dinner knife in 2022, the lawyers threaten you in 2023, and you get fired in 2024, and you testified at Congress in 2025; is that right?"

And your answer was, "Generally speaking, that sounds accurate."

Is that fair?

A. Yeah. That's -- that's what it says.

Q. You once told your manager before things went south, before you were fired, that what you most wanted is to be famous, right?

A. I don't remember that.

Q. Since all of this has happened, you've been featured on television and in the papers a lot,

last three years.

**Q. And the last three years -- '21, '22, '23, and part of '24 -- you say that you saw some really bad things when it came to child safety, correct?**

A. It's true.

**Q. And you say that you collected a bunch of documents about Facebook Marketplace, faith, virtual reality, that show kids are in imminent risk of harm, right?**

A. Yeah, showing a trend of my experience of seeing how -- how Meta does research has changed and then describing the impact that I observed in terms of what that meant for the user.

**Q. And despite that, at no point in those many years, the six years or the second half -- the last three years you were at the company, did you go to law enforcement and say, There's an imminent risk to children being harmed in virtual reality around Facebook, did you?**

A. No. We actually have an internal law enforcement team at Meta that we're told that they're taking care of this. So when things like this happened, they say, well, I'll kick it over to the LEO team.

In fact, in the aftermath of the Ray-Ban/Meta

Stories terrorist attack in New Orleans, they said the same thing, well, we had an LEO team working on this.

And I slowly found over my time there that, again, it wasn't as effective as we thought it was going to be.

**Q. You saw legal, you say, shutting down research for kids in 2022, correct?**

A. Correct.

**Q. You didn't quit, did you?**

A. I didn't, no. As I described yesterday, it's -- you know, it's -- having one person there is better than having zero.

**Q. You kept collecting your paycheck, right?**

A. That was part of it. They did pay me to be an employee there.

**Q. And in 2023, you saw some really bad things, you say, this incident that happened in Germany, but you didn't quit in 2023, did you?**

A. No. I kept -- that's, you know, when I went to Tim Loving, when I went -- I even brought this up with Sara Chen for a little bit, too, and Ayfer Gokalp, a research off-site in October of 2023, bringing it up to them as well. So I tried to surf it as high as I could, but yeah.

MR. PHELPS: Understood. Okay.

(Bench conference concluded.)

MR. PHELPS: Thank you for your time. No further questions from the State, Doctor.

THE WITNESS: Thank you.

THE COURT: You're excused.

THE WITNESS: Thank you, sir.

(Off-the-record discussion.)

(The following is a bench conference.)

MR. PARKINSON: Your Honor, may it please the Court. I'd just like to read something into the record that I would like to read for preservative purposes.

Meta objects to Dr. Sattizahn's disclosure of privileged legal advice and maintains its assertion of attorney-client privilege with respect to other legal proceedings outside of this court.

And as to any advice conveyed to Dr. Sattizahn, Meta does not waive, for any other lawsuits or purposes, any claim of attorney-client privilege related to this testimony.

MR. PHELPS: Nothing from the State.

THE COURT: Okay.

MR. PARKINSON: Thank you.