# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

*People of the State of California, et al. v. Meta Platforms, Inc., et al.*

MDL No. 3047

Case Nos. 4:22-md-03047-YGR
4:23-cv-05448-YGR

**META AND STATE ATTORNEYS GENERAL [PROPOSED] CONSENT JUDGMENT**

Judge: Hon. Yvonne Gonzalez Rogers

Magistrate Judge: Hon. Peter H. Kang

**WHEREAS**, Plaintiffs, State of Arizona, ex rel. Kris Mayes, Attorney General; the People of the State of California, by Rob Bonta, Attorney General; State of Colorado, ex rel. Philip J. Weiser, Attorney General; State of Connecticut; State of Delaware, ex rel. Kathleen Jennings, Attorney General of the State of Delaware; State of Hawai‘i, ex rel. Anne E. Lopez, Attorney General; State of Idaho, through Attorney General Raúl R. Labrador; the People of the State of Illinois, by Kwame Raoul, Attorney General; State of Indiana; State of Kansas, ex rel. Kris W. Kobach, Attorney General; the Commonwealth of Kentucky, by Russell Coleman, Attorney General; State of Louisiana; State of Maine; Office of the Attorney General of Maryland; State of Minnesota, by its Attorney General, Keith Ellison; State of Nebraska ex rel. Michael T. Hilgers, Attorney General; Jennifer Davenport, Attorney General for the State of New Jersey, and Christopher L. Peterson, Acting Director of the New Jersey Division of Consumer Affairs; the People of the State of New York, by Letitia James, Attorney General of the State of New York; State of North Carolina, ex rel. Jeff Jackson, Attorney General; State of Ohio, ex rel. Attorney General D. Andrew Wilson; State of Oregon ex rel. Dan Rayfield, Attorney General for the State of Oregon; Commonwealth of Pennsylvania by Attorney General Dave Sunday; State of Rhode Island; State of South Carolina, ex. rel. Alan M. Wilson, in his official capacity as Attorney General of the State of South Carolina; State of South Dakota ex rel. Marty J. Jackley, South Dakota Attorney General; Commonwealth of Virginia, ex rel. Jay Jones, Attorney General; State of Washington, ex rel. Nicholas W. Brown, Attorney General; State of West Virginia, ex rel. John B. McCuskey, Attorney General; and State of Wisconsin (collectively "Plaintiffs" or "States")[1] filed a complaint (the "Complaint") in this action on October 24, 2023, against Meta Platforms, Inc. (the "Defendant") and others who have since been dismissed from the action.

**WHEREAS**, Plaintiffs allege in relevant part that the Defendant used its technology and Social Media Platforms, Facebook and Instagram, to entice, engage, and ultimately ensnare youth and teens. The Plaintiffs allege that Defendant has repeatedly misled the public about the dangers of its Platforms and ignored the damages these Platforms have caused to the mental and physical wellbeing of America's

[1] Defendant is contemporaneously entering into similar consent judgments with attorneys general throughout the United States.

youth, thereby engaging in deceptive and unlawful conduct in violation of state law, and that Defendant violated the Children's Online Privacy Protection Act ("COPPA") through its collection and use of data from young residents of Plaintiff states;

**WHEREAS**, Meta denies the allegations against it and that it has any liability to the Plaintiffs;

**WHEREAS**, Plaintiffs and Defendant (each a "Party," and together the "Parties") intend to resolve the claims alleged in the Complaint through the entry of a Consent Judgment based on a Settlement Agreement among the Parties, and additional states, concerning the conduct alleged in the Complaint and similar actions, in which, among other things, Meta commits to establishing daily limits and blocks on nighttime use for teenage users of the Defendant's Social Media Platforms, enhanced age assurance measures to prevent children from accessing the platform, or age restricted content available on the platform, and requiring additional tools to help parents and guardians to protect their children online, and requires Defendant to make payments to Plaintiffs as set forth herein;

**WHEREAS**, the Parties have agreed to resolve the claims alleged in the Complaint without the need for further litigation through this Consent Judgment;

**WHEREAS,** this Consent Judgment (referred to herein as the "Consent Judgment") settles and resolves Defendant's alleged violations of state and federal law as more fully described in the operative complaint in this action including by providing certain injunctive and monetary terms to the Plaintiffs;

**NOW, THEREFORE**, without the final adjudication of issues of fact and law, and with the consent of the Parties, **IT IS HEREBY ADJUDGED, ORDERED, AND DECREED** as follows:

## I. JURISDICTION AND VENUE

A. The States are represented by their Attorneys General.

B. The States bring this action pursuant to the authority conferred on them by applicable federal and state law. The States are authorized by the Children's Online Privacy Protection Act of 1998 ("COPPA") to bring actions to enforce COPPA's provisions. 15 U.S.C. § 6504(a)(1). Pursuant to 15 U.S.C. § 6504(a)(2), the States notified the Federal Trade Commission ("FTC") of this action. The States are also authorized by their Unfair and Deceptive Acts and Practices statutes (the "UDAP Statutes") to enforce such statutes. These UDAP Statutes authorize the States to seek injunctive and

other equitable relief, as well as, in some states, other remedies including restitution, disgorgement, civil penalties, declaratory relief, attorneys' fees, expenses, and costs.

C. The Defendant is Meta Platforms, Inc. (the "Defendant").

D. The Parties agree that the Court has jurisdiction over the subject matter of the Action and over the Parties with respect to the Action and this Consent Judgment. This Judgment shall not be construed or used as a waiver of any jurisdictional defense Meta or any other Released Party may raise in any other proceeding. Defendant reserves its right to challenge venue or jurisdiction in any matter that does not arise from the entry, enforcement, or modification of the Stipulation and Judgment.

## II. APPLICABILITY

A. This Consent Judgment incorporates all terms of the Agreement in their entirety to the extent they pertain to the Parties as defined above. Where there is any conflict between this Consent Judgment and the Agreement, the term or terms of the Agreement shall control.

B. Nothing in this Consent Judgment, or the Agreement, shall create or give rise to a private right of action of any kind or create any right in a non-party to enforce any aspect of this Consent Judgment or the Agreement or claim any legal or equitable injury for a violation of this Consent Judgment or the Agreement. The exclusive right to enforce any violation or breach of this Consent Judgment shall be with the Parties to this Consent Judgment and the Court.

C. The obligations of this Consent Judgment apply to and are binding upon the Plaintiffs and Defendant, and any of their respective successors, assigns, or other entities or persons otherwise bound by law.

D. Defendant shall do all things within its power and authority to ensure that any legal successor or assign of Defendant shall remain jointly and severally liable for the payment and other performance obligations hereunder. Defendant shall include an agreement to so remain liable in the terms of any sale, acquisition, merger, or other transaction changing the ownership or control of the Defendant, to which any of them is a party, and no change in the ownership or control of Defendant shall affect the obligations hereunder of Defendant without modification of this Consent Judgment.

E. No Party may assign or otherwise convey any right to enforce any provision of this Consent Judgment or the Agreement.

F. Defendant shall provide a copy of this Consent Judgment to the members of its Board of Directors and its executives whose duties might reasonably include compliance with, or oversight over compliance with, any provision of this Consent Judgment. Defendant shall also ensure that the terms of this Consent Judgment and the Agreement are duly communicated to any of its contractors, agents, and employees to the extent that their duties include compliance with any provision of the Consent Judgment and the Agreement.

G. In any action to enforce this Consent Judgment, Defendant shall not raise as a defense the failure by any of its respective officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Judgment.

## III. DEFINITIONS

The definitions set forth in the Agreement (a copy of which is attached hereto as **Exhibit A**) are incorporated herein by reference into this Consent Judgment. The States are "Settling States" within the meaning of the Agreement. Unless otherwise defined herein, capitalized terms in this Consent Judgment shall have the same meaning given to them in the Agreement.

## IV. VOLUNTARY ACT OF THE PARTIES

Each Party warrants and represents that it negotiated the terms of the Agreement and this Consent Judgment in good faith and with assistance of counsel. Each of the Parties and signatories to this Consent Judgment warrants and represents that it freely and voluntarily entered into this Consent Judgment without any degree of duress or compulsion. The Parties state that no promise of any kind or nature whatsoever (other than the written terms of this Consent Judgment and the Agreement incorporated by reference into, and made a part of, this Consent Judgment) was made to them to induce them to enter into the Agreement or this Consent Judgment.

## V. INJUNCTIVE AND OTHER EQUITABLE RELIEF

The injunctive obligations set forth in Section II of the Agreement are incorporated by reference into, and made a part of, this Consent Judgment.

## VI. AUDIT

The audit provisions of Section III of the Agreement are incorporated by reference into, and made a part of, this Consent Judgment.

## VII. RELEASE

The release provisions of Section IV of the Agreement are incorporated by reference into, and made a part of, this Consent Judgment.

## VIII. PAYMENTS

The monetary relief provisions of Section VI of the Agreement are incorporated by reference into, and made a part of, this Consent Judgment.

## IX. MISCELLANEOUS PROVISIONS

A. The Parties will follow the processes described in Section VIII of the Agreement to resolve any disputes over the interpretation or application of the Agreement or this Consent Judgment. The Court retains jurisdiction of this Consent Judgment and the Parties hereto for the purpose of enforcing and modifying this Consent Judgment.

B. Unless otherwise specified in the Agreement, the obligations of this Consent Judgment shall expire 10 years from the Effective Date. Upon expiration, the Parties shall have no further obligations under this Consent Judgment or the Agreement.

C. This Consent Judgment and the Agreement were entered into for settlement purposes only and do not constitute an admission by Defendant of any liability, wrongdoing, or violation of any local, state, federal, or international law. The obligations, product modifications, and concessions set forth therein are explicitly limited to the States. Nothing in this Consent Judgment or the Agreement shall be construed to apply to, establish a standard of care for, or serve as precedent in any non-participating U.S. state or any international jurisdiction whatsoever.

D. It is the intent of the Parties that this judgment not be admissible in other cases against Defendant or binding on Defendant in any respect other than in connection with the enforcement of this Consent Judgment or the Agreement. For the avoidance of doubt, nothing herein shall prohibit Defendant from entering this Consent Judgment or the Agreement into evidence in any litigation or

arbitration concerning (1) Defendant's right to coverage under an insurance contract or (2) the enforcement of the releases provided for by this Consent Judgment and the Agreement.

E. This Consent Judgment shall not be construed or used as a waiver or any limitation of any defense otherwise available to Defendant in any other pending or future legal, regulatory, or administrative action or proceeding, or Defendant's right to defend itself from, or make any arguments in, any individual or class claims or suits or any other governmental or regulatory action relating to the subject matter or terms of this Settlement. Nothing in this Consent Judgment shall preclude Defendant from challenging any federal, state, or local law, rule, regulation, or guidance, whether presently enacted or enacted in the future.

F. Except as otherwise provided in the Agreement, including with respect to the Cost Fund Payment, each Party shall be responsible for the payment of its own fees, expenses, and disbursements and those of its respective agents, representatives, and counsel that have risen, could have arisen, or that may arise in connection with the Actions, including fees, expenses, and disbursements related to this Consent Judgment or the Agreement.

G. The Parties each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties have reached a good faith settlement. The Parties each further waive any right to challenge or contest the validity of this Consent Judgment on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.

H. The Parties may wish to execute an amended Agreement for clarification or other purposes. Subsequent to its entry, this Consent Judgment may be modified by order of this court, including pursuant to a stipulation of the parties.

**X. FINAL DISPOSITION**

A. The Agreement, and the settlement set forth therein, are hereby approved in all respects, and all claims by the States in this Action are fully and finally resolved through entry of this Consent Judgment.

B. Each Party waives all rights to appeal this Final Judgment and all orders to date arising from the Action. Within 5 business days of the date of entry of this Consent Judgment, every party shall take the necessary steps to withdraw, voluntarily dismiss, or otherwise cease all currently pending appeals, petitions for certiorari, or appellate motions that arise from this action. For the avoidance of doubt, to the extent any appellate matter arising in part from this action also arises in part from one or more other actions and/or from claims in the case *In re Social Media Adolescent/Personal Injury Products Liability Litigation*, No. 4:22-md-03047-YGR (N.D. Cal.), brought by parties other than the Attorneys General, the portion(s) of any such appellate matter that do not arise from the Actions may remain pending, notwithstanding this provision.

C. The Court finds that the Parties to this Consent Judgment have full and complete authority to enter into the binding and fully effective settlement of this action, and that the proposed resolution is fair, reasonable, and equitable and does not violate the law or public policy.

D. Upon approval and entry of this Consent Judgment by the Court, this Consent Judgment shall constitute a final judgment of the Court as to the Parties. The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

E. The Clerk is ordered to enter this Judgment forthwith.

**LET JUDGMENT BE ENTERED ACCORDINGLY**

**DATED** and entered this _______ day of ________, 2026.

DATED:

______________________________
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

# EXHIBIT A

# SETTLEMENT AGREEMENT

**TABLE OF CONTENTS**

Page

I. DEFINITIONS ........ 1
II. INJUNCTIVE PROVISIONS ........ 10
III. ACCOUNTABILITY ........ 29
IV. RELEASE ........ 34
V. PARITY/MFN PROVISIONS ........ 36
VI. MONETARY RELIEF AND PAYMENT STRUCTURE ........ 37
VII. EFFECT OF OTHER LAWS AND CONFLICTS OF LAW ........ 40
VIII. DISPUTE RESOLUTION ........ 40
IX. COOPERATION ........ 40
X. MISCELLANEOUS PROVISIONS ........ 41
XI. ADDITIONAL PROVISIONS ........ 44
XII. SIGNATORIES/SERVICE ........ 45
XIII. INTEGRATION ........ 45

# SETTLEMENT AGREEMENT

## I. DEFINITIONS

A. "**Actions**" means the MDL Action and the Satellite AG Actions.

B. "**Affiliates**," with respect to a Party, means (i) all entities now controlling, controlled by or under common control with that party; (ii) all entities in the past controlling, controlled by or under common control with that party, with respect to the period of time that such control exists or existed; and (iii) predecessors, successors or successors in interest thereof, including all entities formed or acquired by that party. For purposes of this definition, "control" means possession directly or indirectly of the power to direct or cause the direction of management or policies of a company or entity through the ownership of voting securities, contract, or otherwise, and "entities" includes all companies, partnerships, corporations, associations, organizations, and other entities.

C. "**Age Appropriate Experiences**" refers to content that is appropriate for Teen Users based on input from experts, parents, and teens. For the purposes of this Agreement, Age Appropriate Experiences shall mean content captured in Meta's applicable Ages 13+ content setting, which is tied to policies inspired by movie ratings for ages 13+ and parent feedback.

D. "**Age Assurance Methods**" shall have the meaning set forth in Section II.

E. "**Age Inappropriate Accounts**" refers to accounts that regularly share content that is inappropriate for teens or that have account information that otherwise suggests the account is inappropriate for Teen Users. For the purposes of this Agreement, Age Inappropriate Accounts shall mean accounts that: (1) regularly share Age Inappropriate Content in the following categories: Adult Nudity & Sexual Activity, Restricted Goods & Services, Suicide, Self-Harm or Eating Disorders, or (2) have account names or profile photos or bios that suggest the account is otherwise inappropriate for minors, based on Meta's policies for the following categories: Adult Nudity & Sexual Activity, Restricted Goods & Services, Suicide, Self-Harm or Eating Disorders.

F. "**Age Inappropriate Content**" refers to content that is generally perceived by U.S. parents, youth experts, and teens as not being appropriate for Teen Users. For the purposes of this Agreement, Age Inappropriate Content shall mean content prohibited by Meta's Community Standards concerning bullying and harassment; nudity and sexual activity; child sexual exploitation, abuse, and nudity; sexually explicit language; suicide, self-harm and eating disorders; graphic violence and incitements to violence; gambling; and restricted substances or goods (including illegal drug use), as well as policies specifically focused on protections for Teen Users, including those regarding high-risk viral challenges and risky stunts.

G. "**Agreement Term**" shall mean 10 years from the Effective Date except as otherwise specified.

H. "**Attorneys' Fees and Expenses**" means any attorneys' fees, costs, and expenses of any kind or description incurred by the Settling States in connection with the Actions.

I. "**Attorney(s) General**" or "**Settling States Attorney(s) General**" means the Attorney(s) General of Alabama, Alaska, American Samoa, Arizona, Arkansas, California, Colorado,

Connecticut, Delaware, District of Columbia, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming or any of its duly designated representatives.

J. "**Autoplay**" shall mean any function that initiates or continues the playing or playback of content without an affirmative user interruption or action. Autoplay includes, without limitation, automatically playing content (i) upon opening the Meta SMP or (ii) when content becomes visible or hovered over in a feed or grid. Autoplay does not include the initial playing of a specific unit of content that the user affirmatively selects to play once it has become visible.

K. "**Cambridge Attorneys' Fees and Expenses**" means any attorneys' fees, costs, and expenses of any kind or description incurred by the Cambridge Settling States in connection with the Cambridge Complaints.

L. "**Cambridge Complaints**" shall mean (i) Complaint, *People v. Meta Platforms, Inc.*, No. 25-631678 (Cal. Super. Ct., S.F. Cnty. Dec. 18, 2025); (ii) Complaint, *State of New Mexico ex. rel. Raul Torrez v. Facebook, Inc.*, No. D-101-CV-2021-00132 (N.M. 1st Jud. Dist. Ct., Santa Fe Cnty. Jan. 21, 2021); (iii) Complaint, *District of Columbia v. Facebook, Inc.*, No. 2018-CA-008715-B (D.C. Super. Ct. Dec. 19, 2018); and (iv) Amended Complaint, *People of the State of Illinois v. Facebook, Inc.*, No. 2018 CH 03863 (Ill. Cir. Ct., Cook Cnty. Oct. 3, 2019).

M. "**Cambridge Releasors**" means each Attorney General of a Cambridge Settling State and each Cambridge Settling State to the full extent of each of those Attorney General's power, authority, and ability under each Cambridge Settling State's law to release Claims.

N. "**Cambridge Settlement Amount**" shall mean $459,293,017.80.

O. "**Cambridge Settling States**" shall mean the states, Attorneys General, commonwealths, and territories of Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, Delaware, Georgia, Hawaii, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New York, North Carolina, North Dakota, Northern Mariana Islands, Ohio, Oklahoma, Oregon, Pennsylvania, Puerto Rico, Rhode Island, South Carolina, South Dakota, Tennessee, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, Wyoming.

P. "**Claims**" means any claims, counterclaims or cross-claims, theories of liability (including, but not limited to, absolute liability or strict liability), requests, assessments, charges, covenants, demands, actions, disputes, controversies, judgments, rights, obligations, liabilities, debts, liens, losses, suits, grievances and/or causes of action of any type, whether legal, equitable, statutory, regulatory or administrative, including, but not limited to, any request for declaratory, injunctive, or equitable relief, compensatory, punitive, or statutory damages, restitution, abatement, subrogation, contribution, indemnity, apportionment,

disgorgement, reimbursement, set-offs, attorneys' fees, expert fees, consultant fees, fines, penalties, expenses, costs, or claims arising under federal or state law.

Q. "**Clear[ly] and Conspicuous[ly]**" means that a required disclosure is difficult to miss (i.e., easily noticeable), and easily understandable by users, including in all of the following ways:

1. In any communication that is solely visual or solely audible, the disclosure must be made through the same means through which the communication is presented. In any communication made through both visual and audible means, such as a video or television advertisement, the disclosure must be presented simultaneously in both the visual and audible portions of the communication even if the representation requiring the disclosure is made in only one means.

2. A visual disclosure, by its size, contrast, location, the length of time it appears, and other characteristics, must stand out from any accompanying text or other visual elements so that it is easily noticed, read, and understood.

3. An audible disclosure, including by telephone or streaming video, must be delivered in a volume, speed, and cadence sufficient to be easily heard and understood.

4. In any communication using an interactive electronic medium, such as the Internet or software, the disclosure must be unavoidable.

5. The disclosure must use diction and syntax understandable to ordinary users, including Teen Users when targeted at such users, and must appear in each language in which the representation that requires the disclosure appears.

R. "**Compliance Date**" shall mean the date that is six (6) months following the Effective Date.

S. "**Community Standards**" shall mean Meta's published Community Standards, as amended from time to time, which can be found as of the Effective Date at https://transparency.meta.com/policies/community-standards/.

T. **"Consent Judgment"** shall have the meaning set forth in Sections X.H-J.

U. "**Contingent Monetary Payment Trigger**" shall mean, with respect to any Settling State, the date upon which (i) Industry-Wide Adoption as it applies to both Contingent Time Management Obligations has first occurred with respect to all Core Industry Members and (ii) one of the following additional conditions are met: (a) all Core Industry Members with annual profits above $10 billion are subject to a monetary obligation to such Settling State equal to or greater than such Settling State's aggregate amount of Contingency Installment Payments or (b) in the event of a settlement involving one or more Settling States, including the Settling State, all Core Industry Members with annual profits above $10 billion are subject to a monetary obligation to such Settling States equal to or greater than the aggregate amount of all Contingency Installment Payments of all such Settling States.

For the avoidance of doubt, no Settling State will have an obligation to repay the Contingency Installment Payments.

V. "**Contingent Time Management Obligation(s)**" shall mean the obligations under Section II.B.2.b and Section II.B.3.b.

W. "**Core Industry Members"** shall mean Snap, TikTok, and YouTube, for so long as the product or service is available to US Teen Users.

X. "**Cosmetic Procedure Filter**" shall mean any digital filter or augmented reality (AR) effect that distorts, sculpts, redefines, or idealizes a user's face in a way that cannot be achieved without cosmetic surgery or extreme makeup techniques. For the avoidance of doubt, "Cosmetic Procedure Filter" does not include: (1) Fantasy/Character Effects: Filters that change a user's facial structure for the purpose of turning the user into a non-human or fictional character (e.g., an elf or cartoon) or an animal (e.g., a dragon or puppy); (2) Makeup/Smoothing Effects: Filters that smooth skin or alter appearance in ways that can be achieved by ordinary makeup techniques without altering the appearance of underlying physical facial structure or meaningfully changing skin tone; or (3) Parody and Exaggeration Effects: Effects that entertain users by distorting their appearance through parody, satire, or exaggerated forms (e.g., extreme visual distortions outside the scope of normal cosmetic procedures). To help operationalize this definition, the Settling States will provide Meta illustrative examples and guidance of AR effects that are Cosmetic Procedure Filters and AR effects that are not Cosmetic Procedure Filters in a letter to be sent within two (2) months of the Effective Date.

Y. "**Effective Date**" means the first business day after which the Court in the MDL Action has entered the Consent Judgment.

Z. "**Eligible States**" means the states set forth in Exhibit D, or the attorneys general of such states.

AA. "**Harmful Experiences**" refers to instances where teens are exposed to potentially harmful behavior by third parties on Meta SMPs. For the purposes of this Agreement, Harmful Experiences shall mean behaviors that violate Meta's Community Standards prohibiting child sexual exploitation, abuse, and nudity.

BB. "**Inappropriate Interactions with Children**" shall mean content that constitutes or facilitates inappropriate interactions with Teen Users, such as:

1. Soliciting, arranging or planning sexual encounters with Teen Users;
2. Enticing Teen Users to engage in sexual activity through sexualized conversations or offering, displaying, obtaining or requesting sexual material to or from Teen Users, through purposeful exposure or in private messages;
3. Engaging in implicitly sexual conversations in private messages with Teen Users;
4. Obtaining or requesting sexual material from Teen Users in private messages;
5. Selling goods that are illegal for the Teen User to buy; or
6. Engaging in fraudulent solicitation.

CC. "**Independent Auditor**" shall have the meaning set forth in Section III.A.

DD. "**Industry-Wide Adoption**" shall mean, with respect to any Contingent Time Management Obligation as it applies to any Settling State, the period during which all Core Industry Members and any New SMP Entrant following its New SMP Effective Date have:

1. entered into a binding settlement agreement, consent decree, or other enforceable commitment with such Settling State requiring the Core Industry Members and any New SMP Entrant to implement substantively equivalent obligations as such Contingent Time Management Obligation,

2. become subject to one or more federal or, with respect to such Settling State, state laws, statutes, or regulations imposing substantively equivalent obligations in the Settling State as such Contingent Time Management Obligation and such obligation on the Core Industry Members and New SMP Entrant have become effective, or

3. voluntarily undertaken to implement, and has implemented and is in verified compliance with, substantively equivalent obligations in the Settling State as such Contingent Time Management Obligation, so long as an independent third party auditor certifies that such Contingent Time Management Obligation has been implemented;

*provided,* that all Core Industry Members (and any such New SMP Entrant) during such period are subject to binding age assurance requirements as to 13–17-year-olds no less restrictive than those set forth in Section II.A (Age Assurance);

*provided further,* that (A) each Core Industry Member (and any such New SMP Entrant) as of the date it would otherwise satisfy the requirements of this definition of Industry-Wide Adoption is subject to, for a minimum term of five years from such date, an independent third party audit of its compliance with (1) such Contingent Time Management Obligation(s) and (2) age assurance requirements no less restrictive as to 13–17-year-olds than those set forth in Section II.A (Age Assurance), and (B) such Contingent Time Management Obligation(s), as applied to such Core Industry Member (and any such New SMP Entrant), does not exclude any features, surfaces, or portions other than messaging or Longform Content (unless the foregoing requirement is expressly waived by Meta in writing. Meta will not withhold consent unless Meta demonstrates that it will be placed at a significant competitive disadvantage)

(it being understood that, if at any time Industry-Wide Adoption is in effect when a new product or service becomes a New SMP Entrant, unless the conditions for Industry-Wide Adoption are satisfied by the New SMP Effective Date with respect to such New SMP Entrant, Industry-Wide Adoption shall no longer be in effect as of such New SMP Effective Date. It being further understood that if an entity that was previously a New SMP Entrant ceases to qualify as a New SMP Entrant for four consecutive months after the New SMP Effective Date, Industry-Wide Adoption shall be in effect if all conditions for Industry-Wide Adoption are satisfied at such time with respect to all Core Industry Members and any other New SMP Entrants, unless and until (i) the entity re-qualifies as a New SMP

Entrant and a subsequent New SMP Effective Date has passed or (ii) all conditions for Industry-Wide Adoption are no longer satisfied).

EE. "**Longform Content**" shall mean a piece of video or audio content with a duration of at least 22 minutes that Meta has determined with a high degree of reliability to not have been artificially extended. Artificially extended content shall include, but not be limited to, video or audio compilations of content that is not Longform Content, or video or audio content artificially extended to meet the duration requirement, for example by ending in minutes of a still image or silence.

FF. "**MDL Action**" means the case *In re Social Media Adolescent/Personal Injury Products Liability Litigation*, No. 4:22-md-03047-YGR (N.D. Cal.) to the extent of claims brought by Attorneys General, as well as the associated case *California v. Meta Platforms, Inc.*, No. 4:23-cv-05448-YGR (N.D. Cal.).

GG. "**MDL Court**" means the court presiding over the MDL Action.

HH. "**Meta**" means Meta Platforms, Inc., Instagram, LLC, Meta Platforms Technologies, LLC, and Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Technologies, LLC; Meta Payments Inc.; and Siculus, Inc.

II. "**Meta SMP**" shall mean (i) the existing and future web and app versions of Instagram ("Instagram") and Facebook ("Facebook"), (ii) any New Meta SMP, within 30 days following verification that the relevant product or service meets the definition of New Meta SMP by an independent third party, and (iii) any Meta Spin Off App, excluding, in each case, any and all (A) direct messaging features linked to or included in those platforms, such as Instagram Direct or Messenger and (B) for the avoidance of doubt, (1) any other product or service of Meta or any of its Affiliates as it exists as of the Effective Date or (2) any other product, service or feature of Meta and its Affiliates that does not otherwise meet the definition of a New Meta SMP regardless of its integration with Instagram or Facebook (other than any Meta Spin Off App).

JJ. "**Meta Spin Off App**" shall mean any surface or feature of a Meta SMP that, following the Effective Date, becomes a stand-alone app and meets the definition of New Meta SMP; *provided* that, for purposes of this definition, the reference in the definition of New SMP Entrant to "each of the four most recent consecutive months during the Agreement Term" shall be deemed to refer to "the most recent month during the Agreement Term."

KK. "**Minimum State Participation**" means at least 40 states or territories have entered into this Agreement.

LL. "**New Meta SMP**" shall mean a New SMP Entrant owned or operated by Meta.

MM. "**New SMP Entrant**" shall mean an internet-based product or service which for each of the four most recent consecutive months during the Agreement Term: (1) permits U.S. teens, as a primary purpose, to create, to share, and to view user-generated videos and images; (2) permits U.S. teens to interact with such content and with other users (e.g., through comments, likes, or subscriptions); (3) is primarily designed for, and whose primary use by U.S. teens is, entertainment, social connection, or content discovery of the type that competes for the same teen time spent as Meta SMPs; and (4) has (a) at least 5

million U.S. monthly active teens and (b) an average of at least 30 minutes of daily time spent by U.S. teens.

The Parties agree there are no platforms outside of the Core Industry Members that fall within the definition of New SMP Entrant as of the Effective Date. New SMP Entrant shall not include any of the following:

1. An internet-based product and/or service that:

   (a) was commercially available to U.S. teens on the Effective Date;

   (b) did not make changes to its design, after the Effective Date, that materially increased its competition with Meta SMPs for U.S. teen time spent; and

   (c) has not, after the Effective Date, significantly increased the average daily time spent by U.S. teens on the product or service, or

2. An internet-based product and/or service whose primary function is direct messaging, or a product, service, and/or feature whose primary function is:

   (a) digital video editing;

   (b) virtual reality;

   (c) video gaming; or

   (d) artificial intelligence features, chatbots, or interactions with artificial intelligence.

In order for a third party product or service to qualify as a New SMP Entrant, Meta shall provide notice to the Settling States Attorney(s) General in writing. Upon receipt of Meta's notice, the Settling States Attorney(s) General will meet and confer with Meta in good faith to determine whether the parties can mutually agree that the product or service is or otherwise should be deemed a New SMP Entrant under this Agreement. In the event the parties cannot reach agreement within 60 days of Meta providing such notice, the parties shall utilize the process outlined in the Dispute Resolution provisions, Section VIII.

Meta shall provide notice in writing of a New Meta SMP Entrant.

NN. "**New SMP Effective Date**" shall mean five months after a product or service qualifies as a New SMP Entrant.

OO. "**Non-Personalized Feed**" shall mean a Meta SMP feed for which content is populated by accounts the Teen User follows or has friended, displayed in chronological order. Meta retains the ability to determine and control the appearance of certain content where reasonably necessary for platform integrity, security, or compliance with applicable law, including without limitation moderation reasonably necessary to ensure certain content is age-appropriate and satisfies applicable legal requirements. Such measures shall not constitute personalization within the meaning of this definition.

PP. "**Optional Protective Settings**" refers to optional settings that provide additional protections against excessive use, including settings restricting Autoplay and any optional

settings that can reduce exposure to Age Inappropriate Content, such as Instagram's Limited Content setting.

QQ. "**Parental Supervision**" refers to parental supervision controls that establish a link between a teen and Supervising Parent. For the purposes of this Agreement, Parental Supervision shall mean Meta's parental supervision controls establishing a link between a Teen User and a Supervising Parent.

RR. "**Parties**" means Meta and the Settling States.

SS. "**Potentially Harmful Reported Content**" shall mean reports relating to organic content involving the following reporting categories, subject to change or renaming, so long as the harms these policies cover are still addressed:

1. For Facebook: Bullying, harassment, or abuse; Suicide or self harm; Violent, hateful, or disturbing content; Selling or promoting restricted items; Adult content; and Problem involving someone under 18.

2. For Instagram: Bullying or unwanted contact; Suicide, self-injury, or eating disorders; Violence hate or exploitation; Selling or promoting restricted items; and Nudity or sexual activity.

TT. "**Potentially Suspicious Account**" shall mean an adult account based on its stated- or predicted-age or an assessment pursuant to Section II.A subject to restrictions based on its interactions with other accounts, searches for or interactions with violating content (e.g., liking or saving) or membership in communities (e.g., groups) that Meta have removed for violating Meta's policies.

UU. "**Pre-trial Settlement**" means a settlement or consent judgment (a) reached more than seven (7) days prior to a specific state's first trial day and (b) resolving claims similar to the Released Claims.

VV. "**Reasonably Accessible**" shall mean viewable within three user gestures and clearly labeled, easy to notice, viewable without scrolling, and discoverable in an intuitive location within the Meta SMP.

WW. "**Released Claims**" shall have the meaning set forth in Section IV of this Agreement.

XX. "**Released Parties**" means (a) Meta; (b) Meta's past and present direct or indirect parents, subsidiaries, Affiliates, divisions; and (c) the past and present owners, shareholders, officers, directors, members, employees, insurers, predecessors, successors, and assigns of any of the entities in parts (a)-(b) of this paragraph.

YY. "**Releasors**" means each Attorney General and Settling State to the full extent of each Attorney General's power, authority, and ability under each Settling State's law to release Claims.

ZZ. "**Satellite AG Actions**" means the following state court cases: *State of Arkansas v. Meta Platforms, Inc. et al.*, Circuit Court, Polk County, No. 57CV-23-47 (Ark.); *District of Columbia v. Meta Platforms, Inc., et al.*, Superior Court, No. 2023-CAB-006550 (D.C.); *State of Iowa v. Meta Platforms, Inc., et al.*, District Court, Polk County, No. EQCE092822 (Iowa); *Commonwealth of Massachusetts v. Meta Platforms, Inc., et al.*, Suffolk Superior

Court, No. 2384CV02397 (Mass.); *State of Mississippi v. Meta Platforms, Inc., et al.*, Chancery Court, First Judicial District, Hinds County, No. 25CH1:23-cv-01205 (Miss.); *State of Montana v. Meta Platforms, Inc., et al.*, First Judicial Court, Lewis and Clark County, No. BDV-25-2024-0000797 (Mont.); *State of Nevada v. Meta Platforms, Inc.*, District Court, Clark County, No. A-24-886110-B (Nev.); *State of Nevada v. Meta Platforms, Inc.*, District Court, Clark County, No. A-24-886115-B (Nev.); *State of Nevada v. Meta Platforms, Inc., et al.*, District Court, Clark County, No. A-24-886120-B (Nev.); *State of New Hampshire v. Meta Platforms, Inc., et al.*, New Hampshire Superior Court, Merrimack County, No. 217-2023-CV-00594 (N.H.); *State of Oklahoma v. Meta Platforms, Inc., et al.*, District Court, Osage County, No. CJ-2023-180 (Okla.); *Puerto Rico v. Meta Platforms, Inc., et al.*, Tribunal General de Justicia, Centro Judicial de San Juan, No. SJ2024CV11569 (P.R.); *State of Tennessee v. Meta Platforms, Inc., et al.*, Chancery Court, Twentieth Judicial District, Davidson County, No. 23-1364-IV (Tenn.); *Utah Division of Consumer Protection v. Meta Platforms Inc., et al.*, Third Judicial District Court, Salt Lake County, No. 230908060 (Utah); *State of Vermont v. Meta Platforms, Inc., et al.*, Chittenden Superior Court, Civil Division, No. 23-CV-04453 (Vt.).

AAA. "**School Hours**" shall mean the hours between 8 a.m. and 3 p.m. on Monday through Friday each week between August 15 and June 15 for every year of the Agreement Term, subject to adjustment by a Supervising Parent.

BBB. "**Sensitive Aggregate Content**" refers to content that, in the aggregate, may be inappropriate for Teen Users. For the purposes of this Agreement, Sensitive Aggregate Content shall mean nutritional discussion, personal weight and physical fitness accomplishments, muscular physiques, promotion or depiction of non-invasive aesthetic procedures for maximizing physical attractiveness, depiction of certain body parts commonly associated with body idealization, and depiction or discussion of personal experience living with mental or emotional distress.

CCC. "**Settlement**," "**Settlement Agreement**," or "**Agreement**" mean the settlement agreement and release described in this document. For the avoidance of doubt, the Agreement is inclusive of all exhibits.

DDD. "**Settling States**" shall mean the states, Attorneys General, commonwealths, and territories of the United States that (i) agree to enter into and be bound by the terms of this Agreement, and (ii), for those states, Attorneys General, commonwealths, or territories with pending Actions, move for entry of a consent judgment within the time provided by Sections X.G and X.I. If a state, Attorney General, commonwealth, or territory with a pending Action fails to meet the requirement in (ii) within the time provided by Sections X.G and X.I, it shall forfeit its portion of the Cost Fund Payment, its Guaranteed Installment Payments, and its Contingency Installment Payments and cease to qualify as a Settling State.

EEE. "**State Committee**" means a bipartisan group of no more than 6 Attorney General offices appointed by Settling States, as modified from time to time.

FFF. "**Supervising Parent**" refers to an adult who is formally linked through a Meta SMP's parental supervision controls to a Teen User. For the purposes of this Agreement,

Supervising Parent shall mean an adult who is formally linked through Meta's parental supervision controls to supervise a Teen User.

GGG. "**Teen User**" refers to a Meta SMP user with a predicted or stated age from 13 through 17 years old.

HHH. "**U13**" shall mean users under the age of 13 or a user who has been identified as likely to be under the age of 13 by a Meta SMP Age Assurance Method.

III. "**U18 False Positive Rate**" shall mean the percentage of actual users with an age from 13 through 17 years old, who are incorrectly identified or predicted by Meta to be 18 years or older.

## II. INJUNCTIVE PROVISIONS

A. Age Assurance

1. Age Assurance Framework. Within one (1) year of the Effective Date, Meta will adopt an age assurance framework ("**Age Assurance Framework**"), wherein it will apply one or more age assurance methods developed by a third party and licensed to customers ("**Commercially Available Age Assurance Methods**") or age assurance methods developed by Meta ("**Proprietary Age Assurance Methods**") (collectively, "**Age Assurance Methods**") to each Meta SMP user in the Settling States. For the purposes of this Section II.A, an age assurance method developed or acquired by Meta that uses the same or functionally identical technology and methodology to a Commercially Available Age Assurance Method shall be treated as a Commercially Available Age Assurance Method. The Age Assurance Framework must include Age Assurance Methods to evaluate whether a Meta SMP user is a Teen User or U13, as described in Section II.A.6. New users of Meta SMPs who have not yet had their age assessed by an Age Assurance Method pursuant to Meta's Age Assurance Framework shall receive the Default Protections pursuant to Section II.A.10 of this Agreement.

2. Testing of Age Assurance Framework. Any Age Assurance Method adopted by Meta as part of its Age Assurance Framework must be tested annually by an accredited third party that is qualified to perform the actions set forth below, as applicable to the Age Assurance Method being tested ("**Third-Party Testing Provider**").

   (a) A Meta SMP must certify the U18 False Positive Rate for Proprietary Age Assurance Methods based on its own testing, which it will perform either on a statistically significant sample of users using the Meta SMP or on a statistically significant sample of users under conditions that are consistent with users using the Meta SMP. The Meta SMP must also make reasonable efforts to ensure testing data is reflective of the user population as a whole, including by applying statistical methods to attempt to correct for selection bias stemming from the sample of users upon which the Age Assurance Method is evaluated. The Third-Party Testing Provider shall assess and confirm in writing whether (i) the processes and statistical methodologies used by Meta for testing and certification reflect actual product functionality and performance for the Meta SMP user population, (ii) the results of Meta's testing support the certification of the U18 False Positive

Rate, and (iii) the Proprietary Age Assurance method reflects global best practices, or the requirements in ISO 27566 or an equivalent, internationally recognized standard.

(b) Age Assurance Methods must be certified by the Third-Party Testing Provider (in the case of Commercially Available Age Assurance Methods) or Meta (in the case of Proprietary Age Assurance Methods). The certification must state that the Age Assurance Method used meets the U18 False Positive Rate based on testing performed by the Third-Party Testing Provider or Meta, respectively, in "real-world usage" conditions, including:

(i) Not testing with data used for training or tuning;

(ii) Performance across diverse demographic groups (e.g., age, race, gender, disability status); and

(iii) For images or video, variation in photographic or videographic conditions weighted to reflect prevalent conditions in Age Assurance Method deployment, including subject presentation, pose variation, facial archetypes, and lighting conditions.

(c) The Third-Party Testing Provider shall also test and certify that the Meta SMP's use of all Age Assurance Methods pursuant to this Agreement:

(i) Meets the data security and privacy requirements in Section II.A.8 of this Agreement;

(ii) For Commercially Available Age Assurance Methods, reflects global best practices, or the requirements of ISO 27566 or an equivalent, internationally recognized industry standard, except as otherwise required by this Agreement;

(iii) Subject to the limitations of Section II.A.8 of this Agreement, includes controls that are technically advanced and industry-leading in detecting and preventing commonly attempted circumvention methods, including demonstrated anti-spoofing measures and resistance to bypass techniques; and

(iv) Demonstrates operational and technical reliability, including uptime, consistency of results, and scalability.

3. Commercially Available Age Assurance Methods.

(a) Presumption of Compliance. The Settling States acknowledge and agree that Meta shall be presumptively in compliance with Section II.A.6 of its Age Assurance Framework obligations in this section of the Agreement with respect to all users for whom a Commercially Available Age Assurance Method was used and relied upon, based on the most recent certification from the Third-Party Testing Provider that the Commercially Available Age Assurance Method met the criteria in Subsections II.A.2.b-c, in the event that Meta can demonstrate that it has met all of the following

conditions: (1) Meta maintained and operated the Commercially Available Age Assurance Method in accordance with the applicable vendor's current technical specifications and terms of use and any conditions precedent to or requirements for certification provided by the Third-Party Testing Provider during the relevant period, (2) all variable settings or options used in the most recent testing by the Third-Party Testing Provider matched the settings and options applied to each user, (3) Meta did not otherwise undermine or interfere with the Commercially Available Age Assurance Method, including by encouraging, facilitating, or knowingly permitting circumvention by users, (4) Meta did not willfully ignore conditions or events that undermined the efficacy of the Commercially Available Age Assurance Method, (5) Meta provided complete and accurate information to the Third-Party Testing Provider and did not otherwise take steps to undermine or interfere with the certification or skew the results, and (6) Meta did not otherwise violate its obligations under this Agreement as related to the Commercially Available Age Assurance Method.

(b) To the extent that no Commercially Available Age Assurance Method utilizing (1) ID verification or (2) facial age estimation technology or similarly accessible age verification technology meets the requirements of Section II.A.6.a.i, Meta and the Settling States agree to meet and confer on possible alternative methods and/or age assurance metrics.

4. Proprietary Age Assurance Methods. Meta may elect to use one or more Proprietary Age Assurance Methods. In such event, Meta shall not benefit from the presumption of compliance set forth in Section II.A.3.a. Additionally, Meta will maintain continuous oversight of any Proprietary Age Assurance Method sufficient to ensure that the method is functioning as intended.

5. Age Signals from Google and Apple Operating Systems and App Stores. For purposes of this Agreement, Meta agrees to incorporate in its Age Assurance Framework reliable age signals shared with Meta by operating systems and app stores operated by Apple and Google. To determine the reliability of the age signals, Meta may consult the Independent Auditor who may make non-binding recommendations about incorporation of the age signals into Meta's Age Assurance Framework. Nothing in this Section shall be interpreted to increase, limit, or remove any obligations Meta might have under existing or future federal, state, tribal, or local laws or regulations that impose obligations on the use of age signals from operating systems or app stores.

6. Age Assurance Standards.

(a) U18 False Positive Rate Thresholds.

(i) Any Commercially Available Age Assurance Methods deployed by Meta for any new and existing users in the Settling States shall meet or fall below the following U18 False Positive Rates excluding method circumvention within one year of the Effective Date: 10% for minors aged 16-17 and 3% for minors aged 13-15.

(ii) Any Proprietary Age Assurance Methods deployed by Meta for any new and existing users in the Settling States shall meet or fall

below the following U18 False Positive Rates excluding method circumvention within 1 and 2 years of the Effective Date:

(A) Year 1: Within one year of the Effective Date: 14% for minors aged 16-17 and 7% for minors aged 13-15.

(B) Year 2: Within two years of the Effective Date, 10% for minors aged 16-17 and 5% for minors aged 13-15.

(b) U13 Age Assurance Framework.

(i) Within six months of the Effective Date, Meta shall maintain or implement the following methods designed to detect users under the age of 13 (U13):

(A) Subject to the limitations in Section II.A.8, employ technical measures, including Meta's soft-matching models, to (1) identify other Meta SMP accounts likely belonging to a U13 identified by Meta, and place those Meta SMP accounts into Meta's U13 enforcement process;

(B) In Meta's U13 enforcement process, assessing all posts, comments, or other actions by the user that may provide reliable indicia of the user's age or under-13 status when determining whether to checkpoint the user. In the absence of indicia concerning the user's age or age status, Meta shall presume that the user is U13, unless there is reliable evidence that the account was reported by a malicious actor;

(C) Provide a simplified reporting experience to report suspected U13 from within Meta SMPs, as illustrated by the reporting flow in Exhibit F, as well as maintain Meta's existing web-based underage reporting tool, which is available to people who are not Meta SMP users;

(D) Subject to the limitations in Section II.A.8, when a Meta SMP account is removed and deleted as a result of Meta's U13 enforcement process, Meta shall review the Meta SMP user's friend networks of those deleted accounts to attempt to identify additional U13s;

(E) Where Meta utilizes a Commercially Available Age Assurance Method to identify Teen Users and the Commercially Available Age Assurance Method determines a user is U13 (for example, if a user utilizes face-based age prediction to prove they are over 18 years old but is predicted to be U13), Meta already places that user into its U13 enforcement process. Meta agrees to continue this practice and regularly evaluate opportunities to improve upon it, including if or when Meta utilizes new Commercially Available Age Assurance Methods.

(ii) Model Development and Enforcement Commitments.

(A) Within one (1) year following the Effective Date, Meta commits to developing, training, and conducting initial testing of an age assurance model prototype designed to predict whether users on Meta SMPs are under the age of 13 ("**U13 Age Model**"). Meta shall report to the Independent Auditor on its development of the prototype U13 Age Model and the outcome of the initial testing, including data on the effectiveness of the U13 Age Model compared to Meta's pre-existing methods for detecting U13s.

(B) Meta will make best efforts to ensure that the U13 Age Model has a false positive rate that is equal to or less than the lowest U13 false positive rate achieved by a Commercially Available Age Assurance Method where that method also meets all the criteria in Subsections II.A.2.b-c, including published testing data meeting the testing requirements of Subsection II.A.2.b.

(C) At the end of year 1, Meta shall set a target for U13 enforcement volume in year 2 following the Effective Date (the "**Year 2 Enforcement Target**") on each Meta SMP reflecting a reasonably achievable number of Meta SMP U13s to identify and remove based on Meta's continued best efforts to improve the U13 Age Model. The Independent Auditor shall report to the Settling States on the reasonableness of the Year 2 Enforcement Target and the process by which it was set in accordance with Section III hereof.

(D) Within two (2) years following the Effective Date, Meta shall use the U13 Age Model to evaluate all Meta SMP accounts to help it meet the Year 2 Enforcement Target. If Meta does not meet the Year 2 Enforcement Target for a Meta SMP, Meta shall provide to the Independent Auditor an explanation for why Meta SMPs did not meet the target U13 enforcement volume, and describe all planned or implemented changes to the U13 Age Model to increase the efficacy of the U13 Model. The Independent Auditor shall report to the Settling States as to whether Meta SMPs met the Year 2 Enforcement Target in accordance with Section III hereof.

(E) At the end of year 2, Meta shall set a target for U13 enforcement volume in year 3 following the Effective Date (the "**Year 3 Enforcement Target**") on each Meta SMP reflecting a reasonably achievable number of Meta SMP U13s to identify and remove based on Meta's continued best efforts to improve the U13 Age Model. The Independent Auditor shall report to the Settling States on the

reasonableness of the Year 2 Enforcement Target and the process by which it was set in accordance with Section III hereof.

(F) Within three (3) years following the Effective Date, Meta shall use the U13 Age Model to evaluate all Meta SMP accounts to help it meet the Year 3 Enforcement Target. If Meta does not meet the Year 3 Enforcement Target for a Meta SMP, Meta shall provide to the Independent Auditor an explanation for why Meta SMPs did not meet the target U13 enforcement volume, and describe all planned or implemented changes to the U13 Age Model to increase the efficacy of the U13 Model. The Independent Auditor shall report to the Settling States as to whether Meta SMPs met the Year 3 Enforcement Target in accordance with Section III hereof.

(iii) Meta's obligations to develop and use the U13 Age Model as set forth in Section II.A.6.b.ii.A is contingent upon the release described in Section II.A.6.b.iv of this Agreement and the continued application of the Federal Trade Commission's ("**FTC**") COPPA – Enforcement Policy Statement Promoting the Adoption of Age-Verification Technology. Nothing herein shall require Meta to maintain, develop, train, test, or implement age assurance models in any manner that is inconsistent with its obligations under the Children's Online Privacy Protection Act ("**COPPA**"), 15 U.S.C. § 6501 et seq., including as modified by COPPA regulations or policy statements issued by the FTC. In the event Meta is no longer obligated to develop and use the U13 Age Model, Meta will use best efforts to enhance its U13 detection methods as permitted by law.

(iv) In consideration of the monetary provisions and commitments contained in this Agreement, including the commitments to encourage the use of robust age-verification mechanisms, as of the Effective Date, each Settling State's Attorney General agrees to the fullest extent permitted by law, to have fully, finally, and forever released any past, present, or future claims, actions, or proceedings, and covenants not to sue or bring an action pursuant to the Children's Online Privacy Protection Act ("**COPPA**") (15 U.S.C. § 6501, et seq.), the COPPA Rule (16 C.F.R. Part 312), or any analogous state law against Meta arising out of, in whole or in part, the continued or future maintenance or continued or future use of a child's personal information for the sole purpose of enhancing Meta's efforts to detect and remove U13s from Meta SMPs and not for any purposes concerning ads targeting and delivery, marketing, or algorithmic optimization efforts, provided that any such personal information is maintained pursuant to the requirements of Section II.A.8. As such, each Settling State's Attorney General recognizes that this release and covenant not to sue is for the purpose of providing enhanced protections for

consumers, and in particular, children under 13, and is not contrary to each Settling State's public policy.

(v) **Annual Testing and Certification.** On an annual basis, Meta shall certify the number of enforced U13s for each Meta SMP. The number of enforced U13s for each Meta SMP shall be confirmed by the Independent Auditor, which shall audit the processes used to record these removals and the methodologies used to compute the aggregate metrics. The Independent Auditor shall report annually to the Settling States the number of enforced U13s and the enforcement target set for that year in accordance with Section II.A.6.b.ii hereof.

7. Method circumvention detection. In addition to the requirements in Section II.A.2.c.iii, Meta will use additional best practices to discourage method circumvention, including but not limited to:

(a) For any Age Assurance Method a user can affirmatively choose to use (e.g., ID Verification or Face-based Age Assurance Method), placing limits on the number of completed user attempts for each Age Assurance Method not to exceed any of the following: three (3) per method over any 24-hour period, four (4) per method over any one-month period, and six (6) per method over any two-year period. For the avoidance of doubt, a user's completed attempts to use an Age Assurance Method will be counted collectively across all the user's hard-linked and soft-matched accounts;

(b) Using best efforts to link accounts maintained by a single user, including through Meta's soft-matching models;

(c) Incorporating a proactive monitoring system that requires users to undergo an additional Age Assurance Method where a user is determined, including based on their conduct on Meta SMPs, to have likely circumvented the Age Assurance Method and is: (A) likely a Teen User after having been previously assessed as 18 or older; or (B) likely U13 after having been previously assessed as 13 or older. Users Meta determines are likely Teen Users after having been previously assessed as at least eighteen may choose not to undergo additional age assurance but then will be treated as Teen Users; and

(d) For Commercially Available Age Assurance Methods, maintaining regular communications with third-party age assurance vendors regarding method circumvention trends and best practices to help ensure maximum detection and prevention.

Meta will continuously investigate new or previously undetected forms of method circumvention, including in response to public reports, reports directed to Meta or its agents including any third-party age assurance providers, and monitoring of changes in aggregate age assurance outcomes consistent with undetected forms of method circumvention. If undetected forms of method circumvention are confirmed, Meta will use best efforts to timely correct resulting false positive outcomes and to modify its Age Assurance Framework, including working with its third-party age

assurance vendors as applicable, to maximize detection of the identified form(s) of method circumvention going forward.

8. Data minimization and security.

(a) Except as set forth herein, all data collected by Meta from users of Meta SMPs in the Settling States for the sole purpose of conducting age assurance, all data maintained from known U13s, and all data collected by a vendor for use in a Commercially Available Age Assurance Method shall be held for the minimum period required to determine a user's age status and thereafter immediately enqueued for deletion, after which it shall be deleted in a reasonable period of time. Meta may retain (1) U13 data only to the extent required for purposes of developing, training, testing, and measuring the performance of the U13 Age Model ("**U13 Data**"), provided that any U13 data that constitutes Personally Identifiable Information as defined by 16 C.F.R. Part 312.2 will be protected using Meta's highest data privacy and security standards, and (2) metadata about the age assurance method used by the user information ("**Retainable Data**") only where required to ensure the ongoing integrity of age assurance systems, including but not limited to the ability to identify circumvention and related patterns over time, and only for as long as it is required for those purposes. For the avoidance of doubt, U13 Data cannot be used for purposes such as ads targeting and delivery, marketing, or algorithmic optimization efforts. Any U13 Data and Retainable Data shall be maintained at the coarsest viable granularity and cannot be used for any other purpose unless legally required. Any Retainable Data that is no longer required for the purposes set forth herein shall be deleted within 90 days. The terms above shall not pertain to the user's stated date of birth, stated age, nor the outcome of the Age Assurance Method (e.g., "teen or adult" classification).

(b) Data collected by Meta or a vendor, or transmitted by a vendor, must be collected and stored using industry-standard data security measures and as required by law, including encryption in transit and at rest.

(c) The Parties agree to discuss in good faith potential modifications to this provision as necessary to permit Meta to improve the efficacy of its Age Assurance Framework while preserving the principles of data minimization and security set forth in this Section.

9. Appeals Process. Users claiming to have been mis-identified as minors must be offered a Clear and Conspicuous means to appeal the decision. Decisions on all user appeals must be made in a timely manner and communicated to the user along with a basis for the decision.

10. Default protections.

(a) For fourteen (14) days upon creating a Meta SMP account, Meta SMP users who have not yet had their age assessed by an Age Assurance Method pursuant to the Age Assurance Framework shall receive the following protections:

(i) Meta SMP users with a stated U18 age shall be treated as Teen Users for the purposes of this Agreement.

(ii) Meta SMP users with a stated age of 18 years old or older shall receive the following protections:

(A) Interventions that are intended to restrict potential adult bad actors (as identified by integrity signals) from having contact with stated and predicted teens; and

(B) Interventions that are designed to provide content recommendations inspired by Age Appropriate Experiences.

(b) Fourteen (14) days or more after creating a Meta SMP account, Meta SMP users who have not yet had their age assessed by an Age Assurance Method pursuant to the Age Assurance Framework shall be treated as Teen Users for the purposes of this Agreement regardless of their stated age, except that Meta SMP users with a stated age of 18 years old or older shall receive the protections described in Section II.A.10.a.ii.

11. Continuous Improvement.

(a) Meta will make best efforts to improve its Age Assurance Framework in accordance with Age Assurance Method performance and global best practices, including by taking reasonable steps to lower false positive and false negative outcomes and maximize method circumvention detection rates.

(b) Meta shall, no less frequently than annually, evaluate potential changes to its Age Assurance Framework, including by considering industry and technological developments in age assurance. To the extent that Meta does not implement an industry development in age assurance, Meta shall document the reason the development was not implemented and if any alternatives were implemented instead.

B. Time Management

1. Length of Terms

(a) *Phase I*. Section II.B.2.a and Section II.B.3.a shall apply to Teen Users of a Settling State for the five years following the earliest of (i) the Compliance Date or (ii) such earlier date upon Meta's implementation of both of the obligations in Sections II.B.2.a and II.B.3.a; *unless* Phase II (Section II.B.2.b or Section II.B.3.b, respectively) is in effect. In the event Meta implements both of the obligations in Sections II.B.2.a and II.B.3.a prior to the Compliance Date, it shall promptly notify the State Committee in writing of the date such implementation was completed.

(b) *Phase II*. Each of Section II.B.2.b and Section II.B.3.b shall apply with respect to Teen Users of a Settling State whenever, in the 10 years following the Effective Date, Industry-Wide Adoption has occurred and

remains in effect with respect to the applicable Contingent Time Management Obligation.

2. Night Access Mode

(a) Phase I

(i) Meta SMPs shall, by default, at minimum, impose on Teen Users a night access mode from 12 a.m. to 6 a.m. based on the device's local time zone, during which time Teen Users by default will not be able to access Meta SMPs, except as detailed in Section II.B.2.a.iii ("**Phase I Night Access Mode**").

(ii) From 10 p.m. to 7 a.m., based on the device's local time zone, Meta SMPs shall disable push notifications for Teen Users, unless modified by a Supervising Parent. This provision shall not restrict the Meta SMP from delivering urgent push notifications related to account security or platform integrity.

(iii) Teen Users will retain access to messaging and settings during Phase I Night Access Mode. Meta SMPs shall limit messaging and settings feature functionality to ensure that Teen Users cannot access broader Meta SMP features (beyond the content in a single message) and effectively circumvent Phase I Night Access Mode, including limiting access to content from settings.

(iv) During Phase I Night Access Mode, Meta SMPs shall not recommend or otherwise suggest that the Teen User utilize a different Meta SMP or engage in messaging, though Meta SMPs may provide a neutral screen that other parts of the Meta SMP remain available without mentioning the availability of messaging. For the avoidance of doubt, (a) passive, system-generated indicators of incoming activity, such as notification badges reflecting unread messages, do not constitute a recommendation or suggestion under this provision and (b) this provision does not restrict Meta from generally discussing or marketing the availability of messaging features in communications, outside the Phase I Night Access Mode interface.

(v) The default for Teen Users cannot be modified to a less restrictive setting without approval from a Supervising Parent. Teen Users or Supervising Parents may modify the defaults to more restrictive settings.

(b) Phase II

(i) Meta SMPs shall, by default, at minimum, impose on Teen Users a night access mode from 10 p.m. to 7 a.m. based on the device's local time zone, during which time Teen Users by default will not be able to access Meta SMPs, except as detailed in Section II.B.2.b.iii ("**Phase II Night Access Mode**").

(ii) During Phase II Night Access Mode established in Section II.B.2.b.i, Meta SMPs shall disable push notifications for Teen Users, unless modified by a Supervising Parent. This provision shall not restrict the Meta SMP from delivering urgent push notifications related to account security or platform integrity.

(iii) Teen Users will retain access to messaging and settings during Phase II Night Access Mode. Meta SMPs shall limit messaging and settings feature functionality to ensure that Teen Users cannot access broader Meta SMP features (beyond the content in a single message) and effectively circumvent Phase II Night Access Mode, including limiting access to content from settings.

(iv) During Phase II Night Access Mode, Meta SMPs shall not recommend or otherwise suggest that the Teen User utilize a different Meta SMP or engage in messaging, though Meta SMPs may provide a neutral screen that other parts of the Meta SMP remain available without mentioning the availability of messaging. For the avoidance of doubt, (a) passive, system-generated indicators of incoming activity, such as notification badges reflecting unread messages, do not constitute a recommendation or suggestion under this provision and (b) this provision does not restrict Meta from generally discussing or marketing the availability of messaging features in communications, outside the Phase II Night Access Mode interface.

(v) The default for Teen Users cannot be modified to a less restrictive setting without approval from a Supervising Parent. Teen Users or Supervising Parents may modify the defaults to more restrictive settings.

3. Daily Limit

(a) Phase I

(i) Meta SMPs shall default Teen Users to a daily limit maximum of use cumulatively across all Meta SMPs of 2 hours per day, resetting at 12:00 AM based on the device's local time zone. This daily limit shall not include time spent watching Longform Content, engaging in messaging, or accessing settings. Access to content from settings shall be included in the daily time limit.

(ii) Once a Teen User has reached the daily-limit of cumulative use, the Teen User shall not have access to the Meta SMP features for which the daily-limit applies until the reset at 12:00 AM based on the device's local time zone. Meta SMPs shall not recommend or otherwise suggest that the Teen User utilize a different Meta SMP or engage in messaging or the watching of Longform Content, though Meta SMPs may provide a neutral screen that other parts of the Meta SMP remain available without mentioning the availability of messaging. For the avoidance of doubt, (a) passive, system-generated indicators of incoming activity, such as

notification badges reflecting unread messages, do not constitute a recommendation or suggestion under this provision and (b) this provision does not restrict Meta from generally discussing or marketing the availability of messaging features in communications, outside the daily limit interface.

(iii) Meta SMPs shall limit messaging and setting feature functionality to ensure that Teen Users cannot access broader Meta SMP features (beyond the content in a single message) and effectively circumvent the daily-limit once it applies, including limiting access to content from settings.

(iv) The default for Teen Users requires approval of a Supervising Parent to change to a less restrictive daily-limit maximum. Teen Users or Supervising Parents may modify the defaults to a more restrictive limit maximum.

(v) For Teen Users who have linked accounts through an explicit linking method provided by Meta, or pursuant to Section II.B.6.a below, the daily-limit maximum shall apply cumulatively across all such linked accounts on Meta SMPs.

(b) Phase II

(i) Meta SMPs shall default Teen Users to a daily limit maximum of 60 minutes per day of use on each Meta SMP (inclusive of any Meta Spin Off Apps spun off from such Meta SMP), not to exceed 120 minutes per day of use cumulatively across Meta SMPs. The daily limit will reset at 12:00 AM, based on the device's local time zone. This daily limit shall not include time spent watching Longform Content, engaging in messaging, or accessing settings. Access to content from settings shall be included in the daily time limit.

(ii) Once a Teen User has reached the daily-limit of 60 minutes of use on a specific Meta SMP (inclusive of any Meta Spin Off Apps spun off from such Meta SMP) and 120 minutes of use across Meta SMPs, the Teen User shall not have access to the Meta SMP features for which the daily-limit applies until the reset at 12:00 AM based on the device's local time zone. Meta SMPs shall not recommend or otherwise suggest that the Teen User utilize a different Meta SMP or engage in messaging or the watching of Longform Content, though Meta SMPs may provide a neutral screen that other parts of the Meta SMP remain available without mentioning the availability of messaging. For the avoidance of doubt, (a) passive, system-generated indicators of incoming activity, such as notification badges reflecting unread messages, do not constitute a recommendation or suggestion under this provision and (b) this provision does not restrict Meta from generally discussing or marketing the availability of messaging features in communications, outside the daily limit interface.

(iii) Meta SMPs shall limit messaging and setting feature functionality (beyond the content in a single message) to ensure that Teen Users cannot access broader Meta SMP features and effectively circumvent the daily limit once it applies, including limiting access to content from settings.

(iv) The default for Teen Users requires approval from a Supervising Parent to change to a less restrictive daily limit maximum. Teen Users or Supervising Parents may modify the defaults to a more restrictive limit maximum.

(v) For Teen Users who have linked accounts through an explicit linking method provided by Meta, or pursuant to Section II.B.6.a below, the daily-limit maximum shall apply cumulatively across all such linked accounts on Meta SMPs.

4. School Mode

(a) During School Hours, the Meta SMP shall disable push notifications for Teen Users, unless modified by a Supervising Parent. This provision shall not restrict the Meta SMP from delivering push notifications related to messaging, account security, or platform integrity.

(b) The default for Teen Users cannot be modified to a less restrictive setting without approval from a Supervising Parent. Teen Users or Supervising Parents may modify the defaults to more restrictive settings.

(c) A Supervising Parent shall also be able to modify a Teen User's School Hours and restrict access to all functionality other than messaging from Meta SMPs for Teen Users during School Hours.

5. Productive Pauses

(a) Meta must implement productive pauses and notices as described herein designed to reduce or prevent excessive, mindless, or unintended teen usage. Within 4 months of the Effective Date, Meta SMPs will implement for Teen Users by default (a) productive pauses at 60 minutes and 90 minutes of cumulative daily usage of Meta SMPs (as calculated pursuant to Section II.B.3.a.i) and (b) a Clear and Conspicuous notice upon any 15-minute session of continuous usage of a Meta SMP. All such pauses and notices shall be as prominent as the illustrative examples in Exhibit G, and shall escalate in either length or prominence. Such defaults will be subject to modification to a less restrictive setting only by a Supervising Parent or a more restrictive setting by a Teen user or Supervising Parent.

(b) Meta shall provide the Independent Auditor with data on the efficacy of the productive pauses and notices, including but not limited to actions that users take in response to the productive pauses with respect to (a) Teen Users who spend an average of 60 or more minutes per day on Meta SMPs; and (b) Teen Users who spend an average of 90 or more minutes per day on Meta SMPs, in each case calculated pursuant to Section II.B.3.a.i. As

set forth in Section III, the Independent Auditor may provide Meta with non-binding recommendations based on its audit findings.

(c) Meta shall regularly conduct internal user research and expert consultations to determine the impact of the productive pauses and notices on reducing or eliminating excessive, mindless, or unintended social media usage by Teen Users, including regular daily usage beyond 90 minutes.

(d) Meta shall consider user feedback, internal user research, and all recommendations of the Independent Auditor and consulted experts to assess whether to revise the structure, timing, and/or content of the productive pauses and notices. Meta shall (i) use such feedback, research, or recommendations in considering potential changes to the productive pauses and notices to better mitigate or prevent excessive, mindless, or unintended teen usage and (ii) implement changes to the productive pauses and/or notices to achieve the design objectives. Meta, however, retains discretion to determine the changes to be made. For purposes of any dispute arising under this Agreement, Meta shall be presumptively deemed in compliance with this provision so long as it has (a) conducted the assessment process described herein, (b) documented such assessment, including consideration of potential changes as described above and (c) made changes and documented those changes or, if no changes are made, document the reasons why Meta does not believe the recommended changes would reasonably achieve the design objectives.

6. Identification of Suspected Secondary Accounts

(a) To help combat circumvention across unlinked accounts, Meta commits to utilizing and continuing to improve its soft matching models on its Meta SMPs, such as its Single User Multiple Accounts (SUMA) technology, leveraging signals such as device IDs, phone numbers, and e-mail addresses to ensure that Meta is technologically advanced and industry-leading at identifying unlinked accounts belonging to the same Teen User or U13 ("**Soft-matched Accounts**").

(b) On an annual basis, Meta shall provide the Independent Auditor with data on the design, testing, and effectiveness of its soft matching models at identifying unlinked accounts belonging to the same Teen User or U13. The Independent Auditor may provide Meta with non-binding recommendations as to how to alter or improve Meta's soft matching models to increase effectiveness of the models at identifying unlinked accounts belonging to the same Teen User or U13.

(c) For Teen Users who have multiple accounts Meta has identified, either linked accounts via Meta Account Center or other explicit linking method provided by Meta or Soft-matched Accounts, the daily limit maximum described above shall apply cumulatively across all such accounts on Meta SMPs.

C. Feed Options

1. Within 4 months of the Effective Date, Meta SMPs shall provide Teen Users with a Reasonably Accessible option to select a feed that is a Non-Personalized Feed as their default home feed.

2. Within 10 days of identifying a new Teen User account, and every 90 days thereafter unless reminders are disabled by the Teen User, Meta SMPs shall Clearly and Conspicuously prompt Teen Users with the option of switching their default home feed to a Non-Personalized Feed. Meta SMPs shall not preselect or prioritize accepting or rejecting this switch for the Teen User and shall present this choice independent of other setting options.

3. The option to select or disable a Non-Personalized Feed as a default home feed shall be Reasonably Accessible. Meta SMPs shall permit Teen Users the option to enable Optional Protective Settings and shall make such settings Reasonably Accessible.

4. For Teen Users enrolled in Parental Supervision, Supervising Parents shall have the ability to enable a Non-Personalized Feed as the default home feed for Teen Users on Meta SMPs. Supervising Parents shall also have the ability to enable Optional Protective Settings for their Teen User on Meta SMPs. Where a Supervising Parent has enabled a Non-Personalized Feed or any Optional Protective Settings on Meta SMPs, approval from Supervising Parents will be required to revert to a less restrictive setting. Supervising Parents shall be Clearly and Conspicuously notified of the abilities described in this paragraph upon a Teen User entering Parental Supervision on Meta SMPs.

D. Social Comparison

1. Meta SMPs will, by default, disable Teen Users from seeing numbers of likes or reactions on Meta SMPs. This default for Teen Users cannot be modified without approval from a Supervising Parent.

2. Meta SMPs will disable Teen Users from applying Cosmetic Procedure Filters to their content.

E. Teen Content Safety

1. Meta represents that it has already taken measures to promote age-appropriate content for Teen Users. For Instagram those currently include, and for Facebook currently include or will include by the Compliance Date:

(a) Implementing content policies designed to help limit Teen Users' exposure to Age Inappropriate Content;

(b) Implementing content policies designed to help prevent targeting Teen Users with content that violates Meta's Community Standards relating to bullying and harassment;

(c) Implementing product interventions designed to limit or interrupt repeated exposure to Sensitive Aggregate Content for Teen Users;

(d) Defaulting teens into content settings that are designed to provide Age Appropriate Experiences for Teen Users;

(e) Giving Supervising Parents the ability to impose more restrictive content settings on their supervised Teen User; and

(f) Preventing Teen Users from friending or following Age Inappropriate Accounts; preventing Teen Users from seeing content from or interacting with such accounts; not recommending such accounts to Teen Users; and preventing such accounts from interacting with Teen Users.

2. For Meta SMPs, during the Agreement Term Meta agrees to maintain in place features at least as effective at protecting Teen Users and to continuously improve measures to promote age-appropriate content for Teen Users, including through the mechanisms described in Section II.E.1; *provided, however*, that nothing in this provision shall be construed to prevent any Meta SMP from conducting reasonable, limited duration tests of the efficacy of proposed safety features compared to existing Meta SMP safety features, or to prevent any Meta SMP from replacing an existing safety feature with a new feature or features that is designed and reasonably expected to accomplish the same safety goals at least as effectively as the current feature and Meta shall not be deemed in breach of this provision in the event that a reasonably designed enhancement fails to achieve the intended effectiveness. Meta shall provide the Independent Auditor with access to documents and/or data sufficient to assess (i) the reasonableness (including the duration) of any system or program of testing that includes temporarily replacing existing safety measures; and (ii) the reasonableness of any replacements of existing safety features with new features or features to accomplish the same safety goals.

3. For Meta SMPs, during the Agreement Term Meta agrees to (i) regularly evaluate the prevalence of Teen User exposure to Age Inappropriate Content, and Teen User exposure to experiences that are not Age Appropriate Experiences, on Meta SMPs and to take steps designed to reduce the frequency of such exposure over time; (ii) regularly conduct internal user research and expert consultation to better understand Teen Users' experiences on Meta SMPs regarding Age Inappropriate Content and Age Appropriate Experiences to inform their ongoing safety efforts; and (iii) regularly conduct internal user research, including based on in-app reports pursuant to the below subsection, and expert consultation to assess whether to revise Meta's Community Standards relating to Age Inappropriate Content, Meta's Age Appropriate Experience standards, and Sensitive Aggregate Content, and to make policy revisions, implementation changes, or related adjustments in a reasonable time period to address where such policies and practices are not capturing content or experiences that are causing harm to Teen Users.

4. Consumer Representations.

(a) Meta is enjoined from making false, misleading, or deceptive representations regarding the effect or efficacy of safety features for Teen Users on Meta SMPs.

For the avoidance of doubt, this provision applies exclusively to representations made by Meta on or after the Effective Date.

(b) This section may be enforced exclusively with the consent of a majority of the State Committee, and only if the enforcing state provides Meta with at least 30 days notice of the alleged violation, and an opportunity to confer and propose a corrective action plan, prior to taking action to enforce this provision.

(c) The State Committee will take into consideration any actions that Meta has taken or commits to take, in order to mitigate the alleged violation, in determining whether to consent to the enforcement of this section.

(d) Meta's compliance with Section II.E.4.a shall not be subject to the independent audit under Section III.

(e) For the avoidance of doubt, nothing in this Section II.E.4 shall, or is intended to, permit a Settling State or any Releasor to initiate any action whatsoever with respect to a Released Claim.

5. User Reporting.

(a) Meta SMPs shall offer in-app tools to allow Teen Users to report content that is illegal, violates Meta's published Community Standards, or is otherwise unwanted, offensive, or concerning, including bullying and harassment, violence and incitement, nudity and sexual activity, child sexual exploitation, hate speech, and suicide and self-injury. Meta shall continue to accept reports in multiple languages.

(b) With respect to Potentially Harmful Reported Content submitted in English or Spanish, Meta SMPs shall maintain processes designed to permit Teen Users to receive a response indicating Meta's decision on the report within 6 hours in at least 90% of cases.

(c) Meta SMPs shall provide the Teen User with a response to a report concerning Potentially Harmful Reported content when a report is received and:

(A) Content is removed for violating Meta's Community Standards/Guidelines;

(B) A review determines no violation has occurred; or

(C) Content is age-gated.

(d) Meta SMPs will offer Teen Users an option to appeal with respect to Potentially Harmful Reported Content when the review determines that no violation has occurred. Meta SMPs will also provide Teen Users with a response when an appeal is resolved (whether upheld or overturned).

F. Exposure to Harmful Experiences and People

1. Meta represents that it has already taken measures to reduce and avoid Teen Users' exposure to Harmful Experiences, which include, in addition to removing content that violates Meta's Community Standards, robust policies and controls designed

to prevent teen interactions with Potentially Suspicious Accounts, including measures that are designed to:

(a) Limit account discoverability between Teen Users and Potentially Suspicious Accounts;

(b) Default Teen Users into private accounts on Instagram and appropriate privacy settings on Facebook;

(c) Provide reporting and blocking options for Teen Users; and

(d) Provide Supervising Parents with information on Teen Users' messaging contacts.

2. During the Agreement Term, Meta SMPs agree to maintain in place features at least as effective at protecting Teen Users as those described in Section II.F.1 and to continuously improve measures designed to address Teen User exposure to Harmful Experiences; *provided, however*, that nothing in this provision shall be construed to prevent any Meta SMP from conducting reasonable, limited duration tests of the efficacy of proposed safety features compared to existing Meta SMP safety features, or to prevent any Meta SMP from replacing an existing safety feature with a new feature or features that is designed and reasonably expected to accomplish the same safety goals at least as effectively as the current feature and Meta shall not be deemed in breach of this provision in the event that a reasonably designed enhancement fails to achieve the intended effectiveness. Meta shall provide the Independent Auditor with access to documents and/or data sufficient to assess (i) the reasonableness (including the duration) of any system or program of testing that includes temporarily replacing existing safety measures; and (ii) the reasonableness of any replacements of existing safety features with new features or features to accomplish the same safety goals.

3. For Meta SMPs, during the Agreement Term Meta agrees to (i) regularly evaluate the prevalence of Teen User exposure to Harmful Experiences on Meta SMPs and to take steps designed to reduce the frequency of such exposure over time; (ii) regularly conduct internal user research and expert consultation to better understand Teen Users' experiences on Meta SMPs regarding Harmful Experiences to inform Meta SMPs' ongoing safety efforts; and (iii) regularly conduct internal user research and expert consultation to assess whether to revise Meta's Community Standards concerning Teen User exposure to Harmful Experiences, and to make policy revisions, implementation changes, or related adjustments in a reasonable time period to address where such policies and procedures are not capturing content or experiences that are causing harm to Teen Users.

4. Potentially Suspicious Contacts.

(a) When a message thread is established between a Teen User and a Potentially Suspicious Account on Meta SMPs, Meta will promptly deliver Clear and Conspicuous notices directly to the Teen User intended to signal caution.

(b) Additionally, for Teen Users enrolled in Parental Supervision, Meta shall promptly deliver Clear and Conspicuous notices to the Supervising Parent regarding their Teen User's interaction with (a) accounts identified by Meta as potentially likely to engage in financial blackmail using intimate content on Meta SMPs or (b) accounts that Meta has identified, with a sufficient degree of reliability, as potentially likely to engage in Inappropriate Interactions with Children on Meta SMPs. Meta SMPs shall provide resources to support Supervising Parents who wish to speak with their Teen Users about the risks of these interactions, and suggested actions such as blocking or reporting the account.

G. Parental Supervision

1. Meta agrees to provide Supervising Parents with information concerning the amount of time their Teen User is spending on Meta SMPs, including separately for time on the Meta SMP, time using the Meta SMP's messaging features, time viewing Longform Content (to the extent excluded from the calculation of daily limits pursuant to Section II.B.3.a.i), and the usernames of the Teen User's social connections and individuals messaging the Teen User, and usernames of any user reported by a Teen User. In addition, Instagram will notify Supervising Parents should their Teen User engage in repeated searches for terms related to suicide, self-harm, or eating disorders, and Facebook will notify Supervising Parents should their Teen User engage in repeated searches for terms related to suicide, self-harm, or eating disorders.

2. For Teen Users, Supervising Parents will be notified on a daily basis when the Teen User communicates directly with each adult user for the first time with the Teen User and shall provide a link to the adult user's profile to provide information such as their stated hometown or city or mutual connections, to the extent the information is publicly available.

3. Upon a Teen User enrolling Parental Supervision, Meta SMPs shall prompt the Supervising Parent to review their Teen User's settings to consider making updates to support how their Teen User spends their time on Meta SMPs. Meta shall not preselect, recommend, or encourage settings to Supervising Parents that are less restrictive than the default settings in this Agreement.

4. Meta SMPs will periodically suggest checkups for Supervising Parents to do with their Teen Users to evaluate their settings and usage.

5. Meta SMPs agree to continue to take steps designed to encourage enrollment in their Parental Supervision tools.

6. If a Teen User is enrolled in Parental Supervision, Meta shall notify the Supervising Parent if the Teen User creates or explicitly links a new secondary Meta SMP account within their Accounts Center or has been linked to a Soft Matched Account through Meta SMPs, including a link to the secondary account's profile. Meta SMPs shall automatically apply the Supervising Parent's approved time management settings in Section II.B and content restrictions to all explicitly linked Meta SMP accounts and all Supervised Accounts for a Teen User belonging to the same Meta SMP.

7. In the event a Supervising Parent approves a change to a default setting specified in Sections II.B.2 (Night Access Mode), II.B.3 (Daily Limit), or II.B.4 (School Mode) of this Agreement, Meta shall prompt the Supervising Parent, before the modification is implemented on the Teen User's account, to set the duration for the modification, after which the Teen User's settings will revert to their default. Within this prompt, Meta shall Clearly and Conspicuously provide the following options for the duration for the modification: Just for today, 1 week, 30 days, or until I change it back.

8. Meta SMPs shall utilize and continue to improve their controls designed to ensure that individuals who seek to utilize Parental Supervision controls are the Teen User's parent or guardian. Those methods shall include without limitation using Meta's age prediction models to ensure that the ostensible parent or guardian is over 18 and limiting the number of accounts that a Supervising Parent can supervise.

## III. ACCOUNTABILITY

A. The State Committee and Meta shall select a mutually approved qualified, independent third-party auditor ("**Independent Auditor**") within 60 days of the Effective Date, which can be extended by agreement of both Meta and the State Committee, to review Meta's implementation of the Injunctive Provisions (Section II). Meta shall then have a reasonable time to retain and contract the selected Independent Auditor. The Independent Auditor shall have or shall employ or retain sufficient personnel with appropriate expertise such that the Independent Auditor may fulfill its obligations pursuant to this Agreement (a "**Third Party**"). To the extent that additional expertise is required for the engagement, the Independent Auditor may retain the services of Third Parties, after consultation with and approval from Meta and the State Committee. Such Third Parties shall be subject to the same limitations set forth in this agreement as the Independent Auditor. If the parties are unable to mutually agree on the selection and/or engagement of an Independent Auditor or a Third Party, the matter shall be submitted to the dispute resolution process articulated in Section VIII. If at any time during the term set forth in Section III.C the Independent Auditor becomes unable or unwilling to perform the duties required by the terms of this Agreement, the State Committee and Meta shall select within 60 days, and Meta shall retain and contract within a reasonable period, a replacement Independent Auditor for the remainder of the term set forth in Section III.C. If the parties do not agree on a replacement auditor the matter will be submitted to the dispute resolution process articulated in Section VIII.

B. The Independent Auditor and any retained Third Parties shall at all times act in good faith and with integrity and fairness towards all Parties.

C. The term of the Independent Auditor shall begin two (2) months following the Effective Date and continue until 120 days following the fifth Final Report. The Independent Auditor's term will be divided for purposes of the reviews and reporting required below per Section III.G ("**Reporting Periods**").

D. Independent Auditor Scope of Work

1. The Independent Auditor's responsibility is to:

(a) Evaluate Meta's implementation of the Injunctive Relief Terms (Section II). This includes, but shall not be limited to, evaluating how Meta is defining, measuring for, generating data for, and otherwise implementing and evaluating its implementation of the Injunctive Relief Terms;

(b) Establish and/or approve methodologies and/or metrics for evaluating Meta's implementation of the Injunctive Relief Terms; and

(c) Report its findings in accordance with Section III.G below.

2. The Independent Auditor's Scope of Work applies to Meta's provision of services to users within the Settling States.

3. Within ninety (90) days after the appointment of the Independent Auditor, the State Committee and Meta shall agree with the Independent Auditor on a work plan. This time period may be extended for good cause by written agreement as between Meta, the State Committee, and the Independent Auditor. The work plan shall set forth in detail the manner in which the Independent Auditor will carry out his or her responsibilities under this Agreement, and the general scope of information that the Independent Auditor will seek to review in fulfilling the Independent Auditor's Scope of Work. It is not intended that the Independent Auditor will conduct his or her own inquiry into the historical events that allegedly gave rise to this Agreement or into matters beyond the scope of the Injunctive Terms of this Agreement. The work plan shall also include all reasonable and necessary costs of the Independent Auditor, as well as a process by which Meta may challenge Independent Auditor costs as excessive, duplicative, or unnecessary. The work plan shall also set forth the methodologies and/or metrics the Independent Auditor will utilize to evaluate Meta's implementation of the Injunctive Relief Terms under Independent Auditor review.

4. If the Independent Auditor, the State Committee, and Meta fail to reach agreement on a work plan within the designated time frame, the Independent Auditor shall determine a fair and reasonable work plan in consultation with the State Committee and Meta.

5. At least annually, or more frequently by mutual agreement of Meta and the State Committee, Meta and the State Committee will meet in person or virtually to discuss the work of the Independent Auditor and any suggestions, comments, or improvements Meta may wish to discuss with or propose to the State Committee, including with respect to the scope and costs of the work of the Independent Auditor, unless Meta and the State Committee agree that such a meeting is unnecessary.

6. The work plan may be modified from time to time by written agreement of the Independent Auditor and Meta. If such amendment to the work plan is not objected to by the State Committee within twenty (20) days' notice of said amendment, the Independent Auditor shall proceed to implement the amendment to the work plan.

E. Independent Auditor Access to Information

1. The Independent Auditor is entitled to access the non-privileged information, personnel, systems, and records that are reasonably relevant and sufficient to

evaluate Meta's implementation of the Injunctive Relief Terms, including, but not limited to, access to raw data; aggregated data; information; internal documents and communications; and the information identified in Sections II.A.6.b.ii, II.B.5.b, II.B.6.b, II.E.2, and II.F.2 ("**Accessible Information**"). Meta will cooperate in good faith to provide it in a usable form and reasonable timeframe. Where access to particular information is limited (by privilege, legal restriction, third-party confidentiality, or technical constraint), the Independent Auditor and Meta will work in good faith to identify a reasonable alternative sufficient to support the testing objective.

2. Meta shall designate an employee to serve as the primary point of contact for the Independent Auditor to facilitate the Independent Auditor's access to Accessible Information. The Independent Auditor shall make a good faith effort to leverage Meta's existing compliance mechanisms when reviewing Meta's implementation of the Injunctive Relief Terms. The Independent Auditor shall communicate any request for Accessible Information or to communicate with a current employee/contractor of Meta to the designated employee. Nothing here shall prohibit an employee/contractor of Meta from communicating with the Independent Auditor. Meta shall not take adverse action against any employee or contractor because that employee or contractor communicated with the Independent Auditor. Nothing in this paragraph shall prevent Meta from taking lawful employment actions unrelated to an employee or contractor engagement with the Independent Auditor.

3. If at any time the Independent Auditor reasonably believes that there is undue delay, resistance, interference, limitation, or denial of access to any Accessible Information reasonably deemed necessary by the Independent Auditor to evaluate Meta's implementation of the Injunctive Relief Terms under Auditor review, the Independent Auditor may meet and confer with Meta's Chief Privacy and Compliance Officer. If the Independent Auditor and Meta cannot resolve such limitation or denial, it shall be immediately reported to the State Committee. Meta and the State Committee shall address the issue by following the dispute resolution terms in Section VIII.

4. If at any time Meta believes that the Independent Auditor's request for Accessible Information is unnecessarily time consuming, unduly costly, or not proportional to the needs of the Independent Auditor, Meta may meet and confer with the Independent Auditor. If the Independent Auditor and Meta cannot resolve such request, Meta and the State Committee shall address the issue by following the dispute resolution terms in Section VIII.

5. To the extent that any of the documents requested by the Independent Auditor contain material protected from disclosure by the attorney-client privilege or attorney work product doctrine, Meta may redact the privileged material before providing the documents to the Independent Auditor, but must provide the Independent Auditor with a description of the redacted information and basis for redaction in writing. If the Auditor believes Meta has inappropriately categorized material as protected from disclosure, they shall inform the State Committee and any Settling State may take legal action to enforce the Independent Auditor's rights to access material in accordance with Section VIII (Dispute Resolution).

F. Communication with Settling States. There shall be no limitation on the ability of the Independent Auditor to communicate at any time with the Settling States Attorney(s) General regarding Meta's conduct.

G. Independent Auditor Reports

1. The Independent Auditor shall report to the State Committee on Meta's implementation of the Injunctive Relief Terms in the Agreement in periodic reports setting forth his or her findings (the "**Auditor Reports**"). The first Independent Auditor report shall cover the time period starting from the beginning of the five-year term set forth in Section III.C and continuing through the following three, full, successive Quarters from that date. Each successive Auditor Report shall cover the four (4) successive Quarters subsequent to the last Quarter covered by the previous Auditor Report.

2. No later than thirty (30) days after the close of a Reporting Period and/or at any other time deemed reasonably necessary by the Independent Auditor, the Independent Auditor shall provide Meta with a draft Auditor Report ("**Draft Report**"). Within thirty (30) days of its receipt of the Draft Report, Meta shall provide comments and responses to the Draft Report to the Independent Auditor and the State Committee, and the Independent Auditor shall provide the State Committee with the Draft Report.

3. Within thirty (30) days of receipt of Meta's comments and responses to the Draft Report, the Independent Auditor shall provide a final report (the "**Final Report**") simultaneously to the State Committee and Meta. After receipt of the Final Report, the State Committee may request the Draft Report and/or comments and responses thereto. The State Committee may share the Final Report with any Settling States Attorney(s) General.

4. The Final Report shall set forth: the work performed by the Independent Auditor and the Independent Auditor's evaluation regarding Meta's implementation of the Agreements Injunctive Relief Terms during the relevant period, including whether any material gaps or weaknesses were found; an explanation of the nature of any such material gap or weakness; the factual basis for the Independent Auditor's evaluation that any such material gap or weakness occurred (including documents, where available); and the Independent Auditor's evaluation as to whether Meta has cured the material gap or weakness. The Final Report shall contain any non-binding feedback or recommendations concerning provisions of the Agreement that the Independent Auditor is charged with providing non-binding feedback/recommendations, including without limitations Sections II.A.6.b.ii, II.B.5.b, II.B.6.b, II.E.2, and II.F.2 and whether Meta adopted or has agreed to adopt such non-binding recommendations.

5. The Independent Auditor's reports and testimony may be used by the Parties in any action or proceeding.

6. No action or lack of action by the Settling States regarding information received from the Independent Auditor regarding Meta's conduct shall be considered affirmation, acceptance, or ratification of that conduct by the Settling States.

7. All drafts, the Final Report and all related materials (including all materials designated as Confidential pursuant to Section III.I (and any parts, portions, or derivations thereof)) ("**Audit Materials**") shall be treated as confidential by the Independent Auditor and Settling States to the extent permitted by applicable law and shall not be disclosed without prior written notice to Meta. In the event the Independent Auditor or any Settling State receives a court order or request for disclosure that requires the production of Audit Materials, the Independent Auditor or Settling State shall, to the maximum extent available by law, give Meta written notice of its intent to disclose such material and the basis for its intended disclosure. The Independent Auditor or Settling State shall give Meta written notice of at least ten (10) days in advance of the intended disclosure, unless a shorter time is required by law, in order to permit Meta to challenge the intended disclosure in court or through other legal recourse prior to the disclosure. Nothing in this provision is intended to limit Meta's rights under state-specific laws and regulations regarding public disclosure of protected information under FOIA-equivalent state laws, including but not limited to commercially sensitive information.

H. Curing Material Gaps and Weaknesses

1. Within 30 days of issuance of a Final Report, Meta shall prepare corrective action plans for material gaps or weaknesses identified by the Independent Auditor in that Final Report, including a reasonable period for implementation of such plan. The Independent Auditor may extend the period of time to submit a corrective action plan.

2. Within fourteen (14) days of receiving the corrective action plan from Meta, the Independent Auditor shall advise Meta whether it has any feedback on the corrective action plan, including whether it approves Meta's corrective action plan as proposed.

3. All corrective action plans must be approved by the Independent Auditor within 90 Days of a Final Report that identifies the material gap or weakness. This 90-day period may only be extended with the consent of the State Committee. Meta's corrective action plans and related auditor feedback may be provided to the Settling States upon request. Meta must begin implementation of such corrective action plan (though implementation need not be complete) as soon as reasonable and no later than within 90 days of a Final Report that identifies the material gap or weakness, unless otherwise extended by the State Committee. Meta may reasonably revise or update a corrective action plan in consultation with and with approval by the Independent Auditor.

4. The Independent Auditor shall report in a subsequent Final Report following a finding of material gaps or weaknesses whether Meta implemented and completed the approved corrective action plan.

I. Confidentiality

1. Meta may designate materials and information that it believes contain trade secrets, other commercially sensitive information, or other sensitive information (including but not limited to user data or other personally identifiable information) as "Confidential." Materials and information provided by Meta to the Independent Auditor that are designated "Confidential" (and any parts, portions, or derivations

thereof) shall not be disclosed or distributed to any person or entity other than those authorized by these provisions, subject to the provisions in Section III.G.7.

2. All materials obtained from Meta by the Independent Auditor and in the Independent Auditor's possession shall be returned to Meta or destroyed at the conclusion of the Independent Auditor's term.

J. The Independent Auditor shall also prepare and make public an executive summary of each Final Report that does not contain information that is nonpublic, proprietary, or Confidential. At a minimum, the executive summary shall include but not be limited to, (a) a description of Meta's implementation of the Agreement's Injunctive Relief Terms during the relevant period and, (b) where the Independent Auditor has provided Meta with feedback or recommendations based on its audit findings, a summary of such feedback or recommendations and whether Meta adopted or has agreed to adopt such feedback or recommendations. Meta and the State Committee shall have an opportunity to review and comment on a draft of the executive summary, including for purposes of ensuring the exclusion of information that is nonpublic, proprietary, or Confidential.

K. Meta shall maintain all records and documents reviewed by the Independent Auditor for a minimum of five (5) years after the applicable Final Report.

L. Meta shall pay all reasonable and necessary fees and costs of the Independent Auditor, which shall be consistent with reasonable market rates.

## IV. RELEASE

A. In consideration of the monetary provisions and commitments contained in this Agreement, and as of the Effective Date, Releasors will be deemed to have fully, finally, and forever released and discharged, to the maximum extent allowable by law, the Released Parties from any and all Claims, whether known or unknown, whether accrued or unaccrued, that were asserted in any of the Actions or that could have been or could be asserted by any Releasor based on or arising out of the acts, practices, facts, matters, transactions, events, disclosures, statements, failures to act, or omissions alleged in the Actions (the "**Released Claims**"). For the purposes of res judicata, the Claims of Settling States with pending Actions shall be fully and finally resolved through the entry of the Consent Judgments in such Actions.

B. Cambridge Releases. In consideration of the Cambridge Settlement Amount, and as of the Effective Date, Cambridge Releasors will be deemed to have fully, finally, and forever released and discharged, to the maximum extent allowable by law, the Released Parties from any and all Claims, whether known or unknown, whether accrued or unaccrued, that were asserted in any of the Cambridge Complaints or that could have been or could be asserted by any Cambridge Releasor based on or arising out of the acts, practices, facts, matters, transactions, events, disclosures, statements, failures to act, or omissions alleged in the Cambridge Complaints (the "**Released Cambridge Claims**").

C. Scope; carve-outs

1. Notwithstanding any term of this Agreement, except as provided in paragraph 2 below, any and all of the following forms of liability are specifically reserved and not released:

(a) Any criminal liability;

(b) Any liability for state or federal securities violations arising from or related to Releasors' ownership interest in Meta shares;

(c) Any liability for state or federal tax violations;

(d) Any state or federal antitrust liability, except unfair or deceptive acts and practices Claims that were asserted in any of the Actions or that could have been or could be asserted by any Releasor based on or arising out of the acts, practices, facts, matters, transactions, events, disclosures, statements, failures to act, or omissions alleged in the Actions;

(e) Any state or federal environmental liability, it being understood that this carve-out does not include claims for public nuisance based on or arising out of the acts, practices, facts, matters, transactions, events, disclosures, statements, failures to act, or omissions alleged in the Settling State's Action;

(f) Any claims of private individuals for any types of monetary or injunctive relief, it being understood that this carve-out does not permit a Releasor to bring *parens patriae* claims;

(g) Any claims, other than the Actions, by plaintiffs, including school district, school, municipality, township, tribal, political subdivision or any other governmental unit plaintiffs, whose lawsuit is pending or subject to transfer to in Social Media Cases JCCP No. 5255; In re Social Media Adolescent Addiction/Personal Injury Products Litigation, No. 4:22-MD-03047-YGR-PHK (N.D. Cal.); or other state and federal courts in the United States;

(h) Without limiting the above, Claims that are based on or arise out of any investigation of any State(s) into Meta and any of its products or business practices identified in the August 25, 2026 letter from the Colorado Attorney General; and

(i) Any enforcement of the terms of this Agreement.

2. The Parties acknowledge and agree that nothing in paragraph 1 above shall limit, prejudice, or otherwise override the agreement of the Parties set forth in Section IV.A that this Agreement and the Consent Judgments will fully and finally resolve the Actions.

D. In connection with the releases provided for in this Agreement, the Releasors and Cambridge Releasors expressly waive, release, and forever discharge any and all provisions, rights, and benefits conferred by any law of any State or territory of the United States or other jurisdiction, or principle of common law, which is similar, comparable, or equivalent to § 1542 of the California Civil Code, which reads:

> **General Release; extent.** A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that if known by him or

her, would have materially affected his or her settlement with the debtor or released party.

E. For the avoidance of doubt, a Releasor or Cambridge Releasor may hereafter discover facts other than or different from those which it knows, believes, or assumes to be true with respect to the Released Claims or Cambridge Released Claims, but each Releasor or Cambridge Releasor hereby expressly waives and fully, finally, and forever settles, releases and discharges, upon the Effective Date, any and all Released Claims and Cambridge Released Claims that may exist as of such date but which Releasors or Cambridge Releasors do not, for any reason (including, without limitation, ignorance, oversight, error, negligence or through no fault whatsoever) know or suspect to exist and which, if known, would materially affect the Settling States' decision to enter into this Agreement.

## V. PARITY/MFN PROVISIONS

A. **State Monetary Parity Provision.** Provided the Minimum State Participation condition has been satisfied, if, within the first 24 months after the Effective Date, Meta enters into a Pre-trial Settlement with any state or attorney general providing such state or attorney general with guaranteed monetary payments or contingent monetary payments that exceed, on an amount per person basis, the amount represented by the total amount of all Guaranteed Installment Payments for all Settling States or the total amount of all Contingency Installment Payments for all Settling States, respectively, calculated on a per person basis across all Settling States, Meta shall pay to the Settling States an amount equal to that amount-per-person excess times the population for all Settling States. (If this provision is triggered by multiple Pre-trial Settlements, the preceding sentence's payment obligation for additional settlements shall be reduced by any prior payment under this paragraph.) Such payment will be allocated to each Settling State proportionate to the ratio between (x) each Settling State's Guaranteed Installment Payments and (y) the total amount of all Settling States' Guaranteed Installment Payments, and paid to each Settling State in equal portions on each of the dates of the payments then-remaining under this Agreement. Any and all payments under this subsection shall not exceed in the aggregate the total amount of all Contingency Installment Payments for all Settling States. Any payment made under this paragraph shall be separate from all other obligations and shall not reduce or eliminate any requirement to pay any portion of the Guaranteed Installment Payments or the Contingency Installment Payments, which constitutes obligations separate from this paragraph. All calculations of dollars per person in this paragraph shall be calculated using the U.S. Census Bureau's estimated population for states on July 1, 2025 (except in the case of American Samoa, Guam, the Northern Mariana Islands, and the Virgin Islands, population from the April 1, 2020 Census shall be used).

B. **State Injunctive Parity Provision**. If within the first 24 months after the Effective Date, Meta enters into a Pre-trial Settlement with another state or attorney general with:

1. A lower Daily Limit,

2. A more restrictive Night Access Mode, or

3. More restrictive limits during School Hours,

the Settling States shall receive the benefit of the same term within thirty (30) days of the relevant obligation becoming effective pursuant to that Pre-trial Settlement.

C. **Notice of Settlement.** If a Party enters into a settlement that falls within the scope of this Section V, then that Party shall provide a copy of that settlement to the other Party for review within ten (10) calendar days of its effective date.

D. **Meta Injunctive MFN.** If a Settling State reaches a settlement agreement or resolution with any Core Industry Member on or after the Effective Date for comparable Claims, and such settlement agreement or resolution includes terms more favorable to such Core Industry Member than the terms of this Agreement regarding the overall obligations set forth in Sections II.A (excepting 2.A.6.b), II.B, and III of this Agreement, and their associated defined terms, then Meta shall specify in writing to that Settling State the basis for its belief that this sub-paragraph applies. The Settling State will consent to modify the corresponding term or terms of this Agreement so that Meta will obtain, with respect to that Settling State, a term or terms at least as relatively favorable as those obtained by such Core Industry Member. Once the Settling State has modified a term of Section II.B in accordance with this paragraph and has otherwise met the obligations for Industry-Wide Adoption, the obligations of Phase II shall apply.

## VI. MONETARY RELIEF AND PAYMENT STRUCTURE

A. Payment Amount

1. Subject to the terms and conditions of this Agreement, Meta shall pay to the Settling States the Cost Fund Payment, the Guaranteed Installment Payments, and the Contingency Installment Payments in accordance with the terms and conditions of this Section VI.

2. In the event that any state or territory becomes a Settling State following the Effective Date, Exhibit B will be amended to add such additional states and their respective Guaranteed Installment Payment and Contingency Installment Payment.

3. The Parties acknowledge their mutual understanding that the negotiations that led to this Agreement are intended to be confidential and, subject to applicable law, agree to not disclose the details of those negotiations.

B. Cost Fund Payment

1. Within 30 days after the Effective Date, Meta shall pay $75 million for State costs (the "**Cost Fund Payment**") pursuant to instructions from the State Committee.

The Cost Fund Payment shall be used to reimburse Settling States for their investigatory and litigation costs, including the reimbursement of NAAG grants. Disbursements shall be made at the discretion of the State Committee. Any funds remaining after the reimbursement of costs shall be allocated to each Settling State proportionate to the ratio between (x) each Settling State's Guaranteed Installment Payments and (y) the total amount of all Settling States' Guaranteed Installment Payments.

C. Guaranteed Payment

1. Meta shall make payments to each Settling State in ten installments, each in the amount as set out in Exhibit B (each, a "**Guaranteed Installment Payment**").

2. The initial Guaranteed Installment Payment shall be made within 30 days of the Effective Date and further payments on January 15 in each subsequent calendar year of the Agreement Term beginning with January 15, 2027.

3. No Settling State shall receive a Guaranteed Installment Payment until its consent judgment has been entered. If a Settling State's consent judgment has not been entered at the time the initial Guaranteed Installment Payment is due, such Settling State shall be paid its initial Guaranteed Installment Payment within 30 days of the entry of its consent judgment.

D. Contingent Payment

1. In the event the Contingent Monetary Payment Trigger has occurred in a Settling State, Meta shall be obligated to pay to such Settling State ten equal installments in the amount as set out in Exhibit B (each, a "**Contingency Installment Payment**").

2. Following the date the Contingent Monetary Payment Trigger has occurred, the Contingency Installment Payments shall be made to the Settling State on January 15 in each subsequent calendar year of the Agreement Term as follows:

(a) At the next scheduled payment date, the Settling State shall be paid the Contingency Installment Payment for that payment date and all prior payment dates.

(b) For each of the remaining payment dates, the Settling State will be paid the Contingency Installment Payment for that payment date.

3. If a Settling State fails to achieve the Contingent Monetary Payment Trigger during the Agreement Term, the Contingency Installment Payments shall be permanently forfeited by such Settling State and retained by Meta. For the avoidance of doubt, no Settling State will have an obligation to repay the Contingency Payment

E. **Cambridge Payment Amount.** Within 30 days of the Effective Date, Meta shall pay to each Cambridge Settling State, a portion of the Cambridge Settlement Amount corresponding to such state's Cambridge Allocation per Exhibit E, which payment shall be inclusive of amounts to be paid for Cambridge Attorneys' Fees and Expenses, litigation costs, and any pre-suit or post-suit investigation costs. Meta shall have no obligations under this paragraph if Section IV.B is found invalid.

F. **State Specific Provisions.** State-specific provisions regarding payment, use of funds, and other matters are included at Exhibit C. Such payment shall be made pursuant in the manner and for the purposes set out in Exhibit C which may include specific instructions for each Settling State's payment.

G. Nature of Payment and Remediation

1. **Payment Purposes.** The amount paid to each Settling State shall be used for any lawful purpose consistent with the Settling State's Attorney General's authority, such as the following remedial or restitutive purposes:

(a) Crisis intervention services, specifically the expansion and operation of the 988 Suicide & Crisis Lifeline and text-based youth crisis lines;

(b) After school or summer programs, such as sports, literacy, dance, and other activities;

(c) Public health advertising credits;

(d) A digital wellness public education fund;

(e) Funding outdoor activities;

(f) Youth mental health programming;

(g) Support the hiring of digital literacy counselors or implement phone-free school zones;

(h) Training for medical providers on interactive media use and body dysmorphia;

(i) Grants to school districts or other local government entities to accomplish any remedial purpose encompassed here;

(j) Any similar remedial or restitutive purposes as those described above; and

(k) Investigation, litigation, and related efforts to improve teen safety on social media.

2. **Law Enforcement Costs.** Consistent with the Settling State's Attorney General's authority, a Settling State's Attorney General may designate a portion of the amount paid to each Settling State for Attorneys' Fees and Expenses, litigation costs, any pre-suit or post-suit investigation costs, and any other law enforcement costs.

3. Tax Characterization.

(a) The Settling States shall cause to be completed and timely filed a Form 1098-F with the Internal Revenue Service ("**IRS**") that identifies not less than 50% of the amounts paid to the Settling States as compensatory restitution and remediation within the meaning of 26 U.S.C. § 162(f)(2)(A), including appurtenant IRS regulations, guidance, and instructions, and shall timely furnish Copy B of such Form 1098-F (or an acceptable substitute statement) to Meta. This Section VI.G.3.a shall not apply to Settling States who have represented they are statutorily barred from allocating funds in this manner.

(b) In accordance with 26 U.S.C. § 6050X, on behalf of Settling States, the Colorado Attorney General's Office shall (i) file the return requested by the Internal Revenue Service ("**IRS**") by stating the amount of the settlement and the fact that 50% of that amount is attributable to restitution and remediation and (ii) provide to Meta a copy of the IRS 1098-F.

## VII. EFFECT OF OTHER LAWS AND CONFLICTS OF LAW

A. Nothing in this Agreement shall supersede or replace any of Meta's other legal obligations.

B. To the extent that Meta has conflicting obligations under this Judgment and other law, the Parties will confer in good faith.

## VIII. DISPUTE RESOLUTION

A. If any Party determines that there is a dispute arising from or related to this Agreement, that Party shall send a written notice of dispute to the Party subject to the dispute copying all other Parties outlining the nature of the dispute, identifying, if applicable, the provision(s) of the Agreement that appear to be at issue and laying out with reasonable specificity the basis for the belief of violation or other dispute. The Party subject to the dispute shall have thirty days from receipt of such notice to provide a good faith written response, including, for disputes related to alleged violations, either a statement that the Party believes it is in full compliance with the relevant provision or that the alleged violation is not material, or otherwise a statement explaining how the violation occurred, whether it was inadvertent, and how the Party remediated or will remediate the violation. The Party alleging a violation of this Agreement or otherwise raising a dispute hereunder may agree to provide the Party accused of violating this Agreement more than thirty days to respond. During the response period and for fifteen (15) business days after the response period, the Parties to the dispute shall engage in good faith discussion before taking any action(s) consistent with the terms of this Agreement, in an attempt to resolve the alleged non-compliance or other dispute. The Parties shall endeavor to resolve any and all disputes through good faith negotiations. The Party asserting a violation or other dispute, in its sole discretion, shall determine whether such statement from the Party subject to the dispute and good faith negotiations resolves the dispute, in whole or in part, and the Party asserting the violation or other dispute shall promptly notify the Party subject to the dispute if so.

B. Following the notice/response and good faith discussion process specified in Section VIII.A the Party asserting a violation or other dispute may notify the Party subject to the dispute in writing of any ongoing concern and may take any action to enforce compliance with the provision of the Agreement consistent with this Section and applicable law.

C. Notwithstanding anything in Sections VIII.A-B above, a Settling State may take any action, including but not limited to legal action to enforce compliance with the Agreement, without delay if the Settling State believes that a threat to the health or safety of the public requires immediate action.

D. Meta consents to the jurisdiction of the court in each Settling State that brought a Satellite AG Action, limited to and for the sole and exclusive purpose of resolution of disputes identified in Section VIII.A in that court. Meta's consent is limited to disputes brought only by the Settling State located in the same jurisdiction of the court in which it brings its dispute.

## IX. COOPERATION

A. The Parties recognize that the relationship between technology platforms and state regulators will continue to evolve over the term of this Agreement and beyond, presenting potential opportunities, challenges, and questions that no single agreement can fully anticipate. Meta and the Settling States affirm their shared belief that the public interest is

best served when platforms and regulators work as partners rather than solely as adversaries. Therefore, and recognizing the constructive dialogue that has led to this Agreement, the Parties express their mutual aspiration to consult with one another in good faith on emerging issues that may arise between them — whether related to the subject matter of this Agreement or otherwise — to share relevant information and perspectives, and to seek collaborative resolution of disagreements before resorting to formal legal action. The Parties intend to establish and maintain reasonable channels for such dialogue. This paragraph reflects the non-binding aspirations of the Parties and does not create any enforceable obligation or limit the authority of any Party to exercise its legal rights under this Agreement or otherwise.

## X. MISCELLANEOUS PROVISIONS

A. **Compliance Date.** Unless otherwise specified, the obligations set forth in Sections II and III of this Agreement shall be effective as of the Compliance Date.

B. **Term and Sunset.** Unless otherwise specified, the obligations set forth in this Agreement shall expire 10 years from the Effective Date. Upon expiration, the Parties shall have no further obligations under these Sections.

C. **Non-Admission and Jurisdictional Limitation.** This Agreement is entered into for settlement purposes only and does not constitute an admission by Meta of any liability, wrongdoing, or violation of any local, state, federal, or international law. The obligations, product modifications, and concessions set forth herein are explicitly limited to the Settling States. Nothing in this Agreement shall be construed to apply to, establish a standard of care for, or serve as precedent in any non-participating U.S. state or any international jurisdiction whatsoever. Pursuant to Rule 408 of the Federal Rules of Evidence and any federal or state-law equivalents, this Agreement and any related documents filed or created in connection with this Settlement Agreement shall be inadmissible as evidence in any proceeding, except as necessary to approve, interpret, or enforce this Agreement.

D. **Representation of Authority to Sign.** The Attorney General signatories hereto on behalf of their respective Settling States expressly represent and warrant that they have the authority to settle and release all Released Claims.

E. **Reservation of Defenses.** This Agreement shall not be construed or used as a waiver or any limitation of any defense available to Meta in any other pending or future legal, regulatory, or administrative action or proceeding, or Meta's right to defend itself from, or make any arguments in, any individual or class claims or suits or any other governmental or regulatory action relating to the subject matter or terms of this Settlement. Nothing in this Agreement shall preclude Meta from challenging any federal, state, or local law, rule, regulation, or guidance, whether presently enacted or enacted in the future.

F. **Waive Challenge.** The Parties each further waive any right to challenge or contest the validity of this Agreement on any ground, including, without limitation, that any term is unconstitutional or is preempted by, or in conflict with, any current or future law.

G. Promptly, and in no event more than 24 hours after the execution hereof, Meta and the Settling States shall jointly notify the courts in each of the Actions that they have reached

an agreement to resolve and settle all claims in the Action and shall jointly request that each court vacate all deadlines, including trial dates, in each of the Actions.

H. By August 26, 2026, the parties in the MDL Action shall jointly move the court in the MDL Action to enter this Agreement as a Consent Judgment, fully and finally resolving all claims in the MDL Action. As to the MDL, the intention of the Parties is that they will execute this Agreement simultaneously with the Consent Judgment, and immediately thereafter move the MDL Court for the entry of the Consent Judgment and an order vacating all deadlines including trial dates. This Agreement shall not be effective as to the Releasors who are parties to the MDL until the consent judgment has been approved by the MDL Court.

I. The Parties agree that the Settling States with pending actions other than the MDL Action, together with Meta, shall jointly move in each Satellite AG Action within ten (10) business days of the notice provided in Section X.G above for the entry of the Consent Judgment fully and finally resolving the Releasors' Claims.

J. It is the intent of the Parties that each and every Action shall be fully and finally resolved through the entry of a Consent Judgment promptly upon the Parties entering this Agreement; provided, however, that in the event any Eligible State joins this Agreement, each such Eligible State and Meta shall jointly move in that Eligible State's Action, if any, promptly upon becoming a Settling State, for the entry of a Consent Judgment fully and finally resolving the that Eligible State's claims.

K. Non-Participating States shall not be eligible to receive, and shall not receive, any payments pursuant to this Agreement, nor shall they have any rights arising out of or in connection with this Agreement, including but not limited to any rights to enforce the terms of this Agreement.

L. If any portion of this Agreement is held by a court of competent jurisdiction to be invalid by operation of law, the remaining terms of this Agreement shall not be affected and shall remain in full force and effect; *provided*, that this provision shall not apply to any holding of invalidity as to the Releases provided for in Section IV.A.

M. The releases set forth in this Agreement shall not be impacted in any way by any dispute that exists, has existed, or may later exist between or among the Releasors. Nor shall such releases be impacted in any way by any current or future law, regulation, ordinance, or court or agency order limiting, seizing, or controlling the distribution or use of the moneys distributed pursuant to this agreement or any portion thereof, or by the enactment of future laws, or by any seizure of the moneys distributed pursuant to this agreement or any portion thereof.

N. Nothing contained in this Agreement, and no act required to be performed pursuant to this Agreement, is intended to constitute, cause, or effect any waiver (in whole or in part) of any attorney-client privilege, work product protection, or common interest/joint defense privilege.

O. Except as otherwise provided herein with respect to the Cost Fund Payment, each Party shall be responsible for the payment of its own fees, expenses, and disbursements and those of its respective agents, representatives, and counsel that have arisen, could have arisen, or may arise in connection with the Actions, including fees, expenses, and disbursements

related to this Agreement. To the extent there are any and where required by law, Meta agrees to pay all court costs associated with filing of the Consent Judgments.

P. The Parties agree to timely prepare and execute all documents, to seek court approvals, to defend court approvals, and to do all things reasonably necessary to effectuate this Agreement and any corresponding Consent Judgment.

Q. Each Releasor shall cooperate in good faith with Meta with respect to any tax claim, including related disputes, investigations, audits, examinations, contests, litigation, or other proceeding relating to this Agreement.

R. Modification

1. Provisions of this Agreement that have not yet been incorporated into a consent judgment approved by a court may be modified through agreement of the Parties.

2. Where provisions of this Agreement have been incorporated into a consent judgment, that consent judgment, including such incorporated provisions, may be modified in the manner provided by the terms of that consent judgment.

3. Notwithstanding the binding nature of this Agreement, the Parties agree for a period of 60 days to confer in good faith regarding any modifications that may be warranted to the language of this Agreement to ensure it accurately reflects the substance of the Parties' mutual intent.

4. If this Agreement is terminated with respect to a Settling State, then:

(a) An applicable statute of limitation or any similar time requirement (excluding any statute of repose) shall be tolled from the date the Settling State signed this Agreement until the later of the time permitted by applicable law or for one year from the date of such termination, with the effect that Meta and the Settling State in question shall be in the same position with respect to the statute of limitation as they were at the time the Settling State filed its action; and

(b) Meta and the Settling State in question shall jointly move the relevant court of competent jurisdiction for an order reinstating the actions and Claims dismissed pursuant to the terms of this Agreement governing dismissal, with the effect that Meta and the Settling State in question shall be in the same position with respect to those actions and Claims as they were at the time the action or Claim was stayed or dismissed.

5. If the Effective Date is not reached, this Agreement is without prejudice to the rights of any party hereto, and all terms, negotiations, and proceedings connected therewith shall not be deemed or construed to be an admission by any Party or evidence of any kind in these Actions or any other action or proceeding.

S. **Construction.** None of the Parties shall be considered to be the drafter of this Agreement or of any of its provisions for the purpose of any statute, case law, or rule of interpretation or construction that would or might cause any provision to be construed against the drafter of this Agreement. The headings of the provisions of this Agreement are not binding and are for reference only and do not limit, expand, or otherwise affect the contents or meaning

of this Agreement. Unless otherwise specifically defined (e.g., "Meta"), the use of the singular includes the plural, and the use of the plural includes the singular.

T. **Good Faith and Voluntary Entry.** Each Party warrants and represents that it negotiated the terms of this Agreement in good faith. Each of the Parties and signatories to this Agreement warrants and represents that it freely and voluntarily entered into this Agreement without any degree of duress or compulsion. The Parties state that no promise of any kind or nature whatsoever (other than the written terms of this Agreement) was made to them to induce them to enter into this Agreement.

U. **No Prevailing Party.** The Parties each agree that they are not the prevailing party in this action, for purposes of any claim for fees, costs, or expenses as prevailing parties arising under common law or under the terms of any statute, because the Parties have reached a good faith settlement.

V. **Notices.** All notices or other communications under this Agreement shall be in writing (including but not limited to electronic communications) and shall be given to the recipients indicated below:

For Settling States: [to be determined].

For the State Committee: [to be determined].

For Meta: [to be determined].

W. **Business Days.** Any obligation hereunder that, under the terms of this Agreement, is to be performed on a Saturday, Sunday, or legal holiday, shall be performed on the next day that is not a Saturday, Sunday, or legal holiday.

X. **Non-Limiting Language.** The word "including" and words of similar import shall mean "including, without limitation" and "including, but not limited to," whether or not so stated, and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

## XI. ADDITIONAL PROVISIONS

A. Any failure by any Party to this Agreement to insist upon the strict performance by any other Party of the provisions of this Agreement shall not be deemed a waiver of any of the provisions of this Agreement.

B. This Agreement, which constitutes a continuing obligation, is binding upon the Settling States, Meta, and any of Meta's respective successors, assigns or other entities or persons otherwise bound by law.

C. Nothing in this Agreement shall create or give rise to a private right of action of any kind or create any right in a non-party to enforce any aspect of this Agreement or claim any legal or equitable injury for a violation of this Agreement. Unless otherwise provided for in this Agreement, the exclusive right to enforce any violation or breach of this Agreement

shall be with the Parties to this Agreement and the Court. No Settling State may assign or otherwise convey any right to enforce any provision of this Agreement.

D. Nothing in this Agreement shall relieve Meta of its obligation to comply with any applicable law.

E. Nothing in this Agreement shall be construed to waive any claims of sovereign immunity any party may have in any action or proceeding.

F. Each court in which a consent judgment is entered pursuant to this Agreement retains jurisdiction over the consent judgment and the parties thereto for the purpose of enforcing and modifying the judgment and for the purpose of granting such additional relief as may be necessary and appropriate.

## XII. SIGNATORIES/SERVICE

A. Each undersigned representative of the Parties certifies that he or she is fully authorized to enter into the terms and conditions of this Agreement and to execute and legally bind the Party he or she represents to this document.

B. This Agreement may be signed in counterparts, and its validity shall not be challenged on that basis. For purposes of this Agreement, a signature page that is transmitted electronically (e.g., by facsimile or emailed "PDF") shall have the same effect as an original.

## XIII. INTEGRATION

A. This Agreement constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in this Agreement and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein. The Parties acknowledge that there are no documents, representations, inducements, agreements, understandings or promises that constitute any part of this Agreement or the settlement it represents other than those expressly contained or referenced in this Agreement. For avoidance of doubt, no prior version of this Agreement and no prior version of any of its terms may be introduced for any purpose whatsoever in any action between the Parties.

**Meta Platforms, Inc.**

Signed by:
By: C. J. Mahoney
15AA0E150AD1468...
Date: August 25, 2026

C.J. Mahoney
Chief Legal Officer
Meta Platforms, Inc.

Signed by:
By: Michel Protti
86D2ECB1EDF74DC...
Date: August 25, 2026

Michel Protti
Chief Compliance and Privacy Officer
Meta Platforms, Inc.

**FOR THE STATE OF ALABAMA:**

**STEVE MARSHALL**
**Attorney General**

By: *<u>/s/ Olivia W. Martin</u>*
Olivia W. Martin
*Assistant Attorney General*
Division Chief
Consumer Interest Division

Office of the Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, Alabama 36130-0152
(334) 242-7393
Olivia.Martin@AlabamaAG.gov

Dated: August 25, 2026

**FOR THE STATE OF ALASKA:**

**CORI MILLS**
**Acting Attorney General**

*/s/Margaret Paton-Walsh*
Margaret Paton-Walsh
Chief Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
Tel: (907) 269-5100
Email: Margaret.paton-walsh@alaska.gov

Dated: August 25, 2026

**FOR THE TERRITORY OF AMERICAN SAMOA:**

**GWEN TAUILIILI-LANGKILDE**
**Attorney General**

*/s/ Louise Lafitaga*
Louise Lafitaga
Chief, Civil Law
Office of the Attorney General
Department of Legal Affairs
PO Box 7
Pago Pago, AS 96799

Dated: August 25, 2026

**FOR THE STATE OF ARIZONA:**

**KRIS MAYES**
**Attorney General**
State of Arizona

*/s/ Reagan Healey*
Reagan Healey (AZ No. 038733), *pro hac vice*
Assistant Attorney General
Samuel P.A. Fox (AZ No. 035428), *pro hac vice*
Senior Litigation Counsel
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax: (602) 542-4377
Reagan.Healey@azag.gov
Samuel.Fox@azag.gov
*Attorneys for Plaintiff State of Arizona*

Dated: August 25, 2026

**FOR THE STATE OF ARKANSAS:**

**TIM GRIFFIN**
**Attorney General**

By*: /s/ Brittany Edwards*
Brittany Edwards, Ark. Bar No. 2016235
Senior Assistant Attorney General
Complex Litigation Section
Office of the Arkansas Attorney General
101 West Capitol Avenue
Little Rock, AR 72201
Phone: (501) 682-8114
Fax: (501) 682-8118
Email: Brittany.Edwards@ArkansasAG.gov

Dated: August 25, 2026

**FOR THE PEOPLE OF THE STATE OF CALIFORNIA:**

**ROB BONTA**
**Attorney General**

*/s/ Nicklas A. Akers*
Nicklas A. Akers
Senior Assistant Attorney General
Emily Kalanithi
Supervising Deputy Attorney General
Megan O'Neill
Deputy Attorney General

California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004

Dated: August 25, 2026

**FOR THE STATE OF COLORADO:**

**PHILIP J. WEISER**
**Attorney General**

*/s/ Shannon Stevenson*
Shannon Stevenson,
Solicitor General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203

Dated: August 25, 2026

**FOR THE STATE OF CONNECTICUT:**

**WILLIAM TONG**
**Attorney General**

*/s/ Rebecca Borné*
Rebecca Borné
(CT Juris No. 446982), pro hac vice
Tess E. Schneider
(CT Juris No. 444175), pro hac vice
Krislyn M. Launer
(CT Juris No. 440789), pro hac vice
Assistant Attorneys General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5400
Fax: 860-808-5593
Rebecca.Borne@ct.gov
Tess.Schneider@ct.gov
Krislyn.Launer@ct.gov

*Attorneys for Plaintiff State of Connecticut*

Dated: August 25, 2026

**FOR KATHLEEN JENNINGS:**
**Attorney General**
**State of Delaware**

*/s/ Owen Lefkon*
Owen Lefkon
Deputy Attorney General and
Director, Fraud and Consumer Protection Division
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8899

Dated: August 25, 2026

**FOR THE DISTRICT OF COLUMBIA:**

**BRIAN L. SCHWALB**
**Attorney General for the District of Columbia**

*/s/ Kevin Vermillion*
KEVIN VERMILLION
Director, Office of Consumer Protection
400 6th Street NW, 9th Floor
Washington, DC 20001
Tel: (202) 890-9261
Kevin.Vermillion@dc.gov

Dated: August 25, 2026

**FOR THE STATE OF GEORGIA:**

**CHRISTOPHER M. CARR**
**Attorney General**

*/s/Melissa M. Devine*
Melissa M. Devine
Assistant Attorney General
Daniel Walsh
Deputy Attorney General
Office of the Attorney General
Consumer Protection Division
40 Capitol Square SW
Atlanta, GA 30334

Dated: August 25, 2026

**FOR THE STATE OF HAWAIʻI:**

**ANNE E. LOPEZ**
**Attorney General**

*/s/ Christopher J.I. Leong*
Christopher J.I. Leong
Supervising Deputy Attorney General
Kelcie K. Nagata
Deputy Attorney General

Department of the Attorney General
Commerce and Economic Development Division
425 Queen Street
Honolulu, Hawaiʻi 96813

Douglas S. Chin
John W. Kelly
Special Deputy Attorneys General

Starn O'Toole Marcus & Fisher
733 Bishop Street, Suite 1900
Honolulu, Hawaiʻi 96813

Dated: August 25, 2026

**FOR THE STATE OF IDAHO:**

**RAÚL R. LABRADOR**
**Attorney General**

*/s/ James J. Simeri*
James J. Simeri
Deputy Attorney General
Idaho Attorney General's Office
Consumer Protection Division
P.O. Box 83720
Boise, ID 83720-0010

Dated: August 25, 2026

**FOR THE ILLINOIS ATTORNEY GENERAL:**

**KWAME RAOUL**
**Attorney General**

*/s/ Susan Ellis*
SUSAN ELLIS
Chief, Consumer Protection Division
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
Susan.ellis@ilag.gov
312-636-0282

Dated: August 25, 2026

**FOR THE STATE OF INDIANA:**

**THEODORE E. ROKITA**
**Attorney General**
State of Indiana

*/s/ Scott L. Barnhart*
Scott L. Barnhart (IN Atty No. 25474-82)
*pro hac vice*
Chief Counsel and Director of Consumer Protection
Corinne Gilchrist (IN Atty No. 27115-53)
*pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49)
*pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

Dated: August 25, 2026

**FOR THE STATE OF IOWA:**

**BRENNA BIRD**
**Iowa Attorney General**

*/s/ Daniel L. Barnes*
Daniel L. Barnes (AT0015826)
Deputy Attorney General for Consumer Protection
William R. Pearson (AT0012070)
Assistant Attorney General
1305 E. Walnut St.
Des Moines, Iowa 50319
(515) 281-8772
daniel.barnes@ag.iowa.gov
william.pearson@ag.iowa.gov

Dated: August 25, 2026

**FOR THE STATE OF KANSAS:**

*/s/ Sarah Dietz*
Sarah Dietz
Assistant Attorney General
Office of the Kansas Attorney General
120 SW 10th Avenue
Topeka, Kansas 66612
785-296-3751
sarah.dietz@ag.ks.gov

Dated: August 25, 2026

**FOR THE COMMONWEALTH OF KENTUCKY:**

**RUSSELL COLEMAN**
**Attorney General**
Commonwealth of Kentucky

*/s/ J. Christian Lewis*
J. Christian Lewis, Division Chief
(KY Bar No. 87109), pro hac vice
Philip Heleringer, Consumer Chief,
(KY Bar No. 96748), pro hac vice
Zachary Richards (KY Bar No. 99209),
pro hac vice
Daniel I. Keiser (KY Bar No. 100264),
pro hac vice
Matthew Cocanougher (KY Bar No. 94292),
pro hac vice
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Matthew.Cocanougher@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

Dated: August 25, 2026

**FOR THE STATE OF LOUISIANA:**

**LIZ MURRILL**
**Attorney General**
State of Louisiana

*/s/ L. Christopher Styron*
L. Christopher Styron, Deputy Director
(LA Bar No. 30747), *pro hac vice*
Asyl Nachabe, Assistant Attorney General
(LA Bar No. 38846), *pro hac vice*
Louisiana Department of Justice
Public Protection Division
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
styronc@ag.louisiana.gov
nachabea@ag.louisiana.gov
*Attorneys for State of Louisiana*

Dated: August 25, 2026

**FOR THE STATE OF MAINE:**

**AARON M. FREY**
**Attorney General**
State of Maine

*/s/ Michael Devine*
Michael Devine
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333-0006
(207) 626-8800
michael.devine@maine.gov

Dated: August 25, 2026

**FOR THE OFFICE OF THE ATTORNEY GENERAL OF MARYLAND:**

**ANTHONY G. BROWN**
**Attorney General**
State of Maryland

*/s/ Elizabeth J. Stern*
Elizabeth J. Stern
Assistant Attorney General
Philip D. Ziperman
Deputy Chief, Consumer Protection Division
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202

Dated: August 25, 2026

**FOR THE COMMONWEALTH OF MASSACHUSETTS:**

**By its Attorney, ANDREA JOY CAMPBELL ATTORNEY GENERAL**

*/s/ Sara Cable*
Sara Cable
Deputy Attorney General
Office of the Massachusetts Attorney General
One Ashburton Place
Boston, MA 02108

Dated: August 25, 2026

**FOR THE PEOPLE OF THE STATE OF MICHIGAN**

**DANA NESSEL**
**Michigan Attorney General**

By: *<u>/s/ Jason R. Evans</u>*
Jason Evans (P61567)
Bureau Chief, Consumer and Regulatory Enforcement Bureau
Michigan Department of Attorney General
EvansJ@michigan.gov
PO Box 30736
Lansing, MI 48909
Tel: (517) 335-7622

Darrin Fowler (P53464)
Acting Division Chief, Corporate Oversight Division
Michigan Department of Attorney General
fowlerd1@michigan.gov

Scott Mertens (P60069)
Assistant Attorney General, Corporate Oversight Division
Michigan Department of Attorney General
mertenss@michigan.gov

Dated: August 25, 2026

**FOR THE STATE OF MINNESOTA:**

**KEITH ELLISON**
**Attorney General**
State of Minnesota

*/s/ Caitlin Micko*
Caitlin Micko (MN Bar No. 0395388),
*pro hac vice*
Evan Romanoff (MN Bar No. 0398223),
*pro hac vice*
Jason Pleggenkuhle (MN Bar No. 0391772),
*pro hac vice*
Assistant Attorneys General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 800
St. Paul, MN 55101-2130
Tel: (651) 724-9180
caitlin.micko@ag.state.mn.us
evan.romanoff@ag.state.mn.us
jason.pleggenkuhle@ag.state.mn.us

*Attorneys for Plaintiff State of Minnesota, by its Attorney General, Keith Ellison*

Dated: August 25, 2026

**FOR THE STATE OF MISSISSIPPI:**

*/s/ Jake Mahaffey*
Jake Mahaffey
Special Assistant Attorney General
Jake.Mahaffey@ago.ms.gov
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi 39205
Phone: (601) 359-2002

Dated: August 25, 2026

**FOR THE STATE OF MISSOURI:**

**CATHERINE L. HANAWAY**
**Missouri Attorney General**

By: *<u>/s/ Mark B. Leadlove</u>*
Mark B. Leadlove #33205
Deputy Attorney General
mark.leadlove@ago.mo.gov
Peter F. Donohue, Sr. #75835
General Counsel
peter.donohue@ago.mo.gov
Steven Reed #40616
Chief Counsel, Consumer Protection
steven.reed@ago.mo.gov
P.O. Box 899
Jefferson City, MO 65102
Tel. (573) 751-0023

Dated: August 25, 2026

**FOR THE STATE OF MONTANA:**

**AUSTIN KNUDSEN**
**Attorney General**

*/s/ Brent Mead*
Brent Mead
*Deputy Solicitor General*
Anna K. Schneider
*Special Assistant Attorney General, Senior Counsel*
Montana Department of Justice
Office of Consumer Protection
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
(406)444-2026

Dated: August 25, 2026

**FOR THE STATE OF NEBRASKA:**

**MICHAEL T. HILGERS**
**Attorney General**
State of Nebraska

/s/ *Anna M. Anderson*
Anna M. Anderson (NE #28080),
*pro hac vice*
Benjamin J. Swanson (NE #27675),
*pro hac vice*
Assistant Attorneys General
Nebraska Attorney General's Office
1445 K Street, Room 2115
Lincoln, NE 68509
(402) 471-6034
anna.anderson@nebraska.gov
benjamin.swanson@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*

Dated: August 25, 2026

**FOR THE STATE OF NEVADA:**

**AARON D. FORD**
**Attorney General**

*/s/ Mark J. Krueger*
MARK J. KRUEGER
Chief Deputy Attorney General
Office of the Nevada Attorney General
Bureau of Consumer Protection
100 N. Carson Street
Carson City, NV 89701
(775) 684-1298
(775) 684-1299 (fax)

Dated: August 25, 2026

**FOR THE STATE OF NEW HAMPSHIRE:**

**JOHN M. FORMELLA**
**Attorney General**

By: *<u>/s/ Kevin P.J. Scura</u>*
BRANDON H. GAROD
KEVIN P.J. SCURA
Senior Assistant Attorneys General
MARY F. STEWART
Assistant Attorney General
New Hampshire Department of Justice,
Office of the Attorney General
1 Granite Place South
Concord, NH 03301
Tel: 603.271.3650
brandon.h.garod@doj.nh.gov
kevin.p.j.scura@doj.nh.gov
mary.f.stewart@doj.nh.gov

Dated: August 25, 2026

**FOR THE NEW JERSEY OFFICE OF THE ATTORNEY GENERAL AND DIVISION OF CONSUMER AFFAIRS:**

**JENNIFER DAVENPORT,**
**ATTORNEY GENERAL OF NEW JERSEY, AND CHRISTOPHER L. PETERSON,**
**ACTING DIRECTOR, DIVISION OF CONSUMER AFFAIRS:**

By: /s/ *Kashif T. Chand*
Kashif T. Chand
Assistant Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101

Dated: August 25, 2026

**FOR THE STATE OF NEW YORK:**

**LETITIA JAMES**
**Attorney General**
State of New York

*/s/ Christopher D'Angelo*
Christopher D'Angelo, Chief Deputy Attorney General, Economic Justice Division (NY Bar No. 4348744)
Christopher.D'Angelo@ag.ny.gov
Kim Berger, Chief, Bureau of Internet and Technology (NY Bar No. 2481679)
Kim.Berger@ag.ny.gov
Clark Russell, Deputy Chief, Bureau of Internet and Technology (NY Bar No. 2848323)
Clark.Russell@ag.ny.gov
Nathaniel Kosslyn, Assistant Attorney General (NY Bar No. 5773676)
Nathaniel.Kosslyn@ag.ny.gov
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8262

Dated: August 25, 2026

**FOR THE STATE OF NORTH CAROLINA:**

**JEFF JACKSON**
**Attorney General**

LAURA HOWARD
Chief Deputy Attorney General

State of North Carolina

*/s/ Charles White*
Kunal Choksi
Senior Deputy Attorney General
Consumer Protection Division Chief
Charles G. White (N.C. State Bar No. 57735), *pro hac vice*
Assistant Attorney General
Josh Abram
Special Deputy Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6889
Facsimile: (919) 716-6050
E-mail: cwhite@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

Dated: August 25, 2026

**FOR THE STATE OF NORTH DAKOTA:**

**DREW H. WRIGLEY**
**Attorney General**

By: *<u>/s/ Elin S. Alm</u>*
Elin S. Alm (ND Bar No. 05924)
Director/Assistant Attorney General
Christopher G. Lindblad (ND Bar No. 06480)
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
ealm@nd.gov
clindblad@nd.gov

*Attorneys for State of North Dakota, ex rel. Drew H. Wrigley, Attorney General*

Dated: August 25, 2026

**FOR THE COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS:**

**EDWARD MANIBUSAN**
**Attorney General**

*/s/ Alison M. Nelson*
Alison M. Nelson
Chief, Civil Division
Commonwealth of the Northern Mariana Islands
Office of the Attorney General
Hon. Juan A. Sablan Memorial Bldg., 2nd Floor
Saipan, MP 96950

Dated: August 25, 2026

**FOR THE STATE OF OHIO:**

**D. ANDREW WILSON**
**Ohio Attorney General**

*/s/ KEVIN R. WALSH*
KEVIN R. WALSH (0073999)
Kevin.Walsh@ohioago.gov
Principal Assistant Attorney General
MELISSA G. WRIGHT (0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
MELISSA S. SMITH (0083551)
Asst. Section Chief, Consumer Protection Section
Melissa.S.Smith@ohioago.gov
MICHAEL S. ZIEGLER (0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
614-466-8831

Dated: August 25, 2026

**FOR THE STATE OF OKLAHOMA:**

**GENTNER DRUMMOND**
**Attorney General**

*/s/ Amie Ely*
AMIE ELY
First Assistant Attorney General
Mackenzie Jordan
Assistant Attorney General
Office of the Oklahoma Attorney General
313 N.E. 21st St.
Oklahoma City, OK 73105
(405) 522-0691

Dated: August 25, 2026

**FOR THE STATE OF OREGON**

**DAN RAYFIELD**
**Attorney General**
State of Oregon

/s/ *Katherine G. McKeon*
Katherine G. McKeon (CA SBN 266757)
John Dunbar (Oregon Bar No. 842100), *pro hac vice*
Senior Assistant Attorneys General
Oregon Department of Justice
Consumer Protection Section
100 SW Market Street
Portland, Oregon 97201
Telephone: (971) 673-1880
Facsimile: (971) 673-1884
E-mail: kate.mckeon@doj.oregon.gov
E-mail: john.dunbar@doj.oregon.gov

*Attorneys for State of Oregon, ex rel. Dan Rayfield, Attorney General for the State of Oregon*

Dated: August 25, 2026

**FOR THE COMMONWEALTH OF PENNSYLVANIA:**

**DAVID W. SUNDAY, JR.**
**Attorney General**
Commonwealth of Pennsylvania

*/s/ Jonathan R. Burns*
Jonathan R. Burns
Senior Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Suzanne C. Bernstein
Deputy Attorney General
(PA Bar No. 332119), *pro hac vice*
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
(717) 645-7269
jburns@attorneygeneral.gov
sbernstein@attorneygeneral.gov

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

Dated: August 25, 2026

**FOR THE COMMONWEALTH OF PUERTO RICO:**

*/s/ Tania L. Fernández Medero*
Tania L. Fernández Medero
Deputy Attorney General, on behalf of Lourdes L. Gómez Torres, Attorney General, Commonwealth of Puerto Rico

Dated: August 25, 2026

**FOR THE STATE OF RHODE ISLAND:**

**PETER F. NERONHA**
**Attorney General**

*/s/ Adi Goldstein*
ADI GOLDSTEIN (Bar No. 6701)
Deputy Attorney General
Rhode Island Office of the Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400
agoldstein@riag.ri.gov

Dated: August 25, 2026

**FOR THE STATE OF SOUTH CAROLINA:**

**ALAN WILSON**
**Attorney General**
State of South Carolina

*<u>/s/ Anna C. Smith</u>*
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975),
*pro hac vice*
Assistant Deputy Attorney General
Anna C. Smith (SC Bar No. 104749),
*pro hac vice*
Assistant Attorney General
Office of the South Carolina Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
jlibet@scag.gov
annasmith@scag.gov
803-734-0057

*Attorneys for Plaintiff the State of South Carolina, ex rel. Alan M. Wilson, in His Official Capacity as Attorney General of the State of South Carolina*

Dated: August 25, 2026

**FOR THE STATE OF SOUTH DAKOTA:**

**MARTY J. JACKLEY**
**Attorney General**
State of South Dakota

/s/ *Amanda Miiller*
By: Amanda Miiller
Deputy Attorney General
South Dakota Office of the Attorney General
1302 East SD Highway 1889, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: amanda.miiller@state.sd.us

*Attorneys for State of South Dakota*

Dated: August 25, 2026

**FOR THE STATE OF TENNESSEE:**

**JONATHAN SKRMETTI**
**Attorney General and Reporter**

*/s/ Matthew D. Janssen*
MATTHEW D. JANSSEN
Senior Deputy Attorney General
Brian Phelps
Assistant Attorney General
Christopher Dunbar
Assistant Attorney General
Office of the Attorney General of Tennessee
Consumer Protection Division
P.O. Box. 20207
Nashville, TN 37202
(615) 741-3549
(615) 532-2910 (fax)

Dated: August 25, 2026

**FOR THE OFFICE OF THE UTAH ATTORNEY GENERAL AND THE UTAH DIVISION OF CONSUMER PROTECTION:**

By: */s/ Douglas Crapo*
Douglas Crapo (USB No. 14620)
Deputy Attorney General
160 East 300 South, 5th Floor
Salt Lake City, Utah 84114
(801) 366-0310

Dated: August 25, 2026

**FOR THE STATE OF VERMONT:**

**CHARITY R. CLARK**
**Attorney General**

*/s/ Merideth C. Chaudoir*
Merideth C. Chaudoir
Rizlaine M. Sabiani
Assistant Attorneys General
Office of the Attorney General
Consumer Protection Unit
109 State Street
Montpelier, Vermont 05609
Phone: (802) 828-5479 Merideth.Chaudoir@vermont.gov
Rizlaine.Sabiani@vermont.gov

Dated: August 25, 2026

**FOR THE COMMONWEALTH OF VIRGINIA:**

*/s/ Joelle Gotwals*
Joelle Gotwals
Senior Assistant Attorney General
Consumer Protection Section
Office of the Attorney General of Virginia
202 North 9th Street
Richmond, VA 23219
(804) 786-8789
jgotwals@oag.state.va.us

Dated: August 25, 2026

**FOR THE PEOPLE OF THE STATE OF WASHINGTON:**

**NICHOLAS W. BROWN**
**Attorney General**

*/s/ Claire McNamara*
CLAIRE MCNAMARA, WSBA #50097
ALEXANDRA KORY, WSBA #49889
JOSEPH KANADA, WSBA #55055
RABI LAHIRI, WSBA #44214
GARDNER REED, WSBA #55630
Assistant Attorneys General
Attorneys for Plaintiff-Intervenor State of Washington
800 Fifth Avenue, Suite 2000
Seattle, WA 98104

Dated: August 25, 2026

**FOR THE STATE OF WEST VIRGINIA:**

**JOHN B. MCCUSKEY,**
**Attorney General of West Virginia**

*/s/ Laurel K. Lackey*
Laurel K. Lackey
Assistant Attorney General
Abby G. Cunningham
Assistant Attorney General
Office of the West Virginia Attorney General
P.O. Box 1789
Charleston, WV 25326
304-558-8986
abby.g.cunningham@wvago.gov
laurel.k.lackey@wvago.gov

Dated: August 25, 2026

**FOR THE STATE OF WISCONSIN:**

**JOSHUA L. KAUL**
**Attorney General**

*/s/Brittany A. Copper*
Laura E. McFarlane
Brittany A. Copper
Assistant Attorneys General

Wisconsin Department of Justice
17 W Main Street
Madison, WI 53703

Dated: August 25, 2026

**FOR PLAINTIFF STATE OF WYOMING:**

**KEITH G. KAUTZ**
**Attorney General**

*/s/ William T. Young*
WILLIAM T. YOUNG
Assistant Attorney General
WY Bar No. 8-6746

Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
Tel: (307) 777-7847
Email: william.young@wyo.gov

*Attorney for the Plaintiff State of Wyoming*

Dated: August 25, 2026

**Exhibit B**

**Guaranteed Installment Payments & Contingency Installment Payments**

| State | Guaranteed Installment Payment[*] | Contingency Installment Payment* | Maximum State Payment All Installments |
|---:|---:|---:|---:|
| Alabama | $11,734,540.91 | $5,057,609.31 | $167,921,502.24 |
| Alaska | $1,665,969.26 | $718,035.90 | $23,840,051.61 |
| American Samoa | $112,888.64 | $48,655.22 | $1,615,438.59 |
| Arizona | $21,052,648.15 | $9,073,731.15 | $301,263,792.98 |
| Arkansas | $17,245,993.63 | $7,433,055.85 | $246,790,494.82 |
| California | $153,594,791.69 | $66,199,645.57 | $2,197,944,372.61 |
| Colorado | $42,961,077.28 | $18,516,305.52 | $614,773,828.07 |
| Connecticut | $17,518,422.57 | $7,550,473.24 | $250,688,958.09 |
| Delaware | $6,936,927.44 | $2,989,828.84 | $99,267,562.75 |
| District of Columbia | $9,039,594.05 | $3,896,082.12 | $129,356,761.71 |
| Georgia | $9,577,578.80 | $4,127,954.57 | $137,055,333.72 |
| Hawaii | $5,314,500.79 | $2,290,559.88 | $76,050,606.70 |
| Idaho | $8,551,843.74 | $3,685,860.82 | $122,377,045.62 |
| Illinois | $53,667,953.78 | $23,130,989.53 | $767,989,433.10 |
| Indiana | $28,652,276.11 | $12,349,185.17 | $410,014,612.79 |
| Iowa | $12,648,539.14 | $5,451,544.28 | $181,000,834.22 |
| Kansas | $13,435,448.10 | $5,790,703.53 | $192,261,516.27 |
| Kentucky | $35,816,010.72 | $15,436,768.33 | $512,527,790.52 |
| Louisiana | $17,325,335.40 | $7,467,252.31 | $247,925,877.07 |
| Maine | $5,268,880.23 | $2,270,897.34 | $75,397,775.63 |
| Maryland | $22,908,326.56 | $9,873,532.05 | $327,818,586.13 |
| Massachusetts | $34,805,364.98 | $15,001,178.10 | $498,065,430.80 |
| Michigan | $17,164,074.99 | $7,397,748.77 | $245,618,237.52 |
| Minnesota | $21,434,104.09 | $9,238,139.38 | $306,722,434.66 |
| Mississippi | $18,897,725.88 | $8,144,955.58 | $270,426,814.55 |
| Missouri | $10,626,902.51 | $4,580,215.07 | $152,071,175.85 |
| Montana | $8,896,284.26 | $3,834,315.34 | $127,305,996.00 |
| Nebraska | $14,052,534.38 | $6,056,668.88 | $201,092,032.56 |
| Nevada | $17,813,380.59 | $7,677,600.71 | $254,909,812.95 |
| New Hampshire | $15,354,076.24 | $6,617,635.88 | $219,717,121.20 |
| New Jersey | $52,564,567.30 | $22,655,427.87 | $752,199,951.77 |
| New York | $78,949,551.70 | $34,027,406.03 | $1,129,769,577.26 |
| North Carolina | $45,167,732.01 | $19,467,377.88 | $646,351,098.91 |
| North Dakota | $1,354,699.62 | $583,878.10 | $19,385,777.24 |
| N. Mariana Islands | $107,481.52 | $46,324.74 | $1,538,062.63 |
| Ohio | $31,924,434.72 | $13,759,491.71 | $456,839,264.34 |
| Oklahoma | $22,860,449.12 | $9,852,896.79 | $327,133,459.06 |
| Oregon | $12,536,017.24 | $5,403,047.13 | $179,390,643.69 |
| Pennsylvania | $49,280,920.68 | $21,240,169.97 | $705,210,906.46 |

[*] Figures are the payment amounts per installment, not the total amounts over the full payment term.

| State | Guaranteed Installment Payment* | Contingency Installment Payment* | Maximum State Payment All Installments |
|---|---|---|---|
| **Puerto Rico** | $12,467,026.29 | $5,373,311.90 | $178,403,381.90 |
| **Rhode Island** | $4,505,352.31 | $1,941,815.36 | $64,471,676.78 |
| **South Carolina** | $23,896,650.97 | $10,299,501.74 | $341,961,527.12 |
| **South Dakota** | $4,841,598.67 | $2,086,738.18 | $69,283,368.42 |
| **Tennessee** | $51,674,036.64 | $22,271,607.48 | $739,456,441.19 |
| **Utah** | $20,617,667.79 | $8,886,253.79 | $295,039,215.83 |
| **Vermont** | $8,873,571.07 | $3,824,525.91 | $126,980,969.79 |
| **Virginia** | $35,377,257.50 | $15,247,664.86 | $506,249,223.56 |
| **Washington** | $23,683,660.48 | $10,207,702.44 | $338,913,629.19 |
| **West Virginia** | $7,658,427.14 | $3,300,796.57 | $109,592,237.12 |
| **Wisconsin** | $21,916,703.48 | $9,446,140.63 | $313,628,441.06 |
| **Wyoming** | $1,330,373.40 | $573,393.45 | $19,037,668.57 |
| **TOTAL All Installments** | $1,165,662,174.56 | $502,402,600.77 | $16,680,647,753.21 |

**Exhibit C**

**Settling States' Payment Language**

1. For American Samoa, payments pursuant to Section VI of the Settlement Agreement shall be deposited as direct by the American Samoa Attorney General into one or more of the following funds: (i) the Attorney General Court Ordered Settlement Distribution Fund and (ii) a consumer protection account for subsequent expenditure as authorized by the Attorney General. The funds allocated to the Attorney General of American Samoa shall be expended, in the sole discretion of the Attorney General, for any lawful purpose including those identified in Section VI.
2. For the State of Alabama, instructions will be provided to Meta as part of a separate consent judgment.
3. For the State of Alaska, fifty percent of payments made pursuant to Section VI of the Settlement Agreement shall be deposited into the State of Alaska's General Fund to be used for any lawful purpose, including the Payment Purposes set forth in Section VI.G.1 of the Settlement Agreement. Fifty percent shall be deposited into the State of Alaska's Consumer Protection Statutory Designated Program Receipts Fund to be used at the direction of the Attorney General for enforcement activities under state consumer protection laws.
4. For the State of Arizona, all payments pursuant to Sections VI(C)-(D) of the Settlement Agreement shall be received as remediation and restitution for the settlement and release of alleged violations of Arizona's consumer protection laws as specified in the Settlement Agreement. Twenty-five percent (25%) of any and all such payment made pursuant to Sections VI(C)-(D) shall be remediation and shall be deposited by the Attorney General into the Consumer Remediation Subaccount of the Consumer Restitution and Remediation Revolving Fund pursuant to A.R.S. § 44-1531.02(C) and shall be used exclusively for the purposes specified in Section VI(G), Subparts (a), (d), and (f)-(i) of the Settlement Agreement. The remaining seventy-five percent (75%) of any payment received under Sections VI(C)-(D) shall be restitution and shall be deposited by the Attorney General into the Consumer Restitution Subaccount of the Consumer Restitution and Remediation Revolving Fund pursuant to A.R.S. § 44-1531.02(B) and distributed by the Attorney General, consistent with A.R.S. § 44-1531.02(B) and Section VI(G)(1) of the Settlement Agreement. The Attorney General shall have sole discretion as to how and when restitution funds are distributed and the eligibility of any person or entity to receive restitution funds and shall have the lawful discretion to authorize any eligible person or entity to make or distribute payment of restitution funds.

   Payments pursuant to Section VI(E) of the Settlement Agreement, the Cambridge Attorneys' Fees and Expenses, and any cost fund payment received pursuant to Section VI(B) of the Settlement Agreement shall be deposited into the Consumer Protection-Consumer Fraud Revolving Fund pursuant to A.R.S. § 44-1531.01 and used for the purposes set forth therein.
5. For the State of Arkansas, payments pursuant to Section VI of the Settlement Agreement shall be made directly to the Office of the Arkansas Attorney General, which can be used for any lawful purpose. The Payment shall be delivered to Chief Fiscal Officer, Office of the Arkansas Attorney General, 101 West Capitol Avenue, Little Rock, Arkansas 72201.
6. For the State of California, funds paid to California shall be paid to pursuant to wire transfer instructions provided by the California Attorney General's Office, and utilized exclusively for purposes, including programs, local assistance, and/or grants, related to the prevention or

remediation of mental health or other harms to young Californians associated with social media use, and for associated administrative and audit costs, with the exception of the following:

(1) $50,000,000 from each of the first and second annual payments, with the funds allocated as follows: for grants and/or consumer relief related to the prevention or remediation of mental health or other harms to California children and teens associated with social media use, and for associated administrative and audit costs, in the sole discretion of the Attorney General.
(2) $30,000,000 from each of the first, second, third, and fourth annual payments, with the funds from each payment allocated as follows: $20,000,000 to the Unfair Competition Law Fund for the Attorney General's enforcement of consumer protection laws, $9,000,000 to the Public Rights Law Enforcement Special Fund, and $1,000,000 to the Privacy and Piracy Fund created pursuant to the judgment in People v. Hewlett-Packard, Santa Clara Superior Court No. 2026-1-CV-076081.
(3) $10,000,000 from the first annual payment to be deposited into the General Fund.
(4) Funds received as cost reimbursement shall be deposited into the fund from which the cost was paid.

7. For the State of Colorado, any payment Meta makes pursuant to this Settlement Agreement to the Colorado Department of Law is to be held, along with any interest thereon, in trust by the Attorney General to be used in the Attorney General's sole discretion for reimbursement of the State's actual costs and attorney's fees, the payment of restitution, if any, and for future consumer fraud or antitrust enforcement, consumer education, or public welfare purposes.
8. For the State of Connecticut, payments pursuant to Section VI of the Settlement Agreement shall be deposited as directed in the sole discretion of the Connecticut Office of the Attorney General into one or more of the following funds: (i) the General Fund, (ii) the Connecticut Attorney General Consumer Protection Fund, and (iii) such funds duly created by the State of Connecticut for any lawful purpose including those identified in Sections VI.G(1) and (2), provided that payments shall be made consistent with Section VI.G(3)(a), which requires that not less than 50% of the amounts paid to the Settling States be used for compensatory restitution and remediation.

   Any funds placed in or directed to the Connecticut Attorney General Consumer Protection Fund shall be used at the sole discretion of the Attorney General and may be used for purposes that include, but are not limited to, future consumer protection enforcement, consumer education, litigation, local consumer aid funds, revolving funds, or defraying the costs of the inquiry leading hereto.
9. For the State of Delaware, each Guaranteed Installment Payment to Delaware and each Contingency Installment Payment to Delaware shall be directed as follows:

(a) 25% of each such payment shall be deposited into the Consumer Protection Fund established pursuant to 6 Del. C. § 2527 and shall be used for any lawful purpose;
(b) 25% of each such payment shall be deposited into an appropriation to be established within the Department of Justice to be used in the sole discretion of the Delaware Attorney General for personnel and related costs of the Department of Justice related to supporting justice-involved and at-risk youth and other efforts to address teen health, safety, and security; and
(c) 50% of each such payment shall be deposited into an appropriation to be established within the Delaware Office of Management and Budget to be used by the Governor of Delaware in consultation with the Delaware Attorney General for any of the following remedial purposes:

(i) crisis intervention services, specifically the expansion and operation of the 988 Suicide & Crisis Lifeline and text-based youth crisis lines;
(ii) services to address youth conflict resolution and deescalation, including mediation and diversion programs;
(iii) after school or summer programs, such as literacy, sports, dance, and other activities;
(iv) a digital wellness public education fund;
(v) funding outdoor activities;
(vi) youth mental health programming;
(vii) support the hiring of digital literacy counselors or implement phone-free school zones;
(viii) training for medical providers, including on interactive media use and body dysmorphia;
(ix) grants to school districts or other local government entities to accomplish any remedial purpose encompassed here;
(x) any similar remedial or restitutive purposes as those described above; and
(xi) related efforts to improve teen safety on social media.

Delaware's portion of the Cambridge Settlement Amount shall be deposited into an appropriation to be established within the Delaware Department of Justice to be used in the sole discretion of the Delaware Attorney General for the technology and training expenses of the Delaware Department of Justice.

10. For the District of Columbia, payments pursuant to Section VI of the Settlement Agreement shall be made by wire transfer to OAG consistent with instructions provided by OAG. The District may use this payment for any lawful purposes, including, but not limited to, abatement, restitution, civil penalties, attorneys' fees, and other costs of investigation and litigation, and/or this payment may be placed in, or applied to, the District's restitution fund or litigation support fund, used to defray the costs of the inquiry leading hereto, or for other uses permitted by law, at the sole discretion of the Attorney General for the District of Columbia.
11. For the State of Georgia, payments pursuant to Section VI of the Settlement Agreement shall be deposited as directed by the Georgia Attorney General, to be used for any lawful purpose.
12. For the State of Hawaii, payments to the State of Hawaii pursuant to Section VI of the Settlement Agreement shall be made payable to the Director of Finance, State of Hawaii and shall be deposited to the Litigation Deposits Trust Account pursuant to Hawaii Revised Statutes § 28-16. The funds allocated to the State of Hawaii shall be expended for any lawful purpose. Payments to the State of Hawaii of any portion of the Cambridge Settlement Amount shall be deposited in the Compliance Resolution Fund. The funds that constitute any portion of the Cambridge Settlement Amount shall be expended, in the sole discretion of the Executive Director of the Office of Consumer Protection, for any lawful purpose, and shall be made payable to the State of Hawaii Office of Consumer Protection.
13. For the State of Idaho, payments to the state of Idaho pursuant to Section VIII of the Consent Judgment shall be deposited into the Idaho consumer protection fund pursuant to Idaho Code sec. 48-606(5).
14. For the State of Illinois, payments pursuant to the monetary relief and payment sections of the Settlement Agreement and Consent Judgment shall be deposited as directed by the Illinois Attorney General into one or more of the following funds: (i) the Attorney General State Projects and Court Ordered Distribution Fund (the 801 fund), (ii) the Attorney General Court Ordered and Voluntary

Compliance Payment Projects Fund (the 542 fund), (iii) the Attorney General Court Ordered Settlement Distribution Fund (the 990 fund), and (iv) a consumer protection account for subsequent expenditure as authorized by the Attorney General. The funds allocated to the Attorney General of Illinois shall be expended, in the sole discretion of the Attorney General, for any lawful purpose including those identified in the Monetary Relief and Payment Structure Section in the Settlement Agreement.

15. For the State of Indiana, for the MDL Consent related to COPPA/consumer protection claims, payments pursuant to Section VI of the Settlement Agreement shall be deposited to the Indiana Attorney General, where it will be transmitted to the following funds according to Indiana law with instruction from the Indiana Attorney General: (i) the Agency Settlement Fund, pursuant to Ind. Code § 4-12-16-3, where pursuant to the terms of the Consent Judgment and Settlement Agreement, at least fifty percent (50%) of the funds will be used for remedial or restitutive purposes in accordance with Ind. Code § 4-6-3-2.4, and (ii) the Attorney General Contingency Fee Fund, pursuant to Ind. Code 4-6-16. Funds not dedicated to a specific purpose may be used for any purpose allowable under Indiana state law, pursuant to Ind. Code § 4-6-3-2.4.

    For Cambridge Analytica, payments pursuant to Section VI of the Settlement Agreement shall be deposited to the Indiana Attorney General, where it will be transmitted to the following funds according to Indiana law with instruction from the Indiana Attorney General: (i) the Agency Settlement Fund, pursuant to Ind. Code § 4-12-16-3, and (ii) the Attorney General Contingency Fee Fund, pursuant to Ind. Code 4-6-16. Funds may be used for any purpose allowable under Indiana state law, pursuant to Ind. Code § 4-6-3-2.4.

16. For the State of Iowa, instructions will be provided to Meta as part of a separate consent judgment.
17. For the State of Kansas, payment pursuant to Section VI(A-D) of the Settlement Agreement, memorialized in the Consent Judgment, shall be deposited as directed by the Kansas Attorney General into one or more of the following funds:
    (i) the Public Protection Consumer Education and Enforcement Fund and
    (ii) a consumer protection account for subsequent expenditure as authorized by the Attorney General. The funds allocated to the Attorney General of Kansas shall be expended, in the sole discretion of the Attorney General, for any lawful purpose including those identified in Sections VI.G(1) and (2).

    Payments pursuant to Section VI(E) of the Settlement Agreement, memorialized in the Consent Judgment, shall be expended at the sole discretion of the Kansas Attorney General and shall be used for any lawful purpose.
18. For the Commonwealth of Kentucky, payments to the Commonwealth of Kentucky pursuant to Section VI of this Settlement Agreement shall be made payable to the Commonwealth of Kentucky and remitted as directed by the Kentucky Attorney General, and shall be applied, deposited, and disbursed in accordance with KRS 48.005 and KRS 367.370. Nothing in this Settlement Agreement shall be construed to direct or authorize the deposit, administration, or expenditure of any recovery in a manner inconsistent with KRS 48.005.
19. For the State of Louisiana, all payments to Louisiana pursuant to this Settlement Agreement made by Meta must be by electronic fund transfer or other method as directed by the Louisiana Attorney General in accordance with instructions provided by a representative of the Louisiana Attorney General. Said payments shall be used by the Louisiana Attorney General for such purposes consistent with the Settlement Agreement and may include, but are not limited to, being placed in, or applied to, any legal support fund, or consumer protection law enforcement fund, including future consumer protection or privacy enforcement, consumer education, litigation or local

consumer aid fund or revolving fund used for compensatory or remedial purposes, used to defray costs of the inquiry leading hereto, or for attorneys' fees and other costs of investigation, or for other uses permitted by state law, at the sole discretion of the Louisiana Attorney General.

20. For the State of Maine, payments pursuant to Section VI shall be made to the Maine Attorney General to be deposited into any other special revenue account and shall be expended, in the sole discretion of the Maine Attorney General, for any lawful purpose including those identified in Section VI.G(1) and (2).
21. For the State of Maryland, the money received by the Office of the Attorney General of Maryland shall be used in accordance with Maryland law, including for consumer protection enforcement or consumer education, to defray the costs of the inquiry leading hereto, or for any other public purpose.
22. For the Commonwealth of Massachusetts, the amount paid to Massachusetts shall be used for any lawful purpose consistent with the Massachusetts Attorney General's authority, such as the following remedial or restitutive purposes: (a) crisis intervention services, specifically the expansion and operation of the 988 Suicide & Crisis Lifeline and text-based youth crisis lines; (b) after school or summer programs, such as sports, literacy, dance, and other activities; (c) public health advertising credits; (d) digital wellness public education fund; (e) funding outdoor activities; (f) youth mental health programming; (g) support the hiring of digital literacy counselors or implement phone-free school zones; (h) training for medical providers on interactive media use and body dysmorphia; (i) grants to school districts or other local government entities to accomplish any remedial purpose encompassed here; (j) any similar remedial or restitutive purposes as those described above; and (k) investigation, litigation, and related efforts to improve teen safety on social media.

    The amount to be paid to Massachusetts as Guaranteed Payment as set forth in section VI.C. of the Agreement shall be paid in accordance with the installment schedule below. The amount to be paid to Massachusetts as the Cambridge Payment as set forth in section VI.E of the Agreement shall be paid in accordance with the schedule below.

| **Payment No.** | **Date** | **Guaranteed Payment** | **Cambridge Payment** |
|---|---|---|---|
| Payment 1 | 30 days after MDL Consent Judgment Entry | $34,805,364.98 | $18,439,614.56 |
| Payment 2 | January 15, 2027 | $34,805,364.98 | |
| Payment 3 | January 15, 2028 | $34,805,364.98 | |
| Payment 4 | January 15, 2029 | $34,805,364.98 | |
| Payment 5 | January 15, 2030 | $34,805,364.98 | |
| Payment 6 | January 15, 2031 | $34,805,364.98 | |
| Payment 7 | January 15, 2032 | $34,805,364.98 | |
| Payment 8 | January 15, 2033 | $34,805,364.98 | |
| Payment 9 | January 15, 2034 | $34,805,364.98 | |
| Payment 10 | January 15, 2035 | $34,805,364.98 | |

    The amount to be paid as Contingent Payment shall be paid pursuant to section VI.D. of the Agreement. The Contingency Installment Payment shall be $15,001,178.10, and the total Contingent Payment shall be $150,011,781.00. All payments made to Massachusetts under this Settlement Agreement shall be paid pursuant to wire instructions provided to Meta by the Massachusetts Attorney General's Office.

23. For the State of Michigan, payments pursuant to Section VI of the Settlement Agreement shall be deposited as directed by the Michigan Attorney General, to be used by Michigan for any lawful purpose.

24. For the State of Minnesota, payment shall be used by Minnesota for any lawful purpose in accordance with Minnesota Statutes sections 8.31 and 8.37 at the discretion of the Attorney General.
25. For the State of Mississippi, out of the guaranteed amount to be paid to the Settling States, Meta shall pay $188,977,259 to Mississippi in installments as set forth in the Settlement Agreement. Payment shall be made by wire pursuant to instructions provided by the Mississippi Attorney General's Office. Said payment shall be deposited into the Attorney General of Mississippi Contingent Fund to be used after expenses paid, [*for purposes to be determined and specifically set forth in Mississippi's Consent Decree* filed in its state court action], according to the parameters in the Settlement Agreement Section VI.G. The Consent Decree shall likewise set forth payment expectations pursuant to the same parameters should the Contingency Payment be met.
26. For the State of Missouri, Payments pursuant to Section VI of the Settlement Agreement shall be deposited as directed by the Missouri Attorney General into one or more of the following funds: (i) the Office of the Missouri Attorney General Merchandising Practices Revolving Fund; (ii) the State of Missouri General Revenue Fund; and (iii) a consumer protection account for subsequent expenditure as authorized by the Missouri Attorney General. The funds allocated to the Missouri Attorney General shall be expended, in the sole discretion of the Missouri Attorney General, for any lawful purpose.
27. For the State of Montana, instructions will be provided to Meta as part of a separate consent judgment.
28. For the State of Nebraska, payments pursuant to Section VI of the Settlement Agreement shall be deposited as directed by the Nebraska Attorney General into the State Settlement Cash Fund for subsequent expenditure as authorized by the Attorney General. The funds allocated to the Nebraska Attorney General shall be expended, in the sole discretion of the Attorney General, for any lawful purpose including those identified in Sections VI.G(1) and (2).
29. For the State of New Hampshire, the payment shall be used in accordance with state law at the State's sole discretion (i) for future consumer protection enforcement, consumer education or litigation, (ii) for general compensatory or remedial purposes, including, but not limited to, defraying the costs of the inquiry leading hereto, monitoring and potential enforcement of this settlement, and/or (iii) may be used for any other purpose permitted by state law.
30. For the State of New Jersey, out of the total amount, Defendant shall pay $545,905,959 to New Jersey Attorney General. Said payment shall be used by the New Jersey Attorney General for such purposes consistent with the Settlement Agreement and may include, but are not limited to, being placed in, or applied to, any consumer protection law enforcement fund, including future consumer protection or privacy enforcement, consumer education, litigation or local consumer aid fund or revolving fund, used to defray costs of the inquiry leading hereto, or for attorneys' fees and other costs of investigation, or for other uses permitted by state law, at the sole discretion of the New Jersey Attorney General.
31. For the State of New York, payments pursuant to Section VI of the Settlement Agreement shall be deposited as directed by the New York Attorney General, to be used for any lawful purpose.
32. For the State of Nevada, the following use of funds provision is subject to modification and/or revision when incorporated into the State of Nevada's Consent Judgment anticipated to be filed pursuant to the Settlement Agreement:

> Funds received pursuant to the Settlement Agreement shall be administered at the discretion of the Attorney General through grants to support evidence-informed programs

and services within the State of Nevada that address harms of the type alleged in Nevada's social media complaints, including but not limited to those arising from the use of social media platforms and involving the impacts, risks, and harms to the State of Nevada and its residents by Social Media Platforms. For purposes of this Exhibit, the following definitions shall apply:

1. "Digital citizenship" means the responsible, ethical, and safe use of digital technologies, including digital safety and security, respectful online behavior and etiquette, media literacy, understanding of digital rights and responsibilities, and digital health and wellness.
2. "Digital literacy" means the ability to safely access, analyze, evaluate, create, and communicate information using digital technologies, including the application of critical thinking skills to assess online credibility, risk, and impact.
3. "Digital technologies" means any electronic or internet-enabled tools, systems, devices, platforms, or applications that generate, store, process, or transmit data, including but not limited to computers, mobile devices, software, online platforms, social media platforms, and other current or emerging interactive digital environments.
4. "Parents" means parents or legal guardians of Youth.
5. "Social media platform" means any digital platform, application, or service, including current or emerging technologies, that facilitates user-generated content, social interaction, or content sharing among users, whether through text, images, video, audio, live streaming, or other forms of communication, including through public or private features, and including but not limited to social networking services, content-sharing platforms, messaging applications, and virtual or interactive digital environments.
6. "Youth" means individuals under eighteen (18) years of age.
7. "Youth Mental Health" includes but is not limited to providing professional mental healthcare services or programs for Youths, or efforts to improve and safeguard Youth mental health.
8. "Funds" means the recoveries received pursuant to the Settlement Agreement after payment of costs and attorney fees. Funds designated in the Settlement Agreement as Cambridge Analytica recoveries are not subject to a deduction for costs or attorney fees.
9. Any funds not required for immediate expenditure may be invested by the state treasurer in the same manner as other state money is invested in accordance with NRS 355.140.
10. Funds must not be used to supplant existing methods of funding that are available to state, regional, local, or tribal agencies.
11. The Attorney General may not use more than five percent (5%) of the value of awarded grants annually for administrative expenses for allocating the funds through grants.
12. The Attorney General shall:
    a. Establish policies and procedures for the administration and distribution of the Funds through grants;

b. Allocate the Funds through grants to programs and services throughout the state for the purposes described in paragraph 13;
c. Establish requirements governing the use of the Funds consistent with the purposes described in paragraph 13; and
d. Establish requirements for reports on how the Funds granted was spent and proscribe the period in which reports may be made, but in no event shall a reporting period be greater than one calendar year.

13. The Funds may be allocated through grants to:
    a. Programs and services that do one or more of the following:
        i. Promotion of Digital Literacy, including critical thinking skills, and Digital Citizenship for Youth and Parents;
        ii. Training, education, and decision-support tools for Youth and Parents related to the safe and responsible use of digital technologies and social media;
        iii. Education relating to the impact of social media and technology on mental health and wellbeing of Youth;
        iv. Public awareness and communication strategies addressing the risks, impacts, and harms of digital technology and social media use;
        v. Programs or services designed to reduce Youth screen time and encourage engagement in non-digital or offline activities, including recreational, educational, social, or community-based opportunities;
        vi. Innovative programs or services that promote the physical, mental, and social well being of Youth and reduce or limit their use of digital technologies or social media platforms, including by encouraging engagement in non-digital or offline activities;
        vii. Evidence-based or evidence-informed programs that improve Youth access to mental health prevention, early intervention, treatment, and recovery services;
        viii. Criminal and civil law enforcement resources through state, county, or city juvenile probation programs that address and reduce the impact of social media and technology on the mental health and wellbeing of Youth; or
        ix. Criminal and civil law enforcement resources for addressing the exploitation and trafficking of Youth through technology.
14. The grants to programs or services described in paragraph 13 may include, without limitation, programs or services that maximize expenditures through federal, local and private matching contributions.
15. Funds shall not be used for marketing, lobbying, or activities that primarily promote the use of digital technologies or social media platforms by Youth.
16. The recipient of a grant from the Funds shall not use more than five percent (5%) of the granted Funds for administrative expenses related to the grant.

17. All programs or services approved by the Attorney General for grant funding shall include clearly defined objectives consistent with the purposes of this Exhibit and addressing the alleged harms in Nevada's social media platforms litigations, including, where applicable, to mitigate the impacts, risks, and harms to Youth by digital technologies and social media platforms, and improves Youth digital citizenship, digital literacy, and mental health.
18. Grant recipients shall establish measurable performance metrics and conduct outcome evaluations and report those outcome evaluations to the Attorney General on a form prescribed by the Attorney General.
19. The Attorney General may consult with any public body, private agency, or individual that possesses knowledge, skills and experience working in Youth Mental Health. Any fees or expenses incurred in connection with such consultation shall be paid from the Funds.
20. In establishing the requirements for the reports described in paragraph 18, the Attorney general shall require grant recipients to include in the report:
    a. The name and address of the organization or grantee;
    b. The nature of the organization or grantee;
    c. A description of the specific use of the Funds for the purpose authorized by the grant;
    d. The type of activities funded if not contained in the specific use of the Funds;
    e. The number of people assisted, and, to the extent available, information regarding the income level, age, race and ethnicity of those people;
    f. Statistical information on the number of people served;
    g. Geographic distribution by county; Result and impact;
    h. The stated measurable performance metrics and conduct outcome evaluations;
    i. Result and impact;
    j. Partnerships;
    k. Supporting documents; and
    l. Any other information the Attorney General deems relevant for that grant.
21. The Attorney General shall evaluate program or service effectiveness based on reported outcomes and may require modification of programs or services that do not demonstrate sufficient progress.
22. The Attorney General may immediately suspend or terminate funding for any program or service that fails to comply with grant requirements or fails to demonstrate reasonable progress towards stated objectives. The Attorney General is entitled to the return of any money granted but not expended upon suspension or termination. The Attorney General has the sole discretion for any reason to determine if a program or service fails to comply with grant requirements or fails to demonstrate reasonable progress towards stated objectives.

23. If a state, regional, local, or tribal agency granted Funds has a recovery in any litigation concerning social media platforms, the state, regional, local, or tribal entity is not eligible for a grant of Funds, or the continuation of a grant of Funds, unless it can demonstrate that the Funds granted are braided with the state, regional, local, or tribal entity's recovery and the granted Funds shall not exceed the amount of contribution by the entity to the service or program being funded in part by the grant.
24. The Attorney General is entitled to audit, examine or inspect the books and records of each grantee at any time regarding the use of the Funds granted.
25. A violation or misuse of the granted Funds as described above, may result in a range of penalties that may include suspension of current and future funds, recoupment of funds previously awarded, and by civil or criminal penalties under law.

33. For the State of North Carolina, Meta shall pay to the State of North Carolina all payments due pursuant to instructions provided by the North Carolina Attorney General's Office, for use consistent with the terms of this Judgment. The Cambridge Payment Amount shall be used for attorneys' fees and other costs of investigation and litigation, or be placed in, or applied to, the consumer protection enforcement fund, including future consumer protection enforcement, consumer education, litigation, or local consumer aid fund or revolving fund, used to defray the costs of the inquiry leading hereto, at the sole discretion of the North Carolina Attorney General.
34. For the State of North Dakota, payments pursuant to Section VI of the Settlement Agreement shall be deposited as directed by the North Dakota Attorney General into the attorney general refund fund as established by North Dakota Century Code Section 54-12-18. The funds allocated to the Attorney General of North Dakota shall be expended, in the sole discretion of the Attorney General, for any lawful purpose including those identified in Sections VI.G(1) and (2).
35. For the Northern Mariana Islands, instructions will be provided to Meta as part of a separate consent judgment.
36. For the State of Ohio, payments made to the Ohio Attorney General's Office pursuant to Section VI of the Settlement Agreement shall be deposited as directed into one or more of the following Attorney General funds and used as set forth therein: (i) the Consumer Protection Enforcement Fund (Fund 6310), established pursuant to R.C. 1345.51; and/or (ii) the General Holding Account (Fund R004), established pursuant to Section 221.20 of Ohio HB 96.

    Of the first installment payment made to the Ohio Attorney General's Office pursuant to Section VI of the Settlement Agreement, $2 million is specifically designated as payment for pre-suit and post-suit investigation and litigation costs associated with the Ohio Attorney General's representation in this matter and shall be deposited into the Consumer Protection Enforcement Fund (Fund 6310) and used as set forth therein.

    Additionally, from each installment payment made to the Ohio Attorney General's Office pursuant to Section VI of the Settlement Agreement, at a minimum, $2 million shall be deposited into the Consumer Protection Enforcement Fund (Fund 6310) and used as set forth therein, including but not limited to for the purposes of identifying, investigating, litigating, and/or otherwise addressing alleged technology-related acts or practices that may be in violation of Ohio or federal law.

    Payment made to the Ohio Attorney General's Office pursuant to Section VI of the Settlement Agreement in recognition of the Cambridge Settlement Amount shall be deposited as directed into one or more of the following Attorney General funds and used as set forth therein: (i)

the Consumer Protection Enforcement Fund (Fund 6310), established pursuant to R.C. 1345.51; and/or (ii) the General Holding Account (Fund R004), established pursuant to Section 221.20 of Ohio HB 96.

37. For the State of Oklahoma, the amount paid to the Oklahoma Attorney General shall be used for attorneys' fees and other costs of investigation and litigation, or for use in future consumer protection enforcement, consumer education, investigation, litigation, monitoring and potential enforcement of this Settlement Agreement, or for other uses permitted by state law, at the sole discretion of the Oklahoma Attorney General.
38. For the State of Oregon, payments pursuant to Section VIII of the Consent Judgment shall be deposited as directed by the Oregon Attorney General, to be used by Oregon for any lawful purpose.
39. For the Commonwealth of Pennsylvania, all Guaranteed Installment Payments and Contingency Installment Payments as defined in Section VI (Monetary Relief and Payment Structure) of Exhibit A of the Consent Judgment, and the Cambridge Payment Amount set forth in Section VI(E) of Exhibit A of the Consent Judgment, shall be distributed to the Pennsylvania Office of Attorney General, to be deposited into an interest-bearing account (the "Meta Settlement Fund") from which both principal and interest shall be expended, as directed by the Office of Attorney General, for any lawful purpose including, but not limited to, the remedial and restitutive purposes set forth at Section VI(G) of Exhibit A of the Consent Judgment.
40. For the Commonwealth of Puerto Rico, payment pursuant to Section VI of the Settlement Agreement shall be paid in amounts and as directed by the Department of Justice and/or its outside counsel Edelson PC in this matter as follows: [INSTRUCTIONS TO BE PROVIDED].
41. For the State of Rhode Island, as memorialized in the Consent Judgment, payments pursuant to Section VI of the Settlement Agreement shall be deposited as directed by the Rhode Island Attorney General into the General Fund for all lawful purposes to fund youth mental health programming.
42. For the State of South Carolina, South Carolina may allocate such payment in the South Carolina Attorney General's sole discretion and in accordance with any and all obligations imposed by law for purposes including, but not limited to, a consumer protection enforcement fund, consumer education fund, consumer litigation fund, local consumer aid fund, or revolving fund; for attorneys' fees and other costs of investigation and litigation; for cy pres purposes; or for any other uses not prohibited by law.
43. For the State of South Dakota, payments pursuant to Section VIII of the Consent Judgment shall be deposited as directed by the South Dakota Attorney General into the Attorney General's Consumer Protection Fund, which is a consumer protection account for subsequent expenditure as authorized by the Attorney General. The funds allocated to the Attorney General of South Dakota shall be expended, in the sole discretion of the Attorney General, for any lawful purpose including those identified in Sections VI.G(1) and (2).
44. For the State of Tennessee, settlement amounts paid pursuant to Sections VI.A-D of the Agreement shall be directed for use by the Attorney General consistent with Tenn. Code Ann. § 9-4-217, with the net recovery from these payments being deposited in the Children's Digital Protection Fund ("CDP Fund") and used only to implement and administer the purposes set forth in Tenn. Code Ann. § 9-4-217(b). The Attorney General shall have sole discretion to determine the amount of the net recovery (after the State's attorney fees and costs) and direct the deposit of that amount to the CDP Fund. The Cambridge Settlement Amount, paid pursuant to Section VI.E of the Agreement to resolve legal claims not addressed in the State's amended complaint, shall be used for any lawful purpose at the sole discretion of the Attorney General.

45. For the State of Utah, payments to Utah in accordance with the Agreement and Consent Judgment shall be deposited to the into the Attorney General Litigation Fund in accordance with Utah Code section 67-5-40(1).
46. For the State of Vermont, payments pursuant to Section VI of the Settlement Agreement shall be deposited as directed by the Vermont Attorney General to be used by the State of Vermont as attorney's fees and other costs of the investigation and litigation, or to be placed in, or applied to, the consumer protection enforcement including future consumer protection enforcement, consumer education, litigation, or local consumer aid fund or revolving fund, used to defray the costs of the inquiry leading hereto, or for any lawful purpose, at the sole discretion of the Vermont Attorney General, and pursuant to the Constitution of the State of Vermont, Ch. II§ 27 and 32 V.S.A. § 462.
47. For the State of Virginia, payments pursuant to Section VI of the Settlement Agreement shall be deposited, as directed by the Virginia Attorney General, into one or more of the following funds: (i) the Virginia Attorney General's Trust and Agency Fund; and (ii) the Virginia Attorney General's Regulatory, Consumer Advocacy, Litigation, and Enforcement Revolving Trust Fund. The funds allocated to the Attorney General of Virginia shall be expended, in the sole discretion of the Virginia Attorney General, for any lawful purpose, such as those identified in Sections VI.G.1 and 2 of the Settlement Agreement, including enforcement or defense of consumer protection or data privacy laws.
48. For the State of Washington, all payments pursuant to Section VI of the Settlement Agreement and Section VIII of the Consent Judgment allocated to the Attorney General of Washington shall be payable to "State of Washington Attorney General's Office," and delivered to the Office of the Attorney General, Attention, Margaret Farmer, Litigation Support Manager, 800 Fifth Avenue, Suite 2000, Seattle, Washington, 98104. The Cambridge Payment Amount allocated to the Attorney General of Washington, as set forth in Exhibit E of the Agreement, shall be used by the Attorney General in his or her sole discretion for any lawful purpose. Except as limited herein, the Attorney General may expend Guaranteed Installment Payments and Contingency Installment Payments for any lawful purpose, in the sole discretion of the Attorney General, including for the purposes identified in Sections VI(G)(1) and (2). The Attorney General shall set aside five (5) million dollars from each Installment Payment for reimbursement of the Attorney General's expended attorney fees, monitoring compliance with this agreement, and other law enforcement efforts.
49. For the State of West Virginia, payments may be used by the West Virginia Attorney General for any one or more of the following purposes, including but not limited to: direct and indirect administrative, investigative, compliance, enforcement, or litigation costs and services incurred; distributions made to taxpayers and/or consumers; to be held for appropriation by the Legislature; and/or any other lawful purpose in the discharge of the Attorney General's duties.
50. For the State of Wisconsin, payments pursuant to Section VI of the Settlement Agreement shall be made as directed by the Wisconsin Attorney General and used for any lawful purpose, in the sole discretion of the Attorney General, including those purposes identified in Section VI.G(1) and VI.G(2), provided that no less than 50 percent be expended for the remedial or restitutive purposes identified in Section VI.G(1). Payments made pursuant to Section VI may be allocated as costs and expenses of investigation and prosecution, including attorney fees, and the Attorney General may direct that up to ten percent of the payments made pursuant to Section VI be credited to the appropriation in Wis. Stat. § 20.455(1)(gh).

51. For the State of Wyoming, all Guaranteed Installment Payments and Contingency Installment Payments received by the Wyoming Attorney General shall be placed in, or applied to, the State General Fund. These funds may be used for purposes that may include, but are not limited to, attorney's fees and other costs of investigation, future consumer protection enforcement, consumer education, litigation, to defray the costs of the inquiry leading hereto, or for other purposes permitted by state law. The State of Wyoming and Defendants acknowledge that the Guaranteed Installment Payments and Contingency Installment Payments described herein are not a fine, civil penalty, or payment in lieu thereof.

The payment received by the Wyoming Attorney General from the Cambridge Settlement Amount shall be used by the Attorney General of the State of Wyoming as trustee to hold and distribute such amount, pursuant to Wyoming Statutes § 9-1-639(a)(i), exclusively for the purpose of addressing consumer protection matters in the State of Wyoming, including (i) future consumer protection enforcement, consumer education, litigation, or grants or other aid to agencies and organizations approved by the Attorney General of the State of Wyoming at his sole discretion; or (ii) general compensatory or remedial purposes, including, but not limited to, defraying the costs of the inquiry leading hereto, monitoring, and potential enforcement of this settlement. Any interest accruing to these funds will remain with the fund. The State of Wyoming and Defendants acknowledge that the Cambridge Settlement Amount described herein is not a fine, civil penalty, or payment in lieu thereof.

**Exhibit D**

**Eligible States**

Alabama
Alaska
American Samoa
Arizona
Arkansas
California
Colorado
Connecticut
Delaware
District of Columbia
Florida
Georgia
Guam
Hawaii
Idaho
Illinois
Indiana
Iowa
Kansas
Kentucky
Louisiana
Maine
Maryland
Massachusetts
Michigan
Minnesota
Mississippi
Missouri
Montana
Nebraska
Nevada
New Hampshire
New Jersey
New York
North Carolina
North Dakota
N. Mariana Islands
Ohio
Oklahoma
Oregon
Pennsylvania
Puerto Rico
Rhode Island
South Carolina
South Dakota
Tennessee
Texas

Utah
Vermont
Virgin Islands
Virginia
Washington
West Virginia
Wisconsin
Wyoming

**Exhibit E**

**Cambridge Payment Amounts**

| State | Cambridge Payment Amount |
|---|---|
| Alabama | $10,758,311.87 |
| Alaska | $4,065,293.34 |
| Arizona | $12,830,712.62 |
| Arkansas | $6,130,989.89 |
| Colorado | $11,491,249.03 |
| Connecticut | $15,418,290.16 |
| Delaware | $4,273,763.46 |
| Georgia | $12,941,956.24 |
| Hawaii | $4,685,126.54 |
| Idaho | $4,987,956.44 |
| Illinois | $23,738,124.70 |
| Indiana | $9,468,621.57 |
| Iowa | $9,186,865.35 |
| Kansas | $6,038,140.09 |
| Kentucky | $7,450,938.86 |
| Louisiana | $7,624,783.59 |
| Maine | $4,610,637.08 |
| Maryland | $11,806,272.28 |
| Massachusetts | $18,439,614.56 |
| Michigan | $15,393,582.07 |
| Minnesota | $8,487,946.41 |
| Mississippi | $6,106,221.17 |
| Missouri | $8,955,528.44 |
| Montana | $4,360,092.36 |
| Nebraska | $5,146,813.80 |
| Nevada | $6,149,653.31 |
| New Hampshire | $4,627,020.10 |
| New Jersey | $20,260,286.38 |
| New York | $29,909,776.83 |
| North Carolina | $15,745,403.13 |
| North Dakota | $4,085,837.00 |
| N. Mariana Islands | $1,749,671.67 |
| Ohio | $16,930,365.09 |
| Oklahoma | $6,974,237.01 |
| Oregon | $10,125,679.16 |
| Pennsylvania | $23,797,997.94 |
| Puerto Rico | $6,295,535.12 |
| Rhode Island | $4,355,564.20 |
| South Carolina | $8,009,675.58 |
| South Dakota | $4,196,688.69 |
| Tennessee | $12,466,249.94 |
| Utah | $6,264,638.42 |

| State | Cambridge Payment Amount |
|---|---|
| **Vermont** | $3,964,440.79 |
| **Virginia** | $11,125,441.44 |
| **Washington** | $10,234,244.92 |
| **West Virginia** | $5,034,802.39 |
| **Wisconsin** | $8,671,603.34 |
| **Wyoming** | $3,920,373.43 |
| **TOTAL** | $459,293,017.80 |

## Exhibit F

## Illustrative Examples of U13 Reporting Flow

### Instagram



**Exhibit F**

**Illustrative Examples of U13 Reporting Flow**

**Facebook**



## Exhibit G

## Illustrative Examples of Productive Pauses




15 min




60 min




90 min